## IN THE UNITED STATES COURT OF APPEALS
## FOR THE THIRD CIRCUIT

### 3d Cir. App. Nos. 14-4776 & 14-4777
### D.C. Civ. No. 3:12-cv-24 & 3:12-cv-25

**LIANA REVOCK, EXECUTRIX OF THE ESTATE OF BARBARA WALTERS, and JUDITH KROMENHOECK,**
**Appellants,**

**v.**

**COWPET BAY WEST CONDOMINIUM ASSOCIATION; THE BOARD OF THE COWPET BAY WEST CONDOMINIUM ASSOCIATION; MAX HARCOURT; ALFRED FELICE; LANCE TALKINGTON; ROBERT COCKAYNE; VINCENT VERDIRAMO,**
**Appellees.**

**On Appeal from the United States District Court for the District of the Virgin Islands**
**Division of St. Thomas and St. John**

### JOINT APPENDIX VOLUME II
### (Pages 863-1573)

**The Law Offices Of Karin A. Bentz, P.C.**
**Karin A. Bentz, Esq.**
5332 Raadets Gade, Suite 3
St. Thomas, VI 00802-6309
Tel: (340) 774-2669
Fax: (340) 774-2665
Email: kbentz@virginlaw.com
*Attorney for Appellants*

# Table of Contents

| Item | Description | Page Number |
|------|-------------|-------------|
| 1 | **Docket Sheet Walters v. Cowpet Bay West Condominium Association** | 1 |
| 2 | **Docket Sheet Kromenhoek v. Cowpet Bay West Condominium Association** | 26 |
| 3 | **Verified Complain (Walters)** | 54 |
| | Doc 1-4(Exhibit C) CBW Blog Entry | 82 |
| | Doc 1-3(Exhibit B) Rules and Regulations for Owners | 83 |
| | Doc 1-2(Exhibit A) By-Laws of CBW | 86 |
| 4 | **Verified Complaint (Kromenhoek)** | 106 |
| | Doc 1-1 Instructions for civil cover sheet | 134 |
| | Doc 1-2 (Exhibit A) By-Laws of CBW | 135 |
| | Doc 1-3 (Exhibit B) Rules and Regulations for Owners | 155 |
| | Doc 1-4 (Exhibit C) CBW Blog | 158 |
| 5 | **Alfred Felice's Response** | 159 |
| 6 | **Notice of Death for Alfred Felice** | 165 |
| 7 | **Notice of Death for Max Harcourt** | 169 |
| 8 | **Second Amended Complaint (Walters)** | 175 |
| | Doc 95-1 Second Amended Complaint-Redline | 210 |
| | Doc 95-2 (Exhibit A) Advertisement for CBW | 257 |
| | Doc 95-3 (Exhibit B) Affidavit for Louanne Schechter | 263 |
| 9 | **Second Amended Complaint (Kromenhoek)** | 265 |
| | Doc 94-1 Second Amended Complaint-Redline | 299 |
| | Doc 94-2 (Exhibit A) Advertisement for CBW | 341 |
| | Doc 94-3 (Exhibit B) NSAR Certification for "Oliver" | 347 |
| | Doc 94-4 (Exhibit C) Affidavit for Louanne Schechter | 349 |

| | | |
|---|---|---|
| 10 | **Defendant Lance Talkington's Answer to Walters' Second Amended Complaint** | 351 |
| | Doc 177-1 (Exhibit A) CBW Blog Entry 09/27/11 | 374 |
| | Doc 177-2 (Exhibit B) CBW Blog Entry 10/13/11 | 376 |
| | Doc 177-3 (Exhibit C) CBW Blog Entry 10/30/11 | 377 |
| | Doc 177-5 (Exhibit E) CBW Blog Entry 1/15/12 | 378 |
| | Doc 177-6 (Exhibit F) CBW Blog Entry 3/25/12 | 380 |
| 11 | **Defendants' Answer and Affirmative Defenses to Counts I, II, III, VI. VII, VIII, XVI, XVII of Plaintiff's Second Amended Complaint (Walters)** | 382 |
| 12 | **Defendants' Answer and Affirmative Defenses to Counts I, II. III, VI, VII, VIII, XIII, XVI, XVII of Plaintiff's Second Amended Complaint (Kromenhoek)** | 410 |
| 13 | **CBW Motion for Summary Judgment (Walters)** | 437 |
| | Doc 187-1 By-laws, Rules and Regulations, CBW Board of Directors (BOD) Meeting Minutes | 463 |
| 14 | **CBW Motion for Summary Judgment (Kromenhoek)** | 528 |
| | Doc 188-1 By-laws, Rules and Regulations, CBW Board of Directors (BOD) Meeting Minutes | 552 |
| 15 | **Walters' Opposition to CBW Motion for Summary Judgment** | 616 |
| 16 | **Walters' Response to CBW Statement of Undisputed Material Facts and Counter-Statement of Facts** | 635 |
| | Doc 205-1 Dr. Sheena Walker –Cross | 649 |
| 17 | **Kromenhoek's Opposition to CBW Motion for Summary Judgment** | 652 |
| 18 | **Kromenhoek's Response to CBW Statement of Undisputed Facts and Counter-Statement of Facts** | 670 |
| | Doc 202-1 Letter from Stanford S. Sutherland, MA LPC | 683 |
| | Doc 202-2 Notice of Revised By-Laws | 684 |
| | Doc 202-3 By-Laws, Rules and Regulations, BOD Meeting Minutes | 706 |
| | Doc 202-4 CBW Owner Repair/Inquiry Handling Policy | 753 |
| | Doc 202-5 Affidavit for Louanne Schechter | 756 |

| | | |
|---|---|---|
| | Doc 202-6 CBW Blog Entry 3/17/12 | 758 |
| | Doc 202-7 CBW Annual Owners Meeting Minutes 2/12/11 | 766 |
| | Doc 202-8 CBW BOD Meeting Minutes 5/10/11 | 773 |
| | Doc 202-9 CBW BOD Meeting Minutes 9/13/11 | 777 |
| | Doc 202-10 CBW BOD Meeting Minutes 10/11/11 | 781 |
| | Doc 202-11 CBW Blog Entry 10/13/11 | 790 |
| | Doc 202-12 Email from Susan G.S. Anderson to Max Harcourt | 797 |
| | Doc 202-13 Email from Walters to Max Harcourt | 798 |
| | Doc 202-14 CBW Blog Entry 10/26/11 | 799 |
| | Doc 202-15 Email from Walters to CBW Board of Directors | 800 |
| | Doc 202-16 Email from Kromenhoek to Max Harcourt | 802 |
| | Doc 202-17 CBW Blog Entry 11/12/11 | 803 |
| | Doc 202-18 Emails from Walters and Harcourt | 804 |
| | Doc 202-19 CBW Blog Entry 10/30/11 | 806 |
| | Doc 202-20 CBW BOD Meeting Minutes 11/8/11 | 807 |
| | Doc 202-21 Email from Alfred Felice to keep "No Dogs" Policy | 815 |
| | Doc 202-22 CBW BOD Meeting Minutes 12/13/11 | 817 |
| | Doc 202-23 CBW BOD Meeting Minutes 12/13/11 | 827 |
| | Doc 202-24 CBW BOD Meeting Minutes 1/11/12 | 830 |
| | Doc 202-25 Letter from Kromenhoek | 836 |
| | Doc 202-26 Email from Louanne Schechter to Kromenhoek regarding fines for violating "No Dogs" Policy | 837 |
| | Doc 202-27 Letter from BOD to Kromenhoek regarding fines for violating "No Dogs" Policy | 839 |
| | Doc 202-28 Email from Alfred Felice to CBW Owners | 840 |
| | Doc 202-29 CBW BOD Meeting Minutes 1/11/12 | 847 |

|  | Doc 202-30 CBW Blog Entry 1/15/12 | 852 |
|---|---|---|
|  | Doc 202-31 President's Forum | 855 |
|  | Doc 202-32 Email from Harcourt to Lance Talkington regarding complaint against CBW Association | 856 |
|  | Doc 202-33 CBW BOD Meeting Minutes 4/11/12 | 857 |
|  | Doc 202-34 Housing Discrimination Complaint | 862 |
| 19 | **Robert Cockayne's Motion for Summary Judgment (Walters)** | 863 |
|  | Doc 188-1 Declaration of Robert Cockayne | 870 |
| 20 | **Robert Cockayne's Motion for Summary Judgment (Kromenhoek)** | 872 |
|  | Doc 186-1 Declaration of Robeter Cockayne | 879 |
|  | Doc 186-2 Order Granting Motion | 881 |
| 21 | **Kromenhoek's Response to Cockayne's Motion for Summary Judgment** | 882 |
| 22 | **Kromenhoek's Response to Cockayne's Undisputed Material Facts and Counter-Statement of Facts** | 887 |
|  | Doc 201-1 CBW BOD Meeting Minutes 1/11/12 | 890 |
|  | Doc 201-2 CBW Blog Entry "Puppy Dog Diplomas" 1/15/12 | 895 |
|  | Doc 201-3 Dr. Sheena Walker—Redirect | 897 |
| 23 | **Harcourt Motion for Summary Judgment (Walters)** | 899 |
|  | Doc 189-1 By-Laws, Rules and Regulations, CBW BOD Meeting Minutes | 915 |
| 24 | **Harcourt Motion for Summary Judgment(Kromenhoek)** | 980 |
|  | Doc 187-1 By-Laws, Rules and Regulations, CBW BOD Meeting Minutes | 996 |
|  | Doc 187-2 Order Granting Motion | 1059 |
| 25 | **Walters' Response to Harcourt Undisputed Material Facts and Counter-Statement of Facts** | 1060 |
|  | Doc 206-1 Walters' Second Amended Complaint, Second Amended Complaint-Redline | 1067 |
|  | Doc 206-2 Walters' Clinical Summary | 1131 |
|  | Doc 206-3 CBW By-Laws, Rules and Regulations, CBW BOD Meeting Minutes | 1133 |

| | | |
|---|---|---|
| | Doc 206-4 Recap of Suggested Revisions to By-Laws | 1219 |
| | Doc 206-5 CBW Owner Repair/Inquiry Handling Policy | 1279 |
| | Doc 206-6 CBW Blog Entries | 1282 |
| | Doc 206-7 NSAR Certification for "Happy" | 1304 |
| | Doc 206-8 Email from Harcourt to Lance Talkington regarding complaint against CBW Association | 1305 |
| | Doc 206-9 Dr. Sheena Walker—Cross | 1307 |
| 26 | **Kromenhoek's Opposition to Harcourts Motion for Summary Judgment** | 1309 |
| 27 | **Kromenhoek's Response to Harcourt Undisputed Material Facts and Counter-Statement of Facts** | 1322 |
| | Doc 206-1 Walters' Second Amended Complaint, Second Amended Complaint-Redline | 1330 |
| | Doc 206-2 Walters' Clinical Summary | 1394 |
| | Doc 206-3 By-Laws, Rules and Regulations, CBW Owners Meeting Minutes | 1396 |
| | Doc 206-4 Recap of Suggested Revisions to By-Laws | 1482 |
| | Doc 206-5 CBW Owner Repair/Inquiry Handling Policy | 1542 |
| | Doc 206-6 CBW Blog Entries | 1545 |
| | Doc 206-7 NSAR Certification for "Happy" | 1567 |
| | Doc 206-8 Email from Alfred Felice regarding ADA description for service dogs | 1568 |
| | Doc 206-9 Email from Harcourt to Lance Talkington regarding complaint against CBW Association | 1570 |
| | Doc 206-10 Dr. Sheena Walker--Cross | 1571 |
| 28 | **Kromenhoek's Corrected Response to Harcourts Undisputed Material Facts and Counter-Statement of Facts** | 1574 |
| | Doc 209-1 Kromenhoek's Second Amended Complaint | 1581 |
| | Doc 209-2 Kromenhoek's Clinical Summary | 1668 |
| | Doc 209-3 By-Laws, Rules and Regulations, Annual Owners Meeting Minutes | 1671 |
| | Doc 209-4 Recap of Suggested Revisions to By-Laws | 1757 |
| | Doc 209-5 CBW Owner Repair/Inquiry Handling Policy | 1817 |

|    | Doc 209-6 CBW Blog Entries | 1820 |
|----|----|----|
|    | Doc 209-7 NSAR Certification for "Oliver" | 1831 |
|    | Doc 209-8 Email from Alfred Felice regarding ADA description for service dogs | 1832 |
|    | Doc 209-9 Email from Harcourt to Lance Talkington regarding complaint against CBW Association | 1834 |
|    | Doc 209-10 Dr. Sheena Walker--Redirect | 1835 |
| 29 | **Vincent Verdiramo's Motion for Summary Judgment (Walters)** | 1837 |
|    | Doc 190-1 Declaration of Vincent Verdiramo | 1845 |
| 30 | **Vincent Verdiramo's Motion for Summary Judgment (Kromenhoek)** | 1847 |
|    | Doc 185-1 Declaration of Vincent Verdiramo | 1855 |
|    | Doc 185-2 Order Granting Verdiramo's Motion | 1857 |
| 31 | **Walters' Response to Verdiramo's Undisputed Material Facts and Counter-Statement of Facts** | 1858 |
|    | Doc 203-1 Emails from Felice and Verdiramo to CBW Board of Directors | 1861 |
|    | Doc 203-2 Dr. Sheena Walker--Cross | 1863 |
| 32 | **Kromenhoek's Response to Verdiramo's Motion for Summary Judgment** | 1864 |
| 33 | **Lance Talkington's Motion for Summary Judgment (Kromenhoek)** | 1870 |
|    | Doc 189-1 Order Granting Talkington's Motion | 1873 |
| 34 | **Memorandum In Support of Lance Talkington's Motion for Summary Judgment (Kromenhoek)** | 1874 |
|    | Doc 190-1 (Exhibit A) Affidavit of Lance Talkington | 1899 |
| 35 | **Kromenhoek's Opposition to Lance Talkington's Motion for Summary Judgment** | 1955 |
| 36 | **Walters' Response to Talkington's Undisputed Material Facts and Counter-Statement of Facts** | 1973 |
|    | Doc 205-1 Walters' Second Amended Complaint, Second Amended Complaint-Redline | 1980 |
|    | Doc 205-2 Walters' Clinical Summary | 2044 |
|    | Doc 205-3 CBW By-Laws, Rules and Regulations, CBW BOD Meeting Minutes | 2046 |
|    | Doc 205-4 Recap of Suggested Revisions to By-Laws | 2132 |

| | | |
|---|---|---|
| | Doc 205-5 CBW Owner Repair/Inquiry Handling Policy | 2192 |
| | Doc 205-6 CBW Blog Entries | 2195 |
| | Doc 205-7 NSAR Certification for "Happy" | 2217 |
| | Doc 205-8 Email from Alfred Felice regarding ADA description for service dogs | 2218 |
| | Doc 205-9 Email from Harcourt to Lance Talkington regarding complaint against CBW Association | 2220 |
| | Doc 205-10 Dr. Sheena Walker--Cross | 2221 |
| 37 | **Kromenhoek's Response to Talkington's Undisputed Material Facts and Counter-Statement of Facts** | 2224 |
| | Doc 208-1 Chilowee Psychological Services | 2232 |
| | Doc 208-2 Kromenhoek's Clinical Summary | 2233 |
| | Doc 208-3 CBW By-Laws, Rules and Regulations, CBW BOD Meeting Minutes | 2236 |
| | Doc 208-4 Recap of Suggested Revisions to By-Laws | 2322 |
| | Doc 208-5 CBW Owner Repair/Inquiry Handling Policy | 2382 |
| | Doc 208-6 CBW Blog Entries | 2385 |
| | Doc 208-7 NSAR Certification for "Oliver" | 2396 |
| | Doc 208-8 Email from Alfred Felice regarding ADA description for service dogs | 2397 |
| | Doc 208-9 Email from Harcourt to Lance Talkington regarding complaint against CBW Association | 2399 |
| | Doc 208-10 Dr. Sheena Walker--Redirect | 2400 |
| 38 | **Transcript** | 2402 |
| 39 | **Lance Talkington's Answer to Kromenhoek's Second Amended Complaint** | 2526 |
| | Doc 176-1 (Exhibit A) CBW Blog Entry 9/27/11 | 2549 |
| | Doc 176-2 (Exhibit B) CBW Blog Entry 10/13/11 | 2551 |
| | Doc 176-3 (Exhibit C) CBW Blog Entry 10/30/11 | 2552 |
| | Doc 176-4 (Exhibit D) CBW Blog Entry 12/5/11 | 2553 |
| | Doc 176-5 (Exhibit E) CBW Blog Entry 1/15/12 | 2554 |

| | Doc 176-6 (Exhibit F) CBW Blog Entry 3/25/12 | 2556 |
|---|---|---|
| 40 | Lance Talkington's Opposition To Motion To Substitute Liana Walters Revock as Barbara Walters' Personal Representative and/or Her Successor in Interest | 2558 |
| 41 | Doc 169 Memorandum Opinion and Order | 2569 |
| 42 | CBW's Motion to Dismiss Walters' Amended Complaint and Supporting Memorandum of Law | 2575 |
| 43 | Order Granting CBW Motion to Dismiss Walters' Second Amended Complaint | 2594 |
| 44 | Doc 232 ORDER (CVG) the memorandum opinions entered on November 18, 2014[223], and November 19, 2014 [225], and the judgment entered on November 18, 2014 [224], are hereby VACATED as being entered prematurely. (Kromenhoek) | 2596 |
| 45 | Doc 231 ORDER (CVG) the memorandum opinions entered on November 18, 2014 [223], and December 2, 2014 [225], and the judgment entered on November 18, 2014 [224], are hereby VACATED as being entered prematurely. (Kromenhoek) | 2598 |
| 46 | Doc 228 Order Denying Kromenhoek's Second Motion to Amend The Complaint | 2600 |
| 47 | Doc 168 Memorandum Opinion and Order | 2619 |
| 48 | Kromenhoek's Motion to Dismiss CBW's Amended Complaint and Supporting Memorandum of Law | 2625 |
| 49 | Order Granting CBW Motion to Dismiss Kromenhoek's Second Amended Complaint | 2644 |

IN THE UNITED STATES DISTRICT COURT OF THE VIRGIN ISLANDS
DISTRICT OF ST. THOMAS AND ST. JOHN

| | |
|---|---|
| BARBARA WALTERS, )<br><br>    Plaintiff, )<br>v. )<br><br>COWPET BAY WEST CONDOMINIUM )<br>ASSOCIATION; THE BOARD OF THE )<br>COWPET BAY WEST CONDOMINIUM )<br>ASSOCIATION; MAX HARCOURT, in his )<br>personal capacity; ALFRED FELICE; )<br>LANCE TALKINGTON ROBERT )<br>COCKAYNE;VINCENT VERDIRAMO, )<br><br>    Defendants. )<br>_____ ) | CIVIL CASE NO: 3:12-cv-00024 |

**DEFENDANT ROBERT COCKAYNE'S MOTION FOR SUMMARY JUDGMENT AS
TO COUNT XIII OF THE SECOND AMENDED COMPLAINT AND INCORPORATED
MEMORANDUM OF LAW PURSUANT TO FED. R. CIV. P. 56 AND LOCAL RULE
56.1**

Defendant, Robert Cockayne, by and through his undersigned counsel, submit this

Memorandum of Law in support of his Motion for Summary Judgment on the Complaint filed by

Plaintiff, Barbara Walters ("Plaintiff")(Deceased), and move this Honorable Court for entry of

Final Summary Judgment in his favor against Plaintiff. In support, Defendant states the

following:

## I.    INTRODUCTION

This matter stems from a baseless quarrel amongst residents at Cowpet Bay West

Condominium Association regarding Plaintiff's accompaniment of a dog while she resided at her

unit in Cowpet Bay West. Defendant was a board member of Cowpet Bay West at all material

times in this action. Plaintiff alleges that Defendant distributed information regarding online

service dog certification businesses at the January 11, 2012 board meeting and shared a copy of

Plaintiff's dog certification with Mr. Talkington, a non-board member. (Paragraph 86 and 196 of

the Second Amended Complaint). On this sole basis, Plaintiff claims that Defendant caused her negligent and/or an intentional infliction of emotional distress.

Nevertheless, we are now hear two years after Plaintiff's formal request for accommodation was granted and with three deceased parties (Plaintiff, Max Harcourt and Alfred Felice). In just over two years, Plaintiff has conducted no discovery in this matter and due to Plaintiff's death and lack of any sworn statements or testimony, Plaintiff cannot establish any existence of an element essential to her case. As such, pursuant to Fed. R. Civ. P. 56, there can be no genuine issue to any material fact, since the complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial. Thus, Defendant is entitled to summary judgment. The undisputed material evidence shows Defendant did not circulate copies of Plaintiff's dog certification at the January 2012 board meeting and did not provide a copy to Mr. Talkington. Moreover, even if these allegations were true, there is no evidence of outrageous conduct or physical harm. As such, Defendant is entitled to summary judgment as to Count XIII of the Second Amended Complaint.

## II.      UNDISPUTED MATERIAL FACTS

1.      Defendant did not distribute Plaintiff's dog certification at the January 2012 meeting or at any time. (Declaration of Robert Cockayne attached hereto as Exhibit "1").

2.      Defendant did not share a copy of Plaintiff's dog certification with Mr. Talkington. (Declaration of Robert Cockayne attached hereto as Exhibit "2").

## III.      SUMMARY JUDGMENT STANDARD

Rule 56(c) of the Federal Rules of Civil Procedure permits the entry of summary judgment if "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and

that the moving party is entitled to a judgment as a matter of law." The moving party bears the

burden of proving that no genuine issue of material fact is in dispute.[1] A factual dispute is

"material" only if it might "affect the outcome of the suit under the governing law."[2] There is

only a "genuine" issue of material fact "if the evidence is such that a reasonable jury could return

a verdict for the nonmoving party."[3] The court must examine the facts in a light favorable to the

non-movant.[4] Furthermore, the court must resolve "all inferences, doubts and issues of

credibility against the moving party."[5]

> The Supreme Court has further explained in *Celotex* that:

> "the plain language of <u>Rule 56(c)</u> mandates the entry of summary judgment, after
> adequate time for discovery and upon motion, against a party who fails to make a
> showing sufficient to establish the existence of an element essential to that party's
> case, and on which that party will bear the burden of proof at trial. In such a
> situation, there can be 'no genuine issue as to any material fact,' since a complete
> failure of proof concerning an essential element of the nonmoving party's case
> necessarily renders all other facts immaterial. The moving party is 'entitled to a
> judgment as a matter of law' because the nonmoving party has failed to make a
> sufficient showing on an essential element of her case with respect to which she
> has the burden of proof."[6]

The nonmoving party must then "go beyond the pleadings and by her own affidavits, or by the

depositions, answers to interrogatories, and admissions on file, designate *specific facts* showing

that there is a genuine issue for trial."[7] Here, Plaintiff has had more than two years to conduct

discovery, since the filing of the lawsuit, however, neither written discovery nor depositions have

been completed by Plaintiff. Plaintiff has not and cannot establish the existence of any element

essential to prove her case against Defendant.

---

[1] *Matsushita Elec. Indus. Co. Ltd. v. Zenith Radio Corp.,* 475 U.S. 574, 585 n. 10 (1986).
[2] *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248 (1986).
[3] *Id.*
[4] *Id.* at 255.
[5] *Smith v. Pittsburgh Gage & Supply Co.,* 464 F.2d 870, 874 (3d Cir.1972) (citations omitted).
[6] *Celotex Corp. v. Catrett,* 477 U.S. 317, 322-323 (1986).
[7] *Id.* at 324 (emphasis added) (internal quotations and citations omitted).

## IV.    MEMORANDUM OF LAW

### a. Plaintiff Fails to Establish Negligent and/or Intentional Infliction of Emotional Distress

Plaintiff's Count XIII is a combination of two separate causes of action, negligent and/or intentional infliction of emotional distress. Viewing the record evidence and undisputed facts in a light most favorable to Plaintiff, does not establish a prima facie cases for negligent or intentional infliction of emotional distress.

Under Virgin Islands law, a claim of intentional infliction of emotional distress requires "extreme and outrageous conduct intentionally or recklessly causes severe emotional distress ..."[8] The Restatement (Second) of Torts § 46(1) defines outrageous conduct as "so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community."  The court in *Smith* indicated that the court's role when dealing with a claim of intentional infliction of emotional distress is limited to determining "whether the defendant's conduct may reasonably be regarded as so extreme and outrageous as to permit recovery, or whether it is necessarily so."[9]   There is no record evidence that Defendant's actions were so extreme and outrageous to permit recovery.   Furthermore, "Discrimination alone does not state a claim for intentional infliction of emotional distress."[10] Plaintiff's claim for intentional infliction of emotional distress is clearly based on alleged Fair Housing discrimination.

Plaintiff's sole allegation against Defendant is that Defendant provided Mr. Talkington a copy of her dog's certification with the knowledge that Mr. Talkington would post it on his blog.

---

[8] *Smith v. Elias,* 2007 WL 4209701, at *4 (V.I.Super.Ct.2007).
[9] *Id* at *4.
[10] *Id.* see also; *Equal Employment Opportunity Comm'n v. Chestnut Hill Hosp.,* 874 F.Supp. 92, 96 (E.D.Pa.1995); *see also Nichols v. Acme Markets, Inc.,* 712 F.Supp. 488 (E.D.Pa.1989), *aff'd,* 902 F.2d 1561 (3d Cir.1990).

(See Paragraph 196 of the Second Amended Complaint). Frankly, there is a complete lack of evidence to support this contention (see Declaration of Robert Cockayne attached hereto as Exhibit "1"). Even if the record evidence and undisputed facts supported Plaintiff's contention, which they clearly do not, this allegation certainly is not "so extreme in degree to go beyond all possible bounds of decency" or "utterly intolerable in a civilized community." It is not enough to allege or prove that a defendant acted with tortious intent or even acted with malice.[11] As such, Plaintiff's claim for intentional infliction of emotional distress fails and Defendant is entitled to summary judgment.

Plaintiff has similarly failed to meet the required elements for a claim of negligent infliction of emotional distress. This Court has required two elements to sustain a claim of negligent infliction of emotional distress. First the negligent conduct must have placed the plaintiff in danger of his or her own safety. Second, the plaintiff must have suffered some physical harm as a result of the emotional distress.[12] As there are no allegations, record evidence or any discovery indicating physical harm, Plaintiff cannot establish either element of a prima face case for negligent infliction of emotional distress. As such, Defendant is entitled to summary judgment as to Count XIII.

---

[11] *See;* The Restatement (Second) of Torts § 46(1).

[12] *Mingolla v. Minnesota Mining and Mfg. Co.,* 893 F.Supp. 499, 506 (D.Vi. 1995). *See also Lempert v. Singer*, 26 V.I. 326 (D.V.I. 1995)(there can be no liability for negligent infliction of emotional distress absent physical harm); *International Islamic Community of Masjid Baytulkhaliq Inc. v. DEA*, 981 F.Supp. 352, 369-370 (grating summary judgment in defendants favor as to intentional and negligent infliction of emotional distress); *Ramos v. St. Croix Alumina, L.L.C.,* 277 F.Supp.2d 600, 604 (D.V.I.2003) *overruled on other grounds by Miller v. V.I. Hous. Auth.,* CIV. 1998/0089, 2005 WL 1353395 (D.V.I. June 3, 2005). ([p]hysical harm is a required element of a claim for negligent infliction of emotional distress in the Virgin Islands.") *Anderson v. Government of Virgin Islands,* 180 F.R.D. 284, 286 (D.Vi. June 11, 1998); RESTATEMENT (SECOND) OF TORTS § 313.

## V.   CONCLUSION

After two years to complete discovery and conducting none and failing to show any evidence to establish the existence of the essential elements of Plaintiff's claims against Defendant, the plain language of Rule 56(c) mandates the entry of summary judgment.[13] Furthermore, as a result of Plaintiff's death, she cannot sufficiently refute Defendants undisputed facts or prove any aspect of her case.   Put simply, there is no set of facts under which Plaintiff would be entitled to relief in this litigation or under which Plaintiff could bring a successful claim against Defendant. Accordingly, summary judgment in favor of Defendant as to Count XIII of Plaintiff's Second Amended Complaint is not only warranted but required.

WHEREFORE, the Defendant, Robert Cockayne respectfully requests that the Court grant this Motion for Final Summary Judgment, entitlement to Defendant's prevailing party attorneys' fees and costs and for such other and further relief, both at law and in equity, to which the Defendant may be justly and legally entitled.

Dated:  May 1, 2014          Respectfully submitted,

**BIRCH, de JONGH & HINDELS, PLLC & BOYD RICHARDS PARKER & COLONNELLI**
*Counsel for Defendants: Cowpet Bay West Condominium Association, The Board of Cowpet Bay West Condominium Association, Max Harcourt, Robert Cockayne, and Vincent Verdiramo*
1330 Estate Taarnebjerg
St. Thomas, VI 00802
Tel.: 340-774-1100; Fax: 340-774-7300

By:          /s/ Richard P. Farrelly
          **Richard Farrelly**
          Bar No. 105
          rfarrelly@bdhlawvi.com
          **Joseph Riopelle**
          jriopelle@boydlawgroup.com

---

[13] *Celotex Corp. v. Catrett,* 477 U.S. 317, 322-323 (1986).

I hereby certify that on the above-indicated date, I electronically filed the foregoing document with the Clerk of the Court using ECF. I also certify that the foregoing document is being served this day on all counsel of record or pro se parties identified below, either via transmission of Notices of Electronic Filing generated by ECF or in some other authorized manner for those counsel or parties who are not authorized to receive electronically Notices of Electronic Filing.

**Karin A. Bentz, Esq.**
(Attorney for Plaintiff)
5332 Raadets Gade, Ste. 3
St. Thomas, VI 00802
Tel: 340-774-2669
kbentz@virginalaw.com

**John H. Benham, III, Esq.**
(Attorney for Talkington)
Post Office Box 11720
St. Thomas, VI 00801
Tel: 340-774-0673
benham@bclawvi.com

**Ryan C. Meade, Esq.**
(Attorney for Alfred Felice)
9300 S. Dadeland Blvd., 4th Floor
Miami, FL 33156
Tel: 305-670-1101
rmeade@qpwblaw.com

/s/ Richard P. Farrelly

IN THE UNITED STATES DISTRICT COURT OF THE VIRGIN ISLANDS
DISTRICT OF ST. THOMAS AND ST. JOHN

BARBARA WALTERS,       )
                            )
     Plaintiff,        )
v.                        )    CIVIL CASE NO: 3:12-cv-00024
                            )
COWPET BAY WEST CONDOMINIUM  )
ASSOCIATION; THE BOARD OF THE   )
COWPET BAY WEST CONDOMINIUM  )
ASSOCIATION; MAX HARCOURT, in his)
personal capacity; ALFRED FELICE;   )
LANCE TALKINGTON ROBERT      )
COCKAYNE;VINCENT VERDIRAMO,  )
                            )
     Defendants.       )
                            )

## DECLARATION OF ROBERT COCKAYNE

I, ROBERT COCKAYNE, hereby declare as follows:

1.     I have personal knowledge of the matters set forth in this declaration.

2.     I submit this declaration in support of the Motion for Final Summary Judgment filed in this matter on my behalf.

3.     I did not review any paper work in Plaintiff's file at the office at Cowpet Bay West.

4.     I did not distribute Plaintiff's dog certification at the January 2012 meeting or at any time.



5.    I did not share a copy of Plaintiff's dog certification with Mr. Talkington.

Further Affiant Sayeth Not.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on May____/____, 2014.

_____
Robert Cockayne

IN THE UNITED STATES DISTRICT COURT OF THE VIRGIN ISLANDS
DISTRICT OF ST. THOMAS AND ST. JOHN

JUDITH KROMENHOEK, )
                                              )
        Plaintiff,                            )
v.                                            )      CIVIL CASE NO: 3:12-cv-00025
                                              )
COWPET BAY WEST CONDOMINIUM )
ASSOCIATION; THE BOARD OF THE )
COWPET BAY WEST CONDOMINIUM )
ASSOCIATION; MAX HARCOURT, in his )
personal capacity; ALFRED FELICE; )
LANCE TALKINGTON ROBERT )
COCKAYNE;VINCENT VERDIRAMO, )
                                              )
        Defendants.                           )
_____ )

## DEFENDANT ROBERT COCKAYNE'S MOTION FOR SUMMARY JUDGMENT AS TO COUNT XIII OF THE SECOND AMENDED COMPLAINT AND INCORPORATED MEMORANDUM OF LAW PURSUANT TO FED. R. CIV. P. 56 AND LOCAL RULE 56.1

Defendant, Robert Cockayne, by and through his undersigned counsel, submit this

Memorandum of Law in support of his Motion for Summary Judgment on the Complaint filed by

Plaintiff, Judith Kromenhoek ("Plaintiff"), and move this Honorable Court for entry of Final

Summary Judgment in his favor against Plaintiff. In support, Defendant states the following:

### I.    INTRODUCTION

This matter stems from a baseless quarrel amongst residents at Cowpet Bay West

Condominium Association regarding Plaintiff's accompaniment of a dog while she resided at her

unit in Cowpet Bay West. Defendant was a board member of Cowpet Bay West at all material

times in this action. Plaintiff alleges that Defendant distributed information regarding online

service dog certification businesses at the January 11, 2012 board meeting and shared a copy of

Plaintiff's dog certification with Mr. Talkington, a non-board member. (Paragraph 74 and 190 of

the Second Amended Complaint).  On this sole basis, Plaintiff claims that Defendant caused her negligent and/or an intentional infliction of emotional distress.

In just over two years, Plaintiff has conducted no discovery in this matter, despite being given more than an adequate amount of time to complete same.  Frankly, Plaintiff cannot establish any existence of an element essential to her case.  As such, pursuant to Fed. R. Civ. P. 56, there can be no genuine issue to any material fact, since the complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial.  Thus, Defendant is entitled to summary judgment.  As will be discussed more fully below, Plaintiff's claims are unsupported by the evidence. The undisputed material evidence shows Defendant did not circulate copies of Plaintiff's dog certification at the January 2012 board meeting and did not provide a copy to Mr. Talkington.  Moreover, even if these allegations were true, there is no evidence of outrageous conduct or physical harm.  As such, Defendant is entitled to summary judgment as to Count XIII of the Second Amended Complaint.

## II.  UNDISPUTED MATERIAL FACTS

1.  Defendant did not distribute Plaintiff's dog certification at the January 2012 meeting or at any time. (Declaration of Robert Cockayne attached hereto as Exhibit "1").

2.  Defendant did not share a copy of Plaintiff's dog certification with Mr. Talkington. (Declaration of Robert Cockayne attached hereto as Exhibit "1").

## III.  SUMMARY JUDGMENT STANDARD

Rule 56(c) of the Federal Rules of Civil Procedure permits the entry of summary judgment if "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." The moving party bears the

burden of proving that no genuine issue of material fact is in dispute.[1] A factual dispute is "material" only if it might "affect the outcome of the suit under the governing law."[2] There is only a "genuine" issue of material fact "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party."[3] The court must examine the facts in a light favorable to the non-movant.[4] Furthermore, the court must resolve "all inferences, doubts and issues of credibility against the moving party."[5]

The Supreme Court has further explained in *Celotex* that:

"the plain language of Rule 56(c) mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial. In such a situation, there can be 'no genuine issue as to any material fact,' since a complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial. The moving party is 'entitled to a judgment as a matter of law' because the nonmoving party has failed to make a sufficient showing on an essential element of her case with respect to which she has the burden of proof."[6]

The nonmoving party must then "go beyond the pleadings and by her own affidavits, or by the depositions, answers to interrogatories, and admissions on file, designate *specific facts* showing that there is a genuine issue for trial."[7] Here, Plaintiff has had more than two years to conduct discovery, since the filing of the lawsuit, however, neither written discovery nor depositions have been completed by Plaintiff. Plaintiff has not and cannot establish the existence of any element essential to prove her case against Defendant.

---

[1] *Matsushita Elec. Indus. Co. Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 585 n. 10 (1986).

[2] *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

[3] *Id.*

[4] *Id.* at 255.

[5] *Smith v. Pittsburgh Gage & Supply Co.*, 464 F.2d 870, 874 (3d Cir.1972) (citations omitted).

[6] *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-323 (1986).

[7] *Id.* at 324 (emphasis added) (internal quotations and citations omitted).

## IV. MEMORANDUM OF LAW

### a. Plaintiff Fails to Establish Negligent and/or Intentional Infliction of Emotional Distress

Plaintiff's Count XIII is a combination of two separate causes of action, negligent and/or intentional infliction of emotional distress. Viewing the record evidence and undisputed facts in a light most favorable to Plaintiff, does not establish a prima facie cases for negligent or intentional infliction of emotional distress.

Under Virgin Islands law, a claim of intentional infliction of emotional distress requires "extreme and outrageous conduct intentionally or recklessly causes severe emotional distress ..."[8] The Restatement (Second) of Torts § 46(1) defines outrageous conduct as "so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community." The court in *Smith* indicated that the court's role when dealing with a claim of intentional infliction of emotional distress is limited to determining "whether the defendant's conduct may reasonably be regarded as so extreme and outrageous as to permit recovery, or whether it is necessarily so."[9] There is no record evidence that Defendant's actions were so extreme and outrageous to permit recovery. Furthermore, "Discrimination alone does not state a claim for intentional infliction of emotional distress."[10] Plaintiff's claim for intentional infliction of emotional distress is clearly based on alleged Fair Housing discrimination.

Plaintiff's sole allegation against Defendant is that Defendant provided Mr. Talkington a copy of her dog's certification with the knowledge that Mr. Talkington would post it on his blog.

---

[8] *Smith v. Elias*, 2007 WL 4209701, at *4 (V.I.Super.Ct.2007).

[9] *Id.* at *4.

[10] *Id.* see also; *Equal Employment Opportunity Comm'n v. Chestnut Hill Hosp.*, 874 F.Supp. 92, 96 (E.D.Pa.1995); *see also Nichols v. Acme Markets, Inc.*, 712 F.Supp. 488 (E.D.Pa.1989), *aff'd*, 902 F.2d 1561 (3d Cir.1990).

(See Paragraph 190 of the Second Amended Complaint). Frankly, there is a complete lack of evidence to support this contention (see Declaration of Robert Cockayne attached hereto as Exhibit "1"). Even if the record evidence and undisputed facts supported Plaintiff's contention, which they clearly do not, this allegation certainly is not "so extreme in degree to go beyond all possible bounds of decency" or "utterly intolerable in a civilized community." It is not enough to allege or prove that a defendant acted with tortious intent or even acted with malice.[11] As such, Plaintiff's claim for intentional infliction of emotional distress fails and Defendant is entitled to summary judgment.

Plaintiff has similarly failed to meet the required elements for a claim of negligent infliction of emotional distress. This Court has required two elements to sustain a claim of negligent infliction of emotional distress. First the negligent conduct must have placed the plaintiff in danger of his or her own safety. Second, the plaintiff must have suffered some physical harm as a result of the emotional distress.[12] As there are no allegations, record evidence or any discovery indicating physical harm, Plaintiff cannot establish either element of a prima face case for negligent infliction of emotional distress. As such, Defendant is entitled to summary judgment as to Count XIII.

---

[11] *See;* The Restatement (Second) of Torts § 46(1).

[12] *Mingolla v. Minnesota Mining and Mfg. Co.,* 893 F.Supp. 499, 506 (D.Vi. 1995). *See also Lempert v. Singer,* 26 V.I. 326 (D.V.I. 1995)(there can be no liability for negligent infliction of emotional distress absent physical harm); *International Islamic Community of Masjid Baytulkhaliq Inc. v. DEA,* 981 F.Supp. 352, 369-370 (grating summary judgment in defendants favor as to intentional and negligent infliction of emotional distress); *Ramos v. St. Croix Alumina, L.L.C.,* 277 F.Supp.2d 600, 604 (D.V.I.2003) *overruled on other grounds by Miller v. V.I. Hous. Auth.,* CIV. 1998/0089, 2005 WL 1353395 (D.V.I. June 3, 2005). ([p]hysical harm is a required element of a claim for negligent infliction of emotional distress in the Virgin Islands.") *Anderson v. Government of Virgin Islands,* 180 F.R.D. 284, 286 (D.Vi. June 11, 1998); RESTATEMENT (SECOND) OF TORTS § 313.

## V. CONCLUSION

After two years to complete discovery and conducting none and failing to show any evidence to establish the existence of the essential elements of Plaintiff's claims against Defendant, the plain language of Rule 56(c) mandates the entry of summary judgment.[13] Put simply, there is no set of facts under which Plaintiff would be entitled to relief in this litigation or under which Plaintiff could bring a successful claim against Defendant. At bottom, Defendant's actions could, in no conceivable way, be considered severe or outrageous. Accordingly, summary judgment in favor of Defendant as to Count XIII of Plaintiff's Second Amended Complaint is not only warranted but required.

WHEREFORE, the Defendant, Robert Cockayne respectfully requests that the Court grant this Motion for Final Summary Judgment, entitlement to Defendant's prevailing party attorneys' fees and costs and for such other and further relief, both at law and in equity, to which the Defendant may be justly and legally entitled.

Dated: May 1, 2014      Respectfully submitted,

**BIRCH, de JONGH & HINDELS, PLLC & BOYD RICHARDS PARKER & COLONNELLI**
*Counsel for Defendants: Cowpet Bay West Condominium Association, The Board of Cowpet Bay West Condominium Association, Max Harcourt, Robert Cockayne, and Vincent Verdiramo*
1330 Estate Taarnebjerg
St. Thomas, VI 00802
Tel.: 340-774-1100; Fax: 340-774-7300

By:     /s/ Richard P. Farrelly
**Richard Farrelly**
Bar No. 105
rfarrelly@bdhlawvi.com
**Joseph Riopelle**
jriopelle@boydlawgroup.com

---

[13] *Celotex Corp. v. Catrett,* 477 U.S. 317, 322-323 (1986).

I hereby certify that on the above-indicated date, I electronically filed the foregoing document with the Clerk of the Court using ECF. I also certify that the foregoing document is being served this day on all counsel of record or pro se parties identified below, either via transmission of Notices of Electronic Filing generated by ECF or in some other authorized manner for those counsel or parties who are not authorized to receive electronically Notices of Electronic Filing.

**Karin A. Bentz, Esq.**
(Attorney for Plaintiff)
5332 Raadets Gade, Ste. 3
St. Thomas, VI 00802
Tel: 340-774-2669
kbentz@virginalaw.com

**John H. Benham, III, Esq.**
(Attorney for Talkington)
Post Office Box 11720
St. Thomas, VI 00801
Tel: 340-774-0673
benham@bclawvi.com

**Ryan C. Meade, Esq.**
(Attorney for Alfred Felice)
9300 S. Dadeland Blvd., 4th Floor
Miami, FL 33156
Tel: 305-670-1101
rmeade@qpwblaw.com

_____/s/ Richard P. Farrelly_____

IN THE UNITED STATES DISTRICT COURT OF THE VIRGIN ISLANDS
DISTRICT OF ST. THOMAS AND ST. JOHN

JUDITH KROMENHOEK, )
                             )
        Plaintiff, )
v. )            CIVIL CASE NO: 3:12-cv-00025
                             )
COWPET BAY WEST CONDOMINIUM )
ASSOCIATION; THE BOARD OF THE )
COWPET BAY WEST CONDOMINIUM )
ASSOCIATION; MAX HARCOURT, in his )
personal capacity; ALFRED FELICE; )
LANCE TALKINGTON ROBERT )
COCKAYNE;VINCENT VERDIRAMO, )
                             )
        Defendants. )
_____ )

## DECLARATION OF ROBERT COCKAYNE

I, ROBERT COCKAYNE, hereby declare as follows:

1.     I have personal knowledge of the matters set forth in this declaration.

2.     I submit this declaration in support of the Motion for Final Summary Judgment

filed in this matter on my behalf.

3.     I did not review any paper work in Plaintiff's file at the office at Cowpet Bay

West.

4.     I did not distribute Plaintiff's dog certification at the January 2012 meeting or at

any time.

EXHIBIT 1

5.    I did not share a copy of Plaintiff's dog certification with Mr. Talkington.

Further Affiant Sayeth Not.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on May_____, 2014.

_____
Robert Cockayne

IN THE UNITED STATES DISTRICT COURT OF THE VIRGIN ISLANDS
DISTRICT OF ST. THOMAS AND ST. JOHN

JUDITH KROMENHOEK,          )
                              )
    Plaintiff,              )
v.                           )     CIVIL CASE NO: 3:12-cv-00025
                              )
COWPET BAY WEST CONDOMINIUM  )
ASSOCIATION; THE BOARD OF THE  )
COWPET BAY WEST CONDOMINIUM  )
ASSOCIATION; MAX HARCOURT, in his)
personal capacity; ALFRED FELICE;  )
LANCE TALKINGTON ROBERT     )
COCKAYNE;VINCENT VERDIRAMO,  )
                              )
    Defendants.           )
_____)

## ORDER

This matter came before the Court on Defendant, Robert Cockayne's Motion for Final

Summary Judgment of Plaintiff's Second Amended Complaint and Supporting Memorandum of

Law. The Court being advised of same and in the interest of justice it is herby

**ORDERED,** Defendant's Motion for Final Summary Judgment is **GRANTED**. The

Court reserves jurisdiction to determine an award of attorney fees and costs in this action.

ENTERED this _____ day of May, 2014

                               _____
                               CURTIS V. GOMEZ
                               Chief Judge

ATTEST:

WILFREDO F. MORALES
Clerk of the Court
By:_____

IN THE UNITED STATES DISTRICT COURT OF THE VIRGIN ISLANDS
DISTRICT OF ST. THOMAS AND ST. JOHN
*****************

| | | |
|---|---|---|
| JUDITH KROMENHOEK, | ) | CIVIL NO. 12-00025 |
| | ) | |
| Plaintiff, | ) | Action for: Housing |
| | ) | Discrimination; Discrimination |
| v. | ) | Based on Disability; Invasion of |
| | ) | Privacy; Intentional Infliction of |
| COWPET BAY WEST CONDOMINIUM | ) | Emotional Distress; Punitive |
| ASSOCIATION; THE BOARD OF THE | ) | Damages; and Injunctive |
| COWPET BAY WEST CONDOMINIUM | ) | Injunctive and |
| ASSOCIATION; MAX HARCOURT, | ) | Declaratory Judgment |
| in his personal capacity; ALFRED FELICE; | ) | |
| LANCE TALKINGTON; ROBERT | ) | |
| COCKAYNE; VINCENT VERDIRAMO, | ) | JURY TRIAL DEMAND |
| | ) | |
| Defendants. | ) | |
| | ) | |

## PLAINTIFF'S RESPONSE TO DEFENDANT ROBERT COCKAYNE'S MOTION FOR SUMMARY JUDGMENT AS TO COUNT XIII OF THE SECOND AMENDED COMPLAINT AND INCORPORATED MEMORANDUM OF LAW PURSUANT TO FED. R. CIV. PR. 56 AND LOCAL RULE 56.1

**COMES NOW**, Plaintiff Judith Kromenhoek by and through the undersigned counsel, the **LAW OFFICES OF KARIN A. BENTZ, P.C.** (Karin A. Bentz and Julita K. de León, Esq.), and pursuant to Rule 56.1 of the Local Rules of Civil Procedure hereby submits the following in opposition to Defendant Robert Cockayne's (Defendant) summary judgment motion. The facts and evidence supporting this response are contained in Plaintiff's Response to Defendant Robert Cockayne's Statement of Undisputed Material Facts and Plaintiff's Counter-Statements of Facts.[1]

As demonstrated below, the Defendant's motion for summary judgment should be denied because genuine issues of material fact exist as to Plaintiff's Intentional Infliction of Emotional Distress claim.

### Argument[2]

---

[1] Plaintiff's Response and Counter Statement of Facts are sequentially numbered. She will cite to these facts uniformly as "CSOF¶."

[2] For the facts, see Plaintiff's Counter statement of facts.

Judith Kormenhoek vs. Cowpet Bay West Condominium, et al.                    Civil No. 25/2012
Plaintiff's Opposition to Robert Cockayne's Motion for Summary Judgment       Page 2

**1.     Defendant's Motion for Summary Judgment is Procedurally Defective and Must be Denied Without Prejudice.**

Local Rule of Civil Procedure 56.1 requires a separate statement of material facts with serially numbered paragraphs and "specific citation to the record." LRCi 56.1(a)(1). This rule further requires that the movant "affix to the statement copies of the precise portions of the record relied upon as evidence of each material fact." Additionally, Defendant relies on his own affidavit; a fact that in and of itself establishes the procedural defect of the instant motion, as there are no answers to interrogatories, etc. on which to rely because no discovery was conducted. As such, the Defendant's motion for summary judgment should be denied and Defendant given leave to file a motion that complies with the applicable rules of procedure.

**2.     Defendant's Conduct Caused Plaintiff to Suffer Emotional Distress.**

The party seeking summary judgment must show that there is no genuine issue as to any material fact and that he is entitled to judgment as a matter of law. Fed. R. Civ. P. 56; *Celotex Corp. v. Catrett*, 477 U.S. 317 (1986); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242 (1986). The burden on the non-moving party is not a heavy one; she is simply required to show specific facts, as opposed to general allegations, that present a genuine issue worthy of trial. *Hanley v. Jones*, 21 V.I. 190 (1984). The court must inquire whether reasonable fact finders could find facts that demonstrate, by a preponderance of the evidence, that the non-moving party is entitled to a verdict. *In re Paoli R.R. Yard PCL Litig.*, 916 F.2d 829, 860 (3d Cir. 1990). In determining whether there are genuine issues of material fact, the court must draw all reasonable inferences in favor of the non-moving party; and it may not make credibility determinations or weigh the evidence. *Reeves v. Sanderson Plumbing Products, Inc.,* 530 U.S. 133 (2000).

This Court has adopted the standard for intentional infliction of emotional distress set forth in Section 46(1) of the Restatement (Second) Torts: "One who by extreme and outrageous conduct intentionally or recklessly causes severe emotional distress to another is subject to liability." *Desir v. Hovensa, L.L.C.*, CIVIL 2007/97, 2012 WL 762122 (D.V.I. Mar. 7, 2012). Recovery for intentional infliction of emotional distress "is limited to situations where 'the conduct has been so

Judith Kormenhoek vs. Cowpet Bay West Condominium, et al.     Civil No. 25/2012
Plaintiff's Opposition to Robert Cockayne's Motion for Summary Judgment     Page 3

outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious and utterly intolerable in a civilized society.' " *Id.* (quoting Restatement (Second) Torts § 46, cmt. d); *see also   Petersen v. First Fed. Sav. & loan ass'n of P.R. Inc.,* 617 F.Supp. 1039, 1042 ("The plaintiff must make a showing that defendant's conduct was so outrageous that no reasonable person in a civilized society should be expected to endure it.").

Substantively, the Court is to consider whether Defendant's conduct was so outrageous that no reasonable person in a civilized society should be expected to endure it. "Where  reasonable persons may differ, it is for the jury to determine whether the conduct is sufficiently extreme and outrageous so as to result in liability." *Motheral v. Burkhart,* 400 Pa.Super. 408, 583 A.2d 1180, 1188 (1990). Such emotional damages are available "for distress which exceeds the normal transient and trivial aggravation attendant to securing suitable housing." Mor*gan v. Sec'y of Hous. & Urban Dev.,* 985 F.2d 1451, 1459 (10th Cir.1993).

Here, Defendant, as a Board member, was charged with a duty to oversee the granting of a reasonable accommodation to Plaintiff.  However, because of Defendant's unholy alliance with the "organized opposition" to Plaintiff's application, Defendant permitted Plaintiff to be vilified just for requesting a reasonable accommodation.  Defendant also joined in the fray by making public the content of Plaintiff's application, which was personal and confidential.  Such actions violated Defendant's duty to the Association and also caused Plaintiff severe emotional pain.  Because of the Defendant's action, Plaintiff's personal and confidential information was posted on the internet.  As a result, Plaintiff  was forced to defend the validity of the document amidst jeers, ridicules, and the likes from other members of the Association.

Defendant contends that there is no record evidence to prove that he circulated a copy of Plaintiff's dog certification at a meeting in January and caused a copy to be posted on the blog.  This is simply not the case. (CSOF ¶2). Defendant further argues that "this allegation is not so extreme in degree to go beyond all possible bounds of decency or utterly intolerable in a civilized community."  Defendant, however, does not cite to any legal support for this position.  Clearly,

1

2
Judith Kormenhoek vs. Cowpet Bay West Condominium, et al.                    Civil No. 25/2012
Plaintiff's Opposition to Robert Cockayne's Motion for Summary Judgment       Page 4

3
having your personal information posted on the blog for others to poke fun and ridicule, is at bottom,

4
humiliating. "The more inherently degrading or humiliating the defendant's action is, the more

5
reasonable it is to infer that a person would suffer humiliation or distress from that action;

6
consequently, somewhat more conclusory evidence of emotional distress will be acceptable to

7
support an award for emotional damages. " *Krueger v. Cuomo,* 115 F.3d 487, 492 (7th Cir.1997).

8
Here, Plaintiff, has adequately articulated and otherwise established that she suffered

9
emotional distress because of the Defendant's conduct.  Plaintiff was upset and angst ridden after

10
having to defend the validity of the dog's certification. (CSOF ¶4).  Plaintiff complained to her

11
therapist that she was being harassed by Defendant and others at Cowpet Bay. (Id. ¶4). Because of

12
Plaintiff's anxious state, she wrote a letter to the Board President informing him that, since her

13
private documents were not kept confidential, the Board was not allowed to review her file unless

14
the President signs a waiver. (CSOF¶6).   Such drastic step was a manifestations of Plaintiff's

15
emotional distress indicating that she was at a breaking point. What is more, the distress that Plaintiff

16
felt "exceeds the normal transient and trivial aggravation attendant to securing suitable housing."

17
Accordingly, Defendant is not entitled to summary judgment as there are material facts in

18
dispute.

19
                                                 Respectfully submitted,

20
                                         **LAW OFFICES OF KARIN A. BENTZ, P.C.**

21
Dated: May 21, 2014                      /s/ Karin A. Bentz
                                         **KARIN A. BENTZ, ESQ.**
22
                                         **JULITA K. de LEÓN,  ESQ**.
                                         5332 Raadets Gade, Suite 3
23
                                         St. Thomas, Virgin Islands 00802
                                         Telephone: 340-774-2669
24
                                         Telecopier: 340-774-2665
                                         E-mail: kbentz@virginalaw.com
25

26

27

28

Judith Kormenhoek vs. Cowpet Bay West Condominium, et al.        Civil No. 25/2012
Plaintiff's Opposition to Robert Cockayne's Motion for Summary Judgment    Page 5

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that I caused the filing and service of the foregoing with the Clerk of the District Court of the Virgin Islands using the CM/ECF system, which will provide electronic notice by email to the following.

Richard P. Farrelly, Esq.
Birch de Jongh & Hindels, PLLC
1330 Taarneberg
St. Thomas, VI 00802
Email: rfarrelly@bdhlawvi.com

John H. Benham, III, Esq.
Benham & Chan
P.O. Box 11720
St. Thomas, Virgin Islands 00801
Tel: 340-774-0673
Fax: 340-776-3630
Email: benham@bclawvi.com


Joseph G. Riopelle, Esq.
Boyd Richards Parker & Colonnelli, P.L.
Rivergate Tower Suite 1150
400 N. Ashley Drive
Tampa, Fl. 33602
jriopelle@boydlawgroup.com

Ryan S. Meade, Esq.
Quintairos, Prieto, Wood & Boyce, P.A.
9300 South Dadeland Blvd., 4th Floor
Miami, Fl 33156
Email: rmeade@gpwblaw.com

                               /s/ Karin A. Bentz

IN THE UNITED STATES DISTRICT COURT OF THE VIRGIN ISLANDS
DISTRICT OF ST. THOMAS AND ST. JOHN
*****************

JUDITH KROMENHOEK,                    )        CIVIL NO. 12-00025
                                      )
                Plaintiff,            )        Action for: Housing
                                      )        Discrimination; Discrimination
        v.                            )        Based on Disability; Invasion of
                                      )        Privacy; Intentional Infliction of
COWPET BAY WEST CONDOMINIUM           )        Emotional Distress; Punitive
ASSOCIATION; THE BOARD OF THE         )        Damages; and Injunctive
COWPET BAY WEST CONDOMINIUM           )        Injunctive and
ASSOCIATION; MAX HARCOURT,            )        Declaratory Judgment
in his personal capacity; ALFRED FELICE; )
LANCE TALKINGTON; ROBERT              )
COCKAYNE; VINCENT VERDIRAMO,          )        JURY TRIAL DEMAND
                                      )
                Defendants.           )
_____ )

## PLAINTIFF'S RESPONSE TO DEFENDANT ROBERT COCKAYNE'S UNDISPUTED MATERIAL FACTS AND PLAINTIFF'S COUNTER-STATEMENT OF FACTS

**COMES NOW** the Plaintiff, **JUDITH KROMENHOEK** ("Plaintiff") and by and through the undersigned counsel, the **LAW OFFICES OF KARIN A. BENTZ, P.C.** (Karin A. Bentz, Esq., and Julita K. de León, Esq.) and submits her brief response to Defendant Robert Cockayne's ("Defendant") statement of undisputed facts in support of his summary judgment motion, pursuant to Rule 56.1 of the Local Rules of Civil Procedure.

Rule 56.1 permits a party opposing a summary judgment motion to submit, inter alia, a "concise statement of any additional facts that the respondent contends are material to the motion for summary judgment and as to which the respondent contends there exists a genuine issue to be tried." For ease of reference, Plaintiff has referenced the corresponding paragraphs of Defendant's statement of undisputed facts as ("SOF") where appropriate. Additionally, Plaintiff has also referenced Plaintiff's Counter Statement of Facts ("CSOF") where appropriate.

**I.      Defendant's Statement of Undisputed Material Facts.**

1.      Disagreed.

2.      Disagreed.

Judith Kormenhoek vs. Cowpet Bay West Condominium, et al.                    Civil No. 25/2012
Plaintiff's Response to Robert Cockayne's Undisputed Material Facts and Plaintiff's
Counter-statement Facts                                                      Page 2

## II.     Plaintiff's Statement of Undisputed Material Facts.

1.     Cockayne distributed information on Service Dog Certification naming businesses that have
       no requirements for service dog certification. Exhibit 1

2.     Cockayne also distributed the dog's certification at the meeting.

3.     Talkington posted a copy of Plaintiff's dog certification on the blog and went on to ridicule
       Plaintiff for obtaining a certification from an "outfit." Exhibit 2

4.     Plaintiff sought the help of a licensed psychologist to assist her in coping with the
       embarrassment, humiliation, bully and harassment that she was subjected to for having to
       defend the validity of the dog's certification. Exhibit 3

5.     Plaintiff complained to her therapist that certain people at the condominium were causing
       her problems because of her application for a reasonable accommodation. (Id. 79: 1-12)

6.     Plaintiff's therapist found that she was harassed at Cowpet Bay. (Id. 85:1-7).


                                        Respectfully submitted,

                                        **LAW OFFICES OF KARIN A. BENTZ, P.C.**

Dated: May 21, 2014                     /s/ Karin A. Bentz
                                        **KARIN A. BENTZ, ESQ., V.I. Bar No. 413**
                                        **JULITA K. de LEÓN, ESQ., V.I. Bar No. 913**
                                        5332 Dronningens Gade, Suite 3
                                        St. Thomas, Virgin Islands 00802
                                        Telephone: 340-774-2669
                                        Telecopier: 340-774-2665
                                        E-mail: kbentz@virginalaw.com

Judith Kormenhoek vs. Cowpet Bay West Condominium, et al.    Civil No. 25/2012
Plaintiff's Response to Robert Cockayne's Undisputed Material Facts and Plaintiff's
Counter-statement Facts                                      Page 3

## CERTIFICATE OF SERVICE

I hereby certify that I caused the filing and service of the foregoing with the Clerk of the District Court of the Virgin Islands using the CM/ECF system, which will provide electronic notice by email to the following.

Richard P. Farrelly, Esq.
Birch de Jongh & Hindels, PLLC
1330 Taarneberg
St. Thomas, VI 00802
Email: rfarrelly@bdhlawvi.com

John H. Benham, III, Esq.
Benham & Chan
P.O. Box 11720
St. Thomas, Virgin Islands 00801
Tel: 340-774-0673
Fax: 340-776-3630
Email: benham@bclawvi.com

Joseph G. Riopelle, Esq.
Boyd Richards Parker & Colonnelli, P.L.
Rivergate Tower Suite 1150
400 N. Ashley Drive
Tampa, Fl. 33602
Email: jriopelle@boydlawgroup.com

Ryan S. Meade, Esq.
Quintairos, Prieto, Wood & Boyce, P.A.
9300 South Dadeland Blvd., 4th Floor
Miami, Fl 33156
Email: rmeade@gpwblaw.com

/s/ Karin A. Bentz

DRAFT

**Cowpet Bay West**
**Board of Directors Meeting**
**January 11, 2012-01-12**

**Present:** Max Harcourt, Barbara Walters, Bob Cockayne, Rosie Wells, Sharon Koehler, Vince Verdiramo, Jon Cassady, Louanne Schechter
Bill Canfield could not attend

**Owner W-12:** Mr. Kirschenbaum requested to speak to the Directors on behalf of his wife. He made a formal request for an exemption to the no dog policy. He presented a letter from his wife's physician stating the dog was necessary as part of her treatment. He provided the Directors with certification for the dog. He stated he and his wife would be responsible for cleaning up behind the dog. He stated he has purchased a "no bark collar" in the event the dog should bark. He spoke with his neighbours and they have not heard the dog. Mr. Kirschenbaum stated that when he and his wife purchased their condo there was no rule against dogs. Mr. Kirshenbaum left the meeting.

**Executive Session:** Max asked if there was a need for Executive Session. Vince requested Executive Session there was no 2nd, the meeting remained open.

**Nomination Criteria:** Vince asked Bob what criteria were used to determine who was recommended. Bob indicated the committee had discussions on each candidate. Following discussion, Max stated that there was no new issue here to present before the Board of Directors.

**Minutes of the meeting of December 13, 2011** were accepted with the following amendments:
Executive Session: add to the third sentence *but to increase Jon and Louanne's salaries $4k and $2K, respectively (per Max).*
Nomination Committee: Delete *this afternoon* from Bob's comment to bring info to office (per Bob)
Bylaws: Change to: Anna Paiewonsky made provisions for the Association to be an LLC (per Sharon).

**Minutes of the meeting of December 20, 2011** were accepted with the following amendments:
Missing Applications: Last sentence changed to: Max stated he may send all email correspondence out regarding the issue and leave it to the owners (per Max).

Under Executive Session add: The Board voted to award bonuses to Jon, Louanne, the staff and contract workers.

1



PLAINTIFF'S
EXHIBIT
1
PENGAD 800-631-6989

DRAFT

**Treasurer Report:**
<u>2011 Year End Analysis/2012 Budget</u>
Reserve Account

| | |
|---|---|
| Beginning balance -*12131/11* | |
| Collected from owners | $ 501,759 |
| Interest earned (approx) | + 108,800 |
| CI Expenditures | + 3.000 |
| Reserve fund acct total *12131* | 165.391 |
| Bank acct balances (Reserve} | $ 445,468 |
| Owed from General to Reserve | -425.927 |
| | $ 19,541 |

Upon speaking with Jeanne Brennan this week, she recommended we transfer the $19,541 from our general account to our Reserve account this week.

So, our yearend balance in our Reserve account will be $445,468 (+ or - interest actual)

2012 Budget

Suggestions

We have not budgeted anything for the completion of the 4-year electrical project. If Mr. Havey is not yet scheduled to come down here, we should defer his trip to a more reasonable time

Before commencement of any approved CI projects, Exec committee/Board should be thoroughly briefed on scope and cost and terms of contract, if any

2

Joint Appendix Vol. II Page 891

DRAFT

Max asked if we had any unanticipated projects in the last quarter. Sharon reported the masonry project, specifically cistern repair and spalling replacement under buildings cost us 35,000 that we did not budget. Jon reported most of the expense was on spalling which had to be done.

Max requested the new budget be sent out to owners as soon as possible.
Jeanne Brennan is scheduled to meet with Sharon, February 3, to work on Financials.
Sharon asked how much Jon was budgeting to complete the electrical project. Jon said it will be 7-8K that will come out of Building Expense. He stated we were bringing Kent Harvey down after "season" is over.
Sharon requested that any Capital Project that comes up be brought to the Executive Committee or the Directors with bids if possible.

**Old Business**
**L-41**: The property is scheduled to close around the 18th of this month. We expect to get all arrears paid.

**Bylaw vote**: Max reviewed the votes 10 of 10 are for the changes. Bob suggested the Directors begin a campaign to contact owners to vote.

**Insurance:** Marilyn Blackhall will head up the insurance committee, effective immediately. Anyone interested in joining the committee should contact here. Max has asked the committee to craft what we want which is based on current appraisal, accepted risk- agreed value.
Vince requested the Association obtain a risk assessment.
Bob stated that" we comfortably have through February, if that's the time table we agree upon, to make a change." We will have a 10% cancellation penalty should we change the policy.
Max made the motion: It is the intent of the board to investigate retaining a risk assessor to determine what an accepted value of our insurance should be Sharon 2nd 4 voted for and 1 abstained. Motion passed.
Bob reported that Mapfre is now offering an HO6 policy.

**New Business**

**Dog Letter:** Max received a letter from Karen Benson who is the attorney for Barbara Walters. Barbara stated she was confirming her rights and that she is on the correct side of the law.

Vince made a motion that we abide by the rules and immediately begin fining owners that have dogs. Discussion included utilizing the firm of Hodge & Francois to develop a policy regarding our no dog policy and procedure for exemptions when warranted. Bob distributed information on Service Dog Certification naming businesses that have no requirements for service dog certification.

The motion was repeated that we abide by the rules and immediately begin fining owners that have dogs. Fines may be held in abeyance until the issue is adjudicated. The Vote was 3 for and 3 against. Bob and Vinnie requested we contact Bill for his vote on the motion. Bill was not available, a message was left for him to call.

3

DRAFT

Security Gate: The electric gate malfunctioned. A WAPA outage shorted out the pedestal on the outside. The pedestal had a message "power down exchange chip. Jon powered down and powered back up. The pedestal stated erase all memory? Jon powered down again and called the vendor. The vendor was unaware of this message and would have to contact the manufacturer (who was closed for the weekend). The manufacturer was contacted, the service people came out reset the chip and cleared the memory. The memory was restored, and the gate is now functioning.

The manual gate is also broken. Jon recommended the existing manual gate be replaced. A drawing and price was obtained and shared with the Directors. Max stated that the pivot point of the existing gate is not salvageable and perhaps dangerous to use.
Sharon made a motion that we proceed with the new manual gate, Max 2nd, all were in favour.

The No Dog signs will be up next week. Cool Signs is producing them.

Owners Workshop: Sharon reported the workshop is cluttered with chairs, carpet, exercise machine, plastic chairs, glass tables, etc. so that the work table is not usable. The area is to be cleaned.

At this time Bob left the meeting.

Roadside Signage: The Directors suggested the knocked over base of the sign be up righted and reused if possible. The quote and the drawing of the sign from Mad Max was provided to the Directors. Max made a motion we have the sign made and reuse the base if possible, Sharon 2nd, all were in favor.

**Action Items** (not completed).
CBE Bylaws: We do not have a copy.
Electronic Banking: Max would like to delay decision until Owners Meeting. Sharon stated that there are many benefits to electronic banking that we don't have now and suggested we go forward with application. Max tabled the discussion until February's meeting.

February BOD Meeting: Tuesday, February 7th at 8:45am same phone in number

Adjournment:
There being no further business the meeting was adjourned.

5

DRAFT

**ACTION ITEMS**

| | |
|---|---|
| 2012 Budget be sent to Owners | Sharon |
| Attorney for Dog Rule | Max |
| Letter to Owners in Violation of No Dog Rule re:$50/day fine | Louanne |
| Copy of letter from Ms. Walters to D&O Insurance | Max |
| Increase Common Fees to owners that have enclosed porches | Tabled |
| Determination of Additional Weight on Porches | Tabled |
| Contact Liability Insurance re: coverage for Volleyball | Bob |
| Painting of steps | Jon |
| Purchase and implement new manual gate | Jon |
| No Dog Signage | Jon |
| Clean out owners workshop | Jon |
| Contact MadMax re:  road side sign | Louanne |
| Reset base of road side sign | Jon |
| CBE Bylaws (obtain a copy) | Jon |
| Electronic Banking | Tabled |

6

Subj:      **[New post] Puppy Dog Diplomas**
Date:      1/15/2012 9:41:37 A.M. SA Western Standard Time
From:      donotreply@wordpress.com
To:        jerseybarb@aol.com

New post on **Cowpet Bay West Blog**





**Puppy Dog Diplomas**
by Lance Talkington

Readers of the blog may recall a comment that Cowpet owner and Judi Krohmenick made recently regarding the "certification" of her puppy. She claimed that her puppy is a "trained, legally certified service animal". We asked her what that meant and have had no response. After a recent board meeting discussion on the subject of dogs, it's become much clearer what is really happening with puppy dog diplomas.

The board was provided details on the various "certifications" of owner puppies at the January board meeting. Information distributed at the meeting indicated that Judi's puppy is certified by an outfit called Goldstar German Shepherds. We've done some research and found out that for the one time low price of as little as $71.50, a dog owner can obtain all sorts of really cool gadgets and puppy certification without having to leave the comfort of your computer. All anyone has to do is print the little form from their web site; fill out a name; address; and other basic info; write a check; and boom - you get all of the way cool proof needed to tell the world about your very own certified service animal. How tidy is that, right? Heck, if you're in a hurry, operators are standing by at 702-497-7229 to avoid the nasty wait for the mail to make it to them. The link to their site is here for those who would like to see for themselves how all of us can have a certified service animal in darn near no time at all.

http://www.goldstar-germanshepherds.com/certification_licensing.html

The information distributed at the board meeting also indicated that Barbara Welter's and Joel Kirschenbaum's puppies are "certified" by an outfit called the National Service Animal Registry. Here is the link to the similarly totally cool three minute process to get your very own "certified" service puppy from this outfit:

http://www.nsarco.com/cgi-bin/product.cgi?id=081218004

There are at least ten outfits like these two on the Internet that offer the same type of "service". One of them (Service Dogs America) even has the gumption to state that "SDA recognizes that every person in America may have some form of disability". See this fascinating statement for yourself plastered in bold letters squarely in the middle of their home page:

http://www.servicedogsamerica.org/

It is the blog's considered conclusion that these outfits serve no legitimate purpose and exist mainly to sidestep what the ADA works diligently to accomplish. These outfits make it plain on


PLAINTIFF'S
EXHIBIT
PENGAD 800-631-6989

their eites that nothing ie done to verify either the enimel's credentials or the purported disability of the applicant owner. The board is working to put plain language in the proposed By Laws that refers to the ADA as the sole source of legitimacy. We now heve the opportunity to stop the doggy diploma silliness end adopt clear ground rules for dogs at Cowpet.

Lance Telkington | Januery 15, 2012 et 9:41 am | Tags: cowpet, cowpet bay, cowpet bay west | Categories: Uncategorized | URL: http://wp.me/p1mAgb-5z

Comment | See ell comments

Unsubscribe or change your email settings at Manage Subscriptions.

Trouble clicking? Copy and paste this URL into your browser:
http://cowpetbaywest.wordpress.com/2012/01/15/puppy-dog-diplomas/

Thanke for flying with (ⓦ) WordPress.com

; Sunday, March 04, 2012 AOL: JERSEYBARB

3054700/000322

Dr. Sheena Walker -- REDIRECT

```
1         2012, we'll make that Exhibit 13.  It's

2         a letter from your office.

3    Q.   Do you recognize this letter?

4         (Deposition Exhibit No. 13 was

5          marked for identification.)

6    A.   I believe that's the same letter, right.

7    Q.   There is a different date but that's

8 January?

9    A.   Yes.  I'm sorry, yes.  I do remember.  She

10 just needed -- she needed recertification at this

11 time.  This is something that you need every year

12 when you travel.

13   Q.   Okay.  And at that time you did the

14 recertification, did you do another full evaluation of

15 the patient?

16   A.   Yes.  And in fact, I did a more thorough

17 one because, again, she wasn't presenting only for

18 this at that time.  So it was much more thorough than

19 the question that she presented with initially.

20   Q.   Okay.  And at that time, was there any

21 discussion with any issues with homeowners at the

22 condominium here?

23   A.   Yes.

24   Q.   What was the discussion, if you remember?

25   A.   Again, the discussion was that she was
```



PLAINTIFF'S
EXHIBIT
3

PENGAD 800-631-6989

76

**Dr. Sheena Walker -- REDIRECT**

1  having difficulty, I believe, in securing the pet or

2  having the pet -- no, no, no, I'm sorry.  She had

3  difficulties with her neighbors given that she had

4  possession of this companionship pet, yeah, similar

5  to the prior case.

6      Q.    Was there any indication -- did

7  Ms. Kromenhoek ever tell you that she was not able to

8  be at her condominium with her dog?

9      A.    No, I don't believe it was that, no.  I

10  believe her pet was allowed.  It was just more of,

11  again, perceived harassment and things of that nature

12  from her -- or made by her neighbors.

13          MR. RIOPELLE:  Okay.  I am going

14      to introduce Exhibit 14, composite

15      exhibit, three pages, Bates Nos. 207,

16      205 and 202.

17              (Deposition Exhibit No. 14 was

18                marked for identification.)

19      Q.    They appear to be your notes, soap notes?

20      A.    Soap notes.

21      Q.    Dated January 31, 2012, March 26, 2012, and

22  April 16, 2012.  You went to just take a look and

23  confirm that those are, in fact, your notes?

24      A.    Yeah.  Right.  Yes, these are my notes.

25      Q.    Okay.  On Exhibit 9, you referenced you

IN THE UNITED STATES DISTRICT COURT OF THE VIRGIN ISLANDS
DISTRICT OF ST. THOMAS AND ST. JOHN

BARBARA WALTERS,                          )
                                          )
        Plaintiff,                        )
v.                                        )        CIVIL CASE NO: 3:12-cv-00024
                                          )
COWPET BAY WEST CONDOMINIUM               )
ASSOCIATION; THE BOARD OF THE             )
COWPET BAY WEST CONDOMINIUM               )
ASSOCIATION; MAX HARCOURT, in his )
personal capacity; ALFRED FELICE;         )
LANCE TALKINGTON ROBERT                   )
COCKAYNE;VINCENT VERDIRAMO,               )
                                          )
        Defendants.                       )
_____)

## DEFENDANT MAX HARCOURT (DECEASED) MOTION FOR SUMMARY JUDGMENT AS TO COUNTS II, XIII, VX & XVII OF THE SECOND AMENDED COMPLAINT AND INCORPORATED MEMORANDUM OF LAW PURSUANT TO FED. R. CIV. P. 56 AND LOCAL RULE 56.1

Defendants, Max Harcourt (Deceased), by and through his undersigned counsel, submit this Memorandum of Law in support of his Motion for Summary Judgment on the Complaint filed by Plaintiff, Barbara Walters ("Plaintiff")(Deceased), and move this Honorable Court for entry of Final Summary Judgment in his favor against Plaintiff. In support, Defendant states the following:

## I.        INTRODUCTION

This matter stems from a baseless quarrel amongst residents at Cowpet Bay West Condominium Association regarding Plaintiff's accompaniment of a dog while she resided at her unit in Cowpet Bay West. An action, on its face and to all residents who observed same, that was in violation of the No Dogs Rule at Cowpet Bay West. However, Plaintiff, without informing the Defendants of her non-obvious disability and need for an emotional support

animal and after covertly submitting some paper work to the property manager with instructions to keep the contents of the paper work confidential, walked around Cowpet for several months with her dog without answering to anyone. Finally, in October of 2011, after several requests from residents, then president of Defendants, Max Harcourt, wrote Plaintiff asking Plaintiff to submit either in writing or electronically to the Board, a request for an exception to the no dog rule with supporting documentation. Plaintiff refused to submit her medical verifications to the Defendants for consideration until March 2012, when she provided newly elected board president, Ed Wardwell, with a request for an emotional assistance animal and copy of medical certification establishing her medical need for an emotional assistance animal. On March 26th, 2012, the board of directors reviewed the documents provided by Plaintiff and agreed to allow Plaintiff to maintain her dog in her condominium unit.

On April 11, 2012, Plaintiff received confirmation from the Defendants, via letter, that the Board conducted a confidential review of her medical certifications and that the Defendants agreed to provide Plaintiff an exception to the No Dog policy and a waiver of any fines assessed to Plaintiff's unit as a result of the perceived violation of the No Dog policy.

Nevertheless, we are now hear two years after Plaintiff's formal request for accommodation was granted and with three deceased parties (Plaintiff, Defendant and Alfred Felice). In just over two years, Plaintiff has conducted no discovery in this matter, despite being given more than an adequate amount of time to complete same. Frankly, Plaintiff cannot establish any existence of an element essential to her case. As such, pursuant to Fed. R. Civ. P. 56, there can be no genuine issue to any material fact, since the complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial. Thus, Defendant is entitled to summary judgment. As will be discussed more fully

below, Plaintiff's claims are unsupported by the evidence. The undisputed material evidence show: (1) The Board and Cowpet Bay West never refused to accommodate Plaintiff's dog; (2) Plaintiff was never prevented access or use of her unit with her dog in accompaniment; (3) Defendant did not interfere with her Fair Housing Rights; (4) none of the conduct supported by the undisputed facts is severe or outrageous and (5) none of Plaintiff's private facts were ever published by the Defendant.

## II.     UNDISPUTED MATERIAL FACTS

1.     December 20, 2007, The By-Laws of Cowpet Bay West Condominium Association are issued. (See Exhibit "1" attached hereto) Exhibit I of the By-Laws are the Rules and Regulations for Cowpet Bay West. Including in these rules is Rule 6. "Dogs and farm animals are prohibited and owners will be fined as specific by the Board of Directors."

2.     On March 11, 2010 Plaintiff, as a board member of Cowpet, introduced a petition initiated by Windward # 12 with supporting signatures of several owners to permit dogs (subject to certain caveats) on CBW property. No mention of a companion pet was made. (See Exhibit "2" attached hereto)

3.     On October 13, 2011, in response to a post on the blog titled "Bylaws and Puppy Dogs", Plaintiff posted four replies at 11:25 a.m., 11:40 a.m. 12:19 pm and 12:21 p.m. In her first reply indicated she was a person with a disability and discussed laws related to exceptions to the "no pets" rule. In her second reply, Plaintiff indicated that she was on permanent disability, which was documented by the social security office. In her third reply, Plaintiff replying to Mr. Talkington regarding his request for copies of her paperwork. In her last reply, Plaintiff indicated that Mr. Talkington did not have to agree to her need for an emotional support animal.

(See Exhibit "3" attached hereto/Plaintiff's supplemental rule 26 disclosure document bates number 000230-000232.)

4. On October 20, 2011, resident Susan Anderson wrote an email to the Board regarding Ms. Kromenhoek walking with a large dog on the Cowpet Bay West property. Dr. Anderson requested the Board to take action regarding the perceived violations of the no dog rule. This email was forwarded by Plaintiff to Ms. Kromenhoek on the same day (See Exhibit "4" attached hereto/Plaintiff's supplemental rule 26 disclosure document bates number 000233.)

5. On that same day, Defendant, as then President of the Cowpet Bay West Condominium Association, responded to Dr. Anderson's email and indicated that the current rules and regulations are very clear and prohibit dogs. Defendant indicated that fines should be levied which could be mitigated if the offenders would submit appropriate paperwork regarding the dog. (See Exhibit "5" attached hereto/Plaintiff's supplemental rule 26 disclosure document bates number 000234.)

6. Plaintiff responded to Defendant's email and CC'd Ms. Kromenhoek. Plaintiff stated "I don't think that would be a problem, but the information must be kept confidential, or else the board member who discloses any information should himself/herself be subjected to fine or suit or both." (See Exhibit "5" attached hereto/Plaintiff's supplemental rule 26 disclosure document bates number 000234.)

7. On October 26, 2011, resident and defendant, Lance Talkington sent an email to the Cowpet Bay West Board of Directors requesting enforcement of the Rules and Regulations regarding the perceived violations by residents of the no dogs rule. (See Exhibit "6" attached hereto/Plaintiff's supplemental rule 26 disclosure document bates number 000238.)

8.      On October 27, 2011, Plaintiff, sent an email to the Board indicating that she had paperwork on file in the office, but her medical information is no one's business.  Plaintiff failed to respond or write to the Board to inform the Board or Cowpet Bay West that she also allegedly had medical verifications on file in her file at the office. (See Exhibit "7" attached hereto/Plaintiff's supplemental rule 26 disclosure document bates number 000236-000237).

9.      On October 28, 2011, Defendant, wrote an email to Plaintiff and Judith Kromenhoek, reminding them that there is a no dogs rule at Cowpet and that they are in violation of the rule.  Defendant confirmed that Louanne Schechter informed him that they had "papers in the office" regarding service dogs, but that they had not applied for an exception to the rule. Defendant then provided Plaintiff and Ms. Kromenhoek 10 days to submit a request for supporting documentation for an exception to the no dog rule.  (See Exhibit "8" attached hereto/Plaintiff's supplemental rule 26 disclosure document bates number 000242).

10.      On that same day, Plaintiff responded to Defendant and the Board indicating that she was notifying the Board that she was in possession of a service dog, but did not provide any of her medical certifications to the board for review.  (See Exhibit "9" attached hereto/Plaintiff's supplemental rule 26 disclosure document bates number 000240-000241).

11.      On December 16, 2011, Plaintiff's counsel sent a letter to Defendant indicating that Plaintiff was disabled and qualified to keep her dog in her unit.  Par for the course, Plaintiff's counsel did not offer any evidence or documentation to support Plaintiff's disability. This was not a valid request for an accommodation as a condominium is entitled to review medical verifications to determine the validity of the fair housing request.  (See Exhibit "10" attached hereto/Plaintiff's supplemental rule 26 disclosure document bates number 00089-90).

12.     After receipt of the letter from Plaintiff's Counsel, the Board met in January and decided to retain counsel for legal advice related requests for exceptions to the dog rule. (Paragraph 10 of the Affidavit of Sharon Koelher attached here to as Exhibit "15")

13.     On January 12, 2012, Plaintiff filed a Complaint with the U.S. Department of Housing and Urban Development. In that Complaint Plaintiff states that: "Thank goodness, the office manager (a former nurse) has not let these people see my file."   This demonstrates Plaintiff's acknowledgment that the Defendants had not seen the contents of her file as of January 12, 2012.  (See Exhibit "11" attached hereto)

14.     Thereafter, Plaintiff submitted her request for accommodation and medical verifications to the Board, in March 2012.  (See Exhibit "12" Final Investigative Report IV. Other Investigative Findings and paragraph 6 of the Declaration of Sharon Koehler attached hereto as Exhibit "15").

15.     On March 26th, 2012 the Board reviewed the documents provided by Plaintiff and agreed to allow the Plaintiff to maintain the dog in her condominium.  Furthermore, the Board also agreed to waive any fines assessed to the Plaintiff as a result of the perceived violation of the "No Dog Policy" (See Exhibit "12" Final Investigative Report IV. Other Investigative Findings and paragraph 9 of the Declaration of Sharon Koehler attached hereto as Exhibit "15").

16.     On April 11th, the Board sent a letter to Plaintiff confirming that the board had met for a closed door confidential review of her recently submitted medical certifications and that the Board had agreed to an exception to the no dogs rule.  (See Exhibit "13" attached hereto and paragraph 11 of the Declaration of Sharon Koehler attached hereto as Exhibit "15").

17.     On June 4, 2012, U.S. Department of Housing and Urban Development dismissed Plaintiff's Complaint and determined that Plaintiff did not formally request a reasonable

accommodation for her disability until March 2012. In April 2012, upon review of these documents, Defendants granted the request. There was no reasonable cause to believe that Defendants violated the Fair Housing Act. (See Exhibit "14" attached hereto).

18. On October 4, 2012, undersigned counsel filed a Notice of Death of this Defendant Max Harcourt. (D.E. 72).

19. The Cowpet Board neither reviewed nor discussed the content of Plaintiff's medical verification and accommodation request, until March 2012, when Plaintiff submitted same to then president, Ed Wardwell. (See paragraph 6 of the Declaration of Sharon Koehler attached hereto as Exhibit "15").

20. The Board became aware of Plaintiff having "paperwork" in October 2011, but was not allowed to view same per Plaintiff's instructions to the Board and to Louanne Schechter. (See paragraph 7 of the Declaration of Sharon Koehler attached hereto as Exhibit "15").

21. The Board never prevented Plaintiff from accessing or using her unit at any time with the accompaniment of her dog. (See paragraph 8 of the Declaration of Sharon Koehler attached hereto as Exhibit "15").

22. The Board informed Plaintiff that the fines regarding her dog would be held in abeyance until the Board received legal counsel as to procedure to consider exceptions to the no dog rule. (Declaration of Sharon Koehler)

### III.     SUMMARY JUDGMENT STANDARD

Rule 56(c) of the Federal Rules of Civil Procedure permits the entry of summary judgment if "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." The moving party bears the

burden of proving that no genuine issue of material fact is in dispute.[1]  A factual dispute is "material" only if it might "affect the outcome of the suit under the governing law."[2]  There is only a "genuine" issue of material fact "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party."[3] The court must examine the facts in a light favorable to the non-movant.[4]  Furthermore, the court must resolve "all inferences, doubts and issues of credibility against the moving party."[5]

> The Supreme Court has further explained in *Celotex* that:
>
> "the plain language of <u>Rule 56(c)</u> mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial.  In such a situation, there can be 'no genuine issue as to any material fact,' since a complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial. The moving party is 'entitled to a judgment as a matter of law' because the nonmoving party has failed to make a sufficient showing on an essential element of her case with respect to which she has the burden of proof."[6]

The nonmoving party must then "go beyond the pleadings and by her own affidavits, or by the depositions, answers to interrogatories, and admissions on file, designate *specific facts* showing that there is a genuine issue for trial."[7]  Here, Plaintiff has had more than two years to conduct discovery, since the filing of the lawsuit, however, neither written discovery nor depositions have been completed by Plaintiff.  Plaintiff has not and cannot establish the existence of any element essential to prove her case against Defendant.

---

[1] *Matsushita Elec. Indus. Co. Ltd. v. Zenith Radio Corp.,* 475 U.S. 574, 585 n. 10 (1986).
[2] *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248 (1986).
[3] *Id.*
[4] *Id.* at 255.
[5] *Smith v. Pittsburgh Gage & Supply Co.,* 464 F.2d 870, 874 (3d Cir.1972) (citations omitted).
[6] *Celotex Corp. v. Catrett,* 477 U.S. 317, 322-323 (1986).

[7] *Id.* at 324 (emphasis added) (internal quotations and citations omitted).

## IV.     MEMORANDUM OF LAW

### a. Plaintiff Fails to Establish a Violation of 42 U.S.C. § 3617

Plaintiff's Count III attempts to assert a violation of 42 U.S.C. § 3617 which makes it unlawful to coerce, intimidate, threaten, or interfere with any person in the exercise or enjoyment of any right granted or protected by Section 3604 et. seq. The 3rd Circuit in *Sporn v. Ocean Colony Condominium Association*,[8] stated:

> Section 3617 does not, however, purport to impose a code of civility on those dealing with individuals who have exercised their FHA rights. Simply put, § 3617 does not require that neighbors smile, say hello or hold the door open for each other. [9]

Plaintiff, in the instant matter asks this Court to extend § 3617 to areas of disputes that the Fair Housing Act was never intended to cover, namely disputes amongst neighbors. There is no record evidence to support any violation of Section 3617 against these Defendants.

First, Plaintiff asserts that Defendant ignored Plaintiff's request for an accommodation while pushing for the amendment to the by-laws (paragraph 121 of the Second Amended Complaint). However, the record evidence and undisputed facts demonstrate that Defendant did not ignore her application, as he was not aware of any formal application or the contents of the medical certifications until March 2012 (See paragraph 6 of the Declaration of Sharon Koehler attached hereto as Exhibit "15").

Second, Plaintiff also alleges that Defendant falsely accused Plaintiff of violating the no dog rule and levying a fine. (See paragraph 122 of the Second Amended Complaint). The record evidence demonstrates that the fines were held in abeyance and later waived by the Cowpet Baw West Association. (See Exhibit "13" and paragraph 9 of the Declaration of Sharon Koehler

---

[8] *Sporn v. Ocean Colony Condominium Association*,[8] 173 F.Supp.2d 244, 252 (U.S.D.C. N.J. 2001),
[9] *Id.* at 252.

attached hereto as Exhibit "15").  Furthermore, the 11th Circuit has held that the assessment of a fine against a condominium unit owner does not rise to the level of coercion or intimidation required to find a violation of section 3617.[10]  In fact, other circuits have found that even the shunning of an individual is not sufficient to establish a Section 3617 claim.[11]

Nothing in the text of the FHA or the case law interpreting it indicated that Congress intended to federalize unfortunate skirmishes between neighbors, tinged with discriminatory overtones or occasional discriminatory comments.[12]  A review of decisions from the circuits around the country reveals the court's ability, in the majority of cases, to draw a line between acts with discriminatory overtones or occasional discriminatory comments and pervasive or severe actions that include cross-burning, fire-bombing and other similarly overt discriminatory acts designed to intimidate, coerce, or interfere with housing rights.

Additionally, Plaintiff's contention that the Defendant failed to act on her application is not supported by the undisputed facts or case law.  In fact, an alleged failure to act does not rise to the level of the egregious overt conduct that has been held sufficient to state a claim under section 3617.[13]

Furthermore, a plaintiff's subjective beliefs of intentional discrimination or retaliation are insufficient to show an intentional discriminatory animus.[14] Try as she may, but Plaintiff has no record evidence to support any actions by Defendant that would rise to the level of severe and pervasive conduct that is necessary to even begin to consider a Section 3617 violation.[15]

---

[10] See, *Wood v. Briarwinds Condominium Association Board of Directors*, 369 Fed.Appx.1, at 2, (C.A. 11(Fla.).

[11] *Id. Sporn* at 252.

[12] *Walton v. Claybridge Homeowners Association, Inc*., 32004 WL 192106 at *7 (S.D. Ind. 2004).

[13] See *Lawrence v. Courtyards at Deerwood Assn., Inc.,* 318 F.Supp.2d 1133, 1144-1145 (11th Cir. 2004)

[14] *Gavin v. Spring Ridge Conservancy, Inc.*, 934 F.Supp. 685, 687 (D.Md. 1995).

[15] See e.g., *Sporn v. Ocean Colony Condo. Ass'n,* 173 F.Supp.2d 244, 252 (D.N.J.2001) (ruling in favor of defendants because "shunning" of handicapped neighbors is not enough to support a § 3617 claim*);*

Certainly, amending the bylaws (which already included rules and regulations barring dogs), levying a fine (which was held in abeyance and eventually waived) or accusing Plaintiff of a violation the no dogs rule, even given the "generous construction" Plaintiff requests, does not amount to the coercion, intimidation, threatening or interfering conduct required to establish a Section 3617 violation.

As such, there is no record evidence and no disputed facts that support, in any way, a prima facie cause of action for violation of 42 U.S.C. 3617 against these defendants. Thus, Defendant is entitled to summary judgment as to Count III of the Second Amended Complaint.

### b. Plaintiff Fails to Establish Negligent and/or Intentional Infliction of Emotional Distress

Plaintiff's Count XIII is a combination of two separate causes of action, negligent and/or intentional infliction of emotional distress. Viewing the record evidence and undisputed facts in a light most favorable to Plaintiff, does not establish a prima facie cases for negligent or intentional infliction of emotional distress.

Under Virgin Islands law, a claim of intentional infliction of emotional distress requires "extreme and outrageous conduct intentionally or recklessly causes severe emotional distress ..."[16] The Restatement (Second) of Torts § 46(1) defines outrageous conduct as "so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community." The court in *Smith* indicated that the court's role when dealing with a claim of intentional infliction of emotional distress is limited to determining

---

*United States v. Weisz*, 914 F.Supp. 1050, 1054 (S.D.N.Y.1996) (finding for defendants where conduct alleged was "nothing more than a series of skirmishes in an unfortunate war between neighbors."); *See Whisby-Myers v. Kiekenapp,* 293 F.Supp.2d 845, 852 (N.D.Ill.2003)(detonation of explosive device simulator combined with racial epithets stated Section 3617 claim); *Johnson v. Smith*, 810 F.Supp.235, 238-239 (N.D.ILL.1992)(allegations of cross-burning on plaintiff's lawn and breaking plaintiff's windows stated claim under Section 3617.)
[16] *Smith v. Elias,* 2007 WL 4209701, at *4 (V.I.Super.Ct.2007).

"whether the defendant's conduct may reasonably be regarded as so extreme and outrageous as to permit recovery, or whether it is necessarily so."[17] Furthermore, "Discrimination alone does not state a claim for intentional infliction of emotional distress."[18] Plaintiff's claim for intentional infliction of emotional distress is clearly based on alleged Fair Housing discrimination.

Furthermore, Plaintiff alleges that Defendant ignored Plaintiff's accommodation request and assisted in a campaign to amend the by-laws. (See Paragraph 197 of the Second Amended Complaint). First, none of these allegations are supported by the undisputed facts or record evidence. For instance, the undisputed facts make clear that Plaintiff received an accommodation from Defendants in March/April of 2012. Second, there is no record evidence that Defendant ignored plaintiff's request for accommodation or that his participation as a board member in amending the by-laws demonstrated any intent to cause emotional distress to Plaintiff.

Additionally, the undisputed facts demonstrate that the fines were held in abeyance and later waived by these Defendants. What's more, even if the record evidence and undisputed facts supported Plaintiff's allegations, which they clearly do not, these allegations are not so extreme and outrageous to permit recovery. Again, the conduct must be extreme and outrageous. It is not enough that the defendant acted with tortious intent or even acted with malice.[19] As such, Plaintiff's claim for intentional infliction of emotional distress fails and Defendant is entitled to summary judgment.

---

[17] *Id* at *4.
[18] *Id.* see also; *Equal Employment Opportunity Comm'n v. Chestnut Hill Hosp.,* 874 F.Supp. 92, 96 (E.D.Pa.1995); *see also Nichols v. Acme Markets, Inc.,* 712 F.Supp. 488 (E.D.Pa.1989), *aff'd,* 902 F.2d 1561 (3d Cir.1990).
[19] *See;* The Restatement (Second) of Torts § 46(1).

Plaintiff has similarly failed to meet the required elements for a claim of negligent infliction of emotional distress. This Court has required two elements to sustain a claim of negligent infliction of emotional distress. First the negligent conduct must have placed the plaintiff in danger of his or her own safety. Second, the plaintiff must have suffered some physical harm as a result of the emotional distress.[20] As there are no allegations, record evidence or any discovery indicating physical harm, Plaintiff cannot establish either element of a prima face case for negligent infliction of emotional distress. As such, Defendant is entitled to summary judgment as to Count XIII.

### c. Plaintiff Fails to Establish and Invasion of Privacy: Public Disclosure of Private Facts - Counts VX & XVII

The Restatement (Second) of Torts provides the following standard for establishing an invasion of privacy claim:

> One who gives publicity to a matter concerning the private life of another is subject to liability to the other for invasion of his privacy, if the matter publicized is of a kind that <u>(a) would be highly offensive to a reasonable person, and (b) is not of legitimate concern to the public. (emphasis added)</u>

Restatement (Second) of Torts § 652D.

Here, Plaintiff alleges that Defendant publicized private information concerning Plaintiff. (See paragraph 210 of the Second Amended Complaint). However, there is no record evidence to support that Defendant in any way publicized any private information regarding Plaintiff. In

---

[20] *Mingolla v. Minnesota Mining and Mfg. Co.,* 893 F.Supp. 499, 506 (D.Vi. 1995). *See also Lempert v. Singer*, 26 V.I. 326 (D.V.I. 1995)(there can be no liability for negligent infliction of emotional distress absent physical harm); *International Islamic Community of Masjid Baytulkhaliq Inc. v. DEA*, 981 F.Supp. 352, 369-370 (grating summary judgment in defendants favor as to intentional and negligent infliction of emotional distress); *Ramos v. St. Croix Alumina, L.L.C.,* 277 F.Supp.2d 600, 604 (D.V.I.2003) *overruled on other grounds by Miller v. V.I. Hous. Auth.,* CIV. 1998/0089, 2005 WL 1353395 (D.V.I. June 3, 2005). ([p]hysical harm is a required element of a claim for negligent infliction of emotional distress in the Virgin Islands.") *Anderson v. Government of Virgin Islands,* 180 F.R.D. 284, 286 (D.Vi. June 11, 1998); RESTATEMENT (SECOND) OF TORTS § 313.

fact, Plaintiff admits that she herself actually publicized that she had a disability and was afforded protection under the FHA. (See Paragraph 54, of the Second Amended Complaint). Thus, any "private facts" allegedly published on the internet was done by Plaintiff herself.

Furthermore, there is no record evidence that Plaintiff's medical diagnosis was ever publicized by Defendant. What's more, there is no record evidence that Plaintiff's dog certification was publicized by Defendant. With regards to the original email sent by Defendant (Exhibit "7"), it was sent to a small group of individuals (the board and Ms. Walters and Plaintiff). Under Comment (a) to section 652D of the Restatement (Second) of Torts, "[I]t is not an invasion of the right of privacy . . . to communicate a fact concerning a plaintiff's private life to a single person or even to a small group of persons."

Here, the record evidence and undisputed facts do not demonstrate ANY private information concerning Plaintiff that was publicized by Defendant. A review of Plaintiff's allegations against Defendant, even if true and viewed in a light most favorable to Plaintiff, do not support a prima facie case of invasion of privacy and are not highly offense to a reasonable person.

In addition to failing to submit evidence to support part (a) of an invasion of privacy claim, Plaintiff also fails to establish part (b), namely, that the information alleged by Plaintiff is not of legitimate public concern. While Plaintiff alleges that her dog certification was not of legitimate public concern, this is not a plausible argument. The residents of Cowpet had raised many objections to the dogs on the property, including Plaintiff's god, and demanded that the Board take action to enforce the rules and regulations of Cowpet. The residents of Cowpet could not be expected to ignore Plaintiff and her dog in a community with a no dog's policy. The Plaintiff's dog was no secret and the fact that the Board asked Plaintiff to submit paperwork to

seek an exception to the no dogs rule, is not confidential and is necessary information for the public community at Cowpet.  To that end, none of Plaintiff's private or confidential information was every published on the internet or disclosed to anyone besides the board members and that was accomplished only in March 2012.

At bottom, the undisputed material facts establish conclusively that Plaintiff cannot prove the essential elements of any variation of an invasion of privacy claim, thus, final summary judgment is just and proper in favor of Defendant.  Defendant's Motion for Summary Judgment as to Counts XV & XVII of the Second Amended Complaint must be granted.

## V.     CONCLUSION

After two years to complete discovery and conducting none, failing to show any evidence to establish the existence of the essential elements of Plaintiff's claims against Defendant, Plaintiff's own death and failing to take action of the suggestion of death filed on behalf of this Defendant in October 2012, the plain language of Rule 56(c) mandates the entry of summary judgment.[21]  Put simply, there is no set of facts under which Plaintiff would be entitled to relief in this litigation or under which Plaintiff could bring a successful claim against Defendant.  Accordingly, summary judgment in favor of these Defendants on all claims brought by Plaintiff is not only warranted but required.

WHEREFORE, the Defendant, Max Harcourt, respectfully requests that the Court grant this Motion for Final Summary Judgment, entitlement to Defendant's prevailing party attorneys' fees and costs and for such other and further relief, both at law and in equity, to which Defendant may be justly and legally entitled.

---

[21] *Celotex Corp. v. Catrett,* 477 U.S. 317, 322-323 (1986).

Dated:  May 1, 2014          Respectfully submitted,

**BIRCH, de JONGH & HINDELS, PLLC & BOYD RICHARDS PARKER & COLONNELLI**
*Counsel for Defendants: Cowpet Bay West Condominium Association, The Board of Cowpet Bay West Condominium Association, Max Harcourt, Robert Cockayne, and Vincent Verdiramo*
1330 Estate Taarnebjerg
St. Thomas, VI 00802
Tel.: 340-774-1100; Fax: 340-774-7300

By:          /s/ Richard P. Farrelly
     **Richard Farrelly**
     Bar No. 105
     rfarrelly@bdhlawvi.com
     **Joseph Riopelle**
     jriopelle@boydlawgroup.com

I hereby certify that on the above-indicated date, I electronically filed the foregoing document with the Clerk of the Court using ECF.  I also certify that the foregoing document is being served this day on all counsel of record or pro se parties identified below, either via transmission of Notices of Electronic Filing generated by ECF or in some other authorized manner for those counsel or parties who are not authorized to receive electronically Notices of Electronic Filing.

**Karin A. Bentz, Esq.**
(Attorney for Plaintiff)
5332 Raadets Gade, Ste. 3
St. Thomas, VI 00802
Tel: 340-774-2669
kbentz@virginalaw.com

**John H. Benham, III, Esq.**
(Attorney for Talkington)
Post Office Box 11720
St. Thomas, VI 00801
Tel: 340-774-0673
benham@bclawvi.com

**Ryan C. Meade, Esq.**
(Attorney for Alfred Felice)
9300 S. Dadeland Blvd., 4th Floor
Miami, FL 33156
Tel: 305-670-1101
rmeade@qpwblaw.com

          /s/ Richard P. Farrelly

# BY-LAWS OF COWPET BAY WEST
## CONDOMINIUM ASSOCIATION
Cowpet Bay
St. Thomas, Virgin Islands
20 December 2007

### Article I

#### Plan of Apartment Unit Ownership

**Section 1. Apartment Unit Ownership:** The property located at Parcels 8-56-1 and 6-1-2, 4, 5, & 6 of Estate Nazareth, No.1 Red Hook Quarter has previously been submitted in a declaration forming an association under the provisions of Chapter 33, Title 28 of the Virgin Islands Code, known as the "Condominium Act of the Virgin Islands". The association has been and will continue to be known as "COWPET BAY WEST", hereinafter called the "Condominium".

**Section 2. Applicability of By-Laws:** The provisions of these by-laws are applicable to the Property of the Condominium and the use and occupancy thereof. The term "Property", as used herein, shall include the land and all buildings and other improvements thereon owned by the association and all easements, rights and appurtenances belonging thereto, and all other property, personal or mixed, intended for use in connection therewith, all of which were previously submitted to the provisions of said Chapter 33, Title 28 of the Virgin Islands Code.

**Section 3. Application:** All present and future owners, mortgagees, lessees, occupants of apartment units and any other persons who may use the facilities of the Property in any manner are subject to these By-Laws, the Declaration and the Rules and Regulations.

The Acceptance of a deed, mortgage or conveyance or the entering into of a lease or the act of occupancy of an apartment unit shall constitute an agreement that these By-Laws, the Rules and Regulations and the provisions of the Declaration, as they may be amended from time to time, are accepted, ratified, and will be complied with.

**Section 4. Office:** The office of the Condominium and of the Board of Directors shall be located at Cowpet Bay West, Estate Nazareth, No.1 Red Hook Quarter, St. Thomas, Virgin Islands. The mailing address shall be 6201 Windward Way, St. Thomas, USVI 00802, or such address as may be designated by the Board, upon 30 days written notice to the members of the Association.

### ARTICLE II

#### Board of Directors

**Section 1. Number and Qualifications:** The affairs of the Condominium shall be governed by a Board of Directors. The Board of Directors shall be composed of seven persons, all of whom shall be owners or spouses of owners, or in the case of partnership owners, shall be members of said partnership, or in the case of corporate owners, shall be officers or stockholders of such corporations, or in the case of fiduciary owners shall be the fiduciaries or beneficiaries of any such trust. A Board member may not base his/her eligibility to sit on the Board on the same unit as any other member of the Board.



EXHIBIT
Walters-Harcourt
1

No person who is in arrears for ninety days or more on any billing or assessment by the Cowpet Bay West Condominium Association shall be eligible to be elected to or serve as a director on the Board of Directors. In the event such person is serving as a director, that person's position as director shall be declared to be vacant and another person appointed by a majority vote of the remaining Board to fill the vacancy so created, until the next regular election of the Board of Directors. Arrearages of partnerships, corporations, trusts, fiduciary owners, etc. on which a person's eligibility to serve on the board is based, shall be considered in determining the eligibility of a person to be elected to or to continue to serve on the board.

Section 2. Powers and Duties: The Board of Directors shall have the powers and duties necessary for the administration of the affairs of the Condominium and may do all such acts and things except as by law, by the Declaration, or by these By-Laws may not be delegated to the Board of Directors by the unit owners. Such powers and duties of the Board of Directors shall include, but shall not be limited to, the following:

(a) Operation, care, upkeep and maintenance of the common areas and facilities.

(b) Determination of Association Charges, which shall include the common expenses required for the operation of the Condominium, utility rates, late fees and interest charges, fines for By-Laws and rules, regulation violations, and the costs of services provided.

(c) Collection of Association charges, as hereinafter defined, from the unit owners.

(d) Employment and dismissal of the personnel necessary for the maintenance and operation of the common areas and facilities.

(e) Adoption, amendment and enforcement of rules and regulations covering the details of the operation and use of the Property.

(f) Opening of bank accounts on behalf of the Condominium and designating the signatories required therefore.

(g) Purchasing or leasing or otherwise acquiring in the name of the Board of Directors or its designee, corporate or otherwise, on behalf of all unit owners, apartment units offered for sale or surrendered by their owners to the Board of Directors.

(h) Purchasing of apartment units at foreclosure or other judicial sales in the name of the Association or its designee, corporate or otherwise, on behalf of all unit owners.

(i) Selling, leasing, mortgaging, voting the votes appurtenant to (other than for the election of members of the Board of Directors), or otherwise dealing with apartment units acquired and subleasing apartment units leased by the Association, or its designee, corporate or otherwise on behalf of all unit owners.

(j) Organizing corporations to act as designees of the Board of Directors in acquiring title to or leasing of apartment units on behalf of all unit owners.

2

(k) Obtaining of insurance for the Property, including the apartment units, pursuant to the provision of Article V, Section 2 hereof.

(l) Making of repairs, additions and improvements to or alterations of the Property and repairs to and restoration of the Property in accordance with the other provisions of those By-Laws, after damage or destruction by fire or other casualty or as a result of condemnation or eminent domain proceedings.

**Section 3.  Managing Agent and Manager:**  The Board of Directors may employ for the Condominium a managing agent and/or a manager at a compensation established by the Board of Directors, to perform such duties and services as the Board of Directors shall authorize.  The Board of Directors may delegate to the manager or managing agent, all of the powers granted to the Board of Directors by these By-Laws other than the powers set forth in subdivisions (b), (e), (f), (g), (h), (i), and (j) of Section 2 of this Article II.

**Section 4.  Election and Term of Office:**
Directors will serve for a term of three years.  Two Directors shall be elected the first year, two the second year, and three the third year to replace those directors whose terms are expiring. Where a vacancy has been filled by vote of a majority of the vote of the remaining members of the Board, as provided in Section 6, that person shall be a member until the next Annual Meeting, at which time the unit owners shall elect the replacement for the remainder of the original term, if any.  Any candidate for director may run for a full term, or any term created by a vacancy, or both.

Each director shall be elected by the vote of a majority (as defined in Article III Section 9) of the unit owners.  Each vacancy shall be voted on separately, and the candidate with the highest number of votes cast shall be elected.  Each candidate's name for each vacancy shall be preceded by a space where an "X" may be placed to vote for said candidate.  It shall not be required that a name be crossed out and another inserted to vote for a candidate on the ballot. A space for write-in candidates shall also be provided.  Ballots and proxies shall be provided to the owners not less than 30 days prior to the Annual Meeting.

The members of the Board of Directors shall hold office until their respective successors shall have been elected by the unit owners.

A Board member may serve only two consecutive terms and may not hold office for one year before being eligible to run again.

**Section 5.  Removal of Members of the Board of Directors:**  At any regular or special meeting of unit owners, any one or more of the members of the Board of Directors may be removed with or without cause by a majority of the unit owners and a successor may then and there or thereafter be elected to fill the vacancy thus created.  Any members of the Board of Directors whose removal has been proposed by the unit owners shall be given an opportunity to be heard at the meeting.

If a Board member does not attend any of the Board meetings during an entire year, and also does not attend the annual owners meeting that same year, such member may be removed from the Board by a majority of the other members of the Board of Directors.

**Section 6.  Vacancies:**  Vacancies in the Board of Directors caused by any reason other than the removal of a member thereof by a vote of the unit owners, shall be filled by a vote of a majority of the remaining members at a special meeting of the Board of Directors held for that purpose promptly after the occurrence of any such vacancy, even though the members present at such meeting may constitute less than a quorum, and each person so elected shall be a

3

member of the Board of Directors until a successor shall be elected at the next Annual Meeting of the unit owners. At that time a director shall be elected to serve the remainder of the term of the original vacating director.

**Section 7.  Organization Meeting:**  The first meeting of the members of the Board of Directors shall be an organizational meeting held directly following the Annual Meeting of the unit owners, at such time and place as shall be fixed by the Board members at said meeting, and no notice shall be necessary to the newly elected members of the Board of Directors in order to legally constitute such meeting, provided a majority of the whole Board of Directors shall be present thereat.  If it is not possible to hold such first meeting of the new Board immediately, then it shall be held as soon as possible and proper notice shall be given to each director, as for any special meeting of the Board of Directors.

**Section 8.  Regular Meetings:**  Regular meetings of the Board of Directors may be held at such time and place as shall be determined from time to time by a majority of the members of the Board of Directors, but at least two such meetings shall be held during each fiscal year. Notice of regular meetings of the Board of Directors shall be given to each member of the Board of Directors by mail or fax transmission, at least thirty days prior to the day named for such meeting.

**Section 9.  Special Meetings:**  Special meetings of the Board of Directors may be called by the President upon five business days notice to each member of the Board of Directors, given by mail or fax transmission, which notice shall state the time, place and purpose of the meeting. Special meetings of the Board of Directors shall be called by the President or Secretary in like manner and on like notice on the written request of at least two members of the Board of Directors.  Such special meeting may be conducted by a tele-conference call.

**Section 10.  Waiver of Notice:**  Any member of the Board of Directors may, at any time, waive notice of any meeting of the Board of Directors in writing, and such waiver shall be deemed equivalent to the giving of such notice.  Attendance by a member of the Board of Directors at any meeting of the Board shall constitute a waiver of notice by him of the time and place thereof. If all the members of the Board of Directors are present at any meeting of the Board, no notice shall be required and any business may be transacted at such meeting.

**Section 11.  Quorum of Board of Directors:**  At all meetings of the Board of Directors, a majority of the members thereof shall constitute a quorum for the transaction of business, and the votes of the majority of the members of the Board of Directors present at a meeting at which a quorum is present shall constitute the decision of the Board of Directors.  If at any meeting of the Board of Directors there shall be less than a quorum present, a majority of those present may adjourn the meeting from time to time.  At any such adjournment at which a quorum is present, any business, which might have been transacted at the meeting originally called, may be transacted without further notice.  Board members may participate by tele-conference call.

**Section 12.  Fidelity Bonds:**  The Board of Directors shall obtain adequate fidelity bonds for all officers and employees of the Condominium handling or responsible for condominium funds. The premiums on such bonds shall constitute a common expense.

**Section 13.  Compensation:**  No member of the Board of Directors shall receive any compensation from the Condominium Association for serving as a board member.  However, verifiable expenses, in accordance with guidelines established by the Board in advance, are

4

reimbursable. A Board member may also be compensated for other services unrelated to his/her Board function.

**Section 14. Liability of the Board of Directors:** The members of the Board of Directors shall not be liable to the unit owners for any mistake of judgment, negligence, or otherwise, except for their own individual willful misconduct or bad faith. The unit owners shall indemnify and hold harmless each of the members of the Board of Directors against all contractual liability to others arising out of contracts made by the Board of Directors on behalf of the Property unless any such contract shall have been made in bad faith or contrary to the provisions of the Declaration or of these By-Laws.

It is intended that the members of the Board of Directors shall have no personal liability with respect to any contract made by them on behalf of the Property. It is also intended that the liability of any unit owner arising out of any contract made by the Board of Directors or out of the aforesaid indemnity in favor of the members of the Board of Directors shall be limited to such proportion of the total liability thereunder as his interest in the common areas and facilities bears to all such interest.

Every agreement made by the Board of Directors or by the managing agent or by the manager on behalf of the Property shall provide that the members of the Board of Directors or the managing agent, or the manager, as the case may be, are acting only as agents for the unit owners and shall have no personal liability thereunder (except as unit owners) and that each unit owner's liability thereunder shall be limited to such proportion of the total liability thereunder as his interest in the common areas and facilities bears to all such interest.

**Section 15. Executive Committee:** The Board of Directors, by resolution passed by a majority of the entire Board, shall designate at the Organization Meeting or anytime thereafter, three members of the Board to constitute an Executive Committee, with one member thereof designated as Chairman. The purpose of the Executive Committee is to control the day-to-day management of the Association.

The Board of Directors from time to time shall define the authority of the Executive Committee, but shall retain for itself the powers and duties as itemized in Section2 (b), (e), (h), (i), and (j). Additionally, the Board shall retain the right to appoint the manager or managing agent, fill vacancies in the Board, make changes in the Rules and Regulations, acquire property and merge the Association into another.

The Board of Directors, at any time, may change the members of, may fill vacancies in, or may discharge the Executive Committee. Two members shall constitute a quorum of the Executive Committee. The act of a majority of the members at any meeting at which there is a quorum shall be the act of the Committee. The Board of Directors shall establish rules of procedure for the Committee governing, but not limited to, such items as notice and powers.

The Executive Committee shall make recommendations to the Board of Directors, and when the Board is not in session may, to the extent that the committee deems necessary, exercise the powers of the Board in the management of the business and affairs of the Association; and it shall have the powers to authorize the seal of the Association to be affixed to all papers which may require it.

The Executive Committee shall keep records of all its proceedings and shall report same to the Board of Directors, and its individual members, in writing within a reasonably short period of time after each significant action and after all meetings.

**Section 16. Inspection by Executive Committee:** The Executive Committee shall make a detailed inspection of the buildings, pump rooms, offices, maintenance shops, sewage and water-making plants, emergency generator, roads, sidewalks, steps, entry bridges, railings,

6

grounds, landscaping, watering systems, the beach and the sea wall at least twice a year in the company of the manager or managing agent,. Additionally, the Committee shall evaluate the operation of the Association office and the overall security situation of the property.

The purpose of such inspections will be to (a) obtain a better understanding of the job being performed by the manager and his staff and (b) make suitable recommendations for possible future actions. As soon as possible after each such semi-annual inspection, the Committee will report its findings and recommendations to the individual members of the Board of Directors.

**Section 17. Action by Consent:** Any action required or permitted to be taken at any meeting of the Board of Directors, or any committee thereof, may be taken without a meeting if a written consent thereto is signed by three-quarters of the members, (rounded off to the nearest whole number), of the Board of Directors or of such committee as the case may be, and filed with the minutes of proceedings of the Board of Directors or committee.

**Section 18. Nomination of Directors:** Nominations for election to the Board of Directors shall be made by a Nominating Committee. The Nominating Committee shall consist of a chairman, who shall be a member of the Board of Directors, and two or more members of the Association. The Nominating Committee shall be appointed by the Board of Directors at its organizational meeting and serve until the next Annual Meeting.

The Nominating Committee shall make as many nominations for election to the Board of Directors as it shall, in its discretion, determine, but not less than the number of vacancies that are to be filled. Each nomination shall be for a specified vacancy.

Any person qualified under Section 1 of Article II of these By-Laws to serve on the Board of Directors may be nominated for the Board of Directors by submitting a request, signed by the owners of two units in which the nominee has no financial interest, to the Board Secretary sixty days prior to the Annual Meeting. The Board shall include his/her name on the ballot directly following the nominee(s) proposed by the Nominating Committee for each vacancy. Any nomination that does not specify a specific vacancy shall be deemed a nomination for all vacancies.

## ARTICLE III

## Unit Owners

**Section 1. Annual Meeting:**
The Annual Meeting of the unit owners shall be held during the first quarter each year. At the Annual Meeting, Directors shall be elected by ballot in accordance with the requirements of Section 4 of Article II of these By-Laws, and the unit owners may transact such other business at such meetings as may properly come before them.

**Section 2. Place of Meeting:** Meetings of the unit owners shall be held at the principal office of the Condominium or at such other suitable place convenient to the unit owners as may be designated by the Board of Directors.

**Section 3. Special Meetings:** It shall be the duty of the President to call a special meeting of the unit owners if so directed by resolution of the Board of Directors or upon a petition signed and presented to the Secretary by not less than 25% in common interest, in the aggregate, of unit owners. The notice of any special meeting shall state the time and place of such meeting and the purpose thereof. No business shall be transacted at a special meeting except as stated in the notice.

6

**Section 4. Notice of Meeting:** It shall be the duty of the Secretary to mail a notice of each annual meeting of the unit owners not less than thirty days nor more than ninety days prior to such meeting, stating the purpose thereof as well as the time and place where it is to be held, to each unit owner of record, at the building or at such other address as such unit owner may have designated by notice in writing to the Secretary. The mailing of a notice of meeting in the manner provided in this section shall be considered service of notice. The Board of Directors may assign the task of providing notice to unit owners to a person other than the Secretary. Special meetings require not less than ten days notice.

**Section 5. Adjournment of Meetings:** If any meeting of unit owners cannot be held because a quorum has not attended, a majority in common interest of the unit owners who are present at such meeting, either in person or by proxy, may adjourn the meeting to a time not less than forty-eight hours from the time the original meeting was called.

**Section 6. Order of Business:** The annual meeting of the unit owners shall be chaired by the President or other member of the Board of Directors chosen by the Board, and the order of business shall be generally as follows:
  (a)   Roll Call -- by unit
  (b)   Proof of Notice of Meeting
  (c)   Reading of Minutes of preceding meeting
  (d)   Reports of officers
  (e)   Report of Nominating Committee
  (f)   Election of Board members
  (g)   Unfinished business
  (h)   New business

**Section 7. Title to Apartment Units:** Title to apartment units may be taken in the name of an individual, or in the names of two or more persons as tenants in common, joint tenants or tenants by the entirety, or in the name of a corporation, partnership, limited liability company or other legal entity authorized to own real property in the Virgin Islands, or in the name of a fiduciary.

**Section 8. Voting:** The owner or owners of each apartment unit, or some person designated by such owner or owners to act as proxy on his or their behalf and who need not be an owner, shall be entitled to cast the vote appurtenant to such apartment unit at all meetings of unit owners. The designation of any such proxy shall be made in writing and shall be revocable at any time by written notice to the Secretary or in person at the meeting. Any or all such owners or proxies may be present at any meeting of the unit owners and may vote or take any other action as a unit owner either in person or by proxy. Votes of unit owners shall be weighted in accordance with their share of the common interest, as follows, with the total of all votes equaling one hundred:

| | |
|---|---|
| 2 Bedroom | .911 |
| 3 Bedroom | 1.062 |
| 2 Bedroom + Loft | 1.193 |
| 4 Bedroom | 1.301 |
| 3 Bedroom + Loft | 1.376 |

7

The Board of Directors shall accept any vote if the owner is one of the owners of record of the unit, or in the case of a proxy, if there is no obvious defect on the face of such proxy. It shall be the burden of the protestor to offer satisfactory proof that the proffered vote or proxy is invalid and that his is the proper one.

**Section 9. Majority of Unit Owners:** As used in these By-Laws, the term "majority of unit owners: shall mean those unit owners having more than 50% of the total authorized votes of all unit owners present in person or by proxy and voting at any meeting of the unit owners, determined in accordance with the provisions of Section 8 of this Article III.

**Section 10. Quorum:** Except as otherwise provided in these By-Laws, the presence in person or by proxy of unit owners having one-third (1/3) of the total authorized votes of all unit owners shall constitute a quorum at all meetings of the unit owners.

**Section 11. Majority Vote:** The vote of a majority of unit owners at a meeting at which a quorum shall be present shall be binding upon all unit owners for all purposes except where, in the Declaration or these By-Laws, or by law, a higher percentage vote is required.

## ARTICLE IV

### Officers

**Section 1. Designation:** The principal officers of the Condominium shall be the President, the Vice President, the Secretary, and the Treasurer, all of whom shall be elected by the Board of Directors. The Board of Directors may appoint an assistant secretary, an assistant treasurer, and such other officers as in its judgment may be necessary. The President and Vice President, but no other officers, need be members of the Board of Directors.

**Section 2. Election of Officers:** The officers of the Condominium shall be elected annually by the Board of Directors at the Organization Meeting of each new Board of Directors and shall hold office at the pleasure of the Board of Directors.

**Section 3. Removal of Officers:** Upon the affirmative vote of a majority of the members of the Board of Directors, any officer may be removed, either with or without cause, and his successor may be elected by the Board of Directors at any regular or special meeting of the Board of Directors called for such purpose.

**Section 4. President:** The President shall be the chief executive officer of the Condominium. He shall preside at all meetings of the unit owners and of the Board of Directors. He shall have all of the general powers and duties which are incident to the office of president of a stock corporation organized under the Corporation Law of the Virgin Islands, including but not limited to the power to appoint committees from among the unit owners from time to time as he may in his discretion decide is appropriate to assist in the conduct of the affairs of the Condominium.

**Section 5. Vice President:** The Vice President shall take the place of the President and perform his duties whenever the President shall be absent or unable to act. If neither the President nor the Vice President is able to act, the Board of Directors shall appoint some other

8

member of the Board of Directors to act in the place of the President, on an interim basis.  The Vice President shall also perform such other duties as shall from time to time be imposed upon him by the Board of Directors or by the President.

**Section 6.  Secretary:**  The Secretary shall keep the Minutes of all meetings of the unit owners and of the Board of Directors.  He shall have charge of such books and papers as the Board of Directors may direct; and he shall, in general, perform all the duties incident to the office of secretary of a stock corporation organized under the Corporate Law of the Virgin Islands.

**Section 7.  Treasurer:**  The Treasurer shall have the responsibility for Condominium funds and securities and shall be responsible for keeping full and accurate financial records and books of account showing all receipts and disbursements, and for the preparation of all required financial data.  He shall be responsible for the deposit of all monies and other valuable effects in the name of the Board of Directors, or the managing agent, in such depositories as may from time to time be designated by the Board of Directors, and he shall, in general, perform all the duties incident to the office of treasurer of a stock corporation organized under the Corporation Law of the Virgin Islands.

**Section 8.  Agreements, Contracts, Deeds, Checks, etc.:**  All agreements, contracts, deeds, leases and other instruments of the Condominium shall be executed by any two officers of the Condominium or by such other person or persons as may be designated by the Board of Directors.

**Section 9.  Compensation of Officers:**  No officer shall receive any compensation from the Condominium for acting as such.

### ARTICLE V

### Operation of the Property

**Section 1.  Determination of Common Expenses and Fixing of Common Charges:**  The Board of Directors shall from time to time, and at least annually, prepare a budget for the condominium, determine the amount of the common charges payable by the unit owners to meet the common expenses of the Condominium, and allocate and assess such common charges among the unit owners according to their respective common interests.  Common expenses shall include, among other things, operation and maintenance, insurance premiums, repairs and such amounts as the Board of Directors may deem proper for a general operating reserve, for a reserve fund for replacements, and to make up any deficit in the common expenses for any prior year.

The common expenses may also include such amounts as may be required for the purchase buy or lease to the Board of Directors or its designee, corporate or otherwise, on behalf of all unit owners, of any apartment unit whose owner has elected to sell or lease such apartment unit to the Board of Directors, or of any apartment unit which is to be sold at a foreclosure or other judicial sale.

The Board of Directors shall advise all unit owners promptly in writing of the amount of common charges payable by each of them, respectively, as determined by the Board of Directors, as aforesaid, and shall furnish to all unit owners copies of each budget on which such common charges are based.

9

A summary of the previous year's actual income and expenditures, a year end summation of liquid assets and accounts payable/receivable, and a preliminary budget for the next year shall be provided to all owners not less than 30 days prior to the Annual Meeting.

**Section 2. Insurance:** The Board of Directors shall obtain and maintain, to the extent obtainable, the following insurance: (1) fire insurance with extended coverage to include earthquake and flood coverage, vandalism and malicious mischief endorsements insuring the entire buildings and common elements, (including all the individual unit's bathroom and kitchen fixtures and air conditions, but not including any wall, ceiling, or floor decoration, tiles or coverings, or other furniture or furnishings, fixtures or equipment installed by the owner), together with all service machinery contained therein and covering the interest of the Condominium, the Board of Directors and the common interest of the unit owners, in an amount to be determined by the Board of Directors; (2) windstorm, insuring the entire buildings and common elements, (including all the individual units bathroom and kitchen fixtures and air conditioning, but not including any wall, ceiling, or floor decoration, tiles or coverings, or other furniture or furnishing, fixtures or equipment installed by the owner), together with all service machinery contained therein and covering the interest of the Condominium, the Board of Directors and the common interest of the unit owners, in an amount to be determined by the Board of Directors; (3) Worker's Compensation insurance; and (4) such other insurance as the Board of Directors may determine. Fixtures are considered to be permanently attached cabinets, sinks, toilets and tubs, but not stoves, refrigerators, washers, dryers, water heaters and dishwashers.

All policies of physical damage insurance shall to the extent obtainable contain waivers of subrogation and waivers of any defense based on co-insurance or of invalidity arising from any acts of the insured, and shall provide that such policies may not be cancelled or substantially modified without at least thirty days prior written notice.

At least once each ten years, the Board shall obtain an appraisal of the full replacement value, without deduction for depreciation, of the buildings, common areas and facilities -- for the purpose of determining the amount of insurance required. Appraisals should be obtained more often if required by the insurer or considered prudent by the board.

The Board of Directors shall also obtain and maintain, to the extent obtainable, public liability insurance in such limits as the Board of Directors may, from time to time, determine appropriate covering each member of the Board of Directors, the managing agent, the manager and each unit owner. The Board of Directors shall review such limits once a year.

Unit owners shall not be prohibited from carrying other insurance for their own benefit provided that all such policies shall contain waivers of subrogation and further provided that the liability of the carriers issuing insurance obtained by the Board of Directors shall not be affected or diminished by reason of any such additional insurance carried by any unit owner.

At each Annual Meeting, the Board shall provide to the owners a concise summary of all insurance coverage and costs.

**Section 3. Repair or Reconstruction After Fire or Other Casualty:** In the event of damage to or destruction of the commonly owned buildings and elements as a result of fire or other casualty (unless 66-2/3% or more of the buildings are destroyed or substantially damaged and 75% or more of the unit owners determine in accordance with the Declaration not to proceed with the repair or restoration), the Board of Directors shall arrange for the prompt repair or restoration of the commonly owned buildings and elements, and the Board of Directors shall

10

disburse the proceeds of all insurance policies to the contractors engaged in such repair or restoration in appropriate progress payments. Any cost of such repair or restoration in excess of the insurance proceeds shall constitute a common expense – and the Board of Directors may assess all the unit owners for such deficit as part of the common charges.

After repairs to the commonly owned buildings and elements, the Board of Directors shall conduct unit interior repairs of insured items. If insurance proceeds are insufficient for such repairs, the Board may limit payment for restoration of units to their original as-built level of quality, design and/or type where the unit has been upgraded. Additionally, if damage to a unit is caused by the negligence of the owner, any insurance shortfall shall be said owner's responsibility rather than a common expense.

Within ninety days after a casualty of an estimated repair cost of $100,000 or greater, the Board will provide to the owners a financial status report indicating projected repair costs, source(s) of necessary funds, expenditures and commitments to date, and a schedule and plan for completion. This report will be updated and issued to owners on a quarterly basis, thereafter, until repairs are complete. A current report shall be provided at the next Annual Meeting.

If 66-2/3% or more of the Building(s) are destroyed or substantially damaged and if within sixty days of the date of such destruction or damage, 75% or more of the unit owners determine not to proceed with repair and restoration, the Property shall be subject to an auction for partition at the suit of any unit owner or lien holder, as if owned in common, in which event the net proceeds of sale, together with the net proceeds of insurance policies (less any repairs conducted) shall be divided by the Board of Directors among all the unit owners in proportion to their respective common interests, after first paying out of the share of each unit owner the amount of any unpaid liens on his/her apartment unit, in the order of priority of such liens.

<u>Section 4. Payment of Association Charges:</u> All unit owners shall be obligated to pay the common charges assessed by the Board of Directors pursuant to the provisions of Section 1 of this Article V at such time or times as the Board of Directors shall determine, as well as "other charges" for utilities, services, unit repairs, late fees, interest, fines and/or collection costs, if incurred. With respect to the following sections concerning payment, collection, default, foreclosure, etc., in Sections 4, 5, 6, 7, & 8 below, the term "association charges" is intended to include, but not be limited to, all the above items, both the "common" and "other" charges.

No unit owner shall be liable for the payment of any part of association charges assessed against his apartment unit subsequent to a sale, transfer or other conveyance by him of such apartment unit, together with the Appurtenant Interests, as defined in Section 1 of Article VII hereof. In addition, any unit owner may, subject to acceptance by the Board of Directors provided that his apartment unit is free and clear of liens and encumbrances other than mortgages and statutory liens for unpaid association charges, convey his apartment unit, together with the "Appurtenant Interests" to the Board of Directors, or its designee, corporate or otherwise, on behalf of all other unit owners, and in such event be exempt from association charges thereafter assessed.

However, a purchaser of an apartment unit shall be liable for the payment of association charges assessed against such apartment unit prior to the acquisition by him of such apartment unit, without prejudice to such purchaser's right, if any, to recover from the seller the amounts paid by the purchaser, except that a first mortgagee or other purchase of an apartment unit at a foreclosure sale of a first priority mortgage of such apartment unit shall not be liable for and such apartment unit shall not be subject to a lien for the payment of association charges which became due prior to the acquisition of title by such acquirer.

11

**Section 5. Collection of Association Charges:** The Board of Directors shall assess association charges against the unit owners from time to time and shall take prompt action to collect any charges due from any unit owner, which remain unpaid for more than thirty days from the date due for payment thereof. Such action may include placement of a lien on the apartment unit, notification to the mortgagee of the owner's failure to pay association charges and foreclosure on the lien. Additionally, suspension of utilities by a majority vote of the Executive Committee is permitted if an owner is more than 90 days in arrears of any Association charges. Payments received from unit owners will be applied to Association Charges in the chronological order incurred.

**Section 6. Default in Payment of Association Charges:** In the event of default by any unit owner in paying to the association charges as determined by the Board of Directors, such unit owner shall be obligated to:
   (1) pay interest from the date of the initial billing at the maximum legal rate of interest, as defined by the Virgin Islands Laws, on all amounts past due,
   (2) pay a monthly service charge as determined and promulgated from time-to-time by the Board of Directors,
   (3) pay all expenses and attorneys' fees incurred by the Board of Directors in any proceeding brought to collect such unpaid association charges.
   All such unpaid association charges shall constitute a lien on such unit prior to all other liens except those specified in Section 922 of Chapter 33, Title 28 of the Virgin Islands Code. The Board of Directors shall have the right and duty to attempt to recover all association charges, together with interest and monthly service charges thereon, and the expenses of the proceeding, including attorneys' fees, in any action to recover the same brought against such unit owner, or by foreclosure of the lien on such apartment unit granted by Section 922 of Chapter 33, Title 28, Virgin Islands Code.

**Section 7. Foreclosure of Liens For Unpaid Association Charges:** In any action brought by the Board of Directors to foreclose a lien on an apartment unit because of unpaid association charges, the unit owner shall be required to pay a reasonable rental for the use of his apartment unit, and the plaintiff in such foreclosure action shall be entitled to the simultaneous appointment of a receiver to collect the same. The Board of Directors, acting on behalf of all unit owners, shall have power to purchase such apartment unit at the foreclosure sale and to acquire, hold, lease, mortgage, vote the votes appurtenant to, convey or otherwise deal with the same. A suit to recover a money judgment for unpaid association charges shall be maintainable without foreclosing or waiving the lien securing the same.

**Section 8. Statement of Association Charges:** The Board of Directors shall promptly provide any unit owner so requesting the same in writing, with a written statement of all unpaid association charges due from such unit owner.

**Section 9. Abatement and Enjoinment of Violations by Unit Owners:** The violation of any rule or regulation adopted by the Board of Directors or the breach of any of these By-Laws contained herein, or the breach of any provisions of the Declaration, shall give the Board of Directors the right, in addition to any other rights set forth in these By-Laws (a) to enter the apartment unit in which, or as to which, such violation or breach exists and to summarily abate or remove, at the expense of the defaulting unit owner, any structure, thing or condition that may exist therein contrary to the intent and meaning of the provisions hereof, and the Board of Directors shall not thereby be deemed guilty in any manner of trespass or (b) to enjoin, abate or

12

remedy by appropriate legal proceedings, either at law or in equity, the continuance of any such breach.

**Section 10.  Routine Maintenance and Repair:**  All maintenance of and repairs to any "apartment unit" (other than maintenance of and repairs to any common areas and facilities contained therein, and not necessitated by the negligence, misuse or neglect of the owner of such apartment unit) shall be the responsibility of the owner of such apartment unit.  Also, each unit owner shall be responsible for damage to other apartment units and/or to the common areas and facilities resulting from conditions for which such owner has responsibility as indicated above.

An "apartment unit" is considered the space inside the perimeter walls, floor and ceiling.  All decorating, wall and floor coverings, paneling, molding, tiles, wallpaper, paint, finished cabinets, mirrors, refrigerator, stove, washer, dryer, electrical appliances, dishwasher, garbage disposal, hot water heater, air-conditioning equipment, including compressor, shall be part of the unit and not part of the common interests.

Additionally, the unit owner shall be responsible for the routine lubrication and adjustment of doors and windows, and, unless major casualty related, replacement of broken glass, wooden or glass slats and damaged screens.  The unit owner shall also maintain and assure the operability of the storm shutters installed on that unit and is responsible to close them in the event of a windstorm.  Damage caused by failure to do so is the responsibility of the owner if not insurance proceeds are insufficient to cover such damage.

Screen doors may be installed on the main street-side entry doors at the unit owner's expense provided they meet the existing décor.  Once installed, they must be maintained by the unit owner in a good state of repair, or the Association will do so at the owner's expense.

Except for the limited exceptions noted above, all maintenance, repairs and replacements to the "common areas and facilities", whether located inside or outside of the apartment units, (unless necessitated by the negligence, misuse or neglect of a unit owner, in which case such expense shall be charged to such unit owner), shall be made by the Association and be charged to all the unit owners as a common expense.

"Common elements" are considered to include all other elements of the buildings and property except those specified as being part of the "apartment unit".  Additionally, the electrical supply to the fuse box, water lines to the valves at the sinks, tubs, hot water heater, toilet, etc., and drains to the first connection outside a wall are considered common elements.

In the event of a major casualty, such as a fire, earthquake or hurricane type disaster, certain unit elements indicated above as the unit owner's normal responsibility, may be covered by Association insurance per Section 2 of Article V of these By-Laws.

External air conditioning compressor units shall be maintained by the owner in a reasonable state of preservation.  The Association may require removal of inoperable and/or un-maintained units.

**Section 11.  Restriction on Use of Apartment Units:**  In order to provide for congenial occupancy of the Property and for the protection of the value of the apartment units, the use of the Property shall be restricted to and shall be in accordance with the following provisions:

1. The apartment units shall be used for residences only.  Units will not be occupied by more than two persons per bedroom for more than thirty days per year.
2. The common areas and facilities, including the limited common areas and facilities, shall be used only for the furnishing of the services and facilities for which they are reasonably suited and which are incident to the use and occupancy of apartment units

13

3,  No nuisances shall be allowed on the Property nor shall any use or practice be allowed which is a source of annoyance to its residents or which interferes with the peaceful possession proper use of the Property by its residents.

4,  No improper, offensive or unlawful use shall be made of the Property or any part thereof, and all valid laws, zoning laws and regulations of all governmental bodies having jurisdiction thereof shall be observed.

5,  Violations of laws, orders, rules, regulations or requirements of any governmental agency having jurisdiction thereof, relating to any portion of the Property, shall be corrected, by and at the sole expense of the unit owners or the Board of Directors, whichever shall have the obligations to maintain or repair such portion of the Property.

**Section 12.  Additions, Alterations or Improvements by the Board of Directors:**  Additions, alterations or improvements to the common areas and/or facilities up to $50,000 may be made by the Board of Directors.  Additions, alterations or improvements in excess of $50,000 shall require approval by a vote of two-thirds (2/3) in common interest of the owners.  The cost of such additions, alterations or improvements shall constitute a common charge.  This section is not applicable to repairs conducted in accordance with Article V Section 3 of these By-Laws.

**Section 13.  Additions, Alterations, or Improvements bay Unit Owners:**  No unit owner shall make any structural addition, alteration or improvement in or to his apartment unit, including any exterior painting or exterior alteration or addition (including awnings, grills, etc.) without the prior written consent thereto of the  Board of Directors.  The Board of  Directors shall have the obligation to answer any written request by a unit owner for approval of a proposed structural addition, alteration or improvement in such unit owner's apartment unit, within thirty (30) days after such request, and failure to do so within the stipulated time shall constitute a consent by the Board of Directors to the proposed addition, alteration or improvement.

A unit owner shall obtain a receipt from any person accepting his written request for a change under this section and shall show the receipt to the manager or any Director upon request.  Any application to any department of the Government of the Virgin Islands or to any other governmental authority for a permit to make an addition, alteration or improvement in or to any apartment unit shall be executed by the Board of Directors only, without, however, incurring liability on the part of the Board of Directors or any of them to any contractor, sub-contractor or supplier on account of such additions, alteration or improvement, or to any person having any claim for injury to person or damage to property arising therefrom.  The owner in such instance shall provide the Board of Directors with a Hold Harmless Certificate.

**Section 14.  Use of Common Areas and Facilities:**  A unit owner shall not place or cause to be placed in the stairways or other common areas and facilities, including the limited common areas and facilities, other than the areas designated as storage space, any furniture, packages or objects of any kind.  The entry passages, stairways, entry bridges, etc., shall be used for no purpose other than for normal transit through them.

**Section 15.  Right of Access:**  A unit owner shall grant a right of access  to his apartment unit to the manager and/or the managing agent and/or any other person authorized by the Board of Directors, the manager or the managing agent, for the purpose of making inspections or for the purpose of correcting any condition originating in his apartment unit and threatening another apartment unit or a common area or facility, or for the purpose of performing installations, alterations or repairs to the mechanical or electrical services or other common areas or facilities

14

in his apartment unit or elsewhere in the Building, provided that requests for entry are made in advance and that any such entry is at a time reasonably convenient to the unit owner. In case of an emergency, such right of entry shall be immediate, whether or not the unit owner is present at the time.

**Section 16. Rules of Conduct:**  Article V Section II of these By-Laws delineates general restrictions on the use of the property. Additionally, a definitive listing of current Rules and Regulations is provided as Exhibit I hereto. Those Rules and Regulations may be amended by the Board of Directors from time to time. The Board is empowered to enforce those By-Laws and Rules and Regulations with monetary fines and other sanctions and may also take any legal action in court to enforce them. An owner is subject to such fines, sanctions and/or legal actions for the actions of his tenant as if those actions were by the owner.

Copies of the Rules and Regulations shall be furnished by the Board of Directors to each unit owner prior to the time when the same shall become effective. The unit owner must insure that the tenant or occupant be fully informed and furnished with a copy of the Rules and Regulations and by fully bound thereby.

**Section 17. Potable Water and Electricity:**  Potable water and electricity shall be supplied by the Association through the common facilities of the Condominium directly to each apartment unit through a separate meter, and each unit owner shall be required to pay the charges therefore established, from time to time, by the Board of Directors. Water, electricity and other utility charges will normally be billed monthly incident to the common charges and are considered to be part of the "association" charges. Utility charges more than thirty days in arrears are subject to a late fee and interest per Section 6 Article V of these By-Laws, and said utilities may be suspended by the Association if an owner is more than 90 days in arrears of Association charges per Article V Section 5 thereof.

**Section 18. Gas:**  Gas shall not be piped to any apartment unit, and unit owners are specifically prohibited from using gas as a fuel for regular cooking, water heating, or any other regular purpose. Small quantities of propane gas may be used for gas grills kept on street-side galleries and for emergency use inside apartment units.

**Section 19. Grey Water and Sewerage Service:**  Grey water for flushing and sewerage service (including sewage disposal and treatment in the condominium's sewerage treatment plant) shall be supplied as a common facility to all unit owners, and the cost thereof shall be treated as a common expense.

### ARTICLE VI

### Mortgages

**Section 1. Notice of Unpaid Common Charges:**  The Board of Directors, whenever so requested in writing by a mortgagee of an apartment unit, shall promptly report any then unpaid association charges due from, or any other default by the owner of the mortgaged apartment unit.

**Section 2. Notice of Default:**  The Board of Directors, when giving notice to a unit owner of a default in paying common charges or other default, may send a copy of such notice to each holder of a mortgage covering such apartment unit.

16

## ARTICLE VII

### Sales and Mortgages of Units

**Section 1.  No severance of Ownership:** No unit owner shall execute any deed, mortgage or other instrument conveying or mortgaging title to his apartment unit without including therein the Appurtenant Interests, it being the intention hereof to prevent any severance of such combined ownership.  For the purpose of the By-Laws, the "Appurtenant Interests" shall mean collectively, (i) the unit owner's undivided interest in the common areas and facilities appurtenant to such unit; (ii) the interest of such unit owner in any apartment units theretofore acquired by the Board of Directors, or its designee, on behalf of all unit owners, or the proceeds of the sale or lease thereof, if any; and (iii) the interest of such unit owner in any other assets of the Condominium.

Any such deed, mortgage or other instrument purporting to affect one or more of such interests, without including the interest or interests so omitted, shall be deemed to include such interests even though the latter shall not be expressly mentioned or described therein.  No part of the Appurtenant Interests of any apartment unit may be sold, transferred or otherwise disposed of, except as part of a sale, transfer or other disposition of the apartment unit to which such interests are appurtenant, or as part of a sale, transfer or other disposition of such part of the Appurtenant Interests of all apartment units.

**Section 2.  Sale to Board of Directors:** A unit owner may, subject to mutual agreement of the parties, and subject to the provisions of Section 1 of this Article VII, sell his unit to the Board of Directors, or its designee; provided, however that such purchase by the Board of Directors shall have the prior approval of two-thirds (2/3) of the unit owners, as expressed by the vote of at least two third (2/3) in number and in common interest, of all unit owners, cast in person or by proxy in accordance with these By-Laws.

**Section 3.  Financing of Purchase of Apartment Units By Board of Directors:** Acquisition of apartment units by the Board of Directors, or its designee, on behalf of all unit owners, may be made from the working capital and common charges in the hands of the Board of Directors, or if such funds are insufficient the Board of Directors may levy an assessment against each unit owner in proportion to his ownership in the common areas and facilities as a common charge, which assessment shall be enforceable in the same manner as provided in Section 6 and 7 of Article V, or the Board of Directors, in its discretion, may borrow money to finance the acquisition of such apartment units, provided, however, that no financing may be secured by an encumbrance or hypothecation of any property other than the apartment unit, together with the Appurtenant Interests, so to be acquired by the Board of Directors.

**Section 4.  Gifts and Devises, etc:** Any unit owner shall be free to convey or transfer his apartment unit by gift, or to devise his apartment unit by will, or to pass the same by intestacy, without restriction.

**Section 5.  Waiver of Right of Partition with Respect to Such Apartment Units as are Acquired by the Board of Directors, or its Designee, on Behalf of All Unit Owners as Tenants in Common:** In the event that an apartment unit shall be acquired by the Board of Directors, or its designee, on behalf of all unit owners as tenants in common, all such unit owners shall be deemed to have waived all rights of partition with respect to such apartment unit.

16

## ARTICLE VIII

**Section 1. Condemnation – Eminent Domain:** In the event of a taking by condemnation or by eminent domain of part or all of the common areas and facilities, the award made for such taking shall be payable to the Board of Directors for disbursement and/or payment of the common expenses.

## ARTICLE IX

### Records

**Section 1. Records and Audits:** The Board of Directors or the managing agent shall keep detailed records of the actions of the Board of Directors and the managing agent, Minutes of the meetings of the Board of Directors, Minutes of the meetings of unit owners, and financial records and books of account of the Condominium, including a chronological listing of receipts and expenditures, as well as a separate account for each apartment unit which, among other things, shall contain the amount of each assessment of common charges against such apartment unit, the date when due, the amounts paid thereon, and the balance remaining unpaid.

Each unit owner shall be permitted to examine all accounts, records and contracts of the Association in the Condominium office at reasonable times, on business days, but not more often than once a month. All others must request any required information from the Board of Directors.

An annual report of the receipts and expenditures of the Association, examined and approved by a licensed accountant not affiliated with the Association and chosen by the Board of Directors, shall be rendered to the Board and sent, within a reasonable time after the end of each fiscal year, to all unit owners who request it.

## ARTICLE X

### Miscellaneous

**Section 1. Notices:** All notices hereunder shall be sent by registered or certified mail to the Board of Directors c/o the managing agent, or if there is no managing agent, to the office of the Board of Directors or to such other address as the Board of Directors may hereafter designate from time to time, by notice in writing to all unit owners and to all mortgagees of apartment units.

All notices to any unit owner shall be sent by registered or certified mail to the Building or to such other address as may have been designated by him from time to time, in writing, to the Board of Directors. All notices to mortgagees of apartment units shall be sent by registered or certified mail to their respective addresses, as designated by them from time to time, in writing to the Board of Directors. All notices shall be deemed to have been given when mailed, except notices of change of address, which shall be deemed to have been given when received.

Notwithstanding the requirements of this section, all notices of regular, special and Annual Meetings of the unit owners, Board of Directors, and committees of the Board or otherwise, shall be by first class mail but without the requirement of registration or certification. The applicable notice shall be sent so as to comply with the required time limits, if any, to the regular mailing address of the designated party as recorded in the books of the Association.

17

**Section 2. Invalidity:** The invalidity of any part of these By-Laws shall not impair or affect in any manner the validity, enforceability or effect of the balance of these By-Laws.

**Section 3. Captions:** The captions herein are inserted only as a matter of convenience and for reference, and in no way define, limit or described the scope of these By-Laws, or the intent of any provision thereof.

**Section 4. Gender:** The use of the masculine gender in these By-Laws shall be deemed to include the feminine gender and the use of the singular shall be deemed to include the plural, whenever the context so requires.

**Section 5. Waiver:** No restrictions, condition, obligation or provisions contained in these By-Laws shall be deemed to have been abrogated or waived by reason of any failure to enforce same, irrespective of the number of violations or breaches thereof which may occur.

**Section 6. Insurance Trustee:** The Board of Directors may appoint a Trustee to distribute large amounts of any insurance proceeds. The trustee so appointed may be any individual or entity, so long as such is properly bonded in relation to the funds and responsibility involved.

## ARTICLE XI

### Amendments to By-Laws

**Section 1. Amendments to By-Laws:** Except as hereinafter provided, those By-Laws may be modified or amended by the vote of 66-2/3% in number and in common interest of all unit owners.

## ARTICLE XII

### Execution of Instruments and Seal

**Section 1. Execution and Instruments:** All instruments of the Condominium shall be executed under seal by such officer or officers as the Board of Directors may designate, or as may be otherwise authorized.

**Section 2. Seal:** The seal of the Condominium shall be as determined by the Board of Directors from time to time.

## ARTICLE XIII

### Conflicts

**Section 1. Conflicts:** Those By-Laws are set forth to comply with the provisions of Sections 917 and 918 of Chapter 33, Title 28, Virgin Islands Code. In case any of these By-Laws conflict with the provisions of said statute or of the Declaration, the provisions of said statute or of the Declaration, as the case may be, shall control.

18

EXHIBIT I
**Rules and Regulations**
for
**Cowpet Bay West**
December 2007

1. No articles shall be placed on any of the stairways, railings, or entry bridges.

2. Balconies and street-side porches shall be kept neat and clean, and no articles shall be swept or thrown from them.  No laundry, laundry lines, or other unsightly articles shall be placed on the balconies, porches or other common areas and facilities.

3. Radio or television antennas are prohibited and no sign, notice, advertisement or illumination shall be displayed on or at any window or other part of the building.

4. No owner shall make or permit any disturbing noises in his unit or within the common areas and facilities, or do anything, or permit anything to be done wherein which will interfere with the rights and reasonable comfort and convenience of other owners.

5. No inflammable, combustible or explosive fluid, material, chemical or substance is permitted in any unit, except for normal household use.

6. Dogs and farm animals are prohibited, and owners will be fined as specified by the Board of Directors.  The Association may require removal of any animal when it becomes bothersome to others or is deemed by the Association to be unacceptable.

7. No garbage or trash will be left or disposed of on or adjacent to the property -- except in a dumpster, if such is provided by the Association.

8. One space per unit is provided for parking automobiles on the property.  Additional vehicles may be allowed by Management based on space availability.  Any vehicle not currently registered and licensed will be considered a derelict and will be towed.

9. No boat, trailer, heavy commercial or nonself-propelled vehicle shall be parked on the property.  No vehicle shall be parked so as to impede ready movement by another vehicle, nor shall it be parked in any space assigned to another unit without permission of the said unit owner.  Any vehicle in violation of these rules may be towed at the vehicle owner's expense.

10. Beach users shall clean up and remove any trash or other articles on the beach for which they are responsible.

11. The use of barbecues on seaside galleries is prohibited.

12. The number of persons occupying a unit on a routine basis is limited to two per bedroom.  Additional "guests" are permitted not to exceed thirty days total per year.

19

Attachment #2

## Owners' Common Interest
## 30 April 1998

| UNIT SIZE | % COMMON INTEREST | UNITS |
|---|---|---|
| 2 Bedroom | .911 | Leeward |
| | | #1,2,3,4,5,7,8,9,10,11,12 |
| | | 13,14,15,17,18,23,24,25 |
| | | 26,27,28,29,31,32,33,34, |
| | | 35,36,37,39,40,41 |
| | | |
| | | Windward |
| | | #3,4,5,6,7,9,10,11,12,13 |
| | | 14,15,16,17,19,20,21,22 |
| | | 25,26,27,28,29,30,31,33 |
| | | 34,35,37,38,39,40,41,47,49 |
| 3 Bedroom | 1.062 | Leeward |
| | | #6,16,19,20,21,22,30,36,42,43,44,49 |
| | | Windward |
| | | #1,2,8,18,23,24,32,36,42,43,44,45,51 |
| 2 Bedrooms plus Loft | 1.193 | Leeward: # 46,48 |
| | | Windward: # 48,50 |
| 3 Bedrooms plus Loft | 1.376 | Leeward: # 50 |
| | | Windward: # 46,52 |
| 4 Bedroom | 1.301 | Leeward: # 45,47 |

20

Joint Appendix Vol. II Page 934

Cowpet Bay West
Board of Directors Meeting
March 11, 2010

**Present:** Judi Kromenhoek (Chair), Bob Cockayne, Max Harcourt, Greg Miller, Barbara Walters, Ed Wardwell, Rosie Wells and Jon Cassady, Property Manager

The meeting convened at 0845 AST.

The Minutes of the February 19, 2010 Board Meeting were unanimously approved.

Barbara reported the current total in all accounts at February 28, 2010 is $737,636.79.

Jon reported:

The security gate malfunctioned on March 7 due to rainwater accumulation shorting out a relay in the control panel. A spare relay has been acquired and normal gate function should be restored today.

All utility systems are operating normally with an upgrade to the fresh water filtration being completed.

A generator oil spill prevention permit from DPNR is near completion.

The new security lights are on their way from Florida and will be on property next week.

Kent Harvey, electrical/electronic specialist will be scheduled for further system alignment when all components are on hand.

Judi read the monthly Landscape Committee report (copy attached).

Bob presented insurance coverage and premium proposals as presented by the local Lloyd's representative, Lance Chardon. A copy is attached.

A further insurance quotation has been requested from the Tunick Company. Upon receipt, a special meeting of the CBW Board will be convened to decide on an insurance plan to be effective from April 1, 2010 when our current coverage expires.

Jon has obtained complete contractor estimates related to rehabilitation of CW common property after the fire in Windward #23. This information will be given to our insurance adjuster, Herb Horwitz, for his meeting in Miami on March 15 with the insurance underwriter.

The condensation problem in Windward #12 caused by improperly insulated air conditioning ducts in Windward #11 is scheduled to be rectified this week.



EXHIBIT
Walter - Harcourt
2

Joint Appendix Vol. II Page 935

Cleaning of owners' storage lockers is in progress.

Judi proposed a motion that the Association obtain a debit card for administrative use to support the previous credit card (which required an individual's name and guarantee). Ed seconded. The motion was unanimously adopted.

After discussion about safety and architectural concerns, Judi proposed a motion that all non-functional railings be removed and/or relocated to minimize hazards. Greg seconded. The motion was unanimously adopted.

Rosie volunteered to serve as Chair for the 2011 Nominating Committee.

Judi introduced a petition initiated by Windward #12 with the supporting signatures of several owners to permit dogs (subject to certain caveats) on CBW property. After considerable discussion, Barbara volunteered to draft a memorandum to be tabled at the next regular Board meeting.

Bob requested that a complete financial report be made to the Directors at least quarterly.

Max is awaiting guidance from our 2011 insurance underwriter before issuing a notice to owners regarding smoke detector requirements.

No response has been received from Judi/Jon's inquiries to composite railing suppliers.

The next regular CBW Board meeting is scheduled for 0745 AST (0745 EDT) Tuesday, April 13, 2010.

The meeting adjourned at 0955.

## ACTION ITEMS

| | |
|---|---|
| Electric plant upgrade | Jon |
| Insurance proposal for 2011 | Bob |
| Windward #23 fire rehabilitation | Jon |
| Owners' locker clean up | Jon |
| Association debit card | Louanne |
| Non-functional railing removal | Jon |
| Dogs on property memorandum for Board review | Barbara |
| Financial reporting to Board | Barbara/Louanne |
| Smoke detector policy | Max |
| Composite railing proposal | Judi/Jon |

October 13, 2011 at 10:33 am
  0   1   Rate This

It would seem to me that it is the same small minority of owners who constantly cause the majority of our communitys disruption !!! Apparently they have no regard for the huge majority. "service dogs " for true needs are LEGAL ,but anyone can get such a designation by simple request from a friendly physician ,regardless of any real need.Anyone can also get one via the internet for a minimal fee !!!! When someone joins a community one would be expected to "follow the rules". Failure to do so indicates a total disregard for ones neighbors rights and needs. Many have serious allergies,some are disturbed by constant noise harassment, some dislike the stink of the animal, and many are grossed out by the thought of walking on the beach through the run off of urination and feces !!!! The antics of the cute pups are not so cute when they are sticking their nose in someones crotch or attempting fornication on ones leg .These disgusting actions are why some ,maybe most,owners chose to live in a dog free community.When sneaking around these rules ,the perpetrators might just as well spit in our face. The by-laws must be made to reflect the majorities rights.Perhaps,the dessenters would be happier in another community rather than be ostracized at CBW, which would be another fine recourse , besides a significant $$ fine ,with progressive amounts. Al Felice

4. 

  **Lance Talkington** *said:*
October 13, 2011 at 11:24 am
  1   0   Rate This

Following is a comment that the author is having difficulty getting to the blog. It was emailed to us for posting:

Please NO DOGS. NO EXCEPTIONS. Period.

As an aside: we love dogs. Wish we could have one. But there is no way to enforce dog-owners' manners, either by fine or frown.

Holly McGuire, 14L

5.

  **Barbara Walters** *said:*
October 13, 2011 at 11:25 am
  0   0   Rate This

Since you so tactfully used my name in this blog, I am required to defend myself, not as a "violator" of any laws, but a person with a disability who is afforded the protection of the law. The Fair Housing act and subsequent rulings by the courts have explicitly stated that an exception to the "no pets" rule qualifies as part of the ADA act, and that violators of the ADA can be required to pay money damages and penalties. Persons are also not allowed



EXHIBIT
Walters- Harcourt
**3**

Case: 14-4476 Document: 003112129996 Page: 85 Date Filed: 04/15/2015
Case: 14-4476 Document: 003112129996 Page: 85 Date Filed: 04/15/2015

Page 4 of 5

under the law to ask what a persons disability is, so it seems that I am being singled out, which is protected by my first amendment rights too. This may very well end up in litigation, and I hope "Anonymous" will help fund any legal fees.



○ **alfred felice** *said:*
October 13, 2011 at 12:10 pm
   0    0    Rate This

This is another "law" with protection for DISABILITY !!!! That is fine except I believe it is sorely ABUSED. Just think "you can't even inquire as to the disability !!! TERRIFIC !!! So if someone has some DBL by which he/she might go off his/her gourd without the pet at his/her side we must all be innocent victims to any violent reaction. We don't even know we need protection !!! BAD LAW !!!!! WE SHOULD NOT HAVE DOGS AT CBW .

6.

**Barbara Walters** *said:*
October 13, 2011 at 11:40 am
   0    0    Rate This

Also, an addendum. I am on permanent disability, which is documented by the social security office.



○ **Lance Talkington** *said:*
October 13, 2011 at 12:04 pm
   0    0    Rate This

It's unreasonable to expect anyone to rely on anything other than written verification from an unbiased third party as to your or anyone else's supposed disability, particularly when we are expected to agree that it requires the use of a specially trained service dog for you to be able to function. The dog's credentials; type of training; and required use of its services is a reasonable request. Otherwise, it's a pet and is a violation of the rules to which the rest of us adhere.



○ **Lance Talkington** *said:*
October 13, 2011 at 3:02 pm
   0    0    Rate This

OK, so why do you need a trained service dog? Being on SSA disability is not in and of itself indicative of a need for this type of dog. It means you're not able to do certain work functions -- period. Further, what kind of special training certification does your dog have that would enable it to provide a specific type of help that is required for your disability? These are very simple and easy to answer questions that are relevant, and there would be paperwork to prove both the disability and the certification of the animal. Avoiding answering the questions and not producing paperwork leads to a logical conclusion that the dog is a pet. This isn't complicated.

7.

Barbara Walters *said:*
October 13, 2011 at 12:19 pm
   0    0    Rate This

Since you are not a member of the board, you are not the authority to whom ANYONE is accountable to. You seem to trying to rule the roost from your computer.

8.

Barbara Walters *said:*
October 13, 2011 at 12:21 pm
   0    0    Rate This

oh, and you don't have to agree as to my needs. You are not a licensed physician or did you get that degree via computer too!

3054700/000232

Subj:  Fwd: Dog.....again
Date:  10/20/2011 10:67:41 A.M. SA Western Standard Time
From:  JERSEYBARB@aol.com
To:    jkcomes@gmail.com

This bitch is at it again!!!!!!!!!!!

From: susangsanderson@gmail.com
To: canfieldvi@gmail.com, joncassedy@hotmail.com, rbousvi@gmail.com, mllom2@earthlink.net, ehazkoehler@gmail.com, cowpetbaywest@hotmail.com, mverdiramo@optonline.net, jerseybarb@aol.com
Sent: 10/20/2011 7:52:08 A.M. Eastern Daylight Time
Subj: Dog.....again

Dear Board,

Last night as I was returning from my Rotary meeting, I was driving down Windward Way when I saw past president Judy walking a large dog on the road. I stopped and said to her, "There are no dogs allowed on the property." She stared at me and after a few seconds said, "Service dog" to which I responded, "Right". Our Rotary Motto is "Is it the truth," Is this the truth?

Last Sunday, I think it was, when Dan and I went down to the beach on the path from the office, there were people having a Bar-B-Que on the sand at the bottom of the walkway. They had a little dog with them. I recognized one of the men as someone who lives on Island. We didn't say anything, because we don't know what the rules say about the beach. Also we don't know if they brought the dog through Cowpet or Elysian, but the picnic was at the Cowpet end of the beach.

I have heard the "Service Dog" response before when I have seen dogs on the grass by the beach. I have heard more dogs recently barking, and so I ask you, "What will the Board do?" Because if we can have dogs, despite the rules, by saying they are service dogs, whatever that is supposed to mean, maybe I will get one too.

So, I ask you to please deal with this issue. Also I thought we had fines for this. I await your response. Thanks.

Susan
Susan G.S. Anderson, D.M.D.
6501 Red Hook Plaza, Suite 201
St. Thomas, VI 00802-1306
340-513-2705
Dentist, Forensic Odontologist
Lycoming Co, PA Deputy Coroner
Sr. Vice-President, Sharp Properties, Inc.
Member of Rotary of St. Thomas East
Be the change that you want to see in the world. Gandhi



EXHIBIT
Walker - Harcourt
4

Sunday, March 04, 2012 AOL: JERSEYBARB

3054700/000233

Subj: Re: Dog.....again
Date: 10/20/2011 3:39:32 P.M. SA Western Standard Time
From: JERSEYBARB@aol.com
To: milom2@earthlink.net, susanosanderson@gmail.com, canfieldvl@gmail.com,
joncasandy@hotmail.com, rbousyl@gmail.com, shezkoehler@gmail.com,
cownetbayvest@hotmail.com, mverdiramo@optonline.net, walter_@earthlink.net
BCC: jkromes@gmail.com

Max,
I don't think that would be a problem, but the information must be kept confidential, or else the
board member who discloses any information should himself/herself be subjected to fine or
suit or both.
Some of these matters are not public domain.
As we are also discussing that matter, why are the unauthorized additions or porch enclosures
not subjected to a fine by this board. We must keep ruling fair, and not make exceptions.
Barbara
I also included Rosies name, as she was not on this email

In a message dated 10/20/2011 12:47:30 P.M. Eastern Daylight Time, milom2@earthlink.net
writes:

The current Rules and Regulations are very clear:

6. Dogs and farm animals are prohibited, and owners will be fined as specified by the
   Board of Directors. The Association may require removal of any animal when it
   becomes bothersome to others, or is deemed by the Association to be unacceptable.

The Board is discussing changes to the By-Laws which would allow exceptions for true service
animals that are documented and approved by application to the Board. At this time, we should levy a
fine against the offenders that could be mitigated if they would submit appropriate ADA compliant
paperwork regarding the service animal to the Board.

M. Harcourt

-----Original Message-----
From: "Susan GS Anderson, DMD"
Sent: Oct 20, 2011 6:52 AM
To: "Canfield, Bill", "Cassady, Jon", "Cockayne, Bob", "Harcourt, Max", "Koehler, Sharon",
"Schechter, Luanne", "Verdiramo, Vince", "Walters, Barbara"
Subject: Dog.....again

Dear Board,

Last night as I was returning from my Rotary meeting, I was driving down Windward Way when
I saw past president Judy walking a large dog on the road. I stopped and said to her, "There
are no dogs allowed on the property." She stared at me and after a few seconds said,
"Service dog" to which I responded, "Right". Our Rotary Motto is "Is it the truth." Is this the
truth?



EXHIBIT
Walters-Harcourt
5

Sunday, March 04, 2012 AOL: JERSEYBARB

3054700/000234

Last Sunday, I think it was, when Dan and I went down to the beach on the path from the office, there were people having a Bar-B-Que on the sand at the bottom of the walkway. They had a little dog with them. I recognized one of the men as someone who lives on Island. We didn't say anything, because we don't know what the rules say about the beach. Also we don't know if they brought the dog through Cowpet or Elysian, but the picnic was at the Cowpet end of the beach.

I have heard the "Service Dog" response before when I have seen dogs on the grass by the beach. I have heard more dogs recently barking, and so I ask you, "What will the Board do?" Because if we can have dogs, despite the rules, by saying they are service dogs, whatever that is supposed to mean, maybe I will get one too.

So, I ask you to please deal with this issue. Also I thought we had fines for this. I await your response. Thanks.

Susan
Susan G.S. Anderson, D.M.D.
6501 Red Hook Plaza, Suite 201
St. Thomas, VI 00802-1306
340-513-2705
Dentist, Forensic Odontologist
Lycoming Co, PA Deputy Coroner
Sr. Vice-President, Sharp Properties, Inc.
Member of Rotary of St. Thomas East
*Be the change that you want to see in the world. Gandhi*

3054700/000236

Joint Appendix Vol. II Page 942

Page 1 of 1

**Subj):** Re: Request For Enforcement Of Rules And Regulations
**Date:** 10/26/2011 5:23:04 P.M. SA Western Standard Time
**From:** JERSEYBARB@aol.com
**To:** ltalkington@TALKINGTON.CO, milom2@earthlink.net
**CC:** shazkoehler@gmail.com, weller_@earthlink.net, canfieldvl@gmail.com, sallyfcockayne@hotmail.com, cowpetbaywest@hotmail.com

To my fellow board members,
Well, since we seem to be following the letter of the law, I am also in favor of fining owners with illegal additions retroactively. That should make up quite the shortfall, Lance, don't you have an illegal addition on your seaside patio, and weren't you instructed to put the common areas back to regulation???

In a message dated 10/26/2011 9:14:17 A.M. Eastern Daylight Time, ltalkington@TALKINGTON.CO writes:

> To The Cowpet Bay West Board of Directors:
>
> On May 12, 2011 the board adopted a formal written policy titled CBW Owner Repair/Inquiry Handling Policy. The policy includes procedures for owner requests for enforcement of Rules and Regulations. The association has a long standing rule disallowing dogs on the property. It has recently become a well publicized reality that multiple owners, including one current board member, have dogs living in their units. Given that our unit was fined for having a dog when a friend stayed in the unit and unbeknownst to us brought their pet, it is inconceivable how other owners are knowingly permitted to have dogs on a long standing basis without consistent enforcement of fines for such behavior. Repeated requests to the board member for substantiation of her need for a trained service dog have gone purposely unanswered, and in fact her responses have been accompanied by threats of lawsuits against both the board and me if her ability to have a dog is challenged. I have consulted a senior law firm partner who is an expert in condominium association law, and he has confirmed that the board has every right to request any and all documentation and other supporting information for an owner claiming the right to have a service dog as a result of disability. There are no limitations on this right whatsoever. If the board would like to engage the attorney in this regard, I will provide his contact information.
>
> My daughter has repeatedly asked why others are allowed to have dogs while she is not allowed one. It is egregiously inconsistent for me to be fined for a dog in our unit while others are clearly being allowed to have dogs with no consequences. It is our request that the rules be consistently enforced and that any owner with a dog be required to submit documentation as to the need for a trained service dog to assist with their inability to function normally. It is also requested that the ADA guidelines for the definition of a service dog be implemented immediately and also incorporated into the bylaws that are currently being drafted for approval at the February owners meeting. This email is being sent to the board of directors and the association office in accordance with the procedures adopted in the May 12 document.
>
> Lance Talkington
>
> Three Leeward



EXHIBIT
Walters-Harcourt
6

Sunday, March 04, 2012 AOL: JERSEYBARB

3054700/000238

Page 1 of 2

**Subj:** Re: Owner's Inquiries
**Date:** 10/27/2011 10:58:42 A.M. SA Western Standard Time
**From:** JERSEYBARB@aol.com
**To:** shazkoehler@gmail.com, mlom2@earthlink.net
**CC:** weller_@earthlink.net, rbcusyl@gmail.com, canfieldvl@gmail.com, moehogan1@verizon.net
**BCC:** jkromes@gmail.com, rllamoureux@snet.net, cowpalbaywest@hotmail.com, loncassedy@hotmail.com, lamik2@aol.com

Dear fellow board members,
My paperwork is on file in the office, but my medical information is no ones business and is none ~~of~~
this board has a history of violating confidentiality, how the hell can I trust any one of you to
keep their mouth shut? Am I going to find my information on Lances blog again????
While we are on the business of violations, I want Lance and Susan, two of the biggest
complainers fined for violations in their units. They have incorporated common property into
their units, we are paying insurance on total footage, and I refuse to foot the bill for either one of
these jerks. I want their violations corrected and I want them fined retroactively!!!
You people are not addressing my complaints, and I think that the populace would be quite
unhappy if they knew that this board has allowed confidential information to be LEAKED!!!!!
How did Lance get the phone number to call in, why did he not disconnect when instructed
to.....what the hell are you people doing. You are making our association a laughing stock with
your unprofessional behavior.
Sharon, why is it costing us thousands of dollars for the accountant. Are you not capable of
doing your job, should we perhaps put Jeannie Brennen as treasurer, since she's doing the work
anyway?
There's an old song that reminds me of you people.....Harper Valley PTA, listen to the words
sometime. The old double standard seems to work for everyone pretty nicely!
Also, I'd like to know where my boards outrage was when my name and information was
plastered on the Internet. Does a Lance, who sits in front of his computer and pecks away on his
keyboard, trying to cause dissention among the populace count more then I do?? Do his
concerns rate more than mine? Why isn't his time expended on serving rather then criticizing?
And for this he is rewarded with utmost concern by my board.
Now I want my complaints dealt with as expediciously as you seem to want to address the
others.
Comments please???
Barbara

In a message dated 10/27/2011 8:08:57 A.M. Eastern Daylight Time, shazkoehler@gmail.com
writes:

> Max
> I really think the Board needs to respond to the emails/inquiries from both Susan Anderson
> and Lance Talkington in accordance with our Owner Initiated Inquiry Policy. We were
> remiss in answering Susan's first inquiry, now her second has appeared. Lance has also
> sent us an inquiry, which needs, at least, to be acknowledged,
>
> The Board is seriously loosing its credibility with our owners, and I, for one, am upset by
> this. Between all of our early-on infighting, and now several reports about violations of the
> rules and regs, especially connected with both a current board member and our past
> president, with dogs on property, we have become a further laughing matter. Rather than
> addressing these issues head-on, we act by not acting, which I think gives our owners the

**EXHIBIT 7** Walls - Harcourt

Sunday, March 04, 2012 AOL: JERSEYBARB

3064700/000236

impression that we are be partial, rather than impartial, in these matters.

We need to act upon this now. We need to send a request, or fine, to both Barbara and Judi, along with a statement that the fines will be forgiven upon receipt of the necessary paper work and proof of service dog eligibility as defined by the ADA. The longer we wait to accomplish this, the more we appear ineffectual, foolish and bi-partisan.

Fellow board members.....comments please.
Dharon.

3054700/000237

Subj:    **Re: Request For Enforcement Of Rules And Regulations**
Date:    10/28/2011 3:33:50 P.M. SA Western Standard Time
From:   JERSEYBARB@aol.com
To:     mliom2@earthlink.net, jkromes@gmail.com
CC:     cowpetbaywest@hotmail.com, weller_@earthlink.net, rhousvi@gmail.com, nanfieldvi@gmail.com,
shazkoehler@gmail.com, loncassady@hotmail.com, moshogan1@verizon.net

Oh and one other thing,
Including these two in your email about the board of directors, you clearly indicate your lack of
professionalism and confidentiality.

In a message dated 10/28/2011 11:58:32 A.M. Eastern Daylight Time, mliom2@earthlink.not
writes:

> Judi and Barbara,
>
> Cowpet Bay West's current rules are very clear – No Dogs. You are both in violation of these rules,
> and owners have complained to the Board.
>
> As you know, the Board is considering absorbing the "No Dogs" rule into the by-laws, and allowing
> exceptions, upon application to the board with supporting documentation, for service dogs,
>
> Louanne tells me that both of you have "papers in the office" regarding service dogs; however, you
> have not applied for an exception to the rule.
>
> If you, as owners and users of service dogs as defined and documented in accordance with ADA
> rules, wish an exception, you must apply in writing or electronically to the Board and submit supporting
> documentation. You have 10 days to submit this request. It will be considered at the November Board
> meeting, and you will be informed of the outcome. Barbara, you must recuse yourself from voting
> since you are a Board Member.
>
> Even though you are clearly in violation of the rules, this offer is being made in good faith, and in the
> spirit of the consensus of the Board as demonstrated in our by-law discussions.
>
> If you do not avail yourselves of this offer, you are subject to being fined under the current rules of the
> association at the November meeting.
>
> M. M. Harcourt
>
> President, CBW Condo Association



EXHIBIT
Walters - Harcourt
**8**

Sunday, March 04, 2012 AOL: JERSEYBARB

3054700/000242

Subj: Re: Request For Enforcement Of Rules And Regulations
Date: 10/28/2011 3:27:53 P.M. SA Western Standard Time
From: JERSEYBARB@aol.com
To: milom2@earthlink.net, jkromes@gmail.com
CC: cowpatbaywest@hotmail.com, weller_@earthlink.net, rhcusvi@gmail.com, ganfieldvi@gmail.com, ahszkoshler@gmail.com, lonoassadv@hotmail.com, moehogan1@verizon.net

First of all,
How dare you have the audacity to include the two VIOLATORS with any correspondence from me? You are not Obama here, if you change the by-laws, you need 66 2/3 vote. I really don't give a damn what you are threatening me with. Are you fining me for being up in NJ for the past three months. I guess my dogs bark must really go downwind.
I am also notifying the board that I am in possession of a service dog, and under the disabilities act set forth in the Fair Housing Amendment, section 504 and title II of the Americans with Disabilities Act, I qualify to keep service animal even when policy explicitly prohibits pets.
I am also not recusing myself from any vote, not that it matters since this board seems to vote in a bloc, but nevertheless, I was elected, not appointed!!!!
If any medical information is disclosed to Anderson, Talkington or any one else, that will be taken as violation of privacy, and will be dealt with accordingly.
B.A Walters
Vice President CBW Condo Association

In a message dated 10/28/2011 11:58:32 A.M. Eastern Daylight Time, milom2@earthlink.net writes:

> Judi and Barbara,
>
>
> Cowpat Bay West's current rules are very clear - No Dogs. You are both in violation of these rules, and owners have complained to the Board.
>
>
> As you know, the Board is considering absorbing the "No Dogs" rule into the by-laws, and allowing exceptions, upon application to the board with supporting documentation, for service dogs.
>
>
> Louanne tells me that both of you have "papers in the office" regarding service dogs; however, you have not applied for an exception to the rule.
>
>
> If you, as owners and users of service dogs as defined and documented in accordance with ADA rules, wish an exception, you must apply in writing or electronically to the Board and submit supporting documentation. You have 10 days to submit this request. It will be considered at the November Board meeting, and you will be informed of the outcome. Barbara, you must recuse yourself from voting since you are a Board Member.
>
>
> Even though you are clearly in violation of the rules, this offer is being made in good faith, and in the spirit of the consensus of the Board as demonstrated in our by-law discussions.

EXHIBIT
Walters-Harcourt
9

Sunday, March 04, 2012 AOL: JERSEYBARB

3054700/000240

If you do not avail yourselves of this offer, you are subject to being fined under the current rules of the association at the November meeting.

M. M. Harcourt

President, CBW Condo Association

-----Original Message-----
From: Lance Talkington <ltalkington@talkington.co>
Sent: Oct 26, 2011 8:13 AM
To: "mliom2@earthlink.net" <mliom2@earthlink.net>
Cc: 'Sharon Koehler' <sharzkoehler@gmail.com>, 'Rosie Welle' <weller_@earthlink.net>, "JERSEYBARB@aol.com" <jerseybarb@aol.com>, "canfieldvl@gmail.com" <canfieldvl@gmail.com>, Cockayne <sallyfcockayne@hotmail.com>, Cowpet Bay West <cowpetbaywoet@hotmail.com>
Subject: Request For Enforcement Of Rules And Regulations

To The Cowpet Bay West Board of Directors:

On May 12, 2011 the board adopted a formal written policy titled CBW Owner Repair/Inquiry Handling Policy. The policy includes procedures for owner requests for enforcement of Rules and Regulations. The association has a long standing rule disallowing dogs on the property. It has recently become a well publicized reality that multiple owners, including one current board member, have dogs living in their units. Given that our unit was fined for having a dog when a friend stayed in the unit and unbeknownst to us brought their pet, it is inconceivable how other owners are knowingly permitted to have dogs on a long standing basis without consistent enforcement of fines for such behavior. Repeated requests to the board member for substantiation of her need for a trained service dog have gone purposely unanswered, and in fact her responses have been accompanied by threats of lawsuits against both the board and me if her ability to have a dog is challenged. I have consulted a senior law firm partner who is an expert in condominium association law, and he has confirmed that the board has every right to request any and all documentation and other supporting information for an owner claiming the right to have a service dog as a result of disability. There are no limitations on this right whatsoever. If the board would like to engage the attorney in this regard, I will provide his contact information.

My daughter has repeatedly asked why others are allowed to have dogs while she is not allowed one. It is egregiously inconsistent for me to be fined for a dog in our unit while others are clearly being allowed to have dogs with no consequences. It is our request that the rules be consistently enforced and that any owner with a dog be required to submit documentation as to the need for a trained service dog to assist with their inability to function normally. It is also requested that the ADA guidelines for the definition of a service dog be implemented immediately and also incorporated into the bylaws that are currently being drafted for approval at the February owners meeting. This email is being sent to the board of directors and the association office in accordance with the procedures adopted in the May 12 document.

Sunday, March 04, 2012 AOL: JERSEYBARB

3054700/000241

LAW OFFICES OF

# Karin A. Bentz, P.C.

18 DRONNINGENS GADE, SUITE 8

## Charlotte Amalie, VI  00802

www.VirginLaw.com

TELEPHONE (340) 774-2669

FACSIMILE (340) 774-2665

December 16, 2011

**Via Certified Mail**
**Return Receipt Requested**

Max Hartcourt
President
Cowpet Bay West Condominium Association
10 Leeward Way
Cowpet Bay West
St. Thomas, VI 00802

    Re:   **Barbara Walters**
        **Violation of Americans With Disabilities Act**
        **and Rehabilitation Act of 1973**
        **Our File No.: 30547.00**

Dear Board Members:

    We represent Barbara Walters in a complaint for your Association's violation of the Americans With Disabilities Act ("ADA") and Rehabilitation Act of 1973. As you are aware, Ms. Walters, a board member and resident of Cowpet Bay West Condominium Association, is the owner of a dog which resides with her in her condominium. Consequently, due to recent complaints and concerns raised about Ms. Walters' dog living on the premises with her, Ms. Walters' rights under the ADA and Rehabilitation Act of 1973 are threatened and compromised. We also wish to inform you that the issues and concerns that you have expressed over Ms. Walters' right to keep her dog, "Happy", at her apartment threaten to violate Ms. Walters' righters under the ADA and Rehabilitation Act of 1973.

    "The ADA provides a clear and comprehensive national mandate for the elimination of discrimination against individuals with disabilities." *Disabled in Action of Penn. v. Southeastern Penn. Transportation Auth.* 635 F.3d 87, 92 (3d Cir. 2011) (citing 42 U.S.C. § 12101(a) (2010)) (internal quotation omitted). Discrimination against individuals is a serious pervasive problem and therefore, the law has sought to assure equality of opportunity, full participation, independent living, and economic self sufficiency for individuals with disabilities. *Id.*

    Pursuant to the Fair Housing Amendments Act of 1988, Section 504 of the Rehabilitation Act of 1973 and Title II of the Americans With Disability Act, Ms. Walters is qualified to keep her dog to assist her with her disability. Therefore, the Condominium Association cannot enforce or engage in any conduct that seeks to punish or deprive Ms. Walters of her right to have her dog



EXHIBIT
Walters-Hartcourt
**10**

3054700/000089

residing with her at Cowpet Bay West Condominiums. Specifically, Ms. Walters obtained a National Service Animal Registry Certificate which entitles her assistance from her dog, "Happy", for her disability. This certificate cites the Fair Housing Amendments Act of 1988, Section 504 of the Rehabilitation Act of 1973 and Title II of the Americans with Disabilities Act and states that property managers and landlords are required to make reasonable accommodation to permit a disabled handler to keep such a pet even where a landlord's policy prohibits pets. Thus, there is no question that the Association is required by federal law to cooperate and accommodate a disabled pet owner who bears a certificate, like Ms. Walters.

"The ADA is a remedial statute, meant to bring an end to discrimination against individuals with disabilities in all aspects of American life; it must be construed with all the liberality necessary to achieve such purposes." *Disabled in Action of Penn*, 635 F.3d at 94. Therefore, we are highly certain that a court would be likely to find that your actions against Ms. Walters constitute a violation of the ADA and Rehabilitation Act of 1973. If you have any questions or concerns, please have your attorney, if you are represented by one, contact me at the aforementioned telephone contact, e-mail or mailing address.

Yours truly,

Karin A. Bentz

KAB/VNP/apg

cc: Client

3054700/000090



U.S. Department Of Housing and Urban Development
New York State Office
Jacob K. Javits Federal Building
26 Federal Plaza
New York, New York  10278-0068
http://www.hud.gov/local/nyn/nynopen.html

JAN 12 2012

Condominium Owner's Association
Cowpet Bay West
6201 Windward Way
St. Thomas, VI 00802

Dear Respondent:

Subject:  Housing Discrimination Complaint
          Walters, Barbara A. v. Cowpet Bay West Condo. Association, et al.
          Inquiry No.  331513
          HUD Case No.  02-12-0242-8

     We have received a formal complaint alleging that you have engaged in one or more discriminatory housing practices under the Federal Fair Housing Law, 42 U.S.C. Sections 3601-3619.  We are required by statute to send you a copy of the complaint.

     We are enclosing a copy of the complaint for you.  The alleged discriminatory practices are identified in this complaint. We have made no determination as to whether the complaint against you has merit.

     The purpose of this letter is to inform you of: 1) the rights you have in responding to this complaint, 2) the rights each complainant has, and 3) the steps the U.S. Department of Housing and Urban Development (the Department) will take to determine whether the complaint has merit.

     In order to insure that the Department informs you properly of the law's requirements, this notification letter contains language required by the law.  A similar letter is used to notify all parties whenever a formal complaint has been filed with the Department under the Federal Fair Housing Law.

     We are governed by federal law, which sets out what steps we must take when a formal complaint is filed.  The law also includes steps that you can take to answer or refute the allegations of this complaint.

     Under federal law, any answer from you to this complaint can be filed within 10 calendar days of your receipt of this letter or receipt of a letter notifying you of any amendments to this complaint.  Your answer must be signed and you must affirm that you have given a truthful response by including the statement "I declare under penalty of perjury that the foregoing is true and correct."

     You will be allowed to amend your statement at any time, if our investigation shows that it is reasonable and fair for you to do so.



EXHIBIT
Walters-Harcourt
11

Joint Appendix Vol. II Page 951

Our responsibility under the law is to undertake an impartial investigation and, at the same time, encourage all sides to reach an agreement, where appropriate, through conciliation. The law requires us to complete our investigation within 100 days of the date of the official filing of the complaint. If we are unable to meet the 100-day requirement for issuing a determination, the law requires that we notify you and the complainant(s) and explain the reasons why the investigation of the complaint is not completed.

In handling this complaint, we will conduct an impartial investigation of all claims that the Fair Housing Act has been violated. If the investigation indicates that there is not evidence establishing jurisdiction, the case will be dismissed. At any point, you can request that our staff assist you in conciliating (or settling) this complaint with the complainant(s). If the case is not resolved, we will complete our investigation and decide whether or not the evidence indicates that there has been a fair housing violation. If the parties involved have not reached an agreement to settle the complaint, the Department will issue a determination as to whether there is reasonable cause to believe a discriminatory housing practice has occurred.

If our investigation indicates that there is reasonable cause to believe that an unlawful discriminatory housing practice has occurred, the Department must issue a charge. If the investigation indicates that there is no reasonable cause to believe that discrimination has occurred, the complaint will be dismissed. In either event, you will be notified in writing.

If the determination is one of reasonable cause, the notification will advise you and the complainant(s) of your rights to choose, within 20 days, whether you wish to have the case heard by an Administrative Law Judge, or to have the matter referred for trial in the appropriate U.S. District Court.

Each complainant has the legal right to file such a suit, even if the complaint formed the basis for a charge, as long as an Administrative Law Judge has not started a hearing on the record with respect to the charge. Under federal law, even if the Department dismisses the complaint, each complainant still has the right to file an individual lawsuit under the Fair Housing Law in an appropriate federal, state or local court within two years of the date of the alleged discriminatory practice or of the date when a conciliation agreement has been violated. The law does not count, as part of the two-year period, any of the time when a proceeding is pending with the Department.

There may be other applicable federal, state or local statutes under which you and/or the complainant(s) may initiate court action. You may consult a private attorney in this regard.

02-12-0242-8

The law also requires us to notify you that section 818 of the Fair Housing Act makes it unlawful for you, or anyone acting on your behalf, to coerce, intimidate, threaten, or interfere with any person in the exercise or enjoyment of, any right granted or protected under the Federal Fair Housing Law.  The law also makes it illegal for anyone to coerce, threaten or interfere with any person for having aided or encouraged any other person in the exercise or enjoyment of, any right or protection granted to them under the Federal Fair Housing Law.

Some explanatory material on the law is enclosed for your information.

If you have any questions regarding this case, please contact Investigator, Irma Perez-Pillot at the San Juan Office at (787) 766-5400.  Please refer to the case number at the top of this letter in those contacts, and keep this office advised of any change of your address or telephone number. We hope this information has been helpful to you.

Sincerely,

Jay Golden
Region II Director
Office of Fair Housing
 and Equal Opportunity

Enclosures

02-12-0242-8

**Complaint**

and Urban Development
Office of Fair Housing
and Equal Opportunity

OMB Approval No. 2529-0011

Please type or print this form

Public Reporting Burden for this collection of information is estimated to average 1 hour per response, including the time for reviewing instructions, searching existing data sources, gathering and maintaining the data needed, and completing and reviewing the collection of information.

Read this entire form and all the instructions carefully before completing. All questions should be answered. However, if you do not know the answer or if a question is not applicable, leave the question unanswered and fill out as much of the form as you can. Your complaint should be signed and dated. Where more than one individual or organization is filing the same complaint, and all information is the same, each additional individual or organization should complete boxes 1 and 7 of a separate complaint form and attach it to the original form. Complaints may be presented in person or mailed to the HUD State Office covering the State where the complaint arose (see list on back of form), or any local HUD Office, or to the Office of Fair Housing and Equal Opportunity, U.S. Department of HUD, Washington, D.C. 20410.

This section is for HUD use only.

| Number | (Check the applicable box) | Jurisdiction | Signature of HUD personnel who established Jurisdiction |
|---|---|---|---|
| 02-12-0242-8 | [X] Referral & Agency (specify) | [XX] Yes [ ] No | |
| Filing Date | [ ] Systemic P.R. | [ ] Additional Info | |
| 01/12/2012 | [ ] Military Referral | | |

1. Name of Aggrieved Person or Organization (last name, first name, middle initial) (Mr.,Mrs.,Miss,Ms.)  Home Phone  Business Phone Cell

Walters, Barbara A      340 775 2388  1908 217 2033

Street Address (city, county, State & zip code)  Cowpet Bay West  St Thomas V I  00802

51 Windward Way (6200 W 51 Windward)

2. Against Whom is this complaint being filed? (last name, first name, middle initial)  Phone Number

Cowpet Bay West Condominium Association, Lance Talkington 340 775 6675

Street Address (city, county, State & zip code)  al Felice  St Thomas

6201 Windward Way  6100 L3 Leeward  6200 W 27 Windward  V I 00802

Check the applicable box or boxes which describe the party named above:

[ ] Builder  [ ] Owner  [ ] Broker  [ ] Salesperson  [ ] Supt. or Manager  [ ] Bank or Other Lender  [X] Other

If you named an individual above who appeared to be acting for a company in this case, check this box [ ] and write the name and address of the company in this space:

Name:  Address

Name and identify others (if any) you believe violated the law in this case:

3. What did the person you are complaining against do? Check all that apply and give the most recent date these act(s) occurred in block No. 6a below.

[ ] Refuse to rent, sell, or deal with you  [ ] Falsely deny housing was available  [ ] Engage in blockbusting  [ ] Discriminate in broker's services

[ ] Discriminate in the conditions or terms of sale, rental occupancy, or in services or facilities  [X] Advertise in a discriminatory way  [ ] Discriminate in financing  [X] Intimidated, interfered, or coerced you to keep you from the full benefit of the Federal Fair Housing Law

[ ] Other (explain)

4. Do you believe that you were discriminated against because of your race, color, religion, sex, handicap, the presence of children under 18, or a pregnant female in the family or your national origin? Check all that apply.

[ ] Race or Color  [ ] Religion (specify)  [ ] Sex  [X] Handicap  [ ] Familial Status  [ ] National Origin
[ ] Black  |  | [ ] Male | [X] Physical | [ ] Presence of children under 18 in the family | [ ] Hispanic [ ] American [ ] Other (specify)
[ ] White  |  | [ ] Female | [X] Mental |  | [ ] Asian or Pacific Islander [ ] Indian or Alaskan Native
[ ] Other  |  |  |  | [ ] Pregnant female |

5. What kind of house or property was involved?  Did the owner live there?  Is the house or property  What is the address of the house or property?

[ ] Single-family house  [ ] Yes  [ ] Being sold?  (street, city, county, State & zip code)
[ ] A house or building for 2, 3, or 4 families  [ ] No  [ ] Being rented?
[ ] A building for 5 families or more  [ ] Unknown
[X] Other, including vacant land held for residential use (explain) Condominium

6. Summarize in your own words what happened. Use this space for a brief and concise statement of the facts. Additional details may be submitted on an attachment.
Note: HUD will furnish a copy of the complaint to the person or organization against whom the complaint is made.

See attached

6a. When did the act(s) checked in item 3 occur? (Include the most recent date if several dates are involved)

Oct 2011
NOV 2011

7. I declare under penalty of perjury that I have read this complaint (including any attachments) and that it is true and correct.  Signature & Date

Barbara Walters  11/30/2011

Previous editions are obsolete  Page 1 of 3  form HUD-903 (7/2001) ref Handbook 8024.1

I. filed paperwork regarding my emotional service animal in February. I brought my dog in July, and currently have her on premises. I have been ostracized, poked, prodded and intimidated, threatened with fines, and the whole story was put on an internet site. One of the named offenders implied that I would go off my rocker & be a danger.

I have enclosed with comments, all the paperwork that has been circulated about me.

I am mortified that this has gone so far with ugly implications.

I don't believe anyone has the right to do this.

Thank goodness, the office manager (a former nurse) has not let these people see my file (they did try).

It's very awkward, as I am on the board of directors, but the president (Max Hartcourt) allowed this discussion to be opened to public scrutiny, and I don't think

Please help me + I am so upset about this public scrutiny and discrimination.

Thank you

Barbara Walters
51 Windward Way
Coupet Bay West
St Thomas V.I. 00802

## FINAL INVESTIGATIVE REPORT

**CASE NAME:** *Walters, Barbara A. v. Cowpet Bay West Condo. Assoc., et al.*

**CASE NUMBER:** *02-12-0242-8*

### I. JURISDICTION

Complainant, Barbara A. Walters, an aggrieved person as defined in 42 U.S.C. § 3602(i) of the Fair Housing Act ("the Act"), filed a verified complaint of housing discrimination with the U.S. Department of Housing and Urban Development (the "Department" or "HUD"). Complainant alleges violations of the Act based on her disability. If proven, the allegation(s) would constitute violation of Section 804(f)(3)(B) of the Act.

In relevant part, Section 804(f)(3)(B) makes it unlawful to "discriminate against any person by refusing to make reasonable accommodations in rules, policies, practices, or services, when such accommodations may be necessary to afford such person equal opportunity to use and enjoy a dwelling."

The most recent act is alleged to have occurred on November 29, 2011, and is continuing. The Complaint was filed timely with the Department on January 12, 2012. The alleged violation occurred in St. Thomas, Virgin Islands.

The Respondent is Cowpet Bay West Condominium Association ("Respondent Association"). The Respondent Association does not qualify for any exemptions under Section 803 or 807 of the Act. The Respondent Association does not receive any federal funding.

Lance Talkington and Al Felice were also named as Respondents (Respondent Residents). The Complainant alleges that these two neighbors harassed her with comments made on an internet blog that deals with condominium issues, in violation of Section 818 of the Fair Housing Act ("FHAct"). The allegations against Respondent Residents were dismissed for lack of jurisdiction.

### II. PARTIES AND AGGRIEVED PERSONS

A.  Complainant

Barbara A. Walters
Cowpet Bay West
6200 W51 Windward Way
St. Thomas, VI 00802



EXHIBIT
Walters - Harcourt
12

Complainant Allegations

The Complainant states that she suffers from mental disability. She alleges that she had requested that the Respondent Association allow her to keep her emotional support animal, a dog, as a reasonable accommodation for her disability. Complainant maintains that her dog helps her to manage her disability, and allows her to be more active. Complainant states that Respondent Association denied her reasonable accommodation request, explaining that the Condominium's By-Laws prohibit pets.

Complainant also states that she has been threatened with fines by the Respondent Association.

B.    Other Aggrieved Persons

None.

C.    Respondent

Condominium Owner's Association
Cowpet Bay West
6201 Windward Way
St. Thomas, VI 00802

Respondent Defenses

Respondent Association denies any and all allegations of discrimination.

Respondent Association also denies that the Complainant submitted any documentation with the Association's Board of Directors regarding an emotional assistance animal. Moreover, the Respondent Association denies that the Complainant has made a request for a reasonable accommodation.

D.    Witnesses

None.

### III.   CASE SUMMARY

A.   Interviews

COMPLAINANT Walters, Barbara A.
Date of Interview:  February 22, 2011
Type of Interview:  Correspondence
Interviewer:  Perez Pillot, Irma

The following questions were sent by e-mail to Mrs. Barbara Walters.

Good Morning Mrs. Walters,

I am in the process of reviewing the documents you provided me and I need clarification on a couple of things.

1.   When did you move to St. Thomas?

2.   When did you move to Cowpet Cond.?

3.   When did Dr. Stanford Sutherland start treating you?

4.   Are you still under Dr. Sutherland care?

5.   When did Dr. AnnaMarie Resnikoff start treating you?

6.   Are you still under Dr. Resnikoff care?

7.   When did Dr. Sheena Walker start treating you?

8.   Which one of the three medical certifications you provided me, if any, was provided to Cowpet's Board of Directors? When?

9.   Did you ask for a reasonable accommodation to have your emotional assistance animal? When? To whom?

10.   Who is charge in your condominium to approve or disapprove the reasonable accommodation requests?  If there is any regulation in regard to this, please provide me with a copy.

11.   Besides the emotional assistance animal, do you receive another treatment for your condition, such as:  pharmacotherapy and/or psychotherapy?

12.   What kind of dog do you have?

13. Did you provide to the Cowpet's Board of Directors the veterinarian records of your dog, including the dog vaccines?

RESPONDENT Owner's Association, Condominium
Date of Interview: January 26, 2012
Type of Interview: Telephonic
Interviewer: Perez Pillot, Irma

The Investigator received a telephone call from Attorney Maria Hodge, who is the legal representative of the Cowpet Bay West Cond. Association. Mrs. Hodge informed the Investigator that her client received the Complaint on January 18, 2011. She requested additional time to answer the complaint. Additional time was granted until February 14, 2012. Attorney Hodge also alleged that her client only received the transmittal letter from NY Regional Office along with the 903, but without the attachments. The attachments will be sent by facsimile (340) 714-1848.

COMPLAINANT Walters, Barbara A.
Date of Interview: February 23, 2012
Type of Interview: Telephonic
Interviewer: Perez Pillot, Irma

The Investigator called the Complainant to find out if she received an e-mail she sent on February 22, 2012. The Complainat explained the Investigator that indeed she received the e-mail and that expected to send an e-mail in the afternoon answering all the Investigator's concerns.

The Complainant informed the Investigator that she is no longer a member of the Board of Directors. They had a new election on February 11, 2012. She was serving before as a Vice-President, but was not re-elected because the issue with her dog. She also informed that the new elected president already approached her to try to conciliate the case.

COMPLAINANT Walters, Barbara A.
Date of Interview: February 27, 2012
Type of Interview: Correspondence
Interviewer: Perez Pillot, Irma

Mrs. Walters sent the Investigator an e-mail dated February 26, 2012 in response to the Investigator e-mail sent on February 22, 2012.

She states that she bought her apartment in Cowpet West Cond. in 2004, but she moved there full time on November 3, 2011.

She also states that she only had one consultation with Dr. Sutherland, and also one consultation with Dr. Resnickoff. Dr Resnickoff examined her under the directives of social security disability, and concluded that she was suffering from clinical depression in addition to a heart condition from a heart attack suffered in July, 2009. She is now under the care of Dr. Walker, and still a patient of hers. She alleges that she had the recommendation of Dr. Sutherland and Dr. Resnickoff on her Condo's file since about March, 2011.

She moved full time with her dog in November, 2011. She alleges that she was a Board member at that time and that she discussed her situation with her fellow board members during the summer of 2010. She alleges that she explained that she needed special accommodations. She states that they were not in the least bit interested in Federal law, and thought because it was part of the rules and regulations; they could force her to send her dog up north to the states.

She also alleges that her medical records were looked at by at least two board members that she knows of. She also alleges that her information was not kept confidential, and was allowed to be plastered and disclosed on the Internet.

She explained that the office manager had her records on file for months, until she advised her to remove them because others were trying to view them.

She is taking the following medications: lexapro 10mg and wellbutrin 150mg for her depression in addition to her heart medications.

Her dog is 11 lbs. Is a rescue of a chinese- crested mix. She has not provided the Board/Office Manager with the veterinary history of her dog, because she thinks that is not necessary. She use to travel with her dog, and showed the airline all her vaccinations, declarations of good health, and the prescriptions from her doctors for the need of an emotional service dog.

She alleges that at the time of this dispute, the board of directors had the authority to permit or prohibit her having a dog. She also alleges that the Board never differentiated pet from service dog status.

She alleges that she was threatened to be fined, which they did do, but possibly have rescinded because of legality of the fines.

She also alleges that it was made an issue during annual elections for the board of directors, (of which she was running again) and she proceeded to lose because of angry rhetoric and accusations of wrong doing on her part, which was promoted by the President at the time, and five other members of the board of directors.

REPRESENTATIVE Owner's Association, Condominium
Date of Interview: March 19, 2012
Type of Interview: Telephonic
Interviewer: Perez Pillot, Irma

Telephone conference with Respondent's Association legal representative, Mr. Joseph Riopelle, to discuss possible conciliation between the parties. He will be discussing Complainant's conciliation offer with his client.

COMPLAINANT Walters, Barbara A.
Date of Interview: March 26, 2012
Type of Interview: Telephonic
Interviewer: Ortiz, Diana M.

The Investigator along with Diana Ortiz, San Juan FHEO Director, had a telephone conference with the Complainant, in which the Complainant informed that resident Al Felice placed the HUD 903 in the internet (Cowpet Association Blog). She was upset because the former respondent had copy of her complaint. Mrs. Ortiz explained that the respondent had to be served with copy of the complaint. She also was asking us to stop all the residents in use the internet blog. Mrs. Ortiz explained that HUD does not have jurisdiction over that issue.

She informed us that now she is not willing to conciliate the case anymore.

REPRESENTATIVE Owner's Association, Condominium
Date of Interview: March 26, 2012
Type of Interview: Telephonic
Interviewer: Perez Pillot, Irma

The Investigator telephoned the Condo Association's representative, Mr. Joseph Riopelle, to find out the status of Complainant's reasonable accommodation request. He was not available. The Investigator left a message.

B.    Documents

Nature of Document: Medical Certification
Who Provided: Complainant
How transmitted to HUD: Mail
Date of Document: January 21, 2011

Medical Certification from Dr. Standford S. Sutherland, MA, LPS (Chilhowee Psychological Services - Woodland Park, Colorado) indicating that he is currently

treating the Complainant for a mental health disability recognized in the DSM IV-TR. She has been diagnosed with Anxiety Disorder. Dr. Sutherland states that due to symptoms associatd with her condition, the Complainant experiences severe limitations when engaging in certain activities, as well as coping with the stress and anxiety of what most people consider normal day to day events, including travel by air. These issues have proven to be incapacitating. He also states that in order to help alleviate these adverse symptoms associated with ther mental disability; he prescribed the Complainant to obtain a dog or other animal to serve as an emotional support animal.

Nature of Document: Medical Certification
Who Provided: Complainant
How transmitted to HUD: Mail
Date of Document: November 2, 2011

Certification to whom it may concern from Dr. AnnaMarie Resnikoff, PHD, from East Brunswich, NJ, stating that the complainant was seen in her office on March 16, 2011, and that she requires a service dog for her condition. Medical certification did not states what is the complainant's medical condition.

Nature of Document: Ltr sent to Cowpet's attorney
How transmitted to HUD:
Date of Document: February 21, 2012

Letter dated February 21, 2012 sent to Joseph G. Riopelle, Esq., acknowledging receipt of his letter dated February 13, 2012. Also enclosing Interrogatories and Request for Admission and requesting him that you submit to us the answers within ten (10) days of receipt of this request.

Nature of Document: E-mail sent to Complainant
Who Provided: Investigator
How transmitted to HUD: E-mail
Date of Document: February 27, 2012

E-mail sent to the Complainant in response to her e-mail dated February 26, 2012. In the e-mail the Investigator explained the Complainant what is a reasonable accommodation, who is entitled to it, what kind of information, if any, may a housing provider request from a person with a disability in support of a requested reasonable accommodation, etc.

The Investigator also asks for more information in regard her reasonable accommodation request.

Nature of Document: E-mail sent to Complainant
Who Provided: Investigator
How transmitted to HUD:
Date of Document: March 5, 2012

> E-mail sent to the Complainant to inform her that Cowpet Bay Way West Cond. Association's legal representative informed the Department that Respondent Association are agreeable to conciliation in this matter.

Nature of Document: Letter from Cowpet's attorney
How transmitted to HUD: Regular mail
Date of Document: February 29, 2012

> Letter from Joseph g. Riopelle, Esq., Cowpet Bay Way West Cond. Association's legal representative, in which he includes Respondent Association's answer to the interrogatories we submitted. He also informs that his client has advised him that they are agreeable to conciliation in this matter.

Nature of Document: E-mail sent to Complainant
Who Provided: Investigator
How transmitted to HUD:
Date of Document: March 6, 2012

E-mail to the Complainant informing her that Respondent Association are agreeable to conciliation in this matter and will accept the submission of a medical letter confirming your disability and need for an emotional assistance animal. Also, letting her know that Respondent Association understands that the documentation is not to be shared with anyone outside of the Board and the Board's attorney.

Nature of Document: Ltr. to Complainant's attorney
Who Provided: Investigator
How transmitted to HUD: E-mail
Date of Document: March 7, 2012

> Letter to Att. Bentz explaining her that Mrs. Barbara Walters advised the Department that she will represent her in the complaint she filed with our Agency. Also, informing the case status and letting her know that the Respondent Association are willing to conciliate the case.

Nature of Document: E-mail from Complainant
How transmitted to HUD:
Date of Document: March 6, 2012

> E-mail from Complainant to Investigator advising her to discuss her case with her attorney Karin Bentz. Her number is 340-774-2669. Her e-mail address: kbentz@virginlaw.com.

Nature of Document: Ltr sent to Complainant
Who Provided: Investigator
How transmitted to HUD:
Date of Document: March 20, 2012

> Letter sent to Complainant including an amended complaint to be signed by her and send it back to FHEO. The Complaint is being amended to remove Respondents Al Felice and Lance Talkington as a respondentes for lack of jurisdiction.

Nature of Document: Ltr. sent to Resp Al Felice
Who Provided: Investigator
How transmitted to HUD:
Date of Document: March 20, 2012

> Letter sent Mr. Felice informing him that he is being removed as a respondent from this complaint for lack of jurisdiction.

Nature of Document: Ltr. to Resp. Lance Talkington
Who Provided: Investigator
How transmitted to HUD:
Date of Document: March 20, 2012

> Letter sent to Lance Talkington to inform him that he is being removed from the complainant for lack of jurisdiction.

C.   Interrogatories

Date Sent: February 21, 2012
Sent To: Cowpet Cond Assoc
Date Returned: February 21, 2012

U.S. DEPARTMENT OF HOUSING AND URBAN DEVELOPMENT
CARIBBEAN FIELD OFFICE
PARQUE LAS AMERICAS I
235 FEDERICO COSTA STREET, SUITE 200
San Juan, PR 00918

| | | |
|---|---|---|
| WALTERS, BARBARA A. | * | |
| | * | |
| Complainant | * | HUD CASE NO.: 02-12-0242-8 |
| | * | |
| v. | * | RE: |
| | * | |
| COWPET BAY WEST CONDO. ASSOC., | * | HOUSING DISCRIMINATION |
| et al | * | |
| | * | |
| Respondents | * | |
| | * | |

INTERROGATORIES and REQUEST FOR ADMISSION

TO          :          COWPET BAY WEST CONDO. ASSOC.

THROUGH   :          Their Attorney of Record
                            Joseph G. Riopelle, Esq.
                            Boyd, Richards, Parker & Colonnelli, P.L.
                            400 North Ashley Drive, Suite 150
                            Tampa, Florida 33602

We are in the process of investigating a complaint filed against Cowpet Bay West Condominium Association, et al, alleging a violation of Sections 804(f)(3)(B) and 818 of the Title VIII of the Civil Rights Act of 1968, as amended by the Fair Housing Act. Pursuant to the regulations implementing the Fair Housing Act, we request that you submit to us in writing the following documentation and answers within ten (10) days of receipt of this request.

1.          Identify the subject property managed by the Respondent, describe the relationship of the Respondent to the property so identified and specify the date in which such relationship commenced.

2.      State the name, job title and job description, address, email, and telephone number(s) for each person employed by the Respondent in connection with the operation of the subject property. Specify the dates of employment for each current and former employees since January, 2010.

3.      Please provide the names, titles and addresses of all the members the Board of Directors for Cowpet Bay West Condo since January, 2010. Please provide the dates in which the Board members have served.

4.      Identify all disabled residents of the subject property who have asked for reasonable accommodation from the Board or the Board's employees since January, 2010. Please describe the nature of the accommodation requested and whether it was granted. Please identify the unit number in which the resident resides or has resided and the dates of occupancy.

including those related to emotional assistance animals.

6.      Does the Respondent have a reasonable accommodation policy? If so, please provide us with a copy.

7.      Describe in detail the procedures that the Respondent routinely follows when making decisions regarding reasonable accommodations requests.

8.      State whether the Respondent or any of its employees have ever received training on the requirements of the Fair Housing Act of 1968, as amended in 1988. Identify each person who gave such training, the date the training was given, its content, the materials that were handed out and the persons that participated in such training.

9.      Identify all Board's members and employees who were present at any conversation in which Mrs. Walters spoke in regard to her emotional assistance animal. Identify dates in which these conversations, if any, occurred.

10.     Did Barbara Walters request to have an emotional assistance animal as a reasonable accommodation? Was the request made in writing or verbally? When did Barbara Walters made the request and to whom?

11.     Did Mrs. Walters provide medical information regarding her need for an emotional assistance animal to any Board's member or staff member? If so, to whom and when.

12.     Did any Board's member or staff member ever explain to Mrs. Walters what the subject property's policies or procedures were in relation to requesting an emotional assistance animal or any kind of reasonable accommodation? If so, whom and when and what information was conveyed to Mrs. Walters?

13.     Please provide any documentation available to support your responses to these interrogatories.

14.     Please provide any additional information which you feel would be useful in establishing the veracity of the facts alleged in the complaint.

Please be advised that this request is not exhaustive. As the information is analyzed, additional information may be required.

In San Juan, Puerto Rico, this     February, 2012.

Irma Pérez-Pillot, EOS
FHEO Caribbean Field Office
US Dept. of Housing & Urban Dev.
235 Federico Costa St., Suite 200
San Juan, Puerto Rico    00918

## IV.    OTHER INVESTIGATIVE FINDINGS

Mrs. Barbara Walters lives at 6200 Windward Way #51., St. Thomas, VI 00802.

The investigation reveals that the Complainant has been under the medical care of Dr. Stanford s. Sutherland and Dr. Sheena M. Walker for treatment of her emotional disability since 2011.

The medical evidence submitted by the Complainant establishes that her emotional disability substantially limit one or more major life activities. Complainant is therefore an individual with disabilities as defined in 24 CFR § 100.201.

Complainant alleges that the Respondent Association violated Section 804(f)(3)(B) of the Act.

The investigation reveals that the Complainant purchased her apartment in April, 2004, but moved full time on November 3, 2011.

The Complainant alleges that in February, 2011 she submitted to the Condominium Office Manager paperwork regarding her need for an emotional assistance animal. She also advised the Office Manager that she didn't want others to view the medical documentation provided. The Complainant further states that other people were trying to review her paperwork, but she was grateful that the Office Manager did not allow anyone to see it. The Complainant states that the Office Manager had her records on file for months, until she was advised to remove them because other people were trying to view them.

The Complainant also alleges that she was a Board's member at that time and that allegedly she discussed her situation with her fellow board's members during the summer of 2010.

The investigation reveals that Complainant brought her dog to her condo apartment in July, 2011. Her dog is an 11 pound chinese-crested mix.

The investigation reveals that Cowpet Bay West Condominium By-Laws have a clause which prohibits pets. The investigation further reveals that based on the By-Laws, it is the Board of Directors the only one with the vested authority to consider a reasonable accommodation request in Cowpet Bay West Condominium.

The investigation reveals that when the Board of Directors realized that the Complainant was maintaining a dog in her apartment, the former Board's President, Max Harcourt, sent her an e-mail dated October 28, 2011, informing her that she was in violation of the By-Laws, which prohibit maintaining pets in the Condominium. The Board's President gave the Complainant 10-days to apply for an exception to the "No Dog Rule" in writing or electronically; and to submit supporting documentation to her request to be considered in the Board's meeting that was scheduled for November, 2011. She was also informed that she was subject to be fined under the By-Laws.

The investigation reveals that the Complainant neither answered the Board's President's e-mail nor provided a request for an accommodation in response to his e-mail dated October 28, 2011.

The investigation reveals that the Complainant filed a housing discrimination complaint on November 30, 2011 before the Department.

The investigation reveals that after the complaint was filed, the second week of March, 2012 the Complainant provided the newly elected Board President, Ed Wardwell, with a copy of a medical certification establishing her medical need for an emotional assistance animal.

The investigation reveals that on March 26th, 2012, the Board of Directors reviewed Complainant's medical certification and through their legal counsel informed the Investigator that they agreed to provide the Complainant an exception to the "No Dog Policy" in place at Cowpet Condominium. Therefore, once the Board received a copy of the Complainant's medical certification, Complainant's request for a reasonable accommodation was granted.

The investigation reveals that the Board of Directors also agreed to waive any fines assessed to the Complainant as a result of the perceived violation of the "No Dog Policy".

The investigation reveals that on April 11, 2012, Respondent Association sent a confirmation letter to the Complainant indicating the acceptance of her accommodation request.

The investigation also reveals that the Respondent Association has drafted a reasonable accommodation policy to become a part of Cowpet Bay By-Laws.

Conducted by: _____

Irma Perez-Pillot
Equal Opportunity Specialist

April 13, 2012
Date

Reviewed by: _____

Diana Ortiz, Director
FHEO San Juan Field Office

4/13/12
Date

_____

Wanda Nieves, Director
Newark FHEO Center

4/13/2012
Date

_____

Jay Golden, Director
Region II Director
Office of Fair Housing and
Equal Opportunity

4/13/12
Date

PR-11-2012 15:51    FROM:WARDWELL          3407755889                              TO:18132236024                    P.1



# COWPET BAY WEST

### 6201 Windward Way, St. Thomas, USVI 00802
### E-Mail: cowpetbaywest@hotmail.com
### Phone: 340-775-6675 Fax: 340-779-6407

April 11, 2012

Barbara Walters

6200 Windward Way #51

St. Thomas, VI 00802

Dear Barbara,

The Board of Directors convened a closed door meeting on March 26th, 2012 to confidentially review the medical certifications submitted by you to Board President, Ed Wardwell in an attempt to confirm your disability and need for emotional support animals. After review, the Board of Directors has agreed to provide you an exception to the No Dog policy currently in place at Cowpet. Thus, your request for an accommodation to allow your service animals/emotion support animals to reside at Cowpet Bay West is granted. Furthermore, the Board of Directors has agreed to waive any fines assessed to your unit as result of the perceived violation of the No Dog policy at Cowpet.

Lastly, the granting of this accommodation request does not provide an exception to other commons sense rules related to animals on the property, including, keeping dogs on a leash at all times as well as cleaning up the excrements of the service animal or emotional support animal.

Yours Truly,

Edward A. Wardwell

Edward A. Wardwell

President, Cowpet Bay West Association





U.S. Department of Housing and Urban Development
New York State Office
Jacob K. Javits Federal Building
26 Federal Plaza
New York, New York 10278-0068
http://www.hud.gov/local/nyn/

JUN 4  2012

Condominium Owner's Association
Cowpet Bay West
6201 Windward Way
St. Thomas, VI 00802

Dear Respondent:

Subject:  Housing Discrimination Complaint
          Walters, Barbara A. v. Cowpet Bay West Condo. Assoc., et al,
          Inquiry No.:      331513
          HUD Case No.:     021202428

The U.S. Department of Housing and Urban Development (HUD) administratively enforces the Fair Housing Act of 1968 (the Act). HUD has completed its investigation of the above-referenced complaint. Efforts to voluntarily conciliate the complaint during the course of the investigation were unsuccessful.

Based on the evidence obtained during the investigation, HUD has determined that no reasonable cause exists to believe that a discriminatory housing practice has occurred. Accordingly, HUD has completed its administrative processing of this complaint under the Act, and the complaint is hereby dismissed. The enclosed Determination of No Reasonable Cause contains a summary of the factual evidence supporting this dismissal.

**Retaliation is a violation of the Fair Housing Act.** Section 818 of the Act makes it unlawful to retaliate against any person because he or she has filed a housing discrimination complaint; is associated with a complainant; has counseled or otherwise assisted any person in filing a complaint; or exercised or enjoyed a housing opportunity...



EXHIBIT
Walters - Harcourt
14

**Right to file a civil lawsuit.**  Notwithstanding HUD's dismissal of this complaint, under Section 813(a) of the Act, the complainant may file a civil lawsuit in an appropriate federal district court or state court within two (2) years of the date on which the alleged discriminatory housing practice occurred or ended.  The computation of this two-year period does not include the time during which this administrative proceeding was pending with HUD.  If, upon the application of either party, the court determines that the party is financially unable to bear the costs of the civil lawsuit, the court may appoint an attorney, or may authorize the commencement of or continuation of the civil lawsuit without the payment of fees, costs, or security.

**Reconsideration.**  A complainant may ask HUD to reconsider its Determination of No Reasonable Cause.  Requests for reconsideration must be in writing and must set forth the specific reasons why the complainant believes that the Determination of No Reasonable Cause is in error.  Reconsideration requests must be limited to the allegations and issues in the complaint.  The complainant must identify the relevant information that he or she believes is incorrect, or that was omitted from the complaint investigation.  The request must include all new and material evidence that the complainant believes supports the reconsideration request.

Please direct all reconsideration requests to:  Director, Office of Enforcement, FHEO, U.S. Department of Housing and Urban Development, Room 5226, 451-7th Street, SW, Washington, DC 20410-2000.  Before requesting reconsideration, please review the Final Investigative Report.  The enclosed Determination provides instructions for obtaining a copy of the Report.

**Public Disclosure.**  Section 103.400(a)(2)(ii) of HUD's regulation implementing the Act requires that HUD shall publicly disclose the dismissal of this complaint, unless a complainant or a respondent requests in writing that no such disclosure shall be made.  Requests for nondisclosure must be made within thirty (30) days after receipt of this Determination.  Nondisclosure requests should be submitted to the same HUD Office that issued the Determination.  Notwithstanding such a request, the fact of this dismissal, including the names of all parties to the complaint, is public information and is available upon request.

If you have any questions regarding this closure, please contact Irma Perez Pillot, Investigator, at (787) 766-5400 ext. 2034, for assistance.

Sincerely,

Jay Golden
Region II Director
Office of Fair Housing
and Equal Opportunity

Enclosure

021202428

## DETERMINATION OF NO REASONABLE CAUSE

**CASE NAME:** *Walters, Barbara A. v. Cowpet Bay West Condo. Assoc., et al.*

**CASE NUMBER:** 02-12-0242-8

### I. JURISDICTION

Complainant, Barbara A. Walters, an aggrieved person as defined in 42 U.S.C. § 3602(i) of the Fair Housing Act ("the Act"), filed a verified complaint of housing discrimination with the U.S. Department of Housing and Urban Development (the "Department" or "HUD"). Complainant alleges violations of the Act based upon her disability. The Respondent is Cowpet Bay West Condominium Association ("Respondent Association").

If proven, the allegation(s) would constitute a violation of Section 804(f)(3)(B) of the Act, which makes it unlawful to "discriminate against any person by refusing to make reasonable accommodations in rules, policies, practices, or services, when such accommodations may be necessary to afford such person equal opportunity to use and enjoy a dwelling."

The most recent act is alleged to have occurred on November 29, 2011, and is continuing. The complaint was filed timely with the Department on January 12, 2012. The alleged violation occurred in St. Thomas, Virgin Islands.

While the Complainant also alleges harassment by two neighbors, in violation of Section 818 of the Act, the Department has determined that it does not have jurisdiction to investigate this issue. The Complainant has failed to state a violation of the Act, and further, the alleged actions by these neighbors implicate rights protected by the First Amendment.

### II. COMPLAINANT'S ALLEGATIONS

The Complainant alleges that she had requested that the Respondent Association allow her to keep an emotional support animal, a dog, as a reasonable accommodation for her disability. Complainant maintains that her dog helps her to manage her disability, and allows her to be more active. Complainant states that Respondent Association denied her reasonable accommodation request as the Condominium's By-Laws prohibit pets.

### III. RESPONDENT'S DEFENSES

Respondent Association denies all allegations of discrimination. Respondent Association also denies that the Complainant ever requested a reasonable accommodation regarding an emotional assistance animal.

JUN-8-2012 15:58 FROM:WARDKELL 3407755859

2

## IV. FINDINGS AND CONCLUSION

The investigation reveals that the Complainant has been under the medical care of two physicians since 2011.

A prima facie case for denial of a reasonable accommodation for a disability may be established by showing that: Complainant has a disability within the meaning of the Act, Respondent knew or should have known of the disability, Complainant needed an accommodation in order to benefit from housing, Respondent knew or should have known of Complainant's need for an accommodation, and Respondent failed to offer a reasonable accommodation.

In this instance, while the first four prongs of the prima facie case have been established, the fifth prong, a failure to provide a reasonable accommodation, has not been established.

### 1. Complainant has a disability within the meaning of the Act.

In accordance with 24 C.F.R § 100.201, a person with a "*handicap*" means a person who has 1) a physical or mental impairment which substantially limits one or more major life activities; 2) a record of such an impairment; or 3) being regarded as having such an impairment." In addition, the regulation provides that the term "*has a record of such an impairment* means has a history of, or has been misclassified as having, a mental or physical impairment that substantially limits one of more major life activities." Further, in accordance with 24 C.F.R. § 100.201, the term "*major life activities* means functions such as caring for one's self, performing manual tasks, walking, seeing, hearing, speaking, breathing, learning and working."

The investigation reveals that the Complainant is a member of a protected class of individuals as defined by the Act. Medical evidence submitted to the Department establishes that the complainant is an individual with disabilities as defined in 24 CFR § 100.201.

### 2. Respondent knew or should have known of the disability.

In February 2011, the Complainant provided medical documentation to the Condominium Office Manager of her disability, and of her physician's prescription of an emotional support animal.

### 3. Complainant needed an accommodation for her disability.

The Complainant's medical certificates confirm that the Complainant requires an accommodation for her disability, i.e., an emotional support animal.

### 4. Respondent knew or should have known of Complainant's need for an accommodation.

In February 2011, the Complainant informed the Condominium Office Manager of her disability and need for an emotional support animal.

### 5. Complainant failed to request an accommodation for her disability.

While the Complainant informed the Office Manager of the Respondent Association of her disability and need for an emotional support animal in February 2011, she did not formally request an accommodation at that time. In fact, she asked that the Office Manager keep this information confidential, i.e., that it not be shared with the Board of Directors of the Respondent Association. The Complainant understood that any request for a reasonable accommodation would need to be approved by the Board of Directors.

It should be noted that the Complainant herself was a Board member at that time.

In July 2011, the Complainant began to house a dog in her condo unit. The dog is an eleven pound chinese-crested mix.

The investigation reveals that, while the Cowpet Bay West Condominium By-Laws prohibit pets, the Board of Directors is vested with authority to consider and grant a reasonable accommodation request within Cowpet Bay West Condominium.

In October 2011, members of the Board noticed that the Complainant was housing a dog in her condo unit. On October 28, 2011, Board President, Max Harcourt, wrote to the Complainant, by email, informing her that her action, in housing a dog in her unit was in violation of the By-Laws. She was informed that she had ten days within which to apply for an exception to this Rule, and that she should submit all supporting documentation, as well, for consideration by the Board at their November 2011 meeting.

The investigation reveals that the Complainant failed to respond to the Board President's October 28, 2011 email.

On November 30, 2011, the Complainant filed a housing discrimination complaint with HUD.

In March 2012, the Complainant provided the newly elected Board President, Ed Wardwell, with a request for an emotional assistance animal and a copy of a medical certification establishing her medical need for an emotional assistance animal.

The investigation reveals that, on March 26th, 2012, after reviewing the documents provided by the Complainant, the Board of Directors agreed to allow the Complainant to maintain this dog in her co-op, as an emotional support animal. At this time, the Board also agreed to waive any fines assessed to the Complainant as a result of the perceived violation of the "No Dog Policy."

On April 11, 2012, Respondent Association sent a confirmatory letter to the Complainant indicating acceptance of her accommodation request.

4

CONCLUSION

Complainant did not formally request a reasonable accommodation for her disability until March 2012. In April 2012, upon review of these documents, the Respondent granted the request.

There is no reasonable cause to believe that the Respondent violated the Act, as alleged.

## V.  ADDITIONAL INFORMATION

Notwithstanding this determination by HUD, the Fair Housing Act provides that the complainant may file a civil action in an appropriate federal district court or state court within two years after the occurrence or termination of the alleged discriminatory housing practice. The computation of this two-year period does not include the time during which this administrative proceeding was pending. In addition, upon the application of either party to such civil action, the court may appoint an attorney, or may authorize the commencement of or continuation of the civil action without the payment of fees, costs, or security, if the court determines that such party is financially unable to bear the costs of the lawsuit.

The Department's regulations implementing the Act require that a dismissal, if any, be publicly disclosed, unless the Respondents or Complainant request that no such release be made. Such request must be made by the Complainant or Respondents within thirty (30) days of receipt of the determination to the Director, Office of Enforcement, Office of Fair Housing and Equal Opportunity, 451 Seventh Street, S.W. Washington D.C. 20410. Notwithstanding such request, by the Complainant or the Respondents, the fact of a dismissal, including the names of all parties, is public information and is available upon request.

A copy of the final investigative report can be obtained:

US Department of Housing and Urban Development
Office of Fair Housing and Equal Opportunity
Attn.: Jay Golden, Region II Director
26 Federal Plaza - Room 3532
New York, NY 10278-0068

JAY GOLDEN  
Region II Director  
Office of Fair Housing and  
  Equal Opportunity

4/6/12  
DATE

IN THE UNITED STATES DISTRICT COURT OF THE VIRGIN ISLANDS
DISTRICT OF ST. THOMAS AND ST. JOHN

| | | |
|---|---|---|
| BARBARA WALTERS, | ) | |
| | ) | |
| Plaintiff, | ) | |
| v. | ) | CIVIL CASE NO: 3:12-cv-00024 |
| | ) | |
| COWPET BAY WEST CONDOMINIUM | ) | |
| ASSOCIATION; THE BOARD OF THE | ) | |
| COWPET BAY WEST CONDOMINIUM | ) | |
| ASSOCIATION; MAX HARCOURT, in his | ) | |
| personal capacity; ALFRED FELICE; | ) | |
| LANCE TALKINGTON ROBERT | ) | |
| COCKAYNE;VINCENT VERDIRAMO, | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |

## DECLARATION OF SHARON KOEHLER

I, SHARON KOEHLER, hereby declare as follows:

1.      I have personal knowledge of the matters set forth in this declaration.

2.      I submit this declaration in support of the Motions for Final Summary Judgment filed by the Defendants in this matter.

3.      I am a resident of New Suffolk, Suffolk County, New York

4.      I was the treasure of the Cowpet Bay West Board in 2011 and 2012 and I am currently still serving on the Board.

5.      I never reviewed any paperwork of Plaintiff in the office at Cowpet or at any other location prior to March 2012 when Plaintiff finally submitted her paperwork to the Board for review and consideration.

6.      The Cowpet Board neither reviewed nor discussed the content of Plaintiff's medical verification and accommodation request, until March 2012, when Plaintiff submitted same to then president, Ed Wardwell.



EXHIBIT

15

7.      The Board became aware of Plaintiff having "paperwork" in October 2011, but was not allowed to view same per Plaintiff's instructions to the Board and to Louanne Schechter.

8.      The Board never prevented Plaintiff from accessing or using her unit at any time with the accompaniment of her dog.

9.      The Board held all dog violation fines against Plaintiff in abeyance and agreed to waive same in March 2012.

10.     After receipt of the letter from Plaintiff's Counsel, the Board met in January and decided to retain counsel for legal advice related requests for exceptions to the dog rule.

11.     I have personal knowledge, as a member of the Cowpet Bay West Board that Exhibit "13" of Defendants Motion for Summary Judgment in this matter is a true and accurate copy of the correspondence sent by the Board to Plaintiff.

12.     The Board met in a closed door session in March 2012, reviewed the submissions of Plaintiff and agreed to accommodate her request.

Further Affiant Sayeth Not.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on April 3 0, 2014.

_____
Sharon Koehler

IN THE UNITED STATES DISTRICT COURT OF THE VIRGIN ISLANDS
DISTRICT OF ST. THOMAS AND ST. JOHN

JUDITH KROMENHOEK, )
)
Plaintiff, )
)
v. ) CIVIL CASE NO: 3:12-cv-00025
)
COWPET BAY WEST CONDOMINIUM )
ASSOCIATION; THE BOARD OF THE )
COWPET BAY WEST CONDOMINIUM )
ASSOCIATION; MAX HARCOURT, in his )
personal capacity; ALFRED FELICE; )
LANCE TALKINGTON ROBERT )
COCKAYNE;VINCENT VERDIRAMO, )
)
Defendants. )
_____ )

## DEFENDANT MAX HARCOURT (DECEASED) MOTION FOR SUMMARY JUDGMENT AS TO COUNTS II, XIII, VX & XVII OF THE SECOND AMENDED COMPLAINT AND INCORPORATED MEMORANDUM OF LAW PURSUANT TO FED. R. CIV. P. 56 AND LOCAL RULE 56.1

Defendants, Max Harcourt (Deceased), by and through his undersigned counsel, submit this Memorandum of Law in support of his Motion for Summary Judgment on the Complaint filed by Plaintiff, Judith Kromenhoek ("Plaintiff"), and move this Honorable Court for entry of Final Summary Judgment in his favor against Plaintiff. In support, Defendant states the following:

## I.    INTRODUCTION

This matter stems from a baseless quarrel amongst residents at Cowpet Bay West Condominium Association regarding Plaintiff's accompaniment of a dog while she resided at her unit in Cowpet Bay West. An action, on its face and to all residents who observed same, that was in violation of the No Dogs Rule at Cowpet Bay West. However, Plaintiff, without informing any of the Defendants of her non-obvious disability and need for an emotional support

animal and after covertly submitting some paper work to the property manager with instructions to keep the contents of the paper work confidential, walked around Cowpet for several months with her dog without answering to anyone. Finally, in October of 2011, after several requests from residents, then president, Defendant, wrote Plaintiff asking Plaintiff to submit either in writing or electronically to the Board, a request for an exception to the no dog rule with supporting documentation. Defendant confirmed that even though having a dog on property was a violation of the rules, the Cowpet Bay West Association and the Board were offering to Plaintiff her chance to seek an exception, in good faith. However, Plaintiff in response stated she would only meet with Defendant, alone and only after he signed a confidentiality agreement with a monetary penalty for disclosure. This would not provide the Board a chance to review the documents to determine the necessity and appropriateness of the accommodation requests. As such, Plaintiff refused to submit her medical verifications to the Cowpet Bay West or the Board for consideration until March 2012, when she provided newly elected board president, Ed Wardwell, with a request for an emotional assistance animal and copy of medical certification establishing her medical need for an emotional assistance animal. On March 26th, 2012, the board of directors reviewed the documents provided by Plaintiff and agreed to allow Plaintiff to maintain her dog in her condominium unit.

On April 11, 2012, Plaintiff received confirmation from the Cowpet Bay West and the Board, via letter, that the Board conducted a confidential review of her medical certifications and that the Board and Cowpet Bay West agreed to provide Plaintiff an exception to the No Dog policy and a waiver of any fines assessed to Plaintiff's unit as a result of the perceived violation of the No Dog policy.

Nevertheless, we are now hear two years after Plaintiff's formal request for accommodation was granted and after Defendant died in October 2012, trapped in the quagmire that is this lawsuit. In just over two years, Plaintiff has conducted no discovery in this matter, despite being given more than an adequate amount of time to complete same. Frankly, Plaintiff cannot establish any existence of an element essential to her case. As such, pursuant to Fed. R. Civ. P. 56, there can be no genuine issue to any material fact, since the complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial. Thus, Defendant is entitled to summary judgment. As will be discussed more fully below, Plaintiff's claims are unsupported by the evidence. The undisputed material evidence show: (1) The Board and Cowpet Bay West never refused to accommodate Plaintiff's dog; (2) Plaintiff was never prevented access or use of her unit with her dog in accompaniment; (3) Defendant did not interfere with her Fair Housing Rights; (4) none of the conduct supported by the undisputed facts is severe or outrageous and (5) none of Plaintiff's private facts were ever published by the Defendant.

## II.     UNDISPUTED MATERIAL FACTS

1.      December 20, 2007, The By-Laws of Cowpet Bay West Condominium Association are issued. (See Exhibit "1" attached hereto) Exhibit I of the By-Laws are the Rules and Regulations for Cowpet Bay West. Including in these rules is Rule 6. "Dogs and farm animals are prohibited and owners will be fined as specific by the Board of Directors."

2.      On March 11, 2010 Plaintiff, as a board member of Cowpet, introduced a petition initiated by Windward # 12 with supporting signatures of several owners to permit dogs (subject to certain caveats) on CBW property. No mention of a companion pet was made. (See Exhibit "2" attached hereto)

3.      On October 20, 2011, resident Susan Anderson wrote an email to the Board regarding Plaintiff walking with a large dog on the Cowpet Bay West property.  Dr. Anderson requested the Board to take action regarding the perceived violations of the no dog rule. This email was forwarded by Barbara Walters to Plaintiff on the same day (See Exhibit "3" attached hereto).

4.      On that same day, Defendant, as then President of the Cowpet Bay West Condominium Association responded to Dr. Anderson's email and indicated that the current rules and regulations are very clear and prohibit dogs.  Defendant indicated that fines should be levied which could be mitigated if the offenders would submit appropriate paperwork regarding the dog.  (See Exhibit "4" attached hereto.)

5.      Barbara Walters responded to Defendant's email and CC'd Plaintiff.  Ms. Walters stated "I don't think that would be a problem, but the information must be kept confidential, or else the board member who discloses any information should himself/herself be subjected to fine or suit or both."  Plaintiff did not respond to this email. (See Exhibit "5" attached hereto.)

6.      On October 26, 2011, resident and defendant, Lance Talkington sent an email to the Cowpet Bay West Board of Directors requesting enforcement of the Rules and Regulations regarding the perceived violations by residents of the no dogs rule. (See Exhibit "5" attached hereto.)

7.      On October 27, 2011, Barbara Walters, with Plaintiff BCC'd, sent an email to the board indicating that she had paperwork on file in the office, but her medical information is no one's business.  Plaintiff failed to respond or write to the board to inform the Board that she also allegedly had medical verifications on file in her file at the office. (See Exhibit "6" attached hereto.)

8.     On October 28, 2011, Defendant, wrote an email to Plaintiff and Barbara Walters, reminding them that there is a no dogs rule at Cowpet and that they are in violation of the rule. Defendant confirms that Louanne Schechter informed him that they had "papers in the office" regarding service dogs, but that they had not applied for an exception to the rule. Defendant then provided Plaintiff and Ms. Walters 10 days to submit a request for supporting documentation for an exception to the no dog rule.  (See Exhibit "7" attached hereto.)

9.     On that same day, Ms. Walters responded to Defendant and the Board indicating that she was notifying the Board that she was in possession of a service dog, but did not provide any of her medical certifications to the board for review.  (See Exhibit "8" attached hereto.)

10.    Plaintiff waited a few days to respond to Defendant's October 28, 2011 email. Plaintiff emailed Defendant, on October 30, 2011 indicating that she filed necessary paperwork in the office and that she trusts Louanne to protect her privacy.  Plaintiff commented further that she did not trust the board with her medical information.  Plaintiff stated that "this is not a request for you to consider but this is informing you that I have a service dog and I am not in any violation.  Plaintiff then offered to sit down with Defendant, only, and alone and only after execution of a confidentiality agreement.  Only then, would Plaintiff provide her medical verifications for review of Defendant only.  Plaintiff then suggested that with this knowledge, Defendant could then just assure the board that the paperwork is compliant.  (See Exhibit "9" attached hereto/Plaintiff's supplemental rule 26 disclosure document bates number 000134-135.)

11.    With no further written communications being exchanged between Plaintiff and the Board, the Board sent Plaintiff, on January 19, 2012, a letter explaining to her that fines would be assessed to owners who violated the No Dogs rule.  However, those fines would be held in abeyance until legal counsel for the Cowpet Bay West determined the required criteria, at

which time Plaintiff would be required to submit appropriate paperwork. Anyone meeting requirements will be considered for a rule exception and, if approved, the fines will be waived. (See Exhibit "10" attached hereto/Plaintiff's supplemental rule 26 disclosure document bates number 000150.)

12. On March 2, 2012, Plaintiff filed a Complaint with the U.S. Department of Housing and Urban Development. (See Exhibit "11" attached hereto)

13. Thereafter, Plaintiff submitted her request for accommodation and medical verifications to the Board, in March 2012. (See Exhibit "12" Final Investigative Report IV. Other Investigative Findings).

14. On March 26th, 2012 the board reviewed the documents provided by Plaintiff and agreed to allow the Plaintiff to maintain the dog in her condominium. Furthermore, the Board also agreed to waive any fines assessed to the Plaintiff as a result of the perceived violation of the "No Dog Policy" (See Exhibit "12" Final Investigative Report IV. Other Investigative Findings)

15. On April 11th, the Board sent a letter to Plaintiff confirming that the Board had met for a closed door confidential review of her recently submitted medical certifications and that the Board had agreed to an exception to the no dogs rule. (See Exhibit "13" attached hereto/ Plaintiff's supplemental rule 26 disclosure document bates number 000200).

16. On June 5, 2012, U.S. Department of Housing and Urban Development dismissed Plaintiff's Complaint and determined that Plaintiff did not formally request a reasonable accommodation for her disability until March 2012. In April 2012, upon review of these documents, the Board granted the request. There was no reasonable cause to believe that Cowpet Bay West violated the Fair Housing Act. (See Exhibit "14" attached hereto).

17.     On October 4, 2012, undersigned counsel filed a Notice of Death of this Defendant Max Harcourt. (D.E. 71).

18.     The Cowpet Board neither reviewed nor discussed the content of Plaintiff's medical verification and accommodation request, until March 2012, when Plaintiff submitted same to then president, Ed Wardwell. (See paragraph 6 of the Declaration of Sharon Koehler attached hereto as Exhibit "15").

19.     The Board became aware of Plaintiff having "paperwork" in October 2011, but was not allowed to view same per Plaintiff's instructions to the Board and to Louanne Schechter. (See paragraph 7 of the Declaration of Sharon Koehler attached hereto as Exhibit "15").

20.     The Board never prevented Plaintiff from accessing or using her unit at any time with the accompaniment of her dog. (See paragraph 8 of the Declaration of Sharon Koehler attached hereto as Exhibit "15").

### III.     SUMMARY JUDGMENT STANDARD

Rule 56(c) of the Federal Rules of Civil Procedure permits the entry of summary judgment if "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." The moving party bears the burden of proving that no genuine issue of material fact is in dispute.[1] A factual dispute is "material" only if it might "affect the outcome of the suit under the governing law."[2] There is only a "genuine" issue of material fact "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party."[3] The court must examine the facts in a light favorable to the

---

[1] *Matsushita Elec. Indus. Co. Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 585 n. 10 (1986).

[2] *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

[3] *Id.*

non-movant.[4] Furthermore, the court must resolve "all inferences, doubts and issues of credibility against the moving party."[5]

The Supreme Court has further explained in *Celotex* that:

"the plain language of Rule 56(c) mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial. In such a situation, there can be 'no genuine issue as to any material fact,' since a complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial. The moving party is 'entitled to a judgment as a matter of law' because the nonmoving party has failed to make a sufficient showing on an essential element of her case with respect to which she has the burden of proof."[6]

The nonmoving party must then "go beyond the pleadings and by her own affidavits, or by the depositions, answers to interrogatories, and admissions on file, designate *specific facts* showing that there is a genuine issue for trial."[7]  Here, Plaintiff has had more than two years to conduct discovery, since the filing of the lawsuit, however, neither written discovery nor depositions have been completed by Plaintiff.  Plaintiff has not and cannot establish the existence of any element essential to prove her case against Defendant.

## IV.  MEMORANDUM OF LAW

### a.  Plaintiff Fails to Establish a Violation of 42 U.S.C. § 3617

Plaintiff's Count III attempts to assert a violation of 42 U.S.C. § 3617 which makes it unlawful to coerce, intimidate, threaten, or interfere with any person in the exercise or enjoyment

---

[4] *Id.* at 255.

[5] *Smith v. Pittsburgh Gage & Supply Co.,* 464 F.2d 870, 874 (3d Cir.1972) (citations omitted).

[6] *Celotex Corp. v. Catrett,* 477 U.S. 317, 322-323 (1986).

[7] *Id.* at 324 (emphasis added) (internal quotations and citations omitted).

of any right granted or protected by Section 3604 et. seq. The 3rd Circuit in *Sporn v. Ocean Colony Condominium Association*,[8] stated:

> Section 3617 does not, however, purport to impose a code of civility on those dealing with individuals who have exercised their FHA rights. Simply put, § 3617 does not require that neighbors smile, say hello or hold the door open for each other. [9]

Plaintiff, in the instant matter asks this Court to extend § 3617 to areas of disputes that the Fair Housing Act was never intended to cover, namely disputes amongst neighbors. There is no record evidence to support any violation of Section 3617 against these Defendants.

First, Plaintiff asserts that Defendant ignored Plaintiff's request for an accommodation while pushing for the amendment to the by-laws (paragraph 113 of the Second Amended Complaint). However, the record evidence and undisputed facts demonstrate that Defendant did not ignore her application, as he was not aware of any formal application or the contents of the medical certifications until March 2012 (See paragraph 6 of the Declaration of Sharon Koehler attached hereto as Exhibit "15").

Second, Plaintiff also alleges that Defendant falsely accused Plaintiff of violating the no dog rule and levying a fine. (See paragraph 114 of the Second Amended Complaint). The record evidence demonstrates that the fines were held in abeyance and later waived by the Cowpet Baw West Association. (See Exhibit "13" and paragraph 9 of the Declaration of Sharon Koehler attached hereto as Exhibit "15"). Furthermore, the 11th Circuit has held that the assessment of a fine against a condominium unit owner does not rise to the level of coercion or intimidation

---

[8] *Sporn v. Ocean Colony Condominium Association*,[8] 173 F.Supp.2d 244, 252 (U.S.D.C. N.J. 2001),
[9] *Id.* at 252.

required to find a violation of section 3617.[10]  In fact, other circuits have found that even the shunning of an individual is not sufficient to establish a Section 3617 claim.[11]

Nothing in the text of the FHA or the case law interpreting it indicated that Congress intended to federalize unfortunate skirmishes between neighbors, tinged with discriminatory overtones or occasional discriminatory comments.[12]  A review of decisions from the circuits around the country reveals the court's ability, in the majority of cases, to draw a line between acts with discriminatory overtones or occasional discriminatory comments and pervasive or severe actions that include cross-burning, fire-bombing and other similarly overt discriminatory acts designed to intimidate, coerce, or interfere with housing rights.

Additionally, Plaintiff's contention that the Defendant failed to act on her application is not supported by the undisputed facts or case law.  In fact, an alleged failure to act does not rise to the level of the egregious overt conduct that has been held sufficient to state a claim under section 3617.[13]

Furthermore, a plaintiff's subjective beliefs of intentional discrimination or retaliation are insufficient to show an intentional discriminatory animus.[14] Try as she may, but Plaintiff has no record evidence to support any actions by Defendant that would rise to the level of severe and pervasive conduct that is necessary to even begin to consider a Section 3617 violation.[15]

---

[10] See, *Wood v. Briarwinds Condominium Association Board of Directors*, 369 Fed.Appx.1, at 2, (C.A. 11(Fla.).

[11] *Id. Sporn* at 252.

[12] *Walton v. Claybridge Homeowners Association, Inc.*, 32004 WL 192106 at *7 (S.D. Ind. 2004).

[13] See *Lawrence v. Courtyards at Deerwood Assn., Inc.*, 318 F.Supp.2d 1133, 1144-1145 (11th Cir. 2004)

[14] *Gavin v. Spring Ridge Conservancy, Inc.*, 934 F.Supp. 685, 687 (D.Md. 1995).

[15] See e.g., *Sporn v. Ocean Colony Condo. Ass'n*, 173 F.Supp.2d 244, 252 (D.N.J.2001) (ruling in favor of defendants because "shunning" of handicapped neighbors is not enough to support a § 3617 claim*);* *United States v. Weisz*, 914 F.Supp. 1050, 1054 (S.D.N.Y.1996) (finding for defendants where conduct alleged was "nothing more than a series of skirmishes in an unfortunate war between neighbors."); *See Whisby-Myers v. Kiekenapp*, 293 F.Supp.2d 845, 852 (N.D.Ill.2003)(detonation of explosive device simulator combined with racial epithets stated Section 3617 claim); *Johnson v. Smith*, 810 F.Supp.235,

Certainly, amending the bylaws (which already included rules and regulations barring dogs), levying a fine (which was held in abeyance and eventually waived) or accusing Plaintiff of a violation the no dogs rule, even given the "generous construction" Plaintiff requests, does not amount to the coercion, intimidation, threatening or interfering conduct required to establish a Section 3617 violation.

As such, there is no record evidence and no disputed facts that support, in any way, a prima facie cause of action for violation of 42 U.S.C. 3617 against these defendants. Thus, Defendant is entitled to summary judgment as to Count III of the Second Amended Complaint.

### b. Plaintiff Fails to Establish Negligent and/or Intentional Infliction of Emotional Distress

Plaintiff's Count XIII is a combination of two separate causes of action, negligent and/or intentional infliction of emotional distress. Viewing the record evidence and undisputed facts in a light most favorable to Plaintiff, does not establish a prima facie cases for negligent or intentional infliction of emotional distress.

Under Virgin Islands law, a claim of intentional infliction of emotional distress requires "extreme and outrageous conduct intentionally or recklessly causes severe emotional distress ..."[16] The Restatement (Second) of Torts § 46(1) defines outrageous conduct as "so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community." The court in *Smith* indicated that the court's role when dealing with a claim of intentional infliction of emotional distress is limited to determining "whether the defendant's conduct may reasonably be regarded as so extreme and outrageous as

---

238-239 (N.D.ILL.1992)(allegations of cross-burning on plaintiff's lawn and breaking plaintiff's windows stated claim under Section 3617.)

[16] *Smith v. Elias,* 2007 WL 4209701, at *4 (V.I.Super.Ct.2007).

to permit recovery, or whether it is necessarily so."[17]  Furthermore, "Discrimination alone does not state a claim for intentional infliction of emotional distress."[18]  Plaintiff's claim for intentional infliction of emotional distress is clearly based on alleged Fair Housing discrimination.

Furthermore, Plaintiff alleges that Defendant ignored Plaintiff's accommodation request and assisted in a campaign to amend the by-laws. (See Paragraph 191 of the Second Amended Complaint).  First, none of these allegations are supported by the undisputed facts or record evidence.   For instance, the undisputed facts make clear that Plaintiff received an accommodation from Defendants in March/April of 2012.  Second, there is no record evidence that Defendant ignored plaintiff's request for accommodation or that his participation as a board member in amending the by-laws demonstrated any intent to cause emotional distress to Plaintiff.

Additionally, the undisputed facts demonstrate that the fines were held in abeyance and later waived by these Defendants.  What's more, even if the record evidence and undisputed facts supported Plaintiff's allegations, which they clearly do not, these allegations are not so extreme and outrageous to permit recovery.  Again, the conduct must be extreme and outrageous. It is not enough that the defendant acted with tortious intent or even acted with malice.[19]  As such, Plaintiff's claim for intentional infliction of emotional distress fails and Defendant is entitled to summary judgment.

Plaintiff has similarly failed to meet the required elements for a claim of negligent infliction of emotional distress.  This Court has required two elements to sustain a claim of

---

[17] *Id* at *4.

[18] *Id.* see also; *Equal Employment Opportunity Comm'n v. Chestnut Hill Hosp.,* 874 F.Supp. 92, 96 (E.D.Pa.1995); *see also Nichols v. Acme Markets, Inc.,* 712 F.Supp. 488 (E.D.Pa.1989), *aff'd,* 902 F.2d 1561 (3d Cir.1990).

[19] *See;* The Restatement (Second) of Torts § 46(1).

negligent infliction of emotional distress. First the negligent conduct must have placed the plaintiff in danger of his or her own safety. Second, the plaintiff must have suffered some physical harm as a result of the emotional distress.[20] As there are no allegations, record evidence or any discovery indicating physical harm, Plaintiff cannot establish either element of a prima face case for negligent infliction of emotional distress. As such, Defendant is entitled to summary judgment as to Count XIII.

### c. Plaintiff Fails to Establish and Invasion of Privacy: Public Disclosure of Private Facts - Counts VX & XVII

The Restatement (Second) of Torts provides the following standard for establishing an invasion of privacy claim:

> One who gives publicity to a matter concerning the private life of another is subject to liability to the other for invasion of his privacy, if the matter publicized is of a kind that (a) would be highly offensive to a reasonable person, and (b) is not of legitimate concern to the public. (emphasis added)

Restatement (Second) of Torts § 652D.

Here, Plaintiff alleges that Defendant publicized private information concerning Plaintiff. (See paragraph 204 of the Second Amended Complaint). However, there is no record evidence to support that Defendant in any way publicized any private information regarding Plaintiff. In fact, Plaintiff admits that she herself actually publicized that she had a disability and was

---

[20] *Mingolla v. Minnesota Mining and Mfg. Co.*, 893 F.Supp. 499, 506 (D.Vi. 1995). *See also Lempert v. Singer*, 26 V.I. 326 (D.V.I. 1995)(there can be no liability for negligent infliction of emotional distress absent physical harm); *International Islamic Community of Masjid Baytulkhaliq Inc. v. DEA*, 981 F.Supp. 352, 369-370 (grating summary judgment in defendants favor as to intentional and negligent infliction of emotional distress); *Ramos v. St. Croix Alumina, L.L.C.*, 277 F.Supp.2d 600, 604 (D.V.I.2003) *overruled on other grounds by Miller v. V.I. Hous. Auth.*, CIV. 1998/0089, 2005 WL 1353395 (D.V.I. June 3, 2005). ([p]hysical harm is a required element of a claim for negligent infliction of emotional distress in the Virgin Islands.") *Anderson v. Government of Virgin Islands*, 180 F.R.D. 284, 286 (D.Vi. June 11, 1998); RESTATEMENT (SECOND) OF TORTS § 313.

afforded protection under the FHA. (See Paragraph 51, of the Second Amended Complaint). Thus, any "private facts" allegedly published on the internet was done by Plaintiff herself.

Furthermore, there is no record evidence that Plaintiff's medical diagnosis was ever publicized by Defendant. What's more, there is no record evidence that Plaintiff's dog certification was publicized by Defendant. With regards to the original email sent by Defendant (Exhibit "7"), it was sent to a small group of individuals (the board and Ms. Walters and Plaintiff). Under Comment (a) to section 652D of the Restatement (Second) of Torts, "[I]t is not an invasion of the right of privacy . . . to communicate a fact concerning a plaintiff's private life to a single person or even to a small group of persons."

Here, the record evidence and undisputed facts do not demonstrate ANY private information concerning Plaintiff that was publicized by Defendant. A review of Plaintiff's allegations against Defendant, even if true and viewed in a light most favorable to Plaintiff, do not support a prima facie case of invasion of privacy and are not highly offense to a reasonable person.

In addition to failing to submit evidence to support part (a) of an invasion of privacy claim, Plaintiff also fails to establish part (b), namely, that the information alleged by Plaintiff is not of legitimate public concern. While Plaintiff alleges that her dog certification was not of legitimate public concern, this is not a plausible argument. The residents of Cowpet had raised many objections to the dogs on the property, including Plaintiff's god, and demanded that the Board take action to enforce the rules and regulations of Cowpet. The residents of Cowpet could not be expected to ignore Plaintiff and her dog in a community with a no dog's policy. The Plaintiff's dog was no secret and the fact that the Board asked Plaintiff to submit paperwork to seek an exception to the no dogs rule, is not confidential and is necessary information for the

public community at Cowpet. To that end, none of Plaintiff's private or confidential information was every published on the internet or disclosed to anyone besides the board members and that was accomplished only in March 2012.

At bottom, the undisputed material facts establish conclusively that Plaintiff cannot prove the essential elements of any variation of an invasion of privacy claim, thus, final summary judgment is just and proper in favor of Defendant. Defendant's Motion for Summary Judgment as to Counts XV & XVII of the Second Amended Complaint must be granted.

## V.    **CONCLUSION**

After two years to complete discovery and conducting none, failing to show any evidence to establish the existence of the essential elements of Plaintiff's claims against Defendant, and failing to take action of the suggestion of death filed on behalf of this Defendant in October 2012, the plain language of Rule 56(c) mandates the entry of summary judgment.[21] Put simply, there is no set of facts under which Plaintiff would be entitled to relief in this litigation or under which Plaintiff could bring a successful claim against Defendant. Accordingly, summary judgment in favor of these Defendants on all claims brought by Plaintiff is not only warranted but required.

WHEREFORE, the Defendant, Max Harcourt, respectfully requests that the Court grant this Motion for Final Summary Judgment, entitlement to Defendant's prevailing party attorneys' fees and costs and for such other and further relief, both at law and in equity, to which Defendant may be justly and legally entitled.

---

[21] *Celotex Corp. v. Catrett,* 477 U.S. 317, 322-323 (1986).

Dated: May 1, 2014        Respectfully submitted,

**BIRCH, de JONGH & HINDELS, PLLC & BOYD RICHARDS PARKER & COLONNELLI**
*Counsel for Defendants: Cowpet Bay West Condominium Association, The Board of Cowpet Bay West Condominium Association, Max Harcourt, Robert Cockayne, and Vincent Verdiramo*
1330 Estate Taarnebjerg
St. Thomas, VI 00802
Tel.: 340-774-1100; Fax: 340-774-7300

By:      /s/ Richard P. Farrelly
      **Richard Farrelly**
      Bar No. 105
      rfarrelly@bdhlawvi.com
      **Joseph Riopelle**
      jriopelle@boydlawgroup.com

        I hereby certify that on the above-indicated date, I electronically filed the foregoing document with the Clerk of the Court using ECF. I also certify that the foregoing document is being served this day on all counsel of record or pro se parties identified below, either via transmission of Notices of Electronic Filing generated by ECF or in some other authorized manner for those counsel or parties who are not authorized to receive electronically Notices of Electronic Filing.

**Karin A. Bentz, Esq.**
(Attorney for Plaintiff)
5332 Raadets Gade, Ste. 3
St. Thomas, VI 00802
Tel: 340-774-2669
kbentz@virginalaw.com

**John H. Benham, III, Esq.**
(Attorney for Talkington)
Post Office Box 11720
St. Thomas, VI 00801
Tel: 340-774-0673
benham@bclawvi.com

**Ryan C. Meade, Esq.**
(Attorney for Alfred Felice)
9300 S. Dadeland Blvd., 4th Floor
Miami, FL 33156
Tel: 305-670-1101
rmeade@qpwblaw.com

                /s/ Richard P. Farrelly

### BY-LAWS OF COWPET BAY WEST
### CONDOMINIUM ASSOCIATION
Cowpet Bay
St. Thomas, Virgin Islands
20 December 2007

### Article I

### Plan of Apartment Unit Ownership

**Section 1. Apartment Unit Ownership:** The property located at Parcels 8-56-1 and 8-1-2, 4, 5, & 6 of Estate Nazareth, No.1 Red Hook Quarter has previously been submitted in a declaration forming an association under the provisions of Chapter 33, Title 28 of the Virgin Islands Code, known as the "Condominium Act of the Virgin Islands". The association has been and will continue to be known as "COWPET BAY WEST", hereinafter called the "Condominium".

**Section 2. Applicability of By-Laws:** The provisions of these by-laws are applicable to the Property of the Condominium and the use and occupancy thereof. The term "Property", as used herein, shall include the land and all buildings and other improvements thereon owned by the association and all easements, rights and appurtenances belonging thereto, and all other property, personal or mixed, intended for use in connection therewith, all of which were previously submitted to the provisions of said Chapter 33, Title 28 of the Virgin Islands Code.

**Section 3. Application:** All present and future owners, mortgagees, lessees, occupants of apartment units and any other persons who may use the facilities of the Property in any manner are subject to these By-Laws, the Declaration and the Rules and Regulations.

The Acceptance of a deed, mortgage or conveyance or the entering into of a lease or the act of occupancy of an apartment unit shall constitute an agreement that these By-Laws, the Rules and Regulations and the provisions of the Declaration, as they may be amended from time to time, are accepted, ratified, and will be complied with.

**Section 4. Office:** The office of the Condominium and of the Board of Directors shall be located at Cowpet Bay West, Estate Nazareth, No.1 Red Hook Quarter, St. Thomas, Virgin Islands. The mailing address shall be 6201 Windward Way, St. Thomas, USVI 00802, or such address as may be designated by the Board, upon 30 days written notice to the members of the Association.

### ARTICLE II

### Board of Directors

**Section 1. Number and Qualifications:** The affairs of the Condominium shall be governed by a Board of Directors. The Board of Directors shall be composed of seven persons, all of whom shall be owners or spouses of owners, or in the case of partnership owners, shall be members of said partnership, or in the case of corporate owners, shall be officers or stockholders of such corporations, or in the case of fiduciary owners shall be the fiduciaries or beneficiaries of any such trust. A Board member may not base his/her eligibility to sit on the Board on the same unit as any other member of the Board.



No person who is in arrears for ninety days or more on any billing or assessment by the Cowpet Bay West Condominium Association shall be eligible to be elected to or serve as a director on the Board of Directors. In the event such person is serving as a director, that person's position as director shall be declared to be vacant and another person appointed by a majority vote of the remaining Board to fill the vacancy so created, until the next regular election of the Board of Directors. Arrearages of partnerships, corporations, trusts, fiduciary owners, etc. on which a person's eligibility to serve on the board is based, shall be considered in determining the eligibility of a person to be elected to or to continue to serve on the board.

Section 2. Powers and Duties: The Board of Directors shall have the powers and duties necessary for the administration of the affairs of the Condominium and may do all such acts and things except as by law, by the Declaration, or by these By-Laws may not be delegated to the Board of Directors by the unit owners. Such powers and duties of the Board of Directors shall include, but shall not be limited to, the following:

(a) Operation, care, upkeep and maintenance of the common areas and facilities.

(b) Determination of Association Charges, which shall include the common expenses required for the operation of the Condominium, utility rates, late fees and interest charges, fines for By-Laws and rules, regulation violations, and the costs of services provided.

(c) Collection of Association charges, as hereinafter defined, from the unit owners.

(d) Employment and dismissal of the personnel necessary for the maintenance and operation of the common areas and facilities.

(e) Adoption, amendment and enforcement of rules and regulations covering the details of the operation and use of the Property.

(f) Opening of bank accounts on behalf of the Condominium and designating the signatories required therefore.

(g) Purchasing or leasing or otherwise acquiring in the name of the Board of Directors or its designee, corporate or otherwise, on behalf of all unit owners, apartment units offered for sale or surrendered by their owners to the Board of Directors.

(h) Purchasing of apartment units at foreclosure or other judicial sales in the name of the Association or its designee, corporate or otherwise, on behalf of all unit owners.

(i) Selling, leasing, mortgaging, voting the votes appurtenant to (other than for the election of members of the Board of Directors), or otherwise dealing with apartment units acquired and subleasing apartment units leased by the Association, or its designee, corporate or otherwise on behalf of all unit owners.

(j) Organizing corporations to act as designees of the Board of Directors in acquiring title to or leasing of apartment units on behalf of all unit owners.

2

Case: 14-4776  Document: 003112129996  Page: 145  Date Filed: 11/15/2015
Case: 3:12-cv-00025-CVG-RM  Document #: 31-1  Filed: 05/01/14  Page 3 of 63

Case: 3:12-cv-00024-CVG-RM  Document #: 31-1  Filed: 06/19/12  Page 3 of 20

(k) Obtaining of insurance for the Property, including the apartment units, pursuant to the provision of Article V, Section 2 hereof.

(l) Making of repairs, additions and improvements to or alterations of the Property and repairs to and restoration of the Property in accordance with the other provisions of these By-Laws, after damage or destruction by fire or other casualty or as a result of condemnation or eminent domain proceedings.

**Section 3. Managing Agent and Manager:** The Board of Directors may employ for the Condominium a managing agent and/or a manager at a compensation established by the Board of Directors, to perform such duties and services as the Board of Directors shall authorize. The Board of Directors may delegate to the manager or managing agent, all of the powers granted to the Board of Directors by these By-Laws other than the powers set forth in subdivisions (b), (e), (f), (g), (h), (i), and (j) of Section 2 of this Article II.

**Section 4. Election and Term of Office:**
Directors will serve for a term of three years. Two Directors shall be elected the first year, two the second year, and three the third year to replace those directors whose terms are expiring. Where a vacancy has been filled by vote of a majority of the vote of the remaining members of the Board, as provided in Section 6, that person shall be a member until the next Annual Meeting, at which time the unit owners shall elect the replacement for the remainder of the original term, if any. Any candidate for director may run for a full term, or any term created by a vacancy, or both.

Each director shall be elected by the vote of a majority (as defined in Article III Section 9) of the unit owners. Each vacancy shall be voted on separately, and the candidate with the highest number of votes cast shall be elected. Each candidate's name for each vacancy shall be preceded by a space where an "X" may be placed to vote for said candidate. It shall not be required that a name be crossed out and another inserted to vote for a candidate on the ballot. A space for write-in candidates shall also be provided. Ballots and proxies shall be provided to the owners not less than 30 days prior to the Annual Meeting.

The members of the Board of Directors shall hold office until their respective successors shall have been elected by the unit owners.

A Board member may serve only two consecutive terms and may not hold office for one year before being eligible to run again.

**Section 5. Removal of Members of the Board of Directors:** At any regular or special meeting of unit owners, any one or more of the members of the Board of Directors may be removed with or without cause by a majority of the unit owners and a successor may then and there or thereafter be elected to fill the vacancy thus created. Any members of the Board of Directors whose removal has been proposed by the unit owners shall be given an opportunity to be heard at the meeting.

If a Board member does not attend any of the Board meetings during an entire year, and also does not attend the annual owners meeting that same year, such member may be removed from the Board by a majority of the other members of the Board of Directors.

**Section 6. Vacancies:** Vacancies in the Board of Directors caused by any reason other than the removal of a member thereof by a vote of the unit owners, shall be filled by a vote of a majority of the remaining members at a special meeting of the Board of Directors held for that purpose promptly after the occurrence of any such vacancy, even though the members present at such meeting may constitute less than a quorum, and each person so elected shall be a

3

member of the Board of Directors until a successor shall be elected at the next Annual Meeting of the unit owners. At that time a director shall be elected to serve the remainder of the term of the original vacating director.

**Section 7. Organization Meeting:** The first meeting of the members of the Board of Directors shall be an organizational meeting held directly following the Annual Meeting of the unit owners, at such time and place as shall be fixed by the Board members at said meeting, and no notice shall be necessary to the newly elected members of the Board of Directors in order to legally constitute such meeting, provided a majority of the whole Board of Directors shall be present thereat. If it is not possible to hold such first meeting of the new Board immediately, then it shall be held as soon as possible and proper notice shall be given to each director, as for any special meeting of the Board of Directors.

**Section 8. Regular Meetings:** Regular meetings of the Board of Directors may be held at such time and place as shall be determined from time to time by a majority of the members of the Board of Directors, but at least two such meetings shall be held during each fiscal year. Notice of regular meetings of the Board of Directors shall be given to each member of the Board of Directors by mail or fax transmission, at least thirty days prior to the day named for such meeting.

**Section 9. Special Meetings:** Special meetings of the Board of Directors may be called by the President upon five business days notice to each member of the Board of Directors, given by mail or fax transmission, which notice shall state the time, place and purpose of the meeting. Special meetings of the Board of Directors shall be called by the President or Secretary in like manner and on like notice on the written request of at least two members of the Board of Directors. Such special meeting may be conducted by a tele-conference call.

**Section 10. Waiver of Notice:** Any member of the Board of Directors may, at any time, waive notice of any meeting of the Board of Directors in writing, and such waiver shall be deemed equivalent to the giving of such notice. Attendance by a member of the Board of Directors at any meeting of the Board shall constitute a waiver of notice by him of the time and place thereof. If all the members of the Board of Directors are present at any meeting of the Board, no notice shall be required and any business may be transacted at such meeting.

**Section 11. Quorum of Board of Directors:** At all meetings of the Board of Directors, a majority of the members thereof shall constitute a quorum for the transaction of business, and the votes of the majority of the members of the Board of Directors present at a meeting at which a quorum is present shall constitute the decision of the Board of Directors. If at any meeting of the Board of Directors there shall be less than a quorum present, a majority of those present may adjourn the meeting from time to time. At any such adjournment at which a quorum is present, any business, which might have been transacted at the meeting originally called, may be transacted without further notice. Board members may participate by tele-conference call.

**Section 12. Fidelity Bonds:** The Board of Directors shall obtain adequate fidelity bonds for all officers and employees of the Condominium handling or responsible for condominium funds. The premiums on such bonds shall constitute a common expense.

**Section 13. Compensation:** No member of the Board of Directors shall receive any compensation from the Condominium Association for serving as a board member. However, verifiable expenses, in accordance with guidelines established by the Board in advance, are

4

reimbursable. A Board member may also be compensated for other services unrelated to his/her Board function.

**Section 14. Liability of the Board of Directors:** The members of the Board of Directors shall not be liable to the unit owners for any mistake of judgment, negligence, or otherwise, except for their own individual willful misconduct or bad faith. The unit owners shall indemnify and hold harmless each of the members of the Board of Directors against all contractual liability to others arising out of contracts made by the Board of Directors on behalf of the Property unless any such contract shall have been made in bad faith or contrary to the provisions of the Declaration or of these By-Laws.

It is intended that the members of the Board of Directors shall have no personal liability with respect to any contract made by them on behalf of the Property. It is also intended that the liability of any unit owner arising out of any contract made by the Board of Directors or out of the aforesaid indemnity in favor of the members of the Board of Directors shall be limited to such proportion of the total liability thereunder as his interest in the common areas and facilities bears to all such interest.

Every agreement made by the Board of Directors or by the managing agent or by the manager on behalf of the Property shall provide that the members of the Board of Directors or the managing agent, or the manager, as the case may be, are acting only as agents for the unit owners and shall have no personal liability thereunder (except as unit owners) and that each unit owner's liability thereunder shall be limited to such proportion of the total liability thereunder as his interest in the common areas and facilities bears to all such interest.

**Section 15. Executive Committee:** The Board of Directors, by resolution passed by a majority of the entire Board, shall designate at the Organization Meeting or anytime thereafter, three members of the Board to constitute an Executive Committee, with one member thereof designated as Chairman. The purpose of the Executive Committee is to control the day-to-day management of the Association.

The Board of Directors from time to time shall define the authority of the Executive Committee, but shall retain for itself the powers and duties as itemized in Section2 (b), (c), (h), (i), and (j). Additionally, the Board shall retain the right to appoint the manager or managing agent, fill vacancies in the Board, make changes in the Rules and Regulations, acquire property and merge the Association into another.

The Board of Directors, at any time, may change the members of, may fill vacancies in, or may discharge the Executive Committee. Two members shall constitute a quorum of the Executive Committee. The act of a majority of the members at any meeting at which there is a quorum shall be the act of the Committee. The Board of Directors shall establish rules of procedure for the Committee governing, but not limited to, such items as notice and powers.

The Executive Committee shall make recommendations to the Board of Directors, and when the Board is not in session may, to the extent that the committee deems necessary, exercise the powers of the Board in the management of the business and affairs of the Association; and it shall have the powers to authorize the seal of the Association to be affixed to all papers which may require it.

The Executive Committee shall keep records of all its proceedings and shall report same to the Board of Directors, and its individual members, in writing within a reasonably short period of time after each significant action and after all meetings.

**Section 16. Inspection by Executive Committee:** The Executive Committee shall make a detailed inspection of the buildings, pump rooms, offices, maintenance shops, sewage and water-making plants, emergency generator, roads, sidewalks, steps, entry bridges, railings,

5

grounds, landscaping, watering systems, the beach and the sea wall at least twice a year in the company of the manager or managing agent,. Additionally, the Committee shall evaluate the operation of the Association office and the overall security situation of the property.

The purpose of such inspections will be to (a) obtain a better understanding of the job being performed by the manager and his staff and (b) make suitable recommendations for possible future actions. As soon as possible after each such semi-annual inspection, the Committee will report its findings and recommendations to the individual members of the Board of Directors.

**Section 17. Action by Consent:** Any action required or permitted to be taken at any meeting of the Board of Directors, or any committee thereof, may be taken without a meeting if a written consent thereto is signed by three-quarters of the members, (rounded off to the nearest whole number), of the Board of Directors or of such committee as the case may be, and filed with the minutes of proceedings of the Board of Directors or committee.

**Section 18. Nomination of Directors:** Nominations for election to the Board of Directors shall be made by a Nominating Committee. The Nominating Committee shall consist of a chairman, who shall be a member of the Board of Directors, and two or more members of the Association. The Nominating Committee shall be appointed by the Board of Directors at its organizational meeting and serve until the next Annual Meeting.

The Nominating Committee shall make as many nominations for election to the Board of Directors as it shall, in its discretion, determine, but not less than the number of vacancies that are to be filled. Each nomination shall be for a specified vacancy.

Any person qualified under Section1 of Article II of these By-Laws to serve on the Board of Directors may be nominated for the Board of Directors by submitting a request, signed by the owners of two units in which the nominee has no financial interest, to the Board Secretary sixty days prior to the Annual Meeting. The Board shall include his/her name on the ballot directly following the nominee(s) proposed by the Nominating Committee for each vacancy. Any nomination that does not specify a specific vacancy shall be deemed a nomination for all vacancies.

### ARTICLE III

### Unit Owners

**Section 1. Annual Meeting:**
The Annual Meeting of the unit owners shall be held during the first quarter each year. At the Annual Meeting, Directors shall be elected by ballot in accordance with the requirements of Section 4 of Article II of these By-Laws, and the unit owners may transact such other business at such meetings as may properly come before them.

**Section 2. Place of Meeting:** Meetings of the unit owners shall be held at the principal office of the Condominium or at such other suitable place convenient to the unit owners as may be designated by the Board of Directors.

**Section 3. Special Meetings:** It shall be the duty of the President to call a special meeting of the unit owners if so directed by resolution of the Board of Directors or upon a petition signed and presented to the Secretary by not less than 25% in common interest, in the aggregate, of unit owners. The notice of any special meeting shall state the time and place of such meeting and the purpose thereof. No business shall be transacted at a special meeting except as stated in the notice.

6

Case: 3:12-cv-00024-CVG-RM   Document #: 31-1   Filed: 06/19/12   Page 7 of 20

**Section 4. Notice of Meeting:** It shall be the duty of the Secretary to mail a notice of each annual meeting of the unit owners not less than thirty days nor more than ninety days prior to such meeting, stating the purpose thereof as well as the time and place where it is to be held, to each unit owner of record, at the building or at such other address as such unit owner may have designated by notice in writing to the Secretary. The mailing of a notice of meeting in the manner provided in this section shall be considered service of notice. The Board of Directors may assign the task of providing notice to unit owners to a person other than the Secretary. Special meetings require not less than ten days notice.

**Section 5. Adjournment of Meetings:** If any meeting of unit owners cannot be held because a quorum has not attended, a majority in common interest of the unit owners who are present at such meeting, either in person or by proxy, may adjourn the meeting to a time not less than forty-eight hours from the time the original meeting was called.

**Section 6. Order of Business:** The annual meeting of the unit owners shall be chaired by the President or other member of the Board of Directors chosen by the Board, and the order of business shall be generally as follows:

    (a)    Roll Call -- by unit
    (b)    Proof of Notice of Meeting
    (c)    Reading of Minutes of preceding meeting
    (d)    Reports of officers
    (e)    Report of Nominating Committee
    (f)    Election of Board members
    (g)    Unfinished business
    (h)    New business

**Section 7. Title to Apartment Units:** Title to apartment units may be taken in the name of an individual, or in the names of two or more persons as tenants in common, joint tenants or tenants by the entirety, or in the name of a corporation, partnership, limited liability company or other legal entity authorized to own real property in the Virgin Islands, or in the name of a fiduciary.

**Section 8. Voting:** The owner or owners of each apartment unit, or some person designated by such owner or owners to act as proxy on his or their behalf and who need not be an owner, shall be entitled to cast the vote appurtenant to such apartment unit at all meetings of unit owners. The designation of any such proxy shall be made in writing and shall be revocable at any time by written notice to the Secretary or in person at the meeting. Any or all such owners or proxies may be present at any meeting of the unit owners and may vote or take any other action as a unit owner either in person or by proxy. Votes of unit owners shall be weighted in accordance with their share of the common interest, as follows, with the total of all votes equaling one hundred:

| | |
|---|---|
| 2 Bedroom | .911 |
| 3 Bedroom | 1.062 |
| 2 Bedroom + Loft | 1.193 |
| 4 Bedroom | 1.301 |
| 3 Bedroom + Loft | 1.376 |

7

The Board of Directors shall accept any vote if the owner is one of the owners of record of the unit, or in the case of a proxy, if there is no obvious defect on the face of such proxy. It shall be the burden of the protestor to offer satisfactory proof that the proffered vote or proxy is invalid and that his is the proper one.

**Section 9. Majority of Unit Owners:** As used in these By-Laws, the term "majority of unit owners: shall mean those unit owners having more than 50% of the total authorized votes of all unit owners present in person or by proxy and voting at any meeting of the unit owners, determined in accordance with the provisions of Section 8 of this Article III.

**Section 10. Quorum:** Except as otherwise provided in these By-Laws, the presence in person or by proxy of unit owners having one-third (1/3) of the total authorized votes of all unit owners shall constitute a quorum at all meetings of the unit owners.

**Section 11. Majority Vote:** The vote of a majority of unit owners at a meeting at which a quorum shall be present shall be binding upon all unit owners for all purposes except where, in the Declaration or these By-Laws, or by law, a higher percentage vote is required.

## ARTICLE IV

### Officers

**Section 1. Designation:** The principal officers of the Condominium shall be the President, the Vice President, the Secretary, and the Treasurer, all of whom shall be elected by the Board of Directors. The Board of Directors may appoint an assistant secretary, an assistant treasurer, and such other officers as in its judgment may be necessary. The President and Vice President, but no other officers, need be members of the Board of Directors.

**Section 2. Election of Officers:** The officers of the Condominium shall be elected annually by the Board of Directors at the Organization Meeting of each new Board of Directors and shall hold office at the pleasure of the Board of Directors.

**Section 3. Removal of Officers:** Upon the affirmative vote of a majority of the members of the Board of Directors, any officer may be removed, either with or without cause, and his successor may be elected by the Board of Directors at any regular or special meeting of the Board of Directors called for such purpose.

**Section 4. President:** The President shall be the chief executive officer of the Condominium. He shall preside at all meetings of the unit owners and of the Board of Directors. He shall have all of the general powers and duties which are incident to the office of president of a stock corporation organized under the Corporation Law of the Virgin Islands, including but not limited to the power to appoint committees from among the unit owners from time to time as he may in his discretion decide is appropriate to assist in the conduct of the affairs of the Condominium.

**Section 5. Vice President:** The Vice President shall take the place of the President and perform his duties whenever the President shall be absent or unable to act. If neither the President nor the Vice President is able to act, the Board of Directors shall appoint some other

8

member of the Board of Directors to act in the place of the President, on an interim basis. The Vice President shall also perform such other duties as shall from time to time be imposed upon him by the Board of Directors or by the President.

**Section 6. Secretary:** The Secretary shall keep the Minutes of all meetings of the unit owners and of the Board of Directors. He shall have charge of such books and papers as the Board of Directors may direct; and he shall, in general, perform all the duties incident to the office of secretary of a stock corporation organized under the Corporate Law of the Virgin Islands.

**Section 7. Treasurer:** The Treasurer shall have the responsibility for Condominium funds and securities and shall be responsible for keeping full and accurate financial records and books of account showing all receipts and disbursements, and for the preparation of all required financial data. He shall be responsible for the deposit of all monies and other valuable effects in the name of the Board of Directors, or the managing agent, in such depositories as may from time to time be designated by the Board of Directors, and he shall, in general, perform all the duties incident to the office of treasurer of a stock corporation organized under the Corporation Law of the Virgin Islands.

**Section 8. Agreements, Contracts, Deeds, Checks, etc.:** All agreements, contracts, deeds, leases and other instruments of the Condominium shall be executed by any two officers of the Condominium or by such other person or persons as may be designated by the Board of Directors.

**Section 9. Compensation of Officers:** No officer shall receive any compensation from the Condominium for acting as such.

### ARTICLE V

### Operation of the Property

**Section 1. Determination of Common Expenses and Fixing of Common Charges:** The Board of Directors shall from time to time, and at least annually, prepare a budget for the condominium, determine the amount of the common charges payable by the unit owners to meet the common expenses of the Condominium, and allocate and assess such common charges among the unit owners according to their respective common interests. Common expenses shall include, among other things, operation and maintenance, insurance premiums, repairs and such amounts as the Board of Directors may deem proper for a general operating reserve, for a reserve fund for replacements, and to make up any deficit in the common expenses for any prior year.

The common expenses may also include such amounts as may be required for the purchase buy or lease to the Board of Directors or its designee, corporate or otherwise, on behalf of all unit owners, of any apartment unit whose owner has elected to sell or lease such apartment unit to the Board of Directors, or of any apartment unit which is to be sold at a foreclosure or other judicial sale.

The Board of Directors shall advise all unit owners promptly in writing of the amount of common charges payable by each of them, respectively, as determined by the Board of Directors, as aforesaid, and shall furnish to all unit owners copies of each budget on which such common charges are based.

9

A summary of the previous year's actual income and expenditures, a year end summation of liquid assets and accounts payable/receivable, and a preliminary budget for the next year shall be provided to all owners not less than 30 days prior to the Annual Meeting.

**Section 2. Insurance:** The Board of Directors shall obtain and maintain, to the extent obtainable, the following insurance: (1) fire insurance with extended coverage to include earthquake and flood coverage, vandalism and malicious mischief endorsements insuring the entire buildings and common elements, (including all the individual unit's bathroom and kitchen fixtures and air conditions, but not including any wall, ceiling, or floor decoration, tiles or coverings, or other furniture or furnishings, fixtures or equipment installed by the owner), together with all service machinery contained therein and covering the interest of the Condominium, the Board of Directors and the common interest of the unit owners, in an amount to be determined by the Board of Directors: (2) windstorm, insuring the entire buildings and common elements, (including all the individual units bathroom and kitchen fixtures and air conditioning, but not including any wall, ceiling, or floor decoration, tiles or coverings, or other furniture or furnishing, fixtures or equipment installed by the owner), together with all service machinery contained therein and covering the interest of the Condominium, the Board of Directors and the common interest of the unit owners, in an amount to be determined by the Board of Directors: (3) Worker's Compensation Insurance: and (4) such other insurance as the Board of Directors may determine. Fixtures are considered to be permanently attached cabinets, sinks, toilets and tubs, but not stoves, refrigerators, washers, dryers, water heaters and dishwashers.

All policies of physical damage insurance shall to the extent obtainable contain waivers of subrogation and waivers of any defense based on co-insurance or of invalidity arising from any acts of the insured, and shall provide that such policies may not be cancelled or substantially modified without at least thirty days prior written notice.

At least once each ten years, the Board shall obtain an appraisal of the full replacement value, without deduction for depreciation, of the buildings, common areas and facilities – for the purpose of determining the amount of insurance required. Appraisals should be obtained more often if required by the insurer or considered prudent by the board.

The Board of Directors shall also obtain and maintain, to the extent obtainable, public liability insurance in such limits as the Board of Directors may, from time to time, determine appropriate covering each member of the Board of Directors, the managing agent, the manager and each unit owner. The Board of Directors shall review such limits once a year.

Unit owners shall not be prohibited from carrying other insurance for their own benefit provided that all such policies shall contain waivers of subrogation and further provided that the liability of the carriers issuing insurance obtained by the Board of Directors shall not be affected or diminished by reason of any such additional insurance carried by any unit owner.

At each Annual Meeting, the Board shall provide to the owners a concise summary of all insurance coverage and costs.

**Section 3. Repair or Reconstruction After Fire or Other Casualty:** In the event of damage to or destruction of the commonly owned buildings and elements as a result of fire or other casualty (unless 66-2/3% or more of the buildings are destroyed or substantially damaged and 75% or more of the unit owners determine in accordance with the Declaration not to proceed with the repair or restoration), the Board of Directors shall arrange for the prompt repair or restoration of the commonly owned buildings and elements, and the Board of Directors shall

10

Case: 3:12-cv-00025-CVG-RM Document: 003112129996 Page: 153 Date Filed: 11/15/2015
Case: 14-4776 Document: 003112129996 Page: 153 Date Filed: 11/15/2015 Page 11 of 63

Case: 3:12-cv-00024-CVG-RM Document #: 31-1 Filed: 06/19/12 Page 11 of 20

disburse the proceeds of all insurance policies to the contractors engaged in such repair or restoration in appropriate progress payments. Any cost of such repair or restoration in excess of the insurance proceeds shall constitute a common expense – and the Board of Directors may assess all the unit owners for such deficit as part of the common charges.

After repairs to the commonly owned buildings and elements, the Board of Directors shall conduct unit interior repairs of insured items. If insurance proceeds are insufficient for such repairs, the Board may limit payment for restoration of units to their original as-built level of quality, design and/or type where the unit has been upgraded. Additionally, if damage to a unit is caused by the negligence of the owner, any insurance shortfall shall be said owner's responsibility rather than a common expense.

Within ninety days after a casualty of an estimated repair cost of $100,000 or greater, the Board will provide to the owners a financial status report indicating projected repair costs, source(s) of necessary funds, expenditures and commitments to date, and a schedule and plan for completion. This report will be updated and issued to owners on a quarterly basis, thereafter, until repairs are complete. A current report shall be provided at the next Annual Meeting.

If 66-2/3% or more of the Building(s) are destroyed or substantially damaged and if within sixty days of the date of such destruction or damage, 75% or more of the unit owners determine not to proceed with repair and restoration, the Property shall be subject to an auction for partition at the suit of any unit owner or lien holder, as if owned in common, in which event the net proceeds of sale, together with the net proceeds of insurance policies (less any repairs conducted) shall be divided by the Board of Directors among all the unit owners in proportion to their respective common interests, after first paying out of the share of each unit owner the amount of any unpaid liens on his/her apartment unit, in the order of priority of such liens.

**Section 4. Payment of Association Charges:** All unit owners shall be obligated to pay the common charges assessed by the Board of Directors pursuant to the provisions of Section 1 of this Article V at such time or times as the Board of Directors shall determine, as well as "other charges" for utilities, services, unit repairs, late fees, interest, fines and/or collection costs, if incurred. With respect to the following sections concerning payment, collection, default, foreclosure, etc., in Sections 4, 5, 6, 7, & 8 below, the term "association charges" is intended to include, but not be limited to, all the above items, both the "common" and "other" charges.

No unit owner shall be liable for the payment of any part of association charges assessed against his apartment unit subsequent to a sale, transfer or other conveyance by him of such apartment unit, together with the Appurtenant Interests, as defined in Section 1 of Article VII hereof. In addition, any unit owner may, subject to acceptance by the Board of Directors provided that his apartment unit is free and clear of liens and encumbrances other than mortgages and statutory liens for unpaid association charges, convey his apartment unit, together with the "Appurtenant Interests" to the Board of Directors, or its designee, corporate or otherwise, on behalf of all other unit owners, and in such event be exempt from association charges thereafter assessed.

However, a purchaser of an apartment unit shall be liable for the payment of association charges assessed against such apartment unit prior to the acquisition by him of such apartment unit, without prejudice to such purchaser's right, if any, to recover from the seller the amounts paid by the purchaser, except that a first mortgagee or other purchase of an apartment unit at a foreclosure sale of a first priority mortgage of such apartment unit shall not be liable for and such apartment unit shall not be subject to a lien for the payment of association charges which became due prior to the acquisition of title by such acquirer.

11

**Section 5.  Collection of Association Charges:**  The Board of Directors shall assess association charges against the unit owners from time to time and shall take prompt action to collect any charges due from any unit owner, which remain unpaid for more than thirty days from the date due for payment thereof. Such action may include placement of a lien on the apartment unit, notification to the mortgagee of the owner's failure to pay association charges and foreclosure on the lien. Additionally, suspension of utilities by a majority vote of the Executive Committee is permitted if an owner is more than 90 days in arrears of any Association charges. Payments received from unit owners will be applied to Association Charges in the chronological order incurred.

**Section 6.  Default in Payment of Association Charges:**  In the event of default by any unit owner in paying to the association charges as determined by the Board of Directors, such unit owner shall be obligated to:

(1) pay interest from the date of the initial billing at the maximum legal rate of interest, as defined by the Virgin Islands Laws, on all amounts past due,

(2) pay a monthly service charge as determined and promulgated from time-to-time by the Board of Directors,

(3) pay all expenses and attorneys' fees incurred by the Board of Directors in any proceeding brought to collect such unpaid association charges.

All such unpaid association charges shall constitute a lien on such unit prior to all other liens except those specified in Section 922 of Chapter 33, Title 28 of the Virgin Islands Code. The Board of Directors shall have the right and duty to attempt to recover all association charges, together with interest and monthly service charges thereon, and the expenses of the proceeding, including attorneys' fees, in any action to recover the same brought against such unit owner, or by foreclosure of the lien on such apartment unit granted by Section 922 of Chapter 33, Title 28, Virgin Islands Code.

**Section 7.  Foreclosure of Liens For Unpaid Association Charges:**  In any action brought by the Board of Directors to foreclose a lien on an apartment unit because of unpaid association charges, the unit owner shall be required to pay a reasonable rental for the use of his apartment unit, and the plaintiff in such foreclosure action shall be entitled to the simultaneous appointment of a receiver to collect the same. The Board of Directors, acting on behalf of all unit owners, shall have power to purchase such apartment unit at the foreclosure sale and to acquire, hold, lease, mortgage, vote the votes appurtenant to, convey or otherwise deal with the same. A suit to recover a money judgment for unpaid association charges shall be maintainable without foreclosing or waiving the lien securing the same.

**Section 8.  Statement of Association Charges:**  The Board of Directors shall promptly provide any unit owner so requesting the same in writing, with a written statement of all unpaid association charges due from such unit owner.

**Section 9.  Abatement and Enjoinment of Violations by Unit Owners:**  The violation of any rule or regulation adopted by the Board of Directors or the breach of any of these By-Laws contained herein, or the breach of any provisions of the Declaration, shall give the Board of Directors the right, in addition to any other rights set forth in these By-Laws (a) to enter the apartment unit in which, or as to which, such violation or breach exists and to summarily abate or remove, at the expense of the defaulting unit owner, any structure, thing or condition that may exist therein contrary to the intent and meaning of the provisions hereof, and the Board of Directors shall not thereby be deemed guilty in any manner of trespass or (b) to enjoin, abate or

12

remedy by appropriate legal proceedings, either at law or in equity, the continuance of any such breach.

**Section 10. Routine Maintenance and Repair:** All maintenance of and repairs to any "apartment unit" (other than maintenance of and repairs to any common areas and facilities contained therein, and not necessitated by the negligence, misuse or neglect of the owner of such apartment unit) shall be the responsibility of the owner of such apartment unit. Also, each unit owner shall be responsible for damage to other apartment units and/or to the common areas and facilities resulting from conditions for which such owner has responsibility as indicated above.

An "apartment unit" is considered the space inside the perimeter walls, floor and ceiling. All decorating, wall and floor coverings, paneling, molding, tiles, wallpaper, paint, finished cabinets, mirrors, refrigerator, stove, washer, dryer, electrical appliances, dishwasher, garbage disposal, hot water heater, air-conditioning equipment, including compressor, shall be part of the unit and not part of the common interests.

Additionally, the unit owner shall be responsible for the routine lubrication and adjustment of doors and windows, and, unless major casualty related, replacement of broken glass, wooden or glass slats and damaged screens. The unit owner shall also maintain and assure the operability of the storm shutters installed on that unit and is responsible to close them in the event of a windstorm. Damage caused by failure to do so is the responsibility of the owner if net insurance proceeds are insufficient to cover such damage.

Screen doors may be installed on the main street-side entry doors at the unit owner's expense provided they meet the existing décor. Once installed, they must be maintained by the unit owner in a good state of repair, or the Association will do so at the owner's expense.

Except for the limited exceptions noted above, all maintenance, repairs and replacements to the "common areas and facilities", whether located inside or outside of the apartment units, (unless necessitated by the negligence, misuse or neglect of a unit owner, in which case such expense shall be charged to such unit owner), shall be made by the Association and be charged to all the unit owners as a common expense.

"Common elements" are considered to include all other elements of the buildings and property except those specified as being part of the "apartment unit". Additionally, the electrical supply to the fuse box, water lines to the valves at the sinks, tubs, hot water heater, toilet, etc., and drains to the first connection outside a wall are considered common elements.

In the event of a major casualty, such as a fire, earthquake or hurricane type disaster, certain unit elements indicated above as the unit owner's normal responsibility, may be covered by Association insurance per Section 2 of Article V of these By-Laws.

External air conditioning compressor units shall be maintained by the owner in a reasonable state of preservation. The Association may require removal of inoperable and/or un-maintained units.

**Section 11. Restriction on Use of Apartment Units:** In order to provide for congenial occupancy of the Property and for the protection of the value of the apartment units, the use of the Property shall be restricted to and shall be in accordance with the following provisions:

1. The apartment units shall be used for residences only. Units will not be occupied by more than two persons per bedroom for more than thirty days per year.
2. The common areas and facilities, including the limited common areas and facilities, shall be used only for the furnishing of the services and facilities for which they are reasonably suited and which are incident to the use and occupancy of apartment units

13

3. No nuisances shall be allowed on the Property nor shall any use or practice be allowed which is a source of annoyance to its residents or which interferes with the peaceful possession proper use of the Property by its residents.

4. No improper, offensive or unlawful use shall be made of the Property or any part thereof, and all valid laws, zoning laws and regulations of all governmental bodies having jurisdiction thereof shall be observed.

5. Violations of laws, orders, rules, regulations or requirements of any governmental agency having jurisdiction thereof, relating to any portion of the Property, shall be corrected, by and at the sole expense of the unit owners or the Board of Directors, whichever shall have the obligations to maintain or repair such portion of the Property.

**Section 12. Additions, Alterations or Improvements by the Board of Directors:** Additions, alterations or improvements to the common areas and/or facilities up to $50,000 may be made by the Board of Directors. Additions, alterations or improvements in excess of $50,000 shall require approval by a vote of two-thirds (2/3) in common interest of the owners. The cost of such additions, alterations or improvements shall constitute a common charge. This section is not applicable to repairs conducted in accordance with Article V Section 3 of these By-Laws.

**Section 13. Additions, Alterations, or Improvements bay Unit Owners:** No unit owner shall make any structural addition, alteration or improvement in or to his apartment unit, including any exterior painting or exterior alteration or addition (including awnings, grills, etc.) without the prior written consent thereto of the Board of Directors. The Board of Directors shall have the obligation to answer any written request by a unit owner for approval of a proposed structural addition, alteration or improvement in such unit owner's apartment unit, within thirty (30) days after such request, and failure to do so within the stipulated time shall constitute a consent by the Board of Directors to the proposed addition, alteration or improvement.

A unit owner shall obtain a receipt from any person accepting his written request for a change under this section and shall show the receipt to the manager or any Director upon request. Any application to any department of the Government of the Virgin Islands or to any other governmental authority for a permit to make an addition, alteration or improvement in or to any apartment unit shall be executed by the Board of Directors only, without, however, incurring liability on the part of the Board of Directors or any of them to any contractor, sub-contractor or supplier on account of such additions, alteration or improvement, or to any person having any claim for injury to person or damage to property arising therefrom. The owner in such instance shall provide the Board of Directors with a Hold Harmless Certificate.

**Section 14. Use of Common Areas and Facilities:** A unit owner shall not place or cause to be placed in the stairways or other common areas and facilities, including the limited common areas and facilities, other than the areas designated as storage areas, any furniture, packages or objects of any kind. The entry passages, stairways, entry bridges, etc., shall be used for no purpose other than for normal transit through them.

**Section 15. Right of Access:** A unit owner shall grant a right of access to his apartment unit to the manager and/or the managing agent and/or any other person authorized by the Board of Directors, the manager or the managing agent, for the purpose of making inspections or for the purpose of correcting any condition originating in his apartment unit and threatening another apartment unit or a common area or facility, or for the purpose of performing installations, alterations or repairs to the mechanical or electrical services or other common areas or facilities

14

In his apartment unit or elsewhere in the Building, provided that requests for entry are made in advance and that any such entry is at a time reasonably convenient to the unit owner. In case of an emergency, such right of entry shall be immediate, whether or not the unit owner is present at the time.

**Section 16. Rules of Conduct:** Article V Section II of these By-Laws delineates general restrictions on the use of the property. Additionally, a definitive listing of current Rules and Regulations is provided as Exhibit I hereto. These Rules and Regulations may be amended by the Board of Directors from time to time. The Board is empowered to enforce these By-Laws and Rules and Regulations with monetary fines and other sanctions and may also take any legal action in court to enforce them. An owner is subject to such fines, sanctions and/or legal actions for the actions of his tenant as if those actions were by the owner.

Copies of the Rules and Regulations shall be furnished by the Board of Directors to each unit owner prior to the time when the same shall become effective. The unit owner must insure that the tenant or occupant be fully informed and furnished with a copy of the Rules and Regulations and by fully bound thereby.

**Section 17. Potable Water and Electricity:** Potable water and electricity shall be supplied by the Association through the common facilities of the Condominium directly to each apartment unit through a separate meter, and each unit owner shall be required to pay the charges therefore established, from time to time, by the Board of Directors. Water, electricity and other utility charges will normally be billed monthly incident to the common charges and are considered to be part of the "association" charges. Utility charges more than thirty days in arrears are subject to a late fee and interest per Section 6 Article V of these By-Laws, and said utilities may be suspended by the Association if an owner is more than 90 days in arrears of Association charges per Article V Section 5 thereof.

**Section 18. Gas:** Gas shall not be piped to any apartment unit, and unit owners are specifically prohibited from using gas as a fuel for regular cooking, water heating, or any other regular purpose. Small quantities of propane gas may be used for gas grills kept on street-side galleries and for emergency use inside apartment units.

**Section 19. Grey Water and Sewerage Service:** Grey water for flushing and sewerage service (including sewage disposal and treatment in the condominium's sewerage treatment plant) shall be supplied as a common facility to all unit owners, and the cost thereof shall be treated as a common expense.

## ARTICLE VI

### Mortgages

**Section 1. Notice of Unpaid Common Charges:** The Board of Directors, whenever so requested in writing by a mortgagee of an apartment unit, shall promptly report any then unpaid association charges due from, or any other default by the owner of the mortgaged apartment unit.

**Section 2. Notice of Default:** The Board of Directors, when giving notice to a unit owner of a default in paying common charges or other default, may send a copy of such notice to each holder of a mortgage covering such apartment unit.

15

Joint Appendix Vol. II Page 1010

## ARTICLE VII

### Sales and Mortgages of Units

**Section 1.   No severance of Ownership:**  No unit owner shall execute any deed, mortgage or other instrument conveying or mortgaging title to his apartment unit without including therein the Appurtenant Interests, it being the intention hereof to prevent any severance of such combined ownership.  For the purpose of the By-Laws, the "Appurtenant Interests" shall mean collectively, (i) the unit owner's undivided interest in the common areas and facilities appurtenant to such unit; (ii) the interest of such unit owner in any apartment units theretofore acquired by the Board of Directors, or its designee, on behalf of all unit owners, or the proceeds of the sale or lease thereof, if any; and (iii) the interest of such unit owner in any other assets of the Condominium.

Any such deed, mortgage or other instrument purporting to affect one or more of such interests, without including the interest or interests so omitted, shall be deemed to include such interests even though the latter shall not be expressly mentioned or described therein.  No part of the Appurtenant Interests of any apartment unit may be sold, transferred or otherwise disposed of, except as part of a sale, transfer or other disposition of the apartment unit to which such interests are appurtenant, or as part of a sale, transfer or other disposition of such part of the Appurtenant Interests of all apartment units.

**Section 2.  Sale to Board of Directors:**  A unit owner may, subject to mutual agreement of the parties, and subject to the provisions of Section 1 of this Article VII, sell his unit to the Board of Directors, or its designee; provided, however that such purchase by the Board of Directors shall have the prior approval of two-thirds (2/3) of the unit owners, as expressed by the vote of at least two third (2/3) in number and in common interest, of all unit owners, cast in person or by proxy in accordance with these By-Laws.

**Section 3.  Financing of Purchase of Apartment Units By Board of Directors:**  Acquisition of apartment units by the Board of Directors, or its designee, on behalf of all unit owners, may be made from the working capital and common charges in the hands of the Board of Directors, or if such funds are insufficient the Board of Directors may levy an assessment against each unit owner in proportion to his ownership in the common areas and facilities as a common charge, which assessment shall be enforceable in the same manner as provided in Section 6 and 7 of Article V, or the Board of Directors, in its discretion, may borrow money to finance the acquisition of such apartment units, provided, however, that no financing may be secured by an encumbrance or hypothecation of any property other than the apartment unit, together with the Appurtenant Interests, so to be acquired by the Board of Directors.

**Section 4.  Gifts and Devises, etc:**  Any unit owner shall be free to convey or transfer his apartment unit by gift, or to devise his apartment unit by will, or to pass the same by intestacy, without restriction.

**Section 5.  Waiver of Right of Partition with Respect to Such Apartment Units as are Acquired by the Board of Directors, or its Designee, on Behalf of All Unit Owners as Tenants in Common:**  In the event that an apartment unit shall be acquired by the Board of Directors, or its designee, on behalf of all unit owners as tenants in common, all such unit owners shall be deemed to have waived all rights of partition with respect to such apartment unit.

16

## ARTICLE VIII

**Section 1. Condemnation – Eminent Domain:** In the event of a taking by condemnation or by eminent domain of part or all of the common areas and facilities, the award made for such taking shall be payable to the Board of Directors for disbursement and/or payment of the common expenses.

## ARTICLE IX

### Records

**Section 1. Records and Audits:** The Board of Directors or the managing agent shall keep detailed records of the actions of the Board of Directors and the managing agent, Minutes of the meetings of the Board of Directors, Minutes of the meetings of unit owners, and financial records and books of account of the Condominium, including a chronological listing of receipts and expenditures, as well as a separate account for each apartment unit which, among other things, shall contain the amount of each assessment of common charges against such apartment unit, the date when due, the amounts paid thereon, and the balance remaining unpaid.

Each unit owner shall be permitted to examine all accounts, records and contracts of the Association in the Condominium office at reasonable times, on business days, but not more often than once a month. All others must request any required information from the Board of Directors.

An annual report of the receipts and expenditures of the Association, examined and approved by a licensed accountant not affiliated with the Association and chosen by the Board of Directors, shall be rendered to the Board and sent, within a reasonable time after the end of each fiscal year, to all unit owners who request it.

## ARTICLE X

### Miscellaneous

**Section 1. Notices:** All notices hereunder shall be sent by registered or certified mail to the Board of Directors c/o the managing agent, or if there is no managing agent, to the office of the Board of Directors or to such other address as the Board of Directors may hereafter designate from time to time, by notice in writing to all unit owners and to all mortgagees of apartment units.

All notices to any unit owner shall be sent by registered or certified mail to the Building or to such other address as may have been designated by him from time to time, in writing, to the Board of Directors. All notices to mortgagees of apartment units shall be sent by registered or certified mail to their respective addresses, as designated by them from time to time, in writing to the Board of Directors. All notices shall be deemed to have been given when mailed, except notices of change of address, which shall be deemed to have been given when received.

Notwithstanding the requirements of this section, all notices of regular, special and Annual Meetings of the unit owners, Board of Directors, and committees of the Board or otherwise, shall be by first class mail but without the requirement of registration or certification. The applicable notice shall be sent so as to comply with the required time limits, if any, to the regular mailing address of the designated party as recorded in the books of the Association.

17

**Section 2. Invalidity:** The invalidity of any part of these By-Laws shall not impair or affect in any manner the validity, enforceability or effect of the balance of these By-Laws.

**Section 3. Captions:** The captions herein are inserted only as a matter of convenience and for reference, and in no way define, limit or described the scope of these By-Laws, or the intent of any provision thereof.

**Section 4. Gender:** The use of the masculine gender in these By-Laws shall be deemed to include the feminine gender and the use of the singular shall be deemed to include the plural, whenever the context so requires.

**Section 5. Waiver:** No restrictions, condition, obligation or provisions contained in these By-Laws shall be deemed to have been abrogated or waived by reason of any failure to enforce same, irrespective of the number of violations or breaches thereof which may occur.

**Section 6. Insurance Trustee:** The Board of Directors may appoint a Trustee to distribute large amounts of any insurance proceeds. The trustee so appointed may be any individual or entity, so long as such is properly bonded in relation to the funds and responsibility involved.

## ARTICLE XI

## Amendments to By-Laws

**Section 1. Amendments to By-Laws:** Except as hereinafter provided, these By-Laws may be modified or amended by the vote of 66-2/3% in number and in common interest of all unit owners.

## ARTICLE XII

## Execution of Instruments and Seal

**Section 1. Execution and Instruments:** All instruments of the Condominium shall be executed under seal by such officer or officers as the Board of Directors may designate, or as may be otherwise authorized.

**Section 2. Seal:** The seal of the Condominium shall be as determined by the Board of Directors from time to time.

## ARTICLE XIII

## Conflicts

**Section 1. Conflicts:** These By-Laws are set forth to comply with the provisions of Sections 917 and 918 of Chapter 33, Title 28, Virgin Islands Code. In case any of these By-Laws conflict with the provisions of said statute or of the Declaration, the provisions of said statute or of the Declaration, as the case may be, shall control.

18

## EXHIBIT I
## Rules and Regulations
### for
### Cownet Bay West
December 2007

1. No articles shall be placed on any of the stairways, railings, or entry bridges.

2. Balconies and street-side porches shall be kept neat and clean, and no articles shall be swept or thrown from them. No laundry, laundry lines, or other unsightly articles shall be placed on the balconies, porches or other common areas and facilities.

3. Radio or television antennas are prohibited and no sign, notice, advertisement or illumination shall be displayed on or at any window or other part of the building.

4. No owner shall make or permit any disturbing noises in his unit or within the common areas and facilities, or do anything, or permit anything to be done wherein which will interfere with the rights and reasonable comfort and convenience of other owners.

5. No inflammable, combustible or explosive fluid, material, chemical or substance is permitted in any unit, except for normal household use.

6. Dogs and farm animals are prohibited, and owners will be fined as specified by the Board of Directors. The Association may require removal of any animal when it becomes bothersome to others or is deemed by the Association to be unacceptable.

7. No garbage or trash will be left or disposed of on or adjacent to the property – except in a dumpster, if such is provided by the Association.

8. One space per unit is provided for parking automobiles on the property. Additional vehicles may be allowed by Management based on space availability. Any vehicle not currently registered and licensed will be considered a derelict and will be towed.

9. No boat, trailer, heavy commercial or nonself-propelled vehicle shall be parked on the property. No vehicle shall be parked so as to impede ready movement by another vehicle, nor shall it be parked in any space assigned to another unit without permission of the said unit owner. Any vehicle in violation of these rules may be towed at the vehicle owner's expense.

10. Beach users shall clean up and remove any trash or other articles on the beach for which they are responsible.

11. The use of barbecues on seaside galleries is prohibited.

12. The number of persons occupying a unit on a routine basis is limited to two per bedroom. Additional "guests" are permitted not to exceed thirty days total per year.

19

Attachment #2

### Owners' Common Interest
### 30 April 1998

| UNIT SIZE | % COMMON INTEREST | UNITS |
|---|---|---|
| 2 Bedroom | .911 | Leeward |

#1,2,3,4,5,7,8,9,10,11,12
13,14,15,17,18,23,24,25
26,27,28,29,31,32,33,34,
35,36,37,39,40,41

Windward
#3,4,5,6,7,9,10,11,12,13
14,15,16,17,19,20,21,22
25,26,27,28,29,30,31,33
34,35,37,38,39,40,41,47,49

| 3 Bedroom | 1.062 | Leeward |
|---|---|---|

#6,16,19,20,21,22,30,36,42,43,44,49
Windward
#1,2,8,18,23,24,32,36,42,43,44,45,51

| 2 Bedrooms plus Loft | 1.193 | Leeward: # 46,48 |
|---|---|---|
| | | Windward: # 49,50 |
| 3 Bedrooms plus Loft | 1.376 | Leeward: # 50 |
| | | Windward: # 46,52 |
| 4 Bedroom | 1.301 | Leeward: # 45,47 |

20

**Cowpet Bay West**
**Board of Directors Meeting**
**March 11, 2010**

**Present:** Judi Kromenhoek (Chair), Bob Cockayne, Max Harcourt, Greg
Miller, Barbara Walters, Ed Wardwell, Rosie Wells and Jon Cassady,
Property Manager

The meeting convened at 0845 AST.

The Minutes of the February 19, 2010 Board Meeting were unanimously
approved.

Barbara reported the current total in all accounts at February 28, 2010
is $737,636.79.

Jon reported:

The security gate malfunctioned on March 7 due to rainwater
accumulation shorting out a relay in the control panel. A spare relay has
been acquired and normal gate function should be restored today.

All utility systems are operating normally with an upgrade to the fresh
water filtration being completed.

A generator oil spill prevention permit from DPNR is near completion.

The new security lights are on their way from Florida and will be on
property next week.

Kent Harvey, electrical/electronic specialist will be scheduled for further
system alignment when all components are on hand.

Judi read the monthly Landscape Committee report (copy attached).

Bob presented insurance coverage and premium proposals as presented
by the local Lloyd's representative, Lance Chardon. A copy is attached.

A further insurance quotation has been requested from the Tunick
Company. Upon receipt, a special meeting of the CBW Board will be
convened to decide on an insurance plan to be effective from April 1,
2010 when our current coverage expires.

Jon has obtained complete contractor estimates related to rehabilitation
of CW common property after the fire in Windward #23. This information
will be given to our insurance adjuster, Herb Horwitz, for his meeting in
Miami on March 15 with the insurance underwriter.

The condensation problem in Windward #12 caused by improperly
insulated air conditioning ducts in Windward #11 is scheduled to be
rectified this week.



**EXHIBIT**
Kromenhoek-Harcourt

**2**

Cleaning of owners' storage lockers is in progress.

Judi proposed a motion that the Association obtain a debit card for administrative use to support the previous credit card (which required an individual's name and guarantee). Ed seconded. The motion was unanimously adopted.

After discussion about safety and architectural concerns, Judi proposed a motion that all non-functional railings be removed and/or relocated to minimize hazards. Greg seconded. The motion was unanimously adopted.

Rosie volunteered to serve as Chair for the 2011 Nominating Committee.

Judi introduced a petition initiated by Windward #12 with the supporting signatures of several owners to permit dogs (subject to certain caveats) on CBW property. After considerable discussion, Barbara volunteered to draft a memorandum to be tabled at the next regular Board meeting.

Bob requested that a complete financial report be made to the Directors at least quarterly.

Max is awaiting guidance from our 2011 insurance underwriter before issuing a notice to owners regarding smoke detector requirements.

No response has been received from Judi/Jon's inquiries to composite railing suppliers.

The next regular CBW Board meeting is scheduled for 0745 AST (0745 EDT) Tuesday, April 13, 2010.

The meeting adjourned at 0955.

## ACTION ITEMS

| | |
|---|---|
| Electric plant upgrade | Jon |
| Insurance proposal for 2011 | Bob |
| Windward #23 fire rehabilitation | Jon |
| Owners' locker clean up | Jon |
| Association debit card | Louanne |
| Non-functional railing removal | Jon |
| Dogs on property memorandum for Board review | Barbara |
| Financial reporting to Board | Barbara/Louanne |
| Smoke detector policy | Max |
| Composite railing proposal | Judi/Jon |

Page 1 of 1

Subj: Fwd: Dog.....again
Date: 10/20/2011 10:57:41 A.M. SA Western Standard Time
From: JERSEYBARB@aol.com
To: jkromas@gmail.com

**This bitch is at it again!!!!!!!!!!!**

From: susanpsanderson@gmail.com
To: canfieldvl@gmail.com, joncasaady@hotmail.com, rbcusvi@gmail.com, mllom2@earthlink.net,
shezkonhler@gmail.com, cowpetbaywest@hotmail.com, mvardiramo@optonline.net,
jerseybarb@aol.com
Sent: 10/20/2011 7:52:08 A.M. Eastern Daylight Time
Subj: Dog.....again

Dear Board,

Last night as I was returning from my Rotary meeting, I was driving down Windward Way when I saw
past president Judy walking a large dog on the road. I stopped and said to her, "There are no dogs
allowed on the property." She stared at me and after a few seconds said, "Service dog" to which I
responded, "Right". Our Rotary Motto is "Is it the truth." Is this the truth?

Last Sunday, I think it was, when Dan and I went down to the beach on the path from the office, there
were people having a Bar-B-Que on the sand at the bottom of the walkway. They had a little dog with
them. I recognized one of the men as someone who lives on Island. We didn't say anything,
because we don't know what the rules say about the beach. Also we don't know if they brought the
dog through Cowpet or Elysian, but the picnic was at the Cowpet end of the beach.

I have heard the "Service Dog" response before when I have seen dogs on the grass by the beach. I
have heard more dogs recently barking, and so I ask you, "What will the Board do?" Because if we
can have dogs, despite the rules, by saying they are service dogs, whatever that is supposed to mean,
maybe I will get one too.

So, I ask you to please deal with this issue. Also I thought we had fines for this. I await your
response. Thanks.

Susan
Susan G.S. Anderson, D.M.D.
6501 Red Hook Plaza, Suite 201
St. Thomas, VI 00802-1306
340-513-2705
Dentist, Forensic Odontologist
Lycoming Co, PA Deputy Coroner
Sr. Vice-President, Sharp Properties, Inc.
Member of Rotary of St. Thomas East
*Be the change that you want to see in the world. Gandhi*



EXHIBIT
Kromen book - Thirce.ct
3

Sunday, March 04, 2012 AOL: JERSEYBARB

3064700/000233

| | |
|---|---|
| Subj: | Re: Dog.....again |
| Date: | 10/20/2011 8:39:32 P.M. SA Western Standard Time |
| From: | JERSEYBARB@aol.com |
| To: | milom2@earthlink.net, susansanderson@gmail.com, canfieldvl@gmail.com, joncasandy@hotmail.com, rbcvsyl@gmail.com, shezkoehler@gmail.com, cowgetbswwest@hotmail.com, mverdiremo@optonline.net, wallsr_@earthlink.net |
| BCC: | kvomes@gmail.com |

Max,

I don't think that would be a problem, but the information must be kept confidential, or else the board member who discloses any information should himself/herself be subjected to fine or sult or both.

Some of these matters are not public domain.

As we are also discussing that matter, why are the unauthorized additions or porch enclosures not subjected to a fine by this board. We must keep ruling fair, and not make exceptions.

Barbara

I also included Rosles name, as she was not on this email

In a message dated 10/20/2011 12:47:30 P.M. Eastern Daylight Time, milom2@earthlink.net writes:

> The current Rules and Regulations are very clear:
>
>
> 6. Dogs and farm animals are prohibited, and owners will be fined as specified by the Board of Directors. The Association may require removal of any animal when it becomes bothersome to others, or is deemed by the Association to be unacceptable.
>
>
> The Board is discussing changes to the By-Laws which would allow exceptions for true service animals that are documented and approved by application to the Board. At this time, we should levy a fine against the offenders that could be mitigated if they would submit appropriate ADA compliant paperwork regarding the service animal to the Board.
>
>
> M. Harcourt
>
> ----Original Message----
> From: "Susan GS Anderson, DMD"
> Sent: Oct 20, 2011 6:52 AM
> To: "Canfield, Bill" , "Cassady, Jon" , "Cockayne, Bob" , "Harcourt, Max" , "Koehler, Sharon" , "Schechter, Luanne" , "Verdiremo, Vince" , "Walters, Barbara"
> Subject: Dog.....again
>
> Dear Board,
>
> Last night as I was returning from my Rotary meeting, I was driving down Windward Way when I saw past president Judy walking a large dog on the road. I stopped and said to her, "There are no dogs allowed on the property." She stared at me and after a few seconds said, "Service dog" to which I responded, "Right". Our Rotary Motto is "Is it the truth." Is this the truth?



**EXHIBIT**
Kroinenheek - Harcourt
**4**

Sunday, March 04, 2012 AOL: JERSEYBARB

3054700/000234

Joint Appendix Vol. II Page 1019

Last Sunday, I think it was, when Dan and I went down to the beach on the path from the office, there were people having a Bar-B-Que on the sand at the bottom of the walkway. They had a little dog with them. I recognized one of the men as someone who lives on island. We didn't say anything, because we don't know what the rules say about the beach. Also we don't know if they brought the dog through Cowpet or Elysian, but the picnic was at the Cowpet end of the beach.

I have heard the "Service Dog" response before when I have seen dogs on the grass by the beach. I have heard more dogs recently barking, and so I ask you, "What will the Board do?" Because if we can have dogs, despite the rules, by saying they are service dogs, whatever that is supposed to mean, maybe I will get one too.

So, I ask you to please deal with this issue. Also I thought we had fines for this. I await your response. Thanks.

Susan

Susan G.S. Anderson, D.M.D.
6801 Red Hook Plaza, Suite 201
St. Thomas, VI 00802-1306
340-518-2705
Dentist, Forensic Odontologist
Lycoming Co, PA Deputy Coroner
Sr. Vice-President, Sharp Properties, Inc.
Member of Rotary of St. Thomas East
*Be the change that you want to see in the world. Gandhi*

3004700/000236

Subj:      Re: Request For Enforcement Of Rules And Regulations
Date:      10/26/2011 5:23:04 P.M. SA Western Standard Time
From:      JERSEYBARB@aol.com
To:        ltalkington@TALKINGTON.CO, milom2@earthlink.net
CC:        shazkaehler@gmail.com, waller_@earthlink.net, panfieldvi@gmail.com, spliyfcackayns@hotmail.com, cowpelbaywest@hotmail.com

To my fellow board members,

Well, since we seem to be following the letter of the law, I am also in favor of fining owners with illegal additions retroactively. That should make up quite the shortfall, Lance, don't you have an illegal addition on your seaside patio, and weren't you instructed to put the common areas back to regulation???

In a message dated 10/26/2011 9:14:17 A.M. Eastern Daylight Time, ltalkington@TALKINGTON.CO writes:

To The Cowpet Bay West Board of Directors:


On May 12, 2011 the board adopted a formal written policy titled CBW Owner Repair/inquiry Handling Policy. The policy includes procedures for owner requests for enforcement of Rules and Regulations. The association has a long standing rule disallowing dogs on the property. It has recently become a well publicized reality that multiple owners, including one current board member, have dogs living in their units. Given that our unit was fined for having a dog when a friend stayed in the unit and unbeknownst to us brought their pet, it is inconceivable how other owners are knowingly permitted to have dogs on a long standing basis without consistent enforcement of fines for such behavior. Repeated requests to the board member for substantiation of her need for a trained service dog have gone purposely unanswered, and in fact her responses have been accompanied by threats of lawsuits against both the board and me if her ability to have a dog is challenged. I have consulted a senior law firm partner who is an expert in condominium association law, and he has confirmed that the board has every right to request any and all documentation and other supporting information for an owner claiming the right to have a service dog as a result of disability. There are no limitations on this right whatsoever, if the board would like to engage the attorney in this regard, I will provide his contact information.


My daughter has repeatedly asked why others are allowed to have dogs while she is not allowed one. It is egregiously inconsistent for me to be fined for a dog in our unit while others are clearly being allowed to have dogs with no consequences. It is our request that the rules be consistently enforced and that any owner with a dog be required to submit documentation as to the need for a trained service dog to assist with their inability to function normally. It is also requested that the ADA guidelines for the definition of a service dog be implemented immediately and also incorporated into the bylaws that are currently being drafted for approval at the February owners meeting. This email is being sent to the board of directors and the association office in accordance with the procedures adopted in the May 12 document.


Lance Talkington

Three Leeward



EXHIBIT
Vcomenhael-Harcourt
5

Sunday, March 04, 2012 AOL: JERSEYBARB                      3054700/000238

Subj: Re: Owner's Inquiries
Date: 10/27/2011 10:58:42 A.M. SA Western Standard Time
From: JERSEYBARB@aol.com
To: shazkoehler@gmail.com, mlicm2@earthlink.net
CC: weller_@earthlink.net, rbatavi@gmail.com, canfieldvi@gmail.com, moehogan1@verdzon.net
BCC: lkromes@gmail.com, nlamoureux@snet.net, cowpelbaywest@hotmail.com,
joncassady@hotmail.com, lamlk2@aol.com

Dear fellow board members,

My paperwork is on file in the office, but my medical information is no ones business, and since this board has a history of violating confidentiality, how the hell can I trust any one of you to keep their mouth shut? Am I going to find my information on Lances blog again????
While we are on the business of violations, I want Lance and Susan, two of the biggest complainers fined for violations in their units. They have incorporated common property into their units, we are paying insurance on total footage, and I refuse to foot the bill for either one of these jerks. I want their violations corrected and I want them fined retroactively!!!
You people are not addressing my complaints, and I think that the populace would be quite unhappy if they knew that this board has allowed confidential information to be LEAKED!!!!!
How did Lance get the phone number to call in, why did he not disconnect when instructed to.....what the hell are you people doing. You are making our association a laughing stock with your unprofessional behavior.
Sharon, why is it costing us thousands of dollars for the accountant. Are you not capable of doing your job, should we perhaps put Jeannie Brennan as treasurer, since she's doing the work anyway?
There's an old song that reminds me of you people.....Harper Valley PTA, listen to the words sometime. The old double standard seems to work for everyone pretty nicely!
Also, I'd like to know where my boards outrage was when my name and information was plastered on the Internet. Does a Lance, who sits in front of his computer and pecks away on his keyboard, trying to cause dissention among the populace count more than I do?? Do his concerns rate more than mine? Why isn't his time expended on serving rather than criticizing? And for this he is rewarded with utmost concern by my board.
Now I want my complaints dealt with as expediciously as you seem to want to address the others.
Comments please???
Barbara

In a message dated 10/27/2011 8:08:57 A.M. Eastern Daylight Time, shazkoehler@gmail.com writes:

Max

I really think the Board needs to respond to the emails/inquiries from both Susan Anderson and Lance Talkington in accordance with our Owner Initiated Inquiry Policy. We were remiss in answering Susan's first inquiry, now her second has appeared. Lance has also sent us an inquiry, which needs, at least, to be acknowledged,

The Board is seriously loosing its credibility with our owners, and I, for one, am upset by this. Between all of our early-on infighting, and now several reports about violations of the rules and regs, especially connected with both a current board member and our past president, with dogs on property, we have become a further laughing matter. Rather than addressing these issues head-on, we act by not acting, which I think gives our owners the



EXHIBIT
Kromen Noeck - Harcourt
6

3064700/000236

Impression that we are be partial, rather than impartial, in these matters.

We need to act upon this now. We need to send a request, or fine, to both Barbara and Judi, along with a statement that the fines will be forgiven upon receipt of the necessary paper work and proof of service dog eligibility as defined by the ADA. The longer we wait to accomplish this, the more we appear ineffectual, foolish and bi-partisan.

Fellow board members.....comments please.
Dharon.

30B4700/000237

Page 1 of 2

Subj:     **Re: Request For Enforcement Of Rules And Regulations**
Date:     10/29/2011 3:33:50 P.M. SA Western Standard Time
From:     JERSEYBARB@aol.com
To:       milom2@earthlink.net, jkromes@gmail.com
CC:       cowpetbaywest@hotmail.com, weller_@earthlink.net, rhousvi@gmail.com, panfieldvi@gmail.com,
          shazkoshlor@gmail.com, loncasandy@hotmail.com, moshousn1@verizon.net

Oh and one other thing,
including these two in your email about the board of directors, you clearly indicate your lack of
professionalism and confidentiality.

In a message dated 10/28/2011 11:58:32 A.M. Eastern Daylight Time, milom2@earthlink.net
writes:

> Judi and Barbara,
>
>
> Cowpet Bay West's current rules are very clear – No Dogs. You are both in violation of these rules,
> and owners have complained to the Board.
>
>
> As you know, the Board is considering absorbing the "No Dogs" rule into the by-laws, and allowing
> exceptions, upon application to the board with supporting documentation, for service dogs.
>
>
> Louanne tells me that both of you have "papers in the office" regarding service dogs; however, you
> have not applied for an exception to the rule.
>
>
> If you, as owners and users of service dogs as defined and documented in accordance with ADA
> rules, wish an exception, you must apply in writing or electronically to the Board and submit supporting
> documentation. You have 10 days to submit this request. It will be considered at the November Board
> meeting, and you will be informed of the outcome. Barbara, you must recuse yourself from voting
> since you are a Board Member.
>
>
> Even though you are clearly in violation of the rules, this offer is being made in good faith, and in the
> spirit of the consensus of the Board as demonstrated in our by-law discussions.
>
>
> If you do not avail yourselves of this offer, you are subject to being fined under the current rules of the
> association at the November meeting.
>
>
> M. M. Harcourt
>
> President, CBW Condo Association



**EXHIBIT**
Kroin e Neet - Harcourt
**7**

Sunday, March 04, 2012 AOL: JERSEYBARB

3064700/000242

Page 1 of 3

| Subj: | Re: Request For Enforcement Of Rules And Regulations |
|---|---|
| Date: | 10/28/2011 3:27:53 P.M. SA Western Standard Time |
| From: | JERSEYBARB@aol.com |
| To: | milom2@earthlink.net, jkromes@gmail.com |
| CC: | cowpatbaywest@hotmail.com, wolilsr_@earthlink.net, rbcusvi@gmail.com, canfieldvi@gmail.com, shezkoehler@gmail.com, lonpassadv@hotmail.com, moehogan1@verizon.net |

First of all,

How dare you have the audacity to include the two VIOLATORS with any correspondence from me? You are not Obama here, if you change the by-laws, you need 66 2/3 vote. I really don't give a damn what you are threatening me with, Are you fining me for being up in NJ for the past three months. I guess my dogs bark must really go downwind.

I am also notifying the board that I am in possession of a service dog, and under the disabilities act set forth in the Fair Housing Amendment, section 504 and title II of the Americans with Disabilities Act, I qualify to keep service animal even when policy explicitly prohibits pets.

I am also not recusing myself from any vote, not that it matters since this board seems to vote in a bloc, but nevertheless, I was elected, not appointed!!!!!

If any medical information is disclosed to Anderson, Talkington or any one else, that will be taken as violation of privacy, and will be dealt with accordingly.

B.A Walters

Vice President CBW Condo Association

In a message dated 10/28/2011 11:58:32 A.M. Eastern Daylight Time, milom2@earthlink.net writes:

> Judi and Barbara,
>
> Cowpet Bay West's current rules are very clear - No Dogs. You are both in violation of these rules, and owners have complained to the Board.
>
> As you know, the Board is considering absorbing the "No Dogs" rule into the by-laws, and allowing exceptions, upon application to the board with supporting documentation, for service dogs.
>
> Louanne tells me that both of you have "papers in the office" regarding service dogs; however, you have not applied for an exception to the rule.
>
> If you, as owners and users of service dogs as defined and documented in accordance with ADA rules, wish an exception, you must apply in writing or electronically to the Board and submit supporting documentation. You have 10 days to submit this request. It will be considered at the November Board meeting, and you will be informed of the outcome. Barbara, you must recuse yourself from voting since you are a Board Member.
>
> Even though you are clearly in violation of the rules, this offer is being made in good faith, and in the spirit of the consensus of the Board as demonstrated in our by-law discussions.



EXHIBIT
Kronen huck - Harcourt
8

If you do not avail yourselves of this offer, you are subject to being fined under the current rules of the association at the November meeting.

M. M. Harcourt

President, CBW Condo Association

-----Original Message-----
From: Lance Talkington <italkington@talkington.co>
Sent: Oct 26, 2011 8:13 AM
To: "mllom2@earthlink.net" <mllom2@earthlink.net>
Cc: 'Sharon Koehler' <shazkoehler@gmail.com>, 'Rosie Wells' <weller_@earthlink.net>, "JERSEYBARB@aol.com" <jerseybarb@aol.com>, "canfieldvl@gmail.com" <canfieldvl@gmail.com>, Cookayne <sallyfcookayne@hotmail.com>, Cowpet Bay West <cowpetbaywest@hotmail.com>
Subject: Request For Enforcement Of Rules And Regulations

To The Cowpet Bay West Board of Directors:

On May 12, 2011 the board adopted a formal written policy titled CBW Owner Repair/Inquiry Handling Policy. The policy includes procedures for owner requests for enforcement of Rules and Regulations. The association has a long standing rule disallowing dogs on the property. It has recently become a well publicized reality that multiple owners, including one current board member, have dogs living in their units. Given that our unit was fined for having a dog when a friend stayed in the unit and unbeknownst to us brought their pet, it is inconceivable how other owners are knowingly permitted to have dogs on a long standing basis without consistent enforcement of fines for such behavior. Repeated requests to the board member for substantiation of her need for a trained service dog have gone purposely unanswered, and in fact her responses have been accompanied by threats of lawsuits against both the board and me if her ability to have a dog is challenged. I have consulted a senior law firm partner who is an expert in condominium association law, and he has confirmed that the board has every right to request any and all documentation and other supporting information for an owner claiming the right to have a service dog as a result of disability. There are no limitations on this right whatsoever. If the board would like to engage the attorney in this regard, I will provide his contact information.

My daughter has repeatedly asked why others are allowed to have dogs while she is not allowed one. It is egregiously inconsistent for me to be fined for a dog in our unit while others are clearly being allowed to have dogs with no consequences. It is our request that the rules be consistently enforced and that any owner with a dog be required to submit documentation as to the need for a trained service dog to assist with their inability to function normally. It is also requested that the ADA guidelines for the definition of a service dog be implemented immediately and also incorporated into the bylaws that are currently being drafted for approval at the February owners meeting. This email is being sent to the board of directors and the association office in accordance with the procedures adopted in the May 12 document.

3054700/000241

Gmail - Here's your letter

Page 1 of 2



Judith Kromenhoek <jkromes@gmail.com>

## Here's your letter
1 message

JERSEYBARB@aol.com <JERSEYBARB@aol.com>
To: jkromes@gmail.com

Thu, Jan 12, 2012 at 6:38 PM

*letter sent mid Dec. 2011*

Max,

First, allow me to tell you how upset you have made me. You have no right to include Susan Anderson and Lance Talkington on emails concerning Board business. Lance probably already has your letter on his UNOFFICIAL blog.

The Board does not have the authority or the right to "absorb the "NO DOGS" rule into the by-laws. Any change to the by-laws must be approved by at least 66 2/3 of our 102 owners. You may be President this year but you are not the absolute ruler.

Be that as it may, I have filed the necessary paperwork in the office and according to the Disabilities Act set forth in the Fair Housing Amendment, Section 504, Title II of the Americans with Disabilities Act, I qualify to keep a service animal even when policy explicitly prohibits pets. A service animal is not a pet. The ADA requires you to modify your "no pets (dogs) policy to allow the use of a service animal by a person with a disability. This does not mean you must abandon your "no pets" policy altogether but simply that you must make an exception to your general rule for service animals. I fully trust Louanne, a trained nurse who is aware of the HIPPA laws to protect my privacy. I do NOT trust this board with my medical information as you have proved time and again that you cannot be trusted.

My privacy is protected by the Office for Civil Rights and if I find my medical information on "Lance's blog" as Barbara's was, I will file a complaint with OCR and will ask for monetary penalties. On 2/18/2009, the laws were changed to include fines of a minimum of $100, and a maximum of $50,000, for each violation of privacy. I am under no obligation to present my medical history to this board and if you insist then subpoena it and we will see how the judge rules.

You were certainly concerned about preserving Doug Rebak's "privacy" when the police paid him a visit for discharging a firearm on property trying to kill a rooster. He could have hurt or even killed a child with such an act. You would not even allow Doug's name to appear in the Minutes and these Minutes are supposedly factual. It was OK to blast Barbara's medical history on the internet but protect Doug, makes a lot of sense!!

This is not a request for you to consider but this is informing you that I have a service dog and I am not in any violation.

Also, I do not know why these two owners are so upset about my service dog. He does NOT bark, I walk him on a leash and ALWAYS clean up after him. Perhaps you should ban iguanas,



EXHIBIT

Kromenhoek - Her court

9

they certainly create more of a mess.

Since we are on the subject of Susan Anderson and Lance Talkington, they are both in violation and have been for several years when they illegally enclosed their seaside porches. This is common property and both were told so but obviously rules do not apply to them. Lance was told to put the teal wood beam back in the half moon opening repeatedly and has yet to comply. He was also told not to install extra hurricane shutters on his new makeshift room but ignored this as well. I was a member of the board for six years and know how many times both parties were warned. I am waiting to see what your board will do about this.

All the afore mentioned, I would be willing to sit down with you and you alone and disclose my history and paperwork provided you sign a confidentially agreement with a monetary penalty for disclosure, subject penalty would be born by you personally and not the Association or the Associations Insurance. With this knowledge, you can assure the board that I am in compliance with the ADA although you cannot disclose the details.

This is being sent to you in "good faith" and not the entire board because it is not their business. I hope you will finally find the courage to do the right thing because up to now, I am very disappointed in you.

Judith A. Kromenhoek, 44 Windward

3055300/000135

# COWPET BAY WEST

5201 Windward Way, St. Thomas, USVI 00802
E-Mail: cowpetbaywest@hotmail.com
Phone 340-775-6673 Fax: 340-779-6407

January 19, 2012

Judith & Jack Kromenhoek W-44
6200 Windward Way W-44
St. Thomas, VI 00802

RE: Windward 44

Dear Judi,

Please be advised the BOD voted last week to start assessing fines to owners who are in violation of our NO DOGS Rule. We are seeking legal counsel to determine our options regarding providing reasonable accommodation for those with disabilities, and our collection of the fines will be held in abeyance until such time as this information has been received and a policy developed. You will be notified of the required criteria, at which time you will be required to submit appropriate paperwork. Anyone meeting the requirements will be considered for a rule exception and, if approved, the fines will be waived.

CBWBOD



EXHIBIT
Kromenhoek-Harcourt
1D

3055300/000160



U.S. Department Of Housing and Urban Development
New York State Office
Jacob K. Javits Federal Building
26 Federal Plaza
New York, New York  10278-0068
http://www.hud.gov/local/nyn/nynopen.html

MAR 2  2012

Condominium Owner's Association
Cowpet Bay West Condominium
6201 Windward Way
St. Thomas, VI 00802

Dear Respondent:   ......

Subject:   Housing Discrimination Complaint
           Kromenhoek, Judith A. v. Cowpet Bay West Cond., et al.
           Inquiry No.    336193
           HUD Case No.   02-12-0337-8

       We have received a formal complaint alleging that you have engaged in one or more
discriminatory housing practices under the Federal Fair Housing Law, 42 U.S.C. Sections
3601-3619.  We are required by statute to send you a copy of the complaint.

       We are enclosing a copy of the complaint for you.  The alleged discriminatory
practices are identified in this complaint. We have made no determination as to whether
the complaint against you has merit.

       The purpose of this letter is to inform you of: 1) the rights you have in responding
to this complaint, 2) the rights each complainant has, and 3) the steps the U.S. Department
of Housing and Urban Development (the Department) will take to determine whether the
complaint has merit.

       In order to insure that the Department informs you properly of the law's
requirements, this notification letter contains language required by the law.  A similar
letter is used to notify all parties whenever a formal complaint has been filed with the
Department under the Federal Fair Housing Law.

       We are governed by federal law, which sets out what steps we must take when a formal
complaint is filed.  The law also includes steps that you can take to answer or refute
the allegations of this complaint.

       Under federal law, any answer from you to this complaint can be filed within 10
calendar days of your receipt of this letter or receipt of a letter notifying you of any
amendments to this complaint.  Your answer must be signed and you must affirm that you
have given a truthful response by including the statement "I declare under penalty of
perjury that the foregoing is true and correct."

       You will be allowed to amend your statement at any time, if our investigation shows
that it is reasonable and fair for you to do so.

**EXHIBIT**
Kromenhoek - Horwath

**11**

Our responsibility under the law is to undertake an impartial investigation and, at the same time, encourage all sides to reach an agreement, where appropriate, through conciliation. The law requires us to complete our investigation within 100 days of the date of the official filing of the complaint. If we are unable to meet the 100-day requirement for issuing a determination, the law requires that we notify you and the complainant(s) and explain the reasons why the investigation of the complaint is not completed.

In handling this complaint, we will conduct an impartial investigation of all claims that the Fair Housing Act has been violated. If the investigation indicates that there is not evidence establishing jurisdiction, the case will be dismissed. At any point, you can request that our staff assist you in conciliating (or settling) this complaint with the complainant(s). If the case is not resolved, we will complete our investigation and decide whether or not the evidence indicates that there has been a fair housing violation. If the parties involved have not reached an agreement to settle the complaint, the Department will issue a determination as to whether there is reasonable cause to believe a discriminatory housing practice has occurred.

If our investigation indicates that there is reasonable cause to believe that an unlawful discriminatory housing practice has occurred, the Department must issue a charge. If the investigation indicates that there is no reasonable cause to believe that discrimination has occurred, the complaint will be dismissed. In either event, you will be notified in writing.

If the determination is one of reasonable cause, the notification will advise you and the complainant(s) of your rights to choose, within 20 days, whether you wish to have the case heard by an Administrative Law Judge, or to have the matter referred for trial in the appropriate U.S. District Court.

Each complainant has the legal right to file such a suit, even if the complaint formed the basis for a charge, as long as an Administrative Law Judge has not started a hearing on the record with respect to the charge. Under federal law, even if the Department dismisses the complaint, each complainant still has the right to file an individual lawsuit under the Fair Housing Law in an appropriate federal, state or local court within two years of the date of the alleged discriminatory practice or of the date when a conciliation agreement has been violated. The law does not count, as part of the two-year period, any of the time when a proceeding is pending with the Department.

There may be other applicable federal, state or local statutes under which you and/or the complainant(s) may initiate court action. You may consult a private attorney in this regard.

02-12-0337-8

The law also requires us to notify you that section 818 of the Fair Housing Act makes it unlawful for you, or anyone acting on your behalf, to coerce, intimidate, threaten, or interfere with any person in the exercise or enjoyment of, any right granted or protected under the Federal Fair Housing Law. The law also makes it illegal for anyone to coerce, threaten or interfere with any person for having aided or encouraged any other person in the exercise or enjoyment of, any right or protection granted to them under the Federal Fair Housing Law.

Some explanatory material on the law is enclosed for your information.

If you have any questions regarding this case, please contact Investigator, Irma Peroz-Pillot at the San Juan Office at (787) 766-5400. Please refer to the case number at the top of this letter in those contacts, and keep this office advised of any change of your address or telephone number. We hope this information has been helpful to you.

Sincerely

Jay Golden
Region II Director
Office of Fair Housing
and Equal Opportunity

Enclosures

02-12-0337-8

# Housing Discrimination Complaint

**U.S. Department of Housing and Urban Development**
Office of Fair Housing and Equal Opportunity

OMB Approval No. 2529-0011

Please type or print this form

Public Reporting Burden for this collection of information is estimated to average 1 hour per response, including the time for reviewing instructions, searching existing data sources, gathering and maintaining the data needed, and completing and reviewing the collection of information.

Read this entire form and all the instructions carefully before completing. All questions should be answered. However, if you do not know the answer or if a question is not applicable, leave the question unanswered and fill out as much of the form as you can. Your complaint should be signed and dated. Where more than one individual or organization is filing the same complaint, and all information is the same, each additional individual or organization should complete boxes 1 and 7 of a separate complaint form and attach it to the original form. Complaints may be presented in person or mailed to the HUD State Office covering the State where the complaint arose (see list on back of form), or any local HUD Office, or to the Office of Fair Housing and Equal Opportunity, U.S. Department of HUD, Washington, D.C. 20410.

**1. Name of Aggrieved Person or Organization** (last name, first name, middle initial) (Mr., Mrs., Miss, Ms.)
MRS. KROMENHOEK    JUDITH  A

House Phone 340-775-6062   Business Phone 340-672-3267

Street Address (city, county, State & zip code)
6200 Windward Way #44  St Thomas  USVI  00802

**2. Against Whom is the complaint being filed?** (last name, first name, middle initial)
Cowpet Bay West Condominium Assoc., Al Felice
Phone Number 340-775-6675

Street Address (city, county, State & zip code)
6200 Windward Way 627   St Thomas  00802

6201 Windward Way St Thomas 00802

Laura Faulkington - 6200 Leeward Way #3  St Thomas 00802

Check the applicable box or boxes which describe(s) the party named above:
☐ Builder  ☐ Owner  ☐ Broker  ☐ Salesperson  ☐ Supt. or Manager  ☐ Bank or Other Lender  ☑ Other

If you named an individual above who appeared to be acting for a company in this case, check this box ☐ and write the name and address of that company in the space.
Name     Address

Name and identity claims (if any) you believe violated the law in this case)

**3. What did the person you are complaining against do?** Check all that apply and give the most recent date the act(s) occurred in block No. 6a below.
☐ Refuse to rent, sell, or deal with you  ☐ Falsely deny housing was available  ☐ Engage in blockbusting  ☐ Discriminate in broker's services
☐ Discriminate in the conditions or terms of sale, rental occupancy, or in services or facilities  ☑ Advertise in a discriminatory way  ☐ Discriminate in financing  ☑ Intimidated, interfered, or coerced you to keep you from the full benefit of the Federal Fair Housing Law
☐ Other (explain)

**4. Do you believe that you were discriminated against because of your race, color, religion, sex, handicap, the presence of children under 18, or a pregnant female in the family or your national origin?** Check all that apply.
☐ Race or Color  ☐ Religion  ☐ Sex  ☑ Handicap  ☐ Familial Status  ☐ National Origin
  ☐ Black    (specify)  ☐ Male  ☐ Physical  ☐ Presence of children under 18 in the family  ☐ Hispanic  ☐ American  ☐ Other
  ☐ White    ☐ Female  ☑ Mental    ☐ Asian or  ☐ Indian or  (specify)
  ☐ Other    ☐ Pregnant female  ☐ Pacific  ☐ Alaskan
              Islander  Native

**5. What kind of house or property was involved?**
☐ Single-family house
☐ A house or building for 2, 3, or 4 families
☐ A building for 5 families or more
☑ Other, including vacant land held for residential use (explain) Condominium

**Did the owner live there?**
☑ Yes
☐ No
☐ Unknown

**Is the house or property?**
☐ Being sold?
☐ Being rented?

**What is the address of the house or property?** (street, city, county, State & zip code)
6200 Windward Way, 44
St Thomas USVI 00802
44

**6. Summarize in your own words what happened.** Use the space for a brief and concise statement of the facts. Additional details may be submitted on an attachment.
Note: HUD will furnish a copy of the complaint to the person or organization against whom the complaint is made.

See Attached

**6a. When did the act(s) checked in item 3 occur?** (include the most recent date if several dates are involved)
Oct 20 & Jan 2012
Nov 2011  9-19-12 A.F.
Dec 2011

**7. I declare under penalty of perjury that I have read this complaint** (including any attachments) and that it is true and correct.

[signature] Judith A. Kromenhoek     1/24/12

Previous editions are obsolete

Page 1 of 3

form HUD-903 (9/2001)
ref Handbook 8024.1

To Whom It May Concern:

I filed the appropriate paperwork to the Cowpet Bay West Condominium Office in July, 2011 for my Service Animal. He currently lives with me in the condominium. This dog is trained, does not bark, is walked on a leash and I clean up after him. He bothers no one and is a tremendous help to me.

It has been terrible, the Board of Directors of the Association along with two very hateful individuals, Al Felice and Lance Talkington have sent out mass emails criticizing me. Mr. Felice has asked all the condo owners to ban my son's restaurants in St. Thomas. These people demanded to know exactly what my handicap is. When I told him it really was not his business and that the appropriate paperwork was in the office he blasted me on the Internet saying I really did not have a handicap.

My paperwork was in the office in the care of the Office Manager, Louanne (a registered nurse and completely trustworthy). I told the Board President he could review my papers if he signed a confidentiality statement. He never signed but went and told Louanne he had my permission to look. He is her boss and she believed him. He then informed the entire Board.

Louanne had the ADA rules posted in the office until the President, Max Harcourt took them down and told her that Cowpet did not follow those rules, they followed Cowpet rules. This is when the Board decided they would fine me $50 a day for having my Service Animal. When told they had better see an attorney, they decided to hold these fines in abeyance but the fines would continue to add up including penalties. Louanne asked how she was to know if a dog was on the premise and was told to just assume it was there and add the fines. These people are so arrogant and just plain nasty.

This whole thing has me so upset I cannot sleep. It is mean and very ugly.

Please help me to settle this matter, I am just so upset over the terrible discrimination and having my name blasted all over the Internet.

Thank you,

*Judith A. Kromenhoek*

Judith A. Kromenhoek

6200 Windward Way #44

St Thomas, USVI 00802

340-677-3267 (cell)

# COWPET BAY WEST

6201 Windward Way, St. Thomas, USVI 00802
E-Mail: cowpetbaywest@hotmail.com
Phone 340-775-6675 Fax: 340-779-6407

January 19, 2012

Judith & Jack Kromenhoek W-44
6200 Windward Way W-44
St. Thomas, VI 00802

RE: Windward 44

Dear Judi,

Please be advised the BOD voted last week to start assessing fines to owners who are in violation of our NO DOGS Rule. We are seeking legal counsel to determine our options regarding providing reasonable accommodation for those with disabilities, and our collection of the fines will be held in abeyance until such time as this information has been received and a policy developed. You will be notified of the required criteria, at which time you will be required to submit appropriate paperwork. Anyone meeting the requirements will be considered for a rule exception and, if approved, the fines will be waived.

CBWBOD

*these are just*
*some of the*
*inter net pages*

## FINAL INVESTIGATIVE REPORT

CASE NAME: *Kromenhoek, Judith A. v. Cowpet Bay West Cond., et al.*

CASE NUMBER: *02-12-0337-8*

### I. JURISDICTION

A complaint was filed with HUD on March 1, 2012 alleging that the complainant(s) was injured by a discriminatory act. It is alleged that the respondent(s) was responsible for: discriminatory advertising, statements and notices; and discriminatory acts under section 818 (coercion, etc.). It is alleged that the respondent(s)'s acts were based on handicap. The most recent act is alleged to have occurred on January 19, 2012. The violation occurred at St. Thomas, VI. If proven, the allegation(s) would constitute a violation of Sections 804c and 818 of Title VIII of the Civil Rights Act of 1968 as amended by the Fair Housing Act of 1988.

The respondent(s) receive no federal funding.

### II. PARTIES AND AGGRIEVED PERSONS

A. Complainant(s)

Judith A. Kromenhoek
6200 Windward Way 44
Cowpet Bay West
St. Thomas, VI 00802

#### Complainant Allegations

The Complainant alleges that she had requested that the Respondent Association allow her to keep an emotional support animal, a dog, as a reasonable accommodation for her disability. Complainant maintains that her dog helps her to manage her disability. Complainant states that Respondent Association denied her reasonable accommodation request as the Condominium's By-Laws prohibit pets.

B. Other Aggrieved Persons

None.



EXHIBIT
Kromenhoek - Harcourt
12

C. Respondent(s)

Condominium Owner's Association
Cowpet Bay West Condominium
6201 Windward Way
St. Thomas, VI 00802

Respondent Defenses

Respondent Association denies any allegation of discrimination against the
Complainant. Respondent Association states that is without knowledge
regarding whether Complainant filed appropriate paperwork with the Cond.
Association in July, 2011.

Respondent Association admits that "paperwork" was located in the office
of the Association in the care of the Office Manager, but denies that any
member of the Board ever reviewed these documents as of the date of filing
of HUD complaint. The Respondent Association also admits that
Complainant offered to allow the Board President to review her "papers" if
he signed a confidentiality agreement; however, this was in response to the
Association requesting her to submit paperwork to support a request for an
accommodation.

The Respondent Association also denies that the Complainant has made a
request for a reasonable accommodation as of the filing of the HUD
complaint.

D. Witnesses

None.

III. CASE SUMMARY

A. Interviews

COMPLAINANT Kromenhoek, Judith A.
Date of Interview: March 6, 2012
Type of Interview: Correspondence
Interviewer: Perez Pilliot, Irma

Correspondence sent by the Investigator in March 6, 2012:

'In regard to your allegations and the documents you filed along with your

complaint, I have some questions for you:

1. For how long Dr. Sheena Walker has been treating you?

2. Are you still under Dr. Sheena Walker's care?

3. When you state in your complaint "that you filed the appropriate paperwork to the Cowpet Bay West Cond. Office", are you referring to Dr. Walker's certificate dated 7/2//2011?

4. Did you ask for a reasonable accommodation to have your emotional assistance animal? To whom? When? or You just provided the medical certificate to the Office Manager?

5. Besides the emotional assistance animal, do you receive another treatment for your condition, such as: pharmacotherapy and/or psychotherapy?

6. Why kind of dog do you have?

7. At the moment you provided your "paperwork", did you provide also to the Cowpet Bay West Cond. Office with the veterinarian records of your dog, including the dog's vaccines?

I need also you provide me with an e-mail address, so we can communicate more quickly. You can reach me at my e-mail (Irma.g.perez-pillot@hud.gov) or at my direct phone: (787) 274-5834. I prefer the e-mail communication, because I am not always at the office, and I can access my e-mail wherever I am.

Complainant's Response to Investigator Interview/correspondence in March 12, 2012:

This is in response to your letter of March 6, 2012 and your questions.

1. Dr. Sheena Walker has been treating me since July, 2011.

2. Yes, I am still under Dr. Walker's care.

3. Yes, I am referring to Dr. Walker's certificate as well as Chilhowee Psychological Services dated 12/15/2010.

4. Yes, I provided my medical certificate to the Office Manager and the Property Manager. I also sent a letter via e-mail to the then President of the Board, Max Harcourt, telling him:

"I would be willing to sit down with you and you alone and disclose my history and paperwork provided you sign a confidentially agreement with a monetary penalty for disclosure, subject penalty would be borne by you personally and not the Association or the Association insurance. With this knowledge you can assure the Board that I am in compliance with the ADA although you cannot disclose the details."

This letter was sent because Mr. Harcourt and other members of the Board made both my and Barbara Walters medical information public via an internet blog operated by a friend of Mr. Harcourt's.

I trusted the Office Manager, a nurse who is aware of my privacy rights and the Property Manager.

5.    Yes, I am being treated by Dr. Walker in psychotherapy.    I am also on Lorazepam for anxiety.

6.    My dog is a miniature golden doodle, he has been trained.    The dog, Oliver, does not bark, is always on a leash when out of my condo and I clean up after him.    He causes no problems but is a tremendous help calming my anxiety.

7.    Yes, the Cowpet Bay West office saw all the veterinarian records including Oliver's vaccines.    He travels with me so I always have the file with me.

Barbara Walters and I both feel this is a personal vendetta against us. There is one other "emotional support" dog on property and that owner has been given dispensation.    She was also told by a Board member that "there was nothing against her and her dog but unfortunately she got caught in the crossfire".    Barbara and I continue to be fined $50 a day to have our dogs. The other dog owner recently did sign a letter requested by the new Board. Barbara and I were advised not to sign it by our attorney.

My e-mail is Jkromes@gmail.com and my cell is 340-677-3267, home 340-775-6062.

COMPLAINANT Kromenhoek, Judith A.
Date of Interview:    March 10, 2012
Type of Interview:    Correspondence
Interviewer:    Perez Pillot, Inna

This is in response to your letter of March 6, 2012 and your questions.

1.    Dr. Sheena Walker has been treating me since July, 2011.
2.    Yes, I am still under Dr. Walker's care.

3.      Yes, I am referring to Dr. Walker's certificate as well as Chilhowee Psychological Services dated 12/15/2010.

4.      Yes, I provided my medical certificate to the Office Manager and the Property Manager. I also sent a letter via e-mail to the then President of the Board, Max Harcourt, telling him:

"I would be willing to sit down with you and you alone and disclose my history and paperwork provided you sign a confidentially agreement with a monetary penalty for disclosure, subject penalty would be borne by you personally and not the Association or the Association insurance. With this knowledge you can assure the Board that I am in compliance with the ADA although you cannot disclose the details."

This letter was sent because Mr. Harcourt and other members of the Board made both my and Barbara Walters medical information public via an internet blog operated by a friend of Mr. Harcourt's.

I trusted the Office Manager, a nurse who is aware of my privacy rights and the Property Manager.

5.      Yes, I am being treated by Dr. Walker in psychotherapy.  I am also on Lorazepam for anxiety.

6.      My dog is a miniature golden doodle, he has been trained.  The dog, Oliver, does not bark, is always on a leash when out of my condo and I clean up after him.  He causes no problems but is a tremendous help calming my anxiety.

7.      Yes, the Cowpet Bay West office saw all the veterinarian records including Oliver's vaccines.  He travels with me so I always have the file with me.

Barbara Walters and I both feel this is a personal vendetta against us. There is one other "emotional support" dog on property and that owner has been given dispensation.  She was also told by a Board member that "there was nothing against her and her dog but unfortunately she got caught in the crossfire".  Barbara and I continue to be fined $50 a day to have our dogs. The other dog owner recently did sign a letter requested by the new Board. Barbara and I were advised not to sign it by our attorney.

My e-mail is jkromes@gmail.com and my cell is 340-677-3267, home 340-775-6062.
REPRESENTATIVE Owner's Association, Condominium
Date of Interview:  March 19, 2012

Type of Interview:  Telephonic
Interviewer:  Perez Pillot, Irma

Telephone conference with Respondents' Assoc. legal representative,
Joseph Riopelle, to discuss Complainant's offer to conciliate the case.

COMPLAINANT Kromenhoek, Judith A.
Date of Interview:  March 20, 2012
Type of Interview:  Telephonic
Interviewer:  Perez Pillot, Irma

The Investigator telephoned the Complainant to inform her that the
complaint had been amended to remove Mr. Al Felice and Mr. Lance
Talkington as respondents to the complaint for lack of jurisdiction.

The Investigator also informed her that the amended complaint will be
mailed to her so she can sign and return it to the Department.

REPRESENTATIVE Owner's Association, Condominium
Date of Interview:  April 2, 2012
Type of Interview:  Telephonic
Interviewer:  Ortiz, Diana M.

Diana Ortiz, San Juan FHEO Director, held a conference meeting with Mr.
Joseph Riopelle, legal counsel for Respondent Association to discuss case
status and the Complainant's response to Respondent's counter offer.  The
legal counsel was informed that the Complainant is not willing to conciliate
anymore the case.

The Investigator could not be present at the meeting because she was on
sick leave.

B.  Documents

Nature of Document:  Ltr. to Complainant
Who Provided:  Investigator
How transmitted to HUD:
Date of Document:  March 6, 2012

Mrs. Judith Kromenhoek
6200 Windward Way #44
Cowpet Bay West Cond.
St. Thomas, USVI  00802

        Re:  Kromenhoek, Judith A. v. Cowpet Bay West Cond. Assoc,
et al

HUD case # 02-12-0037-8

Dear Mrs. Kromenhoek:

I am the Equal Opportunity Specialist in charge of investigating the housing discrimination complaint you filed with our Agency on January 24, 2012.

My responsibility under the law is to undertake an impartial investigation and, at the same time, encourage all sides to reach an agreement, where appropriate, through conciliation. In addition, the law requires me to make every reasonable effort to complete the investigation within 100 days of the date of the official filing (03/01/2012) of the complaint.

Please be advised that I already began the case investigation and I will be in touch with you and with the Cowpet Association's legal representative. In regard to Mr. Al Felice and Mr. Lance Talkington, I am waiting for a legal opinion from our Headquarters as to whether we have or not jurisdiction to investigate those Respondents' acts.

You allege in your complaint that you have been denied a reasonable accommodation of having an emotional assistance animal. You also allege that you filed the appropriate paperwork to the Cowpet Bay West Cond. Office in July, 2011 for your emotional assistance animal and that the President of the Board Directors reviewed it and then informed the entire Board about it.

A reasonable accommodation is a change, exception, or adjustment to a rule, policy, practice, or service. A person with a disability may need a reasonable accommodation in order to have an equal opportunity to use and enjoy a dwelling. The Fair Housing Act allows the housing provider (Respondent Board), in the case of disabilities which are not clearly visible, to request documentation from a medical professional verifying that the person meets the FHAct's definition of disability and that the requested accommodation is directly related to the individual's disability. Since the Board is responsible for the legality of its decisions, it is not required under the law to delegate this responsibility to an employee manager; indeed, the Fair Housing Act makes clear that the legal liabilities of a housing provider cannot be delegated to staff.

In regard to your allegations and the documents you filed along with your complaint, I have some questions for you:

1. For how long Dr. Sheena Walker has been treating you?

2. Are you still under Dr. Sheena Walker's care?

3.     When you state in your complaint "that you filed the appropriate paperwork to the Cowpet Bay West Cond. Office", are you referring to Dr. Walker's certificate dated 7/2//2011?

4.     Did you ask for a reasonable accommodation to have your emotional assistance animal? To whom? When? or You just provided the medical certificate to the Office Manager?

5.     Besides the emotional assistance animal, do you receive another treatment for your condition, such as:   pharmacotherapy and/or psychotherapy?

6.     Why kind of dog do you have?

7.     At the moment you provided your "paperwork", did you provide also to the Cowpet Bay West Cond. Office with the veterinarian records of your dog, including the dog's vaccines?

I need also you provide me with an e-mail address, so we can communicate more   quickly.        You   can   reach   me   at   my   e-mail (irma.g.perez-pillot@hud.gov) or at my direct phone: (787) 274-5834.   I prefer the e-mail communication, because I am not always at the office, and I can access my e-mail wherever I am.

Sincerely,


Irma Pérez-Pillot
Equal Opportunity Specialist


Nature of Document:   Ltr. to Complainant
Who Provided:   Investigator
How transmitted to HUD:
Date of Document:   March 20, 2012

Letter sent to Complainant including an amended complaint to be signed by her and send it back to FHEO.   The Complaint is being amended to remove Respondent Al Felico as a respondent for lack of jurisdiction.



Nature of Document:   Ltr. to Resp. Al Felico
Who Provided:   Investigator

Case 3:12-cv-08025-CVG-RM Document 311-2 Filed: 03/31/14 Page 49 of 63

Date of Document:   March 20, 2012

Letter sent to Mr. Al Felice informing him that he is being remove
Respondent as a respondent for lack of jurisdiction.


Nature of Document:   E-mail from Cowpet's attorney
Who Provided:   Investigator
Date of Document:   April 10, 2012

Ms. Perez-Pillot:

I have informed the Board that they will need to directly respond to Ms.
Walters and Ms. Kromenhoek and inform them that the Association has
granted their request for an accommodation. We had previously indicated
this in our counter-offer via letter dated March 26, 2012 to your office.
The Association will be sending confirmation letters to Ms. Walters and
Ms. Kromenhoek by the end of the week indicating the Association's
acceptance of their accommodation request.

Regards,


Joseph G. Riopelle, Esquire
Boyd Richards Parker & Colonnelli, P.L.
Rivergate Tower Suite 1150
400 N. Ashley Drive
Tampa, FL 33602
(813) 223-6021
(813) 223-6024 (Fax)
jriopelle@boydlawgroup.com
www.boydlawgroup.com


Nature of Document:   E-mail from Complainant
How transmitted to HUD:   E-mail
Date of Document:   March 28, 2012

E-mail communication sent to the Investigator informing that she is not in
agreement with the offer for settlement. Also, asking the Investigator that
in the future all correspondence should go through her attorney, Ms.
Karen A. Bentz, P.C., 18 Droningens Gade, Suite 8, Charlotte Amalie,
VI  00802.


Nature of Document:   Ltr. from Board to Complainant

Who Provided: Respondent
How transmitted to HUD: e-mail
Date of Document: April 11, 2012

On April 11, 2012, Respondent Association sent a confirmatory letter to the
Complainant indicating acceptance of her accommodation request.

Nature of Document: E-mail to Cowpet's attorney
Who Provided: Investigator
Date of Document: May 22, 2012

Good Morning Mr. Riopelle,

Just a following up on the above referenced matter. I would like to know if
your client will agree to include a reasonable accommodation statement in
their policies and procedures.

Thanks,

Irma Perez-Pillot

Nature of Document: E-mail to Cowpet's attorney
Who Provided: Investigator
Date of Document: May 15, 2012

Good Morning Mr. Riopelle,

Enclosed please find our review of the "reasonable accommodation policy"
draft for Cowpet Bay West.

Thanks,

Irma Perez-Pillot, EOS

Nature of Document: E-mail to Cowpet's attorney
Date of Document: May 16, 2012

Hi Mr. Riopelle,

I got your message, but I am on the field and will be back on the office next
Monday. You can e-mail me your concerns about the policy draft I sent
you.

Thanks,

Irma Perez-Pillot

Nature of Document:   E-mail Compl. to Resp
Date of Document:   October 30, 2011

On October 30, 2011 the Complainant answered the Board's President's
e-mail stating that she would be willing to disclose to him her medical
certification if he signed a confidentiality agreement. She also stated in
the e-mail that once he had reviewed her medical certification, he could
then inform the other Board members that she needed an emotional
assistance animal, but he could not disclose any further details to them.

Nature of Document:   E-mail Board Pres to Compl.
Date of Document:   October 28, 2011

On October 28, 2011, Board President, Max Harcourt, wrote to the
Complainant, by email, informing her that her action, in housing a dog in
her unit was in violation of the By-Laws. She was informed that she had
ten days within which to apply for an exception to this Rule, and that she
should submit all supporting documentation, as well, for consideration by
the Board at their November 2011 meeting.

Nature of Document:   Medical Certificate
Who Provided:   Complainant
Date of Document:   July 2, 2011

Medical Certificate from Dr. Sheena M. Walker her certifying the
Complainant's disability, and recommending her an emotional support
animal.

Nature of Document:   Letter from Cowpet to Compl.
Who Provided:   Complainant
Date of Document:   January 19, 2012

Letter to Complainant informing her that the Board of Directors voted to
start assessing fines to owners who were in violation of the No Dogs Rule.
Also, informing her that the Board was seeking legal counsel to determine
their options regarding providing reasonable accommodation to residents
with disabilities.

C.  Interrogatories

None.

## IV. OTHER INVESTIGATIVE FINDINGS

Mrs. Judith Kromenhoek lives at 6200 Windward Way #44, St. Thomas, VI 00802.

The investigation reveals that the Complainant has been under the medical care of Dr. Sheena M. Walker for treatment of her disability since 2011.

The medical evidence submitted by the Complainant establishes that her emotional disability substantially limit one or more major life activities. Complainant is therefore an individual with disabilities as defined in 24 CFR § 100.201.

Complainant alleges that the Respondent Association violated Section 804(f)(3)(B) of the Act.

The Complainant alleges that in July, 2011 she submitted to the Condominium Office Manager paperwork regarding her need for an emotional assistance animal. She also advised the Office Manager that she didn't want others to view the medical documentation provided. The Complainant further states that other people were trying to review her paperwork, but she was grateful that the Office Manager did not allow anyone to see it. The Complainant states that the Office Manager had her records on file for months, until she was advised to remove them because other people were trying to view them.

The investigation reveals that in July 2011, the Complainant began to house a dog in her condo unit. The dog is a miniature golden doodle.

The investigation reveals that Cowpet Bay West Condominium By-Laws have a clause which prohibits pets. The investigation further reveals that based on the By-Laws, it is the Board of Directors the only one with the vested authority to consider a reasonable accommodation request in Cowpet Bay West Condominium.

The investigation reveals that in October 2011, members of the Board were advised by other residents that the Complainant was housing a dog in her condo unit. On October 28, 2011, Board President, Max Harcourt, wrote to the Complainant, by email, informing her that her action, in housing a dog in her unit was in violation of the By-Laws. She was informed that she had ten days within which to apply for an

exception to this Rule, and that she should submit all supporting documentation, as well, for consideration by the Board at their November 2011 meeting.

The investigation reveals that on October 30, 2011 the Complainant answered the Board's President's e-mail stating that she would be willing to disclose to him her medical certification if he signed a confidentiality agreement. She also stated in the e-mail that once he had reviewed her medical certification, he could then inform the other Board members that she needed an emotional assistance animal, but he could not disclose any further details to them.

The investigation reveals that the Complainant filed a housing discrimination complaint with HUD on March 1st, 2012.

In March 2012, the Complainant provided the newly elected Board President, Ed Wardwell, with a request for an emotional assistance animal and a copy of a medical certification establishing her medical need for an emotional assistance animal.

The investigation reveals that, on March 26th, 2012, after reviewing the documents provided by the Complainant, the Board of Directors agreed to allow the Complainant to maintain this dog in her condo unit, as an emotional support animal. At this time, the Board also agreed to waive any fines assessed to the Complainant as a result of the perceived violation of the "No Dog Policy."

The investigation reveals that on April 11, 2012, Respondent Association sent a confirmation letter to the Complainant indicating the acceptance of her accommodation request.

The investigation also reveals that the Respondent Association has drafted a reasonable accommodation policy to become a part of Cowpet Bay By-Laws.

Conducted by: _Diana Ortez tor_

Irma Perez-Pillot
Equal Opportunity Specialist

June 1, 2012
Date

Reviewed by: _Diana Ortiz_

Diana Ortiz, Director
FHEO San Juan Field Office

June 1, 2012
Date

_Wanda Nieves, Director_
Newark FHEO Center

_Jay Golden, Director_
Region II Director
Office of Fair Housing and
Equal Opportunity

June 1st, 2012
Date

6/1/12
Date

Rec'd 4/11/12
4:44

# COWPET BAY WEST

6201 Windward Way, St. Thomas, USVI 00802
E-Mail: cowpetbaywest@hotmail.com
Phone 340-775-6675 Fax: 340-779-6407

April 11, 2012

Judith Kromenhoek
6200 Windward Way #44
St. Thomas, VI 00802

Dear Judy,

The Board of Directors convened a closed door meeting on March 26th, 2012 to confidentially review the medical certifications submitted by you to Board President, Ed Wardwell in an attempt to confirm your disability and need for emotional support animals. After review, the Board of Directors has agreed to provide you an exception to the No Dog policy currently in place at Cowpet. Thus, your request for an accommodation to allow your service animals/emotion support animals to reside at Cowpet Bay West is granted. Furthermore, the Board of Directors has agreed to waive any fines assessed to your unit as result of the perceived violation of the No Dog policy at Cowpet.

Lastly, the granting of this accommodation request does not provide an exception to other commons sense rules related to animals on the property, including, keeping dogs on a leash at all times as well as cleaning up the excrements of the service animal or emotional support animal.

Yours Truly,

Edward a. Wardwell
Edward A. Wardwell
President, Cowpet Bay West Association



EXHIBIT
Kromenhoek-Herceut
13

3055300/000200

Joint Appendix Vol. II Page 1050

JUN-21-2012 13:59 FROM:WARDWELL          3407755889          TO:18132236984          P.1

TO: JOSEPH RHOPENE, ESQ

JOE:

RECEIVED VIA CERTIFIED MAIL

AT 2:00 PM June 21, 2012

U.S. Department of Housing And Urban Development
New York State Office
Jacob K. Javits Federal Building
26 Federal Plaza
New York, New York 10278-0068
http://www.hud.gov/local/nyo/

Ed Wardwell
President

JUN 15 2012

Cowpet Bay West Condominium
6201 Windward Way
St. Thomas, VI 00802

Dear Respondent:

Subject:    Housing Discrimination Complaint
            Kromenhoek, Judith A. v. Cowpet Bay West Cond., et al.
            Inquiry No.:    336193
            HUD Case No.:   021203370

The U.S. Department of Housing and Urban Development (HUD) administratively enforces the Fair Housing Act of 1968 (the Act). HUD has completed its investigation of the above-referenced complaint. Efforts to voluntarily conciliate the complaint during the course of the investigation were unsuccessful.

Based on the evidence obtained during the investigation, HUD has determined that no reasonable cause exists to believe that a discriminatory housing practice has occurred. Accordingly, HUD has completed its administrative processing of this complaint under the Act, and the complaint is hereby dismissed. The enclosed Determination of No Reasonable Cause contains a summary of the factual evidence supporting this dismissal.

Retaliation is a violation of the Fair Housing Act. Section 818 of the Act makes it unlawful to retaliate against any person because he or she has filed a housing discrimination complaint, is associated with a complainant, has counseled or otherwise assisted any person to file such a complaint, or has provided information to HUD during a complaint investigation. Section 818 also protects complainants against retaliatory acts that occur after a complainant has withdrawn, settled, or conciliated a housing discrimination complaint. Section 818 protects complainants against retaliatory acts that occur after a finding of no reasonable cause. Any person who believes that he or she has been a victim of retaliation for any of the reasons listed above may file a housing discrimination complaint with HUD within one (1) year of the date on which the most recent alleged retaliatory act(s) occurred or ended.



EXHIBIT
Kromenhoek-Harcourt
14

Joint Appendix Vol. II Page 1051

JUN-21-2012 13:59  FROM:HARDWELL          3407755989          TO:18132236024          P.2

**Right to file a civil lawsuit.** Notwithstanding HUD's dismissal of this complaint, under Section 813(a) of the Act, the complainant may file a civil lawsuit in an appropriate Federal district court or state court within two (2) years of the date on which the alleged discriminatory housing practice occurred or ended. The computation of this two-year period does not include the time during which this administrative proceeding was pending with HUD. If, upon the application of either party, the court determines that the party is financially unable to bear the costs of the civil lawsuit, the court may appoint an attorney, or may authorize the commencement of or continuation of the civil lawsuit without the payment of fees, costs, or security.

**Reconsideration.** A complainant may ask HUD to reconsider its determination of No Reasonable Cause. Requests for reconsideration must be in writing and must set forth the specific reasons why the complainant believes that the Determination of No Reasonable Cause is in error. Reconsideration requests must be limited to the allegations and issues in the complaint. The complainant must identify the relevant information that he or she believes is incorrect, or that was omitted from the complaint investigation. The request must include all new and material evidence that the complainant believes supports the reconsideration request.

Please direct all reconsideration requests to: Director, Office of Enforcement, FHEO, U.S. Department of Housing and Urban Development, Room 5226, 451-7th Street, SW, Washington, DC 20410-2000. Before requesting reconsideration, please review the Final Investigative Report. The enclosed Determination provides instructions for obtaining a copy of the Report.

**Public Disclosure.** Section 103.400(a)(2)(ii) of HUD's regulation implementing the Act requires that HUD shall publicly disclose the dismissal of this complaint, unless a complainant or a respondent requests in writing that no such disclosure shall be made. Requests for nondisclosure must be made within thirty (30) days after receipt of this Determination. Nondisclosure requests should be submitted to the same HUD Office that issued the Determination. Notwithstanding such a request, the fact of this dismissal, including the names of all parties to the complaint, is public information and is available upon request.

If you have any questions regarding this closure, please contact Irma Perez Pillot, Investigator, at (787) 766-5400 ext. 2034, for assistance.

Sincerely,

Jay Golden
Region II Director
Office of Fair Housing
and Equal Opportunity

Enclosure

021203376

## DETERMINATION OF NO REASONABLE CAUSE

CASE NAME:  Kromenhoek, Judith v. Cowpet Bay West Condo. Assoc., et al.

CASE NUMBER:  02-12-0337-8

### I.   JURISDICTION

Complainant, Judith Kromenhoek, an aggrieved person as defined in 42 U.S.C. § 3602(i) of the Fair Housing Act ("the Act"), filed a verified complaint of housing discrimination with the U.S. Department of Housing and Urban Development (the "Department" or "HUD"). Complainant alleges violations of the Act based upon her disability. The Respondent is Cowpet Bay West Condominium Association ("Respondent Association").

If proven, the allegation(s) would constitute a violation of Section 804(f)(3)(B) of the Act, which makes it unlawful to "discriminate against any person by refusing to make reasonable accommodations in rules, policies, practices, or services, when such accommodations may be



**5. Complainant failed to request an accommodation for her disability.**

While the Complainant informed the Office Manager of the Respondent Association of her disability and need for an emotional support animal in July 2011, she did not formally request an accommodation at that time. In fact, she asked that the Office Manager keep this information confidential, i.e., that it not be shared with the Board of Directors of the Respondent Association.

It should be noted that the Complainant herself was a former Board president.

The investigation reveals that, in July 2011, the Complainant began to house a dog in her condominium unit. The dog is a miniature golden doodle.

The investigation reveals that, while the Cowpet Bay West Condominium By-Laws prohibit pets, the Board of Directors is vested with the authority to consider and grant a reasonable accommodation request within the Cowpet Bay West Condominium.

The investigation reveals that, in October 2011, members of the Board were advised by certain residents that the Complainant was housing a dog in her condominium unit, in violation of the By-Laws. On October 28, 2011, Board President, Max Harcourt, wrote to the Complainant, by email, informing her that her action, in housing a dog in her unit was a violation of the By-Laws. She was informed that she had ten days within which to apply for an exception to this Rule, and that she should submit all supporting documentation to the Board, for their consideration, before their November 2011 meeting.

The investigation reveals that, on October 30, 2011, the Complainant answered the Board's President's e-mail by stating that she would be willing to provide him with her medical certification if he agreed to sign a confidentiality statement. She also stated in her e-mail that, once the Board President had reviewed her medical certification, he could then inform the other Board members of her need for an emotional assistance animal, but that he could not disclose any further details of her medical condition to them.

The investigation reveals that the Complainant filed a housing discrimination complaint with HUD on March 1st, 2012.

In March 2012, the Complainant provided the newly elected Board President, Ed Wardwell, with a request for an emotional assistance animal and a copy of a medical certification establishing her medical need for an emotional assistance animal.

The investigation reveals that, on March 26th, 2012, after reviewing the documents provided by the Complainant, the Board of Directors agreed to allow the Complainant to maintain this dog in her condominium unit as an emotional support animal. The Board also agreed to waive any fines assessed to the Complainant as a result of the perceived violation of the "No Dog Policy."

On April 11, 2012, Respondent Association sent a confirmatory letter to the Complainant indicating acceptance of her accommodation request.

JUN-21-2012 14:02   FROM:HARDWELL          3407755089          TO:18132036024          P.2

## CONCLUSION

Complainant did not formally request a reasonable accommodation for her disability until March 2012. In April 2012, upon review of these documents, the Respondent granted the request.

There is no reasonable cause to believe that the Respondent violated the Act, as alleged.

## V.   ADDITIONAL INFORMATION

Notwithstanding this determination by HUD, the Fair Housing Act provides that the complainant may file a civil action in an appropriate federal district court or state court within two years after the occurrence or termination of the alleged discriminatory housing practice. The computation of this two-year period does not include the time during which this administrative proceeding was pending. In addition, upon the application of either party to such civil action, the court may appoint an attorney, or may authorize the commencement of or continuation of the civil action without the payment of fees, costs, or security, if the court determines that such party is financially unable to bear the costs of the lawsuit.

The Department's regulations implementing the Act require that a dismissal, if any, be publicly disclosed, unless the Respondents or Complainant request that no such release be made. Such request must be made by the Complainant or Respondents within thirty (30) days of receipt of the determination to the Director, Office of Enforcement, Office of Fair Housing and Equal Opportunity, 451 Seventh Street, S.W, Washington D.C. 20410. Notwithstanding such request, by the Complainant or the Respondents, the fact of a dismissal, including the names of all parties, is public information and is available upon request.

A copy of the final investigative report can be obtained:

US Department of Housing and Urban Development
Office of Fair Housing and Equal Opportunity
Attn.: Mr. Jay Golden, Region II Director
26 Federal Plaza - Room 3532
New York, NY 10278-0068

JAY GOLDEN
Region II Director
Office of Fair Housing and
Equal Opportunity

6/5/12

DATE

IN THE UNITED STATES DISTRICT COURT OF THE VIRGIN ISLANDS
DISTRICT OF ST. THOMAS AND ST. JOHN

JUDITH KROMENHOEK,                          )
                                            )
            Plaintiff,                      )
                                            )
v.                                          )       CIVIL CASE NO: 3:12-cv-00025
                                            )
COWPET BAY WEST CONDOMINIUM                 )
ASSOCIATION; THE BOARD OF THE               )
COWPET BAY WEST CONDOMINIUM                 )
ASSOCIATION; MAX HARCOURT, in his)
personal capacity; ALFRED FELICE;           )
LANCE TALKINGTON ROBERT                     )
COCKAYNE;VINCENT VERDIRAMO,                 )
                                            )
            Defendants.                     )
_____)

## DECLARATION OF SHARON KOEHLER

I, SHARON KOEHLER, hereby declare as follows:

1.     I have personal knowledge of the matters set forth in this declaration.

2.     I submit this declaration in support of the Motions for Final Summary Judgment

filed by the Defendants in this matter.

3.     I am a resident of New Suffolk, Suffolk County, New York

4.     I was the treasure of the Cowpet Bay West Board in 2011 and 2012 and I am

currently still serving on the Board.

5.     I never reviewed any paperwork of Plaintiff in the office at Cowpet or at any

other location prior to March 2012 when Plaintiff finally submitted her paperwork to the Board

for review and consideration.

6.     The Cowpet Board neither reviewed nor discussed the content of Plaintiff's

medical verification and accommodation request, until March 2012, when Plaintiff submitted

same to then president, Ed Wardwell.



**EXHIBIT**
**15**

Joint Appendix Vol. II Page 1056

7.     The Board became aware of Plaintiff having "paperwork" in October 2011, but was not allowed to view same per Plaintiff's instructions to the Board and to Louanne Schechter.

8.     The Board never prevented Plaintiff from accessing or using her unit at any time with the accompaniment of her dog.

9.     The Board held all dog violation fines against Plaintiff in abeyance and agreed to waive same in March 2012.

10.     My email is shazkoehler@gmail.com and I use that email for Cowpet Bay West Board affairs.

11.     As a recipient of the October 20, 2011 email attached as Exhibit "3" to the Defendants Motion for Summary Judgment, I have personal knowledge that this is a true and accurate copy of the email I received from Dr. Susan Anderson.

12.     As a recipient of the October 20, 2011 emails attached as Exhibit "4" to the Defendants Motion for Summary Judgment, I have personal knowledge that this is a true and accurate copy of the emails I received from Plaintiff and Mr. Harcourt.

13.     As a recipient of the October 26, 2011 emails attached as Exhibit "5" to the Defendants Motion for Summary Judgment, I have personal knowledge that this is a true and accurate copy of the emails I received from Plaintiff and Mr. Talkingon.

14.     As a recipient of the October 27, 2011 emails attached as Exhibit "6" to the Defendants Motion for Summary Judgment, I have personal knowledge that this is a true and accurate copy of the emails I received from Plaintiff.

15.     As a recipient of the October 28, 2011 emails attached as Exhibit "7" to the Defendants Motion for Summary Judgment, I have personal knowledge that this is a true and accurate copy of the emails I received from Plaintiff and Mr. Harcourt.

16.     As a recipient of the October 28, 2011 emails attached as Exhibit "8" to the Defendants Motion for Summary Judgment, I have personal knowledge that this is a true and accurate copy of the emails I received from Plaintiff and Mr. Harcourt.

Further Affiant Sayeth Not.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on April 30 , 2014.

Sharon Koehler

IN THE UNITED STATES DISTRICT COURT OF THE VIRGIN ISLANDS
DISTRICT OF ST. THOMAS AND ST. JOHN

JUDITH KROMENHOEK,                          )
                                            )
        Plaintiff,                          )
v.                                          )        CIVIL CASE NO: 3:12-cv-00025
                                            )
COWPET BAY WEST CONDOMINIUM                 )
ASSOCIATION; THE BOARD OF THE               )
COWPET BAY WEST CONDOMINIUM                 )
ASSOCIATION; MAX HARCOURT, in his)
personal capacity; ALFRED FELICE;           )
LANCE TALKINGTON ROBERT                     )
COCKAYNE;VINCENT VERDIRAMO,                 )
                                            )
        Defendants.                         )
_____)

## ORDER

This matter came before the Court on Defendant, Max Harcourt's Motion for Final

Summary Judgment of Plaintiff's Second Amended Complaint and Supporting Memorandum of

Law. The Court being advised of same and in the interest of justice it is herby

**ORDERED,** Defendant's Motion for Final Summary Judgment is **GRANTED**. The

Court reserves jurisdiction to determine an award of attorney fees and costs in this action.

ENTERED this _____ day of May, 2014

                                    _____
                                        CURTIS V. GOMEZ
                                          Chief Judge

ATTEST:

GLENDA LAKE
Clerk of the Court
By:_____
            Deputy Clerk

IN THE UNITED STATES DISTRICT COURT OF THE VIRGIN ISLANDS
DISTRICT OF ST. THOMAS AND ST. JOHN
*****************

BARBARA WALTERS,                            )    CIVIL NO. 12-00024
                                                  )
           **Plaintiff,**                    )    **Action for: Housing**
                                                  )     **Discrimination; Discrimination**
          v.                              )    **Based on Disability; Invasion of**
                                                  )    **Privacy; Negligent Infliction of**
**COWPET BAY WEST CONDOMINIUM**              )    **Emotional Distress**
**ASSOCIATION; THE BOARD OF THE**            )    **Infliction of Emotional Distress;**
**COWPET BAY WEST CONDOMINIUM**              )    **Punitive Damages; and Injunctive**
**ASSOCIATION; MAX HARCOURT,**               )    **and Declaratory Judgment**
**in his personal capacity; ALFRED FELICE;** )
**LANCE TALKINGTON; ROBERT**                 )
**COCKAYNE; VINCENT VERDIRAMO,**             )    **JURY TRIAL DEMAND**
                                                  )
           **Defendants.**                   )
_____ )

## PLAINTIFF'S RESPONSE TO DEFENDANT'S MAX HARCOURT (DECEASED) UNDISPUTED MATERIAL FACTS AND PLAINTIFF'S COUNTER-STATEMENTS OF FACTS

      **COMES NOW** the Plaintiff, **BARBARA WALTERS** ("Plaintiff") and by and through the undersigned counsel, the **LAW OFFICES OF KARIN A. BENTZ, P.C.** (Karin A. Bentz, Esq., and Julita K. de León, Esq.) and submits her brief in response to Defendant Max Harcourt ("Harcourt") statement of undisputed facts in support of their summary judgment motion, pursuant to Rule 56.1 of the Local Rules of Civil Procedure.

      Rule 56. 1 permits a party opposing a summary judgment motion to submit, inter alia, a "concise statement of any additional facts that the respondent contends are material to the motion for summary judgment and as to which the respondent contends there exists a genuine issue to be tried." For ease of reference, Plaintiff has referenced the corresponding paragraphs of Defendants' statement of undisputed facts as ("SOF") where appropriate. Additionally, Plaintiff has also referenced Plaintiff's Counter Statement of Facts ("CSOF") where appropriate.

I.    Plaintiff's Response to Harcourt's Undisputed Material Facts.

    1.    Disagrees.

*Barbara Walters v. Cowpet Bay West Condominium Ass'n.*
Plaintiff's Response to Defendant Max Harcourt's Undisputed Material Facts
and Plaintiff's Counter-Statement of Facts

Civil No. 12/00024

Page 2

2.    Disagrees.

3.    Agrees.

4.    Agrees.

5.    Disagrees.

6.    Agrees.

7.    Agrees.

8.    Disagrees.

9.    Disagreed.  Defendant wrote a letter.

10.    Disagrees.

11.    Disagrees.

12.    Agrees.

13.    Disagrees.

14.    Disagrees.

15.    Disagrees.

16,    Agrees.

**II.    Plaintiff's Counter Statement of Facts**

1.    Plaintiff Barbara Walters owns and resides at a condo at Cowpet Bay West on the east side of St. Thomas. ( Exhibit. 1. Second Amended Compl. §1).

2.    A licensed psychologist wrote a letter stating that he was treating Plaintiff and that she was diagnosed with Anxiety Disorder, citing the DSM-IV. He further explained that Plaintiff had "severe limitations" in coping with stress and anxiety that most people would consider "normal day to day events." He went on to state that he has prescribed the use of an emotional support animal, dog or other, to alleviate her symptoms and that such emotional support animal was necessary. In conclusion, he states that pursuant to the Fair Housing Act, Plaintiff is qualified to keep her emotional support animal despite a policy prohibiting

*Barbara Walters v. Cowpet Bay West Condominium Ass'n.*                                          Civil No. 12/00024
Plaintiff's Response to Defendant Max Harcourt's Undisputed Material Facts
and Plaintiff's Counter-Statement of Facts                                                                    Page 3

pets in her housing. On that same day, the National Service Animal Registry issued a certification that Plaintiff was allowed to keep her emotional support animal even if there is a policy prohibiting pets. (**Exhibit 2.** *Letter from Dr. Sheena Walker*).

3. In 2011, the By-laws of the Cowpet Bay West Condominium Association did not prohibit dogs. ( **Exhibit 3.** *Bylaws*).

4. The Rules and Regulations of the Board prohibited dogs on the premises. ( **Exhibit 4.** *Rules and Regulations*).

5. In July of 2011, Plaintiff submitted an application for a reasonable accommodation to keep Oliver, her emotional support dog on the premises. Because Cowpet Bay West did not have a formal application process, Plaintiff submitted a copy of a letter from her doctor and the dog's certification. (Exhibit 2)

6. At the time submitted her request for a reasonable accommodation, the Association had no written policy in place for processing a reasonable-accommodation request, although it had a NO DOG RULE IN place for at least fifteen (15) years. (Exhibit 4)

7. Louanne Schechter accepted the documents, placed them in Kromenhoek's file and discussed Kromenhoek's request with Jon Cassady, Louanne Schechter's immediate supervisor. (Exhibit 2)

8. Schechter filed and discussed Walters's application with Jon Cassady, Schechter's immediate supervisor. (Id.)

9. Jon Cassady discussed Kromenhoek application with Max Harcourt; and Harcourt subsequently came to the Association's Office to review Kromenhoek's documents. (Id.)

10. Harcourt sent his representative, Bob Canfield, a member of the Board, to review the documents as well. (Id.)

11. There was widespread opposition to having dogs on the premises by members of the Board. (Id.) All of the blog posts related to the dog issues at Cowpet are attached as Exhibit 5.

12. In his first blog post relating to "dogs" on the premises, Talkington, on September 27, 2011,

*Barbara Walters v. Cowpet Bay West Condominium Ass'n.*    Civil No. 12/00024
Plaintiff's Response to Defendant Max Harcourt's Undisputed Material Facts
and Plaintiff's Counter-Statement of Facts    Page 4

stated that " at least three owners. ., have been seen with dogs that are either living in condos or are being entertained by an owner walking them on the property." He goes on to point out that two of the dog owners are present and past Board members. Talkington called for the members of the Association to amend the Association's by-laws to "eliminate any confusion over possible exceptions to the general rule" of no dogs. (Id)

13. In response to increasing attacks by both Talkington and Felice on the blog regarding the requests for a reasonable accommodation, Kromenhoek explained that they were not violating the law or the rules. Walters stated that she has a disability and is afforded protection under the FHA. (Exhibit 8)

14. Harcourt and other members of the Board improperly shared the content of the Kromenhoek's applications with Talkington. (Id.)

15. Susan Anderson, a Board member, wrote an email complaining that she saw Kromenhoek walking a dog and assumed that she was walking the dog for somebody else "because Judith Kromenhoek does not appear to be disabled." (Id.)

16. The prevailing attitude shared most of the Board members was that Walters and Kromenhoek were not disabled because there was no visible evidence of their disability. (Id.)

17. Notwithstanding the objections to providing Talkington with private and personal information, on October 28, 2011, Harcourt emailed a letter to Kromenhoek and copied Talkington. Harcourt wrote as President of the Board and falsely accused Walters of violating the NO DOGS RULE "because they have not applied for an exception to the no dog rule." Harcourt also acknowledged in that same letter that both Walters and Kromenhoek had "papers for service dogs pending in the office." Contradicting himself, Harcourt ordered Kromenhoek to apply and submit documentation for a waiver and threatened to levy a monetary fine if they did not take up his offer. (Id.)

18. Talkington posted the entire letter on the blog in his October 30, 2011 post. (Id)

19. In an October 27, 2011, email, Plaintiff wrote to the entire Board informing them that she

*Barbara Walters v. Cowpet Bay West Condominium Ass'n.*
Plaintiff's Response to Defendant Max Harcourt's Undisputed Material Facts
and Plaintiff's Counter-Statement of Facts

Civil No. 12/00024

Page 5

had paperwork on file in the Condo office. Plaintiff also reiterated her request that her medical information be kept confidential and expressed concern that her medical information might appear on Talkington's blog. (Id)

20. During the January 11, 2012 Board meeting, Cockayne distributed information about service dog certification naming businesses that have no requirements for service dog certification. Cockayne also circulated copies of Kromenhoek's dog certification. (Exhibit 6).

21. In December of 2011, Vincent Verdiramo, a board member, informed at least 99 members of the Association that he had advised the Board about the requirements of the FHA and emotional support dogs. (Exhibit 5).

22. On January 15, 2012, Donna LaScola voiced concern that the Association may be getting into legal trouble with all the blog posts and emails regarding Walters's and Kromenhoek's service animals. (Exhibit 7).

23. On January 17, 2012, ever dutiful to Talkington, Harcourt emailed Talkington informing him that the Board had received a letter from one of the owners stating the owner had filed a complaint. Therefore the Board was retaining counsel. (Exhibit 8).

24. On January 17, 2012, Walters received letters from the Board informing her that she was in violation of the no dogs rule and would be fined. (Exhibit 10)

25. Kromenhoek no longer felt comfortable at her condo because of the constant harassment and publication of her private information on the internet caused her to suffer extreme emotional distress. (Exhibit 9: Depo: Dr. Walker: 75: 1-25; 76: 1-5).

26. Talkington characterizes Walters and Kromenhoek as "playground bullies" and accused them of making a mockery of the Board. He then calls on the Association to "go on the offensive" and file suit against Walters and Kromenhoek stating "when these ladies start spending their own cash instead of relying on the government for free help, the rubber will meet the road on how far everyone is willing to go." In closing, Talkington implores the Board to take Walters and Kromenhoek to court. (Exhibit 5)

*Barbara Walters v. Cowpet Bay West Condominium Ass'n.*
Plaintiff's Response to Defendant Max Harcourt's Undisputed Material Facts
and Plaintiff's Counter-Statement of Facts

Civil No. 12/00024

Page 6

27. Talkington characterizes Kromenhoek and Walters as "playground bullies" and accused them of making a mockery of the Board. He then calls on the Association to "go on the offensive" and file suit against Kromenhoek and Barbara Walters stating "when these ladies start spending their own cash instead of relying on the government for free help, the rubber will meet the road on how far everyone is willing to go." In closing, Talkington implores the Board to take Kromenhoek and Walters to court. (Id.)

28. In a January 5, 2012 blog, Talkington accused Walters of being CB Lawton, a person who blogged about having dogs on the premises. Talkington asserted in his blog post that Walters was CB Lawton citing as evidence Walters's refusal to respond to questions about "why it is OK for her to have a dog." Talkington says she should "either stand up and face the owners or quietly slide into the sunset." (Id.)

Respectfully submitted,

**LAW OFFICES OF KARIN A. BENTZ, P.C.**

Dated: May 21, 2014

/s/Karin A. Bentz
**KARINA. BENTZ, ESQ. (VI Bar #413)**
**JULITA K. de LEÓN, ESQ. (VI Bar #913)**
5150 Dronningens Gade, Suite 8
St. Thomas, Virgin Islands 00802
Telephone: 340-774-2669
Telecopier: 340-774-2665
E-mail: kbentz@virginlaw.com

1  *Barbara Walters v. Cowpet Bay West Condominium Ass'n.*          Civil No. 12/00024
2  Plaintiff's Response to Defendant Max Harcourt's Undisputed Material Facts
   and Plaintiff's Counter-Statement of Facts                        Page 7
3
4
## CERTIFICATE OF SERVICE
5
6  I hereby certify that I caused the filing and service of the foregoing with the Clerk of the District
7  Court of the Virgin Islands using the CM/ECF system, which will provide electronic notice by email
   to the following.

8       Richard P. Farrelly, Esq.
9       Birch de Jongh & Hindels, PLLC
        1330 Taarneberg
10      St. Thomas, VI 00802
        E-mail: rfarrelly@bdhlawvi.com

11      John H. Benham, III, Esq.
12      Benham & Chan
        P.O. Box 11720
13      St. Thomas, Virgin Islands 00801
        Tel: 340-774-0673
14      Fax: 340-776-3630
        email: benham@bclawvi.com

15      Joseph G. Riopelle, Esq.
16      Boyd Richards Parker & Colonnelli, P.L.
        Rivergate Tower Suite 1150
17      400 N. Ashley Drive
        Tampa, Fl. 33602
18      jriopelle@boydlawgroup.com

19      Ryan S. Meade, Esq.
        Quintairos, Prieto, Wood & Boyce, P.A.
20      9300 South Dadeland Blvd., 4th Floor
        Miami, Fl 33156
21      rmeade@gpwblaw.com
                                              /s/ Karin A. Bentz
22
23
24
25
26
27
28

IN THE UNITED STATES DISTRICT COURT OF THE VIRGIN ISLANDS
DISTRICT OF ST. THOMAS AND ST. JOHN
*******************

BARBARA WALTERS,                    )        CIVIL NO. 12-00024
                                    )
            Plaintiff,              )        Action for: Housing
                                    )         Discrimination; Discrimination
        v.                          )        Based on Disability; Invasion of
                                    )        Privacy; Negligent Infliction of
COWPET BAY WEST CONDOMINIUM         )        Emotional Distress
ASSOCIATION; THE BOARD OF THE       )        Infliction of Emotional Distress;
COWPET BAY WEST CONDOMINIUM         )        Punitive Damages; and Injunctive
ASSOCIATION; MAX HARCOURT,          )        and Declaratory Judgment
in his personal capacity; ALFRED FELICE; )
LANCE TALKINGTON; ROBERT            )
COCKAYNE; VINCENT VERDIRAMO,        )        JURY TRIAL DEMAND
                                    )
            Defendants.             )
_____)

## SECOND AMENDED COMPLAINT

**COMES NOW**, Plaintiff **BARBARA WALTERS**, (hereinafter "Walters") by and through her undersigned counsel, the **LAW OFFICES OF KARIN A. BENTZ, P.C.**, (Karin A. Bentz Esq., and Julita K. de León, Esq., of Counsel) and for a Second Amended Complaint against the Defendants in the above captioned action states and alleges as follows:

## PRELIMINARY STATEMENT

1.   On April 11, 1968, President Lyndon B. Johnson signed the Civil Rights Act of 1968. Federal Fair Housing Act, Pub.L. No. 90-284, 82 Stat. 73, 81 (1968) (codified as amended at 42 U.S.C.§§ 3601-3631). The Federal Fair Housing Act (hereinafter "FHA") expanded on the Civil Rights Act of 1964 to prohibit discrimination regarding the sale, rental, and financing of housing based on race, color, religion, and national origin. *Id.* The FHA was amended twice to broaden the class of people falling under the scope of its protections; in 1974, discrimination based on sex was added, and in 1988 discrimination based on familial status or disability was included. (Pub.L. 100-430, approved September 13, 1988).

PLAINTIFF'S
EXHIBIT

Case: 3:12-cv-00024-CVG-RM Document #: 95 Filed: 03/11/13 Page 2 of 35

*Barbara Walters v. Cowpet Bay West Condominium Assoc., et al.*       Civil No. 12-00024
Second Amended Complaint                                       Page 2

2. In amending the FHA, Congress recognized that people with disabilities are subject to artificial, arbitrary, and unnecessary barriers preventing them from making full use of housing. Congress also recognized that more than a mere prohibition against disparate treatment was necessary in order that handicapped persons receive equal housing opportunities. *Secretary of HUD v. Dedham Housing Authority*, 1991 WL 442793 * 5 (HUDAALJ November 15, 1991).

3. Pursuant to the Fair Housing Act (hereinafter "FHA"), it is unlawful to discriminate against any person in the terms, conditions or privileges of sale or rental of a dwelling, or in the provision of services or facilities in connection with such a dwelling, because of the disability of that person or a person residing in that dwelling, because of the disability of that person or a person associated with that person. 42 U.S.C. §3604(f)(2); 24 C.F.R. §100.202(b).

4. It is unlawful to refuse to make reasonable accommodations in rules, policies, practices, or services, when such accommodations may be necessary to afford such person equal opportunity to use and enjoy a dwelling. 42 U.S.C. §3604(f)(3)(B); 24 C.F.R. §100.20.

5. Section 3617 of the FHA makes it unlawful for any person to coerce, intimidate, threaten, or interfere with any person in the exercise or enjoyment of, or on account of his having exercised or enjoyed, or on account of his having aided or encouraged any other person in the exercise or enjoyment of, any right granted or protected by Section 803, 804, 805, 806 of this title.

6. At all times relevant to this action, Walters lived in Condominium unit at Cowpet Bay West Condominium community.

7. The property at Cowpet Bay West is part of the Cowpet Bay West Condominium community that is managed by the Cowpet Bay West Condominium Association (hereinafter, "the Association").

*Barbara Walters v. Cowpet Bay West Condominium Assoc., et al.*  Civil No. 12-00024
Second Amended Complaint  Page 3

8.  At all times relevant to this action, Defendant the Board of the Cowpet Bay West Association, (hereinafter "the Board") run the day to day operations of the Defendant Cowpet Bay West Condominium Association.

9.  At all times relevant to this action, Defendant Max Harcourt (hereinafter "Harcourt") served as the President of the Board. And, at all relevant times, Walters was a member of the Board.

## JURISDICTION AND VENUE

10.  This Court has subject matter jurisdiction over this matter pursuant to 28 U.S.C. §§ 1331, 1332 and §1337; and V.I. Code ANN. tit. 4, §32.

11.  Venue is proper within this District pursuant to 28 U.S.C. §1391(b).

## PARTIES

12.  Plaintiff Barbara Walters (hereinafter "Walters") owns a condo at Cowpet Bay West on the east side of St. Thomas, United States Virgin Islands.  This property constitutes a dwelling under the FHA. 42 U.S.C.§3602(b); 24 C.F.R. §100.20.

13.  The FHA and the American with Disability Act(hereinafter "ADA") define handicapped as a person with "a physical or mental impairment which substantially limits one or more of such person's major life activities, a record of having such an impairment, or being regarded as having such an impairment. . . .

14.  Walters was diagnosed with Anxiety Disorder, DSM-IV by her physician and thus qualifies as a person with a handicapped within the meaning of the FHA and the ADA.

15.  Walters is an aggrieved person under the FHA and the ADA.

16.  Upon information and belief, Defendant Association is an entity organized pursuant to the Virgin Islands Condominium Act, V.I. CODE ANN. tit 28, §901 *et seq*. as

*Barbara Walters v. Cowpet Bay West Condominium Assoc., et al.*       Civil No. 12-00024
Second Amended Complaint       Page 4

amended, that resides and operates its principal place of business in St. Thomas, U.S. Virgin Islands. Cowpet Bay West is the rental manager and governing organization of the condominium development.

17.    Each residential unit owner may use his or her condo unit for permanent, temporary, or transient use. Thus, the owners may permanently reside in their unit, use it as a second home, rent it out on their own or not use it at all.

18.    Defendant Association's facility is structured and operated as both a place of lodging and a condominium. As a place of lodging, it is a place of public accommodation within the meaning of the ADA. **[EXHIBIT A]**

19.    Defendant Association is operated and controlled by a Board of elected persons. The Board is authorized by the Virgin Islands Condominium Act and the Declarations of the Cowpet Bay West Condominium Association, with its purpose set forth more fully in Bylaw Article 1, Section 2. The members of the Board are elected by the homeowners of the Cowpet Bay West Condominiums.

20.    Upon information and belief, on October 22, 1974, Cowpet Bay West was created by a declaration of merger, whereby Cowpet Bay Village-Stages One and Two, the two condominium associations, merged into a single entity. The merger declaration acknowledged that the original 1968 Declaration, except as amended by the merger declaration is still in force. Section 16, of the 1968 Declaration provides that all owners are subject to and must comply with the provisions of the Declaration, the by-laws, and the rules and regulations as may be amended. Section 17 of the 1968 Declaration provides that the Declaration can only be amended by an affirmative vote of 75% of the Owners in number and common interest. Section 19 of the 1968 Declaration states that the by-laws and rules and regulations are " annexed hereto" and that the by-laws can only be amended by "an amendment to this Declaration and such amendment duly recorded."

*Barbara Walters v. Cowpet Bay West Condominium Assoc., et al.*   Civil No. 12-00024
Second Amended Complaint   Page 5

21. Under this provision, any amendment to the by-laws must be by a 75% vote and recorded in order to be valid.

22. The by-laws of the Association were adopted and recorded in 1974 along with the merger declaration. The by-laws were again amended and recorded in April 1998. Article I, Section 2 of those by-laws made them applicable to both the common areas and the individual units. Article II, Section 2, provided that the affairs of the Association were to be governed by the Board, which was empowered to deal with all administrative affairs of the Association and to undertake all acts except those prohibited by law, the Declaration, or the by-laws. Of the enumerated powers of the Board, adoption and amendment of the rules and regulations is provided for: These rules are applicable to both the common areas and the units under Article I, Section 2. Article V, Section 9 empowers the Board to enjoin and remedy a violation of the by-laws, Declaration, or rules and regulations. Article V, Section 16 allows for the adoption of rules and regulations if approved by a majority of the Owners. Article XI, Section 1 requires that the by-laws be modified by a 66 and 2/3% vote of the Owners present at a meeting held for such purpose. Article XIII, Section 1 states that where thee is a conflict between the provisions of the by-laws and the Declaration, the Declaration controls.

23. There is a conflict between the by-laws and the Declaration in that the Declaration makes clear that a vote of 75% of the Owners is required to amend the by-laws.

24. The 1968 rules and regulations prohibited an Owner from making or allowing disturbing noises in his/her apartment and prohibited dogs. The 1998 rules and regulations contained the same provisions.

25. Based upon information and belief Defendant Alfred Felice is a resident of Plainview, New York.

26. Based upon information and belief Defendant Max Harcourt is a resident of St.

*Barbara Walters v. Cowpet Bay West Condominium Assoc., et al.*　　　　　Civil No. 12-00024
Second Amended Complaint　　　　　　　　　　　　　　　　　　　　　　Page 6

Thomas, United States Virgin Islands.

27.　　Based upon information and belief Defendant Lance Talkington is a resident of St. Thomas, United States Virgin Islands.

28.　　Based upon information and belief Defendant Robert Cockayne is a resident of St. Thomas, United States Virgin Islands.

29.　　Based upon information and belief Defendant Vincent Verdiramo is a resident of St. Thomas, United States Virgin Islands.

## STATEMENT OF FACTS

30.　　On January 21, 2011, Stansford S. Sutherland, a licensed psychologist wrote a letter stating that he was treating Walters and that she was diagnosed with Anxiety Disorder, citing the DSM-IV. He further explained that Walters had "severe limitations" in coping with stress and anxiety that most people would consider "normal day to day events." He went on to state that he has prescribed the use of an emotional support animal, dog or other, to alleviate her symptoms and that such emotional support animal was necessary. In conclusion, he states that pursuant to the Fair Housing Act, Walters is qualified to keep her emotional support animal despite a policy prohibiting pets in her housing. On that same day, the National Service Animal Registry issued a certification that Walters was allowed to keep her emotional support animal even if there is a policy prohibiting pets.

31.　　In February of 2011, Defendant Association received the letter from Walters' medical provider and the certification. However, as early as the Summer of 2010, Walters, a member of the Board, discussed with Board members her need to obtain a waiver to the NO DOG RULE to keep an emotional support dog on the premises.

32.　　Walters made the request for a reasonable accommodation because Defendant Association had a NO DOGS RULE in place and Walters needed a waiver from

*Barbara Walters v. Cowpet Bay West Condominium Assoc., et al.*
Second Amended Complaint

Civil No. 12-00024
Page 7

Defendant Association's NO DOGS RULE to keep her emotional support dog (hereinafter "Happy"). Walters furnished those two documents to Louanne Schechter, the Office Manager for Defendant Association as Walters' application because the Defendant Board did not have a form or application in place for requesting a waiver to the NO DOGS RULE. [**EXHIBIT B**]

33. At the time Walters submitted her request for a reasonable accommodation, Defendant Association had no written policy in place for processing a reasonable accommodation request, although it had a NO DOG RULE IN place for at least fifteen (15) years.

34. Upon information and belief, Louanne Schechter accepted the documents, placed them in Walters' file and discussed Walters' request with Jon Cassady, Louanne Schechter's immediate supervisor.

35. Upon information and belief, Jon Cassady discussed Walters' request with Harcourt and Harcourt subsequently came to the Association's Office to review Walters' documents.

36. Upon information and belief, Harcourt sent his representative, Bob Canefield, a member of the Board, to review the documents.

37. Upon information and belief, there was widespread opposition to having dogs on the premises by some members of the Board and Association.

38. Upon information and belief, Harcourt took down a framed copy of an American with Disabilities Act poster that was hanging in the Defendant Association's office saying **Cowpet Bay rules not ADA**.

39. At the February 12, 2011 Board meeting, Board member Robert Cockayne (hereinafter "Cockayne") proposed amending the by-laws to prohibit dogs and farm animals. There was no mention however of providing reasonable accommodations to owners under the FHA or the ADA.

*Barbara Walters v. Cowpet Bay West Condominium Assoc., et al.*     Civil No. 12-00024
Second Amended Complaint     Page 8

40. The Board neither discussed or acted on Walters' request for a reasonable accommodation during the March 8, 2011 Board meeting.

41. During the May 10, 2011 Board meeting, an owner complained of someone walking a dog on the property. The Board, headed by Harcourt voted to post "No Dogs Allowed" signs on the property, despite the fact that Harcourt knew that Walters had submitted a request for a reasonable accommodation to allow her to keep her emotional support dog, Happy on the premises. The Board also took no action on Walters' request for a reasonable accommodation, although it had been pending before them for more than two months.

42. The Board met in June, twice in July and once in August, but did not act on Walters' request for a reasonable accommodation.

43. During the Board meeting on September 13, 2011, the Board discussed Service Dogs and mentioned that the dogs must be registered with the ADA. The Board also opined that the Virgin Islands does not have guidelines for "service dogs." Although the Board, headed by Harcourt, discussed Walters' request for a reasonable accommodation, the Board, however took no action on Walters' request for a reasonable accommodation, although it had been pending before them for more than six months.

44. At all relevant times, some members of the Defendant Association and even the Defendant Board were vehemently oppose to having dogs on the premises. Members of the Defendant Association and the Defendant Board began voicing their oppositions to allowing dogs on the premises through emails and on the Cowpet Bay Blog. They also began harassing Walters. At all relevant times, Lance Talkington (hereinafter "Talkington") owned the Cowpet Bay West Blog (hereinafter "the blog").

45. In his first blog post relating to "dogs" on the premises, Talkington, on September 27, 2011, stated that " at least three owners. . . have been seen with dogs that are either

*Barbara Walters v. Cowpet Bay West Condominium Assoc., et al.*　　Civil No. 12-00024
Second Amended Complaint　　Page 9

living in condos or are being entertained by an owner walking them on the property. He goes on to point out that two of the dog owners are present and past Board members. Talkington called for the owners to amend the Defendant Association's by-laws to "eliminate any confusion over possible exceptions to the general rule" of no dogs.

46. At the October 11, 2011 Board meeting, the Board, headed by Harcourt, took no action on Walters' pending request for a reasonable accommodation, although it had been pending for more than eight (8) months. However, the Board under Harcourt's leadership, discussed changing the by-laws to adopt a NO DOGS ALLOWED rule.

47. The Harcourt led Board proposed NO DOGS ALLOWED rule made an exception only for the ADA. Harcourt and the other members of the Board excluded FHA requests, although Walters' requested a reasonable accommodation pursuant to the FHA. Moreover, Harcourt and at least two Board members knew that Walters' request was currently pending before the Board and had been pending for more than six (6) months.

48. A day after the Board meeting, on October 12, 2011, Talkington emailed Walters regarding her "service animal." In this email, Talkington request from Walters a copy of her request for reasonable accommodation that was submitted to the Defendant Association office.

49. Walters responded on that same day telling Talkington that he has no right to the information.

50. Talkington responded by telling Walters that he will continue to pursue obtaining copies of her request for reasonable accommodation and that her "blatant violation" of the by-laws is completely intolerable.

51. Talkington continued to harass Walters regarding her need for an emotional support

*Barbara Walters v. Cowpet Bay West Condominium Assoc., et al.*       Civil No. 12-00024
Second Amended Complaint       Page 10

dog. In an October 13, 2011 blog, Talkington attacked Walters by stating that she claims to have papers that allow her to have a service dog and implied that Walters' refusal to discuss her disability with him and or the blog is unreasonable. Talkington also implied that Walters had made no attempt to prove her need for a service dog to the Board.

52. Alfred Felice (hereinafter "Felice") chimed in on the blog and stated that "service dogs' for the true needs are legal, but anyone can get such a designation by simple request from a friendly physician, regardless of any real need. Anyone can also get one via the internet for a minimal fee.!!!"

53. Exemplifying the type of discriminatory attitude that the FHA and the ADA were enacted to combat, Felice went on to say that "the perpetrators might just as well spit in our face. The by-laws must be made to reflect the majorities' rights. Perhaps, the dissenters would be happier in another community rather than be ostracized at CBW, which would be another fine recourse."

54. In response increasing attacks by both Talkington and Felice on the blog regarding her request for a reasonable accommodation, Walters explained that she was not violating the law or the rules. Walters stated that she has a disability and is afforded protection under the FHA.

55. Felice responded with disdain for Walters and the law that protects her rights as a disabled American.

56. Walters again attempted to defend herself against allegations of wrongdoing on the part of both Felice and Talkington. Walters blogged that she is on permanent disability and receives social security benefits.

58. Immediately, Talkington discounted Walters' claim in a blog by stating how "unreasonable" it is to expect the Owners to accept Walter's claims of disability. Talkington asked Walters to provide the "dog's credentials.

*Barbara Walters v. Cowpet Bay West Condominium Assoc., et al.*     Civil No. 12-00024
Second Amended Complaint                                            Page 11

59.   In a later blog, Talkington attacked Walters' credibility and accused Walters about having made a request for a reasonable accommodation with Defendant Association's office.

60.   Walters confronted Talkington about his retaliatory and harassing conduct on the blog. In response, Talkington stated that" [i]t is im possible to give someone grief over a disability that is to day completely undefined and unsubstantiated."

61.   After reading Talkington's last blog, on October 13, 2011, Walters emailed the Board with the subject line "This has gone too far." In her email, Walters informs the Board that she feels Talkington obtained her private information from being allowed to attend Board meeting even though he is not a Board member.

62    Upon information and belief Harcourt and other members of the Board improperly shared the content of Walters' request for a reasonable accommodation with Talkington.

63.   Susan Anderson, wrote an email complaining that she saw Judith Kromenhoek walking a dog and assumed that she was walking the dog for somebody else "because Judith Kromenhoek does not appear to be disabled."

64.   The prevailing attitude shared by some Association and Board members was that Walters was not disabled because there was no visible evidence of her disability.

65.   In response to Susan Anderson email regarding Judith Kromenhoek's "presumed disability, in an email dated October 20, 2011, Harcourt informed Susan Anderson that the Board was considering amending the by-laws to allow exceptions for "true" service animals " that are documented." Harcourt response came more than eight (8) months after Walters submitted a request for reasonable accommodation to the Board, which was still pending before the Board.

66.   Harcourt also stated that a fine should be levied against the "offenders" unless they submitted "appropriate ADA compliant paperwork."

| | |
|---|---|
| *Barbara Walters v. Cowpet Bay West Condominium Assoc., et al.* | Civil No. 12-00024 |
| Second Amended Complaint | Page 12 |

67. On October 26, 2011, Talkington blogged requesting that the Board enforce its rules and regulations.

68. On October 27, 2011, a member fo the Board emailed the Board stating that the Board should respond to both Susan Anderson's and Talkington's inquiries.

69. Walters' responded that she had submitted a request for reasonable accommodation with the Board. Walters also mentioned that her request included a letter from her treating physician and asked that her medical record be kept confidential. Walters also expressed concern that medical information might appear on Talkington's blog.

70. Walters and some members of the Defendant Association recommended that Talkington not be allowed to attend Board meetings as he is not a member of the Board. Others, suggested that the Board hold closed meetings to discuss sensitive issues, including Walters' request for a reasonable accommodation.

71. Some members of the Board however violently opposed to having closed Board meetings to discuss Walters' reasonable accommodation request. In response to a blog recommending a closed meeting to discuss Walters' request for reasonable accommodation, Board member Douglas Rebak blogged, "I do support the Board's need for closed sessions on "confidential" matters–but the dog issue??? PLEASE!!! The situation is most disturbing and not at all the way it should be in an upscale Residential/Resort Community!"

72. Notwithstanding Walters' objection to providing Talkington with her private and personal information, on October 28, 2011, Harcourt emailed a letter to Walters and Judith Kromenhoek and copied Talkington. Harcourt wrote as President of the Board and falsely accused Walters and Judith Kromenhoek of violating the NO DOGS RULE "because they have not applied for an exception to the no dog rule." Harcourt also acknowledged in that same letter that both Walters and Judith Kromenhoek had "papers for service dogs pending in the office." Contradicting himself, Harcourt

*Barbara Walters v. Cowpet Bay West Condominium Assoc., et al.*   Civil No. 12-00024
Second Amended Complaint                                          Page 13

ordered Walters to apply and submit documentation for a waiver and threatened to

levy a monetary fine against Walters if she did not take up his offer. . [EXHIBIT M].

73.   In response, Walters addressed the entire Board stating that "if any of her medical

information were disclosed to Susan Anderson or Talkington or anyone who is not on

the Board, she would deal with it accordingly. Walters also emailed the Board under

separate cover and expressed her belief that Harcourt had overstepped by sharing the

letter with Anderson and Talkington.

74.   Talkington posted the entire letter on the blog in his October 30, 2011 post.

75.   The November 8, 2011 Board meeting, the Board took no action on Walters' pending

application for a reasonable    However, the Board, led by Harcourt, discussed

amending Section 11 of the by-laws to add:

> No dogs are allowed on the property, either long term or visiting. The Board
> may grant exceptions to the NO DOGS ALLOWED rule, on an individual
> basis, should an owner require the assistance of a service animal (dog) as
> defined by the ADA. Owners seeking to obtain such an exemption are required
> to apply, in writing, to the Board with supporting document.

76.   At the November 18, 2011 Board meeting the Board did not act on Walters' pending

reasonable accommodation request. However, the Board offered to table discussion

on the proposed amendment to the by-laws until a legal opinion has been obtained.

77.   On December 2, 2011, Vincent Verdiramo (hereinafter "Verdiramo"), an attorney and

member of the Board, emailed a December 1, 2011 letter to 99 members of the

Association. In his letter, Verdiramo offers legal advice to the Defendant Association.

Verdiramo provides that the FHA is "not a blanket law." Verdiramo further notes that

"every case must be handled individually "with official adjudication." He advised that

when a person claims the need for am\n emotional support animal under the FHA, the

must bring the Association to court and present expert testimony.

78.   The Board held at least three meetings in December of 2011, but took no action on

Walters' pending request for a reasonable accommodation.

*Barbara Walters v. Cowpet Bay West Condominium Assoc., et al.*
Second Amended Complaint

Civil No. 12-00024
Page 14

79. Talkington continued his harassing campaign against Walters. In a December 5, 2011, Talkington shares a complaint of a Mr. Bartlett and the barking of a dog in his area of the community. Talkington goes on to point out that the "known violators" live in this same area. Talkington opined that "trained service dogs are specifically trained to NOT bark unless the owner is in imminent danger."

80. As a Board member, Walters was up for re-election in the upcoming Board election. Felice and others suggested retaliating against Walters by defeating her in the upcoming election. In response to Talkington blog, Felice notes "that a change to the by-laws may be necessary and that the Owners should 'WAKE UP START UP A CAMPAIGN FOR A NO DOGS SLATE NOW.

81. In a December 13, 2011 Board meeting, the Board, led by Harcourt decided to amend the by-laws to include the NO DOGS ALLOWED rule. The Board also discussed Verdiramo's December 2, 2011 legal advice.

82. On December 16, 2011, on the behalf of Walters, he Board received a letter from Karin A. Bentz, Esq. In this letter, Board was informed that under the FHA, Walters is qualified to keep Happy to assist her with her disability. The Board was further informed that they could not engage in any conduct that would punish or deprive Walters of her right to keep Happy on the premises.

83. In a January 9, 2012 email, Felice states "PLEASE do not return the coven and their shills to office, they DO NOT deserve another term EVER." In a January 10, 2012 blog, Felice continues, "JUDI and BARBARA have DOGS!!!! They surely have an agenda and DICK is their SHILL."

84. In their January 11, 2012, Board meeting, the Board, led by Harcourt, discussed receipt of the December 16, 2011 from Karin Bentz. Verdiramo motioned to "abide by the rule and immediately begin fining owners that have dogs." The Board voted to fine Walters $50.00 per day for having Happy on the premises.

*Barbara Walters v. Cowpet Bay West Condominium Assoc., et al.*   Civil No. 12-00024
Second Amended Complaint                                          Page 15

85.  In a January 14, 2012 email, Felice states "Only the coven and their shills call me a disaster." He goes on to say that if the Owners want a lot more "bull" "Elect the Coven on the board, with their shill."

86.  During the January 11, 2012, Defendant Cockayne distributed information about service dog certification naming businesses that have no requirements for service dog certification. Copies of Walters' dog certification were circulated during that Board meeting.   A copy of Walters' dog certification was improperly shared with Talkington.

87.  In a January 15, 2012 blog entitled "Puppy Dog Diplomas" Talkington attacked Happy's certification by stating it is "certified by an outfit called the National Service Animal Registry." Talkington concludes his blog post by sharing his "considered opinion" that such "outfits serve no legitimate purpose and exist mainly to sidestep what the ADA works diligently to accomplish" and putting forth a call "to stop the doggy diploma silliness and adopt clear ground rules for dogs at Cowpet". Talkington states that the ADA is the sole source of legitimacy for such rules.

88.  On January 16, 2012, Harcourt distributed his President's Forum to the owners. In it, he says: "[t]he issue of dogs on the property has been the subject of many (unfortunately) blanket emails, There are some owners who are violating the current rule. The Board had shown some restraint in this matter since we wee trying to revise the by-laws to allow for valid exceptions; however, one of these owners had their attorney send the Board a letter saying the attorney was representing them in a complaint against use.   The Board voted to retain an attorney to protect the Association's interest.

89.  On January 15, 2012, Donna LaScola voiced concern that the Defendant Association may be getting into legal trouble with all the blog posts and emails regarding Walters' and Judith Kromenhoek's service animals.

*Barbara Walters v. Cowpet Bay West Condominium Assoc., et al.*  Civil No. 12-00024
Second Amended Complaint                                          Page 16

90.  Ever ready to vilify Walters, Felice states, "[t]he ADA law does not prevent a community from excluding DOGS." He goes on, "[n]o one wishes to prevent proper needs to be satisfied!! He continues, "[a]gain REAL needs or pets??" He concludes, "I suggest they be ostracized, NO dinner dates, no patronage of their establishments, no conversations, no beach conclaves, just ignore them completely!!!"

91.  On January 17, 2012, ever dutiful to Talkington, Harcourt emailed Talkington informing him that the Board had received a letter from one of the owners stating the owner had filed a complaint. Therefore the Board was retaining counsel.

92.  On January 17, 2012, Walters received a letter from the Board informing he that she was in violation of the no dogs rule and would be fined. Walters felt hurt and ashamed after reading the letter.

93.  On January 24, 2012, Talkington screening a candidate for the Board, discussed the candidate's stance on the "issues," one of which is the amendment of the by-laws regarding dogs. Talkington represented that the Board informed him that Judith Kromenhoek and Walters refused to present any proof of their disability that warrants a service animal.

94.  In a January 30, 2012 email, Felice wrote to 40 recipients, "How can you allow 2 admitted 'certified' mentally disabled persons on the ballot for election to our board?? Due diligence was not done properly. The should be removed from consideration.

95.  As of February of 2007, Walters had not received any response from the Board regarding her request for a reasonable accommodation. At the Board's February 7, 2012 meeting, Harcourt stated that he met with Attorney Maria Hodge regarding the HUD complaints and the dog issue in general.

96.  On February 28, 2012, Edward Wardell, the incoming President of the Board, emailed the owners informing them that the by-laws were amended by a vote of 69.2% of the Owners and will become effective once "registered with the U.S. Virgin Islands

*Barbara Walters v. Cowpet Bay West Condominium Assoc., et al.*   Civil No. 12-00024
Second Amended Complaint   Page 17

Government.

97. In this version of the by-laws, Section 11 of Article V was amended to state:

No dogs are allowed on the property, either long term or visiting. The Board may grant exceptions to the NO DOGS ALLOWED rule, on an individual basis, should an owner require the assistance of a service animal (dog) as defined by the ADA. Owners seeking to obtain such an exemption are required to apply, in writing, to the Board with supporting documentation.

98. However, the April 11, 2012 Board minutes reflect that legal counsel had suggested not recording the by-laws and obtaining approval to revised the "no dogs" rule as follows:

No dogs are allowed on the property, either long term or visiting. Owners or occupants who have properly documented and verified disability as defined by Federal Law may make a request for reasonable accommodation and exception to the prohibition on dogs on the property. An owner or occupant seeking an accommodation can do so in writing to the Board. The request shall include: (1) identification of the owner or occupant seeking the accommodation; (2) explanation of the relationship between the requested accommodation and the disability; and (3) verification of the disability and need for accommodation as set forth in this rule. To facilitate the Board's review of each request for an accommodation of a non-obvious handicap, the Board may require(1) the submission of documentation verifying that the person meets the Federal Fair Housing Act's definition of disability; and (2) documentation from a doctor or other medical professional who is in a position to know about the individual's disability, and that the requested accommodation is related to the individual's disability. All information submitted to the Board that is necessary for the evaluation of the reasonableness of an accommodation will be kept confidential.

99. On February 29, 2012, Verdiramo & Verdiramo P.A. delivered a letter to the Board providing an explanation of the Defendant Association's legal obligations under the ADA and the FHA

100. In December of 2011, Walters filed a charge of discrimination under the FHA with the Department of Housing and Urban Development (HUD) against the Association and the Board for violation of the FHA.

101. In response to Walters and Judith Kromenhoek's HUD complaints, on March 25, 2012, Talkington blogged, Walters and Judith Kromenhoek will "hang onto their puppies" at any length. In direct response to the HUD Complaint, Talkington says "Really ladies? Do you seriously believe that either of two owners has any impact whatsoever on the Association's governance of this property in terms of your having

*Barbara Walters v. Cowpet Bay West Condominium Assoc., et al.*   Civil No. 12-00024
Second Amended Complaint                                          Page 18

those puppies?  To call this a fiasco of a complaint 'misguided' is at the moment the most charitable description of the though process (if there even was one) that was involved in filing this complaint."  Talkington characterizes Walters and Judith Kromenhoek as "playground bullies" and of making a mockery of our board." He then calls on the Association to "go on the offensive" and file suit against Walters' and Kromenhoek stating "when these ladies start spending their own cash instead of relying on the government for free help, the rubber will meet the road on how far everyone is willing to go.  In closing, Talkington implores the Board to take Walters and Judith Kromenhoek to court.

102.   Walters was not re-elected to the Board.   In late March or early April of 2012, Walters finally received a response from the Board approving her request for reasonable accommodation more than a year afer she submitted her request.

103.   Defendant Board's act and omissions, including Defendant Board's response to Walter's request for an accommodation, as well as the Board's failure to respond to the request for more than a year, constitute a denial of a request for reasonable accommodation in violation of the FHA.

104.   Defendant Association is vicariously liable for the actions and omissions of its agent, Defendant Board.

105.   Defendant Harcourt's acts and omissions in ignoring Walters' request for reasonable accommodation;  while at the same assisting a campaign to amend the by-laws to specifically exclude emotional support animals by incorporating only the definition of the ADA of service animal; providing Talkington access to Walters' personal and private information; and falsely accusing Walters of violating the rules qualify as retaliatory measures pursuant to the FHA.

106.   The Defendant Board action in assessing Walters a fine after receiving the letter from Karin A. Bentz, qualifies as retaliatory measures pursuant to the FHA.

*Barbara Walters v. Cowpet Bay West Condominium Assoc., et al.*
Second Amended Complaint

Civil No. 12-00024
Page 19

107.   As a result of the Defendants' actions, and each of them, Walters has suffered damages including but not limited to emotional distress, embarrassment, and humiliation.

## COUNT I: VIOLATION OF THE FHA
### (Association and Board)

108.   Walters realleges and incorporates by reference the remainder of the allegations set forth herein.

109.   42 U.S.C. §3604(f)(3)(b), the FHA, prohibits housing providers from discriminating against applicants or residents because of their disability and from treating persons with disabilities less favorably than others because of their disability. The foregoing conduct violates the FHA which prohibits discriminating based on disability and from treating persons with disabilities less favorably than others because of their disability.

110.   The FHA also makes it unlawful for any person to refuse " to make reasonable accommodations in rules, policies, practices, or services, when such accommodations may be necessary to afford persons with disabilities equal opportunity to use and enjoy a dwelling.

111. At all relevant times, Walters had a request for a reasonable accommodation pending before the Defendant Board.

112.   Defendant Association knew or reasonably should have known of Plaintiff's disability.

113.   Defendants Association and Board discriminated against Walters by denying Walters Plaintiff, as a person with a disability, a reasonable accommodation by failing to take action on her request for reasonable accommodation for more than a year.

114.   As direct and proximate result of the Defendants' conduct described above, Walters has suffered and will continue to suffer embarrassment, humiliation, mental anguish, emotional and physical distress.

115.   Defendants' acts or omissions were done maliciously, oppressively and/or fraudulently.

*Barbara Walters v. Cowpet Bay West Condominium Assoc., et al.*  Civil No. 12-00024
Second Amended Complaint  Page 20

116.  Once Walters submitted her application to Louanne Schechter in February of 2011, the Defendant Board had an obligation to take action on the pending claim. Moreover, Defendant Association could have taken measures to assure that the Board complies with the FHA but chose not to.

117.  Defendants conduct violated the FHA and Walters is entitled to the remedies, procedures and rights set forth in 42 U.S.C *§3613 (c)*(1).

## COUNT II: VIOLATION OF SECTION 3617 OF THE FHAA
### (Harcourt)

118.  Walters re-alleges and incorporates all preceding paragraphs herein by reference as though fully restates, wholly, in this Count.

119.  Harcourt is a member of the Association and was the President of the Board, at the time Walters applied for a reasonable accommodation.

120.  Harcourt's removal of the framed copy of the ADA poster made clear his intention to ignore Walters' request for accommodation.

121.  Harcourt's conduct in ignoring Walters' request for a reasonable accommodation while at the same time pushing for an amendment to the by-laws that would deny Walters reasonable accommodation constitute interference pursuant to Section 3617 of the FHA.

122.  Harcourt action in falsely accusing Walters of violating the no dogs rule and levying a fine against Walters constitute retaliation under the FHA.

123.  As a result of Harcourt's acts and/or omissions, Walters has suffered emotional injuries and continues to suffer emotional injuries.

124.  Defendant Harcourt's conduct violated Section 3617 of the FHA and entitles Walters to all categories of damages, including punitive damages.

*Barbara Walters v. Cowpet Bay West Condominium Assoc., et al.*
Second Amended Complaint

Civil No. 12-00024
Page 21

## COUNT III: VIOLATION OF SECTION 3617 OF THE FHAA
### (Board and Association)

125.    Walters incorporates all preceding paragraphs herein by reference as though fully restated, wholly, in the Count.

126.    The foregoing conduct violates the FHA, which makes it unlawful for any person to coerce, intimidate, threaten, or interfere with any person in the exercise or enjoyment of, or on account of his having exercised or enjoyed, or on account of his having aided or encouraged any other person in the exercise or enjoyment of, any right granted or protected by the FHA.

127.    Defendant Association knew or had reason to know that Walters had applied for a reasonable accommodation to keep her emotional support dog, Happy, on the premises. Yet, Defendant Association refused to provide Walters with a reasonable accommodation and amended its by-laws to exclude emotional support dogs from a waiver to the NO DOGS ALLOWED rule.

128.    Defendant's Board Action if assessing Walters a fine after it received a letter from Walters' attorney and assessing Walters a fine despite the fact that Walters' request for a reasonable accommodation was pending in the office constitute retaliation under the FHA.

129.    As a direct and proximate result of Defendant Board and Defendant Association's acts or omissions, Walters has suffered extreme and severe anguish, humiliation, embarrassment, emotional distress and tension, the extent of which is not fully known at this time and the amount of damages caused thus far is not yet fully ascertained but will be proven at the time of trial.

130.    Defendants' conduct as described in this Complaint violated the FHA and the public policy of the United States and entitles Walters to all categories of damages, including punitive damages.

*Barbara Walters v. Cowpet Bay West Condominium Assoc., et al.*
Second Amended Complaint

Civil No. 12-00024
Page 22

## COUNT IV: VIOLATION OF SECTION *3617* OF THE FHA
### (Felice)

131.  Walters re alleges and incorporates by reference all preceding paragraphs herein as though fully restated, wholly, in the Count.

132.  Defendant Felice began interfering with Walters on the blog once he learned that Walters had requested reasonable accommodation for an emotional support animal, her dog.

133.  Defendant Felice interfered with Walters' right to request reasonable accommodation by using the blog and personal emails sent to the Cowpet Bay West Community to intimidate, to discredit and to threaten Walters.  Defendant Felice's actions were designed to intimidate, threaten and scare Walters from pursuing a reasonable accommodation to keep Happy on the premises.

134.  Defendant Felice's conduct violated Section 3617 of the FHA by interfering with Walters exercise of her right to request for a reasonable accommodation.

135.  Defendant Felice violation of the FHA has harmed and will continue to harm Plaintiff Walters.

136.  As a result of Defendant Felice's act or omission, Walters is entitled to the remedies, procedures and rights set forth in 42 U.S.C *§3613 (c)*(1) and (2).

## COUNT V: VIOLATION OF SECTION *3617* OF THE FHA
### (Lance Talkington)

137.  Walters re alleges and incorporates by reference all preceding paragraphs herein as though fully restated, wholly, in the Count.

138.  Upon information and belief Defendant Talkington runs the blog and used the "blog" to attack, embarrass and humiliate Walters after she filed a request for reasonable accommodation.

*Barbara Walters v. Cowpet Bay West Condominium Assoc., et al.*  Civil No. 12-00024
Second Amended Complaint  Page 23

139.  Defendant Talkington interfered with Walters' exercise of her right to request a reasonable accommodation by demonizing Walters on the blog and suggesting both implicitly and explicitly that Walters violated the rules

140.  Defendant Talkington interfered with Walters' right to request a reasonable accommodation by mounting a calculated attack against Walters' reputation, honesty, and standing in the Cowpet Bay West Community.

141.  Defendant Lance Talkington interfered with Walters' right to request a reasonable accommodation by posting and publicly discussing Walters' private medical record on the blog.

142.  Defendant Talkington's actions were designed not only to humiliate and to discredit Walters but to signal to Walters that her medical records and private information will continue to be the subject of public scrutiny if she continued to demand a reasonable accommodation. Defendant Talkington actions were designed to threaten, intimidate or scare Walters into abandoning Walters' right to a reasonable accommodation to keep Happy on the premises.

143.  The conduct mentioned above violated Section 3617 of the FHA.

144.  Defendant Talkington's violation of the FHA has harmed and will continue to harm Walters in the future.

145.  As direct result of Defendant Talkington's act or omission, Walters is to the remedies, procedures and rights set forth in 42 U.S.C §3613 (3)(1) and (2).


## COUNT VI: VIOLATION OF THE AMERICAN WITH DISABILITIES ACT
### (Association and Board)

146.  Walters realleges and incorporates by reference all preceding paragraphs herein as though fully restated, wholly, in the Count.

147.  As set forth herein, at all relevant times, Defendants were subjected to the ADA based on the ADA definition of public lodging.

*Barbara Walters v. Cowpet Bay West Condominium Assoc., et al.*   Civil No. 12-00024
Second Amended Complaint                                          Page 24

148. Defendants owns, operates and/or leases condominium units in Cowpet Bay, St. Thomas, Virgin Islands.

149. Defendants discriminated against Walters   by failing to make reasonable modifications to its NO DOGS RULE to allow Walters to keep Happy on the premises.

150. As such, Defendants violation of the ADA has harmed and will continue to harm Walters

151. As a result, Walters is entitled to the remedies, procedures, and rights set forth in 42 U.S.C.§12188.

### COUNT VII: BOARD EXCEEDED ITS AUTHORITY BY ADOPTING THE NO DOGS RULE

152. Walters incorporates all preceding paragraphs herein by reference as though fully restated, wholly, in the Count.

153. Defendant Association adopted Bylaws pursuant to Chapter 33, of Title 28 of the Virgin Islands Code.

154. At the time Plaintiff requested a reasonable accommodation for her dog, the bylaws of Defendant Association placed no restrictions on dogs on the Cowpet Bay West premises.

155. The Defendant Board subsequently adopted rules and regulations, which were more restrictive than the bylaws and places a restriction on the condominium owners' right to own an animal, including emotional support dogs in a manner not contemplated by the bylaws.

156. The Defendant Board acted outside the scope of their power when they adopted rules that were more restrictive than the bylaws.

157. As a result of the Defendant Board implementing this invalid rule, Walters suffered damages and losses, and will continue to suffer loss and damages, including but not

*Barbara Walters v. Cowpet Bay West Condominium Assoc., et al.*
Second Amended Complaint

Civil No. 12-00024
Page 25

limited to emotional distress, financial loss and other losses for which Defendant Board is liable.

## COUNT VIII: THE FEBRUARY 2012 AMENDMENT TO THE BYLAWS IS VOID

158. Walters incorporates all preceding paragraphs herein by reference as though fully restated, wholly, in the Count.

159. Defendant Association adopted by-laws pursuant to Chapter 33, of Title 28 of the Virgin Islands Code.

160. Section 19 of the 1968 Declaration states that the by-laws and rules can only be amended by "an amendment to the Declaration and such amendment duly recorded.

161. Under this provision, any amendment to the by-laws must be a 75% vote and recorded in order to be valid.

162. The February 2012 amendment to the by-laws was adopted by a roughly 69% vote.

163. The 69% vote is less than what is required by the Declaration.

164. Therefore, the February 2012 amendment is inconsistent with the Declaration.

## COUNT IX: NEGLIGENCE
### (Board and Association)

165. Walters repeats and re-alleges all preceding paragraphs as though fully restated, wholly, in this Count.

166. The Defendant Board and Defendant Association owed Walters a duty to comply with all laws including the FHA and the ADA.

167. Defendant Board violated the FHA when it took more than a year to approve Walters' request for a reasonable accommodation.

168. Defendant Association did otherwise ratify Defendant Board's wrongful conduct.

169. As a result of Defendants' acts and/or omissions, Walters has suffered emotional

*Barbara Walters v. Cowpet Bay West Condominium Assoc., et al.*  Civil No. 12-00024
Second Amended Complaint  Page 26

distress, embarrassment, humiliation and continues to suffer damages for which Defendants are liable.

## COUNT IX: INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS
### ( Felice)

170. Walters incorporates all preceding paragraphs herein by reference as though fully restated, wholly, in the Count.

171. At all relevant times, Walters was subjected to a pattern of harassment and vilification on the blog and through emails based in whole or in part, on her request for a reasonable accommodation by Defendant Felice.

172. Defendant Felice's action in emailing at least 40 people and implying that Walters a "certified mentally disabled person" should not be on the ballot for election to our board"was done intentionally, recklessly and with deliberate indifference to a substantial probability that severe emotional distress would result to Walters.

173. Defendant Felice's blog posts and other emails were intentional acts done with deliberate indifference to a substantial probability that severe emotional distress would result to Walters.

174. Defendant Felice's blog posts and emails are evidence of a pattern of harassment.

175. Defendant Felice's acts further constitute extreme and outrageous conduct.

176. Defendant Felice's conduct was outrageous in character and extreme in degree, because said conduct was atrocious and egregious, and went beyond all possible bounds of decency and is utterly intolerable in a civilized community.

177. Defendant Felice's extreme and outrageous conduct toward Walters was done in a willful and wanton manner, and constituted a disregard for the rights and well-being of Walters.

178. As a result of Defendant Felice's extreme and outrageous conduct, Walters has suffered severe mental and emotional distress, humiliation, embarrassment and will

*Barbara Walters v. Cowpet Bay West Condominium Assoc., et al.*  Civil No. 12-00024
Second Amended Complaint  Page 27

continue to suffer severe emotional distress and other damages for which Defendant

Felice is personally liable for compensatory and punitive damages to Walters.

### COUNT X: CONSPIRACY TO COMMIT AN UNAUTHORIZED ACT
### (Against all Defendants)

179.  Walters repeats and re-alleges all preceding paragraphs as though fully restated, wholly, in this Count.

180.  Defendants, through and among themselves conspired with each other, and acted in concert, to violate the FHA and to deny Walters 'request for reasonable accommodation, without authority, to deprive her of protected rights and interests, to defame her, to cause her emotional distress and suffering, and to deprive her full enjoyment of the goods, services, facilities, privileges, advantages, accommodations and/or opportunities of Cowpet Bay West.

181.  The conduct complained herein are overt acts in furtherance of their conspiracy, and taken together constitute a civil conspiracy to harm Walters and to deny her civil rights under the FHA and the ADA.

182.  As a direct and proximate result of the foregoing, Walters has suffered damages, losses, and severe emotional distress, for which said Defendants are jointly and severally liable.

### COUNT XI: PRIMA FACIE TORT CLAIM (All Defendants)

183.  Walters incorporates all *preceding* paragraphs herein by reference as though fully re-stated, wholly, in the Count.

184.  The Defendants through their wrongful violations of, inter alia, the FHA and the ADA, caused Walters to be improperly deprived of reasonable accommodation.

184.  None of the Defendants had an objective justification for depriving Walters of the aforementioned civil right.

*Barbara Walters v. Cowpet Bay West Condominium Assoc., et al.*       Civil No. 12-00024
Second Amended Complaint      Page 28

185.   Defendants acts and omissions as aforesaid were such that they offend common decency and sensibilities.

186.   As a direct and proximate result of Defendants' wrongful and unlawful acts and omissions, as aforesaid, Walters' rights were violated; she was defamed; and suffered loss of reputation, mental anguish, pain and suffering and loss of enjoyment of life. In addition, Walters was assessed a daily monetary fined and has and will continue to suffer losses, pain, humiliation, mental anguish and damages for which Defendants are liable.

### COUNT XII: DEFAMATION AND SLANDER PER SE
(Board, Association, Felice, Harcourt and Talkington)

187.   Walters incorporates all proceeding paragraphs herein by reference as though fully re-stated, wholly, in the Count.

188.   Defendants wilfully and intentionally published false and wrongful information on the blog and other venues about Walters.

189.   The above described information was false and injurious as to Walters. It lowered the professional and personal reputation of Walters in the Cowpet Bay West community, as it was understood by the members thereof, and such publications were calculated to elicit that very response from that respected community.

190.   As a direct consequence to Defendants' actions, Walters is entitled to an award of compensatory and punitive damages from them to compensate her for humiliation, emotional pain and suffering, inconvenience, mental and emotional distress, loss of enjoyment and embarrassment.

### COUNT XIII: NEGLIGENT AND/OR INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS
(All Defendants except Felice)

191.   Walters incorporates all proceeding paragraphs herein by reference as though fully

*Barbara Walters v. Cowpet Bay West Condominium Assoc., et al.*      Civil No. 12-00024
Second Amended Complaint                                              Page 29

re-stated, wholly, in the Count.

192.    As set forth herein, at all relevant times, Walters was subjected to a pattern of harassment and vilification on the internet and through email based in whole or in part, on her request for reasonable accommodation and for having Happy on the premises by Defendants.

193.    Defendant Board's failure to provide Walters with a reasonable accommodation for Plaintiff's Happy ; publishing on the blog that Plaintiff had violated the NO DOGS RULE, although she had a request pending for more than a year; and imposing unreasonable and egregious fines, penalties and or interests against Plaintiff are all intentional acts design to create severe emotional distress on the part of Walters.

194.    Defendant Talkington's inflammatory blog posts and emails were done with reckless and with deliberate indifference to a substantial probability that severe emotional distress would result to Walters.

195.    Defendant Verdiramo's misrepresentation of the law in his legal opinion to the Board, while at the same time spearheading a campaign to amend the by-laws to specifically exclude Happy, and other emotional support dogs was done intentionally and with deliberate indifference to a substantial probability that severe emotional distress would result to Walters.

196.    Defendant Cockayne's acts and omissions in providing Defendant Talkington with a copy of Walters' dog certification knowing that he would post it on the blog constitute acts of extreme and outrageous conduct.

197.    Defendant Harcourt's act of ignoring Walters' request for a reasonable accommodation while at the same time assisting in the campaign to amend the by-laws to specifically exclude Happy and publishing a letter falsely stating that Walters had no submitted a request for reasonable accommodation was done with deliberate indifference to a substantial probability that severe emotional distress would result to

*Barbara Walters v. Cowpet Bay West Condominium Assoc., et al.*
Second Amended Complaint

Civil No. 12-00024
Page 30

Walters.

198. The conduct of all Defendants were outrageous in character and extreme in degree, because said conduct was atrocious and egregious, and went beyond all possible bounds of decency and is utterly intolerable in a civilized community.

199. The extreme and outrageous conduct of Defendants toward Walters were done in a willful and wanton manner, and constituted a disregard for the rights and well-being of Walters.

200. As a direct and proximate result of Defendants' extreme and outrageous conduct, Walters suffered and continues to sufferer emotional distress.

201. Because Defendants' extreme and outrageous conduct toward Walters were improperly motivated, and were intentional, willful and wanton, Walters is entitled to punitive damages in addition to compensatory damages.

## COUNT IVX: INVASION OF PRIVACY:
## PUBLIC DISCLOSURE OF PRIVATE FACTS
### *(Board and Association)*

202. Walters incorporates all proceeding paragraphs herein by reference as though fully re-stated, wholly, in the Count.

203. Defendants, Association wrongfully disclosed private information concerning Walters when they openly discussed Walters' application for a reasonable accommodation, including Walter's medical condition at Board meetings in the presence of Talkington and other non-board members.

204 Defendants disclosed the content of a personal letter addressed Walters.

205. Walters considered the publicity highly offensive and a reasonable person in Walters position would also consider the publicity highly offensive.

206. The Defendants knew, or acted with reckless disregard of the fact, that Walters would consider the publicity highly offensive and that a reasonable person in Walters'

*Barbara Walters v. Cowpet Bay West Condominium Assoc., et al.*   Civil No. 12-00024
Second Amended Complaint                                          Page 31

position would consider the publicity highly offensive.

207. The private information, Walter's medical diagnosis and Happy's registration were not of legitimate public concern. The private information did not have a substantial connection to a matter of legitimate public concern.

208. As a direct and proximate result of Defendants' act and/or omission, Walters suffered and continues to suffer severe emotional distress and other damages for which Defendants are liable.

### COUNT VX: INVASION OF PRIVACY: <br> PUBLIC DISCLOSURE OF PRIVATE FACTS
(Harcourt and Talkington)

209. Walters incorporates all *preceding* paragraphs herein by reference as though fully re-stated, wholly, in the Count.

210. Defendants Harcourt and Talkington publicized private information concerning Walters.

211. Walters considered the publicity of her private information highly offensive and a reasonable person in Walters position would consider the publicity highly offensive.

212. Walter's medical diagnosis and Happy's dog certification were not of legitimate public concern and or did not have a substantial connection to a matter of legitimate public concern.

213. Defendants knew, or acted with reckless disregard of the fact, that a reasonable person in Walters' position and or Walters would consider the publicity highly offensive.

214. Defendants' actions were done solely to harass, embarrass, humiliate Walters and to frustrate Walters' efforts in requesting and obtaining a reasonable accommodation to keep Happy at Cowpet Bay West.

215. As a direct consequence of Defendants' public disclosure, Walters is entitled to an

*Barbara Walters v. Cowpet Bay West Condominium Assoc., et al.*
Second Amended Complaint

Civil No. 12-00024
Page 32

award of compensatory and punitive damages from them to compensate her for humiliation, emotional pain and suffering, inconvenience, mental anguish, loss of enjoyment and embarrassment.

### COUNT XVI: INVASION OF PRIVACY; FALSE LIGHT
**(All Defendants, except Verdiramo and Cockayne)**

216.  Walters incorporates all preceding paragraphs herein by reference as though fully re-stated, wholly, in the Count.

217.  Defendants publicize information or material that showed Plaintiff in a false light on the blog, in letters and in emails.

218.  Walters considered the portrayal of her on the blog, in letters and in email in a false light to be highly offensive and a reasonable person in Walters' position would find the publication to be highly offensive.

219.  Defendants intended the publication to create a false impression of Walters to adversely impact her pending request for a reasonable accommodation and her bid for re-election to the Board.

220.  Defendants acted with reckless disregard for the truth because they intended to discredit, humiliate, embarrass and make Walters look bad in the Cowpet Bay West community right before the Board of Directors' election.

221.  As a direct consequence of Defendants' acts showing Plaintiff in a false light, Walters suffered humiliation, emotional pain and distress, inconvenience, mental anguish, loss of enjoyment, public embarrassment and loss of credibility and Walters is entitled to an award of compensatory and punitive damages from them as compensation.

### COUNT XVII: INVASION OF PRIVACY
*(Board, Association, Harcourt and Talkington)*

222.  Walters incorporates all preceding paragraphs herein by reference as though fully

*Barbara Walters v. Cowpet Bay West Condominium Assoc., et al.*          Civil No. 12-00024
Second Amended Complaint                                                              Page 33

re-stated, wholly, in the Count.

223.    Defendants invaded Plaintiff's privacy.

224.    Walters had a reasonable expectation of privacy that her application for a reasonable accommodation and the content of the application would not be made public when she submitted the application to Cowpet Bay West Condominium Defendant Association's business office.

225.    Instead, the content of Walters' application was shared with Association members who are not on the Board, specifically Talkington.

226.    As a result, Talkington posted private information about Walters on the blog.

227.    As a result of the publication, Walters was ridiculed, mocked and ostracized by some members of the Cowpet *Bay West* community.

228.    Walters' private information was not of legitimate public concern and or did not have substantial connection to a matter of legitimate public concern.

229.    Defendants knew that the publication would be considered highly offensive by Walters and that Defendants acted with reckless disregard that a reasonable person in Walters' position would consider the publicity highly offensive.

230.    As a direct consequence of Defendants' act, Walters is entitled to an award of compensatory and punitive damages form them to compensate her for humiliation, emotional pain, and suffering, inconvenience, mental anguish, loss of enjoyment and embarrassment.


## COUNT XVIII

### NEGLIGENCE PER SE/LEGAL MALPRACTICE
(Verdiramo)

231.    Walters incorporates all preceding paragraphs herein by reference as though fully re-stated, wholly, in the Count.

232.    Defendant Verdiramo had a duty to provide legal advice that is consistent with the

*Barbara Walters v. Cowpet Bay West Condominium Assoc., et al.*
Second Amended Complaint

Civil No. 12-00024
Page 34

law.

233. Defendant Verdiramo's December 1, 2011 letter fell short of that standard as it misstated the requirements of the FHA.

234. The Board improperly relied on Defendant Verdiramo's legal advice to deny Walters' her request for a reasonable accommodation.

235. As a direct and proximate result of Defendant Verdiramo's intentional or wrongful act or omission, Walters has suffered, and will continue to suffer loses and damages for which Defendant Verdiramo is liable.

**WHEREFORE, THE PREMISES CONSIDERED, PLAINTIFF PRAYS:**

A. That this Court declare that by its acts and/or omissions and practices, the Defendants have violated rights secured to Plaintiff by the FHAA, the ADA, and other public laws and policies of the United States and the Territory of the U.S. Virgin Islands.

B. That this Court order Defendants to make Plaintiff whole, insofar as she was adversely affected by Defendants' discriminatory practices by awarding damages, including interest in an amount to be shown at trial, and other affirmative relief.

C. That the Court grant compensatory and punitive damages.

D. That the Court grant Plaintiff her attorney's fees, costs and disbursements.

E. That the Court grant additional relief as the Court deems just and proper.

1 *Barbara Walters v. Cowpet Bay West Condominium Assoc., et al.*   Civil No. 12-00024
   Second Amended Complaint                                          Page 35
2

3

4 **JURY TRIAL IS DEMANDED.**

5                                              Respectfully submitted,

6                                              **LAW OFFICES OF KARIN A. BENTZ, P.C.**

7
   Dated: March 11,  2013                      /s/ Karin A. Bentz
8                                              **KARIN A. BENTZ, ESQ.**
                                               **JULITA K. de LEÓN,  ESQ.**
9                                              5150 Dronningens Gade, Suite 8
                                               St. Thomas, Virgin Islands 00802
10                                             Telephone: 340-774-2669
                                               Telecopier: 340-774-2665
11                                             E-mail: kbentz@virginalaw.com

12

13

14                          **CERTIFICATE OF SERVICE**

15      I hereby certify that I caused the filing and service of the foregoing with the Clerk of the
   District Court of the Virgin Islands using the CM/ECF system, which will provide electronic notice
16 by email to the following.

17
      Richard P. Farrelly, Esq.
18    Birch de Jongh & Hindels, PLLC
      1330 Taarneberg
19    St. Thomas, VI 00802

20    John Benham, III, Esq.
      Benham & Chan
21    P.O. Box 11720
      St. Thomas, VI 00801

22
      Ryan S. Mead, Esq.
23    Quintairos, Prieto, Wood and Boyce, P.A.
      9300 South Dadeland Blvd., 4th Floor
24    Miami, FL 33156

25
                                               /s/ Karin A. Bentz
26

27

28

# IN THE UNITED STATES DISTRICT COURT OF THE VIRGIN ISLANDS
## DISTRICT OF ST. THOMAS AND ST. JOHN
**\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\***

BARBARA WALTERS,          )     **CIVIL NO. 12-00024**

         **Plaintiff,**      )     **Action for: Housing**
                       )     **Discrimination; Discrimination**
      **v.**               )     **Based on Disability; Invasion of**
                       )     **Privacy; Negligent Infliction of**
COWPET BAY WEST CONDOMINIUM )     **Emotional Distress**
ASSOCIATION; THE BOARD OF THE  )     **Infliction of Emotional Distress;**
COWPET BAY WEST CONDOMINIUM )     **Punitive Damages; and Injunctive**
ASSOCIATION; ~~ED WARDWELL,~~    )     **and Declaratory Judgment**
~~MAX HARCOURT; BILL CANFIELD,~~ )
~~ROSIE WELLS, SHARON KOEHLER,~~ )
~~DOUG REBAK and HERB HORWITZ as~~ )     **JURY TRIAL DEMAND**
~~Board members;~~ MAX HARCOURT,   )
in his personal capacity; LANCE     )
TALKINGTON; ALFRED FELICE,     )
ROBERT COCKAYNE, ~~in his personal capacity;~~ )
VINCENT VERDIRAMO, ~~in his personal~~  )
~~capacity,~~                       )
         **Defendants.**    )

## SECOND AMENDED COMPLAINT- REDLINE

    **COMES NOW**, Plaintiff **BARBARA WALTERS**, by and through her undersigned counsel, the **LAW OFFICES OF KARIN A. BENTZ, P.C.**, (Karin A. Bentz Esq., and Julita K. de León, Esq., of Counsel) and for a ~~Second Amended Complaint~~ against the Defendants in the above captioned action states and alleges as follows:

## PRELIMINARY STATEMENT

    ~~1.~~    ~~On April 11, 1968, President Lyndon B. Johnson signed the Civil Rights Act of 1968.~~ ~~Federal Fair Housing Act, Pub.L. No. 90-284, 82 Stat. 73, 81 (1968) (codified as~~ ~~amended at 42 U.S.C.§§ 3601-3631). The Federal Fair Housing Act (hereinafter~~ ~~"FHA") expanded on the Civil Rights Act of 1964 to prohibit discrimination~~ ~~regarding the sale, rental, and financing of housing based on race, color, religion, and~~ ~~national origin. Id. The FHA was amended twice to broaden the class of people~~ ~~falling under the scope of its protections; in 1974, discrimination based on sex was~~

Barbara Walters vs. Cowpet Bay West Condominium, et al.                Civil No. 24/2012
Second Amended Complaint Redline                                        Page 2

~~added, and in 1988 discrimination based on familial status or disability was included.~~
~~(Pub.L. 100-430, approved September 13, 1988).~~

On April 11, 1968, President Lyndon B. Johnson signed the Civil Rights Act of 1968. Federal Fair Housing Act, Pub.L. No. 90-284, 82 Stat. 73, 81 (1968) (codified as amended at 42 U.S.C. §§ 3601-3631). The Federal Fair Housing Act (hereinafter "FHA") expanded on the Civil Rights Act of 1964 to prohibit discrimination regarding the sale, rental, and financing of housing based on race, color, religion, and national origin. *Id.* The FHA was amended twice to broaden the class of people falling under the scope of its protections; in 1974, discrimination based on sex was added, and in 1988 discrimination based on familial status or disability was included. (Pub.L. 100-430, approved September 13, 1988).

~~2.     In amending the FHA, Congress recognized that people with disabilities are subject~~
~~to artifical, arbitrary, and unnecessary barriers preventing them from making full use~~
~~of housing. Congress also recognized that more than a mere prohibition against~~
~~disparate treatment was necessary in order that handicapped persons receive equal~~
~~housing opportunities. Secretary of HUD v. Dedham Housing Authority, 1991 WL~~
~~442793 * 5 (HUDAALJ November 15, 1991).~~

In amending the FHA, Congress recognized that people with disabilities are subject to artificial, arbitrary, and unnecessary barriers preventing them from making full use of housing. Congress also recognized that more than a mere prohibition against disparate treatment was necessary in order that handicapped persons receive equal housing opportunities. *Secretary of HUD v. Dedham Housing Authority*, 1991 WL 442793 * 5 (HUDAALJ November 15, 1991).

Pursuant to the Fair Housing Act (hereinafter "FHA"), it is unlawful to discriminate against any person in the terms, conditions or privileges of sale or rental of a dwelling, or in the provision of services or facilities in connection with such a dwelling, because of the

Barbara Walters vs. Cowpet Bay West Condominium, et al.                    Civil No. 24/2012
Second Amended Complaint Redline                                           Page 3

disability of that person or a person residing in that dwelling, because of the disability of that person or a person associated with that person. 42 U.S.C. §3604(f)(2); 24 C.F.R. §100.202(b).

4.    It is unlawful to refuse to make reasonable accommodations in rules, policies, practices, or services, when such accommodations may be necessary to afford such person equal opportunity to use and enjoy a dwelling. 42 U.S.C. §3604(f)(3)(B); 24 C.F.R. §100.20.

5.    Section 3617 of the FHA makes it unlawful for any person to coerce, intimidate, threaten, or interfere with any person in the exercise or enjoyment of, or on account of his having exercised or enjoyed, or on account of his having aided or encouraged any other person in the exercise or enjoyment of, any right granted or protected by Section 803, 804, 805, 806 of this title.

6.    At all times relevant to this action, Walters lived in Condominium unit at Cowpet Bay West Condominium community.

7.    The property at Cowpet Bay West is part of the Cowpet Bay West Condominium community that is managed by the Cowpet Bay West Condominium Association (hereinafter, "the Association").

8.    At all times relevant to this action, Defendant the Board of the Cowpet Bay West Association, (hereinafter "the Board") run the day to day operations of the Defendant Cowpet Bay West Condominium Association.

9.    At all times relevant to this action, Defendant Max Harcourt (hereinafter "Harcourt") served as the President of the Board. And, at all relevant times, Walters was a member of the Board

~~3.    Pursuant to the Fair Housing Act (hereinafter "FHA"), it is unlawful to discriminate against any person in the terms, conditions or privileges of sale or~~

Barbara Walters vs. Cowpet Bay West Condominium, et al.                    Civil No. 24/2012
Second Amended Complaint Redline                                          Page 4

rental of a dwelling, or in the provision of services or facilities in connection with such a dwelling, because of the disability of that person or a person residing in that dwelling, because of the disability of that person or a person associated with that person. 42 U.S.C. §3604(f)(2); 24 C.F.R. §100.202(b).

4.   It is unlawful to refuse to make reasonable accommodations in rules, policies, practices, or services, when such accommodations may be necessary to afford such person equal opportunity to use and enjoy a dwelling. 42 U.S.C. §3604(f)(3)(B); 24 C.F.R. §100.20.

5.   Section 3617 of the FHAA makes it unlawful for any person to coerce, intimidate, threaten, or interfere with any person in the exercise or enjoyment of, or on account of his having exercised or enjoyed, or on account of his having aided or encouraged any other person in the exercise or enjoyment of, any right granted or protected by Section 803, 804, 805, 806 of this title.

6.   At all times relevant to this action, Walters lived in Condominium unit at Cowpet Bay West Condominium community.

7.   The property at Cowpet Bay West is part of the Cowpet Bay West Condominium community that is managed by the Cowpet Bay West Condominium Association (hereinafter, "the Association").

6.   At all times relevant to this action, Defendant the Board of the Cowpet Bay West Association, (hereinafter "the Board") run the day to day operations of the Defendant Cowpet Bay West Condominium Association.

7.   At all times relevant to this action, Defendant Max Harcourt (hereinafter "Harcourt") served as the President of the Board. And, at all relevant times, Walters was a member of the Board.

Barbara Walters vs. Cowpet Bay West Condominium, et al.  Civil No. 24/2012
Second Amended Complaint Redline  Page 5

## JURISDICTION AND VENUE

5.  This Court has subject matter jurisdiction over this matter pursuant to 28 U.S.C. §§ 1331, 1332 and §1337; and V.I. Code ANN. tit. 4, §32.

6.  Venue is proper within this District pursuant to 28 U.S.C. §1391(b).

## PARTIES

7.  Plaintiff Barbara Walters (hereinafter "Walters") owns a condo at Cowpet Bay West on the east side of St. Thomas, United States Virgin Islands. ~~This property constitutes a dwelling under the FHA. 42 U.S.C.§3602(b); 24 C.F.R. §100.20.~~

11.  Upon information and belief, Defendant ~~Cowpet Bay West Condominium~~ Association is an entity organized pursuant to the Virgin Islands Condominium Act, V.I. CODE ANN. tit 28, §901 *et seq.* as amended,~~-~~ that resides and operates its principal place of business in St. Thomas, U.S. Virgin Islands. Cowpet Bay West is the rental manager and governing organization of the condominium development.

12.  Each residential unit owner may use his or her condo unit for permanent, temporary, or transient use. Thus, the owners may permanently reside in their unit, use it as a second home, rent it out on their own or not use it at all.

~~13.~~  Defendant Association's facility is structured and operated as both a place of lodging and a condominium. As a place of lodging, it is a place of public accommodation within the meaning of the ADA.

~~14.~~  ~~Defendant Association~~ -is operated and controlled by a Board of elected persons. The Board is authorized by the Virgin Islands Condominium Act and the Declarations of the Cowpet Bay West Condominium Association, with its purpose set forth more fully in Bylaw Article 1, Section 2. The members of the Board are elected by the homeowners of the Cowpet Bay West ~~Condominiums~~.

~~15.~~  ~~Upon information and belief, on October 22, 1974, Cowpet Bay West was created~~

Barbara Walters vs. Cowpet Bay West Condominium, et al.                    Civil No. 24/2012
Second Amended Complaint Redline                                          Page 6

by a declaration of merger, whereby Cowpet Bay Village-Stages One and Two, the two condominium associations, merged into a single entity. The merger declaration acknowledged that the original 1968 Declaration, except as amended by the merger declaration is still in force. Section 16, of the 1968 Declaration provides that all owners are subject to and must comply with the provisions of the Declaration, the by-laws, and the rules and regualtions as may be amended. Section 17 of the 1968 Declaration provides that the Declaration can only be amended by an affirmative vote of 75% of the Owners in number and common interest. Section 19 of the 1968 Declaration states that the by-laws and rules and regulations are " annexed hereto" and that the by-laws can only be amended by "an amendment to this Declaration and such amendment duly recorded."

16.    Under this provision, any amendment to the by-laws must be by a 75% voe and recorded in order to be valid.

17.    The by-laws of the Association were adopted and recorded in 1974 al;ong with the merger declaration. The by-laws were again amended and recorded in April 1998. Article I, Section 2 of those by-laws made them applicable to both the common areas and the individual units. Article II, Section 2, provided that the affairs of the Association were to be governed by the Board , which was empowered to deal with all administrative affairs of the Association and to undetake all acts except those prohibited by law, the Declaration. or the by-laws. Of the enumerated powers of the Board, adoption and amendment of the rules and regulations is provided for. Thrse rules are applicable to both the common areas and the units under Article I, Section 2. Article V, Section 9 empowers the Board to enjoin and remedy a violation of the by-laws, Declaration, or rules and regulations. Article V, Section 16 allows for the adoption of rules and regulations if approved by a majority of the Owners. Article XI, Section 1 requires that the by-laws be modiifed by a 66 and 2/3% vote of the Owners

Barbara Walters vs. Cowpet Bay West Condominium, et al.   Civil No. 24/2012
Second Amended Complaint Redline         Page 7

present at a meeting held for such purpose. Article XIII, Section 1 states that where thee is a conflict between the provisions of the by-laws and the Declaration, the Declaration controls.

18. There is a conflict between the by-laws and the Declaration in that the Declaration makes clear that a vote of 75% of the Owners is required to amend the by-laws.

19. The 1968 rules and regulations prohibited an Owner from making or allowing disturbing noises in his/her apartment and prohibited dogs. The 1998 rules and regulations contained the same provisions.

20. Based upon information and belief Defendant Alfred Felice is a resident of Plainview, New York.

21. Based upon information and belief Defendant Max Harcourt is a resident of St. Thomas, United States Virgin Islands.

22. Based upon information and belief Defendant Lance Talkington is a resident of St. Thomas, United States Virgin Islands.

23. Based upon information and belief Defendant Robert Cockayne is a resident of St. Thomas, United States Virgin Islands.

24. Based upon information and belief Defendant Vincent Verdiramo is a resident of St. Thomas, United States Virgin Islands.


## STATEMENT OF FACTS

25. On January 21, 2011, Stansford S. Sutherland, a licensed psychologist wrote a letter stating that he was treating Walters and that she was diagnosed with Anxiety Disorder, citing the DSM-IV. He further explained that Walters had "severe limitations" in coping with stress and anxiety that most people would consider "normal day to day events." He went on to state that he has prescribed the use of an emotional support animal, dog or other, to alleviate her symptoms and that such

Barbara Walters vs. Cowpet Bay West Condominium, et al.          Civil No. 24/2012
Second Amended Complaint Redline                       Page 8

~~emotional support animal was necessary. In conclusion, he states that pursuant to the Fair Housing Act, Walters is qualified to keep her emotional support animal despite a policy prohibiting pets in her housing. On that same day, the National Service Animal Registry issued a certification that Walters was allowed to keep her emotional support animal even if there is a policy prohibiting pets.~~

26.   ~~In February of 2011, Defendant Association received the letter from Walters' medical provider and the certification.~~ **[EXHIBIT B] LETTER AND DOG CERTIFICATION.** ~~However, as early as the Summer of 2010, Walters, a member of the Board, discussed with Board members her need to obtain a waiver to the NO DOG RULE to keep an emotional support dog on the premises.~~

27.   ~~Walters made the request for a reasonable accommodation because Defendant Association had a NO DOGS RULE in place and Walters needed a waiver from Defendant Association's NO DOGS RULE to keep her emotional support dog (hereinafter "Happy"). Walters furnished those two documents to Louanne Schechter, the Office Manager for Defendant Association as Walters' application because the Defendant Board did not have a form or application in place for requesting a waiver to the NO DOGS RULE.~~

28.   ~~At the time Walters submitted her request for a reasonable accommodation, Defendant Association had no written policy in place for processing a reasonable accommodation request. although it had a NO DOG RULE IN place for at least fifteen (15) years.~~

29.   ~~Upon information and belief, Louanne Schechter accepted the documents, placed them in Walters' file and discussed Walters' request with Jon Cassady, Louanne Schechter's immediate supervisor.~~

30.   ~~Upon information and belief, Jon Cassady discussed Walters' request with Harcourt and Harcourt subsequently came to the Association's Office to review Walters'~~

Barbara Walters vs. Cowpet Bay West Condominium, et al.          Civil No. 24/2012
Second Amended Complaint Redline                                 Page 9

documents.

31.   Upon information and belief, Harcourt sent his representative, Bob Canefield, a member of the Board, to review the documents.

32.   Upon information and belief, there was widespread opposition to having dogs on the premises by some members of the Board and Association.

33.   Upon information and belief, Harcourt took down a framed copy of an American with Disabilities Act poster that was hanging in the Defendant Association's office saying **Cowpet Bay rules not ADA**.

34.   At the February 12, 2011 Board meeting, Board member Robert Cockayne (hereinafter "Cockayne") proposed amending the by-laws to prohibit dogs and farm animals. There was no mention however of providing reasonable accommodations to owners under the FHA or the ADA.

35.   The Board neither discussed or acted on Walters' request for a reasonable accommodation during the March 8, 2011 Board meeting.

36.   During the May 10, 2011 Board meeting, an owner complained of someone walking a dog on the property. The Board, headed by Harcourt voted to post "No Dogs Allowed" signs on the property, despite the fact that Harcourt knew that Walters had submitted a request for a reasonable accommodation to allow her to keep her emotional support dog, Happy on the premises. The Board also took no action on Walters' request for a reasonable accommodation, although it had been pending before them for more than two months.

37.   The Board met in June, twice in July and once in August, but did not act on Walters' request for a reasonable accommodation.

38.   During the Board meeting on September 13, 2011, the Board discussed Service Dogs and mentioned that the dogs must be registered with the ADA. The Board also opined that the Virgin Islands does not have guidelines for "service dogs." Although

Barbara Walters vs. Cowpet Bay West Condominium, et al.                     Civil No. 24/2012
Second Amended Complaint Redline                                                    Page 10

~~the Board, headed by Harcourt, discussed Walters' request for a reasonable~~
~~accommodation, the Board, however took no action on Walters' request for a~~
~~reasonable accommodation, although it had been pending before them for more than~~
~~six months.~~

~~39.~~   ~~At all relevant times, some members of the Defendant Association and even the~~
~~Defendant Board were vehemently oppose to having dogs on the premises. Members~~
~~of the Defendant Association and the Defendant Board began voicing their~~
~~oppositions to allowing dogs on the premises through emails and on the Cowpet Bay~~
~~Blog. They also began harassing Walters. At all relevant times, Lance Talkington~~
~~(hereinafter "Talkington") owned the Cowpet Bay West Blog (hereinafter "the~~
~~blog").~~

~~40.~~   ~~In his first blog post relating to "dogs" on the premises, Talkington, on September~~
~~27, 2011, stated that " at least three owners . . . have been seen with dogs that are~~
~~either living in condos or are being entertained by an owner walking theem on the~~
~~property. He goes on to point out that two of the dog owners are present and past~~
~~Board members. Talkington called for the owners to amend the Defendant~~
~~Association's by-laws to "eliminate any confusion over possible exceptions to the~~
~~general rule" of no dogs . [EXHIBIT D)~~

~~41.~~   ~~At the October 11, 2011 Board meeting, the Board, headed by Harcourt, took no~~
~~action on Walters' pending request for a reasonable accommodation, although it had~~
~~been pending for more than eight (8) months. However, the Board under Harcourt's~~
~~leadership, discussed changing the by-laws to adopt a NO DOGS ALLOWED rule.~~

~~42.~~   ~~The Harcourt led Board proposed NO DOGS ALLOWED rule made an exception~~
~~only for the ADA. Harcourt and the other members of the Board excluded FHA~~
~~requests, although Walters' requested a reasonable accommodation pursuant to the~~

Barbara Walters vs. Cowpet Bay West Condominium, et al.      Civil No. 24/2012
Second Amended Complaint Redline                             Page 11

~~FHA. Moreover, Harcourt and at least two Board members knew that Walters'~~
~~request was currently pending before the Board and had been pending for more than~~
~~six (6)months.~~

~~43.~~    ~~A day after the Board meeting, on October 12, 2011, Talkington emailed Walters~~
~~regarding her "service animal." In this email, Talkington request from Walters a copy~~
~~of her request for reasonable accommodation that was submitted to the Defendant~~
~~Association office.~~

~~44.~~    ~~Walters responded on that same day telling Talkington that he has no right to the~~
~~information.~~

~~45.~~    ~~Talkington responded by telling Walters that he will continue to pursue obtaining~~
~~copies of her request for reasonable accommodation and that her "blatant violation"~~
~~of the by-laws is completely intolerable.~~

~~46.~~    ~~Talkington continued to harass Walters regarding her need for an emotional support~~
~~dog. In an October 13, 2011 blog, Talkington attacked Walters by stating that she~~
~~claims to have papers that allow her to have a service dog and implied that Walters'~~
~~refusal to discuss her disability with him and or the blog is unreasonable. Talkington~~
~~also implied that Walters had made no attempt to prove her need for a service dog to~~
~~the Board. [EXHIBIT E] TALKINGTON'S BLOG OF OCTOBER 13, 2011.~~

~~47.~~    ~~Alfred Felice (hereinafter "Felice") chimed in on the blog and stated that "service~~
~~dogs' for the true needs are legal, but anyone can get such a designation by simple~~
~~request from a friendly physician, regardless of any real need. Anyone can also get~~
~~one via the internet for a minimal fee.!!!"~~

~~48.~~    ~~Exemplifying the type of discriminatory attitude that the FHA and the ADA were~~
~~enacted to combat, Felice went on to say that "the perpetrators might just as well spit~~
~~in our face. The by-laws must be made to reflect the majorities' rights. Perhaps, the~~
~~dissenters would be happier in another community rather than be ostracized at CBW,~~

Barbara Walters vs. Cowpet Bay West Condominium, et al.                    Civil No. 24/2012
Second Amended Complaint Redline                                           Page 12

~~which would be another fine recourse." [EXHIBIT F] FELICE'S OCTOER 13, 2011~~
~~BLOG.~~

~~49.      In rsponse increasing attacks by both Talkington and Felice on the blog regarding~~
~~her request for a reasonable accommodation, Walters explained that she was not~~
~~violating the law or the rules. Walters stated that she has a disability and is afforded~~
~~protection under the FHA.~~

~~50.      Felice responded with disdain for Walters and the law that protects her rights as a~~
~~disabled American. [EXHIBITS G] FELICE'S BLOG~~

~~51.      Walters again attempted to defend herself against allegations of wrongdoing on the~~
~~part of both Felice and Talkington.  Walters blogged that she is on permanent~~
~~disability and receives social security benefits.~~

~~52.      Immediately, Talkington discounted Walters' claim in a blog by stating how~~
~~"unreasonable" it is to expect the Owners to accept Walter's claims of disability.~~
~~Talkington asked Walters to provide the "dog's credentials. [EXHIBIT H]~~

~~53.      In a later blog, Talkington attacked Walters' credibility and accused Walters about~~
~~having made a request for a reasonable accommodation with Defendant~~
~~Association's office. [EXHIBIT I].~~

~~54.      Walters confronted Talkington about his retaliatory and harassing conduct on the~~
~~blog.  In response, Talkington stated that" [i]t is impossible to give someone grief~~
~~over a disability that is to day completely undefined and unsubstantiated." [EXHIBIT~~
~~I]~~

~~55.      After reading Talkington's last blog, on October 13, 2011, Walters emailed the Board~~
~~with the subject line "This has gone too far."  In her email, Walters informs the~~
~~Board that she feels Talkington obtained her private information from being allowed~~
~~to attend Board meeting even though he is not a Board member.~~

~~56.      Upon information and belief Harcourt and other members of the Board improperly~~

Barbara Walters vs. Cowpet Bay West Condominium, et al.　　　　　　Civil No. 24/2012
Second Amended Complaint Redline　　　　　　　　　　　　　　　　　　Page 13

~~shared the content of Walters' request for a reasonable accommodation with Talkington.~~

57. ~~Susan Anderson, wrote an email complaining that she saw Judith Kromenhock walking a dog and assumed that she was walking the dog for somebody else "because Judith Kromenhock does not appear to be disabled."~~

58. ~~The prevailing attitude shared by some Association and Board members was that Walters was not disabled because there was no visible evidence of her disability.~~

59. ~~In response to Susan Anderson email regarding Judith Kromenhock's "presumed disability, in an email dated October 20, 2011, Harcourt informed Susan Anderson that the Board was considering amending the by-laws to allow exceptions for "true" service animals "that are documented." Harcourt response came more than eight (8) months after Walters submitted a request for reasonable accommodation to the Board, which was still pending before the Board.~~

60. ~~Harcourt also stated that a fine should be levied against the "offenders" unless they submitted "appropriate ADA compliant paperwork."~~

61. ~~On October 26, 2011, Talkington blogged requesting that the Board enforce its rules and regulations. [EXHIBIT K] TALKINGTON OCTOBER 26, 2011 BLOG.~~

62. ~~On October 27, 2011, a member for the Board emailed the Board stating that the Board should respond to both Susan Anderson's and Talkington's inquiries.~~

63. ~~Walters' responded that she had submitted a request for reasonable accommodation with the Board. Walters also mentioned that her request included a letter from her treating physician and asked that her medical record be kept confidential. Walters also expressed concern that medical information might appear on Talkington's blog.~~

64. ~~Walters and some members of the Defendant Association recommended that Talkington not be allowed to attend Board meetings as he is not a member of the Board. Others, suggested that the Board hold closed meetings to discuss sensitive~~

Barbara Walters vs. Cowpet Bay West Condominium, et al.
Second Amended Complaint Redline

Civil No. 24/2012
Page 14

issues, including Walters' request for a reasonable accommodation.

65. Some members of the Board however violently opposed to having closed Board meetings to discuss Walters' reasonable accommodation request. In response to a blog recommending a closed meeting to discuss Walters' request for reasonable accommodation, Board member Douglas Rebak blogged, "I do support the Board's need for closed sessions on "confidential" matters=but the dog issue??? PLEASE!!! The situation is most disturbing and not at all the way it should be in an upscale Residential/Resort Community!" EXHIBIT L]. NOVEMBER 12, 2011 BLOG.

64. Notwithstanding Walters' objection to providing Talkington with her private and personal information, on October 28, 2011, Harcourt emailed a letter to Walters and Judith Kromenhoek and copied Talkingon. Harcourt wrote as President of the Board and falsely accused Walters and Judith Kromenhoek of violating the NO DOGS RULE "because they have not applied for an exception to the no dog rule." Harcourt also acknowledged in that same letter that both Walters and Judith Kromenhoek had "papers for service dogs pending in the office." Contradicting himself, Harcourt ordered Walters to apply and submit documentation for a waiver and threatened to levy a monetary fine against Walters if she did not take up his offer. . [EXHIBIT M].

65. In response, Walters addressed the entire Board stating that "if any of her medical information were disclosed to Susan Andeson or Talkinton or anyone who is not on the Board, she would deal with it accordingly. Walters also emailed the Board under separate cover and expressed her belief that Harcourt had overstepped by sharing the letter with Anderson and Talkington.

66. Talkington psoted he entire letter on the blog in his October 30, 2011 post.

67. At the November 8, 2011 Board meeting, the Board took no action on Walters' pending application for a reasonable. However, the Board, led by Harcourt, discussed amending Section 11 of the by-laws to add:

Barbara Walters vs. Cowpet Bay West Condominium, et al.          Civil No. 24/2012
Second Amended Complaint Redline                                 Page 15

~~No dogs are allowed on the property, either long term or visiting. The Board may grant exceptions to the NO DOGS ALLOWED rule, on an individual basis, should an owner require the assistance of a service animal (dog) as defined by the ADA. Owners seeking to obtain such an exemption are required to apply, in writing, to the Board with supporting document.~~

~~68.     At the November 18, 2011 Board meeting the Board did not act on Walters' pending reasonable accommodation request. However, the Board offered to table discussion on the proposed amendment to the by-laws until a legal opinion has been obtained.~~

~~69.     On December 2, 2011, Vincent Verdiramo (hereinafter "Verdiramo"), an attorney and member of the Board, emailed a December 1, 2011 letter to 99 members of the Association.  In his letter, Verdiramo offers legal advice to the Defendant Association. Verdiramo provides that the FHA is "not a blanket law." Verdiramo further notes that "every case must be handled individually "with official adjudication." He advised that when a person claims the need for am\n emotional support animal under the FHA, the must bring the Association to court and present expert testimony.[EXHIBIT N] LETTER FROM VERDIRAMO~~

~~70.     Thr Board held at least three meetings in December of 2011, but took no action on Walters' pending request for a reasonable accommodation.~~

~~71.     Talkington continued his harassing campaign against Walters.  In a December 5, 2011, Talkington shares a complaint of a Mr. Bartlett and the barking of a dog in his area of the community. Talkington goes on to point out that the "known violators" live in this same area. Talkington opined that "trained service dogs are specifically trained to NOT bark unless the owner is in imminent danger."  [EXHIBIT O]~~

~~72.     As a Board member, Walters was up for re-election in the upcoming Board election. Felice and others suggested retaliating against Walters by defeating her in the upcoming election. In response to Talkington blog, Felice notes "that a change to the by-laws may be necessary and taht the Owners shuld "WAKE UP START UP A CAMPAIGN FOR A NO DOGS SLATE NOW.~~

Barbara Walters vs. Cowpet Bay West Condominium, et al.          Civil No. 24/2012
Second Amended Complaint Redline                                Page 16

73.   In a December 13, 2011 Board meeting, the Board, led by Harcourt decided to amend the by-laws to include the  NO DOGS ALLOWED rule.  The Board also discussed Verdiramo's December 2, 2011 legal advice.

74.   On December 16, 2011, on the behalf of Walters, he Board received a letter from Karin A. Bentz, Esq.  In this letter, Board was informed that under the FHA, Walters is qualified to keep Happ to assist her with her disability.  The Board was further informed that they could not engage in any conduct that would punish or deprive Walters of her right to keep Happy on the premises. [EXHIBIT P].

75.   In a January 9, 2012 email, Felice states "PLEASE do not return the coven and their shills to office, they DO NOT deserve another term EVER."  In a January 10, 2012 blog, Felice continues, "JUDI and BARBARA have DOGS!!!! They surely have an agenda and DICK is their SHILL."

76.   In their January 11, 2012, Board meeting, the Board, led by Harcourt, discussed receipt of the December 16, 2011 from Karin Bentz. Verdiramo motioned to "abide by the rule and immediately begin fining owners that have dogs." The Board voted to fine Walters $50.00 per day for having Happy on the premises.

77.   In a January 14, 2012 email, Felice states "Only the coven and their shills call me a disaster." He goes on to say that if the Owners want a lot more "bull" "Elect the Coven on the board, with their shill."

78.   During the January 11, 2012, Defendant Cockayne distributed information about service dog certification naming businesses that have no requirements for service dog certification. Copies of Walters' dog certification were circulated during that Board meeting.   A copy of Walters' dog certification was improperly shared with Talkington.

79.   In a January 15, 2012 blog entitled "Puppy Dog Diplomas" Talkintong attacked Happy's certification by stating it is "certified by an outfit called the Ntional Serivce

Barbara Walters vs. Cowpet Bay West Condominium, et al.           Civil No. 24/2012
Second Amended Complaint Redline                                  Page 17

~~Animal Registry." Talkington concludes his blog post by sharing his "considered~~
~~opinion" that such "outfits serve no legitimate purpose and exist mainly to sidestep~~
~~what the ADA works diligently to accomplish" and putting forth a call "to stop the~~
~~doggy diploma silliness and adopt clear ground rules for dogs at Cowpet". Talkington~~
~~states that the ADA is the sole source of legitimacy for such rules.~~

~~80.~~   ~~On January 16, 2012, Harcourt distributed his President's Forum to the owners. In~~
~~it, he says: "[t]he issue of dogs on the property has been the subject of many~~
~~(unfortunately) blanket emails, There are some owners who are violating the current~~
~~rule. The Board had shown some restraint in this matter since we wee trying to revise~~
~~the by-laws to allow for valid exceptions; however, one of these owners had their~~
~~attorney send the Board a letter saying the attorney was representing them in a~~
~~complaint against use.   The Board voted to retain an attorney to protect the~~
~~Association's interest.~~

~~81.~~   ~~On January 15, 2012, Donna LaScola voiced concern that the Defendant Association~~
~~may be getting into legal trouble with all the blog posts and emails regarding~~
~~Walters' and Judith Kromenhoek's service animals. [EXHIBIT Q].~~

~~81.~~   ~~Ever ready to vilify Walters, Felice states, "[t]he ADA law does not prevent a~~
~~community from excluding DOGS." He goes on, "[n]o one wishes to prevent proper~~
~~needs to be satisfied!! He continues, "[a]gain REAL needs or pets??" He concludes,~~
~~"I suggest they be ostracized, NO dinner dates, no patronage of their establishments,~~
~~no conversations, no beach conclaves, just ignore them completely!!!"~~

~~81.~~   ~~On January 17, 2012, ever dutiful to Talkington, Harcourt emailed Talkington~~
~~informing him that the Board had received a letter from one of the owners stating the~~
~~owner had filed a complaint. Therefore the Board was retaining counsel.~~

~~82.~~   ~~On January 17, 2012, Walters received a letter from the Board informing he that she~~
~~was in violation of the no dogs rule and would be fined. Walters felt hurt and~~

Barbara Walters vs. Cowpet Bay West Condominium, et al.          Civil No. 24/2012
Second Amended Complaint Redline                                 Page 18

ashamed after reading the letter.

83.     On January 24, 2012, Talkington screening a candidate for the Board, discussed the candidate's stance on the "issues," one of which is the amendment of the by-laws regarding dogs.  Talkington respresented that the Board informed him that Judith Kromenhoek and Walters refused to present any proof of their disability that warrants a service animal.

84.     In a January 30, 2012 email, Felice wrote to 40 recipients, "How can you allow 2 admitted 'certified' mentally disabled persons on the ballot for election to our board??  Due diligence was not done properly.  The should be removed from consideration.

85.     As of February of 2007, Walters had not received any response from the Board regarding her request for a reasonable accommodation.  At the Board's February 7, 2012 meeting, Harcourt stated that he met with Attorney Maria Hodge regarding the HUD complaints and the dog issue in general.

86.     On February 28, 2012, Edward Wardell, the incoming President of the Board, emailed the owners informing them that the by-laws were amended by a vote of 69.2% of the Owners and will become effective once "registered with the U.S. Virgin Islands Government.

87.     In this version of the by-laws, Section 11 of Article V was amended to state:

No dogs are allowed on the property, either long term or visiting.  The Board may grant exceptions to the NO DOGS ALLOWED rule, on an individual basis, should an owner require the assistance of a service animal (dog) as defined by the ADA.  Owners seeking to obtain such an exemption are required to apply, in writing, to the Board with supporting documentation.

88.     However, the April 11, 2012 Board minutes reflect that legal counsel had suggested not recording the by-laws and obtaining approval to revised the "no dogs" rule as follows:

No dogs are allowed on the property, either long term or visiting.  Owners or occupants who have properly documented and verified disability as defined by Federal Law may make a request for reasonable accommodation and exception to the

Barbara Walters vs. Cowpet Bay West Condominium, et al.  Civil No. 24/2012
Second Amended Complaint Redline  Page 19

prohibition on dogs on the property. An owner or occupant seeking an accommodation can do so in writing to the Board. The request shall include: (1) identification of the owner or occupant seeking the accommodation; (2) explanation of the relationship between the requested accommodation and the disability; and (3) verification of the disability and need for accommodation as set forth in this rule. To facilitate the Board's review of each request for an accommodation of a non-obvious handicap, the Board may require (1) the submission of documentation verifying that the person meets the Federal Fair Housing Act's definition of disability; and (2) documentation from a doctor or other medical professional who is in a position to know about the individual's disability, and that the requested accommodation is related to the individual's disability. All information submitted to the Board that is necessary for the evaluation of the reasonableness of an accommodation will be kept confidential.

89.    On February 29, 2012, Verdiramo & Verdiramo P.A. delivered a letter to the Board providing an explanation of the Defendant Association's legal obligations under the ADA and the FHA

90.    In December of 2011, Walters filed a charge of discrimination under the FHA with the Department of Housing and Urban Development (HUD) against the Association and the Board for violation of the FHA.

90.    In response to Walters and Judith Kromenhoek's HUD complaints, on March 25, 2012, Talkington blogged, Walters and Judith Kromenhoek will "hang onto their puppies" at any length. In direct response to the HUD Complaint, Talkington says "Really ladies? Do you seriously believe that either of two owners has any impact whatsoever on the Association's governance of this property in terms of your having those puppies? To call this a fiasco of a complaint 'misguided' is at the moment the most charitable description of the though process (if there even was one) that was involved in filing this complaint." Talkington characterizes Walters and Judith Kromenhoek as "playgournd bullies" and of making a mockery of our board." He then calls on the Association to "go on the offensive" and file suit against Walters' and Kromenhoek stating "when these ladies start spending their own cash instead of relying on the government for free help, the rubber will meet the road on how far everyone is willing to go. In closing, Talkington implores the Board to take Walters

Barbara Walters vs. Cowpet Bay West Condominium, et al.  Civil No. 24/2012
Second Amended Complaint Redline                          Page 20

~~and Judith Kromenhock to court.~~

~~91.     Walters was not re-elected to the Board.    In late March or early April of 2012,~~
~~Walters finally received a response from the Board approving her request for~~
~~reasonable accommodation more than a year after she submitted her request.~~

~~92.     Defendant Board's act and omissions, including Defendant Board's response to~~
~~Walter's request for an accommodation, as well as the Board's failure to respond to~~
~~the request for more than a year, constitute a denial of a request for reasonable~~
~~accommodation in violation of the FHA.~~

~~93.     Defendant Association is vicariously liable for the actions and omissions of its agent,~~
~~Defendant Board.~~

~~92.     Defendant Harcourt's acts and omissions in ignoring Walters' request for reasonable~~
~~accommodation;  while at the same assisting a campaign to amend the by-laws to~~
~~specifically exclude emotional support animals by incorporating only the definition~~
~~of the ADA of service animal; providing Talkington access to Walters' personal and~~
~~private information; and falsely accusing Walters of violating the rules qualify as~~
~~retaliatory measures pursuant to the FHA.~~

~~93.     The Defendant Board action in assessing Walters a fine after receiving the letter from~~
~~Karin A. Bentz, qualifies as retaliatory measures pursuant to the FHA.~~

~~94.     As a result of the Defendants' actions, and each of them, Walters has suffered~~
~~damages including but not limited to emotional distress, embarrassment, and~~
~~humiliation.~~

## COUNT I: VIOLATION OF THE FHA

### (Association and Board)

~~95.~~     ~~Plaintiff Walters~~ realleges and incorporates by reference the remainder of the
allegations set forth herein.

Barbara Walters vs. Cowpet Bay West Condominium, et al.  Civil No. 24/2012
Second Amended Complaint Redline  Page 21

96.  ~~42 U.S.C. §3604(f)(3)(b), commonly known as the Fair Housing Act Amendment (FHAA), prohibits housing providers from discriminating against applicants or residents because of their disability and from treating persons with disabilities less favorably than others because of their disability. The foregoing conduct violates the FHA which prohibits discriminating based on disability and from treating persons with disabilities less favorably than others because of their disability.~~

~~97.~~  The FHA also makes it unlawful for any person to refuse " to make reasonable accommodations in rules, policies, practices, or services, when such accommodations may be necessary to afford persons with disabilities equal opportunity to use and enjoy a dwelling.

~~55~~98.  ~~Defendant Cowpet Bay West Association owns, operates and/or leases condominium in Cowpet Bay West.~~ At all relevant times, Walters had a request for a reasonable accommodation pending before the Defendant Board~~:~~

~~56~~99.  ~~Cowpet Bay West is a place of public accommodation. 42 U.S.C §§3601-3619.~~

~~57~~100. Defendant ~~Cowpet Bay West Condominium~~ Association knew or reasonably should have known of Plaintiff's disability.

~~58~~102. Defendants ~~Cowpet Bay West Condominium~~ Association and ~~Cowpet Bay West Condominium the~~ Board ~~have~~ discriminated against ~~Plaintiff~~ Walters by denying Walters ~~Plaintiff,~~ as a person with a disability, a reasonable accommodation by failing to take action on her request for reasonable accommodation for more than a year. ~~Defendant Association id otherwise ratify Defendant Board's acts and/or omissions. the equal opportunity to use and enjoy a dwelling on the basis of disability.~~

~~103.~~  As direct and proximate result of the Defendants' conduct described above, Walters has suffered and will continue to suffer embarrassment, humiliation, mental anguish, emotional and physical distress.

Barbara Walters vs. Cowpet Bay West Condominium, et al.        Civil No. 24/2012
Second Amended Complaint Redline        Page 22

~~a.    Discriminatory exclusion and or denial of services, privileges, accommodations, and/or opportunities in Defendant Cowpet Bay West Condominium Board Rules and Regulations.~~

~~a.    Failing to make reasonable modifications in policies, practices, and/or procedures as necessary to afford the privileges, advantages, and/or accommodations of Cowpet Bay West to Walters Plaintiff.~~

~~b.    Failing to act upon and/or refusing Plaintiff Walters' request for reasonable accommodation after learning of her disability.~~

~~d.    Failing to remove barriers to individuals with disabilities where it would be readily achievable to do so.~~

~~c.    Failing to adopt an exception to its NO DOGS RULE by-laws and or a Reasonable Accommodation Policy  so that Walters Plaintiff and other individuals with disabilities under the FHA have equal opportunity to use and enjoy a dwelling at Cowpet Bay West.~~

~~fd.    Adopting rules and regulations that have a desperate impact on Plaintiff and others like her that suffer from a disability and require the use of an emotional support animal.~~

~~g.    Failing to make a reasonable accommodation in rules, practice, and services after learning of Plaintiff's disability.~~

~~59~~104.    ~~As such Defendants discriminate and will continue to discriminate in the future against Plaintiff on the basis of disability in the full and equal enjoyment of the goods, privileges, facilities accommodations, advantages and/or opportunities of Cowpet Bay West in violation of the Civil Rights Act of 1968, §§802(h), 8049f)(3)(B), 42 U.S.C. §§3602(h), 3604(f)(3)(B) and or their implementing rules and regulations.~~ Defendants' acts or omissions were done maliciously, oppressively and/or fraudulently.

~~60~~105.    ~~Defendants violations of the FHAA and the Civil Rights Act of 1968 have harmed and will continue to harm Plaintiff in the future.~~ Once Walters submitted her application to Louanne Schechter in February of 2011, the Defendant Board had an obligation to take action on the pending claim. Moreover, Defendant Association could have taken measures to assure that the Board complies with the FHA but chose

Barbara Walters vs. Cowpet Bay West Condominium, et al.    Civil No. 24/2012
Second Amended Complaint Redline      Page 23

not to.

—————— 61106. Defendants conduct violated the FHA and Walters is entitled tPursuant to the remedies, procedures and rights set forth in 42 U.S.C *§3613 (c)*(1). and (2), Plaintiff prays for judgment as set forth below.

### COUNT II: VIOLATION OF SECTION 3617 OF THE FHAA
### (Max Harcourt)

62107. Plaintiff Walters re-alleges and incorporates all preceding paragraphs herein by reference as though fully restates, wholly, in this Count.

—————— 63108. Max Harcourt is a member of the Cowpet Bay West Condominium Association and was the President of the Cowpet Bay West Condominium Board, at the time Plaintiff Walters applied for a reasonable accommodation.

—————— 64109. Max Harcourt's removal of the framed copy of the ADA poster made clear his intention to ignore Walters' request for accommodation. individually, vitiated Plaintiff's request for reasonable accommodation by insisting that the Cowpet Bay West Condominium Association Bylaws trumped the FHAA.

—————— 65110. Max Harcourt's joined Lance Talkington and others to publicly ridicule the content of Plaintiff's request for reasonable accommodation on the blog including Plaintiff's medical records. Max Harcourt's actions were designed to intimidate, threaten or coerce Plaintiff into relinquishing her rights to seek a reasonable accommodation. *This was done solely for the purpose of forcing Plaintiff to retreat from her reasonable accommodation application* conduct in ignoring Walters' request for a reasonable accommodation while at the same time pushing for an amendment to the by-laws that would deny Walters reasonable accommodation constitute interference pursuant to Section 3617 of the FHA.

—————— 66111. Section 3617 of the FHAA inter alia makes it unlawful for any person to coerce, intimidate, threaten, or interfere with any person in the exercise or enjoyment of, or

Barbara Walters vs. Cowpet Bay West Condominium, et al.                    Civil No. 24/2012
Second Amended Complaint Redline                                          Page 24

~~on account of his having exercised or enjoyed, or on account of his having aided or~~

~~encouraged any other person in the exercise or enjoyment of, any right granted or~~

~~protected by Section 803, 804, 805, 806 of this title.~~ Harcourt action in falsely

accusing Walters of violating the no dogs rule and levying a fine against Walters

constitute retaliation under the FHA~~.~~

~~67~~112. ~~Max Harcourt violated Section 3617 of the FHAA by interfering with Plaintiff in her~~

~~exercise of the right granted or protected by Sections 803, 804, 805, 806 of the~~

~~FHAA~~. As a result of Harcourt's acts and/or omissions, Walters has suffered

emotional injuries and continues to suffer emotional injuries.

~~68~~113. ~~Defendant Max Harcourt's violations of the FHAA have harmed and will continue~~

~~to harm Plaintiff.~~ Defendant Harcourt's conduct violated Section 3617 of the FHAA

and entitles Walters to all categories of damages, including punitive damages.

~~69.~~ ~~Pursuant to the remedies, procedures and rights set forth in 42 U.S.C. §3613 (c)(1)~~

~~and (2), Plaintiff prays for judgment as set forth below.~~

~~70.~~ ~~In doing the acts and/or omissions alleged herein, Max Harcourt wrongfully and~~

~~unlawfully interfered with Plaintiff's exercise of her right to reasonable~~

~~accommodation and acted with knowledge of the effect his conduct was having on~~

~~Plaintiff.~~

## COUNT III: VIOLATION OF SECTION 3617 OF THE FHAA
### (Bay West Condominium Association)
### ~~Cowpet Bay West Condominium Board~~

~~71~~114. ~~Plaintiff~~ Walters incorporates all preceding paragraphs herein by reference as though

fully restated, wholly, in the Count.

~~72~~115. ~~Defendant Cowpet Bay West Condominium Association was created pursuant to~~

~~Chapter 28 of the Virgin Islands Code and as such is obligated to comply with the~~

Barbara Walters vs. Cowpet Bay West Condominium, et al.          Civil No. 24/2012
Second Amended Complaint Redline                                 Page 25

provisions of the FHAA. ~~*Defendant Cowpet Bay West Condominium Board is also obligated to comply with the FHAA.*~~ The foregoing conduct violates the FHA, which makes it unlawful for any person to coerce, intimidate, threaten, or interfere with any person in the exercise or enjoyment of, or on account of his having exercised or enjoyed, or on account of his having aided or encouraged any other person in the exercise or enjoyment of, any right granted or protected by the FHA.

~~73~~116. Defendant Association knew or had reason to know that Walters had applied for a reasonable accommodation to keep her emotional support dog, Happy, on the premises. Yet, Defendant Association refused to provide Walters with a reasonable accommodation and amended its by-laws to exclude emotional support dogs from a waiver to the NO DOGS ALLOWED rule.

~~74~~117. ~~Section 3617 of the FHAA~~ *inter alia* ~~makes it unlawful for any person to coerce, intimidate, threaten, or interfere with any person in the exercise or enjoyment of, or on account of his having exercised or enjoyed, or on account of his having aided or encouraged any other person in the exercise or enjoyment of, any right granted or protected by Section 803, 804, 805, 806 of this title.~~ Defendant's Board Action if assessing Walters a fine after it received a letter from Walters' attorney and assessing Walters a fine despite the fact that Walters' request for a reasonable accommodation was pending in the office constitute retaliation under the FHA.

~~75~~118. ~~Defendant Cowpet Bay West Condominium Association~~ *and Defendant Cowpet Bay West Condominium Board* ~~have violated Section 3617 of the FHAA by interfering with Plaintiff's request for reasonable accommodation. Defendant Cowpet Bay West Condominium Association also violated Section 3617 of the FHAA by intimidating Plaintiff via the blog and coercing Plaintiff against exercising her right to request a reasonable accommodation.~~ *Defendant Cowpet Bay West Condominium Board violated the FHAA by refusing to provide Plaintiff with reasonable accommodation and by harassing and intimidating Plaintiff with a $50.00 per day fine.* As a direct

Barbara Walters vs. Cowpet Bay West Condominium, et al.  Civil No. 24/2012
Second Amended Complaint Redline  Page 26

and proximate result of Defendant Board and Defendant Association's acts or omissions, Walters has suffered extreme and severe anguish, humiliation, embarrassment, emotional distress and tension, the extent of which is not fully known at this time and the amount of damages caused thus far is not yet fully ascertained but will be proven at the time of trial.

~~76~~119. ~~Defendant Cowpet Bay West Condominium Association's violations of the FHAA~~ ~~have harmed and will continue to harm Plaintiff.~~ *~~Defendant Cowpet Bay West~~* *~~Condominium Board's actions have harmed and will continue to harm Plaintiff.~~* Defendants' conduct as described in this Complaint violated the FHA and the public policy of the United States and entitles Walters to all categories of damages, including punitive damages.

~~77.~~ ~~Pursuant to the remedies, procedures and rights set forth in 42 U.S.C. §3613 (c)(1)~~ ~~and (2), Plaintiff prays for judgment as set forth below.~~

## COUNT IV: VIOLATION OF SECTION *3617* OF THE FHA~~A~~
### (Alfred Felice)

~~78~~120. ~~Plaintiff~~ Walters re alleges and incorporates by reference all preceding paragraphs herein as though fully restated, wholly, in the Count.

~~79~~121. ~~Defendant Alfred Felice is a an owner of a Condominium unit at Cowpet Bay West~~ ~~and is a member of the Cowpet Bay West Association.~~Defendant ~~Alfred~~ Felice began interfering with ~~Plaintiff~~ Walters on the blog once he learned that ~~Plaintiff~~ Walters had requested reasonable accommodation for an emotional support animal, her dog.

~~80~~122. Defendant ~~Alfred~~ Felice interfered with ~~Plaintiff's~~ Walters' right to request reasonable accommodation by using the blog and personal emails sent to the Cowpet Bay West Community to intimidate, to discredit and to threaten ~~Plaintiff Walters.~~ Defendant ~~Alfred~~ Felice's actions ~~are~~ were designed to intimidate, threaten and scare ~~Plaintiff~~ Walters ~~into relinquishing her~~ from pursuing a ~~right to request a~~ reasonable

Barbara Walters vs. Cowpet Bay West Condominium, et al.          Civil No. 24/2012
Second Amended Complaint Redline                                 Page 27

accommodation to keep Happy on the premises.

81.     82.     ~~Section 3617 of the FHAA inter alia makes it unlawful for any person to coerce, intimidate, threaten, or interfere with any person in the exercise or enjoyment of, or on account of his having exercised or enjoyed, or on account of his having aided or encouraged any other person in the exercise or enjoyment of, any right granted or protected by Section 803, 804, 805, 806 of this title.~~

~~82.~~   Defendant ~~Alfred~~ Felice's conduct violated Section 3617 of the FHA~~A~~ by interfering with ~~Plaintiff's~~ Walters'exercise of her right to request for a reasonable accommodation.

~~84~~124. Defendant ~~Alfred~~ Felice violation of the FHA~~A~~ has harmed and will continue to harm ~~Plaintiff~~ Walters.

~~85~~125. As a result of Defendant Felice's act or omission, Walters is entitled ~~Pursuant to the remedies, procedures and rights set forth in 42 U.S.C §3613 (c)(1) and (2).~~ ~~, Plaintiff prays for judgment as set forth below.~~

## COUNT V: VIOLATION OF SECTION *3617* OF THE FHA~~A~~
### (Lance Talkington)

~~86~~126. ~~Plaintiff~~ Walters re alleges and incorporates by reference all preceding paragraphs herein as though fully restated, wholly, in the Count,

~~87~~     ~~Upon information and belief Defendant Lance Talkington owns at least one Condominium unit at Cowpet Bay West and is a member of the Cowpet Bay West Condominium Association.~~

~~88~~127. Upon information and belief Defendant ~~Lance~~ Talkington runs the blog and used the "blog" to attack, embarrass and humiliate Walters after she filed a request for reasonable accommodation. ~~, and to intimidate Plaintiff.~~

Barbara Walters vs. Cowpet Bay West Condominium, et al.          Civil No. 24/2012
Second Amended Complaint Redline                                 Page 28

~~89~~128. Defendant ~~Lance~~ Talkington interfered with ~~Plaintiff's~~ Walters' exercise of her right to request a reasonable accommodation by demonizing Walters on the blog and suggesting both implicitly and explicitly that Walters violated the rules.

~~90~~129. Defendant ~~Lance~~ Talkington interfered with ~~Plaintiff's~~ Walters' right to request a reasonable accommodation by mounting a calculated attack against ~~Plaintiff's~~ ~~Walters'~~ reputation, honesty and standing in the Cowpet Bay West Community.

~~91~~130. Defendant ~~Lance~~ Talkington interfered with ~~Plaintiff's~~ Walters' right to request a reasonable accommodation by posting and publicly discussing ~~Plaintiff's~~ Walters' ~~private medical~~ record on the blog.

~~92~~131. Defendant ~~Lance~~ Talkington's actions ~~are~~ were designed not only to humiliate and to discredit ~~Plaintiff~~ Walters but to signal to ~~Plaintiff~~ Walters that her medical records and private information will continue to be the subject of public scrutiny if she continues to demand a reasonable accommodation. Defendant ~~Lance~~ Talkington actions ~~are~~ were designed to threaten, intimidate or scare ~~Plaintiff~~ Walters into ~~relinquishing~~ abandoning Walters' ~~the right to~~ for a request a reasonable accommodation ~~under the FHAA~~ to keep Happy on the premises.

~~93~~132. The conduct herein violates ~~the FHAA, including~~ Section 3617 of the FHAA.

~~94.~~     ~~Section 3617 of the FHAA~~ inter alia ~~makes it unlawful for any person to coerce, intimidate, threaten, or interfere with any person in the exercise or enjoyment of, or on account of his having exercised or enjoyed, or on account of his having aided or encouraged any other person in the exercise or enjoyment of, any right granted or protected by Section 803, 804, 805, 806 of this title.~~

~~95.~~     ~~Defendant Lance Talkington violated the FHAA,~~ inter alia, ~~by interfering with Plaintiff's exercise of her right to request a reasonable accommodation. Defendant Lance Talkington has violated the FHAA by,~~ inter alia, ~~interfering with Plaintiff's rights to request a reasonable accommodation and by using the blog to intimidate, threaten and coerce Plaintiff into not exercising her statutory right to request a~~

Barbara Walters vs. Cowpet Bay West Condominium, et al.       Civil No. 24/2012
Second Amended Complaint Redline       Page 29

~~reasonable accommodation.~~

96133. Defendant ~~Lance~~ Talkington's violations of the FHAA have harmed and will continue to harm ~~Plaintiff~~ Walters in the future.

~~97134~~. As direct result of Defendant Talkington's act or omission, Walters is ~~entitled Pursuant~~ to the remedies, procedures and rights set forth in 42 U.S.C *§3613 (3)*(1) and (2)., ~~Plaintiff prays for judgment as set forth below.~~

### COUNT VI: VIOLATION OF THE AMERICAN WITH DISABILITIES ACT
#### (~~Cowpet Bay West Condominium~~ Association and ~~Cowpet Bay West Condominium~~ Board)

~~98135~~. ~~Plaintiff~~ Walters realleges and incorporates by reference all preceding paragraphs herein as though fully restated, wholly, in the Count.

~~99136~~. ~~Title III of the ADA provides that "No individual shall be discriminated against on the basis of disability in the full and equal enjoyment of the goods, services, facilities, privileges, advantages, or accommodations of any place of public accommodation by any person who owns, leases, or operates a place of public accommodation."~~ As set forth herein, at all relevant times, Defendants were subjected to the ADA based on the ADA definition of public lodging.

~~100137~~.    Defendants owns, operates and/or leases condominium units in Cowpet Bay, St. Thomas, Virgin Islands~~.~~

~~101138~~.    ~~Cowpet Bay West Condominium is a place of public accommodation. 42 U.S.C. §12181(7)(B).~~

~~102139~~.    Defendants's ~~have~~ discriminated against ~~Plaintiff~~ Walters ~~on the basis of disability. Defendants discriminatory conducts include but is not limited to~~ by failing to make reasonable modifications to its NO DOGS RULE to allow Walters to keep Happy on the premises.

a.    ~~Discriminatory exclusion and/or denial of goods, services, facilities, privileges,~~

# Mind/Body Health & Psychology, LLC

6115 Estate Smith Bay
Suites 334 & 335
St. Thomas, USVI 00802

mbh&p
Mind/Body Health
& Psychology, LLC

| | |
|---|---|
| **Name:** | Barbara Walters |
| **Date of Birth:** | ▇ |
| **Age:** | ▇ |
| **Gender:** | Female |
| **Service:** | Psychotherapy, Individual |
| **Date(s) of Service:** | 1/30/2012; 2/20/2012; 2/17/2012; 3/13/2012; 4/16/2012; 3/19/2013; 4/1/2013 |
| **Service Provider:** | Sheena M. Walker, Ph.D. Clinical Psychologist, VI License 10-029-PSY |

## CLINICAL SUMMARY

**Presenting Complaint(s):** Barbara is a 64-year-old European-American woman who self-referred for assistance with the following issues: Depression, Relational Problems related to possession of service animal, and Familial discord resulting from separation and pending divorce.

**Symptoms Reported:**

- Demonstrates dysphoric affect (e.g., sadness, hopelessness, helplessness, inappropriate guilt, shame, low self-esteem).
- Describes somatic symptoms (e.g., changes in sleep, appetite, and/or sexual patterns; weight loss; headaches; pains; psychomotor agitation or retardation).
- Reports irritability and/or crying spells.
- Verbalizes difficulty coping adequately with stress and conflict related to multiple roles.
- Evidences suicidal ideation with no plan or intent.
- Demonstrates an inability to accomplish daily tasks at a previous level at home and in personal matters.
- Describes poor interpersonal exchanges (e.g., isolation, loneliness, relationship distress with neighbors).
- Reports anger, resentment, irritability, loneliness, and grief related to a divorce.
- Evidences depression and anxiety-related symptoms (e.g., impaired decision-making ability, sleep disturbances, problems with concentration).
- Experiences trauma symptoms associated with a marriage characterized by abuse and/or manipulation which have been recently exacerbated by social interactions with neighbors due to possession of service dog.
- Verbalizes difficulty in coping with everyday stressors during and after separation from spouse.
- Experiences stress associated with difficulties negotiating with ex-spouse on issues related to finances.
- Expresses anxiety and stress associated with financial situation after or during a divorce.

**History of the Problem:** Barbara noted that she has been in a "loveless marriage" for quite some time; however, she described her role in assisting in the family business as her husband's partner as her most effective coping strategy to maintain her contentment.

Phone: 340-714-BFIT (2348)
Facsimile: 340-715-BFIT (2348)
mindbodypsych.vi@gmail.com
www.synergyvi.com





30547.00/000878

BY-LAWS OF

## COWPET BAY WEST CONDOMINIUM ASSOCIATION

Cowpet Bay
St. Thomas, Virgin Islands

February, 2012

# Article I
# Plan of Apartment Unit Ownership

**Section 1. Apartment Unit Ownership:** The property located at Parcels 8-56-1 and 8-1-2, 4, 5, & 6 of Estate Nazareth, No.1 Red Hook Quarter has previously been submitted in a declaration forming an association under the provisions of Chapter 33, Title 28 of the Virgin Islands Code, known as the "Condominium Act of the Virgin Islands". The association has been and will continue to be known as "COWPET BAY WEST", hereinafter called the "Condominium".

**Section 2. Applicability of By-Laws:** The provisions of these by-laws are applicable to the Property of the Condominium and the use and occupancy thereof. The term "Property", as used herein, shall include the land and all buildings and other improvements thereon owned by the association and all easements, rights and appurtenances belonging thereto, and all other property, personal or mixed, intended for use in connection therewith, all of which were previously submitted to the provisions of said Chapter 33, Title 28 of the Virgin Islands Code.

**Section 3. Application:** All present and future owners, mortgagees, lessees, occupants of apartment units and any other persons who may use the facilities of the Property in any manner are subject to these By-Laws, the Declaration and the Rules and Regulations.

The Acceptance of a deed, mortgage or conveyance or the entering into of a lease or the act of occupancy of an apartment unit shall constitute an agreement that these By-Laws, the Rules and Regulations and the provisions of the Declaration, as they may be amended from time to time, are accepted, ratified, and will be complied with.

**Section 4. Office:** The office of the Condominium and of the Board of Directors shall be located at Cowpet Bay West, Estate Nazareth, No.1 Red Hook Quarter, St. Thomas, Virgin Islands. The mailing address shall be 6201 Windward Way, St. Thomas, USVI 00802, or such address as may be designated by the Board, upon 30 days written notice to the members of the Association.

## ARTICLE II
## Board of Directors

**Section 1. Number and Qualifications:** The affairs of the Condominium shall be governed by a Board of Directors. The Board of Directors shall be composed of seven persons, all of whom shall be owners or spouses of owners, or in the case of partnership owners, shall be members of said partnership, or in the case of corporate owners, shall be officers or stockholders of such

PLAINTIFF'S EXHIBIT 3

3055300/000363

corporations, or in the case of fiduciary owners shall be the fiduciaries or beneficiaries of any such trust or in the case of a limited liability company, shall be the members of such company. A Board member may not base his/her eligibility to sit on the Board on the same unit as any other member of the Board.

No person who is in arrears for ninety days or more on any billing or assessment by the Cowpet Bay West Condominium Association shall be eligible to be elected to or serve as a director on the Board of Directors. In the event such person is serving as a director, that person's position as director shall be declared to be vacant and another person appointed by a majority vote of the remaining Board to fill the vacancy so created, until the next regular election of the Board of Directors. Arrearages of partnerships, corporations, trusts, fiduciary owners, etc. on which a person's eligibility to serve on the board is based, shall be considered in determining the eligibility of a person to be elected to or to continue to serve on the board.

**Section 2. Powers and Duties:** The Board of Directors shall have the powers and duties necessary for the administration of the affairs of the Condominium and may do all such acts and things except as by law, by the Declaration (to the extent still applicable), or by these By-Laws may not be delegated to the Board of Directors by the unit owners. Such powers and duties of the Board of Directors shall include, but shall not be limited to, the following:

    (a) Operation, care, upkeep and maintenance of the common areas and facilities.

    (b) Determination of Association Charges, which shall include the common expenses required for the operation of the Condominium, insurance, water, utility rates, late fees and interest charges, fines for By-Laws and rules, regulation violations, any reserve fund maintained by the association and the costs of services provided.

    (c) Collection of Association charges, as hereinafter defined, from the unit owners, and maintaining and accounting for those funds.

    (d) Employment and dismissal of the personnel necessary for the maintenance and operation of the common areas and facilities.

    (e) Adoption, amendment and enforcement of rules and regulations covering the details of the operation and use of the Property.

    (f) Opening of bank accounts on behalf of the Condominium and designating the signatories required therefore.

    (g) Purchasing or leasing or otherwise acquiring in the name of the Association or its designee, corporate or otherwise, on behalf of all unit owners, apartment units offered for sale or surrendered by their owners to the Board of Directors.

    (h) Purchasing of apartment units at foreclosure or other judicial sales in the name of the Association or its designee, corporate or otherwise, on behalf of all unit owners.

    (i) Selling, leasing, mortgaging, voting the votes appurtenant to (other than for the election of members of the Board of Directors), or otherwise dealing with apartment units acquired

2

3055300/000364

and subleasing apartment units leased by the Association, or its designee, corporate or otherwise on behalf of all unit owners.

(j) Organizing corporations to act as designees of the Board of Directors in acquiring title to or leasing of apartment units on behalf of all unit owners.

(k) Obtaining of insurance for the Property, including the apartment units owned or required to be maintained by the Association, pursuant to the provision of Article V, Section 2 hereof.

(l) Making of repairs, additions and improvements to or alterations of the Property and repairs to and restoration of the Property in accordance with the other provisions of these By-Laws, after damage or destruction by fire or other casualty or as a result of condemnation or eminent domain proceedings.

**Section 3. Managing Agent and Manager:** The Board of Directors may employ for the Condominium a managing agent and/or a manager at a compensation established by the Board of Directors, to perform such duties and services as the Board of Directors shall authorize. The Board of Directors may delegate to the manager or managing agent, all of the powers granted to the Board of Directors by these By-Laws other than the powers set forth in subdivisions (b), (e), (f), (g), (h), (i), (j) and (k) of Section 2 of this Article II.

**Section 4. Election and Term of Office:**
Directors will serve for a term of three years. Two Directors shall be elected the first year, two the second year, and three the third year to replace those directors whose terms are expiring. Where a vacancy has been filled by vote of a majority of the vote of the remaining members of the Board, as provided in Section 6, that person shall be a member until the next Annual Meeting, at which time the unit owners shall elect the replacement for the remainder of the original term, if any. Any candidate for director may run for a full term, or any term created by a vacancy, or both.

Each Director shall be elected by the vote of a majority (as defined in Article III Section 9) of the unit owners. All vacancies shall be voted for on the same ballot, and the candidates with the highest number of votes shall be elected to each of the vacancies. Each candidate's name shall be preceded by a space where an "X" may be placed to vote for said candidate. It shall not be required that a name be crossed out and another inserted to vote for a candidate on the ballot. A space for write-in candidates shall also be provided. Ballots and proxies shall be provided to the owners not less than 30 days prior to the Annual Meeting.
The members of the Board of Directors shall hold office until their respective successors shall have been elected by the unit owners.
A Board member may serve only two consecutive terms and may not hold office for one year before being eligible to run again.

**Section 5. Removal of Members of the Board of Directors:** At any regular or special meeting of unit owners, any one or more of the members of the Board of Directors may be removed with or without cause by a majority of the unit owners and a successor may then and there or thereafter be elected to fill the vacancy thus created. Any members of the Board of Directors whose removal has been proposed by the unit owners shall be given an opportunity to be heard at the meeting.

3

If a Board member does not attend any of the Board meetings during an entire year, and also does not attend the annual owners meeting that same year, such member may be removed from the Board by a majority of the other members of the Board of Directors.

**Section 6. Vacancies:** Vacancies in the Board of Directors caused by any reason other than the removal of a member thereof by a vote of the unit owners, shall be filled by a vote of a majority of the remaining members at a special meeting of the Board of Directors held for that purpose promptly after the occurrence of any such vacancy, even though the members present at such meeting may constitute less than a quorum, and each person so elected shall be a member of the Board of Directors until a successor shall be elected at the next Annual Meeting of the unit owners. At that time a director shall be elected to serve the remainder of the term of the original vacating director.

**Section 7. Organization Meeting:** The first meeting of the members of the Board of Directors shall be an organizational meeting held directly following the Annual Meeting of the unit owners, at such time and place as shall be fixed by the Board members at said meeting, and no notice shall be necessary to the newly elected members of the Board of Directors in order to legally constitute such meeting, provided a majority of the whole Board of Directors shall be present thereat. If it is not possible to hold such first meeting of the new Board immediately, then it shall be held as soon as possible and proper notice shall be given to each director, as for any special meeting of the Board of Directors.

**Section 8. Regular Meetings:** Regular meetings of the Board of Directors may be held at such time and place as shall be determined from time to time by a majority of the members of the Board of Directors, but at least two such meetings shall be held during each fiscal year. Notice of regular meetings of the Board of Directors shall be given to each member of the Board of Directors by mail, electronic mail or fax transmission, at least thirty days prior to the day named for such meeting.

**Section 9. Special Meetings:** Special meetings of the Board of Directors may be called by the President upon five business days notice to each member of the Board of Directors, given by mail, electronic mail or fax transmission, which notice shall state the time, place and purpose of the meeting. Special meetings of the Board of Directors shall be called by the President or Secretary in like manner and on like notice on the written request of at least two members of the Board of Directors. Such special meeting may be conducted by a teleconference call.

**Section 10. Waiver of Notice:** Any member of the Board of Directors may, at any time, waive notice of any meeting of the Board of Directors in writing, and such waiver shall be deemed equivalent to the giving of such notice. Attendance by a member of the Board of Directors at any meeting of the Board shall constitute a waiver of notice by him of the time and place thereof. If all the members of the Board of Directors are present at any meeting of the Board, no notice shall be required and any business may be transacted at such meeting.

**Section 11. Quorum of Board of Directors**: At all meetings of the Board of Directors, a majority of the members thereof shall constitute a quorum for the transaction of business, and the votes of the majority of the members of the Board of Directors present at a meeting at which a quorum is present shall constitute the decision of the Board of Directors. If at any meeting of the Board of Directors there shall be less than a quorum present, , a majority of those present may adjourn the meeting from time to time. No business may be transacted until a quorum is achieved. Board members may participate by teleconference call.

4

**Section 12. Fidelity Bonds:** The Board of Directors shall obtain adequate fidelity bonds for all officers and employees of the Condominium handling or responsible for condominium funds. The premiums on such bonds shall constitute a common expense.

**Section 13. Compensation:** No member of the Board of Directors shall receive any compensation from the Condominium Association for serving as a board member. However, verifiable expenses, in accordance with guidelines established by the Board in advance, are reimbursable. A Board member may also be compensated for other services unrelated to his/her Board function.

**Section 14. Liability of the Board of Directors:** The members of the Board of Directors shall not be liable to the unit owners for any mistake of judgment, negligence, or otherwise, except for their own individual willful misconduct or bad faith. The unit owners shall indemnify and hold harmless each of the members of the Board of Directors against all contractual liability to others arising out of contracts made by the Board of Directors on behalf of the Property unless any such contract shall have been made in bad faith or contrary to the provisions of the Declaration or of these By-Laws.

It is intended that the members of the Board of Directors shall have no personal liability with respect to any contract made by them on behalf of the Property. It is also intended that the liability of any unit owner arising out of any contract made by the Board of Directors or out of the aforesaid indemnity in favor of the members of the Board of Directors shall be limited to such proportion of the total liability there under as his interest in the common areas and facilities bears to all such interest.

Every agreement made by the Board of Directors or by the managing agent or by the manager on behalf of the Property shall provide that the members of the Board of Directors or the managing agent, or the manager, as the case may be, are acting only as agents for the unit owners and shall have no personal liability there under (except as unit owners) and that each unit owner's liability there under shall be limited to such proportion of the total liability there under as his interest in the common areas and facilities bears to all such interest.

**Section 15. Executive Committee:** The Board of Directors, by resolution passed by a majority of the entire Board, shall designate at the Organization Meeting or anytime thereafter, three members of the Board to constitute an Executive Committee, with one member thereof designated as Chairman. The purpose of the Executive Committee is to control the day-to-day management of the Association.

The Board of Directors from time to time shall define the authority of the Executive Committee, but shall retain for itself the powers and duties as itemized in Section 2 (b), (e), (h), (i), and (j). Additionally, the Board shall retain the right to appoint the manager or managing agent, fill vacancies in the Board, make changes in the Rules and Regulations, and acquire property.

The Board of Directors, at any time, may change the members of, may fill vacancies in, or may discharge the Executive Committee. Two members shall constitute a quorum of the Executive Committee. The act of a majority of the members at any meeting at which there is a quorum shall be the act of the Committee. The Board of Directors shall establish rules of procedure for the Committee governing, but not limited to, such items as notice and powers.

The Executive Committee shall make recommendations to the Board of Directors, and when the Board is not in session may, to the extent that the committee deems necessary, exercise the powers of the Board in the management of the business and affairs of the Association; and it shall have the powers to authorize the seal of the Association to be affixed to all papers which may require it.

5

3055300/000367

The Executive Committee shall keep records of all its proceedings and shall report same to the Board of Directors, and its individual members, in writing within a reasonably short period of time after each significant action and after all meetings.

**Section 16. Inspection by Executive Committee**: The Executive Committee shall make a detailed inspection of the buildings, pump rooms, offices, maintenance shops, sewage and water-making plants, emergency generator, roads, sidewalks, steps, entry bridges, railings, grounds, landscaping, watering systems, the beach and the sea wall at least twice a year in the company of the manager or managing agent,. Additionally, the Committee shall evaluate the operation of the Association office and the overall security situation of the property.

The purpose of such inspections will be to (a) obtain a better understanding of the job being performed by the manager and his staff and (b) make suitable recommendations for possible future actions. Within 30 days after each such semi-annual inspection, the Committee will report its findings and recommendations to the members of the Board of Directors.

**Section 17. Action by Consent**: Any action required or permitted to be taken at any meeting of the Board of Directors, or any committee thereof, may be taken without a meeting if a written consent thereto is signed by three-quarters of the members, (rounded off to the nearest whole number), of the Board of Directors or of such committee as the case may be, and filed with the minutes of proceedings of the Board of Directors or committee.

**Section 18. Nomination of Directors**: Nominations for election to the Board of Directors shall be made by a Nominating Committee. The Nominating Committee shall consist of a chairman, who shall be a member of the Board of Directors, and two or more members of the Association. The Nominating Committee shall be appointed by the Board of Directors at its organizational meeting and serve until the next Annual Meeting.

The Nominating Committee shall make as many nominations for election to the Board of Directors as it shall, in its discretion, determine, but not less than the number of vacancies that are to be filled. Each nomination shall be for a specified vacancy.

Any person qualified under Section 1 of Article II of these By-Laws to serve on the Board of Directors may be nominated for the Board of Directors by submitting a request, signed by the owners of two units in which the nominee has no financial interest, to the Board Secretary sixty days prior to the Annual Meeting. The Board shall include his/her name on the ballot directly following the nominee(s) proposed by the Nominating Committee for each vacancy. Any nomination that does not specify a specific vacancy shall be deemed a nomination for all vacancies.

**Section 19 – Communications**
Communications by, from, to and among the Board may be in writing, by fax or by electronic communications (telephone, telephone conference, email, internet, etc.) Telephone and telephone conference conversations must be documented (e.g., minutes or record of conversation). This communication will constitute "official" communication by the Board.

**ARTICLE III**
**Unit Owners**

**Section 1. Annual Meeting**:
The Annual Meeting of the unit owners shall be held during the first quarter each year. At the Annual Meeting, Directors shall be elected by ballot in accordance with the requirements of

.6

Section 4 of Article II of these By-Laws, and the unit owners may transact such other business at such meetings as may properly come before them.

**Section 2. Place of Meeting**: Meetings of the unit owners shall be held at the principal office of the Condominium or at such other suitable place convenient to the unit owners as may be designated by the Board of Directors.

**Section 3. Special Meetings**: It shall be the duty of the President to call a special meeting of the unit owners if so directed by resolution of the Board of Directors or upon a petition signed and presented to the Secretary by not less than 25% in common interest, in the aggregate, of unit owners. The notice of any special meeting shall state the time and place of such meeting and the purpose thereof. No other business shall be transacted at a special meeting except as stated in the notice.

**Section 4. Notice of Meeting**: It shall be the duty of the Secretary to mail a notice of each annual meeting of the unit owners not less than thirty days nor more than ninety days prior to such meeting, stating the purpose thereof as well as the time and place where it is to be held, to each unit owner of record, at the building or at such other address as such unit owner may have designated by notice in writing to the Secretary. The mailing of a notice of meeting in the manner provided in this section shall be considered service of notice. The Board of Directors may assign the task of providing notice to unit owners to a person other than the Secretary. Special meetings require not less than ten days notice.

**Section 5. Adjournment of Meetings**: If any meeting of unit owners cannot be held because a quorum has not attended, a majority in common interest of the unit owners who are present at such meeting, either in person or by proxy, may adjourn the meeting to a time not less than forty-eight hours from the time the original meeting was called.

**Section 6. Order of Business**: The annual meeting of the unit owners shall be chaired by the President or other member of the Board of Directors chosen by the Board, and the order of business shall be generally as follows:

  (a)   Roll Call – by unit
  (b)   Establishment of Quorum (1/3 of all unit owners)
  (c)   Proof of Notice of Meeting
  (d)   Approval of Minutes of last year's Annual Meeting
  (e)   President's Report (including cost and coverage of insurance)
  (f)   Treasurer's Report (including discussion of Budget and Financial Status)
  (g)   Property Manager's Report
  (h)   Report of Nominating Committee
  (i)   Election of Board Members
  (j)   Old Business
  (k)   New Business

**Section 7. Title to Apartment Units**: Title to apartment units may be taken in the name of an individual, or in the names of two or more persons as tenants in common, joint tenants or tenants by the entirety, or in the name of a corporation, partnership, limited liability company or other legal entity authorized to own real property in the Virgin Islands, or in the name of a fiduciary.

7

3055300/000369

**Section 8. Voting**: The owner or owners of each apartment unit, or some person designated by such owner or owners to act as proxy on his or their behalf and who need not be an owner, shall be entitled to cast the vote appurtenant to such apartment unit at all meetings of unit owners. The designation of any such proxy shall be made in writing and shall be revocable at any time by written notice to the Secretary or in person at the meeting. Any or all such owners or proxies may be present at any meeting of the unit owners and may vote or take any other action as a unit owner either in person or by proxy. Votes of unit owners shall be weighted in accordance with their share of the common interest, as follows, with the total of all votes equaling one hundred:

| | |
|---|---|
| **2 Bedroom** | **.911** |
| **3 Bedroom** | **1.062** |
| **2 Bedroom + Loft** | **1.193** |
| **4 Bedroom** | **1.301** |
| **3 Bedroom + Loft** | **1.376** |

The Board of Directors shall accept any vote if the owner is one of the owners of record of the unit, or in the case of a proxy, if there is no obvious defect on the face of such proxy. It shall be the burden of the protestor to offer satisfactory proof that the proffered vote or proxy is invalid and that his is the proper one.

**Section 9. Majority of Unit Owners**: As used in these By-Laws, the term "majority of unit owners: shall mean those unit owners having more than 50% of the total authorized votes of all unit owners present in person or by proxy and voting at any meeting of the unit owners, determined in accordance with the provisions of Section 8 of this Article III.

**Section 10. Quorum**: Except as otherwise provided in these By-Laws, the presence in person or by proxy of unit owners having one-third (1/3) of the total authorized votes of all unit owners shall constitute a quorum at all meetings of the unit owners.

**Section 11. Majority Vote**: The vote of a majority of unit owners at a meeting at which a quorum shall be present shall be binding upon all unit owners for all purposes except where, in the Declaration or these By-Laws, or by law, a higher percentage vote is required.

## ARTICLE IV
### Officers

**Section 1. Designation**: The principal officers of the Condominium shall be the President, the Vice President, the Secretary, and the Treasurer, all of whom shall be elected by the Board of Directors. The Board of Directors may appoint an assistant secretary, an assistant treasurer, and such other officers as in its judgment may be necessary. The President and Vice President, but no other officers, need be members of the Board of Directors.

**Section 2. Election of Officers**: The officers of the Condominium shall be elected annually by the Board of Directors at the Organization Meeting of each new Board of Directors and shall hold office at the pleasure of the Board of Directors.

**Section 3. Removal of Officers**: Upon the affirmative vote of a majority of the members of the Board of Directors, any officer may be removed, either with or without cause, and his successor

8

3055300/000370

may be elected by the Board of Directors at any regular or special meeting of the Board of Directors called for such purpose.

**Section 4.  President**:  The President shall be the chief executive officer of the Condominium. He shall preside at all meetings of the unit owners and of the Board of Directors.  He shall have all of the general powers and duties which are incident to the office of president of a stock corporation organized under the Corporation Law of the Virgin Islands, including but not limited to the power to appoint committees from among the unit owners from time to time as he may in his discretion decide is appropriate to assist in the conduct of the affairs of the Condominium.

**Section 5.  Vice President**:  The Vice President shall take the place of the President and perform his duties whenever the President shall be absent or unable to act.  If neither the President nor the Vice President is able to act, the Board of Directors shall appoint some other member of the Board of Directors to act in the place of the President, on an interim basis.  The Vice President shall also perform such other duties as shall from time to time be imposed upon him/her by the Board of Directors or by the President.

**Section 6.  Secretary**:  The Secretary shall keep the Minutes of all meetings of the unit owners and of the Board of Directors.  He shall have charge of such books and papers as the Board of Directors may direct; and he shall, in general, perform all the duties incident to the office of secretary of a stock corporation organized under the Corporate Law of the Virgin Islands.

**Section 7.  Treasurer**:  The Treasurer shall have the responsibility for Condominium funds and securities and shall be responsible for keeping full and accurate financial records and books of account showing all receipts and disbursements, and for the preparation of all required financial data.  He shall be responsible for the deposit of all monies and other valuable effects in the name of the Board of Directors, or the managing agent, in such depositories as may from time to time be designated by the Board of Directors, and he shall, in general, perform all the duties incident to the office of treasurer of a stock corporation organized under the Corporation Law of the Virgin Islands.

**Section 8.  Agreements, Contracts, Deeds, Checks, etc.:**  All agreements, contracts, deeds, leases and other instruments of the Condominium shall be executed by any two officers of the Condominium or by such other person or persons as may be designated by the Board of Directors.

**Section 9.  Compensation of Officers**:  No officer shall receive any compensation from the Condominium for acting as such.

**ARTICLE V**

**<u>Operation of the Property</u>**

**Section 1. Determination of Common Expenses and Fixing of Common Charges:**  The Board of Directors shall from time to time, and at least annually, prepare a budget for the condominium, determine the amount of the common charges payable by the unit owners to meet the common expenses of the Condominium, and allocate end assess such common charges among the unit owners according to their respective common interests.  Common expenses shall include, among other things, operation and maintenance, insurance premiums,

9

3055300/000371

repairs and such amounts as the Board of Directors may deem proper for a general operating reserve, for a reserve fund for replacements, and to make up any deficit in the common expenses for any prior year.

The common expenses may also include such amounts as may be required for the purchase buy or lease to the Board of Directors or its designee, corporate or otherwise, on behalf of all unit owners, of any apartment unit whose owner has elected to sell or lease such apartment unit to the Board of Directors, or of any apartment unit which is to be sold at a foreclosure or other judicial sale.

The Board of Directors shall advise all unit owners promptly in writing of the amount of common charges payable by each of them, respectively, as determined by the Board of Directors, as aforesaid, and shall furnish to all unit owners copies of each budget on which such common charges are based.

A summary of the previous year's actual income and expenditures, a year end summation of liquid assets and accounts payable/receivable, and an approved budget for the current year shall be provided to all owners not less than 30 days prior to the Annual Meeting.

**Section 2. Insurance:**
The Board of Directors shall annually obtain and maintain, to the extent obtainable, the following insurance:

1. Fire insurance with extended coverage to include earthquake and flood coverage, vandalism and malicious mischief endorsements insuring the entire buildings and "common elements" (including all the individual unit's bathroom and kitchen fixtures and air conditions, but not including any wall, ceiling, or floor decoration, tiles or coverings, together with all service machinery contained therein and covering the interest of the Condominium, the Board of Directors and the Common Interest of the unit owners in an amount to be determined by the Board of Directors.

2. Windstorm, insuring the entire buildings and "common elements" together with all service machinery contained therein and covering the interest of the Condominium, the Board of Directors and the Common Interest of the unit owners in an amount to be determined by the Board of directors.

3. Worker's Compensation; Public Liability covering each member of the Board of Directors, the managing agent, the manager, the office manager and each unit owner; Vehicle and
   other such insurance as the Board of Directors may determine in amounts to be determined by the Board of Directors.

All policies of physical damage shall provide that such policies may not be cancelled or substantially modified without written notice from the Board of Directors.

From time to time or as required by insurers, the Board of Directors shall obtain from a certified and USVI licensed real estate appraiser an appraisal of the full replacement value, without deduction for depreciation, of the buildings, common areas and facilities for the purpose of determining the amount of insurance required.

Unit owners shall be encouraged to carry Home Owners insurance on their "apartment unit" for their own benefit provided that all such policies shall indicate that the liability of the carrier(s) issuing insurance obtained by the Board of Directors shall not be affected or diminished by reason of any such additional insurance carried by any unit owner.

10

At each Annual Meeting, the Board shall provide to the owners a concise summary of all insurance coverage and costs.

The terms "common elements" and "apartment unit," as mentioned above, are defined in Article 5, Section 10 "Routine Maintenance and Repair."

**Section 3. Repair or Reconstruction After Fire or Other Casualty:** In the event of damage to or destruction of the commonly owned buildings and elements as a result of fire or other casualty (unless 66-2/3% or more of the buildings are destroyed or substantially damaged and 75% or more of the unit owners determine in accordance with the Declaration not to proceed with the repair or restoration), the Board of Directors shall arrange for the prompt repair or restoration of the commonly owned buildings and elements, and the Board of Directors shall disburse the proceeds of all insurance policies to the contractors engaged in such repair or restoration in appropriate progress payments. Any cost of such repair or restoration in excess of the insurance proceeds shall constitute a common expense – and the Board of Directors may assess all the unit owners for such deficit as part of the common charges.

The association shall only be responsible for inspecting unit interiors to determine if damage is structural or due to external causes, or if adjacent unit damage is caused by external causes, or unless that unit is owned by the association. Unless that unit is owned by the association, repair by the association of other unit damage will be limited to structural damage, that caused by external or adjacent unit causes, and will not include property or fixtures installed by the owner or previous owners.

Within ninety days after a casualty of an estimated repair cost of $100,000 or greater, the Board will provide to the owners a financial status report indicating projected repair costs, source(s) of necessary funds, expenditures and commitments to date, and a schedule and plan for completion. This report will be updated and issued to owners on a quarterly basis, thereafter, until repairs are complete. A current report shall be provided at the next Annual Meeting.

If 66-2/3% or more of the Building(s) are destroyed or substantially damaged and if within sixty days of the date of such destruction or damage, 75% or more of the unit owners determine not to proceed with repair and restoration, the Property shall be subject to an auction for partition at the suit of any unit owner or lien holder, as if owned in common, in which event the net proceeds of sale, together with the net proceeds of insurance policies (less any repairs conducted) shall be divided by the Board of Directors among all the unit owners in proportion to their respective common interests, after first paying out of the share of each unit owner the amount of any unpaid liens on his/her apartment unit, in the order of priority of such liens.

**Section 4. Payment of Association Charges:** All unit owners shall be obligated to pay the common charges assessed by the Board of Directors pursuant to the provisions of Section 1 of this Article V at such time or times as the Board of Directors shall determine, as well as "other charges" for utilities, services, unit repairs, late fees, interest, fines and/or collection costs, if incurred. With respect to the following sections concerning payment, collection, default, foreclosure, etc., in Sections 4, 5, 6, 7, & 8 below, the term "association charges" is intended to include, but not be limited to, all the above items, both the "common" and "other" charges.

No unit owner shall be liable for the payment of any part of association charges assessed against his apartment unit subsequent to a sale, transfer or other conveyance by him of such apartment unit, together with the Appurtenant Interests, as defined in Section1 of Article **VII** hereof. In addition, any unit owner may, subject to acceptance by the Board of Directors provided that his apartment unit is free and clear of liens and encumbrances other than mortgages and statutory liens for unpaid association charges, convey his apartment unit,

11

together with the "Appurtenant Interests" to the Board of Directors, or its designee, corporate or otherwise, on behalf of all other unit owners, and in such event be exempt from association charges thereafter assessed.

However, a purchaser of an apartment unit shall be liable for the payment of association charges assessed against such apartment unit prior to the acquisition by him of such apartment unit, without prejudice to such purchaser's right, if any, to recover from the seller the amounts paid by the purchaser, except that a first mortgagee or other purchase of an apartment unit at a foreclosure sale of a first priority mortgage of such apartment unit shall not be liable for and such apartment unit shall not be subject to a lien for the payment of association charges which became due prior to the acquisition of title by such acquirer.

**Section 5.  Collection of Association Charges**:  The Board of Directors shall assess association charges against the unit owners from time to time and shall take prompt action to collect any charges due from any unit owner, which remain unpaid for more than thirty days from the date due for payment thereof.  Such action may include placement of a lien on the apartment unit, notification to the mortgagee of the owner's failure to pay association charges and foreclosure on the lien.  Additionally, suspension of utilities by a majority vote of the Executive Committee is permitted if an owner is more than 90 days in arrears of any Association charges.  Payments received from unit owners will be applied to Association Charges in the chronological order incurred.

**Section 6.  Default in Payment of Association Charges:**  In the event of default by any unit owner in paying to the association charges as determined by the Board of Directors, such unit owner shall be obligated to:
   (1) pay interest from the date of the initial billing at the maximum legal rate of interest, as defined by the Virgin Islands Laws, on all amounts past due,
   (2) pay a monthly service charge as determined and promulgated from time-to-time by the Board of Directors,
   (3) pay all expenses and attorneys' fees incurred by the Board of Directors in any proceeding brought to collect such unpaid association charges.
   All such unpaid association charges shall constitute a lien on such unit prior to all other liens except those specified in Section 922 of Chapter 33, Title 28 of the Virgin Islands Code.  The Board of Directors shall have the right and duty to attempt to recover all association charges, together with interest and monthly service charges thereon, and the expenses of the proceeding, including attorneys' fees, in any action to recover the same brought against such unit owner, or by foreclosure of the lien on such apartment unit granted by Section 922 of Chapter 33, Title 28, Virgin Islands Code.

**Section 7.  Foreclosure of Liens For Unpaid Association Charges:**  In any action brought by the Board of Directors to foreclose a lien on an apartment unit because of unpaid association charges, the unit owner shall be required to pay a reasonable rental for the use of his apartment unit, and the plaintiff in such foreclosure action shall be entitled to the simultaneous appointment of a receiver to collect the same.  The Board of Directors, acting on behalf of all unit owners, shall have power to purchase such apartment unit at the foreclosure sale and to acquire, hold, lease, mortgage, vote the votes appurtenant to, convey or otherwise deal with the same.  A suit to recover a money judgment for unpaid association charges shall be maintainable without foreclosing or waiving the lien securing the same.

12

**Section 8.  Statement of Association Charges:**  The Board of Directors shall promptly provide any unit owner so requesting the same in writing, with a written statement of all unpaid association charges due from such unit owner.

**Section 9.  Abatement and Enjoinment of Violations by Unit Owners:**  The violation of any rule or regulation adopted by tha Board of Directors or the breach of any of these By-Laws contained herein, or the breach of any provisions of the Declaration, shall give the Board of Directors the right, in addition to any other rights set forth in these By-Laws (a) to enter the apartment unit in which, or as to which, such violation or breach exists and to summarily abate or remove, at the expense of the defaulting unit owner, any structure, thing or condition that may exist therein contrary to the intent and meaning of the provisions hereof, and the Board of Directors shall not thereby be deemed guilty in any manner of trespass or (b) to anjoin, abate or remedy by appropriate legal proceedings, either at law or in equity, the continuance of any such breach.

**Section 10.  Routine Maintenance and Repair:**  All maintenance of and repairs to any "apartment unit" (other than maintenance of and repairs to any common areas and facilities contained therein, and not necessitated by the negligence, misuse or neglect of the owner of such apartment unit) shall be the responsibility of the owner of such apartment unit.  Also, each unit owner shall be responsible for damage to other apartment units and/or to the common areas and facilities resulting from conditions for which such owner has responsibility as indicated above.
   An "apartment unit" is considered the space inside the perimeter walls, interior walls, floor and ceiling to include:

1. All decorating elements including: paint, wall and floor coverings, paneling, molding and tiles; finished cabinets and mirrors.
2. All electrical appliances including: refrigerator, stove, washer, dryer, dishwasher, garbage disposal, hot water heater and air-conditioning equipment (including compressor).
3. All electrical fixtures including: wall ceiling and floor outlets, switches and fuse box.
4. All plumbing fixtures including: tubs, showers, sinks, toilets and faucets.

Additionally, the unit owner shall be responsible for the routine lubrication and adjustment of doors and windows, and, unless major casualty related, replacement of broken glass, wooden or glass slats and damaged screens.  The unit owner shall also maintain and assure the operability of the storm shutters installed on that unit and is responsible to close them in the event of a windstorm.  Damage caused by failure to do so is the responsibility of the owner if net insurance proceeds are insufficient to cover such damage.
   Screen doors may be installed on the main street-side entry doors at the unit owner's expense provided they meet the existing décor.  Once installed, they must be maintained by the unit owner in a good state of repair, or the Association will do so at the owner's expensa.

Except for the limited exceptions noted above, all maintenance, repairs and raplacements to the "common elements", common areas and facilities, whether located inside or outside of the apartment units, (unless necessitated by the negligence, misuse or neglect of a unit owner, in which case such expense shall be charged to such unit owner), shall be made by the Association and be charged to all the unit owners as a common expense.
   "Common elements" are considered to include all other elements of the buildings and property except those specified as being part of the "apartment unit."  Additionally, the following are considered common elements:

1. Electrical supply to the fuse box, not including the panel.

13

3055300/000375

2. Water and plumbing lines in the walls (including interior walls), floor and ceiling to the valves at sinks, showers, tubs, hot water heater, and toilets, etc.
3. Drains to the first connection outside a wall.

External air conditioning compressor units shall be maintained by the owner in a reasonable state of preservation. The Association may require owner to remove inoperable and/or un-maintained units or do so at the owner's expense

Below is a guide to assist in clarifying owner and Association responsibility with regard to maintenance/repair and insurance."

Insurance and Maintenance Responsibility Matrix

| Category (Not intended to be all-inclusive) | Owner Maint/Repair Responsibility | Association Maint/Repair Responsibility | Association Insurance Responsibility | Owner Insurance Responsibility |
|---|---|---|---|---|
| Exterior Walls and Interior Damage Caused by Leaks | | X | X | |
| Roof and Interior Damage Caused by Roof Leaks | | X | X | |
| Interior Damage caused by Adjacent Units (Leaks, etc.) | X | | | Owner or Adjacent Unit's Insurance Responsible |
| Front Doors | X | | X | |
| Screens | X | | X | |
| Exterior Sliders | | X | X | |
| Exterior Wood Railings, Trim, Benches | | X | X | |
| Exterior Windows | X | | X | |
| Electrical System to Breaker Panel | | X | X | |
| Electrical System, Breaker Panel to Outlets, Junction Boxes | X | | X | |
| Electrical Fixtures-Interior | X | | | X |
| Plumbing Inside Walls, Floors Ceilings to valves | | X | X | |
| Condo plumbing not in walls/floors | X | | | X |
| Plumbing Fixtures | X | | | X |
| Interior Walls | X | | X | |
| Interior Doors | X | | | X |
| Cabinets | X | | | X |
| Furniture | X | | | X |
| Appliances | X | | | X |
| Wall/Floor Coverings (tile/carpet) | X | | | X |
| Hurricane Shutters | X | | X | |
| Furniture | X | | | X |
| Personal Property | X | | | X |
| External A/C elements | X | | | X |
| Internal A/C elements | X | | | X |
| Landside Porch/Steps/Railings | | X Excluding Tile | X Excluding Tile | |
| Seaside Balcony/Railings | | X Excluding Tile | X Excluding Tile | |

14

3055300/000376

Joint Appendix Vol. II Page 1146

**Section 11. Restriction on Use of Apartment Units:** In order to provide for congenial occupancy of the Property and for the protection of the value of the apartment units, the use of the Property shall be restricted to and shall be in accordance with the following provisions:

1. The apartment units shall be used for residences only. Units will not be occupied by more than two persons per bedroom for more than thirty days per year.
2. The common areas and facilities, including the limited common areas and facilities, shall be used only for the furnishing of the services and facilities for which they are reasonably suited and which are incident to the use and occupancy of apartment units
3. No nuisances shall be allowed on the Property nor shall any use or practice be allowed which is a source of annoyance to its residents or which interferes with the peaceful possession proper use of the Property by its residents.
4. No improper, offensive or unlawful use shall be made of the Property or any part thereof, and all valid laws, zoning laws and regulations of all governmental bodies having jurisdiction thereof shall be observed.
5. Violations of laws, orders, rules, regulations or requirements of any governmental agency having jurisdiction thereof, relating to any portion of the Property, shall be corrected, by and at the sole expense of the unit owners or the Board of Directors, whichever shall have the obligations to maintain or repair such portion of the Property.
6. No dogs are allowed on the property, either long term or visiting. The Board may grant exceptions to the NO DOGS ALLOWED rule, on an individual basis, should an owner require the assistance of a service animal (dog) as defined by the ADA. Owners seeking to obtain such an exemption are required to apply, in writing, to the Board with supporting documentation.

**Section 12. Additions, Alterations or Improvements by the Board of Directors:** Additions, alterations or improvements to the common areas and/or facilities up to $100,000 may be made by the Board of Directors. Additions, alterations or improvements in excess of $100,000 shall require approval by a vote of two-thirds (2/3) in common interest of the owners. The cost of such additions, alterations or improvements shall constitute a common charge. This section is not applicable to repairs conducted in accordance with Article V Section 3 of these By-Laws.

**Section 13. Additions, Alterations, or Improvements by Unit Owners:** No unit owner shall make any structural addition, alteration or improvement in or to his apartment unit, including any exterior painting or exterior alteration or addition (including awnings, grills, etc.) without the prior written consent thereto of the Board of Directors. The Board of Directors shall have the obligation to answer any written request by a unit owner for approval of a proposed structural addition, alteration or improvement in such unit owner's apartment unit, within thirty (30) days after such request, and failure to do so within the stipulated time shall constitute a consent by the Board of Directors to the proposed addition, alteration or improvement.

A unit owner shall obtain a receipt from any person accepting his written request for a change under this section and shall show the receipt to the manager or any Director upon request. Any application to any department of the Government of the Virgin Islands or to any other governmental authority for a permit to make an addition, alteration or improvement in or to any apartment unit shall be executed by the Board of Directors only, without, however, incurring liability on the part of the Board of Directors or any of them to any contractor, sub-contractor or supplier on account of such additions, alteration or improvement, or to any person having any claim for injury to person or damage to property arising therefrom. The owner in such instance shall provide the Board of Directors with a Hold Harmless Certificate.

15

3055300/000377

**Section 14. Use of Common Areas and Facilities**:  A unit owner shall not place or cause to be placed in the stairways or other common areas and facilities, including the limited common areas and facilities, other than the areas designated as storage areas, any furniture, packages or objects of any kind.  The entry passages, stairways, entry bridges, etc., shall be used for no purpose other than for normal transit through them.

**Section 15. Right of Access:**  A unit owner shall grant a right of access  to his apartment unit to the manager and/or the managing agent and/or any other person authorized by the Board of Directors, the manager or the managing agent, for the purpose of making inspections or for the purpose of correcting any condition originating in his apartment unit and threatening another  apartment unit or a common area or facility, or for the purpose of performing installations, alterations or repairs to the mechanical or electrical services or other common areas or facilities in his apartment unit or elsewhere in the Building, provided that requests for entry are made in advance and that any such entry is at a time reasonably convenient to the unit owner.  In case of an emergency, such right of entry shall be immediate, whether or not the unit owner is present at the time.

**Section 16. Rules of Conduct**:  Article V Section II of these By-Laws delineates general restrictions on the use of the property.  Additionally, a definitive listing of current Rules and Regulations is provided as Exhibit I hereto.  These Rules and Regulations may be amended by the Board of Directors from time to time.  The Board is empowered to enforce these By-Laws and Rules and Regulations with monetary fines and other sanctions and may also take any legal action in court to enforce them.  An owner is subject to such fines, sanctions and/or legal actions for the actions of his tenant as if those actions were by the owner.

Copies of the Rules and Regulations shall be furnished by the Board of Directors to each unit owner prior to the time when the same shall become effective.  The unit owner must insure that the tenant or occupant be fully informed and furnished with a copy of the Rules and Regulations and by fully bound thereby.

**Section 17. Potable Water and Electricity:**  Potable water and electricity shall be supplied by the Association through the common facilities of the Condominium directly to each apartment unit through a separate meter, and each unit owner shall be required to pay the charges therefore established, from time to time, by the Board of Directors.  Water, electricity and other utility charges will normally be billed monthly incident to the common charges and are considered to be part of the "association" charges.  Utility charges more than thirty days in arrears are subject to a late fee and interest per Section 6 Article V of these By-Laws, and said utilities may be suspended by the Association if an owner is more than 90 days in arrears of Association charges per Article V Section 5 thereof.

**Section 18. Gas:**  Gas shall not be piped to any apartment unit, and unit owners are specifically prohibited from using gas as a fuel for regular cooking, water heating, or any other regular purpose.  Small quantities of propane gas may be used for gas grills kept on street-side galleries and for emergency use inside apartment units.

**Section 19. Grey Water and Sewerage Service:**  Grey water for flushing and sewerage service (including sewage disposal and treatment in the condominium's sewerage treatment plant) shall be supplied as a common facility to all unit owners, and the cost thereof shall be treated as a common expense.

16

3055300/000378

## ARTICLE VI
## Mortgages

**Section 1. Notice of Unpaid Common Charges:** The Board of Directors, whenever so requested in writing by a mortgagee of an apartment unit, shall promptly report any then unpaid association charges due from, or any other default by the owner of the mortgaged apartment unit.

**Section 2. Notice of Default:** The Board of Directors, when giving notice to a unit owner of a default in paying common charges or other default, may send a copy of such notice to each holder of a mortgage covering such apartment unit.

## ARTICLE VII
## Sales and Mortgages of Units

**Section 1. No severance of Ownership:** No unit owner shall execute any deed, mortgage or other instrument conveying or mortgaging title to his apartment unit without including therein the Appurtenant Interests, it being the intention hereof to prevent any severance of such combined ownership. For the purpose of the By-Laws, the "Appurtenant Interests" shall mean collectively, (i) the unit owner's undivided interest in the common areas and facilities appurtenant to such unit; (ii) the interest of such unit owner in any apartment units theretofore acquired by the Board of Directors, or its designee, on behalf of all unit owners, or the proceeds of the sale or lease thereof, if any; and (iii) the interest of such unit owner in any other assets of the Condominium.

Any such deed, mortgage or other instrument purporting to affect one or more of such interests, without including the interest or interests so omitted, shall be deemed to include such interests even though the latter shall not be expressly mentioned or described therein. No part of the Appurtenant Interests of any apartment unit may be sold, transferred or otherwise disposed of, except as part of a sale, transfer or other disposition of the apartment unit to which such interests are appurtenant, or as part of a sale, transfer or other disposition of such part of the Appurtenant Interests of all apartment units.

**Section 2. Sale to Board of Directors:** A unit owner may, subject to mutual agreement of the parties, and subject to the provisions of Section 1 of this Article VII, sell his unit to the Board of Directors, or its designee; provided, however that such purchase by the Board of Directors shall have the prior approval of two-thirds (2/3) of the unit owners, as expressed by the vote of at least two third (2/3) in number and in common interest, of all unit owners, cast in person or by proxy in accordance with these By-Laws.

**Section 3. Financing of Purchase of Apartment Units By Board of Directors:** Acquisition of apartment units by the Board of Directors, or its designee, on behalf of all unit owners, may be made from the working capital and common charges in the hands of the Board of Directors, or if such funds are insufficient the Board of Directors may levy an assessment against each unit owner in proportion to his ownership in the common areas and facilities as a common charge, which assessment shall be enforceable in the same manner as provided in Section 6 and 7 of Article V, or the Board of Directors, in its discretion, may borrow money to finance the acquisition of such apartment units, provided, however, that no financing may be secured by an encumbrance or hypothecation of any property other than the apartment unit, together with the Appurtenant Interests, so to be acquired by the Board of Directors.

17

3055300/000379

**Section 4. Gifts and Devises, etc:** Any unit owner shall be free to convey or transfer his apartment unit by gift, or to devise his apartment unit by will, or to pass the same by intestacy, without restriction.

**Section 5. Waiver of Right of Partition with Respect to Such Apartment Units as are Acquired by the Board of Directors, or its Designee, on Behalf of All Unit Owners as Tenants in Common:** In the event that an apartment unit shall be acquired by the Board of Directors, or its designee, on behalf of all unit owners as tenants in common, all such unit owners shall be deemed to have waived all rights of partition with respect to such apartment unit.

### ARTICLE VIII

**Section 1. Condemnation – Eminent Domain:** In the event of a taking by condemnation or by eminent domain of part or all of the common areas and facilities, the award made for such taking shall be payable to the Board of Directors for disbursement and/or payment of the common expenses.

### ARTICLE IX
### Records

**Section 1. Records and Audits:** The Board of Directors or the managing agent shall keep detailed records of the actions of the Board of Directors and the managing agent, Minutes of the meetings of the Board of Directors, Minutes of the meetings of unit owners, and financial records and books of account of the Condominium, including a chronological listing of receipts and expenditures, as well as a separate account for each apartment unit which, among other things, shall contain the amount of each assessment of common charges against such apartment unit, the date when due, the amounts paid thereon, and the balance remaining unpaid.

Each unit owner shall be permitted to examine all accounts, records and contracts of the Association in the Condominium office at reasonable times, on business days, but not more often than once a month. All others must request any required information from the Board of Directors.

An annual report of the receipts and expenditures of the Association, examined and approved by a licensed accountant not affiliated with the Association and chosen by the Board of Directors, shall be rendered to the Board and sent, within a reasonable time after the end of each fiscal year, to all unit owners who request it.

### ARTICLE X
### Miscellaneous

**Section 1. Notices:** All notices hereunder shall be sent by registered or certified mail to the Board of Directors c/o the managing agent, or if there is no managing agent, to the office of the Board of Directors or to such other address as the Board of Directors may hereafter designate from time to time, by notice in writing to all unit owners and to all mortgagees of apartment units.

All notices to any unit owner shall be sent by registered or certified mail to the Building or to such other address as may have been designated by him from time to time, in writing, to the Board of Directors. All notices to mortgagees of apartment units shall be sent by registered or certified mail to their respective addresses, as designated by them from time to time, in writing

18

3055300/000380

to the Board of Directors. All notices shall be deemed to have been given when mailed, except notices of change of address, which shall be deemed to have been given when received.

Notwithstanding the requirements of this section, all notices of regular, special and Annual Meetings of the unit owners, Board of Directors, and committees of the Board or otherwise, shall be by first class mail but without the requirement of registration or certification. The applicable notice shall be sent so as to comply with the required time limits, if any, to the regular mailing address of the designated party as recorded in the books of the Association.

**Section 2. Invalidity:** The invalidity of any part of these By-Laws shall not impair or affect in any manner the validity, enforceability or effect of the balance of these By-Laws.

**Section 3. Captions:** The captions herein are inserted only as a matter of convenience and for reference, and in no way define, limit or described the scope of these By-Laws, or the intent of any provision thereof.

**Section 4. Gender:** The use of the masculine gender in these By-Laws shall be deemed to include the feminine gender and the use of the singular shall be deemed to include the plural, whenever the context so requires.

**Section 5. Waiver:** No restrictions, condition, obligation or provisions contained in these By-Laws shall be deemed to have been abrogated or waived by reason of any failure to enforce same, irrespective of the number of violations or breaches thereof which may occur.

**Section 6. Insurance Trustee:** The Board of Directors may appoint a Trustee to distribute large amounts of any insurance proceeds. The trustee so appointed may be any individual or entity, so long as such is properly bonded in relation to the funds and responsibility involved.

## ARTICLE XI
## Amendments to By-Laws

**Section 1. Amendments to By-Laws:** Except as hereinafter provided, these By-Laws may be modified or amended by the vote of 66-2/3% in number and in common interest of all unit owners.

## ARTICLE XII
## Execution of Instruments and Seal

**Section 1. Execution and Instruments:** All instruments of the Condominium shall be executed under seal by such officer or officers as the Board of Directors may designate, or as may be otherwise authorized.

**Section 2. Seal:** The seal of the Condominium shall be as determined by the Board of Directors from time to time.

19

3055300/000381

## ARTICLE XIII
## <u>Conflicts</u>

**<u>Section 1. Conflicts:</u>** These By-Laws are set forth to comply with the provisions of Sections 917 and 918 of Chapter 33, Title 28, Virgin Islands Code. In case any of these By-Laws conflict with the provisions of said statute or of the Declaration, the provisions of said statute or of the Declaration, as the case may be, shall control.

20

3055300/000382

DRAFT

**BY-LAWS OF COWPET BAY WEST**

**CONDOMINIUM ASSOCIATION**

**Cowpet Bay**

**St. Thomas, Virgin Islands**

**New date**

Article I

Plan of Unit Ownership

**Section 1.  Unit Ownership:** The property located at Parcels 8-56-1 and 8-1-2, 4, 5, & 6 of Estate Nazareth, No.1 Red Hook Quarter has previously been submitted in a declaration forming an association under the provisions of Chapter 33, Title 28 of the Virgin Islands Code, known as the "Condominium Act of the Virgin Islands".  The association has been and will continue to be known as "COWPET BAY WEST", hereinafter called the "Condominium".

**Section 2.  Applicability of By-Laws:**  The provisions of these by-laws are applicable to the Property of the Condominium and the use and occupancy thereof.  The term "Property", as used herein, shall include the land and all buildings and other improvements thereon owned by the association and all easements, rights and appurtenances belonging thereto, and all other property, personal or mixed, intended for use in connection therewith, all of which were previously submitted to the provisions of said Chapter 33, Title 28 of the Virgin Islands Code.

**Section 3.  Application:** All present and future owners, mortgagees, lessees, **tenants**, occupants of units and any other persons who may use **or access** the facilities of the Property in any manner are subject to these By-Laws, the Declaration and the Rules and Regulations.

The Acceptance of a deed, mortgage or conveyance or the entering into of a lease or the act of occupancy of a unit shall constitute an agreement that these By-Laws, the Rules and Regulations and the provisions of the Declaration, as they may be amended from time to time, are accepted, ratified, and will be complied with.

**Section 4.  Office:** The office of the Condominium and of the Board of Directors shall be located at Cowpet Bay West, Estate Nazareth, No.1 Red Hook Quarter, St. Thomas, Virgin Islands.  The mailing address shall be 6201 Windward Way, St. Thomas, USVI 00802, or such address as may be designated by the Board, upon 30 days written notice to the members of the Association.

5

3055300/000383

DRAFT

ARTICLE II

Board of Directors

**Section 1. Number and Qualifications:** The affairs of the Condominium shall be governed by a Board of Directors. The Board of Directors shall be composed of seven persons, all of whom shall be owners or spouses of owners, or in the case of partnership owners, shall be members of said partnership, or in the case of corporate owners, shall be officers or stockholders of such corporations, or in the case of fiduciary owners shall be the fiduciaries or beneficiaries of any such trust, **or in the case of a limited liability company, shall be the members of such company.** A Board member may not base his/her eligibility to sit on the Board, **from the fact that a current Board Director resides in** the same unit **and therefore he/she can stand in said Board Director's position. Only one member of a unit can simultaneously serve on the Board.**

No person who is in arrears for ninety days or more on any billing or assessment by the Cowpet Bay West Condominium Association shall be eligible to be elected to or serve as a director on the Board of Directors. In the event such person is serving as a director, that person's position as director shall be declared to be vacant and another person appointed by a majority vote of the remaining Board to fill the vacancy so created, until the next regular election of the Board of Directors. Arrearages of partnerships, corporations, trusts, fiduciary owners, etc. on which a person's eligibility to serve on the board is based, shall be **subject to the same consequences of ineligibility as set forth above.**

**Section 2. Powers and Duties:** The Board of Directors shall have the powers and duties necessary for the administration of the affairs of the Condominium and may do all such acts and things except as by law, by the Declaration **(to the extent still applicable)**, or by these By-Laws **are** not delegated to the Board of Directors by the unit owners. Such powers and duties of the Board of Directors shall include, but shall not be limited to, the following:

a) Operation, care, upkeep and maintenance of the common areas and facilities.

b) Determination of Association Charges, which shall include the common expenses required for the operation of the Condominium, **insurance,** utility rates, **water,** late fees and interest charges, fines for By-Laws and **for** rules **and** regulation violations, and **any reserve funds maintained by the Association.**

c) Collection of Association charges, as hereinafter defined, from the unit owners.

d) Employment and dismissal of the personnel necessary for the maintenance and operation of the common areas and facilities.

e) Adoption, amendment and Enforcement of rules and regulations covering the details of the operation and use of the Property.

6

3055300/000384

DRAFT

f) Opening of bank accounts on behalf of the Condominium and designating the signatories required therefore **and maintaining and accounting for any funds deposited or withdrawn from said accounts.**

g) Purchasing or leasing or otherwise acquiring, in the name of the **Association** or its designee, corporate or otherwise, on behalf of all unit owners, units offered for sale or surrendered by their owners.

h) Purchasing of units at foreclosure or other judicial sales in the name of the Association or its designees, corporate or otherwise, on behalf of all unit owners.

i) Selling, leasing, voting the votes appurtenant to (other than for the election of members of the Board of Directors), or otherwise dealing with units acquired and subleasing units leased by the Association, or its designee, corporate or otherwise on behalf of all unit owners. **No mortgage shall be entered into without the expressed written consent of a majority (51%) or more of the unit owners.**

j) **Issuing a Power of Attorney for someone** to act as designee of the **Association** in acquiring title to or leasing of units on behalf of all unit owners.

k) Obtaining of insurance for the Property, including **all premises owned or required to be maintained by the Association** pursuant to the provision of Article V, Section 2 hereof.

l) Making of repairs, **restorations,** additions and improvements to or alterations of the Property, **Including all premises owned or required to be maintained by the Association** in accordance with the other provisions of these By-Laws, after damage or destruction by fire or casualty or as a result of condemnation or eminent domain proceedings.

**Section 3. Managing Agent and Manager:** The Board of Directors may employ for the Condominium a managing agent and/or a manager in a compensation established by the Board of Directors, to perform such duties and services as the Board of Directors shall authorize. The Board of Directors may delegate to the manager or managing agent, all of the powers granted to the Board of Directors by these By-Laws other than the powers set forth in subdivisions (b), (e), (f), (g), (h), (i), (j) and (k) of Section 2 of this Article II.

### Section 4. Election and Term of Office:

Directors will serve for a term of three years. Two Directors shall be elected the first year, two the second year, and three the third year to replace those directors whose terms are expiring. Where a vacancy has been filled by vote of a majority of the vote of the remaining members of the Board, as provided in Section 6, that person shall be a member until the next Annual Meeting, at which time the unit owners shall elect the replacement for the remainder of the original term, if any. Any candidate for director may run for a full term, or any term created by a vacancy, or both.

**Each** director shall be elected by the vote of a majority (as defined in Article III Section 9) of the unit owners. All vacancies shall be voted for on **in a single** ballot, and the candidate(s) with the highest number of votes shall be elected to **fill the respective** vacancies. Each candidate's name shall be preceded by a space where an "X" may be placed to vote for said candidate. It shall not be required that a name be crossed out and another inserted to vote for a candidate on the ballot. A space for write-in

7

DRAFT

candidates shall also be provided. Ballots and proxies shall be provided to the owners not less than 30 days prior to the Annual Meeting.

**Each** Director shall hold office until their respective successor shall have been elected by the unit owners.

A **Director** may serve only two consecutive terms and shall not hold office for one year before being eligible to run again.

**Section 5. Removal of Members of the Board of Directors:** At any regular or special meeting of unit owners, any one or more of the members of the Board of Directors may be removed with or without cause by a majority of the unit owners and a successor may then and there or thereafter be elected to fill the vacancy thus created. Any members of the Board of Directors whose removal has been proposed by the unit owners shall be given an opportunity to be heard at the meeting.

If a Board member does not attend any of the Board meetings during an entire year, and also does not attend the annual owners meeting that same year, such member may be removed from the Board by a majority of the other members of the Board of Directors.

If a Director is removed pursuant to Section 5 herein, said Director shall not be eligible for service on the board for a minimum of ___ years.

**Section 6. Vacancies:** Vacancies in the Board of Directors caused by any reason other than the removal of a member thereof by a vote of the unit owners, shall be filled **subject to Section 4 above,** by a vote of a majority of the remaining members at a special meeting of the Board of Directors held for that purpose promptly after the occurrence of any such vacancy, even though the members present at such meeting may constitute less than a quorum, and each person so elected shall be a member of the Board of Directors until a successor shall be elected at the next Annual Meeting of the unit owners. At that time a director shall be elected to serve the remainder of the term of the original vacating director.

**Section 7. Organization Meeting:** The first meeting of the members of the Board of Directors shall be an organizational meeting held directly following the Annual Meeting of the unit owners, at such time and place as shall be fixed by the Board members at said meeting, and no notice shall be necessary to the newly elected members of the Board of Directors in order to legally constitute such meeting, provided a majority of the whole Board of Directors shall be present, **or available via video or audio conference.** If it is not possible to hold such first meeting of the new Board immediately, then it shall be held as soon as possible and proper notice shall be given to each director, as for any special meeting of the Board of Directors.

**Section 8. Regular Meetings:** Regular meetings of the Board of Directors may be held at such time and place as shall be determined from time to time by a majority of the members of the Board of Directors, but at least two such meetings shall be held during each fiscal year. Notice of regular meetings of the Board of Directors shall be given to each member of the Board of Directors by mail, email or fax transmission, at least ten days prior to the day named for such meeting. Meeting notices

**Section 9. Special Meetings:** Special meetings of the Board of Directors may be called by the President upon five business days notice to each member of the Board of Directors given by mail, email or fax transmission, which notice shall state the time, place and purpose of the meeting. Special meetings of the Board of Directors shall be called by the President or Secretary in like manner and on like notice on

8

3055300/000386

DRAFT

the written request of at least two members of the Board of Directors. Such special meeting may be conducted by a **video and/or audio** conference call.

**Section 10. Waiver of Notice:** Any member of the Board of Directors may, at any time, waive notice of any meeting of the Board of Directors in writing, and such waiver shall be deemed equivalent to the giving of such notice. Attendance by a member of the Board of Directors at any meeting of the Board shall constitute a waiver of notice by him of the time and place thereof. If all the members of the Board of Directors are present at any meeting of the Board, no notice shall be required and any business may be transacted at such meeting.

**Section 11. Quorum of Board of Directors**: At all meetings of the Board of Directors, a majority of the members thereof shall constitute a quorum for the transaction of business, and the votes of the majority of the members of the Board of Directors present at a meeting at which a quorum is present shall constitute the decision of the Board of Directors. If at any meeting of the Board of Directors there shall be less than a quorum present, no business may be transacted until a quorum is achieved. Board members may participate by video or audio conference call.

**Section 12. Fidelity Bonds:** The Board of Directors shall obtain adequate fidelity bonds for all officers and employees of the Condominium handling or responsible for condominium funds. The premiums on such bonds shall constitute a common expense.

**Section 13. Compensation:** No member of the Board of Directors shall receive any compensation from the Condominium Association for serving as a board member. However, verifiable expenses, in accordance with guidelines established by the Board in advance, are reimbursable. A **Director** may also be compensated for other services unrelated to his/her Board function.

**Section 14. Liability of the Board of Directors:** The members of the Board of Directors shall not be liable to the unit owners for any mistake of judgment, negligence, or otherwise, except for their own individual willful misconduct or bad faith. The unit owners shall indemnify and hold harmless each of the members of the Board of Directors against all contractual liability to others arising out of contracts made by the Board of Directors on behalf of the Property unless any such contract shall have been made in bad faith or contrary to the provisions of the Declaration or of these By-Laws.

It is intended that the members of the Board of Directors shall have no personal liability with respect to any contract made by them on behalf of the Property. It is also intended that the liability of any unit owner arising out of any contract made by the Board of Directors or out of the aforesaid indemnity in favor of the members of the Board of Directors shall be limited to such proportion of the total liability thereunder as his interest in the common areas and facilities bears to all such interest.

Every agreement made by the Board of Directors or by the managing agent or by the manager on behalf of the Property shall provide that the members of the Board of Directors or the managing agent, or the manager, as the case may be, are acting only as agents for the unit owners and shall have no personal liability thereunder (except as unit owners) and that each unit owner's liability thereunder shall be limited to such proportion of the total liability thereunder as his interest in the common areas and facilities bears to all such interest.

**Section 15. Executive Committee:** The Board of Directors, by resolution passed by a majority of the entire Board, shall designate at the Organization Meeting or anytime thereafter, three members of the

9

3055300/000387

DRAFT

Board to constitute an Executive Committee, with one member thereof designated as Chairman. The purpose of the Executive Committee is to control the day-to-day management of the Association.

The Board of Directors from time to time shall define the authority of the Executive Committee.

The Board of Directors, at any time, may change the members of, may fill vacancies in, or may discharge the Executive Committee. Two members shall constitute a quorum of the Executive Committee. The act of a majority of the members at any meeting at which there is a quorum shall be the act of the Committee. The Board of Directors shall establish rules of procedure for the Committee governing, but not limited to, such items as notice and powers.

The Executive Committee shall make recommendations to the Board of Directors, and when the Board is not in session may, to the extent that the committee deems necessary, exercise the powers of the Board in the management of the business and affairs of the Association. The Executive Committee shall keep records of all its proceedings and shall report same to the Board of Directors, and its individual members, in writing within a reasonably short period of time after each significant action and after all meetings.

**Section 16. Inspection by Executive Committee**: The Executive Committee shall make a detailed inspection of the buildings, pump rooms, offices, maintenance shops, sewage and water-making plants, emergency generator, roads, sidewalks, steps, entry bridges, railings, grounds, landscaping, watering systems, the beach and the sea wall at least twice a year in the company of the manager or managing agent,. Additionally, the Committee shall evaluate the operation of the Association office and the overall security situation of the property.

The purpose of such inspections will be to (a) obtain a better understanding of the job being performed by the manager and his staff and (b) make suitable recommendations for possible future actions. Within 30 days after each such semi-annual inspection, the Committee will report its findings and recommendations to the members of the Board of Directors.

**Section 17. Action by Consent**: Any action required or permitted to be taken at any meeting of the Board of Directors, or any committee thereof, may be taken without a meeting if a written consent thereto is signed by three-quarters of the members, (rounded off to the nearest whole number), of the Board of Directors or of such committee as the case may be, and filed with the minutes of proceedings of the Board of Directors or committee.

**Section 18. Nomination of Directors**: Nominations for election to the Board of Directors shall be made by a Nominating Committee. The Nominating Committee shall consist of a Chair, who shall be a member of the Board of Directors, and two or more members of the Association, **who are not Directors or related to any current Directors**. The Nominating Committee shall be appointed by the Board of Directors at its organizational meeting and serve until the next Annual Meeting.

The Nominating Committee shall make as many nominations for election to the Board of Directors as it shall, in its discretion, determine, but not less than the number of vacancies that are to be filled. Each nomination shall be for a specified vacancy.

Any person qualified under Section1 of Article II of these By-Laws to serve on the Board of Directors may be nominated for the Board of Directors by submitting a request, signed by the owners of two units in which the nominee has no financial interest, to the Board Secretary sixty days prior to the Annual Meeting. The Board shall include his/her name on the ballot directly following the nominee(s) proposed by the Nominating Committee for each vacancy. Any nomination that does not specify a specific vacancy shall be deemed a nomination for all vacancies.

**Section 19 – Communications**

10

DRAFT

Communications by, from, to and among the Board may be in writing, by fax or by electronic communications (telephone, telephone conference, email, internet, etc.) Telephone and telephone conference conversations must be documented (e.g., minutes or record of conversation). This communication will constitute "official" communication by the Board.

## ARTICLE III

### Unit Owners

**Section 1. Annual Meeting:**
The Annual Meeting of the unit owners shall be held during the first quarter each year. At the Annual Meeting, Directors shall be elected by ballot in accordance with the requirements of Section 4 of Article II of these By-Laws, and the unit owners may transact such other business at such meetings as may properly come before them.

**Section 2. Place of Meeting:** Meetings of the unit owners shall be held at the principal office of the Condominium or at such other suitable place convenient to the unit owners as may be designated by the Board of Directors.

**Section 3. Special Meetings:** It shall be the duty of the President to call a special meeting of the unit owners if so directed by resolution of the Board of Directors or upon a petition signed and presented to the Secretary by not less than 25% in common interest, in the aggregate, of unit owners. The notice of any special meeting shall state the time and place of such meeting and the purpose thereof. No other business shall be transacted at a special meeting except as stated in the notice.

**Section 4. Notice of Meeting:** It shall be the duty of the Secretary to mail a notice of each annual meeting of the unit owners not less than thirty days nor more than ninety days prior to such meeting, stating the purpose thereof as well as the time and place where it is to be held, to each unit owner of record, at the building or at such other address as such unit owner may have designated by notice in writing to the Secretary. The mailing of a notice of meeting in the manner provided in this section shall be considered service of notice. The Board of Directors may assign the task of providing notice to unit owners to a person other than the Secretary. Special meetings require not less than ten days notice.

11

3055300/000389

DRAFT

**Section 5. Adjournment of Meetings**: If any meeting of unit owners cannot be held because a quorum has not attended, a majority in common interest of the unit owners who are present at such meeting, either in person or by proxy, may adjourn the meeting to a time not less than forty-eight hours from the time the original meeting was called.

**Section 6. Order of Business**: The annual meeting of the unit owners shall be chaired by the President or other member of the Board of Directors chosen by the Board, and the order of business shall be generally as follows:

a) Roll Call – by unit
b) Establishment of Quorum (1/3 of all unit owners)
c) Proof of Notice of Meeting
d) Approval of Minutes of last year's Annual Meeting
e) President's Report (including cost and coverage of insurance
f) Treasurer's Report (including discussion of Budget and Financial Status
g) Property Manager's Report
h) Report of Nominating Committee
i) Election of Board Members
j) Old Business
k) New Business

**Section 7. Title to Units**: Title to units may be taken in the name of an individual, or in the names of two or more persons as tenants in common, joint tenants or tenants by the entirety, or in the name of a corporation, partnership, limited liability company or other legal entity authorized to own real property in the Virgin Islands, or in the name of a fiduciary.

**Section 8. Voting**: The owner or owners of each unit, or some person designated by such owner or owners to act as proxy on his or their behalf and who need not be an owner, shall be entitled to cast the vote appurtenant to such unit at all meetings of unit owners. The designation of any such proxy shall be made in writing and shall be revocable at any time by written notice to the Secretary or in person at the meeting. Any or all such owners or proxies may be present at any meeting of the unit owners and may vote or take any other action as a unit owner either in person or by proxy. Votes of unit owners shall be weighted in accordance with their share of the common interest, as follows, with the total of all votes equaling one hundred:

| | | |
|---|---|---|
| 2 Bedroom | | .911 |
| 3 Bedroom | | 1.062 |
| 2 Bedroom + Loft | 1.193 | |
| 4 Bedroom | | 1.301 |
| 3 Bedroom + Loft | 1.376 | |

The Board of Directors shall accept any vote if the owner is one of the owners of record of the unit, or in the case of a proxy, if there is no obvious defect on the face of such proxy. It shall be the burden of the protestor to offer satisfactory proof that the proffered vote or proxy is invalid and that his is the proper one.

12

3055300/000390

DRAFT

**Section 9. Majority of Unit Owners**: As used in these By-Laws, the term "majority of unit owners: shall mean those unit owners having more than 50% of the total authorized votes of all unit owners present in person or by proxy and voting at any meeting of the unit owners, determined in accordance with the provisions of Section B of this Article III.

**Section 10. Quorum**: Except as otherwise provided in these By-Laws, the presence in person or by proxy of unit owners having one-third (1/3) of the total authorized votes of all unit owners shall constitute a quorum at all meetings of the unit owners.

**Section 11. Majority Vote**: The vote of a majority of unit owners at a meeting at which a quorum shall be present shall be binding upon all unit owners for all purposes except where, in the Declaration or these By-Laws, or by law, a higher percentage vote is required.

### ARTICLE IV

#### Officers

**Section 1. Designation**: The principal officers of the Condominium shall be the President, the Vice President, the Secretary, and the Treasurer, all of whom shall be elected by the Board of Directors. The Board of Directors may appoint an assistant secretary, an assistant treasurer, and such other officers as in its judgment may be necessary. The President and Vice President, but no other officers, need be members of the Board of Directors.

**Section 2. Election of Officers**: The officers of the Condominium shall be elected annually by the Board of Directors at the Organization Meeting of each new Board of Directors and shall hold office at the pleasure of the Board of Directors.

**Section 3. Removal of Officers**: Upon the affirmative vote of a majority of the members of the Board of Directors, any officer may be removed, either with or without cause, and his successor may be elected by the Board of Directors at any regular or special meeting of the Board of Directors called for such purpose.

**Section 4. President**: The President shall be the chief executive officer of the Condominium. He shall preside at all meetings of the unit owners and of the Board of Directors. He shall have all of the general powers and duties which are incident to the office of president of a stock corporation organized under the Corporation Law of the Virgin Islands, including but not limited to the power to appoint committees from among the unit owners from time to time as he may in his discretion decide is appropriate to assist in the conduct of the affairs of the Condominium.

**Section 5. Vice President**: The Vice President shall take the place of the President and perform his duties whenever the President shall be absent or unable to act. If neither the President nor the Vice President is able to act, the Board of Directors shall appoint some other member of the Board of

13

DRAFT

Directors to act in the place of the President, on an interim basis. The Vice President shall also perform such other duties as shall from time to time be imposed upon him/her by the Board of Directors or by the President.

**Section 6. Secretary**: The Secretary shall keep the Minutes of all meetings of the unit owners and of the Board of Directors. He shall have charge of such books and papers as the Board of Directors may direct; and he shall, in general, perform all the duties incident to the office of secretary of a stock corporation organized under the Corporate Law of the Virgin Islands.

**Section 7. Treasurer**: The Treasurer shall have the responsibility for Condominium funds and securities and shall be responsible for keeping full and accurate financial records and books of account showing all receipts and disbursements, and for the preparation of all required financial data. The Treasurer shall be responsible for the deposit of all monies and other valuable effects in the name of the Board of Directors, or the managing agent, in such depositories as may from time to time be designated by the Board of Directors, and shall, in general, perform all the duties incident to the office of treasurer of a stock corporation organized under the Corporation Law of the Virgin Islands.

**Section 8. Agreements, Contracts, Deeds, Checks, etc.:** All agreements, contracts, deeds, leases and other instruments of the Condominium shall be executed by any two officers of the Condominium or by such other person or persons as may be designated by the Board of Directors, **in the resolution authorizing the execution of said document.**.

**Section 9. Compensation of Officers**: No officer shall receive any compensation from the Condominium for acting as such.

**ARTICLE V**

**Operation of the Property**

**Section 1. Determination of Common Expenses and Fixing of Common Charges:** The Board of Directors shall from time to time, and at least annually, prepare a budget for the condominium, determine the amount of the common charges payable by the unit owners to meet the common expenses of the Condominium, and allocate and assess such common charges among the unit owners according to their respective common interests. Common expenses shall include, among other things, operation and maintenance, insurance premiums, repairs and such amounts as the Board of Directors may deem proper for a general operating reserve, for a reserve fund for replacements, and to make up any deficit in the common expenses for any prior year.

14

3055300/000392

DRAFT

**Section 3. Repair or Reconstruction After Fire or Other Casualty:** In the event of damage to or destruction of the commonly owned buildings and elements as a result of fire or other casualty (unless 66-2/3% or more of the buildings are destroyed or substantially damaged and 75% or more of the unit owners determine in accordance with the Declaration not to proceed with the repair or restoration), the Board of Directors shall arrange for the prompt repair or restoration of the commonly owned buildings and elements, and the Board of Directors shall disburse the proceeds of all insurance policies to the contractors engaged in such repair or restoration in appropriate progress payments. Any cost of such repair or restoration in excess of the insurance proceeds shall constitute a common expense – and the Board of Directors may assess all the unit owners for such deficit as part of the common charges. The association shall only be responsible for inspecting unit interiors to determine if damage is structural or due to external causes, or if adjacent unit damage is caused by external causes, or unless that unit is owned by the association. Unless that unit is owned by the association, repair by the association of other unit damage will be limited to structural damage, that caused by external or adjacent unit causes, and will not include property or fixtures installed by the owner or previous owners.

Within ninety days after a casualty of an estimated repair cost of $100,000 or greater, the Board will provide to the owners a financial status report indicating projected repair costs, source(s) of necessary funds, expenditures and commitments to date, and a schedule and plan for completion. This report will be updated and issued to owners on a quarterly basis, thereafter, until repairs are complete. A current report shall be provided at the next Annual Meeting.

If 66-2/3% or more of the Building(s) are destroyed or substantially damaged and if within sixty days of the date of such destruction or damage, 75% or more of the unit owners determine not to proceed with repair and restoration, the Property shall be subject to an auction for partition at the suit of any unit owner or lien holder, as if owned in common, in which event the net proceeds of sale, together with the net proceeds of insurance policies (less any repairs conducted) shall be divided by the Board of Directors among all the unit owners in proportion to their respective common interests, after first paying out of the share of each unit owner the amount of any unpaid liens on his/her/their unit, in the order of priority of such liens.

**Section 4. Payment of Association Charges:** All unit owners shall be obligated to pay the common charges assessed by the Board of Directors pursuant to the provisions of Section 1 of this Article V at such time or times as the Board of Directors shall determine, as well as "other charges" for utilities, services, unit repairs, late fees, interest, fines and/or collection costs, if incurred. With respect to the following sections concerning payment, collection, default, foreclosure, etc., in Sections 4, 5, 6, 7, & 8 below, the term "association charges" is intended to include, but not be limited to, all the above items, both the "common" and "other" charges.

No unit owner shall be liable for the payment of any part of association charges assessed against his unit subsequent to a sale, transfer or other conveyance by him of such unit, together with the Appurtenant Interests, as defined in Section1 of Article VII hereof. In addition, a unit owner may, subject to acceptance by the Board of Directors provided that the unit is free and clear of liens and encumbrances other than mortgages and statutory liens for unpaid association charges, convey the unit, together with the "Appurtenant Interests" to the Board of Directors, or its designee, corporate or otherwise, on behalf of all other unit owners, and in such event be exempt from association charges thereafter assessed.

However, a purchaser of an unit shall be liable for the payment of association charges assessed against such unit prior to the acquisition of such a unit, without prejudice to such purchaser's right, if any, to recover from the seller the amounts paid by the purchaser, except that a first mortgagee or other purchase of a unit at a foreclosure sale of a first priority mortgage of such a unit shall not be liable

16

3055360/000393

DRAFT

for and such a unit shall not be subject to a lien for the payment of association charges which became due prior to the acquisition of title by such acquirer.

**Section 5. Collection of Association Charges:** The Board of Directors shall assess association charges against the unit owners from time to time and shall take prompt action to collect any charges due from any unit owner, which remain unpaid for more than thirty days from the date due for payment thereof. Such action may include placement of a lien on the apartment unit, notification to the mortgagee of the owner's failure to pay association charges and foreclosure on the lien. Additionally, suspension of utilities by a majority vote of the Executive Committee is permitted if an owner is more than 90 days in arrears of any Association charges. Payments received from unit owners will be applied to **the oldest arrearages first.**

**Section 6. Default in Payment of Association Charges:** In the event of default by any unit owner in paying to the association charges as determined by the Board of Directors, such unit owner shall be obligated to:

1. pay interest from the date of the initial billing at the maximum legal rate of interest, as defined by the Virgin Islands Laws, on all amounts past due,
2. pay a monthly service charge as determined and promulgated from time-to-time by the Board of Directors,
3. pay all expenses and attorneys' fees incurred by the Board of Directors in any proceeding brought to collect such unpaid association charges.

All such unpaid association charges shall constitute a lien on such unit prior to all other liens except those specified in Section 922 of Chapter 33, Title 2B, of the Virgin Islands Code. The Board of Directors shall have the right and duty to attempt to recover all association charges, together with interest and monthly service charges thereon, and the expenses of the proceeding, including attorneys' fees, in any action to recover the same brought against such unit owner, or by foreclosure of the lien on such unit granted by Section 922 of Chapter 33, Title 2B, Virgin Islands Code.

**Section 7. Foreclosure of Liens For Unpaid Association Charges:** In any action brought by the Board of Directors to foreclose a lien on a unit because of unpaid association charges, the unit owner shall be required to pay a reasonable rental for the use of the unit, and the plaintiff in such foreclosure action shall be entitled to the simultaneous appointment of a receiver to collect the same. The Board of Directors, acting on behalf of all unit owners, shall have power to purchase such unit at the foreclosure sale and to acquire, hold, lease, mortgage, vote the votes appurtenant to, convey or otherwise deal with the same. A suit to recover a money judgment for unpaid association charges shall be maintainable without foreclosing or waiving the lien securing the same.

**Section 8. Statement of Association Charges:** The Board of Directors shall promptly provide any unit owner so requesting the same in writing, with a written statement of all unpaid association charges due from such unit owner.

**Section 9. Abatement and Enjoinment of Violations by Unit Owners:** The violation of any rule or regulation adopted by the Board of Directors or the breach of any of these By-Laws contained herein, or the breach of any provisions of the Declaration, shall give the Board of Directors the right, in addition to any other rights set forth in these By-Laws (a) to enter the unit in which, or as to which, such violation or breach exists and to summarily abate or remove, at the expense of the defaulting unit owner, any structure, thing or condition that may exist therein contrary to the intent and meaning of the provisions

17

3055300/000394

DRAFT

hereof, and the Board of Directors shall not thereby be deemed guilty in any manner of trespass or (b) to enjoin, abate or remedy by appropriate legal proceedings, either at law or in equity, the continuance of any such breach.

**Section 10. Routine Maintenance and Repair:** All maintenance of and repairs to any "unit" (other than maintenance of and repairs to any common areas and facilities contained therein, and not necessitated by the negligence, misuse or neglect of the owner of such apartment unit) shall be the responsibility of the owner of such apartment unit. Also, each unit owner shall be responsible for damage to other apartment units and/or to the common areas and facilities resulting from conditions for which such owner has responsibility as indicated above.

A "unit" is considered the space inside the perimeter walls, interior walls, floor and ceiling to include:
- All decorating elements including: paint, wall and floor coverings, paneling, molding and tiles; finished cabinets and mirrors.
- All electrical appliances including: refrigerator, stove, washer, dryer, dishwasher, garbage disposal, hot water heater and air-conditioning equipment (including compressor).
- All electrical fixtures including: wall ceiling and floor outlets, switches and fuse box.
- All plumbing fixtures including: tubs, toilets, showers, sinks and faucets.

Additionally, the unit owner shall be responsible for the routine lubrication and adjustment of doors and windows, and, unless major casualty related, replacement of broken glass, wooden or glass slats and damaged screens. The unit owner shall also maintain and assure the operability of the storm shutters installed on that unit and is responsible to close them in the event of a windstorm. Damage caused by failure to do so is the responsibility of the owner if net insurance proceeds are insufficient to cover such damage.

Screen doors may be installed on the main street-side entry doors at the unit owner's expense provided they meet the existing décor. Once installed, they must be maintained by the unit owner in a good state of repair, or the Association will do so at the owner's expense.

Except for the limited exceptions noted above, all maintenance, repairs and replacements to the "common elements", common areas and facilities, whether located inside or outside of the units, (unless necessitated by the negligence, misuse or neglect of a unit owner, in which case such expense shall be charged to such unit owner), shall be made by the Association and be charged to all the unit owners as a common expense.

"Common elements" are considered to include all other elements of the buildings and property except those specified as being part of the "unit." Additionally, the following are considered common elements:
- Electrical supply to the fuse box.
- Water and plumbing lines in the walls (including interior walls), floor and ceiling to the valves at sinks, showers, tubs, hot water heater, and toilets, etc.
- Drains to the first connection outside a wall.

External air conditioning compressor units shall be maintained by the owner in a reasonable state of preservation. The Association may require owner to remove inoperable and/or un-maintained units or do so at the owner's expense

Below is a guide to assist in clarifying owner and Association responsibility with regard to maintenance/repair and insurance."

18

3055300/000395

DRAFT

**Insurance and Maintenance Responsibility Matrix**

| Category (Not intended to be all-inclusive) | Owner Maint/Repair Responsibility | Association Maint/Repair Responsibility | Association Insurance Responsibility | Owner Insurance Responsibility |
|---|---|---|---|---|
| Exterior Walls and Interior Damage Caused by Leaks | | X | X | |
| Roof and Interior Damage Caused by Roof Leaks | | X | X | |
| Interior Damage caused by Adjacent Units (Leaks, etc.) | X | | | Owner or Adjacent Unit's Insurance Responsible |
| Front Doors | X | | X | |
| Screens | X | | X | |
| Exterior Sliders | | X | X | |
| Exterior Wood Railings, Trim, Benches | | X | X | |
| Exterior Windows | X | | X | |
| Electrical System to Breaker Panel | | X | X | |
| Electrical System, Breaker Panel to Outlets, Junction Boxes | X | | X | |
| Electrical Fixtures-Interior | X | | | X |
| Plumbing Inside Walls, Floors Ceilings to valves | | X | X | |
| Condo plumbing not in walls/floors | X | | | X |
| Plumbing Fixtures | X | | | X |
| Interior Walls | X | | X | |
| Interior Doors | X | | | X |
| Cabinets | X | | | X |
| Furniture | X | | | X |
| Appliances | X | | | X |
| Wall/Floor Coverings (tile/carpet) | X | | | X |
| Hurricane Shutters | X | | X | |
| Furniture | X | | | X |
| Personal Property | X | | | X |
| External A/C elements | X | | | X |
| Internal A/C elements | X | | | X |
| Landside Porch/Steps/Railings | | X Excluding Tile | X Excluding Tile | |
| Seaside Balcony/Railings | | X Excluding Tile | X Excluding Tile | |

**Section 11. Restriction on Use of Units:** In order to provide for congenial occupancy of the Property and for the protection of the value of the units, the use of the Property shall be restricted to and shall be in accordance with the following provisions:

The units shall be used for residences only. Units will not be occupied by more than two persons per bedroom for more than thirty days per year.

19

3055300/000396

DRAFT

The common areas and facilities, including the limited common areas and facilities, shall be used only for the furnishing of the services and facilities for which they are reasonably suited and which are incident to the use and occupancy of the units

2. No nuisances shall be allowed on the Property nor shall any use or practice be allowed which is a source of annoyance to its residents or which interferes with the peaceful possession proper use of the Property by its residents.

3. No improper, offensive or unlawful use shall be made of the Property or any part thereof, and all valid laws, zoning laws and regulations of all governmental bodies having jurisdiction thereof shall be observed.

4. Violations of laws, orders, rules, regulations or requirements of any governmental agency having jurisdiction thereof, relating to any portion of the Property, shall be corrected, by and at the sole expense of the unit owners or the Board of Directors, whichever shall have the obligations to maintain or repair such portion of the Property.

5. No dogs are allowed on the property, either long term or visiting. The Board may grant exceptions to the NO DOGS ALLOWED rule, on an individual basis, should an owner require the assistance of a service animal (dog) as defined by the ADA. Owners seeking to obtain such an exemption are required to apply, in writing, to the Board with supporting documentation. Federal and ADA Compliance, as follows:

"On July 23, 2010, Attorney General Eric Holder signed final regulations revising the Department's ADA regulations, including a revised definition of "service animal." Effective March 15, 2011. "Service animal means any dog that is individually trained to do work or perform tasks for the benefit of an individual with a disability, including a physical, sensory, psychiatric, intellectual, or other mental disability. The work or tasks performed by a service animal must be directly related to the handler's disability.

Dogs used for emotional support, that are not task-trained, are called emotional support animals. They are not service dogs."

**Section 12. Additions, Alterations or Improvements by the Board of Directors:** Additions, alterations or improvements to the common areas and/or facilities up to $100,000 may be made by the Board of Directors. Additions, alterations or improvements in excess of $100,000 shall require approval by a vote of two-thirds (2/3) in common interest of the owners. The cost of such additions, alterations or improvements shall constitute a common charge. This section is not applicable to repairs conducted in accordance with Article V Section 3 of these By-Laws.

**Section 13. Additions, Alterations, or Improvements by Unit Owners:** No unit owner shall make any structural addition, alteration or improvement in or to the unit, including any exterior painting or exterior alteration or addition (including awnings, grills, etc.) without the prior written consent thereto of the Board of Directors. The Board of Directors shall have the obligation to answer any written request by a unit owner for approval of a proposed structural addition, alteration or improvement in such unit owner's unit, within thirty (30) days after such request, and failure to do so within the stipulated time shall constitute a consent by the Board of Directors to the proposed addition, alteration or improvement.

A unit owner shall obtain a receipt from any person accepting his written request for a change under this section and shall show the receipt to the manager or any Director upon request. Any application to any department of the Government of the Virgin Islands or to any other governmental authority for a permit to make an addition, alteration or improvement in or to any unit shall be executed by the Board of Directors only, without, however, incurring liability on the part of the Board of Directors or any of

20

3055300/000397

DRAFT

them to any contractor, sub-contractor or supplier on account of such additions, alteration or improvement, or to any person having any claim for injury to person or damage to property arising therefrom. The owner in such instance shall provide the Board of Directors with a Hold Harmless Certificate.

**Section 14. Use of Common Areas and Facilities**: A unit owner shall not place or cause to be placed in the stairways or other common areas and facilities, including the limited common areas and facilities, other than the areas designated as storage areas, any furniture, packages or objects of any kind. The entry passages, stairways, entry bridges, etc., shall be used for no purpose other than for normal transit through them.

**Section 15. Right of Access**: A unit owner shall grant a right of access to the unit to the manager and/or the managing agent and/or any other person authorized by the Board of Directors, the manager or the managing agent, for the purpose of making inspections or for the purpose of correcting any condition originating in his apartment unit and threatening another unit or a common area or facility, or for the purpose of performing installations, alterations or repairs to the mechanical or electrical services or other common areas or facilities in the unit or elsewhere in the Building, provided that requests for entry are made in advance and that any such entry is at a time reasonably convenient to the unit owner. In case of an emergency, such right of entry shall be immediate, whether or not the unit owner is present at the time.

**Section 16. Rules of Conduct**: Article V Section II of these By-Laws delineates general restrictions on the use of the property. Additionally, a definitive listing of current Rules and Regulations is provided as Exhibit I hereto. These Rules and Regulations may be amended by the Board of Directors from time to time. The Board is empowered to enforce these By-Laws and Rules and Regulations with monetary fines and other sanctions and may also take any legal action in court to enforce them. An owner is subject to such fines, sanctions and/or legal actions for the actions of tenants if those actions were by the owner.

Copies of the Rules and Regulations shall be furnished by the Board of Directors to each unit owner prior to the time when the same shall become effective. The unit owner must insure that the tenant or occupant be fully informed and furnished with a copy of the Rules and Regulations and by fully bound thereby.

**Section 17. Potable Water and Electricity:** **The Association shall supply potable** water and electricity Association through the common facilities of the Condominium directly to each unit through a separate meter, and each unit owner shall be required to pay the charges therefore established, from time to time, by the Board of Directors. Water, electricity and other utility charges will normally be billed monthly incident to the common charges and are considered to be part of the "association" charges. Utility charges more than thirty days in arrears are subject to a late fee and interest per Section 6 Article V of these By-Laws, and said utilities may be suspended by the Association if an owner is more than 90 days in arrears of Association charges per Article V Section 5 thereof.

**Section 18. Gas:** Gas shall not be piped to any apartment unit, and unit owners are specifically prohibited from using gas as a fuel for regular cooking, water heating, or any other regular purpose. Small quantities of propane gas may be used for gas grills kept on street-side galleries and for emergency use inside apartment units.

21

3055300/000398

DRAFT

**Section 19. Grey Water and Sewerage Service:** Grey water for flushing and sewerage service (including sewage disposal and treatment in the condominium's sewerage treatment plant) shall be supplied as a common facility to all unit owners, and the cost thereof shall be treated as a common expense.


## ARTICLE VI

### Mortgages


**Section 1. Notice of Unpaid Common Charges:** The Board of Directors, whenever so requested in writing by a mortgages of a unit, shall promptly report any then unpaid association charges due from, or any other default by the owner of the mortgaged apartment unit.

**Section 2. Notice of Default:** The Board of Directors, when giving notice to a unit owner of a default in paying common charges or other default, may send a copy of such notice to each holder of a mortgage covering such unit.


## ARTICLE VII

### Sales and Mortgages of Units


**Section 1. No severance of Ownership:** No unit owner shall execute any deed, mortgage or other instrument conveying or mortgaging title to the unit without including therein the Appurtenant Interests, it being the intention hereof to prevent any severance of such combined ownership. For the purpose of the By-Laws, the "Appurtenant Interests" shall mean collectively, (i) the unit owner's undivided interest in the common areas and facilities appurtenant to such unit; (ii) the interest of such unit owner in any units theretofore acquired by the Board of Directors, or its designee, on behalf of all unit owners, or the proceeds of the sale or lease thereof, if any; and (iii) the interest of such unit owner in any other assets of the Condominium.

Any such deed, mortgage or other instrument purporting to affect one or more of such interests, without including the interest or interests so omitted, shall be deemed to include such interests even though the latter shall not be expressly mentioned or described therein. No part of the Appurtenant Interests of any apartment unit may be sold, transferred or otherwise disposed of, except as part of a sale, transfer or other disposition of the unit to which such interests are appurtenant, or as part of a sale, transfer or other disposition of such part of the Appurtenant Interests of all apartment units.

22

3055300/000399

DRAFT

**Section 2. Sale to Board of Directors:** A unit owner may, subject to mutual agreement of the parties, and subject to the provisions of Section 1 of this Article VII, sell his unit to the Board of Directors, or its designee; provided, however that such purchase by the Board of Directors shall have the prior approval of two-thirds (2/3) of the unit owners, as expressed by the vote of at least two third (2/3) in number and in common interest, of all unit owners, cast in person or by proxy in accordance with these By-Laws.

**Section 3. Financing of Purchase of Apartment Units By Board of Directors:** Acquisition of units by the Board of Directors, or its designee, on behalf of all unit owners, may be made from the working capital and common charges in the hands of the Board of Directors, or if such funds are insufficient the Board of Directors may levy an assessment against each unit owner in proportion to his ownership in the common areas and facilities as a common charge, which assessment shall be enforceable in the same manner as provided in Section 6 and 7 of Article V, or the Board of Directors, in its discretion, may borrow money to finance the acquisition of such units, provided, however, that no financing may be secured by an encumbrance or hypothecation of any property other than the unit, together with the Appurtenant Interests, so to be acquired by the Board of Directors.

**Section 4. Gifts and Devises, etc:** Any unit owner shall be free to convey or transfer the unit by gift, or to devise the unit by will, or to pass the same by intestacy, without restriction.

**Section 5. Waiver of Right of Partition with Respect to Such Units as are Acquired by the Board of Directors, or its Designee, on Behalf of All Unit Owners as Tenants in Common:** In the event that a unit shall be acquired by the Board of Directors, or its designee, on behalf of all unit owners as tenants in common, all such unit owners shall be deemed to have waived all rights of partition with respect to such unit.

## ARTICLE VIII

**Section 1. Condemnation – Eminent Domain:** In the event of a taking by condemnation or by eminent domain of part or all of the common areas and facilities, the award made for such taking shall be payable to the Board of Directors for disbursement among all unit owners in proportion to their respective common interests after first paying out all common area and facility expenses pertaining to said taking.

## ARTICLE IX

## Records

23

3055300/000400

DRAFT

**Section 1. Records and Audits:** The Board of Directors or the managing agent shall keep detailed records of the actions of the Board of Directors and the managing agent, Minutes of the meetings of the Board of Directors, Minutes of the meetings of unit owners, and financial records and books of account of the Condominium, including a chronological listing of receipts and expenditures, as well as a separate account for each unit which, among other things, shall contain the amount of each assessment of common charges against such unit, the date when due, the amounts paid thereon, and the balance remaining unpaid.

Each unit owner shall be permitted to examine all accounts, records and contracts of the Association in the Condominium office at reasonable times, on business days, but not more often than once a month. All others must request any required information from the Board of Directors.

An annual report of the receipts and expenditures of the Association, examined and approved by a licensed accountant not affiliated with the Association and chosen by the Board of Directors, shall be rendered to the Board and sent, within a reasonable time after the end of each fiscal year, to all unit owners who request it.

**ARTICLE X**

**Miscellaneous**

**Section 1. Notices:** All notices hereunder shall be sent by registered or certified mail to the Board of Directors c/o the managing agent, or if there is no managing agent, to the office of the Board of Directors or to such other address as the Board of Directors may hereafter designate from time to time, by notice in writing to all unit owners and to all mortgagees of units.

All notices to any unit owner shall be sent by registered or certified mail to the Building or to such other address as may have been designated by him from time to time, in writing, to the Board of Directors. All notices to mortgagees of units shall be sent by registered or certified mail to their respective addresses, as designated by them from time to time, in writing to the Board of Directors. All notices shall be deemed to have been given when mailed, except notices of change of address, which shall be deemed to have been given when received.

Notwithstanding the requirements of this section, all notices of regular, special and Annual Meetings of the unit owners, Board of Directors, and committees of the Board or otherwise, shall be by first class mail but without the requirement of registration or certification. The applicable notice shall be sent so as to comply with the required time limits, if any, to the regular mailing address of the designated party as recorded in the books of the Association.

**Section 2. Invalidity:** The invalidity of any part of these By-Laws shall not impair or affect in any manner the validity, enforceability or effect of the balance of these By-Laws.

**Section 3. Captions:** The captions herein are inserted only as a matter of convenience and for reference, and in no way define, limit or described the scope of these By-Laws, or the intent of any provision thereof.

**Section 4. Gender:** The use of the gender in these By-Laws shall be deemed to include the **masculine, feminine or non- gender of the unit owner** and the use of the singular shall be deemed to include the plural, whenever the context so requires.

24

3055300/000401

DRAFT

**Section S. Waiver:** No restrictions, condition, obligation or provisions contained in these By-Laws shall be deemed to have been abrogated or waived by reason of any failure to enforce same, irrespective of the number of violations or breaches thereof which may occur.

**Section 6. Insurance Trustee:** The Board of Directors may appoint a Trustee to distribute large amounts of any insurance proceeds. The trustee so appointed may be any individual or entity, so long as such is properly bonded in relation to the funds and responsibility involved.

## ARTICLE XI

### Amendments to By-Laws

**Section 1. Amendments to By-Laws:** Except as hereinafter provided, these By-Laws may be modified or amended by the vote of 66-2/3% in number and in common interest of all unit owners.

## ARTICLE XII

### Execution of Instruments and Seal

**Section 1. Execution and Instruments:** All instruments of the Condominium shall be executed under seal by such officer or officers as the Board of Directors may designate, or as may be otherwise authorized.

**Section 2. Seal:** The seal of the Condominium shall be as determined by the Board of Directors from time to time.

## ARTICLE XIII

### Conflicts

**Section 1. Conflicts:** These By-Laws are set forth to comply with the provisions of Sections 917 and 918 of Chapter 33, Title 28, Virgin Islands Code. In case any of these By-Laws conflict with the provisions of said statute or of the Declaration, the provisions of said statute or of the Declaration, as the case may be, shall control.

25

3055300/000402

DRAFT

## EXHIBIT I

Rules and Regulations
for
Cowpet Bay West
2012

1.  No articles shall be placed on any of the stairways, railings, or entry bridges.

2.  Balconies and street-side porches shall be kept neat and clean, and no articles shall be swept or thrown from them. No laundry, laundry lines, or other unsightly articles shall be placed on the balconies, porches or other common areas and facilities.

3.  Radio or television antennas are prohibited and no sign, notice, advertisement or illumination shall be displayed on or at any window or other part of the building.

4.  No owner shall make or permit any disturbing noises in his unit or within the common areas and facilities, or do anything, or permit anything to be done wherein which will interfere with the rights and reasonable comfort and convenience of other owners.

5.  No inflammable, combustible or explosive fluid, material, chemical or substance is permitted in any unit, except for normal household use.

6.  Dogs and farm animals are prohibited, and owners will be fined as specified by the Board of Directors. The Association may require removal of any animal when it becomes bothersome to others or is deemed by the Association to be unacceptable.

7.  No garbage or trash will be left or disposed of on or adjacent to the property – except in a dumpster, if such is provided by the Association.

8.  One space per unit is provided for parking automobiles on the property. Additional vehicles may be allowed by Management based on space availability. Any vehicle not currently registered and licensed will be considered a derelict and will be towed.

9.  No boat, trailer, heavy commercial or non-self-propelled vehicle shall be parked on the property. No vehicle shall be parked in any manner restricting passage of any emergency vehicles, such as ambulances, fire trucks, etc. No vehicle shall be parked so as to impede ready movement by another vehicle, nor shall it be parked in any space assigned to another unit without permission of the said unit owner. Any vehicle in violation of these rules may be towed at the vehicle owner's expense.

10. Beach users shall clean up and remove any trash or other articles on the beach for which they are responsible.

11. The use of barbecues on seaside galleries is prohibited.

26

3055300/000403

Joint Appendix Vol. II Page 1173

DRAFT

12. The number of persons occupying a unit on a routine basis is limited to two per bedroom. Additional "guests" are permitted not to exceed thirty days total per year.

3055300/000404

Joint Appendix Vol. II Page 1174

DRAFT

**Attachment #2**

**Owners' Common Interest**

**30 April 1998**

**Unit Type**
      **%Common Interest**

2 Bedroom
      .911

                        **Leeward**
                        #1,2,3,4,5,7,8,9,10,11,12
                        13,14,15,17,18,23,24,25
                        26,27,28,29,31,32,33,34,
                        35,36,37,39,40,41

                        **Windward**
                        #3,4,5,6,7,9,10,11,12,13
                        14,15,16,17,19,20,21,22
                        25,26,27,28,29,30,31,33
                        34,35,37,38,39,40,41,47,49

3 Bedroom                                                **1.062**

                        **Leeward**
                        #6,16,19,20,21,22,30,38,42
                        ,43,44,49

                        **Windward**
                        #1,2,8,18,23,24,32,36,42,4
                        3,44,45,51

2 Bedrooms plus Loft                          **1.193**
              **Leeward: # 46,48**

                                  **Windward: #**
48,50

28

3055300/000405

DRAFT

3 Bedrooms plus Loft                                             **1.376**
                        **Leeward: #** 50

                                                          **Windward: #**
46,52

4 Bedroom                                                       **1.301**
                        **Leeward: #** 45,47

29

3055300/000406

Cowpet Bay West
Board of Directors Meeting
February 7, 2011

Present:  Judi Kromenhoek, Ed Wardwell, Rosie Wells, Bob Cockayne, Barbara
Walters, Greg Miller, Jon Cassady, Louanne Schechter
Max Harcourt is currently hospitalized following emergency surgery.

Minutes of January 11, 2011:  The minutes of the January Board of Directors
meeting were unanimously approved.

W-27:  Jon reported the seaside sliding doors to this unit are being pinched from
spalling rebar.  The Association will repair the doors.  The Association will not be
responsible for replacing tile.  Tile is the responsibility of the owner.

Treasurer Report:  Total cash accounts have a balance of $549,400.18.  The
Reserve Account total is $501,944.61 with the remainder in the Operating accounts.
Louanne reported that the 2nd payment for the insurance was paid from the
operating account.  There are not sufficient funds in the operating account to make
the third and final payment of $60,783.33  The Directors made a resolution
RESOLVED, that an authorization of transfer of designated funds - Future Repairs and
Replacement fund to undesignated funds –Operating fund was made.  The funds will be
repaid from the operating fund with a 1% interest rate over the next 10 months (March-
December 2011.

Proposed 2011 Budget:  The Directors unanimously approved of the proposed
budget.

3055300/000407

Manager Report

**Systems:** Filter changes for systems occurred as scheduled on the first Tuesday of the month.

**Security Lights Parking Lot:** All but 2 posts have been adjusted to the correct height. The remaining 2 require new poles/pad. These should be completed during the week, weather permitting.

**Street side porch lights:** The lights purchased have been installed. The dusk to dawn sensor requires some adjustment. Flickering off and on is a sign the adjustment isn't correct.

**Security Guard:** The guards have been punctual and professional and no complaints have been registered.

**Beach:** The appropriate permits were obtained and approximately 140 ton of sand was spread across the beach from West to East over the course of 1 day.

Old Business

**Voting Procedure:** The Directors agreed that the voting should be kept confidential. Current Board members may check the ballots and votes; however,

3055300/000408

any Director disclosing any owners' vote will be removed from the Board. All Directors were in agreement.

**Procedure for Bylaw changes:** Proposals will be brought before the members at the annual meeting.

**Meet & Greet:** The Meet & Greet is scheduled for Roberts American Grill, Thursday, February 10th, 2011, from 5p-7p. Rosie invited the candidates. Rosie and Judi will obtain sodas, beer, and paper goods. The Directors were asked to get there early to help set-up and clean-up.

**Insurance:** Our agent has a conflict and can not attend the meeting. Bob has compiled a list of questions for the agent, Colin Probyn. Judi said Colin will have the answers before the Annual Meeting.

**March BOD:** No date was set.

**Adjournment:** There being no further business, the meeting was adjourned.

## ACTION ITEMS

| | |
|---|---|
| Report to BOD method used to repair W-27 | Jon |
| Completion of new poles for Security Lights | Jon |
| Beer/Wine/Paper Products for Meet N Greet | Judi/Rosie |
| Handouts for Annual Owners Meeting | Louanne |
| Follow-up with Insurance Agent | Judi |

3055300/000409

DRAFT

## Cowpet Bay West
### Annual Owners Meeting
### February 12, 2011

**Call to Order:** The Annual Owners Meeting was called to order by President Judi Kromenhoek at 9:10 a.m. at Robert's American Grill. Board members present were Judi Kromenhoek, Bob Cockayne, Barbara Walters, Rosie Wells, Greg Miller, and Max Harcourt. Owners were directed to sign in upon arrival (Exhibit 1, sign in sheets for owner attendance).

**Quorum Verification:** Louanne Schechter tallied the attendance Record and verified that a quorum (1/3 of authorized votes) was present by proxy and attendance.

**President Report:**
❖ Judi welcomed all owners and thanked them for attending today's meeting.
❖ Judi acknowledged and commended the Board of Directors for volunteering their time and talents throughout the year.
❖ Judi acknowledged and credited the management staff, Jon & Louanne, for their professionalism and assistance throughout the year. Each staff member was thanked for their work and loyalty to the owners of Cowpet Bay West.
❖ New owners, L-33 Duzy & L-07 Birt families, were asked to stand and welcomed to the community.
❖ Judi introduced the candidates running for the Board of Directors.
❖ Judi listed the projects & accomplishments throughout the year:
   ▪ **Restoration following Fire to W-23:** The restoration process took 9 months to get settled and paid. During this period the Board of Directors became aware of inconsistencies in the Bylaws that caused confusion between the Insurance agencies, owners, and the Association. (Insurance to be discussed)
   ▪ **Seaside Rails:** All damaged seaside rails were removed and replaced. Rails were repainted.

1

3055300/000410

Joint Appendix Vol. II Page 1180

DRAFT

- **Generator:** The 20 year old generator is in good shape, the circuit board needed to be replaced. This was not easy but Jon located a new board and had Kent Harvey install it. Since the company that manufacturers this is no longer in existence, Kent Harvey rebuilt the components in the old board for a back-up.
- **Fresh Water Booster:** Responding to complaints of low water pressure to Leeward units, a water booster pump was installed and corrected the problem
- Gravel Walkways: Walkways on Leeward and Windward were improved by adding crushed gravel.
- **Transformers:** As part of a 3 year plan, all but one transformer was replaced. The remaining transformer will be replaced this year completing a total upgrade to the High Voltage Electrical system.
- **Security Gate:** The conduit that supplied power to the gate, under the road was compromised causing power outages whenever it rained. The conduit was removed and replaced, the road repaired, and the gate is operating without incidence.
- **Transfer Station Building:** Jon noted the concrete roof over the transfer station was cracking and compromised. The roof was removed and replaced without incident.
- **Beach:** Hurricane Earl was responsible for loss of sand on the beach. After obtaining appropriate permits, the Elysian, Cowpet Bay East, and Cowpet Bay West split the cost and provided the workforce to spread 140 tons of sand back onto the beach. New Swim Buoys are in place, and as of today 24 more beach chairs have been added to the beach.
- **Security Streetlights:** Before hurricane Earl, our security streetlights were replaced with new energy efficient fixtures designed to throw a maximum amount of light down to the parking lot. During Earl, Cowpet Bay East lost most of their parking lot light globes while our lights were left intact.
- **Fresh Water Filtration System:** Upon inspection, the existing filtration system required upgrading. The new system was installed.
- **Security Guards:** During the last year, our Association hired different companies with the same results, guards coming late, leaving early, or sleeping on the job. The

2

3055300/000411

DRAFT

current company, No-Nonsense Security, has been with us approximately 5 months and is professional, personable, and friendly.

Reading of the 2010 Annual Owners Meeting Minutes: Motion was made and seconded to waive the reading of the 2010 minutes. Copies of the minutes were available for members upon request.

Proof of Notice of Meeting: Documentation of notice was presented by the Association Office Manager, Louanne Schechter. (Newsletters: November 2010, December 2010, January 2011, February 2011.)

Property Manager Report:

Electrical Upgrade: Jon reported when he was hired, the complex did not have an ongoing maintenance plan for infrastructure. In 2008 he developed a long term plan to upgrade and maintain the Electrical System. In 2009 Jon brought an electrical engineer to the property to inspect the entire system. The engineer, Kent Harvey, then developed a CADD (computer aided design and draft) program outlining the entire system with all the technical data. Where needed and available, crucial back-up parts were ordered and kept in stock. In 2010, The 3 phase transformer on Windward which runs the beach well, lift station, and fresh water distribution system was replaced. All transformers were balanced for even power distribution. Going forward in 2011, the 3 phase transformer removed from Windward was sent back to the states to be reconditioned. When available, projected in the summer, the reconditioned transformer will replace the last "original" transformer located at the Windward circle which runs the RO Plant, the WWTP, and controls the high voltage systems. Jon proposes in 2012 to replace the disconnect breakers on each building.

Territorial Pollutant Discharge Elimination System Permit: During 2010 this permit was up for renewal. The process included inspections of the Waste Water Treatment Plant, Reverse

3

Joint Appendix Vol. II Page 1182

DRAFT

Osmosis Plant, Grey Water Processing, and Fresh Water Distribution as well as General Maintenance. Along with inspections there were endless forms and reports. Cowpet Bay West was approved for the next 5 years and there were no deficiencies found by DPNR.

Generator: During Hurricane Earl, a WAPA power pole and transformer split and landed near the generator. This power to ground surge, we believe, fried the circuit board that controls the automatic functions of the generator. Jon had to manually start the generator and shut it down until a new mother board could be located. The companies that manufactured the generator and the switch gear both had gone out of business. With the help of Kent Harvey, we were able to locate the last known circuit board. When Mr. Harvey installed the new board, he kept and has since rebuilt the original board so we would have a back-up. We have set a 45 minute time delay on the generator to prevent the power surges during false start-ups (the on-off-on- off when power is restored). The generator will power down when electrical power is restored for 45 consecutive minutes.

Masonry: Jon performed a thorough inspection under the buildings and the grey water cisterns. Monies spent this year under the account masonry were used to repair the undersides of some of the buildings that had so much spalling they required immediate attention. Under this year's budget he will continue to repair these areas which include leaking cisterns.

Sewage & Grey Water: Included in 2011 Budget is the project to replace the fractured grey water lines. Jon is looking for a new contractor to do this project. The remainder of the monies are to purchase motors and blowers for the grey water system, which are still running on the originals.

Air Pollution Permit: Jon reported the air pollution permit which regulates the usage of the generator is up for renewal this year.

**Treasurer Report**

4

3055300/000413

DRAFT

**2010 Expenditures vs. Budget and 2011 Budget:**
Copies of the 2010 budget and the 2011-projected budget were available for owners. Barb reported that the cost of increasing the insurance in 2010 to 2 million and the pre-pay for the insurance in December for 2011 were the major factors in the deficit for 2010. Other contributing factors were costs that were unforeseen and not in the budget such as replacement of a leaking transformer and high voltage power lines.

Barbara made a motion the 2011 budget be accepted as presented, the motion was seconded, all were in favor.

**Cash Equivalents & Member Equity:** Barbara reported cash equivalents and member equity and a handout was provided to owners.

**Insurance Summary:** Judi reported on the current insurance policies. A summary sheet was provided for all owners.

**Roll Call:** Owners were asked to identify themselves as their names were called. Owners that were holding proxies were asked to identify themselves as proxy holders. There were owners of 43 units and owners holding 39 proxies for a 73.2% of authorized votes.

**Old Business**
There was no old business brought before the Board.

**New Business**

**Bylaws review and update:** Judi reported the only by-laws found on file in the Virgin Islands are the ones from 1974. She stated our Bylaws need to be updated. The tragic fire enlightened us on what is and what is not covered by our master insurance policy. A lot of owner thought they were covered when they were not. Anna Paiewonsky (attorney L-04) stated that she believes

5

3055300/000414

DRAFT

the 1998 Bylaws superseded 1974 declarations, and that they were properly filed. Accordingly, subsequent Bylaws should be in effect. Attorney Chuck Waggoner (L-46) has agreed to help us write the bylaws to meet the owner needs. There has been a lot of confusion on the wording on the insurance coverage of owner units vs. CBW Association responsibility. Chuck has written bylaws for several condo complexes. He is very familiar with bylaws and how they should read. The original bylaws were written to protect the lender (Chase Bank) at the time. We need to have them read to protect the owners and our insurance needs. Anna Paiewonsky volunteered to work with Chuck Waggoner on this endeavor.

Max Harcourt made a motion that the Board of Directors continue to operate under the 2007 Bylaws. The motion was seconded by the floor and all were in favor.

Following discussion from the floor, a suggestion was made to start a committee that addresses our current Insurance coverage, what is required by our bylaws, and what is requested by our owners. The committee would send recommendations to the Directors within 30 days of their formation.

**Proposal to Amend Bylaws to include No Dogs on Property:** Bob Cockayne would like to amend Article V, Section 11, found on page 13 (of the 2007 Bylaws), by adding new section 6: "Dogs and farm animals are prohibited, and owners will be fined as specified by the Board of Directors. The Association may require removal of any animal when it becomes bothersome to others or is deemed by the Association to be unacceptable."
Amend Exhibit I, Rules and Regulations for Cowpet Bay West by deleting section number 6, found on page 18.

**Petition for dogs to be allowed:** Joel Kirshenbaum asked what happened to the petition begun last year to allow specific size dogs on the property. Judi reported the matter was discussed in the April 2010 Board of Directors Meeting and tabled to be discussed at the 2011 Annual meeting.

6

3055300/000415

DRAFT

**Election of Board Members:** The nominating committee reported the two candidates with the most votes were Bill Canfield and Sharon Koehler.

**Adjournment:** There being no further business, the meeting was adjourned.

3055300/000416

Cowpet Bay West
Board of Directors Meeting
March 8, 2011

**Present:** Max Harcourt, Barbara Walters, Rosie Wells, Bob Cockayne, Greg Miller, Sharon Koehler, Bill Canfield, Jon Cassady, Louanne Schechter

**Meeting Ground Rules:** Max requested Directors and guests conduct all business before the Board in a civil, professional manner treating each other with courtesy and respect.

**L-01:** Herb Horwitz came before the Board of Directors to discuss his reasoning for non-payment to the electrician. The Directors stand by their former decision that the responsibility of payment is with the owner. Max made a motion the Association pay $600 of the bill as a Good Will Adjustment. The owner will be responsible for the balance and late charges.

**W-27:** Dr. Felice asked for minutes of the Organizational Meetings. Max stated the results of the first and second organizational meetings did not meet the Bylaw Requirement of vote by majority, votes were secret ballot, and no minutes were kept. The third meeting lead to a majority vote and minutes are available.

Dr. Felice was told last month that his seaside sliders would be repaired within a week. Jon contacted Karl yesterday, when he was informed the doors were still not fixed. Karl said he would be out on Wednesday. Dr. Felice has a scheduling conflict and will reschedule with Karl. Dr. Felice asked in the event the tile on the deck was broken who would replace it? Directors agreed the tile on the porch is the responsibility of the owner. The Association is responsible for the structural repairs.

Dr. Felice wanted to know the exact difference of votes between the 2nd and 3rd place candidates. Louanne believed there was a margin of 5 votes the results are in the safe.

1

3055300/000417

Minutes of February 7, 2011:  The minutes of the February Board of Directors meeting were unanimously approved.

Treasurer Report:  Sharon reported there was approximately $565,000 in cash accounts.

Greg requested the Directors have a Profit and Loss statement available each month.

Sharon stated she will provide a quarterly report for the Directors next month.

Sharon stated she doesn't have access to the bank accounts.  Max assigned Directors to assist Sharon to be added as signatory to the accounts.

There are 2 units in arrears more than 90 days.  Both have liens on the property.  The Directors suggested Sharon set-up a payment plan.  Owners will be informed that in the event scheduled payments are not made, utilities will be discontinued.

An offer was made by the broker for L-41 for the Association to accept less than what is owed.  Max made a motion to accept the offer, the motion was 2nd the vote was 3-3.  The motion did not pass. Bob suggested the broker put all future offers in writing.

Resolution:  template to be provided by Jeanne Brennan, sample:  *The Board of Directors presented to the owners the 2010 actuals and 2011 budget.  The owners accepted the budget and therefore the Directors resolve to move $114,000 from the Reserve to the Operating Account.*

Review of Action Items from Owners Meeting:

Property adjacent to L-01:  Owner wanted to know if the property is zoned for boat repair.  Bill stated the property is zoned R-1.  It's his understanding that boats are stored there and owners may from time-to-time work on them.  Max made a motion that a Board member call CZM and DPNR

2

3055300/000418

and inquire if boat storage/repair is appropriate for R-1 land. The motion was 2nd all were in favor Greg will call the agencies.

Automatic Voltage Regulator: An owner inquired if an AVR could be installed on the generator. Jo will contact Kent Harvey and report his findings.

Extended Warranty for Reconditioned Transformer: Jon will ask the company when the transform is repaired.

Extend hours of generator usage? Jon and Anna will request extended usage when the air pollution permit is renewed this year.

Electronic Bulletin Board on Website: Max will investigate the options for an electronic bulletin board.

Manager Report

Systems: Filter changes were completed this month as scheduled. The Generator is performing without incident. The WWTP is within normal parameters. New blowers and motors were ordered and will take about 6 weeks before they arrive.

Security Lights: Maintenance has completed all but 2 of the security parking light adjustments. Th remaining two are on Leeward and require new concrete bases and poles. The materials are on sit and maintenance is working on them.

Ritz-Carlton Meeting: Jon attended the meeting posted by the Ritz-Carlton. They are in the preliminary stages of trying to obtain a Title 5 electrical system which would allow them to be self-sustaining and off WAPA's grid. Jon reported they offered no schematics, or basic information othe than they would install a zero noise, zero emissions system.

3

Joint Appendix Vol. II Page 1189

**Owner Issue Flow Sheet:** Jon shared with the Directors a flow sheet for owner complaints that Louanne developed as a tool to record, track and report back to owners. The March Newsletter contained an article requesting owners to put all complaints in writing with details. Sharon suggeste the Association have a written policy for owners to follow when reporting a problem and the Association to follow once it's reported. She will present a policy next month. Greg suggested that the Association keep repair/maintenance logs for each system as well.

**Security Gate:** Jon reported the most recent issue with the gate is the circuit board for the exit pedestal is non-functional. Although a new circuit board can be ordered (actual cost 2009 was $3750) this gate was not designed to handle the amount of daily traffic. Jon suggested the gate be left open during normal business hours and an exit button, that bypasses the circuitry of the swipe cards) be used in the evening. Following discussion, Max made a motion an exit button be installe on the exit pedestal. Barbara 2nd, the motion passed 6 to 1.

**Vandalism:** Jon was called Saturday February 26th at 10:30pm by an owner that reported a broken security pole/light. The owner witnessed the event. Jon investigated. They were tenants and agreed to pay damages. The owner of the unit was notified and a follow up letter will be sent to th owner with an explanation of charges.

**Police Report:** A police report was made by an owner at Elysian when she witnessed a man lying in the bushes by the pool and firing a gun at the rooster as she was walking by him with a small child. She identified the man as an owner at CBW. Police came to the property to follow up on the complaint. The owner denied any fowl play.

New Business

**Office Computer:** The computer has no memory left and is more than 6 years old. The computer on order has an extended warranty of 3 years on site and cost $864. (plus shipping).

4

3055300/000420

**Committees**

Bylaw:  Rosie Wells is Chairperson, Chuck Waggoner, Barbara Walters, Judi Kromenhoek, and Anna Paiewonsky are on this committee.  Chuck will initially submit changes to the committee.  Onc the committee agrees, they will forward to the Directors.

Landscape & Maintenance:  Bill Canfield is chairperson; Jon has volunteered to be on the committee.  Bill and Jon will schedule a walk of the property and invite whoever is interested to join them.
Judi Kromenhoek walked the property and submitted her recommendations for the landscape committee.

Insurance:  Bob Cockayne is chairperson. Max Harcourt, Herb Horwitz, Doug Rebak, and Jon met to organize the committee.  Bob has minutes for anyone interested.

Long-term Capital Planning:  Max Harcourt is chairperson.  Lance Talkington has volunteered to be on the committee, no meeting has been planned.

Social:  Rosie is chairperson, no meeting has been planned.

Nominating:  Bob Cockayne is chairperson, Holly McGuire, Joel Kirshenbaum, and Marilyn Blackhall volunteered for this committee.  Bob made a motion the Board approve the members, Max 2nd, all were in favor.

Max suggested all committees keep minutes and forward them to the Directors.  Sharon requested Directors be notified of meeting dates and times.

**Other Business**

5

3055300/000421

**Hen & chicks:** Bob stated that farm animals were not allowed on property and although the rooster is gone, the hen and chicks remain. Max made a motion the Association hire someone to catch the hen and chicks without harming them and have them removed from the property, the motion was 2ⁿᵈ all were in favor

**AED:** The battery is dead on the AED. Jon said he has batteries on order.

**April Meeting:** The next meeting of the Board of Directors is scheduled for April 5th, at 8:45am.

**Adjournment:** There being no further business the meeting was adjourned at noon.

## ACTION ITEMS

| | |
|---|---|
| Letter to Herb Horwitz: Good Will Adjustment: | Max |
| W-27 Sliding Doors | Jon |
| First Bank Forms for Sharon | Greg |
| Fidelity Forms (if needed) | Judi |
| Banco Forms | Louanne |
| Resolution | Jeanne/Louann |
| Payment Plan | Sharon |
| Speak with Broker L-41 | Louanne/Rosie |
| Speak with Gita Rose Zoning | Sharon |
| Speak with DPNR/CZM boat repair next door | Greg |
| Recommendations from Kent Harvey AVM for Generator | Jon |
| Extended warranty for transformer | Jon |
| Extended hours for running generator | Jon/Anna |
| Electronic Bulletin Board | Max |
| Security Poles Leeward | Jon |

3055300/000422

Joint Appendix Vol. II Page 1192

| Policy for complaints | Sharon |
| Letter to Owners Vandalism/impose fines | Jon/Louanne |
| Hen and chicks removal | Bob |
| AED Batteries | Jon |
| Post minutes, date and times of meetings | Chairpersons |

Addendum to Meeting Minutes

Amended Resolution for

March 8, 2011

Association Resolution for Transfer of designated funds - Future Repairs and
Replacement fund to undesignated funds –Operating fund
Resolution of the Board of Directors of Cowpet Bay West Association
("CBW")
WHEREAS, CBW is a Condominium Association organized and existing under the
laws of the Territory of the U.S. Virgin Islands;
and
WHEREAS, the members desire that the Association shall act in full accordance
with the rulings and regulations of the Internal Revenue Service, as administered by the
Virgin
Islands Bureau of Internal Revenue;
NOW, THEREFORE, the members hereby adopt , on behalf of the Association;
The following resolution
RESOLVED, that an authorization of transfer of designated funds $114,000 - Future
Repairs and Replacement fund to undesignated funds –Operating fund was made.
This resolution is adopted and made a part of the minutes of the meeting of the
Board of Directors on March 8. 2011.
BY:
President
ATTESTED:
Secretary

7

3055300/000423

Draft

**Cowpet Bay West**
**Board of Directors Meeting**
**May 10, 2011-0S-17**

**Present**: Max Harcourt, Barbara Walters, Greg Miller, Bob Cockayne, Bill Canfield, Sharon Koehler, Jon Cassady, Louanne Schechter

**Minutes of April 5, 2011**: The minutes of the April Board of Directors meeting were unanimously approved.

**Treasurer Report**: Sharon stated the total amount of cash funds is $555,408.
- Owner in Arrears- Letter was sent certified, return receipt- no receipt has returned-Sharon will resend letter.
- Owner in Arrears- Short Sale postponed- Directors agreed to extend their offer.

**Manager's Report**

**Infrastructure & Maintenance**: Filters were changed according to schedule.

**Grey Water**: Grey water system malfunctioned 5/2/11. The water distribution pump motor burned, controls would not function and voltage monitor was missing. System was repaired and functioning same day. Housing required welding to prevent future leaks.

**Transformer Covers**: Corrosion was eroding and causing a hazardous situation for the covers of the transformers. New anodized aluminum covers were fabricated for the transformers on Leeward, the Transformer on Windward Circle and the transformer near the generator. Covers were also fabricated for the junction box and each of the 4 splits from the junction box.

**Streetside Inspection:** Street side steps and railings were inspected and repaired on both Windward and Leeward.

**Streetlights:** All security lights were inspected and are in working order and physically secure.

**Owner fine for Vandalism:** A meeting is scheduled for May 19 with the Security Company and the involved parties to discuss fines.

**CBE Bylaws:** Andy LaPlace reported CBE is in the process of revising their Bylaws therefore, a copy is not available at this time.

1

3055300/000424

## Draft

**DPNR Inspection:** Jon reported he had received a written statement from Mr. Donadelle, DPNR Inspector, stating we were not in compliance as DPNR has misplaced our records. We have made copies and provided originals to DPNR.

**Request for external vent:** L-47 has requested an external vent for their stovetop. The manufacturer stated that as long as the filter is maintained, there should be no grease coming through the vent. They will guarantee the product. The Directors agreed to allow the vent if the owner agreed to be responsible for any discoloration of exterior paint around the vent.

### Old Business

**Insurance:** Bob handed out minutes from the previous meetings of the insurance committee. The committee requested a new appraisal be completed. Shep Barrows completed the appraisal as requested. The committee is reviewing options based on this current information and will present their findings and recommendations at the June Board of Directors Meeting.

**L-01 Electrical Repairs:** The owner retracted his statement that he would abide by the decision of the Board as he feels he should not be responsible for paying the electrician. The Directors rescind their goodwill offer and the $600 will be added back to his statement. The owner has requested to meet with the Executive Committee. Max agreed to meet again.

**Owner Initiated Issues Policy:** The directors suggested the new policy be uploaded to the website. Max will upload. The Directors would like to have a "form" that can be downloaded for owners to complete and submit.

**Operating Accounts:** Louanne will obtain the paperwork to remove Judi and Ed from the account and add Bill and Sharon.

**Debris in neighboring property:** Greg Miller will approach CZM and DPNR with the issues of debris and hazardous materials on the site.

**Light Poles:** It was noted by a Director that many of the light poles are crooked. Jon explained the extensions to the existing poles exaggerated the lean of the poles. To "straighten" them would be a major expense of chipping concrete, following the wiring, new conduit, new poles, etc. Max suggested the idea be added to long-term projects.

**Insurance Bid:** Insurance bids were obtained at the request of the insurance committee. It was suggested, next year, the committee provides the criteria for the bidding process next year, well in advance, to make comparisons relevant.

**W-27:** The office contacted the contractor and asked him to inspect the slider as it was sticking. The contractor went to the unit and was asked (by the owner) to reschedule at a time more

2

3055300/000425

Draft

convenient for the owner. The Owner has not contacted the office of a new time or date or if the work was completed.

**Security Gate:** The Directors agreed to maintain the security gate with the exit button.
**Security:** The Directors discussed suggestions from owners regarding security measures. The Directors asked Jon to initiate the following measures:
- Guards will add unit # to their log sheet when recording vehicle make-model-time
- Guards will utilize manual bar gate when electric gate is not functioning

**Electronic Bulletin Board:** Max created the electronic bulletin board. Owners will be notified of the electronic bulletin board by newsletter and on the website.

**Striping:** Directors instructed Jon to have the **NO PARKING ZONES** repainted. Long-term, Max suggested the parking spaces be striped.

**NEW BUSINESS**
**W-7:** Owner notified Directors they have not received any follow-up on some issues. Jon will email Owners.

**Dogs on Property:** An owner notified the Board of a pedestrian walking his dog on property. The Directors agreed to post **NO DOGS ALLOWED** signage by the well pump.

**Property Walk-around:** See attached notes from Board member walk around. Max will discuss recommendations with Jon following meeting. Jon was asked to put significant findings on the maintenance schedule.

**Owner Storage:** The office has received several requests for owner storage. Jon will inspect storage areas for any empty cages. A note will be posted in the newsletter that owners are allotted one storage space per unit and no flammable materials are to be stored.

**Office AC Unit:** A bid was presented to replace the ac unit in the office. Attempts by the vendor to remove all mold and smells have failed. The Directors agreed to replace the unit.

**Reimbursement Request:** The office received a request from an owners' family member to be reimbursed for medical expenses. The family member never reported the incident to the Association. Jon will investigate the incident and provide a written report of the incident and follow-up.

**Balusters:** Bob stated replacement balusters on one unit appeared to be different then the existing ones. Jon stated the goal is to maintain the same appearance but that materials used 40 years ago have changed slightly over the years. He will inspect.

3

3055300/000426

Joint Appendix Vol. II Page 1196

Draft

**Street side rails/steps:** Street side rails and steps will be sanded and painted in August, weather permitting.

**Scorched paint on exterior of unit:** The staff noted scorching of the exterior paint behind a propane grill on one of the units. The Directors agreed the owner is responsible and will be contacted by letter.

**Next Meeting:** The next meeting of the Board of Directors will be June 14, 2011 @ 8:45am AST.

**Adjournment:** There being no further business, the meeting was adjourned.

### ACTION PLAN

| | |
|---|---|
| Owner in arrears-resend certified, return receipt letter | Sharon |
| Meeting with Owner/Renter/Security May 19, 2011 | Jon |
| CBW Bylaws forward copy to Barbara | Jon |
| Letter to owner regarding external vent | Louanne |
| Create Form for owner issues | Sharon/Max/Louanne |
| Operating accounts signers | Louanne |
| Letter to DPNR/CZM | Greg |
| Inform Security Company to add unit #, and use pole | Jon |
| Notify Owners of Electronic Bulletin Board by Newsletter/Web | Louanne |
| Paint "NO PARKING ZONES" | Jon |
| Email W-7 | Jon |
| "NO DOGS ALLOWED" signage | Jon |
| Owner storage: Newsletter | Louanne |
| Investigate incident report L-40 | Jon |
| Inspect recent repaired Balusters | Jon |
| Letter to owner scorched paint | Louanne |

4

3055300/000427

DRAFT

**Cowpet Bay West**
**Board of Directors Meeting**
**June 14, 2011-06-15**

**Present**: Max Harcourt, Barbara Walters, Bob Cockayne, Rosie Wells, Sharon Koehler, Jon Cassady, Louanne Schechter

**Minutes of May 10, 2011**: The minute of the May Board of Directors Meeting were unanimously approved.

**Treasurer Report:** Sharon reported the total cash accounts as of May 31 are approximately $558,497. Of this amount, $464,776 is reserve funds. Sharon will present a quarterly summary next month of actual vs budget for the second quarter. Items that were purchased this quarter but not budgeted were fuel for the generator, water leaks, and beach drainage.

The Directors asked for a report on owners in arrears: Sharon reported she had not received a response from her letter to one owner that was in arrears, the letter was sent return receipt, but was never picked up from the post office and was returned to the office. She will resend. That owner did make a payment this month. The second owner did not sell the unit as planned and has filed bankruptcy. Louanne requested the Directors obtain legal counsel. Barbara made a motion that legal counsel be hired the motion was 2nd and all were in favour. The Directors instructed Louanne to contact Anna Paiewonsky for legal counsel. Louanne reported that the total for owners in arrears was approximately 19,000.

**Manager Report**

**Infrastructure & Maintenance:** Filters were changed according the maintenance schedule.

**RO Plant:** Due to the continuous rains during the last 4 weeks, the RO plant ran a minimal amount of time without problems. The cisterns are over capacity with the rains.

**Electrical Systems:** The transformer that was sent to the states to be rebuilt is on schedule to be completed in 2 weeks. Once the transformer is on island, Mr. Harvey will direct its placement and installation in the Windward circle and reroute lower Windward power and eliminate the exposed high voltage line from Leeward to Windward that runs across the rock wall. Weather permitting; we hope to have Mr. Harvey on island mid July. This will complete the 3 year plan for replacing the electrical high voltage grid.

**Grounds:** The groundcover is infested with bugs that are eating the leaves. ABC nursery is scheduled to spray the grounds, but due to no break in the weather over the last 5 weeks, they have not been out. The grounds crew have also been ineffective in spraying due to the rains.

1

3055300/000428

DRAFT

There is a tropical wave expected to bring rain on Wednesday, ABC will try to spray Thursday or Friday depending on the amount of precipitation.

**Security**: Jon reported there were two incidents since the last Board Meeting. The first incident involved vandalism of 2 vehicles on Leeward occurring sometime after midnight. Both had windows smashed. One of the vehicles had a laptop inside that was stolen. The second incident occurred about a week later. An owner reported cash and wallet stolen from his unit with no forced entry between 12:30-1:30pm on a Sunday afternoon, while they had lunch on the seaside deck. The contents of the wallet and the money clip were found several days later by the contractors building the retaining wall in the gut. They found the contents in-between the cinder blocks as they were moving them off the pallet to build the wall.

Jon increased security by adding an extra guard immediately following the first incident. Two security guards were posted with one stationary and the other roaming. Following the second incident, the guard hours were expanded to cover from 6p to 6a. Jon reported there were 10 homes burglarized in Cabrita Point this month alone. Recommendations from the police and our security company were to remove the "No Dogs Allowed" signs and add more surveillance cameras.

The Directors instructed Jon to get bids on surveillance cameras. The Directors instructed Louanne to advise owners of the events. She reported she had described the events in the June newsletter.

**OLD BUSINESS**

**Leeward 1**: The executive committee met with the owner of Leeward 1 to discuss the unpaid electricians invoice, late fees and finance charges. The owner insists the problem was caused by flooding and therefore should be covered by Association funds. Max made a motion the Association remove electricians bill, fines and finance charges associated with the unpaid bill. The motion was 2nd, 4 voted yes and one abstained.

**Insurance Committee:** Bob reported the committee met with representatives from Tunick, Executive, and Mapfre insurance to verify that our current coverage is sufficient in light of the the recent updated property evaluation. The insurance representatives stated we are underinsured with the current 90% co-insurance clause. The committee is obtaining bids and will forward the information to all Board members as soon as they are available. Max stated he may   call a special meeting when the information is available. The Directors asked the committee to obtain, if possible, favourable group HO-6 rates from each of the vendors.

**Greg Miller Resignation:** Greg Miller publically resigned from the Board through an email to the community. Max reported it was the responsibility of the Directors to appoint a member to the Board until the Annual Owners Meeting in February. This year would be the third year of Mr. Miller's term. Following discussion, Sharon made a motion Vince Verdiramo (L-5) be

2

3055300/000429

DRAFT

appointed to the Board of Directors. Max 2nd, all were in favour. Sharon will contact Mr. Verdiramo of the Board's decision.

**Bylaws Committee:** Rosie said due to critical illness in her family, she was unable to follow-up on any progress Mr. Waggoner may have made. Max stated the most pressing issue with the Bylaws is clarifying the responsibility of the owner and the responsibility of the Association in maintenance and insurance issues. He stated Greg developed a matrix that should be incorporated in the Bylaws to clarify this issue. Barbara suggested Rosie contact Vince for assistance. At this point, Max excused himself from the meeting. Bob excused himself from the meeting.

**July BOD Meeting**: The next meeting of the Board of Directors will be July 12, at 7:45am.

**Adjournment**: There no longer being a quorum, the meeting was adjourned. Items not discussed will be tabled until next month's meeting.

**ACTION ITEMS**

| | |
|---|---|
| Send copy of arrears letter | Sharon |
| Obtain legal counsel re: bankruptcy | Louanne |
| Cost to increase surveillance cameras | Jon |
| Provide information from Insurance Committee to Board | Bob |
| Inquire about group HO-6 Policy rates | Bob |
| Contact Mr. Verdiramo of Appointment to Board | Sharon |
| Invite Mr. Verdiramo to work on Bylaws Committee | Barbara |

3

3055300/000430

## Cowpet Bay West Condo Association
### Board of Directors Meeting
Tuesday, June 14, 2011, 8:45 AM
Cowpet West Office

Below is the agenda for the meeting - if additions should be made, please bring them up at the beginning of the meeting.

Meeting Ground Rules: *Respect!*

Call to order

Review and approval of May 10, 2011 Minutes

Treasurer's Report

Manager's Report

Old Business
      Insurance
      By-Laws
      Owner's Storage Space
New Business
      Resignation and Replacement of Greg
      Vandalism and Security

Review Action Items from this meeting

Adjourn

3055300/000431



# Fwd: Board of Directors Meeting

**JERSEYBARB@aol.com** <JERSEYBARB@aol.com>
To: jkromes@gmail.com

Sun, Dec 2, 2012 at 1:55 PM

From: cowpetbaywest@hotmail.com
Sent: 6/14/2012 2:38:48 P.M. Eastern Standard Time
Subj: Board of Directors Meeting

TO:  The Owners Cowpet Bay West Association

FROM:  Ed Wardwell

SUBJECT:  Board of Directors Meeting

Here are the highlights of Tuesday's Directors Meeting:

Property
- All systems are operating normally.
- The upgraded grey water transfer lines have been connected and are in service.


Treasury
- All of our 2012 insurance premiums have been paid in full.
- The treasurer, Sharon Koehler, will provide an analysis of our six-month operating expenses to the
Board at the August 7th Directors Meeting.  You will be provided a copy of this report after Board review.


Planning
- Max Harcourt, Chairman of the Property and Planning Committee, submitted a comprehensive report
on the current status and projected upgrades for our property.  Major future projects including roof
sealing/painting, structure maintenance and electrical system upgrades will be addressed in the 2013
budget.


Owner Requests
- The staff is currently servicing owner requests in Leeward 3, 31 & 37 and Windward 10, 12 & 31.

We will continue to respond promptly to all your written requests for service.


Legal Proceedings

- On June 6, 2012 the Association was notified by the US Department of Housing and Urban
Development (HUD) that "HUD has completed its administrative proceeding of this complaint (Barbara
Walters vs. Cowpet Bay West Association) under the Act (Fair Housing Act of 1968) and the compliant
is hereby dismissed."

Draft

**Cowpet Bay West**
**Board of Directors Meeting**
**July 12, 2011**

**Present:** Max Harcourt, Barbara Walters, Bob Cockayne, Rosie Wells, Sharon Koehler, Vincent Verdiramo, Bill Canfield, Jon Cassady, Louanne Schechter
Herb Horwitz is in attendance by request of the insurance committee to answer any questions the Directors have regarding insurance.

**Minutes of June 14, 2011:** The minutes of the June Board of Directors Meeting were unanimously approved.

**Treasurer Report:** Our current bank balance as of end of June is $513,000 of which $442,899 is in the reserve account. The financials (budget vs actual) for the 6 month period were distributed and discussed. Sharon noted 2 issues (1) there was no budget for tree trimming and cost $20,000 and (2) there was $20,000 spent on beach drainage. CBR is splitting the cost of this project. They have the invoice but have not paid.

Sharon would like Louanne to investigate other options for phone conferencing that are more cost effective. Max has some suggestions and will discuss with Louanne after the meeting.

**Insurance:** Bob presented the information obtained by the insurance committee. The insurance committee believes CBW is underinsured going into hurricane season. The potential exposure is due to the low value of insurance being substantially less than the appraised value (half) and a 90% coinsurance clause; we would realize a 48% penalty for any claim less our deductable because the low value is higher than what we are insured.
The committee recommends we cancel our current policy and obtain a policy with MAPFRE for the total agreed value of $25,916,630. 2% Windstorm deductible ($518,332.60) with a premium of $272,124.62. Bob said that the policy is designed to insure each building individually. (See attached summary). Following discussion Max made a motion to accept the recommendation of the Insurance Committee to obtain the Mapfre Policy. Bill 2nd the motion. The vote was called: Vincent-no, Barb-no, Rosie-no, Bill-yes, Max-yes, Bob-yes, Sharon-yes. The motion carries 4 yes, 3 no. Vincent, Barb, and Rosie want the minutes to reflect they are against any increase at this time and will do nothing to implement this plan.

There was discussion regarding how to finance the policy. Louanne stated that of the monies in reserve, $225,000 is earmarked for capital improvements and $61,000 was borrowed from the Reserve Fund in February to make the final payment for the current insurance policy. She recommended a special assessment to pay for the entire premium and an increase of approximately $85 dollars per month to the insurance to be able to fund the renewal. Herb added that the agent offered financing with a 30-60-90 payment plan. Max will conference with Sharon and Bob to discuss funding the policy tomorrow.

Bob Cockayne left the meeting at this time.

**Bylaws:** Vince agreed to replace Chuck Waggoner on the bylaw committee. The committee will meet this week and forward recommendations to the Board of Directors.

**Owner in arrears:** Sharon sent an email to owner in arrears that they make $3000/month payment. When they default their utilities will be shut off.

1

3055300/000433

Draft

Bankruptcy unit: The sale of the unit was stopped by the bankruptcy court. Anna Paiewonsky was contacted and referred Louanne to call Mr. Hodge, an attorney that specializes in bankruptcy issues. Mr. Hodge reviewed the pacer account and noted that Scotia Bank had petitioned the court. Once the bank takes over the property as abandoned, the bank will attempt to make a short sale and we should be able to collect the common charges. He recommended the Association allow the bank to handle the legal issues as CBW would have to hire a lawyer in Maryland to handle the claim for us and the bank is the first mortgagee.

Louanne sent a letter to the bankruptcy lawyer asking if the property is still being rented, and if CBW will receive funds for utilities and common charges. The property appears to be empty. Bill stated the renter had left. Barb suggested we shut off the utilities, Sharon 2nd, all were in favour. Jon will inspect the unit today to be sure there is no garbage left behind.

**Meeting Format:** Following discussion by the Directors, the motion was made by Vince that all future meetings will be conducted in the following manner: initially, issues as determined by the entire Board shall be discussed in Executive session and upon completion of executive session the meeting will be open to general owners. Barb 2nd the motion. The vote was taken with 5 yes and 1 no. Max request the minutes reflect he voted no.

**Vandalism & Security:** The Directors discussed the letter they each received from Kellerhals & Ferguson on behalf of their client, a renter in W-37 (letter on file in office). Vince responded to an owner that the matter has been resolved. Vince also sent a letter from his law office to Kellerhals & Ferguson that the matter was discussed with his client and the matter resolved. The owner received documentation in writing of the incident.
Max made a motion the Board commend Jon for professional handling of lamp pole incident and that we are confident in his ability to continue to manage our property in the manner it needs to be done. Barb 2nd all were in favour.

**Guards:** Guards were increased temporarily following 2 incidents; one was car windows smashed on Leeward and the second was a theft. Jon recommends we reduce the overlap of guard hours and change to one guard from 6p to 6a.

**Managers Report**

**Retention Wall:** Completed

**Tree Trimming** Hurricane prep is completed. The Elysian did not remove coconuts from palms on our beach; that service (31 trees) was performed by the tree trimmers.

**Gray Water Transfer Line:** This project should begin this week and hope to have the backhoe in the morning.

**Electrician:** The rebuilt transformer should be completed and returned to property the first week of August. Once the transformer is on property, we will schedule Kent Harvey to wire the transformer and remove the exposed high voltage line.

**No Dog Sign:** Jon was advised by our security company not to advertise we don't allow dogs. The Directors would like a sign posted near beach drive.

2

3055300/000434

Draft

**Balusters:** Inspections completed, we had a couple of issues on Leeward 12 and L-44. L-12 is complete at this time and L-44 to be inspected this week

**Surveillance Cameras:** Functioning cameras cost approximately $500 each. The installation cost depends on the location. Beach Drive, Gut, and Yacht Club Gate are the areas we have discussed. Jon believes we have sufficient light to view footage.

**Letter to Owner:** Letter was sent to owner explaining charges on his unit for vandalism by his renters.

**Incident Report:** Follow-up from fallen security light and pole. Jon inspected all security poles and found none requiring replacement. Owner came to office requesting reimbursement on his daughter's behalf for medical expense. Stated if she didn't receive check that day, her boyfriend would sue. Owner reimbursed her and is now requesting credit to his account. Vince made a motion the owner be reimbursed, Sharon 2nd, 4 voted yes and 1 no. Motion passed.

**ACTION ITEMS**

**Banco Forms:** Not done.

**DPNR response to neighbour property:** Not Done

**Letter to Owner External Vent:** Completed in May

**CBW Bylaws:** Not available at this time, being reviewed by their attorney.

**Direct Deposit for Owners:** Waiting for Ms. Richards of Banco to set up meeting.

**Parking Lot Striping:** Striping the no parking zones- scheduled for first of September when least amount of cars on property.
**Walk-Around Issues:** No scheduled at this time.

**Owner Issue Form:** Not completed

**Storage Space:** Suggest that we have a storage cleanup day during the week of the Annual Meeting.

**Planning Committee:** Max will provide minutes this summer.

**Owner Request:** Sharon requested all complaints be sent to Board members. Max, Barb, Vince, Bill, and Rosie do not want complaints sent to them, Sharon does.

**W-26 Request for Noise Control:** W-26 requested the Board of Directors speak with the Elysian before they award any contracts to restaurants on property about controlling the noise. The Directors agreed that we have not rights as long as they adhere to the laws on island.

**Next Meeting:** The next meeting will be August 9, 2011 at 8:45am

**Adjournment:** There being no further business the meeting is adjourned.

3

Joint Appendix Vol. II Page 1205

3055300/000435

Draft

**ACTION ITEMS**

| | |
|---|---|
| Banco Forms | Louanne |
| DPNR Response | Max |
| CBE Bylaws | Jon |
| Direct Deposit Banco | Louanne |
| Parking Lot Striping (no parking zones) | Jon |
| Walk-Around Issues on Maintenance Schedule | Jon |
| Owner Issue Form | Max |
| Planning Committee Minutes | Max |
| Owner Request sent to Sharon | Louanne |
| Phone Conferencing Options | Max/Sharon/Louanne |
| Funding Insurance Policy | Max/Sharon/Bob |
| Informing Owners of Insurance Policy & Funding | Max/Sharon/Bob |
| Update Bylaws | Bylaws Committee |
| Baluster L-44 | Jon |
| Surveillance Cameras | BOD next meeting |
| Inspect bankruptcy unit/shut off utilities | Jon |
| No Dog Sign posted by gut/beach drive? | Jon |
| Response to W-44 Guards | Jon |
| Storage Space (table to Feb 2012) | |
| Copy of Letter sent from Vince to Kellerhals for file | Vince |

4

3055300/000436

DRAFT

**Cowpet Bay West**
**Board of Directors Meeting**
**August 9, 2011**

**Present:** Max Harcourt, Barbara Walters, Bob Cockayne, Rosie Wells, Sharon Koehler, Vincent Verdiramo, Bill Canfield, Jon Cassady, Louanne Schechter

**Conference Call:** Directors were given a new conference dial-in number and participant code and asked to call back on the new service *Free Conference Call*. Although the conference call is free, there may be associated long distance charges by individual carriers and Directors were urged to use their cell phones. The meeting continued when all Directors were on line.

**Minutes of July 12, 2011:** The minutes of the July 12 Board of Directors Meeting were unanimously approved.

**Executive session:** Max made a motion the meeting move out of Executive Session. There were 3 votes yes, the motion did not carry

**Minutes of July 27, 2011 Special Meeting:** Sharon requested the cash reserve amount of $320,442 be amended to $372,336 in the minutes under the heading of Treasurer Overview, 3rd sentence. Max made the motion the figure be changed, Sharon 2nd, Bill, Max, Bob, and Sharon approved. Motion carried. There being no other changes, the minutes were approved with amendment.

**Tropical Storm Emily:** Jon reported the storm brought some rain and gusty winds, because it was well South of us it was not a problem

**Treasurer Report:**
As of July 31 in our reserve fund we have approximately $397,000 and approximately $96,000 in the operating accounts for a total of $494,000.

**Owner in arrears:** Owner replied they could commit to $2500/month but not the $3000 that was requested. The Owner is in arrears of $8,178. Max made a motion the Board accept the $2500/month Sharon 2nd, all were in favour.

**Insurance Rebate from Tunick:** Not arrived. Bob will contact Colin for the status of the check.

**CBR Bill:** Not paid for their portion of the Retaining Wall. Jon said Gene will be sending a check next week.

**Mapfre Insurance Policy:** The Policy has not arrived in the office. Max will follow up with the sales representative, Jose, as to when the policy will be available.
**Contact Information:** Louanne requested contact information for the office records. Sharon said she thought the information was on the binder. Max will obtain contact information. Max stated that Jose is planning a visit to St. Thomas this September and will bring a local representative with him to meet the staff and see the property.
**Systems not noted on Appraisal** Sharon asked what systems were not noted on the Appraisal. The systems not mentioned were: the fresh water, beach well, 3 lift stations, gray water, electrical control room, and the office. While Shep Barrows was on property last week, Louanne asked him if the items

1

3055300/000437

DRAFT

were omitted on his appraisal would they be covered by the insurance policy. He said, he wasn't sure he made any omissions, and then left without reviewing the appraisal. Bill will speak with Shep regarding the items.

**Budget Revision**: Sharon will contact Jeanne and work on the revisions and provide to the Directors. Max would like a target date of completion before the September BOD Meeting.

**Hourly Employee Compensation**: Jon reported he has no detrimental reviews for the staff and he proposes a 3% increase to all the hourly employees. Max made a motion the employees receive a 3% raise, Vince 2nd, 6 voted yes. Sharon said without knowing the 3% total of increases, she abstained and would like the minutes noted as such.

**OLD BUSINESS**

**Bylaws**: Vince said he had reviewed the Bylaws, made approximately 20 suggested revisions, and will send copies to the Directors for their review and input. The Directors should receive the revisions next week. Vince requested they review the changes and send him their comments.

**Bankruptcy Unit**: The utilities were disconnected as discussed in last month's meeting. As reported in the Special Meeting, the owner filed Chapter 7 in Maryland and the Bankruptcy Court approved it. The owner had a mortgage with Scotia Bank. Vince will follow-up with the Trustee to find out the current status of the property.

**NEW BUSINESS**

**Teleconference**: The service we are using today is a free conference service. Users may be charged a long distance carrier fee. It was suggested users utilize their cell phones if they have free long distance. The phone number and participant code will stay the same.

**Manager Report**

**Operating systems**: RO plant, gray and fresh water systems working well. The GenSet had a bad cell in the battery and new batteries were purchased and installed

**Capital Projects:**
- Gray Water Lines project to be completed in approximately 10 days
- Cistern Repair (Masonry) 2 cisterns that were leaking are completed.
- Transformer-Mr. Harvey confirmed yesterday the transformer rebuild is complete. He will oversee the shipping back to St. Thomas. When the transformer arrives, we will schedule Mr. Harvey to be in St. Thomas and complete the final phase of the High Voltage Project.
- Retaining Wall shared with Elysian: A third level of block was added to the "back splash". Gene is aware of the added work and will split the cost.

**Action Items**
- CBE Bylaws: Andy will have the completed revisions next week. Jon will obtain a copy and send to Vince

2

3055300/000438

DRAFT

- **Balusters**: Inspection of balusters are complete and repaired except for L-44. The owner had installed his hurricane shutters and would like the work completed after season, when the hurricane shutters have been removed.
- **Parking Lot Striping**: Scheduled for September.
- **No Dog Signage**: Have not completed
- **CBW Road Sign Damage**: The sign was found knocked over and broken. We don't know who or how it broke. We have contacted the original sign maker and waiting for his return call. We will obtain bids and pass on to the Directors.
- **Painting of Steps & Rails**: Scheduled for October
- **Work Orders**: Sharon said she is not getting the work order sheet. Louanne stated she was sending them out on Friday. Sharon agreed once a week would be fine and she will look for them on Friday.
- **Banco Forms**: New paper work was obtained. There is one form that needs to be signed by the Treasurer. Louanne will get Rosie's signature when she gets back on island.
- **OPNR**: Max reported that is on hold for now.
- **Direct Oeposit**: Owners would be given the account and routing number. Owners would sign a form for electronic deposit. Barbara suggested we use a separate account for deposits, Vince suggested a lock box through the bank, Max wanted to know the fee schedule. Max asked Louanne to provide all info by the next meeting for a vote.
  Vince had to leave the meeting at this time. Max suggested we set the next meeting date before he left.

**September BOD Meeting:** The next meeting of the Board of Directors is scheduled for September 13, at 7:45am AST.

- **Long Term Plan**: Max would like a copy of the Long-term Plan mailed to him.
- **HO6 Policy rates**: Mapfre is not currently offering this type of policy.
- **Surveillance Cameras**: To be added to the long term planning area. Bill stated in retail business, cameras have not been effective.
- **Satellite TV:** Bill said that Dish is offering a great deal right now of free installation and the box. He would like to take advantage of that by finding a vendor for the complex. Jon is in talks with a vendor .

**Code of Ethics:** Sharon and Max raised the question about a code of ethics for the Directors. Max said he and Sharon would present at the next meeting.

**Adjournment:** There being no further business, the meeting was adjourned.

3

3055300/000439

DRAFT

## CURRENT ACTION ITEMS

| | |
|---|---|
| Letter to owner in arrears | Sharon |
| Contact Tunick Insurance re: insurance refund | Bob |
| Cowpet Bay Resort payment for retaining wall | Jon |
| Contact salesperson from Mapfre re: policy | Max |
| Speak to Shep Barrows re: systems missing from appraisal | Bill |
| Speak with Mapfre are all systems and office (not in appraisal) covered | Max |
| Contact information for Mapfre | Max |
| Budget Revision | Sharon |
| Bylaws first draft of revisions to Directors | Vince |
| Bankruptcy update on unit | Vince |
| CBE Bylaws send copy to Vince | Jon |
| No Dog Sign | Jon |
| Obtain bids for repair of road sign | Louanne |
| Work order sent weekly to Sharon | Louanne |
| Banco Forms | Louanne |
| Banco Electronic Banking Package to Directors | Louanne |
| DPNR | Max |
| Long Term Plan to Max | Jon |
| Update on HO6 policy from Mapfre | Bob |
| Satellite TV Vendors | Jon |
| Code of Ethics Presentation | Max/Sharon |

## PENDING ACTION ITEMS

| | |
|---|---|
| L-44 Baluster repair after hurricane season | Jon |
| Parking lot Striping in September (weather permitting) | Jon |
| Painting of steps and rails | Jon |
| Surveillance Cameras added to long term plan | Max/Jon |

4

Joint Appendix Vol. II Page 1210

3055300/000440

Draft

Max Harcourt Suggested Revisions (in yellow)

**Cowpet Bay West**
**Board of Directors Meeting**
**September 13, 2011**

**Present:** Max Harcourt, Barbara Walters, Bob Cockayne, Rose Wells, Sharon Koehler, Bill Canfield, Jon Cassady, Louanne Schechter,
Vince Verdiramo is out of the country.
Lance Talkington (Leeward ·03) announced himself as attending the telephone conference.

**Minutes of August 9, 2011:** Board members reported they did not receive a copy of the August minutes. A copy of the minutes will be emailed to the members and they will vote on them at the next meeting. (Copies were emailed during the meeting).

**Determination of Necessity for Executive Session:** No Executive Session was required.

**Treasurer Report**
**Budget Revision:** Sharon reported she collaborated with Jeanne Brennan, our accountant, on the revised budget for 2011. Jeanne provided analysis with the changes highlighted. Max made a motion to except the revisions, all were in favour.
Barbara made a motion to send the analysis as provided by the accountant to the owners, Rosie 2nd, all in favour.
**Pay off loan from Reserve fund:** Sharon made a motion to pay off the loan from the Reserve fund. She stated the total payment with interest is $54,981.37, the initial loan was for $60,7B3.33 and the interest is $298.04.
Bill 2nd, all were in favour.
**Transfers of monies:** Sharon will work with Louanne to transfer funds owed to Reserve Fund from the General Funds and transfer funds owed from Reserve Fund (capital projects completed) to General Fund.
**Payment from Elysian:** Sharon asked if we had received a check for the Elysian's portion of the beach and flood control project. Jon stated that he was meeting with Gene today. Max asked Jon to call him after the meeting.
**Bounced Check:** Sharon asked about bounced check- Louanne reported there were none last month,
**Bankruptcy Unit:** Sharon asked who was billed for the account in arrears. Louanne reported that Vince Verdiramo followed up on the ownership of the unit following the awarding of the bankruptcy court; the original owner has retained possession of the property. Louanne contacted the Real Estate agent and the closing attorney. The agent is rewriting the seller's contract as the previous buyer is still interested. The closing attorney, Marcia Resnick, has the current statement and will advise us what is collectable.

**Old Business**

**By-Laws Committee Report:** The committee request the discussion be tabled. Max requested the Directors submit their comments in writing as requested by Vince. Only one Director (Sharon) has responded to Vince's request at this time. Bob asked if the Directors are considered the Committee as a whole. Max stated yes.
Sharon reported she sent copies of Vince's suggested changes to Anna Paiewonsky and Herb Horwitz. The committee has not received any written comments from these owners.

10

3055300/000441

Draft

**Owners in Arrears:** Max asked the status of owners in arrears. The owner that has a payment plan is continuing to follow the plan. Another owner that was 90 days in arrears replied by email they were making a payment and would catch-up by December. Bob asked for the total dollar amount over 60 days in arrears. Sharon reported it was $28,466. Sharon's figure was the total for greater than 90 days. The actual 60 days was $5,528.03 [$21,705.54.] as of August 31. One payment was made reducing the total to $4,860 [$20,505.54] current.

**New Business**

**Code of Ethics:** Following discussion, the Directors agreed a written code of ethics is not necessary. The Directors agreed to improve on their communications and move forward.

**Security Gate:** The gate was open after Irene because the phone lines were down. The manual gate is broken at this time and repairs are being made. The security guards are stopping people in a professional and courteous manner.

**E-mail List:** Sharon requested **owners** email addresses are added to the Owners List. Bill stated trying to keep the list current is very difficult. Max suggested Louanne contact the owners and inform them that the Owners List will be updated with the owner's email(s) unless they contact the office that they don't want it included.

**Blog:** Sharon wanted to know why the newsletter stated that we don't have a blog. Louanne stated owners have called the office requesting clarification. The facts were placed in the newsletter as clarification for all owners. Lance was asked about the blog, but he had dropped off the line. Sharon suggested a Board member be appointed to preview the newsletter before it is sent. Max stated there was no problem and we should continue with the newsletter as we have.

**Resolution:** Sharon stated the resolution (from the February meeting) had never been completed and was not in the minutes. She stated it needed to be typed, and signed or put into file and it should be signed by the President and Secretary. Louanne stated the revisions were inserted into the minutes when the Board approved them. Louanne sent Sharon copies of the revisions, as she requested yesterday. Louanne was unaware the resolutions needed signatures and will obtain the signatures that Sharon is requesting.

**Manager Report**

**Infrastructure and Maintenance:** Gray and fresh water filters were changed 8/5/11. All systems are operating efficiently.
**The RO** has not been run recently due to the heavy rains.
**The generator** ran without problems during the storm. Jon switched the generator to manual after the storm while WAPA made any repairs to the area.
**Shutters:** We follow the mariners 3 day avoidance within the vector cone. Irene was made a named tropical storm on Sunday and passed by on Monday, shutters were not closed. There was no 3 days to prepare. Maria was a named Tropical Storm and we were within the vector. Owners were notified on Thursday and shutters were closed on Friday.

11

3055300/000442

Draft

**Transformer:** 3 phase rebuilt transformer should arrive on island in approximately 2 weeks. When it arrives, we will schedule the electrical contractor, Kent Harvey, to install the transformer and complete the high voltage system changes slated.

**Grey Water Lines:** The project is approximately 70% complete. The heavy rains have prevented any work for the last 2 weeks. Work will complete when weather clears.

**Elysian Payment:** Jon is meeting with Gene after meeting

**CBE Bylaws:** CBW has sent their bylaws back to their attorney and are not complete. Bob would like Jon to try to obtain owner responsibility and insurance portions of their bylaws if they are complete.

**Pump Systems:** Jon has information on the pumps to share with the long term planning committee

**Satellite Vendors:** Dish network was installed by Enrique Garcia in two buildings.

**Parking Lot Striping:** On hold until weather clears.

**Balusters:** Repair after hurricane season

**Painting of steps and railings:** When weather clears.

**Dish TV:** Jon reported that Enrique Garcia had installed units in Leeward, and he was pleased with the operation.

**Mapfre Insurance Policy:** Policy is in the office.

**Revision of Appraisal:** Shep will return and revise the appraisal to include the systems that were left off. Bill will contact Shep to revise.

**Contact information from Mapfre:** Available in office

**Road Sign:** Louanne reported another incident occurred where the concrete base was pushed over. The Board was asked if the sign needed replacing. The bid for the sign does not include the base. Max asked to get an inclusive bid.

**NO DOG SIGN:** Jon asked for verification. Max stated the Board had decided to place a NO DOG SIGN, by the beach drive

**Work Orders:** Louanne is sending the work orders on Fridays. She was unable to send this Friday as the hurricane shutters blocked the internet signal. There were no complaints to send.

**Banco Electronic Banking:** Waiting for return call from Banco. Louanne requested information on several options. She will send any info to Directors when available.

**DPNR:** On hold, per Max

**Long Term Planning:** Jon was asked again to send Max a copy of the LTP. Max is planning on scheduling a meeting of the committee in September.

12

3055300/000443

Joint Appendix Vol. II Page 1213

Draft

**HO6 Policy**: Mapfre will contact us when they have them

**Service Dogs:** Dogs must be registered with the ADA. VI does not have guidelines for service dogs.

**Next meeting**: October 11, 2011 at 7:45am.

**Adjournment**: There being no further business the meeting was adjourned.

ACTION ITEMS

| | |
|---|---|
| August Minutes to BOD | Louanne |
| Transfer monies as calculated by Sharon to Reserve Fund on 9/14/11 | Louanne |
| Letter to Owners in Arrears | Louanne |
| Written comments on revisions to Bylaws | Directors |
| Repair manual Security Gate | Jon |
| Inform owners email address(s) will be added to Owner List | Louanne |
| Update owner's list to include email address(s) | Louanne |
| Send Resolutions from February & March Minutes to Max and Rosie for signatures | |
| | Louanne |
| Send LTP to Max | Jon |
| Gray Water Lines | Jon |
| Elysian Payment | Jon |
| CBW Bylaws to Directors | Jon |
| Parking lot striping | Jon |
| Painting of steps & rails | Jon |
| Revision of Appraisal | Bill |
| Road Sign Bid for base + sign | Jon |
| No Dog Sign | Jon |
| Electronic Banking for Owners to make direct payment | Louanne |
| DPNR | Max |
| Long Term Planning Committee meeting | Max |

13

305530/000444

Draft

**Cowpet Bay West**
**Board of Directors Meeting**
**October 11, 2011**

**Present:** Max Harcourt, Barbara Walter, Bob Cockayne, Rosie Wells, Sharon Koehler, Bill Canfield, Jon Cassady, Louanne Schechter
Vince Verdiramo is out of the country.
Lance Talkington (Leeward 3) announced himself as attending the phone conference

Max announced there would be a brief executive session and Jon would contact Lance when he could rejoin the meeting.

**Executive Session:**
The manager requested Directors do not include the names and titles of vendors used by the Association in their emails as some vendors have agreed to assist us, on their own time, as a second income.
Sharon stated a previous Board recommended the Association not act as a third party vendor. Owners are responsible to hire and pay their own service vendors.
There being no further business for Executive Session, Max opened the meeting to owners, Lance rejoined the meeting.

**Minutes of August 9, 2011:** The minutes of the August minutes were unanimously approved.

**Minutes of September 13, 2011:** The minutes of the September minutes were unanimously approved with the revisions provided by Max Harcourt (see attached).

**Treasurer Report:** The total cash assets as of September 30, 2011 were $557,447. The reserve funds total is $452,300. Sharon presented her analysis of the 3rd quarter budget verses actual report (attached).
CBW BOD-P&L Third Quarter Report 9/30/11 & Treasurer's Report

Cash on Hand 9/30/11   Operating Accounts - $104,000

Reserve Accounts - $ 452,300

We will be depleting the Reserve Account by approximately $ 94,800 and reimbursing same to our general accounts to cover expenses made for capital improvements. After the funds have been cleared, we will write a check to repay the Reserve account current through October, approximately $ 62,855. This will ultimately result in a balance in our Reserve fund of $420,355.

Our 9/30/11 customer receivables are $36,940, of which $25,033 are 60 days and older.

Notes and observations re 3rd quarter P&L-Budget vs Actual

1. Income-fixed charges a little off mark....Louanne and I will work towards finding and correcting the posting problems

1

3055300/000445

Draft

2. Income is about $4500 on the plus side; due to sale of transformer to Elysian ($5900)
3. Expenses:
   - Items under budget
     - ❖ WAPA-Assn ($16,000)
     - ❖ Contract Labor Bldgs. ($11,150)
     - ❖ Grounds ($8,000)
     - ❖ Hurricane ($3,750)
     - ❖ Beach Refurb ($5,100) –
   - Items over budget
     - ❖ Building repairs ($5,300)
     - ❖ Grey Water ($1,900)
     - ❖ Electric/Generator ($6,500) – fuel bills
     - ❖ Vehicles/Fuel ($4,000)
     - ❖ Security Guard ($8,000) Increased hours
     - ❖ Office Expense ($4,000) – new computer & AC unit
     - ❖ Contract Labor-Grounds ($16,000)
     - ❖ Medical ($3500) – increased costs
     - ❖ WAPA Owners ($21,000)
     - ❖ Beach Refurbish ($5,100) – sand, buoys, chairs, cleanup
     - ❖ Legal/Accounting ($1,800) – extra meetings with Jeanne Brennan re insurance

Other observations:

1. A policy was established several years ago that CBW Assn would not act as a 'middleman' between owner and vendor. The primary reason for this was twofold, in that it created a liability situation for the assn. and that it distorted our financial reports. In reviewing our records this year, it has come to my attention that when an owner's phone line is down, we have been having a vendor come and fix the line. The arrangements for these fixes are made by Jon, who then pays the vendor cash ($50) for the repair. Then the office bills the owner for the repair and reimburses Jon via a company check. While I can understand the owners' frustrations not having a working phone, I cannot understand why the owner and the supervisor can't complete the transaction without Jon's involvement. I recommend we cease this practice and find another way to handle these situations.

2. It will soon be time to prepare the 2012 budget. I have been working with Louanne to correct mis-postings throughout the P&L. I believe it is important to have our records accurately reflect our expenses, rather than worry about how much we are over or under compared to our budget. This is the only way to accurately predict the upcoming budget. I will continue to work with Louanne to keep a more accurate accounting of our expenses.

2

3055300/000446

Draft

**2012 Budget:** Max suggested the budget for 2012 be prepared prior to the end of the year. He would like to include the budget with the information sent to owners for the annual meeting.

**OLD BUSINESS**

**Bylaws:** Max set the goal that any changes the Directors would recommend be completed this year and presented to owners so that they could be voted on during the 2012 Owners Meeting. The Directors discussed the changes in the Bylaws suggested by Vince Verdiramo. The following is the recap of suggested Bylaw Revisions

## Recap of suggested Bylaw Revisions                    October 2011

## OUTCOME OF BOD'S DECISIONS AT 10/11/11 BOD MEETING INDICATED IN BLUE

Following is a compilation of suggestions for changes to our bylaws following the order of our current document. In each case, the first name listed below each category initiated the suggested change:

Article II, Section 3 – Managing Agent

Sharon – suggested adding (k) to exclusions limiting the securing of property insurance solely to the Board

Max – Agrees Bill OK, Approved

Article II, Section 4, – Election and Term of Office

Paragraph 2....Sharon – recommended we change the method of voting stated in the current bylaws to reflect the manner we currently follow.

Max – suggested wording be changed to *'All vacancies shall be voted for on the same ballot, and the candidates with the highest number of votes shall be elected to each of the vacancies'.*

Change approved

Paragraph 4...Vinnie – suggested changing the 'time-out' for board membership from 1 to 2 years

Sharon – questioned reason, feels it should remain at 1 year

Max – felt no change was necessary

Bob – felt no change was necessary

All agreed that no change was necessary

Article II, Section 5 – Removal of BOD Members

Vinnie – recommended we change the second paragraph to give the Board the ability to remove a board member who has not attended meetings from an entire year to a six month period.

Sharon – felt the verbiage should be changed to 'six consecutive meetings' and that the attendance at the Annual meeting should be further clarified by 'in person'

3

3055300/000447

Draft

Max – felt no change was necessary

Bob – felt no change was necessary

All agreed that no change was necessary

Article II, Sections 8 & 9 – Regular and Special Board Meetings

Sharon – suggested we include 'email' as an acceptable means of board meeting notification

All agreed

Article II, Section 11 – Quorum of Board of Directors

Max – **recommends the following: Delete –** "… a majority of those present may adjourn the meeting from time to time. At any such adjournment at which a quorum is present, any business, which might have been transacted at the meeting originally called, may be transacted without further notice." **Add, in place:** "no business may be transacted until a quorum is achieved."

Unclear about how this should be worded, but all agreed that no business should be conducted unless a quorum is present.

Article II, Section 15 – Executive Committee

Vinnie – suggests *"in the second paragraph where it states, "merge the association into another," this right, according to this paragraph, is reserved to the Board. However, the merging of the association is a paramount item which in reality should be voted on by all owners and be carried by a simple majority."*

*"In the next to the last paragraph which now reads, "and it shall have the powers to authorize the seal of the association to be affixed to all papers which may require it," this should be changed to read, "and it shall have the powers to authorize the seal of the association to be affixed to all papers which may require it provided said papers and/or contracts do not involve an Board by either e-mail or fax."*

Max – **recommends: Revise wording to read:** "…provided said papers and/or contracts do not involve expenditure greater than $50,000. Greater expenditures require approval by a quorum of the Board in regular or special meeting."

4

3055300/000448

Draft

Sharon – asks if we should reconsider the dollar amount

Undecided, requires more discussion.

Article II, Section 16 – Inspection by Executive Committee

Vinnie – suggests we add "*such reporting to the full Board shall be made within 15 days of the semi-annual inspection*"

Sharon – suggests we also add that monthly progress reports be made by the GM to the Board at each Board meeting.

Max – would like the wording revised to read "Within 30 days after each such semi-annual inspection, the Committee will report its findings and recommendations to the Board of Directors. "

Bob – agrees that report to the entire Board be submitted 15-30 days thereafter.

All agreed to add 30 day requirement

Article II, Section 19 (added) – Communications

Max – suggested Communications by, from, to and among the Board may be in writing, by fax or by electronic communication (telephone, telephone conference, email, internet, etc.). Telephone and telephone conference conversations must be documented (e.g., minutes or record of conversation). This communication will constitute "official" communication by the Board.

All agreed to include

Article III, Section 1 – Annual Meeting

Max – suggested owner's be allowed to attend the Annual Meeting by telephonic/electronic means.

Withdrawn

Article III, Section 3 – Special Meetings

Vinnie – suggested last sentence should read '*no other business shall be transacted at a special meeting except as stated in the notice*'

Sharon – agreed

Bob – agreed

Max – agreed and suggested we add '*Owners may 'attend' via electronic means*"

5



PLAINTIFF'S EXHIBIT 3A

Joint Appendix Vol. II Page 1219

3055300/000449

Draft

*All agreed*

Article III, Section 5 – Adjournment of Meetings

Max – suggested allowing electronic participation by owners

Withdrawn

Article III, Section 6 – Annual Meeting Order of Business

Max - suggested the order of business should read:

(a)   Roll Call – by unit
(b)   Establishment of Quorum (1/3 of all unit owners)
(c)   Proof of Notice of Meeting
(d)   Reading of Minutes of preceding meeting approval
(e)   President's Report (including cost and coverage of insurance)
(f)   Treasurer's Report (including discussion of Budget and Financial Status)
(g)   Property Manager's Report
(h)   Report of Nominating Committee
(i)   Election of Board members
(j)   Old business
(k)   New business

All agreed to change format as above, except (d) should be amended to "Approval" rather than 'Reading". Barbara expressed concern that no provision was made for owners to approve the budget. Bob stated the point would be moot, as the bylaws give the Board the power to develop and approve the budget, and a negative vote by the owners would not be valid.

Article III, Section 9 – Majority of Unit Owners

Max – suggested (as stated in sections 1 and 5 above) that electronic participation be included

Withdrawn

Article V - Sections 2, 3,& 10 – Insurance, Repair/Reconstruction After Fire, Routine Maintenance & Repair – TO BE DISCUSSED AT LENGTH LATER, OR ANOTHER TIME

The entire board agreed in principle that all language concerning these sections should specify that the Assn's insurance covers all items within the walls, and that owners are responsible to insure all items from the paint and beyond into the living area, whether they are original or not. A special board meeting may be called before the end of October to discuss these important sections in further detail.

Article V, Section 11 – Restriction on Use of Apartment Units

6

Draft

Vinnie – suggested we add a paragraph concerning our 'no dogs allowed' policy.

Sharon – provided information from the ADA website regarding 'service dogs'; agreed with Vinnie

Max – provided language as follows:

No dogs are allowed on the property, either long term or visiting. The Board may grant exceptions to the NO DOGS ALLOWED rule, on an individual basis, should an owner require the assistance of a service animal (dog) as defined by the ADA. Owners seeking to obtain such an exemption are required to apply, in writing, to the Board with supporting documentation."

Bob – agreed

Bill – agreed and verified that the USVI follows 'service dog' definition of ADA

**Note – need to establish a minimum fine, or delegate fine ability to the BOD, as this is no longer an R&R

All agreed this restriction should become a part of the bylaws. Barbara cautioned that the ADA act forbids asking service animal owner the cause of disability. Bill stated that we can require proof of ADA compliance documents from owner, but cannot deny ADA approved animals on property. Board ability to assess fines is covered earlier in the bylaws.

Article V, Section 12 – Additions, Alterations or Improvements by BOD

Sharon – recommended we increase the dollar limitation for expenditures with Board approval, and not requiring 2/3rds owner approval.

Max – suggested increasing this to $100,000, from $50,000.

All Board members agreed to increase the dollar limitation to $100,000, except Barbara who felt it should remain at $50,000

Article V, Section 13 – Additions, Alterations or Improvements by Owner

Vinnie – recommended adding an additional paragraph as follows:" No unit owner may use their seaside patio for the storage of any household goods or appliances and shall limit the use to patio furniture only."

Sharon - disagrees

Bob – agrees with Vinnie

Max – feels this should be covered in either Section 14, or belongs in our Rules and Regulations

All agreed this should not be added to the bylaws, but rather covered under rules and regulations

7

Draft

Article XIII – Conflicts

Vinnie – recommends this section should be reviewed to determine if this is still a good law.

Bob – agrees

Rules and Regulations

Max – suggests we review our Rules and Regulations

NOTE: Vinnie Verdiramo was not in attendance at this meeting

Max will ask Anna Paiewonsky if she is interested in providing a legal opinion of these changes to the Bylaws.

**NEW BUSINESS**

**February BDD Meeting?**

**Meet & Greet: Thursday February 2nd, Place to be announced**

**Annual Dwners Meeting February 4th, Place to be announced**

**Nominating Committee:** Bob said the committee is actively preparing.

**Manager Report**

**Systems:** All systems are doing well. The lab retested one fresh water test. The first sample was negative for ecoli as was the second test.
**Dump-truck:** Dump truck stalled at the light when returning from the dump. The truck was covered under warranty for replacement of fuel injectors Jon had the truck towed to the property until arrangements could be made with the Ford company. The truck was then towed to the Ford repair shop for the scheduled repairs.

**Gate:** The gate is functioning without problems.

**Long Term Plan:** Jon is obtaining additions from Mr. Harvey to add to the plan before sending to Max

**Transformer:** The transformer is in route, when it arrives on island we will schedule Mr. Harvey's visit.

**W-17:** Owner sent complaints that will be entered into log. (Louanne off island will enter when she returns; Jon has copy of her complaints).

**L-07:** Owner complained alarm was beeping for 3 days, owner did not report alarm when it started. Jon spoke with owner and suggested she call office immediately for any alarm.

**CBE:** Andy said the owners are still revising bylaws

8

3055300/000452

Draft

**Bankruptcy:** Statements were sent to the lawyer representing the owner and we have had no response.

**Signage:** No Dogs Allowed and replacement of Parking Signs to be installed this month.

**New Road Sign:** We have a quote for the sign but not the base

**November BOD Meeting:**

**Adjournment:** There being no further business,

ACTION ITEMS

| | |
|---|---|
| Repair of manual Security Gate | Jon |
| Long Term Plan to Max | Jon |
| Elysian Payment | Jon |
| CBE Bylaws to Directors when available | Jon |
| Parking lot striping | Jon |
| Painting of steps and rails | Jon |
| Revision of Appraisal | Bill |
| Contact Anna Paiewonsky | Max |
| Road Sign Bid for base and sign | Jon |
| No Dog Sign and No Parking Signs | Jon |
| Electronic Banking (info was sent to Directors last month) | Directors |
| DPNR | Max |
| Long Term Planning Committee | Max |
| Update on Bankruptcy Ruling | Louanne |
| Notify Owners Annual Meeting | Louanne |
| Notify Owners Meet & Greet | Louanne |
| Notify Owners how to contact Nominating Committee | Louanne |

3055300/000453

DRAFT

**Cowpet Bay West**
**Board of Directors Meeting**
**November 8, 2011**

**Present:** Max Harcourt, Barbara Walters, Bob Cockayne, Rosie Wells, Sharon Koehler, Vince Verdiramo, Jon Cassady, Louanne Schechter
Bill Canfield is off island.

**Executive Session:**
Max requested the meeting move to executive session, Vince 2nd, there were 5 yes 1 no. The motion carried.

**Telephonic Conference:** Max stated the purpose of telephonic conference was to allow Directors off island have a means of attending the meeting. Max states the meeting is not manageable opening the meeting telephonically to all owners.

**Service Dogs on Property:** Following discussion Vince made a motion to table the situation until the Directors can obtain a legal opinion of the no dog rule and incorporate that opinion into the rules and regulations and or recommended bylaw changes. Max 2nd, and the Directors were in agreement.

**Imposing Fine for Dogs on Property:** Max made a motion any individual in violation of the no dog rule , that have service dog credential will not be fined until the opinion from legal council is obtained, pursuant to the outcome of the previous motion. Sharon 2nd.

**Executive Committee:** Max asked if any Director is interested in being in the Executive Committee. Barbara and Bob said they would be interested, Max requested the Directors vote by email to him and he will tally the vote.

**Manager and Office Manager Review:** Louanne and Jon were asked to leave the office.

**There being no further Executive Business, the Executive Session ended .**

**Security Gate:** Mr. Daryl Padola, the welder, is repairing the manual gate. The bid was for $460.

**September Minutes:** Sharon requested her revisions be made to the minutes. Under Resolution April resolution had not be executed nor was it attached to the minutes. The revisions were accepted.
**Treasurer Report:**
Treasurer's Report – November Board Meeting 2011
October 31, 2011
Bank balance (all accounts) Oct. 31, 2011 - $559,100
Reserve account through 11/4/11 - $473,600
Owner arrears, 60 days and over - $ 32,267; Alton - $17,500
Owed to General fund from Reserve fund for capital improvements - $41,224
Owed to Reserve fund from General-Oct.& Nov.@ $47B5= $9570
General Observations
Expenses over budget:

1

DRAFT

Lots of fuel for generator, thanks to WAPA outages and storms- 138% over budget ($5,756)
Lots of truck repairs – 243% over budget ($4,058)
Lots of water leaks – 13% over budget ($2,000)
Lots of Accounting fees (insurance funding meetings, attending board meetings regarding insurance, review of revised budget, etc. – 56% over budget ($2,100)
Guard Service, due to increased hours – 22% over budget ($9,400)
Office Expense, new computer, new a/c – 24% over budget ($3,700)
Masonry/Cistern CI- 57% over budget ($25,950)
Sewage/gray water – 11% over budget ($4,230)

(Sharon)Will be on island mid until end of November; will be working with Jon, Bill and Louanne on 2012 budget, and anyone else who wants to join us.

**L-41:** Owner returned statement with a note that he filed for bankruptcy in 3/11 and discharged in May 2011. Vince stated that unless the owner can prove otherwise, because we have a lien on the property, he still owes the Association all charges. Vince suggests the Association consider foreclosing on lien.

**Old Business**

**Meet n Greet and Owners Meeting Date & Place:** The Meet and Greet is February 9 and the Owners' Meeting is February 11 at the Caribbean Fish Market

**Review of Bylaw changes voted on during October Meeting**
Article 2 section 3: Subparagraph k added

Article 2 section4: All vacancies should be voted on the same ballot

Article 2 Section 8: Electronic Mail

Article 2 Section 9: Electronic Mail

Section 11: No business transacted until a forum is achieved

Section 15: Executive Committee 2nd paragraph, last paragraph: Recommend that *merging the Association* should be deleted. All in favour

Section 16: 30 days after the inspection

Section 19: Added

Article 3 Section 3 Special Meeting: Addition

**Bylaw changes discussion continued**

**Article 5 Section 2 Insurance:**

2

DRAFT

**Section 2. Insurance:**  Highlighted suggested changes by Max and Bob are inserted into minutes for this discussion.  (At this time Vince excused himself from the meeting.)

Changes are highlighted in yellow:

*The Board of Directors shall annually obtain and maintain, to the extent obtainable, the following insurance:*

> *1. Fire with extended coverage to include earthquake and flood coverage, vandalism and malicious mischief endorsements insuring the entire buildings and "common elements" together with all service machinery contained therein and covering the interest of the Condominium, the Board of Directors and the Common Interest of the unit owners in an amount to be determined by the Board of Directors.*
>
> *2. Windstorm, insuring the entire buildings and "common elements" together with all service machinery contained therein and covering the interest of the Condominium, the Board of Directors and the Common Interest of the unit owners in an amount to be determined by the Board of directors.*
>
> *3. Worker's Compensation; Public Liability covering each member of the Board of Directors, the managing agent, the manager, the office manager and each unit owner; Vehicle and other such insurance as the Board of Directors may determine in amounts to be determined by the Board of Directors.*

*All policies of physical damage shall to the extent obtainable contain waivers of subrogation and waivers of any defense based on co-insurance or of invalidity arising from any acts of the insured, and shall provide that such policies may not be cancelled or substantially modified without written notice from the Board of Directors.*

*From time to time or as required by insurers, the Board of Directors shall obtain from a certified and USVI licensed real estate appraiser an appraisal of the full replacement value, without*

3

3055300/000456

DRAFT

*deduction for depreciation, of the buildings, common areas and facilities for the purpose of determining the amount of insurance required.*

*Unit owners shall be encouraged to carry Home Owners insurance on their "apartment unit" for their own benefit provided that all such policies shall contain waivers of subrogation and further provided that the liability of the carrier(s) issuing insurance obtained by the Board of Directors shall not be affected or diminished by reason of any such additional insurance carried by any unit owner.*

*The Board of Directors will provide owners a concise summary of all insurance coverage and costs at each Annual meeting.*

*The terms "common elements" and "apartment unit," as mentioned above, are defined*

*in Article 5, Section 10 "Routine Maintenance and Repair."*

Bob will follow-up with several insurance agents regarding information on waivers of subrogation. (At this time Bob excused himself from the meeting) This paragraph requires further discussion by the entire Board. No vote was taken.

Section 3 Recommended changes

*The association shall only be responsible for inspecting unit interiors to determine if damage is structural or due to external causes, or if adjacent unit damage is caused by external causes, or unless that unit is owned by the association. Unless that unit is owned by the association, repair by the association of other unit damage will be limited to structural damage, that caused by external or adjacent unit causes, and will not include property or fixtures installed by the owner or previous owners.*

Max determined that further discussion was needed by the entire board and tabled this section.

4

3055300/000457

DRAFT

Section 10 Recommended changes

An "apartment unit" is considered the space inside the perimeter walls, interior walls, floor and ceiling to include:

1. All decorating elements including: paint, wall and floor coverings, paneling, molding and tiles; finished cabinets and mirrors.
2. All electrical appliances including: refrigerator, stove, washer, dryer, dishwasher, garbage disposal, hot water heater and air-conditioning equipment (including compressor).
3. All electrical fixtures including: wall ceiling and floor outlets, switches and fuse box.
4. All plumbing fixtures including: tubs, showers, sinks and faucets.

Additionally, the unit owner shall be responsible for the routine lubrication and adjustment of doors and windows, and, unless major casualty related, replacement of broken glass, wooden or glass slats and damaged screens. The unit owner shall also maintain and assure the operability of the storm shutters installed on that unit and is responsible to close them in the event of a windstorm. Damage caused by failure to do so is the responsibility of the owner if net insurance proceeds are insufficient to cover such damage.

**Max made a motion to accept the definition of "apartment unit" All were in favour .**

"Common elements" are considered to include all other elements of the buildings and property except those specified as being part of the "apartment unit." Additionally, the following are considered common elements:

1. Electrical supply to the fuse box, electrical supply lines in the walls (including interior walls), floor and ceiling.
2. Water and plumbing lines in the walls (including interior walls), floor and ceiling to the valves at sinks, showers, tubs, hot water heater, end toilets, etc.
3. Drains to the first connection outside a wall.

External air conditioning compressor units shall be maintained by the owner in a reasonable state of preservation. The Association may require owner to remove inoperable and/or un-maintained units or do so at the owner's expense

5

3055300/000458

DRAFT

Max stated this change (above) includes electrical supply lines in walls. Jon stated the cost to the budget would be substantial with this change. Max assigned Jon to determine the estimated budget implications based on these recommended changes. Max also would like to include a statement that holds the Association harmless if the original wiring and plumbing was changed by the owner.

Matrix

| Category (Not Intended to be all-inclusive) | Owner Maint/Repair Responsibility | Association Maint/Repair Responsibility | Association Insurance Responsibility | Owner Insurance Responsibility |
|---|---|---|---|---|
| Exterior Walls and Interior Damage Caused by Leaks | | x | x | |
| Roof and Interior Damage Caused by Roof Leaks | | X | X | |
| Interior Damage caused by Adjacent Units (Leaks, etc.) | X | | | Owner of Adjacent Unit's Insurance Responsible |
| Front Doors | X If Not Original | X If Original | X If Original | X If Not Original |
| Screens | X | | X | |
| Exterior Sliders | | X | X | |
| Exterior Wood Fittings | | X | X | |
| Exterior Windows | X If Not Original | X If Original | X If Original | X If Not Original |
| Electrical System to Breaker Panel | | X | X | |
| Electrical System, Breaker Panel to Outlets, Junction Boxes | X If Not Original | X If Original | X If Original | X If Not Original |
| Electrical Fixtures | X | | | X |
| Plumbing Inside Walls/Floors | X If Not Original | X If Original | X If Original | X If Not Original |
| Condo plumbing not in walls/floors | X | | | X |
| Plumbing Fixtures | X | | | X |
| Interior Walls | X | | X | |
| Interior Doors | X | | | X |
| Cabinets | X | | | X |
| Furniture | X | | | X |
| Appliances | X | | | X |
| Wall/Floor Coverings (tile/carpet) | X | | | X |
| Hurricane Shutters | X | | X | |
| Furniture | X | | | X |
| Personal Property | X | | | X |
| External A/C elements | X | | | X |
| Internal A/C elements | X | | | X |
| Landside Porch/Steps/Railings | | X Excluding Tile | X Excluding Tile | |
| Seaside Balcony/Railings | | X Excluding Tile | X Excluding Tile | |

6

3055300/000459

DRAFT

Max requested Jon review Matrix and comment on each item.

**Special Meeting:** Max requested the Directors meet Friday, November 18th, at 9:45AST to complete the discussion on the Matrix and budgetary concerns.

**2012 Budget Meeting:** Sharon plans to set a meeting while she is on island during November.

**Section 11:** Addition to section

1.  No dogs are allowed on the property, either long term or visiting.  The Board may grant exceptions to the NO DOGS ALLOWED rule, on an individual basis, should an owner require the assistance of a service animal (dog) as defined by the ADA.  Owners seeking to obtain such an exemption are required to apply, in writing, to the Board with supporting documentation.

    Federal and ADA Compliance, as follows:

    *"On July 23, 2010, Attorney General Eric Holder signed final regulations revising the Department's ADA regulations, including a revised definition of "service animal." Effective March 15, 2011, "Service animal means any dog that is individually trained to do work or perform tasks for the benefit of an individual with a disability, including a physical, sensory, psychiatric, intellectual, or other mental disability.  The work or tasks performed by a service animal must be directly related to the handler's disability.*

    *Dogs used for emotional support, that are not task-trained, are called emotional support animals. They are not service dogs".*

This section is tabled until the opinion of a lawyer is obtained.

**New Business**
**23W:** An inspection of the wiring of this unit resulted in several items that required repair.  The repairs were completed , the owner paid the contractor and requested reimbursement.  Jon reviewed the repairs and invoices, Max approved the reimbursement.

**Manager's Report:**

7

3055300/000460

DRAFT

**Infrastructure and maintenance**: Monthly scheduled filter changes to gray and fresh water distribution systems were completed. The new fresh water system recommended the filters to be changed every 3 months, Jon has opted to change those filters every month. All other systems are operating properly until this weekend when a WAPA outage heated the breaker of the gray water motor and caused it to burn out. The breaker was changed and we may be changing the meter box. We continue to run the generator for 45 minutes after power is restored as programmed.

**Off season maintenance items:**
Inspection of steps: 1/3 completed, inspecting on sunny days
Pressure washing 50% complete, inspecting on rainy days
Rails, steps, and parking lot painting will be completed by December 15. Striping and painting will be done after pressure washing is completed.

**Transformer**: should be in Miami tomorrow and is scheduled to be in shipped this week. Once in route, we will schedule Mr. Harvey's visit to reroute the final 3 phase leg of our electrical system.

**Long Term Planning Committee:** Thursday 11/17/11 10:00 AST to use original code for telephonic conference

**Elysian Payment**: No payment has been received. Jon spoke with Gene last week and was told the check is forthcoming.

**CBE Bylaws:** Jon to contact Andy

**Thefts**: Multiple thefts are continuing at CBW, CBE, Elysian, and Cabrita Pointe. Most of the issues have typically occurred Sunday afternoon, between 11a-2p. During each of these occurrences the owner/renter has left his door unlocked and purses, wallets, etc. in plain view. The Association has strongly encouraged the owner/renter to file a police report. Max asked Louanne to draft a letter to the Police Chief from the Board, requesting the police to be on increased alert and provide increased patrolling during the week and weekends.

**Nomination Committee**: The nomination committee recommendations need to be submitted this month to be sent out to the owners by December 1.

**December Meeting:** The December meeting will be 12/13/11 at 8:45am

**Adjournment**: There being no further business the meeting was adjourned.

8

3055300/000461

DRAFT

## ACTION ITEMS

| | |
|---|---|
| Retain lawyer to review and give opinion on No Dog Rule | Max |
| Contact Vince to vote on Executive Committee member | Louanne |
| Announce Executive Committee | Max |
| Evaluation of Managers for December meeting | Max |
| Manual Security Gate repairs | Jon |
| Budget Meeting | Sharon |
| L-41 Determine Foreclosure by CBW | Directors |
| Meet N Greet/Annual Owners Meeting confirm meeting place | Rosie |
| Obtain info on waiver of subrogation and HO-6 policies | Bob |
| Budgetary implications based on recommended changes to Bylaws | Jon |
| Long Term Planning Committee Meeting | Max |
| Elysian Payment | Jon |
| CBE Bylaws | Jon |
| Letter to Police Chief | Louanne |
| Nomination Committee Recommendations for mail-out by Dec | Bob |

9

3055300/000462

**Cowpet Bay West**
**Board of Directors Meeting**
December 13, 2011

**Present:** Max Harcourt, Barbara Walters, Bob Cockayne, Rosie Wells, Sharon Koehler, Bill Canfield, Vince Verdiramo, Jon Cassady, Louanne Schechter

**Open Meeting:**
Max made a motion that our meetings, except when put into executive session are open. "Open" meaning any owner may attend by phone or in person. Bob 2nd, the vote carried with 4 yes and 3 no.

**Executive Session:**
Max made a motion to go into Executive Session to discuss employee performance and compensation. Bob 2nd, all were in favour. Louanne and Jon were asked to leave the meeting at this time. The Executive Committee met and voted to not give bonuses this year. The Board voted 6 in favour of no bonuses and Barbara declined voting.

Louanne and Jon were invited back into the room. Max made a motion to leave Executive Session, Bob 2nd, 5 voted yes and 1no.

**Treasurer Report:** As of November 30
Regular/Special Account Balances - $135,705
Reserve Fund Balance - $425,677

Analysis of Reserve Fund status, Capital Improvement reimbursement, anticipated Reserve Fund balance at year end:

| | |
|---|---|
| Current Reserve Fund Balance - | $ 425,677 |
| Dec. payment due Reserve | + 4,785 |
| Owed for Capital Improvement | - 41,680 |
| Anticipated Reserve Fund Year End | $ 388,782 |

Uncollected funds 60 days & older - $20,880
Louanne reported L-41 is under contract and that we would be collecting the bulk of the outstanding fees if we accept the offer from the buyer which is approximately $18,000. The Directors voted unanimously to accept the offer. Louanne reported that L-48 was also now current.

Budget Issues

1. Management Salaries/bonuses
2. Capital Improvement Projects

Sharon stated that without Capital Expenditures, we would have to reduce the Reserve Fund by approximately $10,000. We would also continue the $60,000 insurance fee but we would spread it over 12 months.

3055300/000463

Joint Appendix Vol. II Page 1233

DRAFT

Max stated he asked Sharon to prepare the budget using (worst case scenario) the current insurance fees. Max tasked the Insurance Committee to obtain bids for the property to be effective preferably by February. Bob reported he spoke with Mapfre and Executive Insurance and will continue to get bids.

Bob asked Vince if he wanted to be considered for the 2012 Board of Directors, Vince declined.

Bill and Vince left the meeting at this time.

Barb asked, do the owners approve the budget? Max stated that according to the Bylaws, the budget is the responsibility of the Directors and that it is presented to the owners.

Max suggested we have a meeting to finalize the budget next week with the intent of distributing it to the owners by year's end. **The meeting will be Tuesday, December 20th, at 8:45 am.**

Max stated that worse case for insurance is if we have to continue with Mapfre at current rates. The insurance committee is creating a bid package to include risk factors, hoping to obtain better rates.

**Old Business**
**ByLaws**
Anna Paiewonsky reviewed proposed Bylaw changes from the Directors. She suggests the Association be an LLC. Anna dropped the word "apartment" from the entire document. Max stated *apartment* remain as it is used throughout the document. Max suggested the Directors look at the proposed changes in the attachment provided by Sharon.

Article II Section 3: Sharon stated exceptions were made to protect the Association from negligent discharge. Following discussion, the directors voted not to accept this change.

Article II Section 5: Suggested change, in red, left out.

Article II Section 6: 4 above, *Subject to section 4 above* leave out.

Article II Section 8: typo: *Meeting notices* at end of section omit. Leave meeting date notice at 30 days.

Article II Section 17: *Action by consent.* Leave as is.

Article V Section 1: last paragraph Operation of Property,
Change the wording from *preliminary* to approved *budget for the ensuing year shall be provided not less than 30 days.*

Article V Section 2: Paragraph 3- omit *and/or an evaluation based on risk exposure*

Artilce V Section 11: #4: No Dogs Allowed moved from Rules to Bylaws. The Directors discussed Vince's legal opinion that was emailed to owners, the Directors agreed to hire a VI lawyer and obtain that opinion. The directors agreed to keep #4 as:
1. No dogs are allowed on the property, either long term or visiting. The Board may grant exceptions to the NO DOGS ALLOWED rule, on an individual basis, should an owner require the

2

3055300/000464

DRAFT

**Status on Electronic Banking:** Louanne stated she sent the cost and form to the Directors and did not get a response. Sharon stated she never received it, Louanne will resend it.

**Owner List:** Louanne reported she is calling each owner and updating the list accordingly. The list is available electronically.

**Approval of Minutes:** Max made a motion the minutes to the meetings on November 8th and 18th be approved as read. Rosie 2nd, all were in favour.

**Next Meeting:** The next Board of Directors meeting will be January 11, 2012 at 9am.

## ACTION ITEMS

| | |
|---|---|
| Retain USVI lawyer to review and give opinion on No Dog Rule | Max |
| Notify Directors of Special Meeting for Budget on 12/12/11 | Max |
| Prepare Bylaws for distribution to Owners | Max & Sharon |
| Complete recommendations for nominations | Nominating Committee |
| Resend information on electronic banking | Louanne |
| Prepare Ballots for distribution to owners | Louanne |
| Owners Directory updated with email address | Louanne |

4

3055300/000465

DRAFT

**Cowpet Bay West**
**Board of Directors Meeting**
**January 11, 2012-01-12**

**Present:** Max Harcourt, Barbara Walters, Bob Cockayne, Rosie Wells, Sharon Koehler, Vince Verdiramo, Jon Cassady, Louanne Schechter
Bill Canfield could not attend

**Owner W-12:** Mr. Kirschenbaum requested to speak to the Directors on behalf of his wife. He made a formal request for an exemption to the no dog policy. He presented a letter from his wife's physician stating the dog was necessary as part of her treatment. He provided the Directors with certification for the dog. He stated he and his wife would be responsible for cleaning up behind the dog. He stated he has purchased a "no bark collar" in the event the dog should bark. He spoke with his neighbours and they have not heard the dog. Mr. Kirschenbaum stated that when he and his wife purchased their condo there was no rule against dogs. Mr. Kirshenbaum left the meeting.

**Executive Session:** Max asked if there was a need for Executive Session. Vince requested Executive Session there was no 2nd, the meeting remained open.

**Nomination Criteria:** Vince asked Bob what criteria were used to determine who was recommended. Bob indicated the committee had discussions on each candidate. Following discussion, Max stated that there was no new issue here to present before the Board of Directors.

**Minutes of the meeting of December 13, 2011** were accepted with the following amendments:
Executive Session: add to the third sentence *but to increase Jon and Louanne's salaries $4k and $2K, respectively (per Max).*
Nomination Committee: Delete *this afternoon* from Bob's comment to bring info to office (per Bob)
Bylaws: Change to: Anna Paiewonsky made provisions for the Association to be an LLC (per Sharon).

**Minutes of the meeting of December 20, 2011** were accepted with the following amendments:
Missing Applications: Last sentence changed to: Max stated he may send all email correspondence out regarding the issue and leave it to the owners (per Max).

Under Executive Session add: The Board voted to award bonuses to Jon, Louanne, the staff and contract workers.

1

3055300/000466

DRAFT

**Treasurer Report:**
<u>2011 Year End Analysis/2012 Budget</u>
Reserve Account

| | |
|---|---|
| Beginning balance -12/31/11 | |
| Collected from owners | $ 501,759 |
| Interest earned (approx) | + 108,800 |
| CI Expenditures | + 3,000 |
| Reserve fund acct total 12131 | 165,391 |
| Bank acct balances (Reserve) | $ 445,468 |
| Owed from General to Reserve | -425.927 |
| | $ 19,541 |

Upon speaking with Jeanne Brennan this week, she recommended we transfer the $19,541 from our general account to our Reserve account this week.

So, our yearend balance in our Reserve account will be $445,468 (+ or - interest actual)

2012 Budget

Suggestions

We have not budgeted anything for the completion of the 4-year electrical project. If Mr Havey is not yet scheduled to come down here, we should defer his trip to a more reasonable time

Before commencement of any approved CI projects, Exec committee/Board should be thoroughly briefed on scope and cost and terms of contract, if any.

2

3055300/000467

DRAFT

Max asked if we had any unanticipated projects in the last quarter. Sharon reported the masonry project, specifically cistern repair and spalling replacement under buildings cost us 35,000 that we did not budget. Jon reported most of the expense was on spalling which had to be done.

Max requested the new budget be sent out to owners as soon as possible.
Jeanne Brennan is scheduled to meet with Sharon, February 3, to work on Financials.
Sharon asked how much Jon was budgeting to complete the electrical project. Jon said it will be 7-8K that will come out of Building Expense. He stated we were bringing Kent Harvey down after "season" is over.
Sharon requested that any Capital Project that comes up be brought to the Executive Committee or the Directors with bids if possible.

**Old Business**
**L-41**: The property is scheduled to close around the 18th of this month. We expect to get all arrears paid.

**Bylaw vote**: Max reviewed the votes 10 of 10 are for the changes. Bob suggested the Directors begin a campaign to contact owners to vote.

**Insurance**: Marilyn Blackhall will head up the insurance committee, effective immediately. Anyone interested in joining the committee should contact here. Max has asked the committee to craft what we want which is based on current appraisal, accepted risk- agreed value.
Vince requested the Association obtain a risk assessment.
Bob stated that" we comfortably have through February, if that's the time table we agree upon, to make a change." We will have a 10% cancellation penalty should we change the policy.
Max made the motion: It is the intent of the board to investigate retaining a risk assessor to determine what an accepted value of our insurance should be Sharon 2nd 4 voted for and 1 abstained. Motion passed.
Bob reported that Mapfre is now offering an HO6 policy.

**New Business**

**Dog Letter**: Max received a letter from Karen Benson who is the attorney for Barbara Walters. Barbara stated she was confirming her rights and that she is on the correct side of the law.

Vince made a motion that we abide by the rules and immediately begin fining owners that have dogs. Discussion included utilizing the firm of Hodge & Francois to develop a policy regarding our no dog policy and procedure for exemptions when warranted. Bob distributed information on Service Dog Certification naming businesses that have no requirements for service dog certification.

The motion was repeated that we abide by the rules and immediately begin fining owners that have dogs. Fines may be held in abeyance until the issue is adjudicated. The Vote was 3 for and 3 against. Bob and Vinnie requested we contact Bill for his vote on the motion. Bill was not available, a message was left for him to call.

3

3055300/000468

DRAFT

Max made a motion that the association hire an attorney to appropriately respond to the letter we have received and assist us with determining our status with our no dog rule, Sharon 2nd, all were in favour.

Bill Canfield phoned in and was placed on speaker phone. Vince restated his rule: We strictly adhere to the no dog rule, and that all owners having dogs on the property be fined and the fines be held in abeyance. Sharon 2nd, 4 voted yes, 2 No, 1 Abstained, Bill left the meeting.

Bob made a motion that the fine be assessed at $50/day in abeyance. Sharon 2nd. 4 voted yes, 2 voted no.

Louanne was instructed to send letters by email and mail that informs the owners with dogs of the decision to begin fines tomorrow.

Max made a motion to begin fining owners with dogs a $50/day fine to be held in abeyance. Sharon 2nd, the vote was taken with 4 yes and 2 no.

Vince suggested that a copy of the letter from Barbara Walters lawyer . be sent to our D & O insurance.

**Non-compliant Enclosed Porch:** Vinnie made a motion regarding Lance Talkington's enclosed back porch: Send a letter to Lance Talkington that he is in violation of the remodelling rules of the condominium association and that he needs to remove it immediately. Rosie 2nd, following discussion and review of records the vote was taken with 3 yes and 3 no, Bill Canfield was contacted by phone, the vote was taken again with 3 yes and 4 no.

During discussion the question was asked should the owner pay more in common fees due to the additional square footage for the unit by enclosing the porch. Max suggested we table the discussion for another meeting

**Additional Weight to Porches**: Max suggested we table until another meeting the addition of additional weight and storing of heavy equipment on porches. Barbara suggested that the owner be responsible for a structural engineer to determine if any additions or equipment can be stored safely.

**Volleyball Court:** The volleyball court appears to be on CBW property. Vince stated the Association should check with our agent of our liability insurance to determine if we are covered should someone get hurt. Should we not be covered, we should find out what the cost of a rider to the policy would cost.

At this time Vince left the meeting.

**Manager Report**

Monthly filter were changed January 3rd. The waste water and treatment plant are functioning well. Typically we exercise the generator on Thursday however, we ran the generator yesterday to decrease the cost of running the R/O plant.

Painting Steps: Jon has added an additional worker to complete the painting of the steps. He hopes to complete 50% this week and the remainder next week (weather permitting).

4

3055300/000469

Joint Appendix Vol. II Page 1239

DRAFT

Security Gate: The electric gate malfunctioned. A WAPA outage shorted out the pedestal on the outside. The pedestal had a message "power down exchange chip. Jon powered down and powered back up. The pedestal stated erase all memory? Jon powered down again and called the vendor. The vendor was unaware of this message and would have to contact the manufacturer (who was closed for the weekend). The manufacturer was contacted, the service people came out reset the chip and cleared the memory. The memory was restored, and the gate is now functioning.

The manual gate is also broken. Jon recommended the existing manual gate be replaced. A drawing and price was obtained and shared with the Directors. Max stated that the pivot point of the existing gate is not salvageable and perhaps dangerous to use.
Sharon made a motion that we proceed with the new manual gate, Max 2nd, all were in favour.

The No Dog signs will be up next week. Cool Signs is producing them.

Owners Workshop: Sharon reported the workshop is cluttered with chairs, carpet, exercise machine, plastic chairs, glass tables, etc. so that the work table is not usable. The area is to be cleaned.

At this time Bob left the meeting.

Roadside Signage: The Directors suggested the knocked over base of the sign be up righted and reused if possible. The quote and the drawing of the sign from Mad Max was provided to the Directors. Max made a motion we have the sign made and reuse the base if possible, Sharon 2nd, all were in favor.

**Action Items** (not completed).
CBE Bylaws: We do not have a copy.
Electronic Banking: Max would like to delay decision until Owners Meeting. Sharon stated that there are many benefits to electronic banking that we don't have now and suggested we go forward with application. Max tabled the discussion until February's meeting.

February BOD Meeting: Tuesday, February 7th at 8:45am same phone in number

Adjournment:
There being no further business the meeting was adjourned.

5

3055300/000470

DRAFT

## **ACTION ITEMS**

| | |
|---|---|
| 2012 Budget be sent to Owners | Sharon |
| Attorney for Dog Rule | Max |
| Letter to Owners in Violation of No Dog Rule re:$50/day fine | Louanne |
| Copy of letter from Ms. Walters to D&O Insurance | Max |
| Increase Common Fees to owners that have enclosed porches | Tabled |
| Determination of Additional Weight on Porches | Tabled |
| Contact Liability Insurance re: coverage for Volleyball | Bob |
| Painting of steps | Jon |
| Purchase and implement new manual gate | Jon |
| No Dog Signage | Jon |
| Clean out owners workshop | Jon |
| Contact MadMax re: road side sign | Louanne |
| Reset base of road side sign | Jon |
| CBE Bylaws (obtain a copy) | Jon |
| Electronic Banking | Tabled |

6

3055300/000471

**Cowpet Bay West**
**Board of Directors Meeting**
**February 7, 2012**

**Present:** Max Harcourt, Barbara Walters, Rosie Wells, Sharon Koehler, Bill Canfield, Jon Cassady, Louanne Schechter, Bob Cockayne attended by phone conference. Vince Verdiramo was absent. Jon was excused to attend to a meeting with representatives from Elysian, and CBE and CBR with a public surveyor and joined the meeting in progress. Also present were: Judi Kromenhoek, Doug Rebak and (by phone) Lance Talkington and Al Felice.

**Executive Session:** Max asked if there were any items to be discussed in Executive Session, there being no necessity, the meeting continued.

**Approval of Minutes of January 11, 2012:** Sharon requested in the December BOD minutes should read Anna Paiewonsky contributed language to make provision for LLC's throughout the bylaw document. In the January minutes, the last name of Barbara's Lawyer is incorrect. Also, omitted from this section is Max asking Barbara if she had registered any complaints and she acknowledged the HUD complaint. Max Indicated that further discussion was halted pending the hiring of an attorney for the Association. In the second paragraph, the document Bob distributed was entitled "Service Dog Certification-Spotting Fake Certification's".

**Treasurer Report:** Sharon reported the bank balance at the end of January is a total of$ 445,760 in our reserve funds and $82,500 in our operating accounts. L-41 closed in the month of January resulting in full payment of fees in arrears ($21K).

Jeanne Brennan, CPA, met with Sharon, Max, Jon, and Louanne to review the financials. The budget was reviewed for accuracy and the cash and cash equivalents were reviewed. Jeanne made suggestions for adjustments to clarify the work on the beach, the payments from Elysian, and our capital improvement expense at the end of the year was $158,178. This year we have $114,000 budgeted for capital expenses. The gray water project from 2011 and the electrical project from 2011 will require funding to finish that is not in the 2012 Budget.

Sharon will change the signatories on the First Bank account following the election to allow for a member with 3 years to be on the account. She will also add checking to the account to allow for monthly deposits to the fund as well as withdrawals as the CPA has suggested.

**OLD BUSINESS**

**HUD complaint:** At the last meeting the board voted to retain an attorney. Max met with Marie Hodge and subsequently engaged her to handle the dog issue. Marie Hodge and our O&O Insurer were sent a copy of the HUD complaint. The insurance Company has assigned an attorney to respond to the HUD complaint and Maria Hodge will be providing the opinion on the dog issue. The Executive Committee met with Maria Hodge via teleconference. The Executive Committee is not at liberty to discuss any more detail on advice of Ms. Hodge.

**L-41:** The unit sold and the arrears collected in full.

1

3055300/000472

Jon returned to the meeting at this time.

**Insurance Committee:** Nothing to report at this time.

**Bylaw Vote Status:** Approximately 28 votes have been collected at this time.

**Annual Owners Meeting:** Max thanked the following people:
> Rosie set up the catering for the meeting. Randy Driscoll will be catering for $300
> Jon negotiated the meeting room for free.
> Sharon and Sally have set up the Meet & Greet
> Bill Canfield arranged for the use of the Yacht Club for the meet and greet for a minimal fee to be determined.

**Owner Package for Annual Owner Meeting:** Louanne stated she will have the material printed tomorrow, to include: Agenda-Insurance Summary-Cash Equivalents-Budget-Owner Issue Policy

Owners were sent an email to bring the proposed Bylaw changes with them to the meeting.

**Owner Issue Policy:** Max requested the Owner Issue Policy be included in the owner package. Jon requested the Directors verify the spalling example in policy. Jon explained that most interior spalling is caused from rebar, but the rebar is not a structural problem unless the rebar itself shows physical signs of distress. Jon obtained the opinion from Mr. Ferraris, the structural engineer that examined some of our exposed rebar. Mr. Ferraris said rebar "pops" in (mortar) plaster because of the property of the metal reacting to moisture causing rust and swelling which eventually will cause a crack or spalling, no different than drywall "pops". The rebar may need to be sanded and chemically treated to prevent further spalling to the finished surface, which is cosmetic. Owners have been responsible for cosmetic repairs and the Association is responsible for structural problems. Max stated in accordance to our Owner Issue Policy, The GM will inspect the problem, if the owner is not in agreement with the GM, then the owner would submit the complaint to the Board. The Directors will then make a decision on the matter.

**Annual Owner Agenda:** Max presented the proposed agenda.
> Parliamentarian: Max requested Ed Wardwell be the parliamentarian to keep order during the meeting.
> Roll Call: Louanne
> Establishment of Quorum: Rosie
> Proof of Notice: Louanne
> Meeting Minutes: Rosie will be responsible for the reading of the minutes from last year.
> President Report: Max
> > Insurance for 2012: Marilyn
> Treasurer Report: Sharon (utilizing the amended 2011 budget)
> Manager's Report: Jon
> Nominations Committee Report: Committee has nothing to report.
> Old Business: From Owner's 2011 Meeting
> New Business:
> Announcement of Election Results

2

Max made a motion that the Agenda as revised be approved for the Annual Meeting. The motion was 2nd by Bob, all were in favour.

**Set-up for Annual Meeting**: Jon will obtain the key on Friday to set-up the meeting room.

**Walk-around:** The walk-around was conducted by the executive committee, the minutes were sent out to the Directors. The focus on the walk-around was to indentify long-term projects as well as inspect the general area.

**Fines:** Judi Kromenhoek requested more detail to the fine that she received on her statement. She would like to know what it was for and who enforced it. Louanne stated that in the statements sent through QuickBooks, item, quantity and cost are the only information provided; she spoke with Jeanne and confirmed that utilizing the invoice feature would allow for an explanation.
Barbara requested a timeline as to when the Attorney would make a determination on the Service Dog Issue. Max stated he was not at liberty to discuss the issue.

**Mailboxes:** Max had a request from Carolyn Wardwell to have the mailboxes replaced. During the walk around, it was noted the mailboxes were showing signs of rust. Louanne followed up on a lead from Carolyn from CA which was disregarded due to the prohibitive shipping cost. Max requested Jon follow-up with local merchants to see if they can be purchased or ordered on island.

**Employee Parking:** Rosie stated she had a complaint that employee's were parking in guest spots. Jon stated employee's park in available spots. Sharon suggested employees park alongside the dump truck. Max stated Jon will be responsible for employee parking.

**Illegally Parked Cars:** Sharon requested the parallel parking on Leeward that has 2 parking spots be striped where parking is illegal, signs be posted again, and Stickers be placed on windows of cars that are parked illegally.

**Security Guard Schedule:** Jon reported the sequences of the guard schedules in the past which has evolved to the current guard schedule being a roving guard on our property from 4-6p then at the Guard House from 6p-6a. The weekends are staffed with roving guards from 10am -6p then, from 6p to 6a at the Guard House.
Sharon asked what the events of the theft from L-22 were. Jon reported the facts as given by the owner to the police. The differences between this theft as opposed to the previous midday "crimes of opportunity" (unlocked doors) are:
L-22 was at night others were midday. Owner was in room adjacent to foyer, other; were on the seaside deck or not in the unit. The purse was taken and has not been found, others: cash was taken and the wallet/purse left behind.

Doug Rebak reported that he has installed devices that sound an alarm when the door is open or there is motion.

**Owner Renovation Request:** Max submitted a request to change his electrical panel to bring his power up to code and running a 220v line to his utility room. Max made a motion for approval of renovation, Barbara 2nd, all in favour.

3

3055300/000474

Stickers on car: Sharon would like the security guards to apply stickers to cars parked illegally.

**L-01 Freezer on Porch:** Sharon reported her husband said there is no issue with the weight of the freezer. The owner is willing to make a cover for the freezer if it appears to be unsightly. Max stated that the white freezer is against the white shutters. Should a cover be made, it would be more visible.

**L-03:** Sharon stated L-03 sent a letter to Max that the addition to his unit was approved by the Directors. Max will forward a copy of this letter to the Directors. The Directors will have to decide if the owner will be responsible for increased charges to his common fees because he has increased his square footage. The Directors will also direct the green stripe to be applied.

**Manual Gate:** The gate is finished and will be delivered and installed this month.

**Security Gate:** No bids have been submitted by Kevin Cogan

**No Dog Signs:** Jon reported during a walk-around with Max, they noted CBE had attractive signs with their logo. He is working with Cool Signs to provide a similar design for CBW.

**Cowpet Road Sign:** The concrete needs to be rolled up and reset. The sign has been ordered by through Mad Max.

**Steps & Railing Painted:** Steps are completed up to L-08 with non-skid. Railings were not completed, on Windward they are being sanded down then repainted. Barbara reported that W-51 back of new stair was not painted.

**Step and Landing Repair:** We have replaced 3 with Chris Thompson at this time. Jon has asked several contractors for bids with the scope of work being: remove old brackets, through bolt and reinstall step. Contractors would like to do one before they commit to a price.
Sharon asked why we had purchased the angle iron and bolts for the entire property, Sharon stated that we were going to do partial order and only the steps that need repair were to be completed. The budget was for $20,000 for the entire project and we have already spent $14,000. Jon requested the Directors choose which stairs/landing be repaired. His understanding was we had $50,000 allotted for this capital project. The budget was reviewed and there is $50,000 on the budget for the stairs.

**Masonry:** Jon has not been able to find a contractor to commit to a fixed price to repair the spalling under the buildings.

**Tree wall damage repair:** The walls around the trees. Sharon stated that her husband, Bud, suggested take down the walls and replace with railing. The tree near L-26 is buckling the sidewalk and the road as well as the walls.

**Owner Workshop:** Jon is contacting the people that have items in that room to have them removed.

**CBE Bylaws:** Jon gave Max a copy of the CBE Bylaws.

**Surveyor:** A surveyor from public works has an "as-built" plan with no footings or markings and is attempting to find the property lines for Elysian, CBW, CBE, and CBR.

4

3055300/000475

**Letter to Owners:** Max sent a letter to our neighbors that the volleyball net needed to b e removed from CBW property as our liability insurance does not cover athletic activities.

**W-47:** Jon reported the events leading to the fines that were charged to W-47. There were multiple phone calls leading to our maintenance men looking for a water leak. The manager stated there was a maid there to let him in the unit. There was no one to let him into the locked closet Thursday, Friday, Saturday (x2). The problem was in the locked owner closet. The owner was instructed on Friday to contact a plumber, that it was not an Association issue.

Sharon stated she would write a letter to the owner explaining the events. Louanne provided Sharon a copy of the plumber's bill that explains the problem is the owner's. Jon will provide Sharon with any other data on the events she may need.

**Manager Report:**

**Filter Changes:** Monthly filter changes were completed as scheduled

**DPNR:** There were 2 inspectors on property yesterday. One was the annual inspection of the WWTP, the RO plant, and the potable water systems for the EPA and DPNR. The other inspector was here to inspect our fuel storage and SPCC (Spill Prevention, Control, and Countermeasure Plan) plan, kit, and Terminal permit. Facilities that have fuel storage over a specified limit that if spilled could find its way to navigable waters require this Terminal permit. DPNR began enforcing this permit process January 2012. CBW has in place, a SPCC plan and spill kit, and applied for the permit December 2010 with the application and a check for $750. The inspector did not have the application on file. CBW will need to have formal training from the inspector for use of the oil diapers. Our Water Pollution Control, TPDES permit, Air Pollution Permit , and SPCC Plan and Terminal Facility Permit were all in compliance with no deficiencies.

**Other Action Items**

**Retain an attorney:** See HUD complaint above.

**Electronic Banking:** Louanne resubmitted to Directors. There was no discussion.

**Owners list with email addresses:** Completed and owners informed to request by email

**March Meeting:** The March meeting will be March 6th, at 0845am AST

**Meet & Greet:** Sharon stated the Meet & Greet is a social function and requested W-44, Judi not be permitted to provide any information regarding L-49 Doug to the event. Max agreed that it is a social event.

**Adjournment:** There being no further business, the meeting was adjourned.

3055300/000476

**Action Items**

| | |
|---|---|
| Update signatories on First Account and include checking | Sharon |
| Annual Owner Meeting Package to Print | Louanne |
| Set-up for Annual Meeting | Jon, Max |
| Invoices for fines | Louanne |
| Mailbox replacements | Jon |
| Striping of no parking areas, posting of signs | Jon |
| Letter to W-47 | Jon, Sharon |
| Letter from L-3 to Directors | Max |
| Increasing fees on units that have enclosed common area | Directors |
| Installation of manual gate | Jon |
| Bids on new automatic security gate/cameras | Jon |
| No Dog Signs | Jon |
| Cowpet Road Sign Base/sign | Jon/Louanne |
| Step & Rail Painting progress | Jon |
| Step & Landing Repair bids/progress | Jon |
| Owner Workshop clean-up | Jon |

6

3055300/000477

**Cowpet Bay West**
**Board of Directors Meeting**
March 6, 2012

**Present:** Ed Wardwell, Bill Canfield, Rosie Wells, Sharon Koehler, Max Harcourt, Herb Horwitz, Doug Rebak, Jon Cassady, Louanne Schechter
　　　　Owners present: Al Felice and by phone Lance Talkington
Comments from the President:  Ed asked the Directors to come prepared, be on time, and serve the best interest of all the owners at Cowpet Bay. He asked that Directors leave their personal bias at the door and treat each other with respect as elected individuals of the Association.

Sharon requested conference phone be activated for owner participation. No one knew the conference number.  Louanne was to locate the number and activate the call.

Each Board Meeting will be an open Directors meeting for any owner to attend.  There will be a closed Executive session following the Board meeting with Board members only.  The purpose of this session is to discuss legal and fiduciary matters to be discussed and protect the privacy of all owners.

**Approval of Minutes of February 7, 2012 meeting:**  Max stated he had sent correction to Louanne.  The corrections from Max are:  Also present were: Judi Kromenhoek, Doug Rebak and (by phone) Lance Talkington and Al Felice.  Treasurer report last sentence add: ($21K), and Letter to Owners, change *owner* to neighbors. Motion to adopt as amended was made and 2nd.  All were in favour, motion carried.

Sharon requested that Louanne send out the minutes, with amendments to all the Directors.  Louanne replied she would send them out as soon as the Secretary had made the changes and forwarded them to her. The amended minutes are to be made available to the Directors by March 12, 2012.

**Treasurer's Report:**  Sharon reported the current bank balance is approximately $13,000 in our general funds.  We have not reimbursed our operating accounts for capital expenditures so far this year. Our First Bank Account has $445,900.  We have approximately $11,000 in uncollected owner fees which our 60 days or over.  This does not include the fines that are approximately $B,000.

Sharon continued that transfers of money have to be made.  As discussed last month there is a concern regarding the FDIC and the amount it insures which is $250,000 per account.  We could have 6 accounts each would be covered.  The current interest rate is .05% Banco Popular interest is .02% and Fidelity is .021%.  Her recommendation is we should open a second account at First Bank.  The current account at First Bank has no checking account; a current signatory on the account must sign a withdrawal slip. There is a time lag between obtaining funds from First and moving them to our operating account at Banco.

Herb suggested using Navy Federal Credit Union that utilized electronic banking.  Sharon said she would be interested in exploring that option

1

3055300/000478

Joint Appendix Vol. II Page 1248

Ed asked what was involved to immediately get the new signatories on the First Account. Sharon stated we need to have a copy of the minutes of the Annual Meeting that shows the elected officers, the new signatories need to go in person to the bank with a driver's license and sign the signature cards.

The conference phone was activated at this time.

The conference phone dropped the call. The number was redialled

Ed asked when the Annual Meeting Minutes would be available. Max stated his comments had been sent. Ed asked Rosie when she would complete the changes by Max. Rosie asked Max to resend. Ed requested Rosie complete the Annual minutes by March 15.

Ed asked Bill and Sharon to meet him at the office at 2:00pm tomorrow. They will go to First Bank to make the changes on signatories which will be: Ed, Bill, Sharon, and Rosie. Ed is currently on the account.

**Employee Severance package:** Jeanne Brennan was unaware we had a severance package. Four employees, Steve, Arlington, Marcellus, and Joey have letters that state they are entitled to 4 weeks of vacation and they would receive 1 week of pay at current rate of pay for every year if they were let go, if they retired they would receive 1 week of pay, at current rate for every year after the third year of employment. Jeanne suggested we begin funding for it and include it in the budget as a line item of liability. The letter of engagement to Jeanne was revised as well as the financial statement to include this item.

Budget vs. Actual: Sharon stated we have used 44% of our current capital improvement fund and we have 56% of our funds to last us through the remainder of the year. She cited the purchase of the hardware for the stairs at $14,000 and the continuation of the masonry projects as the items utilizing most of the capital funds.

Doug asked when funds are expended what is the protocol. Sharon stated the Property Manager reviews the checks and signs the weekly report. The Treasurer then signs off the checks. She stated when she was Treasurer 3 years ago checks were not released until the Treasurer signed the form except for certain circumstances. Ed tabled the discussion at this time.

**Managers Report**
Systems: The gray and fresh water distribution system filters were changed today. They are changed every month on the first Tuesday of the month approximately 10 am. All the rest of our infrastructure systems: the RO, WWTP, GenSet, Fresh and Gray water Distribution systems have no problems to report since last Board Meeting.

Action Items from last meeting:
- Striping and Parking sign along the Leeward wall were reinstalled

2

3055300/000479

**Insurance Committee Report:** Doug reported that he along with Bob Cockayne and Herb Horwitz have selected 7 brokers to go out with a request for proposals with our bid specifications being made to them. Our objective is to pick ones that are reputable ones that understand that we are trying to reduce our insurance cost and also get it to the first quarter of the year being March 29th for our renewal date. We told them we would like to reduce our cost and we are prepared to increase our risk. We have sent to Tunick, Executive Insurance, Marshall and Sterling, Topa, Guardian, Specialty Brokers (Mapfre) and Red Hook Agency. Six have expressed an interest. The Specifications we sent out included a total property agreed value of $25,916,000, no co-insurance, replacement cost insurance, bid on a windstorm sublimit of both 1 and 2 million dollars with a 3% deductable by building. Earthquake and sublimit of 12.5 Million, with a 5% deductable on earthquake which is standard in the VI, Flood sublimit 3 Million with a deductable of $ 10,000, all other perils 12.5Million with a sublimit deductable of $250. The target date for vendors to return proposals is March 15.

The date is critical in the sense that Insurance carriers have more available capacity before hurricane season so obtaining a policy in the first quarter may save some expense.

Doug stated they only asked for 1M & 2M with the thought process that during Marilyn, CBW took a full frontal hit and sustained a $3,700,000 bill. Of that $700,000 went to the adjuster, 1M was for the brand new doors, 1M was for shutters, and $300,000 went to the seawall, leaving $700,000.

Herb said he did several scenarios with none of them going over our reserve fund.

Doug mentioned that improvements and betterments were covered in the Mapfre policy. This coverage lowers the cost of a HO6 policy.

Doug stated the strap downs, the tie downs, the shutters, and the hurricane rated doors are all improvements allowing us to take more risk.

Ed recessed the Directors Meeting at 9:45.

The Directors meeting reconvened at 11:00 with Louanne and Jon present.

**Owner Inquiry Policy:** Ed stated it is self explanatory and his intention is to recall the owners attention to the policy that there is a procedure and the staff is prepared to respond in accordance to the policy.

Sharon stated that when letters are sent to the Board, there is no Director that is responsible for responding. Ed stated he would be responsible for responding to each and every letter that requires a response. Ed will bring the letters to the Directors that are in conflict with the manager's decision. Max stated Sharon had developed a form. Sharon stated the owner should sign off on the form. Ed requested Sharon supply him with the form.

**By-Law Amendments:** Ed stated we did get approval for over 2/3rds to adopt the amendments. Some owners have replied to Ed regarding the legal status of the By-Laws. Following discussion, the Board decided to go forward with the will of the majority of the owners. Max made a motion that Maria Hodge have the By-Laws registered with the condition that another retainer is not requested. The motion was 2nd, all were in favour. Max will contact Ms. Hodge. Ed provided Max with a letter from Ms. Paiewonsky that outlines her legal opinion on the By-Laws.

4

3055300/000480

**Invoices for fines:** Fines were removed from the statement and transferred to an invoice. The invoice allows for description of fines, the statement does not.

**Mailboxes:** The budget does not allow for new mailboxes. Jon will have maintenance reshingle the roofs over the mailboxes and repaint. To be done by next Board meeting.

**W-47:** Ed will respond to their reply.

**L-03:** Max forwarded the letter to Board members regarding the enclosure. The Directors agree this is not an issue

**Increasing fees when owners enclose common areas:** The Directors decided this is not an issue.

**Owner Workshop:** Jon will have treadmill removed.

**New Business**

**Staff Parking:** Sharon stated with her company and other 2 car families in her area there is not enough guest parking. She suggests Employees Park next to the dump truck. She suggested the pick-up be parked in front of the maintenance shop.
Max suggested we have diagonal parking spaces due to the difficulty of backing out.
Sharon wanted to know when her area would be pressure washed: Jon stated is was done recently
Doug asked if the parking lot was going to be striped: Jon said the numbers would be done over the next week.

**L-3 Water Leak:** Herb Horwitz had water leaking in his unit. The source of the leak was from a pipe in the wall that had been modified by L-3 to accommodate a water line to his icemaker. Jon informed L-3 the damage was his responsibility as the leak was on the unit side of the modified valve. The invoice for the plumber was sent to the owner. The owner refutes the issue. Herb Horwitz took pictures of the alterations to the original water line and distributed them to the Directors. Following discussion, the Directors agreed it is the responsibility of the owner. Ed will contact the owner.

**L-01** Needs the wall patched and painted.

**L-06** Needs a wall patch from the water leak repair done 2 weeks ago.

Herb asked for clarification regarding rebar "pops".     Subject was tabled.

**Automatic Gate:** Approximately 3:30am this morning, a renter at CBW rammed the gate and damaged both hydraulic arms and bent the gate. The renter has given Jon his information and accepted responsibility for the accident. The police will be contacted to complete a report.

**Employee shirts:** Rosie said the staff requested new shirts. Rosie made a motion to purchase new employee shirts; the motion was 2nd all were in favour. Louanne will order them.

5

3055300/000481

- The letter for W-47 was completed by Sharon and sent to owner. Jon gave his original notes to Sharon for documentation purposes. Sharon stated W-47 had sent a letter last night refuting the facts sent by Sharon.
- Installation of the Manual Gate is not complete, the pad is completed and the support in place, two brackets ordered from the states have not arrived and the vendor has placed a second order. The gates are on property and the installation will be completed once the brackets arrive. Ed asked for a completion date, Jon stated 3/15/12
- Bids on security cameras. Kevin Cogan, of First Alert, sent bid. He suggested put a remote video recorder in the workshop which will hold up to 4 cameras and if we also want the yacht club area monitored, place another video recorder in the last break room in the end. Ed instructed Jon to forward a copy of the bid to Bill. Bill will have the security committee review and report back to the Directors. Doug suggested that any placement of video recorders should be a secure area.
- No Dog Signs are completed and placed. Sharon said the placement is too far back on the lawn. She would like them placed on the property line of the grass area and add more. Sharon stated at least 4 were necessary along the property line. To be completed by 3/9/12
- Road Sign not complete the base was not budging. Doug suggested leaving it as a safety barrier. Put a new base in front of the old and install the sign.
- Steps & Rail Paint: Steps painting is complete with the exception of 2 on Leeward, 28 and 30, due to renters. Will be completed this week. The rails are just now beginning. Step repair: we have had one contractor do several of them to come up with a firm bid and his price is $225 to remove the old brackets, prime, and drill through and install. He is asking for $100/hr for any additional work. Doug stated the contractor's work, in his opinion, look terrible. He is also concerned the brackets are shorter.
- Owner workshop: Scooter has been removed, the carpet is removed. A treadmill is there. Sharon wants everything removed other than the inventory. Sharon stated the owners' closet also has a scooter and kayak in it.
- L-6, L-10, W-26 Jon is looking for drip edge that will span the difference between the gutter and the roof. The roofs that were replaced in Marilyn were not lined up with the appropriate overhang. The seamless gutter doesn't meet. Jon is looking for drip edge to repair the problem. He has asked Chris Thompson's assistance in obtaining the material.
- L-1 Had a water leak, while chipping the wall away, we found the source of the leak was a modification that L-3 had done to the plumbing.
- W-7 Crack repair. Charleson Burton has completed the Association's responsibility below the window.

**Chairperson Appointments:**

**Committee's**     The five standing committees and their respective chairpersons are:

  ➢ Nominating – Doug Rebak
  ➢ Landscape – Judi Kromenhoek
  ➢ Insurance – Doug Rebak
  ➢ Security – Bill Canfield
  ➢ Property and Planning – Max Harcourt

Ed intends to, in his letter to owners today, identity chairpersons and contact information for any owner interested in serving on these committees

3

3055300/000482

**W-12**: The owner has had problems with condensation on his floor over the last 3 years and submitted multiple requests for the Association to assist in the repairs. The owner was informed on each occasion that this problem is between owners and he should contact the owners of W-11. Ed will inform the owner of W-12 this is not an Association issue.

**W-27**: The owner lost power to the unit and requested the Association investigate. The main breaker was tripped and reset. Jon suggested the owner have his electrical panel checked as the breakers inside shut have tripped first. The owner was charged a service call and now refutes the bill. Ed stated the responsibility was that of the owner. Ed will speak with the owner. The Directors decided to remove the charge.

**L-06**: Sharon stated the cats are now a non-issue. And the other issues were resolved during the meeting.

**Letter to GE**: Bill would like a letter sent to GE regarding their proposals on RO and Waste Water. Bill will draft a letter and Ed will send it.

**Solar Energy**: Herb suggested we follow-up on solar energy. Max stated there is a new company on island that leases a system to offsets the cost. Max will obtain information and incorporate into the long-term planning committee.

**April Meeting**: Wednesday April 11, 2012 at 7:45am. The call in number will be 712-775-7000 the code is 106376

6

3055300/000483

## Action Items

| | |
|---|---|
| Amend February Minutes by 3/12/12 | Rosie |
| Resend Amended Minutes to Board Members | Louanne |
| Change Signatories on First Bank Account | Sharon, Ed, Bill, Rosie |
| Open additional accounts to maintain FDIC coverage | Sharon |
| Transfer of funds from First Bank to operating account | Sharon |
| Organizational Minutes | Max |
| Annual Minutes with Amendments completed by 3/15 | Rosie |
| Provide protocol for release of funds | Sharon |
| Add employee severance to budget as a liability line item | Sharon |
| Installation of Manual Gate completion date 3/15/12 | Jon |
| Security Committee Review of Bid from Alert 1 | Bill |
| Adjust placement of NO DOG signs and add 2 by 3/9/12 | Sharon |
| Rails painted –starting this week | Jon |
| New Base on roadside sign | Jon |
| Step & Bracket Replacement; evaluate recent work | Jon |
| Owner Workshop | Jon |
| Drip Edge on L-6, L-10, W-26, | Jon |
| Contact Chuck Waggoner re: By-Laws | Ed |
| Contact Maria Hodge re: By-Laws | Ed |
| Mailboxes: Replace shingles and paint by next Board meeting | Jon |
| Assign employee parking | Jon |
| Repaint numbers on parking spaces next week | Jon |
| L-3 re: Discuss owner responsibility | Ed |
| L-01 Patch and Paint area used to repair water leak | Jon |
| L-06 Patch and Paint area used to repair water leak | Jon |
| Entry Gate: obtain police report/begin repairs | Jon |
| Employee Shirts | Louanne |
| W-12 Condensation issue | Ed |
| W-27 Suggest electrical inspection | Ed |
| Letter to GE | Bill |
| Solar Energy Company research | Max |

7

3055300/000484

Joint Appendix Vol. II Page 1254

**Cowpet Bay West**
**Board of Directors Meeting**
**April 11, 2012**

**Present:** Ed Wardwell, Rosie Wells, Bill Canfield, Sharon Koehler, Herb Horwitz, Doug Rebak (by phone conference), Jon Cassady, Louanne Schechter
Owner's in attendance: Judi Kromenhoek and by phone Lance Talkington

Approval of Minutes of March 6, 2012: There being no objections to the minutes, a motion was made to approve the March 6, 2012 minutes as recorded. All were in favor.

**Treasurer's Report:** Sharon's report is as follows:
Bank balances – March 31, 2012

| | | |
|---|---|---|
| General and Special | $ 87,000* | |
| Reserve | $397,335 | |
| *Owed to Reserve | $38,355 | |
| **Owed to General $11,550 | | |

Outstanding accounts and fines

| | | |
|---|---|---|
| Due 3/31/12 (no dog fines) | | $ 28,171* |
| Dog fines billed, unpaid | | $ 4,900 |
| *Gate fine included $5788 | | |

Review of QBB-1st Quarter 2012

| | |
|---|---|
| Gray water/Pot. Water | $7,500 over |
| Building Repairs | $6,000 over |
| Security | $8,000 over |
| Legal fees | $8,000 over |
| Masonry | $3,000 over ANNUAL |
| Stairs & rails | $7,000 over |

Funding Insurance Policy
We collect $23,700 in insurance income every month from our owners. Our April 1 payment for our new policy was covered by our return premium. We have a May and June payment due of $ 86,122(each); a total due of $172,244.
Ideally we will have our April. May and June collections($71,100) to put toward part of the remaining premium due.
As discussed at our special insurance meeting, it is the board's plan to borrow, in the form of a loan to be repaid, the funds necessary to pay the remainder of our principal from our Reserve account. There will need to be a Board resolution to accomplish this transaction.

**Manager's Report:**
Systems: The gray and fresh water distribution systems filters were changed on the first Tuesday of the month.
Doug asked why the gray water last month became dark and dirty. Jon was not aware there was a problem. Sharon stated that the gray water in her unit is getting progressively worse. Doug suggested the intensive rain storm may have affected the gray water. Jon stated the cistern is covered and rain should not affect the cistern. Following discussion, apparently Leeward gray water has more sediment than Windward. Jon will investigate the problem.

1

3055300/000485

Bill stated he spoke with GE Representatives regarding a new RO system. GE would like to come out next week and assess the property. The representative has indicated there would be considerable savings to CBW. GE would provide the system, as well as the monitoring and maintenance. CBW would pay for the water usage. GE would also be interested in replacing the water meters.

Jon stated that all systems were operating efficiently.

Responding to the quarterly report of "overages", Jon noted that his expenses , if averaged over the entire year, would be within the limits of the budget.

There was one issue with a raw sewage lift pump located by the yacht club last month, leaving only one pump operating to push uphill to the WWTP. The pump had to be pulled up from the raw sewage pit to be inspected. The impeller was jammed by a large piece of concrete that was in the pit. The concrete was removed and the impeller spun backwards and restarted. To prevent further jamming, the pit was drained, power washed, the gray water cistern was cleaned. There was a considerable amount of grease in the sludge that was removed. There was no obvious explanation for the grease.

Building Repairs: Predominantly we are repairing water leaks. We have had several this quarter. There is no preventative measure.

Security: The dollar amount in the budget is due to increasing the hours of the guards. The owners requested and the Directors approved increasing hours for guards on weekends and from 4p-6p. Bill said he spoke with the head of security, Dean. Dean suggested the guard walk 20 minutes, then return to the guard house 20 minutes, rather than only monitor the gate. Bill also suggested the golf cart be utilized by the guards to monitor the property.
Jon and Bill will meet with Dean and revise our current plan.

Additional cameras were discussed with Alert 1. Bill believes the expense of cameras is not cost effective. He stated a 6 by law a 60% head shot is required.

Masonry: We have completed the cistern repair, sealing and clean-out and began some of the crawl space spalling projects as the budget permitted. The annual masonry budget is exhausted and the project is on hold until the next budget year. Jon estimates that 25% of the spalling repairs were completed.

Stairs and Rails: The project is on hold. The upfront cost of $14,000 was materials. Jon has estimates of $250/stair. At this cost, the project would be on target for the annual budget.

**Insurance Committee Report:** Mapfre representatives visited CBW and brought the policy. The owners received a copy of the comfort letter. Owners are being offered a 25% discount for HO6 policies.

**Property and Planning Report**: Max held a meeting on solar energy. The minutes are as follows:

*Purpose of this meeting: The purpose of this meeting was to examine some possible options for using solar energy to offset our WAPA electrical bills.*

*Mr. Rosen was invited to tell us about his company and how they might fit into our long-term planning for the use of solar energy to ease our WAPA bills. Prosolar is grid-tied photovoltaic (PV) system*

2

3055300/000486

*accommodation of a non-obvious handicap the Board may require (1) the submission of documentation verifying that the person meets the Federal Fair Housing Act's definition of disability; and (2) documentation from a doctor or other medical professional who is in a position to know about the individual's disability, and that the requested accommodation is related to the individual's disability. All information submitted to the Board that is necessary for the evaluation of the reasonableness of an accommodation will be kept confidential.*

By changing this paragraph the By Laws will bring the Association into Federal compliance. Herb and Bill volunteered to assist Ed in contacting the owners and obtaining the 2/3 necessary vote.

**Action Items:**

| | | |
|---|---|---|
| Amend February Minutes by 3/12/12 | Rosie | Done |
| Resend Amended Minutes to Board Members | Louanne | Done |
| Change Signatories on First Bank Account | Sharon, Ed, Bill, Rosie | Done |
| Open additional accounts to maintain FDIC coverage | Sharon | Will open checking account |
| Transfer of funds from First Bank to operating account | Sharon | Hold |
| Organizational Minutes | Max | Done |
| Annual Minutes with Amendments completed by 3/15 | Rosie | Done |
| Provide protocol for release of funds | Sharon | Satisfied with current procedure |
| Add employee severance to budget as a liability line item | Sharon | Done |
| Installation of Manual Gate completion date 3/15/12 | Jon | Done |
| Security Committee Review of Bid from Alert 1 | Bill | Done |
| Adjust placement of NO DDG signs and add 2 by 3/9/12 | Sharon | Done |
| Rails painted –starting this week | Jon | Metal done wood rails in progress |
| New Base on roadside sign | Jon | Replace sign |
| Step & Bracket Replacement; evaluate recent work | Jon | On-hold |
| Owner Workshop | Jon | Done |
| Drip Edge on L-6, L-10, W-26, | Jon | Material on island |
| Contact Chuck Waggoner re: By-Laws | Ed | Done |
| Contact Maria Hodge re: By-Laws | Ed | Done |
| Mailboxes: Replace shingles and paint by next Board meeting | Jon | Done |
| Assign employee parking | Jon | Done |
| Repaint numbers on parking spaces next week | Jon | 75% Done |
| Directors don't like color want redone with teal paint | | |
| L-3 re: Discuss owner responsibility | Ed | Done |
| L-01 Patch and Paint area used to repair water leak | Jon | Done |
| L-06 Patch and Paint area used to repair water leak | Jon | Done |
| Entry Gate: obtain police report/begin repairs | Jon | Police Report not available. |
| Employee Shirts | Louanne | Done |
| W-12 Condensation issue | Ed | Done |
| W-27 Suggest electrical inspection | Ed | Done |
| Letter to GE | Bill | Done |
| Solar Energy Company research | Max | Done |

4

3055300/000487

New Business

W-35  Repaint the edge of the porch following the tile installation.
W-07  Ed spoke with the owners last week.  The issue is between the owner and the contractor.
L-50  Doug request his roof be painted as the patching of leaks has left it unsightly.  Ed said he will discuss in Executive session.

Renewal of other Insurance Policies:  Doug will follow up with the General Liability, D & O, and Vehicle Insurance policies.

May Board Meeting Schedule:  May 8, 2012 at 8:45 AST.

Adjournment:  There being no further business the meeting is adjourned.  There will be an Executive Meeting in 10 minutes.

## Action Items

| | |
|---|---|
| Sediment in gray water | Jon |
| Checking Account | Sharon, Ed |
| Meeting with GE Representative | Jon, Bill |
| Meeting with Dean from No-Nonsense Security | Jon, Bill |
| Contact Owners to amend no dog policy | Ed, Bill, Herb |
| Replace sign on roadside (remove distance) and lower | Jon, Louanne |
| Repair fascia with drip Edge | Jon |
| Repaint parking numbers with teal | Jon |
| Obtain police report | Jon |
| Insurance Renewal policies-forward to Doug | Louanne |

3055300/000488

Joint Appendix Vol. II Page 1258

company that began in Florida and started in St Thomas last year. They have installed 5 systems on St. Thomas, and gave us the names for reference. They have established an excellent working relationship with DPNR and WAPA, and have had no permitting problems.

Max made sure everyone knew this was an exploratory conversation, and CBW is just beginning to look at PV system possibilities.

In preparation for the meeting Max had called Michael Bornn at Montessori to discuss their system choice and vetting process (at Anna's suggestion). He also met early with Peter, and they walked the property to examine such things as roof structure and orientation and electrical disconnects.

Peter explained that WAPA allows only 100 KW PV systems per each meter. The VI Energy Office is out of rebate money and the federal 30% rebate is not available to non-profit organizations like cando associations.

To buy a 100KW PV system, which would cover about 8000 square feet of roof area, would cost about $400K-450K installed. A more feasible approach may be to lease the system from Prosolar, and they would provide a guaranteed amount of power. Such a system would cost Zero down, and be financed for 7 to 12 years at an agreed interest rate (perhaps 6%). The amount financed would be about $375K since the contractor/installer could take advantage of the federal rebate. Much of this would be very negotiable.

The expected power produced would be worth about $6K per month at current rates, and the loan payments would be about $3k per month. This would provide an estimated savings on our WAPA bill of $3K per month.

We then spent some time with Jon discussing roof mount attachments, and how a PV system would tie in to our electrical system.

Max asked the Directors if there was an interest in following up on solar energy. The Directors support the concept of solar energy to defray the increasing cost of WAPA as a long term (2-3 years) project.

Max will be having a telephone call-in conference for his committee in May.

**Security Committee Report**: Bill stated he has one owner interested In the committee. Bill stated he has spoke with the head of our security and agrees the guards should be roving the property rather than guarding the electric gate.

**Registration of By Laws:** Ed stated he has obtained the opinion from our legal counsel that we hold in abeyance registration of the By Laws until the Association obtain approval from the owners (2/3 of owners) to change the no dog wording to the paragraph that the attorney has recommended:

No dogs are allowed on the property, either long term or visiting. Owners or occupants who have properly documented and verified disability as defined by Federal Law may make a request for a reasonable accommodation and exception to the prohibition on dogs on the property. An owner or occupant seeking an accommodation can do so in writing to the Board. The request shall include (1) identification of the Owner or occupant seeking the accommodation; (2) explanation of the relationship between the requested accommodation and the disability; and (3) verification of the disability and need for accommodation as set forth in this rule. To facilitate the Board's review of each request for an

3

3055300/000489

DRAFT

**Cowpet Bay West**
**Board of Directors Meeting**
**June 12, 2012**

**Present:** Ed Wardwell, Herb Horwitz, Bill Canfield, Jon Cassady, Holly Case,
   Phone Conference: Max Harcourt, Doug Rebak, Sharon Koehler, Rosie Wells

**Approval of Minutes:**

Approval of Minutes of May B, 2012: There being no objections to the minutes, a motion was made to approve the May B, 2012 minutes as recorded. All were in favor.

Appreciation to Jon for his hard work over Memorial Day weekend.

**Manager's Report:**

Completion of the scheduled filter changes to our gray and freshwater system was completed June 5th at 10:00am. All other operational systems: the Reverse Osmosis (R/O) Plant, waste water treatment plant, generator Gen Set as well as both distribution systems are all operating well.

Continuing progress on the step and rail painting. The entire complex is approximately 60 percent complete. Windward is almost finished. Leeward 1 through 44 area is what needs to be completed.

Completed the Gray water transfer lines in the Leeward field. It has been operational for over a week. Capped old gray water pipes on each end in case they are needed at a later time.

Continuing to replace exterior lights, an additional 44 sets were ordered.

Owners Request:
Completed the ledge repairs at owners' request for L-46 and L-50. Complete removal of the ledge replacing it with a fiber glass cap with a top coat wax compound to water proof.

**Treasurer Report:**
Report submitted by Sharon:
<u>Bank balances</u> – June 12, 2012

|  |  |  |
|---|---|---|
| General & Special | $ 51,000 |
| Reserve | $ 2B3,181 |

<u>Banking information</u> :
Due to not receiving end of the month back-up of QuickBooks, unable to report everything. There are some discrepancies but will be resolved once required information is received.

All of the 2012 insurance premiums are paid in full. Total amount paid $307,057.00.

1

3055300/000490

DRAFT

Ed stated that Julie the accountant will be working with Holly to do the required tax payments due on the 15th of the month and will come in again for the end of the quarter tax payments and to close the books and make sure everything is in accordance.

Louanne will be compensated to the end of the June for extra time and unused vacation time.

Sharon will provide an analysis of our six-month operating expenses to the Board at the August 7th Directors Meeting.

Arrears:
1 owner is 3 months in arrears, the remaining  7 are 1 month.

Resolution to Amend Banco Popular Checking Accounts Signatories:
**Association Resolution to remove Louanne Schechter and append Holly Case to the Operating (General) Accounts  Signatories**

***Resolution of the Board of Directors of Cowpet Bay West Association ("CBW")***

*WHEREAS, CBW is a Condominium Association organized and existing under the laws of the Territory of the U.S. Virgin Islands; and*

*WHEREAS, the members desire that the Association shall act in full accordance with the rulings and regulations of the Internal Revenue Service, as administered by the Virgin Islands Bureau of Internal Revenue;*

*NOW, THEREFORE, the members hereby adopt , on behalf of the Association, the  following resolution*

*RESOLVED, that the Banco Popular general operating checking accounts (general & special) signatories be amended and only Ed Wardwell, Bill Canfield, Rosie Wells, Jon Cassady, Sharon Koehler and Holly Case to be authorized signatories .*

*This resolution is adopted and made a part of the minutes of the meeting of the Board of Directors on June 12. 2012.*

*BY:_____ Ed Wardwell, President*

*ATTESTED:_____ Rosie Wells, Secretary*

Sharon made a motion that the Resolution be accepted, Bill 2nd , motion passed.

Sharon stated that she has an objection that the second signature on the special account should be a Board member.  She also stated that it was allowed on previous boards but she thought that the original rule was the second signature on the check must be a board member and only with approval from the Treasurer signing the Weekly Report.

**Insurance Committee:**  D&O, General Liability, Umbrella and Property are paid.  Vehicle insurance is due in July.

2

3055300/000491

DRAFT

**Planning & Property:** Max Harcourt, Chairman of the Property and Planning Committee, sent out Meeting Minutes from the May 23rd to the Board members. He also submitted a comprehensive report on the current status and projected upgrades for the property. Major future projects including roof sealing/painting, structure maintenance and electrical system upgrades will be addressed in the 2D13 budget.

**Solar Sub-Committee:** Max is currently putting a sub-committee together for a Solar System and has received volunteers but no one has come forward to chair the committee. Concerns are the initial cost for the purchase of the system and securing a dependable contractor that will be able to service it for a extended period of time.

- Bill presented the option of contractor/owner/lease program.
- Max stated that the Government puts out incredible incentives to develop Solar Systems. Ed stated at one time they were refunding up to 30% of the cost but not for non-profit organizations at this time.
- Doug stated the possibility of using our reserve fund as collateral to borrow funds to complete sizeable costly projects like Solar System, R/O System, and replacing exterior wood with synthetic material.

The next action item will be the committee drafting up an RFP before the next meeting.

**General Electric Meeting:** Bill stated the meeting with GE went well. GE inspected the 35 year old osmosis machine. A fact brought to attention by GE is that we are using our R/O equipment very little. We collect enough water to handle most usage. Jon also uses the R/O equipment when the generator is on which has little to no cost.

GE's proposal is they will build a plant and sell the water back to CBW. At this time our reverse osmosis usage is not large enough to warrant the proposal. GE will produce a statistic report.

**Water to Yacht Club:** Bill proposed the possibility of selling water to the Yacht Club. They are currently buying water from Anchorage that just increased by 20%. Currently we can store 50D,000 gallons of water and average use is 150,000 gallons per month which would allow enough for the Yacht Club. Bill and Jon will look into the logistics of connecting the water supply to the Yacht Club and report to the Board.

**Action Items**

- Notarize & Record Bylaws: Completed
- Arrange Meeting with Security: Completed - Owner car was stolen from the property, security company responded quickly to review the tapes - the guard on duty at the time was released
- Daily Water Usage Data to Bill Canfield: Completed
- Letter to Insurance Carrier re: gate expense: Insurance Co. needs a copy of the back of the insurance check received for the gate damage
- Teleconference Planning & Property: Completed
- Office Manager Replacement: Completed - Holly Case introduced herself
- Roadside Sign: Deciding on final layout and color for the sign
- Gray Water Upgrade connect terminal ends: Completed

3

Joint Appendix Vol. II Page 1262

DRAFT

**New Business**

L-42 Bob Cockayne sent an email in May to Board formally requesting "the exterior roof of L-42 be power washed, repaired, sealed and painted before peak hurricane season - within the next 3 months by the association." Bob stated that "he would like to know if the Board does not agree with the request he wants a recommendation on who can do it and will pay for it himself."
- Ed stated after looking at the condition of the roof and speaking with Jon, sealing the roof is a proper topic for the 2013 Budget. Concern is the singular request from Bob wanting his roof done at present time.
- The roof was last done in 2008 (typically has a 5-8 year life span), CBW generally does it every 5 years.
 - There is no evidence of cracks or leaks at the present time with L-42 roof.
 - Estimate to paint the roofs is approximately $75,000, $1,500 per unit.
Board suggested that if he wants to do the repairs himself they would suggest someone that can do it for him, otherwise it will be addressed in the 2013 Budget. Herb volunteered to discuss the decision with Bob and to make sure there are no other concerns.

On June 6, 2012 the Association was notified by letter from the US Department of Housing and Urban Development (HUD) that "HUD has completed its administrative proceeding of this complaint (Barbara Walters vs. Cowpet Bay West Association) under the Act (Fair Housing Act of 1968) and the compliant is hereby dismissed."
- Complaint failed to request for a accommodation, produce evidence, etc.
- Association has complied with the regulations for emotional handicapped individuals.
- Letter was forwarded to Attorney Joe Riopelle; he feels with the HUD dismissal of the Walters complaint that we can expect the Kromenhoek complaint to be dismissed as well. It still leaves the two civil complaints open and he is required by law to respond to both by June 21st.
- Herb suggested letting the owners know the outcome of the complaint. Ed will put an email out to the owners recapping the Board meeting and letting them know HUD's decision.

August Meeting: The next meeting of the Board of Directors will be August 7, 2012. 8:45AM AST

Meeting was adjourned.

### ACTION ITEMS

| | |
|---|---|
| Letter to Insurance Carrier re: gate expense | Herb/Holly |
| Road Sign | Jon |
| RFP for Solar System | Max |
| Supplying water to the Yacht Club | Bill & Jon |
| GE Report | Bill |
| L-42 Roof Painting | Herb |
| Email to Owners re: HUD Decision | Ed |
| Analysis of six-month of Operating Accounts | Sharon/Holly |
| Signatories changed on Banco Popular Accounts | Holly |

4

3055300/000493

Judith A. Kromenhoek

6200 Windward Way #44

St. Thomas, USVI 00B02

June 22, 2012                    RE: Inquiry No. 336193, HUD Case 02120337B

Mr. Jay Golden

U.S. Department of Housing & Urban Development

New York State Office

Jacob K Javits Federal Building

26 Federal Plaza

New York, New York 1027B-006B


Dear Mr. Golden,

I was very disturbed by your letter dated June 15, 2012 **dismissing** my complaint. I have filed a civil lawsuit and your dismissal makes Cowpet Bay West look like they have done nothing wrong. In the words of a Board member, the other members were gloating over your dismissal.

I have been harassed for over a year. July of 2011 my papers were filed in the office. At this time, there was nothing in our by-laws that said a formal request must be made to the Board. These by-laws have been changed in March, 2012 to now include this (after the HUD complaint). They were changed on the advice of their attorney; they were told they must change them to comply with HUD and the ADA.

The reason I did not make a formal request (it was not required by our by-laws at the time) to the Board was because the then President of the Board, Max Harcourt would leak all of this information to a Lance Talkington and he would then post it on his blog. The blog, although not official was named the Cowpet Bay West Blog so the owners thought everything written on it was the truth.

The Board charged me a $50 a day fine for having my dog, they put up signs all over the property and blasted e mails to CBW owners – all negative toward me. If this is not harassment then what is?

The new Board took office February, 2012 and the new President, Ed Wardwell has tried very hard to rectify the situation. He gave written permission to allow the dog in April, 2012 and he has lifted all the fines. The signs are still up.

Many of my neighbors still do not talk to me; they cannot see my disability so they believe all the nasty e mails.

3055300/000494

**Retaliation is a violation of the Fair Housing Act.** All the fines, signs, e mails – I believe this is retaliation.

I do believe my complaint to HUD is the only reason the CBW Board decided to seek legal advice and therefore comply with the law. Up to that point, Mr. Harcourt said "we do not go by federal laws, we go by Cowpet laws". I know that my dog is now legal and I am not asking you to fine Cowpet Bay West but just re-word the outcome. **Dismissal** makes it sound like I have no credibility.

Thank you for taking the time to review this matter. I can be reached on my cell phone at 340-677-3267.

Sincerely,


Judith A. Kromenhoek

cc: Ms. Irma Perez-Pillot

3055300/000495

Joint Appendix Vol. II Page 1265

DRAFT

**Cowpet Bay West**
**Board of Directors Meeting**
**August 7, 2012**

**Present:** Ed Wardwell, Herb Horwitz, Bill Canfield, Max Harcourt, Holly Case
Phone Conference: Doug Rebak, Sharon Koehler, Rosie Wells

**Approval of Minutes:**

Approval of Minutes of June 12, 2012: Sharon requested that the Treasurer report remove "All of the 2012 insurance premiums are paid in full". At the time vehicle insurance had not been paid.

Motion to adopt as amended was made and 2nd. All were in favor, motion carried.

**Manager's Report:**

Continuing progress on the step and rail painting. The entire complex is approximately 60 percent complete.

Continuing to replace exterior lights, still waiting on the additional 44 sets that were ordered.

Poly Caribe installed new couplings in the waste water transfer piping from Windward Way to the settling basin. The entire piping run is corroded and should be replaced after hurricane season.

Staff is painting the curbs and numbers on parking spots.

Emergency repairs were completed on the seaside balconies of several units. All the railings have been inspected and any that could have resulted in a potential problem were fixed.

**Treasurer Report:**

Bank balances – August 3, 2012
|  | | |
| --- | --- | --- |
| General & Special | $ 36,025 |
| Reserve | $ 302,972 |

Reserve account is owed $19,416.
Capital Projects is owed $19,175 from the Reserve Fund.

Mid-Year Report Review:

Sharon completed a comprehensive review of our six month (through 6/30/12) actual operations compared to our 2012 budget. Our income for this period is on budget. Our total expenses exceeded budget by $69,000. The major overruns were:

1

3055300/000496

DRAFT

- $20,000 - for Guard and Gate Security
- $23,000 - for Building and Grounds Contract Labor
- $23,000 - for Building Masonry Repairs

A $27,000 savings in insurance premiums partially offset these and other smaller overruns.

The Board mandated that management undertake only emergency repairs and minimize any expenditures in the months ahead.

Arrears:
1 owner is 4 months in arrears.

Sharon suggested that a lien should be placed on owners that are several months in arrears.

**General Manager:**

Jon Cassady remains in critical condition in the Mayo Jacksonville Clinic Hospital. Jon continues to improve in response to medical treatment and tests.

After discussion, the Directors unanimously approved to continue Jon's salary and benefits pending further review at the September 5th Board Meeting.

In Jon's absence, the Board decided to contract the services of Arran B. McGinnis as our Interim Property Manager through the impending tropical storm season. Arran will be resident at Cowpet Bay West throughout his contract until October 15th when Jon's situation can be reassessed. Legal counsel is drafting a contract with Mr. McGinnis to be paid $175.00 per day for his services. Ed will execute the contract on behalf of the Association.

COBRA eligibility for Association employees was discussed. Doug is going to research what options are available.

**Insurance Committee:** All insurance has been paid for the year. Doug will be negotiating property liability insurance after hurricane season.

**Security Committee:** Discussion was held on how to decrease spending on security and still keep CBW safe. Suggestion was made to install a card reader to exit the gate, more cameras, replace broken lights and security guard schedule to be random. Bill will investigate the cost for an exit gate card reader and security guard service. Staff will expedite light replacements.

**Planning & Property:** Max is currently putting a sub-committee together for a Solar System and has received volunteers but no one has come forward to chair the committee. Max will continue to organize a sub-committee.

**June Action Items**

- Letter to Insurance Carrier re: gate expense (Completed)
- L-42 Roof Painting (Completed)

2

3055300/000497

DRAFT

- Email to Owners re: HUD Decision (Completed)
- Analysis of six-month of Operating Accounts (Completed)
- Signatories changed on Banco Popular Accounts (Completed)

**New Business**

Legal Proceedings: Received an update from the Travelers Insurance Company, Attorney Joe Riopelle, that the last submission received from Walters/Kromenhoek exceeded the 20 page limit. The judge has given them until the August 8th to amend their 30 page plea down to 25 pages and has given Joe Ripolle until August 20th to reply in 25 pages.

Legal Fees: There is a $5,000 deductible for each of the Walters and Kromenhoek suits. Walters retainer was met and at the end of the month we should have reached Kromenhoek retainer as well. We continue to use Hodge & Francois for other issues. Rosie asked for a breakdown of legal fees, Sharon said she would provide at next meeting.

Staff Evaluations: Jon reported to Ed that he completed the staff evaluations. His recommendation was that each should get a cost of living increase of 3%. Ed met with the staff, discussed Jon's situation with them and informed them he would speak with the board regarding their pay increase for the year.

After board discussion a motion was made to give staff a 3% raise, motion was seconded and passed by majority vote.

Gate Sign: Doug suggested that someone look at the CWB sign to observe the condition and to see what need to be done to have it restored. Max said he would look at it and bring information to next Board meeting.

Parking Issues: Herb suggested that the end of Windward to be dug out and leveled in order to produce more parking spots. Holly volunteered to get estimates and look into what permits are required.

September Meeting: The next meeting of the Board of Directors will be September 5, 2012. 8:45AM AST

Meeting was adjourned.

### ACTION ITEMS

| | |
|---|---|
| Road Sign | Arran/Holly |
| RFP for Solar System | Max |
| Supplying water to the Yacht Club | Bill |
| GE Statistic Report | Bill |
| Insurance information for Jon | Doug |
| Cost of card reader to exit | Bill |
| Security Guard | Bill |
| CBW Sign condition | Max |
| Legal Fee Breakdown | Sharon |
| Additional Parking | Arran/Holly |
| Lighting replacement | Arran |

3

DRAFT

**Cowpet Bay West**
**Board of Directors Meeting**
September 5, 2012

**Present:** Ed Wardwell, Rosie Wells, Arran McGinnis, Holly Case
Phone Conference: Doug Rebak, Sharon Koehler, Max Harcourt

**Approval of Minutes:**

Approval of Minutes of August 7, 2012:

Ed Wardwell submitted correction - After discussion, the Directors unanimously approved to continue Jon's salary and benefits pending further review at the September 5th Board Meeting.
Doug submitted correction - Under parking Issues: changed end of "Leeward " to "Windward".

Motion to adopt as amended was made and 2nd. All were in favor, motion carried.

**Manager's Report:**

RO, WWTP, Gen Set, Operating systems ran all month with no major issues. On schedule for filter changes and maintenance for the RO plant. Water testing is done through Ocean Systems and all findings are reported through DPNR in St. Thomas and EPA in New York, next report will be sent next week.

All porch lights have been replaced, ordered the remainder street lights (5-year warranty). Will be ordering additional for back-up.

Rebuilt back-up transformer is complete, currently in Miami to be shipped to St. Thomas.

Requiring morning meetings with all staff to determine work for the day and to keep them organized and on track. Will be utilizing additional temporary employee to paint the 17 seaside railings and to complete stair and railing capital project in Leeward.

**Treasurer Report:**

Bank balances – September, 2012

| | |
|---|---|
| General & Special | $ 12,117.92 |
| Reserve | $ 312,680.74 |

Reserve account is owed $19,416, two payments for August and September.

| | |
|---|---|
| Accounting Fees: | $5,940 |
| Legal Fees: | $14,956 ($10,000-Walters & Kromenhoek/4,956-Misc. Legal Expenses) |
| Emergency Rail Repair: | $22,000 |

1

3055300/000499

DRAFT

Sharon expressed concern regarding the cost of repairing the Golf Cart. Parts were ordered beforehand without a disclosure of the cost. The golf cart has been repaired and is being used daily by General Manager and Staff.

Arrears:
1 owner is 3 months and 1 is 4 months in arrears.

**General Manager:**

Jon Cassady is currently in the Brooks Rehabilitation Hospital in Jacksonville. Jon is receiving physical and speech therapy 6 hours a day, 6 days a week. He is responding reasonably well from a physical stand point, he is able to stand and has full range of motion with his arms and legs and retains his physical strength. He is still unable to swallow, therefore they will be testing in ensure there is no blockage in his throat or esophagus.

Ed will be meeting with Jon and his brother Jay in Jacksonville this weekend to discuss how to best serve Jon's needs and the Associations requirements.

**Committee Reports:**

Insurance Committee: All Insurance has been paid for the year.

Security Committee: Porch lights have been replaced.

Planning & Property: Max will continue finding a chair for the Solar System Committee.

**Legal Proceedings:** September 7th, Attorney Joe Riopolle (Travelers Insurance Company) will file the names of the individuals who will have to provide a deposition for the Walters/Kromenhoek suit. He is not expecting any further action on the suit until October when the initial stages of mediation begin.

**August Action Items**

- Supplying water to the Yacht Club (Closed) - Further developments in researching on supplying water to Yacht Club have concluded that CBW will not be pursuing this venture
- GE Statistic Report (Closed)
- Insurance information for Jon (Completed) - Once Jon qualifies for Social Security Disability he has to wait 24 months before applying for Medicare. Jon is not eligible for COBRA Insurance.
- CBW Main Sign Condition Checked (Completed)
- Legal Fee Breakdown (Completed) - See Treasurer's Report
- Lighting replacement (Porch Light Completed)

**New Business**

Arrears: Board discussed an owner that owed over $10,000, approximately 5 months behind, and the final steps to collect Association dues. $1,500 of the fees are a result of tenant having a dog on the premises. After a certified letter was sent to the owner, they responded that they would make a good faith payment of $2,000 and would pay the remainder as soon as possible. Owner was advised to put

2

30553C0/000500

DRAFT

their grievance in writing and it would be presented to the Board. As of September 4th neither the letter nor the payment have been received.

Board decided to send a certified letter, final notice, giving the owner 2 more weeks before shutting off utilities.

New Forms: Notice of Parking Violation and Installation Letter of Permission.

Screened in Porch: Owner requested to screen in patio, Board stated that the protocol would be for the owner to put in writing with engineering sketches and present to the Board for approval.

October Meeting: The next meeting of the Board of Directors will be Friday, October 12, 2012. 8:45AM AST

Meeting was adjourned.

## ACTION ITEMS

| | |
|---|---|
| Road Sign | Arran |
| RFP for Solar System | Max |
| Cost of card reader to exit | Bill |
| Security Guard | Bill |
| Additional Parking | Arran/Holly |
| Street lighting replacement | Arran |
| Confirm Earnings for SSD | Holly |

3

3055300/000501

DRAFT

**Cowpet Bay West**
**Board of Directors Meeting**
**October 12, 2012**

**Present:** Ed Wardwell, Herb Horwitz, Bill Canfield, John Foster, Arran McGinnis, Holly Case
Phone Conference: Doug Rebak, Sharon Koehler, Rosie Wells

Ed Wardwell called a moment of silence in remembrance for Max Harcourt.

Resolution introduced by Ed Wardwell.

Association Resolution to elect John Foster, Windward #36, to fill Board Member vacancy caused by the untimely and tragic death of Max Harcourt to serve until the next annual meeting, February 2013.

Motion to accept Resolution, all were in favor, motion carried.

**Approval of Minutes:**

Approval of Minutes of September 4, 2012:

Doug submitted correction - CBW Sign Condition (Completed) - indicated that it was not complete.

Motion to adopt as amended was made and 2nd. All were in favor, motion carried.

**Manager's Report:**

RO, WWTP, Gen Set, Operating systems ran all month with no major issues.

CBW Sign: New CBW Road Sign presented to the Board. It was determined that it was the same sign approved in earlier Board Meeting, with the exception of changing "Entrance in 400ft" to "Next Right". Sign cost is approximately $900 - this includes the sign, mount and installation. Estimated time to be completed is two weeks.

Construction Approval: W-24 construction plans presented to the Board for approval. Owners are in compliance with all Association renovation requirements. Doug suggested that when raising the ceiling they leave room for the chase. Arran confirmed that it was addressed and in the plans.

Seaside Rail Painting: Windward seaside rail painting will be completed today, staff will begin painting Leeward next week. Completion of all seaside railings is expected to be within three weeks.

New projects: Reconstruct stairs and wall by Leeward 20; and replace brackets under the stairs with hardware already purchased.

Street Lights: Four ten-foot poles will be purchased and installed to light the four dark areas on property to assist with security, estimated to be completed by next week. The remainder street lights are complete. Any that have failed will be shipped back for reimbursement under warranty.

1

3055300/000502

DRAFT

<u>Porch Lights</u>: Herb stated he thought the street side porch lights were going to be all replaced to make them standardized. Arran stated that all the lights that were not working have been changed and everything he has received has been changed as well. Arran said he would check to make sure that we didn't have any left in stock to install to make them standardized.

<u>Transformer</u>: Rebuilt back-up transformer is complete and on island. Will be contacting Skyline Electric to install it. During installation the exposed cables coming from Leeward leading to Windward will be replaced. The rebuilt transformer will be used as the main transformer and the current one as the back-up.

<u>Stair and Railing Capital Project</u>: Board decided to repair only emergency cases. Will not subcontract the repairs, staff will be performing the work supervised by Arran.

<u>Security</u>: There was a theft incident on October 3rd when three unlocked vehicles on Leeward were entered and their contents pilfered. The perpetrator was on foot and uncaught despite search efforts by Arran McGinnis and the security guard. Ed will send out a reminder to the owners to lock their units and car doors.

Security gate circuit board needs to be updated so that when exiting the gate, a card or code will have to be used in order to exit the property. The cost of the board is approximately $2,500. Sharon, Treasurer, stated that we currently have appropriated funds in the 2012 budget to cover the cost of upgrading the security gate. Board approved upgrading the circuit board to eliminate the green exit button.

**Treasurer Report:**

<u>Bank balances</u> – October, 2012

| | |
|---|---|
| General & Special | $  46,500.00 |
| Reserve | $ 322,700.00 |

Reserve account is owed $19,416, two payments for September and October.

Sharon expressed concern regarding overtime paid to employees. With our current policy, overtime should only be in emergency cases, otherwise needs to be approved through the Board.

<u>Arrears:</u>
1 owner is 3 months and 1 is 4 months in arrears.

**General Manager:**

Jon Cassady is still in the Brooks Rehabilitation Hospital in Jacksonville. Jon is making progress, although it is slow he is physically doing well. He has vision in both eyes and is speaking but continues to have issues with arm/hand coordination and swallowing. Original release date was October 10th, but has now changed to October 31st. Once he is discharged he will become a Brooks out-patient for 30 days.

Ed spoke with Jay Cassady (power of attorney for Jon) informing him that the Association will continue to cover Jon's medical care until he eligible for Social Security Disability on December 27, 2012.

2

3055300/000503

DRAFT

Resolution introduced by Ed Wardwell.

Association Resolution to continue Jon Cassady on full-time payroll, 30 hours per week at VI minimum wage, and the Association will provide continued medical coverage until December 31, 2012.

Motion to accept Resolution, all were in favor, motion carried.

**Committee Reports:**

Security Committee: We will look into the possibly of hiring a designated security person for CBW. This will allow us to have control over shift hours and can have them on a random schedule to cover different days and hours of the week. It was determined not much activity takes place between 0130-0600 and the best time to have security is 1800-Midnight. Also suggested with the gate change we could cut guard time from 80 to 40 hours. The board also discussed adding more cameras; concern was how to monitor them and the quality of the picture. Bill will look at all options and present at next Board meeting.

Insurance Committee: All insurance premiums are paid and completed for 2012.

Planning & Property: Herb Horowitz has volunteered to resume the responsibilities of Chairman for the Planning and Property Committee. He will report at the November Board meeting.

**Legal Proceedings:**

Any Board member who cannot attend the mediation will need to turn in the "Limited Power of Attorney", notarized, before the mediation on October 19, 2012.

**September Action Items:**

- Confirm Earnings for SSD (Completed)
- Additional Parking (Addressed in 2013 Budget)
- Street lighting replacement (Completed)

**New Business:**

W-52: Owner requesting a handicap parking space. It was determined that the Association is in compliance with the Fair Housing Act of 1988, and in accordance with the Act she is currently receiving reasonable accommodations by having a parking spot as physically close to her unit as possible. We are not required to paint, mark or widen the parking spot. Given that we are in compliance with the Fair Housing Act, no further action will be taken at this time.

2013 Budget: The Executive Committee (Ed Wardwell/Rosie Wells/Bill Canfield) will meet with the Planning & Property Chairman (Herb Horwitz) and Property Manager (Arran McGinnis) to prepare a recommended budget to the Board prior to the November Board Meeting. The budget will include Capital Projects and Operating Expenses.

New Property Manager: The Board decided unanimously in the Executive Meeting that Arran McGinnis would be offered long-term employment as Property Manager for Cowpet Bay West. Board offered the

3

3055300/000504

Joint Appendix Vol. II Page 1274

DRAFT

position under the same terms and agreement made on September 5, 2012, effective October 16, 2012. Arran agreed and accepted the position.

<u>2013 Annual Meeting</u>: Board decided that the Annual Owners Meeting will be Saturday, February 9, 2013.

**November Meeting:** The next meeting of the Board of Directors will be Tuesday, November 13, 2012. 8:45AM AST

Meeting was adjourned.

## ACTION ITEMS

| | |
|---|---|
| Road Sign | Arran |
| Circuit Board/Card Reader for Security Gate | Bill/Arran |
| Security Guard | Bill |
| Additional Security Lights | Arran |
| Stair/Wall Reconstruct Cost | Arran |
| Porch Lights (standardized) | Arran |
| Reminder to owners lock doors | Ed |
| 2013 Budget | Executive Committee |

4

3055300/000505

**Cowpet Bay West**
**Board of Directors**
**Special Meeting**
**July 27, 2011**

**Present:** Max Harcourt, Barbara Walters, Rosie Wells, Sharon Koehler, Bill Canfield, Vince Verdiramo, Bob Cockayne, Jon Cassady, Louanne Schechter

Jeanne Brennan, CPA for Cowpet Bay West attended by phone conference at the request of the Directors.

**Purpose of Meeting:** Discuss a means to pay the premium of the newly acquired insurance and alter the budget if needed. Note: Insurance was in effect before securing finance.

**Treasurer Overview:** We have about $449,000 in cash, $68,000 was written from the reserve fund as the down payment on the new insurance. The rebate from the previous insurance policy is expected to be approximately $50,000. The remaining Capital Improvements are expected to be $110,425. With these expenditures there should be a cash reserve of $320,442. (See Financial Overview sent by Sharon). Max approved financing the remainder of the insurance premium with a 9 month payout at 3.2% which is $23,632/month. The interest adds approximately $8600 to the cost of the insurance.
As the Board had not voted on the financing, Max made a motion to accept the $68,032 down payment with 9 month financing at 3.2% from Mapfre . Bob 2nd the motion. Following discussion, the vote was taken. Max, Sharon, Bob, and Bill voted yes. Barb abstained. Rosie and Vincent voted no.

Max stated the insurance cost to the Association has consistently increased over the years but the owners' fees have not been increased.

Sharon discussed 3 options:
- Suspend our future "reserve" allocation of income for the rest of this year and allocate the funds solely to "insurance"
- Borrow money from the reserve fund via a note, with the intention of paying back to the reserve fund sometime in the future. There was no plan submitted for the future payback.
- Make a permanent transfer from the reserve fund to the insurance, with disclosure that the funds are not intended to be paid back.

Barb suggested a 4th option of a Special Assessment rather than dipping into again or borrowing from the reserve funds.

Jeanne Brennan, CPA, made the following suggestions:
- The Board needs to determine what you deem proper for your reserve fund based on the level of your future needs. A figure would need to be analyzed.
- If you borrow from the reserve fund you break the integrity of the reserve fund, you have to have a resolution, a method of payment, interest, and a new budget sent to the owners. If there is no intent to pay back, you report it as a change in the equity.
- Factor into the next 7 months the cost of the premium and decide if it will include the down payment for the 2012 premium

3055300/000506

Jeanne reported the Reserve Account is specified in the budget and not intermingled with insurance premiums or deductibles. The insurance is actually part of Operations and Management, the insurance was reported separately due to the fluctuation of the insurance premiums following a major hurricane.

Max stated the operating budget is over by approximately $66,000, to include, fuel for the generator, tree trimming, repairs to vehicles, and beach drainage. He wanted to know how this will affect the reserves should we suspend payments to the fund for the remainder of the year. Sharon stated we should have enough money in cash flow to complete the capital projects.

Max moved we transfer the beach drainage project from expense account to a capital project. Sharon 2nd, all were in favour. Motion carried.

Mapfre Deductable Overview: Bob stated he sent out **Shep Barrows Appraisal** that has a breakdown of building by cost. The total deductable for the entire property is $520,000. Bob stated that each building is insured separately. Bob suggested we keep in cash flows for insurance deductable $362,000 which is 70% of the entire deductable.
Bob interjected the policy can be renegotiated in January with Mapfre with same premiums over an 18 month premium.

Vince stated he needed to leave the meeting; his recommendation was to maintain the reserve funds at $500,000. He would not approve of anything less. He noted that we have consistently had that level of operating reserves. Vince left the meeting.

Max made a motion that the reserve fund for 2011 decrease to $380,000. Our CPA had suggested a review of what our total reserve would need to be. The amount voted on had not been reviewed or substantiated by any figures. Sharon 2nd the motion. Following discussion, Max called for the vote. Max, Bill, Sharon, and Bob voted yes. Barb and Rosie voted no. The motion carried the Board made a resolution to decrease the reserve fund to $380,000 with the remainder of funds going to the general operating fund.

The funds ($68,034.) used for the down payment on the new Mapfre insurance policy were drawn off the reserve fund. Sharon moved the Board resolve to permanently diminish the reserve account by $68,000 to the General Account. Bill 2nd. Following discussion, Max called the vote. Max, Bob, Sharon, and Bill voted yes. Barb and Rosie voted no. The motion carried.

Barb made a motion to have a special assessment of $1000 per unit owner to cover the cost of the policy. She stated that we should not borrow from our reserve fund again and must stay on the agreed budget. Rosie 2nd. Following discussion, the amount did not breakdown the amount by each individual unit equity but the total amount needed to be funded. Max, Bill, Bob, and Sharon voted no. Rosie and Barb voted yes. The motion was vetoed.

Max made a motion to increase insurance fees per month by $60,000 over 5 months. Bill 2nd the motion. Following discussion Max called for the vote. Bill, Sharon, Bob, and Max voted yes. Barb and Rosie voted no.

Sharon moved the Board resolve to decrease payments to the reserve fund from $12,125,a month to $4,785 a month and move the difference of $7,340 a month from the reserve fund to the insurance

3055300/000507

fund. Bill 2nd. Following discussion Max called the vote. Bob, Max, and Sharon voted yes. Bill did not respond. Rosie and Barb abstained. The motion carried.

Sharon will work on the revision of the budget.

Max stated we will proceed with the work on the Capital projects.
Jon stated while looking at the breakdown on the insurance, there are 5 systems that are not covered in the breakdown. Max asked Jon to send an email to Shep with the missing systems . Barb requested all Board members receive a copy of the systems problems.

Barb made a motion we contribute $750 to the little league sponsored by DPNR . Max called the vote, 4 were in favour, Max abstained.

3055300/000508

## CBW Owner Repair/Inquiry Handling Policy

May 10, 2011

The CBW Board of Directors has developed this set of guidelines to establish a pr
through which: owners may report issues of concern to the office, the staff is mad
aware of the issues, and the concerns/issues are documented and handled in a ti
manner.

- Emergency repairs/issues (Normally initiated by phone call)
    - ❖ If fire, injury or crime –in-progress is involved, individual noting even
      call 911.
    - ❖ GM or staff member to respond immediately
    - ❖ If needed, additional staff called in to handle problem until secured
    - ❖ Owner to be billed if owner responsible item. Determination made b
      GM in conjunction with owner/representative. In case of disagreeme
      only immediate safety issues will be handled, and the owner must su
      disputed issues to the board by letter or email.

- General repairs-owners units (Initiated by email/letter to Office)
    - ❖ Communication received from owner; Office Manager (OM) enters ir
      log, note to General Manager (GM), copy to BOD
    - ❖ Within 2 business days, acknowledgement of receipt to owner (phor
      email), indicating receipt and, if appropriate, initial action taken
    - ❖ GM, or other staff member, to inspect the problem within 5 business
      days. Maintenance form (being developed) completed indicating da
      assessment of problem, expected action to be taken to correct situa
      along with time frame
        - ▪ Form should include disclaimer information regarding owner
          association responsibility.
        - ▪ Form should be signed by GM and owner or owner's agent, i
          available. If not available, can be done by email. In case of
          disagreement, only immediate safety issues will be handled,
          the owner must submit disputed issues to the board by letter



https://docs.google.com/viewer?pid=sites&srcid=ZGVmYXVsdGRvbWFpbnxih3dwZXRi    5/21/2014

- Owner should be referred to list of association recommended contractors.
- Owner should not be restricted to list only, but must understa should a question arise as to a hidden Association responsibi is the owners/contractor's responsibility to have GM inspect v progress.
- Owner/representative is responsible for directly negotiating w contractor for scope, price and schedule.

❖ Association Responsible

- GM determines scope of work to be done - by staff, by outsid contractor, or by both.
- If complaint requires work to be done by our staff (e.g., tree trimming, porch light replacement, painting, minor wood rail r roof leak, etc.) work needs to be delegated to staff for comple reasonable amount of time, (e.g., 10 business days).
- If complaint solely requires work to be done by an outside contractor, GM to schedule an appointment for inspection an estimate within two weeks, (alternative contractors may have used to meet this schedule). Agreed upon work to be schedu soon as possible after inspection. GM will inspect work in pro as well as completed job.
- Owner will be notified by e-mail or letter of scope of work, expected repair date, and re-contacted when repair is comple or if rescheduling is needed. If the Owner/representative can support the scheduled work, they become responsible for dir negotiating schedule with the contractor – without changing s of work.
- In the event of combined staff/outside contractor work, (e.g., leak by staff; inside wall/rebar repair by outside contractor), s should commence repair as soon as possible, if the job will al for it.

- Landscape requests (Initiated by letter/email to office)

https://docs.google.com/viewer?pid=sites&srcid=ZGVmYXVsdGRvbWFpbnxib3dZXRi... 5/21/2014

❖ Landscape committee responds to Office (copy to Board) recommer
action to be taken within 3 weeks.

❖ Office responds to Landscape committee (copy to Board) indicating
frame for action (within 1 month), or indicating issue must be discus:
Board.

❖ Written (email or letter) reply to owner indicating action to be taken,
and time frame.

◦ Requests for enforcement of Rules and Regulations.    (Initiated by phone,
or letter to the Office and Board)

❖ If safety is involved, handle as an Emergency Request.  If fire, injury
crime –in-progress is involved, individual noting event must call 911.

❖ If not time–urgent, Office issues warning letter to owner (if known); b
e-mail message to possible involved owners/renters/agents, if unkno

❖ In case of illegal parking, staff will place a sticker on driver side winc
of the illegally parked vehicle.  If the vehicle is a hindrance to emerg
vehicles, it may be booted and fines levied in accordance with Parki
Policy.

◦ Owners general suggestions/requests (Initiated by email/letter to Board)

❖ Board will acknowledge letter in a timely manner (within a month),
indicating the matter will be discussed at the next Board/Executive E
Meeting (giving the date of that meeting).

❖ The Board will provide a written reply (e-mail or letter) to the owner
2 weeks after the meeting indicating its disposition.

https://docs.google.com/viewer?pid=sites&srcid=ZGVmYXVsdGRvbWFpbnxib3dvZXBi    5/21/2014

# Cowpet Bay West Blog

## An Informed Active Community

### Puppy Dog Diplomas

January 15, 2012

Readers of the blog may recall a comment that Cowpet owner and board candidate Judi Krohmenick made recently regarding the "certification" of her puppy. She claimed that her puppy is a "trained, legally certified service animal". We asked her what that meant and have had no response. After a recent board meeting discussion on the subject of dogs, it's become much clearer what is really happening·with puppy dog diplomas.

The board was provided details on the various "certifications" of owner puppies at the January board meeting.· Information distributed at the meeting indicated that Judi's puppy is certified by an outfit called Goldstar German Shepherds. We've done some research and found out that for the one time low price of as little as $71.50, a dog owner can obtain all sorts of really cool gadgets and puppy certification without having to leave the comfort of your computer. All anyone has to do is print the little form from their web site; fill out a name; address; and other basic info; write a check; and boom – you get all of the way cool proof needed to tell the world about your very own certified service animal. How tidy is that, right? Heck, if you're in a hurry, operators are standing by at 702-497-7229 to avoid the nasty wait for the mail to make it to them. The link to their site is here for those who would like to see for themselves how all of us can have a certified service animal in darn·near no time at all.

http://www.goldstar-germanshepherds.com/certification_licensing.html

The information distributed at the board meeting also indicated that Barbara Walter's and Joel Kirschenbaum's puppies are "certified" by an outfit called the National Service Animal Registry. Here is the link to the similarly totally cool three minute process to get your very own "certified" service puppy from this outfit:

http://www.nsarco.com/cgi-bin/product.cgi?id=081218004

There are at least ten outfits like these two on the Internet that offer the same type of "service". One of them (Service Dogs America) even has the gumption to state that "SDA recognizes that every person in America may have some form of disability". See this fascinating statement for yourself plastered in bold letters·squarely in the middle of their home page:

http://www.servicedogsamerica.org/

It is the blog's considered opinion that these outfits serve no legitimate purpose and exist mainly to sidestep what the ADA works diligently to accomplish. These outfits make it plain on their sites that nothing is done to verify either the animal's credentials or the purported disability of



PLAINTIFF'S EXHIBIT
PENGAD 800-631-6989
5

LT-29

1. 

**alfred felice** *said:*

January 3, 2012 at 9:18 pm

NO COMMENT OKAY BUT NO VOTE EITHER FAIR IS FAIR AL

2. 

**Anonymous** *said:*

January 4, 2012 at 8:33 am

Thanks for providing this voter material Lance.

LT-28

# Cowpet Bay West Blog

## An Informed Active Community

### Questions Posed to Board Candidates

January 3, 2012

The following was emailed to all board of director candidates:

*To all – my wife and I own 3 Leeward and have the following two questions for the board candidates:*

*What would your vote have been on the recent board vote regarding open or closed meetings in the specific context of the vote taken?*
*Are you in favor of the proposed bylaw revision as stated in the draft regarding dogs on property?*

*Lance Talkington*

Responses received were as follows:

- Herb Horwitz – for open meetings; and for the bylaw revision regarding dogs
- Doug Rebak – 1. I have been in favor of open meetings from the time I voted in favor of Vinny's motion at the Annual Owner's Meeting. This is not theoretical but real. The meetings I held as President were open ,with the few exceptions where we were talking sensitive topics such as Staff Reviews or specific Owner-related problems.
  2. My position on dogs is I love them, have had 2 of our own, but they just do not belong at Cowpet. The issue of a "service dog" can and has been abused, but I feel the Board is taking a reasonable approach in following the ADA guidelines.
  Bottom line, I favor the By Laws revision on dogs.
- Ed Wardwell – declined comment
- Judi Krohmenhoek – declined comment
- Barbara Walters – declined comment
- Dick Lamoreaux – declined comment

While earlier correspondence is not available for Ed Wardwell's position on these issues, Judi; Barbara; and Dick are on record favoring dogs on the property (Judi and Barbara both currently have dogs in their units and have declined to comment as to the basis for it). Barbara is on record favoring closed meetings. Our thanks to Doug and Herb for taking the time to comment.

### Comments on: "Questions Posed to Board Candidates" (2)

LT-27

Case: 3:12-cv-00025-CVG-RM   Document #: 190-1   Filed: 05/01/14   Page 29 of 56

*ASK our property manager, Jon Cassady (340-998-0807), our office manager, Louanne (340-775-6675) or any of the CBW employees, Matuba, Steve, Joey, Ken, Mr. Brown, ChiChi or Marsellus just what they think of those who are running and why.*

*Get their opinions of the current Board, Max Harcourt, Sharon Koehler, Bob Cockayne, Rosie Wells, Barbara Walters Vinny Vertiramo and Bill Canfield.*

*Now ask them what they think of those running for the Board in February, Doug Rebak, Dick Lamoureux, Ed Wardwell, Herb Horwitz, Barbara Walters and myself, Judi Kromenhoek.*

*Base your vote on what these people tell you. They are at CBW twelve months a year, they see and know what is going on. They are not political but honest workers. Use their input to help you make the right choice.*

*I hope you all have a very happy holiday season and a happy, healthy 2012.*
*Sincerely,*
*Judi Kromenhoek*
*44 Windward Way*
*(340-677-3267)*

**Comments on: "Letter From Judi Kromenhoek" (1)**



1.

**alfred felice** *said:*

December 24, 2011 at 11:31 am

I sent an Email response to all included in Judi and Herb's Email. I believe my message was recieved by all on their lists. In short, Judi and Barbara are unqualified to run for our board as they have been terribly disruptive these past 2 years. First Judi, on her own, without board approval, put a disasterous insurance policy on our books which was finally corrected. Second, a board minority tried to oust the majority because they were defeated on a vote!! Third, they defy the entire community by keeping DOGS on our property, that specifically outlaws them. Fourth, they accuse anyone who disagrees with their positions on anything. Also, they recommend the employees as THE primary source of "true" situations. Need I go on? They have some nerve even submitting their names on our ballot.

**LT-26**

# Cowpet Bay West Blog

## An Informed Active Community

### Letter From Judi Kromenhoek

December 24, 2011

The letter below was posted on the blog yesterday from board candidate and recent blog registrant Judi Kromenhoek. It encourages owners to consult with association employees for input on qualification of the various candidates running for election. Our community faces a number of complex business issues on a regular basis, such as insurance coverage; formulating condo law related to animals; formulation and evaluation of budgets and financial statements; strategic planning; capital planning; and supervision and evaluation of staff to name a few.

Anyone who is able to input on these or any other challenging issues is encouraged to provide their input for evaluation in this public forum, whether it be Matuba; Steve; Joey; Jon; Louanne; or anyone else on staff. We can all benefit from being better informed on the difficult business issues that face our wonderful community.

As an aside, the following questions were posed to Judi yesterday on the blog, responses to which we await:

*Hi Judi. Welcome to the blog. We have a couple of questions. First, what would your vote have been on the recent board vote regarding open or closed meetings in the specific context of the vote taken? Secondly, are you in favor of the proposed bylaw revision as stated in the draft regarding dogs on property?*

Since Judi currently houses a dog in her unit, her input will be valuable in understanding the reasons for allowing dogs on the property.

Following is Judi's letter to the blog:

*Dear Fellow Owners,*
*Many of you only spend short periods of time during the year at Cowpet Bay West and therefore are not aware of all that is going on.*

*There is an election coming up and I urge you to do some investigating on your own. DO NOT take my word or any of the current Board's, or those running for the Board but base your vote on what you learn.*

LT-25

**alfred felice** *said:*

December 5, 2011 at 6:07 pm

Let us not wait !!! Those who are against changing our "NO DOGS " rule AND
enforcing its application snould form a slate to replace any empty seats with candidates
who will follow the wants of the majority of our residents. ALL candidates should state
their position on this issue .A change to our BY -LAWS might be needed to put this issue
to permanent rest rather than revisiting this issue every year !!!! "RULES" can be easily
changes by a small minority at a poorly attended board meeting ( especialy behind closed
doors) or if meetings are "closed" WAKE UP STARTUP A CAMPAIGN FOR A NO
DOGS SLATE NOW.

**LT-24**

# Cowpet Bay West Blog

## An Informed Active Community

### Barking Puppy Dogs

December 5, 2011

So far our illegal neighborhood puppy dogs have been seen and smelled but not heard. Until now. Following is an email sent from an owner this morning:

*Jackie,*

*To answer your specific question there is an existing issue and not just a potential problem. Last Monday, Nov 28th a dog left in a high number Windward unit was incessantly barking to the great distraction of our household. This was in the evening and in order for my daughter to do her homework she had to hide out in our bedroom on the street side of the unit. In addition we had to close our windows and put the air-conditioning on – an expense to us and denying us of the advantage of a balcony situated in the Caribbean.*

*Regards,*

*Niall Bartlett, Leeward 47.*

Niall lives on the end of Leeward nearest the gate house. The 40's area of Windward is directly below his unit, and this coincidentally happens to be the very spot where our known violaters Barbara Walters (current board member) and Judy Kromenhoek (immediate past board president) live. If the noise is a high pitched yip, it's Barbara's dog. If it's a deeper barking noise, the dog is Judy's. Maybe blog readers who live in that area can comment on whose dog may be today's perpetrator. As an aside, trained service dogs are specificaly trained to NOT bark unless the owner is in imminent danger. Maybe one of the pups pooped in the owner's unit and was warning the owner to watch out?

These two owners continue to fight for their puppy dogs tooth and nail out of our collective view due to the monthly board meetings being closed to owners. Don't be surprised to see either or maybe both of them show up as candidates for the three open seats on the board. They desperately want to be in power to control this issue that is very real and very personal to both of them.

### Comments on: "Barking Puppy Dogs" (1)



1.

LT-23

I guess there is little hope of changing this nonsensical behavior until the annual meeting,at which time, 2 of the "gang of 3" can be voted off the Board , and a new slate of Officers can be elected by the new Board.
The situation is most disturbing and not at all the way it should be in an upscale Reidential/Resort community!
Doug Rebak

LT-22

for the open part of the meeting and not even have to worry with control utilization. Getting off one private line and moving to the open line takes what, about thirty seconds? Come on Max, all this takes is a little thought and effort. Read the web site you're using for goodness sake rather than for all intents and purposes shutting down the owners. Is it appropriate that you deserve flexibility of access to board meetings while traveling the states since May, but owners don't deserve the same when access can be easily controlled? Oh, and non owners calling in – are you serious? Who in their right mind outside of owners would ever want to subject themselves to this insanity.

OK, so you say that your "camp" is not with Rosie and Barbara and that you're not against accountability and openness. All you can say is "False". What exactly then is the truth Max? Please elaborate so we can know your ground rules without being thrown around in the wind from month to month not knowing what to expect. You deleted my email asking a very simple question that was nothing like your recollection of it – I asked the reasoning behind closing the meeting and made a side observation we felt like fools. Please don't twist what was asked of you. What do you expect for a subsequent response when you purposely ignore a reasonable question? It's pretty simple to draw the conclusion that you're not open and transparent. We're supposed to somehow magically assume you're for open meetings; transparency; and accountability in light of the actions undertaken? Please. We're still listening Max. Actions speak much louder than words.

You bet I resigned from the committee. I will not be associated with clandestine functionality and will only associate with one hundred percent openness and transparency. Until that becomes reality, it's not happening. I've worked too long for a reputation of being completely open and forthright and will not allow that to be tainted by being associated with behind the scenes activities, whether at the board or committee level. Prove that openness and consistency are a commitment, and this issue can be revisited. My participation is completely dependent on how you decide to proceed.

3. 

**dougrebak** *said:*

November 12, 2011 at 12:37 pm

Lance,
Thank you for your input.
I share your ( and many other owner's) frustration with the unilateral rejection of the owner's overwhelming "yes" vote for open meetings.
I do support the Board's need for closed sessions on "confidential" matters –but the dog issue???PLEASE !!!

concerns regarding many people, including perhaps non-owners, calling in. At least 3 Board members intend to address this at our next meeting.

"Owners were purposely excluded from the entire meeting when dogs were on the agenda." We did go into executive session at the beginning of the meeting to discuss dogs and staff issues. As the minutes will reflect, we voted to table dog issues pending the Board engaging ADA expertise. Once this is done, the issue of rule violators and By-Law modification may be more intelligently addressed. After the executive session, the meeting was open.

"Our president is now in the camp of the heretofore minority on the board who insists on closed meetings." False.

"Our president has made it clear that accountability and openness simply isn't priority." False.

"As a sidenote, President Max was asked to respond to our question of his reasoning behind the events detailed here. He did not respond to the request." I received an email from Lance that I've deleted so I can't quote it, but paraphrased it said something like ' Why are you making the blog look foolish?' I don't support, not-support or answer to Lance's blog, so I didn't feel the email warranted an answer.

Shortly after the meeting, I called a meeting of the Long Term Planning Committee, which consisted of Lance, Jon, Bill Canfield and me. Lance responded by resigning from the committee. I hope he wasn't doing this to "punish" me. I hope Lance runs for the Board in our upcoming election so he can address his concerns in a better forum.

Max



**Lance Talkington** *said:*

November 11, 2011 at 11:50 am

The owners voted unanimously for completely open meetings recently. So you say we weren't invited, but we weren't prohibited? Seriously? What in the world does that mean? We should go ahead and try to phone in, but just remember it's against your wishes? Good grief. But wait, it gets better. You have concerns about who calls in, particularly non owners. For goodness sake – you're using Free Conference Call.Com. It's got more access controls than Cowpet's crime count. That's a lot of controls if the comparison isn't clear. All of the access control options are right there in plain view on their web site. You can include or exclude whomever you wish. For that matter, you could have your private executive session on one line and then flip over to the other line where owners are waiting

LT-20

Joint Appendix Vol. II Page 1291

So, there you have it fellow owners. Our president has made it clear that accountability and openness simply isn't priority. Our sympathies go out to a few of the other board members who are trying to do the right thing but find themselves serving out a term in the middle of this sort of underhanded activity. As for the blog, we tried and have failed.

As a sidenote, President Max was asked to respond to our question of his reasoning behind the events detailed here. He did not respond to the request.

**Comments on: "The Final Straw" (4)**



1.

**alfred felice** *said:*

November 9, 2011 at 12:43 pm

A VERY SMALL MINORITY CAN DESTROY DEMOCRACY IF THE MAJORITY ARE PASSIVE !!! IT IS HAPPENING IN THE WORLD -INTHE USA – IN ST. THOMAS- WHY NOT AT CBW !!!! COMPLACENTCY LETS THE BULLIES RULE IF YOU CAN'T REMOVE THE GUILTY , YOU CAN CERTAINLY OSTRACIZE THEM AL FELICE



2.

**Anonymous** *said:*

November 10, 2011 at 2:24 pm

I have previously refrained from weighing in on Lance's blog, but I have been so badly misrepresented that I feel compelled to respond.

"The blog received a reminder from the board over the weekend to invite owners to phone into the board meeting on Tuesday." False. The Board has never invited "the Blog" or owners to phone into the meeting. In the past, Lance and other owners have been invited to sit in on meetings. Owner Lance was never specifically invited to join the telephone call-in, nor was he prohibited. The "Blog" has never been invited.

"President Max now wants owners to be forced to show up in person at the office if they wish to listen in on board meetings." I clearly do not have the desire or authority (or arrogance) to "force" owners to do anything. I did say in an email, and telephonically, to a Board member that I have no trouble with owners sitting in on meetings. The telephone system is provided for the convenience of Board members who are off-island. I do have

**LT-19**

# Cowpet Bay West Blog

## An Informed Active Community

### The Final Straw

November 9, 2011

The blog received a reminder from the board over the weekend to invite owners to phone into the board meeting on Tuesday. The reminder was published Monday on the blog, with an approach taken solely by the blog's initiative to not publish the call in number but rather to allow it to be shared upon request by owners. We weren't asked to handle it that way, but it seemed prudent. See the Monday blog post for reference.

On Monday night, the blog was informed that the call in number provided to the blog earlier that day would suddenly not be used by the board, but rather President Max had taken it upon himself to use a new undisclosed number for the meeting. And so, here we sat, wondering what in the world had just happened in the span of about 24 hours. The meeting is now effectively closed to owners after owners were reminded to participate.

But wait, it gets better. President Max now wants owners to be forced to show up in person at the office if they wish to listen in on board meetings. Really? And what exactly does this accomplish? Our president now believes that owners need adult supervision in order to listen effectively. And this at the same time the president is traveling the states since May and calling in for every meeting. Seriously?

But wait, it gets even better. All of this nonsense happens in the context of a meeting that has dogs on the agenda. Owners were purposely excluded from the entire meeting when dogs were on the agenda. Surely there isn't any connection between the two, right?

The blog has been made the fool for ever buying into this idea of open meetings and transparency. Invite us; uninvite us; conduct secret meetings to discuss dogs; set up secret phone numbers to eliminate owner participation. John Grisham isn't creative enough to invent this stuff. Board credibility that had been moving in a positive direction is now shot. Done. Over. Our president is now in the camp of the heretofore minority on the board who insists on closed meetings. Bravo to what used to be the minority group – you've succeeded. Congratulations on the victory.

Back track to an earlier annual owners meeting when our now newest board member Vinnie, at that time not on the board, moved that all board meetings be completely open in every respect to owners – every meeting in every respect. His motion, along with the unanimous approval vote from the owners, is recorded in the minutes. Now he is on the board. What is his opinion of all of this cloak of secrecy? Toss what the owners voted? Close 'em down?

**LT-18**

# Cowpet Bay West Blog

## An Informed Active Community

### Board Response To Request For Rules Enforcement

October 30, 2011

A few days ago, the blog emailed a formal request to the board for rules enforcement. There continue to be owners who are known to have dogs on the property. Two of those owners are current board member Barbara Walters and former board member and immediate past president Judi Kromenhoek. Earlier blog posts about the dogs issue and the request for rules enforcement may be viewed for details. There have been two earlier formal requests to the board from another owner requesting that the dogs rule be enforced. The board has responded to Barbara and Judi with the following correspondence that was copied to the blog as a formal response to our request. Kudos to the board for doing the right thing by enforcing a rule to which we all agreed to abide when purchasing property in the community.

*Judi and Barbara,*

*Cowpet Bay West's current rules are very clear – No Dogs. You are both in violation of these rules, and owners have complained to the Board.*

*As you know, the Board is considering absorbing the "No Dogs" rule into the by-laws, and allowing exceptions, upon application to the board with supporting documentation, for service dogs.*

*Louanne tells me that both of you have "papers in the office" regarding service dogs; however, you have not applied for an exception to the rule.*

*If you, as owners and users of service dogs as defined and documented in accordance with ADA rules, wish an exception, you must apply in writing or electronically to the Board and submit supporting documentation. You have 10 days to submit this request. It will be considered at the November Board meeting, and you will be informed of the outcome. Barbara, you must recuse yourself from voting since you are a Board Member.*

*Even though you are clearly in violation of the rules, this offer is being made in good faith, and in the spirit of the consensus of the Board as demonstrated in our by-law discussions.*

*If you do not avail yourselves of this offer, you are subject to being fined under the current rules of the association at the November meeting.*

*M. M. Harcourt*

*President, CBW Condo Association*

**LT-17**

sure that they comply, or I can promise you that it will be corrected at the homeowners expense."

Disgusting, and shameful. She should be removed from your board as she clearly cannot be impartial.

Lance, you should immediately file a complaint for Barbara's clear abuse towards you. Do it the same way you did, in writing and formal. Print this page out as it clearly shows the bias.

Barbara, you are not fit to be a board member and you should resign. Clearly you have it in for Lance over the dog issue. You are not capable of acting in a professional manner and remaining objective.

**LT-16**

**Lance Talkington** *said:*

October 26, 2011 at 5:48 pm

Well Barbara, you actually beat me to the next blog post. It is certainly time to hit this one head on since I've overheard the office employees talking about this among themselves and the board. Let's recount the events as they occurred. We asked for approval of the board prior to beginning construction. The entire process was overseen by both the board president and Jon. In fact, they personally came to our unit on the day that Chris Thompson began work and told us to stop until we complied with their new request for architectural plans that included all provisions that they deemed necessary and appropriate. Those plans were obtained from the firm suggested by them, and construction then proceeded with their blessing in strict adherence to the design plans. The entire process was in full view of the board and Jon, and they had every opportunity to indicate lack of adherence to the plans. Construction was adhered to in exact specification to the plans drawn by professionals that was accepted by everyone involved. If you or anyone else wants to take up this issue, I can assure you it will be dealt with firmly.

4.   

**Barbara Walters** *said:*

October 26, 2011 at 8:33 pm

I hope that is not meant as a threat to someone from the board of directors who has a great concern that all rules and regulations be followed. Rest assured, the approvals will be checked and double checked to make sure that they comply, or I can promise you that it will be corrected at the homeowners expense.

5.   

**BIG Kahuna** *said:*

October 29, 2011 at 7:14 am

And remember when I wrote Board Members abuse the little power they have? Here is a classic example of it in writing. Barbara, a board member is now threatening a unit owner basically as retaliation for that unit owner asking the board to clarify the dog rule policy. Read above, it's absolutely, clearly abuse of a board members power to act this way. Board members should ALWAYS remain impartial, clearly this is not the case as Barbara is, in her words "Rest assured, the approvals will be checked and double checked to make

**LT-15**

1. 

**Doug Rebak** *said:*

October 26, 2011 at 10:38 am

Lance,
Your point is well taken.
The solution is quite simple. Fine the "offender" at the current rate, which I believe is $50 per day of offence, and remit the fine when and if proper documentation is provided within a reasonable time period. A "resonable time period" should be established. I would suggest 2 weeks, but that would be up to the Board to decide.
Doug Rebak

2. 

**William Frumkin** *said:*

October 26, 2011 at 11:54 am

If a board is to have any legitimacy they must fulfill their responsibilities and enforce the rules set forth by the members of the Condo Assoc. Perhaps the Association should pass a new amendment to the by-laws stating that any board member found to be in violation of the rules and by-laws shall be removed from the board. It can include an opportunity to cure of say 60 days.

3.

**Barbara Walters** *said:*

October 26, 2011 at 5:22 pm

To my fellow board members,
Well, since we seem to be following the letter of the law, I am also in favor of fining owners with illegal additions retroactively. That should make up quite the shortfall.
Lance, don't you have an illegal addition on your seaside patio, and weren't you instructed to put the common areas back to regulation???



**LT-14**

Joint Appendix Vol. II Page 1297

# Cowpet Bay West Blog

## An Informed Active Community

### Request For Enforcement Of Rules And Regulations

October 26, 2011

The following email was sent today to the board of directors:


To The Cowpet Bay West Board of Directors:

On May 12, 2011 the board adopted a formal written policy titled CBW Owner Repair/Inquiry Handling Policy. The policy includes procedures for owner requests for enforcement of Rules and Regulations. The association has a long standing rule disallowing dogs on the property. It has recently become a well publicized reality that multiple owners, including one current board member, have dogs living in their units. Given that our unit was fined for having a dog when a friend stayed in the unit and unbeknownst to us brought their pet, it is inconceivable how other owners are knowingly permitted to have dogs on a long standing basis without consistent enforcement of fines for such behavior. Repeated requests to the board member for substantiation of her need for a trained service dog have gone purposely unanswered, and in fact her responses have been accompanied by threats of lawsuits against both the board and me if her ability to have a dog is challenged. I have consulted a senior law firm partner who is an expert in condominium association law, and he has confirmed that the board has every right to request any and all documentation and other supporting information for an owner claiming the right to have a service dog as a result of disability. There are no limitations on this right whatsoever. If the board would like to engage the attorney in this regard, I will provide his contact information.

My daughter has repeatedly asked why others are allowed to have dogs while she is not allowed one. It is egregiously inconsistent for me to be fined for a dog in our unit while others are clearly being allowed to have dogs with no consequences. It is our request that the rules be consistently enforced and that any owner with a dog be required to submit documentation as to the need for a trained service dog to assist with their inability to function normally. It is also requested that the ADA guidelines for the definition of a service dog be implemented immediately and also incorporated into the bylaws that are currently being drafted for approval at the February owners meeting. This email is being sent to the board of directors and the association office in accordance with the procedures adopted in the May 12 document.

Lance Talkington
Three Leeward


**Comments on: "Request For Enforcement Of Rules And Regulations" (6)**

LT-13



**BIG Kahuna** *said:*

October 15, 2011 at 1:54 pm

Barbara you have a dog. The condo has rules that say no dogs. Lance pointed that out because it's unfair because he would like a dog and apparently was fined for a guest having one. Lance in no way slandered you or remotely spoke badly of you, you have invented that. The solution seems very easy, Just prove that you have the right to have the dog and that the dog meets requirements as set by the government. Period.

Lance just send a written request certified return receipt and I'm sure the board will have to respond.

**LT-12**

**Barbara Walters** *said:*

October 14, 2011 at 10:06 pm

Thank you for your response Scott. I Like that you clarified for everyone what a blog is, it is personal OPINIONS. Not necessarily facts, just ones personal views on their observations or prejudices. Lance has professed to giving a fair assessment on what is going on with the board, and continues to claim things to be fact when he doesn't verify anything as fact, just writing rumor and innuendo.

That he has also mislead people into thinking that his word is gospel, is another injustice to his claim of a "factual" summation. He posted minutes, which were not the official minutes of a meeting, and his motives are not at all altruistic. This is his 15 minutes of fame, and that is really sad. By the way, I did not want, nor need, nor expect my name to be included in his tirade, when it had nothing to do with my serving on the board. These are two separate issues, and the implication that I am abusing"power" because of my position is not only not fair, it is downright untrue. I do not want or need people to be discussing me in anything other than a professional capacity as to how I serve on this board. My personal business is mine, just that. I have never done anything to abuse any power (which one doesn't have from serving anyway). People who have written in have been abusive, derisive, vicious, and just downright mean. I have never seen a collection of people like these, who get their jollies by hurting others.

If one CLAIMS to be writing truth, then it should be the truth. As an owner, just an owner, I am not accountable to the likes of Lance Talkington, and if he did not share the complex with me, he wouldn't even rate a blink of my eye.

And just to clarify the issue, I am mortified, that my personal business has been laid out over the internet without my permission or forewarning.

Maybe one day I'll find out that Lance et al, are incontinent, so I can blast that. Maybe I'd be so kind hearted that I'd buy he and his cronies diapers! But I would first let everyone know about it!

Barbara



c

**Lance Talkington** *said:*

October 15, 2011 at 9:50 am

It's impossible to give someone grief over a disability that is to date completely undefined and unsubstantiated. Nobody but the board needs to know the details of the disability, but owners have made it clear that they have the right to see that your claim of disability is properly documented and worthy of a waiver for the pet. Fortunately there is a mechanism that you and the rest of the board put in place earlier this year to deal with this very sort of situation. The issue will move in that direction.

**LT-11**

own an ad agency and developed one of the first blogs in the US. I'm what you'd call a "blogging" expert. You can find my website at http://www.brandidentityguru.com.

I also own 3 condos, 1 in Easton Mass with over 125 units, 1 in Hyannis Cape Cod and 1 here in St. Thomas. And in each location board members have either abused their powers, broken rules and or the worst…let the little power they have to go their small brains.

So let me just chime in on some of the nonsense I'm reading here, and by the way, if you'd like I'll be happy to post this on the St. Thomas Blog for all our readers as well as the 10,000 St. Thomas people that follow me on Facebook and Twitter 😁

First off a Blog is someones personal diary, actually it's name came from the term Web Log which was shortened to just blog. It basically is a way for someone to journal. This particular blog is lance's. Period. He can write whatever his little heart desires, good or bad. Because you know why….it's his. When Rosie attacks Lance for actually writing in his own blog it's because she's ignorant to what a blog is. And being a board member it just goes on to make my case that board members are generally people with a little power. And trust me Rosie will be back to read Lance's blog because haters of a blog are the best customers.

The fact that lance is pointing out issues of concern threatens board members because ultimately it exposes things they don't want exposed. like Barbara's dog.

To the dog issue, if Barbara is legit she has the right to keep a dog because she is disabled then the easy solution is to show the board the correct paperwork. She does not nor should she share her disability. Nor do I think any really cares….just prove it. Simple solution.

To the dog haters here, if she's got the paperwork just shut it. There's nothing you can do, swallow the pill and move on.

I think Lance is doing a great service to the owners of the association by pointing out issues that will ultimately make your community better. Of course board members may disagree with that.

And as a professional blogger that actually makes a living at this sort of stuff I must let everyone know that Lance and I are friends. We golf together, boat together and generally like each others company. But Lance also knows I'm the most brutally honest person he probably knows and I'd be the first person to give him the business if he deserved it 😁

Keep Rockin' Lance, your little blog is now the go to source!

12.

LT-10

Barbara's right to have a dog is most certainly open to scrutiny, and she is welcome to carry out her threat to sue both the board and me for asking about it. She isn't applying for a job with us as a disabled person – she wants a dog, and her desire must be scrutinized appropriately. The office has no paperwork on file as is evidenced by Louanne's not replying to our request to confirm paperwork, and Barbara produces nothing other than saying she can't work and is thus entitled to have a dog. It has become clear she has a pet and should be fined just as I was fined in the past when a friend stayed at our unit and had a small dog for a few days without our knowing it.

Lastly, continued attempts by the fractioned group to close meetings to owners as you confirm today is ultimately disturbing. Good things are happening since owners have become more involved earlier this year. While the blog is being criticized for its comments, there has not been a single instance of anyone claiming that something untrue has been said by the blog. The truth in an open forum is powerful and must continue. Kudos to the board as a whole for standing up for truth and openness.

10. 

**pattisays** *said:*

October 14, 2011 at 12:59 am

This is fascinating…and it has become clearly a point of principal with the dog issue serving as the example of blatant disregard for rules, common respect for them and the reasons behind them in the shared community – and by a board member…It seems so simple that this person should excuse herself from this position – unless of course there is a valid reason for her to require an aid dog that the "papers" would have to validate – which this blog suggests have not been produced. If this dog issue can be so hot, the factions be so divided and the rules so easily manipulated we are in for a sad decline in the harmonious management and lifestyle that we have know for decades.

11. 

**BIG Kahuna** *said:*

October 14, 2011 at 10:11 am

My name is Scott White, aka Big Kahuna from the St. Thomas Blog, http://www.stthomasblog.com. I am the first post and I posted under "Anonymous". Really I just quickly posted not even thinking about posting my name. But for those that don't know who I am I run the largest blog in the USVI. I have over 4000 readers a day. I

**LT-9**

appears that every one of your blogs is to critisize and analyse and stir up the pot. You don't want to sit in on any of the board meetings for constructive intent. You are looking for something that you can take it and "run" with on such a negative level.

If you have an issue about something I suggest you bring it to the next meeting in writing. Your blog is not approved by the board as CBW's official blog. Actually you hijacked the one Max had just started with your first negative on your blog and it seems to attract more negative. No different than newspapers these days. Everything you guys write is negative and put downs and attacks.

You have no right to demand the things you have demanded. You have no right to demand anyone's personal medical information. In fact, it is a violation of HIPPA and you should tread very carefully because I work in a clinic here and they do not take that sort of thing lightly.

I know there is nothing I can say or do that will affect your attitude or behaviour. You seem to enjoy being abrasive and if that is what works for you so be it. Just post my comment without "editing" it. This will be my last post to you as I will not recognize this blog as anything more than your dumping ground for your negative regergitating. I wish it was not this way but you seem to like the negative.

Rosie Wells



o

**Lance Talkington** *said:*

October 14, 2011 at 6:58 am

Hi Rosie. As has been posted previously, the board has done a tremendous job on our insurance since the disaster last winter. It has also been posted that kudos should go out to those who are working to bring our budget back in line. And solid work is being done on bylaws. All of this positive work has been posted.

The blog's observations with which issue is being taken boil down to one basic issue. Three board members (Rosie; Vinnie; and Barbara) fractured the board and forced owners to choose sides on issues with which one group disagrees with the other group. That is the source of perceived negativity that is actually objectivity, and it was forced on all of us as owners by the group of dissenters. Owners didn't ask for this, but now we have no choice but to deal with the consequences of that group's actions. The days of the board being a social club with special privileges are gone. Our collective investments here at Cowpet are too important to be compromised by anyone, and the blog will analyze and comment when necessary.

LT-8



# National Service Animal Registry

903 NW F. Street · Grants Pass · Oregon · 97526     Toll Free · (866) 737-3930    Fax · (541) 471-1122

## NSAR CERTIFIED SERVICE ANIMAL

This document affirms that **"HAPPY"** (NSAR database ID **C40084**, see adjacent photo) is certified as an emotional support animal (ESA) and registered with National Service Animal Registry (NSAR) on the date listed below. This emotional support has been formally prescribed and deemed necessary to assist **BARBARA WALTERS**, the confirmed disabled handler. The handler and service animal are listed in the National Service Animal Registry (NSAR) database and may be found on the following website: **www.nsarco.com/database.html.**



**HAPPY**

Emotional Support Animals are animals that are necessary for the normal, day-to-day functioning of their emotionally or psychologically disabled handler, facilitating a normalizing effect by their presence.

An ESA is not considered a working service dog under the ADA and is not granted unlimited public access. Protections under federal law include allowing a disabled handler to be accompanied by his/her emotional support animal in the cabin of the aircraft, in accordance with the Air Carrier Access Act 49 U.S.C. 41705 and Dept of Transportation 14 C.F.R. Part 382.

Additionally, property managers and landlords are required to make reasonable accommodation (a change in the rules) to permit a disabled handler to keep an ESA, even when a landlord's policy explicitly prohibits pets, as set forth in the Fair Housing Amendments Act of 1988, Section 504 of the Rehabilitation Act of 1973 and Title II of the Americans with Disabilities Act.

For more information, please call the U.S. Justice Department ADA Information Line at (800) 514-0301 (voice) or (800) 514-0383 (TTY) or visit the ADA Business Connection at **www.ada.gov.**

January 21, 2011
Date

Tim Livingood, M.ED. CEO

PLAINTIFF'S EXHIBIT 2

3054700/000085

| Subj: | **Fwd: CBW Liability Insurance** |
|---|---|
| Date: | 1/18/2012 8:37:16 A.M. SA Western Standard Time |
| From: | JERSEYBARB@aol.com |
| To: | jkromes@gmail.com, rjlamoureux@snet.net, iamjk2@aol.com |

Nice ..............now he shows my letter. Real Class act
(letter to follow couldn't forward it)

From: milom2@earthlink.net
To: lance@eisvi.com
CC: stycisv@gmail.com, rbcusvi@gmail.com, shazkoehler@gmail.com, moehogan1@verizon.net,
JERSEYBARB@aol.com, wellsr_@earthlink.net, cowpetbaywest@hotmail.com
Sent: 1/17/2012 11:59:02 P.M. SA Western Standard Time
Subj: CBW Liability Insurance

Re: Policies OM-GL11-63 and 105434549

Dear Lance,

The referenced policies are the liability (general and officer) insurance policies for Cowpet Bay West
Condominium Association. The Board of Directors would like to make you aware of a situation which
may call these into play.

Recently one of our owners had their attorney send us a letter in which the attorney stated they were
representing the owner in a "complaint" against the association. The Board is consulting with Atty
Maria Hodge to determine what this means to us, and what our exposure, if any, is.

Attached is a copy of the letter from the attorney. At this time, we don't believe any action is required
on your part; however, we will keep you informed as this matter progresses.

Max Harcourt

President, CBWCA

505-385-9225



PLAINTIFF'S
EXHIBIT
8

Dr. Sheena Walker -- CROSS

1   own life, because they're always depressed because

2   they're born that way, and then there is people who

3   have like a death in their family and go through a

4   major stressor like a divorce, and that's what's

5   called a situational depression.  So what would you

6   call Barbara Walters?

7        A.    That is more of a situational, right.

8        Q.    Do you find it ironic, Doctor, that you've

9   prescribed an emotional support animal for Ms. Walters

10  and the very thing that you said this is supposed to

11  do for her actually aggravated her condition?

12       A.    Yes, absolutely.

13       Q.    And why do you agree with me that it's

14  ironic?

15       A.    Again, ironic given that this is something

16  that could be very, very helpful to her and it was

17  just causing a tremendous amount of stress in just --

18  and she never had any or never mentioned any stress

19  in actually caring for the companionship pet.  It was

20  more just her possession of having the pet created

21  adversity around her based on other people's

22  reactions.

23       Q.    Did she share with you some of the things

24  that some of her neighbors did to her?

25       A.    Yes.

Dr. Sheena Walker -- CROSS

1      Q.    What were they?

2      A.    Yes.  One just having nasty interactions

3  in passing, but the one that really sticks out, to

4  me, is sort of seems to be slanderous information

5  that was published on the internet.  That was a

6  major, major, major stressor for Ms. Walters.

7      Q.    Was it the fact that she had private

8  information about her life being posted on the

9  internet or was it something else?

10     A.    No, it was private information.  Private

11 information that was.

12           MR. WILLIAMS:  I object to the

13      form of that last question.

14     Q.    So, do you recall what Ms. Walters told you

15 was published on the internet?

16     A.    I believe it was regarding her psychiatric

17 status or what was perceived to be her psychiatric

18 status.

19     Q.    Did she ever bring in any of the stuff that

20 she printed off of the internet and discuss it with

21 you?

22     A.    She did.

23     Q.    Do you have any of that stuff in your file

24 somewhere?

25     A.    I'm not sure, actually, because I believe

PLAINTIFF'S
EXHIBIT

Dr. Sheena Walker -- CROSS

1        to speculate.

2        Q.    Did you believe that Barbara Walters was

3    experiencing harassment by any of her neighbors?

4            MR. BENHAM:   Objection as to

5       form.

6            MR. WILLIAMS:  Objection.

7        Q.    Why do you say that?

8        A.    Later on in our sessions, that became at

9    times the focus of her complaints, unfortunately.

10   She just didn't feel comfortable in her own home,

11   which actually brought up a lot of the issues from

12   her marital distress and reinforced some of those,

13   maybe faulty beliefs.  It was very difficult for her.

14       Q.    So, in other words, she lost her home in

15   New Jersey and then she came here to her home in

16   Cowpet, she didn't have that home?  Is that what she

17   means?

18            MR. WILLIAMS:  Objection to form.

19     Been.

20            MS. BENTZ:   Objection.

21       Q.    You could answer.

22       A.    Sure.  What I meant was -- yes,

23   absolutely, there was disruption in her family and

24   she described St. Thomas as her safe haven.  She came

25   here to retreat to wellness, for lack of better

**IN THE UNITED STATES DISTRICT COURT OF THE VIRGIN ISLANDS**
**DISTRICT OF ST. THOMAS AND ST. JOHN**
******************

| | |
|---|---|
| **JUDITH KROMENHOEK,** ) | **CIVIL NO. 12-00025** |
| ) | |
| **Plaintiff,** ) | **Action for: Housing** |
| ) | **Discrimination; Discrimination** |
| **v.** ) | **Based on Disability; Invasion of** |
| ) | **Privacy; Negligent Infliction of** |
| **COWPET BAY WEST CONDOMINIUM** ) | **Emotional Distress** |
| **ASSOCIATION; THE BOARD OF THE** ) | **Infliction of Emotional Distress;** |
| **COWPET BAY WEST CONDOMINIUM** ) | **Punitive Damages; and Injunctive** |
| **ASSOCIATION; MAX HARCOURT,** ) | **and Declaratory Judgment** |
| **in his personal capacity; ALFRED FELICE;** ) | |
| **LANCE TALKINGTON; ROBERT** ) | |
| **COCKAYNE; VINCENT VERDIRAMO,** ) | **JURY TRIAL DEMAND** |
| ) | |
| ) | |
| **Defendants.** ) | |

**PLAINTIFF'S OPPOSITION TO DEFENDANT MARX HARCOURT (DECEASED)**
**MOTION FOR SUMMARY JUDGMENT AS TO COUNTS II, XIII, VX & XVII OF THE**
**SECOND AMENDED COMPLAINT AND INCORPORATED MEMORANDUM OF**
**LAW PURSUANT TO FED.R.CIV.P. 56 AND LOCAL RULE 56.1**

**COMES NOW**, Plaintiff **JUDITH KROMENHOEK** ("Plaintiff") by and through the undersigned counsel, the **LAW OFFICES OF KARIN A. BENTZ, P.C.** (Karin A. Bentz and Julita K. de León, Esq.), and hereby submits the following in opposition to Defendant Harcourt's ("Harcourt") summary judgment motion. The facts and evidence supporting this response are contained in Plaintiff's Response to Harcourt's Statement of Undisputed Material Facts and Plaintiff's Counter-Statement of Facts. As demonstrated below, Harcourt's motion for summary judgment should be denied, because genuine issues of material facts exist as to Plaintiff's claims under the Fair Housing Act and under the common laws of the Territory of the Virgin Islands.

**I.     INTRODUCTION**

In 2010, pursuant to a prescription from her doctor, Plaintiff obtained Oliver, an emotional support dog. Plaintiff, who owns a condominium unit at Cowpet By West was subjected to the Board's no dogs rule. As a result, in July of 2011, Plaintiff submitted an application for a reasonable accommodation pursuant to the Fair Housing Act. Plaintiff handed the application, which contained a letter from her treating physcian and a copy of Oliver's certification to Louanne Schechter, the

Judith Kromenhoek v. Cowpet Bay West Condominium Ass'n.    Civil No. 12/00025
Opposition to Marx Harcout's Motion for Summary Judgment    Page 2

office manager.

Soon after Plaintiff submitted her application, some members of the Board and Association began a campaign to keep emotional support dogs off the premises. Because the Board, and Harcourt were influenced by this discriminatory animus, Plaintiff was denied a reasonable accommodation.

## II.    FACTUAL SUMMARY

Plaintiff owned a unit in the Cowpet Bay West Condominium complex. (CSOF ¶1.) Plaintiff suffered from an anxiety disorder and from depression. (Id. ¶2). As a result Plaintiff's doctor prescribed an emotional support dog to alleviate the symptoms of her illness. (Id. ) In February of 2011, Plaintiff submitted a copy of her dog's registration along with a copy of a letter from her doctor to the Association's Office. (Id. ¶5.) Plaintiff's physician, a licensed psychologist, wrote that he was treating Plaintiff and that she was diagnosed with Anxiety Disorder, citing the DSM-IV. (Id.) The psychologist further wrote that pursuant to the Fair Housing Act ("FHA"), Plaintiff is qualified to keep her emotional support animal, dog or other, to alleviate her symptoms and that such emotional support animal was necessary. (Id.¶2)

At the time Plaintiff submitted her documents to Louanne Schechter, the Association had no written policy in place for processing a request for reasonable accommodation, although it had a NO DOG RULE in place for at least fifteen (15) years. (Id ¶3.) Though the Association's By-Laws did not prohibit dogs, the Rules and Regulations of the Board prohibited dogs on the premises. (Id. ¶3.) No exceptions were written into the rules for emotional and/or service animals, although the FHA and the ADA require that waivers/exemptions be granted to persons who have demonstrated the need for such animals, notwithstanding the Association or Board rules against having animals on the premises. (*Id.*)

Schechter placed the documents in Plaintiff's file and discussed Plaintiff's application with Jon Cassady, Schechter's immediate supervisor. (Id. ¶7.) Cassady in turn discussed the application with Max Harcourt, the then President of the Board. (Id. ¶9.) Harcourt subsequently came to the

Judith Kromenhoek v. Cowpet Bay West Condominium Ass'n.         Civil No. 12/00025
Opposition to Marx Harcout's Motion for Summary Judgment       Page 3

Association's Office to review Walters' application. (Id. ¶10.) Harcourt also sent Robert Canefield, a member of the Board to review the file. (Id. ¶11.)

While Plaintiff's application was pending before the Board, several Owners, including members of the Board, began blogging on the Cowpet Bay West Blog (hereinafter "Blog") about the presence of dogs at Cowpet Bay West and their objections to dogs on the premises. (Id. ¶11).The prevailing sentiment shared by members of the Association and certain members of the Board was that Plaintiff was not deserving of a waiver because there were no physical manifestation of her disability. (Id.) Defendant too shared the same view. (Id.). Because the owners, were opposed to granting a waiver for anything other than for an ADA service dog, the Board denied Plaintiff's waiver in 2011. (Id.).

## III. GENUINE ISSUES OF MATERIAL FACTS EXIST, PRECLUDING SUMMARY JUDGMENT

### A. <u>Summary Judgment Standard</u>

The party seeking summary judgment must show that there is no genuine issue as to any material fact and that it is entitled to judgment as a matter of law. *See* Fed. R. Civ. P. 56; *Celotex Corp. v. Catrett*, 477 U.S. 317 (1986); *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242 (1986). The burden on the *non*-moving party is not a heavy one; that party is simply required to show specific facts, as opposed to general allegations, that present a genuine issue worthy of trial. *Hanley v. Jones,* 21 V.I. 190, 1984 V.I. LEXIS 27 (1984). The burden on the moving party is to establish the basis for its motion. *Donovan v. Harrah's Md. Heights Corp*., 29 F.3d 527, 529 (8th cir. 2002). The court must inquire whether, on the summary judgment record, "reasonable jurors could find facts that demonstrated, by a preponderance of the evidence that the non-moving party is entitled to a verdict." *In re Paoli R.R. Yard PCL Litig.*, 916 F.2d 829, 860 (3d Cir. 1990). In determining whether there are genuine issues of material fact, the court must draw all reasonable inferences in favor of the nonmoving party, and it may not make credibility determinations or weigh the evidence. *See Reeves v. Sanderson Plumbing Products, Inc.,* 530 U.S. 133 (2000) (emphasis added).

Judith Kromenhoek v. Cowpet Bay West Condominium Ass'n. Civil No. 12/00025
Opposition to Marx Harcout's Motion for Summary Judgment Page 4

 A fact is "material" if it might affect the outcome of the case, and a factual dispute is "genuine" if the evidence is such that a reasonable jury could return a verdict for the nonmoving party. *Anderson*, 477 U.S. at 248. When the unresolved issues in case are primarily legal rather than factual, summary judgment is particularly appropriate. *Mansker v. TMG Life Ins. Co.*, 54 F.3d 1322, 1326 (8th Cir. 1995).

 Harcort has failed to meet his burden to establish the absence of any genuine issue of material fact, and therefore summary judgment must be denied.

### B. Harcourt Failed to Comply With Rule 56.1 of the Local Rules.

 Local Rule of Civil Procedure 56.1 requires a separate statement of material facts with serially numbered paragraphs and "specific citation to the record." LRCi 56.1(a)(1). This rule further requires that the movant "affix to the statement copies of the precise portions of the record relied upon as evidence of each material fact." As such, the Defendant's motion for summary judgment should be denied and Defendant given leave to file a motion that complies with the applicable rules of procedure.

### C. Harcourt Violated the Fair Housing Act.

 The United States Supreme Court has held that discrimination covered by the FHA includes "a refusal to make reasonable accommodations in rules, policies, practices, or services, when such accommodations may be necessary to afford handicapped persons equal opportunity to use and enjoy a dwelling." *City of Edmonds v. Oxford House, Inc.*, 514 U.S. 725, 729-30, (1995). To prevail on a 42 U.S.C. § 3604(f)(3)(B) claim, a plaintiff must establish that (1) she is disabled within the meaning of the FHA; (2) she requested reasonable accommodation; (3) Defendants knew or should have known about the disability; (4) such accommodation was necessary to afford her an opportunity to use and enjoy the dwelling; and (5) Defendants refused to make the requested accommodation. *Hawn v. Shoreline Towers Phase I Condominium Assn, Inc.*, 347 Fed. App'x 464, 467 (11th Cir. 2009).

Judith Kromenhoek v. Cowpet Bay West Condominium Ass'n.   Civil No. 12/00025
Opposition to Marx Harcout's Motion for Summary Judgment    Page 5

   Plaintiff submitted her reasonable accommodation application in February of 2011. (CSOF, ¶5.) Included in it was a letter from her doctor explaining that she suffered from anxiety disorder, that she had severe limitations on her ability to cope with day-to-day stress, and that he had prescribed an emotional support animal in order to alleviate the symptoms of her condition. (Id. ¶2). The application was submitted to Louanne Schechter, the Cowpet Bay West office manager. (Id. ¶7). Through an email, that was addressed to the entire Board, on October 27, 2011, Plaintiff informed the Board that she had submitted an application for reasonable accommodation to the Board's no dogs rule. She also reiterated her request that her medical information be kept confidential and expressed concern that her medical information might appear on Lance Talkington's blog. (Id. ¶8). Thus, there is no denying that Defendant became aware of the existence of "a formal application and the content of the application" after October 27, 2011 not March 2012 as Defendant argues.

   Second, Defendant's argument that Plaintiff was not denied a waiver is equally specious. "Discrimination under the FHA includes delays in issuing waivers that are caused in part by discriminatory intent, even if the waivers are ultimately granted. *Carmona-Rivera v. Puerto Rico*, 464 F.3d 14 (1st Cir. 2006). Additionally, the types of discriminatory actions prohibited under the FHA are wide-ranging. *United States v. Bankert,* 186 F. Supp. 2d 623, 628 (E.D. N.C. 2000). Section 3604 prohibits all forms of discrimination, sophisticated as well as simpleminded, and tactics of delay, hindrance, and special treatment must receive short shrift from the courts. *Williams v. Matthews Co.*, 499 F.2d 819, 826(8th Cir. 1974); *see also United States v. Hughes Memorial Home*, 396 F. Supp. 544, 549 (W.D. Va. 1975) (internal citations and quotations omitted) (The FHA's catch-all phraseology may not be easily discounted or de-emphasized. Indeed, it appears to be as broad as Congress could have made it.). "The imposition of more burdensome application procedures, and or delaying tactics. . .constitutes a violation of" the FHA." *United States v. Yuouritan Const. Co.*, 370 F. Supp. 643, 648 (N.D. Cal. 1973); *see also United States v. City of Jackson*, 318 F. Supp. 2d 395, 417-18 (S.D. Miss. 2002) (finding that a delay, combined with

Judith Kromenhoek v. Cowpet Bay West Condominium Ass'n.          Civil No. 12/00025
Opposition to Marx Harcout's Motion for Summary Judgment         Page 6

defendants' statements evincing discriminatory intent, could violate the FHA); *Bankert*, 186 F. Supp. 2d at 628 (noting that delay tactics may be a violation of the FHA; Robet G. Shwemm, Hous. Discrim. Law & Ligig. (2008) 98 § 13.4 ("[D]elaying tactics and burdensome application procedures used to limit. . . access to housing are clearly covered by the phrase. . .'otherwise make unavailable or deny.'"). Thus, the case law is clear that denial of an accommodation can be both actual or constructive. *United States v. Haileah Housing Auth.*, 418 Fed. App'x 872, 878 (11th Cir. 2011). Therefore, it is of no moment that Plaintiff was finally allowed to keep "Oliver" after waiting for almost a year

The FHA provides that "it shall be unlawful to coerce, intimidate, threaten, or interfere with any person in the exercise or enjoyment of, or on account of his having exercised or enjoyed, or on account of his having aided or encouraged any other person in the exercise or enjoyment of, any right granted or protected by Sections 3603, 3604, 3605, or 3606 of this title." 42 U.S.C. § 3617

To establish a prima facie case of retaliation under the FHA, Plaintiff must establish: (1) "that Plaintiff was engaged in activity protected by the Act; (2) that Defendants took adverse action against Plaintiff; and (3) that there is a casual connection between Plaintiff's protected activity and her injury*." Bloch v. Frischholz*, 587 F.3d 771, 783 (7th Cir. 2009).

A protected activity includes "opposition to any act or practice made unlawful by this chapter or because such individual made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under this chapter." 42 U.S.C. §12203(a).

Here, Plaintiff engaged in two protected activities and Defendant does not dispute that there were protected activities. Requesting reasonable accommodation constitutes a protected activity. *See Regional Economic Community Action Program, Inc. v. City of Middletown*, 294 F.3d 35 (2d Cir. 2002). Filing an administrative complaint also constitutes a protected activity. *Miller v. Bd of Managers of Whispering Pines at Colonial Woods Condo*, II, 457 F.Supp.2d 126, 131 (E.D.N.Y. 2006). (A protected activity under the FHA "includes an action taken to protest or oppose statutorily prohibited discrimination.").

Judith Kromenhoek v. Cowpet Bay West Condominium Ass'n.                    Civil No. 12/00025
Opposition to Marx Harcout's Motion for Summary Judgment                  Page 7

Courts have broadly applied "interference" "to reach all practices which have the effect of interfering with the exercise of rights under the federal fair housing laws." *United States v. Hayward*, 36 F.3d 832, 835 (9th Cir. 1994). Defendant argues that Congress did not intend to federalize unfortunate skirmishes between neighbors. While Plaintiff agree that unfortunate skirmishes are not covered under the FHA, the conduct that Plaintiff complained of are more than unfortunate skirmishes. Thus, the substantive issue before this Court is whether Defendant's conduct amounts to 'threatening, intimidating or interfering" within the meaning of the statute and the regulation.

The Department of Housing and Urban Development ("HUD") adopted regulations for the FHA[1]. Under HUD's regulations, section 3617 is an independent cause of action. 24 C.F.R. § 100.400. Crucially, the Courts have adopted the HUD regulations and found that it is not necessary to establish an underlying claim of discrimination to prevail on a retaliation claim. *Halprin v. Prairie Single Family Homes of Dearborn Park Ass'n*, 388 F.3d 327, (7th Cir. 2004) ("The regulation cuts section 3617 loose from section 3604."); *Gonzalez v. Lee County Housing Authority*, 161 F.3d 1290, 1304-05 and n.43 (11th Cir. 1998); *Reyes v. Fairfield Properties*, 661 F.Supp. 2d 249, 265, n.6 ( E.D.N.Y. 2009); *see also United States v. Pospisil*, 127 F.Supp.2d 1059, 1063 (W.D.Mo. 2000)(finding that section 3617 is not solely "limited to violations of sections 3603, 3604, 3605 or 3606."). Thus, contrary to Defendant's argument, Plaintiff does not have to establish violation of section 3604 in order to prevail on her section 3617 claim.

Among the types of conduct identified as unlawful, and the one most relevant to the problem of neighbor harassment is, "[t]hreatening, intimidating or interfering with persons in their enjoyment of a dwelling." 24 C.F.R. § 100.400. Significantly, §3617 does not require a showing of force or violence for coercion, interference, intimidation, or threats to give rise to liability. *Walker v. City of Lakewood*, 272 F.3d 1114, 1128 (9th Cir. 2001). Although Defendant contends that courts have drawn a line between harmful act designed to interfere with housing rights, the lines between

---

[1] Because the Third Circuit has not ruled on whether the HUD regulations establish a separate cause of action for Section 3617, Plaintiff urges the Court to apply Chevron deference and defer to the HUD regulations as a permissible construction of the statute.

Judith Kromenhoek v. Cowpet Bay West Condominium Ass'n.   Civil No. 12/00025
Opposition to Marx Harcout's Motion for Summary Judgment   Page 8

permissible and impermissible conduct, however, are not so easily drawn.  *See People Helpers, Inc. v. City of Richmond*, 789 F.Supp. 725, 733 n.5 (E.D.Va. 1992).  Neither the cases nor the legislative history of §3617 attempt  to define the minimum level of interference, intimidation or coercion necessary to violate the statute.  *Id*.

In discussing the scope of §3617, the Seventh Circuit noted that a clear act of inciting violence such as cross-burning outside someone's home, is but one example of intimidation.  *Halprin*, 388 F.3d 3at  330.  Further, the Court noted, "[t]here are other, less violent but still effective, methods by which a person can be driven from his home and thus 'interfered' with in his enjoyment of it."  *Id*.  It is sufficient to state that interference under the statute can encompass a "pattern of harassment, invidiously motivated."  *Id*.

To be sure, a quarrel among neighbors should not be elevated into an FHA violation.  *Id* at 332.  Where, as here, there is "a pattern of harassment, invidiously motivated," a claim for violation of the FHA has been adequately pled.  *Id; see also King v. Metcalf 56 Homes Ass'n, Inc.*, 385 F. Supp. 2d 1137, 1144 (D. Kan. 2005) (holding on a summary judgment motion, that a neighbor's persistent complaints represented a "severe and pervasive pattern of harassing plaintiff that was designed to interfere with plaintiff's enjoyment of her dwelling.').

 Section 3617 prohibits a third party from interfering with an individual's exercise of her right to be free from discriminatory housing practices, ***Schroeder***, 879 F.Supp. at 177, which is exactly what Defendant did.  Defendant insisted that the Plaintiff did not apply for a reasonable application, although he knew that Plaintiff had an application pending.  As President of the Board, Defendant allowed himself to be improperly influenced by the "organized community opposition" to the Plaintiff's application. The "organized community" opposition was influenced by discriminatory animus and despite the fact that association members are not supposed to be involved in the reasonable accommodation process.  The decision to grant a waiver is a board function.  Because of the departure from the Board's normal process of evaluating reasonable requests, which is evidence of discrimination under *Village of Arlington Heights v. Metropolitan Housing*

Judith Kromenhoek v. Cowpet Bay West Condominium Ass'n.   Civil No. 12/00025
Opposition to Marx Harcout's Motion for Summary Judgment   Page 9

Development Corp., 429 U.S. 252, 265-66 (1977), Plaintiff's was made to feel uncomfortable in her own home. (CSOF ¶24 ). Plaintiff, who was diagnosed with depression, saw her condo at Cowpet Bay as her safe haven. (Id.) However, after Plaintiff applied for a reasonable accommodation and Defendant allowed non-board members to hijack the process, the condo became a source of extreme stress for Plaintiff and therefore interfered with Plaintiff's enjoyment of her what she perceived was her solace. (Id).

Further, Defendant continued to insist that Plaintiff apply for a service dog, although Defendant knew that Plaintiff has applied for a waiver for an emotional support animal. Defendant also spear headed the movement to amend the By-laws to exclude emotional support animals, while Plaintiff's application was pending before the Board. Lastly, Defendant began levying fines against Plaintiff for violating the no dog rule, while at the same time acknowledging that Plaintiff had an application pending in the Association's office. To that end, Defendant's action interfered with Plaintiff's enjoyment of her home.

Defendant has failed to meet his burden to establish the absence of any genuine issue of material fact, and therefore summary judgment must be denied.

**D. Defendant Is Liable for an Intentional Infliction of Emotional Distress Claim**.

This Court has adopted the standard for intentional infliction of emotional distress set forth in Section 46(1) of the Restatement (Second) Torts: "One who by extreme and outrageous conduct intentionally or recklessly causes severe emotional distress to another is subject to liability." *Desir v. Hovensa, L.L.C.*, CIVIL 2007/97, 2012 WL 762122 (D.V.I. Mar. 7, 2012). Recovery for intentional infliction of emotional distress "is limited to situations where 'the conduct has been so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious and utterly intolerable in a civilized society.' " *Id.* (quoting Restatement (Second) Torts § 46, cmt. d); *see also Petersen v. First Fed. Sav. & loan ass'n of P.R. Inc.,* 617 F.Supp. 1039, 1042 ("The plaintiff must make a showing that defendant's conduct was so outrageous that no reasonable person in a civilized society should be expected to endure it.").

Judith Kromenhoek v. Cowpet Bay West Condominium Ass'n.          Civil No. 12/00025
Opposition to Marx Harcout's Motion for Summary Judgment          Page 10

Substantively, the Court is to consider whether Defendant's conduct was so outrageous that no reasonable person in a civilized society should be expected to endure it. "Where reasonable persons may differ, it is for the jury to determine whether the conduct is sufficiently extreme and outrageous so as to result in liability." *Motheral v. Burkhart,* 400 Pa.Super. 408, 583 A.2d 1180, 1188 (1990). Such emotional damages are available "for distress which exceeds the normal transient and trivial aggravation attendant to securing suitable housing." Mor*gan v. Sec'y of Hous. & Urban Dev.,* 985 F.2d 1451, 1459 (10th Cir.1993).

Defendant, as Board President, was charged with a duty to oversee the granting of a reasonable accommodation to Plaintiff. However, because of Defendant's unholy alliance with the "organized opposition," Defendant permitted Plaintiff to be vilified for requesting a reasonable accommodation, by members of his own Board and members of the Association.

By fiat, Defendant invalidated Plaintiff's application and further agitated some members of the Association to become even more bellicose towards Plaintiff. As a result, Plaintiff became even more depressed and felt ostracized from the community because the blog posting led to her losing some dear friends. (CSOF ¶24). Additionally, the posting of Plaintiff's personal and private information on the internet, "was a major, major, major stressor for Plaintiff." (Id). Generally, conduct would be found to be actionable where the recitation of the facts to an average member of the community would arouse his resentment against the actor, and lead him to exclaim, "Outrageous!" Restatement (2nd) of Torts §46. Certainly, Defendant's action could be considered outrageous by a reasonable jury. And, Defendant sharing Plaintiff's private and confidential document to non-members of the Board, taken alone or considered together as part of a course of conduct, are sufficiently outrageous to state a claim for intentional infliction of emotional distress.

Further, Defendant's action in accusing Plaintiff of violating the no dogs rule further humiliated Plaintiff, a former member of the Board, as she was seen as a law breaker. Emotional harm has been generally classified as "humiliation, embarrassment, emotional distress, and other such intangible harms to plaintiff's personality." *Krueger v. Cuomo,* 115 F.3d 487, 492 (7th

Judith Kromenhoek v. Cowpet Bay West Condominium Ass'n.     Civil No. 12/00025
Opposition to Marx Harcout's Motion for Summary Judgment     Page 11

Cir.1997). "The more inherently degrading or humiliating the defendant's action is, the more reasonable it is to infer that a person would suffer humiliation or distress from that action; consequently, somewhat more conclusory evidence of emotional distress will be acceptable to support an award for emotional damages. "*Id.* The distress that Plaintiff felt "exceeds the normal transient and trivial aggravation attendant to securing suitable housing."

**E.     Harcourt  is Liable for Invasion of Privacy.**

Plaintiff alleges that Harcourt  disclosed private information concerning Plaintiff when he improperly sent a copy of private correspondence addressed to Plaintiff.

Invasion of privacy is actionable where there is: (1) unreasonable intrusion upon the seclusion of another; (2) appropriation of another's name or likeness; (3) unreasonable publicity given to another's private life; or (4) publicity that places another in a false light before the public. Restatement (Second) of Torts § 652A (1976).  The primary element Plaintiff must establish to prove her invasion of privacy count is "publicity" of private facts about the Plaintiff individually and specifically.  ***Bussue v. Paradise Motors, Inc***., 1994 WL 223046 (D.V.I. 1994).

Here, the letter that was posted on the "Blog" identified Plaintiff and published private facts about Plaintiff individually and specifically.  Moreover, both the letter and the dog's certification were published on the "Blog."  The letter and dog certification identified Plaintiff individually and specifically.  ***See Harris v. Easton Pub. Co.***, 483 A.2d 1377, 1384 (1994).

To state a cause of action under Virgin Islands law, Plaintiff must plead that there was an intentional intrusion on the seclusion of her private concerns that was highly offensive to a reasonable person.  *See* Restatement (Second) of Torts §652(B).  Talkington posted personal and private information about her on the "Blog." (Id.)      The elements for a claim for public disclosure of private facts include: (a) publicity to a matter concerning the private life of another; (b) that would be highly offensive to a reasonable person; and (c) is not of legitimate concern to the public. Restatement (Second) of Torts § 652(D).  Whether Plaintiff violated the no dogs rule was not a legitimate concern of Talkington. Yet, Defendant provided Talkington with a copy of the letter.

Judith Kromenhoek v. Cowpet Bay West Condominium Ass'n.            Civil No. 12/00025
Opposition to Marx Harcourt's Motion for Summary Judgment         Page 12

     Plaintiff also states a claim for false light. The allegations contained in Harcourt's letter were false.  As a result, members of the Association, and even some members of the Board perceived Plaintiff as a rule violator and treated her as one.  Further, Defendant  himself accused Plaintiff of not submitting an application for a reasonable accommodation.

     **WHEREFORE**, for the foregoing reasons, the Plaintiff, respectfully requests that this Court DENIES Defendant' s summary judgment motion.


                       Respectfully submitted,
                       **LAW OFFICES OF KARIN A. BENTZ, P.C.**

Dated: May 21,  2014         /s/ Karin A. Bentz

                       **KARIN A. BENTZ, ESQ.   (V.I. Bar No. 413)**
                       **JULITA K. de LEÓN,  ESQ. (V.I. Bar No. 913)**
                       5332 Raadets  Gade, Suite 3
                       St. Thomas, Virgin Islands 00802-5309
                       Telephone: 340-774-2669
                       Telecopier: 340-774-2665
                       Email: kbentz@virginalaw.com

Judith Kromenhoek v. Cowpet Bay West Condominium Ass'n.          Civil No. 12/00025
Opposition to Marx Harcout's Motion for Summary Judgment          Page 13

### CERTIFICATE OF SERVICE

I hereby certify that I caused the filing and service of the foregoing with the Clerk of the District Court of the Virgin Islands using the CM/ECF system, which will provide electronic notice by email to the following.

Richard P. Farrelly, Esq.
Birch de Jongh & Hindels, PLLC
1330 Taarneberg
St. Thomas, VI 00802
E-mail: rfarrelly@bdhlawvi.com

John H. Benham, III, Esq.
Benham & Chan
P.O. Box 11720
St. Thomas, Virgin Islands 00801
Tel: 340-774-0673
Fax: 340-776-3630
email: benham@bclawvi.com

Joseph G. Riopelle, Esq.
Boyd Richards Parker & Colonnelli, P.L.
Rivergate Tower Suite 1150
400 N. Ashley Drive
Tampa, Fl. 33602
jriopelle@boydlawgroup.com

Ryan S. Meade, Esq.
Quintairos, Prieto, Wood & Boyce, P.A.
9300 South Dadeland Blvd., 4th Floor
Miami, Fl 33156
rmeade@gpwblaw.com

/s/ Karin A. Bentz

IN THE UNITED STATES DISTRICT COURT OF THE VIRGIN ISLANDS
DISTRICT OF ST. THOMAS AND ST. JOHN
*******************

| | | |
|---|---|---|
| JUDITH KROMENHOEK, | ) | CIVIL NO. 12-00025 |
| | ) | |
| Plaintiff, | ) | Action for: Housing |
| | ) | Discrimination; Discrimination |
| v. | ) | Based on Disability; Invasion of |
| | ) | Privacy; Negligent Infliction of |
| COWPET BAY WEST CONDOMINIUM | ) | Emotional Distress |
| ASSOCIATION; THE BOARD OF THE | ) | Infliction of Emotional Distress; |
| COWPET BAY WEST CONDOMINIUM | ) | Punitive Damages; and Injunctive |
| ASSOCIATION; MAX HARCOURT, | ) | and Declaratory Judgment |
| in his personal capacity; ALFRED FELICE; | ) | |
| LANCE TALKINGTON; ROBERT | ) | |
| COCKAYNE; VINCENT VERDIRAMO, | ) | JURY TRIAL DEMAND |
| | ) | |
| | ) | |
| Defendants. | ) | |

---

## PLAINTIFF'S RESPONSE TO DEFENDANT'S MAX HARCOURT (DECEASED) UNDISPUTED MATERIAL FACTS AND PLAINTIFF'S COUNTER-STATEMENTS OF FACTS

**COMES NOW** the Plaintiff, **JUDITH KROMENHOEK** ("Plaintiff") and by and through the undersigned counsel, the **LAW OFFICES OF KARIN A. BENTZ, P.C.** (Karin A. Bentz, Esq., and Julita K. de León, Esq.) and submits her brief in response to Defendant Max Harcourt ("Harcourt") statement of undisputed facts in support of their summary judgment motion, pursuant to Rule 56.1 of the Local Rules of Civil Procedure.

Rule 56. 1 permits a party opposing a summary judgment motion to submit, inter alia, a "concise statement of any additional facts that the respondent contends are material to the motion for summary judgment and as to which the respondent contends there exists a genuine issue to be tried." For ease of reference, Plaintiff has referenced the corresponding paragraphs of Defendants' statement of undisputed facts as ("SOF") where appropriate. Additionally, Plaintiff has also referenced Plaintiff's Counter Statement of Facts ("CSOF") where appropriate.

I.    Plaintiff's Response to Harcourt's Undisputed Material Facts.

1.    Disagrees.

*Judith Kromenhoek v. Cowpet Bay West Condominium Ass'n.*
Plaintiff's Response to Defendant Max Harcourt's Undisputed Material Facts
and Plaintiff's Counter-Statement of Facts

Civil No. 12/00024

Page 2

2.     Disagrees.

3.     Agrees.

4.     Agrees.

5.     Disagrees.

6.     Agrees.

7.     Agrees.

8.     Disagrees.

9.     Disagreed. Defendant wrote a letter.

10.     Disagrees.

11.     Disagrees.

12.     Agrees.

13.     Disagrees.

14.     Disagrees.

15.     Disagrees.

16,     Agrees.

## II.    Plaintiff's Counter Statement of Facts

1.     Plaintiff Judith Kromenhoek owns and resides at a condo at Cowpet Bay West on the east side of St. Thomas. ( Exhibit. 1. Second Amended Compl. §1).

2.     A licensed psychologist wrote a letter stating that he was treating Plaintiff and that she was diagnosed with Anxiety Disorder, citing the DSM-IV. He further explained that Plaintiff had "severe limitations" in coping with stress and anxiety that most people would consider "normal day to day events." He went on to state that he has prescribed the use of an emotional support animal, dog or other, to alleviate her symptoms and that such emotional support animal was necessary. In conclusion, he states that pursuant to the Fair Housing Act, Plaintiff is qualified to keep her emotional support animal despite a policy prohibiting

*Judith Kromenhoek v. Cowpet Bay West Condominium Ass'n.*
Plaintiff's Response to Defendant Max Harcourt's Undisputed Material Facts
and Plaintiff's Counter-Statement of Facts

Civil No. 12/00024

Page 3

pets in her housing. On that same day, the National Service Animal Registry issued a certification that Plaintiff was allowed to keep her emotional support animal even if there is a policy prohibiting pets. (**Exhibit 2.** *Letter from S. Sutherland*).

3. In 2011, the By-laws of the Cowpet Bay West Condominium Association did not prohibit dogs. ( **Exhibit 3.** *Bylaws*).

4. The Rules and Regulations of the Board prohibited dogs on the premises. ( **Exhibit 4.** *Rules and Regulations*).

5. In July of 2011, Plaintiff submitted an application for a reasonable accommodation to keep Oliver, her emotional support dog on the premises. Because Cowpet Bay West did not have a formal application process, Plaintiff submitted a copy of a letter from her doctor and the dog's certification. (Exhibit 2)

6. At the time submitted her request for a reasonable accommodation, the Association had no written policy in place for processing a reasonable-accommodation request, although it had a NO DOG RULE IN place for at least fifteen (15) years. (Exhibit 4)

7. Louanne Schechter accepted the documents, placed them in Kromenhoek's file and discussed Kromenhoek's request with Jon Cassady, Louanne Schechter's immediate supervisor. (Exhibit 2)

8. Schechter filed and discussed Walters's application with Jon Cassady, Schechter's immediate supervisor. (Id.)

9. Jon Cassady discussed Kromenhoek application with Max Harcourt; and Harcourt subsequently came to the Association's Office to review Kromenhoek's documents. (Id.)

10. Harcourt sent his representative, Bob Canfield, a member of the Board, to review the documents as well. (Id.)

11. There was widespread opposition to having dogs on the premises by members of the Board. (Id.) All of the blog posts related to the dog issues at Cowpet are attached as Exhibit 5.

12. In his first blog post relating to "dogs" on the premises, Talkington, on September 27, 2011,

*Judith Kromenhoek v. Cowpet Bay West Condominium Ass'n.*     Civil No. 12/00024
Plaintiff's Response to Defendant Max Harcourt's Undisputed Material Facts
and Plaintiff's Counter-Statement of Facts     Page 4

stated that " at least three owners. . . have been seen with dogs that are either living in condos or are being entertained by an owner walking them on the property." He goes on to point out that two of the dog owners are present and past Board members. Talkington called for the members of the Association to amend the Association's by-laws to "eliminate any confusion over possible exceptions to the general rule" of no dogs. (Id)

13. In response to increasing attacks by both Talkington and Felice on the blog regarding the requests for a reasonable accommodation, Kromenhoek explained that they were not violating the law or the rules. Walters stated that she has a disability and is afforded protection under the FHA. (Exhibit 8)

14. Harcourt and other members of the Board improperly shared the content of the Kromenhoek's applications with Talkington. (Id.)

15. Susan Anderson, a Board member, wrote an email complaining that she saw Kromenhoek walking a dog and assumed that she was walking the dog for somebody else "because Judith Kromenhoek does not appear to be disabled." (Id.)

16. The prevailing attitude shared most of the Board members was that Walters and Kromenhoek were not disabled because there was no visible evidence of their disability. (Id.)

17. Notwithstanding the objections to providing Talkington with private and personal information, on October 28, 2011, Harcourt emailed a letter to Kromenhoek and copied Talkington. Harcourt wrote as President of the Board and falsely accused Walters of violating the NO DOGS RULE "because they have not applied for an exception to the no dog rule." Harcourt also acknowledged in that same letter that both Walters and Kromenhoek had "papers for service dogs pending in the office." Contradicting himself, Harcourt ordered Kromenhoek to apply and submit documentation for a waiver and threatened to levy a monetary fine if they did not take up his offer. (Id.)

18. Talkington posted the entire letter on the blog in his October 30, 2011 post. (Id)

19. In an October 27, 2011, email, Plaintiff wrote to the entire Board informing them that she

Plaintiff's Response to Defendant Max Harcourt's Undisputed Material Facts
and Plaintiff's Counter-Statement of Facts      Page 5

had paperwork on file in the Condo office. Plaintiff also reiterated her request that her medical information be kept confidential and expressed concern that her medical information might appear on Talkington's blog. (Id)

20. During the January 11, 2012 Board meeting, Cockayne distributed information about service dog certification naming businesses that have no requirements for service dog certification. Cockayne also circulated copies of Kromenhoek's dog certification. (Exhibit 6).

21. In December of 2011, Vincent Verdiramo, a board member, informed at least 99 members of the Association that he had advised the Board about the requirements of the FHA and emotional support dogs. (Exhibit 5).

22. On January 15, 2012, Donna LaScola voiced concern that the Association may be getting into legal trouble with all the blog posts and emails regarding Walters's and Kromenhoek's service animals. (Exhibit 7).

23. On January 17, 2012, ever dutiful to Talkington, Harcourt emailed Talkington informing him that the Board had received a letter from one of the owners stating the owner had filed a complaint. Therefore the Board was retaining counsel. (Exhibit 8).

24. On January 17, 2012, Walters received letters from the Board informing her that she was in violation of the no dogs rule and would be fined. (Exhibit 10)

25. Kromenhoek no longer felt comfortable at her condo because of the constant harassment and publication of her private information on the internet caused her to suffer extreme emotional distress. (Exhibit 9: Depo: Dr. Walker: 75: 1-25; 76: 1-5).

26. Talkington characterizes Walters and Kromenhoek as "playground bullies" and accused them of making a mockery of the Board. He then calls on the Association to "go on the offensive" and file suit against Walters and Kromenhoek stating "when these ladies start spending their own cash instead of relying on the government for free help, the rubber will meet the road on how far everyone is willing to go." In closing, Talkington implores the Board to take Walters and Kromenhoek to court. (Exhibit 5)

*Judith Kromenhoek v. Cowpet Bay West Condominium Ass'n.*   Civil No. 12/00024
Plaintiff's Response to Defendant Max Harcourt's Undisputed Material Facts
and Plaintiff's Counter-Statement of Facts                  Page 6

27. Talkington characterizes Kromenhoek and Walters as "playground bullies" and accused them of making a mockery of the Board. He then calls on the Association to "go on the offensive" and file suit against Kromenhoek and Barbara Walters stating "when these ladies start spending their own cash instead of relying on the government for free help, the rubber will meet the road on how far everyone is willing to go." In closing, Talkington implores the Board to take Kromenhoek and Walters to court. (Id.)

28. In a January 5, 2012 blog, Talkington accused Walters of being CB Lawton, a person who blogged about having dogs on the premises. Talkington asserted in his blog post that Walters was CB Lawton citing as evidence Walters's refusal to respond to questions about "why it is OK for her to have a dog." Talkington says she should "either stand up and face the owners or quietly slide into the sunset." (Id)

Respectfully submitted,

**LAW OFFICES OF KARIN A. BENTZ, P.C.**

Dated: May 21, 2014          /s/Karin A. Bentz
                             **KARINA. BENTZ, ESQ. (VI Bar #413)**
                             **JULITA K. de LEÓN, ESQ. (VI Bar #913)**
                             5150 Dronningens Gade, Suite 8
                             St. Thomas, Virgin Islands 00802
                             Telephone: 340-774-2669
                             Telecopier: 340-774-2665
                             E-mail: kbentz@virginalaw.com

1  *Judith Kromenhoek v. Cowpet Bay West Condominium Ass'n.*  Civil No. 12/00024
2  Plaintiff's Response to Defendant Max Harcourt's Undisputed Material Facts
   and Plaintiff's Counter-Statement of Facts  Page 7
3
4
5
6
7
8
9

## CERTIFICATE OF SERVICE

10
11
12  I hereby certify that I caused the filing and service of the foregoing with the Clerk of the District
    Court of the Virgin Islands using the CM/ECF system, which will provide electronic notice by email
13  to the following.
14
      Richard P. Farrelly, Esq.
15    Birch de Jongh & Hindels, PLLC
      1330 Taarneberg
16    St. Thomas, VI 00802
      E-mail: rfarrelly@bdhlawvi.com
17
      John H. Benham, III, Esq.
18    Benham & Chan
      P.O. Box 11720
19    St. Thomas, Virgin Islands 00801
      Tel: 340-774-0673
20    Fax: 340-776-3630
      email: benham@bclawvi.com
21
      Joseph G. Riopelle, Esq.
22    Boyd Richards Parker & Colonnelli, P.L.
      Rivergate Tower Suite 1150
23    400 N. Ashley Drive
      Tampa, Fl. 33602
24    jriopelle@boydlawgroup.com
25    Ryan S. Meade, Esq.
      Quintairos, Prieto, Wood & Boyce, P.A.
26    9300 South Dadeland Blvd., 4th Floor
      Miami, Fl 33156
27    rmeade@gpwblaw.com
                                                    /s/ Karin A. Bentz
28

*Judith Kromenhoek v. Cowpet Bay West Condominium Ass'n.*
Plaintiff's Response to Defendant Max Harcourt's Undisputed Material Facts
and Plaintiff's Counter-Statement of Facts

Civil No. 12/00024

Page 8

IN THE UNITED STATES DISTRICT COURT OF THE VIRGIN ISLANDS
DISTRICT OF ST. THOMAS AND ST. JOHN
*******************

BARBARA WALTERS,                          )     CIVIL NO. 12-00024
                                          )
              Plaintiff,                   )     Action for: Housing
                                          )      Discrimination; Discrimination
       v.                                 )      Based on Disability; Invasion of
                                          )      Privacy; Negligent Infliction of
COWPET BAY WEST CONDOMINIUM               )      Emotional Distress
ASSOCIATION; THE BOARD OF THE             )      Infliction of Emotional Distress;
COWPET BAY WEST CONDOMINIUM               )      Punitive Damages; and Injunctive
ASSOCIATION; MAX HARCOURT,                )      and Declaratory Judgment
in his personal capacity; ALFRED FELICE;  )
LANCE TALKINGTON; ROBERT                  )
COCKAYNE; VINCENT VERDIRAMO,              )      JURY TRIAL DEMAND
                                          )
              Defendants.                  )
_____)

## SECOND AMENDED COMPLAINT

COMES NOW, Plaintiff **BARBARA WALTERS**, (hereinafter "Walters") by and through her undersigned counsel, the **LAW OFFICES OF KARIN A. BENTZ, P.C.**, (Karin A. Bentz Esq., and Julita K. de León, Esq., of Counsel) and for a Second Amended Complaint against the Defendants in the above captioned action states and alleges as follows:

## PRELIMINARY STATEMENT

1.     On April 11, 1968, President Lyndon B. Johnson signed the Civil Rights Act of 1968. Federal Fair Housing Act, Pub.L. No. 90-284, 82 Stat. 73, 81 (1968) (codified as amended at 42 U.S.C.§§ 3601-3631). The Federal Fair Housing Act (hereinafter "FHA") expanded on the Civil Rights Act of 1964 to prohibit discrimination regarding the sale, rental, and financing of housing based on race, color, religion, and national origin. *Id.* The FHA was amended twice to broaden the class of people falling under the scope of its protections; in 1974, discrimination based on sex was added, and in 1988 discrimination based on familial status or disability was included. (Pub.L. 100-430, approved September 13, 1988).

PLAINTIFF'S
EXHIBIT

*Barbara Walters v. Cowpet Bay West Condominium Assoc., et al.*　　　Civil No. 12-00024
Second Amended Complaint　　　Page 2

2.　　In amending the FHA, Congress recognized that people with disabilities are subject to artificial, arbitrary, and unnecessary barriers preventing them from making full use of housing. Congress also recognized that more than a mere prohibition against disparate treatment was necessary in order that handicapped persons receive equal housing opportunities. *Secretary of HUD v. Dedham Housing Authority*, 1991 WL 442793 * 5 (HUDAALJ November 15, 1991).

3.　　Pursuant to the Fair Housing Act (hereinafter "FHA"), it is unlawful to discriminate against any person in the terms, conditions or privileges of sale or rental of a dwelling, or in the provision of services or facilities in connection with such a dwelling, because of the disability of that person or a person residing in that dwelling, because of the disability of that person or a person associated with that person. 42 U.S.C. §3604(f)(2); 24 C.F.R. §100.202(b).

4.　　It is unlawful to refuse to make reasonable accommodations in rules, policies, practices, or services, when such accommodations may be necessary to afford such person equal opportunity to use and enjoy a dwelling. 42 U.S.C. §3604(f)(3)(B); 24 C.F.R. §100.20.

5.　　Section 3617 of the FHA makes it unlawful for any person to coerce, intimidate, threaten, or interfere with any person in the exercise or enjoyment of, or on account of his having exercised or enjoyed, or on account of his having aided or encouraged any other person in the exercise or enjoyment of, any right granted or protected by Section 803, 804, 805, 806 of this title.

6.　　At all times relevant to this action, Walters lived in Condominium unit at Cowpet Bay West Condominium community.

7.　　The property at Cowpet Bay West is part of the Cowpet Bay West Condominium community that is managed by the Cowpet Bay West Condominium Association (hereinafter, "the Association").

*Barbara Walters v. Cowpet Bay West Condominium Assoc., et al.*   Civil No. 12-00024
Second Amended Complaint                                          Page 3

8.   At all times relevant to this action, Defendant the Board of the Cowpet Bay West Association, (hereinafter "the Board") run the day to day operations of the Defendant Cowpet Bay West Condominium Association.

9.   At all times relevant to this action, Defendant Max Harcourt (hereinafter "Harcourt") served as the President of the Board. And, at all relevant times, Walters was a member of the Board.

## JURISDICTION AND VENUE

10.  This Court has subject matter jurisdiction over this matter pursuant to 28 U.S.C. §§ 1331, 1332 and §1337; and V.I. Code ANN. tit. 4, §32.

11.  Venue is proper within this District pursuant to 28 U.S.C. §1391(b).

## PARTIES

12.  Plaintiff Barbara Walters (hereinafter "Walters") owns a condo at Cowpet Bay West on the east side of St. Thomas, United States Virgin Islands. This property constitutes a dwelling under the FHA. 42 U.S.C.§3602(b); 24 C.F.R. §100.20.

13.  The FHA and the American with Disability Act(hereinafter "ADA") define handicapped as a person with "a physical or mental impairment which substantially limits one or more of such person's major life activities, a record of having such an impairment, or being regarded as having such an impairment. . ..

14.  Walters was diagnosed with Anxiety Disorder, DSM-IV by her physician and thus qualifies as a person with a handicapped within the meaning of the FHA and the ADA.

15.  Walters is an aggrieved person under the FHA and the ADA.

16.  Upon information and belief, Defendant Association is an entity organized pursuant to the Virgin Islands Condominium Act, V.I. CODE ANN. tit 28, §901 *et seq.* as

*Barbara Walters v. Cowpet Bay West Condominium Assoc., et al.*  Civil No. 12-00024
Second Amended Complaint  Page 4

amended, that resides and operates its principal place of business in St. Thomas, U.S. Virgin Islands. Cowpet Bay West is the rental manager and governing organization of the condominium development.

17.  Each residential unit owner may use his or her condo unit for permanent, temporary, or transient use. Thus, the owners may permanently reside in their unit, use it as a second home, rent it out on their own or not use it at all.

18.  Defendant Association's facility is structured and operated as both a place of lodging and a condominium. As a place of lodging, it is a place of public accommodation within the meaning of the ADA. **[EXHIBIT A]**

19.  Defendant Association is operated and controlled by a Board of elected persons. The Board is authorized by the Virgin Islands Condominium Act and the Declarations of the Cowpet Bay West Condominium Association, with its purpose set forth more fully in Bylaw Article 1, Section 2. The members of the Board are elected by the homeowners of the Cowpet Bay West Condominiums.

20.  Upon information and belief, on October 22, 1974, Cowpet Bay West was created by a declaration of merger, whereby Cowpet Bay Village-Stages One and Two, the two condominium associations, merged into a single entity. The merger declaration acknowledged that the original 1968 Declaration, except as amended by the merger declaration is still in force. Section 16, of the 1968 Declaration provides that all owners are subject to and must comply with the provisions of the Declaration, the by-laws, and the rules and regulations as may be amended. Section 17 of the 1968 Declaration provides that the Declaration can only be amended by an affirmative vote of 75% of the Owners in number and common interest. Section 19 of the 1968 Declaration states that the by-laws and rules and regulations are " annexed hereto" and that the by-laws can only be amended by "an amendment to this Declaration and such amendment duly recorded."

*Barbara Walters v. Cowpet Bay West Condominium Assoc., et al.*　　　　Civil No. 12-00024
Second Amended Complaint　　　　　　　　　　　　　　　　　　　　　Page 5

21.　Under this provision, any amendment to the by-laws must be by a 75% vote and recorded in order to be valid.

22.　The by-laws of the Association were adopted and recorded in 1974 along with the merger declaration. The by-laws were again amended and recorded in April 1998. Article I, Section 2 of those by-laws made them applicable to both the common areas and the individual units. Article II, Section 2, provided that the affairs of the Association were to be governed by the Board , which was empowered to deal with all administrative affairs of the Association and to undertake all acts except those prohibited by law, the Declaration, or the by-laws. Of the enumerated powers of the Board, adoption and amendment of the rules and regulations is provided for: These rules are applicable to both the common areas and the units under Article I, Section 2. Article V, Section 9 empowers the Board to enjoin and remedy a violation of the by-laws, Declaration, or rules and regulations. Article V, Section 16 allows for the adoption of rules and regulations if approved by a majority of the Owners. Article XI, Section 1 requires that the by-laws be modified by a 66 and 2/3% vote of the Owners present at a meeting held for such purpose. Article XIII, Section 1 states that where thee is a conflict between the provisions of the by-laws and the Declaration, the Declaration controls.

23.　There is a conflict between the by-laws and the Declaration in that the Declaration makes clear that a vote of 75% of the Owners is required to amend the by-laws.

24.　The 1968 rules and regulations prohibited an Owner from making or allowing disturbing noises in his/her apartment and prohibited dogs. The 1998 rules and regulations contained the same provisions.

25.　Based upon information and belief Defendant Alfred Felice is a resident of Plainview, New York.

26.　Based upon information and belief Defendant Max Harcourt is a resident of St.

*Barbara Walters v. Cowpet Bay West Condominium Assoc., et al.*　　　　Civil No. 12-00024
Second Amended Complaint　　　　Page 6

Thomas, United States Virgin Islands.

27.　　Based upon information and belief Defendant Lance Talkington is a resident of St. Thomas, United States Virgin Islands.

28.　　Based upon information and belief Defendant Robert Cockayne is a resident of St. Thomas, United States Virgin Islands.

29.　　Based upon information and belief Defendant Vincent Verdiramo is a resident of St. Thomas, United States Virgin Islands.

## STATEMENT OF FACTS

30.　　On January 21, 2011, Stansford S. Sutherland, a licensed psychologist wrote a letter stating that he was treating Walters and that she was diagnosed with Anxiety Disorder, citing the DSM-IV. He further explained that Walters had "severe limitations" in coping with stress and anxiety that most people would consider "normal day to day events." He went on to state that he has prescribed the use of an emotional support animal, dog or other, to alleviate her symptoms and that such emotional support animal was necessary. In conclusion, he states that pursuant to the Fair Housing Act, Walters is qualified to keep her emotional support animal despite a policy prohibiting pets in her housing. On that same day, the National Service Animal Registry issued a certification that Walters was allowed to keep her emotional support animal even if there is a policy prohibiting pets.

31.　　In February of 2011, Defendant Association received the letter from Walters' medical provider and the certification. However, as early as the Summer of 2010, Walters, a member of the Board, discussed with Board members her need to obtain a waiver to the NO DOG RULE to keep an emotional support dog on the premises.

32.　　Walters made the request for a reasonable accommodation because Defendant Association had a NO DOGS RULE in place and Walters needed a waiver from

*Barbara Walters v. Cowpet Bay West Condominium Assoc., et al.*
Second Amended Complaint

Civil No. 12-00024
Page 7

Defendant Association's NO DOGS RULE to keep her emotional support dog (hereinafter "Happy"). Walters furnished those two documents to Louanne Schechter, the Office Manager for Defendant Association as Walters' application because the Defendant Board did not have a form or application in place for requesting a waiver to the NO DOGS RULE. [**EXHIBIT B**]

33. At the time Walters submitted her request for a reasonable accommodation, Defendant Association had no written policy in place for processing a reasonable accommodation request, although it had a NO DOG RULE IN place for at least fifteen (15) years.

34. Upon information and belief, Louanne Schechter accepted the documents, placed them in Walters' file and discussed Walters' request with Jon Cassady, Louanne Schechter's immediate supervisor.

35. Upon information and belief, Jon Cassady discussed Walters' request with Harcourt and Harcourt subsequently came to the Association's Office to review Walters' documents.

36. Upon information and belief, Harcourt sent his representative, Bob Canefield, a member of the Board, to review the documents.

37. Upon information and belief, there was widespread opposition to having dogs on the premises by some members of the Board and Association.

38. Upon information and belief, Harcourt took down a framed copy of an American with Disabilities Act poster that was hanging in the Defendant Association's office saying **Cowpet Bay rules not ADA**.

39. At the February 12, 2011 Board meeting, Board member Robert Cockayne (hereinafter "Cockayne") proposed amending the by-laws to prohibit dogs and farm animals. There was no mention however of providing reasonable accommodations to owners under the FHA or the ADA.

*Barbara Walters v. Cowpet Bay West Condominium Assoc., et al.*
Second Amended Complaint

Civil No. 12-00024
Page 8

40. The Board neither discussed or acted on Walters' request for a reasonable accommodation during the March 8, 2011 Board meeting.

41. During the May 10, 2011 Board meeting, an owner complained of someone walking a dog on the property. The Board, headed by Harcourt voted to post "No Dogs Allowed" signs on the property, despite the fact that Harcourt knew that Walters had submitted a request for a reasonable accommodation to allow her to keep her emotional support dog, Happy on the premises. The Board also took no action on Walters' request for a reasonable accommodation, although it had been pending before them for more than two months.

42. The Board met in June, twice in July and once in August, but did not act on Walters' request for a reasonable accommodation.

43. During the Board meeting on September 13, 2011, the Board discussed Service Dogs and mentioned that the dogs must be registered with the ADA. The Board also opined that the Virgin Islands does not have guidelines for "service dogs." Although the Board, headed by Harcourt, discussed Walters' request for a reasonable accommodation, the Board, however took no action on Walters' request for a reasonable accommodation, although it had been pending before them for more than six months.

44. At all relevant times, some members of the Defendant Association and even the Defendant Board were vehemently oppose to having dogs on the premises. Members of the Defendant Association and the Defendant Board began voicing their oppositions to allowing dogs on the premises through emails and on the Cowpet Bay Blog. They also began harassing Walters. At all relevant times, Lance Talkington (hereinafter "Talkington") owned the Cowpet Bay West Blog (hereinafter "the blog").

45. In his first blog post relating to "dogs" on the premises, Talkington, on September 27, 2011, stated that " at least three owners. . . have been seen with dogs that are either

*Barbara Walters v. Cowpet Bay West Condominium Assoc., et al.*       Civil No. 12-00024
Second Amended Complaint                                               Page 9

living in condos or are being entertained by an owner walking them on the property. He goes on to point out that two of the dog owners are present and past Board members. Talkington called for the owners to amend the Defendant Association's by-laws to "eliminate any confusion over possible exceptions to the general rule" of no dogs .

46.   At the October 11, 2011 Board meeting, the Board, headed by Harcourt, took no action on Walters' pending request for a reasonable accommodation, although it had been pending for more than eight (8) months. However, the Board under Harcourt's leadership, discussed changing the by-laws to adopt a NO DOGS ALLOWED rule.

47.   The Harcourt led Board proposed NO DOGS ALLOWED rule made an exception only for the ADA. Harcourt and the other members of the Board excluded FHA requests, although Walters' requested a reasonable accommodation pursuant to the FHA. Moreover, Harcourt and at least two Board members knew that Walters' request was currently pending before the Board and had been pending for more than six (6)months.

48.   A day after the Board meeting, on October 12, 2011, Talkington emailed Walters regarding her "service animal." In this email, Talkington request from Walters a copy of her request for reasonable accommodation that was submitted to the Defendant Association office.

49.   Walters responded on that same day telling Talkington that he has no right to the information.

50.   Talkington responded by telling Walters that he will continue to pursue obtaining copies of her request for reasonable accommodation and that her "blatant violation" of the by-laws is completely intolerable.

51.   Talkington continued to harass Walters regarding her need for an emotional support

| | |
|---|---|
| *Barbara Walters v. Cowpet Bay West Condominium Assoc., et al.* | Civil No. 12-00024 |
| Second Amended Complaint | Page 10 |

dog.  In an October 13, 2011 blog, Talkington attacked Walters by stating that she claims to have papers that allow her to have a service dog and implied that Walters' refusal to discuss her disability with him and or the blog is unreasonable. Talkington also implied that Walters had made no attempt to prove her need for a service dog to the Board.

52.    Alfred Felice (hereinafter "Felice")  chimed in on the blog and stated that "service dogs' for the true needs are legal, but anyone can get such a designation by simple request from a friendly physician, regardless of any real need. Anyone can also get one via the internet for a minimal fee.!!!"

53.    Exemplifying the type of discriminatory attitude that the FHA and the ADA were enacted to combat, Felice went on to say that "the perpetrators might just as well spit in our face. The by-laws must be made to reflect the majorities' rights.  Perhaps, the dissenters would be happier in another community rather than be ostracized at CBW, which would be another fine recourse."

54.     In response increasing attacks by both Talkington and Felice on the blog regarding her request for a reasonable accommodation, Walters explained that she was not violating the law or the rules.  Walters stated that she has a disability and is afforded protection under the FHA.

55.    Felice responded with disdain for Walters and the law that protects her rights as a disabled American.

56.    Walters again attempted to defend herself against allegations of wrongdoing on the part of both Felice and Talkington.   Walters blogged that she is on permanent disability and receives social security benefits.

58.    Immediately, Talkington discounted Walters' claim in a blog by stating how "unreasonable" it is to expect the Owners to accept Walter's claims of disability. Talkington asked Walters to provide the "dog's credentials.

*Barbara Walters v. Cowpet Bay West Condominium Assoc., et al.*   Civil No. 12-00024
Second Amended Complaint                                          Page 11

59.  In a later blog, Talkington attacked Walters' credibility and accused Walters about having made a request for a reasonable accommodation with Defendant Association's office.

60.  Walters confronted Talkington about his retaliatory and harassing conduct on the blog. In response, Talkington stated that" [i]t is im possible to give someone grief over a disability that is to day completely undefined and unsubstantiated."

61.  After reading Talkington's last blog, on October 13, 2011, Walters emailed the Board with the subject line "This has gone too far." In her email, Walters informs the Board that she feels Talkington obtained her private information from being allowed to attend Board meeting even though he is not a Board member.

62   Upon information and belief Harcourt and other members of the Board improperly shared the content of Walters' request for a reasonable accommodation with Talkington.

63.   Susan Anderson, wrote an email complaining that she saw Judith Kromenhoek walking a dog and assumed that she was walking the dog for somebody else "because Judith Kromenhoek does not appear to be disabled."

64.  The prevailing attitude shared by some Association and Board members was that Walters was not disabled because there was no visible evidence of her disability.

65.  In response to Susan Anderson email regarding Judith Kromenhoek's "presumed disability, in an email dated  October 20, 2011, Harcourt informed Susan Anderson that the Board was considering amending the by-laws to allow exceptions for "true" service animals " that are documented." Harcourt response came more than eight (8) months after Walters submitted a request for reasonable accommodation to the Board, which was still pending before the Board.

66.  Harcourt also stated that a fine should be levied against the "offenders" unless they submitted "appropriate ADA compliant paperwork."

*Barbara Walters v. Cowpet Bay West Condominium Assoc., et al.*      Civil No. 12-00024
Second Amended Complaint                                             Page 12

67.  On October 26, 2011, Talkington blogged requesting that the Board enforce its rules and regulations.

68.  On October 27, 2011, a member fo the Board emailed the Board stating that the Board should respond to both Susan Anderson's and Talkington's inquiries.

69.  Walters' responded that she had submitted a request for reasonable accommodation with the Board. Walters also mentioned that her request included a letter from her treating physician and asked that her medical record be kept confidential. Walters also expressed concern that medical information might appear on Talkington's blog.

70.  Walters and some members of the Defendant Association recommended that Talkington not be allowed to attend Board meetings as he is not a member of the Board. Others, suggested that the Board hold closed meetings to discuss sensitive issues, including Walters' request for a reasonable accommodation.

71.  Some members of the Board however violently opposed to having closed Board meetings to discuss Walters' reasonable accommodation request. In response to a blog recommending a closed meeting to discuss Walters' request for reasonable accommodation, Board member Douglas Rebak blogged, "I do support the Board's need for closed sessions on "confidential" matters–but the dog issue??? PLEASE!!! The situation is most disturbing and not at all the way it should be in an upscale Residential/Resort Community!"

72.  Notwithstanding Walters' objection to providing Talkington with her private and personal information, on October 28, 2011, Harcourt emailed a letter to Walters and Judith Kromenhoek and copied Talkington. Harcourt wrote as President of the Board and falsely accused Walters and Judith Kromenhoek of violating the NO DOGS RULE "because they have not applied for an exception to the no dog rule." Harcourt also acknowledged in that same letter that both Walters and Judith Kromenhoek had "papers for service dogs pending in the office." Contradicting himself, Harcourt

*Barbara Walters v. Cowpet Bay West Condominium Assoc., et al.*       Civil No. 12-00024
Second Amended Complaint       Page 13

ordered Walters to apply and submit documentation for a waiver and threatened to levy a monetary fine against Walters if she did not take up his offer. . [EXHIBIT M].

73.    In response, Walters addressed the entire Board stating that "if any of her medical information were disclosed to Susan Anderson or Talkington or anyone who is not on the Board, she would deal with it accordingly. Walters also emailed the Board under separate cover and expressed her belief that Harcourt had overstepped by sharing the letter with Anderson and Talkington.

74.    Talkington posted the entire letter on the blog in his October 30, 2011 post.

75.    The November 8, 2011 Board meeting, the Board took no action on Walters' pending application for a reasonable    However, the Board, led by Harcourt, discussed amending Section 11 of the by-laws to add:

> No dogs are allowed on the property, either long term or visiting. The Board may grant exceptions to the NO DOGS ALLOWED rule, on an individual basis, should an owner require the assistance of a service animal (dog) as defined by the ADA. Owners seeking to obtain such an exemption are required to apply, in writing, to the Board with supporting document.

76.    At the November 18, 2011 Board meeting the Board did not act on Walters' pending reasonable accommodation request. However, the Board offered to table discussion on the proposed amendment to the by-laws until a legal opinion has been obtained.

77.    On December 2, 2011, Vincent Verdiramo (hereinafter "Verdiramo"), an attorney and member of the Board, emailed a December 1, 2011 letter to 99 members of the Association. In his letter, Verdiramo offers legal advice to the Defendant Association. Verdiramo provides that the FHA is "not a blanket law." Verdiramo further notes that "every case must be handled individually "with official adjudication." He advised that when a person claims the need for am\n emotional support animal under the FHA, the must bring the Association to court and present expert testimony.

78.    The Board held at least three meetings in December of 2011, but took no action on Walters' pending request for a reasonable accommodation.

*Barbara Walters v. Cowpet Bay West Condominium Assoc., et al.*  Civil No. 12-00024
Second Amended Complaint                                         Page 14

79. Talkington continued his harassing campaign against Walters. In a December 5, 2011, Talkington shares a complaint of a Mr. Bartlett and the barking of a dog in his area of the community. Talkington goes on to point out that the "known violators" live in this same area. Talkington opined that "trained service dogs are specifically trained to NOT bark unless the owner is in imminent danger."

80. As a Board member, Walters was up for re-election in the upcoming Board election. Felice and others suggested retaliating against Walters by defeating her in the upcoming election. In response to Talkington blog, Felice notes "that a change to the by-laws may be necessary and that the Owners should 'WAKE UP START UP A CAMPAIGN FOR A NO DOGS SLATE NOW.

81. In a December 13, 2011 Board meeting, the Board, led by Harcourt decided to amend the by-laws to include the NO DOGS ALLOWED rule. The Board also discussed Verdiramo's December 2, 2011 legal advice.

82. On December 16, 2011, on the behalf of Walters, he Board received a letter from Karin A. Bentz, Esq. In this letter, Board was informed that under the FHA, Walters is qualified to keep Happy to assist her with her disability. The Board was further informed that they could not engage in any conduct that would punish or deprive Walters of her right to keep Happy on the premises.

83. In a January 9, 2012 email, Felice states "PLEASE do not return the coven and their shills to office, they DO NOT deserve another term EVER." In a January 10, 2012 blog, Felice continues, "JUDI and BARBARA have DOGS!!!! They surely have an agenda and DICK is their SHILL."

84. In their January 11, 2012, Board meeting, the Board, led by Harcourt, discussed receipt of the December 16, 2011 from Karin Bentz. Verdiramo motioned to "abide by the rule and immediately begin fining owners that have dogs." The Board voted to fine Walters $50.00 per day for having Happy on the premises.

*Barbara Walters v. Cowpet Bay West Condominium Assoc., et al.*  Civil No. 12-00024
Second Amended Complaint   Page 15

85.  In a January 14, 2012 email, Felice states "Only the coven and their shills call me a disaster." He goes on to say that if the Owners want a lot more "bull" "Elect the Coven on the board, with their shill."

86.  During the January 11, 2012, Defendant Cockayne distributed information about service dog certification naming businesses that have no requirements for service dog certification. Copies of Walters' dog certification were circulated during that Board meeting.   A copy of Walters' dog certification was improperly shared with Talkington.

87.  In a January 15, 2012 blog entitled "Puppy Dog Diplomas" Talkington attacked Happy's certification by stating it is "certified by an outfit called the National Service Animal Registry." Talkington concludes his blog post by sharing his "considered opinion" that such "outfits serve no legitimate purpose and exist mainly to sidestep what the ADA works diligently to accomplish" and putting forth a call "to stop the doggy diploma silliness and adopt clear ground rules for dogs at Cowpet". Talkington states that the ADA is the sole source of legitimacy for such rules.

88.  On January 16, 2012, Harcourt distributed his President's Forum to the owners. In it, he says: "[t]he issue of dogs on the property has been the subject of many (unfortunately) blanket emails, There are some owners who are violating the current rule. The Board had shown some restraint in this matter since we wee trying to revise the by-laws to allow for valid exceptions; however, one of these owners had their attorney send the Board a letter saying the attorney was representing them in a complaint against use.   The Board voted to retain an attorney to protect the Association's interest.

89.  On January 15, 2012, Donna LaScola voiced concern that the Defendant Association may be getting into legal trouble with all the blog posts and emails regarding Walters' and Judith Kromenhoek's service animals.

*Barbara Walters v. Cowpet Bay West Condominium Assoc., et al.*   Civil No. 12-00024
Second Amended Complaint   Page 16

90.   Ever ready to vilify Walters, Felice states, "[t]he ADA law does not prevent a community from excluding DOGS." He goes on, "[n]o one wishes to prevent proper needs to be satisfied!! He continues, "[a]gain REAL needs or pets??" He concludes, "I suggest they be ostracized, NO dinner dates, no patronage of their establishments, no conversations, no beach conclaves, just ignore them completely!!!"

91.   On January 17, 2012, ever dutiful to Talkington, Harcourt emailed Talkington informing him that the Board had received a letter from one of the owners stating the owner had filed a complaint. Therefore the Board was retaining counsel.

92.   On January 17, 2012, Walters received a letter from the Board informing he that she was in violation of the no dogs rule and would be fined. Walters felt hurt and ashamed after reading the letter.

93.   On January 24, 2012, Talkington screening a candidate for the Board, discussed the candidate's stance on the "issues," one of which is the amendment of the by-laws regarding dogs. Talkington represented that the Board informed him that Judith Kromenhoek and Walters refused to present any proof of their disability that warrants a service animal.

94.   In a January 30, 2012 email, Felice wrote to 40 recipients, "How can you allow 2 admitted 'certified' mentally disabled persons on the ballot for election to our board?? Due diligence was not done properly. The should be removed from consideration.

95.   As of February of 2007, Walters had not received any response from the Board regarding her request for a reasonable accommodation. At the Board's February 7, 2012 meeting, Harcourt stated that he met with Attorney Maria Hodge regarding the HUD complaints and the dog issue in general.

96.   On February 28, 2012, Edward Wardell, the incoming President of the Board, emailed the owners informing them that the by-laws were amended by a vote of 69.2% of the Owners and will become effective once "registered with the U.S. Virgin Islands

*Barbara Walters v. Cowpet Bay West Condominium Assoc., et al.*          Civil No. 12-00024
Second Amended Complaint                                                 Page 17

Government.

97.   In this version of the by-laws, Section 11 of Article V was amended to state:

No dogs are allowed on the property, either long term or visiting. The Board may grant exceptions to the NO DOGS ALLOWED rule, on an individual basis, should an owner require the assistance of a service animal (dog) as defined by the ADA. Owners seeking to obtain such an exemption are required to apply, in writing, to the Board with supporting documentation.

98.   However, the April 11, 2012 Board minutes reflect that legal counsel had suggested not recording the by-laws and obtaining approval to revised the "no dogs" rule as follows:

No dogs are allowed on the property, either long term or visiting. Owners or occupants who have properly documented and verified disability as defined by Federal Law may make a request for reasonable accommodation and exception to the prohibition on dogs on the property. An owner or occupant seeking an accommodation can do so in writing to the Board. The request shall include: (1) identification of the owner or occupant seeking the accommodation; (2) explanation of the relationship between the requested accommodation and the disability; and (3) verification of the disability and need for accommodation as set forth in this rule. To facilitate the Board's review of each request for an accommodation of a non-obvious handicap, the Board may require (1) the submission of documentation verifying that the person meets the Federal Fair Housing Act's definition of disability; and (2) documentation from a doctor or other medical professional who is in a position to know about the individual's disability, and that the requested accommodation is related to the individual's disability. All information submitted to the Board that is necessary for the evaluation of the reasonableness of an accommodation will be kept confidential.

99.   On February 29, 2012, Verdiramo & Verdiramo P.A. delivered a letter to the Board providing an explanation of the Defendant Association's legal obligations under the ADA and the FHA

100.  In December of 2011, Walters filed a charge of discrimination under the FHA with the Department of Housing and Urban Development (HUD) against the Association and the Board for violation of the FHA.

101.  In response to Walters and Judith Kromenhoek's HUD complaints, on March 25, 2012, Talkington blogged, Walters and Judith Kromenhoek will "hang onto their puppies" at any length. In direct response to the HUD Complaint, Talkington says "Really ladies? Do you seriously believe that either of two owners has any impact whatsoever on the Association's governance of this property in terms of your having

*Barbara Walters v. Cowpet Bay West Condominium Assoc., et al.*          Civil No. 12-00024
Second Amended Complaint                                                                Page 18

those puppies?  To call this a fiasco of a complaint 'misguided' is at the moment the most charitable description of the though process (if there even was one) that was involved in filing this complaint."  Talkington characterizes Walters and Judith Kromenhoek as:"playground bullies" and of making a mockery of our board."  He then calls on the Association to "go on the offensive" and file suit against Walters' and Kromenhoek stating "when these ladies start spending their own cash instead of relying on the government for free help, the rubber will meet the road on how far everyone is willing to go.  In closing, Talkington implores the Board to take Walters and Judith Kromenhoek to court.

102.   Walters was not re-elected to the Board.   In late March or early April of 2012, Walters finally received a response from the Board approving her request for reasonable accommodation more than a year afer she submitted her request.

103.   Defendant Board's act and omissions, including Defendant Board's response to Walter's request for an accommodation, as well as the Board's failure to respond to the request for more than a year, constitute a denial of a request for reasonable accommodation in violation of the FHA.

104.   Defendant Association is vicariously liable for the actions and omissions of its agent, Defendant Board.

105.   Defendant Harcourt's acts and omissions in ignoring Walters' request for reasonable accommodation;  while at the same assisting a campaign to amend the by-laws to specifically exclude emotional support animals by incorporating only the definition of the ADA of service animal; providing Talkington access to Walters' personal and private information; and falsely accusing Walters of violating the rules qualify as retaliatory measures pursuant to the FHA.

106.   The Defendant Board action in assessing Walters a fine after receiving the letter from Karin A. Bentz, qualifies as retaliatory measures pursuant to the FHA.

*Barbara Walters v. Cowpet Bay West Condominium Assoc., et al.*      Civil No. 12-00024
Second Amended Complaint                                             Page 19

107.   As a result of the Defendants' actions, and each of them, Walters has suffered damages including but not limited to emotional distress, embarrassment, and humiliation.

## COUNT I: VIOLATION OF THE FHA
### (Association and Board)

108.   Walters realleges and incorporates by reference the remainder of the allegations set forth herein.

109.   42 U.S.C. §3604(f)(3)(b), the FHA, prohibits housing providers from discriminating against applicants or residents because of their disability and from treating persons with disabilities less favorably than others because of their disability. The foregoing conduct violates the FHA which prohibits discriminating based on disability and from treating persons with disabilities less favorably than others because of their disability.

110.   The FHA also makes it unlawful for any person to refuse " to make reasonable accommodations in rules, policies, practices, or services, when such accommodations may be necessary to afford persons with disabilities equal opportunity to use and enjoy a dwelling.

111.   At all relevant times, Walters had a request for a reasonable accommodation pending before the Defendant Board.

112.   Defendant Association knew or reasonably should have known of Plaintiff's disability.

113.   Defendants Association and Board discriminated against Walters by denying Walters Plaintiff, as a person with a disability, a reasonable accommodation by failing to take action on her request for reasonable accommodation for more than a year.

114.   As direct and proximate result of the Defendants' conduct described above, Walters has suffered and will continue to suffer embarrassment, humiliation, mental anguish, emotional and physical distress.

115.   Defendants' acts or omissions were done maliciously, oppressively and/or fraudulently.

*Barbara Walters v. Cowpet Bay West Condominium Assoc., et al.*   Civil No. 12-00024
Second Amended Complaint                                          Page 20

116.   Once Walters submitted her application to Louanne Schechter in February of 2011, the Defendant Board had an obligation to take action on the pending claim. Moreover, Defendant Association could have taken measures to assure that the Board complies with the FHA but chose not to.

117.   Defendants conduct violated the FHA and Walters is entitled to the remedies, procedures and rights set forth in 42 U.S.C §3613 (c)(1).

## COUNT II: VIOLATION OF SECTION 3617 OF THE FHAA
### (Harcourt)

118.   Walters re-alleges and incorporates all preceding paragraphs herein by reference as though fully restates, wholly, in this Count.

119.   Harcourt is a member of the Association and was the President of the Board, at the time Walters applied for a reasonable accommodation.

120.   Harcourt's removal of the framed copy of the ADA poster made clear his intention to ignore Walters' request for accommodation.

121.   Harcourt's conduct in ignoring Walters' request for a reasonable accommodation while at the same time pushing for an amendment to the by-laws that would deny Walters reasonable accommodation constitute interference pursuant to Section 3617 of the FHA.

122.   Harcourt action in falsely accusing Walters of violating the no dogs rule and levying a fine against Walters constitute retaliation under the FHA.

123.   As a result of Harcourt's acts and/or omissions, Walters has suffered emotional injuries and continues to suffer emotional injuries.

124.   Defendant Harcourt's conduct violated Section 3617 of the FHA and entitles Walters to all categories of damages, including punitive damages.

*Barbara Walters v. Cowpet Bay West Condominium Assoc., et al.*   Civil No. 12-00024
Second Amended Complaint   Page 21

## COUNT III: VIOLATION OF SECTION 3617 OF THE FHAA
### (Board and Association)

125.  Walters incorporates all preceding paragraphs herein by reference as though fully restated, wholly, in the Count.

126.  The foregoing conduct violates the FHA, which makes it unlawful for any person to coerce, intimidate, threaten, or interfere with any person in the exercise or enjoyment of, or on account of his having exercised or enjoyed, or on account of his having aided or encouraged any other person in the exercise or enjoyment of, any right granted or protected by the FHA.

127.  Defendant Association knew or had reason to know that Walters had applied for a reasonable accommodation to keep her emotional support dog, Happy, on the premises. Yet, Defendant Association refused to provide Walters with a reasonable accommodation and amended its by-laws to exclude emotional support dogs from a waiver to the NO DOGS ALLOWED rule.

128.  Defendant's Board Action if assessing Walters a fine after it received a letter from Walters' attorney and assessing Walters a fine despite the fact that Walters' request for a reasonable accommodation was pending in the office constitute retaliation under the FHA.

129.  As a direct and proximate result of Defendant Board and Defendant Association's acts or omissions, Walters has suffered extreme and severe anguish, humiliation, embarrassment, emotional distress and tension, the extent of which is not fully known at this time and the amount of damages caused thus far is not yet fully ascertained but will be proven at the time of trial.

130.  Defendants' conduct as described in this Complaint violated the FHA and the public policy of the United States and entitles Walters to all categories of damages, including punitive damages.

| | |
|---|---|
| *Barbara Walters v. Cowpet Bay West Condominium Assoc., et al.* <br> Second Amended Complaint | Civil No. 12-00024 <br> Page 22 |

## COUNT IV: VIOLATION OF SECTION *3617* OF THE FHA
### (Felice)

131.   Walters re alleges and incorporates by reference all preceding paragraphs herein as though fully restated, wholly, in the Count.

132.   Defendant Felice began interfering with Walters on the blog once he learned that Walters had requested reasonable accommodation for an emotional support animal, her dog.

133.   Defendant Felice interfered with Walters' right to request reasonable accommodation by using the blog and personal emails sent to the Cowpet Bay West Community to intimidate, to discredit and to threaten Walters.   Defendant Felice's actions were designed to intimidate, threaten and scare Walters from pursuing a  reasonable accommodation to keep Happy on the premises.

134.   Defendant Felice's conduct  violated Section 3617 of the FHA by interfering with Walters exercise of her right to request for a reasonable accommodation.

135.   Defendant Felice violation of the FHA has harmed and will continue to harm Plaintiff Walters.

136.   As a result of Defendant Felice's act or omission, Walters is entitled to the remedies, procedures and rights set forth in 42 U.S.C *§3613 (c)*(1) and (2).

## COUNT V: VIOLATION OF SECTION *3617* OF THE FHA
### (Lance Talkington)

137.   Walters re alleges and incorporates by reference all preceding paragraphs herein as though fully restated, wholly, in the Count.

138.   Upon information and belief Defendant Talkington runs the blog and used the "blog" to attack, embarrass and humiliate Walters after she filed a request for reasonable accommodation.

*Barbara Walters v. Cowpet Bay West Condominium Assoc., et al.*    Civil No. 12-00024
Second Amended Complaint                                          Page 23

139.  Defendant Talkington interfered with Walters' exercise of her right to request a reasonable accommodation by demonizing Walters on the blog and suggesting both implicitly and explicitly that Walters violated the rules

140.  Defendant Talkington interfered with Walters' right to request a reasonable accommodation by mounting a calculated attack against Walters' reputation, honesty and standing in the Cowpet Bay West Community.

141.  Defendant Lance Talkington interfered with Walters' right to request a reasonable accommodation by posting and publicly discussing Walters' private medical record on the blog.

142.  Defendant Talkington's actions were designed not only to humiliate and to discredit Walters but to signal to Walters that her medical records and private information will continue to be the subject of public scrutiny if she continued to demand a reasonable accommodation. Defendant Talkington actions were designed to threaten, intimidate or scare Walters into abandoning Walters' right to a reasonable accommodation to keep Happy on the premises.

143.  The conduct mentioned above violated Section 3617 of the FHA.

144.  Defendant Talkington's violation of the FHA has harmed and will continue to harm Walters in the future.

145.  As direct result of Defendant Talkington's act or omission, Walters is to the remedies, procedures and rights set forth in 42 U.S.C §3613 (3)(1) and (2).


**COUNT VI: VIOLATION OF THE AMERICAN WITH DISABILITIES ACT**
**(Association and Board)**

146.  Walters realleges and incorporates by reference all preceding paragraphs herein as though fully restated, wholly, in the Count.

147.  As set forth herein, at all relevant times, Defendants were subjected to the ADA based on the ADA definition of public lodging.

*Barbara Walters v. Cowpet Bay West Condominium Assoc., et al.*　　　Civil No. 12-00024
Second Amended Complaint　　　　　　　　　　　　　　　　　　Page 24

148.　Defendants owns, operates and/or leases condominium units in Cowpet Bay, St. Thomas, Virgin Islands.

149.　Defendants discriminated against Walters　by　failing to make reasonable modifications to its NO DOGS RULE to allow Walters to keep Happy on the premises.

150.　As such, Defendants violation of the ADA has harmed and will continue to harm Walters

151.　As a result, Walters is entitled to the remedies, procedures, and rights set forth in 42 U.S.C.§12188.

## COUNT VII: BOARD EXCEEDED ITS AUTHORITY BY ADOPTING THE NO DOGS RULE

152.　Walters incorporates all preceding paragraphs herein by reference as though fully restated, wholly, in the Count.

153.　Defendant Association adopted Bylaws pursuant to Chapter 33, of Title 28 of the Virgin Islands Code.

154.　At the time Plaintiff requested a reasonable accommodation for her dog, the bylaws of Defendant Association placed no restrictions on dogs on the Cowpet Bay West premises.

155.　The Defendant Board subsequently adopted rules and regulations, which were more restrictive than the bylaws and places a restriction on the condominium owners' right to own an animal, including emotional support dogs in a manner not contemplated by the bylaws.

156.　The Defendant Board acted outside the scope of their power when they adopted rules that were more restrictive than the bylaws.

157.　As a result of the Defendant Board implementing this invalid rule, Walters suffered damages and losses, and will continue to suffer loss and damages, including but not

*Barbara Walters v. Cowpet Bay West Condominium Assoc., et al.*       Civil No. 12-00024
Second Amended Complaint       Page 25

limited to emotional distress, financial loss and other losses for which Defendant Board is liable.

## COUNT VIII: THE FEBRUARY 2012 AMENDMENT TO THE BYLAWS IS VOID

158. Walters incorporates all preceding paragraphs herein by reference as though fully restated, wholly, in the Count.

159. Defendant Association adopted by-laws pursuant to Chapter 33, of Title 28 of the Virgin Islands Code.

160. Section 19 of the 1968 Declaration states that the by-laws and rules can only be amended by "an amendment to the Declaration and such amendment duly recorded.

161. Under this provision, any amendment to the by-laws must be a 75% vote and recorded in order to be valid.

162. The February 2012 amendment to the by-laws was adopted by a roughly 69% vote.

163. The 69% vote is less than what is required by the Declaration.

164. Therefore, the February 2012 amendment is inconsistent with the Declaration.

## COUNT IX: NEGLIGENCE
### (Board and Association)

165. Walters repeats and re-alleges all preceding paragraphs as though fully restated, wholly, in this Count.

166. The Defendant Board and Defendant Association owed Walters a duty to comply with all laws including the FHA and the ADA.

167. Defendant Board violated the FHA when it took more than a year to approve Walters' request for a reasonable accommodation.

168. Defendant Association did otherwise ratify Defendant Board's wrongful conduct.

169. As a result of Defendants' acts and/or omissions, Walters has suffered emotional

*Barbara Walters v. Cowpet Bay West Condominium Assoc., et al.*      Civil No. 12-00024
Second Amended Complaint      Page 26

distress, embarrassment, humiliation and continues to suffer damages for which Defendants are liable.

## COUNT IX: INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS
### ( Felice)

170.     Walters incorporates all preceding paragraphs herein by reference as though fully restated, wholly, in the Count.

171     At all relevant times; Walters was subjected to a pattern of harassment and vilification on the blog and through emails based in whole or in part, on her request for a reasonable accommodation by Defendant Felice.

172.     Defendant Felice's action in emailing at least 40 people and implying that Walters a "certified mentally disabled person" should not be on the ballot for election to our board"was done intentionally, recklessly and with deliberate indifference to a substantial probability that severe emotional distress would result to Walters.

173.     Defendant Felice's blog posts and other emails were intentional acts done with deliberate indifference to a substantial probability that severe emotional distress would result to Walters.

174.     Defendant Felice's blog posts and emails are evidence of a pattern of harassment.

175.     Defendant Felice's acts further constitute extreme and outrageous conduct.

176.     Defendant Felice's conduct was outrageous in character and extreme in degree, because said conduct was atrocious and egregious, and went beyond all possible bounds of decency and is utterly intolerable in a civilized community.

177.     Defendant Felice's extreme and outrageous conduct toward Walters was done in a willful and wanton manner, and constituted a disregard for the rights and well-being of Walters.

178.     As a result of Defendant Felice's extreme and outrageous conduct, Walters has suffered severe mental and emotional distress, humiliation, embarrassment and will

*Barbara Walters v. Cowpet Bay West Condominium Assoc., et al.*
Second Amended Complaint

Civil No. 12-00024
Page 27

continue to suffer severe emotional distress and other damages for which Defendant

Felice is personally liable for compensatory and punitive damages to Walters.

## COUNT X: CONSPIRACY TO COMMIT AN UNAUTHORIZED ACT
### (Against all Defendants)

179.    Walters repeats and re-alleges all preceding paragraphs  as though fully restated, wholly, in this Count.

180.    Defendants, through and among themselves conspired  with each other, and acted in concert, to violate the FHA and to deny Walters 'request for reasonable accommodation, without authority, to deprive her of protected rights and interests, to defame her, to cause her emotional distress and suffering, and to deprive her full enjoyment of the goods, services, facilities, privileges, advantages, accommodations and/or opportunities of Cowpet Bay West.

181.    The conduct complained herein are overt acts in furtherance of their conspiracy, and taken together constitute a civil conspiracy to harm Walters and to deny her civil rights under the FHA and the ADA.

182.    As a direct and proximate result of the foregoing, Walters has suffered damages, losses, and severe emotional distress, for which said Defendants are jointly and severally liable.

## COUNT XI: PRIMA FACIE TORT CLAIM (All Defendants)

183.    Walters incorporates all *preceding* paragraphs herein by reference as though fully re-stated, wholly, in the Count.

184.    The Defendants through their wrongful violations of, inter alia, the FHA and the ADA, caused Walters  to be improperly deprived of  reasonable accommodation.

184.    None of the Defendants had an objective justification for depriving Walters of the aforementioned civil right.

*Barbara Walters v. Cowpet Bay West Condominium Assoc., et al.*  Civil No. 12-00024
Second Amended Complaint  Page 28

185.  Defendants acts and omissions as aforesaid were such that they offend common decency and sensibilities.

186.  As a direct and proximate result of Defendants' wrongful and unlawful acts and omissions, as aforesaid, Walters' rights were violated; she was defamed; and suffered loss of reputation, mental anguish, pain and suffering and loss of enjoyment of life. In addition, Walters was assessed a daily monetary fined and has and will continue to suffer losses, pain, humiliation, mental anguish and damages for which Defendants are liable.

## COUNT XII: DEFAMATION AND SLANDER PER SE
### (Board, Association, Felice, Harcourt and Talkington)

187.  Walters incorporates all proceeding paragraphs herein by reference as though fully re-stated, wholly, in the Count.

188.  Defendants wilfully and intentionally published false and wrongful information on the blog and other venues about Walters.

189.  The above described information was false and injurious as to Walters. It lowered the professional and personal reputation of Walters in the Cowpet Bay West community, as it was understood by the members thereof, and such publications were calculated to elicit that very response from that respected community.

190.  As a direct consequence to Defendants' actions, Walters is entitled to an award of compensatory and punitive damages from them to compensate her for humiliation, emotional pain and suffering, inconvenience, mental and emotional distress, loss of enjoyment and embarrassment.

## COUNT XIII: NEGLIGENT AND/OR INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS
### (All Defendants except Felice)

191.  Walters incorporates all proceeding paragraphs herein by reference as though fully

*Barbara Walters v. Cowpet Bay West Condominium Assoc., et al.*      Civil No. 12-00024
Second Amended Complaint      Page 29

re-stated, wholly, in the Count.

192.     As set forth herein, at all relevant times, Walters was subjected to a pattern of harassment and vilification on the internet and through email based in whole or in part, on her request for reasonable accommodation and for having Happy on the premises by Defendants.

193.     Defendant Board's failure to provide Walters with a reasonable accommodation for Plaintiff's Happy ; publishing on the blog that Plaintiff had violated the NO DOGS RULE, although she had a request pending for more than a year; and imposing unreasonable and egregious fines, penalties and or interests against Plaintiff are all intentional acts design to create severe emotional distress on the part of Walters.

194.     Defendant Talkington's inflammatory blog posts and emails were done with reckless and with deliberate indifference to a substantial probability that severe emotional distress would result to Walters.

195.     Defendant Verdiramo's misrepresentation of the law in his legal opinion to the Board, while at the same time spearheading a campaign to amend the by-laws to specifically exclude Happy, and other emotional support dogs was done intentionally and with deliberate indifference to a substantial probability that severe emotional distress would result to Walters.

196.     Defendant Cockayne's acts and omissions in providing Defendant Talkington with a copy of Walters' dog certification knowing that he would post it on the blog constitute acts of extreme and outrageous conduct.

197.     Defendant Harcourt's act of ignoring Walters' request for a reasonable accommodation while at the same time assisting in the campaign to amend the by-laws to specifically exclude Happy and publishing a letter falsely stating that Walters had no submitted a request for reasonable accommodation was done with deliberate indifference to a substantial probability that severe emotional distress would result to

*Barbara Walters v. Cowpet Bay West Condominium Assoc., et al.*  Civil No. 12-00024
Second Amended Complaint  Page 30

Walters.

198.  The conduct of all Defendants were outrageous in character and extreme in degree, because said conduct was atrocious and egregious, and went beyond all possible bounds of decency and is utterly intolerable in a civilized community.

199.  The extreme and outrageous conduct of Defendants toward Walters were done in a willful and wanton manner, and constituted a disregard for the rights and well-being of Walters.

200.  As a direct and proximate result of Defendants' extreme and outrageous conduct, Walters suffered and continues to sufferer emotional distress.

201.  Because Defendants' extreme and outrageous conduct toward Walters were improperly motivated, and were intentional, willful and wanton, Walters is entitled to punitive damages in addition to compensatory damages.

## COUNT IVX: INVASION OF PRIVACY:
## PUBLIC DISCLOSURE OF PRIVATE FACTS
### *(Board and Association)*

202.  Walters incorporates all proceeding paragraphs herein by reference as though fully re-stated, wholly, in the Count.

203.  Defendants, Association wrongfully disclosed private information concerning Walters when they openly discussed Walters' application for a reasonable accommodation, including Walter's medical condition at Board meetings in the presence of Talkington and other non-board members.

204  Defendants disclosed the content of a personal letter addressed Walters.

205.  Walters considered the publicity highly offensive and a reasonable person in Walters position would also consider the publicity highly offensive.

206.  The Defendants knew, or acted with reckless disregard of the fact, that Walters would consider the publicity highly offensive and that a reasonable person in Walters'

*Barbara Walters v. Cowpet Bay West Condominium Assoc., et al.*  Civil No. 12-00024
Second Amended Complaint  Page 31

position would consider the publicity highly offensive.

207.  The private information, Walter's medical diagnosis and Happy's registration were not of legitimate public concern.  The private information did not have a substantial connection to a matter of legitimate public concern.

208.  As a direct and proximate result of Defendants' act and/or omission, Walters suffered and continues to suffer severe emotional distress and other damages for which Defendants are liable.

## COUNT VX: INVASION OF PRIVACY:
## PUBLIC DISCLOSURE OF PRIVATE FACTS
(Harcourt and Talkington)

209.  Walters incorporates all *preceding* paragraphs herein by reference as though fully re-stated, wholly, in the Count.

210.  Defendants  Harcourt and Talkington publicized private information concerning Walters.

211.  Walters considered the publicity of her private information highly offensive and a reasonable person in Walters position would consider the publicity highly offensive.

212.  Walter's medical diagnosis and Happy's dog certification were  not of legitimate public concern and or did not have a substantial connection to a matter of legitimate public concern.

213.   Defendants knew, or acted with reckless disregard of the fact, that a reasonable person in Walters' position and or Walters would consider the publicity highly offensive.

214.  Defendants' actions were done solely to harass, embarrass, humiliate Walters and to frustrate Walters' efforts in requesting and obtaining a reasonable accommodation to keep Happy at Cowpet Bay West.

215.   As a direct consequence of Defendants' public disclosure, Walters  is entitled to an

*Barbara Walters v. Cowpet Bay West Condominium Assoc., et al.*                        Civil No. 12-00024
Second Amended Complaint                                                               Page 32

award of compensatory and punitive damages from them to compensate her for humiliation, emotional pain and suffering, inconvenience, mental anguish, loss of enjoyment and embarrassment.

## COUNT XVI: INVASION OF PRIVACY: FALSE LIGHT
### (All Defendants, except Verdiramo and Cockayne)

216.   Walters incorporates all preceding paragraphs herein by reference as though fully re-stated, wholly, in the Count.

217.   Defendants publicize information or material that showed Plaintiff in a false light on the blog, in letters and in emails.

218.   Walters considered the portrayal of her on the blog, in letters and in email in a false light to be highly offensive and a reasonable person in Walters' position would find the publication to be highly offensive.

219.   Defendants intended the publication to create a false impression of Walters to adversely impact her pending request for a reasonable accommodation and her bid for re-election to the Board.

220.   Defendants acted with reckless disregard for the truth because they intended to discredit, humiliate, embarrass and make Walters look bad in the Cowpet Bay West community right before the Board of Directors' election.

221.   As a direct consequence of Defendants' acts showing Plaintiff in a false light, Walters suffered humiliation, emotional pain and distress, inconvenience, mental anguish, loss of enjoyment, public embarrassment and loss of credibility and Walters is entitled to an award of compensatory and punitive damages from them as compensation.

## COUNT XVII: INVASION OF PRIVACY
### (Board, Association, Harcourt and Talkington)

222.   Walters incorporates all preceding paragraphs herein by reference as though fully

*Barbara Walters v. Cowpet Bay West Condominium Assoc., et al.*   Civil No. 12-00024
Second Amended Complaint   Page 33

re-stated, wholly, in the Count.

223.   Defendants invaded Plaintiff's privacy.

224.   Walters had a reasonable expectation of privacy that her application for a reasonable accommodation and the content of the application would not be made public when she submitted the application to Cowpet Bay West Condominium Defendant Association's business office.

225.   Instead, the content of Walters' application was shared with Association members who are not on the Board, specifically Talkington.

226.   As a result, Talkington posted private information about Walters on the blog.

227.   As a result of the publication, Walters was ridiculed, mocked and ostracized by some members of the Cowpet *Bay West* community.

228.   Walters' private information was not of legitimate public concern and or did not have substantial connection to a matter of legitimate public concern.

229.   Defendants knew that the publication would be considered highly offensive by Walters and that Defendants acted with reckless disregard that a reasonable person in Walters' position would consider the publicity highly offensive.

230.   As a direct consequence of Defendants' act, Walters is entitled to an award of compensatory and punitive damages form them to compensate her for humiliation, emotional pain, and suffering, inconvenience, mental anguish, loss of enjoyment and embarrassment.

## COUNT XVIII

### NEGLIGENCE PER SE/LEGAL MALPRACTICE
#### (Verdiramo)

231.   Walters incorporates all preceding paragraphs herein by reference as though fully re-stated, wholly, in the Count.

232.   Defendant Verdiramo had a duty to provide legal advice that is consistent with the

*Barbara Walters v. Cowpet Bay West Condominium Assoc., et al.*  Civil No. 12-00024
Second Amended Complaint  Page 34

law.

233. Defendant Verdiramo's December 1, 2011 letter fell short of that standard as it misstated the requirements of the FHA.

234. The Board improperly relied on Defendant Verdiramo's legal advice to deny Walters' her request for a reasonable accommodation.

235. As a direct and proximate result of Defendant Verdiramo's intentional or wrongful act or omission, Walters has suffered, and will continue to suffer loses and damages for which Defendant Verdiramo is liable.

## WHEREFORE, THE PREMISES CONSIDERED, PLAINTIFF PRAYS:

A. That this Court declare that by its acts and/or omissions and practices, the Defendants have violated rights secured to Plaintiff by the FHAA, the ADA, and other public laws and policies of the United States and the Territory of the U.S. Virgin Islands.

B. That this Court order Defendants to make Plaintiff whole, insofar as she was adversely affected by Defendants' discriminatory practices by awarding damages, including interest in an amount to be shown at trial, and other affirmative relief.

C. That the Court grant compensatory and punitive damages.

D. That the Court grant Plaintiff her attorney's fees, costs and disbursements.

E. That the Court grant additional relief as the Court deems just and proper.

*Barbara Walters v. Cowpet Bay West Condominium Assoc., et al.*
Second Amended Complaint

Civil No. 12-00024
Page 35

**JURY TRIAL IS DEMANDED.**

Respectfully submitted,

**LAW OFFICES OF KARIN A. BENTZ, P.C.**

Dated: March 11, 2013

/s/ Karin A. Bentz
**KARIN A. BENTZ, ESQ.**
**JULITA K. de LEÓN, ESQ.**
5150 Dronningens Gade, Suite 8
St. Thomas, Virgin Islands 00802
Telephone: 340-774-2669
Telecopier: 340-774-2665
E-mail: kbentz@virginalaw.com

**CERTIFICATE OF SERVICE**

I hereby certify that I caused the filing and service of the foregoing with the Clerk of the District Court of the Virgin Islands using the CM/ECF system, which will provide electronic notice by email to the following.

Richard P. Farrelly, Esq.
Birch de Jongh & Hindels, PLLC
1330 Taarneberg
St. Thomas, VI 00802

John Benham, III, Esq.
Benham & Chan
P.O. Box 11720
St. Thomas, VI 00801

Ryan S. Mead, Esq.
Quintairos, Prieto, Wood and Boyce, P.A.
9300 South Dadeland Blvd., 4th Floor
Miami, FL 33156

/s/ Karin A. Bentz

| | |
|---|---|
| 1 | **IN THE UNITED STATES DISTRICT COURT OF THE VIRGIN ISLANDS** |
| 2 | **DISTRICT OF ST. THOMAS AND ST. JOHN** |
| | **\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*** |

<table>
<tr><td>3</td><td>BARBARA WALTERS,</td><td>)</td><td>CIVIL NO. 12-00024</td></tr>
<tr><td>4</td><td></td><td>)</td><td></td></tr>
<tr><td>5</td><td>Plaintiff,</td><td>)</td><td>Action for: Housing<br>Discrimination; Discrimination</td></tr>
<tr><td></td><td>v.</td><td>)</td><td>Based on Disability; Invasion of</td></tr>
<tr><td>6</td><td></td><td>)</td><td>Privacy; Negligent Infliction of</td></tr>
<tr><td>7</td><td>COWPET BAY WEST CONDOMINIUM<br>ASSOCIATION; THE BOARD OF THE</td><td>)</td><td>Emotional Distress<br>Infliction of Emotional Distress;</td></tr>
<tr><td>8</td><td>COWPET BAY WEST CONDOMINIUM<br>ASSOCIATION; <s>ED WARDWELL,</s></td><td>)</td><td>Punitive Damages; and Injunctive<br>and Declaratory Judgment</td></tr>
<tr><td>9</td><td><s>MAX HARCOURT; BILL CANFIELD,</s><br><s>ROSIE WELLS, SHARON KOEHLER,</s></td><td>)</td><td></td></tr>
<tr><td>10</td><td><s>DOUG REBAK and HERB HORWITZ as</s><br><s>Board members;</s> MAX HARCOURT,</td><td>)</td><td>JURY TRIAL DEMAND</td></tr>
<tr><td>11</td><td>in his personal capacity; LANCE<br>TALKINGTON; ALFRED FELICE,</td><td>)</td><td></td></tr>
<tr><td>12</td><td>ROBERT COCKAYNE, <s>in his personal capacity;)</s><br>VINCENT VERDIRAMO, <s>in his personal</s></td><td>)</td><td></td></tr>
<tr><td>13</td><td><s>capacity,</s> Defendants.</td><td>)</td><td></td></tr>
</table>

14

15 ## SECOND AMENDED COMPLAINT- REDLINE

16     **COMES NOW**, Plaintiff **BARBARA WALTERS**, by and through her undersigned counsel,

17 the **LAW OFFICES OF KARIN A. BENTZ, P.C.**, (Karin A. Bentz Esq., and Julita K. de León,

18 Esq., of Counsel) and for a ~~Second Amended Complaint~~ against the Defendants in the above

19 captioned action states and alleges as follows:

20

21 ## PRELIMINARY STATEMENT

22    .   ~~1.~~   ~~On April 11, 1968, President Lyndon B. Johnson signed the Civil Rights Act of 1968.~~

23        ~~Federal Fair Housing Act, Pub.L. No. 90-284, 82 Stat. 73, 81 (1968) (codified as~~

24        ~~amended at 42 U.S.C.§§ 3601-3631). The Federal Fair Housing Act (hereinafter~~

25        ~~"FHA") expanded on the Civil Rights Act of 1964 to prohibit discrimination~~

26        ~~regarding the sale, rental, and financing of housing based on race, color, religion, and~~

27        ~~national origin. Id. The FHA was amended twice to broaden the class of people~~

28        ~~falling under the scope of its protections; in 1974, discrimination based on sex was~~

Barbara Walters vs. Cowpet Bay West Condominium, et al.                    Civil No. 24/2012
Second Amended Complaint Redline                                          Page 2

~~added, and in 1988 discrimination based on familial status or disability was included.~~

~~(Pub.L. 100-430, approved September 13, 1988).~~

On April 11, 1968, President Lyndon B. Johnson signed the Civil Rights Act of 1968.
Federal Fair Housing Act, Pub.L. No. 90-284, 82 Stat. 73, 81 (1968) (codified as
amended at 42 U.S.C.§§ 3601-3631). The Federal Fair Housing Act (hereinafter
"FHA") expanded on the Civil Rights Act of 1964 to prohibit discrimination
regarding the sale, rental, and financing of housing based on race, color, religion, and
national origin. *Id.* The FHA was amended twice to broaden the class of people
falling under the scope of its protections; in 1974, discrimination based on sex was
added, and in 1988 discrimination based on familial status or disability was included.
(Pub.L. 100-430, approved September 13, 1988).

~~2.     In amending the FHA, Congress recognized that people with disabilities are subject~~
~~to artifical, arbitrary, and unnecessary barriers preventing them from making full use~~
~~of housing. Congress also recognized that more than a mere prohibition against~~
~~disparate treatment was necessary in order that handicapped persons receive equal~~
~~housing opportunities. Secretary of HUD v. Dedham Housing Authority, 1991 WL~~
~~442793 * 5 (HUDAALJ November 15, 1991).~~

In amending the FHA, Congress recognized that people with disabilities are subject to
artificial, arbitrary, and unnecessary barriers preventing them from making full use of
housing. Congress also recognized that more than a mere prohibition against disparate
treatment was necessary in order that handicapped persons receive equal housing
opportunities. *Secretary of HUD v. Dedham Housing Authority*, 1991 WL 442793 * 5
(HUDAALJ November 15, 1991).

Pursuant to the Fair Housing Act (hereinafter "FHA"), it is unlawful to discriminate against
any person in the terms, conditions or privileges of sale or rental of a dwelling, or in the
provision of services or facilities in connection with such a dwelling, because of the

Barbara Walters vs. Cowpet Bay West Condominium, et al.                    Civil No. 24/2012
Second Amended Complaint Redline                                          Page 3

disability of that person or a person residing in that dwelling, because of the disability of that

person or a person associated with that person. 42 U.S.C. §3604(f)(2); 24 C.F.R.

§100.202(b).

4.    It is unlawful to refuse to make reasonable accommodations in rules, policies,

      practices, or services, when such accommodations may be necessary to afford such

      person equal opportunity to use and enjoy a dwelling. 42 U.S.C. §3604(f)(3)(B); 24

      C.F.R. §100.20.

5.    Section 3617 of the FHA makes it unlawful for any person to coerce, intimidate,

      threaten, or interfere with any person in the exercise or enjoyment of, or on account

      of his having exercised or enjoyed, or on account of his having aided or encouraged

      any other person in the exercise or enjoyment of, any right granted or protected by

      Section 803, 804, 805, 806 of this title.

6.    At all times relevant to this action, Walters lived in Condominium unit at Cowpet

      Bay West Condominium community.

7.    The property at Cowpet Bay West is part of the Cowpet Bay West Condominium

      community that is managed by the Cowpet Bay West Condominium Association

      (hereinafter, "the Association').

8.    At all times relevant to this action, Defendant the Board of the Cowpet Bay West

      Association, (hereinafter "the Board") run the day to day operations of the Defendant

      Cowpet Bay West Condominium Association.

9.    At all times relevant to this action, Defendant Max Harcourt (hereinafter "Harcourt")

      served as the President of the Board. And, at all relevant times, Walters was a

      member of the Board

~~3.    Pursuant to the Fair Housing Act (hereinafter "FHA"), it is unlawful to~~

~~discriminate against any person in the terms, conditions or privileges of sale or~~

Barbara Walters vs. Cowpet Bay West Condominium, et al.          Civil No. 24/2012
Second Amended Complaint Redline                                 Page 4

rental of a dwelling, or in the provision of services or facilities in connection with
such a dwelling, because of the disability of that person or a person residing in
that dwelling, because of the disability of that person or a person associated with
that person. 42 U.S.C. §3604(f)(2); 24 C.F.R. §100.202(b).

4.    It is unlawful to refuse to make reasonable accommodations in rules, policies,
practices, or services, when such accommodations may be necessary to afford
such person equal opportunity to use and enjoy a dwelling. 42 U.S.C.
§3604(f)(3)(B); 24 C.F.R. §100.20.

5.    Section 3617 of the FHAA makes it unlawful for any person to coerce, intimidate,
threaten, or interfere with any person in the exercise or enjoyment of, or on
account of his having exercised or enjoyed, or on account of his having aided or
encouraged any other person in the exercise or enjoyment of, any right granted or
protected by Section 803, 804, 805, 806 of this title.

6.    At all times relevant to this action, Walters lived in Condominium unit at Cowpet
Bay West Condominium community.

7.    The property at Cowpet Bay West is part of the Cowpet Bay West Condominium
community that is managed by the Cowpet Bay West Condominium Association
(hereinafter, "the Association").

6.    At all times relevant to this action, Defendant the Board of the Cowpet Bay West
Association, (hereinafter "the Board") run the day to day operations of the
Defendant Cowpet Bay West Condominium Association.

7.    At all times relevant to this action, Defendant Max Harcourt (hereinafter "Harcourt")
served as the President of the Board. And, at all relevant times, Walters was a
member of the Board.

Barbara Walters vs. Cowpet Bay West Condominium, et al.    Civil No. 24/2012
Second Amended Complaint Redline                           Page 5

## JURISDICTION AND VENUE

5.  This Court has subject matter jurisdiction over this matter pursuant to 28 U.S.C. §§ 1331, 1332 and §1337; and V.I. Code ANN. tit. 4, §32.

6.  Venue is proper within this District pursuant to 28 U.S.C. §1391(b).

## PARTIES

7.  Plaintiff Barbara Walters (hereinafter "Walters") owns a condo at Cowpet Bay West on the east side of St. Thomas, United States Virgin Islands. ~~This property constitutes a dwelling under the FHA. 42 U.S.C. §3602(b); 24 C.F.R. §100.20.~~

11.  Upon information and belief, Defendant ~~Cowpet Bay West Condominium~~ Association is an entity organized pursuant to the Virgin Islands Condominium Act, V.I. CODE ANN. tit 28, §901 *et seq.* as amended,~~ that~~ resides and operates its principal place of business in St. Thomas, U.S. Virgin Islands. Cowpet Bay West is the rental manager and governing organization of the condominium development.

12.  Each residential unit owner may use his or her condo unit for permanent, temporary, or transient use. Thus, the owners may permanently reside in their unit, use it as a second home, rent it out on their own or not use it at all.

~~13.~~  Defendant Association's facility is structured and operated as both a place of lodging and a condominium. As a place of lodging, it is a place of public accommodation within the meaning of the ADA.

~~14.~~  ~~Defendant Association~~ ~~-is~~ operated and controlled by a Board of elected persons. The Board is authorized by the Virgin Islands Condominium Act and the Declarations of the Cowpet Bay West Condominium Association, with its purpose set forth more fully in Bylaw Article 1, Section 2. The members of the Board are elected by the homeowners of the Cowpet Bay West ~~Condominiums.~~

~~15.~~  ~~Upon information and belief, on October 22, 1974, Cowpet Bay West was created~~

Barbara Walters vs. Cowpet Bay West Condominium, et al.   Civil No. 24/2012
Second Amended Complaint Redline                           Page 6

~~by a declaration of merger, whereby Cowpet Bay Village Stages One and Two, the~~

~~two condominium associations, merged into a single entity. The merger declaration~~

~~acknowledged that the original 1968 Declaration, except as amended by the merger~~

~~declaration is still in force. Section 16, of the 1968 Declaration provides that all~~

~~owners are subject to and must comply with the provisions of the Declaration, the by-~~

~~laws, and the rules and regualtions as may be amended. Section 17 of the 1968~~

~~Declaration provides that the Declaration can only be amended by an affirmative vote~~

~~of 75% of the Owners in number and common interest. Section 19 of the 1968~~

~~Declaration states that the by-laws and rules and regulations are "annexed hereto"~~

~~and that the by-laws can only be amended by "an amendment to this Declaration and~~

~~such amendment duly recorded."~~

~~16.~~   ~~Under this provision, any amendment to the by-laws must be by a 75% voe and~~

~~recorded in order to be valid.~~

~~17.~~   ~~The by-laws of the Association were adopted and recorded in 1974 al;ong with the~~

~~merger declaration. The by-laws were again amended and recorded in April 1998.~~

~~Article I, Section 2 of those by-laws made them applicable to both the common areas~~

~~and the individual units. Article II, Section 2, provided that the affairs of the~~

~~Association were to be governed by the Board , which was empowered to deal with~~

~~all administrative affairs of the Association and to undetake all acts except those~~

~~prohibited by law, the Declaration, or the by-laws. Of the enumerated powers of the~~

~~Board, adoption and amendment of the rules and regulations is provided for. Thrse~~

~~rules are applicable to both the common areas and the units under Article I, Section~~

~~2. Article V, Section 9 empowers the Board to enjoin and remedy a violation of the~~

~~by-laws, Declaration, or rules and regulations. Article V, Section 16 allows for the~~

~~adoption of rules and regulations if approved by a majority of the Owners. Article XI,~~

~~Section 1 requires that the by-laws be modiifed by a 66 and 2/3% vote of the Owners~~

Barbara Walters vs. Cowpet Bay West Condominium, et al.                    Civil No. 24/2012
Second Amended Complaint Redline                                          Page 7

present at a meeting held for such purpose. Article XIII, Section 1 states that where there is a conflict between the provisions of the by-laws and the Declaration, the Declaration controls.

18.    There is a conflict between the by-laws and the Declaration in that the Declaration makes clear that a vote of 75% of the Owners is required to amend the by-laws.

19.    The 1968 rules and regulations prohibited an Owner from making or allowing disturbing noises in his/her apartment and prohibited dogs. The 1998 rules and regulations contained the same provisions.

20.    Based upon information and belief Defendant Alfred Felice is a resident of Plainview, New York.

21.    Based upon information and belief Defendant Max Harcourt is a resident of St. Thomas, United States Virgin Islands.

22.    Based upon information and belief Defendant Lance Talkington is a resident of St. Thomas, United States Virgin Islands.

23.    Based upon information and belief Defendant Robert Cockayne is a resident of St. Thomas, United States Virgin Islands.

24.    Based upon information and belief Defendant Vincent Verdiramo is a resident of St. Thomas, United States Virgin Islands.

## STATEMENT OF FACTS

25.    On January 21, 2011, Stansford S. Sutherland, a licensed psychologist wrote a letter stating that he was treating Walters and that she was diagnosed with Anxiety Disorder, citing the DSM-IV. He further explained that Walters had "severe limitations" in coping with stress and anxiety that most people would consider "normal day to day events." He went on to state that he has prescribed the use of an emotional support animal, dog or other, to alleviate her symptoms and that such

Barbara Walters vs. Cowpet Bay West Condominium, et al.                    Civil No. 24/2012
Second Amended Complaint Redline                                           Page 8

~~emotional support animal was necessary. In conclusion, he states that pursuant to the Fair Housing Act, Walters is qualified to keep her emotional support animal despite a policy prohibiting pets in her housing.  On that same day, the National Service Animal Registry issued a certification that Walters was allowed to keep her emotional support animal even if there is a policy prohibiting pets.~~

26.     ~~In February of 2011, Defendant Association received the letter from Walters' medical provider and the certification. **[EXHIBIT B]** LETTER AND DOG CERTIFICATION. However, as early as the Summer of 2010, Walters, a member of the Board, discussed with Board members her need to obtain a waiver to the NO DOG RULE to keep an emotional support dog on the premises.~~

27.     ~~Walters made the request for a reasonable accommodation because Defendant Association had a NO DOGS RULE in place and Walters needed a waiver from Defendant Association's NO DOGS RULE to keep her emotional support dog (hereinafter "Happy").  Walters furnished those two documents to Louanne Schechter, the Office Manager for Defendant Association as Walters' application because the Defendant Board did not have a form or application in place for requesting a waiver to the NO DOGS RULE.~~

28.     ~~At the time Walters submitted her request for a reasonable accommodation, Defendant Association had no written policy in place for processing a reasonable accommodation request, although it had a NO DOG RULE IN place for at least fifteen (15) years.~~

29.     ~~Upon information and belief, Louanne Schechter accepted the documents, placed them in Walters' file and discussed Walters' request with Jon Cassady, Louanne Schechter's immediate supervisor.~~

30.     ~~Upon information and belief, Jon Cassady discussed Walters' request with Harcourt and Harcourt subsequently came to the Association's Office to review Walters'~~

Case: 3:14-cv-00025-CVG-RM Document #: 31 Filed: 02/26/16 Page: 520 of 720 Page ID#: 12998 Case: 3:12-cv-00024-CVG-RM Document #: 95-1 Filed: 03/11/13 Page 9 of 47

Case: 3:12-cv-00024-CVG-RM   Document #: 95-1   Filed: 03/11/13   Page 9 of 47

Barbara Walters vs. Cowpet Bay West Condominium, et al.          Civil No. 24/2012
Second Amended Complaint Redline                                 Page 9

documents.

31.   Upon information and belief, Harcourt sent his representative, Bob Canefield, a member of the Board, to review the documents.

32.   Upon information and belief, there was widespread opposition to having dogs on the premises by some members of the Board and Association.

33.   Upon information and belief, Harcourt took down a framed copy of an American with Disabilities Act poster that was hanging in the Defendant Association's office saying **Cowpet Bay rules not ADA**.

34.   At the February 12, 2011 Board meeting, Board member Robert Cockayne (hereinafter "Cockayne") proposed amending the by-laws to prohibit dogs and farm animals. There was no mention however of providing reasonable accommodations to owners under the FHA or the ADA.

35.   The Board neither discussed or acted on Walters' request for a reasonable accommodation during the March 8, 2011 Board meeting.

36.   During the May 10, 2011 Board meeting, an owner complained of someone walking a dog on the property. The Board, headed by Harcourt voted to post "No Dogs Allowed" signs on the property, despite the fact that Harcourt knew that Walters had submitted a request for a reasonable accommodation to allow her to keep her emotional support dog, Happy on the premises. The Board also took no action on Walters' request for a reasonable accommodation, although it had been pending before them for more than two months.

37.   The Board met in June, twice in July and once in August, but did not act on Walters' request for a reasonable accommodation.

38.   During the Board meeting on September 13, 2011, the Board discussed Service Dogs and mentioned that the dogs must be registered with the ADA. The Board also opined that the Virgin Islands does not have guidelines for "service dogs." Although

Barbara Walters vs. Cowpet Bay West Condominium, et al.                Civil No. 24/2012
Second Amended Complaint Redline                                       Page 10

the Board, headed by Harcourt, discussed Walters'request for a reasonable accommodation, the Board, however took no action on Walters' request for a reasonable accommodation, although it had been pending before them for more than six months.

39.    At all relevant times, some members of the Defendant Association and even the Defendant Board were vehemently oppose to having dogs on the premises. Members of the Defendant Association and the Defendant Board began voicing their oppositions to allowing dogs on the premises through emails and on the Cowpet Bay Blog. They also began harassing Walters. At all relevant times, Lance Talkington (hereinafter "Talkington") owned the Cowpet Bay West Blog (hereinafter "the blog").

40.    In his first blog post relating to "dogs" on the premises, Talkington, on September 27, 2011, stated that " at least three owners. . . have been seen with dogs that are either living in condos or are being entertained by an owner walking theem on the property. He goes on to point out that two of the dog owners are present and past Board members.  Talkington called for the owners to amend the Defendant Association's by-laws to "eliminate any confusion over possible exceptions to the general rule" of no dogs . [EXHBIT D]

41.    At the October 11, 2011 Board meeting, the Board, headed by Harcourt,  took no action on Walters' pending request for a reasonable accommodation, although it had been pending for more than eight (8) months. However, the Board under Harcourt's leadership, discussed changing the by-laws to adopt a NO DOGS ALLOWED rule.

42.    The Harcourt led Board proposed NO DOGS ALLOWED rule made an exception only for the ADA. Harcourt and the other members of the Board excluded  FHA requests, although Walters' requested a reasonable accommodation pursuant to the

Barbara Walters vs. Cowpet Bay West Condominium, et al.       Civil No. 24/2012
Second Amended Complaint Redline              Page 11

~~FHA. Moreover, Harcourt and at least two Board members knew that Walters' request was currently pending before the Board and had been pending for more than six (6) months.~~

~~43.    A day after the Board meeting, on October 12, 2011, Talkington emailed Walters regarding her "service animal." In this email, Talkington request from Walters a copy of her request for reasonable accommodation that was submitted to the Defendant Association office.~~

~~44.    Walters responded on that same day telling Talkington that he has no right to the information.~~

~~45.    Talkington responded by telling Walters that he will continue to pursue obtaining copies of her request for reasonable accommodation and that her "blatant violation" of the by-laws is completely intolerable.~~

~~46.    Talkington continued to harass Walters regarding her need for an emotional support dog. In an October 13, 2011 blog, Talkington attacked Walters by stating that she claims to have papers that allow her to have a service dog and implied that Walters' refusal to discuss her disability with him and or the blog is unreasonable. Talkington also implied that Walters had made no attempt to prove her need for a service dog to the Board. [EXHIBIT E] TALKINGTON'S BLOG OF OCTOBER 13, 2011.~~

~~47.    Alfred Felice (hereinafter "Felice") chimed in on the blog and stated that "service dogs' for the true needs are legal, but anyone can get such a designation by simple request from a friendly physician, regardless of any real need. Anyone can also get one via the internet for a minimal fee.!!!"~~

~~48.    Exemplifying the type of discriminatory attitude that the FHA and the ADA were enacted to combat, Felice went on to say that "the perpetrators might just as well spit in our face. The by-laws must be made to reflect the majorities' rights. Perhaps, the dissenters would be happier in another community rather than be ostracized at CBW,~~

Barbara Walters vs. Cowpet Bay West Condominium, et al.
Second Amended Complaint Redline

Civil No. 24/2012
Page 12

which would be another fine recourse." [EXHIBIT F] FELICE'S OCTOBER 13, 2011 BLOG.

49. In response increasing attacks by both Talkington and Felice on the blog regarding her request for a reasonable accommodation, Walters explained that she was not violating the law or the rules. Walters stated that she has a disability and is afforded protection under the FHA.

50. Felice responded with disdain for Walters and the law that protects her rights as a disabled American. [EXHIBITS G] FELICE'S BLOG

51. Walters again attempted to defend herself against allegations of wrongdoing on the part of both Felice and Talkington. Walters blogged that she is on permanent disability and receives social security benefits.

52. Immediately, Talkington discounted Walters' claim in a blog by stating how "unreasonable" it is to expect the Owners to accept Walter's claims of disability. Talkington asked Walters to provide the "dog's credentials. [EXHIBIT H]

53. In a later blog, Talkington attacked Walters' credibility and accused Walters about having made a request for a reasonable accommodation with Defendant Association's office. [EXHIBIT I].

54. Walters confronted Talkington about his retaliatory and harassing conduct on the blog. In response, Talkington stated that" [i]t is impossible to give someone grief over a disability that is today completely undefined and unsubstantiated." [EXHIBIT J]

55. After reading Talkington's last blog, on October 13, 2011, Walters emailed the Board with the subject line "This has gone too far." In her email, Walters informs the Board that she feels Talkington obtained her private information from being allowed to attend Board meeting even though he is not a Board member.

56. Upon information and belief Harcourt and other members of the Board improperly

Barbara Walters vs. Cowpet Bay West Condominium, et al.          Civil No. 24/2012
Second Amended Complaint Redline                                  Page 13

shared the content of Walters' request for a reasonable accommodation with Talkington.

57.    Susan Anderson, wrote an email complaining that she saw Judith Kromenhoek walking a dog and assumed that she was walking the dog for somebody else "because Judith Kromenhoek does not appear to be disabled."

58.    The prevailing attitude shared by some Association and Board members was that Walters was not disabled because there was no visible evidence of her disability.

59.    In response to Susan Anderson email regarding Judith Kromenhoek's "presumed disability, in an email dated October 20, 2011, Harcourt informed Susan Anderson that the Board was considering amending the by-laws to allow exceptions for "true" service animals "that are documented." Harcourt response came more than eight (8) months after Walters submitted a request for reasonable accommodation to the Board, which was still pending before the Board.

60.    Harcourt also stated that a fine should be levied against the "offenders" unless they submitted "appropriate ADA compliant paperwork."

61.    On October 26, 2011, Talkington blogged requesting that the Board enforce its rules and regulations. [EXHIBIT K] TALKINGTON OCTOBER 26, 2011 BLOG.

62.    On October 27, 2011, a member for the Board emailed the Board stating that the Board should respond to both Susan Anderson's and Talkington's inquiries.

63.    Walters' responded that she had submitted a request for reasonable accommodation with the Board. Walters also mentioned that her request included a letter from her treating physician and asked that her medical record be kept confidential. Walters also expressed concern that medical information might appear on Talkington's blog.

64.    Walters and some members of the Defendant Association recommended that Talkington not be allowed to attend Board meetings as he is not a member of the Board. Others, suggested that the Board hold closed meetings to discuss sensitive

Barbara Walters vs. Cowpet Bay West Condominium, et al.                    Civil No. 24/2012
Second Amended Complaint Redline                                          Page 14

issues, including Walters' request for a reasonable accommodation.

65.    Some members of the Board however violently opposed to having closed Board
       meetings to discuss Walters' reasonable accommodation request. In response to a
       blog recommending a closed meeting to discuss Walters' request for reasonable
       accommodation, Board member Douglas Rebak blogged, "I do support the Board's
       need for closed sessions on "confidential" matters=but the dog issue??? PLEASE!!!
       The situation is most disturbing and not at all the way it should be in an upscale
       Residential/Resort Community!" EXHIBIT L]. NOVEMBER 12, 2011 BLOG.

64.    Notwithstanding Walters' objection to providing Talkington with her private and
       personal information, on October 28, 2011, Harcourt emailed a letter to Walters and
       Judith Kromenhoek and copied Talkingon. Harcourt wrote as President of the Board
       and falsely accused Walters and Judith Kromenhoek of violating the NO DOGS
       RULE "because they have not applied for an exception to the no dog rule." Harcourt
       also acknowledged in that same letter that both Walters and Judith Kromenhoek had
       "papers for service dogs pending in the office." Contradicting himself, Harcourt
       ordered Walters to apply and submit documentation for a waiver and threatened to
       levy a monetary fine against Walters if she did not take up his offer. . [EXHIBIT M].

65.    In response, Walters addressed the entire Board stating that "if any of her medical
       information were disclosed to Susan Andeson or Talkinton or anyone who is not on
       the Board, she would deal with it accordingly. Walters also emailed the Board under
       separate cover and expressed her belief that Harcourt had overstepped by sharing the
       letter with Anderson and Talkington.

66.    Talkington psoted he entire letter on the blog in his October 30, 2011 post.

67.    At the November 8, 2011 Board meeting, the Board took no action on Walters'
       pending application for a reasonable   However, the Board, led by Harcourt,
       discussed amending Section 11 of the by-laws to add:

Barbara Walters vs. Cowpet Bay West Condominium, et al.            Civil No. 24/2012
Second Amended Complaint Redline                                   Page 15

~~No dogs are allowed on the property, either long term or visiting. The Board may grant exceptions to the NO DOGS ALLOWED rule, on an individual basis, should an owner require the assistance of a service animal (dog) as defined by the ADA. Owners seeking to obtain such an exemption are required to apply, in writing, to the Board with supporting document.~~

~~68.     At the November 18, 2011 Board meeting the Board did not act on Walters' pending reasonable accommodation request. However, the Board offered to table discussion on the proposed amendment to the by-laws until a legal opinion has been obtained.~~

~~69.     On December 2, 2011, Vincent Verdiramo (hereinafter "Verdiramo"), an attorney and member of the Board, emailed a December 1, 2011 letter to 99 members of the Association.    In his letter, Verdiramo offers legal advice to the Defendant Association. Verdiramo provides that the FHA is "not a blanket law." Verdiramo further notes that "every case must be handled individually "with official adjudication." He advised that when a person claims the need for am\u emotional support animal under the FHA, the must bring the Association to court and present expert testimony.~~**[EXHIBIT N]** ~~LETTER FROM VERDIRAMO~~

~~70.     Thr Board held at least three meetings in December of 2011, but took no action on Walters' pending request for a reasonable accommodation.~~

~~71.     Talkington continued his harassing campaign against Walters.  In a December 5, 2011, Talkingon shares a complaint of a Mr. Bartlett and the barking of a dog in his area of the community. Talkington goes on to point out that the "known violators" live in this same area. Talkington opined that "trained service dogs are specifically trained to NOT bark unless the owner is in imminent danger." [EXHIBIT O]~~

~~72.     As a Board member, Walters was up for re-election in the upcoming Board election. Felice and others suggested retaliating against Walters by defeating her in the upcoming election. In response to Talkington blog, Felice notes "that a change to the by-laws may be necessary and taht the Owners shuld "WAKE UP START UP A CAMPAIGN FOR A NO DOGS SLATE NOW.~~

Barbara Walters vs. Cowpet Bay West Condominium, et al.                    Civil No. 24/2012
Second Amended Complaint Redline                                          Page 16

73.  ~~In a December 13, 2011 Board meeting, the Board, led by Harcourt decided to amend the by-laws to include the NO DOGS ALLOWED rule. The Board also discussed Verdiramo's December 2, 2011 legal advice.~~

74.  ~~On December 16, 2011, on the behalf of Walters, he Board received a letter from Karin A. Bentz, Esq. In this letter, Board was informed that under the FHA, Walters is qualified to keep Happ to assist her with her disability. The Board was further informed that they could not engage in any conduct that would punish or deprive Walters of her right to keep Happy on the premises. [EXHIBIT P].~~

75.  ~~In a January 9, 2012 email, Felice states "PLEASE do not return the coven and their shills to office, they DO NOT deserve another term EVER." In a January 10, 2012 blog, Felice continues, "JUDI and BARBARA have DOGS!!!! They surely have an agenda and DICK is their SHILL."~~

76.  ~~In their January 11, 2012, Board meeting, the Board, led by Harcourt, discussed receipt of the December 16, 2011 from Karin Bentz. Verdiramo motioned to "abide by the rule and immediately begin fining owners that have dogs." The Board voted to fine Walters $50.00 per day for having Happy on the premises.~~

77.  ~~In a January 14, 2012 email, Felice states "Only the coven and their shills call me a disaster." He goes on to say that if the Owners want a lot more "bull" "Elect the Coven on the board, with their shill."~~

78.  ~~During the January 11, 2012, Defendant Cockayne distributed information about service dog certification naming businesses that have no requirements for service dog certification. Copies of Walters' dog certification were circulated during that Board meeting. A copy of Walters' dog certification was improperly shared with Talkington.~~

79.  ~~In a January 15, 2012 blog entitled "Puppy Dog Diplomas" Talkintong attacked Happy's certification by stating it is "certified by an outfit called the Ntional Serivce~~

Barbara Walters vs. Cowpet Bay West Condominium, et al.                    Civil No. 24/2012
Second Amended Complaint Redline                                          Page 17

~~Animal Registry." Talkington concludes his blog post by sharing his "considered~~
~~opinion" that such "outfits serve no legitimate purpose and exist mainly to sidestep~~
~~what the ADA works diligently to accomplish" and putting forth a call "to stop the~~
~~doggy diploma silliness and adopt clear ground rules for dogs at Cowpet". Talkington~~
~~states that the ADA is the sole source of legitimacy for such rules.~~

~~80.~~ ~~On January 16, 2012, Harcourt distributed his President's Forum to the owners. In~~
~~it, he says: "[t]he issue of dogs on the property has been the subject of many~~
~~(unfortunately) blanket emails. There are some owners who are violating the current~~
~~rule. The Board had shown some restraint in this matter since we wee trying to revise~~
~~the by-laws to allow for valid exceptions; however, one of these owners had their~~
~~attorney send the Board a letter saying the attorney was representing them in a~~
~~complaint against use. The Board voted to retain an attorney to protect the~~
~~Association's interest.~~

~~81.~~ ~~On January 15, 2012, Donna LaScola voiced concern that the Defendant Association~~
~~may be getting into legal trouble with all the blog posts and emails regarding~~
~~Walters' and Judith Kromenhoek's service animals. [EXHIBIT Q].~~

~~81.~~ ~~Ever ready to vilify Walters, Felice states, "[t]he ADA law does not prevent a~~
~~community from excluding DOGS." He goes on, "[n]o one wishes to prevent proper~~
~~needs to be satisfied!! He continues, "[a]gain REAL needs or pets??" He concludes,~~
~~"I suggest they be ostracized, NO dinner dates, no patronage of their establishments,~~
~~no conversations, no beach conclaves, just ignore them completely!!!"~~

~~81.~~ ~~On January 17, 2012, ever dutiful to Talkington, Harcourt emailed Talkington~~
~~informing him that the Board had received a letter from one of the owners stating the~~
~~owner had filed a complaint. Therefore the Board was retaining counsel.~~

~~82.~~ ~~On January 17, 2012, Walters received a letter from the Board informing he that she~~
~~was in violation of the no dogs rule and would be fined. Walters felt hurt and~~

Barbara Walters vs. Cowpet Bay West Condominium, et al.          Civil No. 24/2012
Second Amended Complaint Redline                                 Page 18

ashamed after reading the letter.

83. On January 24, 2012, Talkington screening a candidate for the Board, discussed the candidate's stance on the "issues," one of which is the amendment of the by-laws regarding dogs. Talkington respresented that the Board informed him that Judith Kromenhoek and Walters refused to present any proof of their disability that warrants a service animal.

84. In a January 30, 2012 email, Felice wrote to 40 recipients, "How can you allow 2 admitted 'certified' mentally disabled persons on the ballot for election to our board?? Due diligence was not done properly. The should be removed from consideration.

85. As of February of 2007, Walters had not received any response from the Board regarding her request for a reasonable accommodation. At the Board's February 7, 2012 meeting, Harcourt stated that he met with Attorney Maria Hodge regarding the HUD complaints and the dog issue in general.

86. On February 28, 2012, Edward Wardell, the incoming President of the Board, emailed the owners informing them that the by-laws were amended by a vote of 69.2% of the Owners and will become effective once "registered with the U.S. Virgin Islands Government.

87. In this version of the by-laws, Section 11 of Article V was amended to state:

No dogs are allowed on the property, either long term or visiting. The Board may grant exceptions to the NO DOGS ALLOWED rule, on an individual basis, should an owner require the assistance of a service animal (dog) as defined by the ADA. Owners seeking to obtain such an exemption are required to apply, in writing, to the Board with supporting documentation.

88. However, the April 11, 2012 Board minutes reflect that legal counsel had suggested not recording the by-laws and obtaining approval to revised the "no dogs" rule as follows:

No dogs are allowed on the property, either long term or visiting. Owners or occupants who have properly documented and verified disability as defined by Federal Law may make a request for reasonable accommodation and exception to the

Barbara Walters vs. Cowpet Bay West Condominium, et al.        Civil No. 24/2012
Second Amended Complaint Redline                               Page 19

prohibition on dogs on the property. An owner or occupant seeking an accommodation can do so in writing to the Board. The request shall include: (1) identification of the owner or occupant seeking the accommodation; (2) explanation of the relationship between the requested accommodation and the disability; and (3) verification of the disability and need for accommodation as set forth in this rule. To facilitate the Board's review of each request for an accommodation of a non-obvious handicap, the Board may require (1) the submission of documentation verifying that the person meets the Federal Fair Housing Act's definition of disability; and (2) documentation from a doctor or other medical professional who is in a position to know about the individual's disability, and that the requested accommodation is related to the individual's disability. All information submitted to the Board that is necessary for the evaluation of the reasonableness of an accommodation will be kept confidential.

89.    On February 29, 2012, Verdiramo & Verdiramo P.A. delivered a letter to the Board providing an explanation of the Defendant Association's legal obligations under the ADA and the FHA.

90.    In December of 2011, Walters filed a charge of discrimination under the FHA with the Department of Housing and Urban Development (HUD) against the Association and the Board for violation of the FHA.

90.    In response to Walters and Judith Kromenhoek's HUD complaints, on March 25, 2012, Talkington blogged, Walters and Judith Kromenhoek will "hang onto their puppies" at any length. In direct response to the HUD Complaint, Talkington says "Really ladies? Do you seriously believe that either of two owners has any impact whatsoever on the Association's governance of this property in terms of your having those puppies? To call this a fiasco of a complaint 'misguided' is at the moment the most charitable description of the though process (if there even was one) that was involved in filing this complaint." Talkington characterizes Walters and Judith Kromenhoek as "playgournd bullies" and of making a mockery of our board." He then calls on the Association to "go on the offensive" and file suit against Walters' and Kromenhoek stating "when these ladies start spending their own cash instead of relying on the government for free help, the rubber will meet the road on how far everyone is willing to go. In closing, Talkington implores the Board to take Walters

Barbara Walters vs. Cowpet Bay West Condominium, et al.            Civil No. 24/2012
Second Amended Complaint Redline                                   Page 20

and Judith Kromenhock to court.

91.   Walters was not re-elected to the Board.   In late March or early April of 2012,
      Walters finally received a response from the Board approving her request for
      reasonable accommodation more than a year after she submitted her request.

92.   Defendant Board's act and omissions, including Defendant Board's response to
      Walter's request for an accommodation, as well as the Board's failure to respond to
      the request for more than a year, constitute a denial of a request for reasonable
      accommodation in violation of the FHA.

93.   Defendant Association is vicariously liable for the actions and omissions of its agent,
      Defendant Board.

92.   Defendant Harcourt's acts and omissions in ignoring Walters' request for reasonable
      accommodation;   while at the same assisting a campaign to amend the by-laws to
      specifically exclude emotional support animals by incorporating only the definition
      of the ADA of service animal; providing Talkington access to Walters' personal and
      private information; and falsely accusing Walters of violating the rules qualify as
      retaliatory measures pursuant to the FHA.

93.   The Defendant Board action in assessing Walters a fine after receiving the letter from
      Karin A. Bentz, qualifies as retaliatory measures pursuant to the FHA.

94.   As a result of the Defendants' actions, and each of them, Walters has suffered
      damages including but not limited to emotional distress, embarrassment, and
      humiliation.


## COUNT I: VIOLATION OF THE FHA

### (Association and Board)

95.   Plaintiff Walters realleges and incorporates by reference the remainder of the
allegations set forth herein.

Barbara Walters vs. Cowpet Bay West Condominium, et al.                    Civil No. 24/2012
Second Amended Complaint Redline                                          Page 21

~~96.    42 U.S.C. §3604(f)(3)(b), commonly known as the Fair Housing Act Amendment (FHAA), prohibits housing providers from discriminating against applicants or residents because of their disability and from treating persons with disabilities less favorably than others because of their disability. The foregoing conduct violates the FHA which prohibits discriminating based on disability and from treating persons with disabilities less favorably than others because of their disability.~~

~~97.~~    The FHA also makes it unlawful for any person to refuse " to make reasonable accommodations in rules, policies, practices, or services, when such accommodations may be necessary to afford persons with disabilities equal opportunity to use and enjoy a dwelling.

~~55~~98.    ~~Defendant Cowpet Bay West Association owns, operates and/or leases condominium in Cowpet Bay West.~~ At all relevant times, Walters had a request for a reasonable accommodation pending before the Defendant Board~~:~~

~~56~~99.    ~~Cowpet Bay West is a place of public accommodation. 42 U.S.C §§3601-3619.~~

~~57~~100.    Defendant ~~Cowpet Bay West Condominium~~ Association knew or reasonably should have known of Plaintiff's disability.

~~58~~102.    Defendants ~~Cowpet Bay West Condominium~~ Association and ~~Cowpet Bay West Condominium the~~ Board ~~have~~ discriminated against ~~Plaintiff~~ Walters by denying Walters ~~Plaintiff,~~ as a person with a disability, a reasonable accommodation by failing to take action on her request for reasonable accommodation for more than a year. ~~Defendant Association id otherwise ratify Defendant Board's acts and/or omissions. the equal opportunity to use and enjoy a dwelling on the basis of disability.~~

~~103.~~    As direct and proximate result of the Defendants' conduct described above, Walters has suffered and will continue to suffer embarrassment, humiliation, mental anguish, emotional and physical distress.

Barbara Walters vs. Cowpet Bay West Condominium, et al.          Civil No. 24/2012
Second Amended Complaint Redline                                Page 22

a. ~~Discriminatory exclusion and/or denial of services, privileges, accommodations, and/or opportunities in Defendant Cowpet Bay West Condominium Board Rules and Regulations.~~

a. ~~Failing to make reasonable modifications in policies, practices, and/or procedures as necessary to afford the privileges, advantages, and/or accommodations of Cowpet Bay West to Walters Plaintiff.~~

b. ~~Failing to act upon and/or refusing Plaintiff Walters' request for reasonable accommodation after learning of her disability.~~

d. ~~Failing to remove barriers to individuals with disabilities where it would be readily achievable to do so.~~

c. ~~Failing to adopt an exception to its NO DOGS RULE by-laws and/or a Reasonable Accommodation Policy so that Walters Plaintiff and other individuals with disabilities under the FHA have equal opportunity to use and enjoy a dwelling at Cowpet Bay West.~~

f.d. ~~Adopting rules and regulations that have a desperate impact on Plaintiff and others like her that suffer from a disability and require the use of an emotional support animal.~~

g. ~~Failing to make a reasonable accommodation in rules, practice, and services after learning of Plaintiff's disability.~~

59.104. ~~As such Defendants discriminate and will continue to discriminate in the future against Plaintiff on the basis of disability in the full and equal enjoyment of the goods, privileges, facilities accommodations, advantages and/or opportunities of Cowpet Bay West in violation of the Civil Rights Act of 1968, §§802(h), 8049f)(3)(B), 42 U.S.C. §§3602(h), 3604(f)(3)(B) and or their implementing rules and regulations.~~ Defendants' acts or omissions were done maliciously, oppressively and/or fraudulently.

60.105. ~~Defendants violations of the FHAA and the Civil Rights Act of 1968 have harmed and will continue to harm Plaintiff in the future.~~ Once Walters submitted her application to Louanne Schechter in February of 2011, the Defendant Board had an obligation to take action on the pending claim. Moreover, Defendant Association could have taken measures to assure that the Board complies with the FHA but chose

Barbara Walters vs. Cowpet Bay West Condominium, et al.                    Civil No. 24/2012
Second Amended Complaint Redline                                          Page 23

not to.

~~61~~106. Defendants conduct violated the FHA and Walters is entitled t~~Pursuant~~ to the remedies, procedures and rights set forth in 42 U.S.C *§3613 (c)*(1). ~~and (2), Plaintiff prays for judgment as set forth below.~~

### COUNT II: VIOLATION OF SECTION 3617 OF THE FHAA
#### (~~Max~~ Harcourt)

~~62~~107. ~~Plaintiff~~ Walters re-alleges and incorporates all preceding paragraphs herein by reference as though fully restates, wholly, in this Count.

~~63~~108. ~~Max~~ Harcourt is a member of the ~~Cowpet Bay West Condominium~~ Association and was the President of the ~~Cowpet Bay West Condominium~~ Board, at the time ~~Plaintiff~~ Walters applied for a reasonable accommodation.

~~64~~109. ~~Max~~ Harcourt's removal of the framed copy of the ADA poster made clear his intention to ignore Walters' request for accommodation. ~~individually, vitiated Plaintiff's request for reasonable accommodation by insisting that the Cowpet Bay West Condominium Association Bylaws trumped the FHAA.~~

~~65~~110. ~~Max~~ Harcourt's ~~joined Lance Talkington and others to publicly ridicule the content of Plaintiff's request for reasonable accommodation on the blog including Plaintiff's medical records. Max Harcourt's actions were designed to intimidate, threaten or coerce Plaintiff into relinquishing her rights to seek a reasonable accommodation. This was done solely for the purpose of forcing Plaintiff to retreat from her reasonable accommodation application~~ conduct in ignoring Walters' request for a reasonable accommodation while at the same time pushing for an amendment to the by-laws that would deny Walters reasonable accommodation constitute interference pursuant to Section 3617 of the FHA.

~~66~~111. ~~Section 3617 of the FHAA inter alia makes it unlawful for any person to coerce, intimidate, threaten, or interfere with any person in the exercise or enjoyment of, or~~

Barbara Walters vs. Cowpet Bay West Condominium, et al.                    Civil No. 24/2012
Second Amended Complaint Redline                                          Page 24

on account of his having exercised or enjoyed, or on account of his having aided or

encouraged any other person in the exercise or enjoyment of, any right granted or

protected by Section 803, 804, 805, 806 of this title. Harcourt action in falsely

accusing Walters of violating the no dogs rule and levying a fine against Walters

constitute retaliation under the FHA.

67112. Max Harcourt violated Section 3617 of the FHAA by interfering with Plaintiff in her

exercise of the right granted or protected by Sections 803, 804, 805, 806 of the

FHAA. As a result of Harcourt's acts and/or omissions, Walters has suffered

emotional injuries and continues to suffer emotional injuries.

68113. Defendant Max Harcourt's violations of the FHAA have harmed and will continue

to harm Plaintiff. Defendant Harcourt's conduct violated Section 3617 of the FHAA

and entitles Walters to all categories of damages, including punitive damages.

69.     Pursuant to the remedies, procedures and rights set forth in 42 U.S.C. §3613 (c)(1)

and (2), Plaintiff prays for judgment as set forth below.

70.     In doing the acts and/or omissions alleged herein, Max Harcourt wrongfully and

unlawfully interfered with Plaintiff's exercise of her right to reasonable

accommodation and acted with knowledge of the effect his conduct was having on

Plaintiff.


## COUNT III: VIOLATION OF SECTION 3617 OF THE FHAA
### (Bay West Condominium Association)
### Cowpet Bay West Condominium Board

71114. Plaintiff Walters incorporates all preceding paragraphs herein by reference as though

fully restated, wholly, in the Count.

72115. Defendant Cowpet Bay West Condominium Association was created pursuant to

Chapter 28 of the Virgin Islands Code and as such is obligated to comply with the

provisions of the FHAA. ~~Defendant Cowpet Bay West Condominium Board is also obligated to comply with the FHAA.~~ The foregoing conduct violates the FHA, which makes it unlawful for any person to coerce, intimidate, threaten, or interfere with any person in the exercise or enjoyment of, or on account of his having exercised or enjoyed, or on account of his having aided or encouraged any other person in the exercise or enjoyment of, any right granted or protected by the FHA.

~~73~~116. Defendant Association knew or had reason to know that Walters had applied for a reasonable accommodation to keep her emotional support dog, Happy, on the premises. Yet, Defendant Association refused to provide Walters with a reasonable accommodation and amended its by-laws to exclude emotional support dogs from a waiver to the NO DOGS ALLOWED rule.

~~74~~117. ~~Section 3617 of the FHAA~~ inter alia ~~makes it unlawful for any person to coerce, intimidate, threaten, or interfere with any person in the exercise or enjoyment of, or on account of his having exercised or enjoyed, or on account of his having aided or encouraged any other person in the exercise or enjoyment of, any right granted or protected by Section 803, 804, 805, 806 of this title.~~ Defendant's Board Action if assessing Walters a fine after it received a letter from Walters' attorney and assessing Walters a fine despite the fact that Walters' request for a reasonable accommodation was pending in the office constitute retaliation under the FHA.

~~75~~118. ~~Defendant Cowpet Bay West Condominium Association~~ and Defendant Cowpet Bay West Condominium Board ~~have~~ violated Section 3617 of the FHAA by interfering with Plaintiff's request for reasonable accommodation. Defendant Cowpet Bay West Condominium Association also violated Section 3617 of the FHAA by intimidating Plaintiff via the blog and coercing Plaintiff against exercising her right to request a reasonable accommodation. ~~Defendant Cowpet Bay West Condominium Board violated the FHAA by refusing to provide Plaintiff with reasonable accommodation and by harassing and intimidating Plaintiff with a $50.00 per day fine.~~ As a direct

Barbara Walters vs. Cowpet Bay West Condominium, et al.          Civil No. 24/2012
Second Amended Complaint Redline                                 Page 26

and proximate result of Defendant Board and Defendant Association's acts or omissions, Walters has suffered extreme and severe anguish, humiliation, embarrassment, emotional distress and tension, the extent of which is not fully known at this time and the amount of damages caused thus far is not yet fully ascertained but will be proven at the time of trial.

~~76~~119. ~~Defendant Cowpet Bay West Condominium Association's violations of the FHAA have harmed and will continue to harm Plaintiff. Defendant Cowpet Bay West Condominium Board's actions have harmed and will continue to harm Plaintiff.~~ Defendants' conduct as described in this Complaint violated the FHA and the public policy of the United States and entitles Walters to all categories of damages, including punitive damages.

~~77.     Pursuant to the remedies, procedures and rights set forth in 42 U.S.C §3613 (c)(1) and (2), Plaintiff prays for judgment as set forth below.~~

### COUNT IV: VIOLATION OF SECTION *3617* OF THE FHA~~A~~
### (Alfred Felice)

~~78~~120. ~~Plaintiff~~ Walters re alleges and incorporates by reference all preceding paragraphs herein as though fully restated, wholly, in the Count.

~~79~~121. ~~Defendant Alfred Felice is a an owner of a Condominium unit at Cowpet Bay West and is a member of the Cowpet Bay West Association.~~ Defendant ~~Alfred~~ Felice began interfering with ~~Plaintiff~~ Walters on the blog once he learned that ~~Plaintiff~~ Walters had requested reasonable accommodation for an emotional support animal, her dog.

~~80~~122. Defendant ~~Alfred~~ Felice interfered with ~~Plaintiff's~~ Walters' right to request reasonable accommodation by using the blog and personal emails sent to the Cowpet Bay West Community to intimidate, to discredit and to threaten ~~Plaintiff Walters.~~ ~~Defendant Alfred~~ Felice's actions ~~are~~ were designed to intimidate, threaten and scare ~~Plaintiff~~ Walters ~~into relinquishing her~~ from pursuing ~~a right to request~~ a reasonable

Barbara Walters vs. Cowpet Bay West Condominium, et al.                    Civil No. 24/2012
Second Amended Complaint Redline                                          Page 27

accommodation to keep Happy on the premises.

81.    ~~82.    Section 3617 of the FHAA~~ inter alia ~~makes it unlawful for any person to coerce, intimidate, threaten, or interfere with any person in the exercise or enjoyment of, or on account of his having exercised or enjoyed, or on account of his having aided or encouraged any other person in the exercise or enjoyment of, any right granted or protected by Section 803, 804, 805, 806 of this title.~~

~~82.~~    Defendant ~~Alfred~~ Felice's conduct violated Section 3617 of the FHA~~A~~ by interfering with ~~Plaintiff's~~ Walters'exercise of her right to request for a reasonable accommodation.

~~84~~124. Defendant ~~Alfred~~ Felice violation of the FHA~~A~~ has harmed and will continue to harm ~~Plaintiff~~ Walters.

~~85~~125. As a result of Defendant Felice's act or omission, Walters is entitled ~~Pursuant to the~~ remedies, procedures and rights set forth in 42 U.S.C $§3613(c)$(1) and (2).~~, Plaintiff prays for judgment as set forth below:~~

**COUNT V: VIOLATION OF SECTION *3617* OF THE FHA~~A~~**
**(Lance Talkington)**

~~86~~126. ~~Plaintiff~~ Walters re alleges and incorporates by reference all preceding paragraphs herein as though fully restated, wholly, in the Count.

~~87~~    ~~Upon information and belief Defendant Lance Talkington owns at least one Condominium unit at Cowpet Bay West and is a member of the Cowpet Bay West Condominium Association.~~

~~88~~127. Upon information and belief Defendant ~~Lance~~ Talkington runs the blog and used the "blog" to attack, embarrass and humiliate Walters after she filed a request for reasonable accommodation. ~~, and to intimidate Plaintiff.~~

Barbara Walters vs. Cowpet Bay West Condominium, et al.          Civil No. 24/2012
Second Amended Complaint Redline                                                        Page 28

~~89~~128. Defendant ~~Lance~~ Talkington interfered with ~~Plaintiff's~~ Walters' exercise of her right to request a reasonable accommodation by demonizing Walters on the blog and suggesting both implicitly and explicitly that Walters violated the rules.

~~90~~129. Defendant ~~Lance~~ Talkington interfered with ~~Plaintiff's~~ Walters' right to request a reasonable accommodation by mounting a calculated attack against ~~Plaintiff's~~ ~~Walters'~~ reputation, honesty and standing in the Cowpet Bay West Community.

~~91~~130. Defendant ~~Lance~~ Talkington interfered with ~~Plaintiff's~~ Walters' right to request a reasonable accommodation by posting and publicly discussing ~~Plaintiff's~~ Walters' ~~private medical~~ record on the blog.

~~92~~131. Defendant ~~Lance~~ Talkington's actions ~~are~~ were designed not only to humiliate and to discredit ~~Plaintiff~~ Walters but to signal to ~~Plaintiff~~ Walters that her medical records and private information will continue to be the subject of public scrutiny if she continues to demand a reasonable accommodation. Defendant ~~Lance~~ Talkington actions ~~are~~ were designed to threaten, intimidate or scare ~~Plaintiff~~ Walters into ~~relinquishing~~ abandoning Walters' ~~the right to~~ for a request ~~a~~ reasonable accommodation ~~under the FHAA~~ to keep Happy on the premises.

~~93~~132. The conduct herein violates ~~the FHAA, including~~ Section 3617 of the FHAA.

~~94.~~   ~~Section 3617 of the FHAA inter alia makes it unlawful for any person to coerce,~~ ~~intimidate, threaten, or interfere with any person in the exercise or enjoyment of, or~~ ~~on account of his having exercised or enjoyed, or on account of his having aided or~~ ~~encouraged any other person in the exercise or enjoyment of, any right granted or~~ ~~protected by Section 803, 804, 805, 806 of this title.~~

~~95.~~   ~~Defendant Lance Talkington violated the FHAA, inter alia, by interfering with~~ ~~Plaintiff's exercise of her right to request a reasonable accommodation. Defendant~~ ~~Lance Talkington has violated the FHAA by,~~ inter alia, ~~interfering with Plaintiff's~~ ~~rights to request a reasonable accommodation and by using the blog to intimidate,~~ ~~threaten and coerce Plaintiff into not exercising her statutory right to request a~~

Barbara Walters vs. Cowpet Bay West Condominium, et al.  Civil No. 24/2012
Second Amended Complaint Redline                         Page 29

~~reasonable accommodation.~~

96133. Defendant ~~Lance~~ Talkington's violations of the FHAA have harmed and will continue to harm ~~Plaintiff~~ Walters in the future.

~~97134.~~ As direct result of Defendant Talkington's act or omission, Walters is ~~entitled Pursuant~~ to the remedies, procedures and rights set forth in 42 U.S.C *§3613 (3)*(1) and (2)., ~~Plaintiff prays for judgment as set forth below.~~

## COUNT VI: VIOLATION OF THE AMERICAN WITH DISABILITIES ACT
### (~~Cowpet Bay West Condominium~~ Association and ~~Cowpet Bay West Condominium~~ Board)

~~98135.~~ ~~Plaintiff~~ Walters realleges and incorporates by reference all preceding paragraphs herein as though fully restated, wholly, in the Count.

~~99136. Title III of the ADA provides that "No individual shall be discriminated against on the basis of disability in the full and equal enjoyment of the goods, services, facilities, privileges, advantages, or accommodations of any place of public accommodation by any person who owns, leases, or operates a place of public accommodation."~~ As set forth herein, at all relevant times, Defendants were subjected to the ADA based on the ADA definition of public lodging.

~~100137.~~        Defendants owns, operates and/or leases condominium units in Cowpet Bay, St. Thomas, Virgin Islands~~:~~

~~101138.~~        ~~Cowpet Bay West Condominium is a place of public accommodation. 42 U.S.C. §12181(7)(B).~~

~~102139.~~        Defendants's  ~~have~~ discriminated against ~~Plaintiff~~ Walters ~~on the basis of disability. Defendants discriminatory conducts include but is not limited to~~ by failing to make reasonable modifications to its NO DOGS RULE to allow Walters to keep Happy on the premises.

a.        ~~Discriminatory exclusion and/or denial of goods, services, facilities, privileges,~~

# Mind/Body Health & Psychology, LLC

6115 Estate Smith Bay
Suites 334 & 335
St. Thomas, USVI 00802

**mbh&p**

Mind/Body Health
& Psychology, LLC

| | |
|---|---|
| **Name:** | Barbara Walters |
| **Date of Birth:** |  |
| **Age:** | |
| **Gender:** | Female |
| **Service:** | Psychotherapy, Individual |
| **Date(s) of Service:** | 1/30/2012; 2/20/2012; 2/17/2012; 3/13/2012; 4/16/2012; 3/19/2013; 4/1/2013 |
| **Service Provider:** | Sheena M. Walker, Ph.D. Clinical Psychologist, VI License 10-029-PSY |

## CLINICAL SUMMARY

**Presenting Complaint(s):** Barbara is a 64-year-old European-American woman who self-referred for assistance with the following issues: Depression, Relational Problems related to possession of service animal, and Familial discord resulting from separation and pending divorce.

**Symptoms Reported:**

- Demonstrates dysphoric affect (e.g., sadness, hopelessness, helplessness, inappropriate guilt, shame, low self-esteem).
- Describes somatic symptoms (e.g., changes in sleep, appetite, and/or sexual patterns; weight loss; headaches; pains; psychomotor agitation or retardation).
- Reports irritability and/or crying spells.
- Verbalizes difficulty coping adequately with stress and conflict related to multiple roles.
- Evidences suicidal ideation with no plan or intent.
- Demonstrates an inability to accomplish daily tasks at a previous level at home and in personal matters.
- Describes poor interpersonal exchanges (e.g., isolation, loneliness, relationship distress with neighbors).
- Reports anger, resentment, irritability, loneliness, and grief related to a divorce.
- Evidences depression and anxiety-related symptoms (e.g., impaired decision-making ability, sleep disturbances, problems with concentration).
- Experiences trauma symptoms associated with a marriage characterized by abuse and/or manipulation which have been recently exacerbated by social interactions with neighbors due to possession of service dog.
- Verbalizes difficulty in coping with everyday stressors during and after separation from spouse.
- Experiences stress associated with difficulties negotiating with ex-spouse on issues related to finances.
- Expresses anxiety and stress associated with financial situation after or during a divorce.

**History of the Problem:** Barbara noted that she has been in a "loveless marriage" for quite some time; however, she described her role in assisting in the family business as her husband's partner as her most effective coping strategy to maintain her contentment.

Phone: 340-714-BFIT (2348)
Facsimile: 340-715-BFIT (2348)
mindbodypsych.vi@gmail.com
www.synergyvi.com



PLAINTIFF'S EXHIBIT

Joint Appendix Vol. II Page 1394

30547.00/000878

BY-LAWS OF

## COWPET BAY WEST CONDOMINIUM ASSOCIATION

Cowpet Bay
St. Thomas, Virgin Islands

February, 2012

# Article I
# Plan of Apartment Unit Ownership

**Section 1. Apartment Unit Ownership:** The property located at Parcels 8-56-1 and 8-1-2, 4, 5, & 6 of Estate Nazareth, No.1 Red Hook Quarter has previously been submitted in a declaration forming an association under the provisions of Chapter 33, Title 28 of the Virgin Islands Code, known as the "Condominium Act of the Virgin Islands". The association has been and will continue to be known as "COWPET BAY WEST", hereinafter called the "Condominium".

**Section 2. Applicability of By-Laws:** The provisions of these by-laws are applicable to the Property of the Condominium and the use and occupancy thereof. The term "Property", as used herein, shall include the land and all buildings and other improvements thereon owned by the association and all easements, rights and appurtenances belonging thereto, and all other property, personal or mixed, intended for use in connection therewith, all of which were previously submitted to the provisions of said Chapter 33, Title 28 of the Virgin Islands Code.

**Section 3. Application:** All present and future owners, mortgagees, lessees, occupants of apartment units and any other persons who may use the facilities of the Property in any manner are subject to these By-Laws, the Declaration and the Rules and Regulations.

    The Acceptance of a deed, mortgage or conveyance or the entering into of a lease or the act of occupancy of an apartment unit shall constitute an agreement that these By-Laws, the Rules and Regulations and the provisions of the Declaration, as they may be amended from time to time, are accepted, ratified, and will be complied with.

**Section 4. Office:** The office of the Condominium and of the Board of Directors shall be located at Cowpet Bay West, Estate Nazareth, No.1 Red Hook Quarter, St. Thomas, Virgin Islands. The mailing address shall be 6201 Windward Way, St. Thomas, USVI 00802, or such address as may be designated by the Board, upon 30 days written notice to the members of the Association.

## ARTICLE II
## Board of Directors

**Section 1. Number and Qualifications:** The affairs of the Condominium shall be governed by a Board of Directors. The Board of Directors shall be composed of seven persons, all of whom shall be owners or spouses of owners, or in the case of partnership owners, shall be members of said partnership, or in the case of corporate owners, shall be officers or stockholders of such

PLAINTIFF'S EXHIBIT 3

3055300/000363

corporations, or in the case of fiduciary owners shall be the fiduciaries or beneficiaries of any such trust or in the case of a limited liability company, shall be the members of such company. A Board member may not base his/her eligibility to sit on the Board on the same unit as any other member of the Board.

No person who is in arrears for ninety days or more on any billing or assessment by the Cowpet Bay West Condominium Association shall be eligible to be elected to or serve as a director on the Board of Directors. In the event such person is serving as a director, that person's position as director shall be declared to be vacant and another person appointed by a majority vote of the remaining Board to fill the vacancy so created, until the next regular election of the Board of Directors. Arrearages of partnerships, corporations, trusts, fiduciary owners, etc. on which a person's eligibility to serve on the board is based, shall be considered in determining the eligibility of a person to be elected to or to continue to serve on the board.

**Section 2. Powers and Duties:** The Board of Directors shall have the powers and duties necessary for the administration of the affairs of the Condominium and may do all such acts and things except as by law, by the Declaration (to the extent still applicable), or by these By-Laws may not be delegated to the Board of Directors by the unit owners. Such powers and duties of the Board of Directors shall include, but shall not be limited to, the following:

(a) Operation, care, upkeep and maintenance of the common areas and facilities.

(b) Determination of Association Charges, which shall include the common expenses required for the operation of the Condominium, insurance, water, utility rates, late fees and interest charges, fines for By-Laws and rules, regulation violations, any reserve fund maintained by the association and the costs of services provided.

(c) Collection of Association charges, as hereinafter defined, from the unit owners, and maintaining and accounting for those funds.

(d) Employment and dismissal of the personnel necessary for the maintenance and operation of the common areas and facilities.

(e) Adoption, amendment and enforcement of rules and regulations covering the details of the operation and use of the Property.

(f) Opening of bank accounts on behalf of the Condominium and designating the signatories required therefore.

(g) Purchasing or leasing or otherwise acquiring in the name of the Association or its designee, corporate or otherwise, on behalf of all unit owners, apartment units offered for sale or surrendered by their owners to the Board of Directors.

(h) Purchasing of apartment units at foreclosure or other judicial sales in the name of the Association or its designee, corporate or otherwise, on behalf of all unit owners.

(i) Selling, leasing, mortgaging, voting the votes appurtenant to (other than for the election of members of the Board of Directors), or otherwise dealing with apartment units acquired

2

and subleasing apartment units leased by the Association, or its designee, corporate or otherwise on behalf of all unit owners.

(j) Organizing corporations to act as designees of the Board of Directors in acquiring title to or leasing of apartment units on behalf of all unit owners.

(k) Obtaining of insurance for the Property, including the apartment units owned or required to be maintained by the Association, pursuant to the provision of Article V, Section 2 hereof.

(l) Making of repairs, additions and improvements to or alterations of the Property and repairs to and restoration of the Property in accordance with the other provisions of these By-Laws, after damage or destruction by fire or other casualty or as a result of condemnation or eminent domain proceedings.

**Section 3. Managing Agent and Manager:** The Board of Directors may employ for the Condominium a managing agent and/or a manager at a compensation established by the Board of Directors, to perform such duties and services as the Board of Directors shall authorize. The Board of Directors may delegate to the manager or managing agent, all of the powers granted to the Board of Directors by these By-Laws other than the powers set forth in subdivisions (b), (e), (f), (g), (h), (i), (j) and (k) of Section 2 of this Article II.

**Section 4. Election and Term of Office:**
Directors will serve for a term of three years. Two Directors shall be elected the first year, two the second year, and three the third year to replace those directors whose terms are expiring. Where a vacancy has been filled by vote of a majority of the vote of the remaining members of the Board, as provided in Section 6, that person shall be a member until the next Annual Meeting, at which time the unit owners shall elect the replacement for the remainder of the original term, if any. Any candidate for director may run for a full term, or any term created by a vacancy, or both.

Each Director shall be elected by the vote of a majority (as defined in Article III Section 9) of the unit owners. All vacancies shall be voted for on the same ballot, and the candidates with the highest number of votes shall be elected to each of the vacancies. Each candidate's name shall be preceded by a space where an "X" may be placed to vote for said candidate. It shall not be required that a name be crossed out and another inserted to vote for a candidate on the ballot. A space for write-in candidates shall also be provided. Ballots and proxies shall be provided to the owners not less than 30 days prior to the Annual Meeting.
The members of the Board of Directors shall hold office until their respective successors shall have been elected by the unit owners.
A Board member may serve only two consecutive terms and may not hold office for one year before being eligible to run again.

**Section 5. Removal of Members of the Board of Directors:** At any regular or special meeting of unit owners, any one or more of the members of the Board of Directors may be removed with or without cause by a majority of the unit owners and a successor may then and there or thereafter be elected to fill the vacancy thus created. Any members of the Board of Directors whose removal has been proposed by the unit owners shall be given an opportunity to be heard at the meeting.

3

3055300/000365

If a Board member does not attend any of the Board meetings during an entire year, and also does not attend the annual owners meeting that same year, such member may be removed from the Board by a majority of the other members of the Board of Directors.

**Section 6. Vacancies:** Vacancies in the Board of Directors caused by any reason other than the removal of a member thereof by a vote of the unit owners, shall be filled by a vote of a majority of the remaining members at a special meeting of the Board of Directors held for that purpose promptly after the occurrence of any such vacancy, even though the members present at such meeting may constitute less than a quorum, and each person so elected shall be a member of the Board of Directors until a successor shall be elected at the next Annual Meeting of the unit owners. At that time a director shall be elected to serve the remainder of the term of the original vacating director.

**Section 7. Organization Meeting:** The first meeting of the members of the Board of Directors shall be an organizational meeting held directly following the Annual Meeting of the unit owners, at such time and place as shall be fixed by the Board members at said meeting, and no notice shall be necessary to the newly elected members of the Board of Directors in order to legally constitute such meeting, provided a majority of the whole Board of Directors shall be present thereat. If it is not possible to hold such first meeting of the new Board immediately, then it shall be held as soon as possible and proper notice shall be given to each director, as for any special meeting of the Board of Directors.

**Section 8. Regular Meetings:** Regular meetings of the Board of Directors may be held at such time and place as shall be determined from time to time by a majority of the members of the Board of Directors, but at least two such meetings shall be held during each fiscal year. Notice of regular meetings of the Board of Directors shall be given to each member of the Board of Directors by mail, electronic mail or fax transmission, at least thirty days prior to the day named for such meeting.

**Section 9. Special Meetings:** Special meetings of the Board of Directors may be called by the President upon five business days notice to each member of the Board of Directors, given by mail, electronic mail or fax transmission, which notice shall state the time, place and purpose of the meeting. Special meetings of the Board of Directors shall be called by the President or Secretary in like manner and on like notice on the written request of at least two members of the Board of Directors. Such special meeting may be conducted by a teleconference call.

**Section 10. Waiver of Notice:** Any member of the Board of Directors may, at any time, waive notice of any meeting of the Board of Directors in writing, and such waiver shall be deemed equivalent to the giving of such notice. Attendance by a member of the Board of Directors at any meeting of the Board shall constitute a waiver of notice by him of the time and place thereof. If all the members of the Board of Directors are present at any meeting of the Board, no notice shall be required and any business may be transacted at such meeting.

**Section 11. Quorum of Board of Directors:** At all meetings of the Board of Directors, a majority of the members thereof shall constitute a quorum for the transaction of business, and the votes of the majority of the members of the Board of Directors present at a meeting at which a quorum is present shall constitute the decision of the Board of Directors. If at any meeting of the Board of Directors there shall be less than a quorum present, , a majority of those present may adjourn the meeting from time to time. No business may be transacted until a quorum is achieved. Board members may participate by teleconference call.

4

**Section 12. Fidelity Bonds:** The Board of Directors shall obtain adequate fidelity bonds for all officers and employees of the Condominium handling or responsible for condominium funds. The premiums on such bonds shall constitute a common expense.

**Section 13. Compensation:** No member of the Board of Directors shall receive any compensation from the Condominium Association for serving as a board member. However, verifiable expenses, in accordance with guidelines established by the Board in advance, are reimbursable. A Board member may also be compensated for other services unrelated to his/her Board function.

**Section 14. Liability of the Board of Directors**: The members of the Board of Directors shall not be liable to the unit owners for any mistake of judgment, negligence, or otherwise, except for their own individual willful misconduct or bad faith. The unit owners shall indemnify and hold harmless each of the members of the Board of Directors against all contractual liability to others arising out of contracts made by the Board of Directors on behalf of the Property unless any such contract shall have been made in bad faith or contrary to the provisions of the Declaration or of these By-Laws.

It is intended that the members of the Board of Directors shall have no personal liability with respect to any contract made by them on behalf of the Property. It is also intended that the liability of any unit owner arising out of any contract made by the Board of Directors or out of the aforesaid indemnity in favor of the members of the Board of Directors shall be limited to such proportion of the total liability there under as his interest in the common areas and facilities bears to all such interest.

Every agreement made by the Board of Directors or by the managing agent or by the manager on behalf of the Property shall provide that the members of the Board of Directors or the managing agent, or the manager, as the case may be, are acting only as agents for the unit owners and shall have no personal liability there under (except as unit owners) and that each unit owner's liability there under shall be limited to such proportion of the total liability there under as his interest in the common areas and facilities bears to all such interest.

**Section 15. Executive Committee:** The Board of Directors, by resolution passed by a majority of the entire Board, shall designate at the Organization Meeting or anytime thereafter, three members of the Board to constitute an Executive Committee, with one member thereof designated as Chairman. The purpose of the Executive Committee is to control the day-to-day management of the Association.

The Board of Directors from time to time shall define the authority of the Executive Committee, but shall retain for itself the powers and duties as itemized in Section2 (b), (e), (h), (i), and (j). Additionally, the Board shall retain the right to appoint the manager or managing agent, fill vacancies in the Board, make changes in the Rules and Regulations, and acquire property.

The Board of Directors, at any time, may change the members of, may fill vacancies in, or may discharge the Executive Committee. Two members shall constitute a quorum of the Executive Committee. The act of a majority of the members at any meeting at which there is a quorum shall be the act of the Committee. The Board of Directors shall establish rules of procedure for the Committee governing, but not limited to, such items as notice and powers.

The Executive Committee shall make recommendations to the Board of Directors, and when the Board is not in session may, to the extent that the committee deems necessary, exercise the powers of the Board in the management of the business and affairs of the Association; and it shall have the powers to authorize the seal of the Association to be affixed to all papers which may require it.

5

The Executive Committee shall keep records of all its proceedings and shall report same to the Board of Directors, and its individual members, in writing within a reasonably short period of time after each significant action and after all meetings.

**Section 16. Inspection by Executive Committee**: The Executive Committee shall make a detailed inspection of the buildings, pump rooms, offices, maintenance shops, sewage and water-making plants, emergency generator, roads, sidewalks, steps, entry bridges, railings, grounds, landscaping, watering systems, the beach and the sea wall at least twice a year in the company of the manager or managing agent,. Additionally, the Committee shall evaluate the operation of the Association office and the overall security situation of the property.

The purpose of such inspections will be to (a) obtain a better understanding of the job being performed by the manager and his staff and (b) make suitable recommendations for possible future actions. Within 30 days after each such semi-annual inspection, the Committee will report its findings and recommendations to the members of the Board of Directors.

**Section 17. Action by Consent**: Any action required or permitted to be taken at any meeting of the Board of Directors, or any committee thereof, may be taken without a meeting if a written consent thereto is signed by three-quarters of the members, (rounded off to the nearest whole number), of the Board of Directors or of such committee as the case may be, and filed with the minutes of proceedings of the Board of Directors or committee.

**Section 18. Nomination of Directors**: Nominations for election to the Board of Directors shall be made by a Nominating Committee. The Nominating Committee shall consist of a chairman, who shall be a member of the Board of Directors, and two or more members of the Association. The Nominating Committee shall be appointed by the Board of Directors at its organizational meeting and serve until the next Annual Meeting.

The Nominating Committee shall make as many nominations for election to the Board of Directors as it shall, in its discretion, determine, but not less than the number of vacancies that are to be filled. Each nomination shall be for a specified vacancy.

Any person qualified under Section1 of Article II of these By-Laws to serve on the Board of Directors may be nominated for the Board of Directors by submitting a request, signed by the owners of two units in which the nominee has no financial interest, to the Board Secretary sixty days prior to the Annual Meeting. The Board shall include his/her name on the ballot directly following the nominee(s) proposed by the Nominating Committee for each vacancy. Any nomination that does not specify a specific vacancy shall be deemed a nomination for all vacancies.

**Section 19 – Communications**
Communications by, from, to and among the Board may be in writing, by fax or by electronic communications (telephone, telephone conference, email, internet, etc.) Telephone and telephone conference conversations must be documented (e.g., minutes or record of conversation). This communication will constitute "official" communication by the Board.

**ARTICLE III**
**Unit Owners**

**Section 1. Annual Meeting**:
The Annual Meeting of the unit owners shall be held during the first quarter each year. At the Annual Meeting, Directors shall be elected by ballot in accordance with the requirements of

. 6

Section 4 of Article II of these By-Laws, and the unit owners may transact such other business at such meetings as may properly come before them.

**Section 2. Place of Meeting**: Meetings of the unit owners shall be held at the principal office of the Condominium or at such other suitable place convenient to the unit owners as may be designated by the Board of Directors.

**Section 3. Special Meetings**: It shall be the duty of the President to call a special meeting of the unit owners if so directed by resolution of the Board of Directors or upon a petition signed and presented to the Secretary by not less than 25% in common interest, in the aggregate, of unit owners. The notice of any special meeting shall state the time and place of such meeting and the purpose thereof. No other business shall be transacted at a special meeting except as stated in the notice.

**Section 4. Notice of Meeting**: It shall be the duty of the Secretary to mail a notice of each annual meeting of the unit owners not less than thirty days nor more than ninety days prior to such meeting, stating the purpose thereof as well as the time and place where it is to be held, to each unit owner of record, at the building or at such other address as such unit owner may have designated by notice in writing to the Secretary. The mailing of a notice of meeting in the manner provided in this section shall be considered service of notice. The Board of Directors may assign the task of providing notice to unit owners to a person other than the Secretary. Special meetings require not less than ten days notice.

**Section 5. Adjournment of Meetings**: If any meeting of unit owners cannot be held because a quorum has not attended, a majority in common interest of the unit owners who are present at such meeting, either in person or by proxy, may adjourn the meeting to a time not less than forty-eight hours from the time the original meeting was called.

**Section 6. Order of Business**: The annual meeting of the unit owners shall be chaired by the President or other member of the Board of Directors chosen by the Board, and the order of business shall be generally as follows:
- (a)   Roll Call – by unit
- (b)   Establishment of Quorum (1/3 of all unit owners)
- (c)   Proof of Notice of Meeting
- (d)   Approval of Minutes of last year's Annual Meeting
- (e)   President's Report (including cost and coverage of insurance)
- (f)   Treasurer's Report (including discussion of Budget and Financial Status)
- (g)   Property Manager's Report
- (h)   Report of Nominating Committee
- (i)   Election of Board Members
- (j)   Old Business
- (k)   New Business

**Section 7. Title to Apartment Units**: Title to apartment units may be taken in the name of an individual, or in the names of two or more persons as tenants in common, joint tenants or tenants by the entirety, or in the name of a corporation, partnership, limited liability company or other legal entity authorized to own real property in the Virgin Islands, or in the name of a fiduciary.

7

Joint Appendix Vol. II Page 1402

**Section 8. Voting**: The owner or owners of each apartment unit, or some person designated by such owner or owners to act as proxy on his or their behalf and who need not be an owner, shall be entitled to cast the vote appurtenant to such apartment unit at all meetings of unit owners. The designation of any such proxy shall be made in writing and shall be revocable at any time by written notice to the Secretary or in person at the meeting. Any or all such owners or proxies may be present at any meeting of the unit owners and may vote or take any other action as a unit owner either in person or by proxy. Votes of unit owners shall be weighted in accordance with their share of the common interest, as follows, with the total of all votes equaling one hundred:

| | |
|---|---|
| **2 Bedroom** | **.911** |
| **3 Bedroom** | **1.062** |
| **2 Bedroom + Loft** | **1.193** |
| **4 Bedroom** | **1.301** |
| **3 Bedroom + Loft** | **1.376** |

The Board of Directors shall accept any vote if the owner is one of the owners of record of the unit, or in the case of a proxy, if there is no obvious defect on the face of such proxy. It shall be the burden of the protestor to offer satisfactory proof that the proffered vote or proxy is invalid and that his is the proper one.

**Section 9. Majority of Unit Owners**: As used in these By-Laws, the term "majority of unit owners: shall mean those unit owners having more than 50% of the total authorized votes of all unit owners present in person or by proxy and voting at any meeting of the unit owners, determined in accordance with the provisions of Section 8 of this Article III.

**Section 10. Quorum**: Except as otherwise provided in these By-Laws, the presence in person or by proxy of unit owners having one-third (1/3) of the total authorized votes of all unit owners shall constitute a quorum at all meetings of the unit owners.

**Section 11. Majority Vote**: The vote of a majority of unit owners at a meeting at which a quorum shall be present shall be binding upon all unit owners for all purposes except where, in the Declaration or these By-Laws, or by law, a higher percentage vote is required.

**ARTICLE IV**
**Officers**

**Section 1. Designation**: The principal officers of the Condominium shall be the President, the Vice President, the Secretary, and the Treasurer, all of whom shall be elected by the Board of Directors. The Board of Directors may appoint an assistant secretary, an assistant treasurer, and such other officers as in its judgment may be necessary. The President and Vice President, but no other officers, need be members of the Board of Directors.

**Section 2. Election of Officers**: The officers of the Condominium shall be elected annually by the Board of Directors at the Organization Meeting of each new Board of Directors and shall hold office at the pleasure of the Board of Directors.

**Section 3. Removal of Officers**: Upon the affirmative vote of a majority of the members of the Board of Directors, any officer may be removed, either with or without cause, and his successor

8

3055300/000370

may be elected by the Board of Directors at any regular or special meeting of the Board of Directors called for such purpose.

**Section 4. President**:  The President shall be the chief executive officer of the Condominium. He shall preside at all meetings of the unit owners and of the Board of Directors.  He shall have all of the general powers and duties which are incident to the office of president of a stock corporation organized under the Corporation Law of the Virgin Islands, including but not limited to the power to appoint committees from among the unit owners from time to time as he may in his discretion decide is appropriate to assist in the conduct of the affairs of the Condominium.

**Section 5. Vice President**:  The Vice President shall take the place of the President and perform his duties whenever the President shall be absent or unable to act.  If neither the President nor the Vice President is able to act, the Board of Directors shall appoint some other member of the Board of Directors to act in the place of the President, on an interim basis.  The Vice President shall also perform such other duties as shall from time to time be imposed upon him/her by the Board of Directors or by the President.

**Section 6. Secretary**:  The Secretary shall keep the Minutes of all meetings of the unit owners and of the Board of Directors.  He shall have charge of such books and papers as the Board of Directors may direct; and he shall, in general, perform all the duties incident to the office of secretary of a stock corporation organized under the Corporate Law of the Virgin Islands.

**Section 7. Treasurer**:  The Treasurer shall have the responsibility for Condominium funds and securities and shall be responsible for keeping full and accurate financial records and books of account showing all receipts and disbursements, and for the preparation of all required financial data.  He shall be responsible for the deposit of all monies and other valuable effects in the name of the Board of Directors, or the managing agent, in such depositories as may from time to time be designated by the Board of Directors, and he shall, in general, perform all the duties incident to the office of treasurer of a stock corporation organized under the Corporation Law of the Virgin Islands.

**Section 8. Agreements, Contracts, Deeds, Checks, etc.:**  All agreements, contracts, deeds, leases and other instruments of the Condominium shall be executed by any two officers of the Condominium or by such other person or persons as may be designated by the Board of Directors.

**Section 9. Compensation of Officers**:  No officer shall receive any compensation from the Condominium for acting as such.

## ARTICLE V

## Operation of the Property

**Section 1. Determination of Common Expenses and Fixing of Common Charges:**  The Board of Directors shall from time to time, and at least annually, prepare a budget for the condominium, determine the amount of the common charges payable by the unit owners to meet the common expenses of the Condominium, and allocate and assess such common charges among the unit owners according to their respective common interests.  Common expenses shall include, among other things, operation and maintenance, insurance premiums,

9

repairs and such amounts as the Board of Directors may deem proper for a general operating reserve, for a reserve fund for replacements, and to make up any deficit in the common expenses for any prior year.

The common expenses may also include such amounts as may be required for the purchase buy or lease to the Board of Directors or its designee, corporate or otherwise, on behalf of all unit owners, of any apartment unit whose owner has elected to sell or lease such apartment unit to the Board of Directors, or of any apartment unit which is to be sold at a foreclosure or other judicial sale.

The Board of Directors shall advise all unit owners promptly in writing of the amount of common charges payable by each of them, respectively, as determined by the Board of Directors, as aforesaid, and shall furnish to all unit owners copies of each budget on which such common charges are based.

A summary of the previous year's actual income and expenditures, a year end summation of liquid assets and accounts payable/receivable, and an approved budget for the current year shall be provided to all owners not less than 30 days prior to the Annual Meeting.

**Section 2. Insurance:**
The Board of Directors shall annually obtain and maintain, to the extent obtainable, the following insurance:

1. Fire insurance with extended coverage to include earthquake and flood coverage, vandalism and malicious mischief endorsements insuring the entire buildings and "common elements" (including all the individual unit's bathroom and kitchen fixtures and air conditions, but not including any wall, ceiling, or floor decoration, tiles or coverings, together with all service machinery contained therein and covering the interest of the Condominium, the Board of Directors and the Common Interest of the unit owners in an amount to be determined by the Board of Directors.

2. Windstorm, insuring the entire buildings and "common elements" together with all service machinery contained therein and covering the interest of the Condominium, the Board of Directors and the Common Interest of the unit owners in an amount to be determined by the Board of directors.

3. Worker's Compensation; Public Liability covering each member of the Board of Directors, the managing agent, the manager, the office manager and each unit owner; Vehicle and
   other such insurance as the Board of Directors may determine in amounts to be determined by the Board of Directors.

All policies of physical damage shall provide that such policies may not be cancelled or substantially modified without written notice from the Board of Directors.

From time to time or as required by insurers, the Board of Directors shall obtain from a certified and USVI licensed real estate appraiser an appraisal of the full replacement value, without deduction for depreciation, of the buildings, common areas and facilities for the purpose of determining the amount of insurance required.

Unit owners shall be encouraged to carry Home Owners insurance on their "apartment unit" for their own benefit provided that all such policies shall indicate that the liability of the carrier(s) issuing insurance obtained by the Board of Directors shall not be affected or diminished by reason of any such additional insurance carried by any unit owner.

10

3055300/000372

At each Annual Meeting, the Board shall provide to the owners a concise summary of all insurance coverage and costs.

The terms "common elements" and "apartment unit," as mentioned above, are defined in Article 5, Section 10 "Routine Maintenance and Repair."

**Section 3.  Repair or Reconstruction After Fire or Other Casualty:**  In the event of damage to or destruction of the commonly owned buildings and elements as a result of fire or other casualty (unless 66-2/3% or more of the buildings are destroyed or substantially damaged and 75% or more of the unit owners determine in accordance with the Declaration not to proceed with the repair or restoration), the Board of Directors shall arrange for the prompt repair or restoration of the commonly owned buildings and elements, and the Board of Directors shall disburse the proceeds of all insurance policies to the contractors engaged in such repair or restoration in appropriate progress payments.  Any cost of such repair or restoration in excess of the insurance proceeds shall constitute a common expense – and the Board of Directors may assess all the unit owners for such deficit as part of the common charges.

The association shall only be responsible for inspecting unit interiors to determine if damage is structural or due to external causes, or if adjacent unit damage is caused by external causes, or unless that unit is owned by the association.  Unless that unit is owned by the association, repair by the association of other unit damage will be limited to structural damage, that caused by external or adjacent unit causes, and will not include property or fixtures installed by the owner or previous owners.

Within ninety days after a casualty of an estimated repair cost of $100,000 or greater, the Board will provide to the owners a financial status report indicating projected repair costs, source(s) of necessary funds, expenditures and commitments to date, and a schedule and plan for completion.  This report will be updated and issued to owners on a quarterly basis, thereafter, until repairs are complete.  A current report shall be provided at the next Annual Meeting.

If 66-2/3% or more of the Building(s) are destroyed or substantially damaged and if within sixty days of the date of such destruction or damage, 75% or more of the unit owners determine not to proceed with repair and restoration, the Property shall be subject to an auction for partition at the suit of any unit owner or lien holder, as if owned in common, in which event the net proceeds of sale, together with the net proceeds of insurance policies (less any repairs conducted) shall be divided by the Board of Directors among all the unit owners in proportion to their respective common interests, after first paying out of the share of each unit owner the amount of any unpaid liens on his/her apartment unit, in the order of priority of such liens.

**Section 4.  Payment of Association Charges:**  All unit owners shall be obligated to pay the common charges assessed by the Board of Directors pursuant to the provisions of Section 1 of this Article V at such time or times as the Board of Directors shall determine, as well as "other charges" for utilities, services, unit repairs, late fees, interest, fines and/or collection costs, if incurred.  With respect to the following sections concerning payment, collection, default, foreclosure, etc., in Sections 4, 5, 6, 7, & 8 below, the term "association charges" is intended to include, but not be limited to, all the above items, both the "common" and "other" charges.

No unit owner shall be liable for the payment of any part of association charges assessed against his apartment unit subsequent to a sale, transfer or other conveyance by him of such apartment unit, together with the Appurtenant Interests, as defined in Section1 of Article VII hereof.  In addition, any unit owner may, subject to acceptance by the Board of Directors provided that his apartment unit is free and clear of liens and encumbrances other than mortgages and statutory liens for unpaid association charges, convey his apartment unit,

11

together with the "Appurtenant Interests" to the Board of Directors, or its designee, corporate or otherwise, on behalf of all other unit owners, and in such event be exempt from association charges thereafter assessed.

However, a purchaser of an apartment unit shall be liable for the payment of association charges assessed against such apartment unit prior to the acquisition by him of such apartment unit, without prejudice to such purchaser's right, if any, to recover from the seller the amounts paid by the purchaser, except that a first mortgagee or other purchase of an apartment unit at a foreclosure sale of a first priority mortgage of such apartment unit shall not be liable for and such apartment unit shall not be subject to a lien for the payment of association charges which became due prior to the acquisition of title by such acquirer.

**Section 5.  Collection of Association Charges**: The Board of Directors shall assess association charges against the unit owners from time to time and shall take prompt action to collect any charges due from any unit owner, which remain unpaid for more than thirty days from the date due for payment thereof.  Such action may include placement of a lien on the apartment unit, notification to the mortgagee of the owner's failure to pay association charges and foreclosure on the lien.  Additionally, suspension of utilities by a majority vote of the Executive Committee is permitted if an owner is more than 90 days in arrears of any Association charges.  Payments received from unit owners will be applied to Association Charges in the chronological order incurred.

**Section 6.  Default in Payment of Association Charges:**  In the event of default by any unit owner in paying to the association charges as determined by the Board of Directors, such unit owner shall be obligated to:
  (1) pay interest from the date of the initial billing at the maximum legal rate of interest, as defined by the Virgin Islands Laws, on all amounts past due,
  (2) pay a monthly service charge as determined and promulgated from time-to-time by the Board of Directors,
  (3) pay all expenses and attorneys' fees incurred by the Board of Directors in any proceeding brought to collect such unpaid association charges.

All such unpaid association charges shall constitute a lien on such unit prior to all other liens except those specified in Section 922 of Chapter 33, Title 28 of the Virgin Islands Code.  The Board of Directors shall have the right and duty to attempt to recover all association charges, together with interest and monthly service charges thereon, and the expenses of the proceeding, including attorneys' fees, in any action to recover the same brought against such unit owner, or by foreclosure of the lien on such apartment unit granted by Section 922 of Chapter 33, Title 28, Virgin Islands Code.

**Section 7.  Foreclosure of Liens For Unpaid Association Charges:**  In any action brought by the Board of Directors to foreclose a lien on an apartment unit because of unpaid association charges, the unit owner shall be required to pay a reasonable rental for the use of his apartment unit, and the plaintiff in such foreclosure action shall be entitled to the simultaneous appointment of a receiver to collect the same.  The Board of Directors, acting on behalf of all unit owners, shall have power to purchase such apartment unit at the foreclosure sale and to acquire, hold, lease, mortgage, vote the votes appurtenant to, convey or otherwise deal with the same.  A suit to recover a money judgment for unpaid association charges shall be maintainable without foreclosing or waiving the lien securing the same.

12

3055300/000374

**Section 8.  Statement of Association Charges:**  The Board of Directors shall promptly provide any unit owner so requesting the same in writing, with a written statement of all unpaid association charges due from such unit owner.

**Section 9.  Abatement and Enjoinment of Violations by Unit Owners:**  The violation of any rule or regulation adopted by the Board of Directors or the breach of any of these By-Laws contained herein, or the breach of any provisions of the Declaration, shall give the Board of Directors the right, in addition to any other rights set forth in these By-Laws (a) to enter the apartment unit in which, or as to which, such violation or breach exists and to summarily abate or remove, at the expense of the defaulting unit owner, any structure, thing or condition that may exist therein contrary to the intent and meaning of the provisions hereof, and the Board of Directors shall not thereby be deemed guilty in any manner of trespass or (b) to enjoin, abate or remedy by appropriate legal proceedings, either at law or in equity, the continuance of any such breach.

**Section 10.  Routine Maintenance and Repair:**  All maintenance of and repairs to any "apartment unit" (other than maintenance of and repairs to any common areas and facilities contained therein, and not necessitated by the negligence, misuse or neglect of the owner of such apartment unit) shall be the responsibility of the owner of such apartment unit.  Also, each unit owner shall be responsible for damage to other apartment units and/or to the common areas and facilities resulting from conditions for which such owner has responsibility as indicated above.

An "apartment unit" is considered the space inside the perimeter walls, interior walls, floor and ceiling to include:

1. All decorating elements including: paint, wall and floor coverings, paneling, molding and tiles; finished cabinets and mirrors.
2. All electrical appliances including: refrigerator, stove, washer, dryer, dishwasher, garbage disposal, hot water heater and air-conditioning equipment (including compressor).
3. All electrical fixtures including: wall ceiling and floor outlets, switches and fuse box.
4. All plumbing fixtures including: tubs, showers, sinks, toilets and faucets.

Additionally, the unit owner shall be responsible for the routine lubrication and adjustment of doors and windows, and, unless major casualty related, replacement of broken glass, wooden or glass slats and damaged screens.  The unit owner shall also maintain and assure the operability of the storm shutters installed on that unit and is responsible to close them in the event of a windstorm.  Damage caused by failure to do so is the responsibility of the owner if net insurance proceeds are insufficient to cover such damage.

Screen doors may be installed on the main street-side entry doors at the unit owner's expense provided they meet the existing décor.  Once installed, they must be maintained by the unit owner in a good state of repair, or the Association will do so at the owner's expense.

Except for the limited exceptions noted above, all maintenance, repairs and replacements to the "common elements", common areas and facilities, whether located inside or outside of the apartment units, (unless necessitated by the negligence, misuse or neglect of a unit owner, in which case such expense shall be charged to such unit owner), shall be made by the Association and be charged to all the unit owners as a common expense.

"Common elements" are considered to include all other elements of the buildings and property except those specified as being part of the "apartment unit."  Additionally, the following are considered common elements:

1. Electrical supply to the fuse box, not including the panel.

13

3055300/000375

2. Water and plumbing lines in the walls (including interior walls), floor and ceiling to the valves at sinks, showers, tubs, hot water heater, and toilets, etc.
3. Drains to the first connection outside a wall.

External air conditioning compressor units shall be maintained by the owner in a reasonable state of preservation. The Association may require owner to remove inoperable and/or un-maintained units or do so at the owner's expense

Below is a guide to assist in clarifying owner and Association responsibility with regard to maintenance/repair and insurance."

Insurance and Maintenance Responsibility Matrix

| Category (Not intended to be all-inclusive) | Owner Maint/Repair Responsibility | Association Maint/Repair Responsibility | Association Insurance Responsibility | Owner Insurance Responsibility |
|---|---|---|---|---|
| Exterior Walls and Interior Damage Caused by Leaks | | X | X | |
| Roof and Interior Damage Caused by Roof Leaks | | X | X | |
| Interior Damage caused by Adjacent Units (Leaks, etc.) | X | | | Owner or Adjacent Unit's Insurance Responsible |
| Front Doors | X | | X | |
| Screens | X | | X | |
| Exterior Sliders | | X | X | |
| Exterior Wood Railings, Trim, Benches | | X | X | |
| Exterior Windows | X | | X | |
| Electrical System to Breaker Panel | | X | X | |
| Electrical System, Breaker Panel to Outlets, Junction Boxes | X | | X | |
| Electrical Fixtures-Interior | X | | | X |
| Plumbing Inside Walls, Floors Ceilings to valves | | X | X | |
| Condo plumbing not in walls/floors | X | | | X |
| Plumbing Fixtures | X | | | X |
| Interior Walls | X | | X | |
| Interior Doors | X | | | X |
| Cabinets | X | | | X |
| Furniture | X | | | X |
| Appliances | X | | | X |
| Wall/Floor Coverings (tile/carpet) | X | | | X |
| Hurricane Shutters | X | | X | |
| Furniture | X | | | X |
| Personal Property | X | | | X |
| External A/C elements | X | | | X |
| Internal A/C elements | X | | | X |
| Landside Porch/Steps/Railings | | X Excluding Tile | X Excluding Tile | |
| Seaside Balcony/Railings | | X Excluding Tile | X Excluding Tile | |

14

3055300/000376

**Section 11. Restriction on Use of Apartment Units:** In order to provide for congenial occupancy of the Property and for the protection of the value of the apartment units, the use of the Property shall be restricted to and shall be in accordance with the following provisions:

1. The apartment units shall be used for residences only. Units will not be occupied by more than two persons per bedroom for more than thirty days per year.
2. The common areas and facilities, including the limited common areas and facilities, shall be used only for the furnishing of the services and facilities for which they are reasonably suited and which are incident to the use and occupancy of apartment units
3. No nuisances shall be allowed on the Property nor shall any use or practice be allowed which is a source of annoyance to its residents or which interferes with the peaceful possession proper use of the Property by its residents.
4. No improper, offensive or unlawful use shall be made of the Property or any part thereof, and all valid laws, zoning laws and regulations of all governmental bodies having jurisdiction thereof shall be observed.
5. Violations of laws, orders, rules, regulations or requirements of any governmental agency having jurisdiction thereof, relating to any portion of the Property, shall be corrected, by and at the sole expense of the unit owners or the Board of Directors, whichever shall have the obligations to maintain or repair such portion of the Property.
6. No dogs are allowed on the property, either long term or visiting. The Board may grant exceptions to the NO DOGS ALLOWED rule, on an individual basis, should an owner require the assistance of a service animal (dog) as defined by the ADA. Owners seeking to obtain such an exemption are required to apply, in writing, to the Board with supporting documentation.

**Section 12. Additions, Alterations or Improvements by the Board of Directors:** Additions, alterations or improvements to the common areas and/or facilities up to $100,000 may be made by the Board of Directors. Additions, alterations or improvements in excess of $100,000 shall require approval by a vote of two-thirds (2/3) in common interest of the owners. The cost of such additions, alterations or improvements shall constitute a common charge. This section is not applicable to repairs conducted in accordance with Article V Section 3 of these By-Laws.

**Section 13. Additions, Alterations, or Improvements by Unit Owners:** No unit owner shall make any structural addition, alteration or improvement in or to his apartment unit, including any exterior painting or exterior alteration or addition (including awnings, grills, etc.) without the prior written consent thereto of the Board of Directors. The Board of Directors shall have the obligation to answer any written request by a unit owner for approval of a proposed structural addition, alteration or improvement in such unit owner's apartment unit, within thirty (30) days after such request, and failure to do so within the stipulated time shall constitute a consent by the Board of Directors to the proposed addition, alteration or improvement.

A unit owner shall obtain a receipt from any person accepting his written request for a change under this section and shall show the receipt to the manager or any Director upon request. Any application to any department of the Government of the Virgin Islands or to any other governmental authority for a permit to make an addition, alteration or improvement in or to any apartment unit shall be executed by the Board of Directors only, without, however, incurring liability on the part of the Board of Directors or any of them to any contractor, sub-contractor or supplier on account of such additions, alteration or improvement, or to any person having any claim for injury to person or damage to property arising therefrom. The owner in such instance shall provide the Board of Directors with a Hold Harmless Certificate.

15

3055300/000377

**Section 14. Use of Common Areas and Facilities**: A unit owner shall not place or cause to be placed in the stairways or other common areas and facilities, including the limited common areas and facilities, other than the areas designated as storage areas, any furniture, packages or objects of any kind. The entry passages, stairways, entry bridges, etc., shall be used for no purpose other than for normal transit through them.

**Section 15. Right of Access:** A unit owner shall grant a right of access to his apartment unit to the manager and/or the managing agent and/or any other person authorized by the Board of Directors, the manager or the managing agent, for the purpose of making inspections or for the purpose of correcting any condition originating in his apartment unit and threatening another apartment unit or a common area or facility, or for the purpose of performing installations, alterations or repairs to the mechanical or electrical services or other common areas or facilities in his apartment unit or elsewhere in the Building, provided that requests for entry are made in advance and that any such entry is at a time reasonably convenient to the unit owner. In case of an emergency, such right of entry shall be immediate, whether or not the unit owner is present at the time.

**Section 16. Rules of Conduct**: Article V Section II of these By-Laws delineates general restrictions on the use of the property. Additionally, a definitive listing of current Rules and Regulations is provided as Exhibit I hereto. These Rules and Regulations may be amended by the Board of Directors from time to time. The Board is empowered to enforce these By-Laws and Rules and Regulations with monetary fines and other sanctions and may also take any legal action in court to enforce them. An owner is subject to such fines, sanctions and/or legal actions for the actions of his tenant as if those actions were by the owner.

Copies of the Rules and Regulations shall be furnished by the Board of Directors to each unit owner prior to the time when the same shall become effective. The unit owner must insure that the tenant or occupant be fully informed and furnished with a copy of the Rules and Regulations and by fully bound thereby.

**Section 17. Potable Water and Electricity:** Potable water and electricity shall be supplied by the Association through the common facilities of the Condominium directly to each apartment unit through a separate meter, and each unit owner shall be required to pay the charges therefore established, from time to time, by the Board of Directors. Water, electricity and other utility charges will normally be billed monthly incident to the common charges and are considered to be part of the "association" charges. Utility charges more than thirty days in arrears are subject to a late fee and interest per Section 6 Article V of these By-Laws, and said utilities may be suspended by the Association if an owner is more than 90 days in arrears of Association charges per Article V Section 5 thereof.

**Section 18. Gas:** Gas shall not be piped to any apartment unit, and unit owners are specifically prohibited from using gas as a fuel for regular cooking, water heating, or any other regular purpose. Small quantities of propane gas may be used for gas grills kept on street-side galleries and for emergency use inside apartment units.

**Section 19. Grey Water and Sewerage Service:** Grey water for flushing and sewerage service (including sewage disposal and treatment in the condominium's sewerage treatment plant) shall be supplied as a common facility to all unit owners, and the cost thereof shall be treated as a common expense.

16

3055300/000378

## ARTICLE VI
## Mortgages

**Section 1.  Notice of Unpaid Common Charges:**  The Board of Directors, whenever so requested in writing by a mortgages of an apartment unit, shall promptly report any then unpaid association charges due from, or any other default by the owner of the mortgaged apartment unit.

**Section 2.  Notice of Default:**  The Board of Directors, when giving notice to a unit owner of a default in paying common charges or other default, may send a copy of such notice to each holder of a mortgage covering such apartment unit.

## ARTICLE VII
## Sales and Mortgages of Units

**Section 1.   No severance of Ownership:**  No unit owner shall execute any deed, mortgage or other instrument conveying or mortgaging title to his apartment unit without including therein the Appurtenant Interests, it being the intention hereof to prevent any severance of such combined ownership.  For the purpose of the By-Laws, the "Appurtenant Interests" shall mean collectively, (i) the unit owner's undivided interest in the common areas and facilities appurtenant to such unit; (ii) the interest of such unit owner in any apartment units theretofore acquired by the Board of Directors, or its designee, on behalf of all unit owners, or the proceeds of the sale or lease thereof, if any; and (iii) the interest of such unit owner in any other assets of the Condominium.

Any such deed, mortgage or other instrument purporting to affect one or more of such interests, without including the interest or interests so omitted, shall be deemed to include such interests even though the latter shall not be expressly mentioned or described therein.  No part of the Appurtenant Interests of any apartment unit may be sold, transferred or otherwise disposed of, except as part of a sale, transfer or other disposition of the apartment unit to which such interests are appurtenant, or as part of a sale, transfer or other disposition of such part of the Appurtenant Interests of all apartment units.

**Section 2.  Sale to Board of Directors:**  A unit owner may, subject to mutual agreement of the parties, and subject to the provisions of Section 1 of this Article VII, sell his unit to the Board of Directors, or its designee; provided, however that such purchase by the Board of Directors shall have the prior approval of two-thirds (2/3) of the unit owners, as expressed by the vote of at least two third (2/3) in number and in common interest, of all unit owners, cast in person or by proxy in accordance with these By-Laws.

**Section 3.  Financing of Purchase of Apartment Units By Board of Directors:**  Acquisition of apartment units by the Board of Directors, or its designee, on behalf of all unit owners, may be made from the working capital and common charges in the hands of the Board of Directors, or if such funds are insufficient the Board of Directors may levy an assessment against each unit owner in proportion to his ownership in the common areas and facilities as a common charge, which assessment shall be enforceable in the same manner as provided in Section 6 and 7 of Article V, or the Board of Directors, in its discretion, may borrow money to finance the acquisition of such apartment units, provided, however, that no financing may be secured by an encumbrance or hypothecation of any property other than the apartment unit, together with the Appurtenant Interests, so to be acquired by the Board of Directors.

17

3055300/000379

**Section 4. Gifts and Devises, etc:** Any unit owner shall be free to convey or transfer his apartment unit by gift, or to devise his apartment unit by will, or to pass the same by intestacy, without restriction.

**Section 5. Waiver of Right of Partition with Respect to Such Apartment Units as are Acquired by the Board of Directors, or its Designee, on Behalf of All Unit Owners as Tenants in Common:** In the event that an apartment unit shall be acquired by the Board of Directors, or its designee, on behalf of all unit owners as tenants in common, all such unit owners shall be deemed to have waived all rights of partition with respect to such apartment unit.

## ARTICLE VIII

**Section 1. Condemnation – Eminent Domain:** In the event of a taking by condemnation or by eminent domain of part or all of the common areas and facilities, the award made for such taking shall be payable to the Board of Directors for disbursement and/or payment of the common expenses.

## ARTICLE IX
## Records

**Section 1. Records and Audits:** The Board of Directors or the managing agent shall keep detailed records of the actions of the Board of Directors and the managing agent, Minutes of the meetings of the Board of Directors, Minutes of the meetings of unit owners, and financial records and books of account of the Condominium, including a chronological listing of receipts and expenditures, as well as a separate account for each apartment unit which, among other things, shall contain the amount of each assessment of common charges against such apartment unit, the date when due, the amounts paid thereon, and the balance remaining unpaid.

Each unit owner shall be permitted to examine all accounts, records and contracts of the Association in the Condominium office at reasonable times, on business days, but not more often than once a month. All others must request any required information from the Board of Directors.

An annual report of the receipts and expenditures of the Association, examined and approved by a licensed accountant not affiliated with the Association and chosen by the Board of Directors, shall be rendered to the Board and sent, within a reasonable time after the end of each fiscal year, to all unit owners who request it.

## ARTICLE X
## Miscellaneous

**Section 1. Notices:** All notices hereunder shall be sent by registered or certified mail to the Board of Directors c/o the managing agent, or if there is no managing agent, to the office of the Board of Directors or to such other address as the Board of Directors may hereafter designate from time to time, by notice in writing to all unit owners and to all mortgagees of apartment units.

All notices to any unit owner shall be sent by registered or certified mail to the Building or to such other address as may have been designated by him from time to time, in writing, to the Board of Directors. All notices to mortgagees of apartment units shall be sent by registered or certified mail to their respective addresses, as designated by them from time to time, in writing

18

3055300/000380

Joint Appendix Vol. II Page 1413

to the Board of Directors. All notices shall be deemed to have been given when mailed, except notices of change of address, which shall be deemed to have been given when received.

Notwithstanding the requirements of this section, all notices of regular, special and Annual Meetings of the unit owners, Board of Directors, and committees of the Board or otherwise, shall be by first class mail but without the requirement of registration or certification. The applicable notice shall be sent so as to comply with the required time limits, if any, to the regular mailing address of the designated party as recorded in the books of the Association.

**Section 2. Invalidity:** The invalidity of any part of these By-Laws shall not impair or affect in any manner the validity, enforceability or effect of the balance of these By-Laws.

**Section 3. Captions:** The captions herein are inserted only as a matter of convenience and for reference, and in no way define, limit or described the scope of these By-Laws, or the intent of any provision thereof.

**Section 4. Gender:** The use of the masculine gender in these By-Laws shall be deemed to include the feminine gender and the use of the singular shall be deemed to include the plural, whenever the context so requires.

**Section 5. Waiver:** No restrictions, condition, obligation or provisions contained in these By-Laws shall be deemed to have been abrogated or waived by reason of any failure to enforce same, irrespective of the number of violations or breaches thereof which may occur.

**Section 6. Insurance Trustee:** The Board of Directors may appoint a Trustee to distribute large amounts of any insurance proceeds. The trustee so appointed may be any individual or entity, so long as such is properly bonded in relation to the funds and responsibility involved.

**ARTICLE XI**
**Amendments to By-Laws**

**Section 1. Amendments to By-Laws:** Except as hereinafter provided, these By-Laws may be modified or amended by the vote of 66-2/3% in number and in common interest of all unit owners.

**ARTICLE XII**
**Execution of Instruments and Seal**

**Section 1. Execution and Instruments:** All instruments of the Condominium shall be executed under seal by such officer or officers as the Board of Directors may designate, or as may be otherwise authorized.

**Section 2. Seal:** The seal of the Condominium shall be as determined by the Board of Directors from time to time.

19

3055300/000381

**ARTICLE XIII**
**Conflicts**

**Section 1. Conflicts:** These By-Laws are set forth to comply with the provisions of Sections 917 and 918 of Chapter 33, Title 28, Virgin Islands Code. In case any of these By-Laws conflict with the provisions of said statute or of the Declaration, the provisions of said statute or of the Declaration, as the case may be, shall control.

20

3055300/000382

DRAFT

**BY-LAWS OF COWPET BAY WEST**

**CONDOMINIUM ASSOCIATION**

**Cowpet Bay**

**St. Thomas, Virgin Islands**

**New date**

Article I

Plan of Unit Ownership

**Section 1. Unit Ownership:** The property located at Parcels 8-56-1 and 8-1-2, 4, 5, & 6 of Estate Nazareth, No.1 Red Hook Quarter has previously been submitted in a declaration forming an association under the provisions of Chapter 33, Title 28 of the Virgin Islands Code, known as the "Condominium Act of the Virgin Islands". The association has been and will continue to be known as "COWPET BAY WEST", hereinafter called the "Condominium".

**Section 2. Applicability of By-Laws:** The provisions of these by-laws are applicable to the Property of the Condominium and the use and occupancy thereof. The term "Property", as used herein, shall include the land and all buildings and other improvements thereon owned by the association and all easements, rights and appurtenances belonging thereto, and all other property, personal or mixed, intended for use in connection therewith, all of which were previously submitted to the provisions of said Chapter 33, Title 28 of the Virgin Islands Code.

**Section 3. Application:** All present and future owners, mortgagees, lessees, **tenants**, occupants of units and any other persons who may use **or access** the facilities of the Property in any manner are subject to these By-Laws, the Declaration and the Rules and Regulations.

   The Acceptance of a deed, mortgage or conveyance or the entering into of a lease or the act of occupancy of a unit shall constitute an agreement that these By-Laws, the Rules and Regulations and the provisions of the Declaration, as they may be amended from time to time, are accepted, ratified, and will be complied with.

**Section 4. Office:** The office of the Condominium and of the Board of Directors shall be located at Cowpet Bay West, Estate Nazareth, No.1 Red Hook Quarter, St. Thomas, Virgin Islands. The mailing address shall be 6201 Windward Way, St. Thomas, USVI 00802, or such address as may be designated by the Board, upon 30 days written notice to the members of the Association.

5

DRAFT

ARTICLE II

Board of Directors

**Section 1. Number and Qualifications:** The affairs of the Condominium shall be governed by a Board of Directors. The Board of Directors shall be composed of seven persons, all of whom shall be owners or spouses of owners, or in the case of partnership owners, shall be members of said partnership, or in the case of corporate owners, shall be officers or stockholders of such corporations, or in the case of fiduciary owners shall be the fiduciaries or beneficiaries of any such trust, **or in the case of a limited liability company, shall be the members of such company.** A Board member may not base his/her eligibility to sit on the Board, **from the fact that a current Board Director resides** in the same unit **and therefore he/she can stand in said Board Director's position. Only one member of a unit can simultaneously serve on the Board.**

No person who is in arrears for ninety days or more on any billing or assessment by the Cowpet Bay West Condominium Association shall be eligible to be elected to or serve as a director on the Board of Directors. In the event such person is serving as a director, that person's position as director shall be declared to be vacant and another person appointed by a majority vote of the remaining Board to fill the vacancy so created, until the next regular election of the Board of Directors. Arrearages of partnerships, corporations, trusts, fiduciary owners, etc. on which a person's eligibility to serve on the board is based, shall be **subject to the same consequences of ineligibility as set forth above.**

**Section 2. Powers and Duties:** The Board of Directors shall have the powers and duties necessary for the administration of the affairs of the Condominium and may do all such acts and things except as by law, by the Declaration **(to the extent still applicable)**, or by these By-Laws **are** not delegated to the Board of Directors by the unit owners. Such powers and duties of the Board of Directors shall include, but shall not be limited to, the following:

a) Operation, care, upkeep and maintenance of the common areas and facilities.

b) Determination of Association Charges, which shall include the common expenses required for the operation of the Condominium, **insurance,** utility rates, **water,** late fees and interest charges, fines for By-Laws and **for** rules **and** regulation violations, and **any reserve funds maintained by the Association.**

c) Collection of Association charges, as hereinafter defined, from the unit owners.

d) Employment and dismissal of the personnel necessary for the maintenance and operation of the common areas and facilities.

e) Adoption, amendment and Enforcement of rules and regulations covering the details of the operation and use of the Property.

6

DRAFT

f) Opening of bank accounts on behalf of the Condominium and designating the signatories required therefore **and maintaining and accounting for any funds deposited or withdrawn from said accounts.**

g) Purchasing or leasing or otherwise acquiring, in the name of the **Association** or its designee, corporate or otherwise, on behalf of all unit owners, units offered for sale or surrendered by their owners.

h) Purchasing of units at foreclosure or other judicial sales in the name of the Association or its designees, corporate or otherwise, on behalf of all unit owners.

i) Selling, leasing, voting the votes appurtenant to (other than for the election of members of the Board of Directors), or otherwise dealing with units acquired and subleasing units leased by the Association, or its designee, corporate or otherwise on behalf of all unit owners. **No mortgage shall be entered into without the expressed written consent of a majority (51%) or more of the unit owners.**

j) **Issuing a Power of Attorney for someone** to act as designee of the **Association** in acquiring title to or leasing of units on behalf of all unit owners.

k) Obtaining of insurance for the Property, including **all premises owned or required to be maintained by the Association** pursuant to the provision of Article V, Section 2 hereof.

l) Making of repairs, **restorations,** additions and improvements to or alterations of the Property, **including all premises owned or required to be maintained by the Association** in accordance with the other provisions of these By-Laws, after damage or destruction by fire or casualty or as a result of condemnation or eminent domain proceedings.

**Section 3. Managing Agent and Manager:** The Board of Directors may employ for the Condominium a managing agent and/or a manager at a compensation established by the Board of Directors, to perform such duties and services as the Board of Directors shall authorize. The Board of Directors may delegate to the manager or managing agent, all of the powers granted to the Board of Directors by these By-Laws other than the powers set forth in subdivisions (b), (e), (f), (g), (h), (i), (j) and (k) of Section 2 of this Article II.

### Section 4. Election and Term of Office:

Directors will serve for a term of three years. Two Directors shall be elected the first year, two the second year, and three the third year to replace those directors whose terms are expiring. Where a vacancy has been filled by vote of a majority of the vote of the remaining members of the Board, as provided in Section 6, that person shall be a member until the next Annual Meeting, at which time the unit owners shall elect the replacement for the remainder of the original term, if any. Any candidate for director may run for a full term, or any term created by a vacancy, or both.

**Each** director shall be elected by the vote of a majority (as defined in Article III Section 9) of the unit owners. All vacancies shall be voted for on **in a single** ballot, and the candidate(s) with the highest number of votes shall be elected to **fill the respective** vacancies. Each candidate's name shall be preceded by a space where an "X" may be placed to vote for said candidate. It shall not be required that a name be crossed out and another inserted to vote for a candidate on the ballot. A space for write-in

7

3055300/000385

DRAFT

candidates shall also be provided. Ballots and proxies shall be provided to the owners not less than 30 days prior to the Annual Meeting.

**Each** Director shall hold office until their respective successor shall have been elected by the unit owners.

A **Director** may serve only two consecutive terms and shall not hold office for one year before being eligible to run again.

**Section S.  Removal of Members of the Board of Directors:** At any regular or special meeting of unit owners, any one or more of the members of the Board of Directors may be removed with or without cause by a majority of the unit owners and a successor may then and there or thereafter be elected to fill the vacancy thus created.  Any members of the Board of Directors whose removal has been proposed by the unit owners shall be given an opportunity to be heard at the meeting.

If a Board member does not attend any of the Board meetings during an entire year, and also does not attend the annual owners meeting that same year, such member may be removed from the Board by a majority of the other members of the Board of Directors.

If a Director is removed pursuant to Section 5 herein, said Director shall not be eligible for service on the board for a minimum of ___ years.

**Section 6.  Vacancies:** Vacancies in the Board of Directors caused by any reason other than the removal of a member thereof by a vote of the unit owners, shall be filled **subject to Section 4 above,** by a vote of a majority of the remaining members at a special meeting of the Board of Directors held for that purpose promptly after the occurrence of any such vacancy, even though the members present at such meeting may constitute less than a quorum, and each person so elected shall be a member of the Board of Directors until a successor shall be elected at the next Annual Meeting of the unit owners.  At that time a director shall be elected to serve the remainder of the term of the original vacating director.

**Section 7.  Organization Meeting:** The first meeting of the members of the Board of Directors shall be an organizational meeting held directly following the Annual Meeting of the unit owners, at such time and place as shall be fixed by the Board members at said meeting, and no notice shall be necessary to the newly elected members of the Board of Directors in order to legally constitute such meeting, provided a majority of the whole Board of Directors shall be present, **or available via video or audio conference.** If it is not possible to hold such first meeting of the new Board immediately, then it shall be held as soon as possible and proper notice shall be given to each director, as for any special meeting of the Board of Directors.

**Section 8.  Regular Meetings:** Regular meetings of the Board of Directors may be held at such time and place as shall be determined from time to time by a majority of the members of the Board of Directors, but at least two such meetings shall be held during each fiscal year.  Notice of regular meetings of the Board of Directors shall be given to each member of the Board of Directors by mail, email or fax transmission, at least ten days prior to the day named for such meeting. Meeting notices

**Section 9.  Special Meetings:** Special meetings of the Board of Directors may be called by the President upon five business days notice to each member of the Board of Directors  given by mail, email or fax transmission, which notice  shall state the time, place and purpose of the meeting.  Special meetings of the Board of Directors shall be called by the President or Secretary in like manner and on like notice on

8

3055300/000386

DRAFT

the written request of at least two members of the Board of Directors. Such special meeting may be conducted by a **video and/or audio** conference call.

**Section 10. Waiver of Notice:** Any member of the Board of Directors may, at any time, waive notice of any meeting of the Board of Directors in writing, and such waiver shall be deemed equivalent to the giving of such notice. Attendance by a member of the Board of Directors at any meeting of the Board shall constitute a waiver of notice by him of the time and place thereof. If all the members of the Board of Directors are present at any meeting of the Board, no notice shall be required and any business may be transacted at such meeting.

**Section 11. Quorum of Board of Directors:** At all meetings of the Board of Directors, a majority of the members thereof shall constitute a quorum for the transaction of business, and the votes of the majority of the members of the Board of Directors present at a meeting at which a quorum is present shall constitute the decision of the Board of Directors. If at any meeting of the Board of Directors there shall be less than a quorum present, no business may be transacted until a quorum is achieved. Board members may participate by video or audio conference call.

**Section 12. Fidelity Bonds:** The Board of Directors shall obtain adequate fidelity bonds for all officers and employees of the Condominium handling or responsible for condominium funds. The premiums on such bonds shall constitute a common expense.

**Section 13. Compensation:** No member of the Board of Directors shall receive any compensation from the Condominium Association for serving as a board member. However, verifiable expenses, in accordance with guidelines established by the Board in advance, are reimbursable. A **Director** may also be compensated for other services unrelated to his/her Board function.

**Section 14. Liability of the Board of Directors:** The members of the Board of Directors shall not be liable to the unit owners for any mistake of judgment, negligence, or otherwise, except for their own individual willful misconduct or bad faith. The unit owners shall indemnify and hold harmless each of the members of the Board of Directors against all contractual liability to others arising out of contracts made by the Board of Directors on behalf of the Property unless any such contract shall have been made in bad faith or contrary to the provisions of the Declaration or of these By-Laws.

It is intended that the members of the Board of Directors shall have no personal liability with respect to any contract made by them on behalf of the Property. It is also intended that the liability of any unit owner arising out of any contract made by the Board of Directors or out of the aforesaid indemnity in favor of the members of the Board of Directors shall be limited to such proportion of the total liability thereunder as his interest in the common areas and facilities bears to all such interest.

Every agreement made by the Board of Directors or by the managing agent or by the manager on behalf of the Property shall provide that the members of the Board of Directors or the managing agent, or the manager, as the case may be, are acting only as agents for the unit owners and shall have no personal liability thereunder (except as unit owners) and that each unit owner's liability thereunder shall be limited to such proportion of the total liability thereunder as his interest in the common areas and facilities bears to all such interest.

**Section 15. Executive Committee:** The Board of Directors, by resolution passed by a majority of the entire Board, shall designate at the Organization Meeting or anytime thereafter, three members of the

9

3055300/000387

DRAFT

Board to constitute an Executive Committee, with one member thereof designated as Chairman. The purpose of the Executive Committee is to control the day-to-day management of the Association.

The Board of Directors from time to time shall define the authority of the Executive Committee.

The Board of Directors, at any time, may change the members of, may fill vacancies in, or may discharge the Executive Committee. Two members shall constitute a quorum of the Executive Committee. The act of a majority of the members at any meeting at which there is a quorum shall be the act of the Committee. The Board of Directors shall establish rules of procedure for the Committee governing, but not limited to, such items as notice and powers.

The Executive Committee shall make recommendations to the Board of Directors, and when the Board is not in session may, to the extent that the committee deems necessary, exercise the powers of the Board in the management of the business and affairs of the Association. The Executive Committee shall keep records of all its proceedings and shall report same to the Board of Directors, and its individual members, in writing within a reasonably short period of time after each significant action and after all meetings.

**Section 16. Inspection by Executive Committee**: The Executive Committee shall make a detailed inspection of the buildings, pump rooms, offices, maintenance shops, sewage and water-making plants, emergency generator, roads, sidewalks, steps, entry bridges, railings, grounds, landscaping, watering systems, the beach and the sea wall at least twice a year in the company of the manager or managing agent,. Additionally, the Committee shall evaluate the operation of the Association office and the overall security situation of the property.

The purpose of such inspections will be to (a) obtain a better understanding of the job being performed by the manager and his staff and (b) make suitable recommendations for possible future actions. Within 30 days after each such semi-annual inspection, the Committee will report its findings and recommendations to the members of the Board of Directors.

**Section 17. Action by Consent**: Any action required or permitted to be taken at any meeting of the Board of Directors, or any committee thereof, may be taken without a meeting if a written consent thereto is signed by three-quarters of the members (rounded off to the nearest whole number) of the Board of Directors or of such committee as the case may be, and filed with the minutes of proceedings of the Board of Directors or committee.

**Section 18. Nomination of Directors**: Nominations for election to the Board of Directors shall be made by a Nominating Committee. The Nominating Committee shall consist of a Chair, who shall be a member of the Board of Directors, and two or more members of the Association, **who are not Directors or related to any current Directors**. The Nominating Committee shall be appointed by the Board of Directors at its organizational meeting and serve until the next Annual Meeting.

The Nominating Committee shall make as many nominations for election to the Board of Directors as it shall, in its discretion, determine, but not less than the number of vacancies that are to be filled. Each nomination shall be for a specified vacancy.

Any person qualified under Section1 of Article II of these By-Laws to serve on the Board of Directors may be nominated for the Board of Directors by submitting a request, signed by the owners of two units in which the nominee has no financial interest, to the Board Secretary sixty days prior to the Annual Meeting. The Board shall include his/her name on the ballot directly following the nominee(s) proposed by the Nominating Committee for each vacancy. Any nomination that does not specify a specific vacancy shall be deemed a nomination for all vacancies.

**Section 19 – Communications**

10

DRAFT

Communications by, from, to and among the Board may be in writing, by fax or by electronic communications (telephone, telephone conference, email, internet, etc.) Telephone and telephone conference conversations must be documented (e.g., minutes or record of conversation). This communication will constitute "official" communication by the Board.

## ARTICLE III

### Unit Owners

**Section 1. Annual Meeting:**
The Annual Meeting of the unit owners shall be held during the first quarter each year. At the Annual Meeting, Directors shall be elected by ballot in accordance with the requirements of Section 4 of Article II of these By-Laws, and the unit owners may transact such other business at such meetings as may properly come before them.

**Section 2. Place of Meeting:** Meetings of the unit owners shall be held at the principal office of the Condominium or at such other suitable place convenient to the unit owners as may be designated by the Board of Directors.

**Section 3. Special Meetings:** It shall be the duty of the President to call a special meeting of the unit owners if so directed by resolution of the Board of Directors or upon a petition signed and presented to the Secretary by not less than 25% in common interest, in the aggregate, of unit owners. The notice of any special meeting shall state the time and place of such meeting and the purpose thereof. No other business shall be transacted at a special meeting except as stated in the notice.

**Section 4. Notice of Meeting:** It shall be the duty of the Secretary to mail a notice of each annual meeting of the unit owners not less than thirty days nor more than ninety days prior to such meeting, stating the purpose thereof as well as the time and place where it is to be held, to each unit owner of record, at the building or at such other address as such unit owner may have designated by notice in writing to the Secretary. The mailing of a notice of meeting in the manner provided in this section shall be considered service of notice. The Board of Directors may assign the task of providing notice to unit owners to a person other than the Secretary. Special meetings require not less than ten days notice.

11

3055300/000389

DRAFT

**Section 5. Adjournment of Meetings**: If any meeting of unit owners cannot be held because a quorum has not attended, a majority in common interest of the unit owners who are present at such meeting, either in person or by proxy, may adjourn the meeting to a time not less than forty-eight hours from the time the original meeting was called.

**Section 6. Order of Business**: The annual meeting of the unit owners shall be chaired by the President or other member of the Board of Directors chosen by the Board, and the order of business shall be generally as follows:

a) Roll Call – by unit
b) Establishment of Quorum (1/3 of all unit owners)
c) Proof of Notice of Meeting
d) Approval of Minutes of last year's Annual Meeting
e) President's Report (including cost and coverage of insurance
f) Treasurer's Report (including discussion of Budget and Financial Status
g) Property Manager's Report
h) Report of Nominating Committee
i) Election of Board Members
j) Old Business
k) New Business

**Section 7. Title to Units**: Title to units may be taken in the name of an individual, or in the names of two or more persons as tenants in common, joint tenants or tenants by the entirety, or in the name of a corporation, partnership, limited liability company or other legal entity authorized to own real property in the Virgin Islands, or in the name of a fiduciary.

**Section 8. Voting**: The owner or owners of each unit, or some person designated by such owner or owners to act as proxy on his or their behalf and who need not be an owner, shall be entitled to cast the vote appurtenant to such unit at all meetings of unit owners. The designation of any such proxy shall be made in writing and shall be revocable at any time by written notice to the Secretary or in person at the meeting. Any or all such owners or proxies may be present at any meeting of the unit owners and may vote or take any other action as a unit owner either in person or by proxy. Votes of unit owners shall be weighted in accordance with their share of the common interest, as follows, with the total of all votes equaling one hundred:

| | | |
|---|---|---|
| 2 Bedroom | | .911 |
| 3 Bedroom | | 1.062 |
| 2 Bedroom + Loft | 1.193 | |
| 4 Bedroom | | 1.301 |
| 3 Bedroom + Loft | 1.376 | |

The Board of Directors shall accept any vote if the owner is one of the owners of record of the unit, or in the case of a proxy, if there is no obvious defect on the face of such proxy. It shall be the burden of the protestor to offer satisfactory proof that the proffered vote or proxy is invalid and that his is the proper one.

12

3055300/000390

Joint Appendix Vol. II Page 1423

DRAFT

**Section 9.  Majority of Unit Owners**:  As used in these By-Laws, the term "majority of unit owners: shall mean those unit owners having more than 50% of the total authorized votes of all unit owners present in person or by proxy and voting at any meeting of the unit owners, determined in accordance with the provisions of Section 8 of this Article III.

**Section 10.  Quorum**:  Except as otherwise provided in these By-Laws, the presence in person or by proxy of unit owners having one-third (1/3) of the total authorized votes of all unit owners shall constitute a quorum at all meetings of the unit owners.

**Section 11.  Majority Vote**:  The vote of a majority of unit owners at a meeting at which a quorum shall be present shall be binding upon all unit owners for all purposes except where, in the Declaration or these By-Laws, or by law, a higher percentage vote is required.

## ARTICLE IV

### Officers

**Section 1.  Designation**:  The principal officers of the Condominium shall be the President, the Vice President, the Secretary, and the Treasurer, all of whom shall be elected by the Board of Directors.  The Board of Directors may appoint an assistant secretary, an assistant treasurer, and such other officers as in its judgment may be necessary.  The President and Vice President, but no other officers, need be members of the Board of Directors.

**Section 2.  Election of Officers**:  The officers of the Condominium shall be elected annually by the Board of Directors at the Organization Meeting of each new Board of Directors and shall hold office at the pleasure of the Board of Directors.

**Section 3.  Removal of Officers**:  Upon the affirmative vote of a majority of the members of the Board of Directors, any officer may be removed, either with or without cause, and his successor may be elected by the Board of Directors at any regular or special meeting of the Board of Directors called for such purpose.

**Section 4.  President**:  The President shall be the chief executive officer of the Condominium.  He shall preside at all meetings of the unit owners and of the Board of Directors.  He shall have all of the general powers and duties which are incident to the office of president of a stock corporation organized under the Corporation Law of the Virgin Islands, including but not limited to the power to appoint committees from among the unit owners from time to time as he may in his discretion decide is appropriate to assist in the conduct of the affairs of the Condominium.

**Section 5.  Vice President**:  The Vice President shall take the place of the President and perform his duties whenever the President shall be absent or unable to act.  If neither the President nor the Vice President is able to act, the Board of Directors shall appoint some other member of the Board of

13

DRAFT

Directors to act in the place of the President, on an interim basis. The Vice President shall also perform such other duties as shall from time to time be imposed upon him/her by the Board of Directors or by the President.

**Section 6. Secretary**: The Secretary shall keep the Minutes of all meetings of the unit owners and of the Board of Directors. He shall have charge of such books and papers as the Board of Directors may direct; and he shall, in general, perform all the duties incident to the office of secretary of a stock corporation organized under the Corporate Law of the Virgin Islands.

**Section 7. Treasurer**:  The Treasurer shall have the responsibility for Condominium funds and securities and shall be responsible for keeping full and accurate financial records and books of account showing all receipts and disbursements, and for the preparation of all required financial data.  The Treasurer shall be responsible for the deposit of all monies and other valuable effects in the name of the Board of Directors, or the managing agent, in such depositories as may from time to time be designated by the Board of Directors, and shall, in general, perform all the duties incident to the office of treasurer of a stock corporation organized under the Corporation Law of the Virgin Islands.

**Section 8. Agreements, Contracts, Deeds, Checks, etc.:**  All agreements, contracts, deeds, leases and other instruments of the Condominium shall be executed by any two officers of the Condominium or by such other person or persons as may be designated by the Board of Directors, **in the resolution authorizing the execution of said document.**.

**Section 9. Compensation of Officers**:  No officer shall receive any compensation from the Condominium for acting as such.

**ARTICLE V**

**Operation of the Property**

**Section 1. Determination of Common Expenses and Fixing of Common Charges:**  The Board of Directors shall from time to time, and at least annually, prepare a budget for the condominium, determine the amount of the common charges payable by the unit owners to meet the common expenses of the Condominium, and allocate and assess such common charges among the unit owners according to their respective common interests.  Common expenses shall include, among other things, operation and maintenance, insurance premiums, repairs and such amounts as the Board of Directors may deem proper for a general operating reserve, for a reserve fund for replacements, and to make up any deficit in the common expenses for any prior year.

14

3055300/000392

DRAFT

**Section 3.  Repair or Reconstruction After Fire or Other Casualty:**  In the event of damage to or destruction of the commonly owned buildings and elements as a result of fire or other casualty (unless 66-2/3% or more of the buildings are destroyed or substantially damaged and 75% or more of the unit owners determine in accordance with the Declaration not to proceed with the repair or restoration), the Board of Directors shall arrange for the prompt repair or restoration of the commonly owned buildings and elements, and the Board of Directors shall  disburse the proceeds of all insurance policies to the contractors engaged in such repair or restoration in appropriate progress payments.  Any cost of such repair or restoration in excess of the insurance proceeds shall constitute a common expense – and the Board of Directors may assess all the unit owners for such deficit as part of the common charges. The association shall only be responsible for inspecting unit interiors to determine if damage is structural or due to external causes, or if adjacent unit damage is caused by external causes, or unless that unit is owned by the association.  Unless that unit is owned by the association, repair by the association of other unit damage will be limited to structural damage, that caused by external or adjacent unit causes, and will not include property or fixtures installed by the owner or previous owners.

Within ninety days after a casualty of an estimated repair cost of $100,000 or greater, the Board will provide to the owners a financial status report indicating projected repair costs, source(s) of necessary funds, expenditures and commitments to date, and a schedule and plan for completion.  This report will be updated and issued to owners on a quarterly basis, thereafter, until repairs are complete.  A current report shall be provided at the next Annual Meeting.

If 66-2/3% or more of the Building(s) are destroyed or substantially damaged and if within sixty days of the date of such destruction or damage, 75% or more of the unit owners determine not to proceed with repair and restoration, the Property shall be subject to an auction for partition at the suit of any unit owner or lien holder, as if owned in common, in which event the net proceeds of sale, together with the net proceeds of insurance policies (less any repairs conducted) shall be divided by the Board of Directors among all the unit owners in proportion to their respective common interests, after first paying out of the share of each unit owner the amount of any unpaid liens on his/her/their unit, in the order of priority of such liens.

**Section 4.  Payment of Association Charges:**  All unit owners shall be obligated to pay the common charges assessed by the Board of Directors pursuant to the provisions of Section 1 of this Article V at such time or times as the Board of Directors shall determine, as well as "other charges" for utilities, services, unit repairs, late fees, interest, fines and/or collection costs, if incurred.  With respect to the following sections concerning payment, collection, default, foreclosure, etc., in Sections 4, 5, 6, 7, & 8 below, the term "association charges" is intended to include, but not be limited to, all the above items, both the "common" and "other" charges.

No unit owner shall be liable for the payment of any part of association charges assessed against his unit subsequent to a sale, transfer or other conveyance by him of such unit, together with the Appurtenant Interests, as defined in Section1 of Article VII hereof.  In addition, a unit owner may, subject to acceptance by the Board of Directors provided that the unit is free and clear of liens and encumbrances other than mortgages and statutory liens for unpaid association charges, convey the unit, together with the "Appurtenant Interests" to the Board of Directors, or its designee, corporate or otherwise, on behalf of all other unit owners, and in such event be exempt from association charges thereafter assessed.

However, a purchaser of an unit shall be liable for the payment of association charges assessed against such unit prior to the acquisition of such a unit, without prejudice to such purchaser's right, if any,  to recover from the seller the amounts paid by the purchaser, except that a first mortgagee or other purchase of a unit at a foreclosure sale of a first priority mortgage of such a unit shall not be liable

16

3055300/000393

Joint Appendix Vol. II Page 1426

DRAFT

for and such a unit shall not be subject to a lien for the payment of association charges which became due prior to the acquisition of title by such acquirer.

**Section 5. Collection of Association Charges**: The Board of Directors shall assess association charges against the unit owners from time to time and shall take prompt action to collect any charges due from any unit owner, which remain unpaid for more than thirty days from the date due for payment thereof. Such action may include placement of a lien on the apartment unit, notification to the mortgagee of the owner's failure to pay association charges and foreclosure on the lien. Additionally, suspension of utilities by a majority vote of the Executive Committee is permitted if an owner is more than 90 days in arrears of any Association charges. Payments received from unit owners will be applied to **the oldest arrearages first.**

**Section 6. Default in Payment of Association Charges:** In the event of default by any unit owner in paying to the association charges as determined by the Board of Directors, such unit owner shall be obligated to:

1. pay interest from the date of the initial billing at the maximum legal rate of interest, as defined by the Virgin Islands Laws, on all amounts past due,
2. pay a monthly service charge as determined and promulgated from time-to-time by the Board of Directors,
3. pay all expenses and attorneys' fees incurred by the Board of Directors in any proceeding brought to collect such unpaid association charges.

All such unpaid association charges shall constitute a lien on such unit prior to all other liens except those specified in Section 922 of Chapter 33, Title 2B of the Virgin Islands Code. The Board of Directors shall have the right and duty to attempt to recover all association charges, together with interest and monthly service charges thereon, and the expenses of the proceeding, including attorneys' fees, in any action to recover the same brought against such unit owner, or by foreclosure of the lien on such unit granted by Section 922 of Chapter 33, Title 28, Virgin Islands Code.

**Section 7. Foreclosure of Liens For Unpaid Association Charges:** In any action brought by the Board of Directors to foreclose a lien on a unit because of unpaid association charges, the unit owner shall be required to pay a reasonable rental for the use of the unit, and the plaintiff in such foreclosure action shall be entitled to the simultaneous appointment of a receiver to collect the same. The Board of Directors, acting on behalf of all unit owners, shall have power to purchase such unit at the foreclosure sale and to acquire, hold, lease, mortgage, vote the votes appurtenant to, convey or otherwise deal with the same. A suit to recover a money judgment for unpaid association charges shall be maintainable without foreclosing or waiving the lien securing the same.

**Section 8. Statement of Association Charges:** The Board of Directors shall promptly provide any unit owner so requesting the same in writing, with a written statement of all unpaid association charges due from such unit owner.

**Section 9. Abatement and Enjoinment of Violations by Unit Owners:** The violation of any rule or regulation adopted by the Board of Directors or the breach of any of these By-Laws contained herein, or the breach of any provisions of the Declaration, shall give the Board of Directors the right, in addition to any other rights set forth in these By-Laws (a) to enter the unit in which, or as to which, such violation or breach exists and to summarily abate or remove, at the expense of the defaulting unit owner, any structure, thing or condition that may exist therein contrary to the intent and meaning of the provisions

17

3055300/000394

DRAFT

hereof, and the Board of Directors shall not thereby be deemed guilty in any manner of trespass or (b) to enjoin, abate or remedy by appropriate legal proceedings, either at law or in equity, the continuance of any such breach.

**Section 10. Routine Maintenance and Repair:** All maintenance of and repairs to any "unit" (other than maintenance of and repairs to any common areas and facilities contained therein, and not necessitated by the negligence, misuse or neglect of the owner of such apartment unit) shall be the responsibility of the owner of such apartment unit. Also, each unit owner shall be responsible for damage to other apartment units and/or to the common areas and facilities resulting from conditions for which such owner has responsibility as indicated above.

A "unit" is considered the space inside the perimeter walls, interior walls, floor and ceiling to include:
- All decorating elements including: paint, wall and floor coverings, paneling, molding and tiles; finished cabinets and mirrors.
- All electrical appliances including: refrigerator, stove, washer, dryer, dishwasher, garbage disposal, hot water heater and air-conditioning equipment (including compressor).
- All electrical fixtures including: wall ceiling and floor outlets, switches and fuse box.
- All plumbing fixtures including: tubs, toilets, showers, sinks and faucets.

Additionally, the unit owner shall be responsible for the routine lubrication and adjustment of doors and windows, and, unless major casualty related, replacement of broken glass, wooden or glass slats and damaged screens. The unit owner shall also maintain and assure the operability of the storm shutters installed on that unit and is responsible to close them in the event of a windstorm. Damage caused by failure to do so is the responsibility of the owner if net insurance proceeds are insufficient to cover such damage.

Screen doors may be installed on the main street-side entry doors at the unit owner's expense provided they meet the existing décor. Once installed, they must be maintained by the unit owner in a good state of repair, or the Association will do so at the owner's expense.

Except for the limited exceptions noted above, all maintenance, repairs and replacements to the "common elements", common areas and facilities, whether located inside or outside of the units, (unless necessitated by the negligence, misuse or neglect of a unit owner, in which case such expense shall be charged to such unit owner), shall be made by the Association and be charged to all the unit owners as a common expense.

"Common elements" are considered to include all other elements of the buildings and property except those specified as being part of the "unit." Additionally, the following are considered common elements:
- Electrical supply to the fuse box.
- Water and plumbing lines in the walls (including interior walls), floor and ceiling to the valves at sinks, showers, tubs, hot water heater, and toilets, etc.
- Drains to the first connection outside a wall.

External air conditioning compressor units shall be maintained by the owner in a reasonable state of preservation. The Association may require owner to remove inoperable and/or un-maintained units or do so at the owner's expense

Below is a guide to assist in clarifying owner and Association responsibility with regard to maintenance/repair and insurance."

18

3055300/000395

DRAFT

**Insurance and Maintenance Responsibility Matrix**

| Category (Not intended to be all-inclusive) | Owner Maint/Repair Responsibility | Association Maint/Repair Responsibility | Association Insurance Responsibility | Owner Insurance Responsibility |
|---|---|---|---|---|
| Exterior Walls and Interior Damage Caused by Leaks | | X | X | |
| Roof and Interior Damage Caused by Roof Leaks | | X | X | |
| Interior Damage caused by Adjacent Units (Leaks, etc.) | X | | | Owner or Adjacent Unit's Insurance Responsible |
| Front Doors | X | | X | |
| Screens | X | | X | |
| Exterior Sliders | | X | X | |
| Exterior Wood Railings, Trim, Benches | | X | X | |
| Exterior Windows | X | | X | |
| Electrical System to Breaker Panel | | X | X | |
| Electrical System, Breaker Panel to Outlets, Junction Boxes | X | | X | |
| Electrical Fixtures-Interior | X | | | X |
| Plumbing Inside Walls, Floors Ceilings to valves | | X | X | |
| Condo plumbing not in walls/floors | X | | | X |
| Plumbing Fixtures | X | | | X |
| Interior Walls | X | | X | |
| Interior Doors | X | | | X |
| Cabinets | X | | | X |
| Furniture | X | | | X |
| Appliances | X | | | X |
| Wall/Floor Coverings (tile/carpet) | X | | | X |
| Hurricane Shutters | X | | X | |
| Furniture | X | | | X |
| Personal Property | X | | | X |
| External A/C elements | X | | | X |
| Internal A/C elements | X | | | X |
| Landside Porch/Steps/Railings | | X Excluding Tile | X Excluding Tile | |
| Seaside Balcony/Railings | | X Excluding Tile | X Excluding Tile | |

**Section 11. Restriction on Use of Units:** In order to provide for congenial occupancy of the Property and for the protection of the value of the units, the use of the Property shall be restricted to and shall be in accordance with the following provisions:

The units shall be used for residences only. Units will not be occupied by more than two persons per bedroom for more than thirty days per year.

19

3055300/000396

DRAFT

The common areas and facilities, including the limited common areas and facilities, shall be used only for the furnishing of the services and facilities for which they are reasonably suited and which are incident to the use and occupancy of the units

2. No nuisances shall be allowed on the Property nor shall any use or practice be allowed which is a source of annoyance to its residents or which interferes with the peaceful possession proper use of the Property by its residents.

3. No improper, offensive or unlawful use shall be made of the Property or any part thereof, and all valid laws, zoning laws and regulations of all governmental bodies having jurisdiction thereof shall be observed.

4. Violations of laws, orders, rules, regulations or requirements of any governmental agency having jurisdiction thereof, relating to any portion of the Property, shall be corrected, by and at the sole expense of the unit owners or the Board of Directors, whichever shall have the obligations to maintain or repair such portion of the Property.

5. No dogs are allowed on the property, either long term or visiting. The Board may grant exceptions to the NO DOGS ALLOWED rule, on an individual basis, should an owner require the assistance of a service animal (dog) as defined by the ADA. Owners seeking to obtain such an exemption are required to apply, in writing, to the Board with supporting documentation.

Federal and ADA Compliance, as follows:

"On July 23, 2010, Attorney General Eric Holder signed final regulations revising the Department's ADA regulations, including a revised definition of "service animal." Effective March 15, 2011, "service animal means only dog that is individually trained to do work or perform tasks for the benefit of an individual with a disability, including a physical, sensory, psychiatric, intellectual, or other mental disability. The work or tasks performed by a service animal must be directly related to the handler's disability."

Dogs used for emotional support, that are not task-trained, are called emotional support animals. They are not service dogs."

**Section 12. Additions, Alterations or Improvements by the Board of Directors:** Additions, alterations or improvements to the common areas and/or facilities up to $100,000 may be made by the Board of Directors. Additions, alterations or improvements in excess of $100,000 shall require approval by a vote of two-thirds (2/3) in common interest of the owners. The cost of such additions, alterations or improvements shall constitute a common charge. This section is not applicable to repairs conducted in accordance with Article V Section 3 of these By-Laws.

**Section 13. Additions, Alterations, or Improvements by Unit Owners:** No unit owner shall make any structural addition, alteration or improvement in or to the unit, including any exterior painting or exterior alteration or addition (including awnings, grills, etc.) without the prior written consent thereto of the Board of Directors. The Board of Directors shall have the obligation to answer any written request by a unit owner for approval of a proposed structural addition, alteration or improvement in such unit owner's unit, within thirty (30) days after such request, and failure to do so within the stipulated time shall constitute a consent by the Board of Directors to the proposed addition, alteration or improvement.

A unit owner shall obtain a receipt from any person accepting his written request for a change under this section and shall show the receipt to the manager or any Director upon request. Any application to any department of the Government of the Virgin Islands or to any other governmental authority for a permit to make an addition, alteration or improvement in or to any unit shall be executed by the Board of Directors only, without, however, incurring liability on the part of the Board of Directors or any of

20

DRAFT

them to any contractor, sub-contractor or supplier on account of such additions, alteration or improvement, or to any person having any claim for injury to person or damage to property arising therefrom. The owner in such instance shall provide the Board of Directors with a Hold Harmless Certificate.

**Section 14. Use of Common Areas and Facilities**: A unit owner shall not place or cause to be placed in the stairways or other common areas and facilities, including the limited common areas and facilities, other than the areas designated as storage areas, any furniture, packages or objects of any kind. The entry passages, stairways, entry bridges, etc., shall be used for no purpose other than for normal transit through them.

**Section 15. Right of Access:** A unit owner shall grant a right of access to the unit to the manager and/or the managing agent and/or any other person authorized by the Board of Directors, the manager or the managing agent, for the purpose of making inspections or for the purpose of correcting any condition originating in his apartment unit and threatening another unit or a common area or facility, or for the purpose of performing installations, alterations or repairs to the mechanical or electrical services or other common areas or facilities in the unit or elsewhere in the Building, provided that requests for entry are made in advance and that any such entry is at a time reasonably convenient to the unit owner. In case of an emergency, such right of entry shall be immediate, whether or not the unit owner is present at the time.

**Section 16. Rules of Conduct**: Article V Section II of these By-Laws delineates general restrictions on the use of the property. Additionally, a definitive listing of current Rules and Regulations is provided as Exhibit I hereto. These Rules and Regulations may be amended by the Board of Directors from time to time. The Board is empowered to enforce these By-Laws and Rules and Regulations with monetary fines and other sanctions and may also take any legal action in court to enforce them. An owner is subject to such fines, sanctions and/or legal actions for the actions of tenants as if those actions were by the owner.

Copies of the Rules and Regulations shall be furnished by the Board of Directors to each unit owner prior to the time when the same shall become effective. The unit owner must insure that the tenant or occupant be fully informed and furnished with a copy of the Rules and Regulations and by fully bound thereby.

**Section 17. Potable Water and Electricity: The Association shall supply potable** water and electricity Association through the common facilities of the Condominium directly to each unit through a separate meter, and each unit owner shall be required to pay the charges therefore established, from time to time, by the Board of Directors. Water, electricity and other utility charges will normally be billed monthly incident to the common charges and are considered to be part of the "association" charges. Utility charges more than thirty days in arrears are subject to a late fee and interest per Section 6 Article V of these By-Laws, and said utilities may be suspended by the Association if an owner is more than 90 days in arrears of Association charges per Article V Section 5 thereof.

**Section 18. Gas:** Gas shall not be piped to any apartment unit, and unit owners are specifically prohibited from using gas as a fuel for regular cooking, water heating, or any other regular purpose. Small quantities of propane gas may be used for gas grills kept on street-side galleries and for emergency use inside apartment units.

21

3055300/000398

DRAFT

**Section 19.  Grey Water and Sewerage Service:**  Grey water for flushing and sewerage service (including sewage disposal and treatment in the condominium's sewerage treatment plant) shall be supplied as a common facility to all unit owners, and the cost thereof shall be treated as a common expense.

## ARTICLE VI

### Mortgages

**Section 1.  Notice of Unpaid Common Charges:**  The Board of Directors, whenever so requested in writing by a mortgagee of a unit, shall promptly report any then unpaid association charges due from, or any other default by the owner of the mortgaged apartment unit.

**Section 2.  Notice of Default:**  The Board of Directors, when giving notice to a unit owner of a default in paying common charges or other default, may send a copy of such notice to each holder of a mortgage covering such unit.

## ARTICLE VII

### Sales and Mortgages of Units

**Section 1.   No severance of Ownership:**  No unit owner shall execute any deed, mortgage or other instrument conveying or mortgaging title to the unit without including therein the Appurtenant Interests, it being the intention hereof to prevent any severance of such combined ownership.  For the purpose of the By-Laws, the "Appurtenant Interests" shall mean collectively, (i) the unit owner's undivided interest in the common areas and facilities appurtenant to such unit; (ii) the interest of such unit owner in any units theretofore acquired by the Board of Directors, or its designee, on behalf of all unit owners, or the proceeds of the sale or lease thereof, if any; and (iii) the interest of such unit owner in any other assets of the Condominium.

Any such deed, mortgage or other instrument purporting to affect one or more of such interests, without including the interest or interests so omitted, shall be deemed to include such interests even though the latter shall not be expressly mentioned or described therein.  No part of the Appurtenant Interests of any apartment unit may be sold, transferred or otherwise disposed of, except as part of a sale, transfer or other disposition of the unit to which such interests are appurtenant, or as part of a sale, transfer or other disposition of such part of the Appurtenant Interests of all apartment units.

22

3055300/000399

DRAFT

**Section 2. Sale to Board of Directors:** A unit owner may, subject to mutual agreement of the parties, and subject to the provisions of Section 1 of this Article VII, sell his unit to the Board of Directors, or its designee; provided, however that such purchase by the Board of Directors shall have the prior approval of two-thirds (2/3) of the unit owners, as expressed by the vote of at least two third (2/3) in number and in common interest, of all unit owners, cast in person or by proxy in accordance with these By-Laws.

**Section 3. Financing of Purchase of Apartment Units By Board of Directors:** Acquisition of units by the Board of Directors, or its designee, on behalf of all unit owners, may be made from the working capital and common charges in the hands of the Board of Directors, or if such funds are insufficient the Board of Directors may levy an assessment against each unit owner in proportion to his ownership in the common areas and facilities as a common charge, which assessment shall be enforceable in the same manner as provided in Section 6 and 7 of Article V, or the Board of Directors, in its discretion, may borrow money to finance the acquisition of such units, provided, however, that no financing may be secured by an encumbrance or hypothecation of any property other than the unit, together with the Appurtenant Interests, so to be acquired by the Board of Directors.

**Section 4. Gifts and Devises, etc:** Any unit owner shall be free to convey or transfer the unit by gift, or to devise the unit by will, or to pass the same by intestacy, without restriction.

**Section 5. Waiver of Right of Partition with Respect to Such Units as are Acquired by the Board of Directors, or its Designee, on Behalf of All Unit Owners as Tenants in Common:** In the event that a unit shall be acquired by the Board of Directors, or its designee, on behalf of all unit owners as tenants in common, all such unit owners shall be deemed to have waived all rights of partition with respect to such unit.

## ARTICLE VIII

**Section 1. Condemnation – Eminent Domain:** In the event of a taking by condemnation or by eminent domain of part or all of the common areas and facilities, the award made for such taking shall be payable to the Board of Directors for disbursement **among all unit owners in proportion to their respective common interests after first paying out all common area and facility expenses pertaining to said taking.**

## ARTICLE IX

### Records

23

3055300/000400

DRAFT

**Section 1.  Records and Audits:**  The Board of Directors or the managing agent shall keep detailed records of the actions of the Board of Directors and the managing agent, Minutes of the meetings of the Board of Directors, Minutes of the meetings of unit owners, and financial records and books of account of the Condominium, including a chronological listing of receipts and expenditures, as well as a separate account for each unit which, among other things, shall contain the amount of each assessment of common charges against such unit, the date when due, the amounts paid thereon, and the balance remaining unpaid.

Each unit owner shall be permitted to examine all accounts, records and contracts of the Association in the Condominium office at reasonable times, on business days, but not more often than once a month.  All others must request any required information from the Board of Directors.

An annual report of the receipts and expenditures of the Association, examined and approved by a licensed accountant not affiliated with the Association and chosen by the Board of Directors, shall be rendered to the Board and sent, within a reasonable time after the end of each fiscal year, to all unit owners who request it.

## ARTICLE X

### Miscellaneous

**Section 1.  Notices:**  All notices hereunder shall be sent by registered or certified mail to the Board of Directors c/o the managing agent, or if there is no managing agent, to the office of the Board of Directors or to such other address as the Board of Directors may hereafter designate from time to time, by notice in writing to all unit owners and to all mortgagees of units.

All notices to any unit owner shall be sent by registered or certified mail to the Building or to such other address as may have been designated by him from time to time, in writing, to the Board of Directors.  All notices to mortgagees of units shall be sent by registered or certified mail to their respective addresses, as designated by them from time to time, in writing to the Board of Directors.  All notices shall be deemed to have been given when mailed, except notices of change of address, which shall be deemed to have been given when received.

Notwithstanding the requirements of this section, all notices of regular, special and Annual Meetings of the unit owners, Board of Directors, and committees of the Board or otherwise, shall be by first class mail but without the requirement of registration or certification.  The applicable notice shall be sent so as to comply with the required time limits, if any, to the regular mailing address of the designated party as recorded in the books of the Association.

**Section 2.  Invalidity:**  The invalidity of any part of these By-Laws shall not impair or affect in any manner the validity, enforceability or effect of the balance of these By-Laws.

**Section 3.  Captions:**  The captions herein are inserted only as a matter of convenience and for reference, and in no way define, limit or described the scope of these By-Laws, or the intent of any provision thereof.

**Section 4.  Gender:**  The use of the gender in these By-Laws shall he deemed to include the **masculine, feminine or non- gender of the unit owner** and the use of the singular shall be deemed to include the plural, whenever the context so requires.

24

3055300/000401

DRAFT

**Section S. Waiver:** No restrictions, condition, obligation or provisions contained in these By-Laws shall be deemed to have been abrogated or waived by reason of any failure to enforce same, irrespective of the number of violations or breaches thereof which may occur.

**Section 6. Insurance Trustee:** The Board of Directors may appoint a Trustee to distribute large amounts of any insurance proceeds. The trustee so appointed may be any individual or entity, so long as such is properly bonded in relation to the funds and responsibility involved.

## ARTICLE XI

### Amendments to By-Laws

**Section 1. Amendments to By-Laws:** Except as hereinafter provided, these By-Laws may be modified or amended by the vote of 66-2/3% in number and in common interest of all unit owners.

## ARTICLE XII

### Execution of Instruments and Seal

**Section 1. Execution and Instruments:** All instruments of the Condominium shall be executed under seal by such officer or officers as the Board of Directors may designate, or as may be otherwise authorized.

**Section 2. Seal:** The seal of the Condominium shall be as determined by the Board of Directors from time to time.

## ARTICLE XIII

### Conflicts

**Section 1. Conflicts:** These By-Laws are set forth to comply with the provisions of Sections 917 and918 of Chapter 33, Title 28, Virgin Islands Code. In case any of these By-Laws conflict with the provisions of said statute or of the Declaration, the provisions of said statute or of the Declaration, as the case may be, shall control.

25

3055300/000402

Joint Appendix Vol. II Page 1435

DRAFT

## EXHIBIT I

Rules and Regulations
for
Cowpet Bay West
2012

1. No articles shall be placed on any of the stairways, railings, or entry bridges.

2. Balconies and street-side porches shall be kept neat and clean, and no articles shall be swept or thrown from them. No laundry, laundry lines, or other unsightly articles shall be placed on the balconies, porches or other common areas and facilities.

3. Radio or television antennas are prohibited and no sign, notice, advertisement or illumination shall be displayed on or at any window or other part of the building.

4. No owner shall make or permit any disturbing noises in his unit or within the common areas and facilities, or do anything, or permit anything to be done wherein which will interfere with the rights and reasonable comfort and convenience of other owners.

5. No inflammable, combustible or explosive fluid, material, chemical or substance is permitted in any unit, except for normal household use.

6. Dogs and farm animals are prohibited, and owners will be fined as specified by the Board of Directors. The Association may require removal of any animal when it becomes bothersome to others or is deemed by the Association to be unacceptable.

7. No garbage or trash will be left or disposed of on or adjacent to the property – except in a dumpster, if such is provided by the Association.

8. One space per unit is provided for parking automobiles on the property. Additional vehicles may be allowed by Management based on space availability. Any vehicle not currently registered and licensed will be considered a derelict and will be towed.

9. No boat, trailer, heavy commercial or non-self-propelled vehicle shall be parked on the property. No vehicle shall be parked in any manner restricting passage of any emergency vehicles, such as ambulances, fire trucks, etc. No vehicle shall be parked so as to impede ready movement by another vehicle, nor shall it be parked in any space assigned to another unit without permission of the said unit owner. Any vehicle in violation of these rules may be towed at the vehicle owner's expense.

10. Beach users shall clean up and remove any trash or other articles on the beach for which they are responsible.

11. The use of barbecues on seaside galleries is prohibited.

26

3055300/000403

DRAFT

12. The number of persons occupying a unit on a routine basis is limited to two per bedroom. Additional "guests" are permitted not to exceed thirty days total per year.

3055300/000404

Joint Appendix Vol. II Page 1437

DRAFT

**Attachment #2**

**Owners' Common Interest**

**30 April 1998**

**Unit Type**
        **%Common Interest**

2 Bedroom
        .911

**Leeward**
#1,2,3,4,5,7,8,9,10,11,12
13,14,15,17,18,23,24,25
26,27,28,29,31,32,33,34,
35,36,37,39,40,41

**Windward**
#3,4,5,6,7,9,10,11,12,13
14,15,16,17,19,20,21,22
25,26,27,28,29,30,31,33
34,35,37,38,39,40,41,47,49

3 Bedroom                                                    **1.062**

**Leeward**
#6,16,19,20,21,22,30,3B,42
,43,44,49

**Windward**
#1,2,8,18,23,24,32,36,42,4
3,44,45,51

2 Bedrooms plus Loft                              **1.193**

                Leeward: # 46,48

                                                    **Windward: #**
4B,50

28

3055300/000405

DRAFT

3 Bedrooms plus Loft                     **1.376**

            **Leeward: #** 50

                                                  **Windward: #**
46,52

4 Bedroom                                   **1.301**

                **Leeward: #** 45,47

29

3055300/000406

Cowpet Bay West
Board of Directors Meeting
February 7, 2011

Present: Judi Kromenhoek, Ed Wardwell, Rosie Wells, Bob Cockayne, Barbara
Walters, Greg Miller, Jon Cassady, Louanne Schechter
Max Harcourt is currently hospitalized following emergency surgery.

Minutes of January 11, 2011: The minutes of the January Board of Directors
meeting were unanimously approved.

W-27: Jon reported the seaside sliding doors to this unit are being pinched from
spalling rebar. The Association will repair the doors. The Association will not be
responsible for replacing tile. Tile is the responsibility of the owner.

Treasurer Report: Total cash accounts have a balance of $549,400.18. The
Reserve Account total is $501,944.61 with the remainder in the Operating accounts.
Louanne reported that the 2nd payment for the insurance was paid from the
operating account. There are not sufficient funds in the operating account to make
the third and final payment of $60,783.33 The Directors made a resolution
RESOLVED, that an authorization of transfer of designated funds - Future Repairs and
Replacement fund to undesignated funds –Operating fund was made. The funds will be
repaid from the operating fund with a 1% interest rate over the next 10 months (March-
December 2011.

Proposed 2011 Budget: The Directors unanimously approved of the proposed
budget.

3055300/000407

Manager Report

Systems: Filter changes for systems occurred as scheduled on the first Tuesday of the month.

Security Lights Parking Lot: All but 2 posts have been adjusted to the correct height. The remaining 2 require new poles/pad. These should be completed during the week, weather permitting.

Street side porch lights: The lights purchased have been installed. The dusk to dawn sensor requires some adjustment. Flickering off and on is a sign the adjustment isn't correct.

Security Guard: The guards have been punctual and professional and no complaints have been registered.

Beach: The appropriate permits were obtained and approximately 140 ton of sand was spread across the beach from West to East over the course of 1 day.

Old Business

Voting Procedure: The Directors agreed that the voting should be kept confidential. Current Board members may check the ballots and votes; however,

3055300/000408

any Director disclosing any owners' vote will be removed from the Board. All Directors were in agreement.

**Procedure for Bylaw changes:** · Proposals will be brought before the members at the annual meeting.

**Meet & Greet:** The Meet & Greet is scheduled for Roberts American Grill, Thursday, February 10th, 2011, from 5p-7p. Rosie invited the candidates. Rosie and Judi will obtain sodas, beer, and paper goods. The Directors were asked to get there early to help set-up and clean-up.

**Insurance:** Our agent has a conflict and can not attend the meeting. Bob has compiled a list of questions for the agent, Colin Probyn. Judi said Colin will have the answers before the Annual Meeting.

**March BOD:** No date was set.

**Adjournment:** There being no further business, the meeting was adjourned.

## ACTION ITEMS

| | |
|---|---|
| Report to BOD method used to repair W-27 | Jon |
| Completion of new poles for Security Lights | Jon |
| Beer/Wine/Paper Products for Meet N Greet | Judi/Rosie |
| Handouts for Annual Owners Meeting | Louanne |
| Follow-up with Insurance Agent | Judi |

3055300/000409

DRAFT

# Cowpet Bay West
## Annual Owners Meeting
### February 12, 2011

**Call to Order:** The Annual Owners Meeting was called to order by President Judi Kromenhoek at 9:10 a.m. at Robert's American Grill. Board members present were Judi Kromenhoek, Bob Cockayne, Barbara Walters, Rosie Wells, Greg Miller, and Max Harcourt. Owners were directed to sign in upon arrival (Exhibit 1, sign in sheets for owner attendance).

**Quorum Verification:** Louanne Schechter tallied the attendance Record and verified that a quorum (1/3 of authorized votes) was present by proxy and attendance.

**President Report:**
- ❖ Judi welcomed all owners and thanked them for attending today's meeting.
- ❖ Judi acknowledged and commended the Board of Directors for volunteering their time and talents throughout the year.
- ❖ Judi acknowledged and credited the management staff, Jon & Louanne, for their professionalism and assistance throughout the year. Each staff member was thanked for their work and loyalty to the owners of Cowpet Bay West.
- ❖ New owners, L-33 Duzy & L-07 Birt families, were asked to stand and welcomed to the community.
- ❖ Judi introduced the candidates running for the Board of Directors.
- ❖ Judi listed the projects & accomplishments throughout the year:
  - ▪ **Restoration following Fire to W-23:** The restoration process took 9 months to get settled and paid. During this period the Board of Directors became aware of inconsistencies in the Bylaws that caused confusion between the Insurance agencies, owners, and the Association. (Insurance to be discussed)
  - ▪ **Seaside Rails:** All damaged seaside rails were removed and replaced. Rails were repainted.

1

305530/000410

DRAFT

- **Generator:** The 20 year old generator is in good shape, the circuit board needed to be replaced. This was not easy but Jon located a new board and had Kent Harvey install it. Since the company that manufacturers this is no longer in existence, Kent Harvey rebuilt the components in the old board for a back-up.
- **Fresh Water Booster:** Responding to complaints of low water pressure to Leeward units, a water booster pump was installed and corrected the problem
- Gravel Walkways: Walkways on Leeward and Windward were improved by adding crushed gravel.
- **Transformers:** As part of a 3 year plan, all but one transformer was replaced. The remaining transformer will be replaced this year completing a total upgrade to the High Voltage Electrical system.
- **Security Gate:** The conduit that supplied power to the gate, under the road was compromised causing power outages whenever it rained. The conduit was removed and replaced, the road repaired, and the gate is operating without incidence.
- **Transfer Station Building:** Jon noted the concrete roof over the transfer station was cracking and compromised. The roof was removed and replaced without incident.
- **Beach:** Hurricane Earl was responsible for loss of sand on the beach. After obtaining appropriate permits, the Elysian, Cowpet Bay East, and Cowpet Bay West split the cost and provided the workforce to spread 140 tons of sand back onto the beach. New Swim Buoys are in place, and as of today 24 more beach chairs have been added to the beach.
- **Security Streetlights:** Before hurricane Earl, our security streetlights were replaced with new energy efficient fixtures designed to throw a maximum amount of light down to the parking lot. During Earl, Cowpet Bay East lost most of their parking lot light globes while our lights were left intact.
- **Fresh Water Filtration System:** Upon inspection, the existing filtration system required upgrading. The new system was installed.
- **Security Guards:** During the last year, our Association hired different companies with the same results, guards coming late, leaving early, or sleeping on the job. The

2

3055300/000411

DRAFT

current company, No-Nonsense Security, has been with us approximately 5 months and is professional, personable, and friendly.

**Reading of the 2010 Annual Owners Meeting Minutes:** Motion was made and seconded to waive the reading of the 2010 minutes. Copies of the minutes were available for members upon request.

**Proof of Notice of Meeting:** Oocumentation of notice was presented by the Association Office Manager, Louanne Schechter. (Newsletters: November 2010, December 2010, January 2011, February 2011.)

**Property Manager Report:**

**Electrical Upgrade:** Jon reported when he was hired, the complex did not have an ongoing maintenance plan for infrastructure. In 2008 he developed a long term plan to upgrade and maintain the Electrical System. In 2009 Jon brought an electrical engineer to the property to inspect the entire system. The engineer, Kent Harvey, then developed a CADD (computer aided design and draft) program outlining the entire system with all the technical data. Where needed and available, crucial back-up parts were ordered and kept in stock. In 2010, The 3 phase transformer on Windward which runs the beach well, lift station, and fresh water distribution system was replaced. All transformers were balanced for even power distribution. Going forward in 2011, the 3 phase transformer removed from Windward was sent back to the states to be reconditioned. When available, projected in the summer, the reconditioned transformer will replace the last "original" transformer located at the Windward circle which runs the RO Plant, the WWTP, and controls the high voltage systems. Jon proposes in 2012 to replace the disconnect breakers on each building.

**Territorial Pollutant Discharge Elimination System Permit:** During 2010 this permit was up for renewal. The process included inspections of the Waste Water Treatment Plant, Reverse

3

3055300/000412

DRAFT

Osmosis Plant, Grey Water Processing, and Fresh Water Distribution as well as General Maintenance. Along with inspections there were endless forms and reports. Cowpet Bay West was approved for the next 5 years and there were no deficiencies found by DPNR.

Generator: During Hurricane Earl, a WAPA power pole and transformer split and landed near the generator. This power to ground surge, we believe, fried the circuit board that controls the automatic functions of the generator. Jon had to manually start the generator and shut it down until a new mother board could be located. The companies that manufactured the generator and the switch gear both had gone out of business. With the help of Kent Harvey, we were able to locate the last known circuit board. When Mr. Harvey installed the new board, he kept and has since rebuilt the original board so we would have a back-up. We have set a 45 minute time delay on the generator to prevent the power surges during false start-ups (the on-off-on- off when power is restored). The generator will power down when electrical power is restored for 45 consecutive minutes.

Masonry: Jon performed a thorough inspection under the buildings and the grey water cisterns. Monies spent this year under the account masonry were used to repair the undersides of some of the buildings that had so much spalling they required immediate attention. Under this year's budget he will continue to repair these areas which include leaking cisterns.

Sewage & Grey Water: Included in 2011 Budget is the project to replace the fractured grey water lines. Jon is looking for a new contractor to do this project. The remainder of the monies are to purchase motors and blowers for the grey water system, which are still running on the originals.

Air Pollution Permit: Jon reported the air pollution permit which regulates the usage of the generator is up for renewal this year.

**Treasurer Report**

4

3055300/000413

DRAFT

**2010 Expenditures vs. Budget and 2011 Budget:**
Copies of the 2010 budget and the 2011-projected budget were available for owners. Barb reported that the cost of increasing the insurance in 2010 to 2 million and the pre-pay for the insurance in December for 2011 were the major factors in the deficit for 2010. Other contributing factors were costs that were unforeseen and not in the budget such as replacement of a leaking transformer and high voltage power lines.

Barbara made a motion the 2011 budget be accepted as presented, the motion was seconded, all were in favor.

**Cash Equivalents & Member Equity:** Barbara reported cash equivalents and member equity and a handout was provided to owners.

**Insurance Summary:** Judi reported on the current insurance policies. A summary sheet was provided for all owners.

**Roll Call:** Owners were asked to identify themselves as their names were called. Owners that were holding proxies were asked to identify themselves as proxy holders. There were owners of 43 units and owners holding 39 proxies for a 73.2% of authorized votes.

**Old Business**
There was no old business brought before the Board.

**New Business**

Bylaws review and update: Judi reported the only by-laws found on file in the Virgin Islands are the ones from 1974. She stated our Bylaws need to be updated. The tragic fire enlightened us on what is and what is not covered by our master insurance policy. A lot of owner thought they were covered when they were not. Anna Paiewonsky (attorney L-04) stated that she believes

5

3055300/000414

Joint Appendix Vol. II Page 1447

DRAFT

the 1998 Bylaws superseded 1974 declarations, and that they were properly filed. Accordingly, subsequent Bylaws should be in effect. Attorney Chuck Waggoner (L-46) has agreed to help us write the bylaws to meet the owner needs. There has been a lot of confusion on the wording on the insurance coverage of owner units vs. CBW Association responsibility. Chuck has written bylaws for several condo complexes. He is very familiar with bylaws and how they should read. The original bylaws were written to protect the lender (Chase Bank) at the time. We need to have them read to protect the owners and our insurance needs. Anna Paiewonsky volunteered to work with Chuck Waggoner on this endeavor.

Max Harcourt made a motion that the Board of Directors continue to operate under the 2007 Bylaws. The motion was seconded by the floor and all were in favor.

Following discussion from the floor, a suggestion was made to start a committee that addresses our current Insurance coverage, what is required by our bylaws, and what is requested by our owners. The committee would send recommendations to the Directors within 30 days of their formation.

**Proposal to Amend Bylaws to include No Dogs on Property:** Bob Cockayne would like to amend Article V, Section 11, found on page 13 (of the 2007 Bylaws), by adding new section6: "Dogs and farm animals are prohibited, and owners will be fined as specified by the Board of Directors. The Association may require removal of any animal when it becomes bothersome to others or is deemed by the Association to be unacceptable."
Amend Exhibit I, Rules and Regulations for Cowpet Bay West by deleting section number 6, found on page 18.

**Petition for dogs to be allowed:** Joel Kirshenbaum asked what happened to the petition begun last year to allow specific size dogs on the property. Judi reported the matter was discussed in the April 2010 Board of Directors Meeting and tabled to be discussed at the 2011 Annual meeting.

6

3055300/000415

DRAFT

**Election of Board Members:** The nominating committee reported the two candidates with the most votes were Bill Canfield and Sharon Koehler.

**Adjournment:** There being no further business, the meeting was adjourned.

8

3055300/000416

Cowpet Bay West
Board of Directors Meeting
March 8, 2011

Present: Max Harcourt, Barbara Walters, Rosie Wells, Bob Cockayne, Greg Miller, Sharon Koehler, Bill Canfield, Jon Cassady, Louanne Schechter

Meeting Ground Rules: Max requested Directors and guests conduct all business before the Board in a civil, professional manner treating each other with courtesy and respect.

L-01: Herb Horwitz came before the Board of Directors to discuss his reasoning for non-payment to the electrician. The Directors stand by their former decision that the responsibility of payment is with the owner. Max made a motion the Association pay $600 of the bill as a Good Will Adjustment. The owner will be responsible for the balance and late charges.

W-27: Dr. Felice asked for minutes of the Organizational Meetings. Max stated the results of the first and second organizational meetings did not meet the Bylaw Requirement of vote by majority, votes were secret ballot, and no minutes were kept. The third meeting lead to a majority vote and minutes are available.

   Dr. Felice was told last month that his seaside sliders would be repaired within a week. Jon contacted Karl yesterday, when he was informed the doors were still not fixed. Karl said he would be out on Wednesday. Dr. Felice has a scheduling conflict and will reschedule with Karl. Dr. Felice asked in the event the tile on the deck was broken who would replace it? Directors agreed the tile on the porch is the responsibility of the owner. The Association is responsible for the structural repairs.

   Dr. Felice wanted to know the exact difference of votes between the 2nd and 3rd place candidates. Louanne believed there was a margin of 5 votes the results are in the safe.

1

Minutes of February 7, 2011:  The minutes of the February Board of Directors meeting were unanimously approved.

Treasurer Report:  Sharon reported there was approximately $565,000 in cash accounts.

Greg requested the Directors have a Profit and Loss statement available each month.

Sharon stated she will provide a quarterly report for the Directors next month.

Sharon stated she doesn't have access to the bank accounts.  Max assigned Directors to assist Sharon to be added as signatory to the accounts.

There are 2 units in arrears more than 90 days.  Both have liens on the property.  The Directors suggested Sharon set-up a payment plan.  Owners will be informed that in the event scheduled payments are not made, utilities will be discontinued.

An offer was made by the broker for L-41 for the Association to accept less than what is owed.  Ma made a motion to accept the offer, the motion was 2ⁿᵈ the vote was 3-3.  The motion did not pass. Bob suggested the broker put all future offers in writing.

Resolution:  template to be provided by Jeanne Brennan, sample:  *The Board of Directors presente to the owners the 2010 actuals and 2011 budget.  The owners accepted the budget and therefore the Directors resolve to move $114,000 from the Reserve to the Operating Account.*

Review of Action Items from Owners Meeting:

Property adjacent to L-01:  Owner wanted to know if the property is zoned for boat repair.  Bill stated the property is zoned R-1.  It's his understanding that boats are stored there and owners may from time-to-time work on them.  Max made a motion that a Board member call CZM and DPNR

2

and inquire if boat storage/repair is appropriate for R-1 land. The motion was 2nd all were in favor Greg will call the agencies.

**Automatic Voltage Regulator:** An owner inquired if an AVR could be installed on the generator. Jon will contact Kent Harvey and report his findings.

**Extended Warranty for Reconditioned Transformer:** Jon will ask the company when the transformer is repaired.

**Extend hours of generator usage?** Jon and Anna will request extended usage when the air pollution permit is renewed this year.

**Electronic Bulletin Board on Website:** Max will investigate the options for an electronic bulletin board.

**Manager Report**

**Systems:** Filter changes were completed this month as scheduled. The Generator is performing without incident. The WWTP is within normal parameters. New blowers and motors were ordered and will take about 6 weeks before they arrive.

**Security Lights:** Maintenance has completed all but 2 of the security parking light adjustments. The remaining two are on Leeward and require new concrete bases and poles. The materials are on site and maintenance is working on them.

**Ritz-Carlton Meeting:** Jon attended the meeting posted by the Ritz-Carlton. They are in the preliminary stages of trying to obtain a Title 5 electrical system which would allow them to be self-sustaining and off WAPA's grid. Jon reported they offered no schematics, or basic information other than they would install a zero noise, zero emissions system.

3

**Owner Issue Flow Sheet:** Jon shared with the Directors a flow sheet for owner complaints that Louanne developed as a tool to record, track and report back to owners. The March Newsletter contained an article requesting owners to put all complaints in writing with details. Sharon suggeste the Association have a written policy for owners to follow when reporting a problem and the Association to follow once it's reported. She will present a policy next month. Greg suggested that the Association keep repair/maintenance logs for each system as well.

**Security Gate:** Jon reported the most recent issue with the gate is the circuit board for the exit pedestal is non-functional. Although a new circuit board can be ordered (actual cost 2009 was $3750) this gate was not designed to handle the amount of daily traffic. Jon suggested the gate be left open during normal business hours and an exit button, that bypasses the circuitry of the swipe cards) be used in the evening. Following discussion, Max made a motion an exit button be installer on the exit pedestal. Barbara 2nd, the motion passed 6 to 1.

**Vandalism:** Jon was called Saturday February 26th at 10:30pm by an owner that reported a broken security pole/light. The owner witnessed the event. Jon investigated. They were tenants and agreed to pay damages. The owner of the unit was notified and a follow up letter will be sent to th owner with an explanation of charges.

**Police Report:** A police report was made by an owner at Elysian when she witnessed a man lying in the bushes by the pool and firing a gun at the rooster as she was walking by him with a small child. She identified the man as an owner at CBW. Police came to the property to follow up on the complaint. The owner denied any fowl play.

**New Business**

**Office Computer:** The computer has no memory left and is more than 6 years old. The computer on order has an extended warranty of 3 years on site and cost $864. (plus shipping).

4

**Committees**

Bylaw:  Rosie Wells is Chairperson, Chuck Waggoner, Barbara Walters, Judi Kromenhoek, and Anna Paiewonsky are on this committee.  Chuck will initially submit changes to the committee.  Onc the committee agrees, they will forward to the Directors.

Landscape & Maintenance:  Bill Canfield is chairperson; Jon has volunteered to be on the committee.  Bill and Jon will schedule a walk of the property and invite whoever is interested to join them.
Judi Kromenhoek walked the property and submitted her recommendations for the landscape committee.

Insurance:  Bob Cockayne is chairperson. Max Harcourt, Herb Horwitz, Doug Rebak, and Jon met to organize the committee.  Bob has minutes for anyone interested.

Long-term Capital Planning:  Max Harcourt is chairperson.  Lance Talkington has volunteered to be on the committee, no meeting has been planned.

Social:  Rosie is chairperson, no meeting has been planned.

Nominating:  Bob Cockayne is chairperson, Holly McGuire, Joel Kirshenbaum, and Marilyn Blackhall volunteered for this committee.  Bob made a motion the Board approve the members, Max 2nd, all were in favor.

Max suggested all committees keep minutes and forward them to the Directors.  Sharon requested Directors be notified of meeting dates and times.

**Other Business**

5

3055300/000421

**Hen & chicks:** Bob stated that farm animals were not allowed on property and although the rooster is gone, the hen and chicks remain. Max made a motion the Association hire someone to catch the hen and chicks without harming them and have them removed from the property, the motion was 2$^r$ all were in favor

**AED:** The battery is dead on the AED. Jon said he has batteries on order.

**April Meeting:** The next meeting of the Board of Directors is scheduled for April 5th, at 8:45am.

**Adjournment:** There being no further business the meeting was adjourned at noon.

## ACTION ITEMS

| | |
|---|---|
| Letter to Herb Horwitz: Good Will Adjustment: | Max |
| W-27 Sliding Doors | Jon |
| First Bank Forms for Sharon | Greg |
| Fidelity Forms (if needed) | Judi |
| Banco Forms | Louanne |
| Resolution | Jeanne/Louann |
| Payment Plan | Sharon |
| Speak with Broker L-41 | Louanne/Rosie |
| Speak with Gita Rose Zoning | Sharon |
| Speak with DPNR/CZM boat repair next door | Greg |
| Recommendations from Kent Harvey AVM for Generator | Jon |
| Extended warranty for transformer | Jon |
| Extended hours for running generator | Jon/Anna |
| Electronic Bulletin Board | Max |
| Security Poles Leeward | Jon |

6

3055300/000422

Joint Appendix Vol. II Page 1455

| | |
|---|---|
| Policy for complaints | Sharon |
| Letter to Owners Vandalism/impose fines | Jon/Louanne |
| Hen and chicks removal | Bob |
| AED Batteries | Jon |
| Post minutes, date and times of meetings | Chairpersons |

Addendum to Meeting Minutes

Amended Resolution for

March 8, 2011

Association Resolution for Transfer of designated funds - Future Repairs and
Replacement fund to undesignated funds –Operating fund
Resolution of the Board of Directors of Cowpet Bay West Association
("CBW")
WHEREAS, CBW is a Condominium Association organized and existing under the
laws of the Territory of the U.S. Virgin Islands;
and
WHEREAS, the members desire that the Association shall act in full accordance
with the rulings and regulations of the Internal Revenue Service, as administered by the
Virgin
Islands Bureau of Internal Revenue;
NOW, THEREFORE, the members bereby adopt , on behalf of the Association;
The following resolution
RESOLVED, that an authorization of transfer of designated funds $114,000 - Future
Repairs and Replacement fund to undesignated funds –Operating fund was made.
This resolution is adopted and made a part of the minutes of the meeting of the
Board of Directors on March 8. 2011.
BY:
President
ATTESTED:
Secretary

7

3055300/000423

## Draft

**Cowpet Bay West**
**Board of Directors Meeting**
**May 10, 2011-0S-17**

**Present**: Max Harcourt, Barbara Walters, Greg Miller, Bob Cockayne, Bill Canfield, Sharon Koehler, Jon Cassady, Louanne Schechter

**Minutes of April 5, 2011:** The minutes of the April Board of Directors meeting were unanimously approved.

**Treasurer Report:** Sharon stated the total amount of cash funds is $555,408.
- Owner in Arrears- Letter was sent certified, return receipt- no receipt has returned-Sharon will resend letter.
- Owner in Arrears- Short Sale postponed- Directors agreed to extend their offer.

**Manager's Report**

**Infrastructure & Maintenance:** Filters were changed according to schedule.

**Grey Water:** Grey water system malfunctioned 5/2/11. The water distribution pump motor burned, controls would not function and voltage monitor was missing. System was repaired and functioning same day. Housing required welding to prevent future leaks.

**Transformer Covers:** Corrosion was eroding and causing a hazardous situation for the covers of the transformers. New anodized aluminum covers were fabricated for the transformers on Leeward, the Transformer on Windward Circle and the transformer near the generator. Covers were also fabricated for the junction box and each of the 4 splits from the junction box.

**Streetside Inspection:** Street side steps and railings were inspected and repaired on both Windward and Leeward.

**Streetlights:** All security lights were inspected and are in working order and physically secure.

**Owner fine for Vandalism:** A meeting is scheduled for May 19 with the Security Company and the involved parties to discuss fines.

**CBE Bylaws:** Andy LaPlace reported CBE is in the process of revising their Bylaws therefore, a copy is not available at this time.

1

3055300/000424

## Draft

---

**DPNR Inspection:** Jon reported he had received a written statement from Mr. Donadelle, DPNR Inspector, stating we were not in compliance as DPNR has misplaced our records. We have made copies and provided originals to DPNR.

**Request for external vent:** L-47 has requested an external vent for their stovetop. The manufacturer stated that as long as the filter is maintained, there should be no grease coming through the vent. They will guarantee the product. The Directors agreed to allow the vent if the owner agreed to be responsible for any discoloration of exterior paint around the vent.

**Old Business**

**Insurance:** Bob handed out minutes from the previous meetings of the insurance committee. The committee requested a new appraisal be completed. Shep Barrows completed the appraisal as requested. The committee is reviewing options based on this current information and will present their findings and recommendations at the June Board of Directors Meeting.

**L-01 Electrical Repairs:** The owner retracted his statement that he would abide by the decision of the Board as he feels he should not be responsible for paying the electrician. The Directors rescind their goodwill offer and the $600 will be added back to his statement. The owner has requested to meet with the Executive Committee. Max agreed to meet again.

**Owner Initiated Issues Policy:** The directors suggested the new policy be uploaded to the website. Max will upload. The Directors would like to have a "form" that can be downloaded for owners to complete and submit.

**Operating Accounts:** Louanne will obtain the paperwork to remove Judi and Ed from the account and add Bill and Sharon.

**Debris in neighboring property:** Greg Miller will approach CZM and DPNR with the issues of debris and hazardous materials on the site.

**Light Poles:** It was noted by a Director that many of the light poles are crooked. Jon explained the extensions to the existing poles exaggerated the lean of the poles. To "straighten" them would be a major expense of chipping concrete, following the wiring, new conduit, new poles, etc. Max suggested the idea be added to long-term projects.

**Insurance Bid:** Insurance bids were obtained at the request of the insurance committee. It was suggested, next year, the committee provides the criteria for the bidding process next year, well in advance, to make comparisons relevant.

**W-27:** The office contacted the contractor and asked him to inspect the slider as it was sticking. The contractor went to the unit and was asked (by the owner) to reschedule at a time more

2

Draft

convenient for the owner. The Owner has not contacted the office of a new time or date or if the work was completed.

**Security Gate:** The Directors agreed to maintain the security gate with the exit button.
**Security:** The Directors discussed suggestions from owners regarding security measures. The Directors asked Jon to initiate the following measures:
- Guards will add unit # to their log sheet when recording vehicle make-model-time
- Guards will utilize manual bar gate when electric gate is not functioning

**Electronic Bulletin Board:** Max created the electronic bulletin board. Owners will be notified of the electronic bulletin board by newsletter and on the website.

**Striping:** Directors instructed Jon to have the **NO PARKING ZONES** repainted. Long-term, Max suggested the parking spaces be striped.

**NEW BUSINESS**
**W-7:** Owner notified Directors they have not received any follow-up on some issues. Jon will email Owners.

**Dogs on Property:** An owner notified the Board of a pedestrian walking his dog on property. The Directors agreed to post **NO DOGS ALLOWED** signage by the well pump.

**Property Walk-around:** See attached notes from Board member walk around. Max will discuss recommendations with Jon following meeting. Jon was asked to put significant findings on the maintenance schedule.

**Owner Storage:** The office has received several requests for owner storage. Jon will inspect storage areas for any empty cages. A note will be posted in the newsletter that owners are allotted one storage space per unit and no flammable materials are to be stored.

**Office AC Unit:** A bid was presented to replace the ac unit in the office. Attempts by the vendor to remove all mold and smells have failed. The Directors agreed to replace the unit.

**Reimbursement Request:** The office received a request from an owners' family member to be reimbursed for medical expenses. The family member never reported the incident to the Association. Jon will investigate the incident and provide a written report of the incident and follow-up.

**Balusters:** Bob stated replacement balusters on one unit appeared to be different then the existing ones. Jon stated the goal is to maintain the same appearance but that materials used 40 years ago have changed slightly over the years. He will inspect.

3

3055300/000426

## Draft

**Street side rails/steps:** Street side rails and steps will be sanded and painted in August, weather permitting.

**Scorched paint on exterior of unit:** The staff noted scorching of the exterior paint behind a propane grill on one of the units. The Directors agreed the owner is responsible and will be contacted by letter.

**Next Meeting:** The next meeting of the Board of Directors will be June 14, 2011 @ 8:45am AST.

**Adjournment:** There being no further business, the meeting was adjourned.

### ACTION PLAN

| | |
|---|---|
| Owner in arrears-resend certified, return receipt letter | Sharon |
| Meeting with Owner/Renter/Security May 19, 2011 | Jon |
| CBW Bylaws forward copy to Barbara | Jon |
| Letter to owner regarding external vent | Louanne |
| Create Form for owner issues | Sharon/Max/Louanne |
| Operating accounts signers | Louanne |
| Letter to DPNR/CZM | Greg |
| Inform Security Company to add unit #, and use pole | Jon |
| Notify Owners of Electronic Bulletin Board by Newsletter/Web | Louanne |
| Paint "NO PARKING ZONES" | Jon |
| Email W-7 | Jon |
| "NO DOGS ALLOWED" signage | Jon |
| Owner storage: Newsletter | Louanne |
| Investigate incident report L-40 | Jon |
| Inspect recent repaired Balusters | Jon |
| Letter to owner scorched paint | Louanne |

4

3055300/000427

DRAFT

**Cowpet Bay West**
**Board of Directors Meeting**
**June 14, 2011-06-15**

**Present**: Max Harcourt, Barbara Walters, Bob Cockayne, Rosie Wells, Sharon Koehler, Jon Cassady, Louanne Schechter

**Minutes of May 10, 2011:** The minute of the May Board of Directors Meeting were unanimously approved.

**Treasurer Report:** Sharon reported the total cash accounts as of May 31 are approximately $558,497. Of this amount, $464,776 is reserve funds. Sharon will present a quarterly summary next month of actual vs budget for the second quarter. Items that were purchased this quarter but not budgeted were fuel for the generator, water leaks, and beach drainage.

The Directors asked for a report on owners in arrears: Sharon reported she had not received a response from her letter to one owner that was in arrears, the letter was sent return receipt, but was never picked up from the post office and was returned to the office. She will resend. That owner did make a payment this month. The second owner did not sell the unit as planned and has filed bankruptcy. Louanne requested the Directors obtain legal counsel. Barbara made a motion that legal counsel be hired the motion was 2nd and all were in favour. The Directors instructed Louanne to contact Anna Paiewonsky for legal counsel. Louanne reported that the total for owners in arrears was approximately 19,000.

**Manager Report**

**Infrastructure & Maintenance:** Filters were changed according the maintenance schedule.

**RO Plant:** Due to the continuous rains during the last 4 weeks, the RO plant ran a minimal amount of time without problems. The cisterns are over capacity with the rains.

**Electrical Systems:** The transformer that was sent to the states to be rebuilt is on schedule to be completed in 2 weeks. Once the transformer is on island, Mr. Harvey will direct its placement and installation in the Windward circle and reroute lower Windward power and eliminate the exposed high voltage line from Leeward to Windward that runs across the rock wall. Weather permitting; we hope to have Mr. Harvey on island mid July. This will complete the 3 year plan for replacing the electrical high voltage grid.

**Grounds:** The groundcover is infested with bugs that are eating the leaves. ABC nursery is scheduled to spray the grounds, but due to no break in the weather over the last 5 weeks, they have not been out. The grounds crew have also been ineffective in spraying due to the rains.

1

3055300/000428

DRAFT

There is a tropical wave expected to bring rain on Wednesday, ABC will try to spray Thursday or Friday depending on the amount of precipitation.

**Security:** Jon reported there were two incidents since the last Board Meeting. The first incident involved vandalism of 2 vehicles on Leeward occurring sometime after midnight. Both had windows smashed. One of the vehicles had a laptop inside that was stolen. The second incident occurred about a week later. An owner reported cash and wallet stolen from his unit with no forced entry between 12:30-1:30pm on a Sunday afternoon, while they had lunch on the seaside deck. The contents of the wallet and the money clip were found several days later by the contractors building the retaining wall in the gut. They found the contents in-between the cinder blocks as they were moving them off the pallet to build the wall.

Jon increased security by adding an extra guard immediately following the first incident. Two security guards were posted with one stationary and the other roaming. Following the second incident, the guard hours were expanded to cover from 6p to 6a. Jon reported there were 10 homes burglarized in Cabrita Point this month alone. Recommendations from the police and our security company were to remove the "No Dogs Allowed" signs and add more surveillance cameras.

The Directors instructed Jon to get bids on surveillance cameras. The Directors instructed Louanne to advise owners of the events. She reported she had described the events in the June newsletter.

**OLD BUSINESS**

**Leeward 1:** The executive committee met with the owner of Leeward 1 to discuss the unpaid electricians invoice, late fees and finance charges. The owner insists the problem was caused by flooding and therefore should be covered by Association funds. Max made a motion the Association remove electricians bill, fines and finance charges associated with the unpaid bill. The motion was 2nd, 4 voted yes and one abstained.

**Insurance Committee:** Bob reported the committee met with representatives from Tunick, Executive, and Mapfre insurance to verify that our current coverage is sufficient in light of the the recent updated property evaluation. The insurance representatives stated we are underinsured with the current 90% co-insurance clause. The committee is obtaining bids and will forward the information to all Board members as soon as they are available. Max stated he may call a special meeting when the information is available. The Directors asked the committee to obtain, if possible, favourable group HO-6 rates from each of the vendors.

**Greg Miller Resignation:** Greg Miller publically resigned from the Board through an email to the community. Max reported it was the responsibility of the Directors to appoint a member to the Board until the Annual Owners Meeting in February. This year would be the third year of Mr. Miller's term. Following discussion, Sharon made a motion Vince Verdiramo (L-5) be

2

3055300/000429

Joint Appendix Vol. II Page 1462

DRAFT

appointed to the Board of Directors. Max 2nd, all were in favour. Sharon will contact Mr. Verdiramo of the Board's decision.

**Bylaws Committee:** Rosie said due to critical illness in her family, she was unable to follow-up on any progress Mr. Waggoner may have made. Max stated the most pressing issue with the Bylaws is clarifying the responsibility of the owner and the responsibility of the Association in maintenance and insurance issues. He stated Greg developed a matrix that should be incorporated in the Bylaws to clarify this issue. Barbara suggested Rosie contact Vince for assistance. At this point, Max excused himself from the meeting. Bob excused himself from the meeting.

**July BOD Meeting**: The next meeting of the Board of Directors will be July 12, at 7:45am.

**Adjournment**: There no longer being a quorum, the meeting was adjourned. Items not discussed will be tabled until next month's meeting.

## ACTION ITEMS

| | |
|---|---|
| Send copy of arrears letter | Sharon |
| Obtain legal counsel re: bankruptcy | Louanne |
| Cost to increase surveillance cameras | Jon |
| Provide information from Insurance Committee to Board | Bob |
| Inquire about group HO-6 Policy rates | Bob |
| Contact Mr. Verdiramo of Appointment to Board | Sharon |
| Invite Mr. Verdiramo to work on Bylaws Committee | Barbara |

3

3055300/000430

**Cowpet Bay West Condo Association**
<u>Board of Directors Meeting</u>
Tuesday, June 14, 2011, 8:45 AM
Cowpet West Office

Below is the agenda for the meeting - if additions should be made, please bring them up
at the beginning of the meeting.

Meeting Ground Rules: *Respect!*

Call to order

Review and approval of May 10, 2011 Minutes

Treasurer's Report

Manager's Report

Old Business
        Insurance
        By-Laws
        Owner's Storage Space
New Business
        Resignation and Replacement of Greg
        Vandalism and Security

Review Action Items from this meeting

Adjourn

3055300/000431

12/2/12                          Gmail - Fwd: Board of Directors Meeting



# Fwd: Board of Directors Meeting

**JERSEYBARB@aol.com** <JERSEYBARB@aol.com>                    Sun, Dec 2, 2012 at 1:55 PM
To: jkromes@gmail.com

From: cowpetbaywest@hotmail.com
Sent: 6/14/2012 2:38:48 P.M. Eastern Standard Time
Subj: Board of Directors Meeting

TO: The Owners Cowpet Bay West Association

FROM: Ed Wardwell

SUBJECT: Board of Directors Meeting

Here are the highlights of Tuesday's Directors Meeting:

Property
- All systems are operating normally.
- The upgraded grey water transfer lines have been connected and are in service.

Treasury
- All of our 2012 insurance premiums have been paid in full.
- The treasurer, Sharon Koehler, will provide an analysis of our six-month operating expenses to the
Board at the August 7th Directors Meeting. You will be provided a copy of this report after Board review.

Planning
- Max Harcourt, Chairman of the Property and Planning Committee, submitted a comprehensive report
on the current status and projected upgrades for our property. Major future projects including roof
sealing/painting, structure maintenance and electrical system upgrades will be addressed in the 2013
budget.

Owner Requests
- The staff is currently servicing owner requests in Leeward 3, 31 & 37 and Windward 10, 12 & 31.

We will continue to respond promptly to all your written requests for service.

Legal Proceedings

- On June 6, 2012 the Association was notified by the US Department of Housing and Urban
Development (HUD) that "HUD has completed its administrative proceeding of this complaint (Barbara
Walters vs. Cowpet Bay West Association) under the Act (Fair Housing Act of 1968) and the compliant
is hereby dismissed."

3055300/000432

Joint Appendix Vol. II Page 1465

Draft

**Cowpet Bay West**
**Board of Directors Meeting**
**July 12, 2011**

**Present**: Max Harcourt, Barbara Walters, Bob Cockayne, Rosie Wells, Sharon Koehler, Vincent Verdiramo, Bill Canfield, Jon Cassady, Louanne Schechter
Herb Horwitz is in attendance by request of the insurance committee to answer any questions the Directors have regarding insurance.

**Minutes of June 14, 2011:** The minutes of the June Board of Directors Meeting were unanimously approved.

**Treasurer Report:** Our current bank balance as of end of June is $513,000 of which $442,899 is in the reserve account. The financials (budget vs actual) for the 6 month period were distributed and discussed. Sharon noted 2 issues (1) there was no budget for tree trimming and cost $20,000 and (2) there was $20,000 spent on beach drainage. CBR is splitting the cost of this project. They have the invoice but have not paid.

Sharon would like Louanne to investigate other options for phone conferencing that are more cost effective. Max has some suggestions and will discuss with Louanne after the meeting.

**Insurance:** Bob presented the information obtained by the insurance committee. The insurance committee believes CBW is underinsured going into hurricane season. The potential exposure is due to the low value of insurance being substantially less than the appraised value (half) and a 90% coinsurance clause; we would realize a 48% penalty for any claim less our deductible because the low value is higher than what we are insured.
The committee recommends we cancel our current policy and obtain a policy with MAPFRE for the total agreed value of $25,916,630. 2% Windstorm deductible ($518,332.60) with a premium of $272,124.62. Bob said that the policy is designed to insure each building individually. (See attached summary). Following discussion Max made a motion to accept the recommendation of the Insurance Committee to obtain the Mapfre Policy. Bill 2nd the motion. The vote was called: Vincent-no, Barb-no, Rosie-no, Bill-yes, Max-yes, Bob-yes, Sharon-yes. The motion carries 4 yes, 3 no. Vincent, Barb, and Rosie want the minutes to reflect they are against any increase at this time and will do nothing to implement this plan.

There was discussion regarding how to finance the policy. Louanne stated that of the monies in reserve, $225,000 is earmarked for capital improvements and $61,000 was borrowed from the Reserve Fund in February to make the final payment for the current insurance policy. She recommended a special assessment to pay for the entire premium and an increase of approximately $85 dollars per month to the insurance to be able to fund the renewal. Herb added that the agent offered financing with a 30-60-90 payment plan. Max will conference with Sharon and Bob to discuss funding the policy tomorrow.

Bob Cockayne left the meeting at this time.

**Bylaws:** Vince agreed to replace Chuck Waggoner on the bylaw committee. The committee will meet this week and forward recommendations to the Board of Directors.

**Owner in arrears:** Sharon sent an email to owner in arrears that they make $3000/month payment. When they default their utilities will be shut off.

1

3055300/000433

Draft

Bankruptcy unit: The sale of the unit was stopped by the bankruptcy court. Anna Paiewonsky was contacted and referred Louanne to call Mr. Hodge, an attorney that specializes in bankruptcy issues. Mr. Hodge reviewed the pacer account and noted that Scotia Bank had petitioned the court. Once the bank takes over the property as abandoned, the bank will attempt to make a short sale and we should be able to collect the common charges. He recommended the Association allow the bank to handle the legal issues as CBW would have to hire a lawyer in Maryland to handle the claim for us and the bank is the first mortgagee.

Louanne sent a letter to the bankruptcy lawyer asking if the property is still being rented, and if CBW will receive funds for utilities and common charges. The property appears to be empty. Bill stated the renter had left. Barb suggested we shut off the utilities, Sharon 2nd, all were in favour. Jon will inspect the unit today to be sure there is no garbage left behind.

**Meeting Format:** Following discussion by the Directors, the motion was made by Vince that all future meetings will be conducted in the following manner: initially, issues as determined by the entire Board shall be discussed in Executive session and upon completion of executive session the meeting will be open to general owners. Barb 2nd the motion. The vote was taken with 5 yes and 1 no. Max request the minutes reflect he voted no.

**Vandalism & Security:** The Directors discussed the letter they each received from Kellerhals & Ferguson on behalf of their client, a renter in W-37 (letter on file in office). Vince responded to an owner that the matter has been resolved. Vince also sent a letter from his law office to Kellerhals & Ferguson that the matter was discussed with his client and the matter resolved. The owner received documentation in writing of the incident.

Max made a motion the Board commend Jon for professional handling of lamp pole incident and that we are confident in his ability to continue to manage our property in the manner it needs to be done. Barb 2nd all were in favour.

**Guards:** Guards were increased temporarily following 2 incidents; one was car windows smashed on Leeward and the second was a theft. Jon recommends we reduce the overlap of guard hours and change to one guard from 6p to 6a.

**Managers Report**

**Retention Wall:** Completed

**Tree Trimming** Hurricane prep is completed. The Elysian did not remove coconuts from palms on our beach; that service (31 trees) was performed by the tree trimmers.

**Gray Water Transfer Line:** This project should begin this week and hope to have the backhoe in the morning.

**Electrician:** The rebuilt transformer should be completed and returned to property the first week of August. Once the transformer is on property, we will schedule Kent Harvey to wire the transformer and remove the exposed high voltage line.

**No Dog Sign:** Jon was advised by our security company not to advertise we don't allow dogs. The Directors would like a sign posted near beach drive.

2

Draft

**Balusters:** Inspections completed, we had a couple of issues on Leeward 12 and L-44. L-12 is complete at this time and L-44 to be inspected this week

**Surveillance Cameras:** Functioning cameras cost approximately $500 each. The installation cost depends on the location. Beach Drive, Gut, and Yacht Club Gate are the areas we have discussed. Jon believes we have sufficient light to view footage.

**Letter to Owner:** Letter was sent to owner explaining charges on his unit for vandalism by his renters.

**Incident Report:** Follow-up from fallen security light and pole. Jon inspected all security poles and found none requiring replacement. Owner came to office requesting reimbursement on his daughter's behalf for medical expense. Stated if she didn't receive check that day, her boyfriend would sue. Owner reimbursed her and is now requesting credit to his account. Vince made a motion the owner be reimbursed, Sharon 2nd, 4 voted yes and 1 no. Motion passed.

**ACTION ITEMS**

**Banco Forms:** Not done.

**OPNR response to neighbour property:** Not Done

**Letter to Owner External Vent:** Completed in May

**CBW Bylaws:** Not available at this time, being reviewed by their attorney.

**Direct Deposit for Owners:** Waiting for Ms. Richards of Banco to set up meeting.

**Parking Lot Striping:** Striping the no parking zones- scheduled for first of September when least amount of cars on property.
**Walk-Around Issues:** No scheduled at this time.

**Owner Issue Form:** Not completed

**Storage Space:** Suggest that we have a storage cleanup day during the week of the Annual Meeting.

**Planning Committee:** Max will provide minutes this summer.

**Owner Request:** Sharon requested all complaints be sent to Board members. Max, Barb, Vince, Bill, and Rosie do not want complaints sent to them, Sharon does.

**W-26 Request for Noise Control:** W-26 requested the Board of Directors speak with the Elysian before they award any contracts to restaurants on property about controlling the noise. The Directors agreed that we have not rights as long as they adhere to the laws on island.

**Next Meeting:** The next meeting will be August 9, 2011 at 8:45am

**Adjournment:** There being no further business the meeting is adjourned.

3

305530/000435

Draft

**ACTION ITEMS**

| | |
|---|---|
| Banco Forms | Louanne |
| DPNR Response | Max |
| CBE Bylaws | Jon |
| Direct Deposit Banco | Louanne |
| Parking Lot Striping (no parking zones) | Jon |
| Walk-Around Issues on Maintenance Schedule | Jon |
| Owner Issue Form | Max |
| Planning Committee Minutes | Max |
| Owner Request sent to Sharon | Louanne |
| Phone Conferencing Options | Max/Sharon/Louanne |
| Funding Insurance Policy | Max/Sharon/Bob |
| Informing Owners of Insurance Policy & Funding | Max/Sharon/Bob |
| Update Bylaws | Bylaws Committee |
| Baluster L-44 | Jon |
| Surveillance Cameras | BOD next meeting |
| Inspect bankruptcy unit/shut off utilities | Jon |
| No Dog Sign posted by gut/beach drive? | Jon |
| Response to W-44 Guards | Jon |
| Storage Space (table to Feb 2012) | |
| Copy of Letter sent from Vince to Kellerhals for file | Vince |

4

Joint Appendix Vol. II Page 1469

DRAFT

**Cowpet Bay West**
**Board of Directors Meeting**
**August 9, 2011**

**Present:** Max Harcourt, Barbara Walters, Bob Cockayne, Rosie Wells, Sharon Koehler, Vincent Verdiramo, Bill Canfield, Jon Cassady, Louanne Schechter

**Conference Call:** Directors were given a new conference dial-in number and participant code and asked to call back on the new service *Free Conference Call.* Although the conference call is free, there may be associated long distance charges by individual carriers and Directors were urged to use their cell phones. The meeting continued when all Directors were on line.

**Minutes of July 12, 2011:** The minutes of the July 12 Board of Directors Meeting were unanimously approved.

**Executive session:** Max made a motion the meeting move out of Executive Session. There were 3 votes yes, the motion did not carry

**Minutes of July 27, 2011 Special Meeting:** Sharon requested the cash reserve amount of $320,442 be amended to $372,336 in the minutes under the heading of Treasurer Overview, 3rd sentence. Max made the motion the figure be changed, Sharon 2nd, Bill, Max, Bob, and Sharon approved. Motion carried. There being no other changes, the minutes were approved with amendment.

**Tropical Storm Emily:** Jon reported the storm brought some rain and gusty winds, because it was well South of us it was not a problem

**Treasurer Report:**
As of July 31 in our reserve fund we have approximately $397,000 and approximately $96,000 in the operating accounts for a total of $494,000.

**Owner in arrears:** Owner replied they could commit to $2500/month but not the $3000 that was requested. The Owner is in arrears of $8,178. Max made a motion the Board accept the $2500/month Sharon 2nd, all were in favour.

**Insurance Rebate from Tunick:** Not arrived. Bob will contact Colin for the status of the check.

**CBR Bill:** Not paid for their portion of the Retaining Wall. Jon said Gene will be sending a check next week.

**Mapfre Insurance Policy:** The Policy has not arrived in the office. Max will follow up with the sales representative, Jose, as to when the policy will be available.
**Contact Information:** Louanne requested contact information for the office records. Sharon said she thought the information was on the binder. Max will obtain contact information. Max stated that Jose is planning a visit to St. Thomas this September and will bring a local representative with him to meet the staff and see the property.
**Systems not noted on Appraisal** Sharon asked what systems were not noted on the Appraisal. The systems not mentioned were: the fresh water, beach well, 3 lift stations, gray water, electrical control room, and the office. While Shep Barrows was on property last week, Louanne asked him if the items

1

3055300/000437

DRAFT

were omitted on his appraisal would they be covered by the insurance policy. He said, he wasn't sure he made any omissions, and then left without reviewing the appraisal. Bill will speak with Shep regarding the items.

**Budget Revision**: Sharon will contact Jeanne and work on the revisions and provide to the Directors. Max would like a target date of completion before the September BOD Meeting.

**Hourly Employee Compensation**: Jon reported he has no detrimental reviews for the staff and he proposes a 3% increase to all the hourly employees. Max made a motion the employees receive a 3% raise, Vince 2nd, 6 voted yes. Sharon said without knowing the 3% total of increases, she abstained and would like the minutes noted as such.

**OLD BUSINESS**

**Bylaws**: Vince said he had reviewed the Bylaws, made approximately 20 suggested revisions, and will send copies to the Directors for their review and input. The Directors should receive the revisions next week. Vince requested they review the changes and send him their comments.

**Bankruptcy Unit**: The utilities were disconnected as discussed in last month's meeting. As reported in the Special Meeting, the owner filed Chapter 7 in Maryland and the Bankruptcy Court approved it. The owner had a mortgage with Scotia Bank. Vince will follow-up with the Trustee to find out the current status of the property.

**NEW BUSINESS**

**Teleconference**: The service we are using today is a free conference service. Users may be charged a long distance carrier fee. It was suggested users utilize their cell phones if they have free long distance. The phone number and participant code will stay the same.

**Manager Report**

**Operating systems**: RO plant, gray and fresh water systems working well. The GenSet had a bad cell in the battery and new batteries were purchased and installed

**Capital Projects:**
- Gray Water Lines project to be completed in approximately 10 days
- Cistern Repair (Masonry) 2 cisterns that were leaking are completed.
- Transformer-Mr. Harvey confirmed yesterday the transformer rebuild is complete. He will oversee the shipping back to St. Thomas. When the transformer arrives, we will schedule Mr. Harvey to be in St. Thomas and complete the final phase of the High Voltage Project.
- Retaining Wall shared with Elysian: A third level of block was added to the "back splash". Gene is aware of the added work and will split the cost.

**Action Items**
- CBE Bylaws: Andy will have the completed revisions next week. Jon will obtain a copy and send to Vince

2

3055300/000438

DRAFT

- **Balusters**: Inspection of balusters are complete and repaired except for L-44. The owner had installed his hurricane shutters and would like the work completed after season, when the hurricane shutters have been removed.
- **Parking Lot Striping**: Scheduled for September.
- **No Dog Signage**: Have not completed
- **CBW Road Sign Damage**: The sign was found knocked over and broken. We don't know who or how it broke. We have contacted the original sign maker and waiting for his return call. We will obtain bids and pass on to the Directors.
- **Painting of Steps & Rails**: Scheduled for October
- **Work Orders**: Sharon said she is not getting the work order sheet. Louanne stated she was sending them out on Friday. Sharon agreed once a week would be fine and she will look for them on Friday.
- **Banco Forms**: New paper work was obtained. There is one form that needs to be signed by the Treasurer. Louanne will get Rosie's signature when she gets back on island.
- **DPNR**: Max reported that is on hold for now.
- **Direct Deposit**: Owners would be given the account and routing number. Owners would sign a form for electronic deposit. Barbara suggested we use a separate account for deposits, Vince suggested a lock box through the bank, Max wanted to know the fee schedule. Max asked Louanne to provide all info by the next meeting for a vote.
  Vince had to leave the meeting at this time. Max suggested we set the next meeting date before he left.

**September BOD Meeting:** The next meeting of the Board of Directors is scheduled for September 13, at 7:45am AST.

- **Long Term Plan**: Max would like a copy of the Long-term Plan mailed to him.
- **HO6 Policy rates:** Mapfre is not currently offering this type of policy.
- **Surveillance Cameras**: To be added to the long term planning area. Bill stated in retail business, cameras have not been effective.
- **Satellite TV:** Bill said that Dish is offering a great deal right now of free installation and the box. He would like to take advantage of that by finding a vendor for the complex. Jon is in talks with a vendor .

**Code of Ethics:** Sharon and Max raised the question about a code of ethics for the Directors. Max said he and Sharon would present at the next meeting.

**Adjournment:** There being no further business, the meeting was adjourned.

3055300/000439

Joint Appendix Vol. II Page 1472

DRAFT

## CURRENT ACTION ITEMS

| | |
|---|---|
| Letter to owner in arrears | Sharon |
| Contact Tunick Insurance re: insurance refund | Bob |
| Cowpet Bay Resort payment for retaining wall | Jon |
| Contact salesperson from Mapfre re: policy | Max |
| Speak to Shep Barrows re: systems missing from appraisal | Bill |
| Speak with Mapfre are all systems and office (not in appraisal) covered | Max |
| Contact information for Mapfre | Max |
| Budget Revision | Sharon |
| Bylaws first draft of revisions to Directors | Vince |
| Bankruptcy update on unit | Vince |
| CBE Bylaws send copy to Vince | Jon |
| No Dog Sign | Jon |
| Obtain bids for repair of road sign | Louanne |
| Work order sent weekly to Sharon | Louanne |
| Banco Forms | Louanne |
| Banco Electronic Banking Package to Directors | Louanne |
| DPNR | Max |
| Long Term Plan to Max | Jon |
| Update on HO6 policy from Mapfre | Bob |
| Satellite TV Vendors | Jon |
| Code of Ethics Presentation | Max/Sharon |

## PENDING ACTION ITEMS

| | |
|---|---|
| L-44 Baluster repair after hurricane season | Jon |
| Parking lot Striping in September (weather permitting) | Jon |
| Painting of steps and rails | Jon |
| Surveillance Cameras added to long term plan | Max/Jon |

4

Joint Appendix Vol. II Page 1473

Draft

Max Harcourt Suggested Revisions (in yellow)

**Cowpet Bay West**
**Board of Directors Meeting**
**September 13, 2011**

**Present:** Max Harcourt, Barbara Walters, Bob Cockayne, Rose Wells, Sharon Koehler, Bill Canfield, Jon Cassady, Louanne Schechter,
Vince Verdiramo is out of the country.
Lance Talkington (Leeward -03) announced himself as attending the telephone conference.

**Minutes of August 9, 2011:** Board members reported they did not receive a copy of the August minutes. A copy of the minutes will be emailed to the members and they will vote on them at the next meeting. (Copies were emailed during the meeting).

**Determination of Necessity for Executive Session:** No Executive Session was required.

**Treasurer Report**
**Budget Revision:** Sharon reported she collaborated with Jeanne Brennan, our accountant, on the revised budget for 2011. Jeanne provided analysis with the changes highlighted. Max made a motion to except the revisions, all were in favour.
Barbara made a motion to send the analysis as provided by the accountant to the owners, Rosie 2nd, all in favour.
**Pay off loan from Reserve fund:** Sharon made a motion to pay off the loan from the Reserve fund. She stated the total payment with interest is $54,981.37, the initial loan was for $60,783.33 and the interest is $298.04.
Bill 2nd, all were in favour.
**Transfers of monies:** Sharon will work with Louanne to transfer funds owed to Reserve Fund from the General Funds and transfer funds owed from Reserve Fund (capital projects completed) to General Fund.
**Payment from Elysian:** Sharon asked if we had received a check for the Elysian's portion of the beach and flood control project. Jon stated that he was meeting with Gene today. Max asked Jon to call him after the meeting.
**Bounced Check:** Sharon asked about bounced check- Louanne reported there were none last month,
**Bankruptcy Unit:** Sharon asked who was billed for the account in arrears. Louanne reported that Vince Verdiramo followed up on the ownership of the unit following the awarding of the bankruptcy court; the original owner has retained possession of the property. Louanne contacted the Real Estate agent and the closing attorney. The agent is rewriting the seller's contract as the previous buyer is still interested. The closing attorney, Marcia Resnick, has the current statement and will advise us what is collectable.

**Old Business**

**By-Laws Committee Report:** The committee request the discussion be tabled. Max requested the Directors submit their comments in writing as requested by Vince. Only one Director (Sharon) has responded to Vince's request at this time. Bob asked if the Directors are considered the Committee as a whole. Max stated yes.
Sharon reported she sent copies of Vince's suggested changes to Anna Paiewonsky and Herb Horwitz. The committee has not received any written comments from these owners.

10

3055300/000441

Draft

**Owners in Arrears:** Max asked the status of owners in arrears. The owner that has a payment plan is continuing to follow the plan. Another owner that was 90 days in arrears replied by email they were making a payment and would catch-up by December. Bob asked for the total dollar amount over 60 days in arrears. Sharon reported it was $28,466. Sharon's figure was the total for greater than 90 days. The actual 60 days was $5,528.03 [$21,705.54.] as of August 31. One payment was made reducing the total to $4,860 [$20,505.54] current.

**New Business**

**Code of Ethics:** Following discussion, the Directors agreed a written code of ethics is not necessary. The Directors agreed to improve on their communications and move forward.

**Security Gate:** The gate was open after Irene because the phone lines were down. The manual gate is broken at this time and repairs are being made. The security guards are stopping people in a professional and courteous manner.

**E-mail List:** Sharon requested **owners** email addresses are added to the Owners List. Bill stated trying to keep the list current is very difficult. Max suggested Louanne contact the owners and inform them that the Owners List will be updated with the owner's email(s) unless they contact the office that they don't want it included.

**Blog:** Sharon wanted to know why the newsletter stated that we don't have a blog. Louanne stated owners have called the office requesting clarification. The facts were placed in the newsletter as clarification for all owners. Lance was asked about the blog, but he had dropped off the line. Sharon suggested a Board member be appointed to preview the newsletter before it is sent. Max stated there was no problem and we should continue with the newsletter as we have.

**Resolution:** Sharon stated the resolution (from the February meeting) had never been completed and was not in the minutes. She stated it needed to be typed, and signed or put into file and it should be signed by the President and Secretary. Louanne stated the revisions were inserted into the minutes when the Board approved them. Louanne sent Sharon copies of the revisions, as she requested yesterday. Louanne was unaware the resolutions needed signatures and will obtain the signatures that Sharon is requesting.

**Manager Report**

**Infrastructure and Maintenance:** Gray and fresh water filters were changed 8/5/11. All systems are operating efficiently.
The RO has not been run recently due to the heavy rains.
**The generator** ran without problems during the storm. Jon switched the generator to manual after the storm while WAPA made any repairs to the area.
**Shutters:** We follow the mariners 3 day avoidance within the vector cone. Irene was made a named tropical storm on Sunday and passed by on Monday, shutters were not closed. There was no 3 days to prepare. Maria was a named Tropical Storm and we were within the vector. Owners were notified on Thursday and shutters were closed on Friday.

11

3055300/000442

Joint Appendix Vol. II Page 1475

Draft

**Transformer:** 3 phase rebuilt transformer should arrive on island in approximately 2 weeks. When it arrives, we will schedule the electrical contractor, Kent Harvey, to install the transformer and complete the high voltage system changes slated.

**Grey Water Lines:** The project is approximately 70% complete. The heavy rains have prevented any work for the last 2 weeks. Work will complete when weather clears.

**Elysian Payment:** Jon is meeting with Gene after meeting

**CBE Bylaws:** CBW has sent their bylaws back to their attorney and are not complete. Bob would like Jon to try to obtain owner responsibility and insurance portions of their bylaws if they are complete.

**Pump Systems:** Jon has information on the pumps to share with the long term planning committee

**Satellite Vendors:** Dish network was installed by Enrique Garcia in two buildings.

**Parking Lot Striping:** On hold until weather clears.

**Balusters:** Repair after hurricane season

**Painting of steps and railings:** When weather clears.

**Dish TV:** Jon reported that Enrique Garcia had installed units in Leeward, and he was pleased with the operation.

**Mapfre Insurance Policy:** Policy is in the office.

**Revision of Appraisal:** Shep will return and revise the appraisal to include the systems that were left off. Bill will contact Shep to revise.

**Contact information from Mapfre:** Available in office

**Road Sign:** Louanne reported another incident occurred where the concrete base was pushed over. The Board was asked if the sign needed replacing. The bid for the sign does not include the base. Max asked to get an inclusive bid.

**NO DOG SIGN:** Jon asked for verification. Max stated the Board had decided to place a NO DOG SIGN, by the beach drive

**Work Orders:** Louanne is sending the work orders on Fridays. She was unable to send this Friday as the hurricane shutters blocked the internet signal. There were no complaints to send.

**Banco Electronic Banking:** Waiting for return call from Banco. Louanne requested information on several options. She will send any info to Directors when available.

**DPNR:** On hold, per Max

**Long Term Planning:** Jon was asked again to send Max a copy of the LTP. Max is planning on scheduling a meeting of the committee in September.

12

3055300/000443

Draft

**HO6 Policy**: Mapfre will contact us when they have them

**Service Dogs**: Dogs must be registered with the ADA. VI does not have guidelines for service dogs.

**Next meeting**: October 11, 2011 at 7:45am.

**Adjournment**: There being no further business the meeting was adjourned.

### ACTION ITEMS

| | |
|---|---|
| August Minutes to BOD | Louanne |
| Transfer monies as calculated by Sharon to Reserve Fund on 9/14/11 | Louanne |
| Letter to Owners in Arrears | Louanne |
| Written comments on revisions to Bylaws | Directors |
| Repair manual Security Gate | Jon |
| Inform owners email address(s) will be added to Owner List | Louanne |
| Update owner's list to include email address(s) | Louanne |
| Send Resolutions from February & March Minutes to Max and Rosie for signatures | |
| | Louanne |
| Send LTP to Max | Jon |
| Gray Water Lines | Jon |
| Elysian Payment | Jon |
| CBW Bylaws to Directors | Jon |
| Parking lot striping | Jon |
| Painting of steps & rails | Jon |
| Revision of Appraisal | Bill |
| Road Sign Bid for base + sign | Jon |
| No Dog Sign | Jon |
| Electronic Banking for Owners to make direct payment | Louanne |
| DPNR | Max |
| Long Term Planning Committee meeting | Max |

13

Joint Appendix Vol. II Page 1477

3055300/000444

Draft

**Cowpet Bay West**
**Board of Directors Meeting**
**October 11, 2011**

**Present:** Max Harcourt, Barbara Walter, Bob Cockayne, Rosie Wells, Sharon Koehler, Bill Canfield, Jon Cassady, Louanne Schechter
Vince Verdiramo is out of the country.
Lance Talkington (Leeward 3) announced himself as attending the phone conference

Max announced there would be a brief executive session and Jon would contact Lance when he could rejoin the meeting.

**Executive Session:**
The manager requested Directors do not include the names and titles of vendors used by the Association in their emails as some vendors have agreed to assist us, on their own time, as a second income.
Sharon stated a previous Board recommended the Association not act as a third party vendor. Owners are responsible to hire and pay their own service vendors.
There being no further business for Executive Session, Max opened the meeting to owners, Lance rejoined the meeting.

**Minutes of August 9, 2011:** The minutes of the August minutes were unanimously approved.

**Minutes of September 13, 2011:** The minutes of the September minutes were unanimously approved with the revisions provided by Max Harcourt (see attached).

**Treasurer Report:** The total cash assets as of September 30, 2011 were $557,447. The reserve funds total is $452,300. Sharon presented her analysis of the 3rd quarter budget verses actual report (attached).
CBW BOD-P&L Third Quarter Report 9/30/11 & Treasurer's Report

Cash on Hand 9/30/11   Operating Accounts  - $104,000

Reserve Accounts - $ 452,300

We will be depleting the Reserve Account by approximately $ 94,800 and reimbursing same to our general accounts to cover expenses made for capital improvements. After the funds have been cleared, we will write a check to repay the Reserve account current through October, approximately $ 62,855. This will ultimately result in a balance in our Reserve fund of $420,355.

Our 9/30/11 customer receivables are $36,940, of which $25,033 are 60 days and older.

Notes and observations re 3rd quarter P&L-Budget vs Actual

1.   Income-fixed charges a little off mark....Louanne and I will work towards finding and correcting the posting problems

1

3055300/000445

Draft

2. Income is about $4500 on the plus side; due to sale of transformer to Elysian ($5900)
3. Expenses:
   - Items under budget
     - ❖ WAPA-Assn ($16,000)
     - ❖ Contract Labor Bldgs. ($11,150)
     - ❖ Grounds ($8,000)
     - ❖ Hurricane ($3,750)
     - ❖ Beach Refurb ($5,100) –
   - Items over budget
     - ❖ Building repairs ($5,300)
     - ❖ Grey Water ($1,900)
     - ❖ Electric/Generator ($6,500) – fuel bills
     - ❖ Vehicles/Fuel ($4,000)
     - ❖ Security Guard ($8,000) Increased hours
     - ❖ Office Expense ($4,000) – new computer & AC unit
     - ❖ Contract Labor-Grounds ($16,000)
     - ❖ Medical ($3500) – increased costs
     - ❖ WAPA Owners ($21,000)
     - ❖ Beach Refurbish ($5,100) – sand, buoys, chairs, cleanup
     - ❖ Legal/Accounting ($1,800) – extra meetings with Jeanne Brennan re insurance

Other observations:

1. A policy was established several years ago that CBW Assn would not act as a 'middleman' between owner and vendor. The primary reason for this was twofold, in that it created a liability situation for the assn. and that it distorted our financial reports. In reviewing our records this year, it has come to my attention that when an owner's phone line is down, we have been having a vendor come and fix the line. The arrangements for these fixes are made by Jon, who then pays the vendor cash ($50) for the repair. Then the office bills the owner for the repair and reimburses Jon via a company check. While I can understand the owners' frustrations not having a working phone, I cannot understand why the owner and the supervisor can't complete the transaction without Jon's involvement. I recommend we cease this practice and find another way to handle these situations.

2. It will soon be time to prepare the 2012 budget. I have been working with Louanne to correct mis-postings throughout the P&L. I believe it is important to have our records accurately reflect our expenses, rather than worry about how much we are over or under compared to our budget. This is the only way to accurately predict the upcoming budget. I will continue to work with Louanne to keep a more accurate accounting of our expenses.

2

3055300/000446

Draft

**2012 Budget:** Max suggested the budget for 2012 be prepared prior to the end of the year. He would like to include the budget with the information sent to owners for the annual meeting.

**OLD BUSINESS**

**Bylaws:** Max set the goal that any changes the Directors would recommend be completed this year and presented to owners so that they could be voted on during the 2012 Owners Meeting. The Directors discussed the changes in the Bylaws suggested by Vince Verdiramo. The following is the recap of suggested Bylaw Revisions

## Recap of suggested Bylaw Revisions                    October 2011

## OUTCOME OF BOD'S DECISIONS AT 10/11/11 BOD MEETING INDICATED IN BLUE

Following is a compilation of suggestions for changes to our bylaws following the order of our current document. In each case, the first name listed below each category initiated the suggested change:

Article II, Section 3 – Managing Agent

Sharon – suggested adding (k) to exclusions limiting the securing of property insurance solely to the Board

Max – Agrees Bill OK, Approved

Article II, Section 4, – Election and Term of Office

Paragraph 2....Sharon – recommended we change the method of voting stated in the current bylaws to reflect the manner we currently follow.

Max – suggested wording be changed to '*All vacancies shall be voted for on the same ballot, and the candidates with the highest number of votes shall be elected to each of the vacancies'.*

Change approved

Paragraph 4... Vinnie – suggested changing the 'time-out' for board membership from 1 to 2 years

Sharon – questioned reason, feels it should remain at 1 year

Max – felt no change was necessary

Bob – felt no change was necessary

All agreed that no change was necessary

Article II, Section 5 – Removal of BOD Members

Vinnie – recommended we change the second paragraph to give the Board the ability to remove a board member who has not attended meetings from an entire year to a six month period.

Sharon – felt the verbiage should be changed to 'six consecutive meetings' and that the attendance at the Annual meeting should be further clarified by 'in person'

3

3055300/000447

Draft

Max – felt no change was necessary

Bob – felt no change was necessary

All agreed that no change was necessary

Article II, Sections 8 & 9 – Regular and Special Board Meetings

Sharon – suggested we include 'email' as an acceptable means of board meeting notification

All agreed

Article II, Section 11 – Quorum of Board of Directors

Max – **recommends the following: Delete** – "… a majority of those present may adjourn the meeting from time to time.  At any such adjournment at which a quorum is present, any business, which might have been transacted at the meeting originally called, may be transacted without further notice."  **Add, in place:**  "no business may be transacted until a quorum is achieved."

Unclear about how this should be worded, but all agreed that no business should be conducted unless a quorum is present.

Article II, Section 15 – Executive Committee

Vinnie – suggests *"in the second paragraph where it states, "merge the association into another," this right, according to this paragraph, is reserved to the Board. However, the merging of the association is a paramount item which in reality should be voted on by all owners and be carried by a simple majority."*

*"In the next to the last paragraph which now reads, "and it shall have the powers to authorize the seal of the association to be affixed to all papers which may require it," this should be changed to read, "and it shall have the powers to authorize the seal of the association to be affixed to all papers which may require it provided said papers and/or contracts do not involve an Board by either e-mail or fax."*

Max – **recommends: Revise wording to read:** "…provided said papers and/or contracts do not involve expenditure greater than $50,000.  Greater expenditures require approval by a quorum of the Board in regular or special meeting."

4

Draft

Sharon – asks if we should reconsider the dollar amount

Undecided, requires more discussion.


Article II, Section 16 – Inspection by Executive Committee

Vinnie – suggests we add "*such reporting to the full Board shall be made within 15 days of the semi-annual inspection*"

Sharon – suggests we also add that monthly progress reports be made by the GM to the Board at each Board meeting.

Max – would like the wording revised to read "Within 30 days after each such semi-annual inspection, the Committee will report its findings and recommendations to the Board of Directors."

Bob – agrees that report to the entire Board be submitted 15-30 days thereafter.

All agreed to add 30 day requirement

Article II, Section 19 (added) – Communications

Max – suggested Communications by, from, to and among the Board may be in writing, by fax or by electronic communication (telephone, telephone conference, email, internet, etc.). Telephone and telephone conference conversations must be documented (e.g., minutes or record of conversation). This communication will constitute "official" communication by the Board.

All agreed to include

Article III, Section 1 – Annual Meeting

Max – suggested owner's be allowed to attend the Annual Meeting by telephonic/electronic means.

Withdrawn

Article III, Section 3 – Special Meetings

Vinnie – suggested last sentence should read '*no other business shall be transacted at a special meeting except as stated in the notice*'

Sharon – agreed

Bob – agreed

Max – agreed and suggested we add '*Owners may 'attend' via electronic means*"

5



PLAINTIFF'S EXHIBIT 3A

Joint Appendix Vol. II Page 1482

Draft

*All agreed*

Article III, Section 5 – Adjournment of Meetings

Max – suggested allowing electronic participation by owners

Withdrawn

Article III, Section 6 – Annual Meeting Order of Business

Max - suggested the order of business should read:

    (a)    Roll Call – by unit

    (b)    Establishment of Quorum (1/3 of all unit owners)

    (c)    Proof of Notice of Meeting

    (d)    Reading of Minutes of preceding meeting approval

    (e)    President's Report (including cost and coverage of insurance)

    (f)    Treasurer's Report (including discussion of Budget and Financial Status)

    (g)    Property Manager's Report

    (h)    Report of Nominating Committee

    (i)    Election of Board members

    (j)    Old business

    (k)    New business

All agreed to change format as above, except (d) should be amended to "Approval" rather than 'Reading". Barbara expressed concern that no provision was made for owners to approve the budget. Bob stated the point would be moot, as the bylaws give the Board the power to develop and approve the budget, and a negative vote by the owners would not be valid.

Article III, Section 9 – Majority of Unit Owners

Max – suggested (as stated in sections 1 and 5 above) that electronic participation be included

Withdrawn

Article V - Sections 2, 3,& 10 – Insurance, Repair/Reconstruction After Fire, Routine Maintenance & Repair – TO BE DISCUSSED AT LENGTH LATER, OR ANOTHER TIME

The entire board agreed in principle that all language concerning these sections should specify that the Assn's insurance covers all items within the walls, and that owners are responsible to insure all items from the paint and beyond into the living area, whether they are original or not. A special board meeting may be called before the end of October to discuss these important sections in further detail.

Article V, Section 11 – Restriction on Use of Apartment Units

6

Draft

Vinnie – suggested we add a paragraph concerning our 'no dogs allowed' policy.

Sharon – provided information from the ADA website regarding 'service dogs'; agreed with Vinnie

Max – provided language as follows:

No dogs are allowed on the property, either long term or visiting. The Board may grant exceptions to the NO DOGS ALLOWED rule, on an individual basis, should an owner require the assistance of a service animal (dog) as defined by the ADA. Owners seeking to obtain such an exemption are required to apply, in writing, to the Board with supporting documentation."

Bob – agreed

Bill – agreed and verified that the USVI follows 'service dog' definition of ADA

**Note – need to establish a minimum fine, or delegate fine ability to the BOD, as this is no longer an R&R

All agreed this restriction should become a part of the bylaws. Barbara cautioned that the ADA act forbids asking service animal owner the cause of disability. Bill stated that we can require proof of ADA compliance documents from owner, but cannot deny ADA approved animals on property. Board ability to assess fines is covered earlier in the bylaws.

Article V, Section 12 – Additions, Alterations or Improvements by BOD

Sharon – recommended we increase the dollar limitation for expenditures with Board approval, and not requiring 2/3rds owner approval.

Max – suggested increasing this to $100,000, from $50,000.

All Board members agreed to increase the dollar limitation to $100,000, except Barbara who felt it should remain at $50,000

Article V, Section 13 – Additions, Alterations or Improvements by Owner

Vinnie – recommended adding an additional paragraph as follows:" *No unit owner may use their seaside patio for the storage of any household goods or appliances and shall limit the use to patio furniture only.*"

Sharon - disagrees

Bob – agrees with Vinnie

Max – feels this should be covered in either Section 14, or belongs in our Rules and Regulations

All agreed this should not be added to the bylaws, but rather covered under rules and regulations

7

3055300/000451

Draft

Article XIII – Conflicts

Vinnie – recommends this section should be reviewed to determine if this is still a good law.

Bob – agrees

Rules and Regulations

Max – suggests we review our Rules and Regulations

NOTE: Vinnie Verdiramo was not in attendance at this meeting

Max will ask Anna Paiewonsky if she is interested in providing a legal opinion of these changes to the Bylaws.

**NEW BUSINESS**

**February BOD Meeting?**

**Meet & Greet: Thursday February 2nd, Place to be announced**

**Annual Owners Meeting February 4th, Place to be announced**

**Nominating Committee:** Bob said the committee is actively preparing.

**Manager Report**

**Systems:** All systems are doing well. The lab retested one fresh water test. The first sample was negative for ecoli as was the second test.
**Dump-truck**: Dump truck stalled at the light when returning from the dump. The truck was covered under warranty for replacement of fuel injectors Jon had the truck towed to the property until arrangements could be made with the Ford company. The truck was then towed to the Ford repair shop for the scheduled repairs.

**Gate**: The gate is functioning without problems.

**Long Term Plan**: Jon is obtaining additions from Mr. Harvey to add to the plan before sending to Max

**Transformer**: The transformer is in route, when it arrives on island we will schedule Mr. Harvey's visit.

**W-17:** Owner sent complaints that will be entered into log. (Louanne off island will enter when she returns; Jon has copy of her complaints).

**L-07:** Owner complained alarm was beeping for 3 days, owner did not report alarm when it started. Jon spoke with owner and suggested she call office immediately for any alarm.

**CBE:** Andy said the owners are still revising bylaws

8

3055300/000452

Draft

**Bankruptcy:** Statements were sent to the lawyer representing the owner and we have had no response.

**Signage:** No Dogs Allowed and replacement of Parking Signs to be installed this month.

**New Road Sign:** We have a quote for the sign but not the base

**November BOD Meeting:**

**Adjournment:** There being no further business,

ACTION ITEMS

| | |
|---|---|
| Repair of manual Security Gate | Jon |
| Long Term Plan to Max | Jon |
| Elysian Payment | Jon |
| CBE Bylaws to Directors when available | Jon |
| Parking lot striping | Jon |
| Painting of steps and rails | Jon |
| Revision of Appraisal | Bill |
| Contact Anna Paiewonsky | Max |
| Road Sign Bid for base and sign | Jon |
| No Dog Sign and No Parking Signs | Jon |
| Electronic Banking (info was sent to Directors last month) | Directors |
| DPNR | Max |
| Long Term Planning Committee | Max |
| Update on Bankruptcy Ruling | Louanne |
| Notify Owners Annual Meeting | Louanne |
| Notify Dwners Meet & Greet | Louanne |
| Notify Owners how to contact Nominating Committee | Louanne |

3055300/000453

DRAFT

**Cowpet Bay West**
**Board of Directors Meeting**
**November B, 2011**

**Present:** Max Harcourt, Barbara Walters, Bob Cockayne, Rosie Wells, Sharon Koehler, Vince Verdiramo, Jon Cassady, Louanne Schechter
Bill Canfield is off island.

**Executive Session:**
Max requested the meeting move to executive session, Vince 2nd, there were 5 yes 1 no. The motion carried.

**Telephonic Conference:** Max stated the purpose of telephonic conference was to allow Directors off island have a means of attending the meeting. Max states the meeting is not manageable opening the meeting telephonically to all owners.

**Service Dogs on Property:** Following discussion Vince made a motion to table the situation until the Directors can obtain a legal opinion of the no dog rule and incorporate that opinion into the rules and regulations and or recommended bylaw changes. Max 2nd, and the Directors were in agreement.

**Imposing Fine for Dogs on Property:** Max made a motion any individual in violation of the no dog rule , that have service dog credential will not be fined until the opinion from legal council is obtained, pursuant to the outcome of the previous motion. Sharon 2$^{nd.}$

**Executive Committee:** Max asked if any Director is interested in being in the Executive Committee. Barbara and Bob said they would be interested, Max requested the Directors vote by email to him and he will tally the vote.

**Manager and Office Manager Review:** Louanne and Jon were asked to leave the office.

**There being no further Executive Business, the Executive Session ended .**

**Security Gate:** Mr. Daryl Padola, the welder, is repairing the manual gate. The bid was for $460.

**September Minutes:** Sharon requested her revisions be made to the minutes. Under Resolution April resolution had not be executed nor was it attached to the minutes. The revisions were accepted.
**Treasurer Report:**
Treasurer's Report – November Board Meeting 2011
October 31, 2011
Bank balance (all accounts) Oct. 31, 2011 - $559,100
Reserve account through 11/4/11 - $473,600
Owner arrears, 60 days and over - $ 32,267; Alton - $17,500
Owed to General fund from Reserve fund for capital improvements - $41,224
Owed to Reserve fund from General-Oct.& Nov.@ $4785= $9570
General Observations
Expenses over budget:

1

DRAFT

Lots of fuel for generator, thanks to WAPA outages and storms- 138% over budget ($5,756)
Lots of truck repairs – 243% over budget ($4,058)
Lots of water leaks – 13% over budget ($2,000)
Lots of Accounting fees (insurance funding meetings, attending board meetings regarding insurance, review of revised budget, etc. – 56% over budget ($2,100)
Guard Service, due to increased hours – 22% over budget ($9,400)
Office Expense, new computer, new a/c – 24% over budget ($3,700)
Masonry/Cistern CI- 57% over budget ($25,950)
Sewage/gray water – 11% over budget ($4,230)

(Sharon)Will be on island mid until end of November; will be working with Jon, Bill and Louanne on 2012 budget, and anyone else who wants to join us.

**L-41:** Owner returned statement with a note that he filed for bankruptcy in 3/11 and discharged in May 2011. Vince stated that unless the owner can prove otherwise, because we have a lien on the property, he still owes the Association all charges. Vince suggests the Association consider foreclosing on lien.

**Old Business**

**Meet n Greet and Owners Meeting Date & Place:** The Meet and Greet is February 9 and the Owners' Meeting is February 11 at the Caribbean Fish Market

**Review of Bylaw changes voted on during October Meeting**
Article 2 section 3: Subparagraph k added

Article 2 section4: All vacancies should be voted on the same ballot

Article 2 Section 8: Electronic Mail

Article 2 Section 9: Electronic Mail

Section 11: No business transacted until a forum is achieved

Section 15: Executive Committee 2nd paragraph, last paragraph: Recommend that *merging the Association* should be deleted. All in favour

Section 16: 30 days after the inspection

Section 19: Added

Article 3 Section 3 Special Meeting: Addition

**Bylaw changes discussion continued**

**Article 5 Section 2 Insurance:**

2

3055300/000455

Joint Appendix Vol. II Page 1488

DRAFT

**Section 2.  Insurance:**  Highlighted suggested changes by Max and Bob are inserted into minutes for this discussion.  (At this time Vince excused himself from the meeting.)

Changes are highlighted in yellow:

*The Board of Directors shall annually obtain and maintain, to the extent obtainable, the following insurance:*

> *1. Fire with extended coverage to include earthquake and flood coverage, vandalism and malicious mischief endorsements insuring the entire buildings and "common elements" together with all service machinery contained therein and covering the interest of the Condominium, the Board of Directors and the Common Interest of the unit owners in an amount to be determined by the Board of Directors.*
>
> *2. Windstorm, insuring the entire buildings and "common elements" together with all service machinery contained therein and covering the interest of the Condominium, the Board of Directors and the Common Interest of the unit owners in an amount to be determined by the Board of directors.*
>
> *3. Worker's Compensation; Public Liability covering each member of the Board of Directors, the managing agent, the manager, the office manager and each unit owner; Vehicle and other such insurance as the Board of Directors may determine in amounts to be determined by the Board of Directors.*

*All policies of physical damage shall to the extent obtainable contain waivers of subrogation and waivers of any defense based on co-insurance or of invalidity arising from any acts of the insured, and shall provide that such policies may not be cancelled or substantially modified without written notice from the Board of Directors.*

*From time to time or as required by insurers, the Board of Directors shall obtain from a certified and USVI licensed real estate appraiser an appraisal of the full replacement value, without*

3

3055300/000456

DRAFT

*deduction for depreciation, of the buildings, common areas and facilities for the purpose of determining the amount of insurance required.*

*Unit owners shall be encouraged to carry Home Owners insurance on their "apartment unit" for their own benefit provided that all such policies shall contain waivers of subrogation and further provided that the liability of the carrier(s) issuing insurance obtained by the Board of Directors shall not be affected or diminished by reason of any such additional insurance carried by any unit owner.*

*The Board of Directors will provide owners a concise summary of all insurance coverage and costs at each Annual meeting.*

*The terms "common elements" and "apartment unit," as mentioned above, are defined in Article 5, Section 10 "Routine Maintenance and Repair."*

Bob will follow-up with several insurance agents regarding information on waivers of subrogation. (At this time Bob excused himself from the meeting) This paragraph requires further discussion by the entire Board. No vote was taken.

Section 3 Recommended changes

*The association shall only be responsible for inspecting unit interiors to determine if damage is structural or due to external causes, or if adjacent unit damage is caused by external causes, or unless that unit is owned by the association. Unless that unit is owned by the association, repair by the association of other unit damage will be limited to structural damage, that caused by external or adjacent unit causes, and will not include property or fixtures installed by the owner or previous owners.*

Max determined that further discussion was needed by the entire board and tabled this section.

4

DRAFT

Section 10 Recommended changes

An "apartment unit" is considered the space inside the perimeter walls, interior walls, floor and ceiling to include:

1. All decorating elements including: paint, wall and floor coverings, paneling, molding and tiles; finished cabinets and mirrors.
2. All electrical appliances including: refrigerator, stove, washer, dryer, dishwasher, garbage disposal, hot water heater and air-conditioning equipment (including compressor).
3. All electrical fixtures including: wall ceiling and floor outlets, switches and fuse box.
4. All plumbing fixtures including: tubs, showers, sinks and faucets.

Additionally, the unit owner shall be responsible for the routine lubrication and adjustment of doors and windows, and, unless major casualty related, replacement of broken glass, wooden or glass slats and damaged screens. The unit owner shall also maintain and assure the operability of the storm shutters installed on that unit and is responsible to close them in the event of a windstorm. Damage caused by failure to do so is the responsibility of the owner if net insurance proceeds are insufficient to cover such damage.

**Max made a motion to accept the definition of "apartment unit" All were in favour .**

"Common elements" are considered to include all other elements of the buildings and property except those specified as being part of the "apartment unit." Additionally, the following are considered common elements:

1. Electrical supply to the fuse box, electrical supply lines in the walls (including interior walls), floor and ceiling.
2. Water and plumbing lines in the walls (including interior walls), floor and ceiling to the valves at sinks, showers, tubs, hot water heater, and toilets, etc.
3. Drains to the first connection outside a wall.

External air conditioning compressor units shall be maintained by the owner in a reasonable state of preservation. The Association may require owner to remove inoperable and/or un-maintained units or do so at the owner's expense

5

3055300/000458

DRAFT

Max stated this change (above) includes electrical supply lines in walls. Jon stated the cost to the budget would be substantial with this change. Max assigned Jon to determine the estimated budget implications based on these recommended changes. Max also would like to include a statement that holds the Association harmless if the original wiring and plumbing was changed by the owner.

Matrix

| Category (Not intended to be all-inclusive) | Owner Maint/Repair Responsibility | Association Maint/Repair Responsibility | Association Insurance Responsibility | Owner Insurance Responsibility |
|---|---|---|---|---|
| Exterior Walls and Interior Damage Caused by Leaks | | x | x | |
| Roof and Interior Damage Caused by Roof Leaks | | x | x | |
| Interior Damage caused by Adjacent Units (Leaks, etc.) | X | | | Owner of Adjacent Unit's Insurance Responsible |
| Front Doors | X If Not Original | X If Original | X If Original | X If Not Original |
| Screens | X | If Original | X | |
| Exterior Sliders | | x | x | |
| Exterior Wood Fittings | | x | x | |
| Exterior Windows | X If Not Original | X If Original | X If Original | X If Not Original |
| Electrical System to Breaker Panel | | x | x | |
| Electrical System, Breaker Panel to Outlets, Junction Boxes | X If Not Original | X If Original | X If Original | X If Not Original |
| Electrical Fixtures | X | | | X |
| Plumbing Inside Walls/Floors | X If Not Original | X If Original | X If Original | X If Not Original |
| Condo plumbing not in walls/floors | X | | | X |
| Plumbing Fixtures | X | | | X |
| Interior Walls | X | | x | |
| Interior Doors | X | | | X |
| Cabinets | X | | | X |
| Furniture | X | | | X |
| Appliances | X | | | X |
| Wall/Floor Coverings (tile/carpet) | X | | | X |
| Hurricane Shutters | X | | x | |
| Furniture | X | | | X |
| Personal Property | X | | | X |
| External A/C elements | X | | | X |
| Internal A/C elements | X | | | X |
| Landside Porch/Steps/Railings | | X Excluding Tile | X Excluding Tile | |
| Seaside Balcony/Railings | | X Excluding Tile | X Excluding Tile | |

3055300/000459

DRAFT

Max requested Jon review Matrix and comment on each item.

**Special Meeting:** Max requested the Directors meet Friday, November 18th, at 9:45AST to complete the discussion on the Matrix and budgetary concerns.

**2012 Budget Meeting:** Sharon plans to set a meeting while she is on island during November.

**Section 11:** Addition to section

1.  No dogs are allowed on the property, either long term or visiting. The Board may grant exceptions to the NO DOGS ALLOWED rule, on an individual basis, should an owner require the assistance of a service animal (dog) as defined by the ADA. Owners seeking to obtain such an exemption are required to apply, in writing, to the Board with supporting documentation.
    Federal and ADA Compliance, as follows:

    *"On July 23, 2010, Attorney General Eric Holder signed final regulations revising the Department's ADA regulations, including a revised definition of "service animal." Effective March 15, 2011, "Service animal means any dog that is individually trained to do work or perform tasks for the benefit of an individual with a disability, including a physical, sensory, psychiatric, intellectual, or other mental disability. The work or tasks performed by a service animal must be directly related to the handler's disability.*

    *Dogs used for emotional support, that are not task-trained, are called emotional support animals. They are not service dogs".*

This section is tabled until the opinion of a lawyer is obtained.

**New Business**
**23W:** An inspection of the wiring of this unit resulted in several items that required repair. The repairs were completed , the owner paid the contractor and requested reimbursement. Jon reviewed the repairs and invoices, Max approved the reimbursement.

**Manager's Report:**

7

3055300/000460

DRAFT

**Infrastructure and maintenance**: Monthly scheduled filter changes to gray and fresh water distribution systems were completed. The new fresh water system recommended the filters to be changed every 3 months, Jon has opted to change those filters every month. All other systems are operating properly until this weekend when a WAPA outage heated the breaker of the gray water motor and caused it to burn out. The breaker was changed and we may be changing the meter box. We continue to run the generator for 45 minutes after power is restored as programmed.


**Off season maintenance items:**
Inspection of steps: 1/3 completed, inspecting on sunny days
Pressure washing 50% complete, inspecting on rainy days
Rails, steps, and parking lot painting will be completed by December 15. Striping and painting will be done after pressure washing is completed.


**Transformer**: should be in Miami tomorrow and is scheduled to be in shipped this week. Once in route, we will schedule Mr. Harvey's visit to reroute the final 3 phase leg of our electrical system.

**Long Term Planning Committee**: Thursday 11/17/11 10:00 AST to use original code for telephonic conference

**Elysian Payment**: No payment has been received. Jon spoke with Gene last week and was told the check is forthcoming.

**CBE Bylaws**: Jon to contact Andy

**Thefts**: Multiple thefts are continuing at CBW, CBE, Elysian, and Cabrita Pointe. Most of the issues have typically occurred Sunday afternoon, between 11a-2p. During each of these occurrences the owner/renter has left his door unlocked and purses, wallets, etc. in plain view. The Association has strongly encouraged the owner/renter to file a police report. Max asked Louanne to draft a letter to the Police Chief from the Board, requesting the police to be on increased alert and provide increased patrolling during the week and weekends.

**Nomination Committee**: The nomination committee recommendations need to be submitted this month to be sent out to the owners by December 1.

**December Meeting**: The December meeting will be 12/13/11 at 8:45am

**Adjournment**: There being no further business the meeting was adjourned.

8

3055300/000461

DRAFT

## ACTION ITEMS

| | |
|---|---|
| Retain lawyer to review and give opinion on No Dog Rule | Max |
| Contact Vince to vote on Executive Committee member | Louanne |
| Announce Executive Committee | Max |
| Evaluation of Managers for December meeting | Max |
| Manual Security Gate repairs | Jon |
| Budget Meeting | Sharon |
| L-41 Determine Foreclosure by CBW | Directors |
| Meet N Greet/Annual Owners Meeting confirm meeting place | Rosie |
| Obtain info on waiver of subrogation and HO-6 policies | Bob |
| Budgetary implications based on recommended changes to Bylaws | Jon |
| Long Term Planning Committee Meeting | Max |
| Elysian Payment | Jon |
| CBE Bylaws | Jon |
| Letter to Police Chief | Louanne |
| Nomination Committee Recommendations for mail-out by Dec | Bob |

3055300/000462

Joint Appendix Vol. II Page 1495

**Cowpet Bay West**
**Board of Directors Meeting**
December 13, 2011

**Present:** Max Harcourt, Barbara Walters, Bob Cockayne, Rosie Wells, Sharon Koehler, Bill Canfield, Vince Verdiramo, Jon Cassady, Louanne Schechter

**Open Meeting:**
Max made a motion that our meetings, except when put into executive session are open. "Open" meaning any owner may attend by phone or in person. Bob 2nd, the vote carried with 4 yes and 3 no.

**Executive Session:**
Max made a motion to go into Executive Session to discuss employee performance and compensation. Bob 2nd, all were in favour. Louanne and Jon were asked to leave the meeting at this time. The Executive Committee met and voted to not give bonuses this year. The Board voted 6 in favour of no bonuses and Barbara declined voting.

Louanne and Jon were invited back into the room. Max made a motion to leave Executive Session, Bob 2nd, 5 voted yes and 1no.

**Treasurer Report:** As of November 30
Regular/Special Account Balances - $135,705
Reserve Fund Balance - $425,677

Analysis of Reserve Fund status, Capital Improvement reimbursement, anticipated Reserve Fund balance at year end:

| | |
|---|---|
| Current Reserve Fund Balance - | $ 425,677 |
| Dec. payment due Reserve | + 4,785 |
| Owed for Capital Improvement | - 41,680 |
| Anticipated Reserve Fund Year End | $ 388,782 |

Uncollected funds 60 days & older - $20,880
Louanne reported L-41 is under contract and that we would be collecting the bulk of the outstanding fees if we accept the offer from the buyer which is approximately $18,000. The Directors voted unanimously to accept the offer. Louanne reported that L-48 was also now current.

Budget Issues

1. Management Salaries/bonuses
2. Capital Improvement Projects

Sharon stated that without Capital Expenditures, we would have to reduce the Reserve Fund by approximately $10,000. We would also continue the $60,000 insurance fee but we would spread it over 12 months.

3055300/000463

DRAFT

Max stated he asked Sharon to prepare the budget using (worst case scenario) the current insurance fees. Max tasked the Insurance Committee to obtain bids for the property to be effective preferably by February. Bob reported he spoke with Mapfre and Executive Insurance and will continue to get bids.

Bob asked Vince if he wanted to be considered for the 2012 Board of Directors, Vince declined.

Bill and Vince left the meeting at this time.

Barb asked, do the owners approve the budget? Max stated that according to the Bylaws, the budget is the responsibility of the Directors and that it is presented to the owners.

Max suggested we have a meeting to finalize the budget next week with the intent of distributing it to the owners by year's end. **The meeting will be Tuesday, December 20th, at 8:45 am.**

Max stated that worse case for insurance is if we have to continue with Mapfre at current rates. The insurance committee is creating a bid package to include risk factors, hoping to obtain better rates.

**Old Business**
**ByLaws**
Anna Paiewonsky reviewed proposed Bylaw changes from the Directors. She suggests the Association be an LLC. Anna dropped the word "apartment" from the entire document. Max stated *apartment* remain as it is used throughout the document. Max suggested the Directors look at the proposed changes in the attachment provided by Sharon.

Article II Section 3: Sharon stated exceptions were made to protect the Association from negligent discharge. Following discussion, the directors voted not to accept this change.

Article II Section 5: Suggested change, in red, left out.

Article II Section 6: 4 above, *Subject to section 4 above* leave out.

Article II Section 8: typo: *Meeting notices* at end of section omit. Leave meeting date notice at 30 days.

Article II Section 17: *Action by consent.* Leave as is.

Article V Section 1: last paragraph Operation of Property,
Change the wording from *preliminary* to approved *budget for the ensuing year shall be provided not less than 30 days.*

Article V Section 2: Paragraph 3- omit *and/or an evaluation based an risk exposure*

Artilce V Section 11: #4: No Dogs Allowed moved from Rules to Bylaws. The Directors discussed Vince's legal opinion that was emailed to owners, the Directors agreed to hire a VI lawyer and obtain that opinion. The directors agreed to keep #4 as:
1. No dogs are allowed on the property, either long term or visiting. The Board may grant exceptions to the NO DOGS ALLOWED rule, on an individual basis, should an owner require the

2

3055300/000464

DRAFT

**Status on Electronic Banking:** Louanne stated she sent the cost and form to the Directors and did not get a response. Sharon stated she never received it, Louanne will resend it.

**Owner List:** Louanne reported she is calling each owner and updating the list accordingly. The list is available electronically.

**Approval of Minutes:** Max made a motion the minutes to the meetings on November 8th and 18th be approved as read. Rosie 2nd , all were in favour.

**Next Meeting:** The next Board of Directors meeting will be January 11, 2012 at 9am.

### ACTION ITEMS

| | |
|---|---|
| Retain USVI lawyer to review and give opinion on No Dog Rule | Max |
| Notify Directors of Special Meeting for Budget on 12/12/11 | Max |
| Prepare Bylaws for distribution to Owners | Max & Sharon |
| Complete recommendations for nominations | Nominating Committee |
| Resend information on electronic banking | Louanne |
| Prepare Ballots for distribution to owners | Louanne |
| Owners Directory updated with email address | Louanne |

4

3055300/000465

DRAFT

**Cowpet Bay West**
**Board of Directors Meeting**
**January 11, 2012-01-12**

**Present:** Max Harcourt, Barbara Walters, Bob Cockayne, Rosie Wells, Sharon Koehler, Vince Verdiramo, Jon Cassady, Louanne Schechter
Bill Canfield could not attend

**Owner W-12:** Mr. Kirschenbaum requested to speak to the Directors on behalf of his wife. He made a formal request for an exemption to the no dog policy. He presented a letter from his wife's physician stating the dog was necessary as part of her treatment. He provided the Directors with certification for the dog. He stated he and his wife would be responsible for cleaning up behind the dog. He stated he has purchased a "no bark collar" in the event the dog should bark. He spoke with his neighbours and they have not heard the dog. Mr. Kirschenbaum stated that when he and his wife purchased their condo there was no rule against dogs. Mr. Kirshenbaum left the meeting.

**Executive Session:** Max asked if there was a need for Executive Session. Vince requested Executive Session there was no 2nd, the meeting remained open.

**Nomination Criteria:** Vince asked Bob what criteria were used to determine who was recommended. Bob indicated the committee had discussions on each candidate. Following discussion, Max stated that there was no new issue here to present before the Board of Directors.

**Minutes of the meeting of December 13, 2011** were accepted with the following amendments:
Executive Session: add to the third sentence *but to increase Jon and Louanne's salaries $4k and $2K, respectively (per Max).*
Nomination Committee: Delete *this afternoon* from Bob's comment to bring info to office (per Bob)
Bylaws: Change to: Anna Paiewonsky made provisions for the Association to be an LLC (per Sharon).

**Minutes of the meeting of December 20, 2011** were accepted with the following amendments:
Missing Applications: Last sentence changed to: Max stated he may send all email correspondence out regarding the issue and leave it to the owners (per Max).

Under Executive Session add: The Board voted to award bonuses to Jon, Louanne, the staff and contract workers.

1

3055300/000466

DRAFT

**Treasurer Report:**
<u>2011 Year End Analysis/2012 Budget</u>
Reserve Account

| | |
|---|---|
| Beginning balance - 12131/11 | |
| Collected from owners | $ 501,759 |
| Interest earned (approx) | + 108,800 |
| CI Expenditures | + 3,000 |
| Reserve fund acct total 12131 | 165.391 |
| Bank acct balances (Reserve) | $ 445,468 |
| Owed from General to Reserve | -425.927 |
| | $ 19,541 |

Upon speaking with Jeanne Brennan this week, she recommended we transfer the $19,541from our general account to our Reserve account this week.

So, our yearend balance in our Reserve account will be $445,468 (+ or - interest actual)

2012 Budget

Suggestions

We have not budgeted anything for the completion of the 4-year electrical project. If Mr Havey is not yet scheduled to come down here, we should defer his trip to a more reasonable time

Before commencement of any approved CI projects, Exec committee/Board should be thoroughly briefed on scope and cost and terms of contract, if any.

2

3055300/000467

DRAFT

Max asked if we had any unanticipated projects in the last quarter. Sharon reported the masonry project, specifically cistern repair and spalling replacement under buildings cost us 35,000 that we did not budget. Jon reported most of the expense was on spalling which had to be done.

Max requested the new budget be sent out to owners as soon as possible.
Jeanne Brennan is scheduled to meet with Sharon, February 3, to work on Financials.
Sharon asked how much Jon was budgeting to complete the electrical project. Jon said it will be 7-BK that will come out of Building Expense. He stated we were bringing Kent Harvey down after "season" is over.
Sharon requested that any Capital Project that comes up be brought to the Executive Committee or the Directors with bids if possible.

**Old Business**
**L-41**: The property is scheduled to close around the 18th of this month. We expect to get all arrears paid.

**Bylaw vote**: Max reviewed the votes 10 of 10 are for the changes. Bob suggested the Directors begin a campaign to contact owners to vote.

**Insurance**: Marilyn Blackhall will head up the insurance committee, effective immediately. Anyone interested in joining the committee should contact here. Max has asked the committee to craft what we want which is based on current appraisal, accepted risk- agreed value.
Vince requested the Association obtain a risk assessment.
Bob stated that" we comfortably have through February, if that's the time table we agree upon, to make a change." We will have a 10% cancellation penalty should we change the policy.
Max made the motion: It is the intent of the board to investigate retaining a risk assessor to determine what an accepted value of our insurance should be Sharon 2nd 4 voted for and 1 abstained. Motion passed.
Bob reported that Mapfre is now offering an HO6 policy.

**New Business**

**Dog Letter**: Max received a letter from Karen Benson who is the attorney for Barbara Walters. Barbara stated she was confirming her rights and that she is on the correct side of the law.

Vince made a motion that we abide by the rules and immediately begin fining owners that have dogs. Discussion included utilizing the firm of Hodge & Francois to develop a policy regarding our no dog policy and procedure for exemptions when warranted. Bob distributed information on Service Dog Certification naming businesses that have no requirements for service dog certification.

The motion was repeated that we abide by the rules and immediately begin fining owners that have dogs. Fines may be held in abeyance until the issue is adjudicated. The Vote was 3 for and 3 against. Bob and Vinnie requested we contact Bill for his vote on the motion. Bill was not available, a message was left for him to call.

3

3055300/000468

DRAFT

Max made a motion that the association hire an attorney to appropriately respond to the letter we have received and assist us with determining our status with our no dog rule, Sharon 2nd, all were in favour.

Bill Canfield phoned in and was placed on speaker phone. Vince restated his rule: We strictly adhere to the no dog rule, and that all owners having dogs on the property be fined and the fines be held in abeyance. Sharon 2nd, 4 voted yes, 2 No, 1 Abstained, Bill left the meeting.

Bob made a motion that the fine be assessed at $50/day in abeyance. Sharon 2nd. 4 voted yes, 2 voted no.

Louanne was instructed to send letters by email and mail that informs the owners with dogs of the decision to begin fines tomorrow.

Max made a motion to begin fining owner s with dogs a $50/day fine to be held in abeyance. Sharon 2nd, the vote was taken with 4 yes and 2 no.

Vince suggested that a copy of the letter from Barbara Walters lawyer . be sent to our D & O insurance.

**Non-compliant Enclosed Porch:** Vinnie made a motion regarding Lance Talkington's enclosed back porch: Send a letter to Lance Talkington that he is in violation of the remodelling rules of the condominium association and that he needs to remove it immediately. Rosie 2nd, following discussion and review of records the vote was taken with 3 yes and 3 no, Bill Canfield was contacted by phone, the vote was taken again with 3 yes and 4 no.

During discussion the question was asked should the owner pay more in common fees due to the additional square footage for the unit by enclosing the porch. Max suggested we table the discussion for another meeting

**Additional Weight to Porches:** Max suggested we table until another meeting the addition of additional weight and storing of heavy equipment on porches. Barbara suggested that the owner be responsible for a structural engineer to determine if any additions or equipment can be stored safely.

**Volleyball Court:** The volleyball court appears to be on CBW property. Vince stated the Association should check with our agent of our liability insurance to determine if we are covered should someone get hurt. Should we not be covered, we should find out what the cost of a rider to the policy would cost.

At this time Vince left the meeting.

**Manager Report**

Monthly filter were changed January 3rd. The waste water and treatment plant are functioning well. Typically we exercise the generator on Thursday however, we ran the generator yesterday to decrease the cost of running the R/O plant.

Painting Steps: Jon has added an additional worker to complete the painting of the steps. He hopes to complete 50% this week and the remainder next week (weather permitting).

4

3055300/000469

DRAFT

Security Gate: The electric gate malfunctioned. A WAPA outage shorted out the pedestal on the outside. The pedestal had a message "power down exchange chip. Jon powered down and powered back up. The pedestal stated erase all memory? Jon powered down again and called the vendor. The vendor was unaware of this message and would have to contact the manufacturer (who was closed for the weekend). The manufacturer was contacted, the service people came out reset the chip and cleared the memory. The memory was restored, and the gate is now functioning.

The manual gate is also broken. Jon recommended the existing manual gate be replaced. A drawing and price was obtained and shared with the Directors. Max stated that the pivot point of the existing gate is not salvageable and perhaps dangerous to use.
Sharon made a motion that we proceed with the new manual gate, Max 2nd, all were in favour.

The No Dog signs will be up next week. Cool Signs is producing them.

Owners Workshop: Sharon reported the workshop is cluttered with chairs, carpet, exercise machine, plastic chairs, glass tables, etc. so that the work table is not usable. The area is to be cleaned.

At this time Bob left the meeting.

Roadside Signage: The Directors suggested the knocked over base of the sign be up righted and reused if possible. The quote and the drawing of the sign from Mad Max was provided to the Directors. Max made a motion we have the sign made and reuse the base if possible, Sharon 2nd, all were in favor.

**Action Items** (not completed).
CBE Bylaws: We do not have a copy.
Electronic Banking: Max would like to delay decision until Owners Meeting. Sharon stated that there are many benefits to electronic banking that we don't have now and suggested we go forward with application. Max tabled the discussion until February's meeting.

February BOD Meeting: Tuesday, February 7th at 8:45am same phone in number

Adjournment:
There being no further business the meeting was adjourned.

5

3055300/000470

DRAFT

## **ACTION ITEMS**

| | |
|---|---|
| 2012 Budget be sent to Owners | Sharon |
| Attorney for Dog Rule | Max |
| Letter to Owners in Violation of No Dog Rule re:$50/day fine | Louanne |
| Copy of letter from Ms. Walters to D&O Insurance | Max |
| Increase Common Fees to owners that have enclosed porches | Tabled |
| Determination of Additional Weight on Porches | Tabled |
| Contact Liability Insurance re: coverage for Volleyball | Bob |
| Painting of steps | Jon |
| Purchase and implement new manual gate | Jon |
| No Dog Signage | Jon |
| Clean out owners workshop | Jon |
| Contact MadMax re: road side sign | Louanne |
| Reset base of road side sign | Jon |
| CBE Bylaws (obtain a copy) | Jon |
| Electronic Banking | Tabled |

6

3055300/000471

Joint Appendix Vol. II Page 1504

**Cowpet Bay West**
**Board of Directors Meeting**
**February 7, 2012**

**Present:** Max Harcourt, Barbara Walters, Rosie Wells, Sharon Koehler, Bill Canfield, Jon Cassady, Louanne Schechter, Bob Cockayne attended by phone conference. Vince Verdiramo was absent. Jon was excused to attend to a meeting with representatives from Elysian, and CBE and CBR with a public surveyor and joined the meeting in progress. Also present were: Judi Kromenhoek, Doug Rebak and (by phone) Lance Talkington and Al Felice.

**Executive Session:** Max asked if there were any items to be discussed in Executive Session, there being no necessity, the meeting continued.

**Approval of Minutes of January 11, 2012:** Sharon requested in the December BOD minutes should read Anna Paiewonsky contributed language to make provision for LLC's throughout the bylaw document. In the January minutes, the last name of Barbara's Lawyer is incorrect. Also, omitted from this section is Max asking Barbara if she had registered any complaints and she acknowledged the HUD complaint. Max indicated that further discussion was halted pending the hiring of an attorney for the Association. In the second paragraph, the document Bob distributed was entitled "Service Dog Certification-Spotting Fake Certification's".

**Treasurer Report:** Sharon reported the bank balance at the end of January is a total of$ 445,760 in our reserve funds and $82,500 in our operating accounts. L-41 closed in the month of January resulting in full payment of fees in arrears ($21K).

Jeanne Brennan, CPA, met with Sharon, Max, Jon, and Louanne to review the financials. The budget was reviewed for accuracy and the cash and cash equivalents were reviewed. Jeanne made suggestions for adjustments to clarify the work on the beach, the payments from Elysian, and our capital improvement expense at the end of the year was $15B,17B. This year we have $114,000 budgeted for capital expenses. The gray water project from 2011 and the electrical project from 2011 will require funding to finish that is not in the 2012 Budget.

Sharon will change the signatories on the First Bank account following the election to allow for a member with 3 years to be on the account. She will also add checking to the account to allow for monthly deposits to the fund as well as withdrawals as the CPA has suggested.

**OLD BUSINESS**

**HUD complaint:** At the last meeting the board voted to retain an attorney. Max met with Marie Hodge and subsequently engaged her to handle the dog issue. Marie Hodge and our D&O Insurer were sent a copy of the HUD complaint. The Insurance Company has assigned an attorney to respond to the HUD complaint and Maria Hodge will be providing the opinion on the dog issue. The Executive Committee met with Maria Hodge via teleconference. The Executive Committee is not at liberty to discuss any more detail on advice of Ms. Hodge.

**L-41:** The unit sold and the arrears collected in full.

1

Jon returned to the meeting at this time.

**Insurance Committee:** Nothing to report at this time.

**Bylaw Vote Status:** Approximately 28 votes have been collected at this time.

**Annual Owners Meeting:** Max thanked the following people:

Rosie set up the catering for the meeting. Randy Driscoll will be catering for $300

Jon negotiated the meeting room for free.

Sharon and Sally have set up the Meet & Greet

Bill Canfield arranged for the use of the Yacht Club for the meet and greet for a minimal fee to be determined.

**Owner Package for Annual Owner Meeting:** Louanne stated she will have the material printed tomorrow, to include: Agenda-Insurance Summary-Cash Equivalents-Budget-Owner Issue Policy

Owners were sent an email to bring the proposed Bylaw changes with them to the meeting.

**Owner Issue Policy:** Max requested the Owner Issue Policy be included in the owner package. Jon requested the Directors verify the spalling example in policy. Jon explained that most interior spalling is caused from rebar, but the rebar is not a structural problem unless the rebar itself shows physical signs of distress. Jon obtained the opinion from Mr. Ferraris, the structural engineer that examined some of our exposed rebar. Mr. Ferraris said rebar "pops" in (mortar) plaster because of the property of the metal reacting to moisture causing rust and swelling which eventually will cause a crack or spalling, no different than drywall "pops". The rebar may need to be sanded and chemically treated to prevent further spalling to the finished surface, which is cosmetic. Owners have been responsible for cosmetic repairs and the Association is responsible for structural problems. Max stated in accordance to our Owner Issue Policy, The GM will inspect the problem, if the owner is not in agreement with the GM, then the owner would submit the complaint to the Board. The Directors will then make a decision on the matter.

**Annual Owner Agenda:** Max presented the proposed agenda.

Parliamentarian: Max requested Ed Wardwell be the parliamentarian to keep order during the meeting.

Roll Call: Louanne

Establishment of Quorum: Rosie

Proof of Notice: Louanne

Meeting Minutes: Rosie will be responsible for the reading of the minutes from last year.

President Report: Max

Insurance for 2012: Marilyn

Treasurer Report: Sharon (utilizing the amended 2011 budget)

Manager's Report: Jon

Nominations Committee Report: Committee has nothing to report.

Old Business: From Owner's 2011 Meeting

New Business:

Announcement of Election Results

2

Max made a motion that the Agenda as revised be approved for the Annual Meeting. The motion was 2nd by Bob, all were in favour.

**Set-up for Annual Meeting**: Jon will obtain the key on Friday to set-up the meeting room.

**Walk-around:** The walk-around was conducted by the executive committee, the minutes were sent out to the Directors. The focus on the walk-around was to indentify long-term projects as well as inspect the general area.

**Fines:** Judi Kromenhoek requested more detail to the fine that she received on her statement. She would like to know what it was for and who enforced it. Louanne stated that in the statements sent through QuickBooks, item, quantity and cost are the only information provided; she spoke with Jeanne and confirmed that utilizing the invoice feature would allow for an explanation.
Barbara requested a timeline as to when the Attorney would make a determination on the Service Dog Issue. Max stated he was not at liberty to discuss the issue.

**Mailboxes:** Max had a request from Carolyn Wardwell to have the mailboxes replaced. During the walk around, it was noted the mailboxes were showing signs of rust. Louanne followed up on a lead from Carolyn from CA which was disregarded due to the prohibitive shipping cost. Max requested Jon follow-up with local merchants to see if they can be purchased or ordered on island.

**Employee Parking:** Rosie stated she had a complaint that employee's were parking in guest spots. Jon stated employee's park in available spots as they are available. Sharon suggested employees park alongside the dump truck. Max stated Jon will be responsible for employee parking.

**Illegally Parked Cars:** Sharon requested the parallel parking on Leeward that has 2 parking spots be striped where parking is illegal, signs be posted again, and Stickers be placed on windows of cars that are parked illegally.

**Security Guard Schedule:** Jon reported the sequences of the guard schedules in the past which has evolved to the current guard schedule being a roving guard on our property from 4-6p then at the Guard House from 6p-6a. The weekends are staffed with roving guards from 10am -6p then, from 6p to 6a at the Guard House.
Sharon asked what the events of the theft from L-22 were. Jon reported the facts as given by the owner to the police. The differences between this theft as opposed to the previous midday "crimes of opportunity" (unlocked doors) are:
L-22 was at night others were midday. Owner was in room adjacent to foyer, other; were on the seaside deck or not in the unit. The purse was taken and has not been found, others: cash was taken and the wallet/purse left behind.

Doug Rebak reported that he has installed devices that sound an alarm when the door is open or there is motion.

**Owner Renovation Request:** Max submitted a request to change his electrical panel to bring his power up to code and running a 220v line to his utility room. Max made a motion for approval of renovation, Barbara 2nd, all in favour.

3

3055300/000474

Stickers on car: Sharon would like the security guards to apply stickers to cars parked illegally.

**L-01 Freezer on Porch:** Sharon reported her husband said there is no issue with the weight of the freezer. The owner is willing to make a cover for the freezer if it appears to be unsightly. Max stated that the white freezer is against the white shutters. Should a cover be made, it would be more visible.

**L-03:** Sharon stated L-03 sent a letter to Max that the addition to his unit was approved by the Directors. Max will forward a copy of this letter to the Directors. The Directors will have to decide if the owner will be responsible for increased charges to his common fees because he has increased his square footage. The Directors will also direct the green stripe to be applied.

**Manual Gate:** The gate is finished and will be delivered and installed this month.

**Security Gate:** No bids have been submitted by Kevin Cogan

**No Dog Signs:** Jon reported during a walk-around with Max, they noted CBE had attractive signs with their logo. He is working with Cool Signs to provide a similar design for CBW.

**Cowpet Road Sign:** The concrete needs to be rolled up and reset. The sign has been ordered by through Mad Max.

**Steps & Railing Painted:** Steps are completed up to L-08 with non-skid. Railings were not completed, on Windward they are being sanded down then repainted. Barbara reported that W-51 back of new stair was not painted.

**Step and Landing Repair:** We have replaced 3 with Chris Thompson at this time. Jon has asked several contractors for bids with the scope of work being: remove old brackets, through bolt and reinstall step. Contractors would like to do one before they commit to a price.
Sharon asked why we had purchased the angle iron and bolts for the entire property, Sharon stated that we were going to do partial order and only the steps that need repair were to be completed. The budget was for $20,000 for the entire project and we have already spent $14,000. Jon requested the Directors choose which stairs/landing be repaired. His understanding was we had $50,000 allotted for this capital project. The budget was reviewed and there is $50,000 on the budget for the stairs.

**Masonry:** Jon has not been able to find a contractor to commit to a fixed price to repair the spalling under the buildings.

**Tree wall damage repair:** The walls around the trees. Sharon stated that her husband, Bud, suggested take down the walls and replace with railing. The tree near L-26 is buckling the sidewalk and the road as well as the walls.

**Owner Workshop:** Jon is contacting the people that have items in that room to have them removed.

**CBE Bylaws:** Jon gave Max a copy of the CBE Bylaws.

**Surveyor:** A surveyor from public works has an "as-built" plan with no footings or markings and is attempting to find the property lines for Elysian, CBW, CBE, and CBR.

4

3055300/000475

**Letter to Owners:** Max sent a letter to our neighbors that the volleyball net needed to b e removed from CBW property as our liability insurance does not cover athletic activities.

**W-47:** Jon reported the events leading to the fines that were charged to W-47. There were multiple phone calls leading to our maintenance men looking for a water leak. The manager stated there was a maid there to let him in the unit. There was no one to let him into the locked closet Thursday, Friday, Saturday (x2). The problem was in the locked owner closet. The owner was instructed on Friday to contact a plumber, that it was not an Association issue.

Sharon stated she would write a letter to the owner explaining the events. Louanne provided Sharon a copy of the plumber's bill that explains the problem is the owner's. Jon will provide Sharon with any other data on the events she may need.

**Manager Report:**

**Filter Changes:** Monthly filter changes were completed as scheduled

**DPNR:** There were 2 inspectors on property yesterday. One was the annual inspection of the WWTP, the RO plant, and the potable water systems for the EPA and DPNR. The other inspector was here to inspect our fuel storage and SPCC (Spill Prevention, Control, and Countermeasure Plan) plan, kit, and Terminal permit. Facilities that have fuel storage over a specified limit that if spilled could find its way to navigable waters require this Terminal permit. DPNR began enforcing this permit process January 2012. CBW has in place, a SPCC plan and spill kit, and applied for the permit December 2010 with the application and a check for $750. The inspector did not have the application on file. CBW will need to have formal training from the inspector for use of the oil diapers. Our Water Pollution Control, TPDES permit, Air Pollution Permit , and SPCC Plan and Terminal Facility Permit were all in compliance with no deficiencies.

**Other Action Items**

**Retain an attorney:** See HUD complaint above.

**Electronic Banking:** Louanne resubmitted to Directors. There was no discussion.

**Owners list with email addresses:** Completed and owners informed to request by email

**March Meeting:** The March meeting will be March 6th, at 0845am AST

**Meet & Greet:** Sharon stated the Meet & Greet is a social function and requested W-44, Judi not be permitted to provide any information regarding L-49 Doug to the event. Max agreed that it is a social event.

**Adjournment:** There being no further business, the meeting was adjourned.

5

3055300/000476

**Action Items**

| | |
|---|---|
| Update signatories on First Account and include checking | Sharon |
| Annual Owner Meeting Package to Print | Louanne |
| Set-up for Annual Meeting | Jon, Max |
| Invoices for fines | Louanne |
| Mailbox replacements | Jon |
| Striping of no parking areas, posting of signs | Jon |
| Letter to W-47 | Jon, Sharon |
| Letter from L-3 to Directors | Max |
| Increasing fees on units that have enclosed common area | Directors |
| Installation of manual gate | Jon |
| Bids on new automatic security gate/cameras | Jon |
| No Dog Signs | Jon |
| Cowpet Road Sign Base/sign | Jon/Louanne |
| Step & Rail Painting progress | Jon |
| Step & Landing Repair bids/progress | Jon |
| Owner Workshop clean-up | Jon |

6

3055300/000477

Joint Appendix Vol. II Page 1510

**Cowpet Bay West**
**Board of Directors Meeting**
**March 6, 2012**

**Present:** Ed Wardwell, Bill Canfield, Rosie Wells, Sharon Koehler, Max Harcourt, Herb Horwitz, Doug Rebak, Jon Cassady, Louanne Schechter
          Owners present: Al Felice and by phone Lance Talkington
Comments from the President: Ed asked the Directors to come prepared, be on time, and serve the best interest of all the owners at Cowpet Bay. He asked that Directors leave their personal bias at the door and treat each other with respect as elected individuals of the Association.

Sharon requested conference phone be activated for owner participation. No one knew the conference number. Louanne was to locate the number and activate the call.

Each Board Meeting will be an open Directors meeting for any owner to attend. There will be a closed Executive session following the Board meeting with Board members only. The purpose of this session is to discuss legal and fiduciary matters to be discussed and protect the privacy of all owners.

**Approval of Minutes of February 7, 2012 meeting**: Max stated he had sent correction to Louanne. The corrections from Max are: Also present were: Judi Kromenhoek, Doug Rebak and (by phone) Lance Talkington and Al Felice. Treasurer report last sentence add: ($21K), and Letter to Owners, change *owner* to neighbors. Motion to adopt as amended was made and 2nd. All were in favour, motion carried.

Sharon requested that Louanne send out the minutes, with amendments to all the Directors. Louanne replied she would send them out as soon as the Secretary had made the changes and forwarded them to her. The amended minutes are to be made available to the Directors by March 12, 2012.

**Treasurer's Report:** Sharon reported the current bank balance is approximately $13,000 in our general funds. We have not reimbursed our operating accounts for capital expenditures so far this year. Our First Bank Account has $445,900. We have approximately $11,000 in uncollected owner fees which our 60 days or over. This does not include the fines that are approximately $8,000.

Sharon continued that transfers of money have to be made. As discussed last month there is a concern regarding the FDIC and the amount it insures which is $250,000 per account. We could have 6 accounts each would be covered. The current interest rate is .05% Banco Popular interest is .02% and Fidelity is .021%. Her recommendation is we should open a second account at First Bank. The current account at First Bank has no checking account; a current signatory on the account must sign a withdrawal slip. There is a time lag between obtaining funds from First and moving them to our operating account at Banco.

Herb suggested using Navy Federal Credit Union that utilized electronic banking. Sharon said she would be interested in exploring that option

1

3055300/000478

Ed asked what was involved to immediately get the new signatories on the First Account. Sharon stated we need to have a copy of the minutes of the Annual Meeting that shows the elected officers, the new signatories need to go in person to the bank with a driver's license and sign the signature cards.

The conference phone was activated at this time.

The conference phone dropped the call. The number was redialled

Ed asked when the Annual Meeting Minutes would be available. Max stated his comments had been sent. Ed asked Rosie when she would complete the changes by Max. Rosie asked Max to resend. Ed requested Rosie complete the Annual minutes by March 15.

Ed asked Bill and Sharon to meet him at the office at 2:00pm tomorrow. They will go to First Bank to make the changes on signatories which will be: Ed, Bill, Sharon, and Rosie. Ed is currently on the account.

**Employee Severance package:** Jeanne Brennan was unaware we had a severance package. Four employees, Steve, Arlington, Marcellus, and Joey have letters that state they are entitled to 4 weeks of vacation and they would receive 1 week of pay at current rate of pay for every year If they were let go, if they retired they would receive 1 week of pay, at current rate for every year after the third year of employment. Jeanne suggested we begin funding for it and include it in the budget as a line item of liability. The letter of engagement to Jeanne was revised as well as the financial statement to include this item.

Budget vs. Actual: Sharon stated we have used 44% of our current capital improvement fund and we have 56% of our funds to last us through the remainder of the year. She cited the purchase of the hardware for the stairs at $14,000 and the continuation of the masonry projects as the items utilizing most of the capital funds.

Doug asked when funds are expended what is the protocol. Sharon stated the Property Manager reviews the checks and signs the weekly report. The Treasurer then signs off the checks. She stated when she was Treasurer 3 years ago checks were not released until the Treasurer signed the form except for certain circumstances. Ed tabled the discussion at this time.

**Managers Report**
Systems: The gray and fresh water distribution system filters were changed today. They are changed every month on the first Tuesday of the month approximately 10 am. All the rest of our infrastructure systems: the RO, WWTP, GenSet, Fresh and Gray water Distribution systems have no problems to report since last Board Meeting.

Action Items from last meeting:
- Striping and Parking sign along the Leeward wall were reinstalled

2

3055300/000479

**Insurance Committee Report:** Doug reported that he along with Bob Cockayne and Herb Horwitz have selected 7 brokers to go out with a request for proposals with our bid specifications being made to them. Our objective is to pick ones that are reputable ones that understand that we are trying to reduce our insurance cost and also get it to the first quarter of the year being March 29th for our renewal date. We told them we would like to reduce our cost and we are prepared to increase our risk. We have sent to Tunick, Executive Insurance, Marshall and Sterling, Topa, Guardian, Specialty Brokers (Mapfre) and Red Hook Agency. Six have expressed an interest. The Specifications we sent out included a total property agreed value of $25,916,000, no co-insurance, replacement cost insurance, bid on a windstorm sublimit of both 1 and 2 million dollars with a 3% deductable by building. Earthquake and sublimit of 12.5 Million, with a 5% deductable on earthquake which is standard in the VI, Flood sublimit 3 Million with a deductable of $ 10,000, all other perils 12.5Million with a sublimit deductable of $250. The target date for vendors to return proposals is March 15.

The date is critical in the sense that Insurance carriers have more available capacity before hurricane season so obtaining a policy in the first quarter may save some expense.

Doug stated they only asked for 1M & 2M with the thought process that during Marilyn, CBW took a full frontal hit and sustained a $3,700,000 bill. Of that $700,000 went to the adjuster, 1M was for the brand new doors, 1M was for shutters, and $300,000 went to the seawall, leaving $700,000.

Herb said he did several scenarios with none of them going over our reserve fund.

Doug mentioned that improvements and betterments were covered in the Mapfre policy. This coverage lowers the cost of a HO6 policy.

Doug stated the strap downs, the tie downs, the shutters, and the hurricane rated doors are all improvements allowing us to take more risk.

Ed recessed the Directors Meeting at 9:45.

The Directors meeting reconvened at 11:00 with Louanne and Jon present.

**Owner Inquiry Policy:** Ed stated it is self explanatory and his intention is to recall the owners attention to the policy that there is a procedure and the staff is prepared to respond in accordance to the policy.

Sharon stated that when letters are sent to the Board, there is no Director that is responsible for responding. Ed stated he would be responsible for responding to each and every letter that requires a response. Ed will bring the letters to the Directors that are in conflict with the manager's decision. Max stated Sharon had developed a form. Sharon stated the owner should sign off on the form. Ed requested Sharon supply him with the form.

**By-Law Amendments:** Ed stated we did get approval for over 2/3rds to adopt the amendments. Some owners have replied to Ed regarding the legal status of the By-Laws. Following discussion, the Board decided to go forward with the will of the majority of the owners. Max made a motion that Maria Hodge have the By-Laws registered with the condition that another retainer is not requested. The motion was 2nd, all were in favour. Max will contact Ms. Hodge. Ed provided Max with a letter from Ms. Paiewonsky that outlines her legal opinion on the By-Laws.

4

3055300/000480

**Invoices for fines:** Fines were removed from the statement and transferred to an invoice. The invoice allows for description of fines, the statement does not.

**Mailboxes:** The budget does not allow for new mailboxes. Jon will have maintenance reshingle the roofs over the mailboxes and repaint. To be done by next Board meeting.

**W-47:** Ed will respond to their reply.

**L-03:** Max forwarded the letter to Board members regarding the enclosure. The Directors agree this is not an issue

**Increasing fees when owners enclose common areas:** The Directors decided this is not an issue.

**Owner Workshop:** Jon will have treadmill removed.

**New Business**

**Staff Parking:** Sharon stated with her company and other 2 car families in her area there is not enough guest parking. She suggests Employees Park next to the dump truck. She suggested the pick-up be parked in front of the maintenance shop.
Max suggested we have diagonal parking spaces due to the difficulty of backing out.
Sharon wanted to know when her area would be pressure washed: Jon stated is was done recently
Doug asked if the parking lot was going to be striped: Jon said the numbers would be done over the next week.

**L-3 Water Leak:** Herb Horwitz had water leaking in his unit. The source of the leak was from a pipe in the wall that had been modified by L-3 to accommodate a water line to his icemaker. Jon informed L-3 the damage was his responsibility as the leak was on the unit side of the modified valve. The invoice for the plumber was sent to the owner. The owner refutes the issue. Herb Horwitz took pictures of the alterations to the original water line and distributed them to the Directors. Following discussion, the Directors agreed it is the responsibility of the owner. Ed will contact the owner.

**L-01** Needs the wall patched and painted.

**L-06** Needs a wall patch from the water leak repair done 2 weeks ago.

Herb asked for clarification regarding rebar "pops".    Subject was tabled.

**Automatic Gate:** Approximately 3:30am this morning, a renter at CBW rammed the gate and damaged both hydraulic arms and bent the gate. The renter has given Jon his information and accepted responsibility for the accident. The police will be contacted to complete a report.

**Employee shirts:** Rosie said the staff requested new shirts. Rosie made a motion to purchase new employee shirts; the motion was 2nd all were in favour. Louanne will order them.

5

3055300/000481

- The letter for W-47 was completed by Sharon and sent to owner. Jon gave his original notes to Sharon for documentation purposes. Sharon stated W-47 had sent a letter last night refuting the facts sent by Sharon.
- Installation of the Manual Gate is not complete, the pad is completed and the support in place, two brackets ordered from the states have not arrived and the vendor has placed a second order. The gates are on property and the installation will be completed once the brackets arrive. Ed asked for a completion date, Jon stated 3/15/12
- Bids on security cameras. Kevin Cogan, of First Alert, sent bid. He suggested put a remote video recorder in the workshop which will hold up to 4 cameras and if we also want the yacht club area monitored, place another video recorder in the last break room in the end. Ed instructed Jon to forward a copy of the bid to Bill. Bill will have the security committee review and report back to the Directors. Doug suggested that any placement of video recorders should be a secure area.
- No Dog Signs are completed and placed. Sharon said the placement is too far back on the lawn. She would like them placed on the property line of the grass area and add more. Sharon stated at least 4 were necessary along the property line. To be completed by 3/9/12
- Road Sign not complete the base was not budging. Doug suggested leaving it as a safety barrier. Put a new base in front of the old and install the sign.
- Steps & Rail Paint: Steps painting is complete with the exception of 2 on Leeward, 28 and 30, due to renters. Will be completed this week. The rails are just now beginning. Step repair: we have had one contractor do several of them to come up with a firm bid and his price is $225 to remove the old brackets, prime, and drill through and install. He is asking for $100/hr for any additional work. Doug stated the contractor's work, in his opinion, look terrible. He is also concerned the brackets are shorter.
- Owner workshop: Scooter has been removed, the carpet is removed. A treadmill is there. Sharon wants everything removed other than the inventory. Sharon stated the owners' closet also has a scooter and kayak in it.
- L-6, L-10, W-26 Jon is looking for drip edge that will span the difference between the gutter and the roof. The roofs that were replaced in Marilyn were not lined up with the appropriate overhang. The seamless gutter doesn't meet. Jon is looking for drip edge to repair the problem. He has asked Chris Thompson's assistance in obtaining the material.
- L-1 Had a water leak, while chipping the wall away, we found the source of the leak was a modification that L-3 had done to the plumbing.
- W-7 Crack repair. Charleson Burton has completed the Association's responsibility below the window.

**Chairperson Appointments:**

**Committee's**     The five standing committees and their respective chairpersons are:
- ➢ Nominating – Doug Rebak
- ➢ Landscape – Judi Kromenhoek
- ➢ Insurance – Doug Rebak
- ➢ Security – Bill Canfield
- ➢ Property and Planning – Max Harcourt

Ed intends to, in his letter to owners today, identity chairpersons and contact information for any owner interested in serving on these committees

3

3055300/000482

**W-12**: The owner has had problems with condensation on his floor over the last 3 years and submitted multiple requests for the Association to assist in the repairs. The owner was informed on each occasion that this problem is between owners and he should contact the owners of W-11. Ed will inform the owner of W-12 this is not an Association issue.

**W-27**: The owner lost power to the unit and requested the Association investigate. The main breaker was tripped and reset. Jon suggested the owner have his electrical panel checked as the breakers inside shut have tripped first. The owner was charged a service call and now refutes the bill. Ed stated the responsibility was that of the owner. Ed will speak with the owner. The Directors decided to remove the charge.

**L-06**: Sharon stated the cats are now a non-issue. And the other issues were resolved during the meeting.

**Letter to GE**: Bill would like a letter sent to GE regarding their proposals on RO and Waste Water. Bill will draft a letter and Ed will send it.

**Solar Energy**: Herb suggested we follow-up on solar energy. Max stated there is a new company on island that leases a system to offsets the cost. Max will obtain information and incorporate into the long-term planning committee.

**April Meeting**: Wednesday April 11, 2012 at 7:45am. The call in number will be 712-775-7000 the code is 106376

3055300/000483

## Action Items

| | |
|---|---|
| Amend February Minutes by 3/12/12 | Rosie |
| Resend Amended Minutes to Board Members | Louanne |
| Change Signatories on First Bank Account | Sharon, Ed, Bill, Rosie |
| Open additional accounts to maintain FDIC coverage | Sharon |
| Transfer of funds from First Bank to operating account | Sharon |
| Organizational Minutes | Max |
| Annual Minutes with Amendments completed by 3/15 | Rosie |
| Provide protocol for release of funds | Sharon |
| Add employee severance to budget as a liability line item | Sharon |
| Installation of Manual Gate completion date 3/15/12 | Jon |
| Security Committee Review of Bid from Alert 1 | Bill |
| Adjust placement of NO DOG signs and add 2 by 3/9/12 | Sharon |
| Rails painted –starting this week | Jon |
| New Base on roadside sign | Jon |
| Step & Bracket Replacement; evaluate recent work | Jon |
| Owner Workshop | Jon |
| Drip Edge on L-6, L-10, W-26, | Jon |
| Contact Chuck Waggoner re: By-Laws | Ed |
| Contact Maria Hodge re: By-Laws | Ed |
| Mailboxes: Replace shingles and paint by next Board meeting | Jon |
| Assign employee parking | Jon |
| Repaint numbers on parking spaces next week | Jon |
| L-3 re: Discuss owner responsibility | Ed |
| L-01 Patch and Paint area used to repair water leak | Jon |
| L-06 Patch and Paint area used to repair water leak | Jon |
| Entry Gate: obtain police report/begin repairs | Jon |
| Employee Shirts | Louanne |
| W-12 Condensation issue | Ed |
| W-27 Suggest electrical inspection | Ed |
| Letter to GE | Bill |
| Solar Energy Company research | Max |

3055300/000484

Joint Appendix Vol. II Page 1517

**Cowpet Bay West**
**Board of Directors Meeting**
**April 11, 2012**

**Present:** Ed Wardwell, Rosie Wells, Bill Canfield, Sharon Koehler, Herb Horwitz, Doug Rebak (by phone conference), Jon Cassady, Louanne Schechter
Owner's in attendance: Judi Kromenhoek and by phone Lance Talkington

Approval of Minutes of March 6, 2012: There being no objections to the minutes, a motion was made to approve the March 6, 2012 minutes as recorded. All were in favor.

**Treasurer's Report:** Sharon's report is as follows:
Bank balances – March 31, 2012

| | | |
|---|---|---|
| General and Special | $ 87,000* | |
| Reserve | $397,335 | |
| *Owed to Reserve | $38,355 | |
| **Owed to General | $11,550 | |

Outstanding accounts and fines

| | | |
|---|---|---|
| Due 3/31/12 (no dog fines) | | $ 28,171* |
| Dog fines billed, unpaid | | $ 4,900 |
| *Gate fine included $5788 | | |

Review of QBB-1st Quarter 2012

| | |
|---|---|
| Gray water/Pot. Water | $7,500 over |
| Building Repairs | $6,000 over |
| Security | $8,000 over |
| Legal fees | $8,000 over |
| Masonry | $3,000 over ANNUAL |
| Stairs & rails | $7,000 over |

Funding Insurance Policy
We collect $23,700 in insurance income every month from our owners. Our April 1 payment for our new policy was covered by our return premium. We have a May and June payment due of $ 86,122(each); a total due of $172,244.
Ideally we will have our April. May and June collections($71,100) to put toward part of the remaining premium due.
As discussed at our special insurance meeting, it is the board's plan to borrow, in the form of a loan to be repaid, the funds necessary to pay the remainder of our principal from our Reserve account. There will need to be a Board resolution to accomplish this transaction.

**Manager's Report:**
Systems: The gray and fresh water distribution systems filters were changed on the first Tuesday of the month.
Doug asked why the gray water last month became dark and dirty. Jon was not aware there was a problem. Sharon stated that the gray water in her unit is getting progressively worse. Doug suggested the intensive rain storm may have affected the gray water. Jon stated the cistern is covered and rain should not affect the cistern. Following discussion, apparently Leeward gray water has more sediment than Windward. Jon will investigate the problem.

1

3055300/000485

Bill stated he spoke with GE Representatives regarding a new RO system. GE would like to come out next week and assess the property. The representative has indicated there would be considerable savings to CBW. GE would provide the system, as well as the monitoring and maintenance. CBW would pay for the water usage. GE would also be interested in replacing the water meters.

Jon stated that all systems were operating efficiently.

Responding to the quarterly report of "overages", Jon noted that his expenses, if averaged over the entire year, would be within the limits of the budget.

There was one issue with a raw sewage lift pump located by the yacht club last month, leaving only one pump operating to push uphill to the WWTP. The pump had to be pulled up from the raw sewage pit to be inspected. The impeller was jammed by a large piece of concrete that was in the pit. The concrete was removed and the impeller spun backwards and restarted. To prevent further jamming, the pit was drained, power washed, the gray water cistern was cleaned. There was a considerable amount of grease in the sludge that was removed. There was no obvious explanation for the grease.

Building Repairs: Predominantly we are repairing water leaks. We have had several this quarter. There is no preventative measure.

Security: The dollar amount in the budget is due to increasing the hours of the guards. The owners requested and the Directors approved increasing hours for guards on weekends and from 4p-6p. Bill said he spoke with the head of security, Dean. Dean suggested the guard walk 20 minutes, then return to the guard house 20 minutes, rather than only monitor the gate. Bill also suggested the golf cart be utilized by the guards to monitor the property.
Jon and Bill will meet with Dean and revise our current plan.

Additional cameras were discussed with Alert 1. Bill believes the expense of cameras is not cost effective. He stated a 6 by law a 60% head shot is required.

Masonry: We have completed the cistern repair, sealing and clean-out and began some of the crawl space spalling projects as the budget permitted. The annual masonry budget is exhausted and the project is on hold until the next budget year. Jon estimates that 25% of the spalling repairs were completed.

Stairs and Rails: The project is on hold. The upfront cost of $14,000 was materials. Jon has estimates of $250/stair. At this cost, the project would be on target for the annual budget.

**Insurance Committee Report:** Mapfre representatives visited CBW and brought the policy. The owners received a copy of the comfort letter. Owners are being offered a 25% discount for HO6 policies.

**Property and Planning Report:** Max held a meeting on solar energy. The minutes are as follows:

*Purpose of this meeting: The purpose of this meeting was to examine some possible options for using solar energy to offset our WAPA electrical bills.*

*Mr. Rosen was invited to tell us about his company and how they might fit into our long-term planning for the use of solar energy to ease our WAPA bills. Prosolar is grid-tied photovoltaic (PV) system*

2

3055300/000486

*accommodation of a non-obvious handicap the Board may require (1) the submission of documentation verifying that the person meets the Federal Fair Housing Act's definition of disability; and (2) documentation from a doctor or other medical professional who is in a position to know about the individual's disability, and that the requested accommodation is related to the individual's disability. All information submitted to the Board that is necessary for the evaluation of the reasonableness of an accommodation will be kept confidential.*

By changing this paragraph the By Laws will bring the Association into Federal compliance. Herb and Bill volunteered to assist Ed in contacting the owners and obtaining the 2/3 necessary vote.

**Action Items:**

| | | |
|---|---|---|
| Amend February Minutes by 3/12/12 | Rosie | Done |
| Resend Amended Minutes to Board Members | Louanne | Done |
| Change Signatories on First Bank Account | Sharon, Ed, Bill, Rosie | Done |
| Open additional accounts to maintain FDIC coverage | Sharon | Will open checking account |
| Transfer of funds from First Bank to operating account | Sharon | Hold |
| Organizational Minutes | Max | Done |
| Annual Minutes with Amendments completed by 3/15 | Rosie | Done |
| Provide protocol for release of funds | Sharon | Satisfied with current procedure |
| Add employee severance to budget as a liability line item | Sharon | Done |
| Installation of Manual Gate completion date 3/15/12 | Jon | Done |
| Security Committee Review of Bid from Alert 1 | Bill | Done |
| Adjust placement of NO DOG signs and add 2 by 3/9/12 | Sharon | Done |
| Rails painted –starting this week | Jon | Metal done wood rails in progress |
| New Base on roadside sign | Jon | Replace sign |
| Step & Bracket Replacement; evaluate recent work | Jon | On-hold |
| Owner Workshop | Jon | Done |
| Drip Edge on L-6, L-10, W-26, | Jon | Material on island |
| Contact Chuck Waggoner re: By-Laws | Ed | Done |
| Contact Maria Hodge re: By-Laws | Ed | Done |
| Mailboxes: Replace shingles and paint by next Board meeting | Jon | Done |
| Assign employee parking | Jon | Done |
| Repaint numbers on parking spaces next week | Jon | 75% Done |
| Directors don't like color want redone with teal paint | | |
| L-3 re: Discuss owner responsibility | Ed | Done |
| L-01 Patch and Paint area used to repair water leak | Jon | Done |
| L-06 Patch and Paint area used to repair water leak | Jon | Done |
| Entry Gate: obtain police report/begin repairs | Jon | Police Report not available. |
| Employee Shirts | Louanne | Done |
| W-12 Condensation issue | Ed | Done |
| W-27 Suggest electrical inspection | Ed | Done |
| Letter to GE | Bill | Done |
| Solar Energy Company research | Max | Done |

4

3055300/000487

New Business

W-35  Repaint the edge of the porch following the tile Installation.
W-07  Ed spoke with the owners last week.  The issue is between the owner and the contractor.
L-50  Doug request his roof be painted as the patching of leaks has left it unsightly.  Ed said he will discuss in Executive session.

Renewal of other Insurance Policies:  Doug will follow up with the General Liability, D & O, and Vehicle Insurance policies.

May Board Meeting Schedule:  May 8, 2012 at 8:45 AST.

Adjournment:  There being no further business the meeting is adjourned.  There will be an Executive Meeting in 10 minutes.

**Action Items**

| | |
|---|---|
| Sediment in gray water | Jon |
| Checking Account | Sharon, Ed |
| Meeting with GE Representative | Jon, Bill |
| Meeting with Dean from No-Nonsense Security | Jon, Bill |
| Contact Owners to amend no dog policy | Ed, Bill, Herb |
| Replace sign on roadside (remove distance) and lower | Jon, Louanne |
| Repair fascia with drip Edge | Jon |
| Repaint parking numbers with teal | Jon |
| Obtain police report | Jon |
| Insurance Renewal policies-forward to Doug | Louanne |

5

3055300/000488

Joint Appendix Vol. II Page 1521

*company that began in Florida and started in St Thomas last year. They have installed 5 systems on St. Thomas, and gave us the names for reference. They have established an excellent working relationship with DPNR and WAPA, and have had no permitting problems.*

*Max made sure everyone knew this was an exploratory conversation, and CBW is just beginning to look at PV system possibilities.*

*In preparation for the meeting Max had called Michael Bornn at Montessori to discuss their system choice and vetting process (at Anna's suggestion). He also met early with Peter, and they walked the property to examine such things as roof structure and orientation and electrical disconnects.*

*Peter explained that WAPA allows only 100 KW PV systems per each meter. The VI Energy Office is out of rebate money and the federal 30% rebate is not available to non-profit organizations like condo associations.*

*To buy a 100KW PV system, which would cover about 8000 square feet of roof area, would cost about $400K-450K installed. A more feasible approach may be to lease the system from Prosolar, and they would provide a guaranteed amount of power. Such a system would cost Zero down, and be financed for 7 to 12 years at an agreed interest rate (perhaps 6%). The amount financed would be about $375K since the contractor/installer could take advantage of the federal rebate. Much of this would be very negotiable.*

*The expected power produced would be worth about $6K per month at current rates, and the loan payments would be about $3k per month. This would provide an estimated savings on our WAPA bill of $3K per month.*

*We then spent some time with Jon discussing roof mount attachments, and how a PV system would tie in to our electrical system.*

Max asked the Directors if there was an interest in following up on solar energy. The Directors support the concept of solar energy to defray the increasing cost of WAPA as a long term (2-3 years) project.

Max will be having a telephone call-in conference for his committee in May.

**Security Committee Report**: Bill stated he has one owner interested in the committee. Bill stated he has spoke with the head of our security and agrees the guards should be roving the property rather than guarding the electric gate.

**Registration of By Laws:** Ed stated he has obtained the opinion from our legal counsel that we hold in abeyance registration of the By Laws until the Association obtain approval from the owners (2/3 of owners) to change the no dog wording to the paragraph that the attorney has recommended:

*No dogs are allowed on the property, either long term or visiting. Owners or occupants who have properly documented and verified disability as defined by Federal Law may make a request for a reasonable accommodation and exception to the prohibition on dogs on the property. An owner or occupant seeking an accommodation can do so in writing to the Board. The request shall include (1) identification of the Owner or occupant seeking the accommodation; (2) explanation of the relationship between the requested accommodation and the disability; and (3) verification of the disability and need for accommodation as set forth in this rule. To facilitate the Board's review of each request for an*

3

3055300/000489

Joint Appendix Vol. II Page 1522

DRAFT

**Cowpet Bay West**
**Board of Directors Meeting**
**June 12, 2012**

**Present:** Ed Wardwell, Herb Horwitz, Bill Canfield, Jon Cassady, Holly Case,
Phone Conference: Max Harcourt, Doug Rebak, Sharon Koehler, Rosie Wells

**Approval of Minutes:**

Approval of Minutes of May 8, 2012: There being no objections to the minutes, a motion was made to approve the May 8, 2012 minutes as recorded. All were In favor.

Appreciation to Jon for his hard work over Memorial Day weekend.

**Manager's Report:**

Completion of the scheduled filter changes to our gray and freshwater system was completed June 5th at 10:00am. All other operational systems: the Reverse Osmosis (R/O) Plant, waste water treatment plant, generator Gen Set as well as both distribution systems are all operating well.

Continuing progress on the step and rail painting. The entire complex is approximately 60 percent complete. Windward is almost finished. Leeward 1 through 44 area is what needs to be completed.

Completed the Gray water transfer lines in the Leeward field. It has been operational for over a week. Capped old gray water pipes on each end in case they are needed at a later time.

Continuing to replace exterior lights, an additional 44 sets were ordered.

Owners Request:
Completed the ledge repairs at owners' request for L-46 and L-50. Complete removal of the ledge replacing it with a fiber glass cap with a top coat wax compound to water proof.

**Treasurer Report:**
Report submitted by Sharon:
<u>Bank balances</u> – June 12, 2012

|  |  |  |
|---|---|---|
| General & Special | $ 51,000 |
| Reserve | $ 283,181 |

<u>Banking information :</u>
Due to not receiving end of the month back-up of QuickBooks, unable to report everything. There are some discrepancies but will be resolved once required information is received.

All of the 2012 insurance premiums are paid in full. Total amount paid $307,057.00.

1

3055300/000490

Joint Appendix Vol. II Page 1523

DRAFT

Ed stated that Julie the accountant will be working with Holly to do the required tax payments due on the 15th of the month and will come in again for the end of the quarter tax payments and to close the books and make sure everything is in accordance.

Louanne will be compensated to the end of the June for extra time and unused vacation time.

Sharon will provide an analysis of our six-month operating expenses to the Board at the August 7th Directors Meeting.

Arrears:
1 owner is 3 months in arrears, the remaining 7 are 1 month.

Resolution to Amend Banco Popular Checking Accounts Signatories:
**Association Resolution to remove Louanne Schechter and append Holly Case to the Operating (General) Accounts  Signatories**

***Resolution of the Board of Directors of Cowpet Bay West Association ("CBW")***

*WHEREAS, CBW is a Condominium Association organized and existing under the laws of the Territory of the U.S. Virgin Islands; and*

*WHEREAS, the members desire that the Association shall act in full accordance with the rulings and regulations of the Internal Revenue Service, as administered by the Virgin Islands Bureau of Internal Revenue;*

*NOW, THEREFORE, the members hereby adopt , on behalf of the Association, the  following resolution*

*RESOLVED, that the Banco Popular general operating checking accounts (general & special) signatories be amended and only Ed Wordwell, Bill Canfield, Rosie Wells, Jon Cassady, Sharon Koehler and Holly Case to be authorized signatories .*

*This resolution is adopted and made a part of the minutes of the meeting of the Board of Directors on June 12. 2012.*

*BY:_____ Ed Wardwell, President*

*ATTESTED:_____ Rosie Wells, Secretary*

Sharon made a motion that the Resolution be accepted, Bill 2nd , motion passed.

Sharon stated that she has an objection that the second signature on the special account should be a Board member.  She also stated that it was allowed on previous boards but she thought that the original rule was the second signature on the check must be a board member and only with approval from the Treasurer signing the Weekly Report.

**Insurance Committee:**  D&O, General Liability, Umbrella and Property are paid.  Vehicle Insurance is due in July.

2

Joint Appendix Vol. II Page 1524

DRAFT

**Planning & Property:** Max Harcourt, Chairman of the Property and Planning Committee, sent out Meeting Minutes from the May 23rd to the Board members. He also submitted a comprehensive report on the current status and projected upgrades for the property. Major future projects including roof sealing/painting, structure maintenance and electrical system upgrades will be addressed in the 2013 budget.

**Solar Sub-Committee:** Max is currently putting a sub-committee together for a Solar System and has received volunteers but no one has come forward to chair the committee. Concerns are the initial cost for the purchase of the system and securing a dependable contractor that will be able to service it for a extended period of time.

- Bill presented the option of contractor/owner/lease program.
- Max stated that the Government puts out incredible incentives to develop Solar Systems. Ed stated at one time they were refunding up to 30% of the cost but not for non-profit organizations at this time.
- Ooug stated the possibility of using our reserve fund as collateral to borrow funds to complete sizeable costly projects like Solar System, R/O System, and replacing exterior wood with synthetic material.

The next action item will be the committee drafting up an RFP before the next meeting.

**General Electric Meeting:** Bill stated the meeting with GE went well. GE inspected the 35 year old osmosis machine. A fact brought to attention by GE is that we are using our R/O equipment very little. We collect enough water to handle most usage. Jon also uses the R/O equipment when the generator is on which has little to no cost.

GE's proposal is they will build a plant and sell the water back to CBW. At this time our reverse osmosis usage is not large enough to warrant the proposal. GE will produce a statistic report.

**Water to Yacht Club:** Bill proposed the possibility of selling water to the Yacht Club. They are currently buying water from Anchorage that just increased by 20%. Currently we can store 500,000 gallons of water and average use is 150,000 gallons per month which would allow enough for the Yacht Club. Bill and Jon will look into the logistics of connecting the water supply to the Yacht Club and report to the Board.

**Action Items**

- Notarize & Record Bylaws: Completed
- Arrange Meeting with Security: Completed - Owner car was stolen from the property, security company responded quickly to review the tapes - the guard on duty at the time was released
- Daily Water Usage Oata to Bill Canfield: Completed
- Letter to Insurance Carrier re: gate expense: Insurance Co. needs a copy of the back of the insurance check received for the gate damage
- Teleconference Planning & Property: Completed
- Office Manager Replacement: Completed - Holly Case introduced herself
- Roadside Sign: Oeciding on final layout and color for the sign
- Gray Water Upgrade connect terminal ends: Completed

3

3055300/000492

DRAFT

**New Business**

L-42 Bob Cockayne sent an email in May to Board formally requesting "the exterior roof of L-42 be power washed, repaired, sealed and painted before peak hurricane season - within the next 3 months by the association." Bob stated that "he would like to know if the Board does not agree with the request he wants a recommendation on who can do it and will pay for it himself."
- Ed stated after looking at the condition of the roof and speaking with Jon, sealing the roof is a proper topic for the 2013 Budget. Concern is the singular request from Bob wanting his roof done at present time.
- The roof was last done in 2008 (typically has a 5-8 year life span), CBW generally does it every 5 years.
 - There is no evidence of cracks or leaks at the present time with L-42 roof.
 - Estimate to paint the roofs is approximately $75,000, $1,500 per unit.
Board suggested that if he wants to do the repairs himself they would suggest someone that can do it for him, otherwise it will be addressed in the 2013 Budget. Herb volunteered to discuss the decision with Bob and to make sure there are no other concerns.

On June 6, 2012 the Association was notified by letter from the US Department of Housing and Urban Development (HUD) that "HUD has completed its administrative proceeding of this complaint (Barbara Walters vs. Cowpet Bay West Association) under the Act (Fair Housing Act of 1968) and the compliant is hereby dismissed."
- Complaint failed to request for a accommodation, produce evidence, etc.
- Association has complied with the regulations for emotional handicapped individuals.
- Letter was forwarded to Attorney Joe Riopelle; he feels with the HUD dismissal of the Walters complaint that we can expect the Kromenhoek complaint to be dismissed as well. It still leaves the two civil complaints open and he is required by law to respond to both by June 21st.
- Herb suggested letting the owners know the outcome of the complaint. Ed will put an email out to the owners recapping the Board meeting and letting them know HUD's decision.


August Meeting: The next meeting of the Board of Directors will be August 7, 2012. 8:45AM AST

Meeting was adjourned.

### ACTION ITEMS

| | |
|---|---|
| Letter to Insurance Carrier re: gate expense | Herb/Holly |
| Road Sign | Jon |
| RFP for Solar System | Max |
| Supplying water to the Yacht Club | Bill & Jon |
| GE Report | Bill |
| L-42 Roof Painting | Herb |
| Email to Owners re: HUD Decision | Ed |
| Analysis of six-month of Operating Accounts | Sharon/Holly |
| Signatories changed on Banco Popular Accounts | Holly |

4

3055300/000493

Judith A. Kromenhoek

6200 Windward Way #44

St. Thomas, USVI 00B02

June 22, 2012                          RE: Inquiry No. 336193, HUD Case 02120337B

Mr. Jay Golden

U.S. Department of Housing & Development

New York State Office

Jacob K Javits Federal Building

26 Federal Plaza

New York, New York 1027B-006B

Dear Mr. Golden,

I was very disturbed by your letter dated June 15, 2012 **dismissing** my complaint. I have filed a civil lawsuit and your dismissal makes Cowpet Bay West look like they have done nothing wrong. In the words of a Board member, the other members were gloating over your dismissal.

I have been harassed for over a year. July of 2011 my papers were filed in the office. At this time, there was nothing in our by-laws that said a formal request must be made to the Board. These by-laws have been changed in March, 2012 to now include this (after the HUD complaint). They were changed on the advice of their attorney; they were told they must change them to comply with HUD and the ADA.

The reason I did not make a formal request (it was not required by our by-laws at the time) to the Board was because the then President of the Board, Max Harcourt would leak all of this information to a Lance Talkington and he would then post it on his blog. The blog, although not official was named the Cowpet Bay West Blog so the owners thought everything written on it was the truth.

The Board charged me a $50 a day fine for having my dog, they put up signs all over the property and blasted e mails to CBW owners – all negative toward me. If this is not harassment then what is?

The new Board took office February, 2012 and the new President, Ed Wardwell has tried very hard to rectify the situation. He gave written permission to allow the dog in April, 2012 and he has lifted all the fines. The signs are still up.

Many of my neighbors still do not talk to me; they cannot see my disability so they believe all the nasty e mails.

3055300/000494

**Retaliation is a violation of the Fair Housing Act.** All the fines, signs, e mails – I believe this is retaliation.

I do believe my complaint to HUD is the only reason the CBW Board decided to seek legal advice and therefore comply with the law. Up to that point, Mr. Harcourt said "we do not go by federal laws, we go by Cowpet laws". I know that my dog is now legal and I am not asking you to fine Cowpet Bay West but just re-word the outcome. **Dismissal** makes it sound like I have no credibility.

Thank you for taking the time to review this matter. I can be reached on my cell phone at 340-677-3267.

Sincerely,


Judith A. Kromenhoek

cc: Ms. Irma Perez-Pillot

DRAFT

**Cowpet Bay West**
**Board of Directors Meeting**
**August 7, 2012**

**Present:** Ed Wardwell, Herb Horwitz, Bill Canfield, Max Harcourt, Holly Case
Phone Conference: Doug Rebak, Sharon Koehler, Rosie Wells

**Approval of Minutes:**

Approval of Minutes of June 12, 2012: Sharon requested that the Treasurer report remove "All of the 2012 insurance premiums are paid in full". At the time vehicle insurance had not been paid.

Motion to adopt as amended was made and 2nd. All were in favor, motion carried.

**Manager's Report:**

Continuing progress on the step and rail painting. The entire complex is approximately 60 percent complete.

Continuing to replace exterior lights, still waiting on the additional 44 sets that were ordered.

Poly Caribe installed new couplings in the waste water transfer piping from Windward Way to the settling basin. The entire piping run is corroded and should be replaced after hurricane season.

Staff is painting the curbs and numbers on parking spots.

Emergency repairs were completed on the seaside balconies of several units. All the railings have been inspected and any that could have resulted in a potential problem were fixed.

**Treasurer Report:**

<u>Bank balances</u> – August 3, 2012
General & Special     $ 36,025
Reserve                    $ 302,972

Reserve account is owed $19,416.
Capital Projects is owed $19,175 from the Reserve Fund.

<u>Mid-Year Report Review:</u>

Sharon completed a comprehensive review of our six month (through 6/30/12) actual operations compared to our 2012 budget. Our income for this period is on budget. Our total expenses exceeded budget by $69,000. The major overruns were:

1

Joint Appendix Vol. II Page 1529

DRAFT

- $20,000 - for Guard and Gate Security
- $23,000 - for Building and Grounds Contract Labor
- $23,000 - for Building Masonry Repairs

A $27,000 savings in insurance premiums partially offset these and other smaller overruns.

The Board mandated that management undertake only emergency repairs and minimize any expenditures in the months ahead.

Arrears:
1 owner is 4 months in arrears.

Sharon suggested that a lien should be placed on owners that are several months in arrears.

**General Manager:**

Jon Cassady remains in critical condition in the Mayo Jacksonville Clinic Hospital. Jon continues to improve in response to medical treatment and tests.

After discussion, the Directors unanimously approved to continue Jon's salary and benefits pending further review at the September 5th Board Meeting.

In Jon's absence, the Board decided to contract the services of Arran B. McGinnis as our Interim Property Manager through the impending tropical storm season. Arran will be resident at Cowpet Bay West throughout his contract until October 15th when Jon's situation can be reassessed. Legal counsel is drafting a contract with Mr. McGinnis to be paid $175.00 per day for his services. Ed will execute the contract on behalf of the Association.

COBRA eligibility for Association employees was discussed. Doug is going to research what options are available.

**Insurance Committee:** All Insurance has been paid for the year. Doug will be negotiating property liability insurance after hurricane season.

**Security Committee:** Discussion was held on how to decrease spending on security and still keep CBW safe. Suggestion was made to install a card reader to exit the gate, more cameras, replace broken lights and security guard schedule to be random. Bill will investigate the cost for an exit gate card reader and security guard service. Staff will expedite light replacements.

**Planning & Property:** Max is currently putting a sub-committee together for a Solar System and has received volunteers but no one has come forward to chair the committee. Max will continue to organize a sub-committee.

**June Action Items**

- Letter to Insurance Carrier re: gate expense (Completed)
- L-42 Roof Painting (Completed)

2

3055300/000497

Joint Appendix Vol. II Page 1530

DRAFT

- Email to Owners re: HUD Decision (Completed)
- Analysis of six-month of Operating Accounts (Completed)
- Signatories changed on Banco Popular Accounts (Completed)

**New Business**

Legal Proceedings: Received an update from the Travelers Insurance Company, Attorney Joe Riopelle, that the last submission received from Walters/Kromenhoek exceeded the 20 page limit. The judge has given them until the August 8th to amend their 30 page plea down to 25 pages and has given Joe Ripolle until August 20th to reply in 25 pages.

Legal Fees: There is a $5,000 deductible for each of the Walters and Kromenhoek suits. Walters retainer was met and at the end of the month we should have reached Kromenhoek retainer as well. We continue to use Hodge & Francois for other issues. Rosie asked for a breakdown of legal fees, Sharon said she would provide at next meeting.

Staff Evaluations: Jon reported to Ed that he completed the staff evaluations. His recommendation was that each should get a cost of living increase of 3%. Ed met with the staff, discussed Jon's situation with them and informed them he would speak with the board regarding their pay increase for the year.

After board discussion a motion was made to give staff a 3% raise, motion was seconded and passed by majority vote.

Gate Sign: Doug suggested that someone look at the CWB sign to observe the condition and to see what need to be done to have it restored. Max said he would look at it and bring information to next Board meeting.

Parking Issues: Herb suggested that the end of Windward to be dug out and leveled in order to produce more parking spots. Holly volunteered to get estimates and look into what permits are required.

September Meeting: The next meeting of the Board of Directors will be September 5, 2012. 8:45AM AST

Meeting was adjourned.

**ACTION ITEMS**

| | |
|---|---|
| Road Sign | Arran/Holly |
| RFP for Solar System | Max |
| Supplying water to the Yacht Club | Bill |
| GE Statistic Report | Bill |
| Insurance information for Jon | Doug |
| Cost of card reader to exit | Bill |
| Security Guard | Bill |
| CBW Sign condition | Max |
| Legal Fee Breakdown | Sharon |
| Additional Parking | Arran/Holly |
| Lighting replacement | Arran |

3

3055300/000498

DRAFT

**Cowpet Bay West**
**Board of Directors Meeting**
**September 5, 2012**

**Present:** Ed Wardwell, Rosie Wells, Arran McGinnis, Holly Case
    Phone Conference: Doug Rebak, Sharon Koehler, Max Harcourt

**Approval of Minutes:**

Approval of Minutes of August 7, 2012:

Ed Wardwell submitted correction - After discussion, the Directors unanimously approved to continue Jon's salary and benefits pending further review at the September 5th Board Meeting.
Doug submitted correction - Under parking Issues: changed end of "Leeward " to "Windward".

Motion to adopt as amended was made and 2nd. All were in favor, motion carried.

**Manager's Report:**

RO, WWTP, Gen Set, Operating systems ran all month with no major issues. On schedule for filter changes and maintenance for the RO plant. Water testing is done through Ocean Systems and all findings are reported through DPNR in St. Thomas and EPA in New York, next report will be sent next week.

All porch lights have been replaced, ordered the remainder street lights (5-year warranty). Will be ordering additional for back-up.

Rebuilt back-up transformer is complete, currently in Miami to be shipped to St. Thomas.

Requiring morning meetings with all staff to determine work for the day and to keep them organized and on track. Will be utilizing additional temporary employee to paint the 17 seaside railings and to complete stair and railing capital project in Leeward.

**Treasurer Report:**

Bank balances – September, 2012

|  |  |
|---|---|
| General  & Special | $  12,117.92 |
| Reserve | $ 312,680.74 |

Reserve account is owed $19,416, two payments for August and September.

| | |
|---|---|
| Accounting Fees: | $5,940 |
| Legal Fees: | $14,956 ($10,000-Walters & Kromenhoek/4,956-Misc. Legal Expenses) |
| Emergency Rail Repair: | $22,000 |

1

305530/000499

DRAFT

Sharon expressed concern regarding the cost of repairing the Golf Cart. Parts were ordered beforehand without a disclosure of the cost. The golf cart has been repaired and is being used daily by General Manager and Staff.

Arrears:
1 owner is 3 months and 1 is 4 months in arrears.

**General Manager:**

Jon Cassady is currently in the Brooks Rehabilitation Hospital in Jacksonville. Jon is receiving physical and speech therapy 6 hours a day, 6 days a week. He is responding reasonably well from a physical stand point, he is able to stand and has full range of motion with his arms and legs and retains his physical strength. He is still unable to swallow, therefore they will be testing in ensure there is no blockage in his throat or esophagus.

Ed will be meeting with Jon and his brother Jay in Jacksonville this weekend to discuss how to best serve Jon's needs and the Associations requirements.

**Committee Reports:**

Insurance Committee: All Insurance has been paid for the year.

Security Committee: Porch lights have been replaced.

Planning & Property: Max will continue finding a chair for the Solar System Committee.

**Legal Proceedings:** September 7th, Attorney Joe Riopolle (Travelers Insurance Company) will file the names of the individuals who will have to provide a deposition for the Walters/Kromenhoek suit. He is not expecting any further action on the suit until October when the initial stages of mediation begin.

**August Action Items**

- Supplying water to the Yacht Club (Closed) - Further developments in researching on supplying water to Yacht Club have concluded that CBW will not be pursuing this venture
- GE Statistic Report (Closed)
- Insurance information for Jon (Completed) - Once Jon qualifies for Social Security Disability he has to wait 24 months before applying for Medicare. Jon is not eligible for COBRA Insurance.
- CBW Main Sign Condition Checked (Completed)
- Legal Fee Breakdown (Completed) - See Treasurer's Report
- Lighting replacement (Porch Light Completed)

**New Business**

Arrears: Board discussed an owner that owed over $10,000, approximately 5 months behind, and the final steps to collect Association dues. $1,500 of the fees are a result of tenant having a dog on the premises. After a certified letter was sent to the owner, they responded that they would make a good faith payment of $2,000 and would pay the remainder as soon as possible. Owner was advised to put

2

30553C0/000500

DRAFT

their grievance in writing and it would be presented to the Board. As of September 4th neither the letter nor the payment have been received.

Board decided to send a certified letter, final notice, giving the owner 2 more weeks before shutting off utilities.

New Forms: Notice of Parking Violation and Installation Letter of Permission.

Screened in Porch: Owner requested to screen in patio, Board stated that the protocol would be for the owner to put in writing with engineering sketches and present to the Board for approval.

October Meeting: The next meeting of the Board of Directors will be Friday, October 12, 2012. 8:45AM AST

Meeting was adjourned.

**ACTION ITEMS**

| | |
|---|---|
| Road Sign | Arran |
| RFP for Solar System | Max |
| Cost of card reader to exit | Bill |
| Security Guard | Bill |
| Additional Parking | Arran/Holly |
| Street lighting replacement | Arran |
| Confirm Earnings for SSD | Holly |

3

3055300/000501

Joint Appendix Vol. II Page 1534

DRAFT

**Cowpet Bay West**
**Board of Directors Meeting**
**October 12, 2012**

**Present:** Ed Wardwell, Herb Horwitz, Bill Canfield, John Foster, Arran McGinnis, Holly Case
Phone Conference: Doug Rebak, Sharon Koehler, Rosie Wells

Ed Wardwell called a moment of silence in remembrance for Max Harcourt.

Resolution introduced by Ed Wardwell.

Association Resolution to elect John Foster, Windward #36, to fill Board Member vacancy caused by the untimely and tragic death of Max Harcourt to serve until the next annual meeting, February 2013.

Motion to accept Resolution, all were in favor, motion carried.

**Approval of Minutes:**

Approval of Minutes of September 4, 2012:

Doug submitted correction - CBW Sign Condition (Completed) - indicated that it was not complete.

Motion to adopt as amended was made and 2nd. All were in favor, motion carried.

**Manager's Report:**

RO, WWTP, Gen Set, Operating systems ran all month with no major issues.

CBW Sign: New CBW Road Sign presented to the Board. It was determined that it was the same sign approved in earlier Board Meeting, with the exception of changing "Entrance in 400ft" to "Next Right". Sign cost is approximately $900 - this includes the sign, mount and installation. Estimated time to be completed is two weeks.

Construction Approval: W-24 construction plans presented to the Board for approval. Owners are in compliance with all Association renovation requirements. Doug suggested that when raising the ceiling they leave room for the chase. Arran confirmed that it was addressed and in the plans.

Seaside Rail Painting: Windward seaside rail painting will be completed today, staff will begin painting Leeward next week. Completion of all seaside railings is expected to be within three weeks.

New projects: Reconstruct stairs and wall by Leeward 20; and replace brackets under the stairs with hardware already purchased.

Street Lights: Four ten-foot poles will be purchased and installed to light the four dark areas on property to assist with security, estimated to be completed by next week. The remainder street lights are complete. Any that have failed will be shipped back for reimbursement under warranty.

1

3055300/000502

DRAFT

<u>Porch Lights:</u> Herb stated he thought the street side porch lights were going to be all replaced to make them standardized. Arran stated that all the lights that were not working have been changed and everything he has received has been changed as well. Arran said he would check to make sure that we didn't have any left in stock to install to make them standardized.

<u>Transformer:</u> Rebuilt back-up transformer is complete and on island. Will be contacting Skyline Electric to install it. During installation the exposed cables coming from Leeward leading to Windward will be replaced. The rebuilt transformer will be used as the main transformer and the current one as the back-up.

<u>Stair and Railing Capital Project:</u> Board decided to repair only emergency cases. Will not subcontract the repairs, staff will be performing the work supervised by Arran.

<u>Security:</u> There was a theft incident on October 3rd when three unlocked vehicles on Leeward were entered and their contents pilfered. The perpetrator was on foot and uncaught despite search efforts by Arran McGinnis and the security guard. Ed will send out a reminder to the owners to lock their units and car doors.

Security gate circuit board needs to be updated so that when exiting the gate, a card or code will have to be used in order to exit the property. The cost of the board is approximately $2,500. Sharon, Treasurer, stated that we currently have appropriated funds in the 2012 budget to cover the cost of upgrading the security gate. Board approved upgrading the circuit board to eliminate the green exit button.

**Treasurer Report:**

<u>Bank balances</u> – October, 2012

|  |  |
|---|---|
| General & Special | $ 46,500.00 |
| Reserve | $ 322,700.00 |

Reserve account is owed $19,416, two payments for September and October.

Sharon expressed concern regarding overtime paid to employees. With our current policy, overtime should only be in emergency cases, otherwise needs to be approved through the Board.

<u>Arrears:</u>
1 owner is 3 months and 1 is 4 months in arrears.

**General Manager:**

Jon Cassady is still in the Brooks Rehabilitation Hospital in Jacksonville. Jon is making progress, although it is slow he is physically doing well. He has vision in both eyes and is speaking but continues to have issues with arm/hand coordination and swallowing. Original release date was October 10th, but has now changed to October 31st. Once he is discharged he will become a Brooks out-patient for 30 days.

Ed spoke with Jay Cassady (power of attorney for Jon) informing him that the Association will continue to cover Jon's medical care until he eligible for Social Security Disability on December 27, 2012.

2

3055300/000503

DRAFT

Resolution introduced by Ed Wardwell.

<u>Association Resolution to continue Jon Cassady on full-time payroll, 30 hours per week at VI minimum wage, and the Association will provide continued medical coverage until December 31, 2012.</u>

Motion to accept Resolution, all were in favor, motion carried.

**Committee Reports:**

<u>Security Committee</u>: We will look into the possibly of hiring a designated security person for C8W. This will allow us to have control over shift hours and can have them on a random schedule to cover different days and hours of the week. It was determined not much activity takes place between 0130-0600 and the best time to have security is 1800-Midnight. Also suggested with the gate change we could cut guard time from 80 to 40 hours. The board also discussed adding more cameras; concern was how to monitor them and the quality of the picture. 8ill will look at all options and present at next 8oard meeting.

<u>Insurance Committee</u>: All insurance premiums are paid and completed for 2012.

<u>Planning & Property</u>: Herb Horowitz has volunteered to resume the responsibilities of Chairman for the Planning and Property Committee. He will report at the November Board meeting.

**Legal Proceedings:**

Any Board member who cannot attend the mediation will need to turn in the "Limited Power of Attorney", notarized, before the mediation on October 19, 2012.

**September Action Items:**

- Confirm Earnings for SSD (Completed)
- Additional Parking (Addressed in 2013 8udget)
- Street lighting replacement (Completed)

**New Business:**

<u>W-52:</u> Owner requesting a handicap parking space. It was determined that the Association is in compliance with the Fair Housing Act of 1988, and in accordance with the Act she is currently receiving reasonable accommodations by having a parking spot as physically close to her unit as possible. We are not required to paint, mark or widen the parking spot. Given that we are in compliance with the Fair Housing Act, no further action will be taken at this time.

<u>2013 8udget</u>: The Executive Committee (Ed Wardwell/Rosie Wells/Bill Canfield) will meet with the Planning & Property Chairman (Herb Horwitz) and Property Manager (Arran McGinnis), to prepare a recommended budget to the Board prior to the November Board Meeting. The budget will include Capital Projects and Operating Expenses.

<u>New Property Manager</u>: The Board decided unanimously in the Executive Meeting that Arran McGinnis would be offered long-term employment as Property Manager for Cowpet 8ay West. Board offered the

3

3055300/000504

DRAFT

position under the same terms and agreement made on September 5, 2012, effective October 16, 2012. Arran agreed and accepted the position.

<u>2013 Annual Meeting</u>:  Board decided that the Annual Owners Meeting will be Saturday, February 9, 2013.

**November Meeting:**  The next meeting of the Board of Directors will be Tuesday, November 13, 2012. 8:45AM  AST

Meeting was adjourned.

### ACTION ITEMS

| | |
|---|---|
| Road Sign | Arran |
| Circuit Board/Card Reader for Security Gate | Bill/Arran |
| Security Guard | Bill |
| Additional Security Lights | Arran |
| Stair/Wall Reconstruct Cost | Arran |
| Porch Lights (standardized) | Arran |
| Reminder to owners lock doors | Ed |
| 2013 Budget | Executive Committee |

4

3055300/000505

**Cowpet Bay West**
**Board of Directors**
**Special Meeting**
**July 27, 2011**

**Present:** Max Harcourt, Barbara Walters, Rosie Wells, Sharon Koehler, Bill Canfield, Vince Verdiramo, Bob Cockayne, Jon Cassady, Louanne Schechter

Jeanne Brennan, CPA for Cowpet Bay West attended by phone conference at the request of the Directors.

**Purpose of Meeting:** Discuss a means to pay the premium of the newly acquired insurance and alter the budget if needed. Note: Insurance was in effect before securing finance.

**Treasurer Overview:** We have about $449,000 in cash, $68,000 was written from the reserve fund as the down payment on the new insurance. The rebate from the previous insurance policy is expected to be approximately $50,000. The remaining Capital Improvements are expected to be $110,425. With these expenditures there should be a cash reserve of $320,442. (See Financial Overview sent by Sharon). Max approved financing the remainder of the insurance premium with a 9 month payout at 3.2% which is $23,632/month. The interest adds approximately $8600 to the cost of the insurance. As the Board had not voted on the financing, Max made a motion to accept the $68,032 down payment with 9 month financing at 3.2% from Mapfre . Bob 2nd the motion. Following discussion, the vote was taken. Max, Sharon, Bob, and Bill voted yes. Barb abstained. Rosie and Vincent voted no.

Max stated the insurance cost to the Association has consistently increased over the years but the owners' fees have not been increased.

Sharon discussed 3 options:
- Suspend our future "reserve" allocation of income for the rest of this year and allocate the funds solely to "insurance"
- Borrow money from the reserve fund via a note, with the intention of paying back to the reserve fund sometime in the future. There was no plan submitted for the future payback.
- Make a permanent transfer from the reserve fund to the insurance, with disclosure that the funds are not intended to be paid back.

Barb suggested a 4th option of a Special Assessment rather than dipping into again or borrowing from the reserve funds.

Jeanne Brennan, CPA, made the following suggestions:
- The Board needs to determine what you deem proper for your reserve fund based on the level of your future needs. A figure would need to be analyzed.
- If you borrow from the reserve fund you break the integrity of the reserve fund, you have to have a resolution, a method of payment, interest, and a new budget sent to the owners. If there is no intent to pay back, you report it as a change in the equity.
- Factor into the next 7 months the cost of the premium and decide if it will include the down payment for the 2012 premium

3055300/000506

Jeanne reported the Reserve Account is specified in the budget and not intermingled with insurance premiums or deductibles. The insurance is actually part of Operations and Management, the insurance was reported separately due to the fluctuation of the insurance premiums following a major hurricane.

Max stated the operating budget is over by approximately $66,000, to include, fuel for the generator, tree trimming, repairs to vehicles, and beach drainage. He wanted to know how this will affect the reserves should we suspend payments to the fund for the remainder of the year. Sharon stated we should have enough money in cash flow to complete the capital projects.

Max moved we transfer the beach drainage project from expense account to a capital project. Sharon 2nd, all were in favour. Motion carried.

Mapfre Deductable Overview: Bob stated he sent out **Shep Barrows Appraisal** that has a breakdown of building by cost. The total deductable for the entire property is $520,000. Bob stated that each building is insured separately. Bob suggested we keep in cash flows for insurance deductible $362,000 which is 70% of the entire deductible.
Bob interjected the policy can be renegotiated in January with Mapfre with same premiums over an 1B month premium.

Vince stated he needed to leave the meeting; his recommendation was to maintain the reserve funds at $500,000. He would not approve of anything less. He noted that we have consistently had that level of operating reserves. Vince left the meeting.

Max made a motion that the reserve fund for 2011 decrease to $3B0,000. Our CPA had suggested a review of what our total reserve would need to be. The amount voted on had not been reviewed or substantiated by any figures. Sharon 2nd the motion. Following discussion, Max called for the vote. Max, Bill, Sharon, and Bob voted yes. Barb and Rosie voted no. The motion carried the Board made a resolution to decrease the reserve fund to $3B0,000 with the remainder of funds going to the general operating fund.

The funds ($68,034.) used for the down payment on the new Mapfre insurance policy were drawn off the reserve fund. Sharon moved the Board resolve to permanently diminish the reserve account by $6B,000 to the General Account. Bill 2nd. Following discussion, Max called the vote. Max, Bob, Sharon, and Bill voted yes. Barb and Rosie voted no. The motion carried.

Barb made a motion to have a special assessment of $1000 per unit owner to cover the cost of the policy. She stated that we should not borrow from our reserve fund again and must stay on the agreed budget. Rosie 2nd. Following discussion, the amount did not breakdown the amount by each individual unit equity but the total amount needed to be funded. Max, Bill, Bob, and Sharon voted no. Rosie and Barb voted yes. The motion was vetoed.

Max made a motion to increase insurance fees per month by $60,000 over 5 months. Bill 2nd the motion. Following discussion Max called for the vote. Bill, Sharon, Bob, and Max voted yes. Barb and Rosie voted no.

Sharon moved the Board resolve to decrease payments to the reserve fund from $12,125,a month to $4,7B5 a month and move the difference of $7,340 a month from the reserve fund to the insurance

fund. Bill 2nd. Following discussion Max called the vote. Bob, Max, and Sharon voted yes. Bill did not respond. Rosie and Barb abstained. The motion carried.

Sharon will work on the revision of the budget.

Max stated we will proceed with the work on the Capital projects.
Jon stated while looking at the breakdown on the insurance, there are 5 systems that are not covered in the breakdown. Max asked Jon to send an email to Shep with the missing systems . Barb requested all Board members receive a copy of the systems problems.

Barb made a motion we contribute $750 to the little league sponsored by DPNR . Max called the vote, 4 were in favour, Max abstained.

3055300/000508

## CBW Owner Repair/Inquiry Handling Policy

May 10, 2011

The CBW Board of Directors has developed this set of guidelines to establish a pr
through which: owners may report issues of concern to the office, the staff is mad
aware of the issues, and the concerns/issues are documented and handled in a ti
manner.

- Emergency repairs/issues (Normally initiated by phone call)
    - ❖ If fire, injury or crime –in-progress is involved, individual noting even
      call 911.
    - ❖ GM or staff member to respond immediately
    - ❖ If needed, additional staff called in to handle problem until secured
    - ❖ Owner to be billed if owner responsible item. Determination made b
      GM in conjunction with owner/representative. In case of disagreem
      only immediate safety issues will be handled, and the owner must s
      disputed issues to the board by letter or email.

- General repairs-owners units (Initiated by email/letter to Office)
    - ❖ Communication received from owner; Office Manager (OM) enters i
      log, note to General Manager (GM), copy to BOD
    - ❖ Within 2 business days, acknowledgement of receipt to owner (phor
      email), indicating receipt and, if appropriate, initial action taken
    - ❖ GM, or other staff member, to inspect the problem within 5 business
      days. Maintenance form (being developed) completed indicating da
      assessment of problem, expected action to be taken to correct situa
      along with time frame
        - ▪ Form should include disclaimer information regarding owner
          association responsibility.
        - ▪ Form should be signed by GM and owner or owner's agent, i
          available. If not available, can be done by email. In case of
          disagreement, only immediate safety issues will be handled,
          the owner must submit disputed issues to the board by letter



PLAINTIFF'S
EXHIBIT
4

- Owner should be referred to list of association recommended contractors.
- Owner should not be restricted to list only, but must understa should a question arise as to a hidden Association responsibi is the owners/contractor's responsibility to have GM inspect v progress.
- Owner/representative is responsible for directly negotiating w contractor for scope, price and schedule.

❖ Association Responsible

- GM determines scope of work to be done - by staff, by outsid contractor, or by both.
- If complaint requires work to be done by our staff (e.g., tree trimming, porch light replacement, painting, minor wood rail r roof leak, etc.) work needs to be delegated to staff for comple reasonable amount of time, (e.g., 10 business days).
- If complaint solely requires work to be done by an outside contractor, GM to schedule an appointment for inspection an estimate within two weeks, (alternative contractors may have used to meet this schedule). Agreed upon work to be schedu soon as possible after inspection. GM will inspect work in pro as well as completed job.
- Owner will be notified by e-mail or letter of scope of work, expected repair date, and re-contacted when repair is comple or if rescheduling is needed. If the Owner/representative can support the scheduled work, they become responsible for dir negotiating schedule with the contractor – without changing s of work.
- In the event of combined staff/outside contractor work, (e.g., leak by staff; inside wall/rebar repair by outside contractor), s should commence repair as soon as possible, if the job will al for it.

- Landscape requests (Initiated by letter/email to office)

- ❖ Landscape committee responds to Office (copy to Board) recommer action to be taken within 3 weeks.
- ❖ Office responds to Landscape committee (copy to Board) indicating frame for action (within 1 month), or indicating issue must be discus Board.
- ❖ Written (email or letter) reply to owner indicating action to be taken, and time frame.

- ⚬ Requests for enforcement of Rules and Regulations.    (Initiated by phone, or letter to the Office and Board)
  - ❖ If safety is involved, handle as an Emergency Request.  If fire, injury crime –in-progress is involved, individual noting event must call 911.
  - ❖ If not time–urgent, Office issues warning letter to owner (if known); t e-mail message to possible involved owners/renters/agents, if unknc
  - ❖ In case of illegal parking, staff will place a sticker on driver side wind of the illegally parked vehicle.  If the vehicle is a hindrance to emerg vehicles, it may be booted and fines levied in accordance with Parki Policy.
- ⚬ Owners general suggestions/requests (Initiated by email/letter to Board)
  - ❖ Board will acknowledge letter in a timely manner (within a month), indicating the matter will be discussed at the next Board/Executive E Meeting (giving the date of that meeting).
  - ❖ The Board will provide a written reply (e-mail or letter) to the owner  2 weeks after the meeting indicating its disposition.

# Cowpet Bay West Blog

## An Informed Active Community

### Puppy Dog Diplomas

January 15, 2012

Readers of the blog may recall a comment that Cowpet owner and board candidate Judi Krohmenick made recently regarding the "certification" of her puppy. She claimed that her puppy is a "trained, legally certified service animal". We asked her what that meant and have had no response. After a recent board meeting discussion on the subject of dogs, it's become much clearer what is really happening with puppy dog diplomas.

The board was provided details on the various "certifications" of owner puppies at the January board meeting. Information distributed at the meeting indicated that Judi's puppy is certified by an outfit called Goldstar German Shepherds. We've done some research and found out that for the one time low price of as little as $71.50, a dog owner can obtain all sorts of really cool gadgets and puppy certification without having to leave the comfort of your computer. All anyone has to do is print the little form from their web site; fill out a name; address; and other basic info; write a check; and boom – you get all of the way cool proof needed to tell the world about your very own certified service animal. How tidy is that, right? Heck, if you're in a hurry, operators are standing by at 702-497-7229 to avoid the nasty wait for the mail to make it to them. The link to their site is here for those who would like to see for themselves how all of us can have a certified service animal in darn near no time at all.

http://www.goldstar-germanshepherds.com/certification_licensing.html

The information distributed at the board meeting also indicated that Barbara Walter's and Joel Kirschenbaum's puppies are "certified" by an outfit called the National Service Animal Registry. Here is the link to the similarly totally cool three minute process to get your very own "certified" service puppy from this outfit:

http://www.nsarco.com/cgi-bin/product.cgi?id=081218004

There are at least ten outfits like these two on the Internet that offer the same type of "service". One of them (Service Dogs America) even has the gumption to state that "SDA recognizes that every person in America may have some form of disability". See this fascinating statement for yourself plastered in bold letters squarely in the middle of their home page:

http://www.servicedogsamerica.org/

It is the blog's considered opinion that these outfits serve no legitimate purpose and exist mainly to sidestep what the ADA works diligently to accomplish. These outfits make it plain on their sites that nothing is done to verify either the animal's credentials or the purported disability of



PLAINTIFF'S EXHIBIT
5
PENGAD 800-631-6989

LT-29

1. 

**alfred felice** *said:*

January 3, 2012 at 9:18 pm

NO COMMENT OKAY BUT NO VOTE EITHER FAIR IS FAIR AL

2. 

**Anonymous** *said:*

January 4, 2012 at 8:33 am

Thanks for providing this voter material Lance.

**LT-28**

# Cowpet Bay West Blog

## An Informed Active Community

### Questions Posed to Board Candidates

January 3, 2012

The following was emailed to all board of director candidates:

*To all – my wife and I own 3 Leeward and have the following two questions for the board candidates:*

*What would your vote have been on the recent board vote regarding open or closed meetings in the specific context of the vote taken?*
*Are you in favor of the proposed bylaw revision as stated in the draft regarding dogs on property?*

*Lance Talkington*

Responses received were as follows:

- Herb Horwitz – for open meetings; and for the bylaw revision regarding dogs
- Doug Rebak – 1. I have been in favor of open meetings from the time I voted in favor of Vinny's motion at the Annual Owner's Meeting. This is not theoretical but real. The meetings I held as President were open ,with the few exceptions where we were talking sensitive topics such as Staff Reviews or specific Owner-related problems.
  2. My position on dogs is I love them, have had 2 of our own, but they just do not belong at Cowpet. The issue of a "service dog" can and has been abused, but I feel the Board is taking a reasonable approach in following the ADA guidelines.
  Bottom line, I favor the By Laws revision on dogs.
- Ed Wardwell – declined comment
- Judi Krohmenhoek – declined comment
- Barbara Walters – declined comment
- Dick Lamoreaux – declined comment

While earlier correspondence is not available for Ed Wardwell's position on these issues, Judi; Barbara; and Dick are on record favoring dogs on the property (Judi and Barbara both currently have dogs in their units and have declined to comment as to the basis for it). Barbara is on record favoring closed meetings. Our thanks to Doug and Herb for taking the time to comment.

**Comments on: "Questions Posed to Board Candidates" (2)**

LT-27

*ASK our property manager, Jon Cassady (340-998-0807), our office manager, Louanne. (340-775-6675) or any of the CBW employees, Matuba, Steve, Joey, Ken, Mr. Brown, ChiChi or Marsellus just what they think of those who are running and why.*

*Get their opinions of the current Board, Max Harcourt, Sharon Koehler, Bob Cockayne, Rosie Wells, Barbara Walters Vinny Vertiramo and Bill Canfield.*

*Now ask them what they think of those running for the Board in February, Doug Rebak, Dick Lamoureux, Ed Wardwell, Herb Horwitz, Barbara Walters and myself, Judi Kromenhoek.*

*Base your vote on what these people tell you. They are at CBW twelve months a year, they see and know what is going on. They are not political but honest workers. Use their input to help you make the right choice.*

*I hope you all have a very happy holiday season and a happy, healthy 2012.*
*Sincerely,*
*Judi Kromenhoek*
*44 Windward Way*
*(340-677-3267)*

**Comments on: "Letter From Judi Kromenhoek" (1)**



1.

**alfred felice** *said:*

December 24, 2011 at 11:31 am

I sent an Email response to all included in Judi and Herb's Email. I believe my message was recieved by all on their lists. In short, Judi and Barbara are unqualified to run for our board as they have been terribly disruptive these past 2 years. First Judi, on her own, without board approval, put a disasterous insurance policy on our books which was finally corrected. Second, a board minority tried to oust the majority because they were defeated on a vote!! Third, they defy the entire community by keeping DOGS on our property, that specifically outlaws them. Fourth, they accuse anyone who disagrees with their positions on anything. Also, they recommend the employees as THE primary source of "true" situations. Need I go on? They have some nerve even submitting their names on our ballot.

**LT-26**

# Cowpet Bay West Blog

## An Informed Active Community

### Letter From Judi Kromenhoek

December 24, 2011

The letter below was posted on the blog yesterday from board candidate and recent blog registrant Judi Kromenhoek. It encourages owners to consult with association employees for input on qualification of the various candidates running for election. Our community faces a number of complex business issues on a regular basis, such as insurance coverage; formulating condo law related to animals; formulation and evaluation of budgets and financial statements; strategic planning; capital planning; and supervision and evaluation of staff to name a few.

Anyone who is able to input on these or any other challenging issues is encouraged to provide their input for evaluation in this public forum, whether it be Matuba; Steve; Joey; Jon; Louanne; or anyone else on staff. We can all benefit from being better informed on the difficult business issues that face our wonderful community.

As an aside, the following questions were posed to Judi yesterday on the blog, responses to which we await:

*Hi Judi. Welcome to the blog. We have a couple of questions. First, what would your vote have been on the recent board vote regarding open or closed meetings in the specific context of the vote taken? Secondly, are you in favor of the proposed bylaw revision as stated in the draft regarding dogs on property?*

Since Judi currently houses a dog in her unit, her input will be valuable in understanding the reasons for allowing dogs on the property.

Following is Judi's letter to the blog:

*Dear Fellow Owners,*
*Many of you only spend short periods of time during the year at Cowpet Bay West and therefore are not aware of all that is going on.*

*There is an election coming up and I urge you to do some investigating on your own. DO NOT take my word or any of the current Board's, or those running for the Board but base your vote on what you learn.*

LT-25

**alfred felice** *said:*

December 5, 2011 at 6:07 pm

Let us not wait !!! Those who are against changing our "NO DOGS " rule AND enforcing its application snould form a slate to replace any empty seats with candidates who will follow the wants of the majority of our residents. ALL candidates should state their position on this issue .A change to our BY -LAWS might be needed to put this issue to permanent rest rather than revisiting this issue every year !!!! "RULES" can be easily changes by a small minority at a poorly attended board meeting ( especialy behind closed doors) or if meetings are "closed" WAKE UP STARTUP A CAMPAIGN FOR A NO DOGS SLATE NOW.

**LT-24**

# Cowpet Bay West Blog

## An Informed Active Community

### Barking Puppy Dogs

December 5, 2011

So far our illegal neighborhood puppy dogs have been seen and smelled but not heard. Until now. Following is an email sent from an owner this morning:

*Jackie,*

*To answer your specific question there is an existing issue and not just a potential problem. Last Monday, Nov 28th a dog left in a high number Windward unit was incessantly barking to the great distraction of our household. This was in the evening and in order for my daughter to do her homework she had to hide out in our bedroom on the street side of the unit. In addition we had to close our windows and put the air-conditioning on – an expense to us and denying us of the advantage of a balcony situated in the Caribbean.*

*Regards,*

*Niall Bartlett, Leeward 47.*

Niall lives on the end of Leeward nearest the gate house. The 40's area of Windward is directly below his unit, and this coincidentally happens to be the very spot where our known violaters Barbara Walters (current board member) and Judy Kromenhoek (immediate past board president) live. If the noise is a high pitched yip, it's Barbara's dog. If it's a deeper barking noise, the dog is Judy's. Maybe blog readers who live in that area can comment on whose dog may be today's perpetrator. As an aside, trained service dogs are specificaly trained to NOT bark unless the owner is in imminent danger. Maybe one of the pups pooped in the owner's unit and was warning the owner to watch out?

These two owners continue to fight for their puppy dogs tooth and nail out of our collective view due to the monthly board meetings being closed to owners. Don't be surprised to see either or maybe both of them show up as candidates for the three open seats on the board. They desperately want to be in power to control this issue that is very real and very personal to both of them.

### Comments on: "Barking Puppy Dogs" (1)

1. 

I guess there is little hope of changing this nonsensical behavior until the annual meeting,at which time, 2 of the "gang of 3" can be voted off the Board , and a new slate of Officers can be elected by the new Board.
The situation is most disturbing and not at all the way it should be in an upscale Reidential/Resort community!
Doug Rebak

LT-22

for the open part of the meeting and not even have to worry with control utilization. Getting off one private line and moving to the open line takes what, about thirty seconds? Come on Max, all this takes is a little thought and effort. Read the web site you're using for goodness sake rather than for all intents and purposes shutting down the owners. Is it appropriate that you deserve flexibility of access to board meetings while traveling the states since May, but owners don't deserve the same when access can be easily controlled? Oh, and non owners calling in – are you serious? Who in their right mind outside of owners would ever want to subject themselves to this insanity.

OK, so you say that your "camp" is not with Rosie and Barbara and that you're not against accountability and openness. All you can say is "False". What exactly then is the truth Max? Please elaborate so we can know your ground rules without being thrown around in the wind from month to month not knowing what to expect. You deleted my email asking a very simple question that was nothing like your recollection of it – I asked the reasoning behind closing the meeting and made a side observation we felt like fools. Please don't twist what was asked of you. What do you expect for a subsequent response when you purposely ignore a reasonable question? It's pretty simple to draw the conclusion that you're not open and transparent. We're supposed to somehow magically assume you're for open meetings; transparency; and accountability in light of the actions undertaken? Please. We're still listening Max. Actions speak much louder than words.

You bet I resigned from the committee. I will not be associated with clandestine functionality and will only associate with one hundred percent openness and transparency. Until that becomes reality, it's not happening. I've worked too long for a reputation of being completely open and forthright and will not allow that to be tainted by being associated with behind the scenes activities, whether at the board or committee level. Prove that openness and consistency are a commitment, and this issue can be revisited. My participation is completely dependent on how you decide to proceed.



3.

**dougrebak** *said:*

November 12, 2011 at 12:37 pm

Lance,
Thank you for your input.
I share your ( and many other owner's) frustration with the unilateral rejection of the owner's overwhelming "yes" vote for open meetings.
I do support the Board's need for closed sessions on "confidential" matters –but the dog issue???PLEASE !!!

LT-21

Joint Appendix Vol. II Page 1553

concerns regarding many people, including perhaps non-owners, calling in. At least 3
Board members intend to address this at our next meeting.

"Owners were purposely excluded from the entire meeting when dogs were on the
agenda." We did go into executive session at the beginning of the meeting to discuss dogs
and staff issues. As the minutes will reflect, we voted to table dog issues pending the
Board engaging ADA expertise. Once this is done, the issue of rule violators and By-Law
modification may be more intelligently addressed. After the executive session, the
meeting was open.

"Our president is now in the camp of the heretofore minority on the board who insists on
closed meetings." False.

"Our president has made it clear that accountability and openness simply isn't priority."
False.

"As a sidenote, President Max was asked to respond to our question of his reasoning
behind the events detailed here. He did not respond to the request." I received an email
from Lance that I've deleted so I can't quote it, but paraphrased it said something like '
Why are you making the blog look foolish?' I don't support, not-support or answer to
Lance's blog, so I didn't feel the email warranted an answer.

Shortly after the meeting, I called a meeting of the Long Term Planning Committee,
which consisted of Lance, Jon, Bill Canfield and me. Lance responded by resigning from
the committee. I hope he wasn't doing this to "punish" me. I hope Lance runs for the
Board in our upcoming election so he can address his concerns in a better forum.

Max

o 

**Lance Talkington** *said:*

November 11, 2011 at 11:50 am

The owners voted unanimously for completely open meetings recently. So you
say we weren't invited, but we weren't prohibited? Seriously? What in the world
does that mean? We should go ahead and try to phone in, but just remember it's
against your wishes? Good grief. But wait, it gets better. You have concerns about
who calls in, particularly non owners. For goodness sake – you're using Free
Conference Call.Com. It's got more access controls than Cowpet's crime count.
That's a lot of controls if the comparison isn't clear. All of the access control
options are right there in plain view on their web site. You can include or exclude
whomever you wish. For that matter, you could have your private executive
session on one line and then flip over to the other line where owners are waiting

**LT-20**

So, there you have it fellow owners. Our president has made it clear that accountability and openness simply isn't priority. Our sympathies go out to a few of the other board members who are trying to do the right thing but find themselves serving out a term in the middle of this sort of underhanded activity. As for the blog, we tried and have failed.

As a sidenote, President Max was asked to respond to our question of his reasoning behind the events detailed here. He did not respond to the request.

**Comments on: "The Final Straw" (4)**



1.

**alfred felice** *said:*

November 9, 2011 at 12:43 pm

A VERY SMALL MINORITY CAN DESTROY DEMOCRACY IF THE MAJORITY ARE PASSIVE !!! IT IS HAPPENING IN THE WORLD -INTHE USA – IN ST. THOMAS- WHY NOT AT CBW !!!! COMPLACENTCY LETS THE BULLIES RULE IF YOU CAN'T REMOVE THE GUILTY , YOU CAN CERTAINLY OSTRACIZE THEM AL FELICE



2.

**Anonymous** *said:*

November 10, 2011 at 2:24 pm

I have previously refrained from weighing in on Lance's blog, but I have been so badly misrepresented that I feel compelled to respond.

"The blog received a reminder from the board over the weekend to invite owners to phone into the board meeting on Tuesday." False. The Board has never invited "the Blog" or owners to phone into the meeting. In the past, Lance and other owners have been invited to sit in on meetings. Owner Lance was never specificially invited to join the telephone call-in, nor was he prohibited. The "Blog" has never been invited.

"President Max now wants owners to be forced to show up in person at the office if they wish to listen in on board meetings." I clearly do not have the desire or authority (or arrogance) to "force" owners to do anything. I did say in an email, and telephonically, to a Board member that I have no trouble with owners sitting in on meetings. The telephone system is provided for the convenience of Board members who are off-island. I do have

LT-19

# Cowpet Bay West Blog

## An Informed Active Community

### The Final Straw

November 9, 2011

The blog received a reminder from the board over the weekend to invite owners to phone into the board meeting on Tuesday. The reminder was published Monday on the blog, with an approach taken solely by the blog's initiative to not publish the call in number but rather to allow it to be shared upon request by owners. We weren't asked to handle it that way, but it seemed prudent. See the Monday blog post for reference.

On Monday night, the blog was informed that the call in number provided to the blog earlier that day would suddenly not be used by the board, but rather President Max had taken it upon himself to use a new undisclosed number for the meeting. And so, here we sat, wondering what in the world had just happened in the span of about 24 hours. The meeting is now effectively closed to owners after owners were reminded to participate.

But wait, it gets better. President Max now wants owners to be forced to show up in person at the office if they wish to listen in on board meetings. Really? And what exactly does this accomplish? Our president now believes that owners need adult supervision in order to listen effectively. And this at the same time the president is traveling the states since May and calling in for every meeting. Seriously?

But wait, it gets even better. All of this nonsense happens in the context of a meeting that has dogs on the agenda. Owners were purposely excluded from the entire meeting when dogs were on the agenda. Surely there isn't any connection between the two, right?

The blog has been made the fool for ever buying into this idea of open meetings and transparency. Invite us; uninvite us; conduct secret meetings to discuss dogs; set up secret phone numbers to eliminate owner participation. John Grisham isn't creative enough to invent this stuff. Board credibility that had been moving in a positive direction is now shot. Done. Over. Our president is now in the camp of the heretofore minority on the board who insists on closed meetings. Bravo to what used to be the minority group – you've succeeded. Congratulations on the victory.

Back track to an earlier annual owners meeting when our now newest board member Vinnie, at that time not on the board, moved that all board meetings be completely open in every respect to owners – every meeting in every respect. His motion, <u>along with the unanimous approval vote from the owners</u>, is recorded in the minutes. Now he is on the board. What is his opinion of all of this cloak of secrecy? Toss what the owners voted? Close 'em down?

**LT-18**

# Cowpet Bay West Blog

## An Informed Active Community

### Board Response To Request For Rules Enforcement

October 30, 2011

A few days ago, the blog emailed a formal request to the board for rules enforcement. There continue to be owners who are known to have dogs on the property. Two of those owners are current board member Barbara Walters and former board member and immediate past president Judi Kromenhoek. Earlier blog posts about the dogs issue and the request for rules enforcement may be viewed for details. There have been two earlier formal requests to the board from another owner requesting that the dogs rule be enforced. The board has responded to Barbara and Judi with the following correspondence that was copied to the blog as a formal response to our request. Kudos to the board for doing the right thing by enforcing a rule to which we all agreed to abide when purchasing property in the community.

*Judi and Barbara,*

*Cowpet Bay West's current rules are very clear – No Dogs. You are both in violation of these rules, and owners have complained to the Board.*

*As you know, the Board is considering absorbing the "No Dogs" rule into the by-laws, and allowing exceptions, upon application to the board with supporting documentation, for service dogs.*

*Louanne tells me that both of you have "papers in the office" regarding service dogs; however, you have not applied for an exception to the rule.*

*If you, as owners and users of service dogs as defined and documented in accordance with ADA rules, wish an exception, you must apply in writing or electronically to the Board and submit supporting documentation. You have 10 days to submit this request. It will be considered at the November Board meeting, and you will be informed of the outcome. Barbara, you must recuse yourself from voting since you are a Board Member.*

*Even though you are clearly in violation of the rules, this offer is being made in good faith, and in the spirit of the consensus of the Board as demonstrated in our by-law discussions.*

*If you do not avail yourselves of this offer, you are subject to being fined under the current rules of the association at the November meeting.*

*M. M. Harcourt*

*President, CBW Condo Association*

LT-17

sure that they comply, or I can promise you that it will be corrected at the homeowners expense."

Disgusting, and shameful. She should be removed from your board as she clearly cannot be impartial.

Lance, you should immediately file a complaint for Barbara's clear abuse towards you. Do it the same way you did, in writing and formal. Print this page out as it clearly shows the bias.

Barbara, you are not fit to be a board member and you should resign. Clearly you have it in for Lance over the dog issue. You are not capable of acting in a professional manner and remaining objective.

LT-16

**Lance Talkington** *said:*

October 26, 2011 at 5:48 pm

Well Barbara, you actually beat me to the next blog post. It is certainly time to hit
this one head on since I've overheard the office employees talking about this
among themselves and the board. Let's recount the events as they occurred. We
asked for approval of the board prior to beginning construction. The entire
process was overseen by both the board president and Jon. In fact, they personally
came to our unit on the day that Chris Thompson began work and told us to stop
until we complied with their new request for architectural plans that included all
provisions that they deemed necessary and appropriate. Those plans were
obtained from the firm suggested by them, and construction then proceeded with
their blessing in strict adherence to the design plans. The entire process was in full
view of the board and Jon, and they had every opportunity to indicate lack of
adherence to the plans. Construction was adhered to in exact specification to the
plans drawn by professionals that was accepted by everyone involved. If you or
anyone else wants to take up this issue, I can assure you it will be dealt with
firmly.



4.

**Barbara Walters** *said:*

October 26, 2011 at 8:33 pm

I hope that is not meant as a threat to someone from the board of directors who has a
great concern that all rules and regulations be followed. Rest assured, the approvals will
be checked and double checked to make sure that they comply, or I can promise you that
it will be corrected at the homeowners expense.



5.

**BIG Kahuna** *said:*

October 29, 2011 at 7:14 am

And remember when I wrote Board Members abuse the little power they have? Here is a
classic example of it in writing. Barbara, a board member is now threatening a unit owner
basically as retaliation for that unit owner asking the board to clarify the dog rule policy.
Read above, it's absolutely, clearly abuse of a board members power to act this way.
Board members should ALWAYS remain impartial, clearly this is not the case as Barbara
is, in her words "Rest assured, the approvals will be checked and double checked to make

**LT-15**



1.

**Doug Rebak** *said:*

October 26, 2011 at 10:38 am

Lance,
Your point is well taken.
The solution is quite simple. Fine the "offender" at the current rate, which I believe is $50 per day of offence, and remit the fine when and if proper documentation is provided within a reasonable time period. A "resonable time period" should be established. I would suggest 2 weeks, but that would be up to the Board to decide.
Doug Rebak



2.

**William Frumkin** *said:*

October 26, 2011 at 11:54 am

If a board is to have any legitimacy they must fulfill their responsibilities and enforce the rules set forth by the members of the Condo Assoc. Perhaps the Association should pass a new amendment to the by-laws stating that any board member found to be in violation of the rules and by-laws shall be removed from the board. It can include an opportunity to cure of say 60 days.

3.

**Barbara Walters** *said:*

October 26, 2011 at 5:22 pm

To my fellow board members,
Well, since we seem to be following the letter of the law, I am also in favor of fining owners with illegal additions retroactively. That should make up quite the shortfall. Lance, don't you have an illegal addition on your seaside patio, and weren't you instructed to put the common areas back to regulation???



o

**LT-14**

# Cowpet Bay West Blog

## An Informed Active Community

### Request For Enforcement Of Rules And Regulations

October 26, 2011

The following email was sent today to the board of directors:

To The Cowpet Bay West Board of Directors:

On May 12, 2011 the board adopted a formal written policy titled CBW Owner Repair/Inquiry Handling Policy. The policy includes procedures for owner requests for enforcement of Rules and Regulations. The association has a long standing rule disallowing dogs on the property. It has recently become a well publicized reality that multiple owners, including one current board member, have dogs living in their units. Given that our unit was fined for having a dog when a friend stayed in the unit and unbeknownst to us brought their pet, it is inconceivable how other owners are knowingly permitted to have dogs on a long standing basis without consistent enforcement of fines for such behavior. Repeated requests to the board member for substantiation of her need for a trained service dog have gone purposely unanswered, and in fact her responses have been accompanied by threats of lawsuits against both the board and me if her ability to have a dog is challenged. I have consulted a senior law firm partner who is an expert in condominium association law, and he has confirmed that the board has every right to request any and all documentation and other supporting information for an owner claiming the right to have a service dog as a result of disability. There are no limitations on this right whatsoever. If the board would like to engage the attorney in this regard, I will provide his contact information.

My daughter has repeatedly asked why others are allowed to have dogs while she is not allowed one. It is egregiously inconsistent for me to be fined for a dog in our unit while others are clearly being allowed to have dogs with no consequences. It is our request that the rules be consistently enforced and that any owner with a dog be required to submit documentation as to the need for a trained service dog to assist with their inability to function normally. It is also requested that the ADA guidelines for the definition of a service dog be implemented immediately and also incorporated into the bylaws that are currently being drafted for approval at the February owners meeting. This email is being sent to the board of directors and the association office in accordance with the procedures adopted in the May 12 document.

Lance Talkington
Three Leeward

### Comments on: "Request For Enforcement Of Rules And Regulations" (6)

LT-13



**BIG Kahuna** *said:*

October 15, 2011 at 1:54 pm

Barbara you have a dog. The condo has rules that say no dogs. Lance pointed that out because it's unfair because he would like a dog and apparently was fined for a guest having one. Lance in no way slandered you or remotely spoke badly of you, you have invented that. The solution seems very easy, Just prove that you have the right to have the dog and that the dog meets requirements as set by the government. Period.

Lance just send a written request certified return receipt and I'm sure the board will have to respond.

**LT-12**

**Barbara Walters** *said:*

October 14, 2011 at 10:06 pm

Thank you for your response Scott. I Like that you clarified for everyone what a blog is, it is personal OPINIONS. Not necessarily facts, just ones personal views on their observations or prejudices. Lance has professed to giving a fair assessment on what is going on with the board, and continues to claim things to be fact when he doesn't verify anything as fact, just writing rumor and innuendo.

That he has also mislead people into thinking that his word is gospel, is another injustice to his claim of a "factual" summation. He posted minutes, which were not the official minutes of a meeting, and his motives are not at all altruistic. This is his 15 minutes of fame, and that is really sad. By the way, I did not want, nor need, nor expect my name to be included in his tirade, when it had nothing to do with my serving on the board. These are two separate issues, and the implication that I am abusing "power" because of my position is not only not fair, it is downright untrue. I do not want or need people to be discussing me in anything other than a professional capacity as to how I serve on this board. My personal business is mine, just that. I have never done anything to abuse any power (which one doesn't have from serving anyway). People who have written in have been abusive, derisive, vicious, and just downright mean. I have never seen a collection of people like these, who get their jollies by hurting others.

If one CLAIMS to be writing truth, then it should be the truth. As an owner, just an owner, I am not accountable to the likes of Lance Talkington, and if he did not share the complex with me, he wouldn't even rate a blink of my eye.

And just to clarify the issue, I am mortified, that my personal business has been laid out over the internet without my permission or forewarning.

Maybe one day I'll find out that Lance et al, are incontinent, so I can blast that. Maybe I'd be so kind hearted that I'd buy he and his cronies diapers! But I would first let everyone know about it!

Barbara



c

**Lance Talkington** *said:*

October 15, 2011 at 9:50 am

It's impossible to give someone grief over a disability that is to date completely undefined and unsubstantiated. Nobody but the board needs to know the details of the disability, but owners have made it clear that they have the right to see that your claim of disability is properly documented and worthy of a waiver for the pet. Fortunately there is a mechanism that you and the rest of the board put in place earlier this year to deal with this very sort of situation. The issue will move in that direction.

**LT-11**

own an ad agency and developed one of the first blogs in the US. I'm what you'd call a "blogging" expert. You can find my website at http://www.brandidentityguru.com.

I also own 3 condos, 1 in Easton Mass with over 125 units, 1 in Hyannis Cape Cod and 1 here in St. Thomas. And in each location board members have either abused their powers, broken rules and or the worst…let the little power they have to go their small brains.

So let me just chime in on some of the nonsense I'm reading here, and by the way, if you'd like I'll be happy to post this on the St. Thomas Blog for all our readers as well as the 10,000 St. Thomas people that follow me on Facebook and Twitter 😜

First off a Blog is someones personal diary, actually it's name came from the term Web Log which was shortened to just blog. It basically is a way for someone to journal. This particular blog is lance's. Period. He can write whatever his little heart desires, good or bad. Because you know why….it's his. When Rosie attacks Lance for actually writing in his own blog it's because she's ignorant to what a blog is. And being a board member it just goes on to make my case that board members are generally people with a little power. And trust me Rosie will be back to read Lance's blog because haters of a blog are the best customers.

The fact that lance is pointing out issues of concern threatens board members because ultimately it exposes things they don't want exposed. like Barbara's dog.

To the dog issue, if Barbara is legit she has the right to keep a dog because she is disabled then the easy solution is to show the board the correct paperwork. She does not nor should she share her disability. Nor do I think any really cares….just prove it. Simple solution.

To the dog haters here, if she's got the paperwork just shut it. There's nothing you can do, swallow the pill and move on.

I think Lance is doing a great service to the owners of the association by pointing out issues that will ultimately make your community better. Of course board members may disagree with that.

And as a professional blogger that actually makes a living at this sort of stuff I must let everyone know that Lance and I are friends. We golf together, boat together and generally like each others company. But Lance also knows I'm the most brutally honest person he probably knows and I'd be the first person to give him the business if he deserved it 😜

Keep Rockin' Lance, your little blog is now the go to source!

12.

LT-10

Barbara's right to have a dog is most certainly open to scrutiny, and she is
welcome to carry out her threat to sue both the board and me for asking about it.
She isn't applying for a job with us as a disabled person – she wants a dog, and
her desire must be scrutinized appropriately. The office has no paperwork on file
as is evidenced by Louanne's not replying to our request to confirm paperwork,
and Barbara produces nothing other than saying she can't work and is thus
entitled to have a dog. It has become clear she has a pet and should be fined just
as I was fined in the past when a friend stayed at our unit and had a small dog for
a few days without our knowing it.

Lastly, continued attempts by the fractioned group to close meetings to owners as
you confirm today is ultimately disturbing. Good things are happening since
owners have become more involved earlier this year. While the blog is being
criticized for its comments, there has not been a single instance of anyone
claiming that something untrue has been said by the blog. The truth in an open
forum is powerful and must continue. Kudos to the board as a whole for standing
up for truth and openness.



10.

**pattisays** *said:*

October 14, 2011 at 12:59 am

This is fascinating…and it has become clearly a point of principal with the dog issue
serving as the example of blatant disregard for rules, common respect for them and the
reasons behind them in the shared community – and by a board member…It seems so
simple that this person should excuse herself from this position – unless of course there is
a valid reason for her to require an aid dog that the "papers" would have to validate –
which this blog suggests have not been produced. If this dog issue can be so hot, the
factions be so divided and the rules so easily manipulated we are in for a sad decline in
the harmonious management and lifestyle that we have know for decades.



11.

**BIG Kahuna** *said:*

October 14, 2011 at 10:11 am

My name is Scott White, aka Big Kahuna from the St. Thomas Blog,
http://www.stthomasblog.com. I am the first post and I posted under "Anonymous".
Really I just quickly posted not even thinking about posting my name. But for those that
don't know who I am I run the largest blog in the USVI. I have over 4000 readers a day. I

**LT-9**

appears that every one of your blogs is to critisize and analyse and stir up the pot. You don't want to sit in on any of the board meetings for constructive intent. You are looking for something that you can take it and "run" with on such a negative level.

If you have an issue about something I suggest you bring it to the next meeting in writing. Your blog is not approved by the board as CBW's official blog. Actually you hijacked the one Max had just started with your first negative on your blog and it seems to attract more negative. No different than newspapers these days. Everything you guys write is negative and put downs and attacks.

You have no right to demand the things you have demanded. You have no right to demand anyone's personal medical information. In fact, it is a violation of HIPPA and you should tread very carefully because I work in a clinic here and they do not take that sort of thing lightly.

I know there is nothing I can say or do that will affect your attitude or behaviour. You seem to enjoy being abrasive and if that is what works for you so be it. Just post my comment without "editing" it. This will be my last post to you as I will not recognize this blog as anything more than your dumping ground for your negative regergitating. I wish it was not this way but you seem to like the negative.

Rosie Wells



o

**Lance Talkington** *said:*

October 14, 2011 at 6:58 am

Hi Rosie. As has been posted previously, the board has done a tremendous job on our insurance since the disaster last winter. It has also been posted that kudos should go out to those who are working to bring our budget back in line. And solid work is being done on bylaws. All of this positive work has been posted.

The blog's observations with which issue is being taken boil down to one basic issue. Three board members (Rosie; Vinnie; and Barbara) fractured the board and forced owners to choose sides on issues with which one group disagrees with the other group. That is the source of perceived negativity that is actually objectivity, and it was forced on all of us as owners by the group of dissenters. Owners didn't ask for this, but now we have no choice but to deal with the consequences of that group's actions. The days of the board being a social club with special privileges are gone. Our collective investments here at Cowpet are too important to be compromised by anyone, and the blog will analyze and comment when necessary.

**LT-8**



# National Service Animal Registry

903 NW F. Street · Grants Pass · Oregon · 97526    Toll Free · (866) 737-3930    Fax · (541) 471-1122

## NSAR CERTIFIED SERVICE ANIMAL

This document affirms that **"HAPPY"** (NSAR database ID ██████, see adjacent photo) is certified as an emotional support animal (ESA) and registered with National Service Animal Registry (NSAR) on the date listed below. This emotional support has been formally prescribed and deemed necessary to assist **BARBARA WALTERS**, the confirmed disabled handler. The handler and service animal are listed in the National Service Animal Registry (NSAR) database and may be found on the following website:
**www.nsarco.com/database.html.**



**HAPPY**

Emotional Support Animals are animals that are necessary for the normal, day-to-day functioning of their emotionally or psychologically disabled handier, facilitating a normalizing effect by their presence.

An ESA is not considered a working service dog under the ADA and is not granted unlimited public access. Protections under federal law include allowing a disabled handler to be accompanied by his/her emotional support animal in the cabin of the aircraft, in accordance with the Air Carrier Access Act 49 U.S.C. 41705 and Dept of Transportation 14 C.F.R. Part 382.

Additionally, property managers and landlords are required to make reasonable accommodation (a change in the rules) to permit a disabled handler to keep an ESA, even when a landlord's policy explicitly prohibits pets, as set forth in the Fair Housing Amendments Act of 1988, Section 504 of the Rehabilitation Act of 1973 and Title II of the Americans with Disabilities Act.

For more information, please call the U.S. Justice Department ADA Information Line at (800) 514-0301 (voice) or (800) 514-0383 (TTY) or visit the ADA Business Connection at **www.ada.gov**.

January 21, 2011
_____
Date

_____
Tim Livingood, M.ED. CED

**PLAINTIFF'S EXHIBIT 0**

3054700/000085

Case 14-4776, Document 31, 11/09/2016, 1910996, Page 715 of 720    Case 13-42 76-000 Doc 06 Filed 031 20 29996 #: Page 715 Filed 05/21 Filed 10/15/2015

Page 1 of 2

**Subj:** **Re: 2012 Budget,Reserve Fund Statua end Bylaw Revision Information**
**Date:** 1/16/2012 11:35:47 A.M. SA Western Standard Time
**From:** docfelice@gmail.com
**To:** DONNANATEL@aol.com
**CC:** shazkoehler@gmail.com, mrcleen44@aol.com, sidmar42@aol.com, ahg20@msn.com, bobayars@hotmail.com, birtbarbara@gmail.com, jerseybarb@aol.com, Beth.Trahos@smithmoorelaw.com, wfrumkin@varizon.net, robert.daleo@gmail.com, rbcusvi@gmail.com, bradking@xmission.com, rbye117@aol.com, cbfulp@aol.com, apollowell@optonline.net, gmoose@facet-purolator.com, mtamasi@sairealestate.com, sallyfcockayne@hotmail.com, gcowlin@comcast.net, ccrapko@verizon.net, dcshear@verizon.com, nannybar@aol.com, rjlamoureux@vitelcom.net, pjpromo@verizon.net, dougrebak@aol.com, ajuliadoyle45@hotmail.com, randysusvi@msn.com, edwardwell@aol.com, thecolonyshop@optonline.net, cfirouz@aol.com, clairecfoster@hotmail.com, georgeblackhall@hotmail.com, mrgitamo@aol.com, billhanson@comcast.net, hardeep@westarindustries.com, dick.harrington@gmail.com, herbert@hihorwitz.com, donald@hoeschrealestate.com, Highroads2@aol.com, jp.jamison@gmail.com, laura.jamison@gmail.com, fozzisnow@gmail.com, jkromes@gmail.com, barwkelly@hotmail.com, mckamey01@comcast.net, lamjk2@aol.com, ltalkington@talkington.cc, elainernalkani@gmail.com, rrmarcantonio@aol.com, marich9323@aol.com, marilyn@blackhallrealestate.com, mverdiramo@optonline.net, robmccormack@msn.com, pmcculliss@msn.com, heath@alpha-value.com, MFM304@gmail.com, milligancl@aol.com, milom2@earthlink.net, MMF036@aol.com, karebare93@hotmail.com, varda@insureking.com, niallbartlett@lycos.com, gay@norcom2000.com, PJPROMO@verison.net, spompan@optonline.net, gpompan@yahoo.com, janetrebone@sbcglobal.net, g.bop@prodigy.net, ct1964ups@aol.com, rolandgeorges@yahoo.com, ronaldcholmes@gmail.com, wellsr_@earthlink.net, admin@barnonefoods.com, kikisb60@yahoo.com, JAXOH@aol.com, rshell@bashlin.com, jselfridge@verizon.com, sid@corkysfootwear.com, elaineqk@aol.com, alance53@yahoo.com, sharong@4taconic.com, stumpcsw2@gmail.com, cheesa34@optonline.net, canfieldvi@gmail.com, Anna.Paiewonsky@paiewonskylawfirm.com, cowpetbaywest@hotmail.com, joncassady@hotmail.com

Reply to all ;  The ADA law does not prevent e communily from excluding DOGS. It does provide e meana for legitimate needs to be allowed !!  No ona wishes to prevent proper needs to be satisfied !!  We do wiah to prevent a large influx of PETS to Invade our clean and tranquil property .Once there is a removal of our" no dogs policy", pets will abound and there will be no way to control their habits or their owners obeying the rules to maintain a clean quiet property !!  Check other "dogs allowed" properties (especially beach properties)and hear the terrible problems incurred by failure of owners to curb and control their pets !!!  Noise,smell,unpaid fines and in-your-face erroganos (we have that now!!).Again REAL needs for service are one thing,phony pets are another !!  You tell me what the 3 dogs on property are ? needs or pets ??  How you do deal with arrogant rule breakers ?? Talk about IN-YOUR-FACE ,these three have some gall. We can make our rulea effective with proper wording that is legal . We are not the only community faced with shams for pets . How do others attain thair goals within the law? I am sure there la a legal way !!    Short of that I suggest they be ostracized,NO dinnar dates,no patronage of their establishments, no conversationa,no beach conclaves,just ignore them completely !!!!  Certainly do not reelect them !!!!!   PASS THE BY-LAW CHANGE Vote for Doug,Ed and Herb.Board control helpe ,but a by-law change would be harder to overtum.Be serious,what do you want——VOTE        Al Felice  27
WWW

On Sun, Jan 15, 2012 at 11:20 AM, <DONNANATEL@aol.com> wrote:
  Lance, What you need to do is go to the Government ADA website for the disabled, under Service Animals you wili find something surprising, the actual law.  You will elso find, legally, what you are allowed to ask and what the service dog owner is required to provide. It also clearly states that no specialized training is requlred for a service dog. I posted the court decision against Puablo for a reason, I do not want Cowpet Bay using money that is set asida for improvements for legal fees.

  I auggest that all homeowners check out the ADA website because all the amails are setting the association up for an expensive legal fight if the blog or the email authors are tied back to the board or employees of cowpet bay.

  I am very concerned that a legal line is being crossed with the Service dog Issue.

  **Donna M LaScola, CEO**
  NATELCO Corporation
  140 West Hampton Avenue



PLAINTIFF'S EXHIBIT

Case 1:12-cv-00315-RC Document 113-2 Filed 10/13/2025 Page 716 of 720
Case 1:12-cv-00315-RC Document 113-2 Filed 05/04/14 Page 716 of 720

Page 2 of 2

Capitol Heights, MD 20743

In a message dated 1/14/2012 10:45:46 P.M. Eastern Standard Time, docfelice@gmail.com writes:

Hi Sharon, thanks for the "true" numbers !!    Now perhaps every one else will SHUT UP ,including me. I no longer will have to champion our diligent board.I think you guys and gals did a terrific job ,despite all the negativity from a few dissidents. Congratulations for a job well done.                                        Al Felice   27 WWW

On Sat, Jan 14, 2012 at 10:01 PM, Sharon Koehler <shazkoehler@gmail.com> wrote:
Dear Owners,
As required in our bylaws, I am attaching a copy of our 2012 Budget, approved by the Board late in December 2011.  Also attached
you will find documents covering the above two important subjects.  Please take the time to review these reports and, if you have any questions, please get back to me.
Thank you.
Sjaron Koehler, Treasurer
CBW Board of Directors

Subj:     **Fwd: CBW Liability Insurance**
Date:     1/18/2012 8:37:16 A.M. SA Western Standard Time
From:     JERSEYBARB@aol.com
To:       jkromes@gmail.com, rjlamoureux@snet.net, iamjk2@aol.com

Nice ...............now he shows my letter. Real Class act
(letter to follow couldn't forward it)

From: milom2@earthlink.net
To: lance@eisvi.com
CC: stycisv@gmail.com, rbcusvi@gmail.com, shazkoehler@gmail.com, moehogan1@verizon.net,
JERSEYBARB@aol.com, wellsr_@earthlink.net, cowpetbaywest@hotmail.com
Sent: 1/17/2012 11:59:02 P.M. SA Western Standard Time
Subj: CBW Liability Insurance

Re: Policies DM-GL11-63 and 105434549

Dear Lance,

The referenced policies are the liability (general and officer) insurance policies for Cowpet Bay West
Condominium Association. The Board of Directors would like to make you aware of a situation which
may call these into play.

Recently one of our owners had their attorney send us a letter in which the attorney stated they were
representing the owner in a "complaint" against the association. The Board is consulting with Atty
Maria Hodge to determine what this means to us, and what our exposure, if any, is.

Attached is a copy of the letter from the attorney. At this time, we don't believe any action is required
on your part; however, we will keep you informed as this matter progresses.

Max Harcourt

President, CBWCA

505-385-9225



PLAINTIFF'S
EXHIBIT
8

Sunday, March 04, 2012 AOL: JERSEYBARB                          3054700/000334

Dr. Sheena Walker -- CROSS

1    Q.    What were they?

2    A.    Yes.  One just having nasty interactions

3  in passing, but the one that really sticks out, to

4  me, is sort of seems to be slanderous information

5  that was published on the internet.  That was a

6  major, major, major stressor for Ms. Walters.

7    Q.    Was it the fact that she had private

8  information about her life being posted on the

9  internet or was it something else?

10   A.    No, it was private information.  Private

11 information that was.

12             MR. WILLIAMS:  I object to the

13       form of that last question.

14   Q.    So, do you recall what Ms. Walters told you

15 was published on the internet?

16   A.    I believe it was regarding her psychiatric

17 status or what was perceived to be her psychiatric

18 status.

19   Q.    Did she ever bring in any of the stuff that

20 she printed off of the internet and discuss it with

21 you?

22   A.    She did.

23   Q.    Do you have any of that stuff in your file

24 somewhere?

25   A.    I'm not sure, actually, because I believe

HILL'S                    CES

PLAINTIFF'S
EXHIBIT

Dr. Sheena Walker -- CROSS

1      own life, because they're always depressed because

2      they're born that way, and then there is people who

3      have like a death in their family and go through a

4      major stressor like a divorce, and that's what's

5      called a situational depression.  So what would you

6      call Barbara Walters?

7              A.    That is more of a situational, right.

8              Q.    Do you find it ironic, Doctor, that you've

9      prescribed an emotional support animal for Ms. Walters

10     and the very thing that you said this is supposed to

11     do for her actually aggravated her condition?

12             A.    Yes, absolutely.

13             Q.    And why do you agree with me that it's

14     ironic?

15             A.    Again, ironic given that this is something

16     that could be very, very helpful to her and it was

17     just causing a tremendous amount of stress in just --

18     and she never had any or never mentioned any stress

19     in actually caring for the companionship pet.  It was

20     more just her possession of having the pet created

21     adversity around her based on other people's

22     reactions.

23             Q.    Did she share with you some of the things

24     that some of her neighbors did to her?

25             A.    Yes.

64

Dr. Sheena Walker -- CROSS

1    to speculate.

2        Q.    Did you believe that Barbara Walters was

3    experiencing harassment by any of her neighbors?

4            MR. BENHAM:    Objection as to

5        form.

6            MR. WILLIAMS:  Objection.

7        Q.    Why do you say that?

8        A.    Later on in our sessions, that became at

9    times the focus of her complaints, unfortunately.

10   She just didn't feel comfortable in her own home,

11   which actually brought up a lot of the issues from

12   her marital distress and reinforced some of those,

13   maybe faulty beliefs.  It was very difficult for her.

14       Q.    So, in other words, she lost her home in

15   New Jersey and then she came here to her home in

16   Cowpet, she didn't have that home?  Is that what she

17   means?

18           MR. WILLIAMS:  Objection to form.

19       Been.

20           MS. BENTZ:    Objection.

21       Q.    You could answer.

22       A.    Sure.  What I meant was -- yes,

23   absolutely, there was disruption in her family and

24   she described St. Thomas as her safe haven.  She came

25   here to retreat to wellness, for lack of better