**IN THE UNITED STATES COURT OF APPEALS**
**FOR THE THIRD CIRCUIT**

**3d Cir. App. Nos. 14-4776 & 14-4777**
**D.C. Civ. No. 3:12-cv-24 & 3:12-cv-25**

**LIANA REVOCK, EXECUTRIX OF THE ESTATE OF BARBARA WALTERS, and JUDITH KROMENHOECK,**
**Appellants,**

**v.**

**COWPET BAY WEST CONDOMINIUM ASSOCIATION; THE BOARD OF THE COWPET BAY WEST CONDOMINIUM ASSOCIATION; MAX HARCOURT; ALFRED FELICE; LANCE TALKINGTON; ROBERT COCKAYNE; VINCENT VERDIRAMO,**
**Appellees**.

**On Appeal from the United States District Court for the District of the Virgin Islands**
**Division of St. Thomas and St. John**

**JOINT APPENDIX VOLUME II**
**(Pages 1574-2645)**

**The Law Offices Of Karin A. Bentz, P.C.**
**Karin A. Bentz, Esq.**
5332 Raadets Gade, Suite 3
St. Thomas, VI 00802-6309
Tel: (340) 774-2669
Fax: (340) 774-2665
Email: kbentz@virginlaw.com
*Attorney for Appellants*

# Table of Contents

| Item | Description | Page Number |
|---|---|---|
| 1 | **Docket Sheet Walters v. Cowpet Bay West Condominium Association** | 1 |
| 2 | **Docket Sheet Kromenhoek v. Cowpet Bay West Condominium Association** | 26 |
| 3 | **Verified Complain (Walters)** | 54 |
| | Doc 1-4(Exhibit C) CBW Blog Entry | 82 |
| | Doc 1-3(Exhibit B) Rules and Regulations for Owners | 83 |
| | Doc 1-2(Exhibit A) By-Laws of CBW | 86 |
| 4 | **Verified Complaint (Kromenhoek)** | 106 |
| | Doc 1-1 Instructions for civil cover sheet | 134 |
| | Doc 1-2 (Exhibit A) By-Laws of CBW | 135 |
| | Doc 1-3 (Exhibit B) Rules and Regulations for Owners | 155 |
| | Doc 1-4 (Exhibit C) CBW Blog | 158 |
| 5 | **Alfred Felice's Response** | 159 |
| 6 | **Notice of Death for Alfred Felice** | 165 |
| 7 | **Notice of Death for Max Harcourt** | 169 |
| 8 | **Second Amended Complaint (Walters)** | 175 |
| | Doc 95-1 Second Amended Complaint-Redline | 210 |
| | Doc 95-2 (Exhibit A) Advertisement for CBW | 257 |
| | Doc 95-3 (Exhibit B) Affidavit for Louanne Schechter | 263 |
| 9 | **Second Amended Complaint (Kromenhoek)** | 265 |
| | Doc 94-1 Second Amended Complaint-Redline | 299 |
| | Doc 94-2 (Exhibit A) Advertisement for CBW | 341 |
| | Doc 94-3 (Exhibit B) NSAR Certification for "Oliver" | 347 |
| | Doc 94-4 (Exhibit C) Affidavit for Louanne Schechter | 349 |

| | | |
|---|---|---|
| 10 | **Defendant Lance Talkington's Answer to Walters' Second Amended Complaint** | 351 |
| | Doc 177-1 (Exhibit A) CBW Blog Entry 09/27/11 | 374 |
| | Doc 177-2 (Exhibit B) CBW Blog Entry 10/13/11 | 376 |
| | Doc 177-3 (Exhibit C) CBW Blog Entry 10/30/11 | 377 |
| | Doc 177-5 (Exhibit E) CBW Blog Entry 1/15/12 | 378 |
| | Doc 177-6 (Exhibit F) CBW Blog Entry 3/25/12 | 380 |
| 11 | **Defendants' Answer and Affirmative Defenses to Counts I, II, III, VI. VII, VIII, XVI, XVII of Plaintiff's Second Amended Complaint (Walters)** | 382 |
| 12 | **Defendants' Answer and Affirmative Defenses to Counts I, II. III, VI, VII, VIII, XIII, XVI, XVII of Plaintiff's Second Amended Complaint (Kromenhoek)** | 410 |
| 13 | **CBW Motion for Summary Judgment (Walters)** | 437 |
| | Doc 187-1 By-laws, Rules and Regulations, CBW Board of Directors (BOD) Meeting Minutes | 463 |
| 14 | **CBW Motion for Summary Judgment (Kromenhoek)** | 528 |
| | Doc 188-1 By-laws, Rules and Regulations, CBW Board of Directors (BOD) Meeting Minutes | 552 |
| 15 | **Walters' Opposition to CBW Motion for Summary Judgment** | 616 |
| 16 | **Walters' Response to CBW Statement of Undisputed Material Facts and Counter-Statement of Facts** | 635 |
| | Doc 205-1 Dr. Sheena Walker –Cross | 649 |
| 17 | **Kromenhoek's Opposition to CBW Motion for Summary Judgment** | 652 |
| 18 | **Kromenhoek's Response to CBW Statement of Undisputed Facts and Counter-Statement of Facts** | 670 |
| | Doc 202-1 Letter from Stanford S. Sutherland, MA LPC | 683 |
| | Doc 202-2 Notice of Revised By-Laws | 684 |
| | Doc 202-3 By-Laws, Rules and Regulations, BOD Meeting Minutes | 706 |
| | Doc 202-4 CBW Owner Repair/Inquiry Handling Policy | 753 |
| | Doc 202-5 Affidavit for Louanne Schechter | 756 |

| | | |
|---|---|---|
| | Doc 202-6 CBW Blog Entry 3/17/12 | 758 |
| | Doc 202-7 CBW Annual Owners Meeting Minutes 2/12/11 | 766 |
| | Doc 202-8 CBW BOD Meeting Minutes 5/10/11 | 773 |
| | Doc 202-9 CBW BOD Meeting Minutes 9/13/11 | 777 |
| | Doc 202-10 CBW BOD Meeting Minutes 10/11/11 | 781 |
| | Doc 202-11 CBW Blog Entry 10/13/11 | 790 |
| | Doc 202-12 Email from Susan G.S. Anderson to Max Harcourt | 797 |
| | Doc 202-13 Email from Walters to Max Harcourt | 798 |
| | Doc 202-14 CBW Blog Entry 10/26/11 | 799 |
| | Doc 202-15 Email from Walters to CBW Board of Directors | 800 |
| | Doc 202-16 Email from Kromenhoek to Max Harcourt | 802 |
| | Doc 202-17 CBW Blog Entry 11/12/11 | 803 |
| | Doc 202-18 Emails from Walters and Harcourt | 804 |
| | Doc 202-19 CBW Blog Entry 10/30/11 | 806 |
| | Doc 202-20 CBW BOD Meeting Minutes 11/8/11 | 807 |
| | Doc 202-21 Email from Alfred Felice to keep "No Dogs" Policy | 815 |
| | Doc 202-22 CBW BOD Meeting Minutes 12/13/11 | 817 |
| | Doc 202-23 CBW BOD Meeting Minutes 12/13/11 | 827 |
| | Doc 202-24 CBW BOD Meeting Minutes 1/11/12 | 830 |
| | Doc 202-25 Letter from Kromenhoek | 836 |
| | Doc 202-26 Email from Louanne Schechter to Kromenhoek regarding fines for violating "No Dogs" Policy | 837 |
| | Doc 202-27 Letter from BOD to Kromenhoek regarding fines for violating "No Dogs" Policy | 839 |
| | Doc 202-28 Email from Alfred Felice to CBW Owners | 840 |
| | Doc 202-29 CBW BOD Meeting Minutes 1/11/12 | 847 |

| | | |
|---|---|---|
| | Doc 202-30 CBW Blog Entry 1/15/12 | 852 |
| | Doc 202-31 President's Forum | 855 |
| | Doc 202-32 Email from Harcourt to Lance Talkington regarding complaint against CBW Association | 856 |
| | Doc 202-33 CBW BOD Meeting Minutes 4/11/12 | 857 |
| | Doc 202-34 Housing Discrimination Complaint | 862 |
| 19 | **Robert Cockayne's Motion for Summary Judgment (Walters)** | 863 |
| | Doc 188-1 Declaration of Robert Cockayne | 870 |
| 20 | **Robert Cockayne's Motion for Summary Judgment (Kromenhoek)** | 872 |
| | Doc 186-1 Declaration of Robeter Cockayne | 879 |
| | Doc 186-2 Order Granting Motion | 881 |
| 21 | **Kromenhoek's Response to Cockayne's Motion for Summary Judgment** | 882 |
| 22 | **Kromenhoek's Response to Cockayne's Undisputed Material Facts and Counter-Statement of Facts** | 887 |
| | Doc 201-1 CBW BOD Meeting Minutes 1/11/12 | 890 |
| | Doc 201-2 CBW Blog Entry "Puppy Dog Diplomas" 1/15/12 | 895 |
| | Doc 201-3 Dr. Sheena Walker—Redirect | 897 |
| 23 | **Harcourt Motion for Summary Judgment (Walters)** | 899 |
| | Doc 189-1 By-Laws, Rules and Regulations, CBW BOD Meeting Minutes | 915 |
| 24 | **Harcourt Motion for Summary Judgment(Kromenhoek)** | 980 |
| | Doc 187-1 By-Laws, Rules and Regulations, CBW BOD Meeting Minutes | 996 |
| | Doc 187-2 Order Granting Motion | 1059 |
| 25 | **Walters' Response to Harcourt Undisputed Material Facts and Counter-Statement of Facts** | 1060 |
| | Doc 206-1 Walters' Second Amended Complaint, Second Amended Complaint-Redline | 1067 |
| | Doc 206-2 Walters' Clinical Summary | 1131 |
| | Doc 206-3 CBW By-Laws, Rules and Regulations, CBW BOD Meeting Minutes | 1133 |

| | | |
|---|---|---|
| | Doc 206-4 Recap of Suggested Revisions to By-Laws | 1219 |
| | Doc 206-5 CBW Owner Repair/Inquiry Handling Policy | 1279 |
| | Doc 206-6 CBW Blog Entries | 1282 |
| | Doc 206-7 NSAR Certification for "Happy" | 1304 |
| | Doc 206-8 Email from Harcourt to Lance Talkington regarding complaint against CBW Association | 1305 |
| | Doc 206-9 Dr. Sheena Walker—Cross | 1307 |
| 26 | **Kromenhoek's Opposition to Harcourts Motion for Summary Judgment** | 1309 |
| 27 | **Kromenhoek's Response to Harcourt Undisputed Material Facts and Counter-Statement of Facts** | 1322 |
| | Doc 206-1 Walters' Second Amended Complaint, Second Amended Complaint-Redline | 1330 |
| | Doc 206-2 Walters' Clinical Summary | 1394 |
| | Doc 206-3 By-Laws, Rules and Regulations, CBW Owners Meeting Minutes | 1396 |
| | Doc 206-4 Recap of Suggested Revisions to By-Laws | 1482 |
| | Doc 206-5 CBW Owner Repair/Inquiry Handling Policy | 1542 |
| | Doc 206-6 CBW Blog Entries | 1545 |
| | Doc 206-7 NSAR Certification for "Happy" | 1567 |
| | Doc 206-8 Email from Alfred Felice regarding ADA description for service dogs | 1568 |
| | Doc 206-9 Email from Harcourt to Lance Talkington regarding complaint against CBW Association | 1570 |
| | Doc 206-10 Dr. Sheena Walker--Cross | 1571 |
| 28 | **Kromenhoek's Corrected Response to Harcourts Undisputed Material Facts and Counter-Statement of Facts** | 1574 |
| | Doc 209-1 Kromenhoek's Second Amended Complaint | 1581 |
| | Doc 209-2 Kromenhoek's Clinical Summary | 1668 |
| | Doc 209-3 By-Laws, Rules and Regulations, Annual Owners Meeting Minutes | 1671 |
| | Doc 209-4 Recap of Suggested Revisions to By-Laws | 1757 |
| | Doc 209-5 CBW Owner Repair/Inquiry Handling Policy | 1817 |

| | | |
|---|---|---|
| | Doc 209-6 CBW Blog Entries | 1820 |
| | Doc 209-7 NSAR Certification for "Oliver" | 1831 |
| | Doc 209-8 Email from Alfred Felice regarding ADA description for service dogs | 1832 |
| | Doc 209-9 Email from Harcourt to Lance Talkington regarding complaint against CBW Association | 1834 |
| | Doc 209-10 Dr. Sheena Walker--Redirect | 1835 |
| 29 | **Vincent Verdiramo's Motion for Summary Judgment (Walters)** | 1837 |
| | Doc 190-1 Declaration of Vincent Verdiramo | 1845 |
| 30 | **Vincent Verdiramo's Motion for Summary Judgment (Kromenhoek)** | 1847 |
| | Doc 185-1 Declaration of Vincent Verdiramo | 1855 |
| | Doc 185-2 Order Granting Verdiramo's Motion | 1857 |
| 31 | **Walters' Response to Verdiramo's Undisputed Material Facts and Counter-Statement of Facts** | 1858 |
| | Doc 203-1 Emails from Felice and Verdiramo to CBW Board of Directors | 1861 |
| | Doc 203-2 Dr. Sheena Walker--Cross | 1863 |
| 32 | **Kromenhoek's Response to Verdiramo's Motion for Summary Judgment** | 1864 |
| 33 | **Lance Talkington's Motion for Summary Judgment (Kromenhoek)** | 1870 |
| | Doc 189-1 Order Granting Talkington's Motion | 1873 |
| 34 | **Memorandum In Support of Lance Talkington's Motion for Summary Judgment (Kromenhoek)** | 1874 |
| | Doc 190-1 (Exhibit A) Affidavit of Lance Talkington | 1899 |
| 35 | **Kromenhoek's Opposition to Lance Talkington's Motion for Summary Judgment** | 1955 |
| 36 | **Walters' Response to Talkington's Undisputed Material Facts and Counter-Statement of Facts** | 1973 |
| | Doc 205-1 Walters' Second Amended Complaint, Second Amended Complaint-Redline | 1980 |
| | Doc 205-2 Walters' Clinical Summary | 2044 |
| | Doc 205-3 CBW By-Laws, Rules and Regulations, CBW BOD Meeting Minutes | 2046 |
| | Doc 205-4 Recap of Suggested Revisions to By-Laws | 2132 |

| | | |
|---|---|---|
| | Doc 205-5 CBW Owner Repair/Inquiry Handling Policy | 2192 |
| | Doc 205-6 CBW Blog Entries | 2195 |
| | Doc 205-7 NSAR Certification for "Happy" | 2217 |
| | Doc 205-8 Email from Alfred Felice regarding ADA description for service dogs | 2218 |
| | Doc 205-9 Email from Harcourt to Lance Talkington regarding complaint against CBW Association | 2220 |
| | Doc 205-10 Dr. Sheena Walker--Cross | 2221 |
| 37 | **Kromenhoek's Response to Talkington's Undisputed Material Facts and Counter-Statement of Facts** | 2224 |
| | Doc 208-1 Chilowee Psychological Services | 2232 |
| | Doc 208-2 Kromenhoek's Clinical Summary | 2233 |
| | Doc 208-3 CBW By-Laws, Rules and Regulations, CBW BOD Meeting Minutes | 2236 |
| | Doc 208-4 Recap of Suggested Revisions to By-Laws | 2322 |
| | Doc 208-5 CBW Owner Repair/Inquiry Handling Policy | 2382 |
| | Doc 208-6 CBW Blog Entries | 2385 |
| | Doc 208-7 NSAR Certification for "Oliver" | 2396 |
| | Doc 208-8 Email from Alfred Felice regarding ADA description for service dogs | 2397 |
| | Doc 208-9 Email from Harcourt to Lance Talkington regarding complaint against CBW Association | 2399 |
| | Doc 208-10 Dr. Sheena Walker--Redirect | 2400 |
| 38 | **Transcript** | 2402 |
| 39 | **Lance Talkington's Answer to Kromenhoek's Second Amended Complaint** | 2526 |
| | Doc 176-1 (Exhibit A) CBW Blog Entry 9/27/11 | 2549 |
| | Doc 176-2 (Exhibit B) CBW Blog Entry 10/13/11 | 2551 |
| | Doc 176-3 (Exhibit C) CBW Blog Entry 10/30/11 | 2552 |
| | Doc 176-4 (Exhibit D) CBW Blog Entry 12/5/11 | 2553 |
| | Doc 176-5 (Exhibit E) CBW Blog Entry 1/15/12 | 2554 |

| | | |
|---|---|---|
| | Doc 176-6 (Exhibit F) CBW Blog Entry 3/25/12 | 2556 |
| 40 | **Lance Talkington's Opposition To Motion To Substitute Liana Walters Revock as Barbara Walters' Personal Representative and/or Her Successor in Interest** | 2558 |
| 41 | **Doc 169 Memorandum Opinion and Order** | 2569 |
| 42 | **CBW's Motion to Dismiss Walters' Amended Complaint and Supporting Memorandum of Law** | 2575 |
| 43 | **Order Granting CBW Motion to Dismiss Walters' Second Amended Complaint** | 2594 |
| 44 | **Doc 232 ORDER (CVG) the memorandum opinions entered on November 18, 2014[223], and November 19, 2014 [225], and the judgment entered on November 18, 2014 [224], are hereby VACATED as being entered prematurely. (Kromenhoek)** | 2596 |
| 45 | **Doc 231 ORDER (CVG) the memorandum opinions entered on November 18, 2014 [223], and December 2, 2014 [225], and the judgment entered on November 18, 2014 [224], are hereby VACATED as being entered prematurely. (Kromenhoek)** | 2598 |
| 46 | **Doc 228 Order Denying Kromenhoek's Second Motion to Amend The Complaint** | 2600 |
| 47 | **Doc 168 Memorandum Opinion and Order** | 2619 |
| 48 | **Kromenhoek's Motion to Dismiss CBW's Amended Complaint and Supporting Memorandum of Law** | 2625 |
| 49 | **Order Granting CBW Motion to Dismiss Kromenhoek's Second Amended Complaint** | 2644 |

**IN THE UNITED STATES DISTRICT COURT OF THE VIRGIN ISLANDS**
**DISTRICT OF ST. THOMAS AND ST. JOHN**
*****************

| | |
|---|---|
| **JUDITH KROMENHOEK,**<br><br>**Plaintiff,**<br><br>**v.**<br><br>**COWPET BAY WEST CONDOMINIUM ASSOCIATION; THE BOARD OF THE COWPET BAY WEST CONDOMINIUM ASSOCIATION; MAX HARCOURT, in his personal capacity; ALFRED FELICE; LANCE TALKINGTON; ROBERT COCKAYNE; VINCENT VERDIRAMO,**<br><br>**Defendants.** | **CIVIL NO. 12-00025**<br><br>**Action for: Housing Discrimination; Discrimination Based on Disability; Invasion of Privacy; Negligent Infliction of Emotional Distress Infliction of Emotional Distress; Punitive Damages; and Injunctive and Declaratory Judgment**<br><br>**JURY TRIAL DEMAND** |

**PLAINTIFF'S CORRECTED RESPONSE TO DEFENDANT'S MAX HARCOURT (DECEASED) UNDISPUTED MATERIAL FACTS AND PLAINTIFF'S COUNTER-STATEMENTS OF FACTS**

**COMES NOW** the Plaintiff, **JUDITH KROMENHOEK** ("Plaintiff") and by and through the undersigned counsel, the **LAW OFFICES OF KARIN A. BENTZ, P.C.** (Karin A. Bentz, Esq., and Julita K. de León, Esq.) and submits her brief in response to Defendant Max Harcourt ("Harcourt") statement of undisputed facts in support of their summary judgment motion, pursuant to Rule 56.1 of the Local Rules of Civil Procedure.

Rule 56. 1 permits a party opposing a summary judgment motion to submit, inter alia, a "concise statement of any additional facts that the respondent contends are material to the motion for summary judgment and as to which the respondent contends there exists a genuine issue to be tried." For ease of reference, Plaintiff has referenced the corresponding paragraphs of Defendants' statement of undisputed facts as ("SOF") where appropriate. Additionally, Plaintiff has also referenced Plaintiff's Counter Statement of Facts ("CSOF") where appropriate.

I. Plaintiff's Response to Harcourt's Undisputed Material Facts.

1. Disagrees.

*Judith Kromenhoek v. Cowpet Bay West Condominium Ass'n.* Civil No. 12/00025
Plaintiff's Response to Defendant Max Harcourt's Undisputed Material Facts
and Plaintiff's Counter-Statement of Facts Page 2

2. Disagrees.

3. Agrees.

4. Agrees.

5. Disagrees.

6. Agrees.

7. Agrees.

8. Disagrees.

9. Disagreed. Defendant wrote a letter.

10. Disagrees.

11. Disagrees.

12. Agrees.

13. Disagrees.

14. Disagrees.

15. Disagrees.

16, Agrees.

**II. Plaintiff's Counter Statement of Facts**

1. Plaintiff Judith Kromenhoek owns and resides at a condo at Cowpet Bay West on the east side of St. Thomas. ( Exhibit. 1. Second Amended Compl. §1).

2. A licensed psychologist wrote a letter stating that he was treating Plaintiff and that she was diagnosed with Anxiety Disorder, citing the DSM-IV. He further explained that Plaintiff had "severe limitations" in coping with stress and anxiety that most people would consider "normal day to day events." He went on to state that he has prescribed the use of an emotional support animal, dog or other, to alleviate her symptoms and that such emotional support animal was necessary. In conclusion, he states that pursuant to the Fair Housing Act, Plaintiff is qualified to keep her emotional support animal despite a policy prohibiting

Joint Appendix Vol. II Page 1575

*Judith Kromenhoek v. Cowpet Bay West Condominium Ass'n.* Civil No. 12/00025
Plaintiff's Response to Defendant Max Harcourt's Undisputed Material Facts
and Plaintiff's Counter-Statement of Facts Page 3

pets in her housing. On that same day, the National Service Animal Registry issued a certification that Plaintiff was allowed to keep her emotional support animal even if there is a policy prohibiting pets. (**Exhibit 2**. ***Letter from D. Sheena Walker***).

3. In 2011, the By-laws of the Cowpet Bay West Condominium Association did not prohibit dogs. ( **Exhibit 3.** ***Bylaws***).

4. The Rules and Regulations of the Board prohibited dogs on the premises. ( **Exhibit 4.** ***Rules and Regulations***).

5. In July of 2011, Plaintiff submitted a an application for a reasonable accommodation to keep Oliver, her emotional support dog on the premises. Because Cowpet Bay West did not have a formal application process, Plaintiff submitted a copy of a letter from her doctor and the dog's certification. (Exhibit 2)

6. At the time submitted her request for a reasonable accommodation, the Association had no written policy in place for processing a reasonable-accommodation request, although it had a NO DOG RULE IN place for at least fifteen (15) years. (Id).

7. Louanne Schechter accepted the documents, placed them in Kromenhoek's file and discussed Kromenhoek's request with Jon Cassady, Louanne Schechter's immediate supervisor. (Id.)

8. Schechter filed and discussed Walters's application with Jon Cassady, Schechter's immediate supervisor. (Id.)

9. Jon Cassady discussed Kromenhoek application with Max Harcourt; and Harcourt subsequently came to the Association's Office to review Kromenhoek's documents. (Id.)

10. Harcourt sent his representative, Bob Canfield, a member of the Board, to review the documents as well. (Id.)

11. There was widespread opposition to having dogs on the premises by members of the Board. (Id.) All of the blog posts related to the dog issues at Cowpet are attached as Exhibit 8.

12. In his first blog post relating to "dogs" on the premises, Talkington, on September 27, 2011, stated that " at least three owners. . . have been seen with dogs that are either living in condos

Joint Appendix Vol. II Page 1576

*Judith Kromenhoek v. Cowpet Bay West Condominium Ass'n.* Civil No. 12/00025
Plaintiff's Response to Defendant Max Harcourt's Undisputed Material Facts
and Plaintiff's Counter-Statement of Facts Page 4

or are being entertained by an owner walking them on the property." He goes on to point out that two of the dog owners are present and past Board members. Talkington called for the members of the Association to amend the Association's by-laws to "eliminate any confusion over possible exceptions to the general rule" of no dogs. (Id)

13. In response to increasing attacks by both Talkington and Felice on the blog regarding the requests for a reasonable accommodation, Kromenhoek explained that they were not violating the law or the rules. Walters stated that she has a disability and is afforded protection under the FHA. (Exhibit 8)

14. Harcourt and other members of the Board improperly shared the content of the Kromenhoek's applications with Talkington. (Id.)

15. Susan Anderson, a Board member, wrote an email complaining that she saw Kromenhoek walking a dog and assumed that she was walking the dog for somebody else "because Judith Kromenhoek does not appear to be disabled." (Id.)

16. The prevailing attitude shared most of the Board members was that Walters and Kromenhoek were not disabled because there was no visible evidence of their disability. (Id.)

17. Notwithstanding the objections to providing Talkington with private and personal information, on October 28, 2011, Harcourt emailed a letter to Kromenhoek and copied Talkington. Harcourt wrote as President of the Board and falsely accused Walters of violating the NO DOGS RULE "because they have not applied for an exception to the no dog rule." Harcourt also acknowledged in that same letter that both Walters and Kromenhoek had "papers for service dogs pending in the office." Contradicting himself, Harcourt ordered Kromenhoek to apply and submit documentation for a waiver and threatened to levy a monetary fine if they did not take up his offer. (Id.)

18. Talkington posted the entire letter on the blog in his October 30, 2011 post. (Id)

19. In an October 27, 2011, email, Plaintiff wrote to the entire Board informing them that she had paperwork on file in the Condo office. Plaintiff also reiterated her request that her

Joint Appendix Vol. II Page 1577

*Judith Kromenhoek v. Cowpet Bay West Condominium Ass'n.* Civil No. 12/00025
Plaintiff's Response to Defendant Max Harcourt's Undisputed Material Facts
and Plaintiff's Counter-Statement of Facts Page 5

medical information be kept confidential and expressed concern that her medical information might appear on Talkington's blog. (Id)

20. During the January 11, 2012 Board meeting, Cockayne distributed information about service dog certification naming businesses that have no requirements for service dog certification. Cockayne also circulated copies of Kromenhoek's dog certification. (Exhibit 9).

21. In December of 2011, Vincent Verdiramo, a board member, informed at least 99 members of the Association that he had advised the Board about the requirements of the FHA and emotional support dogs. (Exhibit 8).

22. On January 15, 2012, Donna LaScola voiced concern that the Association may be getting into legal trouble with all the blog posts and emails regarding Walters's and Kromenhoek's service animals. (Exhibit 8).

23. On January 17, 2012, ever dutiful to Talkington, Harcourt emailed Talkington informing him that the Board had received a letter from one of the owners stating the owner had filed a complaint. Therefore the Board was retaining counsel. (Exhibit 8).

24. On January 17, 2012, Walters received letters from the Board informing her that she was in violation of the no dogs rule and would be fined. (Exhibit 10)

25. Kromehoek no longer felt comfortable at her condo because of the constant harassment and publication of her private information on the internet caused her to suffer extreme emotional distress. (Exhibit 11: Depo: Dr. Walker: 75: 1-25; 76: 1-5).

26. Talkington characterizes Walters and Kromenhoek as "playground bullies" and accused them of making a mockery of the Board. He then calls on the Association to "go on the offensive" and file suit against Walters and Kromenhoek stating "when these ladies start spending their own cash instead of relying on the government for free help, the rubber will meet the road on how far everyone is willing to go." In closing, Talkington implores the Board to take Walters and Kromenhoek to court. (Exhibit 8)

Joint Appendix Vol. II Page 1578

*Judith Kromenhoek v. Cowpet Bay West Condominium Ass'n.* Civil No. 12/00025
Plaintiff's Response to Defendant Max Harcourt's Undisputed Material Facts
and Plaintiff's Counter-Statement of Facts Page 6

Respectfully submitted,

**LAW OFFICES OF KARIN A. BENTZ, P.C.**

Dated: May 21, 2014

/s/Karin A. Bentz
**KARINA. BENTZ, ESQ. (VI Bar #413)**
**JULITA K. de LEÓN, ESQ. (VI Bar #913)**
5150 Dronningens Gade, Suite 8
St. Thomas, Virgin Islands 00802
Telephone: 340-774-2669
Telecopier: 340-774-2665
E-mail: kbentz@virginalaw.com

**CERTIFICATE OF SERVICE**

I hereby certify that I caused the filing and service of the foregoing with the Clerk of the District Court of the Virgin Islands using the CM/ECF system, which will provide electronic notice by email

Joint Appendix Vol. II Page 1579

*Judith Kromenhoek v. Cowpet Bay West Condominium Ass'n.* Civil No. 12/00025
Plaintiff's Response to Defendant Max Harcourt's Undisputed Material Facts
and Plaintiff's Counter-Statement of Facts Page 7

to the following.

Richard P. Farrelly, Esq.
Birch de Jongh & Hindels, PLLC
1330 Taarneberg
St. Thomas, VI 00802
E-mail: rfarrelly@bdhlawvi.com

John H. Benham, III, Esq.
Benham & Chan
P.O. Box 11720
St. Thomas, Virgin Islands 00801
Tel: 340-774-0673
Fax: 340-776-3630
email: benham@bclawvi.com

Joseph G. Riopelle, Esq.
Boyd Richards Parker & Colonnelli, P.L.
Rivergate Tower Suite 1150
400 N. Ashley Drive
Tampa, Fl. 33602
jriopelle@boydlawgroup.com

Ryan S. Meade, Esq.
Quintairos, Prieto, Wood & Boyce, P.A.
9300 South Dadeland Blvd., 4th Floor
Miami, Fl 33156
rmeade@gpwblaw.com

/s/ Karin A. Bentz

Joint Appendix Vol. II Page 1580

IN THE UNITED STATES DISTRICT COURT OF THE VIRGIN ISLANDS
DISTRICT OF ST. THOMAS AND ST. JOHN
*****************

| | |
|---|---|
| JUDITH KROMENHOEK,<br><br>Plaintiff,<br><br>v.<br><br>COWPET BAY WEST CONDOMINIUM ASSOCIATION; THE BOARD OF THE COWPET BAY WEST CONDOMINIUM ASSOCIATION; MAX HARCOURT, in his personal capacity; ALFRED FELICE; LANCE TALKINGTON; ROBERT COCKAYNE; VINCENT VERDIRAMO,<br><br>Defendants. | CIVIL NO. 12-00025<br><br>Action for: Housing Discrimination; Discrimination Based on Disability; Invasion of Privacy; Negligent Infliction of Emotional Distress Infliction of Emotional Distress; Punitive Damages; and Injunctive and Declaratory Judgment<br><br>JURY TRIAL DEMAND |

## SECOND AMENDED COMPLAINT

**COMES NOW,** Plaintiff **JUDITH KROMENHOEK,** (hereinafter "Kromenhoek") by and through her undersigned counsel, the **LAW OFFICES OF KARIN A. BENTZ, P.C.,** (Karin A. Bentz Esq., and Julita K. de León, Esq., of Counsel) and for a Second Amended Complaint against the Defendants in the above captioned action states and alleges as follows:

## PRELIMINARY STATEMENT

1. On April11, 1968, President Lyndon B. Johnson signed the Civil Rights Act of 1968. Federal Fair Housing Act, Pub.L. No. 90-284, 82 Stat. 73, 81 (1968) (codified as amended at 42 U.S.C.§§ 3601-3631). The Federal Fair Housing Act (hereinafter "FHA") expanded on the Civil Rights Act of 1964 to prohibit discrimination regarding the sale, rental, and financing of housing based on race, color, religion, and national origin. *Id.* The FHA was amended twice to broaden the class of people falling under the scope of its protections; in 1974, discrimination based on sex was added, and in 1988 discrimination based on familial status or disability was included. (Pub.L. 100-430, approved September 13, 1988).

PLAINTIFF'S EXHIBIT 1 PENGAD 800-631-6989

2. In amending the FHA, Congress recognized that people with disabilities are subject to artificial, arbitrary, and unnecessary barriers preventing them from making full use of housing. Congress also recognized that more than a mere prohibition against disparate treatment was necessary in order that handicapped persons receive equal housing opportunities. *Secretary of HUD v. Dedham Housing Authority*, 1991 WL 442793 * 5 (HUDAALJ November 15, 1991).

3. Pursuant to the Fair Housing Act (hereinafter "FHA"), it is unlawful to discriminate against any person in the terms, conditions or privileges of sale or rental of a dwelling, or in the provision of services or facilities in connection with such a dwelling, because of the disability of that person or a person residing in that dwelling, because of the disability of that person or a person associated with that person. 42 U.S.C. §3604(f)(2); 24 C.F.R. §100.202(b).

4. It is unlawful to refuse to make reasonable accommodations in rules, policies, practices, or services, when such accommodations may be necessary to afford such person equal opportunity to use and enjoy a dwelling. 42 U.S.C. §3604(f)(3)(B); 24 C.F.R. §100.20.

5. Section 3617 of the FHA makes it unlawful for any person to coerce, intimidate, threaten, or interfere with any person in the exercise or enjoyment of, or on account of his having exercised or enjoyed, or on account of his having aided or encouraged any other person in the exercise or enjoyment of, any right granted or protected by Section 803, 804, 805, 806 of this title.

6. At all times relevant to this action, Kromenhoek lived in a Condominium unit at Cowpet Bay West Condominium community.

7. The property at Cowpet Bay West is part of the Cowpet Bay West Condominium community that is managed by the Cowpet Bay West Condominium Association (hereinafter, "the Association').

8. At all times relevant to this action, Defendant the Board of the Cowpet Bay West Association, (hereinafter "the Board") run the day to day operations of the Defendant Cowpet Bay West Condominium Association.

9. At all times relevant to this action, Defendant Max Harcourt (hereinafter "Harcourt") served as the President of the Board. And, at all relevant times, Walters was a member of the Board.

**JURISDICTION AND VENUE**

10. This Court has subject matter jurisdiction over this matter pursuant to 28 U.S.C. §§ 1331, 1332 and §1337; and V.I. Code ANN. tit. 4, §32.

11. Venue is proper within this District pursuant to 28 U.S.C. §1391(b).

**PARTIES**

12. Plaintiff Judith Kromenhoek owns a condo at Cowpet Bay West on the east side of St. Thomas, United States Virgin Islands. This property constitutes a dwelling under the FHA. 42 U.S.C.§3602(b); 24 C.F.R. §100.20.

13. The FHA and the American with Disability Act (hereinafter "ADA") define handicapped as a person with "a physical or mental impairment which substantially limits one or more of such person's major life activities, a record of having such an impairment, or being regarded as having such an impairment.

14. Kromenhoek was diagnosed with Anxiety Disorder, DSM-IV by her physician and thus qualifies as a person with a handicapped within the meaning of the FHA and the ADA.

15. Kromenhoek is an aggrieved person under the FHA and the ADA.

16. Upon information and belief, Defendant Association is an entity organized pursuant to the Virgin Islands Condominium Act, V.I. CODE ANN. tit 28, §901 *et seq.* as

amended, that resides and operates its principal place of business in St. Thomas, U.S. Virgin Islands. Cowpet Bay West is the rental manager and governing organization of the condominium development.

17. Each residential unit owner may use his or her condo unit for permanent, temporary, or transient use. Thus, the owners may permanently reside in their unit, use it as a second home, rent it out on their own or not use it at all.

18. Defendant Association's facility is structured and operated as both a place of lodging and a condominium. As a place of lodging, it is a place of public accommodation within the meaning of the ADA **[EXHIBIT A]** INTERNET AD FOR EASTER STAY AT COWPET BAY WEST.

19. Defendant Association is operated and controlled by a Board of elected persons. The Board is authorized by the Virgin Islands Condominium Act and the Declarations of the Cowpet Bay West Condominium Association, with its purpose set forth more fully in Bylaw Article 1, Section 2. The members of the Board are elected by the homeowners of the Cowpet Bay West Condominiums.

20. Upon information and belief, on October 22, 1974, Cowpet Bay West was created by a declaration of merger, whereby Cowpet Bay Village-Stages One and Two, the two condominium associations, merged into a single entity. The merger declaration acknowledged that the original 1968 Declaration, except as amended by the merger declaration is still in force. Section 16, of the 1968 Declaration provides that all owners are subject to and must comply with the provisions of the Declaration, the by-laws, and the rules and regulations as may be amended. Section 17 of the 1968 Declaration provides that the Declaration can only be amended by an affirmative vote of 75% of the Owners in number and common interest. Section 19 of the 1968 Declaration states that the by-laws and rules and regulations are " annexed hereto" and that the by-laws can only be amended by "an amendment to this Declaration and

such amendment duly recorded."

21. Under this provision, any amendment to the by-laws must be by a 75% vote and recorded in order to be valid.

22. The by-laws of the Association were adopted and recorded in 1974 along with the merger declaration. The by-laws were again amended and recorded in April 1998. Article I, Section 2 of those by-laws made them applicable to both the common areas and the individual units. Article II, Section 2, provided that the affairs of the Association were to be governed by the Board , which was empowered to deal with all administrative affairs of the Association and to undertake all acts except those prohibited by law, the Declaration, or the by-laws. Of the enumerated powers of the Board, adoption and amendment of the rules and regulations is provided for: These rules are applicable to both the common areas and the units under Article I, Section 2. Article V, Section 9 empowers the Board to enjoin and remedy a violation of the by-laws, Declaration, or rules and regulations. Article V, Section 16 allows for the adoption of rules and regulations if approved by a majority of the Owners. Article XI, Section 1 requires that the by-laws be modified by a 66 and 2/3% vote of the Owners present at a meeting held for such purpose. Article XIII, Section 1 states that where thee is a conflict between the provisions of the by-laws and the Declaration, the Declaration controls.

23. There is a conflict between the by-laws and the Declaration in that the Declaration makes clear that a vote of 75% of the Owners is required to amend the by-laws.

24. The 1968 rules and regulations prohibited an Owner from making or allowing disturbing noises in his/her apartment and prohibited dogs. The 1998 rules and regulations contained the same provisions.

25. Based upon information and belief Defendant Alfred Felice is a resident of Plainview, New York.

26. Based upon information and belief Defendant Max Harcourt is a resident of St. Thomas, United States Virgin Islands.

27. Based upon information and belief Defendant Lance Talkington is a resident of St. Thomas, United States Virgin Islands.

28. Based upon information and belief Defendant Robert Cockayne is a resident of St. Thomas, United States Virgin Islands.

29. Based upon information and belief Defendant Vincent Verdiramo is a resident of St. Thomas, United States Virgin Islands.

**STATEMENT OF FACTS**

30. On December 15, 2010, Stansford S. Sutherland, a licensed psychologist wrote a letter stating that he was treating Kromenhoek and that she was diagnosed with Anxiety Disorder, citing the DSM-IV. He further explained that Kromenhoek had "severe limitations" in coping with stress and anxiety that most people would consider "normal day to day events." He went on to state that he has prescribed the use of an emotional support animal, dog or other, to alleviate her symptoms and that such emotional support animal was necessary. In conclusion, he states that pursuant to the Fair Housing Act, Kromenhoek is qualified to keep her emotional support animal despite a policy prohibiting pets in her housing. On that same day, the National Service Animal Registry issued a certification that Kromenhoek was allowed to keep her emotional support animal even if there is a policy prohibiting pets.

31. In July of 2011, Defendant Association received the letter from Kromenhoek' medical provider and the certification. **[EXHIBIT B] LETTER AND DOG CERTIFICATION.**

32. Kromenhoek made the request for a reasonable accommodation because Defendant

Association had a NO DOGS RULE in place and Kromenhoek needed a waiver from Defendant Association's NO DOGS RULE to keep her emotional support dog (hereinafter "Oliver").

33. Kromenhoek furnished those two documents to Louanne Schechter, the Office Manager for Defendant Association as Kromenhoek' application because the Defendant Board did not have a form or application in place for requesting a waiver to the NO DOGS RULE.

34. At the time Kromenhoek submitted her request for a reasonable accommodation, Defendant Association had no written policy in place for processing a reasonable accommodation request, although it had a NO DOG RULE IN place for at least fifteen (15) years.

35. Upon information and belief, Louanne Schechter accepted the documents, placed them in Kromenhoek' file and discussed Kromenhoek' request with Jon Cassady, Louanne Schechter's immediate supervisor.

36. Upon information and belief, Jon Cassady discussed Kromenhoek' request with Harcourt and Harcourt subsequently came to the Association's Office to review Kromenhoek' documents. [**EXHIBIT C] LOUANNE'S AFFIDAVIT.**

37. Upon information and belief, Harcourt sent his representative, Bob Canefield, a member of the Board, to review the documents.

38. Upon information and belief, there was widespread opposition to having dogs on the premises by some members of the Board and Association.

39. At the February 12, 2011 Board meeting, Board member Robert Cockayne (hereinafter "Cockayne") proposed amending the by-laws to prohibit dogs and farm animals. There was no mention however of providing reasonable accommodations to owners under the FHA or the ADA.

40. The Board neither discussed or acted on Kromenhoek' request for a reasonable

accommodation during the July 27, 2011 Board meeting.

41. During the May 10, 2011 Board meeting, an owner complained of someone walking a dog on the property.

42. The Board, headed by Harcourt voted to post "No Dogs Allowed" signs on the property, despite the fact that Harcourt knew that Barbara Walters had submitted a request for a reasonable accommodation to allow her to keep her emotional support dog, Happy on the premises.

43. During the Board meeting on September 13, 2011, the Board discussed Service Dogs and mentioned that the dogs must be registered with the ADA. The Board also opined that the Virgin Islands does not have guidelines for "service dogs." Although the Board, headed by Harcourt, discussed Kromenhoek's and Barbara Walters''request for a reasonable accommodation, the Board, however took no action on Kromenhoek' request for a reasonable accommodation, although it had been pending before them for about than three months.

44. At all relevant times, some members of the Defendant Association and even the Defendant Board were vehemently oppose to having dogs on the premises. Members of the Defendant Association and the Defendant Board began voicing their oppositions to allowing dogs on the premises through emails and on the Cowpet Bay Blog. They also began harassing Kromenhoek. At all relevant times, Lance Talkington (hereinafter "Talkington") owned the Cowpet Bay West Blog (hereinafter "the blog").

45. In his first blog post relating to "dogs" on the premises, Talkington, on September 27, 2011, stated that " at least three owners. . . have been seen with dogs that are either living in condos or are being entertained by an owner walking them on the property. He goes on to point out that two of the dog owners are present and past Board members. Talkington called for the owners to amend the Defendant Association's by-

laws to "eliminate any confusion over possible exceptions to the general rule" of no dogs.

46. At the October 11, 2011 Board meeting, the Board, headed by Harcourt, took no action on Kromenhoek' pending request for a reasonable accommodation, although it had been pending for months. However, the Board under Harcourt's leadership, discussed changing the by-laws to adopt a NO DOGS ALLOWED rule.

47. The Harcourt led Board proposed NO DOGS ALLOWED rule made an exception only for the ADA. Harcourt and the other members of the Board excluded FHA requests, although Kromenhoek requested a reasonable accommodation pursuant to the FHA.

48. Harcourt and at least two Board members knew that Kromenhoek' request was currently pending before the Board and had been pending for more than two months.

49. Alfred Felice (hereinafter "Felice") chimed in on the blog and stated that "service dogs' for the true needs are legal, but anyone can get such a designation by simple request from a friendly physician, regardless of any real need. Anyone can also get one via the internet for a minimal fee.!!!"

50. Exemplifying the type of discriminatory attitude that the FHA and the ADA were enacted to combat, Felice went on to say that "the perpetrators might just as well spit in our face. The by-laws must be made to reflect the majorities' rights. Perhaps, the dissenters would be happier in another community rather than be ostracized at CBW, which would be another fine recourse."

51. In response to increasing attacks by both Talkington and Felice on the blog regarding her request for a reasonable accommodation, Kromenhoek explained that she was not violating the law or the rules. Kromenhoek stated that she has a disability and is afforded protection under the FHA.

52. Felice responded with disdain for Kromenhoek and the law that protects her rights as

a disabled American.

53. Upon information and belief Harcourt and other members of the Board improperly shared the content of Kromenhoek' request for a reasonable accommodation with Talkington.

54. Susan Anderson, wrote an email complaining that she saw Kromenhoek walking a dog and assumed that she was walking the dog for somebody else "because Judith Kromenhoek does not appear to be disabled."

55. The prevailing attitude shared by some Association and Board members was that Kromenhoek was not disabled because there was no visible evidence of her disability.

56. In response to Susan Anderson email regarding Judith Kromenhoek's "presumed disability, in an email dated October 20, 2011, Harcourt informed Susan Anderson that the Board was considering amending the by-laws to allow exceptions for "true" service animals " that are documented." Harcourt response came more than two (8) months after Kromenhoek submitted a request for reasonable accommodation to the Board, which was still pending before the Board.

57. Harcourt also stated that a fine should be levied against the "offenders" unless they submitted "appropriate ADA compliant paperwork."

58. On October 26, 2011, Talkington blogged requesting that the Board enforce its rules and regulations.

59. On October 27, 2011, a member fo the Board emailed the Board stating that the Board should respond to both Susan Anderson's and Talkington's inquiries.

60. Kromenhoek raised her concern to Harcourt about the Board keeping her private and personal information confidential.

61. Barbara Walters and some members of the Defendant Association recommended that Talkington not be allowed to attend Board meetings as he is not a member of the Board. Others, suggested that the Board hold closed meetings to discuss sensitive

issues, including Kromenhoek' request for a reasonable accommodation.

62. Some members of the Board however violently opposed to having closed Board meetings to discuss Kromenhoek' reasonable accommodation request. In response to a blog recommending a closed meeting to discuss Kromenhoek' request for reasonable accommodation, Board member Douglas Rebak blogged, "I do support the Board's need for closed sessions on "confidential" matters–but the dog issue??? PLEASE!!! The situation is most disturbing and not at all the way it should be in an upscale Residential/Resort Community!"

63. Notwithstanding Kromenhoek' objection to providing Talkington with her private and personal information, on October 28, 2011, Harcourt emailed a letter to Kromenhoek and Judith Kromenhoek and copied Talkington. Harcourt wrote as President of the Board and falsely accused Kromenhoek and Judith Kromenhoek of violating the NO DOGS RULE "because they have not applied for an exception to the no dog rule." Harcourt also acknowledged in that same letter that both Kromenhoek and Judith Kromenhoek had "papers for service dogs pending in the office." Contradicting himself, Harcourt ordered Kromenhoek to apply and submit documentation for a waiver and threatened to levy a monetary fine against Kromenhoek if she did not take up his offer.

64. Talkington posted the entire letter on the blog in his October 30, 2011 post.

65. The November 8, 2011 Board meeting, the Board took no action on Kromenhoek' pending application for a reasonable However, the Board, led by Harcourt, discussed amending Section 11 of the by-laws to add:

> No dogs are allowed on the property, either long term or visiting. The Board may grant exceptions to the NO DOGS ALLOWED rule, on an individual basis, should an owner require the assistance of a service animal (dog) as defined by the ADA. Owners seeking to obtain such an exemption are required to apply, in writing, to the Board with supporting document.

66. At the November 18, 2011 Board meeting the Board did not act on Kromenhoek'

pending reasonable accommodation request. However, the Board offered to table discussion on the proposed amendment to the by-laws until a legal opinion has been obtained.

67. On December 2, 2011, Vincent Verdiramo (hereinafter "Verdiramo"), an attorney and member of the Board, emailed a December 1, 2011 letter to 99 members of the Association. In his letter, Verdiramo offers legal advice to the Defendant Association. Verdiramo provides that the FHA is "not a blanket law." Verdiramo further notes that "every case must be handled individually "with official adjudication." He advised that when a person claims the need for am\n emotional support animal under the FHA, the must bring the Association to court and present expert testimony.

68. The Board held at least three meetings in December of 2011, but took no action on Kromenhoek' pending request for a reasonable accommodation.

69. Talkington continued his harassing campaign against Kromenhoek. In a December 5, 2011, Talkington shares a complaint of a Mr. Bartlett and the barking of a dog in his area of the community. Talkington goes on to point out that the "known violators" live in this same area. Talkington opined that "trained service dogs are specifically trained to NOT bark unless the owner is in imminent danger."

70. In a December 13, 2011 Board meeting, the Board, led by Harcourt decided to amend the by-laws to include the NO DOGS ALLOWED rule. The Board also discussed Verdiramo's December 2, 2011 legal advice.

71. In a January 9, 2012 email, Felice states "PLEASE do not return the coven and their shills to office, they DO NOT deserve another term EVER." In a January 10, 2012 blog, Felice continues, "JUDI and BARBARA have DOGS!!!! They surely have an agenda and DICK is their SHILL."

72. In their January 11, 2012, Board meeting, the Board, led by Harcourt, discussed receipt of the December 16, 2011 from Karin Bentz. Verdiramo motioned to "abide

by the rule and immediately begin fining owners that have dogs." The Board voted to fine Kromenhoek $50.00 per day for having Oliver on the premises.

73. In a January 14, 2012 email, Felice states "Only the coven and their shills call me a disaster." He goes on to say that if the Owners want a lot more "bull" "Elect the Coven on the board, with their shill."

74. During the January 11, 2012, Defendant Cockayne distributed information about service dog certification naming businesses that have no requirements for service dog certification. Copies of Kromenhoek' dog certification were circulated during that Board meeting. Upon information and believe, Kromenhoek believes that Cockayne shared a copy of Oliver's dog certification with Talkington.

75. In a January 15, 2012 blog entitled "Puppy Dog Diplomas" Talkington attacked Oliver's certification by stating it is "certified by an outfit called the National Service Animal Registry." Talkington concludes his blog post by sharing his "considered opinion" that such "outfits serve no legitimate purpose and exist mainly to sidestep what the ADA works diligently to accomplish" and putting forth a call "to stop the doggy diploma silliness and adopt clear ground rules for dogs at Cowpet". Talkington states that the ADA is the sole source of legitimacy for such rules.

76. On January 16, 2012, Harcourt distributed his President's Forum to the owners. In it, he says: "[t]he issue of dogs on the property has been the subject of many (unfortunately) blanket emails, There are some owners who are violating the current rule. The Board had shown some restraint in this matter since we wee trying to revise the by-laws to allow for valid exceptions; however, one of these owners had their attorney send the Board a letter saying the attorney was representing them in a complaint against use. The Board voted to retain an attorney to protect the Association's interest.

77. On January 15, 2012, Donna LaScola voiced concern that the Defendant Association

may be getting into legal trouble with all the blog posts and emails regarding Kromenhoek' and Judith Kromenhoek's service animals.

78. Ever ready to vilify Kromenhoek, Felice states, "[t]he ADA law does not prevent a community from excluding DOGS." He goes on, "[n]o one wishes to prevent proper needs to be satisfied!! He continues, "[a]gain REAL needs or pets??" He concludes, "I suggest they be ostracized, NO dinner dates, no patronage of their establishments, no conversations, no beach conclaves, just ignore them completely!!!"

79. On January 17, 2012, ever dutiful to Talkington, Harcourt emailed Talkington informing him that the Board had received a letter from one of the owners stating the owner had filed a complaint. Therefore the Board was retaining counsel.

80. On January 17, 2012, Kromenhoek received a letter from the Board informing he that she was in violation of the no dogs rule and would be fined.

81. Kromenhoek felt hurt and ashamed after reading the letter.

82 In a January 30, 2012 email, Felice wrote to 40 recipients, "How can you allow 2 admitted 'certified' mentally disabled persons on the ballot for election to our board?? Due diligence was not done properly. The should be removed from consideration.

83. As of February of 2012 Kromenhoek had not received any response from the Board regarding her request for a reasonable accommodation. At the Board's February 7, 2012 meeting, Harcourt stated that he met with Attorney Maria Hodge regarding the HUD complaints and the dog issue in general.

84. On February 28, 2012, Edward Wardell, the incoming President of the Board, emailed the owners informing them that the by-laws were amended by a vote of 69.2% of the Owners and will become effective once "registered with the U.S. Virgin Islands Government.

85. In this version of the by-laws, Section 11 of Article V was amended to state:

No dogs are allowed on the property, either long term or visiting. The Board may grant exceptions to the NO DOGS ALLOWED rule, on an individual basis, should an

owner require the assistance of a service animal (dog) as defined by the ADA. Owners seeking to obtain such an exemption are required to apply, in writing, to the Board with supporting documentation.

86. However, the April 11, 2012 Board minutes reflect that legal counsel had suggested not recording the by-laws and obtaining approval to revised the "no dogs" rule as follows:

No dogs are allowed on the property, either long term or visiting. Owners or occupants who have properly documented and verified disability as defined by Federal Law may make a request for reasonable accommodation and exception to the prohibition on dogs on the property. An owner or occupant seeking an accommodation can do so in writing to the Board. The request shall include: (1) identification of the owner or occupant seeking the accommodation; (2) explanation of the relationship between the requested accommodation and the disability; and (3) verification of the disability and need for accommodation as set forth in this rule. To facilitate the Board's review of each request for an accommodation of a non-obvious handicap, the Board may require(1) the submission of documentation verifying that the person meets the Federal Fair Housing Act's definition of disability; and (2) documentation from a doctor or other medical professional who is in a position to know about the individual's disability, and that the requested accommodation is related to the individual's disability. All information submitted to the Board that is necessary for the evaluation of the reasonableness of an accommodation will be kept confidential.

87. On February 29, 2012, Verdiramo & Verdiramo P.A. delivered a letter to the Board providing an explanation of the Defendant Association's legal obligations under the ADA and the FHA

88. In December of 2011, Kromenhoek filed a charge of discrimination under the FHA with the Department of Housing and Urban Development (HUD) against the Association and the Board for violation of the FHA.

89. In response to Kromenhoek's and Barbara Walters' HUD complaints, on March 25, 2012, Talkington blogged, Kromenhoek and Barbara Walters will "hang onto their puppies" at any length. In direct response to the HUD Complaint, Talkington says "Really ladies? Do you seriously believe that either of you two owners has any impact whatsoever on the Association's governance of this property in terms of your having those puppies? To call this a fiasco of a complaint 'misguided' is at the moment the most charitable description of the though process (if there even was one) that was involved in filing this complaint." Talkington characterizes Kromenhoek and Barbra

Walters as "playground bullies" and of making a mockery of our board." He then calls on the Association to "go on the offensive" and file suit against Kromenhoek and Barbara Walters stating "when these ladies start spending their own cash instead of relying on the government for free help, the rubber will meet the road on how far everyone is willing to go. In closing, Talkington implores the Board to take Kromenhoek and Barbara Walters to court.

91. In a January 5, 2012 blog, Talkington accused Kromenhoek of being CB Lawton, a person who blogged about having dogs on the premises. Talkington asserted in his blog post that Kromenhoek was CB Lawton citing as evidence Kromenhoek's refusal to respond to questions about "why it is OK for her to have a dog." Talkington says she should "either stand up and face the owners or quietly slide into the sunset."

92. Felice chimed in and said that Kromenhoek is "THE SOURCE OF SO AMY CBW PROBLEMS." He then launches into an attack stating that Barbara Walters and others are also part of the problem referring to this group as a coven and calling a sympathetic board member, Kromenhoek's shill.

93. Felice accused Kromenhoek of having Tunick Insurance in her pocket. Felice also stated that Kromenhoek parades her dog around the property and that the conduct is "anarchy, disrespectful, illegal, unlawful and nasty."

94. In late March or early April of 2012, Kromenhoek finally received a response from the Board approving her request for reasonable accommodation more than a year afer she submitted her request.

95. Defendant Board's act and omissions, including Defendant Board's response to Kromenhoek's request for an accommodation, as well as the Board's failure to respond to the request for more than a year, constitute a denial of a request for reasonable accommodation in violation of the FHA.

96. Defendant Association is vicariously liable for the actions and omissions of its agent,

Defendant Board.

97. Defendant Harcourt's acts and omissions in ignoring Kromenhoek' request for reasonable accommodation; while at the same assisting a campaign to amend the by-laws to specifically exclude emotional support animals by incorporating only the definition of the ADA of service animal; providing Talkington access to Kromenhoek' personal and private information; and falsely accusing Kromenhoek of violating the rules qualify as retaliatory measures pursuant to the FHA.

98. The Defendant Board action in assessing Kromenhoek a fine after receiving the letter from Karin A. Bentz, qualifies as retaliatory measures pursuant to the FHA.

99. As a result of the Defendants' actions, and each of them, Kromenhoek has suffered damages including but not limited to emotional distress, embarrassment, and humiliation.

**COUNT I: VIOLATION OF THE FHA**
**(Association and Board)**

100. Kromenhoek realleges and incorporates by reference the remainder of the allegations set forth herein.

101. 42 U.S.C. §3604(f)(3)(b), the FHA, prohibits housing providers from discriminating against applicants or residents because of their disability and from treating persons with disabilities less favorably than others because of their disability. The foregoing conduct violates the FHA which prohibits discriminating based on disability and from treating persons with disabilities less favorably than others because of their disability.

102. The FHA also makes it unlawful for any person to refuse "to make reasonable accommodations in rules, policies, practices, or services, when such accommodations may be necessary to afford persons with disabilities equal opportunity to use and enjoy a dwelling.

103. At all relevant times, Kromenhoek had a request for a reasonable accommodation

Case: 3:14-cv-00025-CVG-RM Document #: 201-1 Filed: 05/22/14 Page 16 of 57

pending before the Defendant Board.

104. Defendant Association knew or reasonably should have known of Kromenhoek's disability.

105. Defendants Association and Board discriminated against Kromenhoek by denying Kromenhoek , as a person with a disability, a reasonable accommodation by failing to take action on her request for reasonable accommodation for more than a year.

106. As direct and proximate result of the Defendants' conduct described above, Kromenhoek has suffered and will continue to suffer embarrassment, humiliation, mental anguish, emotional and physical distress.

107. Defendants' acts or omissions were done maliciously, oppressively and/or fraudulently.

108. Once Kromenhoek submitted her application to Louanne Schechter in July of 2011, the Defendant Board had an obligation to take action on the pending claim. Moreover, Defendant Association could have taken measures to assure that the Board complies with the FHA but chose not to.

109. Defendants conduct violated the FHA and Kromenhoek is entitled to the remedies, procedures and rights set forth in 42 U.S.C §3613 (c)(1).

**COUNT II: VIOLATION OF SECTION 3617 OF THE FHAA**
**(Harcourt)**

110. Kromenhoek re-alleges and incorporates all preceding paragraphs herein by reference as though fully restates, wholly, in this Count.

111. Harcourt is a member of the Association and was the President of the Board, at the time Kromenhoek applied for a reasonable accommodation.

112. Harcourt's removal of the framed copy of the ADA poster made clear his intention to ignore Kromenhoek' request for accommodation.

113. Harcourt's conduct in ignoring Kromenhoek' request for a reasonable accommodation

while at the same time pushing for an amendment to the by-laws that would deny Kromenhoek reasonable accommodation constitute interference pursuant to Section 3617 of the FHA.

114. Harcourt action in falsely accusing Kromenhoek of violating the no dogs rule and levying a fine against Kromenhoek constitute retaliation under the FHA.

115. As a result of Harcourt's acts and/or omissions, Kromenhoek has suffered emotional injuries and continues to suffer emotional injuries.

116. Defendant Harcourt's conduct violated Section 3617 of the FHA and entitles Kromenhoek to all categories of damages, including punitive damages.

**COUNT III: VIOLATION OF SECTION 3617 OF THE FHAA**
**(Board and Association)**

117. Kromenhoek incorporates all preceding paragraphs herein by reference as though fully restated, wholly, in the Count.

118. The foregoing conduct violates the FHA, which makes it unlawful for any person to coerce, intimidate, threaten, or interfere with any person in the exercise or enjoyment of, or on account of his having exercised or enjoyed, or on account of his having aided or encouraged any other person in the exercise or enjoyment of, any right granted or protected by the FHA.

119. Defendant Association knew or had reason to know that Kromenhoek had applied for a reasonable accommodation to keep her emotional support dog, Oliver, on the premises. Yet, Defendant Association refused to provide Kromenhoek with a reasonable accommodation and amended its by-laws to exclude emotional support dogs from a waiver to the NO DOGS ALLOWED rule.

120. Defendant's Board Action in assessing Kromenhoek a fine despite the fact that Kromenhoek' request for a reasonable accommodation was pending in the office

constitute retaliation under the FHA.

121. As a direct and proximate result of Defendant Board and Defendant Association's acts or omissions, Kromenhoek has suffered extreme and severe anguish, humiliation, embarrassment, emotional distress and tension, the extent of which is not fully known at this time and the amount of damages caused thus far is not yet fully ascertained but will be proven at the time of trial.

122. Defendants' conduct as described in this Complaint violated the FHA and the public policy of the United States and entitles Kromenhoek to all categories of damages, including punitive damages.

**<u>COUNT IV: VIOLATION OF SECTION *3617* OF THE FHA</u>**
**(Felice)**

123. Kromenhoek re alleges and incorporates by reference all preceding paragraphs herein as though fully restated, wholly, in the Count.

124. Defendant Felice began interfering with Kromenhoek on the blog once he learned that Kromenhoek had requested reasonable accommodation for an emotional support animal, her dog.

125. Defendant Felice interfered with Kromenhoek' right to request reasonable accommodation by using the blog and personal emails sent to the Cowpet Bay West Community to intimidate, to discredit and to threaten Kromenhoek. Defendant Felice's actions were designed to intimidate, threaten and scare Kromenhoek from pursuing a reasonable accommodation to keep Oliver on the premises.

126. Defendant Felice's conduct violated Section 3617 of the FHA by interfering with Kromenhoek exercise of her right to request for a reasonable accommodation.

127. Defendant Felice violation of the FHA has harmed and will continue to harm Plaintiff Kromenhoek.

128. As a result of Defendant Felice's act or omission, Kromenhoek is entitled to the

remedies, procedures and rights set forth in 42 U.S.C *§3613 (c)*(1) and (2)

COUNT V: VIOLATION OF SECTION *3617* OF THE FHA
**(Lance Talkington)**

129. Kromenhoek re alleges and incorporates by reference all preceding paragraphs herein as though fully restated, wholly, in the Count.

130. Upon information and belief Defendant Talkington runs the blog and used the "blog" to attack, embarrass and humiliate Kromenhoek after she filed a request for reasonable accommodation.

131. Defendant Talkington interfered with Kromenhoek' exercise of her right to request a reasonable accommodation by demonizing Kromenhoek on the blog and suggesting both implicitly and explicitly that Kromenhoek violated the rules

132. Defendant Talkington interfered with Kromenhoek' right to request a reasonable accommodation by mounting a calculated attack against Kromenhoek' reputation, honesty and standing in the Cowpet Bay West Community.

133. Defendant Lance Talkington interfered with Kromenhoek's right to request a reasonable accommodation by posting and publicly discussing Kromenhoek' private medical record on the blog.

134. Defendant Talkington's actions were designed not only to humiliate and to discredit Kromenhoek but to signal to Kromenhoek that her medical records and private information will continue to be the subject of public scrutiny if she continued to demand a reasonable accommodation. Defendant Talkington actions were designed to threaten, intimidate or scare Kromenhoek into abandoning Kromenhoek' right to a reasonable accommodation to keep Oliver on the premises.

135. The conduct mentioned above violated Section 3617 of the FHA.

136. Defendant Talkington's violation of the FHA has harmed and will continue to harm Kromenhoek in the future.

137. As direct result of Defendant Talkington's act or omission, Kromenhoek is to the remedies, procedures and rights set forth in 42 U.S.C §3613 (3)(1) and (2).

**COUNT VI: VIOLATION OF THE AMERICAN WITH DISABILITIES ACT**
**(Association and Board)**

138. Kromenhoek realleges and incorporates by reference all preceding paragraphs herein as though fully restated, wholly, in the Count.

139. As set forth herein, at all relevant times, Defendants were subjected to the ADA based on the ADA definition of public lodging.

140. Defendants owns, operates and/or leases condominium units in Cowpet Bay, St. Thomas, Virgin Islands.

141. Defendants discriminated against Kromenhoek by failing to make reasonable modifications to its NO DOGS RULE to allow Kromenhoek to keep Oliver on the premises.

142. As such, Defendants violation of the ADA has harmed and will continue to harm Kromenhoek

143. As a result, Kromenhoek is entitled to the remedies, procedures, and rights set forth in 42 U.S.C.§12188.

**COUNT VII: BOARD EXCEEDED ITS AUTHORITY**
**BY ADOPTING THE NO DOGS RULE**

144. Kromenhoek incorporates all preceding paragraphs herein by reference as though fully restated, wholly, in the Count.

145 Defendant Association adopted Bylaws pursuant to Chapter 33, of Title 28 of the Virgin Islands Code.

146. At the time Plaintiff requested a reasonable accommodation for her dog, the bylaws of Defendant Association placed no restrictions on dogs on the Cowpet Bay West

premises.

147. The Defendant Board subsequently adopted rules and regulations, which were more restrictive than the bylaws and places a restriction on the condominium owners' right to own an animal, including emotional support dogs in a manner not contemplated by the bylaws.

148. The Defendant Board acted outside the scope of their power when they adopted rules that were more restrictive than the bylaws.

149. As a result of the Defendant Board implementing this invalid rule, Kromenhoek suffered damages and losses, and will continue to suffer loss and damages, including but not limited to emotional distress, financial loss and other losses for which Defendant Board is liable.

## COUNT VIII: THE FEBRUARY 2012 AMENDMENT TO THE BYLAWS IS VOID

150. Kromenhoek incorporates all preceding paragraphs herein by reference as though fully restated, wholly, in the Count.

151. Defendant Association adopted by-laws pursuant to Chapter 33, of Title 28 of the Virgin Islands Code.

152. Section 19 of the 1968 Declaration states that the by-laws and rules can only be amended by "an amendment to the Declaration and such amendment duly recorded.

153. Under this provision, any amendment to the by-laws must be a 75% vote and recorded in order to be valid.

154. The February 2012 amendment to the by-laws was adopted by a roughly 69% vote.

155. The 69% vote is less than what is required by the Declaration.

156. Therefore, the February 2012 amendment is inconsistent with the Declaration.

**COUNT IX:NEGLIGENCE**
(Board and Association)

157. Kromenhoek repeats and re-alleges all preceding paragraphs as though fully restated, wholly, in this Count.

158. The Defendant Board and Defendant Association owed Kromenhoek a duty to comply with all laws including the FHA and the ADA.

159. Defendant Board violated the FHA when it took more than a year to approve Kromenhoek' request for a reasonable accommodation.

160. Defendant Association did otherwise ratify Defendant Board's wrongful conduct.

161. As a result of Defendants' acts and/or omissions, Kromenhoek has suffered emotional distress, embarrassment, humiliation and continues to suffer damages for which Defendants are liable.

**COUNT IX: INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS**
**( Felice)**

162. Kromenhoek incorporates all preceding paragraphs herein by reference as though fully restated, wholly, in the Count.

163 At all relevant times; Kromenhoek was subjected to a pattern of harassment and vilification on the blog and through emails based in whole or in part, on her request for a reasonable accommodation by Defendant Felice.

164. Defendant Felice's action in emailing at least 40 people and implying that Kromenhoek a "certified mentally disabled person" should not be on the ballot for election to our board"was done intentionally, recklessly and with deliberate indifference to a substantial probability that severe emotional distress would result to Kromenhoek.

165. Defendant Felice's blog posts and other emails were intentional acts done with deliberate indifference to a substantial probability that severe emotional distress would

result to Kromenhoek.

166. Defendant Felice's blog posts and emails are evidence of a pattern of harassment.

167. Defendant Felice's acts further constitute extreme and outrageous conduct.

168 Defendant Felice's conduct was outrageous in character and extreme in degree, because said conduct was atrocious and egregious, and went beyond all possible bounds of decency and is utterly intolerable in a civilized community.

169. Defendant Felice's extreme and outrageous conduct toward Kromenhoek was done in a willful and wanton manner, and constituted a disregard for the rights and well-being of Kromenhoek.

170. As a result of Defendant Felice's extreme and outrageous conduct, Kromenhoek has suffered severe mental and emotional distress, humiliation, embarrassment and will continue to suffer severe emotional distress and other damages for which Defendant Felice is personally liable for compensatory and punitive damages to Kromenhoek.

**COUNT X: CONSPIRACY TO COMMIT AN UNAUTHORIZED ACT**
**(Against all Defendants)**

171. Kromenhoek repeats and re-alleges all preceding paragraphs as though fully restated, wholly, in this Count.

172. Defendants, through and among themselves conspired with each other, and acted in concert, to violate the FHA and to deny Kromenhoek 'request for reasonable accommodation, without authority, to deprive her of protected rights and interests, to defame her, to cause her emotional distress and suffering, and to deprive her full enjoyment of the goods, services, facilities, privileges, advantages, accommodations and/or opportunities of Cowpet Bay West.

173. The conduct complained herein are overt acts in furtherance of their conspiracy, and taken together constitute a civil conspiracy to harm Kromenhoek and to deny her civil rights under the FHA and the ADA.

174. As a direct and proximate result of the foregoing, Kromenhoek has suffered damages, losses, and severe emotional distress, for which said Defendants are jointly and severally liable.

**COUNT XI: PRIMA FACIE TORT CLAIM** (All Defendants)

175. Kromenhoek incorporates all *preceding* paragraphs herein by reference as though fully re-stated, wholly, in the Count.

176. The Defendants through their wrongful violations of, inter alia, the FHA and the ADA, caused Kromenhoek to be improperly deprived of reasonable accommodation.

177. None of the Defendants had an objective justification for depriving Kromenhoek of the aforementioned civil right.

178. Defendants acts and omissions as aforesaid were such that they offend common decency and sensibilities.

179. As a direct and proximate result of Defendants' wrongful and unlawful acts and omissions, as aforesaid, Kromenhoek' rights were violated; she was defamed; and suffered loss of reputation, mental anguish, pain and suffering and loss of enjoyment of life. In addition, Kromenhoek was assessed a daily monetary fined and has and will continue to suffer losses, pain, humiliation, mental anguish and damages for which Defendants are liable.

**COUNT XII: DEFAMATION AND SLANDER PER SE**
(Board, Association, Felice, Harcourt and Talkington)

181. Kromenhoek incorporates all proceeding paragraphs herein by reference as though fully re-stated, wholly, in the Count.

182 Defendants wilfully and intentionally published false and wrongful information on the blog and other venues about Kromenhoek.

183. The above described information was false and injurious as to Kromenhoek. It lowered the professional and personal reputation of Kromenhoek in the Cowpet Bay

Case: 3:12-cv-00025-CVG-RM Document #: 94 Filed: 03/11/13 Page 27 of 34

West community, as it was understood by the members thereof, and such publications were calculated to elicit that very response from that respected community.

184. As a direct consequence to Defendants' actions, Kromenhoek is entitled to an award of compensatory and punitive damages from them to compensate her for humiliation, emotional pain and suffering, inconvenience, mental and emotional distress, loss of enjoyment and embarrassment.

**COUNT XIII: NEGLIGENT AND/OR INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS**
**(All Defendants except Felice)**

185. Kromenhoek incorporates all proceeding paragraphs herein by reference as though fully re-stated, wholly, in the Count.

186. As set forth herein, at all relevant times, Kromenhoek was subjected to a pattern of harassment and vilification on the internet and through email based in whole or in part, on her request for reasonable accommodation and for having Oliver on the premises by Defendants.

187. Defendant Board's failure to provide Kromenhoek with a reasonable accommodation for Plaintiff's Oliver ; publishing on the blog that Plaintiff had violated the NO DOGS RULE, although she had a request pending for more than a year; and imposing unreasonable and egregious fines, penalties and or interests against Plaintiff are all intentional acts design to create severe emotional distress on the part of Kromenhoek.

188. Defendant Talkington's inflamatory blog posts and emails were done with reckless and with deliberate indifference to a ssubstantial probability that severe emotional distress would result to Kromenhoek.

189. Defendant Verdiramo's misrepresentation of the law in his legal opinion to the Board, while at the same time spearheading a campaign to amend the by-laws to specifically exclude Oliver, and other emotional support dogs was done intentionally and with deliberate indifference to a substantial probability that severe emotional distress would

result to Kromenhoek.

190 Defendant Cockayne's acts and omissions in providing Defendant Talkington with a copy of Kromenhoek' dog certification knowing that he would post it on the blog constitute acts of extreme and outrageous conduct.

191. Defendant Harcourt's act of ignoring Kromenhoek' request for a reasonable accommodation while at the same time assisting in the campaign to amend the by-laws to specifically exclude Oliver and publishing a letter falsely stating that Kromenhoek had no submitted a request for reasonable accommodation was done with deliberate indifference to a substantial probability that severe emotional distress would result to Kromenhoek.

192. The conduct of all Defendants were outrageous in character and extreme in degree, because said conduct was atrocious and egregious, and went beyond all possible bounds of decency and is utterly intolerable in a civilized community.

193. The extreme and outrageous conduct of Defendants toward Kromenhoek were done in a willful and wanton manner, and constituted a disregard for the rights and well-being of Kromenhoek.

194. As a direct and proximate result of Defendants' extreme and outrageous conduct, Kromenhoek suffered and continues to sufferer emotional distress.

195. Because Defendants' extreme and outrageous conduct toward Kromenhoek were improperly motivated, and were intentional, willful and wanton, Kromenhoek is entitled to punitive damages in addition to compensatory damages.

**COUNT IVX: INVASION OF PRIVACY:**
**PUBLIC DISCLOSURE OF PRIVATE FACTS**
***(Board and Association)***

196. Kromenhoek incorporates all proceeding paragraphs herein by reference as though fully re-stated, wholly, in the Count.

197. Defendants, Association wrongfully disclosed private information concerning

Kromenhoek when they openly discussed Kromenhoek' application for a reasonable accommodation, including Walter's medical condition at Board meetings in the presence of Talkington and other non-board members.

198 Defendants disclosed the content of a personal letter addressed Kromenhoek.

199. Kromenhoek considered the publicity highly offensive and a reasonable person in Kromenhoek position would also consider the publicity highly offensive.

200. The Defendants knew, or acted with reckless disregard of the fact, that Kromenhoek would consider the publicity highly offensive and that a reasonable person in Kromenhoek' position would consider the publicity highly offensive.

201. The private information, Walter's medical diagnosis and Oliver's registration were not of legitimate public concern. The private information did not have a substantial connection to a matter of legitimate public concern.

202. As a direct and proximate result of Defendants' act and/or omission, Kromenhoek suffered and continues to suffer severe emotional distress and other damages for which Defendants are liable.

**COUNT VX: INVASION OF PRIVACY:**
**PUBLIC DISCLOSURE OF PRIVATE FACTS**
(Harcourt and Talkington)

203. Kromenhoek incorporates all *preceding* paragraphs herein by reference as though fully re-stated, wholly, in the Count.

204. Defendants Harcourt and Talkington publicized private information concerning Kromenhoek.

205. Kromenhoek considered the publicity of her private information highly offensive and a reasonable person in Kromenhoek position would consider the publicity highly offensive.

206. Walter's medical diagnosis and Oliver's dog certification were not of legitimate public concern and or did not have a substantial connection to a matter of legitimate

public concern.

207 Defendants knew, or acted with reckless disregard of the fact, that a reasonable person in Kromenhoek' position and or Kromenhoek would consider the publicity highly offensive.

208. Defendants' actions were done solely to harass, embarrass, humiliate Kromenhoek and to frustrate Kromenhoek' efforts in requesting and obtaining a reasonable accommodation to keep Oliver at Cowpet Bay West.

209. As a direct consequence of Defendants' public disclosure, Kromenhoek is entitled to an award of compensatory and punitive damages from them to compensate her for humiliation, emotional pain and suffering, inconvenience, mental anguish, loss of enjoyment and embarrassment.

**COUNT XVI: INVASION OF PRIVACY; FALSE LIGHT**
**(All Defendants, except Verdiramo and Cockayne)**

211. Kromenhoek incorporates all preceding paragraphs herein by reference as though fully re-stated, wholly, in the Count.

211. Defendants publicize information or material that showed Plaintiff in a false light on the blog, in letters and in emails.

212. Kromenhoek considered the portrayal of her on the blog, in letters and in email in a false light to be highly offensive and a reasonable person in Kromenhoek' position would find the publication to be highly offensive.

213. Defendants intended the publication to create a false impression of Kromenhoek to adversely impact her pending request for a reasonable accommodation and her bid for re-election to the Board.

214. Defendants acted with reckless disregard for the truth because they intended to discredit, humiliate, embarrass and make Kromenhoek look bad in the Cowpet Bay West community right before the Board of Directors' election.

Case: 3:12-cv-00025-CVG-RM Document #: 94 Filed: 03/11/13 Page 31 of 34

215. As a direct consequence of Defendants' acts showing Plaintiff in a false light, Kromenhoek suffered humiliation, emotional pain and distress, inconvenience, mental anguish, loss of enjoyment, public embarrassment and loss of credibility and Kromenhoek is entitled to an award of compensatory and punitive damages from them as compensation.

**COUNT XVII: INVASION OF PRIVACY**
***(Board, Association, Harcourt and Talkington)***

216. Kromenhoek incorporates all preceding paragraphs herein by reference as though fully re-stated, wholly, in the Count.

217 Defendants invaded Plaintiff's privacy.

218. Kromenhoek had a reasonable expectation of privacy that her application for a reasonable accommodation and the content of the application would not be made public when she submitted the application to Cowpet Bay West Condominium Defendant-Association's business office.

219 Instead, the content of Kromenhoek' application was shared with Association members who are not on the Board, specifically Talkington.

220. As a result, Talkington posted private information about Kromenhoek on the blog.

221. As a result of the publication, Kromenhoek was ridiculed, mocked and ostracized by some members of the Cowpet *Bay West* community.

222 Kromenhoek' private information was not of legitimate public concern and or did not have substantial connection to a matter of legitimate public concern.

223. Defendants knew that the publication would be considered highly offensive by Kromenhoek and that Defendants acted with reckless disregard that a reasonable person in Kromenhoek' position would consider the publicity highly offensive.

224. As a direct consequence of Defendants' act, Kromenhoek is entitled to an award of compensatory and punitive damages form them to compensate her for humiliation,

emotional pain, and suffering, inconvenience, mental anguish, loss of enjoyment and embarrassment.

**COUNT XVIII**

**NEGLIGENCE PER SE/LEGAL MALPRACTICE**
**(Verdiramo)**

235. Kromenhoek incorporates all preceding paragraphs herein by reference as though fully re-stated, wholly, in the Count.

236. Defendant Verdiramo had a duty to provide legal advice that is consistent with the law.

237. Defendant Verdiramo's December 1, 2011 letter fell short of that standard as it misstated the requirements of the FHA.

238. The Board improperly relied on Defendant Verdiramo's legal advice to deny Kromenhoek' her request for a reasonable accommodation.

239. As a direct and proximate result of Defendant Verdiramo's intentional or wrongful act or omission, Kromenhoek has suffered, and will continue to suffer loses and damages for which Defendant Verdiramo is liable.

**WHEREFORE, THE PREMISES CONSIDERED, PLAINTIFF PRAYS:**

A. That this Court declare that by its acts and/or omissions and practices, the Defendants have violated rights secured to Plaintiff by the FHAA, the ADA, and other public laws and policies of the United States and the Territory of the U.S. Virgin Islands.

B. That this Court order Defendants to make Plaintiff whole, insofar as she was adversely affected by Defendants' discriminatory practices by awarding damages, including interest in an amount to be shown at trial, and other affirmative relief.

*Judith Kromenhoek v. Cowpet Bay West Condominium Assoc., et al.* Civil No. 12-00025
Second Amended Complaint Page 33

C. That the Court grant compensatory and punitive damages.

D. That the Court grant Plaintiff her attorney's fees, costs and disbursements.

E. That the Court grant additional relief as the Court deems just and proper.

**JURY TRIAL IS DEMANDED.**

Respectfully submitted,

**LAW OFFICES OF KARIN A. BENTZ, P.C.**

Dated: March 11, 2013

/s/ Karin A. Bentz

**KARIN A. BENTZ, ESQ.**
**JULITA K. de LEÓN, ESQ.**
5150 Dronningens Gade, Suite 8
St. Thomas, Virgin Islands 00802
Telephone: 340-774-2669
Telecopier: 340-774-2665
E-mail: kbentz@virginalaw.com

Joint Appendix Vol. II Page 1613

*Judith Kromenhoek v. Cowpet Bay West Condominium Assoc., et al.* Civil No. 12-00025
Second Amended Complaint Page 34

**CERTIFICATE OF SERVICE**

I hereby certify that I caused the filing and service of the foregoing with the Clerk of the District Court of the Virgin Islands using the CM/ECF system, which will provide electronic notice by email to the following.

Richard P. Farrelly, Esq.
Birch de Jongh & Hindels, PLLC
1330 Taarneberg
St. Thomas, VI 00802

John H. Benham, III, Esq.
Benham & Chan
P.O. Box 11720
St. Thomas, Virgin Islands 00801

Ryan S. Meade, Esq.
Quintairos, Prieto, Wood & Boyce, P.A.
9300 South Dadeland Blvd; 4th Floor
Miami, Florida 333156

/s/ Karin A. Bentz

Joint Appendix Vol. II Page 1614

IN THE UNITED STATES DISTRICT COURT OE THE VIRGIN ISLANDS
DISTRICT OF ST. THOMAS AND ST. JOHN
*****************

| | |
|---|---|
| **JUDITH KROMENHOEK,** <br> **Plaintiff,** <br> v. <br> **COWPET BAY WEST CONDOMINIUM ASSOCIATION; THE BOARD OF THE COWPET BAY WEST CONDOMINIUM ASSOCIATION; ~~ED WARDWELL, MAX HARCOURT, BILL CANFIELD, ROSIE WELLS, SHARON KOEHLER, DOUG REBAK and HERB HORWITZ as Board members;~~ MAX HARCOURT, in his personal capacity; LANCE TALKINGTON; ALFRED FELICE, ROBERT COCKAYNE, ~~in his personal capacity;~~ VINCENT VERDIRAMO, ~~in his personal capacity~~,** <br> **Defendants.** | **CIVIL NO. 12-00025** <br> **Action for: Housing Discrimination; Discrimination Based on Disability; Invasion of Privacy; Negligent Infliction of Emotional Distress Infliction of Emotional Distress; Punitive Damages; and Injunctive and Declaratory Judgment** <br> **JURY TRIAL DEMAND** |

## SECOND AMENDED COMPLAINT

**COMES NOW**, Plaintiff **JUDITH KROMENHOEK**, by and through her undersigned counsel, the **LAW OFEICES OE KARIN A. BENTZ, P.C.**, (Karin A. Bentz Esq., and Julita K. de León, Esq., of Counsel) and for a ~~Second Amended Complaint~~ against the Defendants in the above captioned action states and alleges as follows:

## PRELIMINARY STATEMENT

~~1.~~ ~~On April 11, 1968, President Lyndon B. Johnson signed the Civil Rights Act of 1968. Federal Fair Housing Act, Pub.L. No. 90-284, 82 Stat. 73, 81 (1968) (codified as amended at 42 U.S.C. §§ 3601-3631). The Federal Fair Housing Act (hereinafter "FHA") expanded on the Civil Rights Act of 1964 to prohibit discrimination regarding the sale, rental, and financing of housing based on race, color, religion, and national origin. *Id.* The FHA was amended twice to broaden the class of people falling under the scope of its protections; in 1974, discrimination based on sex was~~

~~added, and in 1988 discrimination based on familial status or disability was included. (Pub.L. 100-430, approved September 13, 1988).~~

~~2. In amending the FHA, Congress recognized that people with disabilities are subject to artifical, arbitrary, and unnecessary barriers preventing them from making full use of housing. Congress also recognized that more than a mere prohibition against disparate treatment was necessary in order that handicapped persons receive equal housing opportunities. Secretary of HUD v. Dedham Housing Authority, 1991 WL 442793 * 5 (HUDAALJ November 15, 1991).~~

~~3. Pursuant to the Fair Housing Act (hereinafter "FHA"), it is unlawful to discriminate against any person in the terms, conditions or privileges of sale or rental of a dwelling, or in the provision of services or facilities in connection with such a dwelling, because of the disability of that person or a person residing in that dwelling, because of the disability of that person or a person associated with that person. 42 U.S.C. §3604(f)(2); 24 C.F.R. §100.202(b).~~

~~4. It is unlawful to refuse to make reasonable accommodations in rules, policies, practices, or services, when such accommodations may be necessary to afford such person equal opportunity to use and enjoy a dwelling. 42 U.S.C. §3604(f)(3)(B); 24 C.F.R. §100.20.~~

~~5. Section 3617 of the FHAA makes it unlawful for any person to coerce, intimidate, threaten, or interfere with any person in the exercise or enjoyment of, or on account of his having exercised or enjoyed, or on account of his having aided or encouraged any other person in the exercise or enjoyment of, any right granted or protected by Section 803, 804, 805, 806 of this title.~~

~~6. At all times relevant to this action, Kromenhoek lived in Condominium unit at Cowpet Bay West Condominium community.~~

~~7. The property at Cowpet Bay West is part of the Cowpet Bay West Condominium community that is managed by the Cowpet Bay West Condominium Association (hereinafter, "the Association")~~.

~~6. At all times relevant to this action, Defendant the Board of the Cowpet Bay West Association, (hereinafter "the Board") run the day to day operations of the Defendant Cowpet Bay West Condominium Association.~~

~~7. At all times relevant to this action, Defendant Max Harcourt (hereinafter "Harcourt") served as the President of the Board. And, at all relevant times, Walters was a member of the Board.~~

1. Over twenty years after Congress passed one of our nation's landmark civil rights law for people with disabilities, Defendants still maintain barriers that prevent persons with disabilities from the full, independent and equal enjoyment of housing at Cowpet Bay *West* Condominium.

2. Defendants have been and are in violation of federal civil rights laws pertaining to housing and disability, in that they have failed to comply with the federal nondiscrimination statutes.

3. Defendants have discriminated and continue to discriminate against Plaintiff in many ways, including but not limited to failing to make reasonable *accommodation* in its practice, rules and regulations so that Plaintiff can keep her emotional support dog without being fined daily.

4. This action is brought by the Plaintiff, Judith Kromenhoek ("Plaintiff") a member of the Cowpet Bay West Condominium Association. This action arises under the provisions of the Civil Rights Act of 1968, §§ 802(h), 804(f)(3)(B), 42 U.S.C. §§3602(h), 3604(f)(3)(B); 42 U.S.C. §§ 3601-3619 (hereinafter the "Fair Housing Amendments Act, FHAA"); Americans with Disabilities Act of 1990, 42 U.S.C.. §§ 12101-12212 (hereinafter the "ADA"); and other laws and policies of the United States and the Territory of the Virgin Islands.

## JURISDICTION AND VENUE

5. This Court has subject matter jurisdiction over this matter pursuant to 28 U.S.C. §§

1331, 1332 and §1337; and V.I. Code ANN. tit. 4, §32.

6. Venue is proper within this District pursuant to 28 U.S.C. §1391(b).

**PARTIES**

7. Plaintiff Judith Kromenhoek owns a condo at Cowpet Bay West on the east side of St. Thomas, United States Virgin Islands. ~~This property constitutes a dwelling under the FHA. 42 U.S.C.§3602(b); 24 C.F.R. §100.20.~~

~~8. The FHA and the ADA define handicapped as a person with "a physical or mental impairment which substantially limits one or more of such person's major life activities, a record of having such an impairment, or being regarded as having such an impairment. . . .~~

~~9. Kromenhoek was diagnosed with Anxiety Disorder, DSM-IV by her physician and thus qualifies as a person with a handicapped within the meaning of the FHA and the American with Disabilities Act, (hereinafter "ADA").~~

~~10. Kromenhoek is an aggrieved person under the FHA and the ADA.~~

Plaintiff, Judith Kromenhoek is a resident of St. Thomas, United States Virgin Islands.

8. Upon information and belief, Defendant Cowpet Bay West Condominium Association is an entity organized pursuant to the Virgin Islands Condominium Act, V.I. CODE ANN. tit 28, §901 *et seq.* as amended that resides and operates its principal place of business in St. Thomas, U.S. Virgin Islands.

9. The Declaration for Defendant Cowpet Bay West Condominium Association is recorded in the Office of the Recorder of Deeds, St. Thomas, U.S. Virgin Islands.

10. Defendant Cowpet Bay West Condominium Association, is operated and controlled by a Board of elected persons. The Board is authorized by the Virgin Islands Condominium Act and the Declarations of the Cowpet Bay West Condominium Association, with its purpose set forth more fully in Bylaw Article 1, Section 2. The members of the Board are elected by the homeowners of

the Cowpet Bay West Condominiums

11. Upon information and belief, Defendant ~~Cowpet Bay West Condominium~~ Association is an entity organized pursuant to the Virgin Islands Condominium Act, V.I. CODE ANN. tit 28, §901 *et seq*. as amended~~,~~ that resides and operates its principal place of business in St. Thomas, U.S. Virgin Islands. ~~Cowpet Bay West is the rental manager and governing organization of the condominium development~~.

~~12.~~ ~~Each residential unit owner may use his or her condo unit for permanent, temporary, or transient use. Thus, the owners may permanently reside in their unit, use it as a second home, rent it out on their own or not use it at all.~~

~~13.~~ ~~Defendant Association's facility is structured and operated as both a place of lodging and a condominium. As a place of lodging, it is a place of public accommodation within the meaning of the ADA.~~

~~14.~~ ~~Defendant Association~~ is operated and controlled by a Board of elected persons. The Board is authorized by the Virgin Islands Condominium Act and the Declarations of the Cowpet Bay West Condominium Association, with its purpose set forth more fully in Bylaw Article 1, Section 2. The members of the Board are elected by the homeowners of the Cowpet Bay West ~~Condominiums~~.

~~15.~~ ~~Upon information and belief, on October 22, 1974, Cowpet Bay West was created by a declaration of merger, whereby Cowpet Bay Village-Stages One and Two, the two condominium associations, merged into a single entity. The merger declaration acknowledged that the original 1968 Declaration, except as amended by the merger declaration is still in force. Section 16, of the 1968 Declaration provides that all owners are subject to and must comply with the provisions of the Declaration, the by-laws, and the rules and regualtions as may be amended. Section 17 of the 1968 Declaration provides that the Declaration can only be amended by an affirmative vote of 75% of the Owners in number and common interest. Section 19 of the 1968~~

~~Declaration states that the by-laws and rules and regulations are "annexed hereto" and that the by-laws can only be amended by "an amendment to this Declaration and such amendment duly recorded."~~

~~16. Under this provision, any amendment to the by-laws must be by a 75% voe and recorded in order to be valid.~~

~~17. The by-laws of the Association were adopted and recorded in 1974 al;ong with the merger declaration. The by-laws were again amended and recorded in April 1998. Article I, Section 2 of those by-laws made them applicable to both the common areas and the individual units. Article II, Section 2, provided that the affairs of the Association were to be governed by the Board , which was empowered to deal with all administrative affairs of the Association and to undetake all acts except those prohibited by law, the Declaration, or the by-laws. Of the enumerated powers of the Board, adoption and amendment of the rules and regulations is provided for. Thrse rules are applicable to both the common areas and the units under Article I, Section 2. Article V, Section 9 empowers the Board to enjoin and remedy a violation of the by-laws, Declaration, or rules and regulations. Article V, Section 16 allows for the adoption of rules and regulations if approved by a majority of the Owners. Article XI, Section 1 requires that the by-laws be modiifed by a 66 and 2/3% vote of the Owners present at a meeting held for such purpose. Article XIII, Section 1 states that where thee is a conflict between the provisions of the by-laws and the Declaration, the Declaration controls.~~

~~18. There is a conflict between the by-laws and the Declaration in that the Declaration makes clear that a vote of 75% of the Owners is required to amend the by-laws.~~

~~19. The 1968 rules and regulations prohibiteed an Owner from making or allowing disturbing noises in his/her apartment and prohibited dogs. The 1998 rules and regulations contained the same provisions.~~

~~20.~~ Based upon information and belief Defendant Alfred Felice is a resident of Plainview, New York.

~~21.~~ Based upon information and belief Defendant Max Harcourt is a resident of St. Thomas, United States Virgin Islands.

~~22.~~ Based upon information and belief Defendant Lance Talkington is a resident of St. Thomas, United States Virgin Islands.

~~23.~~ Based upon information and belief Defendant Robert Cockayne is a resident of St. Thomas, United States Virgin Islands.

~~24.~~ Based upon information and belief Defendant Vincent Verdiramo is a resident of St. Thomas, United States Virgin Islands.

**STATEMENT OF FACTS**

~~25.~~ ~~On January 21, 2011, Stansford S. Sutherland, a licensed psychologist wrote a letter stating that he was treating Walters and that she was diagnosed with Anxiety Disorder, citing the DSM-IV. He further explained that Walters had "severe limitations" in coping with stress and anxiety that most people would consider "normal day to day events." He went on to state that he has prescribed the use of an emotional support animal, dog or other, to alleviate her symptoms and that such emotional support animal was necessary. In conclusion, he states that pursuant to the Fair Housing Act, Walters is qualified to keep her emotional support animal despite a policy prohibiting pets in her housing. On that same day, the National Service Animal Registry issued a certification that Walters was allowed to keep her emotional support animal even if there is a policy prohibiting pets.~~

26. ~~In February of 2011, Defendant Association received the letter from Walters' medical provider and the certification. **[EXHIBIT B]** LETTER AND DOG CERTIFICATION. However, as early as the Summer of 2010, Walters, a member~~

~~of the Board, discussed with Board members her need to obtain a waiver to the NO DOG RULE to keep an emotional support dog on the premises.~~

~~27. Walters made the request for a reasonable accommodation because Defendant Association had a NO DOGS RULE in place and Walters needed a waiver from Defendant Association's NO DOGS RULE to keep her emotional support dog (hereinafter "Oliver"). Walters furnished those two documents to Louanne Schechter, the Office Manager for Defendant Association as Walters' application because the Defendant Board did not have a form or application in place for requesting a waiver to the NO DOGS RULE.~~

~~28. At the time Walters submitted her request for a reasonable accommodation, Defendant Association had no written policy in place for processing a reasonable accommodation request, although it had a NO DOG RULE IN place for at least fifteen (15) years.~~

~~29. Upon information and belief, Louanne Schechter accepted the documents, placed them in Walters' file and discussed Walters' request with Jon Cassady, Louanne Schechter's immediate supervisor.~~

~~30. Upon information and belief, Jon Cassady discussed Walters' request with Harcourt and Harcourt subsequently came to the Association's Office to review Walters' documents.~~ [EXHIBIT C] LOUANNE'S AFFIDAVIT.

31. ~~Upon information and belief, Harcourt sent his representative, Bob Canefield, a member of the Board, to review the documents.~~

32. ~~Upon information and belief, there was widespread opposition to having dogs on the premises by some members of the Board and Association.~~

~~33. Upon information and belief, Harcourt took down a framed copy of an American with Disabilities Act poster that was hanging in the Defendant Association's office saying **Cowpet Bay rules not ADA**.~~

34. ~~At the February 12, 2011 Board meeting, Board member Robert Cockayne (hereinafter "Cockayne") proposed amending the by-laws to prohibit dogs and farm animals. There was no mention however of providing reasonable accommodations to owners under the FHA or the ADA.~~

~~35. The Board neither discussed or acted on Walters' request for a reasonable accommodation during the March 8, 2011 Board meeting.~~

~~36. During the May 10, 2011 Board meeting, an owner complained of someone walking a dog on the property. The Board, headed by Harcourt voted to post "No Dogs Allowed" signs on the property, despite the fact that Harcourt knew that Walters had submitted a request for a reasonable accommodation to allow her to keep her emotional support dog, Oliver on the premises. The Board also took no action on Walters' request for a reasonable accommodation, although it had been pending before them for more than two months.~~

~~37. The Board met in June, twice in July and once in August, but did not act on Walters' request for a reasonable accommodation.~~

~~38. During the Board meeting on September 13, 2011, the Board discussed Service Dogs and mentioned that the dogs must be registered with the ADA. The Board also opined that the Virgin Islands does not have guidelines for "service dogs." Although the Board, headed by Harcourt, discussed Walters'request for a reasonable accommodation, the Board, however took no action on Walters' request for a reasonable accommodation, although it had been pending before them for more than six months.~~

~~39. At all relevant times, some members of the Defendant Association and even the Defendant Board were vehemently oppose to having dogs on the premises. Members of the Defendant Association and the Defendant Board began voicing their oppositions to allowing dogs on the premises through emails and on the Cowpet Bay~~

Blog. They also began harassing Walters. At all relevant times, Lance Talkington (hereinafter "Talkington") owned the Cowpet Bay West Blog (hereinafter "the blog").

40. In his first blog post relating to "dogs" on the premises, Talkington, on September 27, 2011, stated that " at least three owners. . . have been seen with dogs that are either living in condos or are being entertained by an owner walking theem on the property. He goes on to point out that two of the dog owners are present and past Board members. Talkington called for the owners to amend the Defendant Association's by-laws to "eliminate any confusion over possible exceptions to the general rule" of no dogs . [EXHIBIT D) TALKINGTON SEPTEMBER 27, 2011 BLOG.

41. At the October 11, 2011 Board meeting, the Board, headed by Harcourt, took no action on Walters' pending request for a reasonable accommodation, although it had been pending for more than eight (8) months. However, the Board under Harcourt's leadership, discussed changing the by-laws to adopt a NO DOGS ALLOWED rule.

42. The Harcourt led Board proposed NO DOGS ALLOWED rule made an exception only for the ADA. Harcourt and the other members of the Board excluded FHA requests, although Walters' requested a reasonable accommodation pursuant to the FHA. Moreover, Harcourt and at least two Board members knew that Walters' request was currently pending before the Board and had been pending for more than six (6)months.

43. A day after the Board meeting, on October 12, 2011, Talkington emailed Walters regarding her "service animal." In this email, Talkington request from Walters a copy of her request for reasonable accommodation that was submitted to the Defendant Association office.

~~44. Walters responded on that same day telling Talkington that he has no right to the information.~~

~~45. Talkington responded by telling Walters that he will continue to pursue obtaining copies of her request for reasonable accommodation and that her "blatant violation" of the by-laws is completely intolerable.~~

~~46. Talkington continued to harass Walters regarding her need for an emotional support dog. In an October 13, 2011 blog, Talkington attacked Walters by stating that she claims to have papers that allow her to have a service dog and implied that Walters' refusal to discuss her disability with him and or the blog is unreasonable. Talkington also implied that Walters had made no attempt to prove her need for a service dog to the Board. [EXHIBIT E] TALKINGTON'S BLOG OF OCTOBER 13, 2011.~~

~~47. Alfred Felice (hereinafter "Felice") chimed in on the blog and stated that "service dogs' for the true needs are legal, but anyone can get such a designation by simple request from a friendly physician, regardless of any real need. Anyone can also get one via the internet for a minimal fee.!!!"~~

~~48. Exemplifying the type of discriminatory attitude that the FHA and the ADA were enacted to combat, Felice went on to say that "the perpetrators might just as well spit in our face. The by-laws must be made to reflect the majorities' rights. Perhaps, the dissenters would be happier in another community rather than be ostracized at CBW, which would be another fine recourse." [EXHIBIT F] FELICE'S OCTOER 13, 2011 BLOG.~~

~~49. In rsponse increasing attacks by both Talkington and Felice on the blog regarding her request for a reasonable accommodation, Walters explained that she was not violating the law or the rules. Walters stated that she has a disability and is afforded protection under the FHA.~~

~~50. Felice responded with disdain for Walters and the law that protects her rights as a~~

~~disabled American. [EXHIBITS G] FELICE'S BLOG~~

~~51. Walters again attempted to defend herself against allegations of wrongdoing on the part of both Felice and Talkington. Walters blogged that she is on permanent disability and receives social security benefits.~~

~~52. Immediately, Talkington discounted Walters' claim in a blog by stating how "unreasonable" it is to expect the Owners to accept Walter's claims of disability. Talkington asked Walters to provide the "dog's credentials. [EXHIBIT H]~~

~~53. In a later blog, Talkington attacked Walters' credibility and accused Walters about having made a request for a reasonable accommodation with Defendant Association's office. [EXHIBIT I].~~

~~54. Walters confronted Talkington about his retaliatory and harassing conduct on the blog. In response, Talkington stated that" [i]t is im possible to give someone grief over a disability that is to day completely undefined and unsubstantiated." [EXHIBIT J]~~

~~55. After reading Talkington's last blog, on October 13, 2011, Walters emailed the Board with the subject line "This has gone too far." In her email, Walters informs the Board that she feels Talkington obtained her private information from being allowed to attend Board meeting even though he is not a Board member.~~

~~56. Upon information and belief Harcourt and other members of the Board improperly shared the content of Walters' request for a reasonable accommodation with Talkington.~~

~~57. Susan Anderson, wrote an email complaining that she saw Judith Kromenhoek walking a dog and assumed that she was walking the dog for somebody else "because Judith Kromenhoek does not appear to be disabled."~~

~~58. The prevailing attitude shared by some Association and Board members was that Walters was not disabled because there was no visible evidence of her disability.~~

~~59. In response to Susan Anderson email regarding Judith Kromenhoek's "presumed disability, in an email dated October 20, 2011, Harcourt informed Susan Anderson that the Board was considering amending the by-laws to allow exceptions for "true" service animals "that are documented." Harcourt response came more than eight (8) months after Walters submitted a request for reasonable accommodation to the Board, which was still pending before the Board.~~

~~60. Harcourt also stated that a fine should be levied against the "offenders" unless they submitted "appropriate ADA compliant paperwork."~~

~~61. On October 26, 2011, Talkington blogged requesting that the Board enforce its rules and regulations. [EXHIBIT K] TALKINGTON OCTOBER 26, 2011 BLOG.~~

~~62. On October 27, 2011, a member fo the Board emailed the Board stating that the Board should respond to both Susan Anderson's and Talkington's inquiries.~~

~~63. Walters' responded that she had submitted a request for reasonable accommodation with the Board. Walters also mentioned that her request included a letter from her treating physician and asked that her medical record be kept confidential. Walters also expressed concern that medical information might appear on Talkington's blog.~~

~~64. Walters and some members of the Defendant Association recommended that Talkington not be allowed to attend Board meetings as he is not a member of the Board. Others, suggested that the Board hold closed meetings to discuss sensitive issues, including Walters' request for a reasonable accommodation.~~

~~65. Some members of the Board however violently opposed to having closed Board meetings to discuss Walters' reasonable accommodation request. In response to a blog recommending a closed meeting to discuss Walters' request for reasonable accommodation, Board member Douglas Rebak blogged, "I do support the Board's need for closed sessions on "confidential" matters–but the dog issue??? PLEASE!!! The situation is most disturbing and not at all the way it should be in an upscale~~

~~Residential/Resort Community!" EXHIBIT L]. NOVEMBER 12, 2011 BLOG.~~

~~64. Notwithstanding Walters' objection to providing Talkington with her private and personal information, on October 28, 2011, Harcourt emailed a letter to Walters and Judith Kromenhoek and copied Talkingon. Harcourt wrote as President of the Board and falsely accused Walters and Judith Kromenhoek of violating the NO DOGS RULE "because they have not applied for an exception to the no dog rule." Harcourt also acknowledged in that same letter that both Walters and Judith Kromenhoek had "papers for service dogs pending in the office." Contradicting himself, Harcourt ordered Walters to apply and submit documentation for a waiver and threatened to levy a monetary fine against Walters if she did not take up his offer. . [EXHIBIT M].~~

~~65. In response, Walters addressed the entire Board stating that "if any of her medical information were disclosed to Susan Andeson or Talkinton or anyone who is not on the Board, she would deal with it accordingly. Walters also emailed the Board under separate cover and expressed her belief that Harcourt had overstepped by sharing the letter with Anderson and Talkington.~~

~~66. Talkington psoted he entire letter on the blog in his October 30, 2011 post.~~

~~67. At the November 8, 2011 Board meeting, the Board took no action on Walters' pending application for a reasonable . However, the Board, led by Harcourt, discussed amending Section 11 of the by-laws to add:~~

> ~~No dogs are allowed on the property, either long term or visiting. The Board may grant exceptions to the NO DOGS ALLOWED rule, on an individual basis, should an owner require the assistance of a service animal (dog) as defined by the ADA. Owners seeking to obtain such an exemption are required to apply, in writing, to the Board with supporting document.~~

~~68. At the November 18, 2011 Board meeting the Board did not act on Walters' pending reasonable accommodation request. However, the Board offered to table discussion on the proposed amendment to the by-laws until a legal opinion has been obtained.~~

~~69. On December 2, 2011, Vincent Verdiramo (hereinafter "Verdiramo"), an attorney~~

~~and member of the Board, emailed a December 1, 2011 letter to 99 members of the Association. In his letter, Verdiramo offers legal advice to the Defendant Association. Verdiramo provides that the FHA is "not a blanket law." Verdiramo further notes that "every case must be handled individually "with official adjudication." He advised that when a person claims the need for am\n emotional support animal under the FHA, the must bring the Association to court and present expert testimony.[EXHIBIT N] LETTER FROM VERDIRAMO~~

~~70. Thr Board held at least three meetings in December of 2011, but took no action on Walters' pending request for a reasonable accommodation.~~

~~71. Talkington continued his harassing campaign against Walters. In a December 5, 2011, Talkingon shares a complaint of a Mr. Bartlett and the barking of a dog in his area of the community. Talkington goes on to point out that the "known violators" live in this same area. Talkingon opined that "trained service dogs are specifically trained to NOT bark unless the owner is in imminent danger." [EXHIBIT O]~~

~~72. As a Board member, Walters was up for re-election in the upcoming Board election. Felice and others suggested retaliating against Walters by defeating her in the upcoming election. In response to Talkington blog, Felice notes "that a change to the by-laws may be necessary and taht the Owners shuld "WAKE UP START UP A CAMPAIGN FOR A NO DOGS SLATE NOW.~~

~~73. In a December 13, 2011 Board meeting, the Board, led by Harcourt decided to amend the by-laws to include the NO DOGS ALLOWED rule. The Board also discussed Verdiramo's December 2, 2011 legal advice.~~

~~74. On December 16, 2011, on the behalf of Walters, he Board received a letter from Karin A. Bentz, Esq. In this letter, Board was informed that under the FHA, Walters is qualified to keep Happ to assist her with her disability. The Board was further informed that they could not engage in any conduct that would punish or deprive~~

~~Walters of her right to keep Oliver on the premises. [EXHIBIT P].~~

~~75. In a January 9, 2012 email, Felice states "PLEASE do not return the coven and their shills to office, they DO NOT deserve another term EVER." In a January 10, 2012 blog, Felice continuees, "JUDI and BARBARA have DOGS!!!! They surely have an agenda and DICK is their SHILL."~~

~~76. In their January 11, 2012, Board meeting, the Board, led by Harcourt, discussed receipt of the December 16, 2011 from Karin Bentz. Verdiramo motioned to "abide by the rule and immediately begin fining owners that have dogs." The Board voted to fine Walters $50.00 per day for having Oliver on the premises.~~

~~77. In a January 14, 2012 email, Felice states "Only the coven and their shills call me a disaster." He goes on to say that if the Owners want a lot more "bull" "Elect the Coven on the board, with their shill."~~

~~78. During the January 11, 2012, Defendant Cockayne distributed information about service dog certification naming businesses that have no requirements for service dog certification. Copies of Walters' dog certification were circulated during that Board meeting. A copy of Walters' dog certification was improperly shared with Talkington.~~

~~79. In a January 15, 2012 blog entitled "Puppy Dog Diplomas" Talkintong attacked Oliver's certification by stating it is "certified by an outfit called the Ntional Scrivce Animal Registry." Talkington concludes his blog post by sharing his "considered opinion" that such "outfits serve no legitimate purpose and exist mainly to sidestep what the ADA works diligently to accomplish" and putting forth a call "to stop the doggy diploma silliness and adopt clear ground rules for dogs at Cowpet". Talkington states that the ADA is the sole source of legitimacy for such rules.~~

~~80. On January 16, 2012, Harcourt distributed his President's Forum to the owners. In it, he says: "[t]he issue of dogs on the property has been the subject of many~~

~~(unfortunately) blanket emails, There are some owners who are violating the current rule. The Board had shown some restraint in this matter since we wee trying to revise the by-laws to allow for valid exceptions, however, one of these owners had their attorney send the Board a letter saying the attorney was representing them in a complaint against use. The Board voted to retain an attorney to protect the Association's interest.~~

~~81. On January 15, 2012, Donna LaScola voiced concern that the Defendant Association may be getting into legal trouble with all the blog posts and emails regarding Walters' and Judith Kromenheok's service animals. [EXHIBIT Q].~~

~~81. Ever ready to vilify Walters, Felice states, "[t]he ADA law does not prevent a community from excluding DOGS." He goes on, "[n]o one wishes to prevent proper needs to be satisfied!! He continues, "[a]gain REAL needs or pets??" He concludes, "I suggest they be ostracized, NO dinner dates, no patronage of their establishments, no conversations, no beach conclaves, just ignore them completely!!!"~~

~~81. On January 17, 2012, ever dutiful to Talkington, Harcourt emailed Talkington informing him that the Board had received a letter from one of the owners stating the owner had filed a complaint. Therefore the Board was retaining counsel.~~

~~82. On January 17, 2012, Walters received a letter from the Board informing he that she was in violation of the no dogs rule and would be fined. Walters felt hurt and ashamed after reading the letter.~~

~~83. On January 24, 2012, Talkington screening a candidate for the Board, discussed the candidate's stance on the "issues," one of which is the amendment of the by-laws regarding dogs. Talkington respresented that the Board informed him that Judith Kromenhoek and Walters refused to present any proof of their disability that warrants a service animal.~~

~~84. In a January 30, 2012 email, Felice wrote to 40 recipients, "How can you allow 2~~

~~admitted "certified" mentally disabled persons on the ballot for election to our board?? Due diligence was not done properly. The should be removed from consideration.~~

~~85. As of February of 2007, Walters had not received any response from the Board regarding her request for a reasonable accommodation. At the Board's February 7, 2012 meeting, Harcourt stated that he met with Attorney Maria Hodge regarding the HUD complaints and the dog issue in general.~~

~~86. On February 28, 2012, Edward Wardell, the incoming President of the Board, emailed the owners informing them that the by-laws were amended by a vote of 69.2% of the Owners and will become effective once "registered with the U.S. Virgin Islands Government.~~

~~87. In this version of the by-laws, Section 11 of Article V was amended to state:~~

> ~~No dogs are allowed on the property, either long term or visiting. The Board may grant exceptions to the NO DOGS ALLOWED rule, on an individual basis, should an owner require the assistance of a service animal (dog) as defined by the ADA. Owners seeking to obtain such an exemption are required to apply, in writing, to the Board with supporting documentation.~~

~~88. However, the April 11, 2012 Board minutes reflect that legal counsel had suggested not recording the by-laws and obtaining approval to revised the "no dogs" rule as follows:~~

> ~~No dogs are allowed on the property, either long term or visiting. Owners or occupants who have properly documented and verified disability as defined by Federal Law may make a request for reasonable accommodation and exception to the prohibition on dogs on the property. An owner or occupant seeking an accommodation can do so in writing to the Board. The request shall include: (1) identification of the owner or occupant seeking the accommodation; (2) explanation of the relationship between the requested accommodation and the disability; and (3) verification of the disability and need for accommodation as set forth in this rule. To facilitate the Board's review of each request for an accommodation of a non-obvious handicap, the Board may require(1) the submission of documentation verifying that the person meets the Federal Fair Housing Act's definition of disability; and (2) documentation from a doctor or other medical professional who is in a position to know about the individual's disability, and that the requested accommodation is related to the individual's disability. All information submitted to the Board that is necessary for the evaluation of the reasonableness of an accommodation will be kept confidential.~~

Case: 3:12-cv-00025-CVG-RM Document #: 94-1 Filed: 03/11/13 Page 19 of 42

~~89. On February 29, 2012, Verdiramo & Verdiramo P.A. delivered a letter to the Board providing an explanation of the Defendant Association's legal obligations under the ADA and the FHA~~

~~90. In December of 2011, Walters filed a charge of discrimination under the FHA with the Department of Housing and Urban Development (HUD) against the Association and the Board for violation of the FHA.~~

~~90. In response to Walters and Judith Kromenhoek's HUD complaints, on March 25, 2012, Talkington blogged, Walters and Judith Kromenhoek will "hang onto their puppies" at any length. In direct response to the HUD Complaint, Talkingon says "Really ladies? Do you seriously believe that either of two owners has any impact whatsoever on the Association's governance of this property in terms of your having those puppies? To call this a fiasco of a complaint 'misguided' is at the moment the most charitable description of the though process (if there even was one) that was involved in filing this complaint." Talkington characterizes Walters and Judith Kromenhoek as "playgournd bullies" and of making a mockery of our board." He then calls on the Association to "go on the offensive" and file suit against Walters' and Kromenhoek stating "when these ladies start spending their own cash instead of relying on the government for free help, the rubber will meet the road on how far everyone is willing to go. In closing, Talkington implores the Board to take Walters and Judith Kromenhoek to court.~~

~~91. Walters was not re-elected to the Board. In late March or early April of 2012, Walters finally received a response from the Board approving her request for reasonable accommodation more than a year afer she submitted her request.~~

~~92. Defendant Board's act and omissions, including Defendant Board's response to Walter's request for an accommodation, as well as the Board's failure to respond to~~

~~the request for more than a year, constitute a denial of a request for reasonable accommodation in violation of the FHA.~~

~~93. Defendant Association is vicariously liable for the actions and omissions of its agent, Defendant Board.~~

~~92. Defendant Harcourt's acts and omissions in ignoring Walters' request for reasonable accommodation; while at the same assisting a campaign to amend the by-laws to specifically exclude emotional support animals by incorporating only the definition of the ADA of service animal; providing Talkington access to Walters' personal and private information; and falsely accusing Walters of violating the rules qualify as retaliatory measures pursuant to the FHA.~~

~~93. The Defendant Board action in assessing Walters a fine after receiving the letter from Karin A. Bentz, qualifies as retaliatory measures pursuant to the FHA.~~

~~94. As a result of the Defendants' actions, and each of them, Walters has suffered damages including but not limited to emotional distress, embarrassment, and humiliation.~~

**<u>COUNT I: VIOLATION OF THE FHA</u>**

**(Association and Board)**

~~95.~~ ~~Plaintiff Walters~~ realleges and incorporates by reference the remainder of the allegations set forth herein.

~~96. 42 U.S.C. §3604(f)(3)(b), commonly known as the Fair Housing Act Amendment (FHAA), prohibits housing providers from discriminating against applicants or residents because of their disability and from treating persons with disabilities less favorably than others because of their disability. The foregoing conduct violates the FHA which prohibits discriminating based on disability and from treating persons with disabilities less favorably than others because of their disability.~~

~~97.~~ The FHA also makes it unlawful for any person to refuse " to make reasonable accommodations in rules, policies, practices, or services, when such accommodations may be necessary to afford persons with disabilities equal opportunity to use and enjoy a dwelling.

~~55~~98. ~~Defendant Cowpet Bay West Association owns, operates and/or leases condominium in Cowpet Bay West.~~ At all relevant times, Walters had a request for a reasonable accommodation pending before the Defendant Board~~.~~

~~56~~99. ~~Cowpet Bay West is a place of public accommodation. 42 U.S.C §§3601-3619.~~

~~57~~100. Defendant ~~Cowpet Bay West Condominium~~ Association knew or reasonably should have known of Plaintiff's disability.

~~58~~102. Defendants ~~Cowpet Bay West Condominium~~ Association and ~~Cowpet Bay West Condominium the~~ Board ~~have~~ discriminated against ~~Plaintiff~~ Walters by denying Walters ~~Plaintiff,~~ as a person with a disability, a reasonable accommodation by failing to take action on her request for reasonable accommodation for more than a year. ~~Defendant Association id otherwise ratify Defendant Board's acts and/or omissions. the equal opportunity to use and enjoy a dwelling on the basis of disability.~~

~~103.~~ As direct and proximate result of the Defendants' conduct described above, Walters has suffered and will continue to suffer embarrassment, humiliation, mental anguish, emotional and physical distress.

~~a. Discriminatory exclusion and or denial of services, privileges, accommodations, and/or opportunities in Defendant Cowpet Bay West Condominium Board Rules and Regulations.~~

~~a. Failing to make reasonable modifications in policies, practices, and/or procedures as necessary to afford the privileges, advantages, and/or accommodations of Cowpet Bay West to Walters Plaintiff.~~

~~b. Failing to act upon and/or refusing Plaintiff Walters' request for reasonable accommodation after learning of her disability.~~

~~d. Failing to remove barriers to individuals with disabilities where it would be readily achievable to do so.~~

~~c. Failing to adopt an exception to its NO DOGS RULE by-laws and or a Reasonable Accommodation Policy so that Walters Plaintiff and other individuals with disabilities under the FHA have equal opportunity to use and enjoy a dwelling at Cowpet Bay West.~~

~~fd. Adopting rules and regulations that have a desperate impact on Plaintiff and others like her that suffer from a disability and require the use of an emotional support animal.~~

~~g. Failing to make a reasonable accommodation in rules, practice, and services after learning of Plaintiff's disability.~~

~~59104~~. ~~As such Defendants discriminate and will continue to discriminate in the future against Plaintiff on the basis of disability in the full and equal enjoyment of the goods, privileges, facilities accommodations, advantages and/or opportunities of Cowpet Bay West in violation of the Civil Rights Act of 1968, §§802(h), 8049f)(3)(B), 42 U.S.C. §§3602(h), 3604(f)(3)(B) and or their implementing rules and regulations.~~ Defendants' acts or omissions were done maliciously, oppressively and/or fraudulently.

~~60105~~. ~~Defendants violations of the FHAA and the Civil Rights Act of 1968 have harmed and will continue to harm Plaintiff in the future.~~ Once Walters submitted her application to Louanne Schechter in February of 2011, the Defendant Board had an obligation to take action on the pending claim. Moreover, Defendant Association could have taken measures to assure that the Board complies with the FHA but chose not to.

~~61106~~. Defendants conduct violated the FHA and Walters is entitled ~~tPursuant~~ to the remedies, procedures and rights set forth in 42 U.S.C *§3613 (c)*(1). ~~and (2), Plaintiff prays for judgment as set forth below.~~

**COUNT II: VIOLATION OF SECTION 3617 OF THE FHAA**
**(~~Max~~ Harcourt)**

~~62107~~. ~~Plaintiff~~ Walters re-alleges and incorporates all preceding paragraphs herein by reference as though fully restates, wholly, in this Count.

~~63108~~. ~~Max~~ Harcourt is a member of the ~~Cowpet Bay West Condominium~~ Association and

was the President of the ~~Cowpet Bay West Condominium~~ Board, at the time ~~Plaintiff~~ Walters applied for a reasonable accommodation.

~~64~~109. ~~Max~~ Harcourt's removal of the framed copy of the ADA poster made clear his intention to ignore Walters' request for accommodation. ~~individually, vitiated Plaintiff's request for reasonable accommodation by insisting that the Cowpet Bay West Condominium Association Bylaws trumped the FHAA.~~

~~65~~110. ~~Max~~ Harcourt's ~~joined Lance Talkington and others to publicly ridicule the content of Plaintiff's request for reasonable accommodation on the blog including Plaintiff's medical records. Max Harcourt's actions were designed to intimidate, threaten or coerce Plaintiff into relinquishing her rights to seek a reasonable accommodation.~~ ~~*This was done solely for the purpose of forcing Plaintiff to retreat from her reasonable accommodation application*~~ conduct in ignoring Walters' request for a reasonable accommodation while at the same time pushing for an amendment to the by-laws that would deny Walters reasonable accommodation constitute interference pursuant to Section 3617 of the FHA.

~~66~~111. ~~Section 3617 of the FHAA inter alia makes it unlawful for any person to coerce, intimidate, threaten, or interfere with any person in the exercise or enjoyment of, or on account of his having exercised or enjoyed, or on account of his having aided or encouraged any other person in the exercise or enjoyment of, any right granted or protected by Section 803, 804, 805, 806 of this title.~~ Harcourt action in falsely accusing Walters of violating the no dogs rule and levying a fine against Walters constitute retaliation under the FHA~~.~~

~~67~~112. ~~Max Harcourt violated Section 3617 of the FHAA by interfering with Plaintiff in her exercise of the right granted or protected by Sections 803, 804, 805, 806 of the FHAA~~. As a result of Harcourt's acts and/or omissions, Walters has suffered emotional injuries and continues to suffer emotional injuries.

~~68~~113. ~~Defendant Max Harcourt's violations of the FHAA have harmed and will continue to harm Plaintiff.~~ Defendant Harcourt's conduct violated Section 3617 of the FHAA and entitles

Walters to all categories of damages, including punitive damages.

~~69. Pursuant to the remedies, procedures and rights set forth in 42 U.S.C. *§3613 (c)*(1) and (2), Plaintiff prays for judgment as set forth below~~.

70. ~~In doing the acts and/or omissions alleged herein, Max Harcourt wrongfully and unlawfully interfered with Plaintiff's exercise of her right to reasonable accommodation and acted with knowledge of the effect his conduct was having on Plaintiff.~~

**COUNT III: VIOLATION OF SECTION 3617 OF THE FHAA**
**(~~Bay West Condominium~~ Association)**
***~~Cowpet Bay West Condominium Board~~***

~~71~~114. ~~Plaintiff~~ Walters incorporates all preceding paragraphs herein by reference as though fully restated, wholly, in the Count.

~~72~~115. ~~Defendant Cowpet Bay West Condominium Association was created pursuant to Chapter 28 of the Virgin Islands Code and as such is obligated to comply with the provisions of the FHAA. *Defendant Cowpet Bay West Condominium Board is also obligated to comply with the FHAA.*~~ The foregoing conduct violates the FHA, which makes it unlawful for any person to coerce, intimidate, threaten, or interfere with any person in the exercise or enjoyment of, or on account of his having exercised or enjoyed, or on account of his having aided or encouraged any other person in the exercise or enjoyment of, any right granted or protected by the FHA.

~~73~~116. Defendant Association knew or had reason to know that Walters had applied for a reasonable accommodation to keep her emotional support dog, Oliver, on the premises. Yet, Defendant Association refused to provide Walters with a reasonable accommodation and amended its by-laws to exclude emotional support dogs from a waiver to the NO DOGS ALLOWED rule.

~~74~~117. ~~Section 3617 of the FHAA inter alia makes it unlawful for any person to coerce, intimidate, threaten, or interfere with any person in the exercise or enjoyment of, or on account of his having exercised or enjoyed, or on account of his having aided or encouraged any other person~~

~~in the exercise or enjoyment of, any right granted or protected by Section 803, 804, 805, 806 of this title.~~ Defendant's Board Action if assessing Walters a fine after it received a letter from Walters' attorney and assessing Walters a fine despite the fact that Walters' request for a reasonable accommodation was pending in the office constitute retaliation under the FHA.

~~75~~118. ~~Defendant Cowpet Bay West Condominium Association *and Defendant Cowpet Bay West Condominum Board have* violated Section 3617 of the FHAA by interfering with Plaintiff's request for reasonable accommodation. Defendant Cowpet Bay West Condominium Association also violated Section 3617 of the FHAA by intimidating Plaintiff via the blog and coercing Plaintiff against exercising her right to request a reasonable accommodation. *Defendant Cowpet Bay West Condominium Board violated the FHAA by refusing to provide Plaintiff with reasonable accommodation and by harassing and intimidating Plaintiff with a $50.00 per day fine.*~~ As a direct and proximate result of Defendant Board and Defendant Association's acts or omissions, Walters has suffered extreme and severe anguish, humiliation, embarrassment, emotional distress and tension, the extent of which is not fully known at this time and the amount of damages caused thus far is not yet fully ascertained but will be proven at the time of trial.

~~76~~119. ~~Defendant Cowpet Bay West Condominium Association's violations of the FHAA have harmed and will continue to harm Plaintiff. *Defendant Cowpet Bay West Condominium Board's actions have harmed and will continue to harm Plaintiff.*~~ Defendants' conduct as described in this Complaint violated the FHA and the public policy of the United States and entitles Walters to all categories of damages, including punitive damages.

~~77. Pursuant to the remedies, procedures and rights set forth in 42 U.S.C. *§3613 (c)*(1) and (2), Plaintiff prays for judgment as set forth below.~~

**COUNT IV: VIOLATION OF SECTION *3617* OF THE FHA~~A~~**
**(Alfred Felice)**

~~78~~120. ~~Plaintiff~~ Walters re alleges and incorporates by reference all preceding paragraphs herein as though fully restated, wholly, in the Count.

**Judith Kromenhoek vs. Cowpet Bay West Condominium, et al.** **Civil No. 25/2012**
**First Amended Complaint** **Page 26**

~~79~~121. ~~Defendant Alfred Felice is a an owner of a Condominium unit at Cowpet Bay West and is a member of the Cowpet Bay West Association.~~ Defendant ~~Alfred~~ Felice began interfering with ~~Plaintiff~~ Walters on the blog once he learned that ~~Plaintiff~~ Walters had requested reasonable accommodation for an emotional support animal, her dog.

~~80~~122. Defendant ~~Alfred~~ Felice interfered with ~~Plaintiff's Walters'~~ right to request reasonable accommodation by using the blog and personal emails sent to the Cowpet Bay West Community to intimidate, to discredit and to threaten ~~Plaintiff Walters.~~ Defendant ~~Alfred~~ Felice's actions ~~are~~ were designed to intimidate, threaten and scare ~~Plaintiff~~ Walters ~~into relinquishing her~~ from pursuing a ~~right to request a~~ reasonable accommodation to keep Oliver on the premises.

81. ~~82. Section 3617 of the FHAA inter alia makes it unlawful for any person to coerce, intimidate, threaten, or interfere with any person in the exercise or enjoyment of, or on account of his having exercised or enjoyed, or on account of his having aided or encouraged any other person in the exercise or enjoyment of, any right granted or protected by Section 803, 804, 805, 806 of this title.~~

~~83~~123. Defendant ~~Alfred~~ Felice's conduct violated Section 3617 of the FHA~~A~~ by interfering with ~~Plaintiff's~~ Walters' exercise of her right to request for a reasonable accommodation.

~~84~~124. Defendant ~~Alfred~~ Felice violation of the FHA~~A~~ has harmed and will continue to harm ~~Plaintiff~~ Walters.

~~85~~125. As a result of Defendant Felice's act or omission, Walters is entitled ~~Pursuant to~~ the remedies, procedures and rights set forth in 42 U.S.C *§3613 (c)*(1) and (2).~~, Plaintiff prays for judgment as set forth below.~~

**COUNT V: VIOLATION OF SECTION *3617* OF THE FHA~~A~~**
**(Lance Talkington)**

Joint Appendix Vol. II Page 1640

~~86~~126. ~~Plaintiff~~ Walters re alleges and incorporates by reference all preceding paragraphs herein as though fully restated, wholly, in the Count.

~~87 Upon information and belief Defendant Lance Talkington owns at least one Condominium unit at Cowpet Bay West and is a member of the Cowpet Bay West Condominium Association.~~

~~88~~127. Upon information and belief Defendant ~~Lance~~ Talkington runs the blog and used the "blog" to attack, embarrass and humiliate Walters after she filed a request for reasonable accommodation. ~~, and to intimidate Plaintiff.~~

~~89~~128. Defendant ~~Lance~~ Talkington interfered with ~~Plaintiff's~~ Walters' exercise of her right to request a reasonable accommodation by demonizingWalters on the blog and suggesting both implicitly and explicitly that Walters violated the rules.

~~90~~129. Defendant ~~Lance~~ Talkington interfered with ~~Plaintiff's~~ Walters~~'~~ right to request a reasonable accommodation by mounting a calculated attack against ~~Plaintiff's Walters'~~ reputation, honesty and standing in the Cowpet Bay West Community.

~~91~~130. Defendant ~~Lance~~ Talkington interfered with ~~Plaintiff's~~ Walters'right to request a reasonable accommodation by posting and publicly discussing ~~Plaintiff's Walters' private medical~~ record on the blog.

~~92~~131. Defendant ~~Lance~~ Talkington's actions ~~are~~ were designed not only to humiliate and to discredit ~~Plaintiff~~ Walters but to signal to ~~Plaintiff~~ Walters that her medical records and private information will continue to be the subject of public scrutiny if she continues to demand a reasonable accommodation. Defendant ~~Lance~~ Talkington actions ~~are~~ were designed to threaten, intimidate or scare ~~Plaintiff~~ Walters into ~~relinquishing~~ abandoning Walters' ~~the right to~~ for a request ~~a~~ reasonable accommodation ~~under the FHAA~~ to keep Oliver on the premises.

~~93~~132. The conduct herein violates ~~the FHAA, including~~ Section 3617 of the FHA~~A~~.

~~94. Section 3617 of the FHAA inter alia makes it unlawful for any person to coerce, intimidate, threaten, or interfere with any person in the exercise or enjoyment of, or on account of~~

~~his having exercised or enjoyed, or on account of his having aided or encouraged any other person in the exercise or enjoyment of, any right granted or protected by Section 803, 804, 805, 806 of this title.~~

~~95. Defendant Lance Talkington violated the FHAA, inter alia, by interfering with Plaintiff's exercise of her right to request a reasonable accommodation. Defendant Lance Talkington has violated the FHAA by, inter alia, interfering with Plaintiff's rights to request a reasonable accommodation and by using the blog to intimidate, threaten and coerce Plaintiff into not exercising her statutory right to request a reasonable accommodation.~~

~~96~~133. Defendant ~~Lance~~ Talkington's violations of the FHA~~A~~ have harmed and will continue to harm ~~Plaintiff~~ Walters in the future.

~~97134~~. As direct result of Defendant Talkington's act or omission, Walters is ~~entitled Pursuant~~ to the remedies, procedures and rights set forth in 42 U.S.C *§3613 (3)*(1) and (2).~~, Plaintiff prays for judgment as set forth below.~~

**COUNT VI: VIOLATION OF THE AMERICAN WITH DISABILITIES ACT**
**(~~Cowpet Bay West Condominium~~ Association and ~~Cowpet Bay West Condominium~~ Board)**

~~98~~135. ~~Plaintiff~~ Walters realleges and incorporates by reference all preceding paragraphs herein as though fully restated, wholly, in the Count.

~~99~~136. ~~Title III of the ADA provides that "No individual shall be discriminated against on the basis of disability in the full and equal enjoyment of the goods, services, facilities, privileges, advantages, or accommodations of any place of public accommodation by any person who owns, leases, or operates a place of public accommodation.~~"As set forth herein, at all relevant times, Defendants were subjected to the ADA based on the ADA definition of public lodging.

~~100~~137. Defendants owns, operates and/or leases condominium units in Cowpet Bay, St. Thomas, Virgin Islands~~.~~

~~101~~138. ~~Cowpet Bay West Condominium is a place of public accommodation. 42~~

~~U.S.C. §12181(7)(B).~~

~~102~~139. Defendants's ~~have~~ discriminated against ~~Plaintiff~~ Walters ~~on the basis of disability. Defendants discriminatory conducts include but is not limited to~~ by failing to make reasonable modifications to its NO DOGS RULE to allow Walters to keep Oliver on the premises.

~~a. Discriminatory exclusion and/or denial of goods, services, facilities, privileges, advantages, accommodations, and/or opportunities.~~

~~b. Failing to make reasonable modifications in policies, practices, and/or procedures as necessary to afford the goods, services, facilities, privileges, advantages, and/or accommodations of the Cowpet Bay West Condominium to Plaintiff based on Plaintiff's disabilities.~~

~~c. Failing to remove barriers where it would be readily achievable to do so that Plaintiff and others with disabilities may enjoy the privilege of owning a Condominium unit at Cowpet Bay West.~~

~~d. Failing to adopt a NO DOGS RULE with an exception that allows for the implementation of the ADA and or a Reasonable Accommodation Policy.~~

~~E. For allowing private rules and regulations to trump the provision of the ADA that requires reasonable accommodation.~~

~~103~~140. As such, Defendants ~~discriminate against Plaintiff and will continue in the future to discriminate against Plaintiff on the basis of disability in the full, and equal enjoyment of the goods, services, facilities, privileges, advantages, accommodations and/or opportunities of Cowpet Bay West Condominium in~~ violated ~~ion of Title III of the American with Disabilities Act~~ ADA. ~~, 42 U.S.C.§12181 et seq. and/or its implementing regulations.~~

104141. Defendants violation of the ADA has harmed and will continue to harm ~~Plaintiff~~ Kromenhoek.

105142. As a result, Kromenhoek is entitled ~~Pursuant~~ to the remedies, procedures, and rights set forth in 42 U.S.C.§12188., ~~Plaintiff prays for judgment as set forth below.~~

**COUNT VII: *THE COWPET BAY WEST CONDOMINIUM BOARD OF EXCEEDED ITS AUTHORITY BY ADOPTING THE NO DOGS RULE***

106143. Plaintiff incorporates all preceding paragraphs herein by reference as though fully restated, wholly, in the Count.

107. Defendant Cowpet Bay West Condominium Association adopted Bylaws pursuant to Chapter 33, of Title 28 of the Virgin Islands Code.

108. At the time Plaintiff requested a reasonable accommodation for her dog, the Bylaws of Defendant Cowpet Bay West Condominium Association placed no restrictions on dogs on the Cowpet Bay West premises.

109. The Defendant Cowpet Bay West Condominium Board subsequently adopted rules and regulations, which are more restrictive than the Bylaws and places a restriction on the condominium owners' right to own an animal, including emotional support dogs in a manner not contemplated by the Bylaws.

110. The Defendant Cowpet Bay West Condominium Board acted outside the scope of their power when they adopted rules that are more restrictive than the Bylaws.

111. As a result of the Defendant Cowpet Bay West Condominium Board implementing this invalid rule, Plaintiff has suffered damages and losses, and will continue to suffer loss and damages, including but not limited to emotional distress, financial loss and other losses for which Defendant Cowpet Bay West Condominium Board is liable.

**COUNT VIII: COWPET BAY WEST CONDOMINIUM BOARD 'S ACT OF ASSESSING A FINE WAS ULTRA VIRES**

112. Plaintiff incorporates all preceding paragraphs herein by reference as though fully restated, wholly, in the Count.

113. Defendant Cowpet Bay West Condominium Association adopted bylaws pursuant to Chapter 33, of Title 28 of the Virgin Islands Code.

Case: 3:12-cv-00025-CVG-RM Document #: 94-1 Filed: 03/11/13 Page 31 of 42

114. At the time Plaintiff requested a reasonable accommodation for her dog, the bylaws of Defendant Cowpet Bay West Condominium Association placed no restrictions on dogs on the Cowpet Bay West premises.

115. The Defendant Cowpet Bay West Condominium Board adopted rules and regulations, which are more restrictive than the bylaws and places a restriction on the condominium owners' right to own an animal, including emotional support dogs in a manner not contemplated by the byaws.

116. The Defendant Cowpet Bay West Condominium Board acted outside the scope of their power when they adopted rules that are more restrictive than the Bylaws.

117. Defendant Cowpet Bay West Condominium Board began assessing a $50.00 per day fine for violating the NO DOGS RULE.

118. Defendant Cowpet Bay West Condominium Board had no basis upon which to assess the $50.00 per day fine as the NO DOGS RULE exceeded its authority.

119. Defendant Cowpet Bay West Condominium Board acted ultra vires when it assessed the $50.00 per day fine.

120. As a result, of the Defendant Cowpet Bay West Condominium Board ultra vires action, Plaintiff has suffered damages and losses, and will continue to suffer loss and damages, including but not limited to emotional distress, financial loss and other losses for which Defendant Cowpet Bay West Condominium Board is liable.

**COUNT IX: COWPET BAY WEST CONDOMINIUM BOARD'S ACTION IS VOID**

121. Plaintiff incorporates all preceding paragraphs herein by reference as though fully restated, wholly, in the Count.

122. Because the Cowpet Bay West Condominium Board exceeded its authority when it adopted the NO DOGS RULE each and every subsequent action taken by the Cowpet Bay West Condominium Board pursuant to the NO DOGS RULE are *void ad initio*. These actions include but are not limited to:

a. the daily fines levied upon Plaintiff;

b. the intentional publication of false and wrongfully imposed fines, penalties and or late charges in its monthly invoices;

c. the letter posted on the blog that Plaintiff and Judith Kromenhoek violated the NO DOGS RULE and continues to violate the NO DOGS RULE.

123. The actions of the Cowpet Bay West Condominium Board described above have damaged Plaintiff. *As a result,, Plaintiff has suffered and continues to suffer damages and losses, including but not limited to emotional distress and other damages for which Defendant is liable.*

**COUNT X: NEGLIGENCE**

***(Cowpet Bay West Condominium Board, Cowpet Bay West Condominium Association)***

124. Plaintiff repeats and re-alleges all preceding paragraphs as though fully restated, wholly, in this Count.

125. The *Cowpet Bay West Condominium Board and Cowpet Bay West Condominium Association were negligent in their handling and processing of Plaintiff's reasonable accommodation application. Cowpet Bay West Condominium Association was negligent for not adopting a reasonable accommodation policy and for not providing a process and procedure for the application of a reasonable accommodation. Cowpet Bay West Condominium Board was negligent for not adopting a reasonable accommodation policy; for not adopting an exception to its NO DOGS RULE; for not adopting a policy and procedure for owners to apply for a reasonable accommodation to the NO DOGS RULE and* for posting a letter, which was addressed to Plaintiff and Judith Kromenhoek on the blog labeling Plaintiff and Judith Kromenhoek violators of the NO DOGS RULE contrary to safeguards plainly and unambiguously set forth in the Bylaws. These actions include but are not limited to:

a. posting the letter on the blog wherein Plaintiff and Judith Kromenhoek were found to be in violation of the NO DOGS RULE.

b. the daily fines levied upon Plaintiff;

c. the negligent publication of false and wrongfully imposed fines, penalties and or late charges;

126. *As a result of Defendants' negligence for not adopting a reasonable accommodation policy and for not putting a procedure in place for processing reasonable accommodation applications, Plaintiff has suffered emotional distress, embarrassment, humiliation and continues to suffer damages for which Defendants are liable.*

**COUNT XI: INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS**
**( Alfred Felice)**

127. Plaintiff incorporates all preceding paragraphs herein by reference as though fully restated, wholly, in the Count.

128. Defendant Alfred Felice acted intentionally and recklessly when he suggested on the Cowpet Bay Blog that Plaintiff's emotional service dog was a "sham pet" and when he recommended to Cowpet Bay West Condominium Association members that Plaintiff be "ostracized, NO dinner dates, no patronage of their establishments, no conversations, no beach conclaves, just ignore them completely!!!"

129. Defendant Alfred Felice's actions were extreme and outrageous.

130. As a result of Defendant's outrageous conduct Plaintiff has suffered severe mental anguish, shame, humiliation, embarrassment, worry and nausea.

131. As a result of Defendant Alfred Felice's extreme and outrageous conduct, Plaintiff has suffered severe *mental* and emotional distress, *humiliation, embarrassment* and will continue to suffer severe emotional distress and other damages for which Defendant Alfred Felice is personally liable for compensatory and punitive damages to Plaintiff.

**COUNT XII: CONSPIRACY TO COMMIT AN UNAUTHORIZED ACT**
**(Against all individual Defendants in their personal capacities, *Cowpet Bay West Condominium Board*)**

132. Plaintiff repeats and re-alleges all preceding paragraphs as though fully restated, wholly, in this Count.

133. All individual defendants, through and among themselves, and the *Cowpet Bay West Condominium Board* have conspired with each other, and acted in concert, to violate the FHAA and deny Plaintiff her request for reasonable accommodation, without authority, to deprive her of protected rights and interests, to defame her, to cause her emotional distress and suffering, and to deprive her full enjoyment of the goods, services, facilities, privileges, advantages, accommodations and/or opportunities of Cowpet Bay West.

134. Defendants' acts and omissions as aforesaid are overt acts in furtherance of their conspiracy, and taken together constitute a civil conspiracy to harm Plaintiff and to deny her civil rights under the FHAA and the ADA.

135. As a direct and proximate result of the foregoing, Plaintiff has suffered damages, losses, and severe emotional distress, for which said defendants are jointly and severally liable.

## COUNT XIII: PRIMA FACIE TORT CLAIM

136. Plaintiff incorporates all *preceding* paragraphs herein by reference as though fully re-stated, wholly, in the Count.

137. The Defendants through their wrongful violations of, inter alia, the FHAA and the ADA, caused Plaintiff to be improperly deprived of reasonable accommodation.

138. None of the Defendants had an objective justification for depriving Plaintiff of the aforementioned civil right.

139. Defendants acts and omissions as aforesaid were such that they offend common decency and sensibilities.

140. As a direct and proximate result of Defendants' wrongful and illegal acts and omissions, as aforesaid, Plaintiff was defamed, suffered loss of reputation, mental anguish, pain and suffering and loss of enjoyment of life. In addition, Plaintiff *was* assessed a daily monetary fined and has and will continue to suffer losses, *pain, humiliation, mental anguish* and damages for which

Defendants are liable.

**COUNT XIV: DEFAMATION AND SLANDER PER SE**
**(All Defendants individually named,**
***Cowpet Bay West Condominium Board, Cowpet Bay West Condominium Association*)**

141. Plaintiff incorporates all proceeding paragraphs herein by reference as though fully re-stated, wholly, in the Count.

142. Defendants Lance Talkington, Max Harcourt, Alfred Felice, Robert Cockayne, *Cowpet Bay West Condominium Board* and Vincent Verdiramo, wilfully and intentionally published false and wrongful information on the blog and other venues.

143. The above described information is false and injurious as to Plaintiff. It lowers the professional and personal reputation of Plaintiff in the Cowpet Bay West community, as it was understood by the members thereof, and such publications were calculated to elicit that very response from that respected community.

144. *As a direct consequence to Defendants' actions, Plaintiff is entitled to an award of compensatory and punitive damages from them to compensate her for humiliation, emotional pain and suffering, inconvenience, mental and emotional distress, loss of enjoyment and embarrassment.*

**COUNT XV: NEGLIGENT AND/OR INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS**

145. Plaintiff incorporates all proceeding paragraphs herein by reference as though fully re-stated, wholly, in the Count.

146. By their extreme and outrageous conducts directed at Plaintiff, Defendants, *Cowpet Bay West Condominium Board*, Lance Talkington, Max Harcourt, Robert Cockayne and Vincent Verdiramo have intentionally, or alternatively by way of gross negligence or negligence, caused the infliction of severe emotional distress by:

a. The Cowpet Bay West Condominium *Board* refusing to provide Plaintiff with a reasonable accommodation for Plaintiff's emotional support animal; publishing on the

blog that Plaintiff had violated the NO DOGS RULE; and imposing unreasonable and egregious fines, penalties and or interests against Plaintiff;

b. Lance Talkington, Max Harcourt, Robert Cockayne and Vincent Verdiramo: by posting or sending vengeful, malicious, grossly negligent and or negligent blogs and or emails to force Plaintiff to withdraw her application for a reasonable accommodation without consideration for Plaintiff's statutory rights under the FHAA and the ADA; and

c. Lance Talkington, Max Harcourt, Robert Cockayne and Vincent Verdiramo: by public ostracizing and mockery of Plaintiff for exercising her statutory right to apply for a reasonable accommodation pursuant to the ADA and FHAA when the Cowpet Bay West Condominium Board failed to provide a written policy and or procedure for applying for reasonable accommodation.

147. These intentional, grossly negligent and negligent acts of Defendants have caused Plaintiff severe emotional distress *for which Plaintiff suffered and continues to suffer physical and emotional distress, humiliation, embarrassment and damage to her reputation and is entitled compensatory and punitive damages..*

**COUNT XVI: INVASION OF PRIVACY:**
**PUBLIC DISCLOSURE OF PRIVATE FACTS**
**(*Cowpet Bay West Condominium Board,*
*Cowpet Bay West Condominium Association*)**

148. Plaintiff incorporates all proceeding paragraphs herein by reference as though fully re-stated, wholly, in the Count.

149: Defendants, *Cowpet Bay West Condominium Board and Cowpet Bay West Condominium Association disclosed* private information concerning Plaintiff when *they* openly discussed Plaintiff's application for a reasonable accommodation, including Plaintiff's medical condition and emotional support animal's registration at the *Cowpet Bay West Condominium Board* meeting and posted a letter addressed to Plaintiff and

Case: 3:12-cv-00025-CVG-RM Document #: 94-1 Filed: 03/11/13 Page 37 of 42

Judith Kromenhoek on the blog accusing Plaintiff of violating the NO DOGS RULE.

150. Plaintiff considered the publicity highly offensive and a reasonable person in Plaintiff's position would also consider the publicity highly offensive.

151. The Cowpet Bay West Condominium Board *and the Cowpet Bay West Condominium Association* knew, or acted with reckless disregard of the fact, that Plaintiff would consider the publicity highly offensive and that a reasonable person in Plaintiff's position would consider the publicity highly offensive.

152. The private information, Plaintiff's medical diagnosis and Plaintiff's emotional support animal's registration were not of legitimate public concern. The private information did not have a substantial connection to a matter of legitimate public concern.

153. Plaintiff was harmed.

154. *As a direct consequence of Defendants' disclosure of Plaintiff's medical records and other private information, Plaintiff is entitled to an award of compensatory and punitive monetary damages from them to compensate her for humiliation, emotional pain and suffering, inconvenience, mental anguish, loss of enjoyment and embarrassment.*

**COUNT XVII: INVASION OF PRIVACY:**
**PUBLIC DISCLOSURE OF PRIVATE FACTS**
**(Max Harcourt, Lance Talkington, Alfred Felice,** ***Robert Cockayne, Vincent Verdiramo*****)**

155. Plaintiff incorporates all *preceding* paragraphs herein by reference as though fully re-stated, wholly, in the Count.

156. Defendants Max Harcourt, Lance Talkington and Alfred Felice publicized private information concerning Plaintiff's by discussing publicly Plaintiff's application for a reasonable accommodation including Plaintiff's medical diagnosis and the certification for Plaintiff's emotional support animal on the blog.

157. Plaintiff considered the publicity of her private information highly offensive and a reasonable person in Plaintiff's position would consider the publicity highly offensive.

158. Plaintiff's medical diagnosis and Plaintiff's certification for her emotional support animal are not of legitimate public concern and or did not have a substantial connection to a matter of legitimate public concern.

159. *Defendants knew, or acted with reckless disregard of the fact, that a reasonable person in Plaintiff's position and or Plaintiff would consider the publicity highly offensive.*

160. *Defendants' actions were done solely to harass, embarrass, humiliate Plaintiff and to frustrate Plaintiff's efforts in requesting and obtaining a reasonable accommodation for her emotional support dog.*

161. *As a direct consequence of Defendants' public disclosure, Plaintiff is entitled to an award of compensatory and punitive damages from them to compensate her for humiliation, emotional pain and suffering, inconvenience, mental anguish, loss of enjoyment and embarrassment.*

**COUNT XVIII: INVASION OF PRIVACY: WRONGFUL INTRUSION**
***(Max Harcourt, Alfred Felice, Lance Talkington, Vincent Verdiramo, Robert Cockayne Cowpet Bay West Condominium Board, Cowpet Bay West Condominium Association)***

162. Plaintiff incorporates all proceeding paragraphs herein by reference as though fully re-stated, wholly, in the Count.

163. Plaintiff had a reasonable expectation of privacy in the Cowpet Bay West Condominium Association business office when she submitted her application for reasonable accommodation. Plaintiff expected that the application including her medical diagnosis and information about her dog certification would be kept private. Cowpet Bay West Condominium Association failed to adopt safeguards to protect Plaintiff's privacy.

164. Defendants Lance Talkington, Max Harcourt and Alfred Felice intentionally intruded on the Cowpet Bay West Condominium Association business office to review Plaintiff's reasonable accommodation application.

165. This intrusion was done solely for the purpose of discrediting and intimidating Plaintiff to prevent her from pursuing *her application* for reasonable accommodation for Plaintiff's emotional

support dog.

166. Defendants intrusion was highly offensive to Plaintiff and would be highly offensive to a reasonable person in Plaintiff's position.

167. *As a direct consequence of Defendants' intrusion upon her right to privacy and seclusion, Plaintiff is entitled to an award of compensatory and punitive damages from them to compensate her for humiliation, emotional pain and suffering, embarrassment, mental anguish, loss of enjoyment and loss of credibility.*

**COUNT XVIIII: INVASION OF PRIVACY; FALSE LIGHT**
***(All Defendants)***

168. Plaintiff incorporates all *preceding* paragraphs herein by reference as though fully re-stated, wholly, in the Count.

169. Defendants publicize information or material that showed Plaintiff in a false light on the blog, *in letters* and in emails.

170. Plaintiff considers the portrayal of her on the blog, *in letters* and in email in a false light to be highly offensive and a reasonable person in Plaintiff's position would find the publication to be highly offensive.

171. Defendants intended the publication to create a false impression of Plaintiff to coerce Plaintiff into dropping her *application* for reasonable accommodation.

172. Defendants acted with reckless disregard for the truth because they were motivated by intimidating Plaintiff into backing away from her *application* for reasonable accommodation.

173. *Defendants also intended to discredit, humiliate, embarrass and make Plaintiff look bad in the Cowpet Bay West Community right before the Board of Directors' election.*

174. *As a direct consequence of Defendants' showing Plaintiff in a false light, Plaintiff suffered humiliation, emotional pain and distress, inconvenience, mental anguish, loss of enjoyment, public embarrassment and loss of credibility and Plaintiff is entitled to an award of compensatory and punitive damages from them as compensation.*

**COUNT XX INVASION OF PRIVACY**
***(All Defendants)***

175. Plaintiff incorporates all preceding paragraphs herein by reference as though fully re-stated, wholly, in the Count.

176. *Defendants invaded Plaintiff's privacy.*

177. Plaintiff had a reasonable expectation of privacy that her application for a reasonable accommodation and the content of the application would not be made public when she submitted the application to Cowpet Bay West Condominium Association business office.

178. Instead, the content of Plaintiff's application and application was shared with Cowpet Bay West Association members who are not on the Board.

179. As a result, Plaintiff's private information was posted on the blog and was the topic of several blog entries for weeks.

180. As a result of the publication, Plaintiff was ridiculed, *mocked* and *ostracized by some members of the Cowpet Bay West* community.

181. Plaintiff's private information was not of legitimate public concern and or did not have substantial connection to a matter of legitimate public concern.

182. Defendants knew that the publication would be considered highly offensive by Plaintiff and that *Defendants* acted with reckless disregard that a reasonable person in Plaintiff's position would consider the publicity highly offensive.

*183. As a direct consequence of Defendants' invasion, Plaintiff is entitled to an award of compensatory and punitive damages form them to compensate her for humiliation, emotional pain, and suffering, inconvenience, mental anguish, loss of enjoyment and embarrassment.*

***COUNT XXI: VIOLATION OF THE V.I PRIVATE NUISANCE ACT***
*(Cowpet Bay West Condominium Board, Lance Talkington, Alfred Felice, Max Harcourt, Robert Cockayne, Vincent Verdiramo)*

*184. Plaintiff incorporates all proceeding paragraphs herein by reference as though fully re-stated, wholly, in the Count.*

*185. Defendants violated V.I. CODE ANN. tit 28, §333 by interfering with Plaintiff's right to enjoy her property by not providing an exception to the NO DOGS RULE.*

*186. As a result of Defendants' actions Plaintiff was harmed and Defendants are liable for Plaintiff's harm.*

**COUNT XXII: BREACH OF FIDUCIARY DUTY**
Cowpet Bay West Condominium Association,
Cowpet Bay West Condominium Board

*187. Plaintiff incorporates all proceeding paragraphs herein by reference as though fully re-stated, wholly, in the Count.*

*188. Defendants owed a fiduciary duty to Plaintiff as member of the Cowpet Bay West Condominium Association.*

*188. Defendants breached that duty and as a result Plaintiff was harm.*

*189. Defendants are liable for Plaintiff's harm.*

**WHEREFORE, THE PREMISES CONSIDERED, PLAINTIFF PRAYS**:

A. That this Court declare that by its acts and/or omissions and practices, the Defendants have violated rights secured to Plaintiff by the FHAA, the ADA, and other public laws and policies of the United States and the Territory of the U.S. Virgin Islands.

B. That this Court order Defendants to make Plaintiff whole, insofar as she was adversely affected by Defendants' discriminatory practices by awarding damages, including interest in an amount to be shown at trial, and other affirmative relief.

C. That the Court grant compensatory and punitive damages.

D. That the Court grant Plaintiff her attorney's fees, costs and disbursements.

E. That the Court grant additional relief as the Court deems just and proper.

**JURY TRIAL IS DEMANDED.**

Respectfully submitted,

**Barbara Kromenhoek vs. Cowpet Bay West Condominium, et al.**
**Amended Verified Complaint**

**Civil No. 24/2012**
**Page 42**

**LAW OFFICES OF KARIN A. BENTZ, P.C.**

Dated: June 19, 2012

/s/ Karin A. Bentz
**KARIN A. BENTZ, ESQ.**
**JULITA K. de LEÓN, ESQ.**
5150 Dronningens Gade, Suite 8
St. Thomas, Virgin Islands 00802
Telephone: 340-774-2669
Telecopier: 340-774-2665
E-mail: kbentz@virginalaw.com

**CERTIFICATE OF SERVICE**

I hereby certify that I caused the filing and service of the foregoing with the Clerk of the District Court of the Virgin Islands using the CM/ECF system, which will provide electronic notice by email to the following.

Richard P. Farrelly, Esq.
Birch de Jongh & Hindels, PLLC
1330 Taarneberg
St. Thomas, VI 00802
Email: rfarrelly@bdhlawvi.com

/s/ Karin A. Bentz

Joint Appendix Vol. II Page 1656

(/) Traveler login | Owner login (/Accounts.mvc/OwnerDash) | List your property (http://www.vrbo.com/cart/signup)

Home (http://www.vrbo.com) Rental Guarantee (http://guarantee.homeaway.com/vrbo/) Caribbean (http://www.vrbo.com/vacation-rentals/caribbean) Advantages (http://www.vrbo.com/global/advantages.htm)
Community (http://vacationrentals.vrbo.com/owner-community) | Help (http://help.homeaway.com?brand=vrbo&type=traveler)

- USVI - St. Thomas (http://www.vrbo.com/vacation-rentals/caribbean/usvi-st-thomas)
- East End (http://www.vrbo.com/vacation-rentals/caribbean/usvi-st-thomas/east-end)
- Cowpet Bay (http://www.vrbo.com/vacation-rentals/caribbean/usvi-st-thomas/east-end/cowpet-bay) · VRBO Listing #11538

# Spring Break and Easter Weeks Still Available at Cowpet Bay West!

Cowpet Bay Vacation Rental by Owner Listing 11538

**Location**: Cowpet Bay, East End, USVI - St. Thomas, Caribbean (Five-minute drive to Red Hook Ferries to St. John & the BVI) View Map

**Accommodations**: Condo, 2 Bedrooms + Convertible bed(s), 2 Baths (Sleeps 4-6)

On a wide, white-sand beach overlooking the spectacular aqua-colored waters of Cowpet Bay, this luxurious condominium is located just minutes from Red Hook for shopping or dining, or the ferry to St. John or Tortola.

Relax in this centrally air-conditioned, two-bedroom, two-bath condominium complete with a fully-equipped kitchen, living/dining room, washer/dryer, ceiling fans, two TVs, VCR, DVD, stereo with CD/cassette player, and telephones. All linens and beach towels are provided. Wi-fi is available.

Each bedroom has a king-sized bed. Situated right above the water, you will enjoy breathtaking ocean views from the large, private deck adjoining the oceanside bedroom and living room. An additional queen-sized sleeper-sofa allows for a total of six guests. Perfect for two couples or families.

Wander the beautifully landscaped grounds. Swim in the crystal-clear blue waters. Lounge chairs are provided on the beach, and sailboat, kayak, windsurfer, snorkel, and waterbike rentals are available, along with a fitness center, beach bar, and beach shop at the next-door Elysian Resort. Enjoy fabulous food and drink at one of the two beachside restaurants and bars on the grounds.

This home is just moments away from casual and elegant restaurants, including one of the island's most luxurious at the Ritz Carlton, and nightlife in Red Hook. Fifteen minutes from Mahogany Run for golf.

Keywords: Condominium

Primary:
**(651) 439-7702**
**(Minnesota, USA)**
Secondary:
**(763) 226-4109 (cell)**

First name

Last name

Email address

Re-Enter Email Address

Phone number

Arrival | Departure

Adults | Children

Message to owner

(500 characters)

☑ Save info for other inquiries

**Submit**

By clicking 'Submit' you are agreeing to our Terms and Conditions (http://www.vrbo.com/global/termsandco

View Owner's Profile

Before paying contact the owner to confirm payment details.

Learn More (http://www.homeaway.com/inf Travelers)

## Vacation Rental Features

*Property Type* Condo

PLAINTIFF'S
EXHIBIT
A
PENGAD 800-631-6989

| | | |
|---|---|---|
| *Accommodation Type* | Vacation Rental | |
| *Suitability* | Non Smoking Only | Pets Not Allowed |
| *Bedrooms* | 2 Bedrooms, Sleeps 6, Beds for 4-6 | |
| | Bedroom 1 | |
| | Bedroom 2 | |
| | Convertible bed(s) | |
| | King size beds (2), Sleep Sofa or Futons (1) | |
| *Bathrooms* | 2.0 Bathrooms | |
| | Bathroom 1 | |
| | Bathroom 2 | |
| *Kitchen & Dining* | Kitchen | Refrigerator |
| | Microwave | Dishwasher |
| | Cooking Utensils | |
| *Amenities* | Linens Provided | Air Conditioning |
| | Washing Machine | Clothes Dryer |
| *Other Amenities* | Central Air Conditioning, Two TVs, CD/Cassette Player, Ironing Board and Iron, Hair Dryers, Cleaning fee included in rental fee | |
| *Entertainment* | Satellite / Cable : (2) | DVD Player |
| | VCR | Stereo |
| | CD Player | |
| *Communications* | Wireless Internet : Complimentary WiFi is provided in our unit. | Telephone : (5) |
| *Outdoor Features* | Outdoor Grill | Balcony |
| | Deck / Patio | |
| *Location & View* | Ocean View | Beach View |
| *Activities* | Restaurants | Boating |
| | Shopping | Sight Seeing |
| | Fitness Center | Parasailing |
| | Snorkeling/Diving | Swimming |
| | Hiking | Fishing |
| | Kayaking | Sailing |
| | Wind-Surfing | Golf |
| | Jet Skiing | |

Cowpet Bay Vacation Rental - VRBO 11538 - 2 BR East End Condo in USVI - St. Thom... Page 3 of 6

## Rate Details (In $)

Personal Currency Assistant™

```
December 15 - April 16:
Up to four people .. $375/night.
Each additional person (up to two extra people) .. $35/night.
April 17 - December 14:
Up to four people .. $275/night.
Each additional person (up to two extra people) .. $25/night.
Includes all taxes and fees.  Includes cleaning fee.
Holiday weeks - $400/night
```

Note: Until confirmed, rates are subject to change without notice.

**Before paying contact the owner to confirm payment details.**
Call the owner directly to confirm reservation details and pay with an approved method (credit card, check, or bank transfer), to protect your payment up to $1,000.

**Dates available:** Year Round

Email Owner () Primary: **(651) 439-7702 (Minnesota, USA)**
Secondary: **(763) 226-4109 (cell)**

Note: Each property is individually owned or managed.

St Thomas
Tutu
Anna's Retreat
Mariendal
Nazareth
Bolongo
Bovoni
Bethany
Content
Google

## Property Photos

http://www.vrbo.com/11538 3/1/2013

3055300/000617

Joint Appendix Vol. II Page 1659

Cowpet Bay Vacation Rental - VRBO 11538 - 2 BR East End Condo in USVI - St. Thom... Page 4 of 6

Cowpet Bay West condos and beach

Sunrise view from condo

Living Room

Oceanside bedroom (with sliding glass doors to deck)

Kitchen

Cowpet Bay Beach

Garden-view bedroom

View from the deck toward Great St. James Island

http://www.vrbo.com/11538 3/3055300/000618

Joint Appendix Vol. II Page 1660



Cowpet Bay Vacation Rental - VRBO 11538 - 2 BR East End Condo in USVI - St. Thom... Page 5 of 6

*Flora of Cowpet Bay West*

## Traveler Reviews (3)

5/5

**New Year's visit to St Thomas**

Guest: Jan (Wilmington De)
Date of Stay: 01/01/12 Review Submitted: 02/24/12

The condo was immaculately clean. The location was easy to maneuver. The layout worked very well for two couples.

Recommended for:Tourists without a car, girls getaway, families with young children, age 55+.
Did you find this review helpful? Yes | No Helpful votes: 0/0

5/5

**great time**

Guest: Judy (tomah,wi)
Date of Stay: 02/04/12 Review Submitted: 02/18/12

We stay a week and really enjoy it The condo was clean and well equip. We really like using the grill
Greg was very pleasant We would stay there again

Recommended for:Age 55+.
Did you find this review helpful? Yes | No Helpful votes: 0/0

5/5

**Great Spacious Condo! Clean, Beautifully Decorated Ocean View!**

Guest: Andi (California)
Date of Stay: 07/23/10 Review Submitted: 12/10/10

We loved staying in this condo. It is clean and well kept up. We loved how it is beautifully decorated and complete with house keeping service, washer and dryer, towels. It is very large and the view is spectacular! The owner is wonderful and very accommodating. We will come again!

Recommended for:Romantic getaway, age 55+.
Did you find this review helpful? Yes | No Helpful votes: 0/0

First (3) of (3). Write a Review (http://www.vrbo.com/11538/reviews/write)

**Dates available:**Year Round

Email Owner () Primary: **(651) 439-7702 (Minnesota, USA)**
Secondary: **(763) 226-4109 (cell)**

http://www.vrbo.com/11538 3/1/2013

3055300/000619

Joint Appendix Vol. II Page 1661

Note: Each property is individually owned or managed.

**Vacation Rentals by Owner Listing #11538**

There have been 50657 visitors to this page since the counter was last reset in 2004. This listing was first published here in 2001.

Date last modified - Tuesday, February 05, 2013

VRBO® is Vacation Rentals by Owner® with 153 million visits in the last year. Specializing in BY OWNER vacation rentals, homes, condos, cabins, villas and apartments. ALSO privately owned properties offered thru rental agencies and management companies. To report any problems with this site, please use our help form (http://www.vrbo.com/support) | URL: http://www.vrbo.com/11538 | ©Copyright 1995-2011 by VRBO.com, Inc., All rights reserved. (http://www.vrbo.com/global/copyright.htm) Use of this website constitutes acceptance of the VRBO Terms and Conditions (http://www.vrbo.com/global/termsandconditions.htm) and Privacy Policy (http://www.vrbo.com/global/privacy.htm). "VRBO", "Vacation Rentals by Owner", & "Carpe Vacationum-'Seize the Vacation'" Reg. U.S. Pat. & TM Off

# National Service Animal Registry

903 NW F. Street · Grants Pass · Oregon · 97526 Toll Free · (866) 737-3930 Fax · (541) 471-1122

**NSAR CERTIFIED SERVICE ANIMAL**

This document affirms that **"OLIVER"** (NSAR database ID [redacted], see adjacent photo) is certified as an emotional support animal (ESA) and registered with National Service Animal Registry (NSAR) on the date listed below. This emotional support has been formally prescribed and deemed necessary to assist **J. KROMENHOEK**, the confirmed disabled handler. The handler and service animal are listed in the National Service Animal Registry (NSAR) database and may be found on the following website: **www.nsarco.com/database.html.**



**OLIVER**

Emotional Support Animals are animals that are necessary for the normal, day-to-day functioning of their emotionally or psychologically disabled handler, facilitating a normalizing effect by their presence.

An ESA is not considered a working service dog under the ADA and is not granted unlimited public access. Protections under federal law include allowing a disabled handler to be accompanied by his/her emotional support animal in the cabin of the aircraft, in accordance with the Air Carrier Access Act 49 U.S.C. 41705 and Dept of Transportation 14 C.F.R. Part 382.

Additionally, property managers and landlords are required to make reasonable accommodation (a change in the rules) to permit a disabled handler to keep an ESA, even when a landlord's policy explicitly prohibits pets, as set forth in the Fair Housing Amendments Act of 1988, Section 504 of the Rehabilitation Act of 1973 and Title II of the Americans with Disabilities Act.

For more information, please call the U.S. Justice Department ADA Information Line at (800) 514-0301 (voice) or (800) 514-0383 (TTY) or visit the ADA Business Connection at **www.ada.gov.**

September 12, 2012
Date

[signature]
Tim Livingood, M.ED. CEO

PLAINTIFF'S EXHIBIT B
PENGAD 800-631-6989

30553.00/000260

# Chilhowee Psychological Services

Testing · Assessment · Treatment

743 Goldhill Pl · Suite 129 · Woodland Park · CO · 80863 · (877) 223-1602

December 15, 2010

Judith Kromenhoek

Dear Ms. Kromenhoek,

Based on the results of the psychosocial battery you recently completed at Chilhowee Psychological Services, a DSM-IV-TR (Diagnostic and Statistical Manual of Mental Disorders, 4th Edition, Text Revision) diagnosis of 300.0, Anxiety Disorder NOS has been provisionally assigned to you.

The following is information designed to help you more clearly understand anxiety disorders in general. The CPS assessment and diagnostic service should increase your awareness of what you are experiencing and provide general information about the characteristics of the condition with which you may be diagnosed. This service is not intended to replace complete face to face assessment and treatment by a local qualified mental health professional.

Mental health and psychiatric conditions are subject to change in an individual, and may become worse without effective treatment. Conversely, these conditions may decrease in severity if left alone. It is based solely on the individual, his/her makeup, and environmental conditions.

Sincerely,

Timothy Livingood, M. Ed.
Executive Director

30553.00/000261

**IN THE UNITED STATES DISTRICT COURT**
**DISTRICT OF ST. THOMAS & ST. JOHN**
********************

**JUDITH KROMENHOEK,**

**Plaintiff,**

**v.**

**COWPET BAY WEST CONDOMINIUM., ASSOCIATION, ET AL**
**Defendant.**

**Civil No. 12-00025**

**Action for Housing Discrimination**

**AFFIDAVIT**

**TERRITORY OF THE VIRGIN ISLANDS ) SS**
**DISTRICT OF ST. THOMAS )**

**I, LOUANNE SCHECHTER,** a resident of the Virgin Islands over eighteen years old affirm under penalty of perjury as follows:

1. In February of 2011, I worked at the Cowpet Bay West Condominium Association office as an office manager.
2. I reported directly to Jon Cassady, the Property Manager.
3. During the time that I worked at the Cowpet Bay West Condominium Association, the Board had a NO DOGS RULE in place.
4. There were no exceptions made to the NO DOGS RULE and no process or procedures were in place to consider an exception to the rule.
5. On or in July of 2011, Judith Kromenhoek handed me a copy of a letter from her Doctor prescribing an emotional support dog for her condition.
6. Judith Kromenhoek also handed me a copy of a certification for her dog, Oliver.
7. I discussed the documents with Jon Cassady, who was my supervisor.
8. Jon Cassady spoke with Max Harcourt and Max Harcourt subsequently came to the office to review the documents that I received from Judith Kromenhoek.
9. Max Harcourt also sent his "representative" Bill Canefield, another Board member to review

PLAINTIFF'S EXHIBIT C

PENGAD 800-631-6989

3055300/000621

the documents.

10. I was not told to do anything with the documents and as a result, they just sat in Judith Kromenhoek file.

**FURTHER THE AFFIANT SAYETH NAUGHT**

LOUANNE SCHECHTER

**SWORN AND SUBSCRIBED** before me, a Notary Public, this 9th, day of March, 2013.

Notary Public

My Commission Expires:

GEORGEANN P. McNICHOLAS
Territory of the
U.S. VIRGIN ISLANDS
District of
ST. THOMAS/ST. JOHN
Notary Public No. NP-44-12

3055300/000622

from an "outfit" a "puppy mill and was therefore not credible. The tenor of Talkington's blog

# Mind/Body Health & Psychology, LLC

6115 Estate Smith Bay
Suites 334 & 335
St. Thomas, USVI 00802

mbh&p
Mind/Body Health & Psychology, LLC

**Name:** Judith Kramenhaek
**Date of Birth:** 
**Age:**
**Gender:** Female
**Service:** Psychotherapy, Individual
**Date(s) of Service:** 7/1/2011; 1/31/2012; 3/26/2012; 4/10/2012; 9/14/2012; 3/19/2013; 7/16/2013
**Service Provider:** Sheena M. Walker, Ph.D.
Clinical Psychologist, VI License 10-029-PSY

## CLINICAL SUMMARY

**Presenting Complaint(s):** Judith is a 65 year old European-American woman who self-referred for assistance with the following issues: Anxiety Management, and to fulfill necessary requirements to maintain certification for service dog.

**Symptoms Reported:**

- Describes an overwhelming and persistent sense of worry and fear about a number of events or circumstances.
- Displays feelings of irritability, being on edge, and/or restlessness.
- Experiences difficulty concentrating or mind going blank.
- Feels immobilized or may completely withdraw in response to/anticipation of a real or imagined danger.

**History of the Problem:** Judith reported being diagnosed with Panic Disorder "years ago," and was previously prescribed medication for anxiety management. After education by her son who also struggles with anxiety, Judith explained that she bought a small lap dog that assists in her with management of anxiety. She further stated that the dog assists greatly when traveling to and from North Carolina. Judith explained that one of her sons living in North Carolina has a daughter who is ill. She further stated that her granddaughter's kidneys are failing, and she is in need of transplant surgery. To assist in caring for her other grandchildren and to allow her son and daughter-in-law to care for her ill granddaughter. Judith explained that she wants to fly up to be with her family. She further requests that her dog be with her to assist her through the anticipated emotional time.

**Social History:** Judith described having a healthy and loving marriage, and supportive family. She reported having some difficulty with her condominium association and neighbors within the condominiums regarding her dog. She described experiencing harassment for the possession of her dog, although it is allowed. Despite the difficulty with her neighbors, Judith described having a good social support network. She did report, however, that her recent interactions with condominium association have heightened her overall anxiety.

Phone: 340-714-8FIT (2348)
Facsimile: 340-715-8FIT (2348)
mindbodypsych.vi@gmail.com
www.synergyvi.com

30553.00/000677

**Mental Status/Behavioral Observations:** Judith consistently presented individually, and arrived on time to scheduled sessions. Her attire was consistently tidy with appropriate hygiene and grooming. Her general behavior was cooperative. She generally presents with euthymic mood and anxious affect. On every occasion, she has been oriented to time, place, person and situation. Her speech tone, pitch and speed were all within normal limits. Her gait is normal. Her stream of thought was productive and within normal limits. She is able to abstract, and has demonstrated fair insight with good judgment. Rapport with Judith has remained from for the entire duration of the theropeutic relationship.

**TREATMENT PLAN**

**Goals:**

- Resolve the core conflict that is the source of anxiety.
- Address and eliminate maladaptive thought processes that lead to anxious responses.
- Enhance ability to handle effectively life stressors.
- Increase overall sense of well-being via reduction/elimination of anxiety.

**Objectives:**

- Establish a support system of trusting individuals in order to discuss life stressors and help reduce anxiety.
- Implement steps (e.g., couples therapy, increased communication) to improve relationships deemed necessary to save or enhance; end relationships that have been deemed unsalvageable due to ongoing extreme negativity or abuse.
- Understand specific social mores, gender roles, and expectations that have led to internal conflicts and anxious feelings.
- Commit to a consistent course of action involving volunteering, community service, activism, further education, or other activity focused on contributing to society at least three or four times per month.
- Obtain an emotional support or companionship animal to assist in the alleviation of depressive symptoms and to encourage appropriate activity.
- Identify the relationship between multiple roles, role overload, role strain, and anxiety reactions.
- Learn and practice methods of reducing anxiety in a variety of situations.
- Develop the ability to determine when the use of anxiety-reduction techniques is necessary and how to use them effectively in 9 out of 10 anxiety-arousing situations.
- Implement self-care strategies that serve to augment the positive effects of other interventions.
- Identify precipitating events, thoughts, feelings, and reactions that are believed to contribute to anxiety.

**SUMMARY AND DIFFERENTIAL DIAGNOSTIC IMPRESSIONS**

| | | |
|---|---|---|
| Axis I: | 300.02 | Generalized Anxiety Disorder |
| | V62.81 | Relational Problem NOS |
| Axis II: | V71.09 | No diagnosis on Axis II |
| Axis III: | | None reported |
| Axis IV: | | Socially ostracized |
| Axis V: | GAF (current)= 57 | |

If there are any questions and/or concerns regarding this report, please feel free to call (340) 714-2348 or email at swalker@synergyvi.com.

Sheena M. Walker, Ph.D.
Licensed Psychologist

1/4/14
Date

30553.00/000679

BY-LAWS OF

COWPET BAY WEST CONDOMINIUM ASSOCIATION

Cowpet Bay
St. Thomas, Virgin Islands

February, 2012

## Article I
## Plan of Apartment Unit Ownership

**Section 1. Apartment Unit Ownership:** The property located at Parcels 8-56-1 and 8-1-2, 4, 5, & 6 of Estate Nazareth, No.1 Red Hook Quarter has previously been submitted in a declaration forming an association under the provisions of Chapter 33, Title 28 of the Virgin Islands Code, known as the "Condominium Act of the Virgin Islands". The association has been and will continue to be known as "COWPET BAY WEST", hereinafter called the "Condominium".

**Section 2. Applicability of By-Laws:** The provisions of these by-laws are applicable to the Property of the Condominium and the use and occupancy thereof. The term "Property", as used herein, shall include the land and all buildings and other improvements thereon owned by the association and all easements, rights and appurtenances belonging thereto, and all other property, personal or mixed, intended for use in connection therewith, all of which were previously submitted to the provisions of said Chapter 33, Title 28 of the Virgin Islands Code.

**Section 3. Application:** All present and future owners, mortgagees, lessees, occupants of apartment units and any other persons who may use the facilities of the Property in any manner are subject to these By-Laws, the Declaration and the Rules and Regulations.

The Acceptance of a deed, mortgage or conveyance or the entering into of a lease or the act of occupancy of an apartment unit shall constitute an agreement that these By-Laws, the Rules and Regulations and the provisions of the Declaration, as they may be amended from time to time, are accepted, ratified, and will be complied with.

**Section 4. Office:** The office of the Condominium and of the Board of Directors shall be located at Cowpet Bay West, Estate Nazareth, No.1 Red Hook Quarter, St. Thomas, Virgin Islands. The mailing address shall be 6201 Windward Way, St. Thomas, USVI 00802, or such address as may be designated by the Board, upon 30 days written notice to the members of the Association.

## ARTICLE II
## Board of Directors

**Section 1. Number and Qualifications:** The affairs of the Condominium shall be governed by a Board of Directors. The Board of Directors shall be composed of seven persons, all of whom shall be owners or spouses of owners, or in the case of partnership owners, shall be members of said partnership, or in the case of corporate owners, shall be officers or stockholders of such

PLAINTIFF'S
EXHIBIT
3

corporations, or in the case of fiduciary owners shall be the fiduciaries or beneficiaries of any such trust or in the case of a limited liability company, shall be the members of such company. A Board member may not base his/her eligibility to sit on the Board on the same unit as any other member of the Board.

No person who is in arrears for ninety days or more on any billing or assessment by the Cowpet Bay West Condominium Association shall be eligible to be elected to or serve as a director on the Board of Directors. In the event such person is serving as a director, that person's position as director shall be declared to be vacant and another person appointed by a majority vote of the remaining Board to fill the vacancy so created, until the next regular election of the Board of Directors. Arrearages of partnerships, corporations, trusts, fiduciary owners, etc. on which a person's eligibility to serve on the board is based, shall be considered in determining the eligibility of a person to be elected to or to continue to serve on the board.

**Section 2. Powers and Duties:** The Board of Directors shall have the powers and duties necessary for the administration of the affairs of the Condominium and may do all such acts and things except as by law, by the Declaration (to the extent still applicable), or by these By-Laws may not be delegated to the Board of Directors by the unit owners. Such powers and duties of the Board of Directors shall include, but shall not be limited to, the following:

(a) Operation, care, upkeep and maintenance of the common areas and facilities.

(b) Determination of Association Charges, which shall include the common expenses required for the operation of the Condominium, insurance, water, utility rates, late fees and interest charges, fines for By-Laws and rules, regulation violations, any reserve fund maintained by the association and the costs of services provided.

(c) Collection of Association charges, as hereinafter defined, from the unit owners, and maintaining and accounting for those funds.

(d) Employment and dismissal of the personnel necessary for the maintenance and operation of the common areas and facilities.

(e) Adoption, amendment and enforcement of rules and regulations covering the details of the operation and use of the Property.

(f) Opening of bank accounts on behalf of the Condominium and designating the signatories required therefore.

(g) Purchasing or leasing or otherwise acquiring in the name of the Association or its designee, corporate or otherwise, on behalf of all unit owners, apartment units offered for sale or surrendered by their owners to the Board of Directors.

(h) Purchasing of apartment units at foreclosure or other judicial sales in the name of the Association or its designee, corporate or otherwise, on behalf of all unit owners.

(i) Selling, leasing, mortgaging, voting the votes appurtenant to (other than for the election of members of the Board of Directors), or otherwise dealing with apartment units acquired

and subleasing apartment units leased by the Association, or its designee, corporate or otherwise on behalf of all unit owners.

(j) Organizing corporations to act as designees of the Board of Directors in acquiring title to or leasing of apartment units on behalf of all unit owners.

(k) Obtaining of insurance for the Property, including the apartment units owned or required to be maintained by the Association, pursuant to the provision of Article V, Section 2 hereof.

(l) Making of repairs, additions and improvements to or alterations of the Property and repairs to and restoration of the Property in accordance with the other provisions of these By-Laws, after damage or destruction by fire or other casualty or as a result of condemnation or eminent domain proceedings.

**Section 3. Managing Agent and Manager:** The Board of Directors may employ for the Condominium a managing agent and/or a manager at a compensation established by the Board of Directors, to perform such duties and services as the Board of Directors shall authorize. The Board of Directors may delegate to the manager or managing agent, all of the powers granted to the Board of Directors by these By-Laws other than the powers set forth in subdivisions (b), (e), (f), (g), (h), (i), (j) and (k) of Section 2 of this Article II.

**Section 4. Election and Term of Office:**

Directors will serve for a term of three years. Two Directors shall be elected the first year, two the second year, and three the third year to replace those directors whose terms are expiring. Where a vacancy has been filled by vote of a majority of the vote of the remaining members of the Board, as provided in Section 6, that person shall be a member until the next Annual Meeting, at which time the unit owners shall elect the replacement for the remainder of the original term, if any. Any candidate for director may run for a full term, or any term created by a vacancy, or both.

Each Director shall be elected by the vote of a majority (as defined in Article III Section 9) of the unit owners. All vacancies shall be voted for on the same ballot, and the candidates with the highest number of votes shall be elected to each of the vacancies. Each candidate's name shall be preceded by a space where an "X" may be placed to vote for said candidate. It shall not be required that a name be crossed out and another inserted to vote for a candidate on the ballot. A space for write-in candidates shall also be provided. Ballots and proxies shall be provided to the owners not less than 30 days prior to the Annual Meeting.

The members of the Board of Directors shall hold office until their respective successors shall have been elected by the unit owners.

A Board member may serve only two consecutive terms and may not hold office for one year before being eligible to run again.

**Section 5. Removal of Members of the Board of Directors:** At any regular or special meeting of unit owners, any one or more of the members of the Board of Directors may be removed with or without cause by a majority of the unit owners and a successor may then and there or thereafter be elected to fill the vacancy thus created. Any members of the Board of Directors whose removal has been proposed by the unit owners shall be given an opportunity to be heard at the meeting.

If a Board member does not attend any of the Board meetings during an entire year, and also does not attend the annual owners meeting that same year, such member may be removed from the Board by a majority of the other members of the Board of Directors.

**Section 6. Vacancies:** Vacancies in the Board of Directors caused by any reason other than the removal of a member thereof by a vote of the unit owners, shall be filled by a vote of a majority of the remaining members at a special meeting of the Board of Directors held for that purpose promptly after the occurrence of any such vacancy, even though the members present at such meeting may constitute less than a quorum, and each person so elected shall be a member of the Board of Directors until a successor shall be elected at the next Annual Meeting of the unit owners. At that time a director shall be elected to serve the remainder of the term of the original vacating director.

**Section 7. Organization Meeting:** The first meeting of the members of the Board of Directors shall be an organizational meeting held directly following the Annual Meeting of the unit owners, at such time and place as shall be fixed by the Board members at said meeting, and no notice shall be necessary to the newly elected members of the Board of Directors in order to legally constitute such meeting, provided a majority of the whole Board of Directors shall be present thereat. If it is not possible to hold such first meeting of the new Board immediately, then it shall be held as soon as possible and proper notice shall be given to each director, as for any special meeting of the Board of Directors.

**Section 8. Regular Meetings:** Regular meetings of the Board of Directors may be held at such time and place as shall be determined from time to time by a majority of the members of the Board of Directors, but at least two such meetings shall be held during each fiscal year. Notice of regular meetings of the Board of Directors shall be given to each member of the Board of Directors by mail, electronic mail or fax transmission, at least thirty days prior to the day named for such meeting.

**Section 9. Special Meetings:** Special meetings of the Board of Directors may be called by the President upon five business days notice to each member of the Board of Directors, given by mail, electronic mail or fax transmission, which notice shall state the time, place and purpose of the meeting. Special meetings of the Board of Directors shall be called by the President or Secretary in like manner and on like notice on the written request of at least two members of the Board of Directors. Such special meeting may be conducted by a teleconference call.

**Section 10. Waiver of Notice:** Any member of the Board of Directors may, at any time, waive notice of any meeting of the Board of Directors in writing, and such waiver shall be deemed equivalent to the giving of such notice. Attendance by a member of the Board of Directors at any meeting of the Board shall constitute a waiver of notice by him of the time and place thereof. If all the members of the Board of Directors are present at any meeting of the Board, no notice shall be required and any business may be transacted at such meeting.

**Section 11. Quorum of Board of Directors:** At all meetings of the Board of Directors, a majority of the members thereof shall constitute a quorum for the transaction of business, and the votes of the majority of the members of the Board of Directors present at a meeting at which a quorum is present shall constitute the decision of the Board of Directors. If at any meeting of the Board of Directors there shall be less than a quorum present, , a majority of those present may adjourn the meeting from time to time. No business may be transacted until a quorum is achieved. Board members may participate by teleconference call.

**Section 12. Fidelity Bonds:** The Board of Directors shall obtain adequate fidelity bonds for all officers and employees of the Condominium handling or responsible for condominium funds. The premiums on such bonds shall constitute a common expense.

**Section 13. Compensation:** No member of the Board of Directors shall receive any compensation from the Condominium Association for serving as a board member. However, verifiable expenses, in accordance with guidelines established by the Board in advance, are reimbursable. A Board member may also be compensated for other services unrelated to his/her Board function.

**Section 14. Liability of the Board of Directors**: The members of the Board of Directors shall not be liable to the unit owners for any mistake of judgment, negligence, or otherwise, except for their own individual willful misconduct or bad faith. The unit owners shall indemnify and hold harmless each of the members of the Board of Directors against all contractual liability to others arising out of contracts made by the Board of Directors on behalf of the Property unless any such contract shall have been made in bad faith or contrary to the provisions of the Declaration or of these By-Laws.

It is intended that the members of the Board of Directors shall have no personal liability with respect to any contract made by them on behalf of the Property. It is also intended that the liability of any unit owner arising out of any contract made by the Board of Directors or out of the aforesaid indemnity in favor of the members of the Board of Directors shall be limited to such proportion of the total liability there under as his interest in the common areas and facilities bears to all such interest.

Every agreement made by the Board of Directors or by the managing agent or by the manager on behalf of the Property shall provide that the members of the Board of Directors or the managing agent, or the manager, as the case may be, are acting only as agents for the unit owners and shall have no personal liability there under (except as unit owners) and that each unit owner's liability there under shall be limited to such proportion of the total liability there under as his interest in the common areas and facilities bears to all such interest.

**Section 15. Executive Committee:** The Board of Directors, by resolution passed by a majority of the entire Board, shall designate at the Organization Meeting or anytime thereafter, three members of the Board to constitute an Executive Committee, with one member thereof designated as Chairman. The purpose of the Executive Committee is to control the day-to-day management of the Association.

The Board of Directors from time to time shall define the authority of the Executive Committee, but shall retain for itself the powers and duties as itemized in Section2 (b), (e), (h), (i), and (j). Additionally, the Board shall retain the right to appoint the manager or managing agent, fill vacancies in the Board, make changes in the Rules and Regulations, and acquire property.

The Board of Directors, at any time, may change the members of, may fill vacancies in, or may discharge the Executive Committee. Two members shall constitute a quorum of the Executive Committee. The act of a majority of the members at any meeting at which there is a quorum shall be the act of the Committee. The Board of Directors shall establish rules of procedure for the Committee governing, but not limited to, such items as notice and powers.

The Executive Committee shall make recommendations to the Board of Directors, and when the Board is not in session may, to the extent that the committee deems necessary, exercise the powers of the Board in the management of the business and affairs of the Association; and it shall have the powers to authorize the seal of the Association to be affixed to all papers which may require it.

The Executive Committee shall keep records of all its proceedings and shall report same to the Board of Directors, and its individual members, in writing within a reasonably short period of time after each significant action and after all meetings.

**Section 16. Inspection by Executive Committee**: The Executive Committee shall make a detailed inspection of the buildings, pump rooms, offices, maintenance shops, sewage and water-making plants, emergency generator, roads, sidewalks, steps, entry bridges, railings, grounds, landscaping, watering systems, the beach and the sea wall at least twice a year in the company of the manager or managing agent,. Additionally, the Committee shall evaluate the operation of the Association office and the overall security situation of the property.

The purpose of such inspections will be to (a) obtain a better understanding of the job being performed by the manager and his staff and (b) make suitable recommendations for possible future actions. Within 30 days after each such semi-annual inspection, the Committee will report its findings and recommendations to the members of the Board of Directors.

**Section 17. Action by Consent**: Any action required or permitted to be taken at any meeting of the Board of Directors, or any committee thereof, may be taken without a meeting if a written consent thereto is signed by three-quarters of the members, (rounded off to the nearest whole number), of the Board of Directors or of such committee as the case may be, and filed with the minutes of proceedings of the Board of Directors or committee.

**Section 18. Nomination of Directors**: Nominations for election to the Board of Directors shall be made by a Nominating Committee. The Nominating Committee shall consist of a chairman, who shall be a member of the Board of Directors, and two or more members of the Association. The Nominating Committee shall be appointed by the Board of Directors at its organizational meeting and serve until the next Annual Meeting.

The Nominating Committee shall make as many nominations for election to the Board of Directors as it shall, in its discretion, determine, but not less than the number of vacancies that are to be filled. Each nomination shall be for a specified vacancy.

Any person qualified under Section1 of Article II of these By-Laws to serve on the Board of Directors may be nominated for the Board of Directors by submitting a request, signed by the owners of two units in which the nominee has no financial interest, to the Board Secretary sixty days prior to the Annual Meeting. The Board shall include his/her name on the ballot directly following the nominee(s) proposed by the Nominating Committee for each vacancy. Any nomination that does not specify a specific vacancy shall be deemed a nomination for all vacancies.

**Section 19 – Communications**

Communications by, from, to and among the Board may be in writing, by fax or by electronic communications (telephone, telephone conference, email, internet, etc.) Telephone and telephone conference conversations must be documented (e.g., minutes or record of conversation). This communication will constitute "official" communication by the Board.

## ARTICLE III
## Unit Owners

**Section 1. Annual Meeting**:

The Annual Meeting of the unit owners shall be held during the first quarter each year. At the Annual Meeting, Directors shall be elected by ballot in accordance with the requirements of

Section 4 of Article II of these By-Laws, and the unit owners may transact such other business at such meetings as may properly come before them.

**Section 2. Place of Meeting**: Meetings of the unit owners shall be held at the principal office of the Condominium or at such other suitable place convenient to the unit owners as may be designated by the Board of Directors.

**Section 3. Special Meetings**: It shall be the duty of the President to call a special meeting of the unit owners if so directed by resolution of the Board of Directors or upon a petition signed and presented to the Secretary by not less than 25% in common interest, in the aggregate, of unit owners. The notice of any special meeting shall state the time and place of such meeting and the purpose thereof. No other business shall be transacted at a special meeting except as stated in the notice.

**Section 4. Notice of Meeting**: It shall be the duty of the Secretary to mail a notice of each annual meeting of the unit owners not less than thirty days nor more than ninety days prior to such meeting, stating the purpose thereof as well as the time and place where it is to be held, to each unit owner of record, at the building or at such other address as such unit owner may have designated by notice in writing to the Secretary. The mailing of a notice of meeting in the manner provided in this section shall be considered service of notice. The Board of Directors may assign the task of providing notice to unit owners to a person other than the Secretary. Special meetings require not less than ten days notice.

**Section 5. Adjournment of Meetings**: If any meeting of unit owners cannot be held because a quorum has not attended, a majority in common interest of the unit owners who are present at such meeting, either in person or by proxy, may adjoum the meeting to a time not less than forty-eight hours from the time the original meeting was called.

**Section 6. Order of Business**: The annual meeting of the unit owners shall be chaired by the President or other member of the Board of Directors chosen by the Board, and the order of business shall be generally as follows:

(a) Roll Call – by unit
(b) Establishment of Quorum (1/3 of all unit owners)
(c) Proof of Notice of Meeting
(d) Approval of Minutes of last year's Annual Meeting
(e) President's Report (including cost and coverage of insurance)
(f) Treasurer's Report (including discussion of Budget and Financial Status)
(g) Property Manager's Report
(h) Report of Nominating Committee
(i) Election of Board Members
(j) Old Business
(k) New Business

**Section 7. Title to Apartment Units**: Title to apartment units may be taken in the name of an individual, or in the names of two or more persons as tenants in common, joint tenants or tenants by the entirety, or in the name of a corporation, partnership, limited liability company or other legal entity authorized to own real property in the Virgin Islands, or in the name of a fiduciary.

**Section 8. Voting**: The owner or owners of each apartment unit, or some person designated by such owner or owners to act as proxy on his or their behalf and who need not be an owner, shall be entitled to cast the vote appurtenant to such apartment unit at all meetings of unit owners. The designation of any such proxy shall be made in writing and shall be revocable at any time by written notice to the Secretary or in person at the meeting. Any or all such owners or proxies may be present at any meeting of the unit owners and may vote or take any other action as a unit owner either in person or by proxy. Votes of unit owners shall be weighted in accordance with their share of the common interest, as follows, with the total of all votes equaling one hundred:

| | |
|---|---|
| **2 Bedroom** | **.911** |
| **3 Bedroom** | **1.062** |
| **2 Bedroom + Loft** | **1.193** |
| **4 Bedroom** | **1.301** |
| **3 Bedroom + Loft** | **1.376** |

The Board of Directors shall accept any vote if the owner is one of the owners of record of the unit, or in the case of a proxy, if there is no obvious defect on the face of such proxy. It shall be the burden of the protestor to offer satisfactory proof that the proffered vote or proxy is invalid and that his is the proper one.

**Section 9. Majority of Unit Owners**: As used in these By-Laws, the term "majority of unit owners: shall mean those unit owners having more than 50% of the total authorized votes of all unit owners present in person or by proxy and voting at any meeting of the unit owners, determined in accordance with the provisions of Section 8 of this Article III.

**Section 10. Quorum**: Except as otherwise provided in these By-Laws, the presence in person or by proxy of unit owners having one-third (1/3) of the total authorized votes of all unit owners shall constitute a quorum at all meetings of the unit owners.

**Section 11. Majority Vote**: The vote of a majority of unit owners at a meeting at which a quorum shall be present shall be binding upon all unit owners for all purposes except where, in the Declaration or these By-Laws, or by law, a higher percentage vote is required.

## ARTICLE IV
## Officers

**Section 1. Designation**: The principal officers of the Condominium shall be the President, the Vice President, the Secretary, and the Treasurer, all of whom shall be elected by the Board of Directors. The Board of Directors may appoint an assistant secretary, an assistant treasurer, and such other officers as in its judgment may be necessary. The President and Vice President, but no other officers, need be members of the Board of Directors.

**Section 2. Election of Officers**: The officers of the Condominium shall be elected annually by the Board of Directors at the Organization Meeting of each new Board of Directors and shall hold office at the pleasure of the Board of Directors.

**Section 3. Removal of Officers**: Upon the affirmative vote of a majority of the members of the Board of Directors, any officer may be removed, either with or without cause, and his successor

may be elected by the Board of Directors at any regular or special meeting of the Board of Directors called for such purpose.

**Section 4. President**: The President shall be the chief executive officer of the Condominium. He shall preside at all meetings of the unit owners and of the Board of Directors. He shall have all of the general powers and duties which are incident to the office of president of a stock corporation organized under the Corporation Law of the Virgin Islands, including but not limited to the power to appoint committees from among the unit owners from time to time as he may in his discretion decide is appropriate to assist in the conduct of the affairs of the Condominium.

**Section 5. Vice President**: The Vice President shall take the place of the President and perform his duties whenever the President shall be absent or unable to act. If neither the President nor the Vice President is able to act, the Board of Directors shall appoint some other member of the Board of Directors to act in the place of the President, on an interim basis. The Vice President shall also perform such other duties as shall from time to time be imposed upon him/her by the Board of Directors or by the President.

**Section 6. Secretary**: The Secretary shall keep the Minutes of all meetings of the unit owners and of the Board of Directors. He shall have charge of such books and papers as the Board of Directors may direct; and he shall, in general, perform all the duties incident to the office of secretary of a stock corporation organized under the Corporate Law of the Virgin Islands.

**Section 7. Treasurer**: The Treasurer shall have the responsibility for Condominium funds and securities and shall be responsible for keeping full and accurate financial records and books of account showing all receipts and disbursements, and for the preparation of all required financial data. He shall be responsible for the deposit of all monies and other valuable effects in the name of the Board of Directors, or the managing agent, in such depositories as may from time to time be designated by the Board of Directors, and he shall, in general, perform all the duties incident to the office of treasurer of a stock corporation organized under the Corporation Law of the Virgin Islands.

**Section 8. Agreements, Contracts, Deeds, Checks, etc.:** All agreements, contracts, deeds, leases and other instruments of the Condominium shall be executed by any two officers of the Condominium or by such other person or persons as may be designated by the Board of Directors.

**Section 9. Compensation of Officers**: No officer shall receive any compensation from the Condominium for acting as such.

## ARTICLE V

## Operation of the Property

**Section 1. Determination of Common Expenses and Fixing of Common Charges:** The Board of Directors shall from time to time, and at least annually, prepare a budget for the condominium, determine the amount of the common charges payable by the unit owners to meet the common expenses of the Condominium, and allocate and assess such common charges among the unit owners according to their respective common interests. Common expenses shall include, among other things, operation and maintenance, insurance premiums,

repairs and such amounts as the Board of Directors may deem proper for a general operating reserve, for a reserve fund for replacements, and to make up any deficit in the common expenses for any prior year.

The common expenses may also include such amounts as may be required for the purchase buy or lease to the Board of Directors or its designee, corporate or otherwise, on behalf of all unit owners, of any apartment unit whose owner has elected to sell or lease such apartment unit to the Board of Directors, or of any apartment unit which is to be sold at a foreclosure or other judicial sale.

The Board of Directors shall advise all unit owners promptly in writing of the amount of common charges payable by each of them, respectively, as determined by the Board of Directors, as aforesaid, and shall furnish to all unit owners copies of each budget on which such common charges are based.

A summary of the previous year's actual income and expenditures, a year end summation of liquid assets and accounts payable/receivable, and an approved budget for the current year shall be provided to all owners not less than 30 days prior to the Annual Meeting.

**Section 2. Insurance:**
The Board of Directors shall annually obtain and maintain, to the extent obtainable, the following insurance:

1. Fire insurance with extended coverage to include earthquake and flood coverage, vandalism and malicious mischief endorsements insuring the entire buildings and "common elements" (including all the individual unit's bathroom and kitchen fixtures and air conditions, but not including any wall, ceiling, or floor decoration, tiles or coverings, together with all service machinery contained therein and covering the interest of the Condominium, the Board of Directors and the Common Interest of the unit owners in an amount to be determined by the Board of Directors.
2. Windstorm, insuring the entire buildings and "common elements" together with all service machinery contained therein and covering the interest of the Condominium, the Board of Directors and the Common Interest of the unit owners in an amount to be determined by the Board of directors.
3. Worker's Compensation; Public Liability covering each member of the Board of Directors, the managing agent, the manager, the office manager and each unit owner; Vehicle and
   other such insurance as the Board of Directors may determine in amounts to be determined by the Board of Directors.

All policies of physical damage shall provide that such policies may not be cancelled or substantially modified without written notice from the Board of Directors.

From time to time or as required by insurers, the Board of Directors shall obtain from a certified and USVI licensed real estate appraiser an appraisal of the full replacement value, without deduction for depreciation, of the buildings, common areas and facilities for the purpose of determining the amount of insurance required.

Unit owners shall be encouraged to carry Home Owners insurance on their "apartment unit" for their own benefit provided that all such policies shall indicate that the liability of the carrier(s) issuing insurance obtained by the Board of Directors shall not be affected or diminished by reason of any such additional insurance carried by any unit owner.

At each Annual Meeting, the Board shall provide to the owners a concise summary of all insurance coverage and costs.

The terms "common elements" and "apartment unit," as mentioned above, are defined in Article 5, Section 10 "Routine Maintenance and Repair."

**Section 3. Repair or Reconstruction After Fire or Other Casualty:** In the event of damage to or destruction of the commonly owned buildings and elements as a result of fire or other casualty (unless 66-2/3% or more of the buildings are destroyed or substantially damaged and 75% or more of the unit owners determine in accordance with the Declaration not to proceed with the repair or restoration), the Board of Directors shall arrange for the prompt repair or restoration of the commonly owned buildings and elements, and the Board of Directors shall disburse the proceeds of all insurance policies to the contractors engaged in such repair or restoration in appropriate progress payments. Any cost of such repair or restoration in excess of the insurance proceeds shall constitute a common expense – and the Board of Directors may assess all the unit owners for such deficit as part of the common charges.

The association shall only be responsible for inspecting unit interiors to determine if damage is structural or due to external causes, or if adjacent unit damage is caused by external causes, or unless that unit is owned by the association. Unless that unit is owned by the association, repair by the association of other unit damage will be limited to structural damage, that caused by external or adjacent unit causes, and will not include property or fixtures installed by the owner or previous owners.

Within ninety days after a casualty of an estimated repair cost of $100,000 or greater, the Board will provide to the owners a financial status report indicating projected repair costs, source(s) of necessary funds, expenditures and commitments to date, and a schedule and plan for completion. This report will be updated and issued to owners on a quarterly basis, thereafter, until repairs are complete. A current report shall be provided at the next Annual Meeting.

If 66-2/3% or more of the Building(s) are destroyed or substantially damaged and if within sixty days of the date of such destruction or damage, 75% or more of the unit owners determine not to proceed with repair and restoration, the Property shall be subject to an auction for partition at the suit of any unit owner or lien holder, as if owned in common, in which event the net proceeds of sale, together with the net proceeds of insurance policies (less any repairs conducted) shall be divided by the Board of Directors among all the unit owners in proportion to their respective common interests, after first paying out of the share of each unit owner the amount of any unpaid liens on his/her apartment unit, in the order of priority of such liens.

**Section 4. Payment of Association Charges:** All unit owners shall be obligated to pay the common charges assessed by the Board of Directors pursuant to the provisions of Section 1 of this Article V at such time or times as the Board of Directors shall determine, as well as "other charges" for utilities, services, unit repairs, late fees, interest, fines and/or collection costs, if incurred. With respect to the following sections concerning payment, collection, default, foreclosure, etc., in Sections 4, 5, 6, 7, & 8 below, the term "association charges" is intended to include, but not be limited to, all the above items, both the "common" and "other" charges.

No unit owner shall be liable for the payment of any part of association charges assessed against his apartment unit subsequent to a sale, transfer or other conveyance by him of such apartment unit, together with the Appurtenant Interests, as defined in Section1 of Article VII hereof. In addition, any unit owner may, subject to acceptance by the Board of Directors provided that his apartment unit is free and clear of liens and encumbrances other than mortgages and statutory liens for unpaid association charges, convey his apartment unit,

together with the "Appurtenant Interests" to the Board of Directors, or its designee, corporate or otherwise, on behalf of all other unit owners, and in such event be exempt from association charges thereafter assessed.

However, a purchaser of an apartment unit shall be liable for the payment of association charges assessed against such apartment unit prior to the acquisition by him of such apartment unit, without prejudice to such purchaser's right, if any, to recover from the seller the amounts paid by the purchaser, except that a first mortgagee or other purchase of an apartment unit at a foreclosure sale of a first priority mortgage of such apartment unit shall not be liable for and such apartment unit shall not be subject to a lien for the payment of association charges which became due prior to the acquisition of title by such acquirer.

**Section 5. Collection of Association Charges**: The Board of Directors shall assess association charges against the unit owners from time to time and shall take prompt action to collect any charges due from any unit owner, which remain unpaid for more than thirty days from the date due for payment thereof. Such action may include placement of a lien on the apartment unit, notification to the mortgagee of the owner's failure to pay association charges and foreclosure on the lien. Additionally, suspension of utilities by a majority vote of the Executive Committee is permitted if an owner is more than 90 days in arrears of any Association charges. Payments received from unit owners will be applied to Association Charges in the chronological order incurred.

**Section 6. Default in Payment of Association Charges:** In the event of default by any unit owner in paying to the association charges as determined by the Board of Directors, such unit owner shall be obligated to:

(1) pay interest from the date of the initial billing at the maximum legal rate of interest, as defined by the Virgin Islands Laws, on all amounts past due,
(2) pay a monthly service charge as determined and promulgated from time-to-time by the Board of Directors,
(3) pay all expenses and attorneys' fees incurred by the Board of Directors in any proceeding brought to collect such unpaid association charges.

All such unpaid association charges shall constitute a lien on such unit prior to all other liens except those specified in Section 922 of Chapter 33, Title 28 of the Virgin Islands Code. The Board of Directors shall have the right and duty to attempt to recover all association charges, together with interest and monthly service charges thereon, and the expenses of the proceeding, including attorneys' fees, in any action to recover the same brought against such unit owner, or by foreclosure of the lien on such apartment unit granted by Section 922 of Chapter 33, Title 28, Virgin Islands Code.

**Section 7. Foreclosure of Liens For Unpaid Association Charges:** In any action brought by the Board of Directors to foreclose a lien on an apartment unit because of unpaid association charges, the unit owner shall be required to pay a reasonable rental for the use of his apartment unit, and the plaintiff in such foreclosure action shall be entitled to the simultaneous appointment of a receiver to collect the same. The Board of Directors, acting on behalf of all unit owners, shall have power to purchase such apartment unit at the foreclosure sale and to acquire, hold, lease, mortgage, vote the votes appurtenant to, convey or otherwise deal with the same. A suit to recover a money judgment for unpaid association charges shall be maintainable without foreclosing or waiving the lien securing the same.

**Section 8. Statement of Association Charges:** The Board of Directors shall promptly provide any unit owner so requesting the same in writing, with a written statement of all unpaid association charges due from such unit owner.

**Section 9. Abatement and Enjoinment of Violations by Unit Owners:** The violation of any rule or regulation adopted by the Board of Directors or the breach of any of these By-Laws contained herein, or the breach of any provisions of the Declaration, shall give the Board of Directors the right, in addition to any other rights set forth in these By-Laws (a) to enter the apartment unit in which, or as to which, such violation or breach exists and to summarily abate or remove, at the expense of the defaulting unit owner, any structure, thing or condition that may exist therein contrary to the intent and meaning of the provisions hereof, and the Board of Directors shall not thereby be deemed guilty in any manner of trespass or (b) to enjoin, abate or remedy by appropriate legal proceedings, either at law or in equity, the continuance of any such breach.

**Section 10. Routine Maintenance and Repair:** All maintenance of and repairs to any "apartment unit" (other than maintenance of and repairs to any common areas and facilities contained therein, and not necessitated by the negligence, misuse or neglect of the owner of such apartment unit) shall be the responsibility of the owner of such apartment unit. Also, each unit owner shall be responsible for damage to other apartment units and/or to the common areas and facilities resulting from conditions for which such owner has responsibility as indicated above.

An "apartment unit" is considered the space inside the perimeter walls, interior walls, floor and ceiling to include:

1. All decorating elements including: paint, wall and floor coverings, paneling, molding and tiles; finished cabinets and mirrors.
2. All electrical appliances including: refrigerator, stove, washer, dryer, dishwasher, garbage disposal, hot water heater and air-conditioning equipment (including compressor).
3. All electrical fixtures including: wall ceiling and floor outlets, switches and fuse box.
4. All plumbing fixtures including: tubs, showers, sinks, toilets and faucets.

Additionally, the unit owner shall be responsible for the routine lubrication and adjustment of doors and windows, and, unless major casualty related, replacement of broken glass, wooden or glass slats and damaged screens. The unit owner shall also maintain and assure the operability of the storm shutters installed on that unit and is responsible to close them in the event of a windstorm. Damage caused by failure to do so is the responsibility of the owner if net insurance proceeds are insufficient to cover such damage.

Screen doors may be installed on the main street-side entry doors at the unit owner's expense provided they meet the existing décor. Once installed, they must be maintained by the unit owner in a good state of repair, or the Association will do so at the owner's expense.

Except for the limited exceptions noted above, all maintenance, repairs and replacements to the "common elements", common areas and facilities, whether located inside or outside of the apartment units, (unless necessitated by the negligence, misuse or neglect of a unit owner, in which case such expense shall be charged to such unit owner), shall be made by the Association and be charged to all the unit owners as a common expense.

"Common elements" are considered to include all other elements of the buildings and property except those specified as being part of the "apartment unit." Additionally, the following are considered common elements:

1. Electrical supply to the fuse box, not including the panel.

    2. Water and plumbing lines in the walls (including interior walls), floor and ceiling to the valves at sinks, showers, tubs, hot water heater, and toilets, etc.
3. Drains to the first connection outside a wall.

External air conditioning compressor units shall be maintained by the owner in a reasonable state of preservation. The Association may require owner to remove inoperable and/or un-maintained units or do so at the owner's expense

Below is a guide to assist in clarifying owner and Association responsibility with regard to maintenance/repair and insurance."

Insurance and Maintenance Responsibility Matrix

| Category (Not Intended to be all-inclusive) | Owner Maint/Repair Responsiblity | Association Maint/Repair Responsibility | Association Insurance Responsibility | Owner Insurance Responsibility |
|---|---|---|---|---|
| Exterior Walls and Interior Damage Caused by Leaks | | X | X | |
| Roof and Interior Damage Caused by Roof Leaks | | X | X | |
| Interior Damage caused by Adjacent Units (Leaks, etc.) | X | | | Owner or Adjacent Unit's Insurance Responsible |
| Front Doors | X | | X | |
| Screens | X | | X | |
| Exterior Sliders | | X | X | |
| Exterior Wood Railings, Trim, Benches | | X | X | |
| Exterior Windows | X | | X | |
| Electrical System to Breaker Panel | | X | X | |
| Electrical System, Breaker Panel to Outlets, Junction Boxes | X | | X | |
| Electrical Fixtures-Interior | X | | | X |
| Plumbing Inside Walls, Floors Ceilings to valves | | X | X | |
| Condo plumbing not in walls/floors | X | | | X |
| Plumbing Fixtures | X | | | X |
| Interior Walls | X | | X | |
| Interior Doors | X | | | X |
| Cabinets | X | | | X |
| Furniture | X | | | X |
| Appliances | X | | | X |
| Wall/Floor Coverings (tile/carpet) | X | | | X |
| Hurricane Shutters | X | | X | |
| Furniture | X | | | X |
| Personal Property | X | | | X |
| External A/C elements | X | | | X |
| Internal A/C elements | X | | | X |
| Landside Porch/Steps/Railings | | X Excluding Tile | X Excluding Tile | |
| Seaside Balcony/Railings | | X Excluding Tile | X Excluding Tile | |

**Section 11. Restriction on Use of Apartment Units:** In order to provide for congenial occupancy of the Property and for the protection of the value of the apartment units, the use of the Property shall be restricted to and shall be in accordance with the following provisions:

1. The apartment units shall be used for residences only. Units will not be occupied by more than two persons per bedroom for more than thirty days per year.
2. The common areas and facilities, including the limited common areas and facilities, shall be used only for the furnishing of the services and facilities for which they are reasonably suited and which are incident to the use and occupancy of apartment units
3. No nuisances shall be allowed on the Property nor shall any use or practice be allowed which is a source of annoyance to its residents or which interferes with the peaceful possession proper use of the Property by its residents.
4. No improper, offensive or unlawful use shall be made of the Property or any part thereof, and all valid laws, zoning laws and regulations of all governmental bodies having jurisdiction thereof shall be observed.
5. Violations of laws, orders, rules, regulations or requirements of any governmental agency having jurisdiction thereof, relating to any portion of the Property, shall be corrected, by and at the sole expense of the unit owners or the Board of Directors, whichever shall have the obligations to maintain or repair such portion of the Property.
6. No dogs are allowed on the property, either long term or visiting. The Board may grant exceptions to the NO DOGS ALLOWED rule, on an individual basis, should an owner require the assistance of a service animal (dog) as defined by the ADA. Owners seeking to obtain such an exemption are required to apply, in writing, to the Board with supporting documentation.

**Section 12. Additions, Alterations or Improvements by the Board of Directors:** Additions, alterations or improvements to the common areas and/or facilities up to $100,000 may be made by the Board of Directors. Additions, alterations or improvements in excess of $100,000 shall require approval by a vote of two-thirds (2/3) in common interest of the owners. The cost of such additions, alterations or improvements shall constitute a common charge. This section is not applicable to repairs conducted in accordance with Article V Section 3 of these By-Laws.

**Section 13. Additions, Alterations, or Improvements by Unit Owners:** No unit owner shall make any structural addition, alteration or improvement in or to his apartment unit, including any exterior painting or exterior alteration or addition (including awnings, grills, etc.) without the prior written consent thereto of the Board of Directors. The Board of Directors shall have the obligation to answer any written request by a unit owner for approval of a proposed structural addition, alteration or improvement in such unit owner's apartment unit, within thirty (30) days after such request, and failure to do so within the stipulated time shall constitute a consent by the Board of Directors to the proposed addition, alteration or improvement.

A unit owner shall obtain a receipt from any person accepting his written request for a change under this section and shall show the receipt to the manager or any Director upon request. Any application to any department of the Government of the Virgin Islands or to any other governmental authority for a permit to make an addition, alteration or improvement in or to any apartment unit shall be executed by the Board of Directors only, without, however, incurring liability on the part of the Board of Directors or any of them to any contractor, sub-contractor or supplier on account of such additions, alteration or improvement, or to any person having any claim for injury to person or damage to property arising therefrom. The owner in such instance shall provide the Board of Directors with a Hold Harmless Certificate.

**Section 14. Use of Common Areas and Facilities**: A unit owner shall not place or cause to be placed in the stairways or other common areas and facilities, including the limited common areas and facilities, other than the areas designated as storage areas, any furniture, packages or objects of any kind. The entry passages, stairways, entry bridges, etc., shall be used for no purpose other than for normal transit through them.

**Section 15. Right of Access:** A unit owner shall grant a right of access to his apartment unit to the manager and/or the managing agent and/or any other person authorized by the Board of Directors, the manager or the managing agent, for the purpose of making inspections or for the purpose of correcting any condition originating in his apartment unit and threatening another apartment unit or a common area or facility, or for the purpose of performing installations, alterations or repairs to the mechanical or electrical services or other common areas or facilities in his apartment unit or elsewhere in the Building, provided that requests for entry are made in advance and that any such entry is at a time reasonably convenient to the unit owner. In case of an emergency, such right of entry shall be immediate, whether or not the unit owner is present at the time.

**Section 16. Rules of Conduct**: Article V Section II of these By-Laws delineates general restrictions on the use of the property. Additionally, a definitive listing of current Rules and Regulations is provided as Exhibit I hereto. These Rules and Regulations may be amended by the Board of Directors from time to time. The Board is empowered to enforce these By-Laws and Rules and Regulations with monetary fines and other sanctions and may also take any legal action in court to enforce them. An owner is subject to such fines, sanctions and/or legal actions for the actions of his tenant as if those actions were by the owner.

Copies of the Rules and Regulations shall be furnished by the Board of Directors to each unit owner prior to the time when the same shall become effective. The unit owner must insure that the tenant or occupant be fully informed and furnished with a copy of the Rules and Regulations and by fully bound thereby.

**Section 17. Potable Water and Electricity:** Potable water and electricity shall be supplied by the Association through the common facilities of the Condominium directly to each apartment unit through a separate meter, and each unit owner shall be required to pay the charges therefore established, from time to time, by the Board of Directors. Water, electricity and other utility charges will normally be billed monthly incident to the common charges and are considered to be part of the "association" charges. Utility charges more than thirty days in arrears are subject to a late fee and interest per Section 6 Article V of these By-Laws, and said utilities may be suspended by the Association if an owner is more than 90 days in arrears of Association charges per Article V Section 5 thereof.

**Section 18. Gas:** Gas shall not be piped to any apartment unit, and unit owners are specifically prohibited from using gas as a fuel for regular cooking, water heating, or any other regular purpose. Small quantities of propane gas may be used for gas grills kept on street-side galleries and for emergency use inside apartment units.

**Section 19. Grey Water and Sewerage Service:** Grey water for flushing and sewerage service (including sewage disposal and treatment in the condominium's sewerage treatment plant) shall be supplied as a common facility to all unit owners, and the cost thereof shall be treated as a common expense.

## ARTICLE VI
## Mortgages

**Section 1. Notice of Unpaid Common Charges:** The Board of Directors, whenever so requested in writing by a mortgages of an apartment unit, shall promptly report any then unpaid association charges due from, or any other default by the owner of the mortgaged apartment unit.

**Section 2. Notice of Default:** The Board of Directors, when giving notice to a unit owner of a default in paying common charges or other default, may send a copy of such notice to each holder of a mortgage covering such apartment unit.

## ARTICLE VII
## Sales and Mortgages of Units

**Section 1. No severance of Ownership:** No unit owner shall execute any deed, mortgage or other instrument conveying or mortgaging title to his apartment unit without including therein the Appurtenant Interests, it being the intention hereof to prevent any severance of such combined ownership. For the purpose of the By-Laws, the "Appurtenant Interests" shall mean collectively, (i) the unit owner's undivided interest in the common areas and facilities appurtenant to such unit; (ii) the interest of such unit owner in any apartment units theretofore acquired by the Board of Directors, or its designee, on behalf of all unit owners, or the proceeds of the sale or lease thereof, if any; and (iii) the interest of such unit owner in any other assets of the Condominium.

Any such deed, mortgage or other instrument purporting to affect one or more of such interests, without including the interest or interests so omitted, shall be deemed to include such interests even though the latter shall not be expressly mentioned or described therein. No part of the Appurtenant Interests of any apartment unit may be sold, transferred or otherwise disposed of, except as part of a sale, transfer or other disposition of the apartment unit to which such interests are appurtenant, or as part of a sale, transfer or other disposition of such part of the Appurtenant Interests of all apartment units.

**Section 2. Sale to Board of Directors:** A unit owner may, subject to mutual agreement of the parties, and subject to the provisions of Section 1 of this Article VII, sell his unit to the Board of Directors, or its designee; provided, however that such purchase by the Board of Directors shall have the prior approval of two-thirds (2/3) of the unit owners, as expressed by the vote of at least two third (2/3) in number and in common interest, of all unit owners, cast in person or by proxy in accordance with these By-Laws.

**Section 3. Financing of Purchase of Apartment Units By Board of Directors:** Acquisition of apartment units by the Board of Directors, or its designee, on behalf of all unit owners, may be made from the working capital and common charges in the hands of the Board of Directors, or if such funds are insufficient the Board of Directors may levy an assessment against each unit owner in proportion to his ownership in the common areas and facilities as a common charge, which assessment shall be enforceable in the same manner as provided in Section 6 and 7 of Article V, or the Board of Directors, in its discretion, may borrow money to finance the acquisition of such apartment units, provided, however, that no financing may be secured by an encumbrance or hypothecation of any property other than the apartment unit, together with the Appurtenant Interests, so to be acquired by the Board of Directors.

**Section 4. Gifts and Devises, etc:** Any unit owner shall be free to convey or transfer his apartment unit by gift, or to devise his apartment unit by will, or to pass the same by intestacy, without restriction.

**Section 5. Waiver of Right of Partition with Respect to Such Apartment Units as are Acquired by the Board of Directors, or its Designee, on Behalf of All Unit Owners as Tenants in Common:** In the event that an apartment unit shall be acquired by the Board of Directors, or its designee, on behalf of all unit owners as tenants in common, all such unit owners shall be deemed to have waived all rights of partition with respect to such apartment unit.

## ARTICLE VIII

**Section 1. Condemnation – Eminent Domain:** In the event of a taking by condemnation or by eminent domain of part or all of the common areas and facilities, the award made for such taking shall be payable to the Board of Directors for disbursement and/or payment of the common expenses.

## ARTICLE IX
## Records

**Section 1. Records and Audits:** The Board of Directors or the managing agent shall keep detailed records of the actions of the Board of Directors and the managing agent, Minutes of the meetings of the Board of Directors, Minutes of the meetings of unit owners, and financial records and books of account of the Condominium, including a chronological listing of receipts and expenditures, as well as a separate account for each apartment unit which, among other things, shall contain the amount of each assessment of common charges against such apartment unit, the date when due, the amounts paid thereon, and the balance remaining unpaid.

Each unit owner shall be permitted to examine all accounts, records and contracts of the Association in the Condominium office at reasonable times, on business days, but not more often than once a month. All others must request any required information from the Board of Directors.

An annual report of the receipts and expenditures of the Association, examined and approved by a licensed accountant not affiliated with the Association and chosen by the Board of Directors, shall be rendered to the Board and sent, within a reasonable time after the end of each fiscal year, to all unit owners who request it.

## ARTICLE X
## Miscellaneous

**Section 1. Notices:** All notices hereunder shall be sent by registered or certified mail to the Board of Directors c/o the managing agent, or if there is no managing agent, to the office of the Board of Directors or to such other address as the Board of Directors may hereafter designate from time to time, by notice in writing to all unit owners and to all mortgagees of apartment units.

All notices to any unit owner shall be sent by registered or certified mail to the Building or to such other address as may have been designated by him from time to time, in writing, to the Board of Directors. All notices to mortgagees of apartment units shall be sent by registered or certified mail to their respective addresses, as designated by them from time to time, in writing

to the Board of Directors. All notices shall be deemed to have been given when mailed, except notices of change of address, which shall be deemed to have been given when received.

Notwithstanding the requirements of this section, all notices of regular, special and Annual Meetings of the unit owners, Board of Directors, and committees of the Board or otherwise, shall be by first class mail but without the requirement of registration or certification. The applicable notice shall be sent so as to comply with the required time limits, if any, to the regular mailing address of the designated party as recorded in the books of the Association.

**Section 2. Invalidity:** The invalidity of any part of these By-Laws shall not impair or affect in any manner the validity, enforceability or effect of the balance of these By-Laws.

**Section 3. Captions:** The captions herein are inserted only as a matter of convenience and for reference, and in no way define, limit or described the scope of these By-Laws, or the intent of any provision thereof.

**Section 4. Gender:** The use of the masculine gender in these By-Laws shall be deemed to include the feminine gender and the use of the singular shall be deemed to include the plural, whenever the context so requires.

**Section 5. Waiver:** No restrictions, condition, obligation or provisions contained in these By-Laws shall be deemed to have been abrogated or waived by reason of any failure to enforce same, irrespective of the number of violations or breaches thereof which may occur.

**Section 6. Insurance Trustee:** The Board of Directors may appoint a Trustee to distribute large amounts of any insurance proceeds. The trustee so appointed may be any individual or entity, so long as such is properly bonded in relation to the funds and responsibility involved.

## ARTICLE XI
## Amendments to By-Laws

**Section 1. Amendments to By-Laws:** Except as hereinafter provided, these By-Laws may be modified or amended by the vote of 66-2/3% in number and in common interest of all unit owners.

## ARTICLE XII
## Execution of Instruments and Seal

**Section 1. Execution and Instruments:** All instruments of the Condominium shall be executed under seal by such officer or officers as the Board of Directors may designate, or as may be otherwise authorized.

**Section 2. Seal:** The seal of the Condominium shall be as determined by the Board of Directors from time to time.

## ARTICLE XIII
## Conflicts

**Section 1. Conflicts:** These By-Laws are set forth to comply with the provisions of Sections 917 and 918 of Chapter 33, Title 28, Virgin Islands Code. In case any of these By-Laws conflict with the provisions of said statute or of the Declaration, the provisions of said statute or of the Declaration, as the case may be, shall control.

DRAFT

BY-LAWS OF COWPET BAY WEST

CONDOMINIUM ASSOCIATION

**Cowpet Bay**

**St. Thomas, Virgin Islands**

**New date**

Article I

Plan of Unit Ownership

**Section 1. Unit Ownership:** The property located at Parcels 8-56-1 and 8-1-2, 4, 5, & 6 of Estate Nazareth, No.1 Red Hook Quarter has previously been submitted in a declaration forming an association under the provisions of Chapter 33, Title 28 of the Virgin Islands Code, known as the "Condominium Act of the Virgin Islands". The association has been and will continue to be known as "COWPET BAY WEST", hereinafter called the "Condominium".

**Section 2. Applicability of By-Laws:** The provisions of these by-laws are applicable to the Property of the Condominium and the use and occupancy thereof. The term "Property", as used herein, shall include the land and all buildings and other improvements thereon owned by the association and all easements, rights and appurtenances belonging thereto, and all other property, personal or mixed, intended for use in connection therewith, all of which were previously submitted to the provisions of said Chapter 33, Title 28 of the Virgin Islands Code.

**Section 3. Application:** All present and future owners, mortgagees, lessees, **tenants**, occupants of units and any other persons who may use **or access** the facilities of the Property in any manner are subject to these By-Laws, the Declaration and the Rules and Regulations.

The Acceptance of a deed, mortgage or conveyance or the entering into of a lease or the act of occupancy of a unit shall constitute an agreement that these By-Laws, the Rules and Regulations and the provisions of the Declaration, as they may be amended from time to time, are accepted, ratified, and will be complied with.

**Section 4. Office:** The office of the Condominium and of the Board of Directors shall be located at Cowpet Bay West, Estate Nazareth, No.1 Red Hook Quarter, St. Thomas, Virgin Islands. The mailing address shall be 6201 Windward Way, St. Thomas, USVI 00802, or such address as may be designated by the Board, upon 30 days written notice to the members of the Association.

DRAFT

ARTICLE II

Board of Directors

**Section 1. Number and Qualifications:** The affairs of the Condominium shall be governed by a Board of Directors. The Board of Directors shall be composed of seven persons, all of whom shall be owners or spouses of owners, or in the case of partnership owners, shall be members of said partnership, or in the case of corporate owners, shall be officers or stockholders of such corporations, or in the case of fiduciary owners shall be the fiduciaries or beneficiaries of any such trust, **or in the case of a limited liability company, shall be the members of such company.** A Board member may not base his/her eligibility to sit on the Board, **from the fact that a current Board Director resides** in the same unit **and therefore he/she can stand in said Board Director's position. Only one member of a unit can simultaneously serve on the Board.**

No person who is in arrears for ninety days or more on any billing or assessment by the Cowpet Bay West Condominium Association shall be eligible to be elected to or serve as a director on the Board of Directors. In the event such person is serving as a director, that person's position as director shall be declared to be vacant and another person appointed by a majority vote of the remaining Board to fill the vacancy so created, until the next regular election of the Board of Directors. Arrearages of partnerships, corporations, trusts, fiduciary owners, etc. on which a person's eligibility to serve on the board is based, shall be **subject to the same consequences of ineligibility as set forth above.**

**Section 2. Powers and Duties:** The Board of Directors shall have the powers and duties necessary for the administration of the affairs of the Condominium and may do all such acts and things except as by law, by the Declaration **(to the extent still applicable)**, or by these By-Laws **are** not delegated to the Board of Directors by the unit owners. Such powers and duties of the Board of Directors shall include, but shall not be limited to, the following:

a) Operation, care, upkeep and maintenance of the common areas and facilities.

b) Determination of Association Charges, which shall include the common expenses required for the operation of the Condominium, **insurance,** utility rates, **water,** late fees and interest charges, fines for By-Laws and **for** rules **and** regulation violations, and **any reserve funds maintained by the Association.**

c) Collection of Association charges, as hereinafter defined, from the unit owners.

d) Employment and dismissal of the personnel necessary for the maintenance and operation of the common areas and facilities.

e) Adoption, amendment and Enforcement of rules and regulations covering the details of the operation and use of the Property.

DRAFT

f) Opening of bank accounts on behalf of the Condominium and designating the signatories required therefore **and maintaining and accounting for any funds deposited or withdrawn from said accounts.**

g) Purchasing or leasing or otherwise acquiring, in the name of the **Association** or its designee, corporate or otherwise, on behalf of all unit owners, units offered for sale or surrendered by their owners.

h) Purchasing of units at foreclosure or other judicial sales in the name of the Association or its designees, corporate or otherwise, on behalf of all unit owners.

i) Selling, leasing, voting the votes appurtenant to (other than for the election of members of the Board of Directors), or otherwise dealing with units acquired and subleasing units leased by the Association, or its designee, corporate or otherwise on behalf of all unit owners. **No mortgage shall be entered into without the expressed written consent of a majority (51%) or more of the unit owners.**

j) **Issuing a Power of Attorney for someone** to act as designee of the **Association** in acquiring title to or leasing of units on behalf of all unit owners.

k) Obtaining of insurance for the Property, including **all premises owned or required to be maintained by the Association** pursuant to the provision of Article V, Section 2 hereof.

l) Making of repairs, **restorations,** additions and improvements to or alterations of the Property, **including all premises owned or required to be maintained by the Association** in accordance with the other provisions of these By-Laws, after damage or destruction by fire or casualty or as a result of condemnation or eminent domain proceedings.

Section 3. Managing Agent and Manager: The Board of Directors may employ for the Condominium a managing agent and/or a manager at a compensation established by the Board of Directors, to perform such duties and services as the Board of Directors shall authorize. The Board of Directors may delegate to the manager or managing agent, all of the powers granted to the Board of Directors by these By-Laws other than the powers set forth in subdivisions (b), (e), (f), (g), (h), (i), (j) and (k) of Section 2 of this Article II.

**Section 4. Election and Term of Office:**

Directors will serve for a term of three years. Two Directors shall be elected the first year, two the second year, and three the third year to replace those directors whose terms are expiring. Where a vacancy has been filled by vote **of** a majority of the vote of the remaining members of the Board, as provided in Section 6, that person shall be a member until the next Annual Meeting, at which time the unit owners shall elect the replacement for the remainder of the original term, if any. Any candidate for director may run for a full term, or any term created by a vacancy, or both.

**Each d**irector shall be elected by the vote of a majority (as defined in Article III Section 9) of the unit owners. All vacancies shall be voted for on **in a single** ballot, and the candidate(s) with the highest number of votes shall be elected to **fill the respective** vacancies. Each candidate's name shall be preceded by a space where an "X" may be placed to vote for said candidate. It shall not be required that a name be crossed out and another inserted to vote for a candidate on the ballot. A space for write-in

DRAFT

candidates shall also be provided. Ballots and proxies shall be provided to the owners not less than 30 days prior to the Annual Meeting.

**Each** Director shall hold office until their respective successor shall have been elected by the unit owners.

A **Director** may serve only two consecutive terms and shall not hold office for one year before being eligible to run again.

**Section 5. Removal of Members of the Board of Directors:** At any regular or special meeting of unit owners, any one or more of the members of the Board of Directors may be removed with or without cause by a majority of the unit owners and a successor may then and there or thereafter be elected to fill the vacancy thus created. Any members of the Board of Directors whose removal has been proposed by the unit owners shall be given an opportunity to be heard at the meeting.

If a Board member does not attend any of the Board meetings during an entire year, and also does not attend the annual owners meeting that same year, such member may be removed from the Board by a majority of the other members of the Board of Directors.

**If a Director is removed pursuant to Section 5 herein, said Director shall not be eligible for service on the board for a minimum of ___ years.**

**Section 6. Vacancies:** Vacancies in the Board of Directors caused by any reason other than the removal of a member thereof by a vote of the unit owners, shall be filled **subject to Section 4 above,** by a vote of a majority of the remaining members at a special meeting of the Board of Directors held for that purpose promptly after the occurrence of any such vacancy, even though the members present at such meeting may constitute less than a quorum, and each person so elected shall be a member of the Board of Directors until a successor shall be elected at the next Annual Meeting of the unit owners. At that time a director shall be elected to serve the remainder of the term of the original vacating director.

**Section 7. Organization Meeting:** The first meeting of the members of the Board of Directors shall be an organizational meeting held directly following the Annual Meeting of the unit owners, at such time and place as shall be fixed by the Board members at said meeting, and no notice shall be necessary to the newly elected members of the Board of Directors in order to legally constitute such meeting, provided a majority of the whole Board of Directors shall be present, **or available via video or audio conference.** If it is not possible to hold such first meeting of the new Board immediately, then it shall be held as soon as possible and proper notice shall be given to each director, as for any special meeting of the Board of Directors.

**Section 8. Regular Meetings:** Regular meetings of the Board of Directors may be held at such time and place as shall be determined from time to time by a majority of the members of the Board of Directors, but at least two such meetings shall be held during each fiscal year. Notice of regular meetings of the Board of Directors shall be given to each member of the Board of Directors by mail, email or fax transmission, at least ten days prior to the day named for such meeting. Meeting notices

**Section 9. Special Meetings:** Special meetings of the Board of Directors may be called by the President upon five business days notice to each member of the Board of Directors given by mail, email or fax transmission, which notice shall state the time, place and purpose of the meeting. Special meetings of the Board of Directors shall be called by the President or Secretary in like manner and on like notice on

3055300/000386

DRAFT

the written request of at least two members of the Board of Directors. Such special meeting may be conducted by a **video and/or audio** conference call.

**Section 10. Waiver of Notice:** Any member of the Board of Directors may, at any time, waive notice of any meeting of the Board of Directors in writing, and such waiver shall be deemed equivalent to the giving of such notice. Attendance by a member of the Board of Directors at any meeting of the Board shall constitute a waiver of notice by him of the time and place thereof. If all the members of the Board of Directors are present at any meeting of the Board, no notice shall be required and any business may be transacted at such meeting.

**Section 11. Quorum of Board of Directors**: At all meetings of the Board of Directors, a majority of the members thereof shall constitute a quorum for the transaction of business, and the votes of the majority of the members of the Board of Directors present at a meeting at which a quorum is present shall constitute the decision of the Board of Directors. If at any meeting of the Board of Directors there shall be less than a quorum present, no business may be transacted until a quorum is achieved. Board members may participate by video or audio conference call.

**Section 12. Fidelity Bonds:** The Board of Directors shall obtain adequate fidelity bonds for all officers and employees of the Condominium handling or responsible for condominium funds. The premiums on such bonds shall constitute a common expense.

**Section 13. Compensation:** No member of the Board of Directors shall receive any compensation from the Condominium Association for serving as a board member. However, verifiable expenses, in accordance with guidelines established by the Board in advance, are reimbursable. A **Director** may also be compensated for other services unrelated to his/her Board function.

**Section 14. Liability of the Board of Directors**: The members of the Board of Directors shall not be liable to the unit owners for any mistake of judgment, negligence, or otherwise, except for their own individual willful misconduct or bad faith. The unit owners shall indemnify and hold harmless each of the members of the Board of Directors against all contractual liability to others arising out of contracts made by the Board of Directors on behalf of the Property unless any such contract shall have been made in bad faith or contrary to the provisions of the Declaration or of these By-Laws.

It is intended that the members of the Board of Directors shall have no personal liability with respect to any contract made by them on behalf of the Property. It is also intended that the liability of any unit owner arising out of any contract made by the Board of Directors or out of the aforesaid indemnity in favor of the members of the Board of Directors shall be limited to such proportion of the total liability thereunder as his interest in the common areas and facilities bears to all such interest.

Every agreement made by the Board of Directors or by the managing agent or by the manager on behalf of the Property shall provide that the members of the Board of Directors or the managing agent, or the manager, as the case may be, are acting only as agents for the unit owners and shall have no personal liability thereunder (except as unit owners) and that each unit owner's liability thereunder shall be limited to such proportion of the total liability thereunder as his interest in the common areas and facilities bears to all such interest.

**Section 15. Executive Committee:** The Board of Directors, by resolution passed by a majority of the entire Board, shall designate at the Organization Meeting or anytime thereafter, three members of the

DRAFT

Board to constitute an Executive Committee, with one member thereof designated as Chairman. The purpose of the Executive Committee is to control the day-to-day management of the Association.

The Board of Directors from time to time shall define the authority of the Executive Committee.

The Board of Directors, at any time, may change the members of, may fill vacancies in, or may discharge the Executive Committee. Two members shall constitute a quorum of the Executive Committee. The act of a majority of the members at any meeting at which there is a quorum shall be the act of the Committee. The Board of Directors shall establish rules of procedure for the Committee governing, but not limited to, such items as notice and powers.

The Executive Committee shall make recommendations to the Board of Directors, and when the Board is not in session may, to the extent that the committee deems necessary, exercise the powers of the Board in the management of the business and affairs of the Association. The Executive Committee shall keep records of all its proceedings and shall report same to the Board of Directors, and its individual members, in writing within a reasonably short period of time after each significant action and after all meetings.

**Section 16. Inspection by Executive Committee**: The Executive Committee shall make a detailed inspection of the buildings, pump rooms, offices, maintenance shops, sewage and water-making plants, emergency generator, roads, sidewalks, steps, entry bridges, railings, grounds, landscaping, watering systems, the beach and the sea wall at least twice a year in the company of the manager or managing agent,. Additionally, the Committee shall evaluate the operation of the Association office and the overall security situation of the property.

The purpose of such inspections will be to (a) obtain a better understanding of the job being performed by the manager and his staff and (b) make suitable recommendations for possible future actions. Within 30 days after each such semi-annual inspection, the Committee will report its findings and recommendations to the members of the Board of Directors.

**Section 17. Action by Consent**: Any action required or permitted to be taken at any meeting of the Board of Directors, or any committee thereof, may be taken without a meeting if a written consent thereto is signed by three-quarters of the members, (rounded off to the nearest whole number), of the Board of Directors or of such committee as the case may be, and filed with the minutes of proceedings of the Board of Directors or committee.

**Section 18. Nomination of Directors**: Nominations for election to the Board of Directors shall be made by a Nominating Committee. The Nominating Committee shall consist of a Chair, who shall be a member of the Board of Directors, and two or more members of the Association, **who are not Directors or related to any current Directors**. The Nominating Committee shall be appointed by the Board of Directors at its organizational meeting and serve until the next Annual Meeting.

The Nominating Committee shall make as many nominations for election to the Board of Directors as it shall, in its discretion, determine, but not less than the number of vacancies that are to be filled. Each nomination shall be for a specified vacancy.

Any person qualified under Section1 of Article II of these By-Laws to serve on the Board of Directors may be nominated for the Board of Directors by submitting a request, signed by the owners of two units in which the nominee has no financial interest, to the Board Secretary sixty days prior to the Annual Meeting. The Board shall include his/her name on the ballot directly following the nominee(s) proposed by the Nominating Committee for each vacancy. Any nomination that does not specify a specific vacancy shall be deemed a nomination for all vacancies.

**Section 19 – Communications**

DRAFT

Communications by, from, to and among the Board may be in writing, by fax or by electronic communications (telephone, telephone conference, email, internet, etc.) Telephone and telephone conference conversations must be documented (e.g., minutes or record of conversation). This communication will constitute "official" communication by the Board.

ARTICLE III

Unit Owners

**Section 1. Annual Meeting:**
The Annual Meeting of the unit owners shall be held during the first quarter each year. At the Annual Meeting, Directors shall be elected by ballot in accordance with the requirements of Section 4 of Article II of these By-Laws, and the unit owners may transact such other business at such meetings as may properly come before them.

**Section 2. Place of Meeting:** Meetings of the unit owners shall be held at the principal office of the Condominium or at such other suitable place convenient to the unit owners as may be designated by the Board of Directors.

**Section 3. Special Meetings:** It shall be the duty of the President to call a special meeting of the unit owners if so directed by resolution of the Board of Directors or upon a petition signed and presented to the Secretary by not less than 25% in common interest, in the aggregate, of unit owners. The notice of any special meeting shall state the time and place of such meeting and the purpose thereof. No other business shall be transacted at a special meeting except as stated in the notice.

**Section 4. Notice of Meeting**: It shall be the duty of the Secretary to mail a notice of each annual meeting of the unit owners not less than thirty days nor more than ninety days prior to such meeting, stating the purpose thereof as well as the time and place where it is to be held, to each unit owner of record, at the building or at such other address as such unit owner may have designated by notice in writing to the Secretary. The mailing of a notice of meeting in the manner provided in this section shall be considered service of notice. The Board of Directors may assign the task of providing notice to unit owners to a person other than the Secretary. Special meetings require not less than ten days notice.

DRAFT

**Section 5. Adjournment of Meetings**: If any meeting of unit owners cannot be held because a quorum has not attended, a majority in common interest of the unit owners who are present at such meeting, either in person or by proxy, may adjourn the meeting to a time not less than forty-eight hours from the time the original meeting was called.

**Section 6. Order of Business**: The annual meeting of the unit owners shall be chaired by the President or other member of the Board of Directors chosen by the Board, and the order of business shall be generally as follows:

a) Roll Call – by unit
b) Establishment of Quorum (1/3 of all unit owners)
c) Proof of Notice of Meeting
d) Approval of Minutes of last year's Annual Meeting
e) President's Report (including cost and coverage of insurance
f) Treasurer's Report (including discussion of Budget and Financial Status
g) Property Manager's Report
h) Report of Nominating Committee
i) Election of Board Members
j) Old Business
k) New Business

**Section 7. Title to Units**: Title to units may be taken in the name of an individual, or in the names of two or more persons as tenants in common, joint tenants or tenants by the entirety, or in the name of a corporation, partnership, limited liability company or other legal entity authorized to own real property in the Virgin Islands, or in the name of a fiduciary.

**Section 8. Voting**: The owner or owners of each unit, or some person designated by such owner or owners to act as proxy on his or their behalf and who need not be an owner, shall be entitled to cast the vote appurtenant to such unit at all meetings of unit owners. The designation of any such proxy shall be made in writing and shall be revocable at any time by written notice to the Secretary or in person at the meeting. Any or all such owners or proxies may be present at any meeting of the unit owners and may vote or take any other action as a unit owner either in person or by proxy. Votes of unit owners shall be weighted in accordance with their share of the common interest, as follows, with the total of all votes equaling one hundred:

| | |
|---|---|
| 2 Bedroom | .911 |
| 3 Bedroom | 1.062 |
| 2 Bedroom + Loft | 1.193 |
| 4 Bedroom | 1.301 |
| 3 Bedroom + Loft | 1.376 |

The Board of Directors shall accept any vote if the owner is one of the owners of record of the unit, or in the case of a proxy, if there is no obvious defect on the face of such proxy. It shall be the burden of the protestor to offer satisfactory proof that the proffered vote or proxy is invalid and that his is the proper one.

3055300/000390

DRAFT

**Section 9. Majority of Unit Owners**: As used in these By-Laws, the term "majority of unit owners: shall mean those unit owners having more than 50% of the total authorized votes of all unit owners present in person or by proxy and voting at any meeting of the unit owners, determined in accordance with the provisions of Section 8 of this Article III.

**Section 10. Quorum**: Except as otherwise provided in these By-Laws, the presence in person or by proxy of unit owners having one-third (1/3) of the total authorized votes of all unit owners shall constitute a quorum at all meetings of the unit owners.

**Section 11. Majority Vote**: The vote of a majority of unit owners at a meeting at which a quorum shall be present shall be binding upon all unit owners for all purposes except where, in the Declaration or these By-Laws, or by law, a higher percentage vote is required.

## ARTICLE IV

## Officers

**Section 1. Designation**: The principal officers of the Condominium shall be the President, the Vice President, the Secretary, and the Treasurer, all of whom shall be elected by the Board of Directors. The Board of Directors may appoint an assistant secretary, an assistant treasurer, and such other officers as in its judgment may be necessary. The President and Vice President, but no other officers, need be members of the Board of Directors.

**Section 2. Election of Officers**: The officers of the Condominium shall be elected annually by the Board of Directors at the Organization Meeting of each new Board of Directors and shall hold office at the pleasure of the Board of Directors.

**Section 3. Removal of Officers**: Upon the affirmative vote of a majority of the members of the Board of Directors, any officer may be removed, either with or without cause, and his successor may be elected by the Board of Directors at any regular or special meeting of the Board of Directors called for such purpose.

**Section 4. President**: The President shall be the chief executive officer of the Condominium. He shall preside at all meetings of the unit owners and of the Board of Directors. He shall have all of the general powers and duties which are incident to the office of president of a stock corporation organized under the Corporation Law of the Virgin Islands, including but not limited to the power to appoint committees from among the unit owners from time to time as he may in his discretion decide is appropriate to assist in the conduct of the affairs of the Condominium.

**Section 5. Vice President**: The Vice President shall take the place of the President and perform his duties whenever the President shall be absent or unable to act. If neither the President nor the Vice President is able to act, the Board of Directors shall appoint some other member of the Board of

Directors to act in the place of the President, on an interim basis. The Vice President shall also perform such other duties as shall from time to time be imposed upon him/her by the Board of Directors or by the President.

**Section 6. Secretary**: The Secretary shall keep the Minutes of all meetings of the unit owners and of the Board of Directors. He shall have charge of such books and papers as the Board of Directors may direct; and he shall, in general, perform all the duties incident to the office of secretary of a stock corporation organized under the Corporate Law of the Virgin Islands.

**Section 7. Treasurer**: The Treasurer shall have the responsibility for Condominium funds and securities and shall be responsible for keeping full and accurate financial records and books of account showing all receipts and disbursements, and for the preparation of all required financial data. The Treasurer shall be responsible for the deposit of all monies and other valuable effects in the name of the Board of Directors, or the managing agent, in such depositories as may from time to time be designated by the Board of Directors, and shall, in general, perform all the duties incident to the office of treasurer of a stock corporation organized under the Corporation Law of the Virgin Islands.

**Section 8. Agreements, Contracts, Deeds, Checks, etc.**: All agreements, contracts, deeds, leases and other instruments of the Condominium shall be executed by any two officers of the Condominium or by such other person or persons as may be designated by the Board of Directors, **in the resolution authorizing the execution of said document.**.

**Section 9. Compensation of Officers**: No officer shall receive any compensation from the Condominium for acting as such.

## ARTICLE V

### Operation of the Property

**Section 1. Determination of Common Expenses and Fixing of Common Charges:** The Board of Directors shall from time to time, and at least annually, prepare a budget for the condominium, determine the amount of the common charges payable by the unit owners to meet the common expenses of the Condominium, and allocate and assess such common charges among the unit owners according to their respective common interests. Common expenses shall include, among other things, operation and maintenance, insurance premiums, repairs and such amounts as the Board of Directors may deem proper for a general operating reserve, for a reserve fund for replacements, and to make up any deficit in the common expenses for any prior year.

DRAFT

**Section 3. Repair or Reconstruction After Fire or Other Casualty:** In the event of damage to or destruction of the commonly owned buildings and elements as a result of fire or other casualty (unless 66-2/3% or more of the buildings are destroyed or substantially damaged and 75% or more of the unit owners determine in accordance with the Declaration not to proceed with the repair or restoration), the Board of Directors shall arrange for the prompt repair or restoration of the commonly owned buildings and elements, and the Board of Directors shall disburse the proceeds of all insurance policies to the contractors engaged in such repair or restoration in appropriate progress payments. Any cost of such repair or restoration in excess of the insurance proceeds shall constitute a common expense – and the Board of Directors may assess all the unit owners for such deficit as part of the common charges. The association shall only be responsible for inspecting unit interiors to determine if damage is structural or due to external causes, or if adjacent unit damage is caused by external causes, or unless that unit is owned by the association. Unless that unit is owned by the association, repair by the association of other unit damage will be limited to structural damage, that caused by external or adjacent unit causes, and will not include property or fixtures installed by the owner or previous owners.

Within ninety days after a casualty of an estimated repair cost of $100,000 or greater, the Board will provide to the owners a financial status report indicating projected repair costs, source(s) of necessary funds, expenditures and commitments to date, and a schedule and plan for completion. This report will be updated and issued to owners on a quarterly basis, thereafter, until repairs are complete. A current report shall be provided at the next Annual Meeting.

If 66-2/3% or more of the Building(s) are destroyed or substantially damaged and if within sixty days of the date of such destruction or damage, 75% or more of the unit owners determine not to proceed with repair and restoration, the Property shall be subject to an auction for partition at the suit of any unit owner or lien holder, as if owned in common, in which event the net proceeds of sale, together with the net proceeds of insurance policies (less any repairs conducted) shall be divided by the Board of Directors among all the unit owners in proportion to their respective common interests, after first paying out of the share of each unit owner the amount of any unpaid liens on his/her/their unit, in the order of priority of such liens.

**Section 4. Payment of Association Charges:** All unit owners shall be obligated to pay the common charges assessed by the Board of Directors pursuant to the provisions of Section 1 of this Article V at such time or times as the Board of Directors shall determine, as well as "other charges" for utilities, services, unit repairs, late fees, interest, fines and/or collection costs, if incurred. With respect to the following sections concerning payment, collection, default, foreclosure, etc., in Sections 4, 5, 6, 7, & 8 below, the term "association charges" is intended to include, but not be limited to, all the above items, both the "common" and "other" charges.

No unit owner shall be liable for the payment of any part of association charges assessed against his unit subsequent to a sale, transfer or other conveyance by him of such unit, together with the Appurtenant Interests, as defined in Section1 of Article VII hereof. In addition, a unit owner may, subject to acceptance by the Board of Directors provided that the unit is free and clear of liens and encumbrances other than mortgages and statutory liens for unpaid association charges, convey the unit, together with the "Appurtenant Interests" to the Board of Directors, or its designee, corporate or otherwise, on behalf of all other unit owners, and in such event be exempt from association charges thereafter assessed.

However, a purchaser of an unit shall be liable for the payment of association charges assessed against such unit prior to the acquisition of such a unit, without prejudice to such purchaser's right, if any, to recover from the seller the amounts paid by the purchaser, except that a first mortgagee or other purchase of a unit at a foreclosure sale of a first priority mortgage of such a unit shall not be liable

for and such a unit shall not be subject to a lien for the payment of association charges which became due prior to the acquisition of title by such acquirer.

**Section 5. Collection of Association Charges**: The Board of Directors shall assess association charges against the unit owners from time to time and shall take prompt action to collect any charges due from any unit owner, which remain unpaid for more than thirty days from the date due for payment thereof. Such action may include placement of a lien on the apartment unit, notification to the mortgagee of the owner's failure to pay association charges and foreclosure on the lien. Additionally, suspension of utilities by a majority vote of the Executive Committee is permitted if an owner is more than 90 days in arrears of any Association charges. Payments received from unit owners will be applied to **the oldest arrearages first.**

**Section 6. Default in Payment of Association Charges:** In the event of default by any unit owner in paying to the association charges as determined by the Board of Directors, such unit owner shall be obligated to:

1. pay interest from the date of the initial billing at the maximum legal rate of interest, as defined by the Virgin Islands Laws, on all amounts past due,
2. pay a monthly service charge as determined and promulgated from time-to-time by the Board of Directors,
3. pay all expenses and attorneys' fees incurred by the Board of Directors in any proceeding brought to collect such unpaid association charges.

All such unpaid association charges shall constitute a lien on such unit prior to all other liens except those specified in Section 922 of Chapter 33, Title 2B of the Virgin Islands Code. The Board of Directors shall have the right and duty to attempt to recover all association charges, together with interest and monthly service charges thereon, and the expenses of the proceeding, including attorneys' fees, in any action to recover the same brought against such unit owner, or by foreclosure of the lien on such unit granted by Section 922 of Chapter 33, Title 28, Virgin Islands Code.

**Section 7. Foreclosure of Liens For Unpaid Association Charges:** In any action brought by the Board of Directors to foreclose a lien on a unit because of unpaid association charges, the unit owner shall be required to pay a reasonable rental for the use of the unit, and the plaintiff in such foreclosure action shall be entitled to the simultaneous appointment of a receiver to collect the same. The Board of Directors, acting on behalf of all unit owners, shall have power to purchase such unit at the foreclosure sale and to acquire, hold, lease, mortgage, vote the votes appurtenant to, convey or otherwise deal with the same. A suit to recover a money judgment for unpaid association charges shall be maintainable without foreclosing or waiving the lien securing the same.

**Section 8. Statement of Association Charges:** The Board of Directors shall promptly provide any unit owner so requesting the same in writing, with a written statement of all unpaid association charges due from such unit owner.

**Section 9. Abatement and Enjoinment of Violations by Unit Owners:** The violation of any rule or regulation adopted by the Board of Directors or the breach of any of these By-Laws contained herein, or the breach of any provisions of the Declaration, shall give the Board of Directors the right, in addition to any other rights set forth in these By-Laws (a) to enter the unit in which, or as to which, such violation or breach exists and to summarily abate or remove, at the expense of the defaulting unit owner, any structure, thing or condition that may exist therein contrary to the intent and meaning of the provisions

hereof, and the Board of Directors shall not thereby be deemed guilty in any manner of trespass or (b) to enjoin, abate or remedy by appropriate legal proceedings, either at law or in equity, the continuance of any such breach.

**Section 10. Routine Maintenance and Repair:** All maintenance of and repairs to any "unit" (other than maintenance of and repairs to any common areas and facilities contained therein, and not necessitated by the negligence, misuse or neglect of the owner of such apartment unit) shall be the responsibility of the owner of such apartment unit. Also, each unit owner shall be responsible for damage to other apartment units and/or to the common areas and facilities resulting from conditions for which such owner has responsibility as indicated above.

A "unit" is considered the space inside the perimeter walls, interior walls, floor and ceiling to include:

- All decorating elements including: paint, wall and floor coverings, paneling, molding and tiles; finished cabinets and mirrors.
- All electrical appliances including: refrigerator, stove, washer, dryer, dishwasher, garbage disposal, hot water heater and air-conditioning equipment (including compressor).
- All electrical fixtures including: wall ceiling and floor outlets, switches and fuse box.
- All plumbing fixtures including: tubs, toilets, showers, sinks and faucets.

Additionally, the unit owner shall be responsible for the routine lubrication and adjustment of doors and windows, and, unless major casualty related, replacement of broken glass, wooden or glass slats and damaged screens. The unit owner shall also maintain and assure the operability of the storm shutters installed on that unit and is responsible to close them in the event of a windstorm. Damage caused by failure to do so is the responsibility of the owner if net insurance proceeds are insufficient to cover such damage.

Screen doors may be installed on the main street-side entry doors at the unit owner's expense provided they meet the existing décor. Once installed, they must be maintained by the unit owner in a good state of repair, or the Association will do so at the owner's expense.

Except for the limited exceptions noted above, all maintenance, repairs and replacements to the "common elements", common areas and facilities, whether located inside or outside of the units, (unless necessitated by the negligence, misuse or neglect of a unit owner, in which case such expense shall be charged to such unit owner), shall be made by the Association and be charged to all the unit owners as a common expense.

"Common elements" are considered to include all other elements of the buildings and property except those specified as being part of the "unit." Additionally, the following are considered common elements:

- Electrical supply to the fuse box.
- Water and plumbing lines in the walls (including interior walls), floor and ceiling to the valves at sinks, showers, tubs, hot water heater, and toilets, etc.
- Drains to the first connection outside a wall.

External air conditioning compressor units shall be maintained by the owner in a reasonable state of preservation. The Association may require owner to remove inoperable and/or un-maintained units or do so at the owner's expense

Below is a guide to assist in clarifying owner and Association responsibility with regard to maintenance/repair and insurance."

DRAFT

**Insurance and Maintenance Responsibility Matrix**

| Category (Not intended to be all-inclusive) | Owner Maint/Repair Responsibility | Association Maint/Repair Responsibility | Association Insurance Responsibility | Owner Insurance Responsibility |
|---|---|---|---|---|
| Exterior Walls and Interior Damage Caused by Leaks | | x | x | |
| Roof and Interior Damage Caused by Roof Leaks | | X | X | |
| Interior Damage caused by Adjacent Units (Leaks, etc.) | X | | | Owner or Adjacent Unit's Insurance Responsible |
| Front Doors | X | | X | |
| Screens | X | | X | |
| Exterior Sliders | | X | X | |
| Exterior Wood Railings, Trim, Benches | | X | X | |
| Exterior Windows | X | | X | |
| Electrical System to Breaker Panel | | X | X | |
| Electrical System, Breaker Panel to Outlets, Junction Boxes | X | | X | |
| Electrical Fixtures-Interior | X | | | X |
| Plumbing Inside Walls, Floors Ceilings to valves | | X | X | |
| Condo plumbing not in walls/floors | X | | | X |
| Plumbing Fixtures | X | | | X |
| Interior Walls | X | | X | |
| Interior Doors | X | | | X |
| Cabinets | X | | | X |
| Furniture | X | | | X |
| Appliances | X | | | X |
| Wall/Floor Coverings (tile/carpet) | X | | | X |
| Hurricane Shutters | X | | X | |
| Furniture | X | | | X |
| Personal Property | X | | | X |
| External A/C elements | X | | | X |
| Internal A/C elements | X | | | X |
| Landside Porch/Steps/Railings | | X Excluding Tile | X Excluding Tile | |
| Seaside Balcony/Railings | | X Excluding Tile | X Excluding Tile | |

**<u>Section 11. Restriction on Use of Units:</u>** In order to provide for congenial occupancy of the Property and for the protection of the value of the units, the use of the Property shall be restricted to and shall be in accordance with the following provisions:

The units shall be used for residences only. Units will not be occupied by more than two persons per bedroom for more than thirty days per year.

DRAFT

The common areas and facilities, including the limited common areas and facilities, shall be used only for the furnishing of the services and facilities for which they are reasonably suited and which are incident to the use and occupancy of the units

2. No nuisances shall be allowed on the Property nor shall any use or practice be allowed which is a source of annoyance to its residents or which interferes with the peaceful possession proper use of the Property by its residents.
3. No improper, offensive or unlawful use shall be made of the Property or any part thereof, and all valid laws, zoning laws and regulations of all governmental bodies having jurisdiction thereof shall be observed.
4. Violations of laws, orders, rules, regulations or requirements of any governmental agency having jurisdiction thereof, relating to any portion of the Property, shall be corrected, by and at the sole expense of the unit owners or the Board of Directors, whichever shall have the obligations to maintain or repair such portion of the Property.
5. No dogs are allowed on the property, either long term or visiting. The Board may grant exceptions to the NO DOGS ALLOWED rule, on an individual basis, should an owner require the assistance of a service animal (dog) as defined by the ADA. Owners seeking to obtain such an exemption are required to apply, in writing, to the Board with supporting documentation.

Federal and ADA Compliance, as follows:

*"On July 23, 2010, Attorney General Eric Holder signed final regulations revising the Department's ADA regulations, including a revised definition of "service animal." Effective March 15, 2011, "Service animal means any dog that is individually trained to do work or perform tasks for the benefit of an individual with a disability, including a physical, sensory, psychiatric, intellectual or other mental disability. The work or tasks performed by a service animal must be directly related to the handler's disability.*

*Dogs used for emotional support, that are not task-trained, are called emotional support animals. They are not service dogs."*

**Section 12. Additions, Alterations or Improvements by the Board of Directors:** Additions, alterations or improvements to the common areas and/or facilities up to $100,000 may be made by the Board of Directors. Additions, alterations or improvements in excess of $100,000 shall require approval by a vote of two-thirds (2/3) in common interest of the owners. The cost of such additions, alterations or improvements shall constitute a common charge. This section is not applicable to repairs conducted in accordance with Article V Section 3 of these By-Laws.

**Section 13. Additions, Alterations, or Improvements by Unit Owners:** No unit owner shall make any structural addition, alteration or improvement in or to the unit, including any exterior painting or exterior alteration or addition (including awnings, grills, etc.) without the prior written consent thereto of the Board of Directors. The Board of Directors shall have the obligation to answer any written request by a unit owner for approval of a proposed structural addition, alteration or improvement in such unit owner's unit, within thirty (30) days after such request, and failure to do so within the stipulated time shall constitute a consent by the Board of Directors to the proposed addition, alteration or improvement.

A unit owner shall obtain a receipt from any person accepting his written request for a change under this section and shall show the receipt to the manager or any Director upon request. Any application to any department of the Government of the Virgin Islands or to any other governmental authority for a permit to make an addition, alteration or improvement in or to any unit shall be executed by the Board of Directors only, without, however, incurring liability on the part of the Board of Directors or any of

3055300/000397

DRAFT

them to any contractor, sub-contractor or supplier on account of such additions, alteration or improvement, or to any person having any claim for injury to person or damage to property arising therefrom. The owner in such instance shall provide the Board of Directors with a Hold Harmless Certificate.

**Section 14. Use of Common Areas and Facilities**: A unit owner shall not place or cause to be placed in the stairways or other common areas and facilities, including the limited common areas and facilities, other than the areas designated as storage areas, any furniture, packages or objects of any kind. The entry passages, stairways, entry bridges, etc., shall be used for no purpose other than for normal transit through them.

**Section 15. Right of Access:** A unit owner shall grant a right of access to the unit to the manager and/or the managing agent and/or any other person authorized by the Board of Directors, the manager or the managing agent, for the purpose of making inspections or for the purpose of correcting any condition originating in his apartment unit and threatening another unit or a common area or facility, or for the purpose of performing installations, alterations or repairs to the mechanical or electrical services or other common areas or facilities in the unit or elsewhere in the Building, provided that requests for entry are made in advance and that any such entry is at a time reasonably convenient to the unit owner. In case of an emergency, such right of entry shall be immediate, whether or not the unit owner is present at the time.

**Section 16. Rules of Conduct**: Article V Section II of these By-Laws delineates general restrictions on the use of the property. Additionally, a definitive listing of current Rules and Regulations is provided as Exhibit I hereto. These Rules and Regulations may be amended by the Board of Directors from time to time. The Board is empowered to enforce these By-Laws and Rules and Regulations with monetary fines and other sanctions and may also take any legal action in court to enforce them. An owner is subject to such fines, sanctions and/or legal actions for the actions of tenants as if those actions were by the owner.

Copies of the Rules and Regulations shall be furnished by the Board of Directors to each unit owner prior to the time when the same shall become effective. The unit owner must insure that the tenant or occupant be fully informed and furnished with a copy of the Rules and Regulations and by fully bound thereby.

**Section 17. Potable Water and Electricity: The Association shall supply potable** water and electricity Association through the common facilities of the Condominium directly to each unit through a separate meter, and each unit owner shall be required to pay the charges therefore established, from time to time, by the Board of Directors. Water, electricity and other utility charges will normally be billed monthly incident to the common charges and are considered to be part of the "association" charges. Utility charges more than thirty days in arrears are subject to a late fee and interest per Section 6 Article V of these By-Laws, and said utilities may be suspended by the Association if an owner is more than 90 days in arrears of Association charges per Article V Section 5 thereof.

**Section 18. Gas:** Gas shall not be piped to any apartment unit, and unit owners are specifically prohibited from using gas as a fuel for regular cooking, water heating, or any other regular purpose. Small quantities of propane gas may be used for gas grills kept on street-side galleries and for emergency use inside apartment units.

DRAFT

**Section 19. Grey Water and Sewerage Service:** Grey water for flushing and sewerage service (including sewage disposal and treatment in the condominium's sewerage treatment plant) shall be supplied as a common facility to all unit owners, and the cost thereof shall be treated as a common expense.

## ARTICLE VI

## Mortgages

**Section 1. Notice of Unpaid Common Charges:** The Board of Directors, whenever so requested in writing by a mortgages of a unit, shall promptly report any then unpaid association charges due from, or any other default by the owner of the mortgaged apartment unit.

**Section 2. Notice of Default:** The Board of Directors, when giving notice to a unit owner of a default in paying common charges or other default, may send a copy of such notice to each holder of a mortgage covering such unit.

## ARTICLE VII

## Sales and Mortgages of Units

**Section 1. No severance of Ownership:** No unit owner shall execute any deed, mortgage or other instrument conveying or mortgaging title to the unit without including therein the Appurtenant Interests, it being the intention hereof to prevent any severance of such combined ownership. For the purpose of the By-Laws, the "Appurtenant Interests" shall mean collectively, (i) the unit owner's undivided interest in the common areas and facilities appurtenant to such unit; (ii) the interest of such unit owner in any units theretofore acquired by the Board of Directors, or its designee, on behalf of all unit owners, or the proceeds of the sale or lease thereof, if any; and (iii) the interest of such unit owner in any other assets of the Condominium.

Any such deed, mortgage or other instrument purporting to affect one or more of such interests, without including the interest or interests so omitted, shall be deemed to include such interests even though the latter shall not be expressly mentioned or described therein. No part of the Appurtenant Interests of any apartment unit may be sold, transferred or otherwise disposed of, except as part of a sale, transfer or other disposition of the unit to which such interests are appurtenant, or as part of a sale, transfer or other disposition of such part of the Appurtenant Interests of all apartment units.

DRAFT

**Section 2. Sale to Board of Directors:** A unit owner may, subject to mutual agreement of the parties, and subject to the provisions of Section 1 of this Article VII, sell his unit to the Board of Directors, or its designee; provided, however that such purchase by the Board of Directors shall have the prior approval of two-thirds (2/3) of the unit owners, as expressed by the vote of at least two third (2/3) in number and in common interest, of all unit owners, cast in person or by proxy in accordance with these By-Laws.

**Section 3. Financing of Purchase of Apartment Units By Board of Directors:** Acquisition of units by the Board of Directors, or its designee, on behalf of all unit owners, may be made from the working capital and common charges in the hands of the Board of Directors, or if such funds are insufficient the Board of Directors may levy an assessment against each unit owner in proportion to his ownership in the common areas and facilities as a common charge, which assessment shall be enforceable in the same manner as provided in Section 6 and 7 of Article V, or the Board of Directors, in its discretion, may borrow money to finance the acquisition of such units, provided, however, that no financing may be secured by an encumbrance or hypothecation of any property other than the unit, together with the Appurtenant Interests, so to be acquired by the Board of Directors.

**Section 4. Gifts and Devises, etc:** Any unit owner shall be free to convey or transfer the unit by gift, or to devise the unit by will, or to pass the same by intestacy, without restriction.

**Section 5. Waiver of Right of Partition with Respect to Such Units as are Acquired by the Board of Directors, or its Designee, on Behalf of All Unit Owners as Tenants in Common:** In the event that a unit shall be acquired by the Board of Directors, or its designee, on behalf of all unit owners as tenants in common, all such unit owners shall be deemed to have waived all rights of partition with respect to such unit.

## ARTICLE VIII

**Section 1. Condemnation – Eminent Domain:** In the event of a taking by condemnation or by eminent domain of part or all of the common areas and facilities, the award made for such taking shall be payable to the Board of Directors for disbursement **among all unit owners in proportion to their respective common interests after first paying out all common area and facility expenses pertaining to said taking.**

## ARTICLE IX

## Records

DRAFT

**Section 1. Records and Audits:** The Board of Directors or the managing agent shall keep detailed records of the actions of the Board of Directors and the managing agent, Minutes of the meetings of the Board of Directors, Minutes of the meetings of unit owners, and financial records and books of account of the Condominium, including a chronological listing of receipts and expenditures, as well as a separate account for each unit which, among other things, shall contain the amount of each assessment of common charges against such unit, the date when due, the amounts paid thereon, and the balance remaining unpaid.

Each unit owner shall be permitted to examine all accounts, records and contracts of the Association in the Condominium office at reasonable times, on business days, but not more often than once a month. All others must request any required information from the Board of Directors.

An annual report of the receipts and expenditures of the Association, examined and approved by a licensed accountant not affiliated with the Association and chosen by the Board of Directors, shall be rendered to the Board and sent, within a reasonable time after the end of each fiscal year, to all unit owners who request it.

**ARTICLE X**

**Miscellaneous**

**Section 1. Notices:** All notices hereunder shall be sent by registered or certified mail to the Board of Directors c/o the managing agent, or if there is no managing agent, to the office of the Board of Directors or to such other address as the Board of Directors may hereafter designate from time to time, by notice in writing to all unit owners and to all mortgagees of units.

All notices to any unit owner shall be sent by registered or certified mail to the Building or to such other address as may have been designated by him from time to time, in writing, to the Board of Directors. All notices to mortgagees of units shall be sent by registered or certified mail to their respective addresses, as designated by them from time to time, in writing to the Board of Directors. All notices shall be deemed to have been given when mailed, except notices of change of address, which shall be deemed to have been given when received.

Notwithstanding the requirements of this section, all notices of regular, special and Annual Meetings of the unit owners, Board of Directors, and committees of the Board or otherwise, shall be by first class mail but without the requirement of registration or certification. The applicable notice shall be sent so as to comply with the required time limits, if any, to the regular mailing address of the designated party as recorded in the books of the Association.

**Section 2. Invalidity:** The invalidity of any part of these By-Laws shall not impair or affect in any manner the validity, enforceability or effect of the balance of these By-Laws.

**Section 3. Captions:** The captions herein are inserted only as a matter of convenience and for reference, and in no way define, limit or described the scope of these By-Laws, or the intent of any provision thereof.

**Section 4. Gender:** The use of the gender in these By-Laws shall he deemed to include the **masculine, feminine or non- gender of the unit owner** and the use of the singular shall be deemed to include the plural, whenever the context so requires.

DRAFT

**Section 5. Waiver:** No restrictions, condition, obligation or provisions contained in these By-Laws shall be deemed to have been abrogated or waived by reason of any failure to enforce same, irrespective of the number of violations or breaches thereof which may occur.

**Section 6. Insurance Trustee:** The Board of Directors may appoint a Trustee to distribute large amounts of any insurance proceeds. The trustee so appointed may be any individual or entity, so long as such is properly bonded in relation to the funds and responsibility involved.

## ARTICLE XI

### Amendments to By-Laws

**Section 1. Amendments to By-Laws:** Except as hereinafter provided, these By-Laws may be modified or amended by the vote of 66-2/3% in number and in common interest of all unit owners.

## ARTICLE XII

### Execution of Instruments and Seal

**Section 1. Execution and Instruments:** All instruments of the Condominium shall be executed under seal by such officer or officers as the Board of Directors may designate, or as may be otherwise authorized.

**Section 2. Seal:** The seal of the Condominium shall be as determined by the Board of Directors from time to time.

## ARTICLE XIII

### Conflicts

**Section 1. Conflicts:** These By-Laws are set forth to comply with the provisions of Sections 917 and918 of Chapter 33, Title 28, Virgin Islands Code. In case any of these By-Laws conflict with the provisions of said statute or of the Declaration, the provisions of said statute or of the Declaration, as the case may be, shall control.

DRAFT

## EXHIBIT I

Rules and Regulations
for
Cowpet Bay West
2012

1. No articles shall be placed on any of the stairways, railings, or entry bridges.

2. Balconies and street-side porches shall be kept neat and clean, and no articles shall be swept or thrown from them. No laundry, laundry lines, or other unsightly articles shall be placed on the balconies, porches or other common areas and facilities.

3. Radio or television antennas are prohibited and no sign, notice, advertisement or illumination shall be displayed on or at any window or other part of the building.

4. No owner shall make or permit any disturbing noises in his unit or within the common areas and facilities, or do anything, or permit anything to be done wherein which will interfere with the rights and reasonable comfort and convenience of other owners.

5. No inflammable, combustible or explosive fluid, material, chemical or substance is permitted in any unit, except for normal household use.

6. Dogs and farm animals are prohibited, and owners will be fined as specified by the Board of Directors. The Association may require removal of any animal when it becomes bothersome to others or is deemed by the Association to be unacceptable.

7. No garbage or trash will be left or disposed of on or adjacent to the property – except in a dumpster, if such is provided by the Association.

8. One space per unit is provided for parking automobiles on the property. Additional vehicles may be allowed by Management based on space availability. Any vehicle not currently registered and licensed will be considered a derelict and will be towed.

9. No boat, trailer, heavy commercial or non-self-propelled vehicle shall be parked on the property. No vehicle shall be parked in any manner restricting passage of any emergency vehicles, such as ambulances, fire trucks, etc. No vehicle shall be parked so as to impede ready movement by another vehicle, nor shall it be parked in any space assigned to another unit without permission of the said unit owner. Any vehicle in violation of these rules may be towed at the vehicle owner's expense.

10. Beach users shall clean up and remove any trash or other articles on the beach for which they are responsible.

11. The use of barbecues on seaside galleries is prohibited.

DRAFT

12. The number of persons occupying a unit on a routine basis is limited to two per bedroom. Additional "guests" are permitted not to exceed thirty days total per year.

DRAFT

Attachment #2

Owners' Common Interest

30 April 1998

Unit Type
%Common Interest

2 Bedroom
.911

Leeward
#1,2,3,4,5,7,8,9,10,11,12
13,14,15,17,18,23,24,25
26,27,28,29,31,32,33,34,
35,36,37,39,40,41

Windward
#3,4,5,6,7,9,10,11,12,13
14,15,16,17,19,20,21,22
25,26,27,28,29,30,31,33
34,35,37,38,39,40,41,47,49

3 Bedroom
1.062

Leeward
#6,16,19,20,21,22,30,3B,42
,43,44,49

Windward
#1,2,8,18,23,24,32,36,42,4
3,44,45,51

2 Bedrooms plus Loft
1.193
Leeward: # 46,48

Windward: #
4B,50

DRAFT

3 Bedrooms plus Loft 1.376
**Leeward: #** 50

**Windward: #** 46,52

4 Bedroom 1.301
**Leeward: #** 45,47

29

3055300/000406

Joint Appendix Vol. II Page 1714

Cowpet Bay West

Board of Directors Meeting

February 7, 2011

**Present:** Judi Kromenhoek, Ed Wardwell, Rosie Wells, Bob Cockayne, Barbara Walters, Greg Miller, Jon Cassady, Louanne Schechter
Max Harcourt is currently hospitalized following emergency surgery.

**Minutes of January 11, 2011:** The minutes of the January Board of Directors meeting were unanimously approved.

**W-27:** Jon reported the seaside sliding doors to this unit are being pinched from spalling rebar. The Association will repair the doors. The Association will not be responsible for replacing tile. Tile is the responsibility of the owner.

**Treasurer Report:** Total cash accounts have a balance of $549,400.18. The Reserve Account total is $501,944.61 with the remainder in the Operating accounts. Louanne reported that the 2nd payment for the insurance was paid from the operating account. There are not sufficient funds in the operating account to make the third and final payment of $60,783.33 The Directors made a resolution RESOLVED, that an authorization of transfer of designated funds - Future Repairs and Replacement fund to undesignated funds –Operating fund was made. The funds will be repaid from the operating fund with a 1% interest rate over the next 10 months (March-December 2011.

**Proposed 2011 Budget:** The Directors unanimously approved of the proposed budget.

3055300/000407

Manager Report

**Systems:** Filter changes for systems occurred as scheduled on the first Tuesday of the month.

**Security Lights Parking Lot:** All but 2 posts have been adjusted to the correct height. The remaining 2 require new poles/pad. These should be completed during the week, weather permitting.

**Street side porch lights:** The lights purchased have been installed. The dusk to dawn sensor requires some adjustment. Flickering off and on is a sign the adjustment isn't correct.

**Security Guard:** The guards have been punctual and professional and no complaints have been registered.

**Beach:** The appropriate permits were obtained and approximately 140 ton of sand was spread across the beach from West to East over the course of 1 day.

Old Business

**Voting Procedure:** The Directors agreed that the voting should be kept confidential. Current Board members may check the ballots and votes; however,

any Director disclosing any owners' vote will be removed from the Board. All Directors were in agreement.

**Procedure for Bylaw changes:** Proposals will be brought before the members at the annual meeting.

**Meet & Greet:** The Meet & Greet is scheduled for Roberts American Grill, Thursday, February 10th, 2011, from 5p-7p. Rosie invited the candidates. Rosie and Judi will obtain sodas, beer, and paper goods. The Directors were asked to get there early to help set-up and clean-up.

**Insurance:** Our agent has a conflict and can not attend the meeting. Bob has compiled a list of questions for the agent, Colin Probyn. Judi said Colin will have the answers before the Annual Meeting.

**March BOD:** No date was set.

**Adjournment:** There being no further business, the meeting was adjourned.

**ACTION ITEMS**

| | |
|---|---|
| Report to BOD method used to repair W-27 | Jon |
| Completion of new poles for Security Lights | Jon |
| Beer/Wine/Paper Products for Meet N Greet | Judi/Rosie |
| Handouts for Annual Owners Meeting | Louanne |
| Follow-up with Insurance Agent | Judi |

DRAFT

# Cowpet Bay West
## Annual Owners Meeting
### February 12, 2011

**Call to Order:** The Annual Owners Meeting was called to order by President Judi Kromenhoek at 9:10 a.m. at Robert's American Grill. Board members present were Judi Kromenhoek, Bob Cockayne, Barbara Walters, Rosie Wells, Greg Miller, and Max Harcourt. Owners were directed to sign in upon arrival (Exhibit 1, sign in sheets for owner attendance).

**Quorum Verification:** Louanne Schechter tallied the attendance Record and verified that a quorum (1/3 of authorized votes) was present by proxy and attendance.

**President Report:**

- ❖ Judi welcomed all owners and thanked them for attending today's meeting.
- ❖ Judi acknowledged and commended the Board of Directors for volunteering their time and talents throughout the year.
- ❖ Judi acknowledged and credited the management staff, Jon & Louanne, for their professionalism and assistance throughout the year. Each staff member was thanked for their work and loyalty to the owners of Cowpet Bay West.
- ❖ New owners, L-33 Duzy & L-07 Birt families, were asked to stand and welcomed to the community.
- ❖ Judi introduced the candidates running for the Board of Directors.
- ❖ Judi listed the projects & accomplishments throughout the year:
    - **Restoration following Fire to W-23:** The restoration process took 9 months to get settled and paid. During this period the Board of Directors became aware of inconsistencies in the Bylaws that caused confusion between the Insurance agencies, owners, and the Association. (Insurance to be discussed)
    - **Seaside Rails:** All damaged seaside rails were removed and replaced. Rails were repainted.

DRAFT

- **Generator:** The 20 year old generator is in good shape, the circuit board needed to be replaced. This was not easy but Jon located a new board and had Kent Harvey install it. Since the company that manufacturers this is no longer in existence, Kent Harvey rebuilt the components in the old board for a back-up.
- **Fresh Water Booster:** Responding to complaints of low water pressure to Leeward units, a water booster pump was installed and corrected the problem
- Gravel Walkways: Walkways on Leeward and Windward were improved by adding crushed gravel.
- **Transformers:** As part of a 3 year plan, all but one transformer was replaced. The remaining transformer will be replaced this year completing a total upgrade to the High Voltage Electrical system.
- **Security Gate:** The conduit that supplied power to the gate, under the road was compromised causing power outages whenever it rained. The conduit was removed and replaced, the road repaired, and the gate is operating without incidence.
- **Transfer Station Building:** Jon noted the concrete roof over the transfer station was cracking and compromised. The roof was removed and replaced without incident.
- **Beach:** Hurricane Earl was responsible for loss of sand on the beach. After obtaining appropriate permits, the Elysian, Cowpet Bay East, and Cowpet Bay West split the cost and provided the workforce to spread 140 tons of sand back onto the beach. New Swim Buoys are in place, and as of today 24 more beach chairs have been added to the beach.
- **Security Streetlights:** Before hurricane Earl, our security streetlights were replaced with new energy efficient fixtures designed to throw a maximum amount of light down to the parking lot. During Earl, Cowpet Bay East lost most of their parking lot light globes while our lights were left intact.
- **Fresh Water Filtration System:** Upon inspection, the existing filtration system required upgrading. The new system was installed.
- **Security Guards:** During the last year, our Association hired different companies with the same results, guards coming late, leaving early, or sleeping on the job. The

current company, No-Nonsense Security, has been with us approximately 5 months and is professional, personable, and friendly.

**Reading of the 2010 Annual Owners Meeting Minutes:** Motion was made and seconded to waive the reading of the 2010 minutes. Copies of the minutes were available for members upon request.

**Proof of Notice of Meeting:** Oocumentation of notice was presented by the Association Office Manager, Louanne Schechter. (Newsletters: November 2010, December 2010, January 2011, February 2011.)

**Property Manager Report:**

**Electrical Upgrade:** Jon reported when he was hired, the complex did not have an ongoing maintenance plan for infrastructure. In 2008 he developed a long term plan to upgrade and maintain the Electrical System. In 2009 Jon brought an electrical engineer to the property to inspect the entire system. The engineer, Kent Harvey, then developed a CADD (computer aided design and draft) program outlining the entire system with all the technical data. Where needed and available, crucial back-up parts were ordered and kept in stock. In 2010, The 3 phase transformer on Windward which runs the beach well, lift station, and fresh water distribution system was replaced. All transformers were balanced for even power distribution. Going forward in 2011, the 3 phase transformer removed from Windward was sent back to the states to be reconditioned. When available, projected in the summer, the reconditioned transformer will replace the last "original" transformer located at the Windward circle which runs the RO Plant, the WWTP, and controls the high voltage systems. Jon proposes in 2012 to replace the disconnect breakers on each building.

**Territorial Pollutant Discharge Elimination System Permit:** During 2010 this permit was up for renewal. The process included inspections of the Waste Water Treatment Plant, Reverse

DRAFT

Osmosis Plant, Grey Water Processing, and Fresh Water Distribution as well as General Maintenance. Along with inspections there were endless forms and reports. Cowpet Bay West was approved for the next 5 years and there were no deficiencies found by DPNR.
Generator: During Hurricane Earl, a WAPA power pole and transformer split and landed near the generator. This power to ground surge, we believe, fried the circuit board that controls the automatic functions of the generator. Jon had to manually start the generator and shut it down until a new mother board could be located. The companies that manufactured the generator and the switch gear both had gone out of business. With the help of Kent Harvey, we were able to locate the last known circuit board. When Mr. Harvey installed the new board, he kept and has since rebuilt the original board so we would have a back-up. We have set a 45 minute time delay on the generator to prevent the power surges during false start-ups (the on-off-on- off when power is restored). The generator will power down when electrical power is restored for 45 consecutive minutes.

Masonry: Jon performed a thorough inspection under the buildings and the grey water cisterns. Monies spent this year under the account masonry were used to repair the undersides of some of the buildings that had so much spalling they required immediate attention. Under this year's budget he will continue to repair these areas which include leaking cisterns.

Sewage & Grey Water: Included in 2011 Budget is the project to replace the fractured grey water lines. Jon is looking for a new contractor to do this project. The remainder of the monies are to purchase motors and blowers for the grey water system, which are still running on the originals.

Air Pollution Permit: Jon reported the air pollution permit which regulates the usage of the generator is up for renewal this year.

**Treasurer Report**

DRAFT

**2010 Expenditures vs. Budget and 2011 Budget:**

Copies of the 2010 budget and the 2011-projected budget were available for owners. Barb reported that the cost of increasing the insurance in 2010 to 2 million and the pre-pay for the insurance in December for 2011 were the major factors in the deficit for 2010. Other contributing factors were costs that were unforeseen and not in the budget such as replacement of a leaking transformer and high voltage power lines.

Barbara made a motion the 2011 budget be accepted as presented, the motion was seconded, all were in favor.

**Cash Equivalents & Member Equity:** Barbara reported cash equivalents and member equity and a handout was provided to owners.

**Insurance Summary:** Judi reported on the current insurance policies. A summary sheet was provided for all owners.

**Roll Call:** Owners were asked to identify themselves as their names were called. Owners that were holding proxies were asked to identify themselves as proxy holders. There were owners of 43 units and owners holding 39 proxies for a 73.2% of authorized votes.

**Old Business**

There was no old business brought before the Board.

**New Business**

**Bylaws review and update:** Judi reported the only by-laws found on file in the Virgin Islands are the ones from 1974. She stated our Bylaws need to be updated. The tragic fire enlightened us on what is and what is not covered by our master insurance policy. A lot of owner thought they were covered when they were not. Anna Paiewonsky (attorney L-04) stated that she believes

DRAFT

the 1998 Bylaws superseded 1974 declarations, and that they were properly filed. Accordingly, subsequent Bylaws should be in effect. Attorney Chuck Waggoner (L-46) has agreed to help us write the bylaws to meet the owner needs. There has been a lot of confusion on the wording on the insurance coverage of owner units vs. CBW Association responsibility. Chuck has written bylaws for several condo complexes. He is very familiar with bylaws and how they should read. The original bylaws were written to protect the lender (Chase Bank) at the time. We need to have them read to protect the owners and our insurance needs. Anna Paiewonsky volunteered to work with Chuck Waggoner on this endeavor.

Max Harcourt made a motion that the Board of Directors continue to operate under the 2007 Bylaws. The motion was seconded by the floor and all were in favor.

Following discussion from the floor, a suggestion was made to start a committee that addresses our current Insurance coverage, what is required by our bylaws, and what is requested by our owners. The committee would send recommendations to the Directors within 30 days of their formation.

**Proposal to Amend Bylaws to include No Dogs on Property**: Bob Cockayne would like to amend Article V, Section 11, found on page 13 (of the 2007 Bylaws), by adding new section6: "Dogs and farm animals are prohibited, and owners will be fined as specified by the Board of Directors. The Association may require removal of any animal when it becomes bothersome to others or is deemed by the Association to be unacceptable."
Amend Exhibit I, Rules and Regulations for Cowpet Bay West by deleting section number 6, found on page 18.

**Petition for dogs to be allowed**: Joel Kirshenbaum asked what happened to the petition begun last year to allow specific size dogs on the property. Judi reported the matter was discussed in the April 2010 Board of Directors Meeting and tabled to be discussed at the 2011 Annual meeting.

DRAFT

**Election of Board Members:** The nominating committee reported the two candidates with the most votes were Bill Canfield and Sharon Koehler.

**Adjournment:** There being no further business, the meeting was adjourned.

Cowpet Bay West

Board of Directors Meeting

March 8, 2011

Present: Max Harcourt, Barbara Walters, Rosie Wells, Bob Cockayne, Greg Miller, Sharon Koehler, Bill Canfield, Jon Cassady, Louanne Schechter

Meeting Ground Rules: Max requested Directors and guests conduct all business before the Board in a civil, professional manner treating each other with courtesy and respect.

L-01: Herb Horwitz came before the Board of Directors to discuss his reasoning for non-payment to the electrician. The Directors stand by their former decision that the responsibility of payment is with the owner. Max made a motion the Association pay $600 of the bill as a Good Will Adjustment. The owner will be responsible for the balance and late charges.

W-27: Dr. Felice asked for minutes of the Organizational Meetings. Max stated the results of the first and second organizational meetings did not meet the Bylaw Requirement of vote by majority, votes were secret ballot, and no minutes were kept. The third meeting lead to a majority vote and minutes are available.

Dr. Felice was told last month that his seaside sliders would be repaired within a week. Jon contacted Karl yesterday, when he was informed the doors were still not fixed. Karl said he would be out on Wednesday. Dr. Felice has a scheduling conflict and will reschedule with Karl. Dr. Felice asked in the event the tile on the deck was broken who would replace it? Directors agreed the tile on the porch is the responsibility of the owner. The Association is responsible for the structural repairs.

Dr. Felice wanted to know the exact difference of votes between the 2nd and 3rd place candidates. Louanne believed there was a margin of 5 votes the results are in the safe.

**Minutes of February 7, 2011:** The minutes of the February Board of Directors meeting were unanimously approved.

**Treasurer Report:** Sharon reported there was approximately $565,000 in cash accounts.

Greg requested the Directors have a Profit and Loss statement available each month.

Sharon stated she will provide a quarterly report for the Directors next month.

Sharon stated she doesn't have access to the bank accounts. Max assigned Directors to assist Sharon to be added as signatory to the accounts.

There are 2 units in arrears more than 90 days. Both have liens on the property. The Directors suggested Sharon set-up a payment plan. Owners will be informed that in the event scheduled payments are not made, utilities will be discontinued.

An offer was made by the broker for L-41 for the Association to accept less than what is owed. Ma made a motion to accept the offer, the motion was 2nd the vote was 3-3. The motion did not pass. Bob suggested the broker put all future offers in writing.

**Resolution:** template to be provided by Jeanne Brennan, sample: *The Board of Directors presente to the owners the 2010 actuals and 2011 budget. The owners accepted the budget and therefore the Directors resolve to move $114,000 from the Reserve to the Operating Account.*

**Review of Action Items from Owners Meeting:**

**Property adjacent to L-01:** Owner wanted to know if the property is zoned for boat repair. Bill stated the property is zoned R-1. It's his understanding that boats are stored there and owners ma from time-to-time work on them. Max made a motion that a Board member call CZM and DPNR

and inquire if boat storage/repair is appropriate for R-1 land. The motion was 2nd all were in favor Greg will call the agencies.

**Automatic Voltage Regulator:** An owner inquired if an AVR could be installed on the generator. Jo will contact Kent Harvey and report his findings.

**Extended Warranty for Reconditioned Transformer:** Jon will ask the company when the transform is repaired.

**Extend hours of generator usage?** Jon and Anna will request extended usage when the air pollution permit is renewed this year.

**Electronic Bulletin Board on Website:** Max will investigate the options for an electronic bulletin board.

**Manager Report**

**Systems:** Filter changes were completed this month as scheduled. The Generator is performing without incident. The WWTP is within normal parameters. New blowers and motors were ordered and will take about 6 weeks before they arrive.

**Security Lights:** Maintenance has completed all but 2 of the security parking light adjustments. Th remaining two are on Leeward and require new concrete bases and poles. The materials are on sit and maintenance is working on them.

**Ritz-Carlton Meeting:** Jon attended the meeting posted by the Ritz-Carlton. They are in the preliminary stages of trying to obtain a Title 5 electrical system which would allow them to be self-sustaining and off WAPA's grid. Jon reported they offered no schematics, or basic information othe than they would install a zero noise, zero emissions system.

**Owner Issue Flow Sheet:** Jon shared with the Directors a flow sheet for owner complaints that Louanne developed as a tool to record, track and report back to owners. The March Newsletter contained an article requesting owners to put all complaints in writing with details. Sharon suggeste the Association have a written policy for owners to follow when reporting a problem and the Association to follow once it's reported. She will present a policy next month. Greg suggested that the Association keep repair/maintenance logs for each system as well.

**Security Gate:** Jon reported the most recent issue with the gate is the circuit board for the exit pedestal is non-functional. Although a new circuit board can be ordered (actual cost 2009 was $3750) this gate was not designed to handle the amount of daily traffic. Jon suggested the gate b left open during normal business hours and an exit button, that bypasses the circuitry of the swipe cards) be used in the evening. Following discussion, Max made a motion an exit button be installe on the exit pedestal. Barbara 2nd, the motion passed 6 to 1.

**Vandalism:** Jon was called Saturday February 26th at 10:30pm by an owner that reported a broken security pole/light. The owner witnessed the event. Jon investigated. They were tenants and agreed to pay damages. The owner of the unit was notified and a follow up letter will be sent to th owner with an explanation of charges.

**Police Report:** A police report was made by an owner at Elysian when she witnessed a man lying in the bushes by the pool and firing a gun at the rooster as she was walking by him with a small child. She identified the man as an owner at CBW. Police came to the property to follow up on the complaint. The owner denied any fowl play.

**New Business**

**Office Computer:** The computer has no memory left and is more than 6 years old. The computer on order has an extended warranty of 3 years on site and cost $864. (plus shipping).

3055300/000420

**Committees**

**Bylaw:** Rosie Wells is Chairperson, Chuck Waggoner, Barbara Walters, Judi Kromenhoek, and Anna Paiewonsky are on this committee. Chuck will initially submit changes to the committee. Onc the committee agrees, they will forward to the Directors.

**Landscape & Maintenance:** Bill Canfield is chairperson; Jon has volunteered to be on the committee. Bill and Jon will schedule a walk of the property and invite whoever is interested to join them.

Judi Kromenhoek walked the property and submitted her recommendations for the landscape committee.

Insurance: Bob Cockayne is chairperson. Max Harcourt, Herb Horwitz, Doug Rebak, and Jon met to organize the committee. Bob has minutes for anyone interested.

**Long-term Capital Planning:** Max Harcourt is chairperson. Lance Talkington has volunteered to be on the committee, no meeting has been planned.

Social: Rosie is chairperson, no meeting has been planned.

**Nominating:** Bob Cockayne is chairperson, Holly McGuire, Joel Kirshenbaum, and Marilyn Blackhall volunteered for this committee. Bob made a motion the Board approve the members, Max 2nd, all were in favor.

Max suggested all committees keep minutes and forward them to the Directors. Sharon requested Directors be notified of meeting dates and times.

**Other Business**

**Hen & chicks:** Bob stated that farm animals were not allowed on property and although the rooster is gone, the hen and chicks remain. Max made a motion the Association hire someone to catch the hen and chicks without harming them and have them removed from the property, the motion was 2nd all were in favor

**AED:** The battery is dead on the AED. Jon said he has batteries on order.

**April Meeting:** The next meeting of the Board of Directors is scheduled for April 5th, at 8:45am.

**Adjournment:** There being no further business the meeting was adjourned at noon.

**ACTION ITEMS**

| | |
|---|---|
| Letter to Herb Horwitz: Good Will Adjustment: | Max |
| W-27 Sliding Doors | Jon |
| First Bank Forms for Sharon | Greg |
| Fidelity Forms (if needed) | Judi |
| Banco Forms | Louanne |
| Resolution | Jeanne/Louanne |
| Payment Plan | Sharon |
| Speak with Broker L-41 | Louanne/Rosie |
| Speak with Gita Rose Zoning | Sharon |
| Speak with DPNR/CZM boat repair next door | Greg |
| Recommendations from Kent Harvey AVM for Generator | Jon |
| Extended warranty for transformer | Jon |
| Extended hours for running generator | Jon/Anna |
| Electronic Bulletin Board | Max |
| Security Poles Leeward | Jon |

| | |
|---|---|
| Policy for complaints | Sharon |
| Letter to Owners Vandalism/impose fines | Jon/Louanne |
| Hen and chicks removal | Bob |
| AED Batteries | Jon |
| Post minutes, date and times of meetings | Chairpersons |

Addendum to Meeting Minutes

Amended Resolution for

March 8, 2011

Association Resolution for Transfer of designated funds - Future Repairs and Replacement fund to undesignated funds –Operating fund
Resolution of the Board of Directors of Cowpet Bay West Association ("CBW")
WHEREAS, CBW is a Condominium Association organized and existing under the laws of the Territory of the U.S. Virgin Islands;
and
WHEREAS, the members desire that the Association shall act in full accordance with the rulings and regulations of the Internal Revenue Service, as administered by the Virgin Islands Bureau of Internal Revenue;
NOW, THEREFORE, the members bereby adopt , on behalf of the Association;
The following resolution
RESOLVED, that an authorization of transfer of designated funds $114,000 - Future Repairs and Replacement fund to undesignated funds –Operating fund was made.
This resolution is adopted and made a part of the minutes of the meeting of the Board of Directors on March 8. 2011.
BY:
President
ATTESTED:
Secretary

Draft

**Cowpet Bay West**
**Board of Directors Meeting**
**May 10, 2011-05-17**

**Present:** Max Harcourt, Barbara Walters, Greg Miller, Bob Cockayne, Bill Canfield, Sharon Koehler, Jon Cassady, Louanne Schechter

**Minutes of April 5, 2011:** The minutes of the April Board of Directors meeting were unanimously approved.

**Treasurer Report:** Sharon stated the total amount of cash funds is $555,408.

- Owner in Arrears- Letter was sent certified, return receipt- no receipt has returned-Sharon will resend letter.
- Owner in Arrears- Short Sale postponed- Directors agreed to extend their offer.

**Manager's Report**

**Infrastructure & Maintenance:** Filters were changed according to schedule.

**Grey Water:** Grey water system malfunctioned 5/2/11. The water distribution pump motor burned, controls would not function and voltage monitor was missing. System was repaired and functioning same day. Housing required welding to prevent future leaks.

**Transformer Covers:** Corrosion was eroding and causing a hazardous situation for the covers of the transformers. New anodized aluminum covers were fabricated for the transformers on Leeward, the Transformer on Windward Circle and the transformer near the generator. Covers were also fabricated for the junction box and each of the 4 splits from the junction box.

**Streetside Inspection:** Street side steps and railings were inspected and repaired on both Windward and Leeward.

**Streetlights:** All security lights were inspected and are in working order and physically secure.

**Owner fine for Vandalism:** A meeting is scheduled for May 19 with the Security Company and the involved parties to discuss fines.

**CBE Bylaws:** Andy LaPlace reported CBE is in the process of revising their Bylaws therefore, a copy is not available at this time.

**DPNR Inspection:** Jon reported he had received a written statement from Mr. Donadelle, DPNR Inspector, stating we were not in compliance as DPNR has misplaced our records. We have made copies and provided originals to DPNR.

**Request for external vent:** L-47 has requested an external vent for their stovetop. The manufacturer stated that as long as the filter is maintained, there should be no grease coming through the vent. They will guarantee the product. The Directors agreed to allow the vent if the owner agreed to be responsible for any discoloration of exterior paint around the vent.

**Old Business**

**Insurance:** Bob handed out minutes from the previous meetings of the insurance committee. The committee requested a new appraisal be completed. Shep Barrows completed the appraisal as requested. The committee is reviewing options based on this current information and will present their findings and recommendations at the June Board of Directors Meeting.

**L-01 Electrical Repairs:** The owner retracted his statement that he would abide by the decision of the Board as he feels he should not be responsible for paying the electrician. The Directors rescind their goodwill offer and the $600 will be added back to his statement. The owner has requested to meet with the Executive Committee. Max agreed to meet again.

**Owner Initiated Issues Policy:** The directors suggested the new policy be uploaded to the website. Max will upload. The Directors would like to have a "form" that can be downloaded for owners to complete and submit.

**Operating Accounts:** Louanne will obtain the paperwork to remove Judi and Ed from the account and add Bill and Sharon.

**Debris in neighboring property:** Greg Miller will approach CZM and DPNR with the issues of debris and hazardous materials on the site.

**Light Poles:** It was noted by a Director that many of the light poles are crooked. Jon explained the extensions to the existing poles exaggerated the lean of the poles. To "straighten" them would be a major expense of chipping concrete, following the wiring, new conduit, new poles, etc. Max suggested the idea be added to long-term projects.

**Insurance Bid:** Insurance bids were obtained at the request of the insurance committee. It was suggested, next year, the committee provides the criteria for the bidding process next year, well in advance, to make comparisons relevant.

**W-27:** The office contacted the contractor and asked him to inspect the slider as it was sticking. The contractor went to the unit and was asked (by the owner) to reschedule at a time more

convenient for the owner. The Owner has not contacted the office of a new time or date or if the work was completed.

**Security Gate:** The Directors agreed to maintain the security gate with the exit button.
**Security:** The Directors discussed suggestions from owners regarding security measures. The Directors asked Jon to initiate the following measures:

- Guards will add unit # to their log sheet when recording vehicle make-model-time
- Guards will utilize manual bar gate when electric gate is not functioning

**Electronic Bulletin Board:** Max created the electronic bulletin board. Owners will be notified of the electronic bulletin board by newsletter and on the website.

**Striping:** Directors instructed Jon to have the **NO PARKING ZONES** repainted. Long-term, Max suggested the parking spaces be striped.

**NEW BUSINESS**
**W-7:** Owner notified Directors they have not received any follow-up on some issues. Jon will email Owners.

**Dogs on Property:** An owner notified the Board of a pedestrian walking his dog on property. The Directors agreed to post **NO DOGS ALLOWED** signage by the well pump.

**Property Walk-around:** See attached notes from Board member walk around. Max will discuss recommendations with Jon following meeting. Jon was asked to put significant findings on the maintenance schedule.

**Owner Storage:** The office has received several requests for owner storage. Jon will inspect storage areas for any empty cages. A note will be posted in the newsletter that owners are allotted one storage space per unit and no flammable materials are to be stored.

**Office AC Unit:** A bid was presented to replace the ac unit in the office. Attempts by the vendor to remove all mold and smells have failed. The Directors agreed to replace the unit.

**Reimbursement Request:** The office received a request from an owners' family member to be reimbursed for medical expenses. The family member never reported the incident to the Association. Jon will investigate the incident and provide a written report of the incident and follow-up.

**Balusters:** Bob stated replacement balusters on one unit appeared to be different then the existing ones. Jon stated the goal is to maintain the same appearance but that materials used 40 years ago have changed slightly over the years. He will inspect.

**Street side rails/steps:** Street side rails and steps will be sanded and painted in August, weather permitting.

**Scorched paint on exterior of unit:** The staff noted scorching of the exterior paint behind a propane grill on one of the units. The Directors agreed the owner is responsible and will be contacted by letter.

**Next Meeting:** The next meeting of the Board of Directors will be June 14, 2011 @ 8:45am AST.

**Adjournment:** There being no further business, the meeting was adjourned.

**ACTION PLAN**

| | |
|---|---|
| Owner in arrears-resend certified, return receipt letter | Sharon |
| Meeting with Owner/Renter/Security May 19, 2011 | Jon |
| CBW Bylaws forward copy to Barbara | Jon |
| Letter to owner regarding external vent | Louanne |
| Create Form for owner issues | Sharon/Max/Louanne |
| Operating accounts signers | Louanne |
| Letter to DPNR/CZM | Greg |
| Inform Security Company to add unit #, and use pole | Jon |
| Notify Owners of Electronic Bulletin Board by Newsletter/Web | Louanne |
| Paint "NO PARKING ZONES" | Jon |
| Email W-7 | Jon |
| "NO DOGS ALLOWED" signage | Jon |
| Owner storage: Newsletter | Louanne |
| Investigate incident report L-40 | Jon |
| Inspect recent repaired Balusters | Jon |
| Letter to owner scorched paint | Louanne |

DRAFT

**Cowpet Bay West**
**Board of Directors Meeting**
**June 14, 2011-06-15**

**Present**: Max Harcourt, Barbara Walters, Bob Cockayne, Rosie Wells, Sharon Koehler, Jon Cassady, Louanne Schechter

**Minutes of May 10, 2011**: The minute of the May Board of Directors Meeting were unanimously approved.

**Treasurer Report:** Sharon reported the total cash accounts as of May 31 are approximately $558,497. Of this amount, $464,776 is reserve funds. Sharon will present a quarterly summary next month of actual vs budget for the second quarter. Items that were purchased this quarter but not budgeted were fuel for the generator, water leaks, and beach drainage.

The Directors asked for a report on owners in arrears: Sharon reported she had not received a response from her letter to one owner that was in arrears, the letter was sent return receipt, but was never picked up from the post office and was returned to the office. She will resend. That owner did make a payment this month. The second owner did not sell the unit as planned and has filed bankruptcy. Louanne requested the Directors obtain legal counsel. Barbara made a motion that legal counsel be hired the motion was 2nd and all were in favour. The Directors instructed Louanne to contact Anna Paiewonsky for legal counsel. Louanne reported that the total for owners in arrears was approximately 19,000.

**Manager Report**

**Infrastructure & Maintenance:** Filters were changed according the maintenance schedule.

**RO Plant:** Due to the continuous rains during the last 4 weeks, the RO plant ran a minimal amount of time without problems. The cisterns are over capacity with the rains.

**Electrical Systems:** The transformer that was sent to the states to be rebuilt is on schedule to be completed in 2 weeks. Once the transformer is on island, Mr. Harvey will direct its placement and installation in the Windward circle and reroute lower Windward power and eliminate the exposed high voltage line from Leeward to Windward that runs across the rock wall. Weather permitting; we hope to have Mr. Harvey on island mid July. This will complete the 3 year plan for replacing the electrical high voltage grid.

**Grounds:** The groundcover is infested with bugs that are eating the leaves. ABC nursery is scheduled to spray the grounds, but due to no break in the weather over the last 5 weeks, they have not been out. The grounds crew have also been ineffective in spraying due to the rains.

DRAFT

There is a tropical wave expected to bring rain on Wednesday, ABC will try to spray Thursday or Friday depending on the amount of precipitation.

**Security:** Jon reported there were two incidents since the last Board Meeting. The first incident involved vandalism of 2 vehicles on Leeward occurring sometime after midnight. Both had windows smashed. One of the vehicles had a laptop inside that was stolen. The second incident occurred about a week later. An owner reported cash and wallet stolen from his unit with no forced entry between 12:30-1:30pm on a Sunday afternoon, while they had lunch on the seaside deck. The contents of the wallet and the money clip were found several days later by the contractors building the retaining wall in the gut. They found the contents in-between the cinder blocks as they were moving them off the pallet to build the wall.
Jon increased security by adding an extra guard immediately following the first incident. Two security guards were posted with one stationary and the other roaming. Following the second incident, the guard hours were expanded to cover from 6p to 6a. Jon reported there were 10 homes burglarized in Cabrita Point this month alone. Recommendations from the police and our security company were to remove the "No Dogs Allowed" signs and add more surveillance cameras.
The Directors instructed Jon to get bids on surveillance cameras. The Directors instructed Louanne to advise owners of the events. She reported she had described the events in the June newsletter.

**OLD BUSINESS**

**Leeward 1**: The executive committee met with the owner of Leeward 1 to discuss the unpaid electricians invoice, late fees and finance charges. The owner insists the problem was caused by flooding and therefore should be covered by Association funds. Max made a motion the Association remove electricians bill, fines and finance charges associated with the unpaid bill. The motion was 2nd, 4 voted yes and one abstained.

**Insurance Committee:** Bob reported the committee met with representatives from Tunick, Executive, and Mapfre insurance to verify that our current coverage is sufficient in light of the the recent updated property evaluation. The insurance representatives stated we are underinsured with the current 90% co-insurance clause. The committee is obtaining bids and will forward the information to all Board members as soon as they are available. Max stated he may call a special meeting when the information is available. The Directors asked the committee to obtain, if possible, favourable group HO-6 rates from each of the vendors.

**Greg Miller Resignation:** Greg Miller publically resigned from the Board through an email to the community. Max reported it was the responsibility of the Directors to appoint a member to the Board until the Annual Owners Meeting in February. This year would be the third year of Mr. Miller's term. Following discussion, Sharon made a motion Vince Verdiramo (L-5) be

appointed to the Board of Directors. Max 2nd, all were in favour. Sharon will contact Mr. Verdiramo of the Board's decision.

**Bylaws Committee:** Rosie said due to critical illness in her family, she was unable to follow-up on any progress Mr. Waggoner may have made. Max stated the most pressing issue with the Bylaws is clarifying the responsibility of the owner and the responsibility of the Association in maintenance and insurance issues. He stated Greg developed a matrix that should be incorporated in the Bylaws to clarify this issue. Barbara suggested Rosie contact Vince for assistance. At this point, Max excused himself from the meeting. Bob excused himself from the meeting.

**July BOD Meeting**: The next meeting of the Board of Directors will be July 12, at 7:45am.

**Adjournment**: There no longer being a quorum, the meeting was adjourned. Items not discussed will be tabled until next month's meeting.

**ACTION ITEMS**

| | |
|---|---|
| Send copy of arrears letter | Sharon |
| Obtain legal counsel re: bankruptcy | Louanne |
| Cost to increase surveillance cameras | Jon |
| Provide information from Insurance Committee to Board | Bob |
| Inquire about group HO-6 Policy rates | Bob |
| Contact Mr. Verdiramo of Appointment to Board | Sharon |
| Invite Mr. Verdiramo to work on Bylaws Committee | Barbara |

**Cowpet Bay West Condo Association**
Board of Directors Meeting
Tuesday, June 14, 2011, 8:45 AM
Cowpet West Office

Below is the agenda for the meeting - if additions should be made, please bring them up at the beginning of the meeting.

Meeting Ground Rules: ***Respect!***

Call to order

Review and approval of May 10, 2011 Minutes

Treasurer's Report

Manager's Report

Old Business
- Insurance
- By-Laws
- Owner's Storage Space

New Business
- Resignation and Replacement of Greg
- Vandalism and Security

Review Action Items from this meeting

Adjourn

3055300/000431



## Fwd: Board of Directors Meeting

**JERSEYBARB@aol.com** <JERSEYBARB@aol.com> Sun, Dec 2, 2012 at 1:55 PM
To: jkromes@gmail.com

From: cowpetbaywest@hotmail.com
Sent: 6/14/2012 2:38:48 P.M. Eastern Standard Time
Subj: Board of Directors Meeting

TO: The Owners Cowpet Bay West Association

FROM: Ed Wardwell

SUBJECT: Board of Directors Meeting

Here are the highlights of Tuesday's Directors Meeting:

Property
- All systems are operating normally.
- The upgraded grey water transfer lines have been connected and are in service.

Treasury
- All of our 2012 insurance premiums have been paid in full.
- The treasurer, Sharon Koehler, will provide an analysis of our six-month operating expenses to the Board at the August 7th Directors Meeting. You will be provided a copy of this report after Board review.

Planning
- Max Harcourt, Chairman of the Property and Planning Committee, submitted a comprehensive report on the current status and projected upgrades for our property. Major future projects including roof sealing/painting, structure maintenance and electrical system upgrades will be addressed in the 2013 budget.

Owner Requests
- The staff is currently servicing owner requests in Leeward 3, 31 & 37 and Windward 10, 12 & 31.

We will continue to respond promptly to all your written requests for service.

Legal Proceedings

- On June 6, 2012 the Association was notified by the US Department of Housing and Urban Development (HUD) that "HUD has completed its administrative proceeding of this complaint (Barbara Walters vs. Cowpet Bay West Association) under the Act (Fair Housing Act of 1968) and the compliant is hereby dismissed."

Draft

**Cowpet Bay West**
**Board of Directors Meeting**
**July 12, 2011**

**Present**: Max Harcourt, Barbara Walters, Bob Cockayne, Rosie Wells, Sharon Koehler, Vincent Verdiramo, Bill Canfield, Jon Cassady, Louanne Schechter
Herb Horwitz is in attendance by request of the insurance committee to answer any questions the Directors have regarding insurance.

**Minutes of June 14, 2011:** The minutes of the June Board of Directors Meeting were unanimously approved.

**Treasurer Report:** Our current bank balance as of end of June is $513,000 of which $442,899 is in the reserve account. The financials (budget vs actual) for the 6 month period were distributed and discussed. Sharon noted 2 issues (1) there was no budget for tree trimming and cost $20,000 and (2) there was $20,000 spent on beach drainage. CBR is splitting the cost of this project. They have the invoice but have not paid.

Sharon would like Louanne to investigate other options for phone conferencing that are more cost effective. Max has some suggestions and will discuss with Louanne after the meeting.

**Insurance:** Bob presented the information obtained by the insurance committee. The insurance committee believes CBW is underinsured going into hurricane season. The potential exposure is due to the low value of insurance being substantially less than the appraised value (half) and a 90% coinsurance clause; we would realize a 48% penalty for any claim less our deductable because the low value is higher than what we are insured.
The committee recommends we cancel our current policy and obtain a policy with MAPFRE for the total agreed value of $25,916,630. 2% Windstorm deductible ($518,332.60) with a premium of $272,124.62. Bob said that the policy is designed to insure each building individually. (See attached summary). Following discussion Max made a motion to accept the recommendation of the Insurance Committee to obtain the Mapfre Policy. Bill 2nd the motion. The vote was called: Vincent-no, Barb-no, Rosie-no, Bill-yes, Max-yes, Bob-yes, Sharon-yes. The motion carries 4 yes, 3 no. Vincent, Barb, and Rosie want the minutes to reflect they are against any increase at this time and will do nothing to implement this plan.

There was discussion regarding how to finance the policy. Louanne stated that of the monies in reserve, $225,000 is earmarked for capital improvements and $61,000 was borrowed from the Reserve Fund in February to make the final payment for the current insurance policy. She recommended a special assessment to pay for the entire premium and an increase of approximately $85 dollars per month to the insurance to be able to fund the renewal. Herb added that the agent offered financing with a 30-60-90 payment plan. Max will conference with Sharon and Bob to discuss funding the policy tomorrow.

Bob Cockayne left the meeting at this time.

**Bylaws:** Vince agreed to replace Chuck Waggoner on the bylaw committee. The committee will meet this week and forward recommendations to the Board of Directors.

**Owner in arrears:** Sharon sent an email to owner in arrears that they make $3000/month payment. When they default their utilities will be shut off.

Draft

Bankruptcy unit: The sale of the unit was stopped by the bankruptcy court. Anna Paiewonsky was contacted and referred Louanne to call Mr. Hodge, an attorney that specializes in bankruptcy issues. Mr. Hodge reviewed the pacer account and noted that Scotia Bank had petitioned the court. Once the bank takes over the property as abandoned, the bank will attempt to make a short sale and we should be able to collect the common charges. He recommended the Association allow the bank to handle the legal issues as CBW would have to hire a lawyer in Maryland to handle the claim for us and the bank is the first mortgagee.

Louanne sent a letter to the bankruptcy lawyer asking if the property is still being rented, and if CBW will receive funds for utilities and common charges. The property appears to be empty. Bill stated the renter had left. Barb suggested we shut off the utilities, Sharon 2nd, all were in favour. Jon will inspect the unit today to be sure there is no garbage left behind.

**Meeting Format:** Following discussion by the Directors, the motion was made by Vince that all future meetings will be conducted in the following manner: initially, issues as determined by the entire Board shall be discussed in Executive session and upon completion of executive session the meeting will be open to general owners. Barb 2nd the motion. The vote was taken with 5 yes and 1 no. Max request the minutes reflect he voted no.

**Vandalism & Security:** The Directors discussed the letter they each received from Kellerhals & Ferguson on behalf of their client, a renter in W-37 (letter on file in office). Vince responded to an owner that the matter has been resolved. Vince also sent a letter from his law office to Kellerhals & Ferguson that the matter was discussed with his client and the matter resolved. The owner received documentation in writing of the incident.
Max made a motion the Board commend Jon for professional handling of lamp pole incident and that we are confident in his ability to continue to manage our property in the manner it needs to be done. Barb 2nd all were in favour.

**Guards:** Guards were increased temporarily following 2 incidents; one was car windows smashed on Leeward and the second was a theft. Jon recommends we reduce the overlap of guard hours and change to one guard from 6p to 6a.

**Managers Report**

**Retention Wall:** Completed

**Tree Trimming** Hurricane prep is completed. The Elysian did not remove coconuts from palms on our beach; that service (31 trees) was performed by the tree trimmers.

**Gray Water Transfer Line:** This project should begin this week and hope to have the backhoe in the morning.

**Electrician:** The rebuilt transformer should be completed and returned to property the first week of August. Once the transformer is on property, we will schedule Kent Harvey to wire the transformer and remove the exposed high voltage line.

**No Dog Sign:** Jon was advised by our security company not to advertise we don't allow dogs. The Directors would like a sign posted near beach drive.

Draft

**Balusters:** Inspections completed, we had a couple of issues on Leeward 12 and L-44. L-12 is complete at this time and L-44 to be inspected this week

**Surveillance Cameras:** Functioning cameras cost approximately $500 each. The installation cost depends on the location. Beach Drive, Gut, and Yacht Club Gate are the areas we have discussed. Jon believes we have sufficient light to view footage.

**Letter to Owner:** Letter was sent to owner explaining charges on his unit for vandalism by his renters.

**Incident Report:** Follow-up from fallen security light and pole. Jon inspected all security poles and found none requiring replacement. Owner came to office requesting reimbursement on his daughter's behalf for medical expense. Stated if she didn't receive check that day, her boyfriend would sue. Owner reimbursed her and is now requesting credit to his account. Vince made a motion the owner be reimbursed, Sharon 2nd, 4 voted yes and 1 no. Motion passed.

**ACTION ITEMS**

**Banco Forms:** Not done.

**OPNR response to neighbour property:** Not Done

**Letter to Owner External Vent:** Completed in May

**CBW Bylaws:** Not available at this time, being reviewed by their attorney.

**Direct Deposit for Owners:** Waiting for Ms. Richards of Banco to set up meeting.

**Parking Lot Striping:** Striping the no parking zones- scheduled for first of September when least amount of cars on property.

**Walk-Around Issues:** No scheduled at this time.

**Owner Issue Form:** Not completed

**Storage Space:** Suggest that we have a storage cleanup day during the week of the Annual Meeting.

**Planning Committee:** Max will provide minutes this summer.

**Owner Request:** Sharon requested all complaints be sent to Board members. Max, Barb, Vince, Bill, and Rosie do not want complaints sent to them, Sharon does.

**W-26 Request for Noise Control:** W-26 requested the Board of Directors speak with the Elysian before they award any contracts to restaurants on property about controlling the noise. The Directors agreed that we have not rights as long as they adhere to the laws on island.

**Next Meeting:** The next meeting will be August 9, 2011 at 8:45am

**Adjournment:** There being no further business the meeting is adjourned.

Draft

**ACTION ITEMS**

| | |
|---|---|
| Banco Forms | Louanne |
| DPNR Response | Max |
| CBE Bylaws | Jon |
| Direct Deposit Banco | Louanne |
| Parking Lot Striping (no parking zones) | Jon |
| Walk-Around Issues on Maintenance Schedule | Jon |
| Owner Issue Form | Max |
| Planning Committee Minutes | Max |
| Owner Request sent to Sharon | Louanne |
| Phone Conferencing Options | Max/Sharon/Louanne |
| Funding Insurance Policy | Max/Sharon/Bob |
| Informing Owners of Insurance Policy & Funding | Max/Sharon/Bob |
| Update Bylaws | Bylaws Committee |
| Baluster L-44 | Jon |
| Surveillance Cameras | BOD next meeting |
| Inspect bankruptcy unit/shut off utilities | Jon |
| No Dog Sign posted by gut/beach drive? | Jon |
| Response to W-44 Guards | Jon |
| Storage Space (table to Feb 2012) | |
| Copy of Letter sent from Vince to Kellerhals for file | Vince |

DRAFT

**Cowpet Bay West**
**Board of Directors Meeting**
**August 9, 2011**

**Present:** Max Harcourt, Barbara Walters, Bob Cockayne, Rosie Wells, Sharon Koehler, Vincent Verdiramo, Bill Canfield, Jon Cassady, Louanne Schechter

**Conference Call**: Directors were given a new conference dial-in number and participant code and asked to call back on the new service *Free Conference Call.* Although the conference call is free, there may be associated long distance charges by individual carriers and Directors were urged to use their cell phones. The meeting continued when all Directors were on line.

**Minutes of July 12, 2011**: The minutes of the July 12 Board of Directors Meeting were unanimously approved.

**Executive session:** Max made a motion the meeting move out of Executive Session. There were 3 votes yes, the motion did not carry

**Minutes of July 27, 2011 Special Meeting:** Sharon requested the cash reserve amount of $320,442 be amended to $372,336 in the minutes under the heading of Treasurer Overview, 3rd sentence. Max made the motion the figure be changed, Sharon 2nd, Bill, Max, Bob, and Sharon approved. Motion carried. There being no other changes, the minutes were approved with amendment.

**Tropical Storm Emily:** Jon reported the storm brought some rain and gusty winds, because it was well South of us it was not a problem

**Treasurer Report:**
As of July 31 in our reserve fund we have approximately $397,000 and approximately $96,000 in the operating accounts for a total of $494,000.

**Owner in arrears:** Owner replied they could commit to $2500/month but not the $3000 that was requested. The Owner is in arrears of $8,178. Max made a motion the Board accept the $2500/month Sharon 2nd, all were in favour.

**Insurance Rebate from Tunick**: Not arrived. Bob will contact Colin for the status of the check.

**CBR Bill:** Not paid for their portion of the Retaining Wall. Jon said Gene will be sending a check next week.

**Mapfre Insurance Policy**: The Policy has not arrived in the office. Max will follow up with the sales representative, Jose, as to when the policy will be available.
**Contact Information**: Louanne requested contact information for the office records. Sharon said she thought the information was on the binder. Max will obtain contact information. Max stated that Jose is planning a visit to St. Thomas this September and will bring a local representative with him to meet the staff and see the property.
**Systems not noted on Appraisal** Sharon asked what systems were not noted on the Appraisal. The systems not mentioned were: the fresh water, beach well, 3 lift stations, gray water, electrical control room, and the office. While Shep Barrows was on property last week, Louanne asked him if the items

3055300/000437

were omitted on his appraisal would they be covered by the insurance policy. He said, he wasn't sure he made any omissions, and then left without reviewing the appraisal. Bill will speak with Shep regarding the items.

**Budget Revision**: Sharon will contact Jeanne and work on the revisions and provide to the Directors. Max would like a target date of completion before the September BOD Meeting.

**Hourly Employee Compensation**: Jon reported he has no detrimental reviews for the staff and he proposes a 3% increase to all the hourly employees. Max made a motion the employees receive a 3% raise, Vince 2nd, 6 voted yes. Sharon said without knowing the 3% total of increases, she abstained and would like the minutes noted as such.

**OLD BUSINESS**

**Bylaws**: Vince said he had reviewed the Bylaws, made approximately 20 suggested revisions, and will send copies to the Directors for their review and input. The Directors should receive the revisions next week. Vince requested they review the changes and send him their comments.

**Bankruptcy Unit**: The utilities were disconnected as discussed in last month's meeting. As reported in the Special Meeting, the owner filed Chapter 7 in Maryland and the Bankruptcy Court approved it. The owner had a mortgage with Scotia Bank. Vince will follow-up with the Trustee to find out the current status of the property.

**NEW BUSINESS**

**Teleconference**: The service we are using today is a free conference service. Users may be charged a long distance carrier fee. It was suggested users utilize their cell phones if they have free long distance. The phone number and participant code will stay the same.

**Manager Report**

**Operating systems**: RO plant, gray and fresh water systems working well. The GenSet had a bad cell in the battery and new batteries were purchased and installed

**Capital Projects**:

- Gray Water Lines project to be completed in approximately 10 days
- Cistern Repair (Masonry) 2 cisterns that were leaking are completed.
- Transformer-Mr. Harvey confirmed yesterday the transformer rebuild is complete. He will oversee the shipping back to St. Thomas. When the transformer arrives, we will schedule Mr. Harvey to be in St. Thomas and complete the final phase of the High Voltage Project.
- Retaining Wall shared with Elysian: A third level of block was added to the "back splash". Gene is aware of the added work and will split the cost.

**Action Items**

- CBE Bylaws: Andy will have the completed revisions next week. Jon will obtain a copy and send to Vince

DRAFT

- **Balusters**: Inspection of balusters are complete and repaired except for L-44. The owner had installed his hurricane shutters and would like the work completed after season, when the hurricane shutters have been removed.
- **Parking Lot Striping**: Scheduled for September.
- **No Dog Signage:** Have not completed
- **CBW Road Sign Damage**: The sign was found knocked over and broken. We don't know who or how it broke. We have contacted the original sign maker and waiting for his return call. We will obtain bids and pass on to the Directors.
- **Painting of Steps & Rails**: Scheduled for October
- **Work Orders**: Sharon said she is not getting the work order sheet. Louanne stated she was sending them out on Friday. Sharon agreed once a week would be fine and she will look for them on Friday.
- **Banco Forms**: New paper work was obtained. There is one form that needs to be signed by the Treasurer. Louanne will get Rosie's signature when she gets back on island.
- **DPNR**: Max reported that is on hold for now.
- **Direct Deposit**: Owners would be given the account and routing number. Owners would sign a form for electronic deposit. Barbara suggested we use a separate account for deposits, Vince suggested a lock box through the bank, Max wanted to know the fee schedule. Max asked Louanne to provide all info by the next meeting for a vote.
  Vince had to leave the meeting at this time. Max suggested we set the next meeting date before he left.

**September BOD Meeting:** The next meeting of the Board of Directors is scheduled for September 13, at 7:45am AST.

- **Long Term Plan**: Max would like a copy of the Long-term Plan mailed to him.
- **HO6 Policy rates:** Mapfre is not currently offering this type of policy.
- **Surveillance Cameras**: To be added to the long term planning area. Bill stated in retail business, cameras have not been effective.
- **Satellite TV:** Bill said that Dish is offering a great deal right now of free installation and the box. He would like to take advantage of that by finding a vendor for the complex. Jon is in talks with a vendor .

**Code of Ethics**: Sharon and Max raised the question about a code of ethics for the Directors. Max said he and Sharon would present at the next meeting.

**Adjournment:** There being no further business, the meeting was adjourned.

3055300/000439

DRAFT

## CURRENT ACTION ITEMS

| | |
|---|---|
| Letter to owner in arrears | Sharon |
| Contact Tunick Insurance re: insurance refund | Bob |
| Cowpet Bay Resort payment for retaining wall | Jon |
| Contact salesperson from Mapfre re: policy | Max |
| Speak to Shep Barrows re: systems missing from appraisal | Bill |
| Speak with Mapfre are all systems and office (not in appraisal) covered | Max |
| Contact information for Mapfre | Max |
| Budget Revision | Sharon |
| Bylaws first draft of revisions to Directors | Vince |
| Bankruptcy update on unit | Vince |
| CBE Bylaws send copy to Vince | Jon |
| No Dog Sign | Jon |
| Obtain bids for repair of road sign | Louanne |
| Work order sent weekly to Sharon | Louanne |
| Banco Forms | Louanne |
| Banco Electronic Banking Package to Directors | Louanne |
| DPNR | Max |
| Long Term Plan to Max | Jon |
| Update on HO6 policy from Mapfre | Bob |
| Satellite TV Vendors | Jon |
| Code of Ethics Presentation | Max/Sharon |

## PENDING ACTION ITEMS

| | |
|---|---|
| L-44 Baluster repair after hurricane season | Jon |
| Parking lot Striping in September (weather permitting) | Jon |
| Painting of steps and rails | Jon |
| Surveillance Cameras added to long term plan | Max/Jon |

Draft

Max Harcourt Suggested Revisions (in yellow)

**Cowpet Bay West**
**Board of Directors Meeting**
**September 13, 2011**

**Present:** Max Harcourt, Barbara Walters, Bob Cockayne, Rose Wells, Sharon Koehler, Bill Canfield, Jon Cassady, Louanne Schechter,
Vince Verdiramo is out of the country.
Lance Talkington (Leeward -03) announced himself as attending the telephone conference.

**Minutes of August 9, 2011:** Board members reported they did not receive a copy of the August minutes. A copy of the minutes will be emailed to the members and they will vote on them at the next meeting. (Copies were emailed during the meeting).

**Determination of Necessity for Executive Session:** No Executive Session was required.

**Treasurer Report**
**Budget Revision:** Sharon reported she collaborated with Jeanne Brennan, our accountant, on the revised budget for 2011. Jeanne provided analysis with the changes highlighted. Max made a motion to except the revisions, all were in favour.
Barbara made a motion to send the analysis as provided by the accountant to the owners, Rosie 2nd, all in favour.
**Pay off loan from Reserve fund:** Sharon made a motion to pay off the loan from the Reserve fund. She stated the total payment with interest is $54,981.37, the initial loan was for $60,783.33 and the interest is $298.04.
Bill 2nd, all were in favour.
**Transfers of monies:** Sharon will work with Louanne to transfer funds owed to Reserve Fund from the General Funds and transfer funds owed from Reserve Fund (capital projects completed) to General Fund.
**Payment from Elysian:** Sharon asked if we had received a check for the Elysian's portion of the beach and flood control project. Jon stated that he was meeting with Gene today. Max asked Jon to call him after the meeting.
**Bounced Check:** Sharon asked about bounced check- Louanne reported there were none last month,
**Bankruptcy Unit:** Sharon asked who was billed for the account in arrears. Louanne reported that Vince Verdiramo followed up on the ownership of the unit following the awarding of the bankruptcy court; the original owner has retained possession of the property. Louanne contacted the Real Estate agent and the closing attorney. The agent is rewriting the seller's contract as the previous buyer is still interested. The closing attorney, Marcia Resnick, has the current statement and will advise us what is collectable.

**Old Business**

**By-Laws Committee Report:** The committee request the discussion be tabled. Max requested the Directors submit their comments in writing as requested by Vince. Only one Director (Sharon) has responded to Vince's request at this time. Bob asked if the Directors are considered the Committee as a whole. Max stated yes.
Sharon reported she sent copies of Vince's suggested changes to Anna Paiewonsky and Herb Horwitz. The committee has not received any written comments from these owners.

**Owners in Arrears:** Max asked the status of owners in arrears. The owner that has a payment plan is continuing to follow the plan. Another owner that was 90 days in arrears replied by email they were making a payment and would catch-up by December. Bob asked for the total dollar amount over 60 days in arrears. Sharon reported it was $28,466. Sharon's figure was the total for greater than 90 days. The actual 60 days was $5,528.03 [$21,705.54.] as of August 31. One payment was made reducing the total to $4,860 [$20,505.54] current.

**New Business**

**Code of Ethics:** Following discussion, the Directors agreed a written code of ethics is not necessary. The Directors agreed to improve on their communications and move forward.

**Security Gate:** The gate was open after Irene because the phone lines were down. The manual gate is broken at this time and repairs are being made. The security guards are stopping people in a professional and courteous manner.

**E-mail List:** Sharon requested **owners** email addresses are added to the Owners List. Bill stated trying to keep the list current is very difficult. Max suggested Louanne contact the owners and inform them that the Owners List will be updated with the owner's email(s) unless they contact the office that they don't want it included.

**Blog:** Sharon wanted to know why the newsletter stated that we don't have a blog. Louanne stated owners have called the office requesting clarification. The facts were placed in the newsletter as clarification for all owners. Lance was asked about the blog, but he had dropped off the line. Sharon suggested a Board member be appointed to preview the newsletter before it is sent. Max stated there was no problem and we should continue with the newsletter as we have.

**Resolution:** Sharon stated the resolution (from the February meeting) had never been completed and was not in the minutes. She stated it needed to be typed, and signed or put into file and it should be signed by the President and Secretary. Louanne stated the revisions were inserted into the minutes when the Board approved them. Louanne sent Sharon copies of the revisions, as she requested yesterday. Louanne was unaware the resolutions needed signatures and will obtain the signatures that Sharon is requesting.

**Manager Report**

**Infrastructure and Maintenance:** Gray and fresh water filters were changed 8/5/11. All systems are operating efficiently.
**The RO** has not been run recently due to the heavy rains.
**The generator** ran without problems during the storm. Jon switched the generator to manual after the storm while WAPA made any repairs to the area.
**Shutters:** We follow the mariners 3 day avoidance within the vector cone. Irene was made a named tropical storm on Sunday and passed by on Monday, shutters were not closed. There was no 3 days to prepare. Maria was a named Tropical Storm and we were within the vector. Owners were notified on Thursday and shutters were closed on Friday.

**Transformer:** 3 phase rebuilt transformer should arrive on island in approximately 2 weeks. When it arrives, we will schedule the electrical contractor, Kent Harvey, to install the transformer and complete the high voltage system changes slated.
**Grey Water Lines:** The project is approximately 70% complete. The heavy rains have prevented any work for the last 2 weeks. Work will complete when weather clears.
**Elysian Payment:** Jon is meeting with Gene after meeting
**CBE Bylaws:** CBW has sent their bylaws back to their attorney and are not complete. Bob would like Jon to try to obtain owner responsibility and insurance portions of their bylaws if they are complete.

**Pump Systems:** Jon has information on the pumps to share with the long term planning committee

**Satellite Vendors:** Dish network was installed by Enrique Garcia in two buildings.

**Parking Lot Striping:** On hold until weather clears.

**Balusters:** Repair after hurricane season

**Painting of steps and railings:** When weather clears.

**Dish TV:** Jon reported that Enrique Garcia had installed units in Leeward, and he was pleased with the operation.

**Mapfre Insurance Policy:** Policy is in the office.

**Revision of Appraisal:** Shep will return and revise the appraisal to include the systems that were left off. Bill will contact Shep to revise.

**Contact information from Mapfre:** Available in office

**Road Sign:** Louanne reported another incident occurred where the concrete base was pushed over. The Board was asked if the sign needed replacing. The bid for the sign does not include the base. Max asked to get an inclusive bid.

**NO DOG SIGN:** Jon asked for verification. Max stated the Board had decided to place a NO DOG SIGN, by the beach drive

**Work Orders:** Louanne is sending the work orders on Fridays. She was unable to send this Friday as the hurricane shutters blocked the internet signal. There were no complaints to send.

**Banco Electronic Banking:** Waiting for return call from Banco. Louanne requested information on several options. She will send any info to Directors when available.

**DPNR:** On hold, per Max

**Long Term Planning:** Jon was asked again to send Max a copy of the LTP. Max is planning on scheduling a meeting of the committee in September.

Draft

**HO6 Policy**: Mapfre will contact us when they have them

**Service Dogs:** Dogs must be registered with the ADA. VI does not have guidelines for service dogs.

**Next meeting**: October 11, 2011 at 7:45am.

**Adjournment**: There being no further business the meeting was adjourned.

ACTION ITEMS

| | |
|---|---|
| August Minutes to BOD | Louanne |
| Transfer monies as calculated by Sharon to Reserve Fund on 9/14/11 | Louanne |
| Letter to Owners in Arrears | Louanne |
| Written comments on revisions to Bylaws | Directors |
| Repair manual Security Gate | Jon |
| Inform owners email address(s) will be added to Owner List | Louanne |
| Update owner's list to include email address(s) | Louanne |
| Send Resolutions from February & March Minutes to Max and Rosie for signatures | Louanne |
| Send LTP to Max | Jon |
| Gray Water Lines | Jon |
| Elysian Payment | Jon |
| CBW Bylaws to Directors | Jon |
| Parking lot striping | Jon |
| Painting of steps & rails | Jon |
| Revision of Appraisal | Bill |
| Road Sign Bid for base + sign | Jon |
| No Dog Sign | Jon |
| Electronic Banking for Owners to make direct payment | Louanne |
| DPNR | Max |
| Long Term Planning Committee meeting | Max |

3055300/000444

Draft

**Cowpet Bay West**
**Board of Directors Meeting**
**October 11, 2011**

**Present:** Max Harcourt, Barbara Walter, Bob Cockayne, Rosie Wells, Sharon Koehler, Bill Canfield, Jon Cassady, Louanne Schechter
Vince Verdiramo is out of the country.
Lance Talkington (Leeward 3) announced himself as attending the phone conference

Max announced there would be a brief executive session and Jon would contact Lance when he could rejoin the meeting.

**Executive Session:**
The manager requested Directors do not include the names and titles of vendors used by the Association in their emails as some vendors have agreed to assist us, on their own time, as a second income.
Sharon stated a previous Board recommended the Association not act as a third party vendor. Owners are responsible to hire and pay their own service vendors.
There being no further business for Executive Session, Max opened the meeting to owners, Lance rejoined the meeting.

**Minutes of August 9, 2011:** The minutes of the August minutes were unanimously approved.

**Minutes of September 13, 2011:** The minutes of the September minutes were unanimously approved with the revisions provided by Max Harcourt (see attached).

**Treasurer Report:** The total cash assets as of September 30, 2011 were $557,447. The reserve funds total is $452,300. Sharon presented her analysis of the 3rd quarter budget verses actual report (attached).
CBW BOD-P&L Third Quarter Report 9/30/11 & Treasurer's Report

Cash on Hand 9/30/11 Operating Accounts - $104,000

Reserve Accounts - $ 452,300

We will be depleting the Reserve Account by approximately $ 94,800 and reimbursing same to our general accounts to cover expenses made for capital improvements. After the funds have been cleared, we will write a check to repay the Reserve account current through October, approximately $ 62,855. This will ultimately result in a balance in our Reserve fund of $420,355.

Our 9/30/11 customer receivables are $36,940, of which $25,033 are 60 days and older.

Notes and observations re 3rd quarter P&L-Budget vs Actual

1. Income-fixed charges a little off mark....Louanne and I will work towards finding and correcting the posting problems

3055300/000445

Draft

2. Income is about $4500 on the plus side; due to sale of transformer to Elysian ($5900)
3. Expenses:
   - Items under budget
     - WAPA-Assn ($16,000)
     - Contract Labor Bldgs. ($11,150)
     - Grounds ($8,000)
     - Hurricane ($3,750)
     - Beach Refurb ($5,100) –
   - Items over budget
     - Building repairs ($5,300)
     - Grey Water ($1,900)
     - Electric/Generator ($6,500) – fuel bills
     - Vehicles/Fuel ($4,000)
     - Security Guard ($8,000) Increased hours
     - Office Expense ($4,000) – new computer & AC unit
     - Contract Labor-Grounds ($16,000)
     - Medical ($3500) – increased costs
     - WAPA Owners ($21,000)
     - Beach Refurbish ($5,100) – sand, buoys, chairs, cleanup
     - Legal/Accounting ($1,800) – extra meetings with Jeanne Brennan re insurance

Other observations:

1. A policy was established several years ago that CBW Assn would not act as a 'middleman' between owner and vendor. The primary reason for this was twofold, in that it created a liability situation for the assn. and that it distorted our financial reports. In reviewing our records this year, it has come to my attention that when an owner's phone line is down, we have been having a vendor come and fix the line. The arrangements for these fixes are made by Jon, who then pays the vendor cash ($50) for the repair. Then the office bills the owner for the repair and reimburses Jon via a company check. While I can understand the owners' frustrations not having a working phone, I cannot understand why the owner and the supervisor can't complete the transaction without Jon's involvement. I recommend we cease this practice and find another way to handle these situations.
2. It will soon be time to prepare the 2012 budget. I have been working with Louanne to correct mis-postings throughout the P&L. I believe it is important to have our records accurately reflect our expenses, rather than worry about how much we are over or under compared to our budget. This is the only way to accurately predict the upcoming budget. I will continue to wnrk with Louanne to keep a more accurate accounting of our expenses.

Draft

**2012 Budget**: Max suggested the budget for 2012 be prepared prior to the end of the year. He would like to include the budget with the information sent to owners for the annual meeting.

**OLD BUSINESS**

**Bylaws**: Max set the goal that any changes the Directors would recommend be completed this year and presented to owners so that they could be voted on during the 2012 Owners Meeting. The Directors discussed the changes in the Bylaws suggested by Vince Verdiramo. The following is the recap of suggested Bylaw Revisions

Recap of suggested Bylaw Revisions October 2011

OUTCOME OF BOD'S DECISIONS AT 10/11/11 BOD MEETING INDICATED IN BLUE

Following is a compilation of suggestions for changes to our bylaws following the order of our current document. In each case, the first name listed below each category initiated the suggested change:

Article II, Section 3 – Managing Agent

Sharon – suggested adding (k) to exclusions limiting the securing of property insurance solely to the Board

Max – Agrees Bill OK, Approved

Article II, Section 4, – Election and Term of Office

Paragraph 2....Sharon – recommended we change the method of voting stated in the current bylaws to reflect the manner we currently follow.

Max – suggested wording be changed to *'All vacancies shall be voted for on the same ballot, and the candidates with the highest number of votes shall be elected to each of the vacancies'.*

Change approved

Paragraph 4... Vinnie – suggested changing the 'time-out' for board membership from 1 to 2 years

Sharon – questioned reason, feels it should remain at 1 year

Max – felt no change was necessary

Bob – felt no change was necessary

All agreed that no change was necessary

Article II, Section 5 – Removal of BOD Members

Vinnie – recommended we change the second paragraph to give the Board the ability to remove a board member who has not attended meetings from an entire year to a six month period.

Sharon – felt the verbiage should be changed to 'six consecutive meetings' and that the attendance at the Annual meeting should be further clarified by 'in person'

3055300/000447

Max – felt no change was necessary

Bob – felt no change was necessary

All agreed that no change was necessary

Article II, Sections 8 & 9 – Regular and Special Board Meetings

Sharon – suggested we include 'email' as an acceptable means of board meeting notification

All agreed

Article II, Section 11 – Quorum of Board of Directors

Max – **recommends the following: Delete** – "... a majority of those present may adjourn the meeting from time to time. At any such adjournment at which a quorum is present, any business, which might have been transacted at the meeting originally called, may be transacted without further notice." **Add, in place:** "no business may be transacted until a quorum is achieved."

Unclear about how this should be worded, but all agreed that no business should be conducted unless a quorum is present.

Article II, Section 15 – Executive Committee

Vinnie – suggests "*in the second paragraph where it states, "merge the association into another," this right, according to this paragraph, is reserved to the Board. However, the merging of the association is a paramount item which in reality should be voted on by all owners and be carried by a simple majority.*"

"*In the next to the last paragraph which now reads, "and it shall have the powers to authorize the seal of the association to be affixed to all papers which may require it," this should be changed to read, "and it shall have the powers to authorize the seal of the association to be affixed to all papers which may require it provided said papers and/or contracts do not involve an Board by either e-mail or fax.*"

Max - **recommends: Revise wording to read:** "...provided said papers and/or contracts do not involve expenditure greater than $50,000. Greater expenditures require approval by a quorum of the Board in regular or special meeting."

Sharon – asks if we should reconsider the dollar amount

Undecided, requires more discussion.

<u>Article II, Section 16 – Inspection by Executive Committee</u>

Vinnie – suggests we add "*such reporting to the full Board shall be made within 15 days of the semi-annual inspection*"

Sharon – suggests we also add that monthly progress reports be made by the GM to the Board at each Board meeting.

Max – would like the wording revised to read "Within 30 days after each such semi-annual inspection, the Committee will report its findings and recommendations to the Board of Directors."

Bob – agrees that report to the entire Board be submitted 15-30 days thereafter.

All agreed to add 30 day requirement

<u>Article II, Section 19 (added)</u> – Communications

Max – suggested Communications by, from, to and among the Board may be in writing, by fax or by electronic communication (telephone, telephone conference, email, internet, etc.). Telephone and telephone conference conversations must be documented (e.g., minutes or record of conversation). This communication will constitute "official" communication by the Board.

All agreed to include

<u>Article III, Section 1 – Annual Meeting</u>

Max – suggested owner's be allowed to attend the Annual Meeting by telephonic/electronic means.

Withdrawn

<u>Article III, Section 3 – Special Meetings</u>

Vinnie – suggested last sentence should read '*no <u>other</u> business shall be transacted at a special meeting except as stated in the notice*'

Sharon – agreed

Bob – agreed

Max – agreed and suggested we add '*Owners may 'attend' via electronic means*"

PLAINTIFF'S
EXHIBIT
3A

*All agreed*

Article III, Section 5 – Adjournment of Meetings

Max – suggested allowing electronic participation by owners

Withdrawn

Article III, Section 6 – Annual Meeting Order of Business

Max - suggested the order of business should read:

(a) Roll Call – by unit

(b) Establishment of Quorum (1/3 of all unit owners)

(c) Proof of Notice of Meeting

(d) Reading of Minutes of preceding meeting approval

(e) President's Report (including cost and coverage of insurance)

(f) Treasurer's Report (including discussion of Budget and Financial Status)

(g) Property Manager's Report

(h) Report of Nominating Committee

(i) Election of Board members

(j) Old business

(k) New business

All agreed to change format as above, except (d) should be amended to "Approval" rather than 'Reading". Barbara expressed concern that no provision was made for owners to approve the budget. Bob stated the point would be moot, as the bylaws give the Board the power to develop and approve the budget, and a negative vote by the owners would not be valid.

Article III, Section 9 – Majority of Unit Owners

Max – suggested (as stated in sections 1 and 5 above) that electronic participation be included

Withdrawn

Article V - Sections 2, 3,& 10 – Insurance, Repair/Reconstruction After Fire, Routine Maintenance & Repair – TO BE DISCUSSED AT LENGTH LATER, OR ANOTHER TIME

The entire board agreed in principle that all language concerning these sections should specify that the Assn's insurance covers all items within the walls, and that owners are responsible to insure all items from the paint and beyond into the living area, whether they are original or not. A special board meeting may be called before the end of October to discuss these important sections in further detail.

Article V, Section 11 – Restriction on Use of Apartment Units

Vinnie – suggested we add a paragraph concerning our 'no dogs allowed' policy.

Sharon – provided information from the ADA website regarding 'service dogs'; agreed with Vinnie

Max – provided language as follows:

No dogs are allowed on the property, either long term or visiting. The Board may grant exceptions to the NO DOGS ALLOWED rule, on an individual basis, should an owner require the assistance of a service animal (dog) as defined by the ADA. Owners seeking to obtain such an exemption are required to apply, in writing, to the Board with supporting documentation."

Bob – agreed

Bill – agreed and verified that the USVI follows 'service dog' definition of ADA

**Note – need to establish a minimum fine, or delegate fine ability to the BOD, as this is no longer an R&R

All agreed this restriction should become a part of the bylaws. Barbara cautioned that the ADA act forbids asking service animal owner the cause of disability. Bill stated that we can require proof of ADA compliance documents from owner, but cannot deny ADA approved animals on property. Board ability to assess fines is covered earlier in the bylaws.

<u>Article V, Section 12 – Additions, Alterations or Improvements by BOD</u>

Sharon – recommended we increase the dollar limitation for expenditures with Board approval, and not requiring 2/3rds owner approval.

Max – suggested increasing this to $100,000, from $50,000.

All Board members agreed to increase the dollar limitation to $100,000, except Barbara who felt it should remain at $50,000

<u>Article V, Section 13 – Additions, Alterations or Improvements by Owner</u>

Vinnie – recommended adding an additional paragraph as follows:" *No unit owner may use their seaside patio for the storage of any household goods or appliances* and *shall limit the use to patio furniture only.*"

Sharon - disagrees

Bob – agrees with Vinnie

Max – feels this should be covered in either Section 14, or belongs in our Rules and Regulations

All agreed this should not be added to the bylaws, but rather covered under rules and regulations

Article XIII – Conflicts

Vinnie – recommends this section should be reviewed to determine if this is still a good law.

Bob – agrees

Rules and Regulations

Max – suggests we review our Rules and Regulations

NOTE: Vinnie Verdiramo was not in attendance at this meeting

Max will ask Anna Paiewonsky if she is interested in providing a legal opinion of these changes to the Bylaws.

**NEW BUSINESS**

**February BOD Meeting?**

**Meet & Greet: Thursday February 2nd, Place to be announced**

**Annual Owners Meeting February 4th, Place to be announced**

**Nominating Committee:** Bob said the committee is actively preparing.

**Manager Report**

**Systems:** All systems are doing well. The lab retested one fresh water test. The first sample was negative for ecoli as was the second test.
**Dump-truck:** Dump truck stalled at the light when returning from the dump. The truck was covered under warranty for replacement of fuel injectors Jon had the truck towed to the property until arrangements could be made with the Ford company. The truck was then towed to the Ford repair shop for the scheduled repairs.

**Gate:** The gate is functioning without problems.

**Long Term Plan:** Jon is obtaining additions from Mr. Harvey to add to the plan before sending to Max

**Transformer:** The transformer is in route, when it arrives on island we will schedule Mr. Harvey's visit.

**W-17:** Owner sent complaints that will be entered into log. (Louanne off island will enter when she returns; Jon has copy of her complaints).

**L-07:** Owner complained alarm was beeping for 3 days, owner did not report alarm when it started. Jon spoke with owner and suggested she call office immediately for any alarm.

**CBE:** Andy said the owners are still revising bylaws

Draft

**Bankruptcy:** Statements were sent to the lawyer representing the owner and we have had no response.

**Signage:** No Dogs Allowed and replacement of Parking Signs to be installed this month.

**New Road Sign**: We have a quote for the sign but not the base

**November BOD Meeting**:

**Adjournment:** There being no further business,

ACTION ITEMS

| | |
|---|---|
| Repair of manual Security Gate | Jon |
| Long Term Plan to Max | Jon |
| Elysian Payment | Jon |
| CBE Bylaws to Directors when available | Jon |
| Parking lot striping | Jon |
| Painting of steps and rails | Jon |
| Revision of Appraisal | Bill |
| Contact Anna Paiewonsky | Max |
| Road Sign Bid for base and sign | Jon |
| No Dog Sign and No Parking Signs | Jon |
| Electronic Banking (info was sent to Directors last month) | Directors |
| DPNR | Max |
| Long Term Planning Committee | Max |
| Update on Bankruptcy Ruling | Louanne |
| Notify Owners Annual Meeting | Louanne |
| Notify Dwners Meet & Greet | Louanne |
| Notify Owners how to contact Nominating Committee | Louanne |

3055300/000453

DRAFT

**Cowpet Bay West**
**Board of Directors Meeting**
**November B, 2011**

**Present:** Max Harcourt, 8arbara Walters, Bob Cockayne, Rosie Wells, Sharon Koehler, Vince Verdiramo, Jon Cassady, Louanne Schechter
Bill Canfield is off island.

**Executive Session:**
Max requested the meeting move to executive session, Vince 2nd, there were 5 yes 1 no. The motion carried.

**Telephonic Conference:** Max stated the purpose of telephonic conference was to allow Directors off island have a means of attending the meeting. Max states the meeting is not manageable opening the meeting telephonically to all owners.

**Service Dogs on Property:** Following discussion Vince made a motion to table the situation until the Directors can obtain a legal opinion of the no dog rule and incorporate that opinion into the rules and regulations and or recommended bylaw changes. Max 2nd, and the Directors were in agreement.

**Imposing Fine for Dogs on Property:** Max made a motion any individual in violation of the no dog rule , that have service dog credential will not be fined until the opinion from legal council is obtained, pursuant to the outcome of the previous motion. Sharon 2nd.

**Executive Committee:** Max asked if any Director is interested in being in the Executive Committee. Barbara and Bob said they would be interested, Max requested the Directors vote by email to him and he will tally the vote.

**Manager and Office Manager Review:** Louanne and Jon were asked to leave the office.

**There being no further Executive Business, the Executive Session ended .**

**Security Gate:** Mr. Daryl Padola, the welder, is repairing the manual gate. The bid was for $460.

**September Minutes:** Sharon requested her revisions be made to the minutes. Under Resolution April resolution had not be executed nor was it attached to the minutes. The revisions were accepted.
**Treasurer Report:**
Treasurer's Report – November Board Meeting 2011
October 31, 2011
Bank balance (all accounts) Oct. 31, 2011 - $559,100
Reserve account through 11/4/11 - $473,600
Owner arrears, 60 days and over - $ 32,267; Alton - $17,500
Owed to General fund from Reserve fund for capital improvements - $41,224
Owed to Reserve fund from General-Oct.& Nov.@ $4785= $9570
General Observations
Expenses over budget:

DRAFT

Lots of fuel for generator, thanks to WAPA outages and storms- 138% over budget ($5,756)
Lots of truck repairs – 243% over budget ($4,058)
Lots of water leaks – 13% over budget ($2,000)
Lots of Accounting fees (insurance funding meetings, attending board meetings regarding insurance, review of revised budget, etc. – 56% over budget ($2,100)
Guard Service, due to increased hours – 22% over budget ($9,400)
Office Expense, new computer, new a/c – 24% over budget ($3,700)
Masonry/Cistern CI- 57% over budget ($25,950)
Sewage/gray water – 11% over budget ($4,230)

(Sharon)Will be on island mid until end of November; will be working with Jon, Bill and Louanne on 2012 budget, and anyone else who wants to join us.

**L-41:** Owner returned statement with a note that he filed for bankruptcy in 3/11 and discharged in May 2011. Vince stated that unless the owner can prove otherwise, because we have a lien on the property, he still owes the Association all charges. Vince suggests the Association consider foreclosing on lien.

**Old Business**

**Meet n Greet and Owners Meeting Date & Place:** The Meet and Greet is February 9 and the Owners' Meeting is February 11 at the Caribbean Fish Market

**Review of Bylaw changes voted on during October Meeting**
Article 2 section 3: Subparagraph k added

Article 2 section4: All vacancies should be voted on the same ballot

Article 2 Section 8: Electronic Mail

Article 2 Section 9: Electronic Mail

Section 11: No business transacted until a forum is achieved

Section 15: Executive Committee 2nd paragraph, last paragraph: Recommend that *merging the Association* should be deleted. All in favour

Section 16: 30 days after the inspection

Section 19: Added

Article 3 Section 3 Special Meeting: Addition

**Bylaw changes discussion continued**

**Article 5 Section 2 Insurance:**

DRAFT

<u>Section 2. Insurance:</u> Highlighted suggested changes by Max and Bob are inserted into minutes for this discussion. (At this time Vince excused himself from the meeting.)

Changes are highlighted in yellow:

*The Board of Directors shall annually obtain and maintain, to the extent obtainable, the following insurance:*

1. *Fire with extended coverage to include earthquake and flood coverage, vandalism and malicious mischief endorsements insuring the entire buildings and "common elements" together with all service machinery contained therein and covering the interest of the Condominium, the Board of Directors and the Common Interest of the unit owners in an amount to be determined by the Board of Directors.*
2. *Windstorm, insuring the entire buildings and "common elements" together with all service machinery contained therein and covering the interest of the Condominium, the Board of Directors and the Common Interest of the unit owners in an amount to be determined by the Board of directors.*
3. *Worker's Compensation; Public Liability covering each member of the Board of Directors, the managing agent, the manager, the office manager and each unit owner; Vehicle and other such insurance as the Board of Directors may determine in amounts to be determined by the Board of Directors.*

*All policies of physical damage shall to the extent obtainable contain waivers of subrogation and waivers of any defense based on co-insurance or of invalidity arising from any acts of the insured, and shall provide that such policies may not be cancelled or substantially modified without written notice from the Board of Directors.*

*From time to time or as required by insurers, the Board of Directors shall obtain from a certified and USVI licensed real estate appraiser an appraisal of the full replacement value, without*

*deduction for depreciation, of the buildings, common areas and facilities for the purpose of determining the amount of insurance required.*

*Unit owners shall be encouraged to carry Home Owners insurance on their "apartment unit" for their own benefit provided that all such policies shall contain waivers of subrogation and further provided that the liability of the carrier(s) issuing insurance obtained by the Board of Directors shall not be affected or diminished by reason of any such additional insurance carried by any unit owner.*

*The Board of Directors will provide owners a concise summary of all insurance coverage and costs at each Annual meeting.*

*The terms "common elements" and "apartment unit," as mentioned above, are defined*

*in Article 5, Section 10 "Routine Maintenance and Repair."*

Bob will follow-up with several insurance agents regarding information on waivers of subrogation. (At this time Bob excused himself from the meeting) This paragraph requires further discussion by the entire Board. No vote was taken.

Section 3 Recommended changes

*The association shall only be responsible for inspecting unit interiors to determine if damage is structural or due to external causes, or if adjacent unit damage is caused by external causes, or unless that unit is owned by the association. Unless that unit is owned by the association, repair by the association of other unit damage will be limited to structural damage, that caused by external or adjacent unit causes, and will not include property or fixtures installed by the owner or previous owners.*

Max determined that further discussion was needed by the entire board and tabled this section.

DRAFT

Section 10 Recommended changes

*An "apartment unit" is considered the space inside the perimeter walls, interior walls, floor and ceiling to include:*

1. *All decorating elements including: paint, wall and floor coverings, paneling, molding and tiles; finished cabinets and mirrors.*
2. *All electrical appliances including: refrigerator, stove, washer, dryer, dishwasher, garbage disposal, hot water heater and air-conditioning equipment (including compressor).*
3. *All electrical fixtures including: wall ceiling and floor outlets, switches and fuse box.*
4. *All plumbing fixtures including: tubs, showers, sinks and faucets.*

*Additionally, the unit owner shall be responsible for the routine lubrication and adjustment of doors and windows, and, unless major casualty related, replacement of broken glass, wooden or glass slats and damaged screens. The unit owner shall also maintain and assure the operability of the storm shutters installed on that unit and is responsible to close them in the event of a windstorm. Damage caused by failure to do so is the responsibility of the owner if net insurance proceeds are insufficient to cover such damage.*

***Max made a motion to accept the definition of "apartment unit" All were in favour .***

*"Common elements" are considered to include all other elements of the buildings and property except those specified as being part of the "apartment unit." Additionally, the following are considered common elements:*

1. *Electrical supply to the fuse box, electrical supply lines in the walls (including interior walls), floor and ceiling.*
2. *Water and plumbing lines in the walls (including interior walls), floor and ceiling to the valves at sinks, showers, tubs, hot water heater, and toilets, etc.*
3. *Drains to the first connection outside a wall.*

*External air conditioning compressor units shall be maintained by the owner in a reasonable state of preservation. The Association may require owner to remove inoperable and/or un-maintained units or do so at the owner's expense*

DRAFT

Max stated this change (above) includes electrical supply lines in walls. Jon stated the cost to the budget would be substantial with this change. Max assigned Jon to determine the estimated budget implications based on these recommended changes. Max also would like to include a statement that holds the Association harmless if the original wiring and plumbing was changed by the owner.

Matrix

| Category (Not Intended to be all-inclusive) | Owner Maint/Repair Responsibility | Association Maint/Repair Responsibility | Association Insurance Responsibility | Owner Insurance Responsibility |
|---|---|---|---|---|
| Exterior Walls and Interior Damage Caused by Leaks | | x | x | |
| Roof and Interior Damage Caused by Roof Leaks | | X | X | |
| Interior Damage caused by Adjacent Units (Leaks, etc.) | X | | | Owner of Adjacent Unit's Insurance Responsible |
| Front Doors | X If Not Original | X If Original | X If Original | X If Not Original |
| Screens | X | | X | |
| Exterior Sliders | | X | X | |
| Exterior Wood Fittings | | X | X | |
| Exterior Windows | X If Not Original | X If Original | X If Original | X If Not Original |
| Electrical System to Breaker Panel | | X | X | |
| Electrical System, Breaker Panel to Outlets, Junction Boxes | X If Not Original | X If Original | X If Original | X If Not Original |
| Electrical Fixtures | X | | | X |
| Plumbing Inside Walls/Floors | X If Not Original | X If Original | X If Original | X If Not Original |
| Condo plumbing not in walls/floors | X | | | X |
| Plumbing Fixtures | X | | | X |
| Interior Walls | X | | X | |
| Interior Doors | X | | | X |
| Cabinets | X | | | X |
| Furniture | X | | | X |
| Appliances | X | | | X |
| Wall/Floor Coverings (tile/carpet) | X | | | X |
| Hurricane Shutters | X | | X | |
| Furniture | X | | | X |
| Personal Property | X | | | X |
| External A/C elements | X | | | X |
| Internal A/C elements | X | | | X |
| Landside Porch/Steps/Railings | | X Excluding Tile | X Excluding Tile | |
| Seaside Balcony/Railings | | X Excluding Tile | X Excluding Tile | |

3055300/000459

DRAFT

**Max requested Jon review Matrix and comment on each item.**

**Special Meeting:** Max requested the Directors meet Friday, November 18th, at 9:45AST to complete the discussion on the Matrix and budgetary concerns.

**2012 Budget Meeting:** Sharon plans to set a meeting while she is on island during November.

**Section 11:** Addition to section

1. No dogs are allowed on the property, either long term or visiting. The Board may grant exceptions to the NO DOGS ALLOWED rule, on an individual basis, should an owner require the assistance of a service animal (dog) as defined by the ADA. Owners seeking to obtain such an exemption are required to apply, in writing, to the Board with supporting documentation.

   Federal and ADA Compliance, as follows:

*"On July 23, 2010, Attorney General Eric Holder signed final regulations revising the Department's ADA regulations, including a revised definition of "service animal." Effective March 15, 2011, "Service animal means any dog that is individually trained to do work or perform tasks for the benefit of an individual with a disability, including a physical, sensory, psychiatric, intellectual, or other mental disability. The work or tasks performed by a service animal must be directly related to the handler's disability.*

*Dogs used for emotional support, that are not task-trained, are called emotional support animals. They are not service dogs".*

This section is tabled until the opinion of a lawyer is obtained.

**New Business**

**23W**: An inspection of the wiring of this unit resulted in several items that required repair. The repairs were completed , the owner paid the contractor and requested reimbursement. Jon reviewed the repairs and invoices, Max approved the reimbursement.

**Manager's Report:**

DRAFT

**Infrastructure and maintenance**: Monthly scheduled filter changes to gray and fresh water distribution systems were completed. The new fresh water system recommended the filters to be changed every 3 months, Jon has opted to change those filters every month. All other systems are operating properly until this weekend when a WAPA outage heated the breaker of the gray water motor and caused it to burn out. The breaker was changed and we may be changing the meter box. We continue to run the generator for 45 minutes after power is restored as programmed.

**Off season maintenance items:**
Inspection of steps: 1/3 completed, inspecting on sunny days
Pressure washing 50% complete, inspecting on rainy days
Rails, steps, and parking lot painting will be completed by December 15. Striping and painting will be done after pressure washing is completed.

**Transformer**: should be in Miami tomorrow and is scheduled to be in shipped this week. Once in route, we will schedule Mr. Harvey's visit to reroute the final 3 phase leg of our electrical system.

**Long Term Planning Committee**: Thursday 11/17/11 10:00 AST to use original code for telephonic conference

**Elysian Payment**: No payment has been received. Jon spoke with Gene last week and was told the check is forthcoming.

**CBE Bylaws**: Jon to contact Andy

**Thefts**: Multiple thefts are continuing at CBW, CBE, Elysian, and Cabrita Pointe. Most of the issues have typically occurred Sunday afternoon, between 11a-2p. During each of these occurrences the owner/renter has left his door unlocked and purses, wallets, etc. in plain view. The Association has strongly encouraged the owner/renter to file a police report. Max asked Louanne to draft a letter to the Police Chief from the Board, requesting the police to be on increased alert and provide increased patrolling during the week and weekends.

**Nomination Committee**: The nomination committee recommendations need to be submitted this month to be sent out to the owners by December 1.

**December Meeting**: The December meeting will be 12/13/11 at 8:45am

**Adjournment**: There being no further business the meeting was adjourned.

DRAFT

## ACTION ITEMS

| | |
|---|---|
| Retain lawyer to review and give opinion on No Dog Rule | Max |
| Contact Vince to vote on Executive Committee member | Louanne |
| Announce Executive Committee | Max |
| Evaluation of Managers for December meeting | Max |
| Manual Security Gate repairs | Jon |
| Budget Meeting | Sharon |
| L-41 Determine Foreclosure by CBW | Directors |
| Meet N Greet/Annual Owners Meeting confirm meeting place | Rosie |
| Obtain info on waiver of subrogation and HO-6 policies | Bob |
| Budgetary implications based on recommended changes to Bylaws | Jon |
| Long Term Planning Committee Meeting | Max |
| Elysian Payment | Jon |
| CBE Bylaws | Jon |
| Letter to Police Chief | Louanne |
| Nomination Committee Recommendations for mail-out by Dec | Bob |

**Cowpet Bay West**
**Board of Directors Meeting**
**December 13, 2011**

**Present:** Max Harcourt, Barbara Walters, Bob Cockayne, Rosie Wells, Sharon Koehler, Bill Canfield, Vince Verdiramo, Jon Cassady, Louanne Schechter

**Open Meeting:**
Max made a motion that our meetings, except when put into executive session are open. "Open" meaning any owner may attend by phone or in person. Bob 2nd, the vote carried with 4 yes and 3 no.

**Executive Session:**
Max made a motion to go into Executive Session to discuss employee performance and compensation. Bob 2nd, all were in favour. Louanne and Jon were asked to leave the meeting at this time. The Executive Committee met and voted to not give bonuses this year. The Board voted 6 in favour of no bonuses and Barbara declined voting.

Louanne and Jon were invited back into the room. Max made a motion to leave Executive Session, Bob 2nd, 5 voted yes and 1no.

**Treasurer Report:** As of November 30
Regular/Special Account Balances - $135,705
Reserve Fund Balance - $425,677

Analysis of Reserve Fund status, Capital Improvement reimbursement, anticipated Reserve Fund balance at year end:

| | |
|---|---|
| Current Reserve Fund Balance - | $ 425,677 |
| Dec. payment due Reserve | + 4,785 |
| Owed for Capital Improvement | - 41,680 |
| Anticipated Reserve Fund Year End | $ 388,782 |

Uncollected funds 60 days & older - $20,880
Louanne reported L-41 is under contract and that we would be collecting the bulk of the outstanding fees if we accept the offer from the buyer which is approximately $18,000. The Directors voted unanimously to accept the offer. Louanne reported that L-48 was also now current.

<u>Budget Issues</u>

1. Management Salaries/bonuses
2. Capital Improvement Projects

Sharon stated that without Capital Expenditures, we would have to reduce the Reserve Fund by approximately $10,000. We would also continue the $60,000 insurance fee but we would spread it over 12 months.

3055300/000463

DRAFT

Max stated he asked Sharon to prepare the budget using (worst case scenario) the current insurance fees. Max tasked the Insurance Committee to obtain bids for the property to be effective preferably by February. Bob reported he spoke with Mapfre and Executive Insurance and will continue to get bids.

Bob asked Vince if he wanted to be considered for the 2012 Board of Directors, Vince declined.

Bill and Vince left the meeting at this time.

Barb asked, do the owners approve the budget? Max stated that according to the Bylaws, the budget is the responsibility of the Directors and that it is presented to the owners.

Max suggested we have a meeting to finalize the budget next week with the intent of distributing it to the owners by year's end. **The meeting will be Tuesday, December 20th, at 8:45 am.**

Max stated that worse case for insurance is if we have to continue with Mapfre at current rates. The insurance committee is creating a bid package to include risk factors, hoping to obtain better rates.

**Old Business**

**ByLaws**

Anna Paiewonsky reviewed proposed Bylaw changes from the Directors. She suggests the Association be an LLC. Anna dropped the word "apartment" from the entire document. Max stated *apartment* remain as it is used throughout the document. Max suggested the Directors look at the proposed changes in the attachment provided by Sharon.

Article II Section 3: Sharon stated exceptions were made to protect the Association from negligent discharge. Following discussion, the directors voted not to accept this change.

Article II Section 5: Suggested change, in red, left out.

Article II Section 6: 4 above, *Subject to section 4 above* leave out.

Article II Section 8: typo: *Meeting notices* at end of section omit. Leave meeting date notice at 30 days.

Article II Section 17: *Action by consent*. Leave as is.

Article V Section 1: last paragraph Operation of Property,
Change the wording from *preliminary* to approved *budget for the ensuing year shall be provided not less than 30 days.*

Article V Section 2: Paragraph 3- omit ***and/or an evaluatian based an risk exposure***

Artilce V Section 11: #4: No Dogs Allowed moved from Rules to Bylaws. The Directors discussed Vince's legal opinion that was emailed to owners, the Directors agreed to hire a VI lawyer and obtain that opinion. The directors agreed to keep #4 as:

1. No dogs are allowed on the property, either long term or visiting. The Board may grant exceptions to the NO DOGS ALLOWED rule, on an individual basis, should an owner require the

DRAFT

**Status on Electronic Banking:** Louanne stated she sent the cost and form to the Directors and did not get a response. Sharon stated she never received it, Louanne will resend it.

**Owner List:** Louanne reported she is calling each owner and updating the list accordingly. The list is available electronically.

**Approval of Minutes:** Max made a motion the minutes to the meetings on November 8th and 18th be approved as read. Rosie 2nd, all were in favour.

**Next Meeting:** The next Board of Directors meeting will be January 11, 2012 at 9am.

**ACTION ITEMS**

| | |
|---|---|
| Retain USVI lawyer to review and give opinion on No Dog Rule | Max |
| Notify Directors of Special Meeting for Budget on 12/12/11 | Max |
| Prepare Bylaws for distribution to Owners | Max & Sharon |
| Complete recommendations for nominations | Nominating Committee |
| Resend information on electronic banking | Louanne |
| Prepare Ballots for distribution to owners | Louanne |
| Owners Directory updated with email address | Louanne |

DRAFT

**Cowpet Bay West**
**Board of Directors Meeting**
**January 11, 2012-01-12**

**Present:** Max Harcourt, Barbara Walters, Bob Cockayne, Rosie Wells, Sharon Koehler, Vince Verdiramo, Jon Cassady, Louanne Schechter
Bill Canfield could not attend

**Owner W-12:** Mr. Kirschenbaum requested to speak to the Directors on behalf of his wife. He made a formal request for an exemption to the no dog policy. He presented a letter from his wife's physician stating the dog was necessary as part of her treatment. He provided the Directors with certification for the dog. He stated he and his wife would be responsible for cleaning up behind the dog. He stated he has purchased a "no bark collar" in the event the dog should bark. He spoke with his neighbours and they have not heard the dog. Mr. Kirschenbaum stated that when he and his wife purchased their condo there was no rule against dogs. Mr. Kirshenbaum left the meeting.

**Executive Session:** Max asked if there was a need for Executive Session. Vince requested Executive Session there was no 2nd, the meeting remained open.

**Nomination Criteria:** Vince asked Bob what criteria were used to determine who was recommended. Bob indicated the committee had discussions on each candidate. Following discussion, Max stated that there was no new issue here to present before the Board of Directors.

**Minutes of the meeting of December 13, 2011** were accepted with the following amendments:
Executive Session: add to the third sentence *but to increase Jon and Louanne's salaries $4k and $2K, respectively (per Max).*
Nomination Committee: Delete *this afternoon* from Bob's comment to bring info to office (per Bob)
Bylaws: Change to: Anna Paiewonsky made provisions for the Association to be an LLC (per Sharon).

**Minutes of the meeting of December 20, 2011** were accepted with the following amendments:
Missing Applications: Last sentence changed to: Max stated he may send all email correspondence out regarding the issue and leave it to the owners (per Max).

Under Executive Session add: The Board voted to award bonuses to Jon, Louanne, the staff and contract workers.

DRAFT

**Treasurer Report:**

2011 Year End Analysis/2012 Budget

Reserve Account

| | |
|---|---|
| Beginning balance -12131/11 | |
| Collected from owners | $ 501,759 |
| Interest eamed (approx) | + 108,800 |
| CI Expenditures | + 3,000 |
| Reserve fund acct total 12131 | 165.391 |
| Bank acct balances (Reserve) | $ 445,468 |
| Owed from General to Reserve | -425.927 |
| | $ 19.541 |

Upon speaking with Jeanne Brennan this week, she recommended we transfer the $19,541from our general account to our Reserve account this week.

So, our yearend balance in our Reserve account will be $445,468 (+ or - interest actual)

2012 Budget

Suggestions

We have not budgeted anything for the completion of the 4-year electrical project. If Mr Havey is not yet scheduled to come down here, we should defer his trip to a more reasonable time

Before commencement of any approved CI projects, Exec committee/Board should be thoroughly briefed on scope and cost and terms of contract, if any.

3055300/000467

DRAFT

Max asked if we had any unanticipated projects in the last quarter. Sharon reported the masonry project, specifically cistern repair and spalling replacement under buildings cost us 35,000 that we did not budget. Jon reported most of the expense was on spalling which had to be done.

Max requested the new budget be sent out to owners as soon as possible.
Jeanne Brennan is scheduled to meet with Sharon, February 3, to work on Financials.
Sharon asked how much Jon was budgeting to complete the electrical project. Jon said it will be 7-8K that will come out of Building Expense. He stated we were bringing Kent Harvey down after "season" is over.
Sharon requested that any Capital Project that comes up be brought to the Executive Committee or the Directors with bids if possible.

**Old Business**
**L-41**: The property is scheduled to close around the 18th of this month. We expect to get all arrears paid.

**Bylaw vote**: Max reviewed the votes 10 of 10 are for the changes. Bob suggested the Directors begin a campaign to contact owners to vote.

**Insurance:** Marilyn Blackhall will head up the insurance committee, effective immediately. Anyone interested in joining the committee should contact here. Max has asked the committee to craft what we want which is based on current appraisal, accepted risk- agreed value.
Vince requested the Association obtain a risk assessment.
Bob stated that" we comfortably have through February, if that's the time table we agree upon, to make a change." We will have a 10% cancellation penalty should we change the policy.
Max made the motion: It is the intent of the board to investigate retaining a risk assessor to determine what an accepted value of our insurance should be Sharon 2nd 4 voted for and 1 abstained. Motion passed.
Bob reported that Mapfre is now offering an HO6 policy.

**New Business**

**Dog Letter**: Max received a letter from Karen Benson who is the attorney for Barbara Walters. Barbara stated she was confirming her rights and that she is on the correct side of the law.

Vince made a motion that we abide by the rules and immediately begin fining owners that have dogs. Discussion included utilizing the firm of Hodge & Francois to develop a policy regarding our no dog policy and procedure for exemptions when warranted. Bob distributed information on Service Dog Certification naming businesses that have no requirements for service dog certification.

The motion was repeated that we abide by the rules and immediately begin fining owners that have dogs. Fines may be held in abeyance until the issue is adjudicated. The Vote was 3 for and 3 against. Bob and Vinnie requested we contact Bill for his vote on the motion. Bill was not available, a message was left for him to call.

DRAFT

Max made a motion that the association hire an attorney to appropriately respond to the letter we have received and assist us with determining our status with our no dog rule, Sharon 2nd, all were in favour.

Bill Canfield phoned in and was placed on speaker phone. Vince restated his rule: We strictly adhere to the no dog rule, and that all owners having dogs on the property be fined and the fines be held in abeyance. Sharon 2nd, 4 voted yes, 2 No, 1 Abstained, Bill left the meeting.

Bob made a motion that the fine be assessed at $50/day in abeyance. Sharon 2nd. 4 voted yes, 2 voted no.

Louanne was instructed to send letters by email and mail that informs the owners with dogs of the decision to begin fines tomorrow.

Max made a motion to begin fining owner s with dogs a $50/day fine to be held in abeyance. Sharon 2nd, the vote was taken with 4 yes and 2 no.

Vince suggested that a copy of the letter from Barbara Walters lawyer . be sent to our D & O insurance.

**Non-compliant Enclosed Porch:** Vinnie made a motion regarding Lance Talkington's enclosed back porch: Send a letter to Lance Talkington that he is in violation of the remodelling rules of the condominium association and that he needs to remove it immediately. Rosie 2nd, following discussion and review of records the vote was taken with 3 yes and 3 no, Bill Canfield was contacted by phone, the vote was taken again with 3 yes and 4 no.

During discussion the question was asked should the owner pay more in common fees due to the additional square footage for the unit by enclosing the porch. Max suggested we table the discussion for another meeting

**Additional Weight to Porches:** Max suggested we table until another meeting the addition of additional weight and storing of heavy equipment on porches. Barbara suggested that the owner be responsible for a structural engineer to determine if any additions or equipment can be stored safely.

**Volleyball Court:** The volleyball court appears to be on CBW property. Vince stated the Association should check with our agent of our liability insurance to determine if we are covered should someone get hurt. Should we not be covered, we should find out what the cost of a rider to the policy would cost.

At this time Vince left the meeting.

**Manager Report**

Monthly filter were changed January 3rd. The waste water and treatment plant are functioning well. Typically we exercise the generator on Thursday however, we ran the generator yesterday to decrease the cost of running the R/O plant.

Painting Steps: Jon has added an additional worker to complete the painting of the steps. He hopes to complete 50% this week and the remainder next week (weather permitting).

DRAFT

Security Gate: The electric gate malfunctioned. A WAPA outage shorted out the pedestal on the outside. The pedestal had a message "power down exchange chip. Jon powered down and powered back up. The pedestal stated erase all memory? Jon powered down again and called the vendor. The vendor was unaware of this message and would have to contact the manufacturer (who was closed for the weekend). The manufacturer was contacted, the service people came out reset the chip and cleared the memory. The memory was restored, and the gate is now functioning.

The manual gate is also broken. Jon recommended the existing manual gate be replaced. A drawing and price was obtained and shared with the Directors. Max stated that the pivot point of the existing gate is not salvageable and perhaps dangerous to use.
Sharon made a motion that we proceed with the new manual gate, Max 2nd, all were in favour.

The No Dog signs will be up next week. Cool Signs is producing them.

Owners Workshop: Sharon reported the workshop is cluttered with chairs, carpet, exercise machine, plastic chairs, glass tables, etc. so that the work table is not usable. The area is to be cleaned.

At this time Bob left the meeting.

Roadside Signage: The Directors suggested the knocked over base of the sign be up righted and reused if possible. The quote and the drawing of the sign from Mad Max was provided to the Directors. Max made a motion we have the sign made and reuse the base if possible, Sharon 2nd, all were in favor.

**Action Items** (not completed).
CBE Bylaws: We do not have a copy.
Electronic Banking: Max would like to delay decision until Owners Meeting. Sharon stated that there are many benefits to electronic banking that we don't have now and suggested we go forward with application. Max tabled the discussion until February's meeting.

February BOD Meeting: Tuesday, February 7th at 8:45am same phone in number

Adjournment:
There being no further business the meeting was adjourned.

DRAFT

**ACTION ITEMS**

| | |
|---|---|
| 2012 Budget be sent to Owners | Sharon |
| Attorney for Dog Rule | Max |
| Letter to Owners in Violation of No Dog Rule re:$50/day fine | Louanne |
| Copy of letter from Ms. Walters to D&O Insurance | Max |
| Increase Common Fees to owners that have enclosed porches | Tabled |
| Determination of Additional Weight on Porches | Tabled |
| Contact Liability Insurance re: coverage for Volleyball | Bob |
| Painting of steps | Jon |
| Purchase and implement new manual gate | Jon |
| No Dog Signage | Jon |
| Clean out owners workshop | Jon |
| Contact MadMax re: road side sign | Louanne |
| Reset base of road side sign | Jon |
| CBE Bylaws (obtain a copy) | Jon |
| Electronic Banking | Tabled |

**Cowpet Bay West**
**Board of Directors Meeting**
**February 7, 2012**

**Present**: Max Harcourt, Barbara Walters, Rosie Wells, Sharon Koehler, Bill Canfield, Jon Cassady, Louanne Schechter, Bob Cockayne attended by phone conference. Vince Verdiramo was absent. Jon was excused to attend to a meeting with representatives from Elysian, and CBE and CBR with a public surveyor and joined the meeting in progress. Also present were: Judi Kromenhoek, Doug Rebak and (by phone) Lance Talkington and Al Felice.

**Executive Session**: Max asked if there were any items to be discussed in Executive Session, there being no necessity, the meeting continued.

**Approval of Minutes of January 11, 2012**: Sharon requested in the December BOD minutes should read Anna Paiewonsky contributed language to make provision for LLC's throughout the bylaw document. In the January minutes, the last name of Barbara's Lawyer is incorrect. Also, omitted from this section is Max asking Barbara if she had registered any complaints and she acknowledged the HUD complaint. Max indicated that further discussion was halted pending the hiring of an attorney for the Association. In the second paragraph, the document Bob distributed was entitled "Service Dog Certification-Spotting Fake Certification's".

**Treasurer Report**: Sharon reported the bank balance at the end of January is a total of$ 445,760 in our reserve funds and $82,500 in our operating accounts. L-41 closed in the month of January resulting in full payment of fees in arrears ($21K).

Jeanne Brennan, CPA, met with Sharon, Max, Jon, and Louanne to review the financials. The budget was reviewed for accuracy and the cash and cash equivalents were reviewed. Jeanne made suggestions for adjustments to clarify the work on the beach, the payments from Elysian, and our capital improvement expense at the end of the year was $158,178. This year we have $114,000 budgeted for capital expenses. The gray water project from 2011 and the electrical project from 2011 will require funding to finish that is not in the 2012 Budget.

Sharon will change the signatories on the First Bank account following the election to allow for a member with 3 years to be on the account. She will also add checking to the account to allow for monthly deposits to the fund as well as withdrawals as the CPA has suggested.

**OLD BUSINESS**

**HUD complaint:** At the last meeting the board voted to retain an attorney. Max met with Marie Hodge and subsequently engaged her to handle the dog issue. Marie Hodge and our D&O Insurer were sent a copy of the HUD complaint. The Insurance Company has assigned an attorney to respond to the HUD complaint and Maria Hodge will be providing the opinion on the dog issue. The Executive Committee met with Maria Hodge via teleconference. The Executive Committee is not at liberty to discuss any more detail on advice of Ms. Hodge.

**L-41:** The unit sold and the arrears collected in full.

Jon returned to the meeting at this time.

**Insurance Committee:** Nothing to report at this time.

**Bylaw Vote Status:** Approximately 28 votes have been collected at this time.

**Annual Owners Meeting:** Max thanked the following people:

Rosie set up the catering for the meeting. Randy Driscoll will be catering for $300

Jon negotiated the meeting room for free.

Sharon and Sally have set up the Meet & Greet

Bill Canfield arranged for the use of the Yacht Club for the meet and greet for a minimal fee to be determined.

**Owner Package for Annual Owner Meeting:** Louanne stated she will have the material printed tomorrow, to include: Agenda-Insurance Summary-Cash Equivalents-Budget-Owner Issue Policy

Owners were sent an email to bring the proposed Bylaw changes with them to the meeting.

**Owner Issue Policy:** Max requested the Owner Issue Policy be included in the owner package. Jon requested the Directors verify the spalling example in policy. Jon explained that most interior spalling is caused from rebar, but the rebar is not a structural problem unless the rebar itself shows physical signs of distress. Jon obtained the opinion from Mr. Ferraris, the structural engineer that examined some of our exposed rebar. Mr. Ferraris said rebar "pops" in (mortar) plaster because of the property of the metal reacting to moisture causing rust and swelling which eventually will cause a crack or spalling, no different than drywall "pops". The rebar may need to be sanded and chemically treated to prevent further spalling to the finished surface, which is cosmetic. Owners have been responsible for cosmetic repairs and the Association is responsible for structural problems. Max stated in accordance to our Owner Issue Policy, The GM will inspect the problem, if the owner is not in agreement with the GM, then the owner would submit the complaint to the Board. The Directors will then make a decision on the matter.

**Annual Owner Agenda:** Max presented the proposed agenda.

Parliamentarian: Max requested Ed Wardwell be the parliamentarian to keep order during the meeting.
Roll Call: Louanne
Establishment of Quorum: Rosie
Proof of Notice: Louanne
Meeting Minutes: Rosie will be responsible for the reading of the minutes from last year.
President Report: Max
    Insurance for 2012: Marilyn
Treasurer Report: Sharon (utilizing the amended 2011 budget)
Manager's Report: Jon
Nominations Committee Report: Committee has nothing to report.
Old Business: From Owner's 2011 Meeting
New Business:
Announcement of Election Results

Max made a motion that the Agenda as revised be approved for the Annual Meeting. The motion was 2nd by Bob, all were in favour.

**Set-up for Annual Meeting**: Jon will obtain the key on Friday to set-up the meeting room.

**Walk-around:** The walk-around was conducted by the executive committee, the minutes were sent out to the Directors. The focus on the walk-around was to indentify long-term projects as well as inspect the general area.

**Fines:** Judi Kromenhoek requested more detail to the fine that she received on her statement. She would like to know what it was for and who enforced it. Louanne stated that in the statements sent through QuickBooks, item, quantity and cost are the only information provided; she spoke with Jeanne and confirmed that utilizing the invoice feature would allow for an explanation.
Barbara requested a timeline as to when the Attorney would make a determination on the Service Dog Issue. Max stated he was not at liberty to discuss the issue.

**Mailboxes:** Max had a request from Carolyn Wardwell to have the mailboxes replaced. During the walk around, it was noted the mailboxes were showing signs of rust. Louanne followed up on a lead from Carolyn from CA which was disregarded due to the prohibitive shipping cost. Max requested Jon follow-up with local merchants to see if they can be purchased or ordered on island.

**Employee Parking:** Rosie stated she had a complaint that employee's were parking in guest spots. Jon stated employee's park in available spots as they are available. Sharon suggested employees park alongside the dump truck. Max stated Jon will be responsible for employee parking.

**Illegally Parked Cars:** Sharon requested the parallel parking on Leeward that has 2 parking spots be striped where parking is illegal, signs be posted again, and Stickers be placed on windows of cars that are parked illegally.

**Security Guard Schedule:** Jon reported the sequences of the guard schedules in the past which has evolved to the current guard schedule being a roving guard on our property from 4-6p then at the Guard House from 6p-6a. The weekends are staffed with roving guards from 10am -6p then, from 6p to 6a at the Guard House.
Sharon asked what the events of the theft from L-22 were. Jon reported the facts as given by the owner to the police. The differences between this theft as opposed to the previous midday "crimes of opportunity" (unlocked doors) are:
L-22 was at night others were midday. Owner was in room adjacent to foyer, other; were on the seaside deck or not in the unit. The purse was taken and has not been found, others: cash was taken and the wallet/purse left behind.

Doug Rebak reported that he has installed devices that sound an alarm when the door is open or there is motion.

**Owner Renovation Request:** Max submitted a request to change his electrical panel to bring his power up to code and running a 220v line to his utility room. Max made a motion for approval of renovation, Barbara 2nd, all in favour.

Stickers on car: Sharon would like the security guards to apply stickers to cars parked illegally.

**L-01 Freezer on Porch:** Sharon reported her husband said there is no issue with the weight of the freezer. The owner is willing to make a cover for the freezer if it appears to be unsightly. Max stated that the white freezer is against the white shutters. Should a cover be made, it would be more visible.

**L-03:** Sharon stated L-03 sent a letter to Max that the addition to his unit was approved by the Directors. Max will forward a copy of this letter to the Directors. The Directors will have to decide if the owner will be responsible for increased charges to his common fees because he has increased his square footage. The Directors will also direct the green stripe to be applied.

**Manual Gate:** The gate is finished and will be delivered and installed this month.

**Security Gate:** No bids have been submitted by Kevin Cogan

**No Dog Signs:** Jon reported during a walk-around with Max, they noted CBE had attractive signs with their logo. He is working with Cool Signs to provide a similar design for CBW.

**Cowpet Road Sign:** The concrete needs to be rolled up and reset. The sign has been ordered by through Mad Max.

**Steps & Railing Painted:** Steps are completed up to L-08 with non-skid. Railings were not completed, on Windward they are being sanded down then repainted. Barbara reported that W-51 back of new stair was not painted.

**Step and Landing Repair:** We have replaced 3 with Chris Thompson at this time. Jon has asked several contractors for bids with the scope of work being: remove old brackets, through bolt and reinstall step. Contractors would like to do one before they commit to a price.
Sharon asked why we had purchased the angle iron and bolts for the entire property, Sharon stated that we were going to do partial order and only the steps that need repair were to be completed. The budget was for $20,000 for the entire project and we have already spent $14,000. Jon requested the Directors choose which stairs/landing be repaired. His understanding was we had $50,000 allotted for this capital project. The budget was reviewed and there is $50,000 on the budget for the stairs.

**Masonry:** Jon has not been able to find a contractor to commit to a fixed price to repair the spalling under the buildings.

**Tree wall damage repair:** The walls around the trees. Sharon stated that her husband, Bud, suggested take down the walls and replace with railing. The tree near L-26 is buckling the sidewalk and the road as well as the walls.

**Owner Workshop:** Jon is contacting the people that have items in that room to have them removed.

**CBE Bylaws:** Jon gave Max a copy of the CBE Bylaws.

**Surveyor:** A surveyor from public works has an "as-built" plan with no footings or markings and is attempting to find the property lines for Elysian, CBW, CBE, and CBR.

**Letter to Owners**: Max sent a letter to our neighbors that the volleyball net needed to b e removed from CBW property as our liability insurance does not cover athletic activities.

**W-47**: Jon reported the events leading to the fines that were charged to W-47. There were multiple phone calls leading to our maintenance men looking for a water leak. The manager stated there was a maid there to let him in the unit. There was no one to let him into the locked closet Thursday, Friday, Saturday (x2). The problem was in the locked owner closet. The owner was instructed on Friday to contact a plumber, that it was not an Association issue.

Sharon stated she would write a letter to the owner explaining the events. Louanne provided Sharon a copy of the plumber's bill that explains the problem is the owner's. Jon will provide Sharon with any other data on the events she may need.

**Manager Report:**

**Filter Changes**: Monthly filter changes were completed as scheduled

**DPNR**: There were 2 inspectors on property yesterday. One was the annual inspection of the WWTP, the RO plant, and the potable water systems for the EPA and DPNR. The other inspector was here to inspect our fuel storage and SPCC (Spill Prevention, Control, and Countermeasure Plan) plan, kit, and Terminal permit. Facilities that have fuel storage over a specified limit that if spilled could find its way to navigable waters require this Terminal permit. DPNR began enforcing this permit process January 2012. CBW has in place, a SPCC plan and spill kit, and applied for the permit December 2010 with the application and a check for $750. The inspector did not have the application on file. CBW will need to have formal training from the inspector for use of the oil diapers. Our Water Pollution Control, TPDES permit, Air Pollution Permit, and SPCC Plan and Terminal Facility Permit were all in compliance with no deficiencies.

**Other Action Items**

**Retain an attorney:** See HUD complaint above.

**Electronic Banking**: Louanne resubmitted to Directors. There was no discussion.

**Owners list with email addresses**: Completed and owners informed to request by email

**March Meeting**: The March meeting will be March 6th, at 0845am AST

**Meet & Greet**: Sharon stated the Meet & Greet is a social function and requested W-44, Judi not be permitted to provide any information regarding L-49 Doug to the event. Max agreed that it is a social event.

**Adjournment**: There being no further business, the meeting was adjourned.

**Action Items**

| | |
|---|---|
| Update signatories on First Account and include checking | Sharon |
| Annual Owner Meeting Package to Print | Louanne |
| Set-up for Annual Meeting | Jon, Max |
| Invoices for fines | Louanne |
| Mailbox replacements | Jon |
| Striping of no parking areas, posting of signs | Jon |
| Letter to W-47 | Jon, Sharon |
| Letter from L-3 to Directors | Max |
| Increasing fees on units that have enclosed common area | Directors |
| Installation of manual gate | Jon |
| Bids on new automatic security gate/cameras | Jon |
| No Dog Signs | Jon |
| Cowpet Road Sign Base/sign | Jon/Louanne |
| Step & Rail Painting progress | Jon |
| Step & Landing Repair bids/progress | Jon |
| Owner Workshop clean-up | Jon |

**Cowpet Bay West**
**Board of Directors Meeting**
**March 6, 2012**

**Present:** Ed Wardwell, Bill Canfield, Rosie Wells, Sharon Koehler, Max Harcourt, Herb Horwitz, Doug Rebak, Jon Cassady, Louanne Schechter

Owners present: Al Felice and by phone Lance Talkington

Comments from the President: Ed asked the Directors to come prepared, be on time, and serve the best interest of all the owners at Cowpet Bay. He asked that Directors leave their personal bias at the door and treat each other with respect as elected individuals of the Association.

Sharon requested conference phone be activated for owner participation. No one knew the conference number. Louanne was to locate the number and activate the call.

Each Board Meeting will be an open Directors meeting for any owner to attend. There will be a closed Executive session following the Board meeting with Board members only. The purpose of this session is to discuss legal and fiduciary matters to be discussed and protect the privacy of all owners.

**Approval of Minutes of February 7, 2012 meeting**: Max stated he had sent correction to Louanne. The corrections from Max are: Also present were: Judi Kromenhoek, Doug Rebak and (by phone) Lance Talkington and Al Felice. Treasurer report last sentence add: ($21K), and Letter to Owners, change *owner* to neighbors. Motion to adopt as amended was made and 2nd. All were in favour, motion carried.

Sharon requested that Louanne send out the minutes, with amendments to all the Directors. Louanne replied she would send them out as soon as the Secretary had made the changes and forwarded them to her. The amended minutes are to be made available to the Directors by March 12, 2012.

**Treasurer's Report**: Sharon reported the current bank balance is approximately $13,000 in our general funds. We have not reimbursed our operating accounts for capital expenditures so far this year. Our First Bank Account has $445,900. We have approximately $11,000 in uncollected owner fees which our 60 days or over. This does not include the fines that are approximately $8,000.

Sharon continued that transfers of money have to be made. As discussed last month there is a concern regarding the FDIC and the amount it insures which is $250,000 per account. We could have 6 accounts each would be covered. The current interest rate is .05% Banco Popular interest is .02% and Fidelity is .021%. Her recommendation is we should open a second account at First Bank. The current account at First Bank has no checking account; a current signatory on the account must sign a withdrawal slip. There is a time lag between obtaining funds from First and moving them to our operating account at Banco.

Herb suggested using Navy Federal Credit Union that utilized electronic banking. Sharon said she would be interested in exploring that option

3055300/000478

Ed asked what was involved to immediately get the new signatories on the First Account. Sharon stated we need to have a copy of the minutes of the Annual Meeting that shows the elected officers, the new signatories need to go in person to the bank with a driver's license and sign the signature cards.

The conference phone was activated at this time.

The conference phone dropped the call. The number was redialled

Ed asked when the Annual Meeting Minutes would be available. Max stated his comments had been sent. Ed asked Rosie when she would complete the changes by Max. Rosie asked Max to resend. Ed requested Rosie complete the Annual minutes by March 15.

Ed asked Bill and Sharon to meet him at the office at 2:00pm tomorrow. They will go to First Bank to make the changes on signatories which will be: Ed, Bill, Sharon, and Rosie. Ed is currently on the account.

**Employee Severance package:** Jeanne Brennan was unaware we had a severance package. Four employees, Steve, Arlington, Marcellus, and Joey have letters that state they are entitled to 4 weeks of vacation and they would receive 1 week of pay at current rate of pay for every year if they were let go, if they retired they would receive 1 week of pay, at current rate for every year after the third year of employment. Jeanne suggested we begin funding for it and include it in the budget as a line item of liability. The letter of engagement to Jeanne was revised as well as the financial statement to include this item.

Budget vs. Actual: Sharon stated we have used 44% of our current capital improvement fund and we have 56% of our funds to last us through the remainder of the year. She cited the purchase of the hardware for the stairs at $14,000 and the continuation of the masonry projects as the items utilizing most of the capital funds.

Doug asked when funds are expended what is the protocol. Sharon stated the Property Manager reviews the checks and signs the weekly report. The Treasurer then signs off the checks. She stated when she was Treasurer 3 years ago checks were not released until the Treasurer signed the form except for certain circumstances. Ed tabled the discussion at this time.

**Managers Report**

Systems: The gray and fresh water distribution system filters were changed today. They are changed every month on the first Tuesday of the month approximately 10 am. All the rest of our infrastructure systems: the RO, WWTP, GenSet, Fresh and Gray water Distribution systems have no problems to report since last Board Meeting.

Action Items from last meeting:

- Striping and Parking sign along the Leeward wall were reinstalled

**Insurance Committee Report:** Doug reported that he along with Bob Cockayne and Herb Horwitz have selected 7 brokers to go out with a request for proposals with our bid specifications being made to them. Our objective is to pick ones that are reputable ones that understand that we are trying to reduce our insurance cost and also get it to the first quarter of the year being March 29th for our renewal date. We told them we would like to reduce our cost and we are prepared to increase our risk. We have sent to Tunick, Executive Insurance, Marshall and Sterling, Topa, Guardian, Specialty Brokers (Mapfre) and Red Hook Agency. Six have expressed an interest. The Specifications we sent out included a total property agreed value of $25,916,000, no co-insurance, replacement cost insurance, bid on a windstorm sublimit of both 1 and 2 million dollars with a 3% deductable by building. Earthquake and sublimit of 12.5 Million, with a 5% deductable on earthquake which is standard in the VI, Flood sublimit 3 Million with a deductable of $ 10,000, all other perils 12.5Million with a sublimit deductable of $250. The target date for vendors to return proposals is March 15.
The date is critical in the sense that Insurance carriers have more available capacity before hurricane season so obtaining a policy in the first quarter may save some expense.
Doug stated they only asked for 1M & 2M with the thought process that during Marilyn, CBW took a full frontal hit and sustained a $3,700,000 bill. Of that $700,000 went to the adjuster, 1M was for the brand new doors, 1M was for shutters, and $300,000 went to the seawall, leaving $700,000.
Herb said he did several scenarios with none of them going over our reserve fund.

Doug mentioned that improvements and betterments were covered in the Mapfre policy. This coverage lowers the cost of a HO6 policy.

Doug stated the strap downs, the tie downs, the shutters, and the hurricane rated doors are all improvements allowing us to take more risk.

Ed recessed the Directors Meeting at 9:45.

The Directors meeting reconvened at 11:00 with Louanne and Jon present.

**Owner Inquiry Policy:** Ed stated it is self explanatory and his intention is to recall the owners attention to the policy that there is a procedure and the staff is prepared to respond in accordance to the policy.

Sharon stated that when letters are sent to the Board, there is no Director that is responsible for responding. Ed stated he would be responsible for responding to each and every letter that requires a response. Ed will bring the letters to the Directors that are in conflict with the manager's decision. Max stated Sharon had developed a form. Sharon stated the owner should sign off on the form. Ed requested Sharon supply him with the form.

**By-Law Amendments:** Ed stated we did get approval for over 2/3rds to adopt the amendments. Some owners have replied to Ed regarding the legal status of the By-Laws. Following discussion, the Board decided to go forward with the will of the majority of the owners. Max made a motion that Maria Hodge have the By-Laws registered with the condition that another retainer is not requested. The motion was 2nd, all were in favour. Max will contact Ms. Hodge. Ed provided Max with a letter from Ms. Paiewonsky that outlines her legal opinion on the By-Laws.

**Invoices for fines:** Fines were removed from the statement and transferred to an invoice. The invoice allows for description of fines, the statement does not.

**Mailboxes**: The budget does not allow for new mailboxes. Jon will have maintenance reshingle the roofs over the mailboxes and repaint. To be done by next Board meeting.

**W-47**: Ed will respond to their reply.

**L-03**: Max forwarded the letter to Board members regarding the enclosure. The Directors agree this is not an issue

**Increasing fees when owners enclose common areas:** The Directors decided this is not an issue.

**Owner Workshop**: Jon will have treadmill removed.

**New Business**

**Staff Parking**: Sharon stated with her company and other 2 car families in her area there is not enough guest parking. She suggests Employees Park next to the dump truck. She suggested the pick-up be parked in front of the maintenance shop.
Max suggested we have diagonal parking spaces due to the difficulty of backing out.
Sharon wanted to know when her area would be pressure washed: Jon stated is was done recently
Doug asked if the parking lot was going to be striped: Jon said the numhers would be done over the next week.

**L-3 Water Leak:** Herb Horwitz had water leaking in his unit. The source of the leak was from a pipe in the wall that had been modified by L-3 to accommodate a water line to his icemaker. Jon informed L-3 the damage was his responsibility as the leak was on the unit side of the modified valve. The invoice for the plumber was sent to the owner. The owner refutes the issue. Herb Horwitz took pictures of the alterations to the original water line and distributed them to the Directors. Following discussion, the Directors agreed it is the responsibility of the owner. Ed will contact the owner.

**L-01** Needs the wall patched and painted.

**L-06** Needs a wall patch from the water leak repair done 2 weeks ago.

Herb asked for clarification regarding rebar "pops". Subject was tabled.

**Automatic Gate**: Approximately 3:30am this morning, a renter at CBW rammed the gate and damaged both hydraulic arms and bent the gate. The renter has given Jon his information and accepted responsibility for the accident. The police will be contacted to complete a report.

**Employee shirts:** Rosie said the staff requested new shirts. Rosie made a motion to purchase new employee shirts; the motion was 2nd all were in favour. Louanne will order them.

- The letter for W-47 was completed by Sharon and sent to owner. Jon gave his original notes to Sharon for documentation purposes. Sharon stated W-47 had sent a letter last night refuting the facts sent by Sharon.
- Installation of the Manual Gate is not complete, the pad is completed and the support in place, two brackets ordered from the states have not arrived and the vendor has placed a second order. The gates are on property and the installation will be completed once the brackets arrive. Ed asked for a completion date, Jon stated 3/15/12
- Bids on security cameras. Kevin Cogan, of First Alert, sent bid. He suggested put a remote video recorder in the workshop which will hold up to 4 cameras and if we also want the yacht club area monitored, place another video recorder in the last break room in the end. Ed instructed Jon to forward a copy of the bid to Bill. Bill will have the security committee review and report back to the Directors. Doug suggested that any placement of video recorders should be a secure area.
- No Dog Signs are completed and placed. Sharon said the placement is too far back on the lawn. She would like them placed on the property line of the grass area and add more. Sharon stated at least 4 were necessary along the property line. To be completed by 3/9/12
- Road Sign not complete the base was not budging. Doug suggested leaving it as a safety barrier. Put a new base in front of the old and install the sign.
- Steps & Rail Paint: Steps painting is complete with the exception of 2 on Leeward, 28 and 30, due to renters. Will be completed this week. The rails are just now beginning. Step repair: we have had one contractor do several of them to come up with a firm bid and his price is $225 to remove the old brackets, prime, and drill through and install. He is asking for $100/hr for any additional work. Doug stated the contractor's work, in his opinion, look terrible. He is also concerned the brackets are shorter.
- Owner workshop: Scooter has been removed, the carpet is removed. A treadmill is there. Sharon wants everything removed other than the inventory. Sharon stated the owners' closet also has a scooter and kayak in it.
- L-6, L-10, W-26 Jon is looking for drip edge that will span the difference between the gutter and the roof. The roofs that were replaced in Marilyn were not lined up with the appropriate overhang. The seamless gutter doesn't meet. Jon is looking for drip edge to repair the problem. He has asked Chris Thompson's assistance in obtaining the material.
- L-1 Had a water leak, while chipping the wall away, we found the source of the leak was a modification that L-3 had done to the plumbing.
- W-7 Crack repair. Charleson Burton has completed the Association's responsibility below the window.

**Chairperson Appointments:**

**Committee's** The five standing committees and their respective chairpersons are:

- Nominating – Doug Rebak
- Landscape – Judi Kromenhoek
- Insurance – Doug Rebak
- Security – Bill Canfield
- Property and Planning – Max Harcourt

Ed intends to, in his letter to owners today, identity chairpersons and contact information for any owner interested in serving on these committees

**W-12**: The owner has had problems with condensation on his floor over the last 3 years and submitted multiple requests for the Association to assist in the repairs. The owner was informed on each occasion that this problem is between owners and he should contact the owners of W-11. Ed will inform the owner of W-12 this is not an Association issue.

**W-27**: The owner lost power to the unit and requested the Association investigate. The main breaker was tripped and reset. Jon suggested the owner have his electrical panel checked as the breakers inside shut have tripped first. The owner was charged a service call and now refutes the bill. Ed stated the responsibility was that of the owner. Ed will speak with the owner. The Directors decided to remove the charge.

**L-06**: Sharon stated the cats are now a non-issue. And the other issues were resolved during the meeting.

**Letter to GE**: Bill would like a letter sent to GE regarding their proposals on RO and Waste Water. Bill will draft a letter and Ed will send it.

**Solar Energy**: Herb suggested we follow-up on solar energy. Max stated there is a new company on island that leases a system to offsets the cost. Max will obtain information and incorporate into the long-term planning committee.

**April Meeting**: Wednesday April 11, 2012 at 7:45am. The call in number will be 712-775-7000 the code is 106376

**Action Items**

| | |
|---|---|
| Amend February Minutes by 3/12/12 | Rosie |
| Resend Amended Minutes to Board Members | Louanne |
| Change Signatories on First Bank Account | Sharon, Ed, Bill, Rosie |
| Open additional accounts to maintain FDIC coverage | Sharon |
| Transfer of funds from First Bank to operating account | Sharon |
| Organizational Minutes | Max |
| Annual Minutes with Amendments completed by 3/15 | Rosie |
| Provide protocol for release of funds | Sharon |
| Add employee severance to budget as a liability line item | Sharon |
| Installation of Manual Gate completion date 3/15/12 | Jon |
| Security Committee Review of Bid from Alert 1 | Bill |
| Adjust placement of NO DOG signs and add 2 by 3/9/12 | Sharon |
| Rails painted –starting this week | Jon |
| New Base on roadside sign | Jon |
| Step & Bracket Replacement; evaluate recent work | Jon |
| Owner Workshop | Jon |
| Drip Edge on L-6, L-10, W-26, | Jon |
| Contact Chuck Waggoner re: By-Laws | Ed |
| Contact Maria Hodge re: By-Laws | Ed |
| Mailboxes: Replace shingles and paint by next Board meeting | Jon |
| Assign employee parking | Jon |
| Repaint numbers on parking spaces next week | Jon |
| L-3 re: Discuss owner responsibility | Ed |
| L-01 Patch and Paint area used to repair water leak | Jon |
| L-06 Patch and Paint area used to repair water leak | Jon |
| Entry Gate: obtain police report/begin repairs | Jon |
| Employee Shirts | Louanne |
| W-12 Condensation issue | Ed |
| W-27 Suggest electrical inspection | Ed |
| Letter to GE | Bill |
| Solar Energy Company research | Max |

**Cowpet Bay West**
**Board of Directors Meeting**
**April 11, 2012**

**Present:** Ed Wardwell, Rosie Wells, Bill Canfield, Sharon Koehler, Herb Horwitz, Doug Rebak (by phone conference), Jon Cassady, Louanne Schechter
Owner's in attendance: Judi Kromenhoek and by phone Lance Talkington

Approval of Minutes of March 6, 2012: There being no objections to the minutes, a motion was made to approve the March 6, 2012 minutes as recorded. All were in favor.

**Treasurer's Report:** Sharon's report is as follows:
Bank balances – March 31, 2012

| | |
|---|---|
| General and Special | $ 87,000* |
| Reserve | $397,335 |
| *Owed to Reserve | $38,355 |
| **Owed to General | $11,550 |

Outstanding accounts and fines

| | |
|---|---|
| Due 3/31/12 (no dog fines) | $ 28,171* |
| Dog fines billed, unpaid | $ 4,900 |
| *Gate fine included | $5788 |

Review of QBB-1st Quarter 2012

| | |
|---|---|
| Gray water/Pot. Water | $7,500 over |
| Building Repairs | $6,000 over |
| Security | $8,000 over |
| Legal fees | $8,000 over |
| Masonry | $3,000 over ANNUAL |
| Stairs & rails | $7,000 over |

Funding Insurance Policy
We collect $23,700 in insurance income every month from our owners. Our April 1 payment for our new policy was covered by our return premium. We have a May and June payment due of $ 86,122(each); a total due of $172,244.
Ideally we will have our April. May and June collections($71,100) to put toward part of the remaining premium due.
As discussed at our special insurance meeting, it is the board's plan to borrow, in the form of a loan to be repaid, the funds necessary to pay the remainder of our principal from our Reserve account. There will need to be a Board resolution to accomplish this transaction.

**Manager's Report:**
Systems: The gray and fresh water distribution systems filters were changed on the first Tuesday of the month.
Doug asked why the gray water last month became dark and dirty. Jon was not aware there was a problem. Sharon stated that the gray water in her unit is getting progressively worse. Doug suggested the intensive rain storm may have affected the gray water. Jon stated the cistern is covered and rain should not affect the cistern. Following discussion, apparently Leeward gray water has more sediment than Windward. Jon will investigate the problem.

Bill stated he spoke with GE Representatives regarding a new RO system. GE would like to come out next week and assess the property. The representative has indicated there would be considerable savings to CBW. GE would provide the system, as well as the monitoring and maintenance. CBW would pay for the water usage. GE would also be interested in replacing the water meters.

Jon stated that all systems were operating efficiently.

Responding to the quarterly report of "overages", Jon noted that his expenses , if averaged over the entire year, would be within the limits of the budget.

There was one issue with a raw sewage lift pump located by the yacht club last month, leaving only one pump operating to push uphill to the WWTP. The pump had to be pulled up from the raw sewage pit to be inspected. The impeller was jammed by a large piece of concrete that was in the pit. The concrete was removed and the impeller spun backwards and restarted. To prevent further jamming, the pit was drained, power washed, the gray water cistern was cleaned. There was a considerable amount of grease in the sludge that was removed. There was no obvious explanation for the grease.

Building Repairs: Predominantly we are repairing water leaks. We have had several this quarter. There is no preventative measure.

Security: The dollar amount in the budget is due to increasing the hours of the guards. The owners requested and the Directors approved increasing hours for guards on weekends and from 4p-6p. Bill said he spoke with the head of security, Dean. Dean suggested the guard walk 20 minutes, then return to the guard house 20 minutes, rather than only monitor the gate. Bill also suggested the golf cart be utilized by the guards to monitor the property.
Jon and Bill will meet with Dean and revise our current plan.

Additional cameras were discussed with Alert 1. Bill believes the expense of cameras is not cost effective. He stated a 6 by law a 60% head shot is required.

Masonry: We have completed the cistern repair, sealing and clean-out and began some of the crawl space spalling projects as the budget permitted. The annual masonry budget is exhausted and the project is on hold until the next budget year. Jon estimates that 25% of the spalling repairs were completed.

Stairs and Rails: The project is on hold. The upfront cost of $14,000 was materials. Jon has estimates of $250/stair. At this cost, the project would be on target for the annual budget.

**Insurance Committee Report:** Mapfre representatives visited CBW and brought the policy. The owners received a copy of the comfort letter. Owners are being offered a 25% discount for HO6 policies.

**Property and Planning Report**: Max held a meeting on solar energy. The minutes are as follows:

*Purpose of this meeting: The purpose of this meeting was to examine some possible options for using solar energy to offset our WAPA electrical bills.*

*Mr. Rosen was invited to tell us about his company and how they might fit into our long-term planning for the use of solar energy to ease our WAPA bills. Prosolar is grid-tied photovoltaic (PV) system*

*accommodation of a non-obvious handicap the Board may require (1) the submission of documentation verifying that the person meets the Federal Fair Housing Act's definition of disability; and (2) documentation from a doctor or other medical professional who is in a position to know about the individual's disability, and that the requested accommodation is related to the individual's disability. All information submitted to the Board that is necessary for the evaluation of the reasonableness of an accommodation will be kept confidential.*

By changing this paragraph the By Laws will bring the Association into Federal compliance. Herb and Bill volunteered to assist Ed in contacting the owners and obtaining the 2/3 necessary vote.

**Action Items:**

| | | |
|---|---|---|
| Amend February Minutes by 3/12/12 | Rosie | Done |
| Resend Amended Minutes to Board Members | Louanne | Done |
| Change Signatories on First Bank Account | Sharon, Ed, Bill, Rosie | Done |
| Open additional accounts to maintain FDIC coverage | Sharon | Will open checking account |
| Transfer of funds from First Bank to operating account | Sharon | Hold |
| Organizational Minutes | Max | Done |
| Annual Minutes with Amendments completed by 3/15 | Rosie | Done |
| Provide protocol for release of funds | Sharon | Satisfied with current procedure |
| Add employee severance to budget as a liability line item | Sharon | Done |
| Installation of Manual Gate completion date 3/15/12 | Jon | Done |
| Security Committee Review of Bid from Alert 1 | Bill | Done |
| Adjust placement of NO DOG signs and add 2 by 3/9/12 | Sharon | Done |
| Rails painted –starting this week | Jon | Metal done wood rails in progress |
| New Base on roadside sign | Jon | Replace sign |
| Step & Bracket Replacement; evaluate recent work | Jon | On-hold |
| Owner Workshop | Jon | Done |
| Drip Edge on L-6, L-10, W-26, | Jon | Material on island |
| Contact Chuck Waggoner re: By-Laws | Ed | Done |
| Contact Maria Hodge re: By-Laws | Ed | Done |
| Mailboxes: Replace shingles and paint by next Board meeting | Jon | Done |
| Assign employee parking | Jon | Done |
| Repaint numbers on parking spaces next week<br>Directors don't like color want redone with teal paint | Jon | 75% Done |
| L-3 re: Discuss owner responsibility | Ed | Done |
| L-01 Patch and Paint area used to repair water leak | Jon | Done |
| L-06 Patch and Paint area used to repair water leak | Jon | Done |
| Entry Gate: obtain police report/begin repairs | Jon | Police Report not available. |
| Employee Shirts | Louanne | Done |
| W-12 Condensation issue | Ed | Done |
| W-27 Suggest electrical inspection | Ed | Done |
| Letter to GE | Bill | Done |
| Solar Energy Company research | Max | Done |

New Business

W-35 Repaint the edge of the porch following the tile Installation.
W-07 Ed spoke with the owners last week. The issue is between the owner and the contractor.
L-50 Doug request his roof be painted as the patching of leaks has left it unsightly. Ed said he will discuss in Executive session.

Renewal of other Insurance Policies: Doug will follow up with the General Liability, D & O, and Vehicle Insurance policies.

May Board Meeting Schedule: May 8, 2012 at 8:45 AST.

Adjournment: There being no further business the meeting is adjourned. There will be an Executive Meeting in 10 minutes.

**Action Items**

| | |
|---|---|
| Sediment in gray water | Jon |
| Checking Account | Sharon, Ed |
| Meeting with GE Representative | Jon, Bill |
| Meeting with Dean from No-Nonsense Security | Jon, Bill |
| Contact Owners to amend no dog policy | Ed, Bill, Herb |
| Replace sign on roadside (remove distance) and lower | Jon, Louanne |
| Repair fascia with drip Edge | Jon |
| Repaint parking numbers with teal | Jon |
| Obtain police report | Jon |
| Insurance Renewal policies-forward to Doug | Louanne |

*compony that began in Florida and started in St Thomas last year. They have installed 5 systems on St. Thomas, and gave us the names for reference. They have established an excellent working relationship with DPNR and WAPA, and have had no permitting problems.*

*Max made sure everyone knew this was an exploratory conversation, and CBW is just beginning to look at PV system possibilities.*

*In preparation for the meeting Max had called Michael Bornn at Montessori to discuss their system choice and vetting process (at Anna's suggestion). He also met early with Peter, and they walked the property to examine such things as roof structure and orientation and electrical disconnects.*

*Peter explained that WAPA allows only 100 KW PV systems per each meter. The VI Energy Office is out of rebate money and the federal 30% rebate is not available to non-profit organizations like condo associations.*

*To buy a 100KW PV system, which would cover about 8000 square feet of roof area, would cost about $400K-450K installed. A more feasible approach may be to lease the system from Prosolar, and they would provide a guaranteed amount of power. Such a system would cost Zero down, and be financed for 7 to 12 years at an agreed interest rate (perhaps 6%). The amount financed would be about $375K since the contractor/installer could take advantage of the federal rebate. Much of this would be very negotiable.*

*The expected power produced would be worth about $6K per month at current rates, and the loan payments would be about $3k per month. This would provide an estimated savings on our WAPA bill of $3K per month.*

*We then spent some time with Jon discussing roof mount attachments, and how a PV system would tie in to our electrical system.*

Max asked the Directors if there was an interest in following up on solar energy. The Directors support the concept of solar energy to defray the increasing cost of WAPA as a long term (2-3 years) project.

Max will be having a telephone call-in conference for his committee in May.

**Security Committee Report**: Bill stated he has one owner interested in the committee. Bill stated he has spoke with the head of our security and agrees the guards should be roving the property rather than guarding the electric gate.

**Registration of By Laws**: Ed stated he has obtained the opinion from our legal counsel that we hold in abeyance registration of the By Laws until the Association obtain approval from the owners (2/3 of owners) to change the no dog wording to the paragraph that the attorney has recommended:

*No dogs are allowed on the property, either long term or visiting. Owners or occupants who have properly documented and verified disability as defined by Federal Law may make a request for a reasonable accommodation and exception to the prohibition on dogs on the property. An owner or occupant seeking an accommodation can do so in writing to the Board. The request shall include (1) identification of the Owner or occupant seeking the accommodation; (2) explanation of the relationship between the requested accommodation and the disability; and (3) verification of the disability and need for accommodation as set forth in this rule. To facilitate the Board's review of each request for an*

DRAFT

**Cowpet Bay West**
**Board of Directors Meeting**
**June 12, 2012**

**Present:** Ed Wardwell, Herb Horwitz, Bill Canfield, Jon Cassady, Holly Case,
Phone Conference: Max Harcourt, Doug Rebak, Sharon Koehler, Rosie Wells

**Approval of Minutes:**

Approval of Minutes of May 8, 2012: There being no objections to the minutes, a motion was made to approve the May B, 2012 minutes as recorded. All were in favor.

Appreciation to Jon for his hard work over Memorial Day weekend.

**Manager's Report:**

Completion of the scheduled filter changes to our gray and freshwater system was completed June 5th at 10:00am. All other operational systems: the Reverse Osmosis (R/O) Plant, waste water treatment plant, generator Gen Set as well as both distribution systems are all operating well.

Continuing progress on the step and rail painting. The entire complex is approximately 60 percent complete. Windward is almost finished. Leeward 1 through 44 area is what needs to be completed.

Completed the Gray water transfer lines in the Leeward field. It has been operational for over a week. Capped old gray water pipes on each end in case they are needed at a later time.

Continuing to replace exterior lights, an additional 44 sets were ordered.

Owners Request:
Completed the ledge repairs at owners' request for L-46 and L-50. Complete removal of the ledge replacing it with a fiber glass cap with a top coat wax compound to water proof.

**Treasurer Report:**
Report submitted by Sharon:
Bank balances – June 12, 2012

| | |
|---|---|
| General & Special | $ 51,000 |
| Reserve | $ 283,181 |

Banking information :
Due to not receiving end of the month back-up of QuickBooks, unable to report everything. There are some discrepancies but will be resolved once required information is received.

All of the 2012 insurance premiums are paid in full. Total amount paid $307,057.00.

DRAFT

Ed stated that Julie the accountant will be working with Holly to do the required tax payments due on the 15th of the month and will come in again for the end of the quarter tax payments and to close the books and make sure everything is in accordance.

Louanne will be compensated to the end of the June for extra time and unused vacation time.

Sharon will provide an analysis of our six-month operating expenses to the Board at the August 7th Directors Meeting.

Arrears:
1 owner is 3 months in arrears, the remaining 7 are 1 month.

Resolution to Amend Banco Popular Checking Accounts Signatories:
**Association Resolution to remove Louanne Schechter and append Holly Case to the Operating (General) Accounts Signataries**

***Resolution of the Board of Directors of Cowpet Bay West Association ("CBW")***

*WHEREAS, CBW is a Condominium Association orgonized ond existing under the lows of the Territory of the U.S. Virgin Islonds; and*

*WHEREAS, the members desire thot the Associotion sholl act in full occordonce with the rulings ond regulations of the Internal Revenue Service, os odministered by the Virgin Islonds Bureau of Internol Revenue;*

*NOW, THEREFORE, the members hereby adopt , on behalf of the Association, the following resolution*

*RESOLVED, thot the Banco Popular general operating checking occounts (generol & special) signatories be amended ond only Ed Wordwell, Bill Canfield, Rosie Wells, Jon Cossady, Shoron Koehler ond Holly Case to be outhorized signotories .*

*This resolution is adopted and mode a port of the minutes of the meeting of the Boord of Directors on June 12. 2012.*

*BY:______________________________ Ed Wardwell, President*

*ATTESTED:______________________________ Rosie Wells, Secretary*

Sharon made a motion that the Resolution be accepted, Bill 2nd , motion passed.

Sharon stated that she has an objection that the second signature on the special account should be a Board member. She also stated that it was allowed on previous boards but she thought that the original rule was the second signature on the check must be a board member and only with approval from the Treasurer signing the Weekly Report.

**Insurance Committee:** D&O, General Liability, Umbrella and Property are paid. Vehicle Insurance is due in July.

DRAFT

**Planning & Property:** Max Harcourt, Chairman of the Property and Planning Committee, sent out Meeting Minutes from the May 23rd to the Board members. He also submitted a comprehensive report on the current status and projected upgrades for the property. Major future projects including roof sealing/painting, structure maintenance and electrical system upgrades will be addressed in the 2013 budget.

**Solar Sub-Committee:** Max is currently putting a sub-committee together for a Solar System and has received volunteers but no one has come forward to chair the committee. Concerns are the initial cost for the purchase of the system and securing a dependable contractor that will be able to service it for a extended period of time.

- Bill presented the option of contractor/owner/lease program.
- Max stated that the Government puts out incredible incentives to develop Solar Systems. Ed stated at one time they were refunding up to 30% of the cost but not for non-profit organizations at this time.
- Doug stated the possibility of using our reserve fund as collateral to borrow funds to complete sizeable costly projects like Solar System, R/O System, and replacing exterior wood with synthetic material.

The next action item will be the committee drafting up an RFP before the next meeting.

**General Electric Meeting:** Bill stated the meeting with GE went well. GE inspected the 35 year old osmosis machine. A fact brought to attention by GE is that we are using our R/O equipment very little. We collect enough water to handle most usage. Jon also uses the R/O equipment when the generator is on which has little to no cost.

GE's proposal is they will build a plant and sell the water back to CBW. At this time our reverse osmosis usage is not large enough to warrant the proposal. GE will produce a statistic report.

**Water to Yacht Club:** Bill proposed the possibility of selling water to the Yacht Club. They are currently buying water from Anchorage that just increased by 20%. Currently we can store 500,000 gallons of water and average use is 150,000 gallons per month which would allow enough for the Yacht Club. Bill and Jon will look into the logistics of connecting the water supply to the Yacht Club and report to the Board.

**Action Items**

- Notarize & Record Bylaws: Completed
- Arrange Meeting with Security: Completed - Owner car was stolen from the property, security company responded quickly to review the tapes - the guard on duty at the time was released
- Daily Water Usage Data to Bill Canfield: Completed
- Letter to Insurance Carrier re: gate expense: Insurance Co. needs a copy of the back of the insurance check received for the gate damage
- Teleconference Planning & Property: Completed
- Office Manager Replacement: Completed - Holly Case introduced herself
- Roadside Sign: Deciding on final layout and color for the sign
- Gray Water Upgrade connect terminal ends: Completed

DRAFT

**New Business**

L-42 Bob Cockayne sent an email in May to Board formally requesting "the exterior roof of L-42 be power washed, repaired, sealed and painted before peak hurricane season - within the next 3 months by the association." Bob stated that "he would like to know if the Board does not agree with the request he wants a recommendation on who can do it and will pay for it himself."

- Ed stated after looking at the condition of the roof and speaking with Jon, sealing the roof is a proper topic for the 2013 Budget. Concern is the singular request from Bob wanting his roof done at present time.
- The roof was last done in 2008 (typically has a 5-8 year life span), CBW generally does it every 5 years.
- There is no evidence of cracks or leaks at the present time with L-42 roof.
- Estimate to paint the roofs is approximately $75,000, $1,500 per unit.

Board suggested that if he wants to do the repairs himself they would suggest someone that can do it for him, otherwise it will be addressed in the 2013 Budget. Herb volunteered to discuss the decision with Bob and to make sure there are no other concerns.

On June 6, 2012 the Association was notified by letter from the US Department of Housing and Urban Development (HUD) that "HUD has completed its administrative proceeding of this complaint (Barbara Walters vs. Cowpet Bay West Association) under the Act (Fair Housing Act of 1968) and the compliant is hereby dismissed."

- Complaint failed to request for a accommodation, produce evidence, etc.
- Association has complied with the regulations for emotional handicapped individuals.
- Letter was forwarded to Attorney Joe Riopelle; he feels with the HUD dismissal of the Walters complaint that we can expect the Kromenhoek complaint to be dismissed as well. It still leaves the two civil complaints open and he is required by law to respond to both by June 21st.
- Herb suggested letting the owners know the outcome of the complaint. Ed will put an email out to the owners recapping the Board meeting and letting them know HUD's decision.

August Meeting: The next meeting of the Board of Directors will be August 7, 2012. B:45AM AST

Meeting was adjourned.

**ACTION ITEMS**

| | |
|---|---|
| Letter to Insurance Carrier re: gate expense | Herb/Holly |
| Road Sign | Jon |
| RFP for Solar System | Max |
| Supplying water to the Yacht Club | Bill & Jon |
| GE Report | Bill |
| L-42 Roof Painting | Herb |
| Email to Owners re: HUD Decision | Ed |
| Analysis of six-month of Operating Accounts | Sharon/Holly |
| Signatories changed on Banco Popular Accounts | Holly |

Judith A. Kromenhoek

6200 Windward Way #44

St. Thomas, USVI 00802

June 22, 2012 RE: Inquiry No. 336193, HUD Case 02120337B

Mr. Jay Golden

U.S. Department of Housing & Urban Development

New York State Office

Jacob K Javits Federal Building

26 Federal Plaza

New York, New York 10278-0068

Dear Mr. Golden,

I was very disturbed by your letter dated June 15, 2012 **dismissing** my complaint. I have filed a civil lawsuit and your dismissal makes Cowpet Bay West look like they have done nothing wrong. In the words of a Board member, the other members were gloating over your dismissal.

I have been harassed for over a year. July of 2011 my papers were filed in the office. At this time, there was nothing in our by-laws that said a formal request must be made to the Board. These by-laws have been changed in March, 2012 to now include this (after the HUD complaint). They were changed on the advice of their attorney; they were told they must change them to comply with HUD and the ADA.

The reason I did not make a formal request (it was not required by our by-laws at the time) to the Board was because the then President of the Board, Max Harcourt would leak all of this information to a Lance Talkington and he would then post it on his blog. The blog, although not official was named the Cowpet Bay West Blog so the owners thought everything written on it was the truth.

The Board charged me a $50 a day fine for having my dog, they put up signs all over the property and blasted e mails to CBW owners – all negative toward me. If this is not harassment then what is?

The new Board took office February, 2012 and the new President, Ed Wardwell has tried very hard to rectify the situation. He gave written permission to allow the dog in April, 2012 and he has lifted all the fines. The signs are still up.

Many of my neighbors still do not talk to me; they cannot see my disability so they believe all the nasty e mails.

**Retaliation is a violation of the Fair Housing Act**. All the fines, signs, e mails – I believe this is retaliation.

I do believe my complaint to HUD is the only reason the CBW Board decided to seek legal advice and therefore comply with the law. Up to that point, Mr. Harcourt said "we do not go by federal laws, we go by Cowpet laws". I know that my dog is now legal and I am not asking you to fine Cowpet Bay West but just re-word the outcome. **Dismissal** makes it sound like I have no credibility.

Thank you for taking the time to review this matter. I can be reached on my cell phone at 340-677-3267.

Sincerely,

Judith A. Kromenhoek

cc: Ms. Irma Perez-Pillot

3055300/000495

DRAFT

**Cowpet Bay West**
**Board of Directors Meeting**
**August 7, 2012**

**Present:** Ed Wardwell, Herb Horwitz, Bill Canfield, Max Harcourt, Holly Case
Phone Conference: Doug Rebak, Sharon Koehler, Rosie Wells

**Approval of Minutes:**

Approval of Minutes of June 12, 2012: Sharon requested that the Treasurer report remove "All of the 2012 insurance premiums are paid in full". At the time vehicle insurance had not been paid.

Motion to adopt as amended was made and 2nd. All were in favor, motion carried.

**Manager's Report:**

Continuing progress on the step and rail painting. The entire complex is approximately 60 percent complete.

Continuing to replace exterior lights, still waiting on the additional 44 sets that were ordered.

Poly Caribe installed new couplings in the waste water transfer piping from Windward Way to the settling basin. The entire piping run is corroded and should be replaced after hurricane season.

Staff is painting the curbs and numbers on parking spots.

Emergency repairs were completed on the seaside balconies of several units. All the railings have been inspected and any that could have resulted in a potential problem were fixed.

**Treasurer Report:**

Bank balances – August 3, 2012

| | |
|---|---|
| General & Special | $ 36,025 |
| Reserve | $ 302,972 |

Reserve account is owed $19,416.
Capital Projects is owed $19,175 from the Reserve Fund.

Mid-Year Report Review:

Sharon completed a comprehensive review of our six month (through 6/30/12) actual operations compared to our 2012 budget. Our income for this period is on budget. Our total expenses exceeded budget by $69,000. The major overruns were:

DRAFT

- $20,000 - for Guard and Gate Security
- $23,000 - for Building and Grounds Contract Labor
- $23,000 - for Building Masonry Repairs

A $27,000 savings in insurance premiums partially offset these and other smaller overruns.

The Board mandated that management undertake only emergency repairs and minimize any expenditures in the months ahead.

Arrears:
1 owner is 4 months in arrears.

Sharon suggested that a lien should be placed on owners that are several months in arrears.

**General Manager:**

Jon Cassady remains in critical condition in the Mayo Jacksonville Clinic Hospital. Jon continues to improve in response to medical treatment and tests.

After discussion, the Directors unanimously approved to continue Jon's salary and benefits pending further review at the September 5th Board Meeting.

In Jon's absence, the Board decided to contract the services of Arran B. McGinnis as our Interim Property Manager through the impending tropical storm season. Arran will be resident at Cowpet Bay West throughout his contract until October 15th when Jon's situation can be reassessed. Legal counsel is drafting a contract with Mr. McGinnis to be paid $175.00 per day for his services. Ed will execute the contract on behalf of the Association.

COBRA eligibility for Association employees was discussed. Doug is going to research what options are available.

**Insurance Committee:** All Insurance has been paid for the year. Doug will be negotiating property liability insurance after hurricane season.

**Security Committee**: Discussion was held on how to decrease spending on security and still keep CBW safe. Suggestion was made to install a card reader to exit the gate, more cameras, replace broken lights and security guard schedule to be random. Bill will investigate the cost for an exit gate card reader and security guard service. Staff will expedite light replacements.

**Planning & Property:** Max is currently putting a sub-committee together for a Solar System and has received volunteers but no one has come forward to chair the committee. Max will continue to organize a sub-committee.

**June Action Items**

- Letter to Insurance Carrier re: gate expense (Completed)
- L-42 Roof Painting (Completed)

DRAFT

- Email to Owners re: HUD Decision (Completed)
- Analysis of six-month of Operating Accounts (Completed)
- Signatories changed on Banco Popular Accounts (Completed)

**New Business**

Legal Proceedings: Received an update from the Travelers Insurance Company, Attorney Joe Riopelle, that the last submission received from Walters/Kromenhoek exceeded the 20 page limit. The judge has given them until the August 8th to amend their 30 page plea down to 25 pages and has given Joe Ripolle until August 20th to reply in 25 pages.

Legal Fees: There is a $5,000 deductible for each of the Walters and Kromenhoek suits. Walters retainer was met and at the end of the month we should have reached Kromenhoek retainer as well. We continue to use Hodge & Francois for other issues. Rosie asked for a breakdown of legal fees, Sharon said she would provide at next meeting.

Staff Evaluations: Jon reported to Ed that he completed the staff evaluations. His recommendation was that each should get a cost of living increase of 3%. Ed met with the staff, discussed Jon's situation with them and informed them he would speak with the board regarding their pay increase for the year.

After board discussion a motion was made to give staff a 3% raise, motion was seconded and passed by majority vote.

Gate Sign: Doug suggested that someone look at the CWB sign to observe the condition and to see what need to be done to have it restored. Max said he would look at it and bring information to next Board meeting.

Parking Issues: Herb suggested that the end of Windward to be dug out and leveled in order to produce more parking spots. Holly volunteered to get estimates and look into what permits are required.

September Meeting: The next meeting of the Board of Directors will be September 5, 2012. B:45AM AST

Meeting was adjourned.

**ACTION ITEMS**

| | |
|---|---|
| Road Sign | Arran/Holly |
| RFP for Solar System | Max |
| Supplying water to the Yacht Club | Bill |
| GE Statistic Report | Bill |
| Insurance information for Jon | Doug |
| Cost of card reader to exit | Bill |
| Security Guard | Bill |
| CBW Sign condition | Max |
| Legal Fee Breakdown | Sharon |
| Additional Parking | Arran/Holly |
| Lighting replacement | Arran |

DRAFT

**Cowpet Bay West**
**Board of Directors Meeting**
**September 5, 2012**

**Present:** Ed Wardwell, Rosie Wells, Arran McGinnis, Holly Case
Phone Conference: Doug Rebak, Sharon Koehler, Max Harcourt

**Approval of Minutes:**

Approval of Minutes of August 7, 2012:

Ed Wardwell submitted correction - After discussion, the Directors unanimously approved to continue Jon's salary and benefits pending further review at the September 5th Board Meeting.
Doug submitted correction - Under parking Issues: changed end of "Leeward " to "Windward".

Motion to adopt as amended was made and 2nd. All were in favor, motion carried.

**Manager's Report:**

RO, WWTP, Gen Set, Operating systems ran all month with no major issues. On schedule for filter changes and maintenance for the RO plant. Water testing is done through Ocean Systems and all findings are reported through DPNR in St. Thomas and EPA in New York, next report will be sent next week.

All porch lights have been replaced, ordered the remainder street lights (5-year warranty). Will be ordering additional for back-up.

Rebuilt back-up transformer is complete, currently in Miami to be shipped to St. Thomas.

Requiring morning meetings with all staff to determine work for the day and to keep them organized and on track. Will be utilizing additional temporary employee to paint the 17 seaside railings and to complete stair and railing capital project in Leeward.

**Treasurer Report:**

Bank balances – September, 2012

| | |
|---|---|
| General & Special | $ 12,117.92 |
| Reserve | $ 312,680.74 |

Reserve account is owed $19,416, two payments for August and September.

| | |
|---|---|
| Accounting Fees: | $5,940 |
| Legal Fees: | $14,956 ($10,000-Walters & Kromenhoek/4,956-Misc. Legal Expenses) |
| Emergency Rail Repair: | $22,000 |

3055300/000499

DRAFT

Sharon expressed concern regarding the cost of repairing the Golf Cart. Parts were ordered beforehand without a disclosure of the cost. The golf cart has been repaired and is being used daily by General Manager and Staff.

Arrears:
1 owner is 3 months and 1 is 4 months in arrears.

**General Manager:**

Jon Cassady is currently in the Brooks Rehabilitation Hospital in Jacksonville. Jon is receiving physical and speech therapy 6 hours a day, 6 days a week. He is responding reasonably well from a physical stand point, he is able to stand and has full range of motion with his arms and legs and retains his physical strength. He is still unable to swallow, therefore they will be testing in ensure there is no blockage in his throat or esophagus.

Ed will be meeting with Jon and his brother Jay in Jacksonville this weekend to discuss how to best serve Jon's needs and the Associations requirements.

**Committee Reports:**

Insurance Committee: All Insurance has been paid for the year.

Security Committee: Porch lights have been replaced.

Planning & Property: Max will continue finding a chair for the Solar System Committee.

**Legal Proceedings:** September 7th, Attorney Joe Riopolle (Travelers Insurance Company) will file the names of the individuals who will have to provide a deposition for the Walters/Kromenhoek suit. He is not expecting any further action on the suit until October when the initial stages of mediation begin.

**August Action Items**

- Supplying water to the Yacht Club (Closed) - Further developments in researching on supplying water to Yacht Club have concluded that CBW will not be pursuing this venture
- GE Statistic Report (Closed)
- Insurance information for Jon (Completed) - Once Jon qualifies for Social Security Disability he has to wait 24 months before applying for Medicare. Jon is not eligible for COBRA Insurance.
- CBW Main Sign Condition Checked (Completed)
- Legal Fee Breakdown (Completed) - See Treasurer's Report
- Lighting replacement (Porch Light Completed)

**New Business**

Arrears: Board discussed an owner that owed over $10,000, approximately 5 months behind, and the final steps to collect Association dues. $1,500 of the fees are a result of tenant having a dog on the premises. After a certified letter was sent to the owner, they responded that they would make a good faith payment of $2,000 and would pay the remainder as soon as possible. Owner was advised to put

their grievance in writing and it would be presented to the Board. As of September 4th neither the letter nor the payment have been received.

Board decided to send a certified letter, final notice, giving the owner 2 more weeks before shutting off utilities.

New Forms: Notice of Parking Violation and Installation Letter of Permission.

Screened in Porch: Owner requested to screen in patio, Board stated that the protocol would be for the owner to put in writing with engineering sketches and present to the Board for approval.

October Meeting: The next meeting of the Board of Directors will be Friday, October 12, 2012. 8:45AM AST

Meeting was adjourned.

**ACTION ITEMS**

| | |
|---|---|
| Road Sign | Arran |
| RFP for Solar System | Max |
| Cost of card reader to exit | Bill |
| Security Guard | Bill |
| Additional Parking | Arran/Holly |
| Street lighting replacement | Arran |
| Confirm Earnings for SSD | Holly |

DRAFT

**Cowpet Bay West**
**Board of Directors Meeting**
**October 12, 2012**

**Present:** Ed Wardwell, Herb Horwitz, Bill Canfield, John Foster, Arran McGinnis, Holly Case
Phone Conference: Doug Rebak, Sharon Koehler, Rosie Wells

Ed Wardwell called a moment of silence in remembrance for Max Harcourt.

Resolution introduced by Ed Wardwell.

Association Resolution to elect John Foster, Windward #36, to fill Board Member vacancy caused by the untimely and tragic death of Max Harcourt to serve until the next annual meeting, February 2013.

Motion to accept Resolution, all were in favor, motion carried.

**Approval of Minutes:**

Approval of Minutes of September 4, 2012:

Doug submitted correction - CBW Sign Condition (Completed) - indicated that it was not complete.

Motion to adopt as amended was made and 2nd. All were in favor, motion carried.

**Manager's Report:**

RO, WWTP, Gen Set, Operating systems ran all month with no major issues.

CBW Sign: New CBW Road Sign presented to the Board. It was determined that it was the same sign approved in earlier Board Meeting, with the exception of changing "Entrance in 400ft" to "Next Right". Sign cost is approximately $900 - this includes the sign, mount and installation. Estimated time to be completed is two weeks.

Construction Approval: W-24 construction plans presented to the Board for approval. Owners are in compliance with all Association renovation requirements. Doug suggested that when raising the ceiling they leave room for the chase. Arran confirmed that it was addressed and in the plans.

Seaside Rail Painting: Windward seaside rail painting will be completed today, staff will begin painting Leeward next week. Completion of all seaside railings is expected to be within three weeks.

New projects: Reconstruct stairs and wall by Leeward 20; and replace brackets under the stairs with hardware already purchased.

Street Lights: Four ten-foot poles will be purchased and installed to light the four dark areas on property to assist with security, estimated to be completed by next week. The remainder street lights are complete. Any that have failed will be shipped back for reimbursement under warranty.

DRAFT

Porch Lights: Herb stated he thought the street side porch lights were going to be all replaced to make them standardized. Arran stated that all the lights that were not working have been changed and everything he has received has been changed as well. Arran said he would check to make sure that we didn't have any left in stock to install to make them standardized.

Transformer: Rebuilt back-up transformer is complete and on island. Will be contacting Skyline Electric to install it. During installation the exposed cables coming from Leeward leading to Windward will be replaced. The rebuilt transformer will be used as the main transformer and the current one as the back-up.

Stair and Railing Capital Project: Board decided to repair only emergency cases. Will not subcontract the repairs, staff will be performing the work supervised by Arran.

Security: There was a theft incident on October 3rd when three unlocked vehicles on Leeward were entered and their contents pilfered. The perpetrator was on foot and uncaught despite search efforts by Arran McGinnis and the security guard. Ed will send out a reminder to the owners to lock their units and car doors.

Security gate circuit board needs to be updated so that when exiting the gate, a card or code will have to be used in order to exit the property. The cost of the board is approximately $2,500. Sharon, Treasurer, stated that we currently have appropriated funds in the 2012 budget to cover the cost of upgrading the security gate. Board approved upgrading the circuit board to eliminate the green exit button.

**Treasurer Report:**

Bank balances – October, 2012

| | |
|---|---|
| General & Special | $ 46,500.00 |
| Reserve | $ 322,700.00 |

Reserve account is owed $19,416, two payments for September and October.

Sharon expressed concern regarding overtime paid to employees. With our current policy, overtime should only be in emergency cases, otherwise needs to be approved through the Board.

Arrears:
1 owner is 3 months and 1 is 4 months in arrears.

**General Manager:**

Jon Cassady is still in the Brooks Rehabilitation Hospital in Jacksonville. Jon is making progress, although it is slow he is physically doing well. He has vision in both eyes and is speaking but continues to have issues with arm/hand coordination and swallowing. Original release date was October 10th, but has now changed to October 31st. Once he is discharged he will become a Brooks out-patient for 30 days.

Ed spoke with Jay Cassady (power of attorney for Jon) informing him that the Association will continue to cover Jon's medical care until he eligible for Social Security Disability on December 27, 2012.

DRAFT

Resolution introduced by Ed Wardwell.

Association Resolution to continue Jon Cassady on full-time payroll, 30 hours per week at VI minimum wage, and the Association will provide continued medical coverage until December 31, 2012.

Motion to accept Resolution, all were in favor, motion carried.

**Committee Reports:**

Security Committee: We will look into the possibly of hiring a designated security person for CBW. This will allow us to have control over shift hours and can have them on a random schedule to cover different days and hours of the week. It was determined not much activity takes place between 0130-0600 and the best time to have security is 1800-Midnight. Also suggested with the gate change we could cut guard time from 80 to 40 hours. The board also discussed adding more cameras; concern was how to monitor them and the quality of the picture. Bill will look at all options and present at next Board meeting.

Insurance Committee: All insurance premiums are paid and completed for 2012.

Planning & Property: Herb Horowitz has volunteered to resume the responsibilities of Chairman for the Planning and Property Committee. He will report at the November Board meeting.

**Legal Proceedings:**

Any Board member who cannot attend the mediation will need to turn in the "Limited Power of Attorney", notarized, before the mediation on October 19, 2012.

**September Action Items:**

- Confirm Earnings for SSD (Completed)
- Additional Parking (Addressed in 2013 Budget)
- Street lighting replacement (Completed)

**New Business:**

W-52: Owner requesting a handicap parking space. It was determined that the Association is in compliance with the Fair Housing Act of 1988, and in accordance with the Act she is currently receiving reasonable accommodations by having a parking spot as physically close to her unit as possible. We are not required to paint, mark or widen the parking spot. Given that we are in compliance with the Fair Housing Act, no further action will be taken at this time.

2013 Budget: The Executive Committee (Ed Wardwell/Rosie Wells/Bill Canfield) will meet with the Planning & Property Chairman (Herb Horwitz) and Property Manager (Arran McGinnis), to prepare a recommended budget to the Board prior to the November Board Meeting. The budget will include Capital Projects and Operating Expenses.

New Property Manager: The Board decided unanimously in the Executive Meeting that Arran McGinnis would be offered long-term employment as Property Manager for Cowpet Bay West. Board offered the

DRAFT

position under the same terms and agreement made on September 5, 2012, effective October 16, 2012. Arran agreed and accepted the position.

2013 Annual Meeting: Board decided that the Annual Owners Meeting will be Saturday, February 9, 2013.

**November Meeting:** The next meeting of the Board of Directors will be Tuesday, November 13, 2012. 8:45AM AST

Meeting was adjourned.

**ACTION ITEMS**

| | |
|---|---|
| Road Sign | Arran |
| Circuit Board/Card Reader for Security Gate | Bill/Arran |
| Security Guard | Bill |
| Additional Security Lights | Arran |
| Stair/Wall Reconstruct Cost | Arran |
| Porch Lights (standardized) | Arran |
| Reminder to owners lock doors | Ed |
| 2013 Budget | Executive Committee |

**Cowpet Bay West**
**Board of Directors**
**Special Meeting**
**July 27, 2011**

**Present:** Max Harcourt, Barbara Walters, Rosie Wells, Sharon Koehler, Bill Canfield, Vince Verdiramo, Bob Cockayne, Jon Cassady, Louanne Schechter

Jeanne Brennan, CPA for Cowpet Bay West attended by phone conference at the request of the Directors.

**Purpose of Meeting:** Discuss a means to pay the premium of the newly acquired insurance and alter the budget if needed. Note: Insurance was in effect before securing finance.

**Treasurer Overview:** We have about $449,000 in cash, $68,000 was written from the reserve fund as the down payment on the new insurance. The rebate from the previous insurance policy is expected to be approximately $50,000. The remaining Capital Improvements are expected to be $110,425. With these expenditures there should be a cash reserve of $320,442. (See Financial Overview sent by Sharon). Max approved financing the remainder of the insurance premium with a 9 month payout at 3.2% which is $23,632/month. The interest adds approximately $8600 to the cost of the insurance.
As the Board had not voted on the financing, Max made a motion to accept the $68,032 down payment with 9 month financing at 3.2% from Mapfre . Bob 2nd the motion. Following discussion, the vote was taken. Max, Sharon, Bob, and Bill voted yes. Barb abstained. Rosie and Vincent voted no.

Max stated the insurance cost to the Association has consistently increased over the years but the owners' fees have not been increased.

Sharon discussed 3 options:

- Suspend our future "reserve" allocation of income for the rest of this year and allocate the funds solely to "insurance"
- Borrow money from the reserve fund via a note, with the intention of paying back to the reserve fund sometime in the future. There was no plan submitted for the future payback.
- Make a permanent transfer from the reserve fund to the insurance, with disclosure that the funds are not intended to be paid back.

Barb suggested a 4th option of a Special Assessment rather than dipping into again or borrowing from the reserve funds.

Jeanne Brennan, CPA, made the following suggestions:

- The Board needs to determine what you deem proper for your reserve fund based on the level of your future needs. A figure would need to be analyzed.
- If you borrow from the reserve fund you break the integrity of the reserve fund, you have to have a resolution, a method of payment, interest, and a new budget sent to the owners. If there is no intent to pay back, you report it as a change in the equity.
- Factor into the next 7 months the cost of the premium and decide if it will include the down payment for the 2012 premium

Jeanne reported the Reserve Account is specified in the budget and not intermingled with insurance premiums or deductibles. The insurance is actually part of Operations and Management, the Insurance was reported separately due to the fluctuation of the insurance premiums following a major hurricane.

Max stated the operating budget is over by approximately $66,000, to include, fuel for the generator, tree trimming, repairs to vehicles, and beach drainage. He wanted to know how this will affect the reserves should we suspend payments to the fund for the remainder of the year. Sharon stated we should have enough money in cash flow to complete the capital projects.

Max moved we transfer the beach drainage project from expense account to a capital project. Sharon 2nd, all were in favour. Motion carried.

Mapfre Deductable Overview: Bob stated he sent out **Shep Barrows Appraisal** that has a breakdown of building by cost. The total deductable for the entire property is $520,000. Bob stated that each building is insured separately. Bob suggested we keep in cash flows for insurance deductable $362,000 which is 70% of the entire deductable.
Bob interjected the policy can be renegotiated in January with Mapfre with same premiums over an 1B month premium.

Vince stated he needed to leave the meeting; his recommendation was to maintain the reserve funds at $500,000. He would not approve of anything less. He noted that we have consistently had that level of operating reserves. Vince left the meeting.

Max made a motion that the reserve fund for 2011 decrease to $3B0,000. Our CPA had suggested a review of what our total reserve would need to be. The amount voted on had not been reviewed or substantiated by any figures. Sharon 2nd the motion. Following discussion, Max called for the vote. Max, Bill, Sharon, and Bob voted yes. Barb and Rosie voted no. The motion carried the Board made a resolution to decrease the reserve fund to $3B0,000 with the remainder of funds going to the general operating fund.

The funds ($68,034.) used for the down payment on the new Mapfre insurance policy were drawn off the reserve fund. Sharon moved the Board resolve to permanently diminish the reserve account by $6B,000 to the General Account. Bill 2nd. Following discussion, Max called the vote. Max, Bob, Sharon, and Bill voted yes. Barb and Rosie voted no. The motion carried.

Barb made a motion to have a special assessment of $1000 per unit owner to cover the cost of the policy. She stated that we should not borrow from our reserve fund again and must stay on the agreed budget. Rosie 2nd. Following discussion, the amount did not breakdown the amount by each individual unit equity but the total amount needed to be funded. Max, Bill, Bob, and Sharon voted no. Rosie and Barb voted yes. The motion was vetoed.

Max made a motion to increase insurance fees per month by $60,000 over 5 months. Bill 2nd the motion. Following discussion Max called for the vote. Bill, Sharon, Bob, and Max voted yes. Barb and Rosie voted no.

Sharon moved the Board resolve to decrease payments to the reserve fund from $12,125,a month to $4,7B5 a month and move the difference of $7,340 a month from the reserve fund to the insurance

3055300/000507

fund. Bill 2nd. Following discussion Max called the vote. Bob, Max, and Sharon voted yes. Bill did not respond. Rosie and Barb abstained. The motion carried.

Sharon will work on the revision of the budget.

Max stated we will proceed with the work on the Capital projects.
Jon stated while looking at the breakdown on the insurance, there are 5 systems that are not covered in the breakdown. Max asked Jon to send an email to Shep with the missing systems . Barb requested all Board members receive a copy of the systems problems.

Barb made a motion we contribute $750 to the little league sponsored by DPNR . Max called the vote, 4 were in favour, Max abstained.

**CBW Owner Repair/Inquiry Handling Policy**

May 10, 2011

The CBW Board of Directors has developed this set of guidelines to establish a pı through which: owners may report issues of concern to the office, the staff is mac aware of the issues, and the concerns/issues are documented and handled in a ti manner.

- Emergency repairs/issues (Normally initiated by phone call)
  - If fire, injury or crime –in-progress is involved, individual noting even call 911.
  - GM or staff member to respond immediately
  - If needed, additional staff called in to handle problem until secured
  - Owner to be billed if owner responsible item. Determination made b GM in conjunction with owner/representative. In case of disagreem only immediate safety issues will be handled, and the owner must sı disputed issues to the board by letter or email.

- General repairs-owners units (Initiated by email/letter to Office)
  - Communication received from owner; Office Manager (OM) enters iı log, note to General Manager (GM), copy to BOD
  - Within 2 business days, acknowledgement of receipt to owner (phor email), indicating receipt and, if appropriate, initial action taken
  - GM, or other staff member, to inspect the problem within 5 business days. Maintenance form (being developed) completed indicating da assessment of problem, expected action to be taken to correct situa along with time frame
    - Form should include disclaimer information regarding owner association responsibility.
    - Form should be signed by GM and owner or owner's agent, i available. If not available, can be done by email. In case of disagreement, only immediate safety issues will be handled, the owner must submit disputed issues to the board by letter

PLAINTIFF'S
EXHIBIT
4

- Owner should be referred to list of association recommended contractors.
- Owner should not be restricted to list only, but must understa should a question arise as to a hidden Association responsibi is the owners/contractor's responsibility to have GM inspect v progress.
- Owner/representative is responsible for directly negotiating w contractor for scope, price and schedule.

❖ Association Responsible

- GM determines scope of work to be done - by staff, by outsid contractor, or by both.
- If complaint requires work to be done by our staff (e.g., tree trimming, porch light replacement, painting, minor wood rail r roof leak, etc.) work needs to be delegated to staff for comple reasonable amount of time, (e.g., 10 business days).
- If complaint solely requires work to be done by an outside contractor, GM to schedule an appointment for inspection an estimate within two weeks, (alternative contractors may have used to meet this schedule). Agreed upon work to be schedu soon as possible after inspection. GM will inspect work in pro as well as completed job.
- Owner will be notified by e-mail or letter of scope of work, expected repair date, and re-contacted when repair is comple or if rescheduling is needed. If the Owner/representative can support the scheduled work, they become responsible for dire negotiating schedule with the contractor – without changing s of work.
- In the event of combined staff/outside contractor work, (e.g., r leak by staff; inside wall/rebar repair by outside contractor), s should commence repair as soon as possible, if the job will al for it.

- Landscape requests (Initiated by letter/email to office)

- ❖ Landscape committee responds to Office (copy to Board) recommer action to be taken within 3 weeks.
- ❖ Office responds to Landscape committee (copy to Board) indicating frame for action (within 1 month), or indicating issue must be discus Board.
- ❖ Written (email or letter) reply to owner indicating action to be taken, and time frame.

- Requests for enforcement of Rules and Regulations. (Initiated by phone, or letter to the Office and Board)
  - ❖ If safety is involved, handle as an Emergency Request. If fire, injury crime –in-progress is involved, individual noting event must call 911.
  - ❖ If not time–urgent, Office issues warning letter to owner (if known); b e-mail message to possible involved owners/renters/agents, if unkno
  - ❖ In case of illegal parking, staff will place a sticker on driver side winc of the illegally parked vehicle. If the vehicle is a hindrance to emerg vehicles, it may be booted and fines levied in accordance with Parki Policy.
- Owners general suggestions/requests (Initiated by email/letter to Board)
  - ❖ Board will acknowledge letter in a timely manner (within a month), indicating the matter will be discussed at the next Board/Executive E Meeting (giving the date of that meeting).
  - ❖ The Board will provide a written reply (e-mail or letter) to the owner \ 2 weeks after the meeting indicating its disposition.

# Cowpet Bay West Blog

## An Informed Active Community

### Puppy Dog Diplomas

January 15, 2012

Readers of the blog may recall a comment that Cowpet owner and board candidate Judi Krohmenick made recently regarding the "certification" of her puppy. She claimed that her puppy is a "trained, legally certified service animal". We asked her what that meant and have had no response. After a recent board meeting discussion on the subject of dogs, it's become much clearer what is really happening with puppy dog diplomas.

The board was provided details on the various "certifications" of owner puppies at the January board meeting. Information distributed at the meeting indicated that Judi's puppy is certified by an outfit called Goldstar German Shepherds. We've done some research and found out that for the one time low price of as little as $71.50, a dog owner can obtain all sorts of really cool gadgets and puppy certification without having to leave the comfort of your computer. All anyone has to do is print the little form from their web site; fill out a name; address; and other basic info; write a check; and boom – you get all of the way cool proof needed to tell the world about your very own certified service animal. How tidy is that, right? Heck, if you're in a hurry, operators are standing by at 702-497-7229 to avoid the nasty wait for the mail to make it to them. The link to their site is here for those who would like to see for themselves how all of us can have a certified service animal in darn near no time at all.

http://www.goldstar-germanshepherds.com/certification_licensing.html

The information distributed at the board meeting also indicated that Barbara Walter's and Joel Kirschenbaum's puppies are "certified" by an outfit called the National Service Animal Registry. Here is the link to the similarly totally cool three minute process to get your very own "certified" service puppy from this outfit:

http://www.nsarco.com/cgi-bin/product.cgi?id=081218004

There are at least ten outfits like these two on the Internet that offer the same type of "service". One of them (Service Dogs America) even has the gumption to state that "SDA recognizes that every person in America may have some form of disability". See this fascinating statement for yourself plastered in bold letters squarely in the middle of their home page:

http://www.servicedogsamerica.org/

It is the blog's considered opinion that these outfits serve no legitimate purpose and exist mainly to sidestep what the ADA works diligently to accomplish. These outfits make it plain on their sites that nothing is done to verify either the animal's credentials or the purported disability of

LT-29

PLAINTIFF'S
EXHIBIT
5
PENGAD 800-631-6989

# Cowpet Bay West Blog

## An Informed Active Community

### Questions Posed to Board Candidates

January 3, 2012

The following was emailed to all board of director candidates:

*To all – my wife and I own 3 Leeward and have the following two questions for the board candidates:*

*What would your vote have been on the recent board vote regarding open or closed meetings in the specific context of the vote taken?*
*Are you in favor of the proposed bylaw revision as stated in the draft regarding dogs on property?*

*Lance Talkington*

Responses received were as follows:

- Herb Horwitz – for open meetings; and for the bylaw revision regarding dogs
- Doug Rebak – 1. I have been in favor of open meetings from the time I voted in favor of Vinny's motion at the Annual Owner's Meeting. This is not theoretical but real. The meetings I held as President were open ,with the few exceptions where we were talking sensitive topics such as Staff Reviews or specific Owner-related problems.
  2. My position on dogs is I love them, have had 2 of our own, but they just do not belong at Cowpet. The issue of a "service dog" can and has been abused, but I feel the Board is taking a reasonable approach in following the ADA guidelines.
  Bottom line, I favor the By Laws revision on dogs.
- Ed Wardwell – declined comment
- Judi Krohmenhoek – declined comment
- Barbara Walters – declined comment
- Dick Lamoreaux – declined comment

While earlier correspondence is not available for Ed Wardwell's position on these issues, Judi, Barbara, and Dick are on record favoring dogs on the property (Judi and Barbara both currently have dogs in their units and have declined to comment as to the basis for it). Barbara is on record favoring closed meetings. Our thanks to Doug and Herb for taking the time to comment.

**Comments on: "Questions Posed to Board Candidates" (2)**

LT-27

# Cowpet Bay West Blog

## An Informed Active Community

### Letter From Judi Kromenhoek

December 24, 2011

The letter below was posted on the blog yesterday from board candidate and recent blog registrant Judi Kromenhoek. It encourages owners to consult with association employees for input on qualification of the various candidates running for election. Our community faces a number of complex business issues on a regular basis, such as insurance coverage; formulating condo law related to animals; formulation and evaluation of budgets and financial statements; strategic planning; capital planning; and supervision and evaluation of staff to name a few.

Anyone who is able to input on these or any other challenging issues is encouraged to provide their input for evaluation in this public forum, whether it be Matuba; Steve; Joey; Jon; Louanne; or anyone else on staff. We can all benefit from being better informed on the difficult business issues that face our wonderful community.

As an aside, the following questions were posed to Judi yesterday on the blog, responses to which we await:

***Hi Judi. Welcome to the blog. We have a couple of questions. First, what would your vote have been on the recent board vote regarding open or closed meetings in the specific context of the vote taken? Secondly, are you in favor of the proposed bylaw revision as stated in the draft regarding dogs on property?***

Since Judi currently houses a dog in her unit, her input will be valuable in understanding the reasons for allowing dogs on the property.

Following is Judi's letter to the blog:

*Dear Fellow Owners,*
*Many of you only spend short periods of time during the year at Cowpet Bay West and therefore are not aware of all that is going on.*

*There is an election coming up and I urge you to do some investigating on your own. DO NOT take my word or any of the current Board's, or those running for the Board but base your vote on what you learn.*

**LT-25**

# Cowpet Bay West Blog

## An Informed Active Community

### Barking Puppy Dogs

December 5, 2011

So far our illegal neighborhood puppy dogs have been seen and smelled but not heard. Until now. Following is an email sent from an owner this morning:

*Jackie,*

*To answer your specific question there is an existing issue and not just a potential problem. Last Monday, Nov 28th a dog left in a high number Windward unit was incessantly barking to the great distraction of our household. This was in the evening and in order for my daughter to do her homework she had to hide out in our bedroom on the street side of the unit. In addition we had to close our windows and put the air-conditioning on – an expense to us and denying us of the advantage of a balcony situated in the Caribbean.*

*Regards,*

*Niall Bartlett, Leeward 47.*

Niall lives on the end of Leeward nearest the gate house. The 40's area of Windward is directly below his unit, and this coincidentally happens to be the very spot where our known violaters Barbara Walters (current board member) and Judy Kromenhoek (immediate past board president) live. If the noise is a high pitched yip, it's Barbara's dog. If it's a deeper barking noise, the dog is Judy's. Maybe blog readers who live in that area can comment on whose dog may be today's perpetrator. As an aside, trained service dogs are specificaly trained to NOT bark unless the owner is in imminent danger. Maybe one of the pups pooped in the owner's unit and was warning the owner to watch out?

These two owners continue to fight for their puppy dogs tooth and nail out of our collective view due to the monthly board meetings being closed to owners. Don't be surprised to see either or maybe both of them show up as candidates for the three open seats on the board. They desperately want to be in power to control this issue that is very real and very personal to both of them.

**Comments on: "Barking Puppy Dogs" (1)**

1. 

LT-23

for the open part of the meeting and not even have to worry with control utilization. Getting off one private line and moving to the open line takes what, about thirty seconds? Come on Max, all this takes is a little thought and effort. Read the web site you're using for goodness sake rather than for all intents and purposes shutting down the owners. Is it appropriate that you deserve flexibility of access to board meetings while traveling the states since May, but owners don't deserve the same when access can be easily controlled? Oh, and non owners calling in – are you serious? Who in their right mind outside of owners would ever want to subject themselves to this insanity.

OK, so you say that your "camp" is not with Rosie and Barbara and that you're not against accountability and openness. All you can say is "False". What exactly then is the truth Max? Please elaborate so we can know your ground rules without being thrown around in the wind from month to month not knowing what to expect. You deleted my email asking a very simple question that was nothing like your recollection of it – I asked the reasoning behind closing the meeting and made a side observation we felt like fools. Please don't twist what was asked of you. What do you expect for a subsequent response when you purposely ignore a reasonable question? It's pretty simple to draw the conclusion that you're not open and transparent. We're supposed to somehow magically assume you're for open meetings; transparency; and accountability in light of the actions undertaken? Please. We're still listening Max. Actions speak much louder than words.

You bet I resigned from the committee. I will not be associated with clandestine functionality and will only associate with one hundred percent openness and transparency. Until that becomes reality, it's not happening. I've worked too long for a reputation of being completely open and forthright and will not allow that to be tainted by being associated with behind the scenes activities, whether at the board or committee level. Prove that openness and consistency are a commitment, and this issue can be revisited. My participation is completely dependent on how you decide to proceed.

3. 

**dougrebak** *said:*

November 12, 2011 at 12:37 pm

Lance,
Thank you for your input.
I share your ( and many other owner's) frustration with the unilateral rejection of the owner's overwhelming "yes" vote for open meetings.
I do support the Board's need for closed sessions on "confidential" matters –but the dog issue???PLEASE !!!

LT-21

So, there you have it fellow owners. Our president has made it clear that accountability and openness simply isn't priority. Our sympathies go out to a few of the other board members who are trying to do the right thing but find themselves serving out a term in the middle of this sort of underhanded activity. As for the blog, we tried and have failed.

As a sidenote, President Max was asked to respond to our question of his reasoning behind the events detailed here. He did not respond to the request.

**Comments on: "The Final Straw" (4)**

1. 

   **alfred felice** *said:*

   November 9, 2011 at 12:43 pm

   A VERY SMALL MINORITY CAN DESTROY DEMOCRACY IF THE MAJORITY ARE PASSIVE !!! IT IS HAPPENING IN THE WORLD -INTHE USA – IN ST. THOMAS- WHY NOT AT CBW !!!! COMPLACENTCY LETS THE BULLIES RULE IF YOU CAN'T REMOVE THE GUILTY , YOU CAN CERTAINLY OSTRACIZE THEM AL FELICE

2. 

   **Anonymous** *said:*

   November 10, 2011 at 2:24 pm

   I have previously refrained from weighing in on Lance's blog, but I have been so badly misrepresented that I feel compelled to respond.

   "The blog received a reminder from the board over the weekend to invite owners to phone into the board meeting on Tuesday." False. The Board has never invited "the Blog" or owners to phone into the meeting. In the past, Lance and other owners have been invited to sit in on meetings. Owner Lance was never specificially invited to join the telephone call-in, nor was he prohibited. The "Blog" has never been invited.

   "President Max now wants owners to be forced to show up in person at the office if they wish to listen in on board meetings." I clearly do not have the desire or authority (or arrogance) to "force" owners to do anything. I did say in an email, and telephonically, to a Board member that I have no trouble with owners sitting in on meetings. The telephone system is provided for the convenience of Board members who are off-island. I do have

# Cowpet Bay West Blog

## An Informed Active Community

### Board Response To Request For Rules Enforcement

October 30, 2011

A few days ago, the blog emailed a formal request to the board for rules enforcement. There continue to be owners who are known to have dogs on the property. Two of those owners are current board member Barbara Walters and former board member and immediate past president Judi Kromenhoek. Earlier blog posts about the dogs issue and the request for rules enforcement may be viewed for details. There have been two earlier formal requests to the board from another owner requesting that the dogs rule be enforced. The board has responded to Barbara and Judi with the following correspondence that was copied to the blog as a formal response to our request. Kudos to the board for doing the right thing by enforcing a rule to which we all agreed to abide when purchasing property in the community.

*Judi and Barbara,*

*Cowpet Bay West's current rules are very clear – No Dogs. You are both in violation of these rules, and owners have complained to the Board.*

*As you know, the Board is considering absorbing the "No Dogs" rule into the by-laws, and allowing exceptions, upon application to the board with supporting documentation, for service dogs.*

*Louanne tells me that both of you have "papers in the office" regarding service dogs; however, you have not applied for an exception to the rule.*

*If you, as owners and users of service dogs as defined and documented in accordance with ADA rules, wish an exception, you must apply in writing or electronically to the Board and submit supporting documentation. You have 10 days to submit this request. It will be considered at the November Board meeting, and you will be informed of the outcome. Barbara, you must recuse yourself from voting since you are a Board Member.*

*Even though you are clearly in violation of the rules, this offer is being made in good faith, and in the spirit of the consensus of the Board as demonstrated in our by-law discussions.*

*If you do not avail yourselves of this offer, you are subject to being fined under the current rules of the association at the November meeting.*

*M. M. Harcourt*

*President, CBW Condo Association*

LT-17

**Lance Talkington** *said:*

October 26, 2011 at 5:48 pm

Well Barbara, you actually beat me to the next blog post. It is certainly time to hit this one head on since I've overheard the office employees talking about this among themselves and the board. Let's recount the events as they occurred. We asked for approval of the board prior to beginning construction. The entire process was overseen by both the board president and Jon. In fact, they personally came to our unit on the day that Chris Thompson began work and told us to stop until we complied with their new request for architectural plans that included all provisions that they deemed necessary and appropriate. Those plans were obtained from the firm suggested by them, and construction then proceeded with their blessing in strict adherence to the design plans. The entire process was in full view of the board and Jon, and they had every opportunity to indicate lack of adherence to the plans. Construction was adhered to in exact specification to the plans drawn by professionals that was accepted by everyone involved. If you or anyone else wants to take up this issue, I can assure you it will be dealt with firmly.

4. 

**Barbara Walters** *said:*

October 26, 2011 at 8:33 pm

I hope that is not meant as a threat to someone from the board of directors who has a great concern that all rules and regulations be followed. Rest assured, the approvals will be checked and double checked to make sure that they comply, or I can promise you that it will be corrected at the homeowners expense.

5. 

**BIG Kahuna** *said:*

October 29, 2011 at 7:14 am

And remember when I wrote Board Members abuse the little power they have? Here is a classic example of it in writing. Barbara, a board member is now threatening a unit owner basically as retaliation for that unit owner asking the board to clarify the dog rule policy. Read above, it's absolutely, clearly abuse of a board members power to act this way. Board members should ALWAYS remain impartial, clearly this is not the case as Barbara is, in her words "Rest assured, the approvals will be checked and double checked to make

LT-15

# Cowpet Bay West Blog

## An Informed Active Community

### Request For Enforcement Of Rules And Regulations

October 26, 2011

The following email was sent today to the board of directors:

To The Cowpet Bay West Board of Directors:

On May 12, 2011 the board adopted a formal written policy titled CBW Owner Repair/Inquiry Handling Policy. The policy includes procedures for owner requests for enforcement of Rules and Regulations. The association has a long standing rule disallowing dogs on the property. It has recently become a well publicized reality that multiple owners, including one current board member, have dogs living in their units. Given that our unit was fined for having a dog when a friend stayed in the unit and unbeknownst to us brought their pet, it is inconceivable how other owners are knowingly permitted to have dogs on a long standing basis without consistent enforcement of fines for such behavior. Repeated requests to the board member for substantiation of her need for a trained service dog have gone purposely unanswered, and in fact her responses have been accompanied by threats of lawsuits against both the board and me if her ability to have a dog is challenged. I have consulted a senior law firm partner who is an expert in condominium association law, and he has confirmed that the board has every right to request any and all documentation and other supporting information for an owner claiming the right to have a service dog as a result of disability. There are no limitations on this right whatsoever. If the board would like to engage the attorney in this regard, I will provide his contact information.

My daughter has repeatedly asked why others are allowed to have dogs while she is not allowed one. It is egregiously inconsistent for me to be fined for a dog in our unit while others are clearly being allowed to have dogs with no consequences. It is our request that the rules be consistently enforced and that any owner with a dog be required to submit documentation as to the need for a trained service dog to assist with their inability to function normally. It is also requested that the ADA guidelines for the definition of a service dog be implemented immediately and also incorporated into the bylaws that are currently being drafted for approval at the February owners meeting. This email is being sent to the board of directors and the association office in accordance with the procedures adopted in the May 12 document.

Lance Talkington
Three Leeward

**Comments on: "Request For Enforcement Of Rules And Regulations" (6)**

LT-13

**Barbara Walters** *said:*

October 14, 2011 at 10:06 pm

Thank you for your response Scott. I Like that you clarified for everyone what a blog is, it is personal OPINIONS. Not necessarily facts, just ones personal views on their observations or prejudices. Lance has professed to giving a fair assessment on what is going on with the board, and continues to claim things to be fact when he doesn't verify anything as fact, just writing rumor and innuendo.
That he has also mislead people into thinking that his word is gospel, is another injustice to his claim of a "factual" summation. He posted minutes, which were not the official minutes of a meeting, and his motives are not at all altruistic. This is his 15 minutes of fame, and that is really sad. By the way, I did not want, nor need, nor expect my name to be included in his tirade, when it had nothing to do with my serving on the board. These are two separate issues, and the implication that I am abusing"power" because of my position is not only not fair, it is downright untrue. I do not want or need people to be discussing me in anything other than a professional capacity as to how I serve on this board. My personal business is mine, just that. I have never done anything to abuse any power (which one doesn't have from serving anyway). People who have written in have been abusive, derisive, vicious, and just downright mean. I have never seen a collection of people like these, who get their jollies by hurting others.
If one CLAIMS to be writing truth, then it should be the truth. As an owner, just an owner, I am not accountable to the likes of Lance Talkington, and if he did not share the complex with me, he wouldn't even rate a blink of my eye.
And just to clarify the issue, I am mortified, that my personal business has been laid out over the internet without my permission or forewarning.
Maybe one day I'll find out that Lance et al, are incontinent, so I can blast that. Maybe I'd be so kind hearted that I'd buy he and his cronies diapers! But I would first let everyone know about it!
Barbara

- 

  **Lance Talkington** *said:*

  October 15, 2011 at 9:50 am

  It's impossible to give someone grief over a disability that is to date completely undefined and unsubstantiated. Nobody but the board needs to know the details of the disability, but owners have made it clear that they have the right to see that your claim of disability is properly documented and worthy of a waiver for the pet. Fortunately there is a mechanism that you and the rest of the board put in place earlier this year to deal with this very sort of situation. The issue will move in that direction.

LT-11

Barbara's right to have a dog is most certainly open to scrutiny, and she is welcome to carry out her threat to sue both the board and me for asking about it. She isn't applying for a job with us as a disabled person – she wants a dog, and her desire must be scrutinized appropriately. The office has no paperwork on file as is evidenced by Louanne's not replying to our request to confirm paperwork, and Barbara produces nothing other than saying she can't work and is thus entitled to have a dog. It has become clear she has a pet and should be fined just as I was fined in the past when a friend stayed at our unit and had a small dog for a few days without our knowing it.

Lastly, continued attempts by the fractioned group to close meetings to owners as you confirm today is ultimately disturbing. Good things are happening since owners have become more involved earlier this year. While the blog is being criticized for its comments, there has not been a single instance of anyone claiming that something untrue has been said by the blog. The truth in an open forum is powerful and must continue. Kudos to the board as a whole for standing up for truth and openness.

10. 

**pattisays** *said:*

October 14, 2011 at 12:59 am

This is fascinating…and it has become clearly a point of principal with the dog issue serving as the example of blatant disregard for rules, common respect for them and the reasons behind them in the shared community – and by a board member…It seems so simple that this person should excuse herself from this position – unless of course there is a valid reason for her to require an aid dog that the "papers" would have to validate – which this blog suggests have not been produced. If this dog issue can be so hot, the factions be so divided and the rules so easily manipulated we are in for a sad decline in the harmonious management and lifestyle that we have know for decades.

11. 

**BIG Kahuna** *said:*

October 14, 2011 at 10:11 am

My name is Scott White, aka Big Kahuna from the St. Thomas Blog, http://www.stthomasblog.com. I am the first post and I posted under "Anonymous". Really I just quickly posted not even thinking about posting my name. But for those that don't know who I am I run the largest blog in the USVI. I have over 4000 readers a day. I

LT-9



# National Service Animal Registry

903 NW F. Street · Grants Pass · Oregon · 97526 Toll Free · (866) 737-3930 Fax · (541) 471-1122

**NSAR CERTIFIED SERVICE ANIMAL**

This document affirms that **"OLIVER"** (NSAR database ID [redacted] see adjacent photo) is certified as an emotional support animal (ESA) and registered with National Service Animal Registry (NSAR) on the date listed below. This emotional support has been formally prescribed and deemed necessary to assist **J. KROMENHOEK**, the confirmed disabled handler. The handler and service animal are listed in the National Service Animal Registry (NSAR) database and may be found on the following website: **www.nsarco.com/database.html.**

**OLIVER**

Emotional Support Animals are animals that are necessary for the normal, day-to-day functioning of their emotionally or psychologically disabled handler, facilitating a normalizing effect by their presence.

An ESA is not considered a working service dog under the ADA and is not granted unlimited public access. Protections under federal law include allowing a disabled handler to be accompanied by his/her emotional support animal in the cabin of the aircraft, in accordance with the Air Carrier Access Act 49 U.S.C. 41705 and Dept of Transportation 14 C.F.R. Part 382.

Additionally, property managers and landlords are required to make reasonable accommodation (a change in the rules) to permit a disabled handler to keep an ESA, even when a landlord's policy explicitly prohibits pets, as set forth in the Fair Housing Amendments Act of 1988, Section 504 of the Rehabilitation Act of 1973 and Title II of the Americans with Disabilities Act.

For more information, please call the U.S. Justice Department ADA Information Line at (800) 514-0301 (voice) or (800) 514-0383 (TTY) or visit the ADA Business Connection at **www.ada.gov**.

September 12, 2012
Date

[signature]
Tim Livingood, M.ED. CEO

PLAINTIFF'S EXHIBIT 6

30553.00/000260

Subj: **Re: 2012 Budget,Reserve Fund Statua end Bylaw Revision Information**
Date: 1/16/2012 11:35:47 A.M. SA Western Standard Time
From: docfelice@gmail.com
To: DONNANATEL@aol.com
CC: shazkoehler@gmail.com, mrcleen44@aol.com, sidmar42@aol.com, ahg20@msn.com, bobayars@hotmail.com, birtbarbara@gmail.com, jerseybarb@aol.com, Beth.Trahos@smithmoorelaw.com, wfrumkin@varizon.net, robert.daleo@gmail.com, rbcusvi@gmail.com, bradking@xmission.com, rbye117@aol.com, cbfulp@aol.com, apollowell@optonline.net, gmoose@facet-purolator.com, mtamasi@sairealestate.com, sallyfcockayne@hotmail.com, gcowlin@comcast.net, ccrapko@verizon.net, dcshear@verizon.com, nannybar@aol.com, rjlamoureux@vitelcom.net, pjpromo@verizon.net, dougrebak@aol.com, ajuliadoyle45@hotmail.com, randysusvi@msn.com, edwardwell@aol.com, thecolonyshop@optonline.net, cfirouz@aol.com, clairecfoster@hotmail.com, georgeblackhall@hotmail.com, mrgitamo@aol.com, billhanson@comcast.net, hardeep@westarindustries.com, dick.harrington@gmail.com, herbert@hihorwitz.com, donald@hoeschrealestate.com, Highroads2@aol.com, jp.jamison@gmail.com, laura.jamison@gmail.com, fozzisnow@gmail.com, jkromes@gmail.com, barwkelly@hotmail.com, mckamey01@comcast.net, lamjk2@aol.com, ltalkington@talkington.cc, elainemalkani@gmail.com, rmarcantonio@aol.com, marich9323@aol.com, marilyn@blackhallrealestate.com, mverdiramo@optonline.net, robmccormack@msn.com, pmcculliss@msn.com, heath@alpha-value.com, MFM304@gmail.com, milliganci@aol.com, milom2@earthlink.net, MMF036@aol.com, karebare93@hotmail.com, varda@insureking.com, niallbartlett@lycos.com, gay@norcom2000.com, PJPROMO@verison.net, spompan@optonline.net, gpompan@yahoo.com, janetrebone@sbcglobal.net, g.bop@prodigy.net, ct1964ups@aol.com, rolandgeorges@yahoo.com, ronaldcholmes@gmail.com, wellsr_@earthlink.net, admin@barnonefoods.com, kikisb60@yahoo.com, JAXOH@aol.com, rshell@bashlin.com, jselfridge@verizon.com, sid@corkysfootwear.com, elainegk@aol.com, alance53@yahoo.com, sharong@4taconic.com, stumpcsw2@gmail.com, cheesa34@optonline.com, canfieldvi@gmail.com, Anna.Paiewonsky@paiewonskylawfirm.com, cowpetbaywest@hotmail.com, joncassady@hotmail.com

Reply to all ; The ADA law does not prevent e communily from excluding DOGS. It does provide e meana for legitimate needs to be allowed !! No ona wishes to prevent proper needs to be satisfied !! We do wiah to prevent a large influx of PETS to Invade our clean and tranquil property .Once there is a removal of our" no dogs policy", pets will abound and there will be no way to control their habits or their owners obeying the rules to maintain a clean quiet property !! Check other "dogs allowed" properties (especially beach properties)and hear the terrible problems incurred by failure of owners to curb and control their pets !!! Noise,smell,unpaid fines and in-your-face erroganos (we have that now!!).Again REAL needs for service are one thing,phony pets are another !! You tell me what the 3 dogs on property are ? needs or pets ?? How you do deal with arrogant rule breakers ?? Talk about IN-YOUR-FACE ,these three have some gall. We can make our rulea effective with proper wording that is legal . We are not the only community faced with shams for pets . How do others attain their goals within the law? I am sure there la a legal way !! Short of that I auggest they be ostracized,NO dinnar dates,no patronage of their establishments, no conversationa,no beach conclaves,just ignore them completely !!!! Certainly do not reelect them !!!!! PASS THE BY-LAW CHANGE Vote for Doug,Ed and Herb.Board control helpe ,but a by-law change would be harder to overturn.Be serious,what do you want——VOTE Al Felice 27 WWW

On Sun, Jan 15, 2012 at 11:20 AM, <DONNANATEL@aol.com> wrote:

Lance, What you need to do is go to the Government ADA website for the disabled, under Service Animals you will find something surprising, the actual law. You will elso find, legally, what you are allowed to ask and what the service dog owner is required to provide. It also clearly states that no specialized training is requlred for a service dog. I posted the court decision against Puablo for a reason, I do not want Cowpet Bay using money that is set asida for improvements for legal fees.

I auggest that all homeowners check out the ADA website because all the amails are setting the association up for an expensive legal fight if the blog or the email authors are tied back to the board or employees of cowpet bay.

I am very concerned that a legal line is being crossed with the Service dog Issue.

Donna M LaScola, CEO
NATELCO Corporation
140 West Hampton Avenue

Sunday, M... RSEYBARB

3054700/000329



Capitol Heights, MD 20743

In a message dated 1/14/2012 10:45:46 P.M. Eastern Standard Time, docfelice@gmail.com writes:

> Hi Sharon, thanks for the "true" numbers !! Now perhaps every one else will SHUT UP ,including me. I no longer will have to champion our diligent board.I think you guys and gals did a terrific job ,despite all the negativity from a few dissidents. Congratulations for a job well done. Al Felice 27 WWW
>
> On Sat, Jan 14, 2012 at 10:01 PM, Sharon Koehler <shazkoehler@gmail.com> wrote:
>
> Dear Owners,
>
> As required in our bylaws, I am attaching a copy of our 2012 Budget, approved by the Board late in December 2011. Also attached you will find documents covering the above two important subjects. Please take the time to review these reports and, if you have any questions, please get back to me.
>
> Thank you.
>
> Sjaron Koehler, Treasurer
>
> CBW Board of Directors

Subj: **Fwd: CBW Liability Insurance**
Date: 1/18/2012 8:37:16 A.M. SA Western Standard Time
From: JERSEYBARB@aol.com
To: jkromes@gmail.com, rjlamoureux@snet.net, iamjk2@aol.com

**Nice ..............now he shows my letter. Real Class act**
**(letter to follow couldn't forward it)**

From: milom2@earthlink.net
To: lance@eisvi.com
CC: stycisv@gmail.com, rbcusvi@gmail.com, shazkoehler@gmail.com, moehogan1@verizon.net, JERSEYBARB@aol.com, wellsr_@earthlink.net, cowpetbaywest@hotmail.com
Sent: 1/17/2012 11:59:02 P.M. SA Western Standard Time
Subj: CBW Liability Insurance

Re: Policies DM-GL11-63 and 105434549

Dear Lance,

The referenced policies are the liability (general and officer) insurance policies for Cowpet Bay West Condominium Association. The Board of Directors would like to make you aware of a situation which may call these into play.

Recently one of our owners had their attorney send us a letter in which the attorney stated they were representing the owner in a "complaint" against the association. The Board is consulting with Atty Maria Hodge to determine what this means to us, and what our exposure, if any, is.

Attached is a copy of the letter from the attorney. At this time, we don't believe any action is required on your part; however, we will keep you informed as this matter progresses.

Max Harcourt

President, CBWCA

505-385-9225

3054700/000334

2012, we'll make that Exhibit 13. It's a letter from your office.

Q. Do you recognize this letter?

(Deposition Exhibit No. 13 was marked for identification.)

A. I believe that's the same letter, right.

Q. There is a different date but that's January?

A. Yes. I'm sorry, yes. I do remember. She just needed -- she needed recertification at this time. This is something that you need every year when you travel.

Q. Okay. And at that time you did the recertification, did you do another full evaluation of the patient?

A. Yes. And in fact, I did a more thorough one because, again, she wasn't presenting only for this at that time. So it was much more thorough than the question that she presented with initially.

Q. Okay. And at that time, was there any discussion with any issues with homeowners at the condominium here?

A. Yes.

Q. What was the discussion, if you remember?

A. Again, the discussion was that she was

PLAINTIFF'S EXHIBIT

having difficulty, I believe, in securing the pet or having the pet -- no, no, no, I'm sorry. She had difficulties with her neighbors given that she had possession of this companionship pet, yeah, similar to the prior case.

Q. Was there any indication -- did Ms. Kromenhoek ever tell you that she was not able to be at her condominium with her dog?

A. No, I don't believe it was that, no. I believe her pet was allowed. It was just more of, again, perceived harassment and things of that nature from her -- or made by her neighbors.

MR. RIOPELLE: Okay. I am going to introduce Exhibit 14, composite exhibit, three pages, Bates Nos. 207, 205 and 202.

(Deposition Exhibit No. 14 was marked for identification.)

Q. They appear to be your notes, soap notes?

A. Soap notes.

Q. Dated January 31, 2012, March 26, 2012, and April 16, 2012. You went to just take a look and confirm that those are, in fact, your notes?

A. Yeah. Right. Yes, these are my notes.

Q. Okay. On Exhibit 9, you referenced you

IN THE UNITED STATES DISTRICT COURT OF THE VIRGIN ISLANDS
DISTRICT OF ST. THOMAS AND ST. JOHN

BARBARA WALTERS,

Plaintiff,

v.

COWPET BAY WEST CONDOMINIUM ASSOCIATION; THE BOARD OF THE COWPET BAY WEST CONDOMINIUM ASSOCIATION; MAX HARCOURT, in his personal capacity; ALFRED FELICE; LANCE TALKINGTON ROBERT COCKAYNE;VINCENT VERDIRAMO,

Defendants.

CIVIL CASE NO: 3:12-cv-00024

**DEFENDANT VINCENT VERDIRAMO'S MOTION FOR SUMMARY JUDGMENT AS TO COUNT XIII OF THE SECOND AMENDED COMPLAINT AND INCORPORATED MEMORANDUM OF LAW PURSUANT TO FED. R. CIV. P. 56 AND LOCAL RULE 56.1**

Defendant, Vincent Verdiramo by and through his undersigned counsel, submit this Memorandum of Law in support of his Motion for Summary Judgment on the Complaint filed by Plaintiff, Barbara Walters ("Plaintiff")(Deceased), and move this Honorable Court for entry of Final Summary Judgment in his favor against Plaintiff. In support, Defendant states the following:

## I. INTRODUCTION

This matter stems from a baseless quarrel amongst residents at Cowpet Bay West Condominium Association regarding Plaintiff's accompaniment of a dog while she resided at her unit in Cowpet Bay West. Defendant was a board member of Cowpet Bay West at all material times in this action. Plaintiff alleges that Defendant gave a legal opinion to the Board and spearheaded a campaign to amend the by-laws to exclude Happy and other emotional support

dogs (Paragraph 195 of the Second Amended Complaint). On this sole basis, Plaintiff claims that Defendant caused her negligent and/or an intentional infliction of emotional distress.

In just over two years, Plaintiff has conducted no discovery in this matter, despite being given more than an adequate amount of time to complete same. Frankly, Plaintiff cannot establish any existence of an element essential to her case. As such, pursuant to Fed. R. Civ. P. 56, there can be no genuine issue to any material fact, since the complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial. Thus, Defendant is entitled to summary judgment. As will be discussed more fully below, Plaintiff's claims are unsupported by the evidence. The undisputed material evidence shows Defendant did not provide a legal opinion to the Cowpet Board as Defendant is neither a Virgin Island's licensed attorney nor was he retained by the Board to act as their attorney. Furthermore, there is no record evidence that Defendant was spearheading any campaign to amend the by-laws. He voted along with rest of the board to move forward with the amending of the by-laws, which included a number of amendments that had no involvement with dogs. As such, Defendant is entitled to summary judgment as to Count XIII of the Second Amended Complaint.

## II. UNDISPUTED MATERIAL FACTS

1. Defendant did email on December 2, 2011, several residents discussing the ADA and Fair Housing Act and suggested that the board would need to hire legal counsel to put forth Cowpet Bay West's regarding dog exception requests. (Declaration of Vincent Verdiramo is attached hereto as Exhibit "1").

2. Defendant has never been retained by Cowpet Bay West Condominium Association as their attorney. (Declaration of Vincent Verdiramo is attached hereto as Exhibit "1").

3. Defendant is not licensed to practice law in the Virgin Islands. (Declaration of Vincent Verdiramo is attached hereto as Exhibit "1").

4. Defendant has never rendered a legal opinion to the Cowpet Bay West Condominium Association. (Declaration of Vincent Verdiramo is attached hereto as Exhibit "1").

5. Defendant did not spearhead the amendment of the by-laws but was an active participant in their preparation, as were other board members. (Declaration of Vincent Verdiramo is attached hereto as Exhibit "1").

6. Defendant has never reviewed any medical certifications or a request for an accommodation from Plaintiff. (Declaration of Vincent Verdiramo is attached hereto as Exhibit "1").

7. Neither Jon Cassidy nor Louanne Schechter ever spoke to Defendant regarding any "papers" submitted by Plaintiff. (Declaration of Vincent Verdiramo is attached hereto as Exhibit "1").

8. The Board never prevented Plaintiff from accessing or using her unit at any time with the accompaniment of her dog. (Declaration of Vincent Verdiramo is attached hereto as Exhibit "1").

## III. <u>SUMMARY JUDGMENT STANDARD</u>

Rule 56(c) of the Federal Rules of Civil Procedure permits the entry of summary judgment if "the pleadings, depositions, answers to interrogatories, and admissions on file,

Case 1:12-cv-00024-CVG-RM Document #: 120 Filed: 05/01/14 Page 11 of 18

together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." The moving party bears the burden of proving that no genuine issue of material fact is in dispute.[1] A factual dispute is "material" only if it might "affect the outcome of the suit under the governing law."[2] There is only a "genuine" issue of material fact "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party."[3] The court must examine the facts in a light favorable to the non-movant.[4] Furthermore, the court must resolve "all inferences, doubts and issues of credibility against the moving party."[5]

The Supreme Court has further explained in *Celotex* that:

> "the plain language of Rule 56(c) mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial. In such a situation, there can be 'no genuine issue as to any material fact,' since a complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial. The moving party is 'entitled to a judgment as a matter of law' because the nonmoving party has failed to make a sufficient showing on an essential element of her case with respect to which she has the burden of proof."[6]

The nonmoving party must then "go beyond the pleadings and by her own affidavits, or by the depositions, answers to interrogatories, and admissions on file, designate *specific facts* showing that there is a genuine issue for trial."[7] Here, Plaintiff has had more than two years to conduct discovery, since the filing of the lawsuit, however, neither written discovery nor depositions have

[1] *Matsushita Elec. Indus. Co. Ltd. v. Zenith Radio Corp.,* 475 U.S. 574, 585 n. 10 (1986).
[2] *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248 (1986).
[3] *Id.*
[4] *Id.* at 255.
[5] *Smith v. Pittsburgh Gage & Supply Co.,* 464 F.2d 870, 874 (3d Cir.1972) (citations omitted).
[6] *Celotex Corp. v. Catrett,* 477 U.S. 317, 322-323 (1986).

[7] *Id.* at 324 (emphasis added) (internal quotations and citations omitted).

been completed by Plaintiff. Plaintiff has not and cannot establish the existence of any element essential to prove her case against Defendant.

## IV. MEMORANDUM OF LAW

### a. Plaintiff Fails to Establish Negligent and/or Intentional Infliction of Emotional Distress

Plaintiff's Count XIII is a combination of two separate causes of action, negligent and/or intentional infliction of emotional distress. Viewing the record evidence and undisputed facts in a light most favorable to Plaintiff does not establish a prima facie cases for negligent or intentional infliction of emotional distress.

Under Virgin Islands law, a claim of intentional infliction of emotional distress requires "extreme and outrageous conduct intentionally or recklessly causes severe emotional distress ..."[8] The Restatement (Second) of Torts § 46(1) defines outrageous conduct as "so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community." The court in *Smith* indicated that the court's role when dealing with a claim of intentional infliction of emotional distress is limited to determining "whether the defendant's conduct may reasonably be regarded as so extreme and outrageous as to permit recovery, or whether it is necessarily so."[9] There is no record evidence that Defendant's actions were so extreme and outrageous to permit recovery. Furthermore, "Discrimination alone does not state a claim for intentional infliction of emotional distress."[10] Plaintiff's claim for intentional infliction of emotional distress is clearly based on alleged Fair Housing discrimination.

[8] *Smith v. Elias,* 2007 WL 4209701, at *4 (V.I.Super.Ct.2007).
[9] *Id* at *4.
[10] *Id.* see also; *Equal Employment Opportunity Comm'n v. Chestnut Hill Hosp.,* 874 F.Supp. 92, 96 (E.D.Pa.1995); *see also Nichols v. Acme Markets, Inc.,* 712 F.Supp. 488 (E.D.Pa.1989), *aff'd,* 902 F.2d 1561 (3d Cir.1990).

Plaintiff alleges that Defendant gave a legal opinion to the Board and spearheaded a campaign to amend the by-laws to exclude Oliver and other emotional support dogs (Paragraph 195 of the Second Amended Complaint). Frankly, there is a complete lack of evidence to support this contention. Defendant was never retained as counsel for Cowpet Bay West, never gave a legal opinion and even suggested that Cowpet Bay West consider retaining counsel to address ADA/FHA exemption requests. (See Declaration of Vincent Verdiramo attached hereto as Exhibit "1") Moreover, there is no record evidence that Defendant was any more involved in the 2012 By-law amendments than any other board member. Even if the record evidence and undisputed facts supported Plaintiff's contention that Defendant gave a legal opinion and spearheaded the by-law amendments, which they clearly do not, these alleged actions certainly are not "so extreme in degree to go beyond all possible bounds of decency" or "utterly intolerable in a civilized community." It is not enough to allege or prove that a defendant acted with tortious intent or even acted with malice.[11] As such, Plaintiff's claim for intentional infliction of emotional distress fails and Defendant is entitled to summary judgment.

Plaintiff has similarly failed to meet the required elements for a claim of negligent infliction of emotional distress. This Court has required two elements to sustain a claim of negligent infliction of emotional distress. First the negligent conduct must have placed the plaintiff in danger of his or her own safety. Second, the plaintiff must have suffered some physical harm as a result of the emotional distress.[12] As there are no allegations, record evidence

[11] *See;* The Restatement (Second) of Torts § 46(1).
[12] *Mingolla v. Minnesota Mining and Mfg. Co.,* 893 F.Supp. 499, 506 (D.Vi. 1995). *See also Lempert v. Singer*, 26 V.I. 326 (D.V.I. 1995)(there can be no liability for negligent infliction of emotional distress absent physical harm); *International Islamic Community of Masjid Baytulkhaliq Inc. v. DEA*, 981 F.Supp. 352, 369-370 (grating summary judgment in defendants favor as to intentional and negligent infliction of emotional distress); *Ramos v. St. Croix Alumina, L.L.C.,* 277 F.Supp.2d 600, 604 (D.V.I.2003) *overruled on other grounds by Miller v. V.I. Hous. Auth.,* CIV. 1998/0089, 2005 WL 1353395 (D.V.I. June 3, 2005). ([p]hysical harm is a required element of a claim for negligent infliction of emotional distress in

or any discovery indicating physical harm, Plaintiff cannot establish either element of a prima face case for negligent infliction of emotional distress. As such, Defendant is entitled to summary judgment as to Count XIII.

## V. CONCLUSION

After two years to complete discovery and conducting none and failing to show any evidence to establish the existence of the essential elements of Plaintiff's claims against Defendant, the plain language of Rule 56(c) mandates the entry of summary judgment.[13] Furthermore, as a result of Plaintiff's death, she cannot sufficiently refute Defendants undisputed facts or prove any aspect of her case. Put simply, there is no set of facts under which Plaintiff would be entitled to relief in this litigation or under which Plaintiff could bring a successful claim against Defendant. Accordingly, summary judgment in favor of Defendant as to Count XIII of Plaintiff's Second Amended Complaint is not only warranted but required.

WHEREFORE, the Defendant, Vincent Verdiramo respectfully requests that the Court grant this Motion for Final Summary Judgment, entitlement to Defendant's prevailing party attorneys' fees and costs and for such other and further relief, both at law and in equity, to which the Defendant may be justly and legally entitled.

the Virgin Islands.") *Anderson v. Government of Virgin Islands*, 180 F.R.D. 284, 286 (D.Vi. June 11, 1998); RESTATEMENT (SECOND) OF TORTS § 313.

[13] *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-323 (1986).

Dated:  May 1, 2014            Respectfully submitted,

**BIRCH, de JONGH & HINDELS, PLLC & BOYD
RICHARDS PARKER & COLONNELLI**
*Counsel for Defendants: Cowpet Bay West Condominium
Association, The Board of Cowpet Bay West Condominium Association,
Max Harcourt, Robert Cockayne, and Vincent Verdiramo*
1330 Estate Taarnebjerg
St. Thomas, VI 00802
Tel.: 340-774-1100; Fax: 340-774-7300

By:            /s/ Richard P. Farrelly
       **Richard Farrelly**
       Bar No. 105
       rfarrelly@bdhlawvi.com
       **Joseph Riopelle**
       jriopelle@boydlawgroup.com

        I hereby certify that on the above-indicated date, I electronically filed the foregoing
document with the Clerk of the Court using ECF.  I also certify that the foregoing document is
being served this day on all counsel of record or pro se parties identified below, either via
transmission of Notices of Electronic Filing generated by ECF or in some other authorized
manner for those counsel or parties who are not authorized to receive electronically Notices of
Electronic Filing.

**Karin A. Bentz, Esq.**
(Attorney for Plaintiff)
5332 Raadets Gade, Ste. 3
St. Thomas, VI 00802
Tel: 340-774-2669
kbentz@virginalaw.com

**John H. Benham, III, Esq.**
(Attorney for Talkington)
Post Office Box 11720
St. Thomas, VI 00801
Tel: 340-774-0673
benham@bclawvi.com

**Ryan C. Meade, Esq.**
(Attorney for Alfred Felice)
9300 S. Dadeland Blvd., 4th Floor
Miami, FL 33156
Tel: 305-670-1101
rmeade@qpwblaw.com

            /s/ Richard P. Farrelly

IN THE UNITED STATES DISTRICT COURT OF THE VIRGIN ISLANDS
DISTRICT OF ST. THOMAS AND ST. JOHN

BARBARA WALTERS,

Plaintiff,

v.

COWPET BAY WEST CONDOMINIUM ASSOCIATION; THE BOARD OF THE COWPET BAY WEST CONDOMINIUM ASSOCIATION; MAX HARCOURT, in his personal capacity; ALFRED FELICE; LANCE TALKINGTON ROBERT COCKAYNE;VINCENT VERDIRAMO,

Defendants.

CIVIL CASE NO: 3:12-cv-00024

**DECLARATION OF VINCENT VERDIRAMO**

I, VINCENT VERDIRAMO, hereby declare as follows:

1. I have personal knowledge of the matters set forth in this declaration.

2. I submit this declaration in support of the Motion for Final Summary Judgment filed in this matter on my behalf.

3. I am a resident of Martinsville, Somerset County, New Jersey

4. On December 2, 2011, I emailed several residents discussing the ADA and Fair Housing Act and suggested that the board would need to hire legal counsel to put forth Cowpet Bay West' position when dog exception requests are received.

5. I have never been retained by Cowpet Bay West Condominium Association as their attorney.

6. I am not licensed to practice law in the Virgin Islands.

7. I have never rendered a legal opinion to the Cowpet Bay West Condominium Association.

EXHIBIT
Verdiramo - MSS
1

8. I did not spearhead the amendment of the by-laws, but was an active participant in their preparation, as were other board members.

9. I have never reviewed any medical certifications or a request for an accommodation from Plaintiff.

10. Neither Jon Cassidy nor Louanne Schechter ever spoke to me regarding any "papers" submitted by Plaintiff.

11. The Board never prevented Plaintiff from accessing or using her unit at any time with the accompaniment of her dog.

Further Affiant Sayeth Not.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on May __1__, 2014.

Vincent Verdiramo, Esq.

IN THE UNITED STATES DISTRICT COURT OF THE VIRGIN ISLANDS
DISTRICT OF ST. THOMAS AND ST. JOHN

JUDITH KROMENHOEK,

Plaintiff,

v.

COWPET BAY WEST CONDOMINIUM ASSOCIATION; THE BOARD OF THE COWPET BAY WEST CONDOMINIUM ASSOCIATION; MAX HARCOURT, in his personal capacity; ALFRED FELICE; LANCE TALKINGTON ROBERT COCKAYNE;VINCENT VERDIRAMO,

Defendants.

CIVIL CASE NO: 3:12-cv-00025

**DEFENDANT VINCENT VERDIRAMO'S MOTION FOR SUMMARY JUDGMENT AS TO COUNT XIII OF THE SECOND AMENDED COMPLAINT AND INCORPORATED MEMORANDUM OF LAW PURSUANT TO FED. R. CIV. P. 56 AND LOCAL RULE 56.1**

Defendant, Vincent Verdiramo by and through his undersigned counsel, submit this Memorandum of Law in support of his Motion for Summary Judgment on the Complaint filed by Plaintiff, Judith Kromenhoek ("Plaintiff"), and move this Honorable Court for entry of Final Summary Judgment in his favor against Plaintiff. In support, Defendant states the following:

## I. INTRODUCTION

This matter stems from a baseless quarrel amongst residents at Cowpet Bay West Condominium Association regarding Plaintiff's accompaniment of a dog while she resided at her unit in Cowpet Bay West. Defendant was a board member of Cowpet Bay West at all material times in this action. Plaintiff alleges that Defendant gave a legal opinion to the Board and spearheaded a campaign to amend the by-laws to exclude Oliver and other emotional support

dogs (Paragraph 189 of the Second Amended Complaint). On this sole basis, Plaintiff claims that Defendant caused her negligent and/or an intentional infliction of emotional distress.

In just over two years, Plaintiff has conducted no discovery in this matter, despite being given more than an adequate amount of time to complete same. Frankly, Plaintiff cannot establish any existence of an element essential to her case. As such, pursuant to Fed. R. Civ. P. 56, there can be no genuine issue to any material fact, since the complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial. Thus, Defendant is entitled to summary judgment. As will be discussed more fully below, Plaintiff's claims are unsupported by the evidence. The undisputed material evidence shows Defendant did not provide a legal opinion to the Cowpet Board as Defendant is neither a Virgin Island's licensed attorney nor was he retained by the Board to act as their attorney. Furthermore, there is no record evidence that Defendant was spearheading any campaign to amend the by-laws. He voted along with rest of the board to move forward with the amending of the by-laws, which included a number of amendments that had no involvement with dogs. As such, Defendant is entitled to summary judgment as to Count XIII of the Second Amended Complaint.

## II.    UNDISPUTED MATERIAL FACTS

1.    Defendant did email on December 2, 2011, several residents discussing the ADA and Fair Housing Act and suggested that the board would need to hire legal counsel to put forth Cowpet Bay West's regarding dog exception requests. (Declaration of Vincent Verdiramo is attached hereto as Exhibit "1").

2. Defendant has never been retained by Cowpet Bay West Condominium Association as their attorney. (Declaration of Vincent Verdiramo is attached hereto as Exhibit "1").

3. Defendant is not licensed to practice law in the Virgin Islands. (Declaration of Vincent Verdiramo is attached hereto as Exhibit "1").

4. Defendant has never rendered a legal opinion to the Cowpet Bay West Condominium Association. (Declaration of Vincent Verdiramo is attached hereto as Exhibit "1").

5. Defendant did not spearhead the amendment of the by-laws but was an active participant in their preparation, as were other board members. (Declaration of Vincent Verdiramo is attached hereto as Exhibit "1").

6. Defendant has never reviewed any medical certifications or a request for an accommodation from Plaintiff. (Declaration of Vincent Verdiramo is attached hereto as Exhibit "1").

7. Neither Jon Cassidy nor Louanne Schechter ever spoke to Defendant regarding any "papers" submitted by Plaintiff. (Declaration of Vincent Verdiramo is attached hereto as Exhibit "1").

8. The Board never prevented Plaintiff from accessing or using her unit at any time with the accompaniment of her dog. (Declaration of Vincent Verdiramo is attached hereto as Exhibit "1").

## III. SUMMARY JUDGMENT STANDARD

Rule 56(c) of the Federal Rules of Civil Procedure permits the entry of summary judgment if "the pleadings, depositions, answers to interrogatories, and admissions on file,

together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." The moving party bears the burden of proving that no genuine issue of material fact is in dispute.[1] A factual dispute is "material" only if it might "affect the outcome of the suit under the governing law."[2] There is only a "genuine" issue of material fact "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party."[3] The court must examine the facts in a light favorable to the non-movant.[4] Furthermore, the court must resolve "all inferences, doubts and issues of credibility against the moving party."[5]

The Supreme Court has further explained in *Celotex* that:

> "the plain language of Rule 56(c) mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial. In such a situation, there can be 'no genuine issue as to any material fact,' since a complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial. The moving party is 'entitled to a judgment as a matter of law' because the nonmoving party has failed to make a sufficient showing on an essential element of her case with respect to which she has the burden of proof."[6]

The nonmoving party must then "go beyond the pleadings and by her own affidavits, or by the depositions, answers to interrogatories, and admissions on file, designate *specific facts* showing that there is a genuine issue for trial."[7] Here, Plaintiff has had more than two years to conduct discovery, since the filing of the lawsuit, however, neither written discovery nor depositions have

[1] *Matsushita Elec. Indus. Co. Ltd. v. Zenith Radio Corp.,* 475 U.S. 574, 585 n. 10 (1986).
[2] *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248 (1986).
[3] *Id.*
[4] *Id.* at 255.
[5] *Smith v. Pittsburgh Gage & Supply Co.,* 464 F.2d 870, 874 (3d Cir.1972) (citations omitted).
[6] *Celotex Corp. v. Catrett,* 477 U.S. 317, 322-323 (1986).

[7] *Id.* at 324 (emphasis added) (internal quotations and citations omitted).

been completed by Plaintiff. Plaintiff has not and cannot establish the existence of any element essential to prove her case against Defendant.

## IV. MEMORANDUM OF LAW

### a. Plaintiff Fails to Establish Negligent and/or Intentional Infliction of Emotional Distress

Plaintiff's Count XIII is a combination of two separate causes of action, negligent and/or intentional infliction of emotional distress. Viewing the record evidence and undisputed facts in a light most favorable to Plaintiff does not establish a prima facie cases for negligent or intentional infliction of emotional distress.

Under Virgin Islands law, a claim of intentional infliction of emotional distress requires "extreme and outrageous conduct intentionally or recklessly causes severe emotional distress ..."[8] The Restatement (Second) of Torts § 46(1) defines outrageous conduct as "so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community." The court in *Smith* indicated that the court's role when dealing with a claim of intentional infliction of emotional distress is limited to determining "whether the defendant's conduct may reasonably be regarded as so extreme and outrageous as to permit recovery, or whether it is necessarily so."[9] There is no record evidence that Defendant's actions were so extreme and outrageous to permit recovery. Furthermore, "Discrimination alone does not state a claim for intentional infliction of emotional distress."[10] Plaintiff's claim for intentional infliction of emotional distress is clearly based on alleged Fair Housing discrimination.

[8] *Smith v. Elias,* 2007 WL 4209701, at *4 (V.I.Super.Ct.2007).
[9] *Id* at *4.
[10] *Id.* see also; *Equal Employment Opportunity Comm'n v. Chestnut Hill Hosp.,* 874 F.Supp. 92, 96 (E.D.Pa.1995); *see also Nichols v. Acme Markets, Inc.,* 712 F.Supp. 488 (E.D.Pa.1989), *aff'd,* 902 F.2d 1561 (3d Cir.1990).

Plaintiff alleges that Defendant gave a legal opinion to the Board and spearheaded a campaign to amend the by-laws to exclude Oliver and other emotional support dogs (Paragraph 189 of the Second Amended Complaint). Frankly, there is a complete lack of evidence to support this contention. Defendant was never retained as counsel for Cowpet Bay West, never gave a legal opinion and even suggested that Cowpet Bay West consider retaining counsel to address ADA/FHA exemption requests. (See Declaration of Vincent Verdiramo attached hereto as Exhibit "1") Moreover, there is no record evidence that Defendant was any more involved in the 2012 By-law amendments than any other board member. Even if the record evidence and undisputed facts supported Plaintiff's contention that Defendant gave a legal opinion and spearheaded the by-law amendments, which they clearly do not, these alleged actions certainly are not "so extreme in degree to go beyond all possible bounds of decency" or "utterly intolerable in a civilized community." It is not enough to allege or prove that a defendant acted with tortious intent or even acted with malice.[11] As such, Plaintiff's claim for intentional infliction of emotional distress fails and Defendant is entitled to summary judgment.

Plaintiff has similary failed to meet the required elements for a claim of negligent infliction of emotional distress. This Court has required two elements to sustain a claim of negligent infliction of emotional distress. First the negligent conduct must have placed the plaintiff in danger of his or her own safety. Second, the plaintiff must have suffered some physical harm as a result of the emotional distress.[12] As there are no allegations, record evidence

[11] *See;* The Restatement (Second) of Torts § 46(1).

[12] *Mingolla v. Minnesota Mining and Mfg. Co.*, 893 F.Supp. 499, 506 (D.Vi. 1995). *See also Lempert v. Singer*, 26 V.I. 326 (D.V.I. 1995)(there can be no liability for negligent infliction of emotional distress absent physical harm); *International Islamic Community of Masjid Baytulkhaliq Inc. v. DEA*, 981 F.Supp. 352, 369-370 (grating summary judgment in defendants favor as to intentional and negligent infliction of emotional distress); *Ramos v. St. Croix Alumina, L.L.C.*, 277 F.Supp.2d 600, 604 (D.V.I.2003) *overruled on other grounds by Miller v. V.I. Hous. Auth.*, CIV. 1998/0089, 2005 WL 1353395 (D.V.I. June 3, 2005). ([p]hysical harm is a required element of a claim for negligent infliction of emotional distress in

Case: 3:12-cv-00025-CVG-RM Document #: 185 Filed: 05/01/14 Page 17 of 18

or any discovery indicating physical harm, Plaintiff cannot establish either element of a prima face case for negligent infliction of emotional distress. As such, Defendant is entitled to summary judgment as to Count XIII.

## V. **<u>CONCLUSION</u>**

After two years to complete discovery and conducting none and failing to show any evidence to establish the existence of the essential elements of Plaintiff's claims against Defendant, the plain language of Rule 56(c) mandates the entry of summary judgment.[13] Put simply, there is no set of facts under which Plaintiff would be entitled to relief in this litigation or under which Plaintiff could bring a successful claim against Defendant. Accordingly, summary judgment in favor of Defendant as to Count XIII of Plaintiff's Second Amended Complaint is not only warranted but required.

WHEREFORE, the Defendant, Vincent Verdiramo respectfully requests that the Court grant this Motion for Final Summary Judgment, entitlement to Defendant's prevailing party attorneys' fees and costs and for such other and further relief, both at law and in equity, to which the Defendant may be justly and legally entitled.

the Virgin Islands.") *Anderson v. Government of Virgin Islands*, 180 F.R.D. 284, 286 (D.Vi. June 11, 1998); RESTATEMENT (SECOND) OF TORTS § 313.

[13] *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-323 (1986).

Dated: May 1, 2014  Respectfully submitted,

**BIRCH, de JONGH & HINDELS, PLLC & BOYD RICHARDS PARKER & COLONNELLI**
*Counsel for Defendants: Cowpet Bay West Condominium Association, The Board of Cowpet Bay West Condominium Association, Max Harcourt, Robert Cockayne, and Vincent Verdiramo*
1330 Estate Taarnebjerg
St. Thomas, VI 00802
Tel.: 340-774-1100; Fax: 340-774-7300

By:   /s/ Richard P. Farrelly
   **Richard Farrelly**
   Bar No. 105
   rfarrelly@bdhlawvi.com
   **Joseph Riopelle**
   jriopelle@boydlawgroup.com

   I hereby certify that on the above-indicated date, I electronically filed the foregoing document with the Clerk of the Court using ECF. I also certify that the foregoing document is being served this day on all counsel of record or pro se parties identified below, either via transmission of Notices of Electronic Filing generated by ECF or in some other authorized manner for those counsel or parties who are not authorized to receive electronically Notices of Electronic Filing.

**Karin A. Bentz, Esq.**
(Attorney for Plaintiff)
5332 Raadets Gade, Ste. 3
St. Thomas, VI 00802
Tel: 340-774-2669
kbentz@virginalaw.com

**John H. Benham, III, Esq.**
(Attorney for Talkington)
Post Office Box 11720
St. Thomas, VI 00801
Tel: 340-774-0673
benham@bclawvi.com

**Ryan C. Meade, Esq.**
(Attorney for Alfred Felice)
9300 S. Dadeland Blvd., 4th Floor
Miami, FL 33156
Tel: 305-670-1101
rmeade@qpwblaw.com

     /s/ Richard P. Farrelly

IN THE UNITED STATES DISTRICT COURT OF THE VIRGIN ISLANDS
DISTRICT OF ST. THOMAS AND ST. JOHN

JUDITH KROMENHOEK,

Plaintiff,

v.

COWPET BAY WEST CONDOMINIUM ASSOCIATION; THE BOARD OF THE COWPET BAY WEST CONDOMINIUM ASSOCIATION; MAX HARCOURT, in his personal capacity; ALFRED FELICE; LANCE TALKINGTON ROBERT COCKAYNE;VINCENT VERDIRAMO,

Defendants.

CIVIL CASE NO: 3:12-cv-00025

**DECLARATION OF VINCENT VERDIRAMO**

I, VINCENT VERDIRAMO, hereby declare as follows:

1. I have personal knowledge of the matters set forth in this declaration.

2. I submit this declaration in support of the Motion for Final Summary Judgment filed in this matter on my behalf.

3. I am a resident of Martinsville, Somerset County, New Jersey

4. On December 2, 2011, I emailed several residents discussing the ADA and Fair Housing Act and suggested that the board would need to hire legal counsel to put forth Cowpet Bay West' position when dog exception requests are received.

5. I have never been retained by Cowpet Bay West Condominium Association as their attorney.

6. I am not licensed to practice law in the Virgin Islands.

7. I have never rendered a legal opinion to the Cowpet Bay West Condominium Association.

EXHIBIT
Verdiramo - MSJ
1

8. I did not spearhead the amendment of the by-laws, but was an active participant in their preparation, as were other board members.

9. I have never reviewed any medical certifications or a request for an accommodation from Plaintiff.

10. Neither Jon Cassidy nor Louanne Schechter ever spoke to me regarding any "papers" submitted by Plaintiff.

11. The Board never prevented Plaintiff from accessing or using her unit at any time with the accompaniment of her dog.

Further Affiant Sayeth Not.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on May 7, 2014.

Vincent Verdiramo, Esq.

IN THE UNITED STATES DISTRICT COURT OF THE VIRGIN ISLANDS
DISTRICT OF ST. THOMAS AND ST. JOHN

JUDITH KROMENHOEK, )
)
Plaintiff, )
v. ) CIVIL CASE NO: 3:12-cv-00025
)
COWPET BAY WEST CONDOMINIUM )
ASSOCIATION; THE BOARD OF THE )
COWPET BAY WEST CONDOMINIUM )
ASSOCIATION; MAX HARCOURT, in his)
personal capacity; ALFRED FELICE; )
LANCE TALKINGTON ROBERT )
COCKAYNE;VINCENT VERDIRAMO, )
)
Defendants. )
____________________________________)

**ORDER**

This matter came before the Court on Defendant, Vincent Verdiramo's Motion for Final Summary Judgment of Plaintiff's Second Amended Complaint and Supporting Memorandum of Law. The Court being advised of same and in the interest of justice it is herby

**ORDERED,** Defendant's Motion for Final Summary Judgment is **GRANTED**. The Court reserves jurisdiction to determine an award of attorney fees and costs in this action.

ENTERED this ________day of May, 2014

______________________________
CURTIS V. GOMEZ
Chief Judge

ATTEST:

GLENDA LAKE
Clerk of the Court
By:______________________________
Deputy Clerk

IN THE UNITED STATES DISTRICT COURT OE THE VIRGIN ISLANDS
DISTRICT OF ST. THOMAS AND ST. JOHN
****************

| | |
|---|---|
| BARBARA WALTERS,<br><br>Plaintiff,<br><br>v.<br><br>COWPET BAY WEST CONDOMINIUM ASSOCIATION; THE BOARD OE THE COWPET BAY WEST CONDOMINIUM ASSOCIATION; MAX HARCOURT, in his personal capacity; ALERED EELICE; LANCE TALKINGTON; ROBERT COCKAYNE; VINCENT VERDIRAMO,<br><br>Defendants. | **CIVIL NO. I2-00024**<br><br>**Action for: Housing Discrimination; Discrimination Based on Disability; Invasion of Privacy; Intentional Infliction of Emotional Distress; Punitive Damages; and Injunctive Injunctive and Declaratory Judgment**<br><br>**JURY TRIAL DEMAND** |

**PLAINTIFF'S RESPONSE TO DEFENDANT'S VINCENT VERDIRAMO UNDISPUTED MATERIAL EACTS AND PLAINTIEF'S COUNTER-STATEMENT OE FACTS.**

**COMES NOW** the Plaintiff, **BARBARA WALTERS** ("Plaintiff") and by and through the undersigned counsel, the **LAW OEFICES OF KARIN A. BENTZ, P.C.** (Karin A. Bentz, Esq., and Julita K. de León, Esq.) and submits her brief response to Defendant Vincent Verdiramo's ("Defendant") statement of undisputed facts in support of his summary judgment motion, pursuant to Rule 56.1 of the Local Rules of Civil Procedure.

Rule 56. 1 permits a party opposing a summary judgment motion to submit, inter alia, a "concise statement of any additional facts that the respondent contends are material to the motion for summary judgment and as to which the respondent contends there exists a genuine issue to be tried." For ease of reference, Plaintiff has referenced the corresponding paragraphs of Defendant's statement of undisputed facts as ("SOF") where appropriate. Additionally, Plaintiff has also referenced Plaintiff's Counter Statement of Facts ("CSOF") where appropriate.

*Barbara Walters v. Cowpet Bay West Condominium Ass'n., et al.* Civil No. 12/24
Plaintiff's Response to Vincent Verderamo's Undisputed Material Facts
And Plaintiff's Counter-Statement of Facts Page 2

**I. Defendant's Statement of Undisputed Material Facts**

1. Disagreed.

2. Disagreed.

3. Agreed for purposes of summary judgment.

4. Disagreed.

5. Disagreed.

6. Agreed for purposes of summary judgment.

7. Agreed for purposes of summary judgment.

8. Agreed for purposes of summary judgment.

**II. Plaintiff's Statement of Undisputed Material Facts**

1. Defendant informed members of the Association through email that he was acting as the Board' counsel. (Exhibit 1. 12/2/11 email.)

2. Defendant informed members of the Association via a legal opinion that the Plaintiff should be sued as that is the only way to verify the veracity of her application. (Id.)

3. Defendant invited members of the Association, at least 99 members, to call the Board to register their opposition to Plaintiff's application. (Id.)

4. Plaintiff sought the help of a licensed psychologist to assist her in coping with the stress associated with having her emotional support dog on the premises. (Depo. Transcript of Dr. Walker: 60: 15-22)

5. Plaintiff complained of lost friendship as a result of the reaction from members of the Board and Association to her emotional support dog. (Id. 62: 12-18)

6. Plaintiff's therapist found that she was harassed at Cowpet Bay and that the harassment and bullying made her feel uncomfortable in her own home. (Id. 64:9-13).

7. As a result, she grew increasingly even more depressed. (Id. 62: 7-19).

Joint Appendix Vol. II Page 1859

*Barbara Walters v. Cowpet Bay West Condominium Ass'n., et al.* Civil No. 12/24
Plaintiff's Response to Vincent Verderamo's Undisputed Material Facts
And Plaintiff's Counter-Statement of Facts Page 3

Respectfully submitted,

**LAW OFFICES OF KARIN A. BENTZ, P.C.**

Dated: May 21, 2014

/s/ Karin A. Bentz
**KARIN A. BENTZ, ESQ.**
**JULITA K. de LEÓN, ESQ.**
5150 Dronningens Gade, Suite 8
St. Thomas, Virgin Islands 00802
Telephone: 340-774-2669
Telecopier: 340-774-2665
E-mail: kbentz@virginalaw.com

**CERTIFICATE OF SERVICE**

I hereby certify that I caused the filing and service of the foregoing with the Clerk of the District Court of the Virgin Islands using the CM/ECF system, which will provide electronic notice by email to the following.

Richard P. Farrelly, Esq.
Birch de Jongh & Hindels, PLLC
1330 Taarneberg
St. Thomas, VI 00802
E-mail: rfarrelly@bdhlawvi.com

John H. Benham, III, Esq.
Benham & Chan
P.O. Box 11720
St. Thomas, Virgin Islands 00801
Tel: 340-774-0673
Fax: 340-776-3630
email: benham@bclawvi.com

Joseph G. Riopelle, Esq.
Boyd Richards Parker & Colonnelli, P.L.
Rivergate Tower Suite 1150
400 N. Ashley Drive
Tampa, Fl. 33602
jriopelle@boydlawgroup.com

Ryan S. Meade, Esq.
Quintairos, Prieto, Wood & Boyce, P.A.
9300 South Dadeland Blvd., 4th Floor
Miami, Fl 33156
rmeade@gpwblaw.com

/s/ Karin A. Bentz

Joint Appendix Vol. II Page 1860

Subj: **Re: COWPET BAY WEST**
Date: 12/2/2011 2:41:41 P.M. SA Western Standard Time
From: docfelice@gmail.com
To: MMF036@aol.com
CC: Dougrebak@aol.com, wellsr_@earthlink.net, admin@barnonefoods.com, ahg20@msn.com, ajuliadoyle45@hotmail.com, alance53@yahoo.com, anna.paiewonsky@hotmail.com, apollowell@optonline.net, barwkelly@hotmail.com, bayviewmarina@comcast.net, beth.trahos@smithmoorelaw.com, bgmengineers@yahoo.com, billcreque@msn.com, billhanson@comcast.net, birtbarbara@gmail.com, bobayars@hotmail.com, canfieldvi@gmail.com, carlene@calypsorealty.com, cbfulp@aol.com, ccrapko@verizon.net, ccrowe129@aol.com, cfirouz@aol.com, clairecfoster@hotmail.com, cowpetbaywest@hotmail.com, creole712@aol.com, ct1964ups@aol.com, dcshear@verizon.net, dick.harrington@gmail.com, dmcateer@wieseusa.com, donald@hoechrealestate.com, donnanatel@aol.com, edwardwell@aol.com, elainegk@aol.com, erowaan@lycos.com, fbunting@autowares.com, fereich@yahoo.com, g.bop@prodigy.net, g.moose@facet-purolator.com, gay@norcom2000.com, gcowlin@comcast.net, georgeblackhall@hotmail.com, hardeep@westarindustries.com, heath@alpha-value.com, highroads2@aol.com, iamjk2@aol.com, j.selfridge@verizon.net, janetrebone@sbcglobal.net, jaxoh@aol.com, jkromes@gmail.com, joncassady@hotmail.com, karebare93@hotmail.com, kft@druckerandtalk.com, kikisb60@yahoo.com, laura.jamison@gmail.com, marich9323@aol.com, marilyn@blackhallrealestate.com, maryhoney1@hotmail.com, mbzdds@hotmail.com, mckerney01@comcast.net, milligancl@aol.com, milom2@earthlink.net, moehogan@optonline.net, mrgitamo@aol.com, mtamasi@sairealestate.com, mverdiramo@optonline.net, nannybar@aol.com, niallbartlett@lycos.com, pattih@patriciandesign.com, pjpromo@verizon.net, pmcculliss@msn.com, randysusvi@msn.com, rbcusvi@gmail.com, rbye117@aol.com, rjlamoureux@snet.net, rlange@pol.net, robert.daleo@gmail.com, robmccormack@msn.com, roland.georges@yahoo.com, ronaldcholmes@gmail.com, rschell@bashlin.com, sallyfcockayne@hotmail.com, sharong@4taconic.com, shazkoehler@gmail.com, sid@corkysfootwear.com, spompan@optonline.net, standuzy@comcast.net, stumpcsw2@gmail.com, sue@caribbeansoulcharters.com, susangsharp@earthlink.net, thecolonyshop@optonline.net, varda@insureking.com, wdowychyn@msn.com, wfrumkin@verizon.net, wwaltsway@aol.com, Herbert@hihorwitz.com, ltalkington@talkington.cc, JERSEYBARB@aol.com, wellsr@earthlink.net

I , Alfred Felice end my wife Rosemary, vigorously vote to maintain our currant "NO DOGS " policy at Cowpet Bay West. Quite frankly ,we are terribly offended by fellow residents who defy our rules and insist on forcing their preferences in our face.REAL NEEDS are acceptable BUT please prove the need,we realy do not trust YOUR word !!!!! ( or your private physician) SORRY but honest
AL

On Fri, Dec 2, 2011 at 2:01 PM, <MMF036@aol.com> wrote:
>
> December 1, 2011
>
>
> To All Board Members of Cowpet Bay West:
>
> As everyone is aware, there is a great deal of discussion involving whether
> or not we should allow dogs on the premises. Three individuals have sought
> an exemption under the Americans With Disabilities Act and this exemption
> was accompanied by a letter or report from various doctors. It was my
> advice to the Board that no exemptions be given unless the ADA is fully
> complied with as follows:
>
> 1. The animal must be specifically trained to help in a disability.
>
> 2. The entire application of the individual should be reviewed by a third
> party physician and if it is a physical disability by someone in that field
> and if someone is claiming a mental disabilify of some sort, then by a
> qualified psychiatrist. It must be remembered that it has been edjudicated
> that animals that are being kept for companionship, etc. are not service
> dogs, they are pets and should be treated as such.

PENGAD 800-631-6989
PLAINTIFF'S EXHIBIT
1

>
> Another area of contention is the Fair Housing Act where individuals seek to
> have animals for this so called emotional support. This is not a blanket
> law. Every case has to be handled on an individual basis with official
> judicial adjudication. Therefore, if a person wants to claim the need to
> have an animal under the Fair Housing Act they have to bring the association
> to court, have a judge and expert look at all the evidence and then a
> decision will be made. Therefore, the association should be prepared to
> hire the necessary lawyers and/or doctors to put forth the association's
> position. PRESENTLY THE POSITION OF THE ASSOCIATION IS NO DOGS ALLOWED.
>
> As I have stated previously many months ago, allowing dogs on this property
> would definitely disturb our peace and quiet and eventual will lead to
> conditions that are both unhealthy, unsanitary and quite frankly
> disgusting. The dogs will of course then be brought to the beach because
> the individuals who are keeping them don't want to keep the animals cooped
> up all day in an apartment and as such you will have animals urinating on
> the beach, etc.
>
> The majority of owners do not want animals. It is just a few who wish to
> push the envelope and contest the legality of our laws. That is their
> prerogative. However, the same individuals should be made to understand
> that it will become necessary for them to adjudicate these matters in a
> court of law and their positions evaluated by competent third parties.
> THERE IS NO ONE ON THIS BOARD WITH THE NECESSARY BACKGROUND TO EVALUATE
> APPLICATIONS FOR EXEMPTION. The only way to verify the truth and voracity
> of the applications being made by individuals for service dogs is to subject
> the individual and their experts to cross examination under oath. This can
> many times be done telephonically with a notary public administering the
> oath in the United States therefore cutting down expenses for the
> association's attorney and for the litigants.
>
> It is my understanding that other condominium associations have attempted to
> allow dogs and it turned out to be a nightmare. The only facility that
> presently allows dogs is the Elysian. I am therefore urging everyone to
> contact the Board and make your wishes known. If you sit ideally by and
> allow this to happen then we have no one to blame but ourselves.
>
> Please take an active part in our endeavor to keep Cowpet Bay animal free.
>
> Very truly yours,
>
>
>
> Vincent L. Verdiramo
>
> VLV/mf

own life, because they're always depressed because they're born that way, and then there is people who have like a death in their family and go through a major stressor like a divorce, and that's what's called a situational depression. So what would you call Barbara Walters?

A. That is more of a situational, right.

Q. Do you find it ironic, Doctor, that you've prescribed an emotional support animal for Ms. Walters and the very thing that you said this is supposed to do for her actually aggravated her condition?

A. Yes, absolutely.

Q. And why do you agree with me that it's ironic?

A. Again, ironic given that this is something that could be very, very helpful to her and it was just causing a tremendous amount of stress in just -- and she never had any or never mentioned any stress in actually caring for the companionship pet. It was more just her possession of having the pet created adversity around her based on other people's reactions.

Q. Did she share with you some of the things that some of her neighbors did to her?

A. Yes.



IN THE UNITED STATES DISTRICT COURT OF THE VIRGIN ISLANDS
DISTRICT OF ST. THOMAS AND ST. JOHN
*****************

| | |
|---|---|
| **JUDITH KROMENHOEK,**<br><br>**Plaintiff,**<br><br>**v.**<br><br>**COWPET BAY WEST CONDOMINIUM ASSOCIATION; THE BOARD OF THE COWPET BAY WEST CONDOMINIUM ASSOCIATION; MAX HARCOURT, in his personal capacity; ALFRED FELICE; LANCE TALKINGTON; ROBERT COCKAYNE; VINCENT VERDIRAMO,**<br><br>**Defendants.** | **CIVIL NO. 12-00025**<br><br>**Action for: Housing Discrimination; Discrimination Based on Disability; Invasion of Privacy; Intentional Infliction of Emotional Distress; Punitive Damages; and Injunctive Injunctive and Declaratory Judgment**<br><br>**JURY TRIAL DEMAND** |

**PLAINTIFF'S RESPONSE TO DEFENDANT VINCENT VERDIRAMO'S MOTION FOR SUMMARY JUDGMENT AS TO COUNT XIII OF THE SECOND AMENDED COMPLAINT AND INCORPORATED MEMORANDUM OF LAW PURSUANT TO FED. R. CIV. PR. 56 AND LOCAL RULE 56.1**

**COMES NOW**, Plaintiff **JUDITH KROMENHOEK** by and through the undersigned counsel, the **LAW OFFICES OF KARIN A. BENTZ, P.C.** (Karin A. Bentz and Julita K. de León, Esq.), and pursuant to Rule 56.1 of the Local Rules of Civil Procedure hereby submits the following in opposition to Defendant Vincent Verdiramo's (Defendant) summary judgment motion. The facts and evidence supporting this response are contained in Plaintiff's Response to Defendant's Statement of Undisputed Material Facts and Plaintiff's Counter-Statements of Facts.[1]

As demonstrated below, the Defendant's motion for summary judgment should be denied, because genuine issues of material fact exist as to Plaintiff's claim for Intentional Infliction of Emotional Distress.

**Argument[2]**

**1. Defendant's Motion for Summary Judgment is Procedurally Defective and Must be D**

[1] Plaintiff's Response and Counter Statement of Facts are sequentially numbered. She will cite to these facts uniformly as "CSOF¶__________."

[2] For the facts, see Plaintiff's Counter statement of facts.

Local Rule of Civil Procedure 56.1 requires a separate statement of material facts with serially numbered paragraphs and "specific citation to the record." LRCi 56.1(a)(1). This rule further requires that the movant "affix to the statement copies of the precise portions of the record relied upon as evidence of each material fact." Additionally, Defendant relies on his own affidavit; a fact that in and of itself establishes the procedural defect of the instant motion, as there are no answers to interrogatories, etc. on which to rely because no discovery was conducted. As such, the Defendant's motion for summary judgment should be denied and Defendant given leave to file a motion that complies with the applicable rules of procedure.

**2. Defendant's Conduct Caused Plaintiff to Suffer Emotional Distress**.

The party seeking summary judgment must show that there is no genuine issue as to any material fact and that he is entitled to judgment as a matter of law. Fed. R. Civ. P. 56; *Celotex Corp. v. Catrett*, 477 U.S. 317 (1986); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242 (1986). The burden on the non-moving party is not a heavy one; she is simply required to show specific facts, as opposed to general allegations, that present a genuine issue worthy of trial. *Hanley v. Jones*, 21 V.I. 190 (1984). The court must inquire whether reasonable fact finders could find facts that demonstrate, by a preponderance of the evidence, that the non-moving party is entitled to a verdict. *In re Paoli R.R. Yard PCL Litig.*, 916 F.2d 829, 860 (3d Cir. 1990). In determining whether there are genuine issues of material fact, the court must draw all reasonable inferences in favor of the non-moving party; and it may not make credibility determinations or weigh the evidence. *Reeves v. Sanderson Plumbing Products, Inc.,* 530 U.S. 133 (2000).

This Court has adopted the standard for intentional infliction of emotional distress set forth in Section 46(1) of the Restatement (Second) Torts: "One who by extreme and outrageous conduct intentionally or recklessly causes severe emotional distress to another is subject to liability." *Desir v. Hovensa, L.L.C.*, CIVIL 2007/97, 2012 WL 762122 (D.V.I. Mar. 7, 2012). Recovery for intentional infliction of emotional distress "is limited to situations where 'the conduct has been so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency,

and to be regarded as atrocious and utterly intolerable in a civilized society.' " *Id.* (quoting Restatement (Second) Torts § 46, cmt. d); *see also  Petersen v. First Fed. Sav. & loan ass'n of P.R. Inc.,* 617 F.Supp. 1039, 1042 ("The plaintiff must make a showing that defendant's conduct was so outrageous that no reasonable person in a civilized society should be expected to endure it.").

Substantively, the Court is to consider whether Defendant's conduct was so outrageous that no reasonable person in a civilized society should be expected to endure it. "Where  reasonable persons may differ, it is for the jury to determine whether the conduct is sufficiently extreme and outrageous so as to result in liability." *Motheral v. Burkhart,* 400 Pa.Super. 408, 583 A.2d 1180, 1188 (1990). Such emotional damages are available "for distress which exceeds the normal transient and trivial aggravation attendant to securing suitable housing." Mor*gan v. Sec'y of Hous. & Urban Dev.,* 985 F.2d 1451, 1459 (10th Cir.1993).

Here, Defendant, as a Board member, was charged with a duty to oversee the granting of a reasonable accommodation to Plaintiff.  However, because of Defendant's unholy alliance with the "organized opposition: to Plaintiff's application, Defendant permitted Plaintiff to be vilified just for requesting a reasonable accommodation. (CSOF ¶1).  Defendant also joined in the fray by offering the Board legal advice that was contrary to the requirement of the law in an effort to deny Plaintiff her request for a reasonable accommodation. (Id. ¶2).  In an effort to further sabotage Plaintiff's application for a reasonable accommodation, Defendant, knowing that Plaintiff needed an emotional support animal, urged members of the Association, at least 99 members, to contact the Board and register their oppositions to having dogs on the premises. (Id.).

Specifically, Defendant wrote:

> "PRESENTLY THE POSITION OF THE ASSOCIATION IS NO DOGS ALLOWED. The majority of owners do not want animals.  It is just a few who wish to push the envelope and contest the legality of our laws.  That is their prerogative. However, the same individuals should be made to understand that it will become necessary for them to adjudicate these matters in a court of law and their positions evaluated by competent third parties.  THERE IS NO ONE ON THIS BOARD WITH THE NECESSARY BACKGROUND TO EVALUATE APPLICATION FOR EXEMPTION.  The only way to verify the truth and voracity of the applications being made by individuals for service dogs is to subject the individual and their experts to cross examination under oath.. . .  It is my understanding that other

> condominium associations have attempted to allow dogs and it turned out to be a nightmare. The only facility that presently allows dogs is the Elysian. I am therefore urging everyone to contact the Board and make your wishes known. If you sit ideally by and allow this to happen then we have no one to blame that ourselves. Please take an active part in our endeavor to keep Cowpet Bay animal free.

(Id.)
Such action violated Defendant's duty to the Association; but more importantly, it "exceeded the bounds of decency" as Defendant, by virtue of being a board member, was required to review Plaintiff's application, not organize an opposition to her application. Yet, Defendant, using the imprimatur of his profession as an attorney[3], offered the Board and the Association legal advice that was contrary to the stated purposes of Plaintiff's application. By fiat, Defendant invalidated Plaintiff's application and further agitated some members of the Association to become even more bellicose towards Plaintiff. As a result, Plaintiff became even more anguished and felt uncomfortable in her own home.

Generally, conduct would be found to be actionable where the recitation of the facts to an average member of the community would arouse his resentment against the actor, and lead him to exclaim, "Outrageous!" Restatement (2nd) of Torts §46. Certainly, Defendant's action as a Board member may be considered outrageous by a reasonable jury. And, Defendant's email to the Association informing them that he had advised the Board, and his subsequent plea to members of the Association to call the Board and register their oppositions to having dogs on the premises, while at the same time presiding over Plaintiff's application, taken alone or considered together as part of a course of conduct, are sufficiently outrageous to state a claim for intentional infliction of emotional distress.

Further, Defendant's conduct further humiliated Plaintiff, a former president of the Board, as she was seen as a law breaker. Emotional harm has been generally classified as "humiliation, embarrassment, emotional distress, and other such intangible harms to plaintiff's personality." *Krueger v. Cuomo,* 115 F.3d 487, 492 (7th Cir.1997). "The more inherently degrading or humiliating

[3]Vincent Verdiramo was not licensed in the U.S. Virgin Islands.

Judith Kromenhoek v. Cowpet Bay West Condominium Ass'n., et al. Civil No. 25/2012
Plaintiff's Opposition to Vincent Verdiramo's Motion for Summary Judgment Page 5

the defendant's action is, the more reasonable it is to infer that a person would suffer humiliation or distress from that action; consequently, somewhat more conclusory evidence of emotional distress will be acceptable to support an award for emotional damages. "*Id.* The distress that Plaintiff felt "exceeds the normal transient and trivial aggravation attendant to securing suitable housing."

Accordingly, Defendant is not entitled to summary judgment as there are material facts in dispute.

Respectfully submitted,

**LAW OFFICES OF KARIN A. BENTZ, P.C.**

Dated: May 21, 2014

/s/ Karin A. Bentz
**KARIN A. BENTZ, ESQ.**
**JULITA K. de LEÓN, ESQ.**
5150 Dronningens Gade, Suite 8
St. Thomas, Virgin Islands 00802
Telephone: 340-774-2669
Telecopier: 340-774-2665
E-mail: kbentz@virginalaw.com

**CERTIFICATE OF SERVICE**

I hereby certify that I caused the filing and service of the foregoing with the Clerk of the District Court of the Virgin Islands using the CM/ECF system, which will provide electronic notice by email to the following.

Richard P. Farrelly, Esq.
Birch de Jongh & Hindels, PLLC
1330 Taarneberg
St. Thomas, VI 00802
E-mail: rfarrelly@bdhlawvi.com

John H. Benham, III, Esq.
Benham & Chan
P.O. Box 11720
St. Thomas, Virgin Islands 00801
Tel: 340-774-0673
Fax: 340-776-3630
email: benham@bclawvi.com

Joint Appendix Vol. II Page 1868

Judith Kromenhoek v. Cowpet Bay West Condominium Ass'n., et al. Civil No. 25/2012
Plaintiff's Opposition to Vincent Verdiramo's Motion for Summary Judgment Page 6

Joseph G. Riopelle, Esq.
Boyd Richards Parker & Colonnelli, P.L.
Rivergate Tower Suite 1150
400 N. Ashley Drive
Tampa, Fl. 33602
jriopelle@boydlawgroup.com

Ryan S. Meade, Esq.
Quintairos, Prieto, Wood & Boyce, P.A.
9300 South Dadeland Blvd., 4th Floor
Miami, Fl 33156
rmeade@gpwblaw.com

/s/ Karin A. Bentz

Joint Appendix Vol. II Page 1869

IN THE DISTRICT COURT OF THE VIRGIN ISLANDS
DIVISION OF ST. THOMAS AND ST. JOHN

| | |
|---|---|
| JUDITH KROMENHOEK,<br>Plaintiff,<br>vs.<br>COWPET BAY WEST CONDOMINIUM ASSOCIATION; THE BOARD OF THE COWPET BAY WEST CONDOMINIUM ASSOCIATION; MAX HARCOURT, in his personal capacity; ALFRED FELICE; LANCE TALKINGTON; ROBERT COCKAYNE; VINCENT VERDIRAMO<br>Defendants. | CASE NO. ST-12-CV-00025<br>Action for: Housing Discrimination; Discrimination Based on Disability; Invasion of Privacy; Negligent Infliction of Emotional Distress; Intentional Infliction of Emotional Distress; Punitive Damages; and Injunctive and Declaratory Judgment |

**DEFENDANT LANCE TALKINGTON'S MOTION FOR SUMMARY JUDGMENT**

COMES NOW Defendant Lance Talkington ("Talkington"), by his attorneys Benham & Chan, and moves this Court, pursuant to Local Rule of Civil Procedure 56.1 and Federal Rule of Civil Procedure 56(a) to grant summary judgment in favor of Talkington as to the following counts of the Plaintiff's Second Amended Complaint:

- Count V - Violation of Section 3617 of the FHA;

- Count XI - Conspiracy to Commit an Unauthorized Act;

- Count XIII - Negligent and/or Intentional Infliction of Emotional Distress;

- Count XV - Invasion of Privacy: Public Disclosure of Private Facts;

- Count XVI - Invasion of Privacy: False Light; and

- Count XVII - Invasion of Privacy.

The above comprise all the counts of the Plaintiff's Second Amended Complaint directed to Defendant Talkington. It is noted that the Plaintiff has moved for leave to file a Third Amended Complaint (Docket No. 181) and for leave to file a Fourth Amended Complaint (Docket No. 183). The Court has not acted on either of those motions to amend as of the date of filing of this motion for summary judgment. Neither the proposed Third Amended Complaint nor the proposed Fourth Amended Complaint effect this Motion for Summary Judgment. The allegations and causes of action directed to Defendant Talkington remain as alleged in the Second Amended Complaint.

A statement of undisputed material facts and memorandum in support are filed simultaneous with this Motion for Summary Judgment. A proposed order is attached to this motion.

WHEREFORE, Defendant Lance Talkington prays this Court to enter summary judgment:

- dismissing all Plaintiff's claims against this Defendant with prejudice;
- awarding Defendant his costs and attorneys fees; and
- awarding such other and further relief as is appropriate in the circumstances of this action.

---

Dated: May 1, 2014

By: /s/ John H. Benham, III
John H. Benham, III, Esq.
V.I. Bar No. 130
Benham & Chan
P.O. Box 11720
St. Thomas, V.I. 00801
Tel. (340) 774-0673
Fax. (340) 776-3630
benham@bclawvi.com

CERTIFICATE OF SERVICE

I hereby certify that on the 1st day of May 2014, I electronically filed the foregoing DEFENDANT LANCE TALKINGTON'S MOTION FOR SUMMARY JUDGMENT, with attached proposed order, with the Clerk of the Court using the CM/ECF system which will send a notification of such filling (NEF) to:

Karin A. Bentz, Esq.
Julita K. De Leon, Esq.
5150 Dronningens Gade, Suite 8
St. Thomas, VI 00802
kbentz@virginlaw.com

Richard P. Farrelly, Esq.
Birch de Jongh & Hindels, PLLC
1330 Taarneberg
St. Thomas, VI 00802
rfarrelly@bdhlawvi.com

Joseph G. Riopelle, Esq.
Boyd Richards Parker & Colonnelli, P.L.
Rivergate Tower Suite 1150
400 N. Ashley Drive
Tampa, FL 33602
jriopelle@boydlawgroup.com

Ryan S. Meade, Esq.
Quintairos, Prieto, Wood & Boyce, P.A.
9300 South Dadeland Blvd., 4th Floor
Miami, FL 33156
rmeade@qpwblaw.com

By: /s/ John H. Benham, III

IN THE DISTRICT COURT OF THE VIRGIN ISLANDS
DIVISION OF ST. THOMAS AND ST. JOHN

| | |
|---|---|
| JUDITH KROMENHOEK,<br><br>Plaintiff,<br><br>vs.<br>COWPET BAY WEST CONDOMINIUM ASSOCIATION; THE BOARD OF THE COWPET BAY WEST CONDOMINIUM ASSOCIATION; MAX HARCOURT, in his personal capacity; ALFRED FELICE; LANCE TALKINGTON; ROBERT COCKAYNE; VINCENT VERDIRAMO<br><br>Defendants. | CASE NO. ST-12-CV-00025<br><br>Action for: Housing Discrimination; Discrimination Based on Disability; Invasion of Privacy; Negligent Infliction of Emotional Distress; Intentional Infliction of Emotional Distress; Punitive Damages; and Injunctive and Declaratory Judgment |

**ORDER**

This matter coming before this Court on Defendant Lance Talkington's Motion for Summary Judgment, and this Court being fully advised in the premises, it is hereby ORDERED that:

1. This Defendant's Motion for Summary Judgment is GRANTED;

2. The Plaintiff's claims as to Defendant Talkington in Counts V, XI, XIII, XV, XVI and XVII are dismissed with prejudice; and

3. Defendant Talkington shall file any request seeking recovery for attorneys fees and costs within fourteen (14) days of entry of this Order.

Date: ________________, 2014

______________________________
Hon. Curtis V. Gómez
Judge

Attest: Glenda L. Lake, Esq.
Clerk of the Court

By: __________________________

IN THE DISTRICT COURT OF THE VIRGIN ISLANDS
DIVISION OF ST. THOMAS AND ST. JOHN

| | | |
|---|---|---|
| JUDITH KROMENHOEK,<br><br>Plaintiff,<br><br>vs.<br>COWPET BAY WEST CONDOMINIUM ASSOCIATION; THE BOARD OF THE COWPET BAY WEST CONDOMINIUM ASSOCIATION; MAX HARCOURT, in his personal capacity; ALFRED FELICE; LANCE TALKINGTON; ROBERT COCKAYNE; VINCENT VERDIRAMO<br><br>Defendants. | ) | CASE NO. ST-12-CV-00025<br><br>Action for: Housing Discrimination; Discrimination Based on Disability; Invasion of Privacy; Negligent Infliction of Emotional Distress; Intentional Infliction of Emotional Distress; Punitive Damages; and Injunctive and Declaratory Judgment |

**MEMORANDUM IN SUPPORT OF DEFENDANT LANCE TALKINGTON'S MOTION FOR SUMMARY JUDGMENT**

COMES NOW Defendant Lance Talkington, by his attorneys Benham & Chan, and pursuant to Federal Rule of Civil Procedure 56 and Local Rule of Civil Procedure 56.1(a)(1) submits this Memorandum in Support of Defendant Lance Talkington's Motion for Summary Judgment.

## I. Introduction and Summary of Proceedings

The initial complaint in this action was filed on April 9, 2012. Thereafter, the Plaintiff Judith Kromenhoek filed her First Amended Complaint on June 19, 2012. *Document No. 30.* No leave of court was required, as this amended pleading was filed before any defendant had responded to the initial complaint. The First Amended Complaint contained twenty-two (22) separately numbered causes of action. All of Kromenhoek's claims arise from her desire to have a dog in her condominium unit at Cowpet Bay West Condominium ("CBWC").

Defendant Talkington joined his co-defendants and moved to dismiss the First Amended Complaint for failure to state a claim upon which relief could be granted. *Document No. 44.* On March 1, 2013 this Court heard oral arguments on the motions to dismiss. At that hearing this Court ruled from the bench that the First Amended Complaint failed to state any claim for relief under federal law. Thereafter this Court issued an order directing the Plaintiff to file a further amended complaint on or before March 11, 2013. *Order, March 8, 2013; Document No. 92.*

Kroemenhoek filed her Second Amended Complaint on March 11, 2013. *Document No. 94.* Count V of that pleading was directed solely to Defendant Talkington, alleging that Talkington violated section 3617 of the FHAA. That was the only federal law claim directed at Defendant Talkington. The other counts in which Defendant Talkington was named were are all based on local Virgin Islands law, and name other defendants in various combinations with Defendant Talkington. These other counts are:

- Count X - Conspiracy to Commit an Unauthorized Act (Against All Defendants);
- Count XI - Prima Facie Tort (All Defendants);
- Count XII - Defamation and Slander Per Se (Board, Association, Felice, Harcourt and Talkington);
- Count XIII - Negligent and/or Intentional Infliction of Emotional Distress (All Defendants except Felice);

- Count XV - Invasion of Privacy: Public Disclosure of Private Facts (Harcourt and Talkington);
- Count XVI - Invasion of Privacy: False Light (All Defendants, except Verdiramo and Cockayne); and
- Count XVII - Invasion of Privacy (Board, Association, Harcourt and Talkington).

Subsequent to the filing of the Second Amended Complaint, Talkington, and the co-defendants, filed separate motions to dismiss for failure to state a claim. *Talkington Motion to Dismiss and Memorandum, Docket Nos. 100-101, filed March 25, 2013.* On March 31, 2014 this Court issued an order, without opinion, granting the motions to dismiss as to some counts of the Second Amended Complaint, and denying the motions to dismiss as to other counts of the Second Amended Complaint. *Order, entered March 31, 2014, Docket No. 168.* Specifically with regard to the claims in the Second Amended Complaint directed to Talkington, this Court ordered:

- Count V - Violation of Section 3617 of the FHA - motion to dismiss denied;
- Count X - Conspiracy to Commit an Unauthorized Act (Against All Defendants) - dismissed with leave to amend;
- Count XI - Prima Facie Tort (All Defendants) - dismissed;
- Count XII - Defamation and Slander Per Se (Board, Association, Felice, Harcourt and Talkington) - dismissed;
- Count XIII - Negligent and/or Intentional Infliction of Emotional Distress (All Defendants except Felice) - motion to dismiss denied;

- Count XV - Invasion of Privacy: Public Disclosure of Private Facts (Harcourt and Talkington) - motion to dismiss denied;

- Count XVI - Invasion of Privacy: False Light (All Defendants, except Verdiramo and Cockayne) - motion to dismiss denied; and

- Count XVII - Invasion of Privacy (Board, Association, Harcourt and Talkington) - motion to dismiss denied.

The Plaintiff has moved for leave to file a Third Amended Complaint, *Docket No. 181* and for leave to file a Fourth Amended Complaint, *Docket No. 183.* The Court has not acted on either of those motions to amend as of the date of filing of this motion for summary judgment. Neither the proposed Third Amended Complaint nor the proposed Fourth Amended Complaint effect this Motion for Summary Judgment. The allegations and causes of action directed to Defendant Talkington remain as alleged in the Second Amended Complaint. References to allegations in the Plaintiff's pleadings are stated here according to the paragraph numbering in the Second Amended Complaint, unless otherwise stated.

Nor has there been any change in the status of Defendant Talkington. Mr. Talkington is not now, and has never been a member of the board of directors of the condominium association. Accordingly, he has never had any role in making policy or rules for the association, including the "no dogs" rule at the heart of this litigation. Instead, Defendant Talkington founded an internet blog devoted to owner discussion of various issues at Cowpet Bay

West Condominium ("CWBC"). All of the various claims against Defendant Talkington arise solely from postings on the blog.

**II. Analysis and Argument**

**A. The standard for summary judgment.**

Fed. R. Civ. P. 56(a) provides that summary judgment should be granted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law. The court should state on the record the reasons for granting or denying the motion".

In applying this general standard, the Supreme Court has stated:

> Rule 56(c) mandates the entry of summary judgment, after adequate time for discovery . . . against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial. ... {A] complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial.

Celotex Corp. v. Catrett, 477 U.S. 317, 322-323, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). The Third Circuit Court of Appeals has stated: "[A]t the summary judgment stage the judge's function is not himself to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." Hersh v. Allen Products Co., 789 F.2d 230, 232 (3d Cir. 1986). Once the moving party has met its initial burden of showing there are no genuine issues of material fact, the burden shifts to the nonmoving

party to designate specific material facts which show there is a genuine issue for trial. Celotex, 477 U.S. at 324. See also: Gans v. Mundy, 762 F.2d 338, 342 (3d Cir. 1985). To carry this shifted burden successfully and defeat a motion for summary judgment, the nonmovant must "point to an evidentiary conflict created on the record." Armco, Inc. v. Cyclops Corp., 791 F.2d 147, 149 (Fed. Cir. 1986). Furthermore, "[S]peculation, conclusory allegations, and mere denials are insufficient to raise genuine issues of material fact." Rhames v. Sch. Dist. of Philadelphia, 2002 U.S. Dist. LEXIS 13816, at *6 (E.D.Pa. 2002) (citation omitted).

**B. The Plaintiff cannot demonstrate that the Cowpet Bay West Blog postings interfered with her rights under the federal Fair Housing Act Amendments.**

Section 3617 of the federal Fair Housing Act Amendments states as follows:

> It shall be unlawful to coerce, intimidate, threaten, or interfere with any person in the exercise or enjoyment of, or on account of his having exercised or enjoyed, or on account of his having aided or encouraged any other person in the exercise or enjoyment of, any right granted or protected by section 3603, 3604, 3605, or 3606 of this title.

*42 U.S.C. §3617.* The plaintiff alleges that she was discriminated against in violation of section 3604(f)(3)(b) of the Fair Housing Act Amendments ("FHA"). *Second Amended Complaint at ¶101.* This specific section of the FHA provides:

> As made applicable by section 3603 of this title and except as exempted by sections 3603(b) and 3607 of this title, it shall be unlawful--
>
> * * *
>
> (f)(1) To discriminate in the sale or rental, or to otherwise make unavailable or deny, a dwelling to any buyer or renter because of a handicap of--
> (A) that buyer or renter, [FN1]
> (B) a person residing in or intending to reside in that dwelling after it is so sold, rented, or made available; or
> (C) any person associated with that buyer or renter.
> (2) To discriminate against any person in the terms, conditions, or privileges of sale or rental of a dwelling, or in the provision of services or facilities in connection with such dwelling, because of a handicap of--
>
> (A) that person; or
> (B) a person residing in or intending to reside in that dwelling after it is so sold, rented, or made available; or
> (C) any person associated with that person.
>
> (3) For purposes of this subsection, discrimination includes--
>
> * * *
>
> (B) a refusal to make reasonable accommodations in rules, policies, practices, or services, when such accommodations may be necessary to afford such person equal opportunity to use and enjoy a dwelling; or.....

Count V of the Second Amended Complaint, at paragraphs 130 to 132, alleges variously that Talkington "embarassed", "humilated", and "demonized" the Plaintiff on the blog. These conclusory allegations are without basis, which is best demonstrated by examination of the blog postings. Accompanying this motion for summary judgment is Mr. Talkington's affidavit which includes as an exhibit, a print-out of every page of the internet blog containing references to the

"no dogs" policy dispute at the condominium. It is not practical to quote the entirety of the exchanges posted on the blog by various unit owners at the condominium in this memorandum. However the exhibited blog postings demonstrate that Talkington and numerous other persons, including the Plaintiff herself, expressed their opinions, both in favor of Plaintiff's position and arguing against it. *Talkington Affidavit at Exhibit 1.*

The claims of this Plaintiff echo those presented by the plaintiffs in *Sporn v. Ocean Colony Condominium Assoc.*, 173 F.Supp.2d 244 (D.N.J. 2001). The *Sporn* plaintiffs alleged that they were "shunned" by the members of the condominium association in retaliation for filing a HUD complaint alleging denial of reasonable handicap accommodations. *173 F.Supp.2d at 251.* In granting summary judgment to the defendants on this point, the *Sporn* court stated:

> Even if there were sufficient evidence to support an inference that Plaintiffs were "shunned" in response to their HUD complaints, such actions simply do not constitute "coercion, intimidation, threats or interference" within the meaning of §3617. The Fair Housing Act is remedial legislation designed to address the very important goal of providing accessibility to housing without regard to race, color, religion, sex, familial status, national origin or disability. See generally, 42 U.S.C. §§ 3601, 3604. Consistent with this goal, the prohibitions of §3617 operate to ensure that situations that need to remedied can be brought to the attention of those with the power to effectuate the necessary changes. **Section 3617 does not, however, purport to impose a code of civility on those dealing with individuals who have exercised their FHA rights. Simply put, §3617 does not require that neighbors smile,**

> **say hello or hold the door for each other.** To hold otherwise would be to extend §3617 to conduct it was never intended to address and would have the effect of demeaning the aims of the Act and the legitimate claims of plaintiffs who have been subjected to invidious and hurtful discrimination and retaliation in the housing market.
>
> While "the language 'interfere with' has been broadly applied to 'reach all practices which have the effect of interfering with the exercise of rights' under the federal fair housing laws", *Michigan Advocacy Serv. v. Babin*, 18 F.3d 337, 347 (6th Cir.1994), a brief look at the cases in which §3617 violations have been found demonstrates that "shunning" is not the kind of behavior that interferes with FHA rights. See, e.g., *Fowler v. Borough of Westville*, 97 F.Supp.2d 602 (D.N.J.2000) (use of building code and police harassment to drive handicapped plaintiffs out of their special residences); *Byrd v. Brandeburg*, 922 F.Supp. 60 (N.D.Ohio 1996) (tossing of Molotov cocktail onto porch of African-American residents); *United States v. Sea Winds of Marco, Inc.*, 893 F.Supp. 1051 (M.D.Fla.1995) (requiring Hispanic tenants to wear special wrist bands and subjecting them to excessive monitoring and racially-derogatory remarks); *Johnson v. Smith*, 878 F.Supp. 1150 (N.D.Ill.1995) (cross burned in front yard of African-American family and brick thrown through their window); *People Helpers v. City of Richmond*, 789 F.Supp. 725 (E.D.Va.1992) (police "bullied" their way into and selectively searched handicapped and African-American plaintiffs' apartments).

*Sporn*, 173 F.Supp.2d at 251-52 (emphasis added). Consistent with the observations of the *Sporn* court, section 3617 does not require Plaintiff's fellow Cowpet Bay West owners to refrain from voicing criticism of or debating the validity of the Plaintiff's request on an internet blog. The provisions of section 3617 are best directed to actions that actually interfere with rights protected under the Fair Housing Act Amendments. Section 3617 is not intended to address mere disagreements among neighbors.

The Plaintiff further alleges that Talkington interfered with her rights under the FHA "by posting and publicly discussing Kromenhoek's private medical record on the blog". *Second Amended Complaint at ¶¶132-135.* These allegations are completely without merit as they are patently false. Examination of the blog postings demonstrates that no private or confidential information was posted or discussed on the blog. *Talkington Affidavit at Exhibit 1.* Moreover, Mr. Talkington never obtained or had access to any medical records or other confidential information that may have been provided to the condominium association board of directors.

Finally, Plaintiff's claim under the FHA fails because she was never denied her requested accommodation. At no time was the Plaintiff denied the company of her dog "Oliver" at the condominium. *Talkington Affidavit at ¶13.* The Plaintiff admits that eventually the board granted her request for accommodation, allowing her dog to remain on the premises. *Second Amended Complaint at ¶ 94.* However, she further alleges that the board's failure to act earlier on the request constituted "a denial of a request for reasonable accommodation in violation of the FHA." *Id. at ¶ 95.* The Plaintiff in this action was never denied the accommodation she requested even though the board delayed issuing a formal waiver of the "no dogs" rule.

The Ninth Circuit Court of Appeals considered similar facts and held that there was no denial of the requested accommodation.

---

*Dubois v. Association of Apartment Owners of 2987 Kalakaua, 453 F.3d 1175 (9th Cir. 2006).* The *Dubois* plaintiffs sued their condominium association, two association board members, a property management company, and one of its employees for refusing to allow the plaintiffs to keep a dog in their apartment. 453 F.3d at 1177. In January 2000 one of the plaintiffs brought home a dog, and submitted to the association letters from doctors which stated that the dog assisted in treating the plaintiff's depression. *Id.* The association board granted temporary permission for the dog to remain while it considered the plaintiff's request. *Id.* Thereafter the plaintiffs filed administrative complaints with HUD alleging discrimination, and then a federal lawsuit alleging the same claims. *Id.* At all relevant times the dog remained on the premises, and the association took no action to remove the dog or evict the plaintiffs. The Ninth Circuit held that the plaintiffs had failed to establish that the association had ever refused to allow the requested accommodation and affirmed the district court's grant of summary judgment for the defendants. *Id. at 1179.*

The Sixth Circuit has also examined similar facts, and likewise found no violation of federal law. *Overlook Mutual Homes, Inc. v. Spencer*, 415 Fed.Appx. 617 (6th Cir. 2011). In *Spencer*, a mutual housing corporation provider brought a declaratory judgment action against a member family of the corporation. The lawsuit sought a ruling approving denial of the family's requested

---

accommodation for an emotional support animal, and approving enforcement of the housing community's "no dogs" rule. The defendant owners counterclaimed, alleging that the refusal of the housing corporation to allow the dog was a violation of the FHAA. *415 Fed.Appx. at 619-20.* At all relevant times the dog remained with its owners on the premises. The case proceeded to jury trial, and after the close of the evidence the district court granted the housing corporation's Rule 50(a) motion for judgment as a matter of law. *Id. at 620.* The Ninth Circuit affirmed, holding that there was never a refusal of the requested accommodation since the family's dog had remained on the premises throughout and the housing corporation had never sought to evict the dog's family or remove the dog. *Id. at 623-24.*

The Plaintiff herein has not, and she cannot in good faith, allege that she was ever deprived of the company of her dog. While the board did not grant her a formal waiver of the "no dogs" rule until April 2012, she was never refused the accommodation she requested.

The Plaintiff's claims as to Talkington, and the other defendants, fail under the FHAA as the refusal of a requested reasonable accommodation is an essential element of such a claim. In this action there has never been a refusal of the requested accommodation.

**C. Defendant Talkington is immune from liability for the postings of other persons on the Cowpet Bay West Blog pursuant to the federal Communications Decency Act.**

The Plaintiff's claims against Talkington are based entirely on what was posted on the Cowpet Bay West blog website. Mr. Talkington was not a member of the board of directors, and had no authority to enact or enforce policies of the board of directors or the owners association. *Talkington Affidavit at ¶5.* The federal Communications Decency Act immunizes Mr. Talkington from any claims based on the "publication" of materials authored by other persons on the blog. *47 U.S.C. §230.* This statute provides broad protection to those persons in the position of Mr. Talkington, stating:

> **Treatment of publisher or speaker.** No provider or user of an interactive computer service shall be treated as the publisher or speaker of any information provided by another information content provider.

*47 U.S.C. §230(c)(1); see also Green v. American Online*, 318 F.3d 465, 470-71 (3d Cir. 2003) (AOL not liable for liable for content transmitted by service user); *Chicago Lawyers' Committee for Civil Rights Under Law, Inc. v. Craigslist, Inc.*, 519 F.3d 666, 670-72 (7th Cir. 2008)(Craigslist not liable for promoting discrimination in housing by posting advertisements proclaiming "No Minorities" or "No Children"); *see generally* Claudia G. Catalano, Annotation, *Validity, Construction, and Application of Immunity Provisions of*

*Communications Decency Act, 47 U.S.C.A. § 230*, 52 A.L.R.Fed.2d 37 (2011).

The Second Amended Complaint alleges several postings to the Cowpet Bay West Blog by persons other than Talkington:

- **Defendant Alfred Felice (now deceased) -** paragraphs 49, 50, 52, 71, 78, 92, and 93;

- **non-party Douglas Reebak** - paragraph 62; and

- **Defendant Max Harcourt (deceased) -** paragraph 57.

Pursuant to the federal Communications Decency Act, none of these blog postings by other persons can create liability under any legal theory for Talkington. Instead, the only statements that may be considered are those alleged to have been authored by Talkington. All of these statements are reproduced in Exhibit A to Mr. Talkington's affidavit. None of these statements provide the basis for any claims against Mr. Talkington.

**D. The Plaintiff cannot prove any claim for a civil conspiracy.**

A civil conspiracy consists of an agreement or combination to perform a wrongful act that results in damage to the plaintiff, or it may consist of an agreement to do a lawful act by unlawful means. *Government Guarantee Fund of the Republic of Finland v. Hyatt Corp.*, 955 F.Supp. 441, 456-57 (D.V.I. 1997). A complaint alleging the existence of a conspiracy "must provide some factual basis to support the existence of the elements of a conspiracy:

agreement and concerted action." *Capogrosso v. Supreme Court of N.J.*, 588 F.3d 180, 185 (3d Cir. 2009).

This Court's Order of March 31, 2014 directed the Plaintiff to amend the allegations of Count X of the Second Amended Complaint, presumably because the Plaintiff failed to allege any factual basis for the existence of the elements of a conspiracy. In the Plaintiff's proposed Third Amended Complaint, Count X has been re-numbered as Count XI, and names the only "conspirators" as Mr. Talkington, Alfred Felice and Max Harcourt. *Third Amended Complaint at ¶172.* Both Alfred Felice and Max Harcourt have died during the pendency of this litigation. *Statement of Undisputed Material Facts at ¶¶ 4 & 5.* Neither Felice or Harcourt were ever deposed during the course of discovery. Accordingly, the record of this matter is silent as to what actions Felice or Harcourt may have undertaken. However, there is no need for this Court, or any of the parties to speculate as to what Felice and Harcourt may have done, or not done. Paragraph 172 of the Third Amended Complaint alleges that the object of the conspiracy was the public disclosure of Plaintiff's "private information on the blog, including her medical records..."

As noted above, the Plaintiff's repeated allegations that her medical records, and other private information, were publicly disclosed are false. Mr. Talkington never sought, obtained or had access to any private information, including medical records, of

the Plaintiff. *Talkington Affidavit at ¶12.* The Plaintiff's continued repetition of this allegation does not make it true.

**E. The Plaintiff cannot prove any claim under Count XIII of the Second Amended Complaint for either negligent or intentional infliction of emotional distress.**

The Plaintiff alleges that all Defendants, excepting Alfred Felice, are liable to her for either negligent or intentional infliction of emotional distress. As to Talkington, Count XIII alleges only:

> 187. Defendant Talkington's inflammatory blog posts and emails were done with reckless and with deliberate indifference to a substantial probability that severe emotional distress would result to Kromenhoek.

This allegation is found at paragraph 182 of the proposed Third Amended Complaint. A review of the Second Amended Complaint reveals that there are no factual allegations reciting, or referring to, any e-mail messages sent by Talkington. All of the blog postings of Mr. Talkington are contained within Exhibit 1 to his affidavit, attached to the Statement of Undisputed Material Facts. Neither the Second Amended Complaint, nor the Third Amended Complaint contains any allegation that Plaintiff suffered any physical harm. Instead, the Plaintiff alleges that she "suffered and continues to suffer emotional distress." *Second Amended Complaint at ¶194; Third Amended Complaint at ¶188.*

Under Virgin Islands law "the tort of negligent infliction of emotional distress requires that: (1) the plaintiff was in danger

of his or her own safety; (2) the plaintiff suffered some physical harm; and (3) the physical harm was a result of the emotional distress." *Liburd v. Govt. of the Virgin Islands*, 2013 WL 960780 at *11 (D.V.I., March 13, 2013)(citations omitted). The Second Amended Complaint fails to allege any of these elements, and fails to state a claim for negligent infliction of emotional distress.

In the Virgin Islands, "[i]n order to state a claim for intentional infliction of emotional distress, the plaintiff must allege that the defendant engaged in extreme and outrageous conduct that intentionally or recklessly caused severe emotional distress *Liburd at *11* (internal quotation marks omitted); *Restatement (Second) of Torts §46*. As noted by the *Liburd* court, "there is a 'high bar to meet' in order to state an intentional infliction of emotional distress claim:

> [Intentional infliction of emotional distress] occurs when one who by extreme and outrageous conduct intentionally or recklessly causes severe emotional distress to another. In order to be liable for [intentional infliction of emotional distress], a defendant's conduct must be so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious and utterly intolerable in a civilized society.

*Liburd at *11.* The comments to section 46 of the Restatement further restrict the type of conduct that can create liability for intentional infliction of emotional distress:

> The liability clearly does not extend to mere insults, indignities, threats, annoyances, petty oppressions, or other trivialities. The rough edges of our society are

> still in need of a good deal of filing down, and in the meantime plaintiffs must necessarily be expected and required to be hardened to a certain amount of rough language, and to occasional acts that are definitely inconsiderate and unkind. There is no occasion for the law to intervene in every case where some one's feelings are hurt. There must still be freedom to express an unflattering opinion, and some safety valve must be left through which irascible tempers may blow off relatively harmless steam.

*Restatement (Second) of Torts, §46 at comment d.* The commentary included in Talkington's blog postings falls far short of the type of conduct which would subject him to liability for intentional infliction of emotional distress.

**F. Talkington is entitled to summary judgment on Counts XV, XVI and XVII as he did not in any fashion invade the privacy of the Plaintiff.**

The Plaintiff alleges that her privacy was invaded by various actions of the Defendants in this action. The Court's order of March 31, 2014 directed the Plaintiff to amend Count XVI. The allegations directed to Mr. Talkington are, as referenced to the proposed Third Amended Complaint:

**Count XV - Invasion of Privacy: Public Disclosure of Private Facts (Harcourt and Talkington)**

207. Defendants Harcourt and Talkington publicized private information concerning Kromenhoek.

**Count XVI - Invasion of Privacy: False Light (All Defendants except Verdiramo and Cockayne)**

214. Defendants, through the above-described blog entries, placed or caused to be placed on the internet and through emails written to more than One Hundred members of the Association, including the defamatory content and depiction of same, gave publicity to matters concerning Kroemhoek that unreasonably placed Kromenhoek in false light and violated her right of privacy.

**Count XVII - Invasion of Privacy**

220. As a result, Talkington posted private information about Kromenhoek on the blog.

Count XVII is redundant as there is no recognized general tort of "invasion of privacy". Instead, the law has recognized four (4), sometimes overlapping forms of invasion of privacy:

1. unreasonable intrusion upon the seclusion of another;
2. appropriation of the other's name or likeness;
3. unreasonable publicity given to the other's private life;
4. publicity that unreasonably places the other in a false light before the public.

*Restatement (Second) of Torts, §652A.* Only the latter two versions of this tort are at issue in this action - Count XV - unreasonable publicity and Count XVI - false light invasion of privacy. Each of these counts rests on the same baseless allegation - that Talkington posted and discussed private information regarding the Plaintiff on the Cowpet Bay West blog. Talkington never obtained or posted any private information regarding the Plaintiff on the blog. *Talkington Affidavit at ¶12.*

In addition, the Plaintiff cannot plausibly allege that her dispute with the condominium association was not a matter of legitimate concern to the public. The other condominium owners could not be reasonably expected to simply ignore the Plaintiff and her dog in a community with a general rule of "no dogs allowed". The Plaintiff's dog was not a secret, nor could the Plaintiff's professed justifications for having a dog be kept confidential.

Talkington Memorandum in Support of Motion to Dismiss
*Kromenhoek v. Cowpet Bay West Condominium Association, et al.*
Case No. ST-12-CV-00025
Page 20

In sum, the Plaintiff's claims for invasion of privacy have no merit since the Plaintiff's request for an exception to the "no dogs rule" was not a private, confidential matter.

**III. Conclusion**

WHEREFORE, Defendant Lance Talkington prays this Court to enter an order granting summary judgment and:

- dismissing with prejudice Counts V, X (now XI), XIII, XV, XVI and XVII of the Plaintiff's Second Amended Complaint to the extent the allegations of those counts are directed at this Defendant;
- awarding this Defendant his costs and attorneys fees; and
- granting such other and further relief as is appropriate in the circumstances.

Dated: May 1, 2014

By: /s/ John H. Benham, III

John H. Benham, III, Esq.
V.I. Bar No. 130
Benham & Chan
P.O. Box 11720
St. Thomas, V.I. 00801
Tel. (340) 774-0673
Fax. (340) 776-3630
benham@bclawvi.com

Joint Appendix Vol. II Page 1893

Talkington Memorandum in Support of Motion to Dismiss
*Kromenhoek v. Cowpet Bay West Condominium Association, et al.*
Case No. ST-12-CV-00025
Page 21

---

CERTIFICATE OF SERVICE

I hereby certify that on the 1st day of May 2014, I electronically filed the foregoing MEMORANDUM IN SUPPORT OF DEFENDANT LANCE TALKINGTON'S MOTION FOR SUMMARY JUDGMENT with the Clerk of the Court using the CM/ECF system which will send a notification of such filling (NEF) to:

Karin A. Bentz, Esq.
Julita K. De Leon, Esq.
5150 Dronningens Gade, Suite 8
St. Thomas, VI 00802
kbentz@virginlaw.com

Richard P. Farrelly, Esq.
Birch de Jongh & Hindels, PLLC
1330 Taarneberg
St. Thomas, VI 00802
rfarrelly@bdhlawvi.com

Joseph G. Riopelle, Esq.
Boyd Richards Parker & Colonnelli, P.L.
Rivergate Tower Suite 1150
400 N. Ashley Drive
Tampa, FL 33602
jriopelle@boydlawgroup.com

Ryan S. Meade, Esq.
Quintairos, Prieto, Wood & Boyce, P.A.
9300 South Dadeland Blvd., 4th Floor
Miami, FL 33156
rmeade@qpwblaw.com

By: /s/ John H. Benham, III

Joint Appendix Vol. II Page 1894

IN THE DISTRICT COURT OF THE VIRGIN ISLANDS
DIVISION OF ST. THOMAS AND ST. JOHN

| | | |
|---|---|---|
| JUDITH KROMENHOEK,<br><br>Plaintiff,<br><br>vs.<br>COWPET BAY WEST CONDOMINIUM ASSOCIATION; THE BOARD OF THE COWPET BAY WEST CONDOMINIUM ASSOCIATION; MAX HARCOURT, in his personal capacity; ALFRED FELICE; LANCE TALKINGTON; ROBERT COCKAYNE; VINCENT VERDIRAMO<br><br>Defendants. | ) | CASE NO. ST-12-CV-00025<br><br>Action for: Housing Discrimination; Discrimination Based on Disability; Invasion of Privacy; Negligent Infliction of Emotional Distress; Intentional Infliction of Emotional Distress; Punitive Damages; and Injunctive and Declaratory Judgment |

**DEFENDANT LANCE TALKINGTON'S STATEMENT OF UNDISPUTED MATERIAL FACTS**

COMES NOW Defendant Lance Talkington ("Talkington"), by his attorneys Benham & Chan, and pursuant to Local Rule of Civil Procedure 56.1(a)(1) provides the following Statement of Undisputed Material Facts in support of his Motion for Summary Judgment:

1. Plaintiff Judith Kromenhoek is a owner of a condominium unit at Cowpet Bay West Condominium, St. Thomas, Virgin Islands (the "condominium"). *Second Amended Complaint at ¶12.*

2. Defendant Lance Talkington is a former owner of a unit at the condominium. *Affidavit of Lance Talkington, attached hereto as Exhibit A, at ¶5 (hereinafter "Talkington Affidavit").*

3. Defendant Talkington was not a member of the board of directors of the condominium association. *Id.*

4. Defendant Max Harcourt ("Harcourt") is deceased. *Notice of Death of Defendant Max Harcourt, filed October 4, 2012, Docket No. 71.*

5. Defendant Alfred Felice ("Felice") is deceased. *Notice of Death of Defendant Alfred Felice, filed June 1, 2012, Docket No. 28.*

6. The rules and regulations of the condominium contain a "no dogs" prohibition. *Second Amended Complaint at ¶24.*

7. At some time during 2011 the Plaintiff brought her dog "Oliver" to live with her in her condominium unit. *Talkington Affidavit at ¶13.*

8. Plaintiff alleges that she suffers from an Anxiety Disorder", and that "Oliver" functions as an emotional support animal, assisting her in coping with her disorder. *Second Amended Complaint at ¶30.*

9. Oliver has always lived with the Plaintiff since his arrival at the condominium, and he has never been excluded from her condominium residence. *Talkington Affidavit at ¶13.*

10. While Defendant Talkington was an owner at the condominium he created an internet blog for owners at the condominium, https://cowpetbaywest.wordpress.com/. *Talkington Affidavit at* ¶6.

Talkington Statement of Undisputed Facts
*Kromenhoek v. Cowpet Bay West Condominium Association, et al.*
Case No. ST-12-CV-00025
Page 3

---

11. Various owners posted entries on the blog regarding the "no dogs" rule, and the presence of the Plaintiff's dog on the condominium property. *Talkington Affidavit at 8.*

12. Defendant Talkington never obtained any medical records of the Plaintiff, or any other confidential information, from the board of directors or any other source. *Talkington Affidavit at ¶12.*

13. Defendant Talkington never posted any confidential information regarding the Plaintiff Kromenhoek on the Cowpet Bay West blog. *Talkington Affidavit at ¶12.*

14. All of the blog posts related to the dog issues at Cowpet Bay West Condominium are attached to Mr. Talkington's affidavit as Exhibit 1.

Dated: May 1, 2014

By: /s/ John H. Benham, III

John H. Benham, III, Esq.
V.I. Bar No. 130
Benham & Chan
P.O. Box 11720
St. Thomas, V.I. 00801
Tel. (340) 774-0673
Fax. (340) 776-3630
benham@bclawvi.com

Joint Appendix Vol. II Page 1897

Talkington Statement of Undisputed Facts
*Kromenhoek v. Cowpet Bay West Condominium Association, et al.*
Case No. ST-12-CV-00025
Page 4

---

CERTIFICATE OF SERVICE

I hereby certify that on the 1st day of May 2014, I electronically filed the foregoing DEFENDANT LANCE TALKINGTON'S STATEMENT OF UNDISPUTED MATERIAL FACTS, with the Clerk of the Court using the CM/ECF system which will send a notification of such filling (NEF) to:

Karin A. Bentz, Esq.
Julita K. De Leon, Esq.
5150 Dronningens Gade, Suite 8
St. Thomas, VI 00802
kbentz@virginlaw.com

Richard P. Farrelly, Esq.
Birch de Jongh & Hindels, PLLC
1330 Taarneberg
St. Thomas, VI 00802
rfarrelly@bdhlawvi.com

Joseph G. Riopelle, Esq.
Boyd Richards Parker & Colonnelli, P.L.
Rivergate Tower Suite 1150
400 N. Ashley Drive
Tampa, FL 33602
jriopelle@boydlawgroup.com

Ryan S. Meade, Esq.
Quintairos, Prieto, Wood & Boyce, P.A.
9300 South Dadeland Blvd., 4th Floor
Miami, FL 33156
rmeade@qpwblaw.com

By: /s/ John H. Benham, III

Joint Appendix Vol. II Page 1898

# EXHIBIT A

**AFFIDAVIT OF LANCE TALKINGTON**

LANCE TALKINGTON, being duly sworn, states as follows:

1. I am over the age of twenty-one years and competent to make this Affidavit.

2. Unless otherwise stated, the contents of this Affidavit are based on my personal knowledge.

3. I am a defendant in the pending action in this Court, captioned *Judith Kromenhoek v. Cowpet Bay West Condominium Association, et al.*, Case No. 3:12-cv-00025-CVG-RM, District Court of the Virgin Islands, Division of St. Thomas & St. John (the "Lawsuit"). The statements in this Affidavit have been drafted by my attorney. I have reviewed the entirety of this Affidavit and verify that the contents are true and correct.

4. I am providing this Affidavit in support of the motion for summary judgment to be filed by my attorney.

5. I was previously a co-owner, with my wife Cheryl, of a condominium unit at Cowpet Bay West Condominium (the "condominium"), located on the east end of St. Thomas, Virgin Islands. The unit was sold in January 2013, and I am no longer an owner at the condominium, and was never on the board of directors.

6. During the time that I was an owner, I created an internet blog website devoted to discussion of issues relating to the condominium. The blog address is: https://cowpetbaywest.wordpress.com/

7. The issues discussed by owners on the blog were wide-ranging and included the adequacy of the condominium's insurance coverage, various budget items, occurrence of burglaries or other crimes at the condominium, association elections, conduct of board of directors meetings and numerous other matters relating to the condominium and the community at-large.

8. One issue that attracted numerous blog postings from various owners at the condominium was the question of whether dogs should be allowed at the condominium and, if so, under what conditions.

9. Attached to this Affidavit as Exhibit 1 are print-outs of all postings on the blog related to the discussion of dogs at the condominium. All of these documents were previously provided to the parties in this case as part of the my attorney's Rule 26 voluntary disclosures on my behalf.

10. I have reviewed and am familiar with the complaint and amended complaints filed by counsel for Plaintiff Judith Kromenhoek in the lawsuit.

11. Included in the complaints filed on behalf of Mrs. Kromenhoek are allegations that I obtained Mrs. Kromenhoek's medical records and other information she considered to be confidential from the condominium's board of directors, then posted and discussed those medical records and confidential information on the Cowpet Bay West blog. *See Third Amended Complaint at ¶¶ 133, 172, 209 and 227.*

12. These allegations are false. At no time did I receive any medical records or confidential information from the board of directors, or any members of the board. At no time did I post any of Mrs. Kromenhoek's medical records or other confidential information on the blog website.

13. Mrs. Kromenhoek owns a dog named "Oliver" which she brought to the condominium to live with her sometime during 2011. At no time was Oliver excluded from living with Mrs. Kromenhoek at her condominium unit. At the time I sold my unit in January 2013, Oliver continued to live with Mrs. Kromenhoek at the condominium.

Further Affiant sayeth naught.

Date: 5/1, 2014

Lance Talkington

State of Arkansas )
) SS:
County of Pulaski )

On this the 1st day May, 2014, before me, the undersigned officer, personally appeared Lance Talkington, known to me (or satisfactorily proven) to be the person whose name is subscribed to the foregoing Affidavit and acknowledged that he executed the same for the purposes therein.

In witness whereof I hereunto set my hand and official seal.

Notary Public

# Cowpet Bay West Blog

## An Informed Active Community

### Dogs At Cowpet

September 27, 2011

Wow – it's been, like, weeks since time has been available to bring more info to the blog. Darned work always seems to find a way to interfere. OK..... finding time has finally happened, so let's go for it.

As our sign at the entrance says, dogs are not allowed on the property. That seems pretty clear and simple, right? Well….operationally it's not quite as simple as it may appear. We have been informed over the last several months of at least three owners who have been seen with dogs that are either living in condos or are being entertained by an owner walking them on the property. From reports made by owners to the blog, two of these owners are present and past board members. To date, the association has not had formal bylaws dealing with the issue of dogs on the property, and it is time to do something in this regard to eliminate any confusion over possible exceptions to the general rule as outlined on our signage.

There may be valid reasons for exceptions to the general rule for an owner who has a clearly defined disability and is unable to function without a "service" type dog. The question revolves around how to define the exception. Recently elected board member Bill Canfield has done some research on the issue by obtaining guidance from the Americans with Disabilities Act, and Treasurer Sharon Koehler has worked to assimilate the information into what hopefully will end up as a workable bylaw revision.

According to the ADA, a service dog is "any guide dog, signal dog, or other animal individually trained to provide assistance to an individual with a disability." This could be a dog helping a wheelchair-bound individual, a blind person, or a sick and/or elderly person. Service dogs are highly trained animals and are often identified by the special collars or harnesses they wear.

Also from the ADA website – The Department is proposing new regulatory text in § 35.104 to formalize its position on emotional support or comfort animals, which is that ''[a]nimals whose sole function is to provide emotional support, comfort, therapy, companionship, therapeutic benefits, or promote emotional wellbeing are not service animals.'' The Department wishes to underscore that the exclusion of emotional support animals from ADA coverage does not mean that persons with psychiatric, cognitive, or mental disabilities cannot use service animals. The Department proposes specific regulatory text in § 35.104 to make this clear: ''[t]he term service animal includes individually trained animals that do work or perform tasks for the benefit of individuals with disabilities, including psychiatric, cognitive, and mental disabilities.'' This language simply clarifies the Department's longstanding position."

Exhibit 1

The guidance for Cowpet to use appears to be very well laid out by the ADA in these guidelines. We need a bylaw that properly restricts use of animals for very specific and legitimate purposes. Adopting the ADA'a language would be a very simple and straightforward way to achieve an easy to follow bylaw for our association.

LT-2

# Cowpet Bay West Blog

## An Informed Active Community

### Bylaws and Puppy Dogs

October 13, 2011

My daughter has come to her mother and me over the years and asked about why she can't have a puppy. We've explained that we all love dogs and wish that it was possible for her to have one, but we live in a shared community where it just doesn't work. Cowpet has always had a "no dogs on property" policy, but application of the rule has been inconsistent at best. A few years ago, a friend stayed in our unit for a week while we were off island. She brought a small dog without our knowledge, and we were fined on a daily basis while the dog was there. We were properly held accountable with a monetary sanction for violating the rule.

Fast forward to today when the board is busily working to redo our bylaws so that they can be presented for the annual meeting in February. In the board meeting Tuesday, Bill Canfield discussed the research he had done on the issue as it relates to incorporating clear rules on dogs into the bylaws. The blog posted about this research earlier for anyone who needs to look at it for details. One board member (Barbara) has a dog and claims to have "papers" that allow her to have it. In preparation for this blog post, we asked her for details of the reason for her being allowed to have a dog. Her response was the following:

***You have absolutely no right to ask me anything, and if you pursue this, I will retain an attorney. Spin this any way you want to.***

It sounds like the blog should be prepared for legal action being pursued against us for inquiring about this. Barbara told the board the same thing at the meeting in terms of their having no right to ask her about it. The blog has also asked Louanne about whether the office has Barbara's paperwork in their files and whether monetary fines have been assessed if not. There has been no response from Louanne to the inquiry.

Now is the time for owners to weigh in on the bylaws while they're in the process of being rewritten. Everyone is encouraged to contact a board member or the blog via commentary with any ideas about how to formalize a workable written codification on the dogs policy.

**Comments on: "Bylaws and Puppy Dogs" (18)**

1. 

   **Anonymous** *said:*

LT-3

October 13, 2011 at 8:38 am

Board members notoriously break rules. How can this women have a dog but everyone else can't? The beauty of a condo association is that everyone has to follow the rules and as such supposedly benefits the community. It's not fair for Barbara to have a dog if you can't. Further to her threat of legal action, don't worry about that. You have something called the first amendment behind you and as long as you tell the truth she's just blowing off steam. I would suggest you file a written complaint to the board and ask for a response. I own 3 condo's and whenever something is formal they are required to respond. This is the best approach to seeing her "papers".

2. 

**Lance Talkington** *said:*

October 13, 2011 at 8:41 am

Great idea on making a formal inquiry. Thanks for the input.

3. 

**alfred felice** *said:*

October 13, 2011 at 10:33 am

It would seem to me that it is the same small minority of owners who constantly cause the majority of our communitys disruption !!! Apparently they have no regard for the huge majority. "service dogs " for true needs are LEGAL ,but anyone can get such a designation by simple reguest from a friendly physician ,regardless of any real need.Anyone can also get one via the internet for a minimal fee !!!! When someone joins a community one would be expected to "follow the rules". Failure to do so indicates a total disregard for ones neighbors rights and needs. Many have serious allergies,some are disturbed by constant noise harassment, some dislike the stink of the animal, and many are grossed out by the thought of walking on the beach through the run off of urination and feces !!!! The antics of the cute pups are not so cute when they are sicking their nose in someones crotch or attempting fornication on ones leg .These disgusting actions are why some ,maybe most,owners chose to live in a dog free community.When sneaking around these rules ,the perpetrators might just as well spit in our face. The by-laws must be made to reflect the majorities rights.Perhaps,the dessenters would be happier in another community rather than be ostracized at CBW, which would be another fine recourse , besides a significant $$ fine ,with progressive amounts. Al Felice

LT-4



4. 

**Lance Talkington** *said:*

October 13, 2011 at 11:24 am

Following is a comment that the author is having difficulty getting to the blog. It was emailed to us for posting:

Please NO DOGS. NO EXCEPTIONS. Period.

As an aside: we love dogs. Wish we could have one. But there is no way to enforce dog-owners' manners, either by fine or frown.

Holly McGuire, 14L

5.

**Barbara Walters** *said:*

October 13, 2011 at 11:25 am

Since you so tactfully used my name in this blog, I am required to defend myself, not as a "violator" of any laws, but a person with a disability who is afforded the protection of the law. The Fair Housing act and subsequent rulings by the courts have explicitly stated that an exception to the "no pets" rule qualifies as part of the ADA act, and that violators of the ADA can be required to pay money damages and penalties. Persons are also not allowed under the law to ask what a persons disability is, so it seems that I am being singled out, which is protected by my first amendment rights too. This may very well end up in litigation, and I hope "Anonymous" will help fund any legal fees.

- 

  **alfred felice** *said:*

  October 13, 2011 at 12:10 pm

  This is another "law" with protection for DISABILITY !!!! That is fine except I believe it is sorely ABUSED. Just think "you can't even inquire as to the disability !!! TERRIFIC !!! So if someone has some DBL by which he/she might go off his/her gourd without the pet at his/her side we must all be innocent victims

LT-5

to any violent reaction. We don't even know we need protection !!! BAD LAW !!!!! WE SHOULD NOT HAVE DOGS AT CBW

6.

**Barbara Walters** *said:*

October 13, 2011 at 11:40 am

Also, an addendum. I am on permanent disability, which is documented by the social security office

- 

  **Lance Talkington** *said:*

  October 13, 2011 at 12:04 pm

  It's unreasonable to expect anyone to rely on anything other than written verification from an unbiased third party as to your or anyone else's supposed disability, particularly when we are expected to agree that it requires the use of a specially trained service dog for you to be able to function. The dog's credentials; type of training; and required use of its services is a reasonable request. Otherwise, it's a pet and is a violation of the rules to which the rest of us adhere.

- 

  **Lance Talkington** *said:*

  October 13, 2011 at 3:02 pm

  OK, so why do you need a trained service dog? Being on SSA disability is not in and of itself indicative of a need for this type of dog. It means you're not able to do certain work functions – period. Further, what kind of special training certification does your dog have that would enable it to provide a specific type of help that is required for your disability? These are very simple and easy to answer questions that are relevant, and there would be paperwork to prove both the disability and the certification of the animal. Avoiding answering the questions and not producing paperwork leads to a logical conclusion that the dog is a pet. This isn't complicated.

LT-6

7.

**Barbara Walters** *said:*

October 13, 2011 at 12:19 pm

Since you are not a member of the board,you are not the authority to whom ANYONE is accountable to. You seem to trying to rule the roost from your computer.

8.

**Barbara Walters** *said:*

October 13, 2011 at 12:21 pm

oh, and you don't have to agree as to my needs. You are not a licensed physician or did you get that degree via computer too!

9.

**Rosie** *said:*

October 13, 2011 at 10:26 pm

Lance.....I just got home from work and I am sickened by what you are doing. This blog is nothing more than your avenue to spew your negativity. We had you at the first meeting and you posted the whole meeting that you had recorded on "your" blog as if it was "official' minutes that we had not even approved yet. Hence the reason we wanted to eliminate owners attendance unless they had something they needed to be brought up and dealt with.

Next meeting you are there again and we had business to discuss that is usually with the board and not the general public. You leave and then post that we threw you out and are not transparent. Negative twist again.

Now this time you claim the board members "notoriously" break rules.....well I would like to inform you that the only rule I did not break is my own......never put up with someone's BS. And today I not putting up with your BS anymore.

You attack the board continually and now Barbara personally. Who do you think you are? Have you ever said one good thing about anything we are trying to accomplish? It

LT-7

appears that every one of your blogs is to critisize and analyse and stir up the pot. You don't want to sit in on any of the board meetings for constructive intent. You are looking for something that you can take it and "run" with on such a negative level.

If you have an issue about something I suggest you bring it to the next meeting in writing. Your blog is not approved by the board as CBW's official blog. Actually you hijacked the one Max had just started with your first negative on your blog and it seems to attract more negative. No different than newspapers these days. Everything you guys write is negative and put downs and attacks.

You have no right to demand the things you have demanded. You have no right to demand anyone's personal medical information. In fact, it is a violation of HIPPA and you should tread very carefully because I work in a clinic here and they do not take that sort of thing lightly.

I know there is nothing I can say or do that will affect your attitude or behaviour. You seem to enjoy being abrasive and if that is what works for you so be it. Just post my comment without "editing" it. This will be my last post to you as I will not recognize this blog as anything more than your dumping ground for your negative regergitating. I wish it was not this way but you seem to like the negative.

Rosie Wells

**Lance Talkington** *said:*

October 14, 2011 at 6:58 am

Hi Rosie. As has been posted previously, the board has done a tremendous job on our insurance since the disaster last winter. It has also been posted that kudos should go out to those who are working to bring our budget back in line. And solid work is being done on bylaws. All of this positive work has been posted.

The blog's observations with which issue is being taken boil down to one basic issue. Three board members (Rosie; Vinnie; and Barbara) fractured the board and forced owners to choose sides on issues with which one group disagrees with the other group. That is the source of perceived negativity that is actually objectivity, and it was forced on all of us as owners by the group of dissenters. Owners didn't ask for this, but now we have no choice but to deal with the consequences of that group's actions. The days of the board being a social club with special privileges are gone. Our collective investments here at Cowpet are too important to be compromised by anyone, and the blog will analyze and comment when necessary.

LT-8

Barbara's right to have a dog is most certainly open to scrutiny, and she is welcome to carry out her threat to sue both the board and me for asking about it. She isn't applying for a job with us as a disabled person – she wants a dog, and her desire must be scrutinized appropriately. The office has no paperwork on file as is evidenced by Louanne's not replying to our request to confirm paperwork, and Barbara produces nothing other than saying she can't work and is thus entitled to have a dog. It has become clear she has a pet and should be fined just as I was fined in the past when a friend stayed at our unit and had a small dog for a few days without our knowing it.

Lastly, continued attempts by the fractioned group to close meetings to owners as you confirm today is ultimately disturbing. Good things are happening since owners have become more involved earlier this year. While the blog is being criticized for its comments, there has not been a single instance of anyone claiming that something untrue has been said by the blog. The truth in an open forum is powerful and must continue. Kudos to the board as a whole for standing up for truth and openness.

10. 

**pattisays** *said:*

October 14, 2011 at 12:59 am

This is fascinating…and it has become clearly a point of principal with the dog issue serving as the example of blatant disregard for rules, common respect for them and the reasons behind them in the shared community – and by a board member…It seems so simple that this person should excuse herself from this position – unless of course there is a valid reason for her to require an aid dog that the "papers" would have to validate – which this blog suggests have not been produced. If this dog issue can be so hot, the factions be so divided and the rules so easily manipulated we are in for a sad decline in the harmonious management and lifestyle that we have know for decades.

11. 

**BIG Kahuna** *said:*

October 14, 2011 at 10:11 am

My name is Scott White, aka Big Kahuna from the St. Thomas Blog, http://www.stthomasblog.com. I am the first post and I posted under "Anonymous". Really I just quickly posted not even thinking about posting my name. But for those that don't know who I am I run the largest blog in the USVI. I have over 4000 readers a day. I

LT-9

own an ad agency and developed one of the first blogs in the US. I'm what you'd call a "blogging" expert. You can find my website at http://www.brandidentityguru.com.

I also own 3 condos, 1 in Easton Mass with over 125 units, 1 in Hyannis Cape Cod and 1 here in St. Thomas. And in each location board members have either abused their powers, broken rules and or the worst…let the little power they have to go their small brains.

So let me just chime in on some of the nonsense I'm reading here, and by the way, if you'd like I'll be happy to post this on the St. Thomas Blog for all our readers as well as the 10,000 St. Thomas people that follow me on Facebook and Twitter 😃

First off a Blog is someones personal diary, actually it's name came from the term Web Log which was shortened to just blog. It basically is a way for someone to journal. This particular blog is lance's. Period. He can write whatever his little heart desires, good or bad. Because you know why….it's his. When Rosie attacks Lance for actually writing in his own blog it's because she's ignorant to what a blog is. And being a board member it just goes on to make my case that board members are generally people with a little power. And trust me Rosie will be back to read Lance's blog because haters of a blog are the best customers.

The fact that lance is pointing out issues of concern threatens board members because ultimately it exposes things they don't want exposed. like Barbara's dog.

To the dog issue, if Barbara is legit she has the right to keep a dog because she is disabled then the easy solution is to show the board the correct paperwork. She does not nor should she share her disability. Nor do I think any really cares….just prove it. Simple solution.

To the dog haters here, if she's got the paperwork just shut it. There's nothing you can do, swallow the pill and move on.

I think Lance is doing a great service to the owners of the association by pointing out issues that will ultimately make your community better. Of course board members may disagree with that.

And as a professional blogger that actually makes a living at this sort of stuff I must let everyone know that Lance and I are friends. We golf together, boat together and generally like each others company. But Lance also knows I'm the most brutally honest person he probably knows and I'd be the first person to give him the business if he deserved it 😃

Keep Rockin' Lance, your little blog is now the go to source!

12.

LT-10

**Barbara Walters** *said:*

October 14, 2011 at 10:06 pm

Thank you for your response Scott. I Like that you clarified for everyone what a blog is, it is personal OPINIONS. Not necessarily facts, just ones personal views on their observations or prejudices. Lance has professed to giving a fair assessment on what is going on with the board, and continues to claim things to be fact when he doesn't verify anything as fact, just writing rumor and innuendo.
That he has also mislead people into thinking that his word is gospel, is another injustice to his claim of a "factual" summation. He posted minutes, which were not the official minutes of a meeting, and his motives are not at all altruistic. This is his 15 minutes of fame, and that is really sad. By the way, I did not want, nor need, nor expect my name to be included in his tirade, when it had nothing to do with my serving on the board. These are two separate issues, and the implication that I am abusing"power" because of my position is not only not fair, it is downright untrue. I do not want or need people to be discussing me in anything other than a professional capacity as to how I serve on this board. My personal business is mine, just that. I have never done anything to abuse any power (which one doesn't have from serving anyway). People who have written in have been abusive, derisive, vicious, and just downright mean. I have never seen a collection of people like these, who get their jollies by hurting others.
If one CLAIMS to be writing truth, then it should be the truth. As an owner, just an owner, I am not accountable to the likes of Lance Talkington, and if he did not share the complex with me, he wouldn't even rate a blink of my eye.
And just to clarify the issue, I am mortified, that my personal business has been laid out over the internet without my permission or forewarning.
Maybe one day I'll find out that Lance et al, are incontinent, so I can blast that. Maybe I'd be so kind hearted that I'd buy he and his cronies diapers! But I would first let everyone know about it!
Barbara

**Lance Talkington** *said:*

October 15, 2011 at 9:50 am

It's impossible to give someone grief over a disability that is to date completely undefined and unsubstantiated. Nobody but the board needs to know the details of the disability, but owners have made it clear that they have the right to see that your claim of disability is properly documented and worthy of a waiver for the pet. Fortunately there is a mechanism that you and the rest of the board put in place earlier this year to deal with this very sort of situation. The issue will move in that direction.

LT-11



**BIG Kahuna** *said:*

October 15, 2011 at 1:54 pm

Barbara you have a dog. The condo has rules that say no dogs. Lance pointed that out because it's unfair because he would like a dog and apparently was fined for a guest having one. Lance in no way slandered you or remotely spoke badly of you, you have invented that. The solution seems very easy, Just prove that you have the right to have the dog and that the dog meets requirements as set by the government. Period.

Lance just send a written request certified return receipt and I'm sure the board will have to respond.

LT-12

# Cowpet Bay West Blog

## An Informed Active Community

### Request For Enforcement Of Rules And Regulations

October 26, 2011

The following email was sent today to the board of directors:


To The Cowpet Bay West Board of Directors:

On May 12, 2011 the board adopted a formal written policy titled CBW Owner Repair/Inquiry Handling Policy. The policy includes procedures for owner requests for enforcement of Rules and Regulations. The association has a long standing rule disallowing dogs on the property. It has recently become a well publicized reality that multiple owners, including one current board member, have dogs living in their units. Given that our unit was fined for having a dog when a friend stayed in the unit and unbeknownst to us brought their pet, it is inconceivable how other owners are knowingly permitted to have dogs on a long standing basis without consistent enforcement of fines for such behavior. Repeated requests to the board member for substantiation of her need for a trained service dog have gone purposely unanswered, and in fact her responses have been accompanied by threats of lawsuits against both the board and me if her ability to have a dog is challenged. I have consulted a senior law firm partner who is an expert in condominium association law, and he has confirmed that the board has every right to request any and all documentation and other supporting information for an owner claiming the right to have a service dog as a result of disability. There are no limitations on this right whatsoever. If the board would like to engage the attorney in this regard, I will provide his contact information.

My daughter has repeatedly asked why others are allowed to have dogs while she is not allowed one. It is egregiously inconsistent for me to be fined for a dog in our unit while others are clearly being allowed to have dogs with no consequences. It is our request that the rules be consistently enforced and that any owner with a dog be required to submit documentation as to the need for a trained service dog to assist with their inability to function normally. It is also requested that the ADA guidelines for the definition of a service dog be implemented immediately and also incorporated into the bylaws that are currently being drafted for approval at the February owners meeting. This email is being sent to the board of directors and the association office in accordance with the procedures adopted in the May 12 document.

Lance Talkington
Three Leeward

**Comments on: "Request For Enforcement Of Rules And Regulations" (6)**

LT-13



1. 

**Doug Rebak** *said:*

October 26, 2011 at 10:38 am

Lance,
Your point is well taken.
The solution is quite simple. Fine the "offender" at the current rate, which I believe is $50 per day of offence, and remit the fine when and if proper documentation is provided within a reasonable time period. A "resonable time period" should be established. I would suggest 2 weeks, but that would be up to the Board to decide.
Doug Rebak

2. 

**William Frumkin** *said:*

October 26, 2011 at 11:54 am

If a board is to have any legitimacy they must fulfill their responsibilities and enforce the rules set forth by the members of the Condo Assoc. Perhaps the Association should pass a new amendment to the by-laws stating that any board member found to be in violation of the rules and by-laws shall be removed from the board. It can include an opportunity to cure of say 60 days.

3.

**Barbara Walters** *said:*

October 26, 2011 at 5:22 pm

To my fellow board members,
Well, since we seem to be following the letter of the law, I am also in favor of fining owners with illegal additions retroactively. That should make up quite the shortfall.
Lance, don't you have an illegal addition on your seaside patio, and weren't you instructed to put the common areas back to regulation???

○ 

LT-14

**Lance Talkington** *said:*

October 26, 2011 at 5:48 pm

Well Barbara, you actually beat me to the next blog post. It is certainly time to hit this one head on since I've overheard the office employees talking about this among themselves and the board. Let's recount the events as they occurred. We asked for approval of the board prior to beginning construction. The entire process was overseen by both the board president and Jon. In fact, they personally came to our unit on the day that Chris Thompson began work and told us to stop until we complied with their new request for architectural plans that included all provisions that they deemed necessary and appropriate. Those plans were obtained from the firm suggested by them, and construction then proceeded with their blessing in strict adherence to the design plans. The entire process was in full view of the board and Jon, and they had every opportunity to indicate lack of adherence to the plans. Construction was adhered to in exact specification to the plans drawn by professionals that was accepted by everyone involved. If you or anyone else wants to take up this issue, I can assure you it will be dealt with firmly.

4.

**Barbara Walters** *said:*

October 26, 2011 at 8:33 pm

I hope that is not meant as a threat to someone from the board of directors who has a great concern that all rules and regulations be followed. Rest assured, the approvals will be checked and double checked to make sure that they comply, or I can promise you that it will be corrected at the homeowners expense.

5. 

**BIG Kahuna** *said:*

October 29, 2011 at 7:14 am

And remember when I wrote Board Members abuse the little power they have? Here is a classic example of it in writing. Barbara, a board member is now threatening a unit owner basically as retaliation for that unit owner asking the board to clarify the dog rule policy. Read above, it's absolutely, clearly abuse of a board members power to act this way. Board members should ALWAYS remain impartial, clearly this is not the case as Barbara is, in her words "Rest assured, the approvals will be checked and double checked to make

LT-15

sure that they comply, or I can promise you that it will be corrected at the homeowners expense."

Disgusting, and shameful. She should be removed from your board as she clearly cannot be impartial.

Lance, you should immediately file a complaint for Barbara's clear abuse towards you. Do it the same way you did, in writing and formal. Print this page out as it clearly shows the bias.

Barbara, you are not fit to be a board member and you should resign. Clearly you have it in for Lance over the dog issue. You are not capable of acting in a professional manner and remaining objective.

# Cowpet Bay West Blog

## An Informed Active Community

### Board Response To Request For Rules Enforcement

October 30, 2011

A few days ago, the blog emailed a formal request to the board for rules enforcement. There continue to be owners who are known to have dogs on the property. Two of those owners are current board member Barbara Walters and former board member and immediate past president Judi Kromenhoek. Earlier blog posts about the dogs issue and the request for rules enforcement may be viewed for details. There have been two earlier formal requests to the board from another owner requesting that the dogs rule be enforced. The board has responded to Barbara and Judi with the following correspondence that was copied to the blog as a formal response to our request. Kudos to the board for doing the right thing by enforcing a rule to which we all agreed to abide when purchasing property in the community.

*Judi and Barbara,*

*Cowpet Bay West's current rules are very clear – No Dogs. You are both in violation of these rules, and owners have complained to the Board.*

*As you know, the Board is considering absorbing the "No Dogs" rule into the by-laws, and allowing exceptions, upon application to the board with supporting documentation, for service dogs.*

*Louanne tells me that both of you have "papers in the office" regarding service dogs; however, you have not applied for an exception to the rule.*

*If you, as owners and users of service dogs as defined and documented in accordance with ADA rules, wish an exception, you must apply in writing or electronically to the Board and submit supporting documentation. You have 10 days to submit this request. It will be considered at the November Board meeting, and you will be informed of the outcome. Barbara, you must recuse yourself from voting since you are a Board Member.*

*Even though you are clearly in violation of the rules, this offer is being made in good faith, and in the spirit of the consensus of the Board as demonstrated in our by-law discussions.*

*If you do not avail yourselves of this offer, you are subject to being fined under the current rules of the association at the November meeting.*

*M. M. Harcourt*

*President, CBW Condo Association*

LT-17

# Cowpet Bay West Blog

## An Informed Active Community

### The Final Straw

November 9, 2011

The blog received a reminder from the board over the weekend to invite owners to phone into the board meeting on Tuesday. The reminder was published Monday on the blog, with an approach taken solely by the blog's initiative to not publish the call in number but rather to allow it to be shared upon request by owners. We weren't asked to handle it that way, but it seemed prudent. See the Monday blog post for reference.

On Monday night, the blog was informed that the call in number provided to the blog earlier that day would suddenly not be used by the board, but rather President Max had taken it upon himself to use a new undisclosed number for the meeting. And so, here we sat, wondering what in the world had just happened in the span of about 24 hours. The meeting is now effectively closed to owners after owners were reminded to participate.

But wait, it gets better. President Max now wants owners to be forced to show up in person at the office if they wish to listen in on board meetings. Really? And what exactly does this accomplish? Our president now believes that owners need adult supervision in order to listen effectively. And this at the same time the president is traveling the states since May and calling in for every meeting. Seriously?

But wait, it gets even better. All of this nonsense happens in the context of a meeting that has dogs on the agenda. Owners were purposely excluded from the entire meeting when dogs were on the agenda. Surely there isn't any connection between the two, right?

The blog has been made the fool for ever buying into this idea of open meetings and transparency. Invite us; uninvite us; conduct secret meetings to discuss dogs; set up secret phone numbers to eliminate owner participation. John Grisham isn't creative enough to invent this stuff. Board credibility that had been moving in a positive direction is now shot. Done. Over. Our president is now in the camp of the heretofore minority on the board who insists on closed meetings. Bravo to what used to be the minority group – you've succeeded. Congratulations on the victory.

Back track to an earlier annual owners meeting when our now newest board member Vinnie, at that time not on the board, moved that all board meetings be completely open in every respect to owners – every meeting in every respect. His motion, along with the unanimous approval vote from the owners, is recorded in the minutes. Now he is on the board. What is his opinion of all of this cloak of secrecy? Toss what the owners voted? Close 'em down?

**LT-18**

So, there you have it fellow owners. Our president has made it clear that accountability and openness simply isn't priority. Our sympathies go out to a few of the other board members who are trying to do the right thing but find themselves serving out a term in the middle of this sort of underhanded activity. As for the blog, we tried and have failed.

As a sidenote, President Max was asked to respond to our question of his reasoning behind the events detailed here. He did not respond to the request.

**Comments on: "The Final Straw" (4)**

1. 

   **alfred felice** *said:*

   November 9, 2011 at 12:43 pm

   A VERY SMALL MINORITY CAN DESTROY DEMOCRACY IF THE MAJORITY ARE PASSIVE !!! IT IS HAPPENING IN THE WORLD -INTHE USA – IN ST. THOMAS- WHY NOT AT CBW !!!! COMPLACENTCY LETS THE BULLIES RULE IF YOU CAN'T REMOVE THE GUILTY , YOU CAN CERTAINLY OSTRACIZE THEM AL FELICE

2. 

   **Anonymous** *said:*

   November 10, 2011 at 2:24 pm

   I have previously refrained from weighing in on Lance's blog, but I have been so badly misrepresented that I feel compelled to respond.

   "The blog received a reminder from the board over the weekend to invite owners to phone into the board meeting on Tuesday." False. The Board has never invited "the Blog" or owners to phone into the meeting. In the past, Lance and other owners have been invited to sit in on meetings. Owner Lance was never specificially invited to join the telephone call-in, nor was he prohibited. The "Blog" has never been invited.

   "President Max now wants owners to be forced to show up in person at the office if they wish to listen in on board meetings." I clearly do not have the desire or authority (or arrogance) to "force" owners to do anything. I did say in an email, and telephonically, to a Board member that I have no trouble with owners sitting in on meetings. The telephone system is provided for the convenience of Board members who are off-island. I do have

LT-19

concerns regarding many people, including perhaps non-owners, calling in. At least 3 Board members intend to address this at our next meeting.

"Owners were purposely excluded from the entire meeting when dogs were on the agenda." We did go into executive session at the beginning of the meeting to discuss dogs and staff issues. As the minutes will reflect, we voted to table dog issues pending the Board engaging ADA expertise. Once this is done, the issue of rule violators and By-Law modification may be more intellegently addressed. After the executive session, the meeting was open.

"Our president is now in the camp of the heretofore minority on the board who insists on closed meetings." False.

"Our president has made it clear that accountability and openness simply isn't priority." False.

"As a sidenote, President Max was asked to respond to our question of his reasoning behind the events detailed here. He did not respond to the request." I received an email from Lance that I've deleted so I can't quote it, but paraphrased it said something like ' Why are you making the blog look foolish?' I don't support, not-support or answer to Lance's blog, so I didn't feel the email warranted an answer.

Shortly after the meeting, I called a meeting of the Long Term Planning Committee, which consisted of Lance, Jon, Bill Canfield and me. Lance responded by resigning from the committee. I hope he wasn't doing this to "punish" me. I hope Lance runs for the Board in our upcoming election so he can address his concerns in a better forum.

Max

**Lance Talkington** *said:*

November 11, 2011 at 11:50 am

The owners voted unanimously for completely open meetings recently. So you say we weren't invited, but we weren't prohibited? Seriously? What in the world does that mean? We should go ahead and try to phone in, but just remember it's against your wishes? Good grief. But wait, it gets better. You have concerns about who calls in, particularly non owners. For goodness sake – you're using Free Conference Call.Com. It's got more access controls than Cowpet's crime count. That's a lot of controls if the comparison isn't clear. All of the access control options are right there in plain view on their web site. You can include or exclude whomever you wish. For that matter, you could have your private executive session on one line and then flip over to the other line where owners are waiting

LT-20

for the open part of the meeting and not even have to worry with control utilization. Getting off one private line and moving to the open line takes what, about thirty seconds? Come on Max, all this takes is a little thought and effort. Read the web site you're using for goodness sake rather than for all intents and purposes shutting down the owners. Is it appropriate that you deserve flexibility of access to board meetings while traveling the states since May, but owners don't deserve the same when access can be easily controlled? Oh, and non owners calling in – are you serious? Who in their right mind outside of owners would ever want to subject themselves to this insanity.

OK, so you say that your "camp" is not with Rosie and Barbara and that you're not against accountability and openness. All you can say is "False". What exactly then is the truth Max? Please elaborate so we can know your ground rules without being thrown around in the wind from month to month not knowing what to expect. You deleted my email asking a very simple question that was nothing like your recollection of it – I asked the reasoning behind closing the meeting and made a side observation we felt like fools. Please don't twist what was asked of you. What do you expect for a subsequent response when you purposely ignore a reasonable question? It's pretty simple to draw the conclusion that you're not open and transparent. We're supposed to somehow magically assume you're for open meetings; transparency; and accountability in light of the actions undertaken? Please. We're still listening Max. Actions speak much louder than words.

You bet I resigned from the committee. I will not be associated with clandestine functionality and will only associate with one hundred percent openness and transparency. Until that becomes reality, it's not happening. I've worked too long for a reputation of being completely open and forthright and will not allow that to be tainted by being associated with behind the scenes activities, whether at the board or committee level. Prove that openness and consistency are a commitment, and this issue can be revisited. My participation is completely dependent on how you decide to proceed.

3. 

**dougrebak** *said:*

November 12, 2011 at 12:37 pm

Lance,
Thank you for your input.
I share your ( and many other owner's) frustration with the unilateral rejection of the owner's overwhelming "yes" vote for open meetings.
I do support the Board's need for closed sessions on "confidential" matters –but the dog issue???PLEASE !!!

LT-21

I guess there is little hope of changing this nonsensical behavior until the annual meeting,at which time, 2 of the "gang of 3" can be voted off the Board , and a new slate of Officers can be elected by the new Board.
The situation is most disturbing and not at all the way it should be in an upscale Reidential/Resort community!
Doug Rebak

LT-22

# Cowpet Bay West Blog

## An Informed Active Community

### Barking Puppy Dogs

December 5, 2011

So far our illegal neighborhood puppy dogs have been seen and smelled but not heard. Until now. Following is an email sent from an owner this morning:

*Jackie,*

*To answer your specific question there is an existing issue and not just a potential problem. Last Monday, Nov 28th a dog left in a high number Windward unit was incessantly barking to the great distraction of our household. This was in the evening and in order for my daughter to do her homework she had to hide out in our bedroom on the street side of the unit. In addition we had to close our windows and put the air-conditioning on – an expense to us and denying us of the advantage of a balcony situated in the Caribbean.*

*Regards,*

*Niall Bartlett, Leeward 47.*

Niall lives on the end of Leeward nearest the gate house. The 40's area of Windward is directly below his unit, and this coincidentally happens to be the very spot where our known violaters Barbara Walters (current board member) and Judy Kromenhoek (immediate past board president) live. If the noise is a high pitched yip, it's Barbara's dog. If it's a deeper barking noise, the dog is Judy's. Maybe blog readers who live in that area can comment on whose dog may be today's perpetrator. As an aside, trained service dogs are specificaly trained to NOT bark unless the owner is in imminent danger. Maybe one of the pups pooped in the owner's unit and was warning the owner to watch out?

These two owners continue to fight for their puppy dogs tooth and nail out of our collective view due to the monthly board meetings being closed to owners. Don't be surprised to see either or maybe both of them show up as candidates for the three open seats on the board. They desperately want to be in power to control this issue that is very real and very personal to both of them.

**Comments on: "Barking Puppy Dogs" (1)**

1. 

LT-23

**alfred felice** *said:*

December 5, 2011 at 6:07 pm

Let us not wait !!! Those who are against changing our "NO DOGS " rule AND enforcing its application snould form a slate to replace any empty seats with candidates who will follow the wants of the majority of our residents. ALL candidates should state their position on this issue .A change to our BY -LAWS might be needed to put this issue to permanent rest rather than revisiting this issue every year !!!! "RULES" can be easily changes by a small minority at a poorly attended board meeting ( especialy behind closed doors) or if meetings are "closed" WAKE UP STARTUP A CAMPAIGN FOR A NO DOGS SLATE NOW.

LT-24

# Cowpet Bay West Blog

## An Informed Active Community

### Letter From Judi Kromenhoek

December 24, 2011

The letter below was posted on the blog yesterday from board candidate and recent blog registrant Judi Kromenhoek. It encourages owners to consult with association employees for input on qualification of the various candidates running for election. Our community faces a number of complex business issues on a regular basis, such as insurance coverage; formulating condo law related to animals; formulation and evaluation of budgets and financial statements; strategic planning; capital planning; and supervision and evaluation of staff to name a few.

Anyone who is able to input on these or any other challenging issues is encouraged to provide their input for evaluation in this public forum, whether it be Matuba; Steve; Joey; Jon; Louanne; or anyone else on staff. We can all benefit from being better informed on the difficult business issues that face our wonderful community.

As an aside, the following questions were posed to Judi yesterday on the blog, responses to which we await:

***Hi Judi. Welcome to the blog. We have a couple of questions. First, what would your vote have been on the recent board vote regarding open or closed meetings in the specific context of the vote taken? Secondly, are you in favor of the proposed bylaw revision as stated in the draft regarding dogs on property?***

Since Judi currently houses a dog in her unit, her input will be valuable in understanding the reasons for allowing dogs on the property.

Following is Judi's letter to the blog:

*Dear Fellow Owners,*
*Many of you only spend short periods of time during the year at Cowpet Bay West and therefore are not aware of all that is going on.*

*There is an election coming up and I urge you to do some investigating on your own. DO NOT take my word or any of the current Board's, or those running for the Board but base your vote on what you learn.*

LT-25

*ASK our property manager, Jon Cassady (340-998-0807), our office manager, Louanne (340-775-6675) or any of the CBW employees, Matuba, Steve, Joey, Ken, Mr. Brown, ChiChi or Marsellus just what they think of those who are running and why.*

*Get their opinions of the current Board, Max Harcourt, Sharon Koehler, Bob Cockayne, Rosie Wells, Barbara Walters Vinny Vertiramo and Bill Canfield.*

*Now ask them what they think of those running for the Board in February, Doug Rebak, Dick Lamoureux, Ed Wardwell, Herb Horwitz, Barbara Walters and myself, Judi Kromenhoek.*

*Base your vote on what these people tell you. They are at CBW twelve months a year, they see and know what is going on. They are not political but honest workers. Use their input to help you make the right choice.*

*I hope you all have a very happy holiday season and a happy, healthy 2012.*
*Sincerely,*
*Judi Kromenhoek*
*44 Windward Way*
*(340-677-3267)*

**Comments on: "Letter From Judi Kromenhoek" (1)**

1. 

   **alfred felice** *said:*

   December 24, 2011 at 11:31 am

   I sent an Email response to all included in Judi and Herb's Email. I believe my message was recieved by all on their lists. In short, Judi and Barbara are unqualified to run for our board as they have been terribly disruptive these past 2 years. First Judi, on her own, without board approval, put a disasterous insurance policy on our books which was finally corrected. Second, a board minority tried to oust the majority because they were defeated on a vote!! Third, they defy the entire community by keeping DOGS on our property, that specifically outlaws them. Fourth, they accuse anyone who disagrees with their positions on anything. Also, they recommend the employees as THE primary source of "true" situations. Need I go on? They have some nerve even submitting their names on our ballot.

LT-26

# Cowpet Bay West Blog

## An Informed Active Community

### Questions Posed to Board Candidates

January 3, 2012

The following was emailed to all board of director candidates:

*To all – my wife and I own 3 Leeward and have the following two questions for the board candidates:*

*What would your vote have been on the recent board vote regarding open or closed meetings in the specific context of the vote taken?*
*Are you in favor of the proposed bylaw revision as stated in the draft regarding dogs on property?*

*Lance Talkington*

Responses received were as follows:

- Herb Horwitz – for open meetings; and for the bylaw revision regarding dogs
- Doug Rebak – 1. I have been in favor of open meetings from the time I voted in favor of Vinny's motion at the Annual Owner's Meeting. This is not theoretical but real. The meetings I held as President were open ,with the few exceptions where we were talking sensitive topics such as Staff Reviews or specific Owner-related problems.
  2. My position on dogs is I love them, have had 2 of our own, but they just do not belong at Cowpet. The issue of a "service dog" can and has been abused, but I feel the Board is taking a reasonable approach in following the ADA guidelines.
  Bottom line, I favor the By Laws revision on dogs.
- Ed Wardwell – declined comment
- Judi Krohmenhoek – declined comment
- Barbara Walters – declined comment
- Dick Lamoreaux – declined comment

While earlier correspondence is not available for Ed Wardwell's position on these issues, Judi; Barbara; and Dick are on record favoring dogs on the property (Judi and Barbara both currently have dogs in their units and have declined to comment as to the basis for it). Barbara is on record favoring closed meetings. Our thanks to Doug and Herb for taking the time to comment.

**Comments on: "Questions Posed to Board Candidates" (2)**

LT-27

1. 

**alfred felice** *said:*

January 3, 2012 at 9:18 pm

NO COMMENT OKAY BUT NO VOTE EITHER FAIR IS FAIR AL

2. 

**Anonymous** *said:*

January 4, 2012 at 8:33 am

Thanks for providing this voter material Lance.

LT-28

# Cowpet Bay West Blog

## An Informed Active Community

### Puppy Dog Diplomas

January 15, 2012

Readers of the blog may recall a comment that Cowpet owner and board candidate Judi Krohmenick made recently regarding the "certification" of her puppy. She claimed that her puppy is a "trained, legally certified service animal". We asked her what that meant and have had no response. After a recent board meeting discussion on the subject of dogs, it's become much clearer what is really happening with puppy dog diplomas.

The board was provided details on the various "certifications" of owner puppies at the January board meeting. Information distributed at the meeting indicated that Judi's puppy is certified by an outfit called Goldstar German Shepherds. We've done some research and found out that for the one time low price of as little as $71.50, a dog owner can obtain all sorts of really cool gadgets and puppy certification without having to leave the comfort of your computer. All anyone has to do is print the little form from their web site; fill out a name; address; and other basic info; write a check; and boom – you get all of the way cool proof needed to tell the world about your very own certified service animal. How tidy is that, right? Heck, if you're in a hurry, operators are standing by at 702-497-7229 to avoid the nasty wait for the mail to make it to them. The link to their site is here for those who would like to see for themselves how all of us can have a certified service animal in darn near no time at all.

http://www.goldstar-germanshepherds.com/certification_licensing.html

The information distributed at the board meeting also indicated that Barbara Walter's and Joel Kirschenbaum's puppies are "certified" by an outfit called the National Service Animal Registry. Here is the link to the similarly totally cool three minute process to get your very own "certified" service puppy from this outfit:

http://www.nsarco.com/cgi-bin/product.cgi?id=081218004

There are at least ten outfits like these two on the Internet that offer the same type of "service". One of them (Service Dogs America) even has the gumption to state that "SDA recognizes that every person in America may have some form of disability". See this fascinating statement for yourself plastered in bold letters squarely in the middle of their home page:

http://www.servicedogsamerica.org/

It is the blog's considered opinion that these outfits serve no legitimate purpose and exist mainly to sidestep what the ADA works diligently to accomplish. These outfits make it plain on their sites that nothing is done to verify either the animal's credentials or the purported disability of

LT-29

the applicant owner. The board is working to put plain language in the proposed By Laws that refers to the ADA as the sole source of legitimacy. We now have the opportunity to stop the doggy diploma silliness and adopt clear ground rules for dogs at Cowpet.

**Comments on: "Puppy Dog Diplomas" (2)**

1. 

   **alfred felice** *said:*

   January 15, 2012 at 10:29 am

   Good info !! I told you the same thing in prior emails. I also love dogs, IN MY HOME. On community property it does not work!! Most other doggy condos have a hell of a time trying to enforce reasonable rules like picking up !!! No one wants to monitor their neighbors and get into arguments !! Who would ?? And people just disobey rules, AS WE SEE. Really, I would not argue against properly trained dogs for a truly needing owner. Imagine a change in rules, we COULD have 100 dogs about !!! Think of how that would sound and smell !!! No thank you, NO DOGS !!!!

   Al Felice 27WWW (the watchdog)

2. 

   **Sharon Koehler** *said:*

   January 15, 2012 at 8:23 pm

   At our Board meeting last Wednesday, Joel Kirschenbaum requested and received time to speak to the Board about his wife's need of a 'service dog'. He honestly and openly presented his case, showed board members copies of a letter from a medical professional as well as his paperwork from the National Service Animal Registry and promptly left the meeting.
   The Board then discussed a letter received from an attorney representing another dog owner, and it was futher determined that this owner had registered a complaint with HUD. The board quickly agreed that in lieu of these matters, we needed to consult with legal counsel to determine our rights and responsibilities under the various federal agencies regarding CBW's 'No Dog' regulation and a 'service dog' exemption.
   The board first confirmed that there is presently a 'No Dogs Allowed' rule The board then voted to consult with legal counsel, and to start assessing fines to all owners with dogs in residence. For those owners who have submmitted some sort of paperwork to the office,(there are 3 including the Kirschenbaums), the collection of said fines would be held in abeyance pending advice from counsel about our legal responsibilities and what

LT-30

criteria will be expected from those who wish to seek an exemption.
As the blog correctly indicated, all Service Dog certifications received thus far from the dog owners have been forthcoming from those agencies in question.
There is, to the best of our knowledge, one other dog on premises, and this dog belongs to a long-term renter. As is our recourse, we are commencing fines to the owner of the unit.
Sharon Koehler
Coowpet Bay West BOD

# Cowpet Bay West Blog

## An Informed Active Community

### Board Candidate Richard Lamoureux Speaks Out

January 24, 2012

Readers may recall a recent email sent by the blog to all board candidates asking for their position on both open board meetings and the proposed bylaw provision on dogs. Dick Lamoureux declined the oppportunity to respond on either front. Instead, Dick has chosen to send two email blasts to owners regarding his position on dogs to supplement an earlier email about his position on insurance. In order to gain insight on this candidate's decision making, it is instructive to review his words on these issues.

On July 13, 2011 Dick sent an email blast to owners on the subject of insurance. He stated as follows:

***There's nothing the four board members who wanted the change can show me that will convince me that this much coverage is necessary.***

***Since this affects the association as well as me personally I'm going to take an avid interest in the events to come. When do we hear about all the wonderful things we're going to get for the massive increase?***

***P.S. If we ever had damage that approached $25m there wouldn't be anything left of the island to bother rebuilding for.***

Well Dick, the answer has come from not only two insurance experts but also your former very own insurance company itself (Tunick). It has been posted numerous times on the blog how we are not now being insured to protect against a $25 million loss. We are insuring to protect against a huge out of pocket deductible and coinsurance outlay by every owner via assessment in the event of as little as a one million dollar loss. It's been explained over and over, and Judi; Barbara; and Dick do not understand that one simple point about the insurance concept of "Agreed Value", which we thankfully have now and did not have in Judi's policy.

Now we move on to December 6, 2011 when Dick sent his second email blast to owners explaining his position on dogs. It was as follows:

***I've been getting a lot of e-mails concerning dogs. I've been an owner since 1987. In that time there were dogs on the beach from High Road and other places. There was a Great Dane named Moose who would rush to the side of a toddler when they got too close to the water to watch over them. There was a spanial who would stand in the shallows and try to catch parrot fish when they got close to the shore. Then there was Ellen Payers little dog. Most of us not***

LT-32

***only tolerated these dogs but loved them. What I'm saying is that there were always dogs at Cowpet.***

***Now we have a new breed (no pun intended) of owners who are perhaps less tolerant. Before we get our collective BVD's in a knot regarding by-laws, etc. we should all agree on what's acceptable and what's not. If a dog barks once or twice because someone knocked at the door; that's OK with me. If a dog barks for any length of time because the owner's out having dinner – that's UNACCEPTABLE! No one at CBW should be subjected to that!***

***I'm not telling anyone what to do but if it happened to me I'd take a stroll and verify where the barking is coming from (sounds tend to carry off the beach and could come from anywhere down there) and then I'd contact Jon Cassidy to do something about it. Needless to say, drastic action should occur if the barking continued.***

***As far as dogs defecating on the beach, I'd bet anything it's not CBW dogs. Might even come from iguanas.***

***There's plenty of other issues like insurance, robberies, etc. that people should give equal time to. I hope this dog issue isn't personal. We've had more than enough of that.***

That's fairly plain, right? It would sure seem clear that Dick is OK with dogs because they've always been there; barking is OK unless there is, like, a whole lot of it (whatever that means) or while the owner is out to dinner if just a little barking (thank goodness for a rule exception for a night out to dinner in peace right?); and we owners have a collective responsibility to walk the grounds and check for barking noises so it can be reported to Jon. OK, fair enough. At least we knew where Dick stood on the issue, right? Well, not really. Now yesterday we get the following email blast from Dick:

***Now for the all-consuming DOG issue. For the record: I'm AGAINST DOGS except when the owners have the proper certifications. Guess what? They do! Now the board has hired an attorney to fight this at OUR cost of $2,500 just to look it over. This is just the beginning. When the dust settles we will have shelled out a LOT MORE. And all this is because some people have an axe to grind against a couple of dog owners.***

Really Dick? The blog has never met you and wouldn't know you or anything about your positions on anything absent these sporadic and inconsistent email barrages. And beyond that, your board tells us owners that the folks who have dogs have refused to present any sort of proof of their disability that warrants a service animal so that the board can evaluate whether they have a legitimate claim. We are in agreement on one thing – if someone can present a care doctor's certification that someone is disabled and has a need for a service animal, then by all means they should be allowed an exception. Nobody needs to know the details of a disability, but physician certification of its existence can and should be required in an application to the board for an exception. These rediculous puppy dog diplomas from the paper mills are out of line, and presumably it is those certifications that you state are adequate to allow the exception since the board tells the owners that this is the only "certification" presented to date by any owner.

If so, this is a completely scary position Dick. Do you know that the diploma mill that produced certificates for two of our owners states in their application process that "stress" is a disability that qualifies for their certification? Yep, you can't make up this stuff. And guess what. I qualify for a service dog due to my stress disability that is exacerbated daily from work coupled with the intermittent stress created by having to post about things like this in order to protect my huge investment in this place. All I had to do after working through the application process was go to the final step of entering my credit card number for the seventy bucks, and my certfication package would be in the mail. My daughter is thrilled about the prospect of our having a dog by summer that will be allowable because her daddy is stressed. No doctor confirmation is required – just tell the nice folks at the web site that daddy is stressed. Seriously.

Cowpet needs board members who comprehend complex issues like insurance and who can be counted on to take solid positions on issues that affect the owners. Your positions to date are of great concern in light of your asking to be in control of our half million dollar investments. Oh, and Dick, multiple owners forward to the blog on almost a daily basis emails from you; Judi; Barbara; and the infamous CB since they choose to selectively blast their emails to a smaller group of people than the whole. We're confident that owners are able to see the tactic for what it is.

**Comments on: "Board Candidate Richard Lamoureux Speaks Out" (2)**

1. 

   **alfred felice** *said:*

   January 24, 2012 at 1:29 pm

   Dear Lance,blog and owners, It is a shame the ADA ,HUD etc make rules that effect so many honest people , but fail to specify how to impliment those rules. "Handicaps shall be allowed to circumvent community rules (like NO dogs) by certifying that the dog is needed by the handicapped". Fair enough !! BUT they do not specify how the need is certified !!! SURELY they did not intend for ANYONE to claim a need ,PAY a few $'s on the internet and "PRESTO" a service dog is born !!! I could "certify " my ceramic toy with THAT process !! Too bad they do not establish an honest method of certification !! Simple PROOF and I will apologize !!! The insurance issue will not be resolved when one party says "there is nothing that could be said that would change my mind" Now that is wrongly OK in Congress,but hardly useful in community governance. IF the property is appraised at $24000000,and it is ,then THAT is what must be insured. The insurance company is never going to believe the half (or what ever portion WAS insured) was theirs and they are fully liable for the whole loss !!! Use your brain, do the math and see how rediculous your position is !! There may be a type of policy that insures a specific amount at a particular cost, but that was not "JUDI"S POLICY" She had us as co-insurers, wether she knew it or not (that is why board approval should have been sought) Acting on her own is why so many are upset, to say the least, with her PLUS her refusal to respond to questions honestly asked !!!! Dick.Judi, and Barbara still refuse to

LT-34

acknowledge the gross error !!!! VOTE ED ,HERB and DOUG for YOUR board membership

2. 

**alfred felice** *said:*

January 24, 2012 at 1:47 pm

Again, many Emails circulated by "the rebels" as to the pure nature of Dick, Judi, and Barbara, AND the terrible nature of Doug and Herb !!!! Do NOT believe those self serving ,misrepresented,…inuendos,and misleading "facts", served up by someone unable to stand behind HIS/HER words with integrity and the courage of their convictions!!! How could we even consider such statements???? Talk to each other, know the truth, make your own decisions AND VOTE !! I will state catagorically I have NEVER LIED to you AND I will swear under oath, hand on bible, that every statement I have made I HAVE PERSONALLY SEEN AND WHITNESSED, SO HELP ME GOD !!!!

ON MY WORD AL

LT-35

# Cowpet Bay West Blog

## An Informed Active Community

**Someone Isn't A Happy Camper……**

March 16, 2012

A vandal with with a can of black spray paint apparently has an issue with the community's No Dogs policy. This pic was taken today at the edge of the beach. Someone isn't a happy camper at Cowpet West.

# Cowpet Bay West Blog

## An Informed Active Community

### Is It Time To Lawyer Up?

March 17, 2012

As most owners probably know by now, Cowpet has a newly approved service dog. The blog would like to take a moment to acknowledge the board's efforts in working through a reasonable approach to approving service dogs as it did recently by approving an animal for one of our owners. The board has put together a very fair yet thorough process with which an owner can comply in order to apply for a service dog exception to the No Dogs rule at Cowpet. Congratulations to the board for a job well done.

As the board reported earlier in the year, fines are being accrued but unpaid daily on those owners with dogs who have not met the board's requirements for having an animal on the property. It may very well be time for the association to go on the offensive and lawyer up to pursue an action against owners who are noncompliant with the policy on service dogs. We may actually benefit from the help of our legal system when it comes to standing firm on a policy that is in part developed with the help of a court.

Will it be cheap? Nope, but everyone knows that going in. This is the type of action where each party will bear their own legal costs regardless of the outcome, so each party will have to decide how badly they want to pursue it. The question of the day for Cowpet owners is whether they are interested in essentially dividing legal costs for the association between roughly a hundred owners in order to bring this situation to some sort of resolution. The blog believes initiating an action just may be the right business decision to make, and the costs are what the costs are in order to wind up with a dog policy that will survive legal challenges. So what do you think fellow owners?

LT-37

Comments on: "Is It Time To Lawyer Up?" (2)

Lance Talkington said:
March 18, 2012 at 7:06 am

Rate This

The following observation was made by a fellow owner via email and is being shared with permission:

"...if we don't pursue legal action then it is all a farce...we, the board and the association – the whole lot are useless when it comes to enforcement...do we put a lien on their units? Can we? It is so NOT all about dogs...this is a precedence for any rule that is disregarded...It certainly IS about dogs to the extent that it is the issue at hand. For all the reasons that we dog lovers have maintained the position of no dogs – we must maintain the stance."

Alfred Felice said:
March 22, 2012 at 1:02 pm

A MERE 3 OWNERS AND 2 MORE "PAWNS " HAVE BEEN THE CAUSE OF 95 % OF OUR PROBLEMS. 2 DOG OWNERS HAVE PUT IN CLAIMS WITH " HUD " AGAINST OUR ASSOCIATION, AND AL FELICE personally. ALREADY "HUD " HAS DISMISSED THE CLAIM AGAINST AL AS NOT BEING UNDER THEIR (HUD"S) jurisdiction !!! NICE NEIGHBORS!!!! FIRST INUENDOES THEN EXAGGERATIONS AND MISREPRESENTATIONS THEN LIES AND NAME CALLING THEN MORE LIES AFTER LOSING THE ELECTIONS THEN MORE LIES AND NAME CALLING AFTER THE BY-LAW VOTE THEN FEDERAL FALSE CLAIMS TO HUD !!! WHEN WILL THESE MISCREANTS STOP ??? YES YES YES WE MUST PROCEED WITH OUR VERY REASONABLE PLAN FOR LIGITIMATE SERVICE ANIMALS!!! FAILURE TO COMPLY MUST LEAD TO LIENS AND EVEN FORECLOSURE, IF NEEDED, FOR COMPLIANCE TO BE EFFECTIVE. THESE UNGRACIOUS OWNERS ARE TOTALLY SELFISH,SPOILED,BRATS,WILLING TO FLAUNT THIER ILLEGALITY IN EVERY ONES FACE, WITHOUT REGARD FOR OVERWHELMING VOTES TO THE CONTRARY. SUCH GALL AND NERVE REQUIRE FULL RESPONCE. WITH OSTRACIZING THE OFFENDERS IN EVERY MANNER AT OUR DISPOSAL!!!! ISOLATE THEM COMPLETELY TO THEIR LITTLE "DOG PATCH" ON THE BEACH AND IGNORE THEM AT EVERY VENUE OR OCCASION!!!! THESE 5 FEW "LADIES" HAVE CAUSED SO MUCH GRIEF IN OUR COMMUNITY THIS WHOLE 2011-12 SEASON HOW SAD !!!!!!

LT-38

# Cowpet Bay West Blog

## An Informed Active Community

### HUD Complaint

March 25, 2012

HUD Complaint Documents

The lengths to which a couple of owners will go to hang onto their puppies has now reached a whole new level. Attached in the above link is a formal complaint filed with HUD against the Association claiming that the association has engaged in "one or more discriminatory housing practices" against Ms. Walters (remember her – the recent board member and recent board candidate?) But wait – it gets better. The complaint also includes Yours Truly and Al Felice as co-offenders in the practice of discriminatory housing practices. That's right – not only has the Association supposedly discriminated against Ms. Walters, but in their minds so have the blog and Al.

And then, shortly after Ms. Walters files her complaint, along comes Ms. Kromenhoek (remember her – former board president and recent candidate for reelection?) who files the identical brand of complaint against the same three parties. It almost seems as though the two of them have been working together on this issue.

So fellow owners, let's ponder this for a moment. The ladies still have their puppies for whatever reason they claim is justifiable for having them. If they're truly disabled and can provide reasonable medical proof to the board, they should have their puppies. Instead of doing what another owner has already done by providing simple proof of disability, they not only refuse to do so but then haul off and file a complaint with the U.S. Government (translated "free legal help") in part against two individuals who are no more their landlords than the man in the moon. Really ladies? Do you seriously believe that either of two owners has any impact whatsoever on the Association's governance of this property in terms of your having those puppies? To call this fiasco of a complaint "misguided" is at the moment the most charitable description of the thought process (if there even was one) that was involved in filing this complaint.

As the attached documents demostrate, it fortunately didn't take HUD long to realize they had goofed in allowing complaints to be filed against non landlords. The complaints have now been properly amended to only include the Association. In the meantime, these ladies continue to have their puppies while the board has continued in vain to require them to produce appropriate evidence of their claimed disabilities.

It is the blog's opinion that these two individuals are doing everything possible in an attempt to be the playground bullie and make a mockery of our board. As the blog posted recently, it is time for the association to go on the offensive and file suit in a court of law to force the issue.

LT-39

When these ladies have to start spending their own cash instead of relying on the government for free help, the rubber will meet the road on how far everyone is willing to go on this issue. As an owner recently commented on the blog, this is not just about puppy dogs – it's about rules and those who will do whatever they can to avoid abiding by them.

To the board – please take this to the courts. This silliness and demonstration of bully tactics by two owners have gone on long enough. If this situation is allowed to continue unresolved, the domino effect is not going to be pretty since owners will know that they can bend the rules for their own benefit without expecting accountability from the board. Spending money to pursue a legal action is not attractive, but it has become necessary to preserve the integrity of the board. The board may count our unit as being on board to share in the cost of pursuing this necessary action. We're willing to wager that there are plenty of other owners who feel similarly.



U.S. DEPARTMENT OF HOUSING AND URBAN DEVELOPMENT
SAN JUAN FIELD OFFICE
PARQUE LAS AMERICAS 1
235 FEDERICO COSTA STREET, SUITE 200
San Juan, PR 00918

May 20, 2012

Mr. Al Felice
Cowpet Bay West
6200 Windward Way #27
St. Thomas, VI 00802

***Subject:*** ***Housing Discrimination Complaint***
***Barbara A. Walters v. Cowpet Bay West Assoc., et al.***
***HUD Case No. 02-12-0242-7-8***

Dear Mr. Felice:

We received a complaint alleging that you engaged in one or more discriminatory housing practices under the Federal Fair Housing Law. The complaint has been amended to remove you as a respondent to the complaint for lack of jurisdiction.

If you have any questions regarding this case, please contact Investigator Irma Pérez-Pillot at (787) 766-5400. Please refer to the case number at the top of this letter in those contacts, and keep this office advised of any change of your address or telephone number. We hope this information has been helpful to you.

Sincerely,

Diana Ortiz

Diana Ortiz
Director
Office of Fair Housing
and Equal Opportunity

Enclosures

LT-41

## Complaint

U.S. Department of Housing and Urban Development
Office of Fair Housing and Equal Opportunity

OMB Approval No. 2529-0011

Please type or print this form.

Public Reporting Burden for this collection of information is estimated to average 1 hour per response, including the time for reviewing instructions, searching existing data sources, gathering and maintaining the data needed, and completing and reviewing the collection of information.

Read this entire form and all the instructions carefully before completing. All questions should be answered. However, if you do not know the answer or if a question is not applicable, leave the question unanswered and fill out as much of the form as you can. Your complaint should be signed and dated. Where more than one individual or organization is filing the same complaint, and all information is the same, each additional individual or organization should complete boxes 1 and 7 of a separate complaint form and attach it to the original form. Complaints may be presented in person or mailed to the HUD State Office covering the State where the complaint arose (see list on back of form), or any local HUD Office, or to the Office of Fair Housing and Equal Opportunity, U.S. Department of HUD, Washington, D.C. 20410.

This section is for HUD use only.

Number: 02-12-0242-8
Filing Date: 01/12/2012
(Check the applicable box): [X] Referral & Agency (specify) P.R. [ ] Systemic [ ] Military Referral
Jurisdiction: [X] Yes [ ] No [ ] Additional Info
Signature of HUD personnel who established Jurisdiction: [signature]

1. Name of Aggrieved Person or Organization (last name, first name, middle initial) (Mr.,Mrs.,Miss,Ms.): Walters, Barbara A
Home Phone: 340 7752388
Business Phone: Cell 908 217 2033
Street Address (city, county, State & zip code): 51 Windward Way (6200 W51 Windward) Coupet Bay West St Thomas VI 00802

2. Against Whom is this complaint being filed? (last name, first name, middle initial): Coupet Bay West Condominium Association, Lance Talkington, Al Felice
Phone Number: 340 7756675
Street Address (city, county, State & zip code): 6201 Windward Way 6100 L3 Leeward → 6200 W27 Windward St Thomas VI 00802

Check the applicable box or boxes which describe(s) the party named above: [ ] Builder [ ] Owner [ ] Broker [ ] Salesperson [ ] Supt. or Manager [ ] Bank or Other Lender [X] Other

If you named an individual above who appeared to be acting for a company in this case, check this box [ ] and write the name and address of the company in this space:
Name:
Address:

Name and identify others (if any) you believe violated the law in this case:

3. What did the person you are complaining against do? Check all that apply and give the most recent date these act(s) occurred in block No. 6a below.
[ ] Refuse to rent, sell, or deal with you
[ ] Falsely deny housing was available
[ ] Engage in blockbusting
[ ] Discriminate in broker's services
[ ] Discriminate in the conditions or terms of sale, rental occupancy, or in services or facilities
[X] Advertise in a discriminatory way
[ ] Discriminate in financing
[X] Intimidated, interfered, or coerced you to keep you from the full benefit of the Federal Fair Housing Law
[ ] Other (explain)

4. Do you believe that you were discriminated against because of your race, color, religion, sex, handicap, the presence of children under 18, or a pregnant female in the family or your national origin? Check all that apply.
[ ] Race or Color: [ ] Black [ ] White [ ] Other
[ ] Religion (specify)
[ ] Sex: [ ] Male [ ] Female
[X] Handicap: [ ] Physical [X] Mental
[ ] Familial Status: [ ] Presence of children under 18 in the family [ ] Pregnant female
[ ] National Origin: [ ] Hispanic [ ] Asian or Pacific Islander [ ] American Indian or Alaskan Native [ ] Other (specify)

5. What kind of house or property was involved?
[ ] Single-family house
[ ] A house or building for 2, 3, or 4 families
[ ] A building for 5 families or more
[X] Other, including vacant land held for residential use (explain) Condominium

Did the owner live there? [ ] Yes [ ] No [ ] Unknown

Is the house or property [ ] Being sold? [ ] Being rented?

What is the address of the house or property? (street, city, county, State & zip code)

6. Summarize in your own words what happened. Use this space for a brief and concise statement of the facts. Additional details may be submitted on an attachment.
Note: HUD will furnish a copy of the complaint to the person or organization against whom the complaint is made.

See attached

6a. When did the act(s) checked in Item 3 occur? (Include the most recent date if several dates are involved)
Oct 2011
NOV 2011

7. I declare under penalty of perjury that I have read this complaint (including any attachments) and that it is true and correct.
Signature & Date: Barbara Walters 11/30/2011

Previous editions are obsolete

form HUD-903 (7/2001)
ref Handbook 8024.1

LT-42



U.S. DEPARTMENT OF HOUSING AND URBAN DEVELOPMENT
SAN JUAN FIELD OFFICE
PARQUE LAS AMERICAS I
235 FEDERICO COSTA STREET, SUITE 200
San Juan, PR 00918

May 20, 2012

Mr. Al Felice
Cowpet Bay West
6200 Windward Way #27
St. Thomas, VI 00802

***Subject:*** ***Housing Discrimination Complaint***
***Judith Kromenhoek v. Cowpet Bay West Assoc., et al.***
***HUD Case No. 02-12-0337-8***

Dear Mr. Felice:

We received a complaint alleging that you engaged in one or more discriminatory housing practices under the Federal Fair Housing Law. The complaint has been amended to remove you as a respondent to the complaint for lack of jurisdiction.

If you have any questions regarding this case, please contact Investigator Irma Pérez-Pillot at (787) 766-5400. Please refer to the case number at the top of this letter in those contacts, and keep this office advised of any change of your address or telephone number. We hope this information has been helpful to you.

Sincerely,

Diana Ortiz

Diana Ortiz
Director
Office of Fair Housing
and Equal Opportunity

Enclosures

LT-43

## Housing Discrimination Complaint

U.S. Department of Housing and Urban Development
Office of Fair Housing and Equal Opportunity

OMB Approval No. 2529-0011

**Please type or print this form**

Public Reporting Burden for this collection of information is estimated to average 1 hour per response, including the time for reviewing instructions, searching existing data sources, gathering and maintaining the data needed, and completing and reviewing the collection of information.

Read this entire form and all the instructions carefully before completing. All questions should be answered. However, if you do not know the answer or if a question is not applicable, leave the question unanswered and fill out as much of the form as you can. Your complaint should be signed and dated. Where more than one individual or organization is filing the same complaint, and all information is the same, each additional individual or organization should complete boxes 1 and 7 of a separate complaint form and attach it to the original form. Complaints may be presented in person or mailed to the HUD State Office covering the State where the complaint arose (see list on back of form), or any local HUD Office, or to the Office of Fair Housing and Equal Opportunity, U.S. Department of HUD, Washington, D.C. 20410.

This section is for HUD use only.
Number: 02/12/0337-8
Filing Date: 03/01/2012
(Check the applicable box) [X] Referral & Agency (specify) P-R; [ ] Systemic; [ ] Military Referral
Jurisdiction: [X] Yes [ ] No; [ ] Additional Info
Signature of HUD personnel who established Jurisdiction: [signature]

1. Name of Aggrieved Person or Organization (last name, first name, middle initial) (Mr., Mrs., Miss, Ms.)
MRS. KROMENHOEK JUDITH A
Home Phone: 340-775-6062
Business Phone: Cell 340-677-3267
Street Address (city, county, State & zip code)
6200 Windward Way #44 ST Thomas USVI 00802

2. Against Whom is this complaint being filed? (last name, first name, middle initial)
Cowpet Bay West Condominium Assoc. Al Felice
Phone Number: 340 775-6675
Street Address (city, county, State & zip code)
6201 Windward Way ST Thomas 00802
6200 Windward Way #27 ST Thomas 00802
Laura Farrington - 6200 Leeward Way #3 ST Thomas 00802

Check the applicable box or boxes which describe(s) the party named above:
[ ] Builder [ ] Owner [ ] Broker [ ] Salesperson [ ] Supt. or Manager [ ] Bank or Other Lender [X] Other

If you named an individual above who appeared to be acting for a company in this case, check this box [ ] and write the name and address of the company in this space:
Name:
Address:

Name and identify others (if any) you believe violated the law in this case:

3. What did the person you are complaining against do? Check all that apply and give the most recent date these act(s) occurred in block No. 6a below.
[ ] Refuse to rent, sell, or deal with you
[ ] Falsely deny housing was available
[ ] Engage in blockbusting
[ ] Discriminate in broker's services
[ ] Discriminate in the conditions or terms of sale, rental occupancy, or in services or facilities
[X] Advertise in a discriminatory way
[ ] Discriminate in financing
[X] Intimidated, interfered, or coerced you to keep you from the full benefit of the Federal Fair Housing Law
[ ] Other (explain)

4. Do you believe that you were discriminated against because of your race, color, religion, sex, handicap, the presence of children under 18, or a pregnant female in the family or your national origin? Check all that apply.
[ ] Race or Color: [ ] Black [ ] White [ ] Other
[ ] Religion (specify)
[ ] Sex: [ ] Male [ ] Female
[X] Handicap: [ ] Physical [X] Mental
[ ] Familial Status: [ ] Presence of children under 18 in the family [ ] Pregnant female
[ ] National Origin: [ ] Hispanic [ ] Asian or Pacific Islander [ ] American Indian or Alaskan Native [ ] Other (specify)

5. What kind of house or property was involved?
[ ] Single-family house
[ ] A house or building for 2, 3, or 4 families
[ ] A building for 5 families or more
[X] Other, including vacant land held for residential use (explain) Condominium

Did the owner live there? [ ] Yes [ ] No [ ] Unknown

Is the house or property [ ] Being sold? [ ] Being rented?

What is the address of the house or property? (street, city, county, State & zip code)
6200 Windward Way 44 ST Thomas USVI 00802

6. Summarize in your own words what happened. Use this space for a brief and concise statement of the facts. Additional details may be submitted on an attachment.
Note: HUD will furnish a copy of the complaint to the person or organization against whom the complaint is made.

See attached

6a. When did the act(s) checked in Item 3 occur? (Include the most recent date if several dates are involved)
Oct 2011 JAN 2012
Nov 2011 1-19-12 LF
Dec 2011

7. I declare under penalty of perjury that I have read this complaint (including any attachments) and that it is true and correct.
Signature & Date: Judith A Kromenhoek 1/24/12

Previous editions are obsolete

form HUD-903 (7/2007) ref Handbook 8024.1

44



**U.S. Department Of Housing and Urban Development**
New York State Office
Jacob K. Javits Federal Building
26 Federal Plaza
New York, New York 10278-0068
http://www.hud.gov/local/nyn/nynopen.html

JAN 12 2012

Lance Talkington
Cowpet Bay West
6100 L3 Leeward
St. Thomas, VI 00802

Dear Respondent:

Subject: Housing Discrimination Complaint
Walters, Barbara A. v. Cowpet Bay West Condo. Association, et al.
Inquiry No. 331513
HUD Case No. 02-12-0242-8

We have received a formal complaint alleging that you have engaged in one or more discriminatory housing practices under the Federal Fair Housing Law, 42 U.S.C. Sections 3601-3619. We are required by statute to send you a copy of the complaint.

We are enclosing a copy of the complaint for you. The alleged discriminatory practices are identified in this complaint. We have made no determination as to whether the complaint against you has merit.

The purpose of this letter is to inform you of: 1) the rights you have in responding to this complaint, 2) the rights each complainant has, and 3) the steps the U.S. Department of Housing and Urban Development (the Department) will take to determine whether the complaint has merit.

In order to insure that the Department informs you properly of the law's requirements, this notification letter contains language required by the law. A similar letter is used to notify all parties whenever a formal complaint has been filed with the Department under the Federal Fair Housing Law.

We are governed by federal law, which sets out what steps we must take when a formal complaint is filed. The law also includes steps that you can take to answer or refute the allegations of this complaint.

Under federal law, any answer from you to this complaint can be filed within 10 calendar days of your receipt of this letter or receipt of a letter notifying you of any amendments to this complaint. Your answer must be signed and you must affirm that you have given a truthful response by including the statement "I declare under penalty of perjury that the foregoing is true and correct."

LT-45

You will be allowed to amend your statement at any time, if our investigation shows that it is reasonable and fair for you to do so.

Our responsibility under the law is to undertake an impartial investigation and, at the same time, encourage all sides to reach an agreement, where appropriate, through conciliation. The law requires us to complete our investigation within 100 days of the date of the official filing of the complaint. If we are unable to meet the 100-day requirement for issuing a determination, the law requires that we notify you and the complainant(s) and explain the reasons why the investigation of the complaint is not completed.

In handling this complaint, we will conduct an impartial investigation of all claims that the Fair Housing Act has been violated. If the investigation indicates that there is not evidence establishing jurisdiction, the case will be dismissed. At any point, you can request that our staff assist you in conciliating (or settling) this complaint with the complainant(s). If the case is not resolved, we will complete our investigation and decide whether or not the evidence indicates that there has been a fair housing violation. If the parties involved have not reached an agreement to settle the complaint, the Department will issue a determination as to whether there is reasonable cause to believe a discriminatory housing practice has occurred.

If our investigation indicates that there is reasonable cause to believe that an unlawful discriminatory housing practice has occurred, the Department must issue a charge. If the investigation indicates that there is no reasonable cause to believe that discrimination has occurred, the complaint will be dismissed. In either event, you will be notified in writing.

If the determination is one of reasonable cause, the notification will advise you and the complainant(s) of your rights to choose, within 20 days, whether you wish to have the case heard by an Administrative Law Judge, or to have the matter referred for trial in the appropriate U.S. District Court.

Each complainant has the legal right to file such a suit, even if the complaint formed the basis for a charge, as long as an Administrative Law Judge has not started a hearing on the record with respect to the charge. Under federal law, even if the Department dismisses the complaint, each complainant still has the right to file an individual lawsuit under the Fair Housing Law in an appropriate federal, state or local court within two years of the date of the alleged discriminatory practice or of the date when a conciliation agreement has been violated. The law does not count, as part of the two-year period, any of the time when a proceeding is pending with the Department.

There may be other applicable federal, state or local statutes under which you and/or the complainant(s) may initiate court action. You may consult a private attorney in this regard.

02-12-0242-8

LT-46

The law also requires us to notify you that section 818 of the Fair Housing Act makes it unlawful for you, or anyone acting on your behalf, to coerce, intimidate, threaten, or interfere with any person in the exercise or enjoyment of, any right granted or protected under the Federal Fair Housing Law. The law also makes it illegal for anyone to coerce, threaten or interfere with any person for having aided or encouraged any other person in the exercise or enjoyment of, any right or protection granted to them under the Federal Fair Housing Law.

Some explanatory material on the law is enclosed for your information.

If you have any questions regarding this case, please contact Investigator, Irma Perez-Pillot at the San Juan Office at (787) 766-5400. Please refer to the case number at the top of this letter in those contacts, and keep this office advised of any change of your address or telephone number. We hope this information has been helpful to you.

Sincerely,

Jay Golden
Region II Director
Office of Fair Housing
and Equal Opportunity

Enclosures

02-12-0242-8

OMB Approval No. 2529-0011

## Complaint

U.S. Department of Housing and Urban Development
Office of Fair Housing and Equal Opportunity

**Please type or print this form**

Public Reporting Burden for this collection of information is estimated to average 1 hour per response, including the time for reviewing instructions, searching existing data sources, gathering and maintaining the data needed, and completing and reviewing the collection of information.

Read this entire form and all the instructions carefully before completing. All questions should be answered. However, if you do not know the answer or if a question is not applicable, leave the question unanswered and fill out as much of the form as you can. Your complaint should be signed and dated. Where more than one individual or organization is filing the same complaint, and all information is the same, each additional individual or organization should complete boxes 1 and 7 of a separate complaint form and attach it to the original form. Complaints may be presented in person or mailed to the HUD State Office covering the State where the complaint arose (see list on back of form), or any local HUD Office, or to the Office of Fair Housing and Equal Opportunity, U.S. Department of HUD, Washington, D.C. 20410.

This section is for HUD use only.

Number: 02-12-0242-8
Filing Date: 01/12/2012
(Check the applicable box): [X] Referral & Agency (specify) P.R. [ ] Systemic [ ] Military Referral
Jurisdiction: [X] Yes [ ] No [ ] Additional Info
Signature of HUD personnel who established Jurisdiction: [signature]

1. Name of Aggrieved Person or Organization (last name, first name, middle initial) (Mr., Mrs., Miss, Ms.)
Walters, Barbara A
Home Phone: 340 775 2388
Business Phone: Cell 908 217 2033
Street Address (city, county, State & zip code)
51 Windward Way (6200 W51 Windward) Coupet Bay West St Thomas VI 00802

2. Against Whom is this complaint being filed? (last name, first name, middle initial)
Coupet Bay West Condominium Association, Lance Talkington
Phone Number: 340 775 6675
Street Address (city, county, State & zip code)
6201 Windward Way 6100 L3 Leeward; Al Felice 6200 W27 Windward St Thomas VI 00802

Check the applicable box or boxes which describe(s) the party named above:
[ ] Builder [ ] Owner [ ] Broker [ ] Salesperson [ ] Supt. or Manager [ ] Bank or Other Lender [X] Other

If you named an individual above who appeared to be acting for a company in this case, check this box [ ] and write the name and address of the company in this space:
Name: Address:

Name and identify others (if any) you believe violated the law in this case:

3. What did the person you are complaining against do? Check all that apply and give the most recent date these act(s) occurred in block No. 6a below.
[ ] Refuse to rent, sell, or deal with you
[ ] Falsely deny housing was available
[ ] Engage in blockbusting
[ ] Discriminate in broker's services
[ ] Discriminate in the conditions or terms of sale, rental occupancy, or in services or facilities
[X] Advertise in a discriminatory way
[ ] Discriminate in financing
[X] Intimidated, interfered, or coerced you to keep you from the full benefit of the Federal Fair Housing Law
[ ] Other (explain)

4. Do you believe that you were discriminated against because of your race, color, religion, sex, handicap, the presence of children under 18, or a pregnant female in the family or your national origin? Check all that apply.
[ ] Race or Color: [ ] Black [ ] White [ ] Other
[ ] Religion (specify)
[ ] Sex: [ ] Male [ ] Female
[X] Handicap: [ ] Physical [X] Mental
[ ] Familial Status: [ ] Presence of children under 18 in the family [ ] Pregnant female
[ ] National Origin: [ ] Hispanic [ ] Asian or Pacific Islander [ ] American Indian or Alaskan Native [ ] Other (specify)

5. What kind of house or property was involved?
[ ] Single-family house
[ ] A house or building for 2, 3, or 4 families
[ ] A building for 5 families or more
[X] Other, including vacant land held for residential use (explain) Condominium

Did the owner live there? [ ] Yes [ ] No [ ] Unknown

Is the house or property [ ] Being sold? [ ] Being rented?

What is the address of the house or property? (street, city, county, State & zip code)

6. Summarize in your own words what happened. Use this space for a brief and concise statement of the facts. Additional details may be submitted on an attachment.
Note: HUD will furnish a copy of the complaint to the person or organization against whom the complaint is made.

See attached

6a. When did the act(s) checked in Item 3 occur? (Include the most recent date if several dates are involved)
Oct 2011
NOV 2011

7. I declare under penalty of perjury that I have read this complaint (including any attachments) and that it is true and correct.
Signature & Date: Barbara Walters 11/30/2011

Previous editions are obsolete

Page 1 of 3

form HUD-903 (7/2001)
ref Handbook 8024.1

LT-48

I filed paperwork regarding my emotional service animal in February. I brought my dog in July, and currently have her on premises. I have been ostracized, poked, prodded and intimidated, threatened with fines, and the whole story was put on an internet site. One of the named offenders implied that I would go off my rocker & be a danger.

I have enclosed with comments, all the paperwork that has been circulated about me.

I am mortified that this has gone so far with ugly implications.

I dont believe anyone has the right to do this.

thank goodness, the office manager (a former nurse) has not let these people see my file (they did try)

Its very awkward, as I am on the board of directors but the president (Max Hartcourt) allowed this discussion to be opend to public scrutiny, and I don't trust them to keep my information private —

LT-49

Case: 3:12-cv-00025-CVG-RM Document #: 10-1 Filed: 03/01/14 Page 53 of 56

Please help me, I am so upset about this public scrutiny and discrimination.

Thank you

Barbara Walters

51 Windward Way
Coupet Bay West
St Thomas V.I. 00802

LT-50

# Cowpet Bay West Blog

## An Informed Active Community

### Board Meeting Tomorrow

April 10, 2012

Good morning everyone. With a week to go for tax season, the blog is looking forward to some personal down time. In the meantime, there is a monthly board meeting tomorrow (Wednesday) at 7:45 local time. On the agenda for the meeting are both our insurance renewal and the matter of puppy dogs. As always, the meeting is open to owners either in person or via conference call. Owners desiring to participate via call may obtain the call in number and password from either the blog or a board member. Our email is lance@talkington.cc.

LT-51

# Cowpet Bay West Blog

## An Informed Active Community

### Budgets and Puppy Dogs

April 12, 2012

Good afternoon fellow owners. The monthly board meeting was insightful on how things are progressing with Cowpet and its growing community of puppy dogs. We are over budget in several areas, one of which is legal fees to the tune of $8,000 at last count. To be precise, total legal fees this year to date are $10,000. And guess how this was spent? Yep – you guessed it. It was spent on puppy dogs. The cost is related to receiving lawyer letters and HUD complaints filed by Barbara Walters and Judi Kromenhoek who have done everything possible to keep their puppies. So here we stand with each owner effectively ponying up $100 at last count to defend the ladies' government complaints funded with our collective tax dollars. But hey, at least each of them is covering their $100 share of the cost, right?

The blog takes this just a wee bit personally since both women chose to file a HUD complaint against the blog as well, which was appropriately tossed in the can by HUD once they realized the idiocy of claiming that someone other than the board has an influence in whether they keep their precious puppies. These ladies are having a difficult time comprehending why they were soundly defeated in an attempt to run for the board this year. It's actually really simple for the rest of us to understand. Kudos to our fellow owners for taking a stand against this sort of behavior.

LT-52

# Cowpet Bay West Blog

## An Informed Active Community

### Board Resolution On Animals and Bylaws

April 14, 2012

As everyone has probably seen by now, President Ed sent two emails to owners yesterday. The first one was a recap of the montly board meeting held this week, and it said that closure has now been reached on all of the service animal applications that were outstanding. Two more animals have been approved after following the requisite application process with the board. The blog's objective in posting about this from the beginning was to require applicants to abide by an established reasonable procedure for exceptions to the No Dogs rule at Cowpet, and we now have one that has been approved and followed by the board and the applicants. This matter of outstanding applications can finally be put to bed once and for all since the board has now deemed the applicants approved.

Secondly and on a related note, the board has asked owners to approve a change to the recently approved bylaws. The section dealing with service animals has been revised to comply with what the law allows on that front. Owners must be required to follow a reasonable application process that goes through the board in order to be allowed an exception to the No Dogs rule, and we now have a provision up for vote that memorializes a process. While the blog voted against the bylaws in February, we agree that the language in our bylaws should be modified as recommended by the board.

The blog believes there are issues remaining to be worked out in the bylaws on matters related to owner responsibility and association responsibility. We're concerned that the potential for disagreement remains on a number of fronts, and our hope is that further modifications to the recently approved bylaws will be forthcoming as the issues are clarified. We'll follow up on that front in later blog posts.

LT-53

Case 3:12-cv-00025-CVG-RM Document #: 203 Filed: 05/21/14 Page 1 of 18

IN THE UNITED STATES DISTRICT COURT OF THE VIRGIN ISLANDS
DISTRICT OF ST. THOMAS AND ST. JOHN
****************

| | |
|---|---|
| **JUDITH KROMENHOEK,** **Plaintiff,** **v.** **COWPET BAY WEST CONDOMINIUM ASSOCIATION; THE BOARD OF THE COWPET BAY WEST CONDOMINIUM ASSOCIATION; MAX HARCOURT, in his personal capacity; ALFRED FELICE; LANCE TALKINGTON; ROBERT COCKAYNE; VINCENT VERDIRAMO,** **Defendants.** | **CIVIL NO. 12-00025** **Action for: Housing Discrimination; Discrimination Based on Disability; Invasion of Privacy; Negligent Infliction of Emotional Distress Infliction of Emotional Distress; Punitive Damages; and Injunctive and Declaratory Judgment** **JURY TRIAL DEMAND** |

**PLAINTIFF'S OPPOSITION TO DEFENDANT LANCE TALKINGTON'S MOTION FOR SUMMARY JUDGMENT**

**COMES NOW**, Plaintiff **JUDITH KROMENHEOK** ("Plaintiff") by and through the undersigned counsel, the **LAW OFFICES OF KARIN A. BENTZ, P.C.** (Karin A. Bentz and Julita K. de León, Esq.), and hereby submits the following in opposition to Defendant Lance Talkington's ("Talkington") summary judgment motion. The facts and evidence supporting this response are contained in Plaintiff's Response to Talkington's Statement of Undisputed Material Facts and Plaintiff's Counter-Statement of Facts. As demonstrated below, Talkington's motion for summary judgment should be denied, because genuine issues of material facts exist as to Plaintiff's claims under the Fair Housing Act and under the common laws of the Territory of the Virgin Islands.

## I. INTRODUCTION

In 2011, pursuant to a prescription from her doctor, Plaintiff obtained Oliver, an emotional support dog. Plaintiff, who owns a condominium unit at Cowpet By West was subjected to the Board's no dogs rule. As a result, in July of 2011, Plaintiff submitted an application for a reasonable accommodation pursuant to the Fair Housing Act. Plaintiff handed the application, which contained a letter from her treating physcian and a copy of Oliver's certification to Louanne Schechter, the office manager.

Judith Kromenhoek v. Cowpet Bay West Condominium Ass'n. Civil No. 12/00025
Plaintiff's Opposition to Defendant Lance Talkington's Motion for Summary Judgment Page 2

Soon after Plaintiff submitted her application, Talkington, who is a member of the Association and not the Board, began a campaign on the internet to discredit Plaintiff and her application. The campaign got so nasty that several Association members cautioned Talkington about going too far. However, Talkington persisted with his ridicule, bullying and defamatory comments. Talkington's comments centered on the fact that Plaintiff, who appeared well, was requesting a waiver to the no dogs rule. While Talkington accepted the concept of having a waiver for a "service dog" under the American With Disabilities Act, he could not accept a waiver for an emotional support animal.

## II. FACTUAL SUMMARY

Plaintiff owns a unit in the Cowpet Bay West Condominium complex. (CSOF ¶1.) Plaintiff suffers from an anxiety disorder; and on December 15, 2010, Plaintiff's doctor prescribed an emotional support dog to alleviate the symptoms of her illness. (Id. ¶2.) In July of 2011, Plaintiff submitted a copy of her dog's registration along with a copy of a letter from her doctor to the Association's Office. (Id. ¶5.) Plaintiff's physician, a licensed psychologist, wrote that he was treating Plaintiff and that she was diagnosed with Anxiety Disorder, citing the DSM-IV. (Id.) The psychologist further wrote that pursuant to the Fair Housing Act ("FHA"), Plaintiff is qualified to keep her emotional support animal, dog or other, to alleviate her symptoms and that such emotional support animal was necessary. (Id.¶2)

At the time Plaintiff submitted her documents to Louanne Schechter, the Association had no written policy in place for processing a request for reasonable accommodation, although it had a NO DOG RULE in place for at least fifteen (15) years. (Id ¶3.) Though the Association's By-Laws did not prohibit dogs, the Rules and Regulations of the Board prohibited dogs on the premises. (Id. ¶3.) No exceptions were written into the rules for emotional and/or service animals, although the FHA and the ADA require that waivers/exemptions be granted to persons who have demonstrated the need for such animals, notwithstanding the Association or Board rules against having animals on the premises. (*Id.*)

Joint Appendix Vol. II Page 1956

Judith Kromenhoek v. Cowpet Bay West Condominium Ass'n. Civil No. 12/00025
Plaintiff's Opposition to Defendant Lance Talkington's Motion for Summary Judgment Page 3

Schechter placed the documents in Plaintiff's file and discussed Plaintiff's application with Jon Cassady, Schechter's immediate supervisor. (Id. ¶7.) Cassady in turn discussed the application with Max Harcourt, the then President of the Board. (Id. ¶9.) Harcourt subsequently came to the Association's Office to review Walters' application. (Id. ¶10.) Harcourt also sent Robert Canefield, a member of the Board to review the file. (Id. ¶11.)

While Plaintiff's application was pending before the Board, several Owners, including members of the Board, began blogging on the Cowpet Bay West Blog (hereinafter "Blog") about the presence of dogs at Cowpet Bay West and their objections to dogs on the premises. (Id. ¶11).The prevailing sentiment shared by members of the Association, including Talkington, and members of the Board was that Plaintiff was not deserving of a waiver because there were no physical manifestation of her disability. (Id.)

Detailed information about the Board's position and Plaintiff's application, however, was posted on the Blog, leaked to Talkington by certain members of the Board, including Harcourt. (Id.) Members of the Association and even some Board members blogged vehemently against granting the waiver to allow Plaintiff to keep the emotional support dog on the premises on the basis that Plaintiff had not met the requirement of a service animal as defined by the ADA. (Id.) Stoked by Talkington, some members of the Association and certain members of the Board began posting, almost daily, hateful and defamatory blog entries about Plaintiff on the Blog. (Id.)

Talkington, although not a member of the Board, became significantly involved in the process. Talkington wrote to Harcourt stating that the "Blog" would like to know whether he intended to enforce the no dogs rule. (Id.) Talkington at times appears to be writing on behalf of the "Blog." (Id.) Moreover, Talkington blogged several entries in which he either personally attacked Plaintiff's person and her character or instigated additional attacks against Plaintiff. (Id.) For instance, Talkington blogged that Plaintiff has a dog and claims to have papers that allow her to have it but refused to discuss her medical condition with the "Blog." (Id, ¶11.)

Talkington completely disregarded the requirements of the FHA, which Plaintiff had drawn

Joint Appendix Vol. II Page 1957

Judith Kromenhoek v. Cowpet Bay West Condominium Ass'n. Civil No. 12/00025
Plaintiff's Opposition to Defendant Lance Talkington's Motion for Summary Judgment Page 4

to his attention previously and continued to insist on the "Blog" that Plaintiff's dog needed to meet the requirement of a service animal. (Id.) He blogged that the ADA is the sole source of legitimacy. (Id). In addition, Talkington suggested to the Board that Plaintiff should be assessed a fine. (Id) He blogged that Plaintiff was an idiot for filing the HUD complaint. (Id.). He also accused Plaintiff of being a freeloader "relying on the government for free help." ***(Id.)*** He also called Plaintiff a "playground bully" and accused her of making a mockery of "our board." ***(Id.)***

Talkington blogged on more than one occasion that Plaintiff should be punished for having an emotional support dog on the premises. (Id) Talkington also posted Plaintiff's personal and private documents on the "Blog" including a letter from Harcourt falsely accusing Plaintiff of violating the NO DOGS RULE. (Id) Because the Owners, led by Talkington, were opposed to granting a waiver for anything other than for an ADA service dog, the Board denied Plaintiff's waiver in 2011. (Id.)

## III. GENUINE ISSUE OF MATERIAL FACTS EXIST, PRECLUDING SUMMARY JUDGMENT

### A. Summary Judgment Standard

The party seeking summary judgment must show that there is no genuine issue as to any material fact and that it is entitled to judgment as a matter of law. *See* Fed. R. Civ. P. 56; *Celotex Corp. v. Catrett*, 477 U.S. 317 (1986); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242 (1986). The burden on the *non*-moving party is not a heavy one; that party is simply required to show specific facts, as opposed to general allegations, that present a genuine issue worthy of trial. *Hanley v. Jones*, 21 V.I. 190, 1984 V.I. LEXIS 27 (1984). The burden on the moving party is to establish the basis for its motion. *Donovan v. Harrah's Md. Heights Corp.*, 29 F.3d 527, 529 (8th cir. 2002). The court must inquire whether, on the summary judgment record, "reasonable jurors could find facts that demonstrated, by a preponderance of the evidence that the non-moving party is entitled to a verdict." *In re Paoli R.R. Yard PCL Litig.*, 916 F.2d 829, 860 (3d Cir. 1990). In determining whether there are genuine issues of material fact, the court must draw all reasonable inferences in favor of the

Joint Appendix Vol. II Page 1958

Case: 3:12-cv-00025-CVG-RM Document #: 203 Filed: 05/21/14 Page 5 of 15

Judith Kromenhoek v. Cowpet Bay West Condominium Ass'n. Civil No. 12/00025
Plaintiff's Opposition to Defendant Lance Talkington's Motion for Summary Judgment Page 5

nonmoving party, and it may not make credibility determinations or weigh the evidence. *See Reeves v. Sanderson Plumbing Products, Inc.*, 530 U.S. 133 (2000) (emphasis added).

A fact is "material" if it might affect the outcome of the case, and a factual dispute is "genuine" if the evidence is such that a reasonable jury could return a verdict for the nonmoving party. *Anderson*, 477 U.S. at 248. When the unresolved issues in case are primarily legal rather than factual, summary judgment is particularly appropriate. *Mansker v. TMG Life Ins. Co.*, 54 F.3d 1322, 1326 (8th Cir. 1995).

Talkington has failed to meet his burden to establish the absence of any genuine issue of material fact, and therefore summary judgment must be denied.

**B. Talkington Violated the Fair Housing Act.**

The United States Supreme Court has held that discrimination covered by the FHA includes "a refusal to make reasonable accommodations in rules, policies, practices, or services, when such accommodations may be necessary to afford handicapped persons equal opportunity to use and enjoy a dwelling." *City of Edmonds v. Oxford House, Inc.*, 514 U.S. 725, 729-30, (1995). To prevail on a 42 U.S.C. § 3604(f)(3)(B) claim, a plaintiff must establish that (1) she is disabled within the meaning of the FHA; (2) she requested reasonable accommodation; (3) Defendants knew or should have known about the disability; (4) such accommodation was necessary to afford her an opportunity to use and enjoy the dwelling; and (5) Defendants refused to make the requested accommodation. *Hawn v. Shoreline Towers Phase I Condominium Assn, Inc.*, 347 Fed. App'x 464, 467 (11th Cir. 2009).

Plaintiff submitted her reasonable accommodation application in July of 2011. (CSOF, ¶5.) Included in it was a letter from her doctor explaining that she suffered from anxiety disorder, that she had severe limitations on her ability to cope with day-to-day stress, and that he had prescribed an emotional support animal in order to alleviate the symptoms of her condition. (Id. ¶2). The application was submitted to Louanne Schechter, the Cowpet Bay West office manager. (Id. ¶7).

Joint Appendix Vol. II Page 1959

Case: 14-4776 Document: 003112129995 #: 203 Page: 396 Filed: 05/21/14 Page 6 of 10

Judith Kromenhoek v. Cowpet Bay West Condominium Ass'n. Civil No. 12/00025
Plaintiff's Opposition to Defendant Lance Talkington's Motion for Summary Judgment Page 6

Moreover, Plaintiff subsequently requested a reasonable accommodation in her letter of January 12, 2012 to Harcourt. (Id. ¶8).

Clearly, the Board was aware that Plaintiff requested a reasonable accommodation, as at least two Board members reviewed the application before March 2012. (Id. ¶9-10.) Further, Doug Rebak, a member of the Board publicly rejected the necessity to hold closed meetings to discuss Plaintiff's pending application in a November 12, 2011 blog post. (Id ¶8.) What is more, Harcourt, the then President of the Board, acknowledged that Plaintiff had "papers for service dogs pending in the office as early as October of 2011." (Id. ¶8.) Lastly, Robert Cockayne, a Board member distributed copies of Plaintiff's dog's certification to fellow Board members and non-Board members. (Id. ¶8) Thus, the Board's knowledge of Plaintiff's application was never at issue.

Further, Talkington's argument that Plaintiff's claim fails because she was not denied the company of her dog "Oliver" is not supported by any legal authority except a self-serving affidavit from Talkington. Discrimination under the FHA includes delays in issuing waivers that are caused in part by discriminatory intent, even if the waivers are ultimately granted. *Carmona-Rivera v. Puerto Rico*, 464 F.3d 14 (1st Cir. 2006).

Additionally, the types of discriminatory actions prohibited under the FHA are wide-ranging. *United States v. Bankert,* 186 F. Supp. 2d 623, 628 (E.D. N.C. 2000). Section 3604 prohibits all forms of discrimination, sophisticated as well as simpleminded, and tactics of delay, hindrance, and special treatment must receive short shrift from the courts. *Williams v. Matthews Co.*, 499 F.2d 819, 826(8th Cir. 1974); *see also United States v. Hughes Memorial Home*, 396 F. Supp. 544, 549 (W.D. Va. 1975) (internal citations and quotations omitted) (The FHA's catch-all phraseology may not be easily discounted or de-emphasized. Indeed, it appears to be as broad as Congress could have made it.). "The imposition of more burdensome application procedures, and or delaying tactics. . .constitutes a violation of" the FHA." *United States v. Yuouritan Const. Co.*, 370 F. Supp. 643, 648 (N.D. Cal. 1973); *see also United States v. City of Jackson*, 318 F. Supp. 2d 395, 417-18 (S.D. Miss. 2002) (finding that a delay, combined with defendants' statements evincing discriminatory intent,

Joint Appendix Vol. II Page 1960

Judith Kromenhoek v. Cowpet Bay West Condominium Ass'n. Civil No. 12/00025
Plaintiff's Opposition to Defendant Lance Talkington's Motion for Summary Judgment Page 7

could violate the FHA); *Bankert*, 186 F. Supp. 2d at 628 (noting that delay tactics may be a violation of the FHA; Robet G. Shwemm, Hous. Discrim. Law & Ligig. (2008) 98 § 13.4 ("[D]elaying tactics and burdensome application procedures used to limit. . . access to housing are clearly covered by the phrase. . .'otherwise make unavailable or deny.'"). Thus, the case law is clear that denial of an accommodation can be both actual or constructive. *United States v. Haileah Housing Auth.*, 418 Fed. App'x 872, 878 (11th Cir. 2011). Therefore, it is of no moment that Plaintiff was allowed to keep "Oliver" while her application for a reasonable accommodation languished before the Board.

In voicing his plan, that he should not be held responsible because the Board never expressly denied Plaintiff a reasonable accommodation, Talkington relied on *Dubois v. Association of Apartment Owners of 297 Kalakaua*, 453 F.3d. 1175 (9th Cir. 2006). Unlike in this case, the Association in *Dubois* granted a temporary exemption pending an inquiry into the accommodation request. *Dubois*, 453 F.3d at 1178. That exemption—a reasonable accommodation was in place for the perceived medical necessity—was in place when the administrative claim was instituted, and the Association "thus never refused to make the requested accommodation." *Id.* at 1179. That is a far cry from the instant case, in which the Board never granted Plaintiff permission to keep Oliver on the premises after she filed her application in July of 2011. In fact, when Plaintiff insisted on keeping Oliver on the premises, she received violation notices and fines were levied against her. *Dubois*, is therefore, readily distinguishable.

The FHA provides that "it shall be unlawful to coerce, intimidate, threaten, or interfere with any person in the exercise or enjoyment of, or on account of his having exercised or enjoyed, or on account of his having aided or encouraged any other person in the exercise or enjoyment of, any right granted or protected by Sections 3603, 3604, 3605, or 3606 of this title." 42 U.S.C. § 3617

To establish a prima facie case of retaliation under the FHA, Plaintiff must establish: (1) "that Plaintiff was engaged in activity protected by the Act; (2) that Defendants took adverse action against Plaintiff; and (3) that there is a casual connection between Plaintiff's protected activity and her injury." *Bloch v. Frischholz*, 587 F.3d 771, 783 (7th Cir. 2009).

Joint Appendix Vol. II Page 1961

Judith Kromenhoek v. Cowpet Bay West Condominium Ass'n. Civil No. 12/00025
Plaintiff's Opposition to Defendant Lance Talkington's Motion for Summary Judgment Page 8

A protected activity includes "opposition to any act or practice made unlawful by this chapter or because such individual made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under this chapter." 42 U.S.C. §12203(a).

Here, Plaintiff engaged in two protected activities and Talkington do not dispute that there were protected activities. Requesting reasonable accommodation constitutes a protected activity. *See Regional Economic Community Action Program, Inc. v. City of Middletown*, 294 F.3d 35 (2d Cir. 2002). Filing an administrative complaint also constitutes a protected activity. *Miller v. Bd of Managers of Whispering Pines at Colonial Woods Condo*, II, 457 F.Supp.2d 126, 131 (E.D.N.Y. 2006). (A protected activity under the FHA "includes an action taken to protest or oppose statutorily prohibited discrimination.").

Courts have broadly applied "interference" "to reach all practices which have the effect of interfering with the exercise of rights under the federal fair housing laws." *United States v. Hayward*, 36 F.3d 832, 835 (9th Cir. 1994). Talkington's argument that his blog postings were harmless is inconsistent with both the facts and the law.

The substantive issue before this Court is whether Talkington's blog postings amounts to 'threatening, intimidating or interfering" within the meaning of the statute and the regulation. The Department of Housing and Urban Development ("HUD") adopted regulations for the FHA[1]. Under HUD's regulations, section 3617 is an independent cause of action. 24 C.F.R. § 100.400. Crucially, the Courts have adopted the HUD regulations and found that it is not necessary to establish an underlying claim of discrimination to prevail on a retaliation claim. *Halprin v. Prairie Single Family Homes of Dearborn Park Ass'n*, 388 F.3d 327, (7th Cir. 2004) ("The regulation cuts section 3617 loose from section 3604."); *Gonzalez v. Lee County Housing Authority*, 161 F.3d 1290, 1304-05 and n.43(11th Cir. 1998); *Reyes v. Fairfield Properties*, 661 F.Supp. 2d 249, 265, n.6( E.D.N.Y. 2009); *see also United States v. Pospisil*, 127 F.Supp.2d 1059, 1063 (W.D.Mo. 2000)(finding that section

---

[1] Because the Third Circuit has not ruled on whether the HUD regulations establish a separate cause of action for Section 3617, Plaintiff urges the Court to apply Chevron deference and defer to the HUD regulations as a permissible construction of the statute.

Joint Appendix Vol. II Page 1962

Judith Kromenhoek v. Cowpet Bay West Condominium Ass'n. Civil No. 12/00025
Plaintiff's Opposition to Defendant Lance Talkington's Motion for Summary Judgment Page 9

3617 is not solely "limited to violations of sections 3603, 3604, 3605 or 3606."). Thus, contrary to Talkington's argument, Plaintiff does not have to establish violation of section 3604 in order to prevail on her section 3617 claim.

Among the types of conduct identified as unlawful, and the one most relevant to the problem of neighbor harassment is, "[t]hreatening, intimidating or interfering with persons in their enjoyment of a dwelling." 24 C.F.R. § 100.400. Significantly, §3617 does not require a showing of force or violence for coercion, interference, intimidation, or threats to give rise to liability. *Walker v. City of Lakewood*, 272 F.3d 1114, 1128 (9th Cir. 2001).

Talkington maintains that his blog postings are insufficient to create liability under section 3617 of the FHA. The lines between permissible and impermissible conduct, however, are not so easily drawn. *See People Helpers, Inc. v. City of Richmond*, 789 F.Supp. 725, 733 n.5 (E.D.Va. 1992). Neither the cases nor the legislative history of §3617 attempt to define the minimum level of interference, intimidation or coercion necessary to violate the statute. *Id.*

In discussing the scope of §3617, the Seventh Circuit noted that a clear act of inciting violence such as cross-burning outside someone's home, is but one example of intimidation. *Halprin*, 388 F.3d 3at 330. Further, the Court noted, "[t]here are other, less violent but still effective, methods by which a person can be driven from his home and thus 'interfered' with in his enjoyment of it." *Id.* It is sufficient to state that interference under the statute can encompass a "pattern of harassment, invidiously motivated." *Id.*

To be sure, a quarrel among neighbors should not be elevated into an FHA violation. *Id* at 332. Where, as here, there is "a pattern of harassment, invidiously motivated," a claim for violation of the FHA has been adequately pled. *Id; see also King v. Metcalf 56 Homes Ass'n, Inc.*, 385 F. Supp. 2d 1137, 1144 (D. Kan. 2005) (holding on a summary judgment motion, that a neighbor's persistent complaints represented a "severe and pervasive pattern of harassing plaintiff that was designed to interfere with plaintiff's enjoyment of her dwelling.').

Joint Appendix Vol. II Page 1963

Plaintiff agrees with Talkington that section 3617 does not require neighbors to say hello or hold the door for each other. However, section 3617 prohibits a third party from interfering with an individual's exercise of her right to be free from discriminatory housing practices. ***Schroeder***, 879 F.Supp. at 177, which is exactly what Talkington did. While Talkington did not have jurisdiction over the decisions made by the Board, several of the actions taken by Talkington, including his numerous blog entries adversely impacted Plaintiff and the enjoyment of her dwelling. Thanks to Talkington, members of the Association and others learned that Plaintiff was cited by the Board for violation of the no dogs rule. Again, thanks to Talkington, members of the Association and others learned that "Oliver's dog certification came from an "outfit" a "puppy mill and was therefore not credible." The tenor of Talkington's blog postings; the context in which they were written; and the numerosity of blog postings represented a "severe and pervasive pattern of harassing that was designed to interfere with plaintiff's enjoyment of her home."

## C. Talkington is Liable Under the Communications Decency Act.

Talkington also contends that the federal Communications Decency Act (hereinafter "CDA") immunizes him from any claims based on the "publication" of materials authored by other persons on the blog." Contrary to Talkington's assertions, however, the CDA's protections have limits.

Under the CDA, a defendant is immune from liability if: (1) it is a "provider or user of an interactive computer service"; (2) the complaint seeks to hold the defendant liable as a "publisher or speaker"; and (3) the action is based on "information provided by another information content provider." *Federal Trade Comm v. Accusearch Inc.*, 570 F.3d 1187, 1196 (10th Cir. 2009). The statute defines an "information content provider" as "any person or entity that is responsible, in whole or in part, for the creation or development of information provided through the Internet or any other interactive computer service." 47 U.S.C. § 230(f)(3); *see also, Universal Communication Sys., Inc. v Lycos, Inc*, 478 F.3d 413, 418 (1st Cir. 2007).

Judith Kromenhoek v. Cowpet Bay West Condominium Ass'n. Civil No. 12/00025
Plaintiff's Opposition to Defendant Lance Talkington's Motion for Summary Judgment Page 11

Service providers are only entitled to immunity, however, where the content at issue is provided by "another information content provider." *See Batzel v. Smith*, 333 F.3d 1018, 1031 (9th Cir. 2003). If a defendant service provider is himself the content provider, he is not shielded from liability. *See Nemet Chevrolet, Ltd. v. Cosumeraffairs.com, Inc.*, 591 F.3d 250, 254 (4th Cir. 2009) (emphasis added).

A website operator can be both a service provider and a content provider. If he passively displays content that is created entirely by third parties, then he is only a service provider with respect to the content. As to content that he creates himself or is responsible, in whole or in part for creating or developing, the website is also a content provider. To that end, the website may be immune from liability for some of the content it displays to the public but be subject to liability for other content. *Anthony v. Yahoo! Inc.*, 421 F.Supp.2d 1257, 1262-63 (N.D. Cal. 2006).

There is no question that Talkington blogged continuously about Plaintiff's application for a reasonable accommodation. (CSOF ¶8). Talkington acted as "content provider" in that he blogged or provided the content of the blog. Indeed, Talkington conceded in his moving papers that he acted as a content provider.

As the owner or operator of the "Blog," Talkington serves as a website operator pursuant to the CDA. A website operator is not liable where he posts or links to a third party's content. *Atlantic Recording Corp, v. Project Playlist, Inc.*, 603 F.Supp.2d 690, 700 (S.D. N.Y. 2009). However, as the operator of the Blog, Talkington entered his own blog entries. (Id). Through those blog entries, Talkington solicited and encouraged other owners, members of the Association, to obstruct the granting of the reasonable accommodation or raised procedural hurdles. (CSOF ¶8)

Moreover, it is well established that "a website helps to develop unlawful content, and thus falls within the exception to the CDA, if it contributes materially to the alleged illegality of the conduct." *Fair Hous. Council of San Fernando Valley v. Room-mates.Com, LLC*, 521 F.3d 1157, 1168 (9th Cir. 2008). At some point, active involvement in the creation of unlawful Internet posting exposes a defendant to liability as an original source. *Barrett v. Rosenthal*, 146 P.3d 510, (2006);

Joint Appendix Vol. II Page 1965

Judith Kromenhoek v. Cowpet Bay West Condominium Ass'n. Civil No. 12/00025
Plaintiff's Opposition to Defendant Lance Talkington's Motion for Summary Judgment Page 12

*see also, MCW, Inc. v. BadBusinessBureau.com, LLC*, No. Civ. A. 3:02-CV-2727-G (N.D. Tex. Apr. 19, 2004) (finding defendants were information content providers because they were "responsible, in whole or in part, for the creation or development" of messages by actively encouraging a consumer to gather specific detailed information). Talkington encouraged and was involved in the creation of unlawful internet posting. (CSOF ¶8)

In addition, the party responsible for putting information online may be subject to liability, even if the information originated with a user. *Bartzel*, 333 F.3d at 1033. If the service provider publishes material that he does not believe was tendered to him for posting online, then he is the one making the affirmative decision to publish; and so, he contributes materially to its unlawful dissemination. He is thus properly deemed a content developer and not entitled to CDA immunity. ***Id.***

Harcourt improperly provided Talkington with a copy of a letter, in which he falsely accused Plaintiff of violating the no dogs rule. (CSOF, ¶11) Talkington intentionally posted the letter on the "Blog." Examining the facts in the light most favorable to Plaintiff, the Court need only ask whether a reasonable jury could find that Talkington is a content developer. *Graehling v. Village of Lombard, III*, 58 F.3d 295, 297 (7th Cir. 1995).

**C. Talkington is Liable for Civil Conspiracy**

"A civil conspiracy consists of an agreement or combination to perform a wrongful act that results in damage to the Plaintiff. A conspiracy may also consist of an agreement to do a lawful act by unlawful means." ***Shomo v. Mugar Enters., Inc.***, Civil No. 2007-154, 2009 U.S. Dist. LEXIS 89198, at *14 (D.V.I. 2009, Sept. 28, 2009). Although allegations of a conspiracy must provide some factual basis to support the existence of the elements of a conspiracy, agreement and concerted action, a conspiracy can be proven by circumstantial evidence. ***United States v. Pressler,*** 256 F.3d 144, 149 (3d Cir. 2001).

"An express agreement among all conspirators is not a necessary element of civil conspiracy as long as the participants in the conspiracy share a general objective or the same motives for

Joint Appendix Vol. II Page 1966

Case: 3:12-cv-00025-CVG-RM Document #: 203 Filed: 05/21/14 Page 13 of 25

desiring the same conspiratorial result." ***Fisher v. Borough of Doylestown***, No.02-4007, 2003 U.S. Dist. LEXIS 23943, at *8 (E.D. Pa. Dec. 10, 2003). The [q]uestion of whether an agreement exists is for the jury to decide so long as there is a possibility that the jury can infer from the circumstances that the alleged conspirators had a meeting of the minds and thus reached an understanding to achieve the conspiracy's objectives. ***Id.***

Talkington, working in tandem with Harcourt and Felice, organized a campaign to discredit Plaintiff's application for a reasonable application. Proof that Talkington was in cahoots with Harcourt and other members of the Board can be found in Talkington's own blog entry entry that the Board informed him that Plaintiff refused to present any proof of her disability that warrants a service animal. (CSOF ¶8) Additionally, Harcourt emailed Talkington a copy of the Board's letter and Talkington subsequently posted it on the blog. (Id) This letter not only incited more hateful comments from some members of the Association but garnered a call to levy a fine against Plaintiff. (Id.) Harcourt and other Board members copied Talkington on Board actions. (CSOF ¶8) These actions became the topic for Talkington blog postings, which always attacked Plaintiff and her application for a reasonable accommodation.

Accordingly, it is reasonable to infer from these actions that Talkington, the Board, and some members of the Association decided to defeat Plaintiff's reasonable application by ginning up opposition on the internet.

**D. <u>Talkington is Liable for Intentional Infliction of Emotional Distress</u>.**

This Court has adopted the standard for intentional infliction of emotional distress set forth in Section 46(1) of the Restatement (Second) Torts: "One who by extreme and outrageous conduct intentionally or recklessly causes severe emotional distress to another is subject to liability." *Desir v. Hovensa, L.L.C.*, CIVIL 2007/97, 2012 WL 762122 (D.V.I. Mar. 7, 2012). Recovery for intentional infliction of emotional distress "is limited to situations where 'the conduct has been so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious and utterly intolerable in a civilized society.' " *Id.* (quoting

Judith Kromenhoek v. Cowpet Bay West Condominium Ass'n. Civil No. 12/00025
Plaintiff's Opposition to Defendant Lance Talkington's Motion for Summary Judgment Page 14

Restatement (Second) Torts § 46, cmt. d); *see also Petersen v. First Fed. Sav. & loan ass'n of P.R. Inc.*, 617 F.Supp. 1039, 1042 ("The plaintiff must make a showing that defendant's conduct was so outrageous that no reasonable person in a civilized society should be expected to endure it.").

Substantively, the Court is to consider whether Talkington's conduct was so outrageous that no reasonable person in a civilized society should be expected to endure it. "Where reasonable persons may differ, it is for the jury to determine whether the conduct is sufficiently extreme and outrageous so as to result in liability." *Motheral v. Burkhart,* 400 Pa.Super. 408, 583 A.2d 1180, 1188 (1990). Such emotional damages are available "for distress which exceeds the normal transient and trivial aggravation attendant to securing suitable housing." *Morgan v. Sec'y of Hous. & Urban Dev.,* 985 F.2d 1451, 1459 (10th Cir.1993).

Talkington became involved in the Board's decision to deny Plaintiff the reasonable accommodation requests, despite the fact that Talkington was not supposed to be involved in the reasonable accommodation process. Talkington was not a Board member. Yet, he became the poster child for "organized opposition" against Plaintiff's application for a reasonable request.

In his first blog post on September 27, 2011, Talkington stated "at least three owners. . . have been seen with dogs that are either living in condos or are being entertained by an owner walking them on the property." (CSOF ¶8). In an effort to villianize Plaintiff by making his perceived violation of the rules by Plaintiff to be more flagrant, Talkington pointed out that the dog owner is a past member of the Board. (Id). Talkington went on to accuse Plaintiff of being CB Lawton citing as evidence, Plaintiff's refusal to respond to questions about her health reason for needing an emotional support dog (Id.) Talkington demands that Plaintiff either put up or slide into the sunset. (Id). In an effort to further discredit Plaintiff, Talkington put on his blog post entitled "Puppy Dog Diplomas," which in essence attacked Plaintiff claims of qualifications of her emotional support animal and the credibility of the certification. Further, he refers to the Plaintiff's certifying agency as "an outfit" to further discredit her claim that Oliver is an emotional support animal. (Id). He concludes his post by sharing his "considered opinion" that such "outfits serve no legitimate purpose and exist mainly to

Joint Appendix Vol. II Page 1968

Judith Kromenhoek v. Cowpet Bay West Condominium Ass'n. Civil No. 12/00025
Plaintiff's Opposition to Defendant Lance Talkington's Motion for Summary Judgment Page 15

sidestep what the ADA works diligently to accomplish" and putting forth a call " to stop the doggy diploma silliness and adopt clear ground rules for dogs at Cowpet " stating that the "ADA is the sole source of legitimacy" for such rules. (Id)

By fiat, Talkington invalidated Plaintiff's application and further agitated some members of the Association to become even more bellicose towards Plaintiff. As a result, Plaintiff became even more anguished and felt uncomfortable in her own home. (CSOF ¶14). Plaintiff expressed her anxiety and emotional anguished over Talkington and other's behavior toward her to her therapist. (Id.) Generally, conduct would be found to be actionable where the recitation of the facts to an average member of the community would arouse his resentment against the actor, and lead him to exclaim, "Outrageous!" Restatement (2nd) of Torts §46. Certainly, Talkington's action may be considered outrageous by a reasonable jury. And, Defendant posting of Plaintiff's private and confidential documents, taken alone or considered together as part of a course of conduct, are sufficiently outrageous to state a claim for intentional infliction of emotional distress.

Further, Talkington's conduct in posting a letter from the Board on the internet which accused Plaintiff of violating the no dogs rule further humiliated Plaintiff, a former president of the Board, as she was seen as a law breaker. Emotional harm has been generally classified as "humiliation, embarrassment, emotional distress, and other such intangible harms to plaintiff's personality." *Krueger v. Cuomo*, 115 F.3d 487, 492 (7th Cir.1997). "The more inherently degrading or humiliating the defendant's action is, the more reasonable it is to infer that a person would suffer humiliation or distress from that action; consequently, somewhat more conclusory evidence of emotional distress will be acceptable to support an award for emotional damages. "*Id.* The distress that Plaintiff felt "exceeds the normal transient and trivial aggravation attendant to securing suitable housing."

**E. Talkington is Liable for Invasion of Privacy.**

Plaintiff alleges that Talkington disclosed private information concerning Plaintiff when he openly discussed Plaintiff's private and personal information on the "Blog." Talkington also

Joint Appendix Vol. II Page 1969

published Harcourt's letter falsely accusing Plaintiff of violating the no dogs rule and failing to make requests for reasonable accommodation on the "Blog." Talkington contends that Plaintiff failed to assert specific facts regarding how the Defendants invaded her privacy, cast her in a false light, or intruded on her privacy.

Invasion of privacy is actionable where there is: (1) unreasonable intrusion upon the seclusion of another; (2) appropriation of another's name or likeness; (3) unreasonable publicity given to another's private life; or (4) publicity that places another in a false light before the public. Restatement (Second) of Torts § 652A (1976). The primary element Plaintiff must establish to prove her invasion of privacy count is "publicity" of private facts about the Plaintiff individually and specifically. ***Bussue v. Paradise Motors, Inc.***, 1994 WL 223046 (D.V.I. 1994).

Here, the letter that was posted on the "Blog" identified Plaintiff and published private facts about Plaintiff individually and specifically. Moreover, both the letter and the dog's certification were published on the "Blog." The letter and dog certification identified Plaintiff individually and specifically. In addition, Talkington blogged about Plaintiff's medical condition and discussed extensively Plaintiff's dog certification and the quality of the dog certification company. Talkington even identified the name of the company in his blog entry and directed his audience to the company's website. ***See Harris v. Easton Pub. Co.***, 483 A.2d 1377, 1384 (1994).

Talkington advances that Plaintiff's "request for an exception to the no dogs rule was not a private, confidential matter." While Plaintiff agrees that the fact that she submitted a request for a reasonable accommodation is not a private, confidential matter, Plaintiff vehemently disagrees that the content of her application, which includes her medical records, is not private and confidential.

To state a cause of action under Virgin Islands law, Plaintiff must plead that there was an intentional intrusion on the seclusion of her private concerns that was highly offensive to a reasonable person. *See* Restatement (Second) of Torts §652(B). Talkington posted personal and private information about her on the "Blog." (Id.) The elements for a claim for public disclosure of private facts include: (a) publicity to a matter concerning the private life of another; (b) that would

Judith Kromenhoek v. Cowpet Bay West Condominium Ass'n. Civil No. 12/00025
Plaintiff's Opposition to Defendant Lance Talkington's Motion for Summary Judgment Page 17

be highly offensive to a reasonable person; and (c) is not of legitimate concern to the public. Restatement (Second) of Torts § 652(D). Plaintiff asserts that Talkington disclosed private and personal information about Plaintiff on the blog. Information about Plaintiff's dog's certification is not of legitimate concern to the public nor is her medical condition.

Plaintiff also states a claim for false light. The allegations contained in Harcourt's letter were false. Talkington's posting of the letter on the internet painted Plaintiff in a false light, because members of the Association, and even some members of the Board perceived Plaintiff as a rule violator and treated her as one. Further, Talkington himself accused Plaintiff of not submitting an application for a reasonable accommodation, not being disabled, being a freeloaded, and being a liar. Talkington's blog entries posted Plaintiff in a false light.

**WHEREFORE**, for the foregoing reasons, the Plaintiff, respectfully requests that this Court DENIES Talkington's summary judgment motion.

Respectfully submitted,
**LAW OFFICES OF KARIN A. BENTZ, P.C.**

Dated: May 21, 2014

/s/ Karin A. Bentz

**KARIN A. BENTZ, ESQ. (V.I. Bar No. 413)**
**JULITA K. de LEÓN, ESQ. (V.I. Bar No. 913)**
5332 Raadets Gade, Suite 3
St. Thomas, Virgin Islands 00802-5309
Telephone: 340-774-2669
Telecopier: 340-774-2665
Email: kbentz@virginalaw.com

Joint Appendix Vol. II Page 1971

Judith Kromenhoek v. Cowpet Bay West Condominium Ass'n. Civil No. 12/00025
Plaintiff's Opposition to Defendant Lance Talkington's Motion for Summary Judgment Page 18

**CERTIFICATE OF SERVICE**

I hereby certify that I caused the filing and service of the foregoing with the Clerk of the District Court of the Virgin Islands using the CM/ECF system, which will provide electronic notice by email to the following.

Richard P. Farrelly, Esq.
Birch de Jongh & Hindels, PLLC
1330 Taarneberg
St. Thomas, VI 00802
E-mail: rfarrelly@bdhlawvi.com

John H. Benham, III, Esq.
Benham & Chan
P.O. Box 11720
St. Thomas, Virgin Islands 00801
Tel: 340-774-0673
Fax: 340-776-3630
email: benham@bclawvi.com

Joseph G. Riopelle, Esq.
Boyd Richards Parker & Colonnelli, P.L.
Rivergate Tower Suite 1150
400 N. Ashley Drive
Tampa, Fl. 33602
jriopelle@boydlawgroup.com

Ryan S. Meade, Esq.
Quintairos, Prieto, Wood & Boyce, P.A.
9300 South Dadeland Blvd., 4th Floor
Miami, Fl 33156
rmeade@gpwblaw.com

Joint Appendix Vol. II Page 1972

Case 3:12-cv-00025-CVG-RM Document #: 205 Filed: 05/21/14 Page 1 of 20

IN THE UNITED STATES DISTRICT COURT OF THE VIRGIN ISLANDS
DISTRICT OF ST. THOMAS AND ST. JOHN
****************

| | |
|---|---|
| BARBARA WALTERS,<br><br>Plaintiff,<br><br>v.<br><br>COWPET BAY WEST CONDOMINIUM ASSOCIATION; THE BOARD OF THE COWPET BAY WEST CONDOMINIUM ASSOCIATION; MAX HARCOURT, in his personal capacity; ALFRED FELICE; LANCE TALKINGTON; ROBERT COCKAYNE; VINCENT VERDIRAMO,<br><br>Defendants. | CIVIL NO. 12-00024<br><br>Action for: Housing Discrimination; Discrimination Based on Disability; Invasion of Privacy; Negligent Infliction of Emotional Distress Infliction of Emotional Distress; Punitive Damages; and Injunctive and Declaratory Judgment<br><br>JURY TRIAL DEMAND |

**PLAINTIFF'S RESPONSE TO DEFENDANT'S LANCE TALKINGTON UNDISPUTED MATERIAL FACTS AND PLAINTIFF'S COUNTER-STATEMENTS OF FACTS**

**COMES NOW** the Plaintiff, **BARBARA WALTERS** ("Plaintiff") and by and through the undersigned counsel, the **LAW OFFICES OF KARIN A. BENTZ, P.C.** (Karin A. Bentz, Esq., and Julita K. de León, Esq.) and submits her brief response to Defendant Lance Talkington's ("Talkington") statement of undisputed facts in support of their summary judgment motion, pursuant to Rule 56.1 of the Local Rules of Civil Procedure.

Rule 56. 1 permits a party opposing a summary judgment motion to submit, inter alia, a "concise statement of any additional facts that the respondent contends are material to the motion for summary judgment and as to which the respondent contends there exists a genuine issue to be tried." For ease of reference, Plaintiff has referenced the corresponding paragraphs of Defendants' statement of undisputed facts as ("SOF") where appropriate. Additionally, Plaintiff has also referenced Plaintiff's Counter Statement of Facts ("CSOF") where appropriate.

I. Plaintiff's Response to Talkington's Undisputed Material Facts.

1. Agrees

2. Agrees

*Barbara Walters v. Cowpet Bay West Condominium Ass'n.* Civil No. 12/00024
Plaintiff's Response to Defendant Lance Talkington's Undisputed Material Facts
and Plaintiff's Counter-Statement of Facts Page 2

3. Agrees.

4. Agrees.

5. Agrees.

6. Agrees.

7. Agrees.

8. Agrees.

9. Disagrees.

10. Agrees.

11. Agrees.

12. Disagrees.

13. Disagrees.

14. Agrees.

**II. Plaintiff's Counter Statement of Facts**

1. Plaintiff Judith Kromenhoek owns and resides at a condo at Cowpet Bay West on the east side of St. Thomas. ( **Exhibit 1** ***Second Amended Compl. §1***).

2. A licensed psychologist wrote a letter stating that he was treating Plaintiff and that she was diagnosed with Anxiety Disorder, citing the DSM-IV. He further explained that Plaintiff had "severe limitations" in coping with stress and anxiety that most people would consider "normal day to day events." He went on to state that he has prescribed the use of an emotional support animal, dog or other, to alleviate her symptoms and that such emotional support animal was necessary. In conclusion, he states that pursuant to the Fair Housing Act, Plaintiff is qualified to keep her emotional support animal despite a policy prohibiting pets in her housing. On that same day, the National Service Animal Registry issued a certification that Plaintiff was allowed to keep her emotional support animal even if there is a policy prohibiting pets. (**Exhibit 2**. *Letter from Dr. Sheena Walker*).

Joint Appendix Vol. II Page 1974

*Barbara Walters v. Cowpet Bay West Condominium Ass'n.* Civil No. 12/00024
Plaintiff's Response to Defendant Lance Talkington's Undisputed Material Facts
and Plaintiff's Counter-Statement of Facts Page 3

3. In 2011, the By-laws of the Cowpet Bay West Condominium Association did not prohibit dogs. (**Exhibit 3. *Bylaws***).

4. The Rules and Regulations of the Board prohibited dogs on the premises. (**Exhibit 4. *Rules and Regulations***)

5. In July of 2011, Plaintiff submitted an application for a reasonable accommodation to keep Oliver, her emotional support dog on the premises. Because Cowpet Bay West did not have a formal application process, Plaintiff submitted a copy of a letter from her doctor and the dog's certification. (**Exhibit 2**)

6. At the time Plaintiff submitted her request for a reasonable accommodation, the Association had no written policy in place for processing a reasonable accommodation request, although it had a NO DOG RULE in place for at least fifteen (15) years. (**Exhibit 4**)

7. Louanne Schechter accepted the documents, placed them in Walters' file and discussed Walters' request with Jon Cassady, Louanne Schechter's immediate supervisor. (**Exhibit 2**)

8. Schechter filed and discussed Walter's application with Jon Cassady, Schechter's immediate supervisor. (Id.)

9. Jon Cassady discussed Walter's application with Max Harcourt; and Harcourt subsequently came to the Association's Office to review Walter's documents. (Id.)

10. Harcourt sent his representative, Bob Canefield, a member of the Board, to review the documents as well. (Id.)

11. There was widespread opposition to having dogs on the premises by members of the Board. (Id.) All of the blog posts related to the dog issues at Cowpet are attached as **Exhibit 5**.

12. In his first blog post relating to "dogs" on the premises, Talkington, on September 27, 2011, stated that " at least three owners. . . have been seen with dogs that are either living in condos or are being entertained by an owner walking them on the property." He goes on to point out that two of the dog owners are present and past Board members. Talkington called for the members of the Association to amend the Association's by-laws to "eliminate any confusion

Joint Appendix Vol. II Page 1975

Barbara Walters v. Cowpet Bay West Condominium Ass'n. Civil No. 12/00024
Plaintiff's Response to Defendant Lance Talkington's Undisputed Material Facts
and Plaintiff's Counter-Statement of Facts Page 4

over possible exceptions to the general rule" of no dogs. (Id)

13. In response to increasing attacks by both Talkington and Felice on the blog regarding the requests for a reasonable accommodation, Walters explained that they were not violating the law or the rules. Walters stated that she has a disability and is afforded protection under the FHA. (Id)

14. Harcourt and other members of the Board improperly shared the content of the Plaintiff's applications with Talkington. (Id.)

15. Susan Anderson, a Board member, wrote an email complaining that she saw Walters walking a dog and assumed that she was walking the dog for somebody else "because Judith Walters does not appear to be disabled." (Id.)

16. The prevailing attitude shared most of the Board members was that Kromenhoek and Walters were not disabled because there was no visible evidence of their disability. (Id.)

17. Notwithstanding the objections to providing Talkington with private and personal information, on October 28, 2011, Harcourt emailed a letter to Kromenhoek and Walters and copied Talkington. Harcourt wrote as President of the Board and falsely accused Kromenhoek and Walters of violating the NO DOGS RULE "because they have not applied for an exception to the no dog rule." Harcourt also acknowledged in that same letter that both Kromenhoek and Walters had "papers for service dogs pending in the office." Contradicting himself, Harcourt ordered Kromenhoek and Walters to apply and submit documentation for a waiver and threatened to levy a monetary fine if they did not take up his offer. (Id.)

18. Talkington posted the entire letter on the blog in his October 30, 2011 post. (Id)

19. Talkington continued his harassing campaign against Kromenhoek and Walters. In a December 5, 2011 post, Talkington shares a complaint of a Mr. Bartlett and the barking of a dog in his area of the community. Talkington goes on to point out that the "known violators" live in this same area. Talkington opined that "trained service dogs are

Joint Appendix Vol. II Page 1976

*Barbara Walters v. Cowpet Bay West Condominium Ass'n.* Civil No. 12/00024
Plaintiff's Response to Defendant Lance Talkington's Undisputed Material Facts
and Plaintiff's Counter-Statement of Facts Page 5

specifically trained to NOT bark unless the owner is in imminent danger." (Id)

20. During the January 11, 2012 Board meeting, Cockayne distributed information about service dog certification naming businesses that have no requirements for service dog certification. Cockayne also circulated copies of Kromenhoek's dog certification. (**Exhibit 6**).

21. In a January 15, 2012 blog entitled "Puppy Dog Diplomas," Talkington attacked the service dogs' certifications by stating they are "certified by an outfit called the National Service Animal Registry." Talkington concludes his blog post by sharing his "considered opinion" that such "outfits serve no legitimate purpose and exist mainly to sidestep what the ADA works diligently to accomplish" and putting forth a call "to stop the doggy diploma silliness and adopt clear ground rules for dogs at Cowpet." Talkington proclaims that the ADA is the sole source of legitimacy for such rules. (**Exhibit 5**).

22. On January 15, 2012, Donna LaScola voiced concern that the Association may be getting into legal trouble with all the blog posts and emails regarding Kromenhoek's and Walters' service animals. (**Exhibit 7**).

23. On January 17, 2012, ever dutiful to Talkington, Harcourt emailed Talkington informing him that the Board had received a letter from one of the owners stating the owner had filed a complaint. Therefore the Board was retaining counsel. (Exhibit 8).

24. On January 17, 2012, Kromenhoek and Walters received letters from the Board informing them that they were in violation of the no dogs rule and would be fined. (Exhibit )

25. Walters felt hurt and ashamed after reading the letter. (**Exhibit 9: Depo: Dr. Walker: 75: 16-24; 76: 1-25**).

26. In response to Kromenhoek's and Walters' HUD complaints, on March 25, 2012, Talkington blogged, Kromenhoek and Walters will "hang onto their puppies" at any length. In direct response to the HUD Complaint, Talkington says "Really ladies? Do you seriously believe that either of you two owners has any impact whatsoever on the Association's governance of this property in terms of your having those puppies? To call this a fiasco of a complaint

Joint Appendix Vol. II Page 1977

*Barbara Walters v. Cowpet Bay West Condominium Ass'n.* Civil No. 12/00024
Plaintiff's Response to Defendant Lance Talkington's Undisputed Material Facts
and Plaintiff's Counter-Statement of Facts Page 6

'misguided' is at the moment the most charitable description of the thought process (if there even was one) that was involved in filing this complaint." (Exhibit 5)

27. Talkington characterizes Kromenhoek and Walters as "playground bullies" and accused them of making a mockery of the Board. He then calls on the Association to "go on the offensive" and file suit against Kromenhoek and Barbara Walters stating "when these ladies start spending their own cash instead of relying on the government for free help, the rubber will meet the road on how far everyone is willing to go." In closing, Talkington implores the Board to take Kromenhoek and Walters to court. (Id.)

28. In a January 5, 2012 blog, Talkington accused Walters of being CB Lawton, a person who blogged about having dogs on the premises. Talkington asserted in his blog post that Walters was CB Lawton citing as evidence Walters's refusal to respond to questions about "why it is OK for her to have a dog." Talkington says she should "either stand up and face the owners or quietly slide into the sunset." (Id).

Respectfully submitted,

**LAW OFFICES OF KARIN A. BENTZ, P.C.**

Dated: May 21, 2014

/s/Karin A. Bentz

**KARINA. BENTZ, ESQ. (VI Bar #413)**
**JULITA K. de LEÓN, ESQ. (VI Bar #913)**
5150 Dronningens Gade, Suite 8
St. Thomas, Virgin Islands 00802
Telephone: 340-774-2669
Telecopier: 340-774-2665
E-mail: kbentz@virginalaw.com

Joint Appendix Vol. II Page 1978

*Barbara Walters v. Cowpet Bay West Condominium Ass'n.* Civil No. 12/00024
Plaintiff's Response to Defendant Lance Talkington's Undisputed Material Facts and Plaintiff's Counter-Statement of Facts Page 7

**CERTIFICATE OF SERVICE**

I hereby certify that I caused the filing and service of the foregoing with the Clerk of the District Court of the Virgin Islands using the CM/ECF system, which will provide electronic notice by email to the following.

Richard P. Farrelly, Esq.
Birch de Jongh & Hindels, PLLC
1330 Taarneberg
St. Thomas, VI 00802
E-mail: rfarrelly@bdhlawvi.com

John H. Benham, III, Esq.
Benham & Chan
P.O. Box 11720
St. Thomas, Virgin Islands 00801
Tel: 340-774-0673
Fax: 340-776-3630
email: benham@bclawvi.com

Joseph G. Riopelle, Esq.
Boyd Richards Parker & Colonnelli, P.L.
Rivergate Tower Suite 1150
400 N. Ashley Drive
Tampa, Fl. 33602
jriopelle@boydlawgroup.com

Ryan S. Meade, Esq.
Quintairos, Prieto, Wood & Boyce, P.A.
9300 South Dadeland Blvd., 4th Floor
Miami, Fl 33156
rmeade@gpwblaw.com

/s/ Karin A. Bentz

Joint Appendix Vol. II Page 1979

Case: 3:12-cv-00024-CVG-RM Document #: 95 Filed: 03/11/13 Page 1 of 35

IN THE UNITED STATES DISTRICT COURT OF THE VIRGIN ISLANDS
DISTRICT OF ST. THOMAS AND ST. JOHN
******************

**BARBARA WALTERS,**

**Plaintiff,**

**v.**

**COWPET BAY WEST CONDOMINIUM ASSOCIATION; THE BOARD OF THE COWPET BAY WEST CONDOMINIUM ASSOCIATION; MAX HARCOURT, in his personal capacity; ALFRED FELICE; LANCE TALKINGTON; ROBERT COCKAYNE; VINCENT VERDIRAMO,**

**Defendants.**

**CIVIL NO. 12-00024**

**Action for: Housing Discrimination; Discrimination Based on Disability; Invasion of Privacy; Negligent Infliction of Emotional Distress Infliction of Emotional Distress; Punitive Damages; and Injunctive and Declaratory Judgment**

**JURY TRIAL DEMAND**

**SECOND AMENDED COMPLAINT**

**COMES NOW**, Plaintiff **BARBARA WALTERS**, (hereinafter "Walters") by and through her undersigned counsel, the **LAW OFFICES OF KARIN A. BENTZ, P.C.**, (Karin A. Bentz Esq., and Julita K. de León, Esq., of Counsel) and for a Second Amended Complaint against the Defendants in the above captioned action states and alleges as follows:

**PRELIMINARY STATEMENT**

1. On April 11, 1968, President Lyndon B. Johnson signed the Civil Rights Act of 1968. Federal Fair Housing Act, Pub.L. No. 90-284, 82 Stat. 73, 81 (1968) (codified as amended at 42 U.S.C.§§ 3601-3631). The Federal Fair Housing Act (hereinafter "FHA") expanded on the Civil Rights Act of 1964 to prohibit discrimination regarding the sale, rental, and financing of housing based on race, color, religion, and national origin. *Id.* The FHA was amended twice to broaden the class of people falling under the scope of its protections; in 1974, discrimination based on sex was added, and in 1988 discrimination based on familial status or disability was included. (Pub.L. 100-430, approved September 13, 1988).

PLAINTIFF'S EXHIBIT
1

2. In amending the FHA, Congress recognized that people with disabilities are subject to artificial, arbitrary, and unnecessary barriers preventing them from making full use of housing. Congress also recognized that more than a mere prohibition against disparate treatment was necessary in order that handicapped persons receive equal housing opportunities. *Secretary of HUD v. Dedham Housing Authority*, 1991 WL 442793 * 5 (HUDAALJ November 15, 1991).

3. Pursuant to the Fair Housing Act (hereinafter "FHA"), it is unlawful to discriminate against any person in the terms, conditions or privileges of sale or rental of a dwelling, or in the provision of services or facilities in connection with such a dwelling, because of the disability of that person or a person residing in that dwelling, because of the disability of that person or a person associated with that person. 42 U.S.C. §3604(f)(2); 24 C.F.R. §100.202(b).

4. It is unlawful to refuse to make reasonable accommodations in rules, policies, practices, or services, when such accommodations may be necessary to afford such person equal opportunity to use and enjoy a dwelling. 42 U.S.C. §3604(f)(3)(B); 24 C.F.R. §100.20.

5. Section 3617 of the FHA makes it unlawful for any person to coerce, intimidate, threaten, or interfere with any person in the exercise or enjoyment of, or on account of his having exercised or enjoyed, or on account of his having aided or encouraged any other person in the exercise or enjoyment of, any right granted or protected by Section 803, 804, 805, 806 of this title.

6. At all times relevant to this action, Walters lived in Condominium unit at Cowpet Bay West Condominium community.

7. The property at Cowpet Bay West is part of the Cowpet Bay West Condominium community that is managed by the Cowpet Bay West Condominium Association (hereinafter, "the Association').

8. At all times relevant to this action, Defendant the Board of the Cowpet Bay West Association, (hereinafter "the Board") run the day to day operations of the Defendant Cowpet Bay West Condominium Association.

9. At all times relevant to this action, Defendant Max Harcourt (hereinafter "Harcourt") served as the President of the Board. And, at all relevant times, Walters was a member of the Board.

**JURISDICTION AND VENUE**

10. This Court has subject matter jurisdiction over this matter pursuant to 28 U.S.C. §§ 1331, 1332 and §1337; and V.I. Code ANN. tit. 4, §32.

11. Venue is proper within this District pursuant to 28 U.S.C. §1391(b).

**PARTIES**

12. Plaintiff Barbara Walters (hereinafter "Walters") owns a condo at Cowpet Bay West on the east side of St. Thomas, United States Virgin Islands. This property constitutes a dwelling under the FHA. 42 U.S.C.§3602(b); 24 C.F.R. §100.20.

13. The FHA and the American with Disability Act(hereinafter "ADA") define handicapped as a person with "a physical or mental impairment which substantially limits one or more of such person's major life activities, a record of having such an impairment, or being regarded as having such an impairment. . ..

14. Walters was diagnosed with Anxiety Disorder, DSM-IV by her physician and thus qualifies as a person with a handicapped within the meaning of the FHA and the ADA.

15. Walters is an aggrieved person under the FHA and the ADA.

16. Upon information and belief, Defendant Association is an entity organized pursuant to the Virgin Islands Condominium Act, V.I. CODE ANN. tit 28, §901 *et seq*. as

amended, that resides and operates its principal place of business in St. Thomas, U.S. Virgin Islands. Cowpet Bay West is the rental manager and governing organization of the condominium development.

17. Each residential unit owner may use his or her condo unit for permanent, temporary, or transient use. Thus, the owners may permanently reside in their unit, use it as a second home, rent it out on their own or not use it at all.

18. Defendant Association's facility is structured and operated as both a place of lodging and a condominium. As a place of lodging, it is a place of public accommodation within the meaning of the ADA. **[EXHIBIT A]**

19. Defendant Association is operated and controlled by a Board of elected persons. The Board is authorized by the Virgin Islands Condominium Act and the Declarations of the Cowpet Bay West Condominium Association, with its purpose set forth more fully in Bylaw Article 1, Section 2. The members of the Board are elected by the homeowners of the Cowpet Bay West Condominiums.

20. Upon information and belief, on October 22, 1974, Cowpet Bay West was created by a declaration of merger, whereby Cowpet Bay Village-Stages One and Two, the two condominium associations, merged into a single entity. The merger declaration acknowledged that the original 1968 Declaration, except as amended by the merger declaration is still in force. Section 16, of the 1968 Declaration provides that all owners are subject to and must comply with the provisions of the Declaration, the by-laws, and the rules and regulations as may be amended. Section 17 of the 1968 Declaration provides that the Declaration can only be amended by an affirmative vote of 75% of the Owners in number and common interest. Section 19 of the 1968 Declaration states that the by-laws and rules and regulations are " annexed hereto" and that the by-laws can only be amended by "an amendment to this Declaration and such amendment duly recorded."

21. Under this provision, any amendment to the by-laws must be by a 75% vote and recorded in order to be valid.

22. The by-laws of the Association were adopted and recorded in 1974 along with the merger declaration. The by-laws were again amended and recorded in April 1998. Article I, Section 2 of those by-laws made them applicable to both the common areas and the individual units. Article II, Section 2, provided that the affairs of the Association were to be governed by the Board , which was empowered to deal with all administrative affairs of the Association and to undertake all acts except those prohibited by law, the Declaration, or the by-laws. Of the enumerated powers of the Board, adoption and amendment of the rules and regulations is provided for: These rules are applicable to both the common areas and the units under Article I, Section 2. Article V, Section 9 empowers the Board to enjoin and remedy a violation of the by-laws, Declaration, or rules and regulations. Article V, Section 16 allows for the adoption of rules and regulations if approved by a majority of the Owners. Article XI, Section 1 requires that the by-laws be modified by a 66 and 2/3% vote of the Owners present at a meeting held for such purpose. Article XIII, Section 1 states that where thee is a conflict between the provisions of the by-laws and the Declaration, the Declaration controls.

23. There is a conflict between the by-laws and the Declaration in that the Declaration makes clear that a vote of 75% of the Owners is required to amend the by-laws.

24. The 1968 rules and regulations prohibited an Owner from making or allowing disturbing noises in his/her apartment and prohibited dogs. The 1998 rules and regulations contained the same provisions.

25. Based upon information and belief Defendant Alfred Felice is a resident of Plainview, New York.

26. Based upon information and belief Defendant Max Harcourt is a resident of St.

Thomas, United States Virgin Islands.

27. Based upon information and belief Defendant Lance Talkington is a resident of St. Thomas, United States Virgin Islands.

28. Based upon information and belief Defendant Robert Cockayne is a resident of St. Thomas, United States Virgin Islands.

29. Based upon information and belief Defendant Vincent Verdiramo is a resident of St. Thomas, United States Virgin Islands.

## STATEMENT OF FACTS

30. On January 21, 2011, Stansford S. Sutherland, a licensed psychologist wrote a letter stating that he was treating Walters and that she was diagnosed with Anxiety Disorder, citing the DSM-IV. He further explained that Walters had "severe limitations" in coping with stress and anxiety that most people would consider "normal day to day events." He went on to state that he has prescribed the use of an emotional support animal, dog or other, to alleviate her symptoms and that such emotional support animal was necessary. In conclusion, he states that pursuant to the Fair Housing Act, Walters is qualified to keep her emotional support animal despite a policy prohibiting pets in her housing. On that same day, the National Service Animal Registry issued a certification that Walters was allowed to keep her emotional support animal even if there is a policy prohibiting pets.

31. In February of 2011, Defendant Association received the letter from Walters' medical provider and the certification. However, as early as the Summer of 2010, Walters, a member of the Board, discussed with Board members her need to obtain a waiver to the NO DOG RULE to keep an emotional support dog on the premises.

32. Walters made the request for a reasonable accommodation because Defendant Association had a NO DOGS RULE in place and Walters needed a waiver from

Defendant Association's NO DOGS RULE to keep her emotional support dog (hereinafter "Happy"). Walters furnished those two documents to Louanne Schechter, the Office Manager for Defendant Association as Walters' application because the Defendant Board did not have a form or application in place for requesting a waiver to the NO DOGS RULE. [**EXHIBIT B**]

33. At the time Walters submitted her request for a reasonable accommodation, Defendant Association had no written policy in place for processing a reasonable accommodation request, although it had a NO DOG RULE IN place for at least fifteen (15) years.

34. Upon information and belief, Louanne Schechter accepted the documents, placed them in Walters' file and discussed Walters' request with Jon Cassady, Louanne Schechter's immediate supervisor.

35. Upon information and belief, Jon Cassady discussed Walters' request with Harcourt and Harcourt subsequently came to the Association's Office to review Walters' documents.

36. Upon information and belief, Harcourt sent his representative, Bob Canefield, a member of the Board, to review the documents.

37. Upon information and belief, there was widespread opposition to having dogs on the premises by some members of the Board and Association.

38. Upon information and belief, Harcourt took down a framed copy of an American with Disabilities Act poster that was hanging in the Defendant Association's office saying **Cowpet Bay rules not ADA**.

39. At the February 12, 2011 Board meeting, Board member Robert Cockayne (hereinafter "Cockayne") proposed amending the by-laws to prohibit dogs and farm animals. There was no mention however of providing reasonable accommodations to owners under the FHA or the ADA.

40. The Board neither discussed or acted on Walters' request for a reasonable accommodation during the March 8, 2011 Board meeting.

41. During the May 10, 2011 Board meeting, an owner complained of someone walking a dog on the property. The Board, headed by Harcourt voted to post "No Dogs Allowed" signs on the property, despite the fact that Harcourt knew that Walters had submitted a request for a reasonable accommodation to allow her to keep her emotional support dog, Happy on the premises. The Board also took no action on Walters' request for a reasonable accommodation, although it had been pending before them for more than two months.

42. The Board met in June, twice in July and once in August, but did not act on Walters' request for a reasonable accommodation.

43. During the Board meeting on September 13, 2011, the Board discussed Service Dogs and mentioned that the dogs must be registered with the ADA. The Board also opined that the Virgin Islands does not have guidelines for "service dogs." Although the Board, headed by Harcourt, discussed Walters' request for a reasonable accommodation, the Board, however took no action on Walters' request for a reasonable accommodation, although it had been pending before them for more than six months.

44. At all relevant times, some members of the Defendant Association and even the Defendant Board were vehemently oppose to having dogs on the premises. Members of the Defendant Association and the Defendant Board began voicing their oppositions to allowing dogs on the premises through emails and on the Cowpet Bay Blog. They also began harassing Walters. At all relevant times, Lance Talkington (hereinafter "Talkington") owned the Cowpet Bay West Blog (hereinafter "the blog").

45. In his first blog post relating to "dogs" on the premises, Talkington, on September 27, 2011, stated that " at least three owners. . . have been seen with dogs that are either

living in condos or are being entertained by an owner walking them on the property. He goes on to point out that two of the dog owners are present and past Board members. Talkington called for the owners to amend the Defendant Association's by-laws to "eliminate any confusion over possible exceptions to the general rule" of no dogs .

46. At the October 11, 2011 Board meeting, the Board, headed by Harcourt, took no action on Walters' pending request for a reasonable accommodation, although it had been pending for more than eight (8) months. However, the Board under Harcourt's leadership, discussed changing the by-laws to adopt a NO DOGS ALLOWED rule.

47. The Harcourt led Board proposed NO DOGS ALLOWED rule made an exception only for the ADA. Harcourt and the other members of the Board excluded FHA requests, although Walters' requested a reasonable accommodation pursuant to the FHA. Moreover, Harcourt and at least two Board members knew that Walters' request was currently pending before the Board and had been pending for more than six (6)months.

48. A day after the Board meeting, on October 12, 2011, Talkington emailed Walters regarding her "service animal." In this email, Talkington request from Walters a copy of her request for reasonable accommodation that was submitted to the Defendant Association office.

49. Walters responded on that same day telling Talkington that he has no right to the information.

50. Talkington responded by telling Walters that he will continue to pursue obtaining copies of her request for reasonable accommodation and that her "blatant violation" of the by-laws is completely intolerable.

51. Talkington continued to harass Walters regarding her need for an emotional support

dog. In an October 13, 2011 blog, Talkington attacked Walters by stating that she claims to have papers that allow her to have a service dog and implied that Walters' refusal to discuss her disability with him and or the blog is unreasonable. Talkington also implied that Walters had made no attempt to prove her need for a service dog to the Board.

52. Alfred Felice (hereinafter "Felice") chimed in on the blog and stated that "service dogs' for the true needs are legal, but anyone can get such a designation by simple request from a friendly physician, regardless of any real need. Anyone can also get one via the internet for a minimal fee.!!!"

53. Exemplifying the type of discriminatory attitude that the FHA and the ADA were enacted to combat, Felice went on to say that "the perpetrators might just as well spit in our face. The by-laws must be made to reflect the majorities' rights. Perhaps, the dissenters would be happier in another community rather than be ostracized at CBW, which would be another fine recourse."

54. In response increasing attacks by both Talkington and Felice on the blog regarding her request for a reasonable accommodation, Walters explained that she was not violating the law or the rules. Walters stated that she has a disability and is afforded protection under the FHA.

55. Felice responded with disdain for Walters and the law that protects her rights as a disabled American.

56. Walters again attempted to defend herself against allegations of wrongdoing on the part of both Felice and Talkington. Walters blogged that she is on permanent disability and receives social security benefits.

58. Immediately, Talkington discounted Walters' claim in a blog by stating how "unreasonable" it is to expect the Owners to accept Walter's claims of disability. Talkington asked Walters to provide the "dog's credentials.

59. In a later blog, Talkington attacked Walters' credibility and accused Walters about having made a request for a reasonable accommodation with Defendant Association's office.

60. Walters confronted Talkington about his retaliatory and harassing conduct on the blog. In response, Talkington stated that" [i]t is im possible to give someone grief over a disability that is to day completely undefined and unsubstantiated."

61. After reading Talkington's last blog, on October 13, 2011, Walters emailed the Board with the subject line "This has gone too far." In her email, Walters informs the Board that she feels Talkington obtained her private information from being allowed to attend Board meeting even though he is not a Board member.

62 Upon information and belief Harcourt and other members of the Board improperly shared the content of Walters' request for a reasonable accommodation with Talkington.

63. Susan Anderson, wrote an email complaining that she saw Judith Kromenhoek walking a dog and assumed that she was walking the dog for somebody else "because Judith Kromenhoek does not appear to be disabled."

64. The prevailing attitude shared by some Association and Board members was that Walters was not disabled because there was no visible evidence of her disability.

65. In response to Susan Anderson email regarding Judith Kromenhoek's "presumed disability, in an email dated October 20, 2011, Harcourt informed Susan Anderson that the Board was considering amending the by-laws to allow exceptions for "true" service animals " that are documented." Harcourt response came more than eight (8) months after Walters submitted a request for reasonable accommodation to the Board, which was still pending before the Board.

66. Harcourt also stated that a fine should be levied against the "offenders" unless they submitted "appropriate ADA compliant paperwork."

67. On October 26, 2011, Talkington blogged requesting that the Board enforce its rules and regulations.

68. On October 27, 2011, a member fo the Board emailed the Board stating that the Board should respond to both Susan Anderson's and Talkington's inquiries.

69. Walters' responded that she had submitted a request for reasonable accommodation with the Board. Walters also mentioned that her request included a letter from her treating physician and asked that her medical record be kept confidential. Walters also expressed concern that medical information might appear on Talkington's blog.

70. Walters and some members of the Defendant Association recommended that Talkington not be allowed to attend Board meetings as he is not a member of the Board. Others, suggested that the Board hold closed meetings to discuss sensitive issues, including Walters' request for a reasonable accommodation.

71. Some members of the Board however violently opposed to having closed Board meetings to discuss Walters' reasonable accommodation request. In response to a blog recommending a closed meeting to discuss Walters' request for reasonable accommodation, Board member Douglas Rebak blogged, "I do support the Board's need for closed sessions on "confidential" matters–but the dog issue??? PLEASE!!! The situation is most disturbing and not at all the way it should be in an upscale Residential/Resort Community!"

72. Notwithstanding Walters' objection to providing Talkington with her private and personal information, on October 28, 2011, Harcourt emailed a letter to Walters and Judith Kromenhoek and copied Talkington. Harcourt wrote as President of the Board and falsely accused Walters and Judith Kromenhoek of violating the NO DOGS RULE "because they have not applied for an exception to the no dog rule." Harcourt also acknowledged in that same letter that both Walters and Judith Kromenhoek had "papers for service dogs pending in the office." Contradicting himself, Harcourt

ordered Walters to apply and submit documentation for a waiver and threatened to levy a monetary fine against Walters if she did not take up his offer. . [EXHIBIT M].

73. In response, Walters addressed the entire Board stating that "if any of her medical information were disclosed to Susan Anderson or Talkington or anyone who is not on the Board, she would deal with it accordingly. Walters also emailed the Board under separate cover and expressed her belief that Harcourt had overstepped by sharing the letter with Anderson and Talkington.

74. Talkington posted the entire letter on the blog in his October 30, 2011 post.

75. The November 8, 2011 Board meeting, the Board took no action on Walters' pending application for a reasonable However, the Board, led by Harcourt, discussed amending Section 11 of the by-laws to add:

> No dogs are allowed on the property, either long term or visiting. The Board may grant exceptions to the NO DOGS ALLOWED rule, on an individual basis, should an owner require the assistance of a service animal (dog) as defined by the ADA. Owners seeking to obtain such an exemption are required to apply, in writing, to the Board with supporting document.

76. At the November 18, 2011 Board meeting the Board did not act on Walters' pending reasonable accommodation request. However, the Board offered to table discussion on the proposed amendment to the by-laws until a legal opinion has been obtained.

77. On December 2, 2011, Vincent Verdiramo (hereinafter "Verdiramo"), an attorney and member of the Board, emailed a December 1, 2011 letter to 99 members of the Association. In his letter, Verdiramo offers legal advice to the Defendant Association. Verdiramo provides that the FHA is "not a blanket law." Verdiramo further notes that "every case must be handled individually "with official adjudication." He advised that when a person claims the need for am\n emotional support animal under the FHA, the must bring the Association to court and present expert testimony.

78. The Board held at least three meetings in December of 2011, but took no action on Walters' pending request for a reasonable accommodation.

79. Talkington continued his harassing campaign against Walters. In a December 5, 2011, Talkington shares a complaint of a Mr. Bartlett and the barking of a dog in his area of the community. Talkington goes on to point out that the "known violators" live in this same area. Talkington opined that "trained service dogs are specifically trained to NOT bark unless the owner is in imminent danger."

80. As a Board member, Walters was up for re-election in the upcoming Board election. Felice and others suggested retaliating against Walters by defeating her in the upcoming election. In response to Talkington blog, Felice notes "that a change to the by-laws may be necessary and that the Owners should 'WAKE UP START UP A CAMPAIGN FOR A NO DOGS SLATE NOW.

81. In a December 13, 2011 Board meeting, the Board, led by Harcourt decided to amend the by-laws to include the NO DOGS ALLOWED rule. The Board also discussed Verdiramo's December 2, 2011 legal advice.

82. On December 16, 2011, on the behalf of Walters, he Board received a letter from Karin A. Bentz, Esq. In this letter, Board was informed that under the FHA, Walters is qualified to keep Happy to assist her with her disability. The Board was further informed that they could not engage in any conduct that would punish or deprive Walters of her right to keep Happy on the premises.

83. In a January 9, 2012 email, Felice states "PLEASE do not return the coven and their shills to office, they DO NOT deserve another term EVER." In a January 10, 2012 blog, Felice continues, "JUDI and BARBARA have DOGS!!!! They surely have an agenda and DICK is their SHILL."

84. In their January 11, 2012, Board meeting, the Board, led by Harcourt, discussed receipt of the December 16, 2011 from Karin Bentz. Verdiramo motioned to "abide by the rule and immediately begin fining owners that have dogs." The Board voted to fine Walters $50.00 per day for having Happy on the premises.

85. In a January 14, 2012 email, Felice states "Only the coven and their shills call me a disaster." He goes on to say that if the Owners want a lot more "bull" "Elect the Coven on the board, with their shill."

86. During the January 11, 2012, Defendant Cockayne distributed information about service dog certification naming businesses that have no requirements for service dog certification. Copies of Walters' dog certification were circulated during that Board meeting. A copy of Walters' dog certification was improperly shared with Talkington.

87. In a January 15, 2012 blog entitled "Puppy Dog Diplomas" Talkington attacked Happy's certification by stating it is "certified by an outfit called the National Service Animal Registry." Talkington concludes his blog post by sharing his "considered opinion" that such "outfits serve no legitimate purpose and exist mainly to sidestep what the ADA works diligently to accomplish" and putting forth a call "to stop the doggy diploma silliness and adopt clear ground rules for dogs at Cowpet". Talkington states that the ADA is the sole source of legitimacy for such rules.

88. On January 16, 2012, Harcourt distributed his President's Forum to the owners. In it, he says: "[t]he issue of dogs on the property has been the subject of many (unfortunately) blanket emails, There are some owners who are violating the current rule. The Board had shown some restraint in this matter since we wee trying to revise the by-laws to allow for valid exceptions; however, one of these owners had their attorney send the Board a letter saying the attorney was representing them in a complaint against use. The Board voted to retain an attorney to protect the Association's interest.

89. On January 15, 2012, Donna LaScola voiced concern that the Defendant Association may be getting into legal trouble with all the blogposts and emails regarding Walters' and Judith Kromenhoek's service animals.

90. Ever ready to vilify Walters, Felice states, "[t]he ADA law does not prevent a community from excluding DOGS." He goes on, "[n]o one wishes to prevent proper needs to be satisfied!! He continues, "[a]gain REAL needs or pets??" He concludes, "I suggest they be ostracized, NO dinner dates, no patronage of their establishments, no conversations, no beach conclaves, just ignore them completely!!!"

91. On January 17, 2012, ever dutiful to Talkington, Harcourt emailed Talkington informing him that the Board had received a letter from one of the owners stating the owner had filed a complaint. Therefore the Board was retaining counsel.

92. On January 17, 2012, Walters received a letter from the Board informing he that she was in violation of the no dogs rule and would be fined. Walters felt hurt and ashamed after reading the letter.

93. On January 24, 2012, Talkington screening a candidate for the Board, discussed the candidate's stance on the "issues," one of which is the amendment of the by-laws regarding dogs. Talkington represented that the Board informed him that Judith Kromenhoek and Walters refused to present any proof of their disability that warrants a service animal.

94. In a January 30, 2012 email, Felice wrote to 40 recipients, "How can you allow 2 admitted 'certified' mentally disabled persons on the ballot for election to our board?? Due diligence was not done properly. The should be removed from consideration.

95. As of February of 2007, Walters had not received any response from the Board regarding her request for a reasonable accommodation. At the Board's February 7, 2012 meeting, Harcourt stated that he met with Attorney Maria Hodge regarding the HUD complaints and the dog issue in general.

96. On February 28, 2012, Edward Wardell, the incoming President of the Board, emailed the owners informing them that the by-laws were amended by a vote of 69.2% of the Owners and will become effective once "registered with the U.S. Virgin Islands

Government.

97. In this version of the by-laws, Section 11 of Article V was amended to state:

> No dogs are allowed on the property, either long term or visiting. The Board may grant exceptions to the NO DOGS ALLOWED rule, on an individual basis, should an owner require the assistance of a service animal (dog) as defined by the ADA. Owners seeking to obtain such an exemption are required to apply, in writing, to the Board with supporting documentation.

98. However, the April 11, 2012 Board minutes reflect that legal counsel had suggested not recording the by-laws and obtaining approval to revised the "no dogs" rule as follows:

> No dogs are allowed on the property, either long term or visiting. Owners or occupants who have properly documented and verified disability as defined by Federal Law may make a request for reasonable accommodation and exception to the prohibition on dogs on the property. An owner or occupant seeking an accommodation can do so in writing to the Board. The request shall include: (1) identification of the owner or occupant seeking the accommodation; (2) explanation of the relationship between the requested accommodation and the disability; and (3) verification of the disability and need for accommodation as set forth in this rule. To facilitate the Board's review of each request for an accommodation of a non-obvious handicap, the Board may require(1) the submission of documentation verifying that the person meets the Federal Fair Housing Act's definition of disability; and (2) documentation from a doctor or other medical professional who is in a position to know about the individual's disability, and that the requested accommodation is related to the individual's disability. All information submitted to the Board that is necessary for the evaluation of the reasonableness of an accommodation will be kept confidential.

99. On February 29, 2012, Verdiramo & Verdiramo P.A. delivered a letter to the Board providing an explanation of the Defendant Association's legal obligations under the ADA and the FHA

100. In December of 2011, Walters filed a charge of discrimination under the FHA with the Department of Housing and Urban Development (HUD) against the Association and the Board for violation of the FHA.

101. In response to Walters and Judith Kromenhoek's HUD complaints, on March 25, 2012, Talkington blogged, Walters and Judith Kromenhoek will "hang onto their puppies" at any length. In direct response to the HUD Complaint, Talkington says "Really ladies? Do you seriously believe that either of two owners has any impact whatsoever on the Association's governance of this property in terms of your having

those puppies? To call this a fiasco of a complaint 'misguided' is at the moment the most charitable description of the though process (if there even was one) that was involved in filing this complaint." Talkington characterizes Walters and Judith Kromenhoek as "playground bullies" and of making a mockery of our board." He then calls on the Association to "go on the offensive" and file suit against Walters' and Kromenhoek stating "when these ladies start spending their own cash instead of relying on the government for free help, the rubber will meet the road on how far everyone is willing to go. In closing, Talkington implores the Board to take Walters and Judith Kromenhoek to court.

102. Walters was not re-elected to the Board. In late March or early April of 2012, Walters finally received a response from the Board approving her request for reasonable accommodation more than a year afer she submitted her request.

103. Defendant Board's act and omissions, including Defendant Board's response to Walter's request for an accommodation, as well as the Board's failure to respond to the request for more than a year, constitute a denial of a request for reasonable accommodation in violation of the FHA.

104. Defendant Association is vicariously liable for the actions and omissions of its agent, Defendant Board.

105. Defendant Harcourt's acts and omissions in ignoring Walters' request for reasonable accommodation; while at the same assisting a campaign to amend the by-laws to specifically exclude emotional support animals by incorporating only the definition of the ADA of service animal; providing Talkington access to Walters' personal and private information; and falsely accusing Walters of violating the rules qualify as retaliatory measures pursuant to the FHA.

106. The Defendant Board action in assessing Walters a fine after receiving the letter from Karin A. Bentz, qualifies as retaliatory measures pursuant to the FHA.

107. As a result of the Defendants' actions, and each of them, Walters has suffered damages including but not limited to emotional distress, embarrassment, and humiliation.

**COUNT I: VIOLATION OF THE FHA**
**(Association and Board)**

108. Walters realleges and incorporates by reference the remainder of the allegations set forth herein.

109. 42 U.S.C. §3604(f)(3)(b), the FHA, prohibits housing providers from discriminating against applicants or residents because of their disability and from treating persons with disabilities less favorably than others because of their disability. The foregoing conduct violates the FHA which prohibits discriminating based on disability and from treating persons with disabilities less favorably than others because of their disability.

110. The FHA also makes it unlawful for any person to refuse " to make reasonable accommodations in rules, policies, practices, or services, when such accommodations may be necessary to afford persons with disabilities equal opportunity to use and enjoy a dwelling.

111. At all relevant times, Walters had a request for a reasonable accommodation pending before the Defendant Board.

112. Defendant Association knew or reasonably should have known of Plaintiff's disability.

113. Defendants Association and Board discriminated against Walters by denying Walters Plaintiff, as a person with a disability, a reasonable accommodation by failing to take action on her request for reasonable accommodation for more than a year.

114. As direct and proximate result of the Defendants' conduct described above, Walters has suffered and will continue to suffer embarrassment, humiliation, mental anguish, emotional and physical distress.

115. Defendants' acts or omissions were done maliciously, oppressively and/or fraudulently.

116. Once Walters submitted her application to Louanne Schechter in February of 2011, the Defendant Board had an obligation to take action on the pending claim. Moreover, Defendant Association could have taken measures to assure that the Board complies with the FHA but chose not to.

117. Defendants conduct violated the FHA and Walters is entitled to the remedies, procedures and rights set forth in 42 U.S.C *§3613 (c)*(1).

**COUNT II: VIOLATION OF SECTION 3617 OF THE FHAA**
**(Harcourt)**

118. Walters re-alleges and incorporates all preceding paragraphs herein by reference as though fully restates, wholly, in this Count.

119. Harcourt is a member of the Association and was the President of the Board, at the time Walters applied for a reasonable accommodation.

120. Harcourt's removal of the framed copy of the ADA poster made clear his intention to ignore Walters' request for accommodation.

121. Harcourt's conduct in ignoring Walters' request for a reasonable accommodation while at the same time pushing for an amendment to the by-laws that would deny Walters reasonable accommodation constitute interference pursuant to Section 3617 of the FHA.

122. Harcourt action in falsely accusing Walters of violating the no dogs rule and levying a fine against Walters constitute retaliation under the FHA.

123. As a result of Harcourt's acts and/or omissions, Walters has suffered emotional injuries and continues to suffer emotional injuries.

124. Defendant Harcourt's conduct violated Section 3617 of the FHA and entitles Walters to all categories of damages, including punitive damages.

**COUNT III: VIOLATION OF SECTION 3617 OF THE FHAA**
**(Board and Association)**

125. Walters incorporates all preceding paragraphs herein by reference as though fully restated, wholly, in the Count.

126. The foregoing conduct violates the FHA, which makes it unlawful for any person to coerce, intimidate, threaten, or interfere with any person in the exercise or enjoyment of, or on account of his having exercised or enjoyed, or on account of his having aided or encouraged any other person in the exercise or enjoyment of, any right granted or protected by the FHA.

127. Defendant Association knew or had reason to know that Walters had applied for a reasonable accommodation to keep her emotional support dog, Happy, on the premises. Yet, Defendant Association refused to provide Walters with a reasonable accommodation and amended its by-laws to exclude emotional support dogs from a waiver to the NO DOGS ALLOWED rule.

128. Defendant's Board Action if assessing Walters a fine after it received a letter from Walters' attorney and assessing Walters a fine despite the fact that Walters' request for a reasonable accommodation was pending in the office constitute retaliation under the FHA.

129. As a direct and proximate result of Defendant Board and Defendant Association's acts or omissions, Walters has suffered extreme and severe anguish, humiliation, embarrassment, emotional distress and tension, the extent of which is not fully known at this time and the amount of damages caused thus far is not yet fully ascertained but will be proven at the time of trial.

130. Defendants' conduct as described in this Complaint violated the FHA and the public policy of the United States and entitles Walters to all categories of damages, including punitive damages.

**COUNT IV: VIOLATION OF SECTION *3617* OF THE FHA**
**(Felice)**

131. Walters re alleges and incorporates by reference all preceding paragraphs herein as though fully restated, wholly, in the Count.

132. Defendant Felice began interfering with Walters on the blog once he learned that Walters had requested reasonable accommodation for an emotional support animal, her dog.

133. Defendant Felice interfered with Walters' right to request reasonable accommodation by using the blog and personal emails sent to the Cowpet Bay West Community to intimidate, to discredit and to threaten Walters. Defendant Felice's actions were designed to intimidate, threaten and scare Walters from pursuing a reasonable accommodation to keep Happy on the premises.

134. Defendant Felice's conduct violated Section 3617 of the FHA by interfering with Walters exercise of her right to request for a reasonable accommodation.

135. Defendant Felice violation of the FHA has harmed and will continue to harm Plaintiff Walters.

136. As a result of Defendant Felice's act or omission, Walters is entitled to the remedies, procedures and rights set forth in 42 U.S.C *§3613 (c)*(1) and (2).

**COUNT V: VIOLATION OF SECTION *3617* OF THE FHA**
**(Lance Talkington)**

137. Walters re alleges and incorporates by reference all preceding paragraphs herein as though fully restated, wholly, in the Count.

138. Upon information and belief Defendant Talkington runs the blog and used the "blog" to attack, embarrass and humiliate Walters after she filed a request for reasonable accommodation.

139. Defendant Talkington interfered with Walters' exercise of her right to request a reasonable accommodation by demonizing Walters on the blog and suggesting both implicitly and explicitly that Walters violated the rules

140. Defendant Talkington interfered with Walters' right to request a reasonable accommodation by mounting a calculated attack against Walters' reputation, honesty and standing in the Cowpet Bay West Community.

141. Defendant Lance Talkington interfered with Walters' right to request a reasonable accommodation by posting and publicly discussing Walters' private medical record on the blog.

142. Defendant Talkington's actions were designed not only to humiliate and to discredit Walters but to signal to Walters that her medical records and private information will continue to be the subject of public scrutiny if she continued to demand a reasonable accommodation. Defendant Talkington actions were designed to threaten, intimidate or scare Walters into abandoning Walters' right to a reasonable accommodation to keep Happy on the premises.

143. The conduct mentioned above violated Section 3617 of the FHA.

144. Defendant Talkington's violation of the FHA has harmed and will continue to harm Walters in the future.

145. As direct result of Defendant Talkington's act or omission, Walters is to the remedies, procedures and rights set forth in 42 U.S.C §3613 (3)(1) and (2).

**COUNT VI: VIOLATION OF THE AMERICAN WITH DISABILITIES ACT**
**(Association and Board)**

146. Walters realleges and incorporates by reference all preceding paragraphs herein as though fully restated, wholly, in the Count.

147. As set forth herein, at all relevant times, Defendants were subjected to the ADA based on the ADA definition of public lodging.

148. Defendants owns, operates and/or leases condominium units in Cowpet Bay, St. Thomas, Virgin Islands.

149. Defendants discriminated against Walters by failing to make reasonable modifications to its NO DOGS RULE to allow Walters to keep Happy on the premises.

150. As such, Defendants violation of the ADA has harmed and will continue to harm Walters

151. As a result, Walters is entitled to the remedies, procedures, and rights set forth in 42 U.S.C.§12188.

**COUNT *VII: BOARD EXCEEDED ITS AUTHORITY BY ADOPTING THE NO DOGS RULE***

152. Walters incorporates all preceding paragraphs herein by reference as though fully restated, wholly, in the Count.

153. Defendant Association adopted Bylaws pursuant to Chapter 33, of Title 28 of the Virgin Islands Code.

154. At the time Plaintiff requested a reasonable accommodation for her dog, the bylaws of Defendant Association placed no restrictions on dogs on the Cowpet Bay West premises.

155. The Defendant Board subsequently adopted rules and regulations, which were more restrictive than the bylaws and places a restriction on the condominium owners' right to own an animal, including emotional support dogs in a manner not contemplated by the bylaws.

156. The Defendant Board acted outside the scope of their power when they adopted rules that were more restrictive than the bylaws.

157. As a result of the Defendant Board implementing this invalid rule, Walters suffered damages and losses, and will continue to suffer loss and damages, including but not

limited to emotional distress, financial loss and other losses for which Defendant Board is liable.

**COUNT VIII: THE FEBRUARY 2012 AMENDMENT TO THE BYLAWS IS VOID**

158. Walters incorporates all preceding paragraphs herein by reference as though fully restated, wholly, in the Count.

159. Defendant Association adopted by-laws pursuant to Chapter 33, of Title 28 of the Virgin Islands Code.

160 Section 19 of the 1968 Declaration states that the by-laws and rules can only be amended by "an amendment to the Declaration and such amendment duly recorded.

161. Under this provision, any amendment to the by-laws must be a 75% vote and recorded in order to be valid.

162. The February 2012 amendment to the by-laws was adopted by a roughly 69% vote.

163. The 69% vote is less than what is required by the Declaration.

164. Therefore, the February 2012 amendment is inconsistent with the Declaration.

**COUNT IX: NEGLIGENCE**
(Board and Association)

165. Walters repeats and re-alleges all preceding paragraphs as though fully restated, wholly, in this Count.

166. The Defendant Board and Defendant Association owed Walters a duty to comply with all laws including the FHA and the ADA.

167. Defendant Board violated the FHA when it took more than a year to approve Walters' request for a reasonable accommodation.

168. Defendant Association did otherwise ratify Defendant Board's wrongful conduct.

169. As a result of Defendants' acts and/or omissions, Walters has suffered emotional

distress, embarrassment, humiliation and continues to suffer damages for which Defendants are liable.

**COUNT IX: INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS**
**( Felice)**

170. Walters incorporates all preceding paragraphs herein by reference as though fully restated, wholly, in the Count.

171 At all relevant times; Walters was subjected to a pattern of harassment and vilification on the blog and through emails based in whole or in part, on her request for a reasonable accommodation by Defendant Felice.

172. Defendant Felice's action in emailing at least 40 people and implying that Walters a "certified mentally disabled person" should not be on the ballot for election to our board"was done intentionally, recklessly and with deliberate indifference to a substantial probability that severe emotional distress would result to Walters.

173. Defendant Felice's blog posts and other emails were intentional acts done with deliberate indifference to a substantial probability that severe emotional distress would result to Walters.

174. Defendant Felice's blog posts and emails are evidence of a pattern of harassment.

175. Defendant Felice's acts further constitute extreme and outrageous conduct.

176. Defendant Felice's conduct was outrageous in character and extreme in degree, because said conduct was atrocious and egregious, and went beyond all possible bounds of decency and is utterly intolerable in a civilized community.

177. Defendant Felice's extreme and outrageous conduct toward Walters was done in a willful and wanton manner, and constituted a disregard for the rights and well-being of Walters.

178. As a result of Defendant Felice's extreme and outrageous conduct, Walters has suffered severe mental and emotional distress, humiliation, embarrassment and will

continue to suffer severe emotional distress and other damages for which Defendant Felice is personally liable for compensatory and punitive damages to Walters.

**COUNT X: CONSPIRACY TO COMMIT AN UNAUTHORIZED ACT**
**(Against all Defendants)**

179. Walters repeats and re-alleges all preceding paragraphs as though fully restated, wholly, in this Count.

180. Defendants, through and among themselves conspired with each other, and acted in concert, to violate the FHA and to deny Walters 'request for reasonable accommodation, without authority, to deprive her of protected rights and interests, to defame her, to cause her emotional distress and suffering, and to deprive her full enjoyment of the goods, services, facilities, privileges, advantages, accommodations and/or opportunities of Cowpet Bay West.

181. The conduct complained herein are overt acts in furtherance of their conspiracy, and taken together constitute a civil conspiracy to harm Walters and to deny her civil rights under the FHA and the ADA.

182. As a direct and proximate result of the foregoing, Walters has suffered damages, losses, and severe emotional distress, for which said Defendants are jointly and severally liable.

**COUNT XI: PRIMA FACIE TORT CLAIM** (All Defendants)

183. Walters incorporates all *preceding* paragraphs herein by reference as though fully re-stated, wholly, in the Count.

184. The Defendants through their wrongful violations of, inter alia, the FHA and the ADA, caused Walters to be improperly deprived of reasonable accommodation.

184. None of the Defendants had an objective justification for depriving Walters of the aforementioned civil right.

185. Defendants acts and omissions as aforesaid were such that they offend common decency and sensibilities.

186. As a direct and proximate result of Defendants' wrongful and unlawful acts and omissions, as aforesaid, Walters' rights were violated; she was defamed; and suffered loss of reputation, mental anguish, pain and suffering and loss of enjoyment of life. In addition, Walters was assessed a daily monetary fined and has and will continue to suffer losses, pain, humiliation, mental anguish and damages for which Defendants are liable.

**COUNT XII: DEFAMATION AND SLANDER PER SE**
(Board, Association, Felice, Harcourt and Talkington)

187. Walters incorporates all proceeding paragraphs herein by reference as though fully re-stated, wholly, in the Count.

188. Defendants wilfully and intentionally published false and wrongful information on the blog and other venues about Walters.

189. The above described information was false and injurious as to Walters. It lowered the professional and personal reputation of Walters in the Cowpet Bay West community, as it was understood by the members thereof, and such publications were calculated to elicit that very response from that respected community.

190. As a direct consequence to Defendants' actions, Walters is entitled to an award of compensatory and punitive damages from them to compensate her for humiliation, emotional pain and suffering, inconvenience, mental and emotional distress, loss of enjoyment and embarrassment.

**COUNT XIII: NEGLIGENT AND/OR INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS**
**(All Defendants except Felice)**

191. Walters incorporates all proceeding paragraphs herein by reference as though fully

re-stated, wholly, in the Count.

192. As set forth herein, at all relevant times, Walters was subjected to a pattern of harassment and vilification on the internet and through email based in whole or in part, on her request for reasonable accommodation and for having Happy on the premises by Defendants.

193. Defendant Board's failure to provide Walters with a reasonable accommodation for Plaintiff's Happy ; publishing on the blog that Plaintiff had violated the NO DOGS RULE, although she had a request pending for more than a year; and imposing unreasonable and egregious fines, penalties and or interests against Plaintiff are all intentional acts design to create severe emotional distress on the part of Walters.

194. Defendant Talkington's inflamatory blog posts and emails were done with reckless and with deliberate indifference to a substantial probability that severe emotional distress would result to Walters.

195. Defendant Verdiramo's misrepresentation of the law in his legal opinion to the Board, while at the same time spearheading a campaign to amend the by-laws to specifically exclude Happy, and other emotional support dogs was done intentionally and with deliberate indifference to a substantial probability that severe emotional distress would result to Walters.

196. Defendant Cockayne's acts and omissions in providing Defendant Talkington with a copy of Walters' dog certification knowing that he would post it on the blog constitute acts of extreme and outrageous conduct.

197. Defendant Harcourt's act of ignoring Walters' request for a reasonable accommodation while at the same time assisting in the campaign to amend the by-laws to specifically exclude Happy and publishing a letter falsely stating that Walters had no submitted a request for reasonable accommodation was done with deliberate indifference to a substantial probability that severe emotional distress would result to

Walters.

198. The conduct of all Defendants were outrageous in character and extreme in degree, because said conduct was atrocious and egregious, and went beyond all possible bounds of decency and is utterly intolerable in a civilized community.

199. The extreme and outrageous conduct of Defendants toward Walters were done in a willful and wanton manner, and constituted a disregard for the rights and well-being of Walters.

200. As a direct and proximate result of Defendants' extreme and outrageous conduct, Walters suffered and continues to sufferer emotional distress.

201. Because Defendants' extreme and outrageous conduct toward Walters were improperly motivated, and were intentional, willful and wanton, Walters is entitled to punitive damages in addition to compensatory damages.

**COUNT IVX: INVASION OF PRIVACY:**
**PUBLIC DISCLOSURE OF PRIVATE FACTS**
***(Board and Association)***

202. Walters incorporates all proceeding paragraphs herein by reference as though fully re-stated, wholly, in the Count.

203. Defendants, Association wrongfully disclosed private information concerning Walters when they openly discussed Walters' application for a reasonable accommodation, including Walter's medical condition at Board meetings in the presence of Talkington and other non-board members.

204 Defendants disclosed the content of a personal letter addressed Walters.

205. Walters considered the publicity highly offensive and a reasonable person in Walters position would also consider the publicity highly offensive.

206. The Defendants knew, or acted with reckless disregard of the fact, that Walters would consider the publicity highly offensive and that a reasonable person in Walters'

position would consider the publicity highly offensive.

207. The private information, Walter's medical diagnosis and Happy's registration were not of legitimate public concern. The private information did not have a substantial connection to a matter of legitimate public concern.

208. As a direct and proximate result of Defendants' act and/or omission, Walters suffered and continues to suffer severe emotional distress and other damages for which Defendants are liable.

**COUNT VX: INVASION OF PRIVACY:**
**PUBLIC DISCLOSURE OF PRIVATE FACTS**
(Harcourt and Talkington)

209. Walters incorporates all *preceding* paragraphs herein by reference as though fully re-stated, wholly, in the Count.

210. Defendants Harcourt and Talkington publicized private information concerning Walters.

211. Walters considered the publicity of her private information highly offensive and a reasonable person in Walters position would consider the publicity highly offensive.

212. Walter's medical diagnosis and Happy's dog certification were not of legitimate public concern and or did not have a substantial connection to a matter of legitimate public concern.

213. Defendants knew, or acted with reckless disregard of the fact, that a reasonable person in Walters' position and or Walters would consider the publicity highly offensive.

214. Defendants' actions were done solely to harass, embarrass, humiliate Walters and to frustrate Walters' efforts in requesting and obtaining a reasonable accommodation to keep Happy at Cowpet Bay West.

215. As a direct consequence of Defendants' public disclosure, Walters is entitled to an

award of compensatory and punitive damages from them to compensate her for humiliation, emotional pain and suffering, inconvenience, mental anguish, loss of enjoyment and embarrassment.

**COUNT XVI: INVASION OF PRIVACY; FALSE LIGHT**
**(All Defendants, except Verdiramo and Cockayne)**

216. Walters incorporates all preceding paragraphs herein by reference as though fully re-stated, wholly, in the Count.

217. Defendants publicize information or material that showed Plaintiff in a false light on the blog, in letters and in emails.

218. Walters considered the portrayal of her on the blog, in letters and in email in a false light to be highly offensive and a reasonable person in Walters' position would find the publication to be highly offensive.

219. Defendants intended the publication to create a false impression of Walters to adversely impact her pending request for a reasonable accommodation and her bid for re-election to the Board.

220. Defendants acted with reckless disregard for the truth because they intended to discredit, humiliate, embarrass and make Walters look bad in the Cowpet Bay West community right before the Board of Directors' election.

221. As a direct consequence of Defendants' acts showing Plaintiff in a false light, Walters suffered humiliation, emotional pain and distress, inconvenience, mental anguish, loss of enjoyment, public embarrassment and loss of credibility and Walters is entitled to an award of compensatory and punitive damages from them as compensation.

**COUNT XVII: INVASION OF PRIVACY**
***(Board, Association, Harcourt and Talkington)***

222. Walters incorporates all preceding paragraphs herein by reference as though fully

re-stated, wholly, in the Count.

223. Defendants invaded Plaintiff's privacy.

224. Walters had a reasonable expectation of privacy that her application for a reasonable accommodation and the content of the application would not be made public when she submitted the application to Cowpet Bay West Condominium Defendant Association's business office.

225. Instead, the content of Walters' application was shared with Association members who are not on the Board, specifically Talkington.

226. As a result, Talkington posted private information about Walters on the blog.

227. As a result of the publication, Walters was ridiculed, mocked and ostracized by some members of the Cowpet *Bay West* community.

228. Walters' private information was not of legitimate public concern and or did not have substantial connection to a matter of legitimate public concern.

229. Defendants knew that the publication would be considered highly offensive by Walters and that Defendants acted with reckless disregard that a reasonable person in Walters' position would consider the publicity highly offensive.

230. As a direct consequence of Defendants' act, Walters is entitled to an award of compensatory and punitive damages form them to compensate her for humiliation, emotional pain, and suffering, inconvenience, mental anguish, loss of enjoyment and embarrassment.

**COUNT XVIII**

**NEGLIGENCE PER SE/LEGAL MALPRACTICE**
**(Verdiramo)**

231. Walters incorporates all preceding paragraphs herein by reference as though fully re-stated, wholly, in the Count.

232. Defendant Verdiramo had a duty to provide legal advice that is consistent with the

law.

233. Defendant Verdiramo's December 1, 2011 letter fell short of that standard as it misstated the requirements of the FHA.

234. The Board improperly relied on Defendant Verdiramo's legal advice to deny Walters' her request for a reasonable accommodation.

235. As a direct and proximate result of Defendant Verdiramo's intentional or wrongful act or omission, Walters has suffered, and will continue to suffer loses and damages for which Defendant Verdiramo is liable.

**WHEREFORE, THE PREMISES CONSIDERED, PLAINTIFF PRAYS:**

A. That this Court declare that by its acts and/or omissions and practices, the Defendants have violated rights secured to Plaintiff by the FHAA, the ADA, and other public laws and policies of the United States and the Territory of the U.S. Virgin Islands.

B. That this Court order Defendants to make Plaintiff whole, insofar as she was adversely affected by Defendants' discriminatory practices by awarding damages, including interest in an amount to be shown at trial, and other affirmative relief.

C. That the Court grant compensatory and punitive damages.

D. That the Court grant Plaintiff her attorney's fees, costs and disbursements.

E. That the Court grant additional relief as the Court deems just and proper.

**JURY TRIAL IS DEMANDED.**

Respectfully submitted,

**LAW OFFICES OF KARIN A. BENTZ, P.C.**

Dated: March 11, 2013

/s/ Karin A. Bentz

**KARIN A. BENTZ, ESQ.**
**JULITA K. de LEÓN, ESQ.**
5150 Dronningens Gade, Suite 8
St. Thomas, Virgin Islands 00802
Telephone: 340-774-2669
Telecopier: 340-774-2665
E-mail: kbentz@virginalaw.com

**CERTIFICATE OF SERVICE**

I hereby certify that I caused the filing and service of the foregoing with the Clerk of the District Court of the Virgin Islands using the CM/ECF system, which will provide electronic notice by email to the following.

Richard P. Farrelly, Esq.
Birch de Jongh & Hindels, PLLC
1330 Taarneberg
St. Thomas, VI 00802

John Benham, III, Esq.
Benham & Chan
P.O. Box 11720
St. Thomas, VI 00801

Ryan S. Mead, Esq.
Quintairos, Prieto, Wood and Boyce, P.A.
9300 South Dadeland Blvd., 4th Floor
Miami, FL 33156

/s/ Karin A. Bentz

**IN THE UNITED STATES DISTRICT COURT OF THE VIRGIN ISLANDS
DISTRICT OF ST. THOMAS AND ST. JOHN**

*****************

**BARBARA WALTERS,**

**Plaintiff,**

**v.**

**COWPET BAY WEST CONDOMINIUM ASSOCIATION; THE BOARD OF THE COWPET BAY WEST CONDOMINIUM ASSOCIATION; ~~ED WARDWELL, MAX HARCOURT; BILL CANFIELD, ROSIE WELLS, SHARON KOEHLER, DOUG REBAK and HERB HORWITZ as Board members;~~ MAX HARCOURT, in his personal capacity; LANCE TALKINGTON; ALFRED FELICE, ROBERT COCKAYNE, ~~in his personal capacity;~~ VINCENT VERDIRAMO, ~~in his personal capacity,~~**

**Defendants.**

**CIVIL NO. 12-00024**

**Action for: Housing Discrimination; Discrimination Based on Disability; Invasion of Privacy; Negligent Infliction of Emotional Distress Infliction of Emotional Distress; Punitive Damages; and Injunctive and Declaratory Judgment**

**JURY TRIAL DEMAND**

**SECOND AMENDED COMPLAINT- REDLINE**

**COMES NOW**, Plaintiff **BARBARA WALTERS**, by and through her undersigned counsel, the **LAW OFFICES OF KARIN A. BENTZ, P.C.**, (Karin A. Bentz Esq., and Julita K. de León, Esq., of Counsel) and for a ~~Second Amended Complaint~~ against the Defendants in the above captioned action states and alleges as follows:

**PRELIMINARY STATEMENT**

~~1.~~ ~~On April 11, 1968, President Lyndon B. Johnson signed the Civil Rights Act of 1968. Federal Fair Housing Act, Pub.L. No. 90-284, 82 Stat. 73, 81 (1968) (codified as amended at 42 U.S.C.§§ 3601-3631). The Federal Fair Housing Act (hereinafter "FHA") expanded on the Civil Rights Act of 1964 to prohibit discrimination regarding the sale, rental, and financing of housing based on race, color, religion, and national origin. *Id.* The FHA was amended twice to broaden the class of people falling under the scope of its protections; in 1974, discrimination based on sex was~~

~~added, and in 1988 discrimination based on familial status or disability was included. (Pub.L. 100-430, approved September 13, 1988).~~

On April 11, 1968, President Lyndon B. Johnson signed the Civil Rights Act of 1968. Federal Fair Housing Act, Pub.L. No. 90-284, 82 Stat. 73, 81 (1968) (codified as amended at 42 U.S.C.§§ 3601-3631). The Federal Fair Housing Act (hereinafter "FHA") expanded on the Civil Rights Act of 1964 to prohibit discrimination regarding the sale, rental, and financing of housing based on race, color, religion, and national origin. ***Id.*** The FHA was amended twice to broaden the class of people falling under the scope of its protections; in 1974, discrimination based on sex was added, and in 1988 discrimination based on familial status or disability was included. (Pub.L. 100-430, approved September 13, 1988).

~~2. In amending the FHA, Congress recognized that people with disabilities are subject to artifical, arbitrary, and unnecessary barriers preventing them from making full use of housing. Congress also recognized that more than a mere prohibition against disparate treatment was necessary in order that handicapped persons receive equal housing opportunities. Secretary of HUD v. Dedham Housing Authority, 1991 WL 442793 * 5 (HUDAALJ November 15, 1991).~~

In amending the FHA, Congress recognized that people with disabilities are subject to artificial, arbitrary, and unnecessary barriers preventing them from making full use of housing. Congress also recognized that more than a mere prohibition against disparate treatment was necessary in order that handicapped persons receive equal housing opportunities. *Secretary of HUD v. Dedham Housing Authority*, 1991 WL 442793 * 5 (HUDAALJ November 15, 1991).

Pursuant to the Fair Housing Act (hereinafter "FHA"), it is unlawful to discriminate against any person in the terms, conditions or privileges of sale or rental of a dwelling, or in the provision of services or facilities in connection with such a dwelling, because of the

disability of that person or a person residing in that dwelling, because of the disability of that person or a person associated with that person. 42 U.S.C. §3604(f)(2); 24 C.F.R. §100.202(b).

4. It is unlawful to refuse to make reasonable accommodations in rules, policies, practices, or services, wben such accommodations may be necessary to afford such person equal opportunity to use and enjoy a dwelling. 42 U.S.C. §3604(f)(3)(B); 24 C.F.R. §100.20.

5. Section 3617 of the FHA makes it unlawful for any person to coerce, intimidate, threaten, or interfere with any person in the exercise or enjoyment of, or on account of his having exercised or enjoyed, or on account of his having aided or encouraged any other person in the exercise or enjoyment of, any right granted or protected by Section 803, 804, 805, 806 of this title.

6. At all times relevant to this action, Walters lived in Condominium unit at Cowpet Bay West Condominium community.

7. The property at Cowpet Bay West is part of the Cowpet Bay West Condominium community that is managed by the Cowpet Bay West Condominium Association (hereinafter, "the Association').

8. At all times relevant to this action, Defendant the Board of the Cowpet Bay West Association, (hereinafter "the Board") run the day to day operations of the Defendant Cowpet Bay West Condominium Association.

9. At all times relevant to this action, Defendant Max Harcourt (hereinafter "Harcourt") served as the President of the Board. And, at all relevant times, Walters was a member of the Board

~~3. Pursuant to the Fair Housing Act (hereinafter "FHA"), it is unlawful to discriminate against any person in the terms, conditions or privileges of sale or~~

~~rental of a dwelling, or in the provision of services or facilities in connection with such a dwelling, because of the disability of that person or a person residing in that dwelling, because of the disability of that person or a person associated with that person. 42 U.S.C. §3604(f)(2); 24 C.F.R. §100.202(b).~~

~~4. It is unlawful to refuse to make reasonable accommodations in rules, policies, practices, or services, when such accommodations may be necessary to afford such person equal opportunity to use and enjoy a dwelling. 42 U.S.C. §3604(f)(3)(B); 24 C.F.R. §100.20.~~

~~5. Section 3617 of the FHAA makes it unlawful for any person to coerce, intimidate, threaten, or interfere with any person in the exercise or enjoyment of, or on account of his having exercised or enjoyed, or on account of his having aided or encouraged any other person in the exercise or enjoyment of, any right granted or protected by Section 803, 804, 805, 806 of this title.~~

~~6. At all times relevant to this action, Walters lived in Condominium unit at Cowpet Bay West Condominium community.~~

~~7. The property at Cowpet Bay West is part of the Cowpet Bay West Condominium community that is managed by the Cowpet Bay West Condominium Association (hereinafter, "the Association").~~

~~6. At all times relevant to this action, Defendant the Board of the Cowpet Bay West Association, (hereinafter "the Board") run the day to day operations of the Defendant Cowpet Bay West Condominium Association.~~

~~7. At all times relevant to this action, Defendant Max Harcourt (hereinafter "Harcourt") served as the President of the Board. And, at all relevant times, Walters was a member of the Board.~~

**JURISDICTION AND VENUE**

5. This Court has subject matter jurisdiction over this matter pursuant to 28 U.S.C. §§ 1331, 1332 and §1337; and V.I. Code ANN. tit. 4, §32.

6. Venue is proper within this District pursuant to 28 U.S.C. §1391(b).

**PARTIES**

7. Plaintiff Barbara Walters (~~hereinafter "Walters~~") owns a condo at Cowpet Bay West on the east side of St. Thomas, United States Virgin Islands. ~~This property constitutes a dwelling under the FHA. 42 U.S.C.§3602(b); 24 C.F.R. §100.20.~~

11. Upon information and belief, Defendant ~~Cowpet Bay West Condominium~~ Association is an entity organized pursuant to the Virgin Islands Condominium Act, V.I. CODE ANN. tit 28, §901 *et seq*. as amended~~,~~ that resides and operates its principal place of business in St. Thomas, U.S. Virgin Islands. Cowpet Bay West is the rental manager and governing organization of the condominium development.

12. Each residential unit owner may use his or ber condo unit for permanent, temporary, or transient use. Thus, the owners may permanently reside in their unit, use it as a second bome, rent it out on their own or not use it at all.

~~13.~~ Defendant Association's facility is structured and operated as both a place of lodging and a condominium. As a place of lodging, it is a place of public accommodation witbin the meaning of the ADA.

~~14.~~ ~~Defendant Association~~ is operated and controlled by a Board of elected persons. The Board is authorized by the Virgin Islands Condominium Act and the Declarations of the Cowpet Bay West Condominium Association, with its purpose set forth more fully in Bylaw Article 1, Section 2. The members of the Board are elected by the homeowners of the Cowpet Bay West ~~Condominiums~~.

~~15.~~ ~~Upon information and belief~~, ~~on October 22, 1974, Cowpet Bay West was created~~

~~by a declaration of merger, whereby Cowpet Bay Village-Stages One and Two, the two condominium associations, merged into a single entity. The merger declaration acknowledged that the original 1968 Declaration, except as amended by the merger declaration is still in force. Section 16, of the 1968 Declaration provides that all owners are subject to and must comply with the provisions of the Declaration, the by-laws, and the rules and regualtions as may be amended. Section 17 of the 1968 Declaration provides that the Declaration can only be amended by an affirmative vote of 75% of the Owners in number and common interest. Section 19 of the 1968 Declaration states that the by-laws and rules and regulations are "annexed hereto" and that the by-laws can only be amended by "an amendment to this Declaration and such amendment duly recorded."~~

~~16. Under this provision, any amendment to the by-laws must be by a 75% voe and recorded in order to be valid.~~

~~17. The by-laws of the Association were adopted and recorded in 1974 al;ong with the merger declaration. The by-laws were again amended and recorded in April 1998. Article I, Section 2 of those by-laws made them applicable to both the common areas and the individual units. Article II, Section 2, provided that the affairs of the Association were to be governed by the Board , which was empowered to deal with all administrative affairs of the Association and to undetake all acts except those prohibited by law, the Declaration, or the by-laws. Of the enumerated powers of the Board, adoption and amendment of the rules and regulations is provided for. Thrse rules are applicable to both the common areas and the units under Article I, Section 2. Article V, Section 9 empowers the Board to enjoin and remedy a violation of the by-laws, Declaration, or rules and regulations. Article V, Section 16 allows for the adoption of rules and regulations if approved by a majority of the Owners. Article XI, Section 1 requires that the by-laws be modiifed by a 66 and 2/3% vote of the Owners~~

~~present at a meeting held for such purpose. Article XIII, Section 1 states that where thee is a conflict between the provisions of the by-laws and the Declaration, the Declaration controls.~~

~~18. There is a conflict between the by-laws and the Declaration in that the Declaration makes clear that a vote of 75% of the Owners is required to amend the by-laws.~~

~~19. The 1968 rules and regulations prohibiteed an Owner from making or allowing disturbing noises in his/her apartment and prohibited dogs. The 1998 rules and regulations contained the same provisions.~~

~~20.~~ Based upon information and belief Defendant Alfred Felice is a resident of Plainview, New York.

~~21.~~ Based upon information and belief Defendant Max Harcourt is a resident of St. Thomas, United States Virgin Islands.

~~22.~~ Based upon information and belief Defendant Lance Talkington is a resident of St. Thomas, United States Virgin Islands.

~~23.~~ Based upon information and belief Defendant Robert Cockayne is a resident of St. Thomas, United States Virgin Islands.

~~24.~~ Based upon information and belief Defendant Vincent Verdiramo is a resident of St. Thomas, United States Virgin Islands.

## STATEMENT OF FACTS

~~25. On January 21, 2011, Stansford S. Sutherland, a licensed psychologist wrote a letter stating that he was treating Walters and that she was diagnosed with Anxiety Disorder, citing the DSM-IV. He further explained that Walters had "severe limitations" in coping with stress and anxiety that most people would consider "normal day to day events." He went on to state that he has prescribed the use of an emotional support animal, dog or other, to alleviate her symptoms and that such~~

~~emotional support animal was necessary. In conclusion, he states that pursuant to the Fair Housing Act, Walters is qualified to keep her emotional support animal despite a policy prohibiting pets in her housing. On that same day, the National Service Animal Registry issued a certification that Walters was allowed to keep her emotional support animal even if there is a policy prohibiting pets.~~

26. ~~In February of 2011, Defendant Association received the letter from Walters' medical provider and the certification. **[EXHIBIT B] LETTER AND DOG CERTIFICATION.** However, as early as the Summer of 2010, Walters, a member of the Board, discussed with Board members her need to obtain a waiver to the NO DOG RULE to keep an emotional support dog on the premises.~~

~~27. Walters made the request for a reasonable accommodation because Defendant Association had a NO DOGS RULE in place and Walters needed a waiver from Defendant Association's NO DOGS RULE to keep her emotional support dog (hereinafter "Happy"). Walters furnished those two documents to Louanne Schechter, the Office Manager for Defendant Association as Walters' application because the Defendant Board did not have a form or application in place for requesting a waiver to the NO DOGS RULE.~~

~~28. At the time Walters submitted her request for a reasonable accommodation, Defendant Association had no written policy in place for processing a reasonable accommodation request, although it had a NO DOG RULE IN place for at least fifteen (15) years.~~

~~29. Upon information and belief, Louanne Schechter accepted the documents, placed them in Walters' file and discussed Walters' request with Jon Cassady, Louanne Schechter's immediate supervisor.~~

~~30. Upon information and belief, Jon Cassady discussed Walters' request with Harcourt and Harcourt subsequently came to the Association's Office to review Walters'~~

~~documents.~~

31. ~~Upon information and belief, Harcourt sent his representative, Bob Canefield, a member of the Board, to review the documents.~~

32. ~~Upon information and belief, there was widespread opposition to having dogs on the premises by some members of the Board and Association.~~

~~33. Upon information and belief, Harcourt took down a framed copy of an American with Disabilities Act poster that was hanging in the Defendant Association's office saying **Cowpet Bay rules not ADA**.~~

34. ~~At the February 12, 2011 Board meeting, Board member Robert Cockayne (hereinafter "Cockayne") proposed amending the by-laws to prohibit dogs and farm animals. There was no mention however of providing reasonable accommodations to owners under the FHA or the ADA.~~

~~35. The Board neither discussed or acted on Walters' request for a reasonable accommodation during the March 8, 2011 Board meeting.~~

~~36. During the May 10, 2011 Board meeting, an owner complained of someone walking a dog on the property. The Board, headed by Harcourt voted to post "No Dogs Allowed" signs on the property, despite the fact that Harcourt knew that Walters had submitted a request for a reasonable accommodation to allow her to keep her emotional support dog, Happy on the premises. The Board also took no action on Walters' request for a reasonable accommodation, although it had been pending before them for more than two months.~~

~~37. The Board met in June, twice in July and once in August, but did not act on Walters' request for a reasonable accommodation.~~

~~38. During the Board meeting on September 13, 2011, the Board discussed Service Dogs and mentioned that the dogs must be registered with the ADA. The Board also opined that the Virgin Islands does not have guidelines for "service dogs." Although~~

~~the Board, headed by Harcourt, discussed Walters'request for a reasonable accommodation, the Board, however took no action on Walters' request for a reasonable accommodation, although it had been pending before them for more than six months.~~

~~39. At all relevant times, some members of the Defendant Association and even the Defendant Board were vehemently oppose to having dogs on the premises. Members of the Defendant Association and the Defendant Board began voicing their oppositions to allowing dogs on the premises through emails and on the Cowpet Bay Blog. They also began harassing Walters. At all relevant times, Lance Talkington (hereinafter "Talkington") owned the Cowpet Bay West Blog (hereinafter "the blog").~~

~~40. In his first blog post relating to "dogs" on the premises, Talkington, on September 27, 2011, stated that " at least three owners. . . have been seen with dogs that are either living in condos or are being entertained by an owner walking theem on the property. He goes on to point out that two of the dog owners are present and past Board members. Talkington called for the owners to amend the Defendant Association's by-laws to "eliminate any confusion over possible exceptions to the general rule" of no dogs . [EXHIBIT D)~~

~~41. At the October 11, 2011 Board meeting, the Board, headed by Harcourt, took no action on Walters' pending request for a reasonable accommodation, although it had been pending for more than eight (8) months. However, the Board under Harcourt's leadership, discussed changing the by-laws to adopt a NO DOGS ALLOWED rule.~~

~~42. The Harcourt led Board proposed NO DOGS ALLOWED rule made an exception only for the ADA. Harcourt and the other members of the Board excluded FHA requests, although Walters' requested a reasonable accommodation pursuant to the~~

~~FHA. Moreover, Harcourt and at least two Board members knew that Walters' request was currently pending before the Board and had been pending for more than six (6)months.~~

~~43. A day after the Board meeting, on October 12, 2011, Talkington emailed Walters regarding her "service animal." In this email, Talkington request from Walters a copy of her request for reasonable accommodation that was submitted to the Defendant Association office.~~

~~44. Walters responded on that same day telling Talkington that he has no right to the information.~~

~~45. Talkington responded by telling Walters that he will continue to pursue obtaining copies of her request for reasonable accommodation and that her "blatant violation" of the by-laws is completely intolerable.~~

~~46. Talkington continued to harass Walters regarding her need for an emotional support dog. In an October 13, 2011 blog, Talkington attacked Walters by stating that she claims to have papers that allow her to have a service dog and implied that Walters' refusal to discuss her disability with him and or the blog is unreasonable. Talkington also implied that Walters had made no attempt to prove her need for a service dog to the Board. [EXHIBIT E] TALKINGTON'S BLOG OF OCTOBER 13, 2011.~~

~~47. Alfred Felice (hereinafter "Felice") chimed in on the blog and stated that "service dogs' for the true needs are legal; but anyone can get such a designation by simple request from a friendly physician, regardless of any real need. Anyone can also get one via the internet for a minimal fee.!!!"~~

~~48. Exemplifying the type of discriminatory attitude that the FHA and the ADA were enacted to combat, Felice went on to say that "the perpetrators might just as well spit in our face. The by-laws must be made to reflect the majorities' rights. Perhaps, the dissenters would be happier in another community rather than be ostracized at CBW,~~

~~which would be another fine recourse." [EXHIBIT F] FELICE'S OCTOER 13, 2011 BLOG.~~

~~49. In rsponse increasing attacks by both Talkington and Felice on the blog regarding her request for a reasonable accommodation, Walters explained that she was not violating the law or the rules. Walters stated that she has a disability and is afforded protection under the FHA.~~

~~50. Felice responded with disdain for Walters and the law that protects her rights as a disabled American. [EXHIBITS G] FELICE'S BLOG~~

~~51. Walters again attempted to defend herself against allegations of wrongdoing on the part of both Felice and Talkington. Walters blogged that she is on permanent disability and receives social security benefits.~~

~~52. Immediately, Talkington discounted Walters' claim in a blog by stating how "unreasonable" it is to expect the Owners to accept Walter's claims of disability. Talkington asked Walters to provide the "dog's credentials. [EXHIBIT H]~~

~~53. In a later blog, Talkington attacked Walters' credibility and accused Walters about having made a request for a reasonable accommodation with Defendant Association's office. [EXHIBIT I].~~

~~54. Walters confronted Talkington about his retaliatory and harassing conduct on the blog. In response, Talkington stated that" [i]t is im possible to give someone grief over a disability that is to day completely undefined and unsubstantiated." [EXHIBIT J]~~

~~55. After reading Talkington's last blog, on October 13, 2011, Walters emailed the Board with the subject line "This has gone too far." In her email, Walters informs the Board that she feels Talkington obtained her private information from being allowed to attend Board meeting even though he is not a Board member.~~

~~56. Upon information and belief Harcourt and other members of the Board improperly~~

~~shared the content of Walters' request for a reasonable accommodation with Talkington.~~

~~57. Susan Anderson, wrote an email complaining that she saw Judith Kromenhoek walking a dog and assumed that she was walking the dog for somebody else "because Judith Kromenhoek does not appear to be disabled."~~

~~58. The prevailing attitude shared by some Association and Board members was that Walters was not disabled because there was no visible evidence of her disability.~~

~~59. In response to Susan Anderson email regarding Judith Kromenhoek's "presumed disability, in an email dated October 20, 2011, Harcourt informed Susan Anderson that the Board was considering amending the by-laws to allow exceptions for "true" service animals "that are documented." Harcourt response came more than eight (8) months after Walters submitted a request for reasonable accommodation to the Board, which was still pending before the Board.~~

~~60. Harcourt also stated that a fine should be levied against the "offenders" unless they submitted "appropriate ADA compliant paperwork."~~

~~61. On October 26, 2011, Talkington blogged requesting that the Board enforce its rules and regulations. [EXHIBIT K] TALKINGTON OCTOBER 26, 2011 BLOG.~~

~~62. On October 27, 2011, a member fo the Board emailed the Board stating that the Board should respond to both Susan Anderson's and Talkington's inquiries.~~

~~63. Walters' responded that she had submitted a request for reasonable accommodation with the Board. Walters also mentioned that her request included a letter from her treating physician and asked that her medical record be kept confidential. Walters also expressed concern that medical information might appear on Talkington's blog.~~

~~64. Walters and some members of the Defendant Association recommended that Talkington not be allowed to attend Board meetings as he is not a member of the Board. Others, suggested that the Board hold closed meetings to discuss sensitive~~

~~issues, including Walters' request for a reasonable accommodation.~~

~~65. Some members of the Board however violently opposed to having closed Board meetings to discuss Walters' reasonable accommodation request. In response to a blog recommending a closed meeting to discuss Walters' request for reasonable accommodation, Board member Douglas Rebak blogged, "I do support the Board's need for closed sessions on "confidential" matters–but the dog issue??? PLEASE!!! The situation is most disturbing and not at all the way it should be in an upscale Residential/Resort Community!" EXHIBIT L]. NOVEMBER 12, 2011 BLOG.~~

~~64. Notwithstanding Walters' objection to providing Talkington with her private and personal information, on October 28, 2011, Harcourt emailed a letter to Walters and Judith Kromenhoek and copied Talkingon. Harcourt wrote as President of the Board and falsely accused Walters and Judith Kromenhoek of violating the NO DOGS RULE "because they have not applied for an exception to the no dog rule." Harcourt also acknowledged in that same letter that both Walters and Judith Kromenhoek had "papers for service dogs pending in the office." Contradicting himself, Harcourt ordered Walters to apply and submit documentation for a waiver and threatened to levy a monetary fine against Walters if she did not take up his offer. . [EXHIBIT M].~~

~~65. In response, Walters addressed the entire Board stating that "if any of her medical information were disclosed to Susan Andeson or Talkinton or anyone who is not on the Board, she would deal with it accordingly. Walters also emailed the Board under separate cover and expressed her belief that Harcourt had overstepped by sharing the letter with Anderson and Talkington.~~

~~66. Talkington psoted he entire letter on the blog in his October 30, 2011 post.~~

~~67. At the November 8, 2011 Board meeting, the Board took no action on Walters' pending application for a reasonable However, the Board, led by Harcourt, discussed amending Section 11 of the by-laws to add:~~

> No dogs are allowed on the property, either long term or visiting. The Board may grant exceptions to the NO DOGS ALLOWED rule, on an individual basis, should an owner require the assistance of a service animal (dog) as defined by the ADA. Owners seeking to obtain such an exemption are required to apply, in writing, to the Board with supporting document.

68. At the November 18, 2011 Board meeting the Board did not act on Walters' pending reasonable accommodation request. However, the Board offered to table discussion on the proposed amendment to the by-laws until a legal opinion has been obtained.

69. On December 2, 2011, Vincent Verdiramo (hereinafter "Verdiramo"), an attorney and member of the Board, emailed a December 1, 2011 letter to 99 members of the Association. In his letter, Verdiramo offers legal advice to the Defendant Association. Verdiramo provides that the FHA is "not a blanket law." Verdiramo further notes that "every case must be handled individually "with official adjudication." He advised that when a person claims the need for am\n emotional support animal under the FHA, the must bring the Association to court and present expert testimony.[EXHIBIT N] LETTER FROM VERDIRAMO

70. Thr Board held at least three meetings in December of 2011, but took no action on Walters' pending request for a reasonable accommodation.

71. Talkington continued his harassing campaign against Walters. In a December 5, 2011, Talkingon shares a complaint of a Mr. Bartlett and the barking of a dog in his area of the community. Talkington goes on to point out that the "known violators" live in this same area. Talkingon opined that "trained service dogs are specifically trained to NOT bark unless the owner is in imminent danger." [EXHIBIT O]

72. As a Board member, Walters was up for re-election in the upcoming Board election. Felice and others suggested retaliating against Walters by defeating her in the upcoming election. In response to Talkington blog, Felice notes "that a change to the by-laws may be necessary and taht the Owners shuld 'WAKE UP START UP A CAMPAIGN FOR A NO DOGS SLATE NOW.

~~73. In a December 13, 2011 Board meeting, the Board, led by Harcourt decided to amend the by-laws to include the NO DOGS ALLOWED rule. The Board also discussed Verdiramo's December 2, 2011 legal advice.~~

~~74. On December 16, 2011, on the behalf of Walters, he Board received a letter from Karin A. Bentz, Esq. In this letter, Board was informed that under the FHA, Walters is qualified to keep Happ to assist her with her disability. The Board was further informed that they could not engage in any conduct that would punish or deprive Walters of her right to keep Happy on the premises. [EXHIBIT P].~~

~~75. In a January 9, 2012 email, Felice states "PLEASE do not return the coven and their shills to office, they DO NOT deserve another term EVER." In a January 10, 2012 blog, Felice continuees, "JUDI and BARBARA have DOGS!!!! They surely have an agenda and DICK is their SHILL."~~

~~76. In their January 11, 2012, Board meeting, the Board, led by Harcourt, discussed receipt of the December 16, 2011 from Karin Bentz. Verdiramo motioned to "abide by the rule and immediately begin fining owners that have dogs." The Board voted to fine Walters $50.00 per day for having Happy on the premises.~~

~~77. In a January 14, 2012 email, Felice states "Only the coven and their shills call me a disaster." He goes on to say that if the Owners want a lot more "bull" "Elect the Coven on the board, with their shill."~~

~~78. During the January 11, 2012, Defendant Cockayne distributed information about service dog certification naming businesses that have no requirements for service dog certification. Copies of Walters' dog certification were circulated during that Board meeting. A copy of Walters' dog certification was improperly shared with Talkington.~~

~~79. In a January 15, 2012 blog entitled "Puppy Dog Diplomas" Talkintong attacked Happy's certification by stating it is "certified by an outfit called the Ntional Serivce~~

~~Animal Registry." Talkington concludes his blog post by sharing his "considered opinion" that such "outfits serve no legitimate purpose and exist mainly to sidestep what the ADA works diligently to accomplish" and putting forth a call "to stop the doggy diploma silliness and adopt clear ground rules for dogs at Cowpet". Talkington states that the ADA is the sole source of legitimacy for such rules.~~

~~80. On January 16, 2012, Harcourt distributed his President's Forum to the owners. In it, he says: "[t]he issue of dogs on the property has been the subject of many (unfortunately) blanket emails, There are some owners who are violating the current rule. The Board had shown some restraint in this matter since we wee trying to revise the by-laws to allow for valid exceptions; however, one of these owners had their attorney send the Board a letter saying the attorney was representing them in a complaint against use. The Board voted to retain an attorney to protect the Association's interest.~~

~~81. On January 15, 2012, Donna LaScola voiced concern that the Defendant Association may be getting into legal trouble with all the blog posts and emails regarding Walters' and Judith Kromenheok's service animals. [EXHIBIT Q].~~

~~81. Ever ready to vilify Walters, Felice states, "[t]he ADA law does not prevent a community from excluding DOGS." He goes on, "[n]o one wishes to prevent proper needs to be satisfied!! He continues, "[a]gain REAL needs or pets??" He concludes, "I suggest they be ostracized, NO dinner dates, no patronage of their establishments, no conversations, no beach conclaves, just ignore them completely!!!"~~

~~81. On January 17, 2012, ever dutiful to Talkington, Harcourt emailed Talkington informing him that the Board had received a letter from one of the owners stating the owner had filed a complaint. Therefore the Board was retaining counsel.~~

~~82. On January 17, 2012, Walters received a letter from the Board informing he that she was in violation of the no dogs rule and would be fined. Walters felt hurt and~~

~~ashamed after reading the letter.~~

~~83. On January 24, 2012, Talkington screening a candidate for the Board, discussed the candidate's stance on the "issues," one of which is the amendment of the by-laws regarding dogs. Talkington respresented that the Board informed him that Judith Kromenhoek and Walters refused to present any proof of their disability that warrants a service animal.~~

~~84. In a January 30, 2012 email, Felice wrote to 40 recipients, "How can you allow 2 admitted 'certified' mentally disabled persons on the ballot for election to our board?? Due diligence was not done properly. The should be removed from consideration.~~

~~85. As of February of 2007, Walters had not received any response from the Board regarding her request for a reasonable accommodation. At the Board's February 7, 2012 meeting, Harcourt stated that he met with Attorney Maria Hodge regarding the HUD complaints and the dog issue in general.~~

~~86. On February 28, 2012, Edward Wardell, the incoming President of the Board, emailed the owners informing them that the by-laws were amended by a vote of 69.2% of the Owners and will become effective once "registered with the U.S. Virgin Islands Government.~~

~~87. In this version of the by-laws, Section 11 of Article V was amended to state:~~

~~No dogs are allowed on the property, either long term or visiting. The Board may grant exceptions to the NO DOGS ALLOWED rule, on an individual basis, should an owner require the assistance of a service animal (dog) as defined by the ADA. Owners seeking to obtain such an exemption are required to apply, in writing, to the Board with supporting documentation.~~

~~88. However, the April 11, 2012 Board minutes reflect that legal counsel had suggested not recording the by-laws and obtaining approval to revised the "no dogs" rule as follows:~~

~~No dogs are allowed on the property, either long term or visiting. Owners or occupants who have properly documented and verified disability as defined by Federal Law may make a request for reasonable accommodation and exception to the~~

~~prohibition on dogs on the property. An owner or occupant seeking an accommodation can do so in writing to the Board. The request shall include: (1) identification of the owner or occupant seeking the accommodation; (2) explanation of the relationship between the requested accommodation and the disability; and (3) verification of the disability and need for accommodation as set forth in this rule. To facilitate the Board's review of each request for an accommodation of a non-obvious handicap, the Board may require(1) the submission of documentation verifying that the person meets the Federal Fair Housing Act's definition of disability; and (2) documentation from a doctor or other medical professional who is in a position to know about the individual's disability, and that the requested accommodation is related to the individual's disability. All information submitted to the Board that is necessary for the evaluation of the reasonableness of an accommodation will be kept confidential.~~

~~89. On February 29, 2012, Verdiramo & Verdiramo P.A. delivered a letter to the Board providing an explanation of the Defendant Association's legal obligations under the ADA and the FHA~~

~~90. In December of 2011, Walters filed a charge of discrimination under the FHA with the Department of Housing and Urban Development (HUD) against the Association and the Board for violation of the FHA.~~

~~90. In response to Walters and Judith Kromenhoek's HUD complaints, on March 25, 2012, Talkington blogged, Walters and Judith Kromenhoek will "hang onto their puppies" at any length. In direct response to the HUD Complaint, Talkingon says "Really ladies? Do you seriously believe that either of two owners has any impact whatsoever on the Association's governance of this property in terms of your having those puppies? To call this a fiasco of a complaint 'misguided' is at the moment the most charitable description of the though process (if there even was one) that was involved in filing this complaint." Talkington characterizes Walters and Judith Kromenhoek as "playgournd bullies" and of making a mockery of our board." He then calls on the Association to "go on the offensive" and file suit against Walters' and Kromenhoek stating "when these ladies start spending their own cash instead of relying on the government for free help, the rubber will meet the road on how far everyone is willing to go. In closing, Talkington implores the Board to take Walters~~

~~and Judith Kromenhoek to court.~~

~~91. Walters was not re-elected to the Board. In late March or early April of 2012, Walters finally received a response from the Board approving her request for reasonable accommodation more than a year afer she submitted her request.~~

~~92. Defendant Board's act and omissions, including Defendant Board's response to Walter's request for an accommodation, as well as the Board's failure to respond to the request for more than a year, constitute a denial of a request for reasonable accommodation in violation of the FHA.~~

~~93. Defendant Association is vicariously liable for the actions and omissions of its agent, Defendant Board.~~

~~92. Defendant Harcourt's acts and omissions in ignoring Walters' request for reasonable accommodation; while at the same assisting a campaign to amend the by-laws to specifically exclude emotional support animals by incorporating only the definition of the ADA of service animal; providing Talkington access to Walters' personal and private information; and falsely accusing Walters of violating the rules qualify as retaliatory measures pursuant to the FHA.~~

~~93. The Defendant Board action in assessing Walters a fine after receiving the letter from Karin A. Bentz, qualifies as retaliatory measures pursuant to the FHA.~~

~~94. As a result of the Defendants' actions, and each of them, Walters has suffered damages including but not limited to emotional distress, embarrassment, and humiliation.~~

**COUNT I: VIOLATION OF THE FHA**

**(Association and Board)**

95. ~~Plaintiff Walters~~ realleges and incorporates by reference the remainder of the allegations set forth herein.

~~96.~~ ~~42 U.S.C. §3604(f)(3)(b), commonly known as the Fair Housing Act Amendment (FHAA), prohibits housing providers from discriminating against applicants or residents because of their disability and from treating persons with disabilities less favorably than others because of their disability. The foregoing conduct violates the FHA which prohibits discriminating based on disability and from treating persons with disabilities less favorably than others because of their disability.~~

~~97.~~ The FHA also makes it unlawful for any person to refuse " to make reasonable accommodations in rules, policies, practices, or services, when such accommodations may be necessary to afford persons with disabilities equal opportunity to use and enjoy a dwelling.

~~55~~98. ~~Defendant Cowpet Bay West Association owns, operates and/or leases condominium in Cowpet Bay West.~~ At all relevant times, Walters had a request for a reasonable accommodation pending before the Defendant Board~~.~~

~~56~~99. ~~Cowpet Bay West is a place of public accommodation. 42 U.S.C §§3601-3619.~~

~~57~~100. Defendant ~~Cowpet Bay West Condominium~~ Association knew or reasonably should have known of Plaintiff's disability.

~~58~~102. Defendants ~~Cowpet Bay West Condominium~~ Association and ~~Cowpet Bay West Condominium the~~ Board ~~have~~ discriminated against ~~Plaintiff~~ Walters by denying Walters ~~Plaintiff,~~ as a person with a disability, a reasonable accommodation by failing to take action on her request for reasonable accommodation for more than a year. ~~Defendant Association id otherwise ratify Defendant Board's acts and/or omissions.~~ ~~the equal opportunity to use and enjoy a dwelling on the basis of disability.~~

~~103.~~ As direct and proximate result of the Defendants' conduct described above, Walters has suffered and will continue to suffer embarrassment, humiliation, mental anguish, emotional and physical distress.

a. Discriminatory exclusion and or denial of services, privileges, accommodations, and/or opportunities in Defendant Cowpet Bay West Condominium Board Rules and Regulations.

a. Failing to make reasonable modifications in policies, practices, and/or procedures as necessary to afford the privileges, advantages, and/or accommodations of Cowpet Bay West to Walters Plaintiff.

b. Failing to act upon and/or refusing Plaintiff Walters' request for reasonable accommodation after learning of her disability.

d. Failing to remove barriers to individuals with disabilities where it would be readily achievable to do so.

e. Failing to adopt an exception to its NO DOGS RULE by-laws and or a Reasonable Accommodation Policy so that Walters Plaintiff and other individuals with disabilities under the FHA have equal opportunity to use and enjoy a dwelling at Cowpet Bay West.

fd. Adopting rules and regulations that have a desperate impact on Plaintiff and others like her that suffer from a disability and require the use of an emotional support animal.

g. Failing to make a reasonable accommodation in rules, practice, and services after learning of Plaintiff's disability.

59104. As such Defendants discriminate and will continue to discriminate in the future against Plaintiff on the basis of disability in the full and equal enjoyment of the goods, privileges, facilities accommodations, advantages and/or opportunities of Cowpet Bay West in violation of the Civil Rights Act of 1968, §§802(h), 8049f)(3)(B), 42 U.S.C. §§3602(h), 3604(f)(3)(B) and or their implementing rules and regulations. Defendants' acts or omissions were done maliciously, oppressively and/or fraudulently.

60105. Defendants violations of the FHAA and the Civil Rights Act of 1968 have harmed and will continue to harm Plaintiff in the future. Once Walters submitted her application to Louanne Schechter in February of 2011, the Defendant Board had an obligation to take action on the pending claim. Moreover, Defendant Association could have taken measures to assure that the Board complies with the FHA but chose

not to.

~~61~~106. Defendants conduct violated the FHA and Walters is entitled ~~tPursuant~~ to the remedies, procedures and rights set forth in 42 U.S.C *§3613 (c)*(1). ~~and (2), Plaintiff prays for judgment as set forth below.~~

**<u>COUNT II: VIOLATION OF SECTION 3617 OF THE FHAA</u>**
**(~~Max~~ Harcourt)**

~~62~~107. ~~Plaintiff~~ Walters re-alleges and incorporates all preceding paragraphs herein by reference as though fully restates, wholly, in this Count.

~~63~~108. ~~Max~~ Harcourt is a member of the ~~Cowpet Bay West Condominium~~ Association and was the President of the ~~Cowpet Bay West Condominium~~ Board, at the time ~~Plaintiff~~ Walters applied for a reasonable accommodation.

~~64~~109. ~~Max~~ Harcourt's removal of the framed copy of the ADA poster made clear his intention to ignore Walters' request for accommodation. ~~individually, vitiated Plaintiff's request for reasonable accommodation by insisting that the Cowpet Bay West Condominium Association Bylaws trumped the FHAA.~~

~~65~~110. ~~Max~~ Harcourt's ~~joined Lance Talkington and others to publicly ridicule the content of Plaintiff's request for reasonable accommodation on the blog including Plaintiff's medical records. Max Harcourt's actions were designed to intimidate, threaten or coerce Plaintiff into relinquishing her rights to seek a reasonable accommodation.~~ ~~*This was done solely for the purpose of forcing Plaintiff to retreat from her reasonable accommodation application*~~ conduct in ignoring Walters' request for a reasonable accommodation while at the same time pushing for an amendment to the by-laws that would deny Walters reasonable accommodation constitute interference pursuant to Section 3617 of the FHA.

~~66~~111. ~~Section 3617 of the FHAA <u>inter alia</u> makes it unlawful for any person to coerce, intimidate, threaten, or interfere with any person in the exercise or enjoyment of, or~~

on account of his having exercised or enjoyed, or on account of his having aided or encouraged any other person in the exercise or enjoyment of, any right granted or protected by Section 803, 804, 805, 806 of this title. Harcourt action in falsely accusing Walters of violating the no dogs rule and levying a fine against Walters constitute retaliation under the FHA.

67112. Max Harcourt violated Section 3617 of the FHAA by interfering with Plaintiff in her exercise of the right granted or protected by Sections 803, 804, 805, 806 of the FHAA. As a result of Harcourt's acts and/or omissions, Walters has suffered emotional injuries and continues to suffer emotional injuries.

68113. Defendant Max Harcourt's violations of the FHAA have harmed and will continue to harm Plaintiff. Defendant Harcourt's conduct violated Section 3617 of the FHAA and entitles Walters to all categories of damages, including punitive damages.

69. Pursuant to the remedies, procedures and rights set forth in 42 U.S.C. *§3613 (c)*(1) and (2), Plaintiff prays for judgment as set forth below.

70. In doing the acts and/or omissions alleged herein, Max Harcourt wrongfully and unlawfully interfered with Plaintiff's exercise of her right to reasonable accommodation and acted with knowledge of the effect his conduct was having on Plaintiff.

**COUNT III: VIOLATION OF SECTION 3617 OF THE FHAA**
**(Bay West Condominium Association)**
***Cowpet Bay West Condominium Board***

71114. Plaintiff Walters incorporates all preceding paragraphs herein by reference as though fully restated, wholly, in the Count.

72115. Defendant Cowpet Bay West Condominium Association was created pursuant to Chapter 28 of the Virgin Islands Code and as such is obligated to comply with the

~~provisions of the FHAA. *Defendant Cowpet Bay West Condominium Board is also obligated to comply with the FHAA.*~~ The foregoing conduct violates the FHA, which makes it unlawful for any person to coerce, intimidate, threaten, or interfere with any person in the exercise or enjoyment of, or on account of his having exercised or enjoyed, or on account of his having aided or encouraged any other person in the exercise or enjoyment of, any right granted or protected by the FHA.

~~73~~116. Defendant Association knew or had reason to know that Walters had applied for a reasonable accommodation to keep her emotional support dog, Happy, on the premises. Yet, Defendant Association refused to provide Walters with a reasonable accommodation and amended its by-laws to exclude emotional support dogs from a waiver to the NO DOGS ALLOWED rule.

~~74~~117. ~~Section 3617 of the FHAA inter alia makes it unlawful for any person to coerce, intimidate, threaten, or interfere with any person in the exercise or enjoyment of, or on account of his having exercised or enjoyed, or on account of his having aided or encouraged any other person in the exercise or enjoyment of, any right granted or protected by Section 803, 804, 805, 806 of this title.~~ Defendant's Board Action if assessing Walters a fine after it received a letter from Walters' attorney and assessing Walters a fine despite the fact that Walters' request for a reasonable accommodation was pending in the office constitute retaliation under the FHA.

~~75~~118. ~~Defendant Cowpet Bay West Condominium Association *and Defendant Cowpet Bay West Condominum Board have* violated Section 3617 of the FHAA by interfering with Plaintiff's request for reasonable accommodation. Defendant Cowpet Bay West Condominium Association also violated Section 3617 of the FHAA by intimidating Plaintiff via the blog and coercing Plaintiff against exercising her right to request a reasonable accommodation. *Defendant Cowpet Bay West Condominium Board violated the FHAA by refusing to provide Plaintiff with reasonable accommodation and by harassing and intimidating Plaintiff with a $50.00 per day fine.*~~ As a direct

and proximate result of Defendant Board and Defendant Association's acts or omissions, Walters has suffered extreme and severe anguish, humiliation, embarrassment, emotional distress and tension, the extent of which is not fully known at this time and the amount of damages caused thus far is not yet fully ascertained but will be proven at the time of trial.

~~76~~119. ~~Defendant Cowpet Bay West Condominium Association's violations of the FHAA have harmed and will continue to harm Plaintiff.~~ ~~*Defendant Cowpet Bay West Condominium Board's actions have harmed and will continue to harm Plaintiff.*~~ Defendants' conduct as described in this Complaint violated the FHA and the public policy of the United States and entitles Walters to all categories of damages, including punitive damages.

~~77. Pursuant to the remedies, procedures and rights set forth in 42 U.S.C. §3613 (c)(1) and (2), Plaintiff prays for judgment as set forth below.~~

**COUNT IV: VIOLATION OF SECTION *3617* OF THE FHA~~A~~**
**(Alfred Felice)**

~~78~~120. ~~Plaintiff~~ Walters re alleges and incorporates by reference all preceding paragraphs herein as though fully restated, wholly, in the Count.

~~79~~121. ~~Defendant Alfred Felice is a an owner of a Condominium unit at Cowpet Bay West and is a member of the Cowpet Bay West Association.~~Defendant ~~Alfred~~ Felice began interfering with ~~Plaintiff~~ Walters on the blog once he learned that ~~Plaintiff~~ Walters had requested reasonable accommodation for an emotional support animal, her dog.

~~80~~122. Defendant ~~Alfred~~ Felice interfered with ~~Plaintiff's Walters'~~ right to request reasonable accommodation by using the blog and personal emails sent to the Cowpet Bay West Community to intimidate, to discredit and to threaten ~~Plaintiff Walters.~~ Defendant ~~Alfred~~ Felice's actions ~~are~~ were designed to intimidate, threaten and scare ~~Plaintiff~~ Walters ~~into relinquishing her~~ from pursuing a ~~right to request a~~ reasonable

accommodation to keep Happy on the premises.

81. ~~82. Section 3617 of the FHAA inter alia makes it unlawful for any person to coerce, intimidate, threaten, or interfere with any person in the exercise or enjoyment of, or on account of his having exercised or enjoyed, or on account of his having aided or encouraged any other person in the exercise or enjoyment of, any right granted or protected by Section 803, 804, 805, 806 of this title.~~

~~82~~. Defendant ~~Alfred~~ Felice's conduct violated Section 3617 of the FHA~~A~~ by interfering with ~~Plaintiff's~~ Walters'exercise of her right to request for a reasonable accommodation.

~~84~~124. Defendant ~~Alfred~~ Felice violation of the FHA~~A~~ has harmed and will continue to harm ~~Plaintiff~~ Walters.

~~85~~125. As a result of Defendant Felice's act or omission, Walters is entitled ~~Pursuant to~~ the remedies, procedures and rights set forth in 42 U.S.C *§3613 (c)*(1) and (2).~~, Plaintiff prays for judgment as set forth below.~~

**COUNT V: VIOLATION OF SECTION *3617* OF THE FHA~~A~~**
**(Lance Talkington)**

~~86~~126. ~~Plaintiff~~ Walters re alleges and incorporates by reference all preceding paragraphs herein as though fully restated, wholly, in the Count.

~~87 Upon information and belief Defendant Lance Talkington owns at least one Condominium unit at Cowpet Bay West and is a member of the Cowpet Bay West Condominium Association.~~

~~88~~127. Upon information and belief Defendant ~~Lance~~ Talkington runs the blog and used the "blog" to attack, embarrass and humiliate Walters after she filed a request for reasonable accommodation. ~~, and to intimidate Plaintiff.~~

~~89~~128. Defendant ~~Lance~~ Talkington interfered with ~~Plaintiff's~~ Walters' exercise of her right to request a reasonable accommodation by demonizingWalters on the blog and suggesting both implicitly and explicitly that Walters violated the rules.

~~90~~129. Defendant ~~Lance~~ Talkington interfered with ~~Plaintiff's~~ Walters~~'~~ right to request a reasonable accommodation by mounting a calculated attack against ~~Plaintiff's Walters'~~ reputation, honesty and standing in the Cowpet Bay West Community.

~~91~~130. Defendant ~~Lance~~ Talkington interfered with ~~Plaintiff's~~ Walters'right to request a reasonable accommodation by posting and publicly discussing ~~Plaintiff's Walters' private medical~~ record on the blog.

~~92~~131. Defendant ~~Lance~~ Talkington's actions ~~are~~ were designed not only to humiliate and to discredit ~~Plaintiff~~ Walters but to signal to ~~Plaintiff~~ Walters that her medical records and private information will continue to be the subject of public scrutiny if she continues to demand a reasonable accommodation. Defendant ~~Lance~~ Talkington actions ~~are~~ were designed to threaten, intimidate or scare ~~Plaintiff~~ Walters into ~~relinquishing~~ abandoning Walters' ~~the right to~~ for a request ~~a~~ reasonable accommodation ~~under the FHAA~~ to keep Happy on the premises.

~~93~~132. The conduct herein violates ~~the FHAA, including~~ Section 3617 of the FHA~~A~~.

~~94. Section 3617 of the FHAA inter alia makes it unlawful for any person to coerce, intimidate, threaten, or interfere with any person in the exercise or enjoyment of, or on account of his having exercised or enjoyed, or on account of his having aided or encouraged any other person in the exercise or enjoyment of, any right granted or protected by Section 803, 804, 805, 806 of this title.~~

~~95. Defendant Lance Talkington violated the FHAA, inter alia, by interfering with Plaintiff's exercise of her right to request a reasonable accommodation. Defendant Lance Talkington has violated the FHAA by, inter alia, interfering with Plaintiff's rights to request a reasonable accommodation and by using the blog to intimidate, threaten and coerce Plaintiff into not exercising her statutory right to request a~~

~~reasonable accommodation.~~

96133. Defendant ~~Lance~~ Talkington's violations of the FHA~~A~~ have harmed and will continue to harm ~~Plaintiff~~ Walters in the future.

~~97~~134. As direct result of Defendant Talkington's act or omission, Walters is ~~entitled Pursuant~~ to the remedies, procedures and rights set forth in 42 U.S.C *§3613 (3)*(1) and (2).,~~ Plaintiff prays for judgment as set forth below.~~

**COUNT VI: VIOLATION OF THE AMERICAN WITH DISABILITIES ACT**
**(~~Cowpet Bay West Condominium~~ Association and ~~Cowpet Bay West Condominium~~ Board)**

~~98~~135. ~~Plaintiff~~ Walters realleges and incorporates by reference all preceding paragraphs herein as though fully restated, wholly, in the Count.

~~99~~136. ~~Title III of the ADA provides that "No individual shall be discriminated against on the basis of disability in the full and equal enjoyment of the goods, services, facilities, privileges, advantages, or accommodations of any place of public accommodation by any person who owns, leases, or operates a place of public accommodation.~~"As set forth herein, at all relevant times, Defendants were subjected to the ADA based on the ADA definition of public lodging.

~~100~~137. Defendants owns, operates and/or leases condominium units in Cowpet Bay, St. Thomas, Virgin Islands~~.~~

~~101~~138. ~~Cowpet Bay West Condominium is a place of public accommodation. 42 U.S.C. §12181(7)(B).~~

~~102~~139~~.~~ Defendants's ~~have~~ discriminated against ~~Plaintiff~~ Walters ~~on the basis of disability. Defendants discriminatory conducts include but is not limited to~~ by failing to make reasonable modifications to its NO DOGS RULE to allow Walters to keep Happy on the premises.

~~a. Discriminatory exclusion and/or denial of goods, services, facilities, privileges,~~

# Mind/Body Health & Psychology, LLC

6115 Estate Smith Bay
Suites 334 & 335
St. Thomas, USVI 00802

mbh&p
Mind/Body Health & Psychology, LLC

**Name:** Barbara Walters
**Date of Birth:**
**Age:**
**Gender:** Female
**Service:** Psychotherapy, Individual
**Date(s) of Service:** 1/30/2012; 2/20/2012; 2/17/2012; 3/13/2012; 4/16/2012; 3/19/2013; 4/1/2013
**Service Provider:** Sheena M. Walker, Ph.D.
Clinical Psychologist, VI License 10-029-PSY

## CLINICAL SUMMARY

**Presenting Complaint(s):** Barbara is a 64-year-old European-American woman who self-referred for assistance with the following issues: Depression, Relational Problems related to possession of service animal, and Familial discord resulting from separation and pending divorce.

**Symptoms Reported:**

- Demonstrates dysphoric affect (e.g., sadness, hopelessness, helplessness, inappropriate guilt, shame, low self-esteem).
- Describes somatic symptoms (e.g., changes in sleep, appetite, and/or sexual patterns; weight loss; headaches; pains; psychomator agitation or retardation).
- Reports irritability and/or crying spells.
- Verbalizes difficulty coping adequately with stress and conflict related to multiple roles.
- Evidences suicidal ideation with no plan or intent.
- Demonstrates an inability to accomplish daily tasks at a previous level at home and in personal matters.
- Describes poor interpersonal exchanges (e.g., isolation, loneliness, relationship distress with neighbors).
- Reports anger, resentment, irritability, loneliness, and grief related to a divorce.
- Evidences depression and anxiety-related symptoms (e.g., impaired decision-making ability, sleep disturbances, problems with concentration).
- Experiences trauma symptoms associated with a marriage characterized by abuse and/or manipulation which have been recently exacerbated by social interactions with neighbors due to possession of service dog.
- Verbalizes difficulty in coping with everyday stressors during and after separation from spouse.
- Experiences stress associated with difficulties negotiating with ex-spouse on issues related to finances.
- Expresses anxiety and stress associated with financial situation after or during a divorce.

**History of the Problem:** Barbara noted that she has been in a "loveless marriage" for quite some time; however, she described her role in assisting in the family business as her husband's partner as her most effective coping strategy to maintain her contentment.

Phone: 340-714-BFIT (2348)
Facsimile: 340-715-BFIT (2348)
mindbodypsych.vi@gmail.com
www.synergyvi.com

30547.00/000878

BY-LAWS OF

COWPET BAY WEST CONDOMINIUM ASSOCIATION

Cowpet Bay
St. Thomas, Virgin Islands

February, 2012

## Article I
## Plan of Apartment Unit Ownership

**Section 1. Apartment Unit Ownership:** The property located at Parcels 8-56-1 and 8-1-2, 4, 5, & 6 of Estate Nazareth, No.1 Red Hook Quarter has previously been submitted in a declaration forming an association under the provisions of Chapter 33, Title 28 of the Virgin Islands Code, known as the "Condominium Act of the Virgin Islands". The association has been and will continue to be known as "COWPET BAY WEST", hereinafter called the "Condominium".

**Section 2. Applicability of By-Laws**: The provisions of these by-laws are applicable to the Property of the Condominium and the use and occupancy thereof. The term "Property", as used herein, shall include the land and all buildings and other improvements thereon owned by the association and all easements, rights and appurtenances belonging thereto, and all other property, personal or mixed, intended for use in connection therewith, all of which were previously submitted to the provisions of said Chapter 33, Title 28 of the Virgin Islands Code.

**Section 3. Application:** All present and future owners, mortgagees, lessees, occupants of apartment units and any other persons who may use the facilities of the Property in any manner are subject to these By-Laws, the Declaration and the Rules and Regulations.

The Acceptance of a deed, mortgage or conveyance or the entering into of a lease or the act of occupancy of an apartment unit shall constitute an agreement that these By-Laws, the Rules and Regulations and the provisions of the Declaration, as they may be amended from time to time, are accepted, ratified, and will be complied with.

**Section 4. Office:** The office of the Condominium and of the Board of Directors shall be located at Cowpet Bay West, Estate Nazareth, No.1 Red Hook Quarter, St. Thomas, Virgin Islands. The mailing address shall be 6201 Windward Way, St. Thomas, USVI 00802, or such address as may be designated by the Board, upon 30 days written notice to the members of the Association.

## ARTICLE II
## Board of Directors

**Section 1. Number and Qualifications:** The affairs of the Condominium shall be governed by a Board of Directors. The Board of Directors shall be composed of seven persons, all of whom shall be owners or spouses of owners, or in the case of partnership owners, shall be members of said partnership, or in the case of corporate owners, shall be officers or stockholders of such

PLAINTIFF'S
EXHIBIT
3

corporations, or in the case of fiduciary owners shall be the fiduciaries or beneficiaries of any such trust or in the case of a limited liability company, shall be the members of such company. A Board member may not base his/her eligibility to sit on the Board on the same unit as any other member of the Board.

No person who is in arrears for ninety days or more on any billing or assessment by the Cowpet Bay West Condominium Association shall be eligible to be elected to or serve as a director on the Board of Directors. In the event such person is serving as a director, that person's position as director shall be declared to be vacant and another person appointed by a majority vote of the remaining Board to fill the vacancy so created, until the next regular election of the Board of Directors. Arrearages of partnerships, corporations, trusts, fiduciary owners, etc. on which a person's eligibility to serve on the board is based, shall be considered in determining the eligibility of a person to be elected to or to continue to serve on the board.

**Section 2. Powers and Duties:** The Board of Directors shall have the powers and duties necessary for the administration of the affairs of the Condominium and may do all such acts and things except as by law, by the Declaration (to the extent still applicable), or by these By-Laws may not be delegated to the Board of Directors by the unit owners. Such powers and duties of the Board of Directors shall include, but shall not be limited to, the following:

(a) Operation, care, upkeep and maintenance of the common areas and facilities.

(b) Determination of Association Charges, which shall include the common expenses required for the operation of the Condominium, insurance, water, utility rates, late fees and interest charges, fines for By-Laws and rules, regulation violations, any reserve fund maintained by the association and the costs of services provided.

(c) Collection of Association charges, as hereinafter defined, from the unit owners, and maintaining and accounting for those funds.

(d) Employment and dismissal of the personnel necessary for the maintenance and operation of the common areas and facilities.

(e) Adoption, amendment and enforcement of rules and regulations covering the details of the operation and use of the Property.

(f) Opening of bank accounts on behalf of the Condominium and designating the signatories required therefore.

(g) Purchasing or leasing or otherwise acquiring in the name of the Association or its designee, corporate or otherwise, on behalf of all unit owners, apartment units offered for sale or surrendered by their owners to the Board of Directors.

(h) Purchasing of apartment units at foreclosure or other judicial sales in the name of the Association or its designee, corporate or otherwise, on behalf of all unit owners.

(i) Selling, leasing, mortgaging, voting the votes appurtenant to (other than for the election of members of the Board of Directors), or otherwise dealing with apartment units acquired

and subleasing apartment units leased by the Association, or its designee, corporate or otherwise on behalf of all unit owners.

(j) Organizing corporations to act as designees of the Board of Directors in acquiring title to or leasing of apartment units on behalf of all unit owners.

(k) Obtaining of insurance for the Property, including the apartment units owned or required to be maintained by the Association, pursuant to the provision of Article V, Section 2 hereof.

(l) Making of repairs, additions and improvements to or alterations of the Property and repairs to and restoration of the Property in accordance with the other provisions of these By-Laws, after damage or destruction by fire or other casualty or as a result of condemnation or eminent domain proceedings.

**Section 3. Managing Agent and Manager:** The Board of Directors may employ for the Condominium a managing agent and/or a manager at a compensation established by the Board of Directors, to perform such duties and services as the Board of Directors shall authorize. The Board of Directors may delegate to the manager or managing agent, all of the powers granted to the Board of Directors by these By-Laws other than the powers set forth in subdivisions (b), (e), (f), (g), (h), (i), (j) and (k) of Section 2 of this Article II.

**Section 4. Election and Term of Office:**
Directors will serve for a term of three years. Two Directors shall be elected the first year, two the second year, and three the third year to replace those directors whose terms are expiring. Where a vacancy has been filled by vote of a majority of the vote of the remaining members of the Board, as provided in Section 6, that person shall be a member until the next Annual Meeting, at which time the unit owners shall elect the replacement for the remainder of the original term, if any. Any candidate for director may run for a full term, or any term created by a vacancy, or both.

Each Director shall be elected by the vote of a majority (as defined in Article III Section 9) of the unit owners. All vacancies shall be voted for on the same ballot, and the candidates with the highest number of votes shall be elected to each of the vacancies. Each candidate's name shall be preceded by a space where an "X" may be placed to vote for said candidate. It shall not be required that a name be crossed out and another inserted to vote for a candidate on the ballot. A space for write-in candidates shall also be provided. Ballots and proxies shall be provided to the owners not less than 30 days prior to the Annual Meeting.

The members of the Board of Directors shall hold office until their respective successors shall have been elected by the unit owners.

A Board member may serve only two consecutive terms and may not hold office for one year before being eligible to run again.

**Section 5. Removal of Members of the Board of Directors:** At any regular or special meeting of unit owners, any one or more of the members of the Board of Directors may be removed with or without cause by a majority of the unit owners and a successor may then and there or thereafter be elected to fill the vacancy thus created. Any members of the Board of Directors whose removal has been proposed by the unit owners shall be given an opportunity to be heard at the meeting.

If a Board member does not attend any of the Board meetings during an entire year, and also does not attend the annual owners meeting that same year, such member may be removed from the Board by a majority of the other members of the Board of Directors.

**Section 6. Vacancies:** Vacancies in the Board of Directors caused by any reason other than the removal of a member thereof by a vote of the unit owners, shall be filled by a vote of a majority of the remaining members at a special meeting of the Board of Directors held for that purpose promptly after the occurrence of any such vacancy, even though the members present at such meeting may constitute less than a quorum, and each person so elected shall be a member of the Board of Directors until a successor shall be elected at the next Annual Meeting of the unit owners. At that time a director shall be elected to serve the remainder of the term of the original vacating director.

**Section 7. Organization Meeting:** The first meeting of the members of the Board of Directors shall be an organizational meeting held directly following the Annual Meeting of the unit owners, at such time and place as shall be fixed by the Board members at said meeting, and no notice shall be necessary to the newly elected members of the Board of Directors in order to legally constitute such meeting, provided a majority of the whole Board of Directors shall be present thereat. If it is not possible to hold such first meeting of the new Board immediately, then it shall be held as soon as possible and proper notice shall be given to each director, as for any special meeting of the Board of Directors.

**Section 8. Regular Meetings:** Regular meetings of the Board of Directors may be held at such time and place as shall be determined from time to time by a majority of the members of the Board of Directors, but at least two such meetings shall be held during each fiscal year. Notice of regular meetings of the Board of Directors shall be given to each member of the Board of Directors by mail, electronic mail or fax transmission, at least thirty days prior to the day named for such meeting.

**Section 9. Special Meetings:** Special meetings of the Board of Directors may be called by the President upon five business days notice to each member of the Board of Directors, given by mail, electronic mail or fax transmission, which notice shall state the time, place and purpose of the meeting. Special meetings of the Board of Directors shall be called by the President or Secretary in like manner and on like notice on the written request of at least two members of the Board of Directors. Such special meeting may be conducted by a teleconference call.

**Section 10. Waiver of Notice:** Any member of the Board of Directors may, at any time, waive notice of any meeting of the Board of Directors in writing, and such waiver shall be deemed equivalent to the giving of such notice. Attendance by a member of the Board of Directors at any meeting of the Board shall constitute a waiver of notice by him of the time and place thereof. If all the members of the Board of Directors are present at any meeting of the Board, no notice shall be required and any business may be transacted at such meeting.

**Section 11. Quorum of Board of Directors**: At all meetings of the Board of Directors, a majority of the members thereof shall constitute a quorum for the transaction of business, and the votes of the majority of the members of the Board of Directors present at a meeting at which a quorum is present shall constitute the decision of the Board of Directors. If at any meeting of the Board of Directors there shall be less than a quorum present, , a majority of those present may adjourn the meeting from time to time. No business may be transacted until a quorum is achieved. Board members may participate by teleconference call.

**Section 12. Fidelity Bonds:** The Board of Directors shall obtain adequate fidelity bonds for all officers and employees of the Condominium handling or responsible for condominium funds. The premiums on such bonds shall constitute a common expense.

**Section 13. Compensation:** No member of the Board of Directors shall receive any compensation from the Condominium Association for serving as a board member. However, verifiable expenses, in accordance with guidelines established by the Board in advance, are reimbursable. A Board member may also be compensated for other services unrelated to his/her Board function.

**Section 14. Liability of the Board of Directors**: The members of the Board of Directors shall not be liable to the unit owners for any mistake of judgment, negligence, or otherwise, except for their own individual willful misconduct or bad faith. The unit owners shall indemnify and hold harmless each of the members of the Board of Directors against all contractual liability to others arising out of contracts made by the Board of Directors on behalf of the Property unless any such contract shall have been made in bad faith or contrary to the provisions of the Declaration or of these By-Laws.

It is intended that the members of the Board of Directors shall have no personal liability with respect to any contract made by them on behalf of the Property. It is also intended that the liability of any unit owner arising out of any contract made by the Board of Directors or out of the aforesaid indemnity in favor of the members of the Board of Directors shall be limited to such proportion of the total liability there under as his interest in the common areas and facilities bears to all such interest.

Every agreement made by the Board of Directors or by the managing agent or by the manager on behalf of the Property shall provide that the members of the Board of Directors or the managing agent, or the manager, as the case may be, are acting only as agents for the unit owners and shall have no personal liability there under (except as unit owners) and that each unit owner's liability there under shall be limited to such proportion of the total liability there under as his interest in the common areas and facilities bears to all such interest.

**Section 15. Executive Committee:** The Board of Directors, by resolution passed by a majority of the entire Board, shall designate at the Organization Meeting or anytime thereafter, three members of the Board to constitute an Executive Committee, with one member thereof designated as Chairman. The purpose of the Executive Committee is to control the day-to-day management of the Association.

The Board of Directors from time to time shall define the authority of the Executive Committee, but shall retain for itself the powers and duties as itemized in Section2 (b), (e), (h), (i), and (j). Additionally, the Board shall retain the right to appoint the manager or managing agent, fill vacancies in the Board, make changes in the Rules and Regulations, and acquire property.

The Board of Directors, at any time, may change the members of, may fill vacancies in, or may discharge the Executive Committee. Two members shall constitute a quorum of the Executive Committee. The act of a majority of the members at any meeting at which there is a quorum shall be the act of the Committee. The Board of Directors shall establish rules of procedure for the Committee governing, but not limited to, such items as notice and powers.

The Executive Committee shall make recommendations to the Board of Directors, and when the Board is not in session may, to the extent that the committee deems necessary, exercise the powers of the Board in the management of the business and affairs of the Association; and it shall have the powers to authorize the seal of the Association to be affixed to all papers which may require it.

The Executive Committee shall keep records of all its proceedings and shall report same to the Board of Directors, and its individual members, in writing within a reasonably short period of time after each significant action and after all meetings.

**Section 16. Inspection by Executive Committee**: The Executive Committee shall make a detailed inspection of the buildings, pump rooms, offices, maintenance shops, sewage and water-making plants, emergency generator, roads, sidewalks, steps, entry bridges, railings, grounds, landscaping, watering systems, the beach and the sea wall at least twice a year in the company of the manager or managing agent,. Additionally, the Committee shall evaluate the operation of the Association office and the overall security situation of the property.

The purpose of such inspections will be to (a) obtain a better understanding of the job being performed by the manager and his staff and (b) make suitable recommendations for possible future actions. Within 30 days after each such semi-annual inspection, the Committee will report its findings and recommendations to the members of the Board of Directors.

**Section 17. Action by Consent**: Any action required or permitted to be taken at any meeting of the Board of Directors, or any committee thereof, may be taken without a meeting if a written consent thereto is signed by three-quarters of the members, (rounded off to the nearest whole number), of the Board of Directors or of such committee as the case may be, and filed with the minutes of proceedings of the Board of Directors or committee.

**Section 18. Nomination of Directors**: Nominations for election to the Board of Directors shall be made by a Nominating Committee. The Nominating Committee shall consist of a chairman, who shall be a member of the Board of Directors, and two or more members of the Association. The Nominating Committee shall be appointed by the Board of Directors at its organizational meeting and serve until the next Annual Meeting.

The Nominating Committee shall make as many nominations for election to the Board of Directors as it shall, in its discretion, determine, but not less than the number of vacancies that are to be filled. Each nomination shall be for a specified vacancy.

Any person qualified under Section1 of Article II of these By-Laws to serve on the Board of Directors may be nominated for the Board of Directors by submitting a request, signed by the owners of two units in which the nominee has no financial interest, to the Board Secretary sixty days prior to the Annual Meeting. The Board shall include his/her name on the ballot directly following the nominee(s) proposed by the Nominating Committee for each vacancy. Any nomination that does not specify a specific vacancy shall be deemed a nomination for all vacancies.

**Section 19 – Communications**

Communications by, from, to and among the Board may be in writing, by fax or by electronic communications (telephone, telephone conference, email, internet, etc.) Telephone and telephone conference conversations must be documented (e.g., minutes or record of conversation). This communication will constitute "official" communication by the Board.

## ARTICLE III
## Unit Owners

**Section 1. Annual Meeting**:

The Annual Meeting of the unit owners shall be held during the first quarter each year. At the Annual Meeting, Directors shall be elected by ballot in accordance with the requirements of

Section 4 of Article II of these By-Laws, and the unit owners may transact such other business at such meetings as may properly come before them.

**Section 2. Place of Meeting**: Meetings of the unit owners shall be held at the principal office of the Condominium or at such other suitable place convenient to the unit owners as may be designated by the Board of Directors.

**Section 3. Special Meetings**: It shall be the duty of the President to call a special meeting of the unit owners if so directed by resolution of the Board of Directors or upon a petition signed and presented to the Secretary by not less than 25% in common interest, in the aggregate, of unit owners. The notice of any special meeting shall state the time and place of such meeting and the purpose thereof. No other business shall be transacted at a special meeting except as stated in the notice.

**Section 4. Notice of Meeting**: It shall be the duty of the Secretary to mail a notice of each annual meeting of the unit owners not less than thirty days nor more than ninety days prior to such meeting, stating the purpose thereof as well as the time and place where it is to be held, to each unit owner of record, at the building or at such other address as such unit owner may have designated by notice in writing to the Secretary. The mailing of a notice of meeting in the manner provided in this section shall be considered service of notice. The Board of Directors may assign the task of providing notice to unit owners to a person other than the Secretary. Special meetings require not less than ten days notice.

**Section 5. Adjournment of Meetings**: If any meeting of unit owners cannot be held because a quorum has not attended, a majority in common interest of the unit owners who are present at such meeting, either in person or by proxy, may adjoum the meeting to a time not less than forty-eight hours from the time the original meeting was called.

**Section 6. Order of Business**: The annual meeting of the unit owners shall be chaired by the President or other member of the Board of Directors chosen by the Board, and the order of business shall be generally as follows:

(a) Roll Call – by unit
(b) Establishment of Quorum (1/3 of all unit owners)
(c) Proof of Notice of Meeting
(d) Approval of Minutes of last year's Annual Meeting
(e) President's Report (including cost and coverage of insurance)
(f) Treasurer's Report (including discussion of Budget and Financial Status)
(g) Property Manager's Report
(h) Report of Nominating Committee
(i) Election of Board Members
(j) Old Business
(k) New Business

**Section 7. Title to Apartment Units**: Title to apartment units may be taken in the name of an individual, or in the names of two or more persons as tenants in common, joint tenants or tenants by the entirety, or in the name of a corporation, partnership, limited liability company or other legal entity authorized to own real property in the Virgin Islands, or in the name of a fiduciary.

**Section 8. Voting**: The owner or owners of each apartment unit, or some person designated by such owner or owners to act as proxy on his or their behalf and who need not be an owner, shall be entitled to cast the vote appurtenant to such apartment unit at all meetings of unit owners. The designation of any such proxy shall be made in writing and shall be revocable at any time by written notice to the Secretary or in person at the meeting. Any or all such owners or proxies may be present at any meeting of the unit owners and may vote or take any other action as a unit owner either in person or by proxy. Votes of unit owners shall be weighted in accordance with their share of the common interest, as follows, with the total of all votes equaling one hundred:

| | |
|---|---|
| **2 Bedroom** | **.911** |
| **3 Bedroom** | **1.062** |
| **2 Bedroom + Loft** | **1.193** |
| **4 Bedroom** | **1.301** |
| **3 Bedroom + Loft** | **1.376** |

The Board of Directors shall accept any vote if the owner is one of the owners of record of the unit, or in the case of a proxy, if there is no obvious defect on the face of such proxy. It shall be the burden of the protestor to offer satisfactory proof that the proffered vote or proxy is invalid and that his is the proper one.

**Section 9. Majority of Unit Owners**: As used in these By-Laws, the term "majority of unit owners: shall mean those unit owners having more than 50% of the total authorized votes of all unit owners present in person or by proxy and voting at any meeting of the unit owners, determined in accordance with the provisions of Section 8 of this Article III.

**Section 10. Quorum**: Except as otherwise provided in these By-Laws, the presence in person or by proxy of unit owners having one-third (1/3) of the total authorized votes of all unit owners shall constitute a quorum at all meetings of the unit owners.

**Section 11. Majority Vote**: The vote of a majority of unit owners at a meeting at which a quorum shall be present shall be binding upon all unit owners for all purposes except where, in the Declaration or these By-Laws, or by law, a higher percentage vote is required.

## ARTICLE IV
## Officers

**Section 1. Designation**: The principal officers of the Condominium shall be the President, the Vice President, the Secretary, and the Treasurer, all of whom shall be elected by the Board of Directors. The Board of Directors may appoint an assistant secretary, an assistant treasurer, and such other officers as in its judgment may be necessary. The President and Vice President, but no other officers, need be members of the Board of Directors.

**Section 2. Election of Officers**: The officers of the Condominium shall be elected annually by the Board of Directors at the Organization Meeting of each new Board of Directors and shall hold office at the pleasure of the Board of Directors.

**Section 3. Removal of Officers**: Upon the affirmative vote of a majority of the members of the Board of Directors, any officer may be removed, either with or without cause, and his successor

may be elected by the Board of Directors at any regular or special meeting of the Board of Directors called for such purpose.

**Section 4. President**: The President shall be the chief executive officer of the Condominium. He shall preside at all meetings of the unit owners and of the Board of Directors. He shall have all of the general powers and duties which are incident to the office of president of a stock corporation organized under the Corporation Law of the Virgin Islands, including but not limited to the power to appoint committees from among the unit owners from time to time as he may in his discretion decide is appropriate to assist in the conduct of the affairs of the Condominium.

**Section 5. Vice President**: The Vice President shall take the place of the President and perform his duties whenever the President shall be absent or unable to act. If neither the President nor the Vice President is able to act, the Board of Directors shall appoint some other member of the Board of Directors to act in the place of the President, on an interim basis. The Vice President shall also perform such other duties as shall from time to time be imposed upon him/her by the Board of Directors or by the President.

**Section 6. Secretary**: The Secretary shall keep the Minutes of all meetings of the unit owners and of the Board of Directors. He shall have charge of such books and papers as the Board of Directors may direct; and he shall, in general, perform all the duties incident to the office of secretary of a stock corporation organized under the Corporate Law of the Virgin Islands.

**Section 7. Treasurer**: The Treasurer shall have the responsibility for Condominium funds and securities and shall be responsible for keeping full and accurate financial records and books of account showing all receipts and disbursements, and for the preparation of all required financial data. He shall be responsible for the deposit of all monies and other valuable effects in the name of the Board of Directors, or the managing agent, in such depositories as may from time to time be designated by the Board of Directors, and he shall, in general, perform all the duties incident to the office of treasurer of a stock corporation organized under the Corporation Law of the Virgin Islands.

**Section 8. Agreements, Contracts, Deeds, Checks, etc.:** All agreements, contracts, deeds, leases and other instruments of the Condominium shall be executed by any two officers of the Condominium or by such other person or persons as may be designated by the Board of Directors.

**Section 9. Compensation of Officers**: No officer shall receive any compensation from the Condominium for acting as such.

## ARTICLE V

## Operation of the Property

**Section 1. Determination of Common Expenses and Fixing of Common Charges:** The Board of Directors shall from time to time, and at least annually, prepare a budget for the condominium, determine the amount of the common charges payable by the unit owners to meet the common expenses of the Condominium, and allocate and assess such common charges among the unit owners according to their respective common interests. Common expenses shall include, among other things, operation and maintenance, insurance premiums,

repairs and such amounts as the Board of Directors may deem proper for a general operating reserve, for a reserve fund for replacements, and to make up any deficit in the common expenses for any prior year.

The common expenses may also include such amounts as may be required for the purchase buy or lease to the Board of Directors or its designee, corporate or otherwise, on behalf of all unit owners, of any apartment unit whose owner has elected to sell or lease such apartment unit to the Board of Directors, or of any apartment unit which is to be sold at a foreclosure or other judicial sale.

The Board of Directors shall advise all unit owners promptly in writing of the amount of common charges payable by each of them, respectively, as determined by the Board of Directors, as aforesaid, and shall furnish to all unit owners copies of each budget on which such common charges are based.

A summary of the previous year's actual income and expenditures, a year end summation of liquid assets and accounts payable/receivable, and an approved budget for the current year shall be provided to all owners not less than 30 days prior to the Annual Meeting.

**Section 2. Insurance:**
The Board of Directors shall annually obtain and maintain, to the extent obtainable, the following insurance:

1. Fire insurance with extended coverage to include earthquake and flood coverage, vandalism and malicious mischief endorsements insuring the entire buildings and "common elements" (including all the individual unit's bathroom and kitchen fixtures and air conditions, but not including any wall, ceiling, or floor decoration, tiles or coverings, together with all service machinery contained therein and covering the interest of the Condominium, the Board of Directors and the Common Interest of the unit owners in an amount to be determined by the Board of Directors.
2. Windstorm, insuring the entire buildings and "common elements" together with all service machinery contained therein and covering the interest of the Condominium, the Board of Directors and the Common Interest of the unit owners in an amount to be determined by the Board of directors.
3. Worker's Compensation; Public Liability covering each member of the Board of Directors, the managing agent, the manager, the office manager and each unit owner; Vehicle and
   other such insurance as the Board of Directors may determine in amounts to be determined by the Board of Directors.

All policies of physical damage shall provide that such policies may not be cancelled or substantially modified without written notice from the Board of Directors.

From time to time or as required by insurers, the Board of Directors shall obtain from a certified and USVI licensed real estate appraiser an appraisal of the full replacement value, without deduction for depreciation, of the buildings, common areas and facilities for the purpose of determining the amount of insurance required.

Unit owners shall be encouraged to carry Home Owners insurance on their "apartment unit" for their own benefit provided that all such policies shall indicate that the liability of the carrier(s) issuing insurance obtained by the Board of Directors shall not be affected or diminished by reason of any such additional insurance carried by any unit owner.

At each Annual Meeting, the Board shall provide to the owners a concise summary of all insurance coverage and costs.

The terms "common elements" and "apartment unit," as mentioned above, are defined in Article 5, Section 10 "Routine Maintenance and Repair."

**Section 3. Repair or Reconstruction After Fire or Other Casualty:** In the event of damage to or destruction of the commonly owned buildings and elements as a result of fire or other casualty (unless 66-2/3% or more of the buildings are destroyed or substantially damaged and 75% or more of the unit owners determine in accordance with the Declaration not to proceed with the repair or restoration), the Board of Directors shall arrange for the prompt repair or restoration of the commonly owned buildings and elements, and the Board of Directors shall disburse the proceeds of all insurance policies to the contractors engaged in such repair or restoration in appropriate progress payments. Any cost of such repair or restoration in excess of the insurance proceeds shall constitute a common expense – and the Board of Directors may assess all the unit owners for such deficit as part of the common charges.

The association shall only be responsible for inspecting unit interiors to determine if damage is structural or due to external causes, or if adjacent unit damage is caused by external causes, or unless that unit is owned by the association. Unless that unit is owned by the association, repair by the association of other unit damage will be limited to structural damage, that caused by external or adjacent unit causes, and will not include property or fixtures installed by the owner or previous owners.

Within ninety days after a casualty of an estimated repair cost of $100,000 or greater, the Board will provide to the owners a financial status report indicating projected repair costs, source(s) of necessary funds, expenditures and commitments to date, and a schedule and plan for completion. This report will be updated and issued to owners on a quarterly basis, thereafter, until repairs are complete. A current report shall be provided at the next Annual Meeting.

If 66-2/3% or more of the Building(s) are destroyed or substantially damaged and if within sixty days of the date of such destruction or damage, 75% or more of the unit owners determine not to proceed with repair and restoration, the Property shall be subject to an auction for partition at the suit of any unit owner or lien holder, as if owned in common, in which event the net proceeds of sale, together with the net proceeds of insurance policies (less any repairs conducted) shall be divided by the Board of Directors among all the unit owners in proportion to their respective common interests, after first paying out of the share of each unit owner the amount of any unpaid liens on his/her apartment unit, in the order of priority of such liens.

**Section 4. Payment of Association Charges:** All unit owners shall be obligated to pay the common charges assessed by the Board of Directors pursuant to the provisions of Section 1 of this Article V at such time or times as the Board of Directors shall determine, as well as "other charges" for utilities, services, unit repairs, late fees, interest, fines and/or collection costs, if incurred. With respect to the following sections concerning payment, collection, default, foreclosure, etc., in Sections 4, 5, 6, 7, & 8 below, the term "association charges" is intended to include, but not be limited to, all the above items, both the "common" and "other" charges.

No unit owner shall be liable for the payment of any part of association charges assessed against his apartment unit subsequent to a sale, transfer or other conveyance by him of such apartment unit, together with the Appurtenant Interests, as defined in Section1 of Article VII hereof. In addition, any unit owner may, subject to acceptance by the Board of Directors provided that his apartment unit is free and clear of liens and encumbrances other than mortgages and statutory liens for unpaid association charges, convey his apartment unit,

together with the "Appurtenant Interests" to the Board of Directors, or its designee, corporate or otherwise, on behalf of all other unit owners, and in such event be exempt from association charges thereafter assessed.

However, a purchaser of an apartment unit shall be liable for the payment of association charges assessed against such apartment unit prior to the acquisition by him of such apartment unit, without prejudice to such purchaser's right, if any, to recover from the seller the amounts paid by the purchaser, except that a first mortgagee or other purchase of an apartment unit at a foreclosure sale of a first priority mortgage of such apartment unit shall not be liable for and such apartment unit shall not be subject to a lien for the payment of association charges which became due prior to the acquisition of title by such acquirer.

**Section 5. Collection of Association Charges**: The Board of Directors shall assess association charges against the unit owners from time to time and shall take prompt action to collect any charges due from any unit owner, which remain unpaid for more than thirty days from the date due for payment thereof. Such action may include placement of a lien on the apartment unit, notification to the mortgagee of the owner's failure to pay association charges and foreclosure on the lien. Additionally, suspension of utilities by a majority vote of the Executive Committee is permitted if an owner is more than 90 days in arrears of any Association charges. Payments received from unit owners will be applied to Association Charges in the chronological order incurred.

**Section 6. Default in Payment of Association Charges:** In the event of default by any unit owner in paying to the association charges as determined by the Board of Directors, such unit owner shall be obligated to:

(1) pay interest from the date of the initial billing at the maximum legal rate of interest, as defined by the Virgin Islands Laws, on all amounts past due,

(2) pay a monthly service charge as determined and promulgated from time-to-time by the Board of Directors,

(3) pay all expenses and attorneys' fees incurred by the Board of Directors in any proceeding brought to collect such unpaid association charges.

All such unpaid association charges shall constitute a lien on such unit prior to all other liens except those specified in Section 922 of Chapter 33, Title 28 of the Virgin Islands Code. The Board of Directors shall have the right and duty to attempt to recover all association charges, together with interest and monthly service charges thereon, and the expenses of the proceeding, including attorneys' fees, in any action to recover the same brought against such unit owner, or by foreclosure of the lien on such apartment unit granted by Section 922 of Chapter 33, Title 28, Virgin Islands Code.

**Section 7. Foreclosure of Liens For Unpaid Association Charges:** In any action brought by the Board of Directors to foreclose a lien on an apartment unit because of unpaid association charges, the unit owner shall be required to pay a reasonable rental for the use of his apartment unit, and the plaintiff in such foreclosure action shall be entitled to the simultaneous appointment of a receiver to collect the same. The Board of Directors, acting on behalf of all unit owners, shall have power to purchase such apartment unit at the foreclosure sale and to acquire, hold, lease, mortgage, vote the votes appurtenant to, convey or otherwise deal with the same. A suit to recover a money judgment for unpaid association charges shall be maintainable without foreclosing or waiving the lien securing the same.

**Section 8. Statement of Association Charges:** The Board of Directors shall promptly provide any unit owner so requesting the same in writing, with a written statement of all unpaid association charges due from such unit owner.

**Section 9. Abatement and Enjoinment of Violations by Unit Owners:** The violation of any rule or regulation adopted by the Board of Directors or the breach of any of these By-Laws contained herein, or the breach of any provisions of the Declaration, shall give the Board of Directors the right, in addition to any other rights set forth in these By-Laws (a) to enter the apartment unit in which, or as to which, such violation or breach exists and to summarily abate or remove, at the expense of the defaulting unit owner, any structure, thing or condition that may exist therein contrary to the intent and meaning of the provisions hereof, and the Board of Directors shall not thereby be deemed guilty in any manner of trespass or (b) to enjoin, abate or remedy by appropriate legal proceedings, either at law or in equity, the continuance of any such breach.

**Section 10. Routine Maintenance and Repair:** All maintenance of and repairs to any "apartment unit" (other than maintenance of and repairs to any common areas and facilities contained therein, and not necessitated by the negligence, misuse or neglect of the owner of such apartment unit) shall be the responsibility of the owner of such apartment unit. Also, each unit owner shall be responsible for damage to other apartment units and/or to the common areas and facilities resulting from conditions for which such owner has responsibility as indicated above.

An "apartment unit" is considered the space inside the perimeter walls, interior walls, floor and ceiling to include:

1. All decorating elements including: paint, wall and floor coverings, paneling, molding and tiles; finished cabinets and mirrors.
2. All electrical appliances including: refrigerator, stove, washer, dryer, dishwasher, garbage disposal, hot water heater and air-conditioning equipment (including compressor).
3. All electrical fixtures including: wall ceiling and floor outlets, switches and fuse box.
4. All plumbing fixtures including: tubs, showers, sinks, toilets and faucets.

Additionally, the unit owner shall be responsible for the routine lubrication and adjustment of doors and windows, and, unless major casualty related, replacement of broken glass, wooden or glass slats and damaged screens. The unit owner shall also maintain and assure the operability of the storm shutters installed on that unit and is responsible to close them in the event of a windstorm. Damage caused by failure to do so is the responsibility of the owner if net insurance proceeds are insufficient to cover such damage.

Screen doors may be installed on the main street-side entry doors at the unit owner's expense provided they meet the existing décor. Once installed, they must be maintained by the unit owner in a good state of repair, or the Association will do so at the owner's expense.

Except for the limited exceptions noted above, all maintenance, repairs and replacements to the "common elements", common areas and facilities, whether located inside or outside of the apartment units, (unless necessitated by the negligence, misuse or neglect of a unit owner, in which case such expense shall be charged to such unit owner), shall be made by the Association and be charged to all the unit owners as a common expense.

"Common elements" are considered to include all other elements of the buildings and property except those specified as being part of the "apartment unit." Additionally, the following are considered common elements:

1. Electrical supply to the fuse box, not including the panel.

2. Water and plumbing lines in the walls (including interior walls), floor and ceiling to the valves at sinks, showers, tubs, hot water heater, and toilets, etc.
3. Drains to the first connection outside a wall.

External air conditioning compressor units shall be maintained by the owner in a reasonable state of preservation. The Association may require owner to remove inoperable and/or un-maintained units or do so at the owner's expense

Below is a guide to assist in clarifying owner and Association responsibility with regard to maintenance/repair and insurance."

Insurance and Maintenance Responsibility Matrix

| Category (Not Intended to be all-inclusive) | Owner Maint/Repair Responsiblity | Association Maint/Repair Responsibility | Association Insurance Responsibility | Owner Insurance Responsibility |
|---|---|---|---|---|
| Exterior Walls and Interior Damage Caused by Leaks | | X | X | |
| Roof and Interior Damage Caused by Roof Leaks | | X | X | |
| Interior Damage caused by Adjacent Units (Leaks, etc.) | X | | | Owner or Adjacent Unit's Insurance Responsible |
| Front Doors | X | | X | |
| Screens | X | | X | |
| Exterior Sliders | | X | X | |
| Exterior Wood Railings, Trim, Benches | | X | X | |
| Exterior Windows | X | | X | |
| Electrical System to Breaker Panel | | X | X | |
| Electrical System, Breaker Panel to Outlets, Junction Boxes | X | | X | |
| Electrical Fixtures-Interior | X | | | X |
| Plumbing Inside Walls, Floors Ceilings to valves | | X | X | |
| Condo plumbing not in walls/floors | X | | | X |
| Plumbing Fixtures | X | | | X |
| Interior Walls | X | | X | |
| Interior Doors | X | | | X |
| Cabinets | X | | | X |
| Furniture | X | | | X |
| Appliances | X | | | X |
| Wall/Floor Coverings (tile/carpet) | X | | | X |
| Hurricane Shutters | X | | X | |
| Furniture | X | | | X |
| Personal Property | X | | | X |
| External A/C elements | X | | | X |
| Internal A/C elements | X | | | X |
| Landside Porch/Steps/Railings | | X Excluding Tile | X Excluding Tile | |
| Seaside Balcony/Railings | | X Excluding Tile | X Excluding Tile | |

**Section 11. Restriction on Use of Apartment Units:** In order to provide for congenial occupancy of the Property and for the protection of the value of the apartment units, the use of the Property shall be restricted to and shall be in accordance with the following provisions:

1. The apartment units shall be used for residences only. Units will not be occupied by more than two persons per bedroom for more than thirty days per year.
2. The common areas and facilities, including the limited common areas and facilities, shall be used only for the furnishing of the services and facilities for which they are reasonably suited and which are incident to the use and occupancy of apartment units
3. No nuisances shall be allowed on the Property nor shall any use or practice be allowed which is a source of annoyance to its residents or which interferes with the peaceful possession proper use of the Property by its residents.
4. No improper, offensive or unlawful use shall be made of the Property or any part thereof, and all valid laws, zoning laws and regulations of all governmental bodies having jurisdiction thereof shall be observed.
5. Violations of laws, orders, rules, regulations or requirements of any governmental agency having jurisdiction thereof, relating to any portion of the Property, shall be corrected, by and at the sole expense of the unit owners or the Board of Directors, whichever shall have the obligations to maintain or repair such portion of the Property.
6. No dogs are allowed on the property, either long term or visiting. The Board may grant exceptions to the NO DOGS ALLOWED rule, on an individual basis, should an owner require the assistance of a service animal (dog) as defined by the ADA. Owners seeking to obtain such an exemption are required to apply, in writing, to the Board with supporting documentation.

**Section 12. Additions, Alterations or Improvements by the Board of Directors:** Additions, alterations or improvements to the common areas and/or facilities up to $100,000 may be made by the Board of Directors. Additions, alterations or improvements in excess of $100,000 shall require approval by a vote of two-thirds (2/3) in common interest of the owners. The cost of such additions, alterations or improvements shall constitute a common charge. This section is not applicable to repairs conducted in accordance with Article V Section 3 of these By-Laws.

**Section 13. Additions, Alterations, or Improvements by Unit Owners:** No unit owner shall make any structural addition, alteration or improvement in or to his apartment unit, including any exterior painting or exterior alteration or addition (including awnings, grills, etc.) without the prior written consent thereto of the Board of Directors. The Board of Directors shall have the obligation to answer any written request by a unit owner for approval of a proposed structural addition, alteration or improvement in such unit owner's apartment unit, within thirty (30) days after such request, and failure to do so within the stipulated time shall constitute a consent by the Board of Directors to the proposed addition, alteration or improvement.

A unit owner shall obtain a receipt from any person accepting his written request for a change under this section and shall show the receipt to the manager or any Director upon request. Any application to any department of the Government of the Virgin Islands or to any other governmental authority for a permit to make an addition, alteration or improvement in or to any apartment unit shall be executed by the Board of Directors only, without, however, incurring liability on the part of the Board of Directors or any of them to any contractor, sub-contractor or supplier on account of such additions, alteration or improvement, or to any person having any claim for injury to person or damage to property arising therefrom. The owner in such instance shall provide the Board of Directors with a Hold Harmless Certificate.

**Section 14. Use of Common Areas and Facilities**: A unit owner shall not place or cause to be placed in the stairways or other common areas and facilities, including the limited common areas and facilities, other than the areas designated as storage areas, any furniture, packages or objects of any kind. The entry passages, stairways, entry bridges, etc., shall be used for no purpose other than for normal transit through them.

**Section 15. Right of Access:** A unit owner shall grant a right of access to his apartment unit to the manager and/or the managing agent and/or any other person authorized by the Board of Directors, the manager or the managing agent, for the purpose of making inspections or for the purpose of correcting any condition originating in his apartment unit and threatening another apartment unit or a common area or facility, or for the purpose of performing installations, alterations or repairs to the mechanical or electrical services or other common areas or facilities in his apartment unit or elsewhere in the Building, provided that requests for entry are made in advance and that any such entry is at a time reasonably convenient to the unit owner. In case of an emergency, such right of entry shall be immediate, whether or not the unit owner is present at the time.

**Section 16. Rules of Conduct**: Article V Section II of these By-Laws delineates general restrictions on the use of the property. Additionally, a definitive listing of current Rules and Regulations is provided as Exhibit I hereto. These Rules and Regulations may be amended by the Board of Directors from time to time. The Board is empowered to enforce these By-Laws and Rules and Regulations with monetary fines and other sanctions and may also take any legal action in court to enforce them. An owner is subject to such fines, sanctions and/or legal actions for the actions of his tenant as if those actions were by the owner.

Copies of the Rules and Regulations shall be furnished by the Board of Directors to each unit owner prior to the time when the same shall become effective. The unit owner must insure that the tenant or occupant be fully informed and furnished with a copy of the Rules and Regulations and by fully bound thereby.

**Section 17. Potable Water and Electricity:** Potable water and electricity shall be supplied by the Association through the common facilities of the Condominium directly to each apartment unit through a separate meter, and each unit owner shall be required to pay the charges therefore established, from time to time, by the Board of Directors. Water, electricity and other utility charges will normally be billed monthly incident to the common charges and are considered to be part of the "association" charges. Utility charges more than thirty days in arrears are subject to a late fee and interest per Section 6 Article V of these By-Laws, and said utilities may be suspended by the Association if an owner is more than 90 days in arrears of Association charges per Article V Section 5 thereof.

**Section 18. Gas:** Gas shall not be piped to any apartment unit, and unit owners are specifically prohibited from using gas as a fuel for regular cooking, water heating, or any other regular purpose. Small quantities of propane gas may be used for gas grills kept on street-side galleries and for emergency use inside apartment units.

**Section 19. Grey Water and Sewerage Service:** Grey water for flushing and sewerage service (including sewage disposal and treatment in the condominium's sewerage treatment plant) shall be supplied as a common facility to all unit owners, and the cost thereof shall be treated as a common expense.

## ARTICLE VI
## Mortgages

**Section 1. Notice of Unpaid Common Charges:** The Board of Directors, whenever so requested in writing by a mortgages of an apartment unit, shall promptly report any then unpaid association charges due from, or any other default by the owner of the mortgaged apartment unit.

**Section 2. Notice of Default:** The Board of Directors, when giving notice to a unit owner of a default in paying common charges or other default, may send a copy of such notice to each holder of a mortgage covering such apartment unit.

## ARTICLE VII
## Sales and Mortgages of Units

**Section 1. No severance of Ownership:** No unit owner shall execute any deed, mortgage or other instrument conveying or mortgaging title to his apartment unit without including therein the Appurtenant Interests, it being the intention hereof to prevent any severance of such combined ownership. For the purpose of the By-Laws, the "Appurtenant Interests" shall mean collectively, (i) the unit owner's undivided interest in the common areas and facilities appurtenant to such unit; (ii) the interest of such unit owner in any apartment units theretofore acquired by the Board of Directors, or its designee, on behalf of all unit owners, or the proceeds of the sale or lease thereof, if any; and (iii) the interest of such unit owner in any other assets of the Condominium.

Any such deed, mortgage or other instrument purporting to affect one or more of such interests, without including the interest or interests so omitted, shall be deemed to include such interests even though the latter shall not be expressly mentioned or described therein. No part of the Appurtenant Interests of any apartment unit may be sold, transferred or otherwise disposed of, except as part of a sale, transfer or other disposition of the apartment unit to which such interests are appurtenant, or as part of a sale, transfer or other disposition of such part of the Appurtenant Interests of all apartment units.

**Section 2. Sale to Board of Directors:** A unit owner may, subject to mutual agreement of the parties, and subject to the provisions of Section 1 of this Article VII, sell his unit to the Board of Directors, or its designee; provided, however that such purchase by the Board of Directors shall have the prior approval of two-thirds (2/3) of the unit owners, as expressed by the vote of at least two third (2/3) in number and in common interest, of all unit owners, cast in person or by proxy in accordance with these By-Laws.

**Section 3. Financing of Purchase of Apartment Units By Board of Directors:** Acquisition of apartment units by the Board of Directors, or its designee, on behalf of all unit owners, may be made from the working capital and common charges in the hands of the Board of Directors, or if such funds are insufficient the Board of Directors may levy an assessment against each unit owner in proportion to his ownership in the common areas and facilities as a common charge, which assessment shall be enforceable in the same manner as provided in Section 6 and 7 of Article V, or the Board of Directors, in its discretion, may borrow money to finance the acquisition of such apartment units, provided, however, that no financing may be secured by an encumbrance or hypothecation of any property other than the apartment unit, together with the Appurtenant Interests, so to be acquired by the Board of Directors.

**Section 4. Gifts and Devises, etc:** Any unit owner shall be free to convey or transfer his apartment unit by gift, or to devise his apartment unit by will, or to pass the same by intestacy, without restriction.

**Section 5. Waiver of Right of Partition with Respect to Such Apartment Units as are Acquired by the Board of Directors, or its Designee, on Behalf of All Unit Owners as Tenants in Common:** In the event that an apartment unit shall be acquired by the Board of Directors, or its designee, on behalf of all unit owners as tenants in common, all such unit owners shall be deemed to have waived all rights of partition with respect to such apartment unit.

## ARTICLE VIII

**Section 1. Condemnation – Eminent Domain:** In the event of a taking by condemnation or by eminent domain of part or all of the common areas and facilities, the award made for such taking shall be payable to the Board of Directors for disbursement and/or payment of the common expenses.

## ARTICLE IX
## Records

**Section 1. Records and Audits:** The Board of Directors or the managing agent shall keep detailed records of the actions of the Board of Directors and the managing agent, Minutes of the meetings of the Board of Directors, Minutes of the meetings of unit owners, and financial records and books of account of the Condominium, including a chronological listing of receipts and expenditures, as well as a separate account for each apartment unit which, among other things, shall contain the amount of each assessment of common charges against such apartment unit, the date when due, the amounts paid thereon, and the balance remaining unpaid.

Each unit owner shall be permitted to examine all accounts, records and contracts of the Association in the Condominium office at reasonable times, on business days, but not more often than once a month. All others must request any required information from the Board of Directors.

An annual report of the receipts and expenditures of the Association, examined and approved by a licensed accountant not affiliated with the Association and chosen by the Board of Directors, shall be rendered to the Board and sent, within a reasonable time after the end of each fiscal year, to all unit owners who request it.

## ARTICLE X
## Miscellaneous

**Section 1. Notices:** All notices hereunder shall be sent by registered or certified mail to the Board of Directors c/o the managing agent, or if there is no managing agent, to the office of the Board of Directors or to such other address as the Board of Directors may hereafter designate from time to time, by notice in writing to all unit owners and to all mortgagees of apartment units.

All notices to any unit owner shall be sent by registered or certified mail to the Building or to such other address as may have been designated by him from time to time, in writing, to the Board of Directors. All notices to mortgagees of apartment units shall be sent by registered or certified mail to their respective addresses, as designated by them from time to time, in writing

to the Board of Directors. All notices shall be deemed to have been given when mailed, except notices of change of address, which shall be deemed to have been given when received.

Notwithstanding the requirements of this section, all notices of regular, special and Annual Meetings of the unit owners, Board of Directors, and committees of the Board or otherwise, shall be by first class mail but without the requirement of registration or certification. The applicable notice shall be sent so as to comply with the required time limits, if any, to the regular mailing address of the designated party as recorded in the books of the Association.

**Section 2. Invalidity:** The invalidity of any part of these By-Laws shall not impair or affect in any manner the validity, enforceability or effect of the balance of these By-Laws.

**Section 3. Captions:** The captions herein are inserted only as a matter of convenience and for reference, and in no way define, limit or described the scope of these By-Laws, or the intent of any provision thereof.

**Section 4. Gender:** The use of the masculine gender in these By-Laws shall be deemed to include the feminine gender and the use of the singular shall be deemed to include the plural, whenever the context so requires.

**Section 5. Waiver:** No restrictions, condition, obligation or provisions contained in these By-Laws shall be deemed to have been abrogated or waived by reason of any failure to enforce same, irrespective of the number of violations or breaches thereof which may occur.

**Section 6. Insurance Trustee:** The Board of Directors may appoint a Trustee to distribute large amounts of any insurance proceeds. The trustee so appointed may be any individual or entity, so long as such is properly bonded in relation to the funds and responsibility involved.

## ARTICLE XI
## Amendments to By-Laws

**Section 1. Amendments to By-Laws:** Except as hereinafter provided, these By-Laws may be modified or amended by the vote of 66-2/3% in number and in common interest of all unit owners.

## ARTICLE XII
## Execution of Instruments and Seal

**Section 1. Execution and Instruments:** All instruments of the Condominium shall be executed under seal by such officer or officers as the Board of Directors may designate, or as may be otherwise authorized.

**Section 2. Seal:** The seal of the Condominium shall be as determined by the Board of Directors from time to time.

**ARTICLE XIII**
**Conflicts**

**Section 1. Conflicts:** These By-Laws are set forth to comply with the provisions of Sections 917 and 918 of Chapter 33, Title 28, Virgin Islands Code. In case any of these By-Laws conflict with the provisions of said statute or of the Declaration, the provisions of said statute or of the Declaration, as the case may be, shall control.

DRAFT

# BY-LAWS OF COWPET BAY WEST

## CONDOMINIUM ASSOCIATION

**Cowpet Bay**

**St. Thomas, Virgin Islands**

**New date**

## Article I

## Plan of Unit Ownership

**Section 1. Unit Ownership:** The property located at Parcels 8-56-1 and 8-1-2, 4, 5, & 6 of Estate Nazareth, No.1 Red Hook Quarter has previously been submitted in a declaration forming an association under the provisions of Chapter 33, Title 28 of the Virgin Islands Code, known as the "Condominium Act of the Virgin Islands". The association has been and will continue to be known as "COWPET BAY WEST", hereinafter called the "Condominium".

**Section 2. Applicability of By-Laws:** The provisions of these by-laws are applicable to the Property of the Condominium and the use and occupancy thereof. The term "Property", as used herein, shall include the land and all buildings and other improvements thereon owned by the association and all easements, rights and appurtenances belonging thereto, and all other property, personal or mixed, intended for use in connection therewith, all of which were previously submitted to the provisions of said Chapter 33, Title 28 of the Virgin Islands Code.

**Section 3. Application:** All present and future owners, mortgagees, lessees, **tenants**, occupants of units and any other persons who may use **or access** the facilities of the Property in any manner are subject to these By-Laws, the Declaration and the Rules and Regulations.

The Acceptance of a deed, mortgage or conveyance or the entering into of a lease or the act of occupancy of a unit shall constitute an agreement that these By-Laws, the Rules and Regulations and the provisions of the Declaration, as they may be amended from time to time, are accepted, ratified, and will be complied with.

**Section 4. Office:** The office of the Condominium and of the Board of Directors shall be located at Cowpet Bay West, Estate Nazareth, No.1 Red Hook Quarter, St. Thomas, Virgin Islands. The mailing address shall be 6201 Windward Way, St. Thomas, USVI 00802, or such address as may be designated by the Board, upon 30 days written notice to the members of the Association.

DRAFT

## ARTICLE II

## Board of Directors

**Section 1. Number and Qualifications:** The affairs of the Condominium shall be governed by a Board of Directors. The Board of Directors shall be composed of seven persons, all of whom shall be owners or spouses of owners, or in the case of partnership owners, shall be members of said partnership, or in the case of corporate owners, shall be officers or stockholders of such corporations, or in the case of fiduciary owners shall be the fiduciaries or beneficiaries of any such trust, **or in the case of a limited liability company, shall be the members of such company.** A Board member may not base his/her eligibility to sit on the Board, **from the fact that a current Board Director resides** in the same unit **and therefore he/she can stand in said Board Director's position. Only one member of a unit can simultaneously serve on the Board.**

No person who is in arrears for ninety days or more on any billing or assessment by the Cowpet Bay West Condominium Association shall be eligible to be elected to or serve as a director on the Board of Directors. In the event such person is serving as a director, that person's position as director shall be declared to be vacant and another person appointed by a majority vote of the remaining Board to fill the vacancy so created, until the next regular election of the Board of Directors. Arrearages of partnerships, corporations, trusts, fiduciary owners, etc. on which a person's eligibility to serve on the board is based, shall be **subject to the same consequences of ineligibility as set forth above.**

**Section 2. Powers and Duties:** The Board of Directors shall have the powers and duties necessary for the administration of the affairs of the Condominium and may do all such acts and things except as by law, by the Declaration **(to the extent still applicable)**, or by these By-Laws **are** not delegated to the Board of Directors by the unit owners. Such powers and duties of the Board of Directors shall include, but shall not be limited to, the following:

a) Operation, care, upkeep and maintenance of the common areas and facilities.

b) Determination of Association Charges, which shall include the common expenses required for the operation of the Condominium, **insurance,** utility rates, **water,** late fees and interest charges, fines for By-Laws and **for** rules **and** regulation violations, and **any reserve funds maintained by the Association.**

c) Collection of Association charges, as hereinafter defined, from the unit owners.

d) Employment and dismissal of the personnel necessary for the maintenance and operation of the common areas and facilities.

e) Adoption, amendment and Enforcement of rules and regulations covering the details of the operation and use of the Property.

DRAFT

f) Opening of bank accounts on behalf of the Condominium and designating the signatories required therefore **and maintaining and accounting for any funds deposited or withdrawn from said accounts.**

g) Purchasing or leasing or otherwise acquiring, in the name of the **Association** or its designee, corporate or otherwise, on behalf of all unit owners, units offered for sale or surrendered by their owners.

h) Purchasing of units at foreclosure or other judicial sales in the name of the Association or its designees, corporate or otherwise, on behalf of all unit owners.

i) Selling, leasing, voting the votes appurtenant to (other than for the election of members of the Board of Directors), or otherwise dealing with units acquired and subleasing units leased by the Association, or its designee, corporate or otherwise on behalf of all unit owners. **No mortgage shall be entered into without the expressed written consent of a majority (51%) or more of the unit owners.**

j) **Issuing a Power of Attorney for someone** to act as designee of the **Association** in acquiring title to or leasing of units on behalf of all unit owners.

k) Obtaining of insurance for the Property, including **all premises owned or required to be maintained by the Association** pursuant to the provision of Article V, Section 2 hereof.

l) Making of repairs, **restorations,** additions and improvements to or alterations of the Property, **including all premises owned or required to be maintained by the Association** in accordance with the other provisions of these By-Laws, after damage or destruction by fire or casualty or as a result of condemnation or eminent domain proceedings.

__Section 3. Managing Agent and Manager:__ The Board of Directors may employ for the Condominium a managing agent and/or a manager at a compensation established by the Board of Directors, to perform such duties and services as the Board of Directors shall authorize. The Board of Directors may delegate to the manager or managing agent, all of the powers granted to the Board of Directors by these By-Laws other than the powers set forth in subdivisions (b), (e), (f), (g), (h), (i), (j) and (k) of Section 2 of this Article II.

__Section 4. Election and Term of Office:__

Directors will serve for a term of three years. Two Directors shall be elected the first year, two the second year, and three the third year to replace those directors whose terms are expiring. Where a vacancy has been filled by vote of a majority of the vote of the remaining members of the Board, as provided in Section 6, that person shall be a member until the next Annual Meeting, at which time the unit owners shall elect the replacement for the remainder of the original term, if any. Any candidate for director may run for a full term, or any term created by a vacancy, or both.

**Each** director shall be elected by the vote of a majority (as defined In Article III Section 9) of the unit owners. All vacancies shall be voted for on **in a single** ballot, and the candidate(s) with the highest number of votes shall be elected to **fill the respective** vacancies. Each candidate's name shall be preceded by a space where an "X" may be placed to vote for said candidate. It shall not be required that a name be crossed out and another inserted to vote for a candidate on the ballot. A space for write-in

DRAFT

candidates shall also be provided. Ballots and proxies shall be provided to the owners not less than 30 days prior to the Annual Meeting.

**Each** Director shall hold office until their respective successor shall have been elected by the unit owners.

A **Director** may serve only two consecutive terms and shall not hold office for one year before being eligible to run again.

**Section 5. Removal of Members of the Board of Directors:** At any regular or special meeting of unit owners, any one or more of the members of the Board of Directors may be removed with or without cause by a majority of the unit owners and a successor may then and there or thereafter be elected to fill the vacancy thus created. Any members of the Board of Directors whose removal has been proposed by the unit owners shall be given an opportunity to be heard at the meeting.

If a Board member does not attend any of the Board meetings during an entire year, and also does not attend the annual owners meeting that same year, such member may be removed from the Board by a majority of the other members of the Board of Directors.

**If a Director is removed pursuant to Section 5 herein, said Director shall not be eligible for service on the board for a minimum of ___ years.**

**Section 6. Vacancies:** Vacancies in the Board of Directors caused by any reason other than the removal of a member thereof by a vote of the unit owners, shall be filled **subject to Section 4 above,** by a vote of a majority of the remaining members at a special meeting of the Board of Directors held for that purpose promptly after the occurrence of any such vacancy, even though the members present at such meeting may constitute less than a quorum, and each person so elected shall be a member of the Board of Directors until a successor shall be elected at the next Annual Meeting of the unit owners. At that time a director shall be elected to serve the remainder of the term of the original vacating director.

**Section 7. Organization Meeting:** The first meeting of the members of the Board of Directors shall be an organizational meeting held directly following the Annual Meeting of the unit owners, at such time and place as shall be fixed by the Board members at said meeting, and no notice shall be necessary to the newly elected members of the Board of Directors in order to legally constitute such meeting, provided a majority of the whole Board of Directors shall be present, **or available via video or audio conference.** If it is not possible to hold such first meeting of the new Board immediately, then it shall be held as soon as possible and proper notice shall be given to each director, as for any special meeting of the Board of Directors.

**Section 8. Regular Meetings:** Regular meetings of the Board of Directors may be held at such time and place as shall be determined from time to time by a majority of the members of the Board of Directors, but at least two such meetings shall be held during each fiscal year. Notice of regular meetings of the Board of Directors shall be given to each member of the Board of Directors by mail, email or fax transmission, at least ten days prior to the day named for such meeting. Meeting notices

**Section 9. Special Meetings:** Special meetings of the Board of Directors may be called by the President upon five business days notice to each member of the Board of Directors given by mail, email or fax transmission, which notice shall state the time, place and purpose of the meeting. Special meetings of the Board of Directors shall be called by the President or Secretary in like manner and on like notice on

DRAFT

the written request of at least two members of the Board of Directors. Such special meeting may be conducted by a **video and/or audio** conference call.

**Section 10. Waiver of Notice:** Any member of the Board of Directors may, at any time, waive notice of any meeting of the Board of Directors in writing, and such waiver shall be deemed equivalent to the giving of such notice. Attendance by a member of the Board of Directors at any meeting of the Board shall constitute a waiver of notice by him of the time and place thereof. If all the members of the Board of Directors are present at any meeting of the Board, no notice shall be required and any business may be transacted at such meeting.

**Section 11. Quorum of Board of Directors:** At all meetings of the Board of Directors, a majority of the members thereof shall constitute a quorum for the transaction of business, and the votes of the majority of the members of the Board of Directors present at a meeting at which a quorum is present shall constitute the decision of the Board of Directors. If at any meeting of the Board of Directors there shall be less than a quorum present, no business may be transacted until a quorum is achieved. Board members may participate by video or audio conference call.

**Section 12. Fidelity Bonds:** The Board of Directors shall obtain adequate fidelity bonds for all officers and employees of the Condominium handling or responsible for condominium funds. The premiums on such bonds shall constitute a common expense.

**Section 13. Compensation:** No member of the Board of Directors shall receive any compensation from the Condominium Association for serving as a board member. However, verifiable expenses, in accordance with guidelines established by the Board in advance, are reimbursable. A **Director** may also be compensated for other services unrelated to his/her Board function.

**Section 14. Liability of the Board of Directors:** The members of the Board of Directors shall not be liable to the unit owners for any mistake of judgment, negligence, or otherwise, except for their own individual willful misconduct or bad faith. The unit owners shall indemnify and hold harmless each of the members of the Board of Directors against all contractual liability to others arising out of contracts made by the Board of Directors on behalf of the Property unless any such contract shall have been made in bad faith or contrary to the provisions of the Declaration or of these By-Laws.

It is intended that the members of the Board of Directors shall have no personal liability with respect to any contract made by them on behalf of the Property. It is also intended that the liability of any unit owner arising out of any contract made by the Board of Directors or out of the aforesaid indemnity in favor of the members of the Board of Directors shall be limited to such proportion of the total liability thereunder as his interest in the common areas and facilities bears to all such interest.

Every agreement made by the Board of Directors or by the managing agent or by the manager on behalf of the Property shall provide that the members of the Board of Directors or the managing agent, or the manager, as the case may be, are acting only as agents for the unit owners and shall have no personal liability thereunder (except as unit owners) and that each unit owner's liability thereunder shall be limited to such proportion of the total liability thereunder as his interest in the common areas and facilities bears to all such interest.

**Section 15. Executive Committee:** The Board of Directors, by resolution passed by a majority of the entire Board, shall designate at the Organization Meeting or anytime thereafter, three members of the

DRAFT

Board to constitute an Executive Committee, with one member thereof designated as Chairman. The purpose of the Executive Committee is to control the day-to-day management of the Association.

The Board of Directors from time to time shall define the authority of the Executive Committee.

The Board of Directors, at any time, may change the members of, may fill vacancies in, or may discharge the Executive Committee. Two members shall constitute a quorum of the Executive Committee. The act of a majority of the members at any meeting at which there is a quorum shall be the act of the Committee. The Board of Directors shall establish rules of procedure for the Committee governing, but not limited to, such items as notice and powers.

The Executive Committee shall make recommendations to the Board of Directors, and when the Board is not in session may, to the extent that the committee deems necessary, exercise the powers of the Board in the management of the business and affairs of the Association. The Executive Committee shall keep records of all its proceedings and shall report same to the Board of Directors, and its individual members, in writing within a reasonably short period of time after each significant action and after all meetings.

**Section 16. Inspection by Executive Committee**: The Executive Committee shall make a detailed inspection of the buildings, pump rooms, offices, maintenance shops, sewage and water-making plants, emergency generator, roads, sidewalks, steps, entry bridges, railings, grounds, landscaping, watering systems, the beach and the sea wall at least twice a year in the company of the manager or managing agent,. Additionally, the Committee shall evaluate the operation of the Association office and the overall security situation of the property.

The purpose of such inspections will be to (a) obtain a better understanding of the job being performed by the manager and his staff and (b) make suitable recommendations for possible future actions. Within 30 days after each such semi-annual inspection, the Committee will report its findings and recommendations to the members of the Board of Directors.

**Section 17. Action by Consent**: Any action required or permitted to be taken at any meeting of the Board of Directors, or any committee thereof, may be taken without a meeting if a written consent thereto is signed by three-quarters of the members, (rounded off to the nearest whole number), of the Board of Directors or of such committee as the case may be, and filed with the minutes of proceedings of the Board of Directors or committee.

**Section 18. Nomination of Directors**: Nominations for election to the Board of Directors shall be made by a Nominating Committee. The Nominating Committee shall consist of a Chair, who shall be a member of the Board of Directors, and two or more members of the Association, **who are not Directors or related to any current Directors**. The Nominating Committee shall be appointed by the Board of Directors at its organizational meeting and serve until the next Annual Meeting.

The Nominating Committee shall make as many nominations for election to the Board of Directors as it shall, in its discretion, determine, but not less than the number of vacancies that are to be filled. Each nomination shall be for a specified vacancy.

Any person qualified under Section1 of Article II of these By-Laws to serve on the Board of Directors may be nominated for the Board of Directors by submitting a request, signed by the owners of two units in which the nominee has no financial interest, to the Board Secretary sixty days prior to the Annual Meeting. The Board shall include his/her name on the ballot directly following the nominee(s) proposed by the Nominating Committee for each vacancy. Any nomination that does not specify a specific vacancy shall be deemed a nomination for all vacancies.

**Section 19 – Communications**

3055300/000388

DRAFT

Communications by, from, to and among the Board may be in writing, by fax or by electronic communications (telephone, telephone conference, email, internet, etc.) Telephone and telephone conference conversations must be documented (e.g., minutes or record of conversation). This communication will constitute "official" communication by the Board.

## ARTICLE III

## Unit Owners

**Section 1. Annual Meeting:**
The Annual Meeting of the unit owners shall be held during the first quarter each year. At the Annual Meeting, Directors shall be elected by ballot in accordance with the requirements of Section 4 of Article II of these By-Laws, and the unit owners may transact such other business at such meetings as may properly come before them.

**Section 2. Place of Meeting:** Meetings of the unit owners shall be held at the principal office of the Condominium or at such other suitable place convenient to the unit owners as may be designated by the Board of Directors.

**Section 3. Special Meetings:** It shall be the duty of the President to call a special meeting of the unit owners if so directed by resolution of the Board of Directors or upon a petition signed and presented to the Secretary by not less than 25% in common interest, in the aggregate, of unit owners. The notice of any special meeting shall state the time and place of such meeting and the purpose thereof. No other business shall be transacted at a special meeting except as stated in the notice.

**Section 4. Notice of Meeting**: It shall be the duty of the Secretary to mail a notice of each annual meeting of the unit owners not less than thirty days nor more than ninety days prior to such meeting, stating the purpose thereof as well as the time and place where it is to be held, to each unit owner of record, at the building or at such other address as such unit owner may have designated by notice in writing to the Secretary. The mailing of a notice of meeting in the manner provided in this section shall be considered service of notice. The Board of Directors may assign the task of providing notice to unit owners to a person other than the Secretary. Special meetings require not less than ten days notice.

DRAFT

**Section 5. Adjournment of Meetings**: If any meeting of unit owners cannot be held because a quorum has not attended, a majority in common interest of the unit owners who are present at such meeting, either in person or by proxy, may adjourn the meeting to a time not less than forty-eight hours from the time the original meeting was called.

**Section 6. Order of Business**: The annual meeting of the unit owners shall be chaired by the President or other member of the Board of Directors chosen by the Board, and the order of business shall be generally as follows:

a) Roll Call – by unit
b) Establishment of Quorum (1/3 of all unit owners)
c) Proof of Notice of Meeting
d) Approval of Minutes of last year's Annual Meeting
e) President's Report (including cost and coverage of insurance
f) Treasurer's Report (including discussion of Budget and Financial Status
g) Property Manager's Report
h) Report of Nominating Committee
i) Election of Board Members
j) Old Business
k) New Business

**Section 7. Title to Units**: Title to units may be taken in the name of an individual, or in the names of two or more persons as tenants in common, joint tenants or tenants by the entirety, or in the name of a corporation, partnership, limited liability company or other legal entity authorized to own real property in the Virgin Islands, or in the name of a fiduciary.

**Section 8. Voting**: The owner or owners of each unit, or some person designated by such owner or owners to act as proxy on his or their behalf and who need not be an owner, shall be entitled to cast the vote appurtenant to such unit at all meetings of unit owners. The designation of any such proxy shall be made in writing and shall be revocable at any time by written notice to the Secretary or in person at the meeting. Any or all such owners or proxies may be present at any meeting of the unit owners and may vote or take any other action as a unit owner either in person or by proxy. Votes of unit owners shall be weighted in accordance with their share of the common interest, as follows, with the total of all votes equaling one hundred:

| | |
|---|---|
| 2 Bedroom | .911 |
| 3 Bedroom | 1.062 |
| 2 Bedroom + Loft | 1.193 |
| 4 Bedroom | 1.301 |
| 3 Bedroom + Loft | 1.376 |

The Board of Directors shall accept any vote if the owner is one of the owners of record of the unit, or in the case of a proxy, if there is no obvious defect on the face of such proxy. It shall be the burden of the protestor to offer satisfactory proof that the proffered vote or proxy is invalid and that his is the proper one.

DRAFT

**Section 9. Majority of Unit Owners**: As used in these By-Laws, the term "majority of unit owners: shall mean those unit owners having more than 50% of the total authorized votes of all unit owners present in person or by proxy and voting at any meeting of the unit owners, determined in accordance with the provisions of Section 8 of this Article III.

**Section 10. Quorum**: Except as otherwise provided in these By-Laws, the presence in person or by proxy of unit owners having one-third (1/3) of the total authorized votes of all unit owners shall constitute a quorum at all meetings of the unit owners.

**Section 11. Majority Vote**: The vote of a majority of unit owners at a meeting at which a quorum shall be present shall be binding upon all unit owners for all purposes except where, in the Declaration or these By-Laws, or by law, a higher percentage vote is required.

## ARTICLE IV

## Officers

**Section 1. Designation**: The principal officers of the Condominium shall be the President, the Vice President, the Secretary, and the Treasurer, all of whom shall be elected by the Board of Directors. The Board of Directors may appoint an assistant secretary, an assistant treasurer, and such other officers as in its judgment may be necessary. The President and Vice President, but no other officers, need be members of the Board of Directors.

**Section 2. Election of Officers**: The officers of the Condominium shall be elected annually by the Board of Directors at the Organization Meeting of each new Board of Directors and shall hold office at the pleasure of the Board of Directors.

**Section 3. Removal of Officers**: Upon the affirmative vote of a majority of the members of the Board of Directors, any officer may be removed, either with or without cause, and his successor may be elected by the Board of Directors at any regular or special meeting of the Board of Directors called for such purpose.

**Section 4. President**: The President shall be the chief executive officer of the Condominium. He shall preside at all meetings of the unit owners and of the Board of Directors. He shall have all of the general powers and duties which are incident to the office of president of a stock corporation organized under the Corporation Law of the Virgin Islands, including but not limited to the power to appoint committees from among the unit owners from time to time as he may in his discretion decide is appropriate to assist in the conduct of the affairs of the Condominium.

**Section 5. Vice President**: The Vice President shall take the place of the President and perform his duties whenever the President shall be absent or unable to act. If neither the President nor the Vice President is able to act, the Board of Directors shall appoint some other member of the Board of

DRAFT

Directors to act in the place of the President, on an interim basis. The Vice President shall also perform such other duties as shall from time to time be imposed upon him/her by the Board of Directors or by the President.

**Section 6. Secretary**: The Secretary shall keep the Minutes of all meetings of the unit owners and of the Board of Directors. He shall have charge of such books and papers as the Board of Directors may direct; and he shall, in general, perform all the duties incident to the office of secretary of a stock corporation organized under the Corporate Law of the Virgin Islands.

**Section 7. Treasurer**: The Treasurer shall have the responsibility for Condominium funds and securities and shall be responsible for keeping full and accurate financial records and books of account showing all receipts and disbursements, and for the preparation of all required financial data. The Treasurer shall be responsible for the deposit of all monies and other valuable effects in the name of the Board of Directors, or the managing agent, in such depositories as may from time to time be designated by the Board of Directors, and shall, in general, perform all the duties incident to the office of treasurer of a stock corporation organized under the Corporation Law of the Virgin Islands.

**Section 8. Agreements, Contracts, Deeds, Checks, etc.:** All agreements, contracts, deeds, leases and other instruments of the Condominium shall be executed by any two officers of the Condominium or by such other person or persons as may be designated by the Board of Directors, **in the resolution authorizing the execution of said document.**.

**Section 9. Compensation of Officers**: No officer shall receive any compensation from the Condominium for acting as such.

## ARTICLE V

### Operation of the Property

**Section 1. Determination of Common Expenses and Fixing of Common Charges:** The Board of Directors shall from time to time, and at least annually, prepare a budget for the condominium, determine the amount of the common charges payable by the unit owners to meet the common expenses of the Condominium, and allocate and assess such common charges among the unit owners according to their respective common interests. Common expenses shall include, among other things, operation and maintenance, insurance premiums, repairs and such amounts as the Board of Directors may deem proper for a general operating reserve, for a reserve fund for replacements, and to make up any deficit in the common expenses for any prior year.

DRAFT

**Section 3. Repair or Reconstruction After Fire or Other Casualty:** In the event of damage to or destruction of the commonly owned buildings and elements as a result of fire or other casualty (unless 66-2/3% or more of the buildings are destroyed or substantially damaged and 75% or more of the unit owners determine in accordance with the Declaration not to proceed with the repair or restoration), the Board of Directors shall arrange for the prompt repair or restoration of the commonly owned buildings and elements, and the Board of Directors shall disburse the proceeds of all insurance policies to the contractors engaged in such repair or restoration in appropriate progress payments. Any cost of such repair or restoration in excess of the insurance proceeds shall constitute a common expense – and the Board of Directors may assess all the unit owners for such deficit as part of the common charges. The association shall only be responsible for inspecting unit interiors to determine if damage is structural or due to external causes, or if adjacent unit damage is caused by external causes, or unless that unit is owned by the association. Unless that unit is owned by the association, repair by the association of other unit damage will be limited to structural damage, that caused by external or adjacent unit causes, and will not include property or fixtures installed by the owner or previous owners.

Within ninety days after a casualty of an estimated repair cost of $100,000 or greater, the Board will provide to the owners a financial status report indicating projected repair costs, source(s) of necessary funds, expenditures and commitments to date, and a schedule and plan for completion. This report will be updated and issued to owners on a quarterly basis, thereafter, until repairs are complete. A current report shall be provided at the next Annual Meeting.

If 66-2/3% or more of the Building(s) are destroyed or substantially damaged and if within sixty days of the date of such destruction or damage, 75% or more of the unit owners determine not to proceed with repair and restoration, the Property shall be subject to an auction for partition at the suit of any unit owner or lien holder, as if owned in common, in which event the net proceeds of sale, together with the net proceeds of insurance policies (less any repairs conducted) shall be divided by the Board of Directors among all the unit owners in proportion to their respective common interests, after first paying out of the share of each unit owner the amount of any unpaid liens on his/her/their unit, in the order of priority of such liens.

**Section 4. Payment of Association Charges:** All unit owners shall be obligated to pay the common charges assessed by the Board of Directors pursuant to the provisions of Section 1 of this Article V at such time or times as the Board of Directors shall determine, as well as "other charges" for utilities, services, unit repairs, late fees, interest, fines and/or collection costs, if incurred. With respect to the following sections concerning payment, collection, default, foreclosure, etc., in Sections 4, 5, 6, 7, & 8 below, the term "association charges" is intended to include, but not be limited to, all the above items, both the "common" and "other" charges.

No unit owner shall be liable for the payment of any part of association charges assessed against his unit subsequent to a sale, transfer or other conveyance by him of such unit, together with the Appurtenant Interests, as defined in Section1 of Article VII hereof. In addition, a unit owner may, subject to acceptance by the Board of Directors provided that the unit is free and clear of liens and encumbrances other than mortgages and statutory liens for unpaid association charges, convey the unit, together with the "Appurtenant Interests" to the Board of Directors, or its designee, corporate or otherwise, on behalf of all other unit owners, and in such event be exempt from association charges thereafter assessed.

However, a purchaser of an unit shall be liable for the payment of association charges assessed against such unit prior to the acquisition of such a unit, without prejudice to such purchaser's right, if any, to recover from the seller the amounts paid by the purchaser, except that a first mortgagee or other purchase of a unit at a foreclosure sale of a first priority mortgage of such a unit shall not be liable

for and such a unit shall not be subject to a lien for the payment of association charges which became due prior to the acquisition of title by such acquirer.

__Section 5. Collection of Association Charges__: The Board of Directors shall assess association charges against the unit owners from time to time and shall take prompt action to collect any charges due from any unit owner, which remain unpaid for more than thirty days from the date due for payment thereof. Such action may include placement of a lien on the apartment unit, notification to the mortgagee of the owner's failure to pay association charges and foreclosure on the lien. Additionally, suspension of utilities by a majority vote of the Executive Committee is permitted if an owner is more than 90 days in arrears of any Association charges. Payments received from unit owners will be applied to **the oldest arrearages first.**

__Section 6. Default in Payment of Association Charges:__ In the event of default by any unit owner in paying to the association charges as determined by the Board of Directors, such unit owner shall be obligated to:

1. pay interest from the date of the initial billing at the maximum legal rate of interest, as defined by the Virgin Islands Laws, on all amounts past due,
2. pay a monthly service charge as determined and promulgated from time-to-time by the Board of Directors,
3. pay all expenses and attorneys' fees incurred by the Board of Directors in any proceeding brought to collect such unpaid association charges.

All such unpaid association charges shall constitute a lien on such unit prior to all other liens except those specified in Section 922 of Chapter 33, Title 28 of the Virgin Islands Code. The Board of Directors shall have the right and duty to attempt to recover all association charges, together with interest and monthly service charges thereon, and the expenses of the proceeding, including attorneys' fees, in any action to recover the same brought against such unit owner, or by foreclosure of the lien on such unit granted by Section 922 of Chapter 33, Title 28, Virgin Islands Code.

__Section 7. Foreclosure of Liens For Unpaid Association Charges:__ In any action brought by the Board of Directors to foreclose a lien on a unit because of unpaid association charges, the unit owner shall be required to pay a reasonable rental for the use of the unit, and the plaintiff in such foreclosure action shall be entitled to the simultaneous appointment of a receiver to collect the same. The Board of Directors, acting on behalf of all unit owners, shall have power to purchase such unit at the foreclosure sale and to acquire, hold, lease, mortgage, vote the votes appurtenant to, convey or otherwise deal with the same. A suit to recover a money judgment for unpaid association charges shall be maintainable without foreclosing or waiving the lien securing the same.

__Section 8. Statement of Association Charges:__ The Board of Directors shall promptly provide any unit owner so requesting the same in writing, with a written statement of all unpaid association charges due from such unit owner.

__Section 9. Abatement and Enjoinment of Violations by Unit Owners:__ The violation of any rule or regulation adopted by the Board of Directors or the breach of any of these By-Laws contained herein, or the breach of any provisions of the Declaration, shall give the Board of Directors the right, in addition to any other rights set forth in these By-Laws (a) to enter the unit in which, or as to which, such violation or breach exists and to summarily abate or remove, at the expense of the defaulting unit owner, any structure, thing or condition that may exist therein contrary to the intent and meaning of the provisions

hereof, and the Board of Directors shall not thereby be deemed guilty in any manner of trespass or (b) to enjoin, abate or remedy by appropriate legal proceedings, either at law or in equity, the continuance of any such breach.

**Section 10. Routine Maintenance and Repair:** All maintenance of and repairs to any "unit" (other than maintenance of and repairs to any common areas and facilities contained therein, and not necessitated by the negligence, misuse or neglect of the owner of such apartment unit) shall be the responsibility of the owner of such apartment unit. Also, each unit owner shall be responsible for damage to other apartment units and/or to the common areas and facilities resulting from conditions for which such owner has responsibility as indicated above.

A "unit" is considered the space inside the perimeter walls, interior walls, floor and ceiling to include:

- All decorating elements including: paint, wall and floor coverings, paneling, molding and tiles; finished cabinets and mirrors.
- All electrical appliances including: refrigerator, stove, washer, dryer, dishwasher, garbage disposal, hot water heater and air-conditioning equipment (including compressor).
- All electrical fixtures including: wall ceiling and floor outlets, switches and fuse box.
- All plumbing fixtures including: tubs, toilets, showers, sinks and faucets.

Additionally, the unit owner shall be responsible for the routine lubrication and adjustment of doors and windows, and, unless major casualty related, replacement of broken glass, wooden or glass slats and damaged screens. The unit owner shall also maintain and assure the operability of the storm shutters installed on that unit and is responsible to close them in the event of a windstorm. Damage caused by failure to do so is the responsibility of the owner if net insurance proceeds are insufficient to cover such damage.

Screen doors may be installed on the main street-side entry doors at the unit owner's expense provided they meet the existing décor. Once installed, they must be maintained by the unit owner in a good state of repair, or the Association will do so at the owner's expense.

Except for the limited exceptions noted above, all maintenance, repairs and replacements to the "common elements", common areas and facilities, whether located inside or outside of the units, (unless necessitated by the negligence, misuse or neglect of a unit owner, in which case such expense shall be charged to such unit owner), shall be made by the Association and be charged to all the unit owners as a common expense.

"Common elements" are considered to include all other elements of the buildings and property except those specified as being part of the "unit." Additionally, the following are considered common elements:

- Electrical supply to the fuse box.
- Water and plumbing lines in the walls (including interior walls), floor and ceiling to the valves at sinks, showers, tubs, hot water heater, and toilets, etc.
- Drains to the first connection outside a wall.

External air conditioning compressor units shall be maintained by the owner in a reasonable state of preservation. The Association may require owner to remove inoperable and/or un-maintained units or do so at the owner's expense

Below is a guide to assist in clarifying owner and Association responsibility with regard to maintenance/repair and insurance."

DRAFT

**Insurance and Maintenance Responsibility Matrix**

| Category (Not intended to be all-inclusive) | Owner Maint/Repair Responsibility | Association Maint/Repair Responsibility | Association Insurance Responsibility | Owner Insurance Responsibility |
|---|---|---|---|---|
| Exterior Walls and Interior Damage Caused by Leaks | | x | x | |
| Roof and Interior Damage Caused by Roof Leaks | | X | X | |
| Interior Damage caused by Adjacent Units (Leaks, etc.) | X | | | Owner or Adjacent Unit's Insurance Responsible |
| Front Doors | X | | X | |
| Screens | X | | X | |
| Exterior Sliders | | X | X | |
| Exterior Wood Railings, Trim, Benches | | X | X | |
| Exterior Windows | X | | X | |
| Electrical System to Breaker Panel | | X | X | |
| Electrical System, Breaker Panel to Outlets, Junction Boxes | X | | X | |
| Electrical Fixtures-Interior | X | | | X |
| Plumbing Inside Walls, Floors Ceilings to valves | | X | X | |
| Condo plumbing not in walls/floors | X | | | X |
| Plumbing Fixtures | X | | | X |
| Interior Walls | X | | X | |
| Interior Doors | X | | | X |
| Cabinets | X | | | X |
| Furniture | X | | | X |
| Appliances | X | | | X |
| Wall/Floor Coverings (tile/carpet) | X | | | X |
| Hurricane Shutters | X | | X | |
| Furniture | X | | | X |
| Personal Property | X | | | X |
| External A/C elements | X | | | X |
| Internal A/C elements | X | | | X |
| Landside Porch/Steps/Railings | | X Excluding Tile | X Excluding Tile | |
| Seaside Balcony/Railings | | X Excluding Tile | X Excluding Tile | |

**<u>Section 11. Restriction on Use of Units:</u>** In order to provide for congenial occupancy of the Property and for the protection of the value of the units, the use of the Property shall be restricted to and shall be in accordance with the following provisions:

The units shall be used for residences only. Units will not be occupied by more than two persons per bedroom for more than thirty days per year.

DRAFT

The common areas and facilities, including the limited common areas and facilities, shall be used only for the furnishing of the services and facilities for which they are reasonably suited and which are incident to the use and occupancy of the units

2. No nuisances shall be allowed on the Property nor shall any use or practice be allowed which is a source of annoyance to its residents or which interferes with the peaceful possession proper use of the Property by its residents.
3. No improper, offensive or unlawful use shall be made of the Property or any part thereof, and all valid laws, zoning laws and regulations of all governmental bodies having jurisdiction thereof shall be observed.
4. Violations of laws, orders, rules, regulations or requirements of any governmental agency having jurisdiction thereof, relating to any portion of the Property, shall be corrected, by and at the sole expense of the unit owners or the Board of Directors, whichever shall have the obligations to maintain or repair such portion of the Property.
5. No dogs are allowed on the property, either long term or visiting. The Board may grant exceptions to the NO DOGS ALLOWED rule, on an individual basis, should an owner require the assistance of a service animal (dog) as defined by the ADA. Owners seeking to obtain such an exemption are required to apply, in writing, to the Board with supporting documentation.

Federal and ADA Compliance, as follows:

*"On July 23, 2010, Attorney General Eric Holder signed final regulations revising the Department's ADA regulations, including a revised definition of "service animal." Effective March 15, 2011, "Service animal means any dog that is individually trained to do work or perform tasks for the benefit of an individual with a disability, including a physical, sensory, psychiatric, intellectual, or other mental disability. The work or tasks performed by a service animal must be directly related to the handler's disability.*

*Dogs used for emotional support, that are not task-trained, are called emotional support animals. They are not service dogs."*

**Section 12. Additions, Alterations or Improvements by the Board of Directors:** Additions, alterations or improvements to the common areas and/or facilities up to $100,000 may be made by the Board of Directors. Additions, alterations or improvements in excess of $100,000 shall require approval by a vote of two-thirds (2/3) in common interest of the owners. The cost of such additions, alterations or improvements shall constitute a common charge. This section is not applicable to repairs conducted in accordance with Article V Section 3 of these By-Laws.

**Section 13. Additions, Alterations, or Improvements by Unit Owners:** No unit owner shall make any structural addition, alteration or improvement in or to the unit, including any exterior painting or exterior alteration or addition (including awnings, grills, etc.) without the prior written consent thereto of the Board of Directors. The Board of Directors shall have the obligation to answer any written request by a unit owner for approval of a proposed structural addition, alteration or improvement in such unit owner's unit, within thirty (30) days after such request, and failure to do so within the stipulated time shall constitute a consent by the Board of Directors to the proposed addition, alteration or improvement.

A unit owner shall obtain a receipt from any person accepting his written request for a change under this section and shall show the receipt to the manager or any Director upon request. Any application to any department of the Government of the Virgin Islands or to any other governmental authority for a permit to make an addition, alteration or improvement in or to any unit shall be executed by the Board of Directors only, without, however, incurring liability on the part of the Board of Directors or any of

them to any contractor, sub-contractor or supplier on account of such additions, alteration or improvement, or to any person having any claim for injury to person or damage to property arising therefrom. The owner in such instance shall provide the Board of Directors with a Hold Harmless Certificate.

**Section 14. Use of Common Areas and Facilities**: A unit owner shall not place or cause to be placed in the stairways or other common areas and facilities, including the limited common areas and facilities, other than the areas designated as storage areas, any furniture, packages or objects of any kind. The entry passages, stairways, entry bridges, etc., shall be used for no purpose other than for normal transit through them.

**Section 15. Right of Access:** A unit owner shall grant a right of access to the unit to the manager and/or the managing agent and/or any other person authorized by the Board of Directors, the manager or the managing agent, for the purpose of making inspections or for the purpose of correcting any condition originating in his apartment unit and threatening another unit or a common area or facility, or for the purpose of performing installations, alterations or repairs to the mechanical or electrical services or other common areas or facilities in the unit or elsewhere in the Building, provided that requests for entry are made in advance and that any such entry is at a time reasonably convenient to the unit owner. In case of an emergency, such right of entry shall be immediate, whether or not the unit owner is present at the time.

**Section 16. Rules of Conduct**: Article V Section II of these By-Laws delineates general restrictions on the use of the property. Additionally, a definitive listing of current Rules and Regulations is provided as Exhibit I hereto. These Rules and Regulations may be amended by the Board of Directors from time to time. The Board is empowered to enforce these By-Laws and Rules and Regulations with monetary fines and other sanctions and may also take any legal action in court to enforce them. An owner is subject to such fines, sanctions and/or legal actions for the actions of tenants as if those actions were by the owner.

Copies of the Rules and Regulations shall be furnished by the Board of Directors to each unit owner prior to the time when the same shall become effective. The unit owner must insure that the tenant or occupant be fully informed and furnished with a copy of the Rules and Regulations and by fully bound thereby.

**Section 17. Potable Water and Electricity: The Association shall supply potable** water and electricity Association through the common facilities of the Condominium directly to each unit through a separate meter, and each unit owner shall be required to pay the charges therefore established, from time to time, by the Board of Directors. Water, electricity and other utility charges will normally be billed monthly incident to the common charges and are considered to be part of the "association" charges. Utility charges more than thirty days in arrears are subject to a late fee and interest per Section 6 Article V of these By-Laws, and said utilities may be suspended by the Association if an owner is more than 90 days in arrears of Association charges per Article V Section 5 thereof.

**Section 18. Gas:** Gas shall not be piped to any apartment unit, and unit owners are specifically prohibited from using gas as a fuel for regular cooking, water heating, or any other regular purpose. Small quantities of propane gas may be used for gas grills kept on street-side galleries and for emergency use inside apartment units.

DRAFT

**Section 19. Grey Water and Sewerage Service:** Grey water for flushing and sewerage service (including sewage disposal and treatment in the condominium's sewerage treatment plant) shall be supplied as a common facility to all unit owners, and the cost thereof shall be treated as a common expense.

## ARTICLE VI

## Mortgages

**Section 1. Notice of Unpaid Common Charges:** The Board of Directors, whenever so requested in writing by a mortgages of a unit, shall promptly report any then unpaid association charges due from, or any other default by the owner of the mortgaged apartment unit.

**Section 2. Notice of Default:** The Board of Directors, when giving notice to a unit owner of a default in paying common charges or other default, may send a copy of such notice to each holder of a mortgage covering such unit.

## ARTICLE VII

## Sales and Mortgages of Units

**Section 1. No severance of Ownership:** No unit owner shall execute any deed, mortgage or other instrument conveying or mortgaging title to the unit without including therein the Appurtenant Interests, it being the intention hereof to prevent any severance of such combined ownership. For the purpose of the By-Laws, the "Appurtenant Interests" shall mean collectively, (i) the unit owner's undivided interest in the common areas and facilities appurtenant to such unit; (ii) the interest of such unit owner in any units theretofore acquired by the Board of Directors, or its designee, on behalf of all unit owners, or the proceeds of the sale or lease thereof, if any; and (iii) the interest of such unit owner in any other assets of the Condominium.

Any such deed, mortgage or other instrument purporting to affect one or more of such interests, without including the interest or interests so omitted, shall be deemed to include such interests even though the latter shall not be expressly mentioned or described therein. No part of the Appurtenant Interests of any apartment unit may be sold, transferred or otherwise disposed of, except as part of a sale, transfer or other disposition of the unit to which such interests are appurtenant, or as part of a sale, transfer or other disposition of such part of the Appurtenant Interests of all apartment units.

DRAFT

**Section 2. Sale to Board of Directors:** A unit owner may, subject to mutual agreement of the parties, and subject to the provisions of Section 1 of this Article VII, sell his unit to the Board of Directors, or its designee; provided, however that such purchase by the Board of Directors shall have the prior approval of two-thirds (2/3) of the unit owners, as expressed by the vote of at least two third (2/3) in number and in common interest, of all unit owners, cast in person or by proxy in accordance with these By-Laws.

**Section 3. Financing of Purchase of Apartment Units By Board of Directors:** Acquisition of units by the Board of Directors, or its designee, on behalf of all unit owners, may be made from the working capital and common charges in the hands of the Board of Directors, or if such funds are insufficient the Board of Directors may levy an assessment against each unit owner in proportion to his ownership in the common areas and facilities as a common charge, which assessment shall be enforceable in the same manner as provided in Section 6 and 7 of Article V, or the Board of Directors, in its discretion, may borrow money to finance the acquisition of such units, provided, however, that no financing may be secured by an encumbrance or hypothecation of any property other than the unit, together with the Appurtenant Interests, so to be acquired by the Board of Directors.

**Section 4. Gifts and Devises, etc:** Any unit owner shall be free to convey or transfer the unit by gift, or to devise the unit by will, or to pass the same by intestacy, without restriction.

**Section 5. Waiver of Right of Partition with Respect to Such Units as are Acquired by the Board of Directors, or its Designee, on Behalf of All Unit Owners as Tenants in Common:** In the event that a unit shall be acquired by the Board of Directors, or its designee, on behalf of all unit owners as tenants in common, all such unit owners shall be deemed to have waived all rights of partition with respect to such unit.

## ARTICLE VIII

**Section 1. Condemnation – Eminent Domain:** In the event of a taking by condemnation or by eminent domain of part or all of the common areas and facilities, the award made for such taking shall be payable to the Board of Directors for disbursement **among all unit owners in proportion to their respective common interests after first paying out all common area and facility expenses pertaining to said taking.**

## ARTICLE IX

## Records

3055300/000400

DRAFT

**Section 1. Records and Audits:** The Board of Directors or the managing agent shall keep detailed records of the actions of the Board of Directors and the managing agent, Minutes of the meetings of the Board of Directors, Minutes of the meetings of unit owners, and financial records and books of account of the Condominium, including a chronological listing of receipts and expenditures, as well as a separate account for each unit which, among other things, shall contain the amount of each assessment of common charges against such unit, the date when due, the amounts paid thereon, and the balance remaining unpaid.

Each unit owner shall be permitted to examine all accounts, records and contracts of the Association in the Condominium office at reasonable times, on business days, but not more often than once a month. All others must request any required information from the Board of Directors.

An annual report of the receipts and expenditures of the Association, examined and approved by a licensed accountant not affiliated with the Association and chosen by the Board of Directors, shall be rendered to the Board and sent, within a reasonable time after the end of each fiscal year, to all unit owners who request it.

**ARTICLE X**

**Miscellaneous**

**Section 1. Notices:** All notices hereunder shall be sent by registered or certified mail to the Board of Directors c/o the managing agent, or if there is no managing agent, to the office of the Board of Directors or to such other address as the Board of Directors may hereafter designate from time to time, by notice in writing to all unit owners and to all mortgagees of units.

All notices to any unit owner shall be sent by registered or certified mail to the Building or to such other address as may have been designated by him from time to time, in writing, to the Board of Directors. All notices to mortgagees of units shall be sent by registered or certified mail to their respective addresses, as designated by them from time to time, in writing to the Board of Directors. All notices shall be deemed to have been given when mailed, except notices of change of address, which shall be deemed to have been given when received.

Notwithstanding the requirements of this section, all notices of regular, special and Annual Meetings of the unit owners, Board of Directors, and committees of the Board or otherwise, shall be by first class mail but without the requirement of registration or certification. The applicable notice shall be sent so as to comply with the required time limits, if any, to the regular mailing address of the designated party as recorded in the books of the Association.

**Section 2. Invalidity:** The invalidity of any part of these By-Laws shall not impair or affect in any manner the validity, enforceability or effect of the balance of these By-Laws.

**Section 3. Captions:** The captions herein are inserted only as a matter of convenience and for reference, and in no way define, limit or described the scope of these By-Laws, or the intent of any provision thereof.

**Section 4. Gender:** The use of the gender in these By-Laws shall he deemed to include the **masculine, feminine or non- gender of the unit owner** and the use of the singular shall be deemed to include the plural, whenever the context so requires.

DRAFT

**Section 5. Waiver:** No restrictions, condition, obligation or provisions contained in these By-Laws shall be deemed to have been abrogated or waived by reason of any failure to enforce same, irrespective of the number of violations or breaches thereof which may occur.

**Section 6. Insurance Trustee:** The Board of Directors may appoint a Trustee to distribute large amounts of any insurance proceeds. The trustee so appointed may be any individual or entity, so long as such is properly bonded in relation to the funds and responsibility involved.

## ARTICLE XI

### Amendments to By-Laws

**Section 1. Amendments to By-Laws:** Except as hereinafter provided, these By-Laws may be modified or amended by the vote of 66-2/3% in number and in common interest of all unit owners.

## ARTICLE XII

### Execution of Instruments and Seal

**Section 1. Execution and Instruments:** All instruments of the Condominium shall be executed under seal by such officer or officers as the Board of Directors may designate, or as may be otherwise authorized.

**Section 2. Seal:** The seal of the Condominium shall be as determined by the Board of Directors from time to time.

## ARTICLE XIII

### Conflicts

**Section 1. Conflicts:** These By-Laws are set forth to comply with the provisions of Sections 917 and918 of Chapter 33, Title 28, Virgin Islands Code. In case any of these By-Laws conflict with the provisions of said statute or of the Declaration, the provisions of said statute or of the Declaration, as the case may be, shall control.

DRAFT

**EXHIBIT I**

Rules and Regulations
for
Cowpet Bay West
2012

1. No articles shall be placed on any of the stairways, railings, or entry bridges.

2. Balconies and street-side porches shall be kept neat and clean, and no articles shall be swept or thrown from them. No laundry, laundry lines, or other unsightly articles shall be placed on the balconies, porches or other common areas and facilities.

3. Radio or television antennas are prohibited and no sign, notice, advertisement or illumination shall be displayed on or at any window or other part of the building.

4. No owner shall make or permit any disturbing noises in his unit or within the common areas and facilities, or do anything, or permit anything to be done wherein which will interfere with the rights and reasonable comfort and convenience of other owners.

5. No inflammable, combustible or explosive fluid, material, chemical or substance is permitted in any unit, except for normal household use.

6. Dogs and farm animals are prohibited, and owners will be fined as specified by the Board of Directors. The Association may require removal of any animal when it becomes bothersome to others or is deemed by the Association to be unacceptable.

7. No garbage or trash will be left or disposed of on or adjacent to the property – except in a dumpster, if such is provided by the Association.

8. One space per unit is provided for parking automobiles on the property. Additional vehicles may be allowed by Management based on space availability. Any vehicle not currently registered and licensed will be considered a derelict and will be towed.

9. No boat, trailer, heavy commercial or non-self-propelled vehicle shall be parked on the property. No vehicle shall be parked in any manner restricting passage of any emergency vehicles, such as ambulances, fire trucks, etc. No vehicle shall be parked so as to impede ready movement by another vehicle, nor shall it be parked in any space assigned to another unit without permission of the said unit owner. Any vehicle in violation of these rules may be towed at the vehicle owner's expense.

10. Beach users shall clean up and remove any trash or other articles on the beach for which they are responsible.

11. The use of barbecues on seaside galleries is prohibited.

Case 3:14-cv-00025-CVG-RM Document #: 205-3 Filed: 05/21/14 Page 43 of 85

DRAFT

12. The number of persons occupying a unit on a routine basis is limited to two per bedroom. Additional "guests" are permitted not to exceed thirty days total per year.

DRAFT

**Attachment #2**

**Owners' Common Interest**

**30 April 1998**

**Unit Type**

**%Common Interest**

2 Bedroom

.911

**Leeward**
#1,2,3,4,5,7,8,9,10,11,12
13,14,15,17,18,23,24,25
26,27,28,29,31,32,33,34,
35,36,37,39,40,41

**Windward**
#3,4,5,6,7,9,10,11,12,13
14,15,16,17,19,20,21,22
25,26,27,28,29,30,31,33
34,35,37,38,39,40,41,47,49

3 Bedroom

**1.062**

**Leeward**
#6,16,19,20,21,22,30,3B,42
,43,44,49

**Windward**
#1,2,8,18,23,24,32,36,42,4
3,44,45,51

2 Bedrooms plus Loft

**1.193**

**Leeward: #** 46,48

**Windward: #**

4B,50

Case 3:12-cv-00025-CVG-RM Document #: 205-3 Filed: 05/21/14 Page 44 of 86

DRAFT

3 Bedrooms plus Loft 1.376
**Leeward: #** 50

**Windward: #** 46,52

4 Bedroom **1.301**
**Leeward: #** 45,47

Cowpet Bay West

Board of Directors Meeting

February 7, 2011

Present: Judi Kromenhoek, Ed Wardwell, Rosie Wells, Bob Cockayne, Barbara Walters, Greg Miller, Jon Cassady, Louanne Schechter

Max Harcourt is currently hospitalized following emergency surgery.

Minutes of January 11, 2011: The minutes of the January Board of Directors meeting were unanimously approved.

W-27: Jon reported the seaside sliding doors to this unit are being pinched from spalling rebar. The Association will repair the doors. The Association will not be responsible for replacing tile. Tile is the responsibility of the owner.

Treasurer Report: Total cash accounts have a balance of $549,400.18. The Reserve Account total is $501,944.61 with the remainder in the Operating accounts. Louanne reported that the 2nd payment for the insurance was paid from the operating account. There are not sufficient funds in the operating account to make the third and final payment of $60,783.33 The Directors made a resolution RESOLVED, that an authorization of transfer of designated funds - Future Repairs and Replacement fund to undesignated funds –Operating fund was made. The funds will be repaid from the operating fund with a 1% interest rate over the next 10 months (March-December 2011.

Proposed 2011 Budget: The Directors unanimously approved of the proposed budget.

3055300/000407

Manager Report

**Systems:** Filter changes for systems occurred as scheduled on the first Tuesday of the month.

**Security Lights Parking Lot:** All but 2 posts have been adjusted to the correct height. The remaining 2 require new poles/pad. These should be completed during the week, weather permitting.

**Street side porch lights:** The lights purchased have been installed. The dusk to dawn sensor requires some adjustment. Flickering off and on is a sign the adjustment isn't correct.

**Security Guard:** The guards have been punctual and professional and no complaints have been registered.

**Beach:** The appropriate permits were obtained and approximately 140 ton of sand was spread across the beach from West to East over the course of 1 day.

**Old Business**

**Voting Procedure:** The Directors agreed that the voting should be kept confidential. Current Board members may check the ballots and votes; however,

any Director disclosing any owners' vote will be removed from the Board. All Directors were in agreement.

**Procedure for Bylaw changes:** Proposals will be brought before the members at the annual meeting.

**Meet & Greet:** The Meet & Greet is scheduled for Roberts American Grill, Thursday, February 10th, 2011, from 5p-7p. Rosie invited the candidates. Rosie and Judi will obtain sodas, beer, and paper goods. The Directors were asked to get there early to help set-up and clean-up.

**Insurance:** Our agent has a conflict and can not attend the meeting. Bob has compiled a list of questions for the agent, Colin Probyn. Judi said Colin will have the answers before the Annual Meeting.

**March BOD:** No date was set.

**Adjournment:** There being no further business, the meeting was adjourned.

**ACTION ITEMS**

| | |
|---|---|
| Report to BOD method used to repair W-27 | Jon |
| Completion of new poles for Security Lights | Jon |
| Beer/Wine/Paper Products for Meet N Greet | Judi/Rosie |
| Handouts for Annual Owners Meeting | Louanne |
| Follow-up with Insurance Agent | Judi |

DRAFT

# Cowpet Bay West

## Annual Owners Meeting

**February 12, 2011**

**Call to Order:** The Annual Owners Meeting was called to order by President Judi Kromenhoek at 9:10 a.m. at Robert's American Grill. Board members present were Judi Kromenhoek, Bob Cockayne, Barbara Walters, Rosie Wells, Greg Miller, and Max Harcourt. Owners were directed to sign in upon arrival (Exhibit 1, sign in sheets for owner attendance).

**Quorum Verification:** Louanne Schechter tallied the attendance Record and verified that a quorum (1/3 of authorized votes) was present by proxy and attendance.

**President Report:**

- Judi welcomed all owners and thanked them for attending today's meeting.
- Judi acknowledged and commended the Board of Directors for volunteering their time and talents throughout the year.
- Judi acknowledged and credited the management staff, Jon & Louanne, for their professionalism and assistance throughout the year. Each staff member was thanked for their work and loyalty to the owners of Cowpet Bay West.
- New owners, L-33 Duzy & L-07 Birt families, were asked to stand and welcomed to the community.
- Judi introduced the candidates running for the Board of Directors.
- Judi listed the projects & accomplishments throughout the year:
  - **Restoration following Fire to W-23:** The restoration process took 9 months to get settled and paid. During this period the Board of Directors became aware of inconsistencies in the Bylaws that caused confusion between the Insurance agencies, owners, and the Association. (Insurance to be discussed)
  - **Seaside Rails:** All damaged seaside rails were removed and replaced. Rails were repainted.

DRAFT

- **Generator:** The 20 year old generator is in good shape, the circuit board needed to be replaced. This was not easy but Jon located a new board and had Kent Harvey install it. Since the company that manufacturers this is no longer in existence, Kent Harvey rebuilt the components in the old board for a back-up.
- **Fresh Water Booster:** Responding to complaints of low water pressure to Leeward units, a water booster pump was installed and corrected the problem
- **Gravel Walkways:** Walkways on Leeward and Windward were improved by adding crushed gravel.
- **Transformers:** As part of a 3 year plan, all but one transformer was replaced. The remaining transformer will be replaced this year completing a total upgrade to the High Voltage Electrical system.
- **Security Gate:** The conduit that supplied power to the gate, under the road was compromised causing power outages whenever it rained. The conduit was removed and replaced, the road repaired, and the gate is operating without incidence.
- **Transfer Station Building:** Jon noted the concrete roof over the transfer station was cracking and compromised. The roof was removed and replaced without incident.
- **Beach:** Hurricane Earl was responsible for loss of sand on the beach. After obtaining appropriate permits, the Elysian, Cowpet Bay East, and Cowpet Bay West split the cost and provided the workforce to spread 140 tons of sand back onto the beach. New Swim Buoys are in place, and as of today 24 more beach chairs have been added to the beach.
- **Security Streetlights:** Before hurricane Earl, our security streetlights were replaced with new energy efficient fixtures designed to throw a maximum amount of light down to the parking lot. During Earl, Cowpet Bay East lost most of their parking lot light globes while our lights were left intact.
- **Fresh Water Filtration System:** Upon inspection, the existing filtration system required upgrading. The new system was installed.
- **Security Guards:** During the last year, our Association hired different companies with the same results, guards coming late, leaving early, or sleeping on the job. The

DRAFT

current company, No-Nonsense Security, has been with us approximately 5 months and is professional, personable, and friendly.

**Reading of the 2010 Annual Owners Meeting Minutes:** Motion was made and seconded to waive the reading of the 2010 minutes. Copies of the minutes were available for members upon request.

**Proof of Notice of Meeting:** Oocumentation of notice was presented by the Association Office Manager, Louanne Schechter. (Newsletters: November 2010, December 2010, January 2011, February 2011.)

**Property Manager Report:**

**Electrical Upgrade:** Jon reported when he was hired, the complex did not have an ongoing maintenance plan for infrastructure. In 2008 he developed a long term plan to upgrade and maintain the Electrical System. In 2009 Jon brought an electrical engineer to the property to inspect the entire system. The engineer, Kent Harvey, then developed a CADD (computer aided design and draft) program outlining the entire system with all the technical data. Where needed and available, crucial back-up parts were ordered and kept in stock. In 2010, The 3 phase transformer on Windward which runs the beach well, lift station, and fresh water distribution system was replaced. All transformers were balanced for even power distribution. Going forward in 2011, the 3 phase transformer removed from Windward was sent back to the states to be reconditioned. When available, projected in the summer, the reconditioned transformer will replace the last "original" transformer located at the Windward circle which runs the RO Plant, the WWTP, and controls the high voltage systems. Jon proposes in 2012 to replace the disconnect breakers on each building.

**Territorial Pollutant Discharge Elimination System Permit:** During 2010 this permit was up for renewal. The process included inspections of the Waste Water Treatment Plant, Reverse

DRAFT

Osmosis Plant, Grey Water Processing, and Fresh Water Distribution as well as General Maintenance. Along with inspections there were endless forms and reports. Cowpet Bay West was approved for the next 5 years and there were no deficiencies found by DPNR.

Generator: During Hurricane Earl, a WAPA power pole and transformer split and landed near the generator. This power to ground surge, we believe, fried the circuit board that controls the automatic functions of the generator. Jon had to manually start the generator and shut it down until a new mother board could be located. The companies that manufactured the generator and the switch gear both had gone out of business. With the help of Kent Harvey, we were able to locate the last known circuit board. When Mr. Harvey installed the new board, he kept and has since rebuilt the original board so we would have a back-up. We have set a 45 minute time delay on the generator to prevent the power surges during false start-ups (the on-off-on- off when power is restored). The generator will power down when electrical power is restored for 45 consecutive minutes.

**Masonry:** Jon performed a thorough inspection under the buildings and the grey water cisterns. Monies spent this year under the account masonry were used to repair the undersides of some of the buildings that had so much spalling they required immediate attention. Under this year's budget he will continue to repair these areas which include leaking cisterns.

**Sewage & Grey Water:** Included in 2011 Budget is the project to replace the fractured grey water lines. Jon is looking for a new contractor to do this project. The remainder of the monies are to purchase motors and blowers for the grey water system, which are still running on the originals.

**Air Pollution Permit:** Jon reported the air pollution permit which regulates the usage of the generator is up for renewal this year.

**Treasurer Report**

DRAFT

**2010 Expenditures vs. Budget and 2011 Budget:**

Copies of the 2010 budget and the 2011-projected budget were available for owners. Barb reported that the cost of increasing the insurance in 2010 to 2 million and the pre-pay for the insurance in December for 2011 were the major factors in the deficit for 2010. Other contributing factors were costs that were unforeseen and not in the budget such as replacement of a leaking transformer and high voltage power lines.

Barbara made a motion the 2011 budget be accepted as presented, the motion was seconded, all were in favor.

**Cash Equivalents & Member Equity:** Barbara reported cash equivalents and member equity and a handout was provided to owners.

**Insurance Summary:** Judi reported on the current insurance policies. A summary sheet was provided for all owners.

**Roll Call:** Owners were asked to identify themselves as their names were called. Owners that were holding proxies were asked to identify themselves as proxy holders. There were owners of 43 units and owners holding 39 proxies for a 73.2% of authorized votes.

Old Business

There was no old business brought before the Board.

New Business

Bylaws review and update: Judi reported the only by-laws found on file in the Virgin Islands are the ones from 1974. She stated our Bylaws need to be updated. The tragic fire enlightened us on what is and what is not covered by our master insurance policy. A lot of owner thought they were covered when they were not. Anna Paiewonsky (attorney L-04) stated that she believes

3055300/000414

DRAFT

the 1998 Bylaws superseded 1974 declarations, and that they were properly filed. Accordingly, subsequent Bylaws should be in effect. Attorney Chuck Waggoner (L-46) has agreed to help us write the bylaws to meet the owner needs. There has been a lot of confusion on the wording on the insurance coverage of owner units vs. CBW Association responsibility. Chuck has written bylaws for several condo complexes. He is very familiar with bylaws and how they should read. The original bylaws were written to protect the lender (Chase Bank) at the time. We need to have them read to protect the owners and our insurance needs. Anna Paiewonsky volunteered to work with Chuck Waggoner on this endeavor.

Max Harcourt made a motion that the Board of Directors continue to operate under the 2007 Bylaws. The motion was seconded by the floor and all were in favor.

Following discussion from the floor, a suggestion was made to start a committee that addresses our current Insurance coverage, what is required by our bylaws, and what is requested by our owners. The committee would send recommendations to the Directors within 30 days of their formation.

**Proposal to Amend Bylaws to include No Dogs on Property:** Bob Cockayne would like to amend Article V, Section 11, found on page 13 (of the 2007 Bylaws), by adding new section6: "Dogs and farm animals are prohibited, and owners will be fined as specified by the Board of Directors. The Association may require removal of any animal when it becomes bothersome to others or is deemed by the Association to be unacceptable."
Amend Exhibit I, Rules and Regulations for Cowpet Bay West by deleting section number 6, found on page 18.

**Petition for dogs to be allowed:** Joel Kirshenbaum asked what happened to the petition begun last year to allow specific size dogs on the property. Judi reported the matter was discussed in the April 2010 Board of Directors Meeting and tabled to be discussed at the 2011 Annual meeting.

DRAFT

**Election of Board Members:** The nominating committee reported the two candidates with the most votes were Bill Canfield and Sharon Koehler.

**Adjournment:** There being no further business, the meeting was adjourned.

Cowpet Bay West

Board of Directors Meeting

March 8, 2011

Present: Max Harcourt, Barbara Walters, Rosie Wells, Bob Cockayne, Greg Miller, Sharon Koehler, Bill Canfield, Jon Cassady, Louanne Schechter

Meeting Ground Rules: Max requested Directors and guests conduct all business before the Board in a civil, professional manner treating each other with courtesy and respect.

L-01: Herb Horwitz came before the Board of Directors to discuss his reasoning for non-payment to the electrician. The Directors stand by their former decision that the responsibility of payment is with the owner. Max made a motion the Association pay $600 of the bill as a Good Will Adjustment. The owner will be responsible for the balance and late charges.

W-27: Dr. Felice asked for minutes of the Organizational Meetings. Max stated the results of the first and second organizational meetings did not meet the Bylaw Requirement of vote by majority, votes were secret ballot, and no minutes were kept. The third meeting lead to a majority vote and minutes are available.

Dr. Felice was told last month that his seaside sliders would be repaired within a week. Jon contacted Karl yesterday, when he was informed the doors were still not fixed. Karl said he would be out on Wednesday. Dr. Felice has a scheduling conflict and will reschedule with Karl. Dr. Felice asked in the event the tile on the deck was broken who would replace it? Directors agreed the tile on the porch is the responsibility of the owner. The Association is responsible for the structural repairs.

Dr. Felice wanted to know the exact difference of votes between the 2nd and 3rd place candidates. Louanne believed there was a margin of 5 votes the results are in the safe.

**Minutes of February 7, 2011:** The minutes of the February Board of Directors meeting were unanimously approved.

**Treasurer Report:** Sharon reported there was approximately $565,000 in cash accounts.

Greg requested the Directors have a Profit and Loss statement available each month.

Sharon stated she will provide a quarterly report for the Directors next month.

Sharon stated she doesn't have access to the bank accounts. Max assigned Directors to assist Sharon to be added as signatory to the accounts.

There are 2 units in arrears more than 90 days. Both have liens on the property. The Directors suggested Sharon set-up a payment plan. Owners will be informed that in the event scheduled payments are not made, utilities will be discontinued.

An offer was made by the broker for L-41 for the Association to accept less than what is owed. Ma made a motion to accept the offer, the motion was 2nd the vote was 3-3. The motion did not pass. Bob suggested the broker put all future offers in writing.

**Resolution:** template to be provided by Jeanne Brennan, sample: *The Board of Directors presente to the owners the 2010 actuals and 2011 budget. The owners accepted the budget and therefore the Directors resolve to move $114,000 from the Reserve to the Operating Account.*

**Review of Action Items from Owners Meeting:**

**Property adjacent to L-01:** Owner wanted to know if the property is zoned for boat repair. Bill stated the property is zoned R-1. It's his understanding that boats are stored there and owners ma from time-to-time work on them. Max made a motion that a Board member call CZM and DPNR

and inquire if boat storage/repair is appropriate for R-1 land. The motion was 2nd all were in favor Greg will call the agencies.

**Automatic Voltage Regulator:** An owner inquired if an AVR could be installed on the generator. Jo will contact Kent Harvey and report his findings.

**Extended Warranty for Reconditioned Transformer:** Jon will ask the company when the transform is repaired.

**Extend hours of generator usage?** Jon and Anna will request extended usage when the air pollution permit is renewed this year.

**Electronic Bulletin Board on Website:** Max will investigate the options for an electronic bulletin board.

**Manager Report**

**Systems:** Filter changes were completed this month as scheduled. The Generator is performing without incident. The WWTP is within normal parameters. New blowers and motors were ordered and will take about 6 weeks before they arrive.

**Security Lights:** Maintenance has completed all but 2 of the security parking light adjustments. Th remaining two are on Leeward and require new concrete bases and poles. The materials are on sit and maintenance is working on them.

**Ritz-Carlton Meeting:** Jon attended the meeting posted by the Ritz-Carlton. They are in the preliminary stages of trying to obtain a Title 5 electrical system which would allow them to be self-sustaining and off WAPA's grid. Jon reported they offered no schematics, or basic information othe than they would install a zero noise, zero emissions system.

**Owner Issue Flow Sheet:** Jon shared with the Directors a flow sheet for owner complaints that Louanne developed as a tool to record, track and report back to owners. The March Newsletter contained an article requesting owners to put all complaints in writing with details. Sharon suggeste the Association have a written policy for owners to follow when reporting a problem and the Association to follow once it's reported. She will present a policy next month. Greg suggested that the Association keep repair/maintenance logs for each system as well.

**Security Gate:** Jon reported the most recent issue with the gate is the circuit board for the exit pedestal is non-functional. Although a new circuit board can be ordered (actual cost 2009 was $3750) this gate was not designed to handle the amount of daily traffic. Jon suggested the gate b left open during normal business hours and an exit button, that bypasses the circuitry of the swipe cards) be used in the evening. Following discussion, Max made a motion an exit button be installe on the exit pedestal. Barbara 2nd, the motion passed 6 to 1.

**Vandalism:** Jon was called Saturday February 26th at 10:30pm by an owner that reported a broken security pole/light. The owner witnessed the event. Jon investigated. They were tenants and agreed to pay damages. The owner of the unit was notified and a follow up letter will be sent to th owner with an explanation of charges.

**Police Report:** A police report was made by an owner at Elysian when she witnessed a man lying in the bushes by the pool and firing a gun at the rooster as she was walking by him with a small child. She identified the man as an owner at CBW. Police came to the property to follow up on the complaint. The owner denied any fowl play.

**New Business**

**Office Computer:** The computer has no memory left and is more than 6 years old. The computer on order has an extended warranty of 3 years on site and cost $864. (plus shipping).

**Committees**

**Bylaw:** Rosie Wells is Chairperson, Chuck Waggoner, Barbara Walters, Judi Kromenhoek, and Anna Paiewonsky are on this committee. Chuck will initially submit changes to the committee. Onc the committee agrees, they will forward to the Directors.

**Landscape & Maintenance:** Bill Canfield is chairperson; Jon has volunteered to be on the committee. Bill and Jon will schedule a walk of the property and invite whoever is interested to join them.

Judi Kromenhoek walked the property and submitted her recommendations for the landscape committee.

**Insurance:** Bob Cockayne is chairperson. Max Harcourt, Herb Horwitz, Doug Rebak, and Jon met to organize the committee. Bob has minutes for anyone interested.

**Long-term Capital Planning:** Max Harcourt is chairperson. Lance Talkington has volunteered to be on the committee, no meeting has been planned.

**Social:** Rosie is chairperson, no meeting has been planned.

**Nominating:** Bob Cockayne is chairperson, Holly McGuire, Joel Kirshenbaum, and Marilyn Blackhall volunteered for this committee. Bob made a motion the Board approve the members, Max 2nd, all were in favor.

Max suggested all committees keep minutes and forward them to the Directors. Sharon requested Directors be notified of meeting dates and times.

**Other Business**

**Hen & chicks:** Bob stated that farm animals were not allowed on property and although the rooster is gone, the hen and chicks remain. Max made a motion the Association hire someone to catch the hen and chicks without harming them and have them removed from the property, the motion was 2ⁿ all were in favor

**AED:** The battery is dead on the AED. Jon said he has batteries on order.

**April Meeting:** The next meeting of the Board of Directors is scheduled for April 5th, at 8:45am.

**Adjournment:** There being no further business the meeting was adjourned at noon.

**ACTION ITEMS**

| | |
|---|---|
| Letter to Herb Horwitz: Good Will Adjustment: | Max |
| W-27 Sliding Doors | Jon |
| First Bank Forms for Sharon | Greg |
| Fidelity Forms (if needed) | Judi |
| Banco Forms | Louanne |
| Resolution | Jeanne/Louann |
| Payment Plan | Sharon |
| Speak with Broker L-41 | Louanne/Rosie |
| Speak with Gita Rose Zoning | Sharon |
| Speak with DPNR/CZM boat repair next door | Greg |
| Recommendations from Kent Harvey AVM for Generator | Jon |
| Extended warranty for transformer | Jon |
| Extended hours for running generator | Jon/Anna |
| Electronic Bulletin Board | Max |
| Security Poles Leeward | Jon |

| | |
|---|---|
| Policy for complaints | Sharon |
| Letter to Owners Vandalism/impose fines | Jon/Louanne |
| Hen and chicks removal | Bob |
| AED Batteries | Jon |
| Post minutes, date and times of meetings | Chairpersons |

Addendum to Meeting Minutes

Amended Resolution for

March 8, 2011

Association Resolution for Transfer of designated funds - Future Repairs and Replacement fund to undesignated funds –Operating fund
Resolution of the Board of Directors of Cowpet Bay West Association ("CBW")
WHEREAS, CBW is a Condominium Association organized and existing under the laws of the Territory of the U.S. Virgin Islands;
and
WHEREAS, the members desire that the Association shall act in full accordance with the rulings and regulations of the Internal Revenue Service, as administered by the Virgin
Islands Bureau of Internal Revenue;
NOW, THEREFORE, the members bereby adopt , on behalf of the Association;
The following resolution
RESOLVED, that an authorization of transfer of designated funds $114,000 - Future Repairs and Replacement fund to undesignated funds –Operating fund was made.
This resolution is adopted and made a part of the minutes of the meeting of the Board of Directors on March 8. 2011.
BY:
President
ATTESTED:
Secretary

Draft

**Cowpet Bay West**
**Board of Directors Meeting**
**May 10, 2011-05-17**

**Present:** Max Harcourt, Barbara Walters, Greg Miller, Bob Cockayne, Bill Canfield, Sharon Koehler, Jon Cassady, Louanne Schechter

**Minutes of April 5, 2011:** The minutes of the April Board of Directors meeting were unanimously approved.

**Treasurer Report:** Sharon stated the total amount of cash funds is $555,408.

- Owner in Arrears- Letter was sent certified, return receipt- no receipt has returned-Sharon will resend letter.
- Owner in Arrears- Short Sale postponed- Directors agreed to extend their offer.

**Manager's Report**

**Infrastructure & Maintenance:** Filters were changed according to schedule.

**Grey Water:** Grey water system malfunctioned 5/2/11. The water distribution pump motor burned, controls would not function and voltage monitor was missing. System was repaired and functioning same day. Housing required welding to prevent future leaks.

**Transformer Covers:** Corrosion was eroding and causing a hazardous situation for the covers of the transformers. New anodized aluminum covers were fabricated for the transformers on Leeward, the Transformer on Windward Circle and the transformer near the generator. Covers were also fabricated for the junction box and each of the 4 splits from the junction box.

**Streetside Inspection:** Street side steps and railings were inspected and repaired on both Windward and Leeward.

**Streetlights:** All security lights were inspected and are in working order and physically secure.

**Owner fine for Vandalism:** A meeting is scheduled for May 19 with the Security Company and the involved parties to discuss fines.

**CBE Bylaws:** Andy LaPlace reported CBE is in the process of revising their Bylaws therefore, a copy is not available at this time.

Draft

**DPNR Inspection:** Jon reported he had received a written statement from Mr. Donadelle, DPNR Inspector, stating we were not in compliance as DPNR has misplaced our records. We have made copies and provided originals to DPNR.
**Request for external vent:** L-47 has requested an external vent for their stovetop. The manufacturer stated that as long as the filter is maintained, there should be no grease coming through the vent. They will guarantee the product. The Directors agreed to allow the vent if the owner agreed to be responsible for any discoloration of exterior paint around the vent.

**Old Business**

**Insurance:** Bob handed out minutes from the previous meetings of the insurance committee. The committee requested a new appraisal be completed. Shep Barrows completed the appraisal as requested. The committee is reviewing options based on this current information and will present their findings and recommendations at the June Board of Directors Meeting.

**L-01 Electrical Repairs:** The owner retracted his statement that he would abide by the decision of the Board as he feels he should not be responsible for paying the electrician. The Directors rescind their goodwill offer and the $600 will be added back to his statement. The owner has requested to meet with the Executive Committee. Max agreed to meet again.

**Owner Initiated Issues Policy:** The directors suggested the new policy be uploaded to the website. Max will upload. The Directors would like to have a "form" that can be downloaded for owners to complete and submit.

**Operating Accounts:** Louanne will obtain the paperwork to remove Judi and Ed from the account and add Bill and Sharon.

**Debris in neighboring property:** Greg Miller will approach CZM and DPNR with the issues of debris and hazardous materials on the site.

**Light Poles:** It was noted by a Director that many of the light poles are crooked. Jon explained the extensions to the existing poles exaggerated the lean of the poles. To "straighten" them would be a major expense of chipping concrete, following the wiring, new conduit, new poles, etc. Max suggested the idea be added to long-term projects.

**Insurance Bid:** Insurance bids were obtained at the request of the insurance committee. It was suggested, next year, the committee provides the criteria for the bidding process next year, well in advance, to make comparisons relevant.

**W-27:** The office contacted the contractor and asked him to inspect the slider as it was sticking. The contractor went to the unit and was asked (by the owner) to reschedule at a time more

Draft

convenient for the owner. The Owner has not contacted the office of a new time or date or if the work was completed.

**Security Gate:** The Directors agreed to maintain the security gate with the exit button.
**Security:** The Directors discussed suggestions from owners regarding security measures. The Directors asked Jon to initiate the following measures:

- Guards will add unit # to their log sheet when recording vehicle make-model-time
- Guards will utilize manual bar gate when electric gate is not functioning

**Electronic Bulletin Board:** Max created the electronic bulletin board. Owners will be notified of the electronic bulletin board by newsletter and on the website.

**Striping:** Directors instructed Jon to have the **NO PARKING ZONES** repainted. Long-term, Max suggested the parking spaces be striped.

**NEW BUSINESS**
**W-7:** Owner notified Directors they have not received any follow-up on some issues. Jon will email Owners.

**Dogs on Property:** An owner notified the Board of a pedestrian walking his dog on property. The Directors agreed to post **NO DOGS ALLOWED** signage by the well pump.

**Property Walk-around:** See attached notes from Board member walk around. Max will discuss recommendations with Jon following meeting. Jon was asked to put significant findings on the maintenance schedule.

**Owner Storage:** The office has received several requests for owner storage. Jon will inspect storage areas for any empty cages. A note will be posted in the newsletter that owners are allotted one storage space per unit and no flammable materials are to be stored.

**Office AC Unit:** A bid was presented to replace the ac unit in the office. Attempts by the vendor to remove all mold and smells have failed. The Directors agreed to replace the unit.

**Reimbursement Request:** The office received a request from an owners' family member to be reimbursed for medical expenses. The family member never reported the incident to the Association. Jon will investigate the incident and provide a written report of the incident and follow-up.

**Balusters:** Bob stated replacement balusters on one unit appeared to be different then the existing ones. Jon stated the goal is to maintain the same appearance but that materials used 40 years ago have changed slightly over the years. He will inspect.

**Street side rails/steps:** Street side rails and steps will be sanded and painted in August, weather permitting.

**Scorched paint on exterior of unit:** The staff noted scorching of the exterior paint behind a propane grill on one of the units. The Directors agreed the owner is responsible and will be contacted by letter.

**Next Meeting:** The next meeting of the Board of Directors will be June 14, 2011 @ 8:45am AST.

**Adjournment:** There being no further business, the meeting was adjourned.

**ACTION PLAN**

| | |
|---|---|
| Owner in arrears-resend certified, return receipt letter | Sharon |
| Meeting with Owner/Renter/Security May 19, 2011 | Jon |
| CBW Bylaws forward copy to Barbara | Jon |
| Letter to owner regarding external vent | Louanne |
| Create Form for owner issues | Sharon/Max/Louanne |
| Operating accounts signers | Louanne |
| Letter to DPNR/CZM | Greg |
| Inform Security Company to add unit #, and use pole | Jon |
| Notify Owners of Electronic Bulletin Board by Newsletter/Web | Louanne |
| Paint "NO PARKING ZONES" | Jon |
| Email W-7 | Jon |
| "NO DOGS ALLOWED" signage | Jon |
| Owner storage: Newsletter | Louanne |
| Investigate incident report L-40 | Jon |
| Inspect recent repaired Balusters | Jon |
| Letter to owner scorched paint | Louanne |

DRAFT

**Cowpet Bay West**
**Board of Directors Meeting**
**June 14, 2011-06-15**

**Present**: Max Harcourt, Barbara Walters, Bob Cockayne, Rosie Wells, Sharon Koehler, Jon Cassady, Louanne Schechter

**Minutes of May 10, 2011**: The minute of the May Board of Directors Meeting were unanimously approved.

**Treasurer Report:** Sharon reported the total cash accounts as of May 31 are approximately $558,497. Of this amount, $464,776 is reserve funds. Sharon will present a quarterly summary next month of actual vs budget for the second quarter. Items that were purchased this quarter but not budgeted were fuel for the generator, water leaks, and beach drainage.

The Directors asked for a report on owners in arrears: Sharon reported she had not received a response from her letter to one owner that was in arrears, the letter was sent return receipt, but was never picked up from the post office and was returned to the office. She will resend. That owner did make a payment this month. The second owner did not sell the unit as planned and has filed bankruptcy. Louanne requested the Directors obtain legal counsel. Barbara made a motion that legal counsel be hired the motion was 2nd and all were in favour. The Directors instructed Louanne to contact Anna Paiewonsky for legal counsel. Louanne reported that the total for owners in arrears was approximately 19,000.

**Manager Report**

**Infrastructure & Maintenance:** Filters were changed according the maintenance schedule.

**RO Plant:** Due to the continuous rains during the last 4 weeks, the RO plant ran a minimal amount of time without problems. The cisterns are over capacity with the rains.

**Electrical Systems:** The transformer that was sent to the states to be rebuilt is on schedule to be completed in 2 weeks. Once the transformer is on island, Mr. Harvey will direct its placement and installation in the Windward circle and reroute lower Windward power and eliminate the exposed high voltage line from Leeward to Windward that runs across the rock wall. Weather permitting; we hope to have Mr. Harvey on island mid July. This will complete the 3 year plan for replacing the electrical high voltage grid.

**Grounds:** The groundcover is infested with bugs that are eating the leaves. ABC nursery is scheduled to spray the grounds, but due to no break in the weather over the last 5 weeks, they have not been out. The grounds crew have also been ineffective in spraying due to the rains.

There is a tropical wave expected to bring rain on Wednesday, ABC will try to spray Thursday or Friday depending on the amount of precipitation.

**Security:** Jon reported there were two incidents since the last Board Meeting. The first incident involved vandalism of 2 vehicles on Leeward occurring sometime after midnight. Both had windows smashed. One of the vehicles had a laptop inside that was stolen. The second incident occurred about a week later. An owner reported cash and wallet stolen from his unit with no forced entry between 12:30-1:30pm on a Sunday afternoon, while they had lunch on the seaside deck. The contents of the wallet and the money clip were found several days later by the contractors building the retaining wall in the gut. They found the contents in-between the cinder blocks as they were moving them off the pallet to build the wall.
Jon increased security by adding an extra guard immediately following the first incident. Two security guards were posted with one stationary and the other roaming. Following the second incident, the guard hours were expanded to cover from 6p to 6a. Jon reported there were 10 homes burglarized in Cabrita Point this month alone. Recommendations from the police and our security company were to remove the "No Dogs Allowed" signs and add more surveillance cameras.
The Directors instructed Jon to get bids on surveillance cameras. The Directors instructed Louanne to advise owners of the events. She reported she had described the events in the June newsletter.

**OLD BUSINESS**

**Leeward 1**: The executive committee met with the owner of Leeward 1 to discuss the unpaid electricians invoice, late fees and finance charges. The owner insists the problem was caused by flooding and therefore should be covered by Association funds. Max made a motion the Association remove electricians bill, fines and finance charges associated with the unpaid bill. The motion was 2nd, 4 voted yes and one abstained.

**Insurance Committee:** Bob reported the committee met with representatives from Tunick, Executive, and Mapfre insurance to verify that our current coverage is sufficient in light of the the recent updated property evaluation. The insurance representatives stated we are underinsured with the current 90% co-insurance clause. The committee is obtaining bids and will forward the information to all Board members as soon as they are available. Max stated he may call a special meeting when the information is available. The Directors asked the committee to obtain, if possible, favourable group HO-6 rates from each of the vendors.

**Greg Miller Resignation:** Greg Miller publically resigned from the Board through an email to the community. Max reported it was the responsibility of the Directors to appoint a member to the Board until the Annual Owners Meeting in February. This year would be the third year of Mr. Miller's term. Following discussion, Sharon made a motion Vince Verdiramo (L-5) be

DRAFT

appointed to the Board of Directors. Max 2nd, all were in favour. Sharon will contact Mr. Verdiramo of the Board's decision.

**Bylaws Committee:** Rosie said due to critical illness in her family, she was unable to follow-up on any progress Mr. Waggoner may have made. Max stated the most pressing issue with the Bylaws is clarifying the responsibility of the owner and the responsibility of the Association in maintenance and insurance issues. He stated Greg developed a matrix that should be incorporated in the Bylaws to clarify this issue. Barbara suggested Rosie contact Vince for assistance. At this point, Max excused himself from the meeting. Bob excused himself from the meeting.

**July BOD Meeting**: The next meeting of the Board of Directors will be July 12, at 7:45am.

**Adjournment**: There no longer being a quorum, the meeting was adjourned. Items not discussed will be tabled until next month's meeting.

**ACTION ITEMS**

| | |
|---|---|
| Send copy of arrears letter | Sharon |
| Obtain legal counsel re: bankruptcy | Louanne |
| Cost to increase surveillance cameras | Jon |
| Provide information from Insurance Committee to Board | Bob |
| Inquire about group HO-6 Policy rates | Bob |
| Contact Mr. Verdiramo of Appointment to Board | Sharon |
| Invite Mr. Verdiramo to work on Bylaws Committee | Barbara |

3055300/000430

**Cowpet Bay West Condo Association**

Board of Directors Meeting

Tuesday, June 14, 2011, 8:45 AM

Cowpet West Office

Below is the agenda for the meeting - if additions should be made, please bring them up at the beginning of the meeting.

Meeting Ground Rules: ***Respect!***

Call to order

Review and approval of May 10, 2011 Minutes

Treasurer's Report

Manager's Report

Old Business

- Insurance
- By-Laws
- Owner's Storage Space

New Business

- Resignation and Replacement of Greg
- Vandalism and Security

Review Action Items from this meeting

Adjourn

3055300/000431



## Fwd: Board of Directors Meeting

**JERSEYBARB@aol.com** <JERSEYBARB@aol.com> Sun, Dec 2, 2012 at 1:55 PM
To: jkromes@gmail.com

From: cowpetbaywest@hotmail.com
Sent: 6/14/2012 2:38:48 P.M. Eastern Standard Time
Subj: Board of Directors Meeting

TO: The Owners Cowpet Bay West Association

FROM: Ed Wardwell

SUBJECT: Board of Directors Meeting

Here are the highlights of Tuesday's Directors Meeting:

Property
- All systems are operating normally.
- The upgraded grey water transfer lines have been connected and are in service.

Treasury
- All of our 2012 insurance premiums have been paid in full.
- The treasurer, Sharon Koehler, will provide an analysis of our six-month operating expenses to the Board at the August 7th Directors Meeting. You will be provided a copy of this report after Board review.

Planning
- Max Harcourt, Chairman of the Property and Planning Committee, submitted a comprehensive report on the current status and projected upgrades for our property. Major future projects including roof sealing/painting, structure maintenance and electrical system upgrades will be addressed in the 2013 budget.

Owner Requests
- The staff is currently servicing owner requests in Leeward 3, 31 & 37 and Windward 10, 12 & 31.

We will continue to respond promptly to all your written requests for service.

Legal Proceedings

- On June 6, 2012 the Association was notified by the US Department of Housing and Urban Development (HUD) that "HUD has completed its administrative proceeding of this complaint (Barbara Walters vs. Cowpet Bay West Association) under the Act (Fair Housing Act of 1968) and the compliant is hereby dismissed."

Draft

**Cowpet Bay West**
**Board of Directors Meeting**
**July 12, 2011**

**Present**: Max Harcourt, Barbara Walters, Bob Cockayne, Rosie Wells, Sharon Koehler, Vincent Verdiramo, Bill Canfield, Jon Cassady, Louanne Schechter
Herb Horwitz is in attendance by request of the insurance committee to answer any questions the Directors have regarding insurance.

**Minutes of June 14, 2011:** The minutes of the June Board of Directors Meeting were unanimously approved.

**Treasurer Report:** Our current bank balance as of end of June is $513,000 of which $442,B99 is in the reserve account. The financials (budget vs actual) for the 6 month period were distributed and discussed. Sharon noted 2 issues (1) there was no budget for tree trimming and cost $20,000 and (2) there was $20,000 spent on beach drainage. CBR is splitting the cost of this project. They have the invoice but have not paid.

Sharon would like Louanne to investigate other options for phone conferencing that are more cost effective. Max has some suggestions and will discuss with Louanne after the meeting.

**Insurance:** Bob presented the information obtained by the insurance committee. The insurance committee believes CBW is underinsured going into hurricane season. The potential exposure is due to the low value of insurance being substantially less than the appraised value (half) and a 90% coinsurance clause; we would realize a 48% penalty for any claim less our deductable because the low value is higher than what we are insured.
The committee recommends we cancel our current policy and obtain a policy with MAPFRE for the total agreed value of $25,916,630. 2% Windstorm deductible ($518,332.60) with a premium of $272,124.62. Bob said that the policy is designed to insure each building individually. (See attached summary). Following discussion Max made a motion to accept the recommendation of the Insurance Committee to obtain the Mapfre Policy. Bill 2nd the motion. The vote was called: Vincent-no, Barb-no, Rosie-no, Bill-yes, Max-yes, Bob-yes, Sharon-yes. The motion carries 4 yes, 3 no. Vincent, Barb, and Rosie want the minutes to reflect they are against any increase at this time and will do nothing to implement this plan.

There was discussion regarding how to finance the policy. Louanne stated that of the monies in reserve, $225,000 is earmarked for capital improvements and $61,000 was borrowed from the Reserve Fund in February to make the final payment for the current insurance policy. She recommended a special assessment to pay for the entire premium and an increase of approximately $85 dollars per month to the insurance to be able to fund the renewal. Herb added that the agent offered financing with a 30-60-90 payment plan. Max will conference with Sharon and Bob to discuss funding the policy tomorrow.

Bob Cockayne left the meeting at this time.

**Bylaws**: Vince agreed to replace Chuck Waggoner on the bylaw committee. The committee will meet this week and forward recommendations to the Board of Directors.

**Owner in arrears:** Sharon sent an email to owner in arrears that they make $3000/month payment. When they default their utilities will be shut off.

Draft

Bankruptcy unit: The sale of the unit was stopped by the bankruptcy court. Anna Paiewonsky was contacted and referred Louanne to call Mr. Hodge, an attorney that specializes in bankruptcy issues. Mr. Hodge reviewed the pacer account and noted that Scotia Bank had petitioned the court. Once the bank takes over the property as abandoned, the bank will attempt to make a short sale and we should be able to collect the common charges. He recommended the Association allow the bank to handle the legal issues as CBW would have to hire a lawyer in Maryland to handle the claim for us and the bank is the first mortgagee.

Louanne sent a letter to the bankruptcy lawyer asking if the property is still being rented, and if CBW will receive funds for utilities and common charges. The property appears to be empty. Bill stated the renter had left. Barb suggested we shut off the utilities, Sharon 2nd, all were in favour. Jon will inspect the unit today to be sure there is no garbage left behind.

**Meeting Format:** Following discussion by the Directors, the motion was made by Vince that all future meetings will be conducted in the following manner: initially, issues as determined by the entire Board shall be discussed in Executive session and upon completion of executive session the meeting will be open to general owners. Barb 2nd the motion. The vote was taken with 5 yes and 1 no. Max request the minutes reflect he voted no.

**Vandalism & Security:** The Directors discussed the letter they each received from Kellerhals & Ferguson on behalf of their client, a renter in W-37 (letter on file in office). Vince responded to an owner that the matter has been resolved. Vince also sent a letter from his law office to Kellerhals & Ferguson that the matter was discussed with his client and the matter resolved. The owner received documentation in writing of the incident.
Max made a motion the Board commend Jon for professional handling of lamp pole incident and that we are confident in his ability to continue to manage our property in the manner it needs to be done. Barb 2nd all were in favour.

**Guards:** Guards were increased temporarily following 2 incidents; one was car windows smashed on Leeward and the second was a theft. Jon recommends we reduce the overlap of guard hours and change to one guard from 6p to 6a.

**Managers Report**

**Retention Wall:** Completed

**Tree Trimming** Hurricane prep is completed. The Elysian did not remove coconuts from palms on our beach; that service (31 trees) was performed by the tree trimmers.

**Gray Water Transfer Line:** This project should begin this week and hope to have the backhoe in the morning.

**Electrician:** The rebuilt transformer should be completed and returned to property the first week of August. Once the transformer is on property, we will schedule Kent Harvey to wire the transformer and remove the exposed high voltage line.

**No Dog Sign:** Jon was advised by our security company not to advertise we don't allow dogs. The Directors would like a sign posted near beach drive.

Draft

**Balusters:** Inspections completed, we had a couple of issues on Leeward 12 and L-44. L-12 is complete at this time and L-44 to be inspected this week

**Surveillance Cameras:** Functioning cameras cost approximately $500 each. The installation cost depends on the location. Beach Drive, Gut, and Yacht Club Gate are the areas we have discussed. Jon believes we have sufficient light to view footage.

**Letter to Owner:** Letter was sent to owner explaining charges on his unit for vandalism by his renters.

**Incident Report:** Follow-up from fallen security light and pole. Jon inspected all security poles and found none requiring replacement. Owner came to office requesting reimbursement on his daughter's behalf for medical expense. Stated if she didn't receive check that day, her boyfriend would sue. Owner reimbursed her and is now requesting credit to his account. Vince made a motion the owner be reimbursed, Sharon 2nd, 4 voted yes and 1 no. Motion passed.

**ACTION ITEMS**

**Banco Forms:** Not done.

**OPNR response to neighbour property:** Not Done

**Letter to Owner External Vent:** Completed in May

**CBW Bylaws:** Not available at this time, being reviewed by their attorney.

**Direct Deposit for Owners:** Waiting for Ms. Richards of Banco to set up meeting.

**Parking Lot Striping:** Striping the no parking zones- scheduled for first of September when least amount of cars on property.

**Walk-Around Issues:** No scheduled at this time.

**Owner Issue Form:** Not completed

**Storage Space:** Suggest that we have a storage cleanup day during the week of the Annual Meeting.

**Planning Committee:** Max will provide minutes this summer.

**Owner Request:** Sharon requested all complaints be sent to Board members. Max, Barb, Vince, Bill, and Rosie do not want complaints sent to them, Sharon does.

**W-26 Request for Noise Control:** W-26 requested the Board of Directors speak with the Elysian before they award any contracts to restaurants on property about controlling the noise. The Directors agreed that we have not rights as long as they adhere to the laws on island.

**Next Meeting:** The next meeting will be August 9, 2011 at 8:45am

**Adjournment:** There being no further business the meeting is adjourned.

Draft

**ACTION ITEMS**

| | |
|---|---|
| Banco Forms | Louanne |
| DPNR Response | Max |
| CBE Bylaws | Jon |
| Direct Deposit Banco | Louanne |
| Parking Lot Striping (no parking zones) | Jon |
| Walk-Around Issues on Maintenance Schedule | Jon |
| Owner Issue Form | Max |
| Planning Committee Minutes | Max |
| Owner Request sent to Sharon | Louanne |
| Phone Conferencing Options | Max/Sharon/Louanne |
| Funding Insurance Policy | Max/Sharon/Bob |
| Informing Owners of Insurance Policy & Funding | Max/Sharon/Bob |
| Update Bylaws | Bylaws Committee |
| Baluster L-44 | Jon |
| Surveillance Cameras | BOD next meeting |
| Inspect bankruptcy unit/shut off utilities | Jon |
| No Dog Sign posted by gut/beach drive? | Jon |
| Response to W-44 Guards | Jon |
| Storage Space (table to Feb 2012) | |
| Copy of Letter sent from Vince to Kellerhals for file | Vince |

DRAFT

**Cowpet Bay West**
**Board of Directors Meeting**
**August 9, 2011**

**Present:** Max Harcourt, Barbara Walters, Bob Cockayne, Rosie Wells, Sharon Koehler, Vincent Verdiramo, Bill Canfield, Jon Cassady, Louanne Schechter

**Conference Call**: Directors were given a new conference dial-in number and participant code and asked to call back on the new service *Free Conference Call.* Although the conference call is free, there may be associated long distance charges by individual carriers and Directors were urged to use their cell phones. The meeting continued when all Directors were on line.

**Minutes of July 12, 2011**: The minutes of the July 12 Board of Directors Meeting were unanimously approved.

**Executive session:** Max made a motion the meeting move out of Executive Session. There were 3 votes yes, the motion did not carry

**Minutes of July 27, 2011 Special Meeting:** Sharon requested the cash reserve amount of $320,442 be amended to $372,336 in the minutes under the heading of Treasurer Overview, 3rd sentence. Max made the motion the figure be changed, Sharon 2nd, Bill, Max, Bob, and Sharon approved. Motion carried. There being no other changes, the minutes were approved with amendment.

**Tropical Storm Emily:** Jon reported the storm brought some rain and gusty winds, because it was well South of us it was not a problem

**Treasurer Report:**
As of July 31 in our reserve fund we have approximately $397,000 and approximately $96,000 in the operating accounts for a total of $494,000.

**Owner in arrears:** Owner replied they could commit to $2500/month but not the $3000 that was requested. The Owner is in arrears of $8,178. Max made a motion the Board accept the $2500/month Sharon 2nd, all were in favour.

**Insurance Rebate from Tunick**: Not arrived. Bob will contact Colin for the status of the check.

**CBR Bill:** Not paid for their portion of the Retaining Wall. Jon said Gene will be sending a check next week.

**Mapfre Insurance Policy**: The Policy has not arrived in the office. Max will follow up with the sales representative, Jose, as to when the policy will be available.

**Contact Information**: Louanne requested contact information for the office records. Sharon said she thought the information was on the binder. Max will obtain contact information. Max stated that Jose is planning a visit to St. Thomas this September and will bring a local representative with him to meet the staff and see the property.

**Systems not noted on Appraisal** Sharon asked what systems were not noted on the Appraisal. The systems not mentioned were: the fresh water, beach well, 3 lift stations, gray water, electrical control room, and the office. While Shep Barrows was on property last week, Louanne asked him if the items

DRAFT

were omitted on his appraisal would they be covered by the insurance policy. He said, he wasn't sure he made any omissions, and then left without reviewing the appraisal. Bill will speak with Shep regarding the items.

**Budget Revision**: Sharon will contact Jeanne and work on the revisions and provide to the Directors. Max would like a target date of completion before the September BOD Meeting.

**Hourly Employee Compensation**: Jon reported he has no detrimental reviews for the staff and he proposes a 3% increase to all the hourly employees. Max made a motion the employees receive a 3% raise, Vince 2nd, 6 voted yes. Sharon said without knowing the 3% total of increases, she abstained and would like the minutes noted as such.

**OLD BUSINESS**

**Bylaws**: Vince said he had reviewed the Bylaws, made approximately 20 suggested revisions, and will send copies to the Directors for their review and input. The Directors should receive the revisions next week. Vince requested they review the changes and send him their comments.

**Bankruptcy Unit**: The utilities were disconnected as discussed in last month's meeting. As reported in the Special Meeting, the owner filed Chapter 7 in Maryland and the Bankruptcy Court approved it. The owner had a mortgage with Scotia Bank. Vince will follow-up with the Trustee to find out the current status of the property.

**NEW BUSINESS**

**Teleconference**: The service we are using today is a free conference service. Users may be charged a long distance carrier fee. It was suggested users utilize their cell phones if they have free long distance. The phone number and participant code will stay the same.

**Manager Report**

**Operating systems**: RO plant, gray and fresh water systems working well. The GenSet had a bad cell in the battery and new batteries were purchased and installed

**Capital Projects**:

- Gray Water Lines project to be completed in approximately 10 days
- Cistern Repair (Masonry) 2 cisterns that were leaking are completed.
- Transformer-Mr. Harvey confirmed yesterday the transformer rebuild is complete. He will oversee the shipping back to St. Thomas. When the transformer arrives, we will schedule Mr. Harvey to be in St. Thomas and complete the final phase of the High Voltage Project.
- Retaining Wall shared with Elysian: A third level of block was added to the "back splash". Gene is aware of the added work and will split the cost.

**Action Items**

- CBE Bylaws: Andy will have the completed revisions next week. Jon will obtain a copy and send to Vince

- **Balusters**: Inspection of balusters are complete and repaired except for L-44. The owner had installed his hurricane shutters and would like the work completed after season, when the hurricane shutters have been removed.
- **Parking Lot Striping**: Scheduled for September.
- **No Dog Signage:** Have not completed
- **CBW Road Sign Damage**: The sign was found knocked over and broken. We don't know who or how it broke. We have contacted the original sign maker and waiting for his return call. We will obtain bids and pass on to the Directors.
- **Painting of Steps & Rails**: Scheduled for October
- **Work Orders**: Sharon said she is not getting the work order sheet. Louanne stated she was sending them out on Friday. Sharon agreed once a week would be fine and she will look for them on Friday.
- **Banco Forms**: New paper work was obtained. There is one form that needs to be signed by the Treasurer. Louanne will get Rosie's signature when she gets back on island.
- **DPNR**: Max reported that is on hold for now.
- **Direct Deposit**: Owners would be given the account and routing number. Owners would sign a form for electronic deposit. Barbara suggested we use a separate account for deposits, Vince suggested a lock box through the bank, Max wanted to know the fee schedule. Max asked Louanne to provide all info by the next meeting for a vote.
  Vince had to leave the meeting at this time. Max suggested we set the next meeting date before he left.

**September BOD Meeting:** The next meeting of the Board of Directors is scheduled for September 13, at 7:45am AST.

- **Long Term Plan**: Max would like a copy of the Long-term Plan mailed to him.
- **HO6 Policy rates:** Mapfre is not currently offering this type of policy.
- **Surveillance Cameras**: To be added to the long term planning area. Bill stated in retail business, cameras have not been effective.
- **Satellite TV:** Bill said that Dish is offering a great deal right now of free installation and the box. He would like to take advantage of that by finding a vendor for the complex. Jon is in talks with a vendor .

**Code of Ethics**: Sharon and Max raised the question about a code of ethics for the Directors. Max said he and Sharon would present at the next meeting.

**Adjournment:** There being no further business, the meeting was adjourned.

DRAFT

**CURRENT ACTION ITEMS**

| | |
|---|---|
| Letter to owner in arrears | Sharon |
| Contact Tunick Insurance re: insurance refund | Bob |
| Cowpet Bay Resort payment for retaining wall | Jon |
| Contact salesperson from Mapfre re: policy | Max |
| Speak to Shep Barrows re: systems missing from appraisal | Bill |
| Speak with Mapfre are all systems and office (not in appraisal) covered | Max |
| Contact information for Mapfre | Max |
| Budget Revision | Sharon |
| Bylaws first draft of revisions to Directors | Vince |
| Bankruptcy update on unit | Vince |
| CBE Bylaws send copy to Vince | Jon |
| No Dog Sign | Jon |
| Obtain bids for repair of road sign | Louanne |
| Work order sent weekly to Sharon | Louanne |
| Banco Forms | Louanne |
| Banco Electronic Banking Package to Directors | Louanne |
| DPNR | Max |
| Long Term Plan to Max | Jon |
| Update on HO6 policy from Mapfre | Bob |
| Satellite TV Vendors | Jon |
| Code of Ethics Presentation | Max/Sharon |

**PENDING ACTION ITEMS**

| | |
|---|---|
| L-44 Baluster repair after hurricane season | Jon |
| Parking lot Striping in September (weather permitting) | Jon |
| Painting of steps and rails | Jon |
| Surveillance Cameras added to long term plan | Max/Jon |

Max Harcourt Suggested Revisions (in yellow)

**Cowpet Bay West**
**Board of Directors Meeting**
**September 13, 2011**

**Present:** Max Harcourt, Barbara Walters, Bob Cockayne, Rose Wells, Sharon Koehler, Bill Canfield, Jon Cassady, Louanne Schechter,
Vince Verdiramo is out of the country.
Lance Talkington (Leeward -03) announced himself as attending the telephone conference.

**Minutes of August 9, 2011:** Board members reported they did not receive a copy of the August minutes. A copy of the minutes will be emailed to the members and they will vote on them at the next meeting. (Copies were emailed during the meeting).

**Determination of Necessity for Executive Session:** No Executive Session was required.

**Treasurer Report**
**Budget Revision:** Sharon reported she collaborated with Jeanne Brennan, our accountant, on the revised budget for 2011. Jeanne provided analysis with the changes highlighted. Max made a motion to except the revisions, all were in favour.
Barbara made a motion to send the analysis as provided by the accountant to the owners, Rosie 2nd, all in favour.
**Pay off loan from Reserve fund:** Sharon made a motion to pay off the loan from the Reserve fund. She stated the total payment with interest is $54,981.37, the initial loan was for $60,783.33 and the interest is $298.04.
Bill 2nd, all were in favour.
**Transfers of monies:** Sharon will work with Louanne to transfer funds owed to Reserve Fund from the General Funds and transfer funds owed from Reserve Fund (capital projects completed) to General Fund.
**Payment from Elysian:** Sharon asked if we had received a check for the Elysian's portion of the beach and flood control project. Jon stated that he was meeting with Gene today. Max asked Jon to call him after the meeting.
**Bounced Check:** Sharon asked about bounced check- Louanne reported there were none last month,
**Bankruptcy Unit:** Sharon asked who was billed for the account in arrears. Louanne reported that Vince Verdiramo followed up on the ownership of the unit following the awarding of the bankruptcy court; the original owner has retained possession of the property. Louanne contacted the Real Estate agent and the closing attorney. The agent is rewriting the seller's contract as the previous buyer is still interested. The closing attorney, Marcia Resnick, has the current statement and will advise us what is collectable.

**Old Business**

**By-Laws Committee Report:** The committee request the discussion be tabled. Max requested the Directors submit their comments in writing as requested by Vince. Only one Director (Sharon) has responded to Vince's request at this time. Bob asked if the Directors are considered the Committee as a whole. Max stated yes.
Sharon reported she sent copies of Vince's suggested changes to Anna Paiewonsky and Herb Horwitz. The committee has not received any written comments from these owners.

**Owners in Arrears:** Max asked the status of owners in arrears. The owner that has a payment plan is continuing to follow the plan. Another owner that was 90 days in arrears replied by email they were making a payment and would catch-up by December. Bob asked for the total dollar amount over 60 days in arrears. Sharon reported it was $28,466. Sharon's figure was the total for greater than 90 days. The actual 60 days was $5,528.03 [$21,705.54.] as of August 31. One payment was made reducing the total to $4,860 [$20,505.54] current.

**New Business**

**Code of Ethics:** Following discussion, the Directors agreed a written code of ethics is not necessary. The Directors agreed to improve on their communications and move forward.

**Security Gate:** The gate was open after Irene because the phone lines were down. The manual gate is broken at this time and repairs are being made. The security guards are stopping people in a professional and courteous manner.

**E-mail List:** Sharon requested **owners** email addresses are added to the Owners List. Bill stated trying to keep the list current is very difficult. Max suggested Louanne contact the owners and inform them that the Owners List will be updated with the owner's email(s) unless they contact the office that they don't want it included.

**Blog:** Sharon wanted to know why the newsletter stated that we don't have a blog. Louanne stated owners have called the office requesting clarification. The facts were placed in the newsletter as clarification for all owners. Lance was asked about the blog, but he had dropped off the line. Sharon suggested a Board member be appointed to preview the newsletter before it is sent. Max stated there was no problem and we should continue with the newsletter as we have.

**Resolution:** Sharon stated the resolution (from the February meeting) had never been completed and was not in the minutes. She stated it needed to be typed, and signed or put into file and it should be signed by the President and Secretary. Louanne stated the revisions were inserted into the minutes when the Board approved them. Louanne sent Sharon copies of the revisions, as she requested yesterday. Louanne was unaware the resolutions needed signatures and will obtain the signatures that Sharon is requesting.

**Manager Report**

**Infrastructure and Maintenance:** Gray and fresh water filters were changed 8/5/11. All systems are operating efficiently.
**The RO** has not been run recently due to the heavy rains.
**The generator** ran without problems during the storm. Jon switched the generator to manual after the storm while WAPA made any repairs to the area.
**Shutters:** We follow the mariners 3 day avoidance within the vector cone. Irene was made a named tropical storm on Sunday and passed by on Monday, shutters were not closed. There was no 3 days to prepare. Maria was a named Tropical Storm and we were within the vector. Owners were notified on Thursday and shutters were closed on Friday.

Draft

**Transformer:** 3 phase rebuilt transformer should arrive on island in approximately 2 weeks. When it arrives, we will schedule the electrical contractor, Kent Harvey, to install the transformer and complete the high voltage system changes slated.
**Grey Water Lines:** The project is approximately 70% complete. The heavy rains have prevented any work for the last 2 weeks. Work will complete when weather clears.
**Elysian Payment:** Jon is meeting with Gene after meeting
**CBE Bylaws:** CBW has sent their bylaws back to their attorney and are not complete. Bob would like Jon to try to obtain owner responsibility and insurance portions of their bylaws if they are complete.

**Pump Systems:** Jon has information on the pumps to share with the long term planning committee

**Satellite Vendors:** Dish network was installed by Enrique Garcia in two buildings.

**Parking Lot Striping:** On hold until weather clears.

**Balusters:** Repair after hurricane season

**Painting of steps and railings:** When weather clears.

**Dish TV:** Jon reported that Enrique Garcia had installed units in Leeward, and he was pleased with the operation.

**Mapfre Insurance Policy:** Policy is in the office.

**Revision of Appraisal:** Shep will return and revise the appraisal to include the systems that were left off. Bill will contact Shep to revise.

**Contact information from Mapfre:** Available in office

**Road Sign:** Louanne reported another incident occurred where the concrete base was pushed over. The Board was asked if the sign needed replacing. The bid for the sign does not include the base. Max asked to get an inclusive bid.

**NO DOG SIGN:** Jon asked for verification. Max stated the Board had decided to place a NO DOG SIGN, by the beach drive

**Work Orders:** Louanne is sending the work orders on Fridays. She was unable to send this Friday as the hurricane shutters blocked the internet signal. There were no complaints to send.

**Banco Electronic Banking:** Waiting for return call from Banco. Louanne requested information on several options. She will send any info to Directors when available.

**DPNR:** On hold, per Max

**Long Term Planning:** Jon was asked again to send Max a copy of the LTP. Max is planning on scheduling a meeting of the committee in September.

Draft

**HO6 Policy**: Mapfre will contact us when they have them

**Service Dogs:** Dogs must be registered with the ADA. VI does not have guidelines for service dogs.

**Next meeting**: October 11, 2011 at 7:45am.

**Adjournment**: There being no further business the meeting was adjourned.

ACTION ITEMS

| | |
|---|---|
| August Minutes to BOD | Louanne |
| Transfer monies as calculated by Sharon to Reserve Fund on 9/14/11 | Louanne |
| Letter to Owners in Arrears | Louanne |
| Written comments on revisions to Bylaws | Directors |
| Repair manual Security Gate | Jon |
| Inform owners email address(s) will be added to Owner List | Louanne |
| Update owner's list to include email address(s) | Louanne |
| Send Resolutions from February & March Minutes to Max and Rosie for signatures | Louanne |
| Send LTP to Max | Jon |
| Gray Water Lines | Jon |
| Elysian Payment | Jon |
| CBW Bylaws to Directors | Jon |
| Parking lot striping | Jon |
| Painting of steps & rails | Jon |
| Revision of Appraisal | Bill |
| Road Sign Bid for base + sign | Jon |
| No Dog Sign | Jon |
| Electronic Banking for Owners to make direct payment | Louanne |
| DPNR | Max |
| Long Term Planning Committee meeting | Max |

Draft

**Cowpet Bay West**
**Board of Directors Meeting**
**October 11, 2011**

**Present**: Max Harcourt, Barbara Walter, Bob Cockayne, Rosie Wells, Sharon Koehler, Bill Canfield, Jon Cassady, Louanne Schechter
Vince Verdiramo is out of the country.
Lance Talkington (Leeward 3) announced himself as attending the phone conference

Max announced there would be a brief executive session and Jon would contact Lance when he could rejoin the meeting.

**Executive Session**:
The manager requested Directors do not include the names and titles of vendors used by the Association in their emails as some vendors have agreed to assist us, on their own time, as a second income.
Sharon stated a previous Board recommended the Association not act as a third party vendor. Owners are responsible to hire and pay their own service vendors.
There being no further business for Executive Session, Max opened the meeting to owners, Lance rejoined the meeting.

**Minutes of August 9, 2011**: The minutes of the August minutes were unanimously approved.

**Minutes of September 13, 2011**: The minutes of the September minutes were unanimously approved with the revisions provided by Max Harcourt (see attached).

**Treasurer Report:** The total cash assets as of September 30, 2011 were $557,447. The reserve funds total is $452,300. Sharon presented her analysis of the 3rd quarter budget verses actual report (attached).
CBW BOD-P&L Third Quarter Report 9/30/11 & Treasurer's Report

Cash on Hand 9/30/11 Operating Accounts - $104,000

Reserve Accounts - $ 452,300

We will be depleting the Reserve Account by approximately $ 94,800 and reimbursing same to our general accounts to cover expenses made for capital improvements. After the funds have been cleared, we will write a check to repay the Reserve account current through October, approximately $ 62,855. This will ultimately result in a balance in our Reserve fund of $420,355.

Our 9/30/11 customer receivables are $36,940, of which $25,033 are 60 days and older.

Notes and observations re 3rd quarter P&L-Budget vs Actual

1. Income-fixed charges a little off mark....Louanne and I will work towards finding and correcting the posting problems

2. Income is about $4500 on the plus side; due to sale of transformer to Elysian ($5900)
3. Expenses:
   - Items under budget
     - WAPA-Assn ($16,000)
     - Contract Labor Bldgs. ($11,150)
     - Grounds ($8,000)
     - Hurricane ($3,750)
     - Beach Refurb ($5,100) –
   - Items over budget
     - Building repairs ($5,300)
     - Grey Water ($1,900)
     - Electric/Generator ($6,500) – fuel bills
     - Vehicles/Fuel ($4,000)
     - Security Guard ($8,000) Increased hours
     - Office Expense ($4,000) – new computer & AC unit
     - Contract Labor-Grounds ($16,000)
     - Medical ($3500) – increased costs
     - WAPA Owners ($21,000)
     - Beach Refurbish ($5,100) – sand, buoys, chairs, cleanup
     - Legal/Accounting ($1,800) – extra meetings with Jeanne Brennan re insurance

Other observations:

1. A policy was established several years ago that CBW Assn would not act as a 'middleman' between owner and vendor. The primary reason for this was twofold, in that it created a liability situation for the assn. and that it distorted our financial reports. In reviewing our records this year, it has come to my attention that when an owner's phone line is down, we have been having a vendor come and fix the line. The arrangements for these fixes are made by Jon, who then pays the vendor cash ($50) for the repair. Then the office bills the owner for the repair and reimburses Jon via a company check. While I can understand the owners' frustrations not having a working phone, I cannot understand why the owner and the supervisor can't complete the transaction without Jon's involvement. I recommend we cease this practice and find another way to handle these situations.
2. It will soon be time to prepare the 2012 budget. I have been working with Louanne to correct mis-postings throughout the P&L. I believe it is important to have our records accurately reflect our expenses, rather than worry about how much we are over or under compared to our budget. This is the only way to accurately predict the upcoming budget. I will continue to wnrk with Louanne to keep a more accurate accounting of our expenses.

Draft

**2012 Budget:** Max suggested the budget for 2012 be prepared prior to the end of the year. He would like to include the budget with the information sent to owners for the annual meeting.

**OLD BUSINESS**

**Bylaws:** Max set the goal that any changes the Directors would recommend be completed this year and presented to owners so that they could be voted on during the 2012 Owners Meeting. The Directors discussed the changes in the Bylaws suggested by Vince Verdiramo. The following is the recap of suggested Bylaw Revisions

Recap of suggested Bylaw Revisions October 2011

OUTCOME OF BOD'S DECISIONS AT 10/11/11 BOD MEETING INDICATED IN BLUE

Following is a compilation of suggestions for changes to our bylaws following the order of our current document. In each case, the first name listed below each category initiated the suggested change:

Article II, Section 3 – Managing Agent

Sharon – suggested adding (k) to exclusions limiting the securing of property insurance solely to the Board

Max – Agrees Bill OK, Approved

Article II, Section 4, – Election and Term of Office

Paragraph 2....Sharon – recommended we change the method of voting stated in the current bylaws to reflect the manner we currently follow.

Max – suggested wording be changed to *'All vacancies shall be voted for on the same ballot, and the candidates with the highest number of votes shall be elected to each of the vacancies'*.

Change approved

Paragraph 4... Vinnie – suggested changing the 'time-out' for board membership from 1 to 2 years

Sharon – questioned reason, feels it should remain at 1 year

Max – felt no change was necessary

Bob – felt no change was necessary

All agreed that no change was necessary

Article II, Section 5 – Removal of BOD Members

Vinnie – recommended we change the second paragraph to give the Board the ability to remove a board member who has not attended meetings from an entire year to a six month period.

Sharon – felt the verbiage should be changed to 'six consecutive meetings' and that the attendance at the Annual meeting should be further clarified by 'in person'

3055300/000447

Max – felt no change was necessary

Bob – felt no change was necessary

All agreed that no change was necessary

Article II, Sections 8 & 9 – Regular and Special Board Meetings

Sharon – suggested we include 'email' as an acceptable means of board meeting notification

All agreed

Article II, Section 11 – Quorum of Board of Directors

Max – **recommends the following: Delete** – "... a majority of those present may adjourn the meeting from time to time. At any such adjournment at which a quorum is present, any business, which might have been transacted at the meeting originally called, may be transacted without further notice." **Add, in place:** "no business may be transacted until a quorum is achieved."

Unclear about how this should be worded, but all agreed that no business should be conducted unless a quorum is present.

Article II, Section 15 – Executive Committee

Vinnie – suggests "*in the second paragraph where it states, "merge the association into another," this right, according to this paragraph, is reserved to the Board. However, the merging of the association is a paramount item which in reality should be voted on by all owners and be carried by a simple majority.*"

"*In the next to the last paragraph which now reads, "and it shall have the powers to authorize the seal of the association to be affixed to all papers which may require it," this should be changed to read, "and it shall have the powers to authorize the seal of the association to be affixed to all papers which may require it provided said papers and/or contracts do not involve an Board by either e-mail or fax.*"

Max - **recommends: Revise wording to read:** "...provided said papers and/or contracts do not involve expenditure greater than $50,000. Greater expenditures require approval by a quorum of the Board in regular or special meeting."

Draft

Sharon – asks if we should reconsider the dollar amount

Undecided, requires more discussion.

Article II, Section 16 – Inspection by Executive Committee

Vinnie – suggests we add "*such reporting to the full Board shall be made within 15 days of the semi-annual inspection*"

Sharon – suggests we also add that monthly progress reports be made by the GM to the Board at each Board meeting.

Max – would like the wording revised to read "Within 30 days after each such semi-annual inspection, the Committee will report its findings and recommendations to the Board of Directors."

Bob – agrees that report to the entire Board be submitted 15-30 days thereafter.

All agreed to add 30 day requirement

Article II, Section 19 (added) – Communications

Max – suggested Communications by, from, to and among the Board may be in writing, by fax or by electronic communication (telephone, telephone conference, email, internet, etc.). Telephone and telephone conference conversations must be documented (e.g., minutes or record of conversation). This communication will constitute "official" communication by the Board.

All agreed to include

Article III, Section 1 – Annual Meeting

Max – suggested owner's be allowed to attend the Annual Meeting by telephonic/electronic means.

Withdrawn

Article III, Section 3 – Special Meetings

Vinnie – suggested last sentence should read '*no other business shall be transacted at a special meeting except as stated in the notice*'

Sharon – agreed

Bob – agreed

Max – agreed and suggested we add '*Owners may 'attend' via electronic means*"

PLAINTIFF'S
EXHIBIT
3A

3055300/000449

*All agreed*

Article III, Section 5 – Adjournment of Meetings

Max – suggested allowing electronic participation by owners

Withdrawn

Article III, Section 6 – Annual Meeting Order of Business

Max - suggested the order of business should read:

(a) Roll Call – by unit
(b) Establishment of Quorum (1/3 of all unit owners)
(c) Proof of Notice of Meeting
(d) Reading of Minutes of preceding meeting approval
(e) President's Report (including cost and coverage of insurance)
(f) Treasurer's Report (including discussion of Budget and Financial Status)
(g) Property Manager's Report
(h) Report of Nominating Committee
(i) Election of Board members
(j) Old business
(k) New business

All agreed to change format as above, except (d) should be amended to "Approval" rather than 'Reading". Barbara expressed concern that no provision was made for owners to approve the budget. Bob stated the point would be moot, as the bylaws give the Board the power to develop and approve the budget, and a negative vote by the owners would not be valid.

Article III, Section 9 – Majority of Unit Owners

Max – suggested (as stated in sections 1 and 5 above) that electronic participation be included

Withdrawn

Article V - Sections 2, 3,& 10 – Insurance, Repair/Reconstruction After Fire, Routine Maintenance & Repair – TO BE DISCUSSED AT LENGTH LATER, OR ANOTHER TIME

The entire board agreed in principle that all language concerning these sections should specify that the Assn's insurance covers all items within the walls, and that owners are responsible to insure all items from the paint and beyond into the living area, whether they are original or not. A special board meeting may be called before the end of October to discuss these important sections in further detail.

Article V, Section 11 – Restriction on Use of Apartment Units

Vinnie – suggested we add a paragraph concerning our 'no dogs allowed' policy.

Sharon – provided information from the ADA website regarding 'service dogs'; agreed with Vinnie

Max – provided language as follows:

No dogs are allowed on the property, either long term or visiting. The Board may grant exceptions to the NO DOGS ALLOWED rule, on an individual basis, should an owner require the assistance of a service animal (dog) as defined by the ADA. Owners seeking to obtain such an exemption are required to apply, in writing, to the Board with supporting documentation."

Bob – agreed

Bill – agreed and verified that the USVI follows 'service dog' definition of ADA

**Note – need to establish a minimum fine, or delegate fine ability to the BOD, as this is no longer an R&R

All agreed this restriction should become a part of the bylaws. Barbara cautioned that the ADA act forbids asking service animal owner the cause of disability. Bill stated that we can require proof of ADA compliance documents from owner, but cannot deny ADA approved animals on property. Board ability to assess fines is covered earlier in the bylaws.

Article V, Section 12 – Additions, Alterations or Improvements by BOD

Sharon – recommended we increase the dollar limitation for expenditures with Board approval, and not requiring 2/3rds owner approval.

Max – suggested increasing this to $100,000, from $50,000.

All Board members agreed to increase the dollar limitation to $100,000, except Barbara who felt it should remain at $50,000

Article V, Section 13 – Additions, Alterations or Improvements by Owner

Vinnie – recommended adding an additional paragraph as follows:" *No unit owner may use their seaside patio for the storage of any household goods or appliances* and *shall limit the use to patio furniture only."*

Sharon - disagrees

Bob – agrees with Vinnie

Max – feels this should be covered in either Section 14, or belongs in our Rules and Regulations

All agreed this should not be added to the bylaws, but rather covered under rules and regulations

Article XIII – Conflicts

Vinnie – recommends this section should be reviewed to determine if this is still a good law.

Bob – agrees

Rules and Regulations

Max – suggests we review our Rules and Regulations

NOTE: Vinnie Verdiramo was not in attendance at this meeting

Max will ask Anna Paiewonsky if she is interested in providing a legal opinion of these changes to the Bylaws.

**NEW BUSINESS**

**February BOD Meeting?**

**Meet & Greet: Thursday February 2nd, Place to be announced**

**Annual Owners Meeting February 4th, Place to be announced**

**Nominating Committee:** Bob said the committee is actively preparing.

**Manager Report**

**Systems:** All systems are doing well. The lab retested one fresh water test. The first sample was negative for ecoli as was the second test.
**Dump-truck**: Dump truck stalled at the light when returning from the dump. The truck was covered under warranty for replacement of fuel injectors Jon had the truck towed to the property until arrangements could be made with the Ford company. The truck was then towed to the Ford repair shop for the scheduled repairs.

**Gate**: The gate is functioning without problems.

**Long Term Plan**: Jon is obtaining additions from Mr. Harvey to add to the plan before sending to Max

**Transformer**: The transformer is in route, when it arrives on island we will schedule Mr. Harvey's visit.

**W-17:** Owner sent complaints that will be entered into log. (Louanne off island will enter when she returns; Jon has copy of her complaints).

**L-07**: Owner complained alarm was beeping for 3 days, owner did not report alarm when it started. Jon spoke with owner and suggested she call office immediately for any alarm.

**CBE:** Andy said the owners are still revising bylaws

Draft

**Bankruptcy:** Statements were sent to the lawyer representing the owner and we have had no response.

**Signage:** No Dogs Allowed and replacement of Parking Signs to be installed this month.

**New Road Sign**: We have a quote for the sign but not the base

**November BOD Meeting**:

**Adjournment:** There being no further business,

ACTION ITEMS

| | |
|---|---|
| Repair of manual Security Gate | Jon |
| Long Term Plan to Max | Jon |
| Elysian Payment | Jon |
| CBE Bylaws to Directors when available | Jon |
| Parking lot striping | Jon |
| Painting of steps and rails | Jon |
| Revision of Appraisal | Bill |
| Contact Anna Paiewonsky | Max |
| Road Sign Bid for base and sign | Jon |
| No Dog Sign and No Parking Signs | Jon |
| Electronic Banking (info was sent to Directors last month) | Directors |
| DPNR | Max |
| Long Term Planning Committee | Max |
| Update on Bankruptcy Ruling | Louanne |
| Notify Owners Annual Meeting | Louanne |
| Notify Dwners Meet & Greet | Louanne |
| Notify Owners how to contact Nominating Committee | Louanne |

DRAFT

**Cowpet Bay West**
**Board of Directors Meeting**
**November B, 2011**

**Present:** Max Harcourt, 8arbara Walters, Bob Cockayne, Rosie Wells, Sharon Koehler, Vince Verdiramo, Jon Cassady, Louanne Schechter
Bill Canfield is off island.

**Executive Session:**
Max requested the meeting move to executive session, Vince 2nd, there were 5 yes 1 no. The motion carried.

**Telephonic Conference:** Max stated the purpose of telephonic conference was to allow Directors off island have a means of attending the meeting. Max states the meeting is not manageable opening the meeting telephonically to all owners.

**Service Dogs on Property:** Following discussion Vince made a motion to table the situation until the Directors can obtain a legal opinion of the no dog rule and incorporate that opinion into the rules and regulations and or recommended bylaw changes. Max 2nd, and the Directors were in agreement.

**Imposing Fine for Dogs on Property:** Max made a motion any individual in violation of the no dog rule , that have service dog credential will not be fined until the opinion from legal council is obtained, pursuant to the outcome of the previous motion. Sharon 2nd.

**Executive Committee:** Max asked if any Director is interested in being in the Executive Committee. Barbara and Bob said they would be interested, Max requested the Directors vote by email to him and he will tally the vote.

**Manager and Office Manager Review:** Louanne and Jon were asked to leave the office.

**There being no further Executive Business, the Executive Session ended .**

**Security Gate:** Mr. Daryl Padola, the welder, is repairing the manual gate. The bid was for $460.

**September Minutes:** Sharon requested her revisions be made to the minutes. Under Resolution April resolution had not be executed nor was it attached to the minutes. The revisions were accepted.
**Treasurer Report:**
Treasurer's Report – November Board Meeting 2011
October 31, 2011
Bank balance (all accounts) Oct. 31, 2011 - $559,100
Reserve account through 11/4/11 - $473,600
Owner arrears, 60 days and over - $ 32,267; Alton - $17,500
Owed to General fund from Reserve fund for capital improvements - $41,224
Owed to Reserve fund from General-Oct.& Nov.@ $4785= $9570
General Observations
Expenses over budget:

DRAFT

Lots of fuel for generator, thanks to WAPA outages and storms- 138% over budget ($5,756)
Lots of truck repairs – 243% over budget ($4,058)
Lots of water leaks – 13% over budget ($2,000)
Lots of Accounting fees (insurance funding meetings, attending board meetings regarding insurance, review of revised budget, etc. – 56% over budget ($2,100)
Guard Service, due to increased hours – 22% over budget ($9,400)
Office Expense, new computer, new a/c – 24% over budget ($3,700)
Masonry/Cistern CI- 57% over budget ($25,950)
Sewage/gray water – 11% over budget ($4,230)

(Sharon)Will be on island mid until end of November; will be working with Jon, Bill and Louanne on 2012 budget, and anyone else who wants to join us.

**L-41:** Owner returned statement with a note that he filed for bankruptcy in 3/11 and discharged in May 2011. Vince stated that unless the owner can prove otherwise, because we have a lien on the property, he still owes the Association all charges. Vince suggests the Association consider foreclosing on lien.

**Old Business**

**Meet n Greet and Owners Meeting Date & Place:** The Meet and Greet is February 9 and the Owners' Meeting is February 11 at the Caribbean Fish Market

**Review of Bylaw changes voted on during October Meeting**
Article 2 section 3: Subparagraph k added

Article 2 section4: All vacancies should be voted on the same ballot

Article 2 Section 8: Electronic Mail

Article 2 Section 9: Electronic Mail

Section 11: No business transacted until a forum is achieved

Section 15: Executive Committee 2nd paragraph, last paragraph: Recommend that *merging the Association* should be deleted. All in favour

Section 16: 30 days after the inspection

Section 19: Added

Article 3 Section 3 Special Meeting: Addition

**Bylaw changes discussion continued**

**Article 5 Section 2 Insurance:**

DRAFT

<u>Section 2. Insurance:</u> Highlighted suggested changes by Max and Bob are inserted into minutes for this discussion. (At this time Vince excused himself from the meeting.)

Changes are highlighted in yellow:

*The Board of Directors shall annually obtain and maintain, to the extent obtainable, the following insurance:*

1. *Fire with extended coverage to include earthquake and flood coverage, vandalism and malicious mischief endorsements insuring the entire buildings and "common elements" together with all service machinery contained therein and covering the interest of the Condominium, the Board of Directors and the Common Interest of the unit owners in an amount to be determined by the Board of Directors.*
2. *Windstorm, insuring the entire buildings and "common elements" together with all service machinery contained therein and covering the interest of the Condominium, the Board of Directors and the Common Interest of the unit owners in an amount to be determined by the Board of directors.*
3. *Worker's Compensation; Public Liability covering each member of the Board of Directors, the managing agent, the manager, the office manager and each unit owner; Vehicle and other such insurance as the Board of Directors may determine in amounts to be determined by the Board of Directors.*

*All policies of physical damage shall to the extent obtainable contain waivers of subrogation and waivers of any defense based on co-insurance or of invalidity arising from any acts of the insured, and shall provide that such policies may not be cancelled or substantially modified without written notice from the Board of Directors.*

*From time to time or as required by insurers, the Board of Directors shall obtain from a certified and USVI licensed real estate appraiser an appraisal of the full replacement value, without*

DRAFT

*deduction for depreciation, of the buildings, common areas and facilities for the purpose of determining the amount of insurance required.*

*Unit owners shall be encouraged to carry Home Owners insurance on their "apartment unit" for their own benefit provided that all such policies shall contain waivers of subrogation and further provided that the liability of the carrier(s) issuing insurance obtained by the Board of Directors shall not be affected or diminished by reason of any such additional insurance carried by any unit owner.*

*The Board of Directors will provide owners a concise summary of all insurance coverage and costs at each Annual meeting.*

*The terms "common elements" and "apartment unit," as mentioned above, are defined*

*in Article 5, Section 10 "Routine Maintenance and Repair."*

Bob will follow-up with several insurance agents regarding information on waivers of subrogation. (At this time Bob excused himself from the meeting) This paragraph requires further discussion by the entire Board. No vote was taken.

Section 3 Recommended changes

*The association shall only be responsible for inspecting unit interiors to determine if damage is structural or due to external causes, or if adjacent unit damage is caused by external causes, or unless that unit is owned by the association. Unless that unit is owned by the association, repair by the association of other unit damage will be limited to structural damage, that caused by external or adjacent unit causes, and will not include property or fixtures installed by the owner or previous owners.*

Max determined that further discussion was needed by the entire board and tabled this section.

DRAFT

Section 10 Recommended changes

*An "apartment unit" is considered the space inside the perimeter walls, interior walls, floor and ceiling to include:*

1. *All decorating elements including: paint, wall and floor coverings, paneling, molding and tiles; finished cabinets and mirrors.*
2. *All electrical appliances including: refrigerator, stove, washer, dryer, dishwasher, garbage disposal, hot water heater and air-conditioning equipment (including compressor).*
3. *All electrical fixtures including: wall ceiling and floor outlets, switches and fuse box.*
4. *All plumbing fixtures including: tubs, showers, sinks and faucets.*

*Additionally, the unit owner shall be responsible for the routine lubrication and adjustment of doors and windows, and, unless major casualty related, replacement of broken glass, wooden or glass slats and damaged screens. The unit owner shall also maintain and assure the operability of the storm shutters installed on that unit and is responsible to close them in the event of a windstorm. Damage caused by failure to do so is the responsibility of the owner if net insurance proceeds are insufficient to cover such damage.*

***Max made a motion to accept the definition of "apartment unit" All were in favour .***

*"Common elements" are considered to include all other elements of the buildings and property except those specified as being part of the "apartment unit." Additionally, the following are considered common elements:*

1. *Electrical supply to the fuse box, electrical supply lines in the walls (including interior walls), floor and ceiling.*
2. *Water and plumbing lines in the walls (including interior walls), floor and ceiling to the valves at sinks, showers, tubs, hot water heater, and toilets, etc.*
3. *Drains to the first connection outside a wall.*

*External air conditioning compressor units shall be maintained by the owner in a reasonable state of preservation. The Association may require owner to remove inoperable and/or un-maintained units or do so at the owner's expense*

DRAFT

Max stated this change (above) includes electrical supply lines in walls. Jon stated the cost to the budget would be substantial with this change. Max assigned Jon to determine the estimated budget implications based on these recommended changes. Max also would like to include a statement that holds the Association harmless if the original wiring and plumbing was changed by the owner.

Matrix

| Category (Not intended to be all-inclusive) | Owner Maint/Repair Responsibility | Association Maint/Repair Responsibility | Association Insurance Responsibility | Owner Insurance Responsibility |
|---|---|---|---|---|
| Exterior Walls and Interior Damage Caused by Leaks | | x | x | |
| Roof and Interior Damage Caused by Roof Leaks | | X | X | |
| Interior Damage caused by Adjacent Units (Leaks, etc.) | X | | | Owner of Adjacent Unit's Insurance Responsible |
| Front Doors | X If Not Original | X If Original | X If Original | X If Not Original |
| Screens | X | | X | |
| Exterior Sliders | | X | X | |
| Exterior Wood Fittings | | X | X | |
| Exterior Windows | X If Not Original | X If Original | X If Original | X If Not Original |
| Electrical System to Breaker Panel | | X | X | |
| Electrical System, Breaker Panel to Outlets, Junction Boxes | X If Not Original | X If Original | X If Original | X If Not Original |
| Electrical Fixtures | X | | | X |
| Plumbing Inside Walls/Floors | X If Not Original | X If Original | X If Original | X If Not Original |
| Condo plumbing not in walls/floors | X | | | X |
| Plumbing Fixtures | X | | | X |
| Interior Walls | X | | X | |
| Interior Doors | X | | | X |
| Cabinets | X | | | X |
| Furniture | X | | | X |
| Appliances | X | | | X |
| Wall/Floor Coverings (tile/carpet) | X | | | X |
| Hurricane Shutters | X | | X | |
| Furniture | X | | | X |
| Personal Property | X | | | X |
| External A/C elements | X | | | X |
| Internal A/C elements | X | | | X |
| Landside Porch/Steps/Railings | | X Excluding Tile | X Excluding Tile | |
| Seaside Balcony/Railings | | X Excluding Tile | X Excluding Tile | |

3055300/000459

DRAFT

**Max requested Jon review Matrix and comment on each item.**

**Special Meeting:** Max requested the Directors meet Friday, November 18th, at 9:45AST to complete the discussion on the Matrix and budgetary concerns.

**2012 Budget Meeting:** Sharon plans to set a meeting while she is on island during November.

**Section 11:** Addition to section

1. No dogs are allowed on the property, either long term or visiting. The Board may grant exceptions to the NO DOGS ALLOWED rule, on an individual basis, should an owner require the assistance of a service animal (dog) as defined by the ADA. Owners seeking to obtain such an exemption are required to apply, in writing, to the Board with supporting documentation.

   Federal and ADA Compliance, as follows:

*"On July 23, 2010, Attorney General Eric Holder signed final regulations revising the Department's ADA regulations, including a revised definition of "service animal." Effective March 15, 2011, "Service animal means any dog that is individually trained to do work or perform tasks for the benefit of an individual with a disability, including a physical, sensory, psychiatric, intellectual, or other mental disability. The work or tasks performed by a service animal must be directly related to the handler's disability.*

*Dogs used for emotional support, that are not task-trained, are called emotional support animals. They are not service dogs".*

This section is tabled until the opinion of a lawyer is obtained.

**New Business**

**23W:** An inspection of the wiring of this unit resulted in several items that required repair. The repairs were completed , the owner paid the contractor and requested reimbursement. Jon reviewed the repairs and invoices, Max approved the reimbursement.

**Manager's Report:**

DRAFT

**Infrastructure and maintenance**: Monthly scheduled filter changes to gray and fresh water distribution systems were completed. The new fresh water system recommended the filters to be changed every 3 months, Jon has opted to change those filters every month. All other systems are operating properly until this weekend when a WAPA outage heated the breaker of the gray water motor and caused it to burn out. The breaker was changed and we may be changing the meter box. We continue to run the generator for 45 minutes after power is restored as programmed.

**Off season maintenance items:**
Inspection of steps: 1/3 completed, inspecting on sunny days
Pressure washing 50% complete, inspecting on rainy days
Rails, steps, and parking lot painting will be completed by December 15. Striping and painting will be done after pressure washing is completed.

**Transformer**: should be in Miami tomorrow and is scheduled to be in shipped this week. Once in route, we will schedule Mr. Harvey's visit to reroute the final 3 phase leg of our electrical system.

**Long Term Planning Committee**: Thursday 11/17/11 10:00 AST to use original code for telephonic conference

**Elysian Payment**: No payment has been received. Jon spoke with Gene last week and was told the check is forthcoming.

**CBE Bylaws**: Jon to contact Andy

**Thefts**: Multiple thefts are continuing at CBW, CBE, Elysian, and Cabrita Pointe. Most of the issues have typically occurred Sunday afternoon, between 11a-2p. During each of these occurrences the owner/renter has left his door unlocked and purses, wallets, etc. in plain view. The Association has strongly encouraged the owner/renter to file a police report. Max asked Louanne to draft a letter to the Police Chief from the Board, requesting the police to be on increased alert and provide increased patrolling during the week and weekends.

**Nomination Committee**: The nomination committee recommendations need to be submitted this month to be sent out to the owners by December 1.

**December Meeting**: The December meeting will be 12/13/11 at 8:45am

**Adjournment**: There being no further business the meeting was adjourned.

DRAFT

## ACTION ITEMS

| | |
|---|---|
| Retain lawyer to review and give opinion on No Dog Rule | Max |
| Contact Vince to vote on Executive Committee member | Louanne |
| Announce Executive Committee | Max |
| Evaluation of Managers for December meeting | Max |
| Manual Security Gate repairs | Jon |
| Budget Meeting | Sharon |
| L-41 Determine Foreclosure by CBW | Directors |
| Meet N Greet/Annual Owners Meeting confirm meeting place | Rosie |
| Obtain info on waiver of subrogation and HO-6 policies | Bob |
| Budgetary implications based on recommended changes to Bylaws | Jon |
| Long Term Planning Committee Meeting | Max |
| Elysian Payment | Jon |
| CBE Bylaws | Jon |
| Letter to Police Chief | Louanne |
| Nomination Committee Recommendations for mail-out by Dec | Bob |

**Cowpet Bay West**
**Board of Directors Meeting**
**December 13, 2011**

**Present:** Max Harcourt, Barbara Walters, Bob Cockayne, Rosie Wells, Sharon Koehler, Bill Canfield, Vince Verdiramo, Jon Cassady, Louanne Schechter

**Open Meeting:**
Max made a motion that our meetings, except when put into executive session are open. "Open" meaning any owner may attend by phone or in person. Bob 2nd, the vote carried with 4 yes and 3 no.

**Executive Session:**
Max made a motion to go into Executive Session to discuss employee performance and compensation. Bob 2nd, all were in favour. Louanne and Jon were asked to leave the meeting at this time. The Executive Committee met and voted to not give bonuses this year. The Board voted 6 in favour of no bonuses and Barbara declined voting.

Louanne and Jon were invited back into the room. Max made a motion to leave Executive Session, Bob 2nd, 5 voted yes and 1no.

**Treasurer Report:** As of November 30
Regular/Special Account Balances - $135,705
Reserve Fund Balance - $425,677

Analysis of Reserve Fund status, Capital Improvement reimbursement, anticipated Reserve Fund balance at year end:

| | |
|---|---|
| Current Reserve Fund Balance - | $ 425,677 |
| Dec. payment due Reserve | + 4,785 |
| Owed for Capital Improvement | - 41,680 |
| Anticipated Reserve Fund Year End | $ 388,782 |

Uncollected funds 60 days & older - $20,880
Louanne reported L-41 is under contract and that we would be collecting the bulk of the outstanding fees if we accept the offer from the buyer which is approximately $18,000. The Directors voted unanimously to accept the offer. Louanne reported that L-48 was also now current.

Budget Issues

1. Management Salaries/bonuses
2. Capital Improvement Projects

Sharon stated that without Capital Expenditures, we would have to reduce the Reserve Fund by approximately $10,000. We would also continue the $60,000 insurance fee but we would spread it over 12 months.

3055300/000463

DRAFT

Max stated he asked Sharon to prepare the budget using (worst case scenario) the current insurance fees. Max tasked the Insurance Committee to obtain bids for the property to be effective preferably by February. Bob reported he spoke with Mapfre and Executive Insurance and will continue to get bids.

Bob asked Vince if he wanted to be considered for the 2012 Board of Directors, Vince declined.

Bill and Vince left the meeting at this time.

Barb asked, do the owners approve the budget? Max stated that according to the Bylaws, the budget is the responsibility of the Directors and that it is presented to the owners.

Max suggested we have a meeting to finalize the budget next week with the intent of distributing it to the owners by year's end. **The meeting will be Tuesday, December 20th, at 8:45 am.**

Max stated that worse case for insurance is if we have to continue with Mapfre at current rates. The insurance committee is creating a bid package to include risk factors, hoping to obtain better rates.

**Old Business**

**ByLaws**

Anna Paiewonsky reviewed proposed Bylaw changes from the Directors. She suggests the Association be an LLC. Anna dropped the word "apartment" from the entire document. Max stated *apartment* remain as it is used throughout the document. Max suggested the Directors look at the proposed changes in the attachment provided by Sharon.

Article II Section 3: Sharon stated exceptions were made to protect the Association from negligent discharge. Following discussion, the directors voted not to accept this change.

Article II Section 5: Suggested change, in red, left out.

Article II Section 6: 4 above, *Subject to section 4 above* leave out.

Article II Section 8: typo: *Meeting notices* at end of section omit. Leave meeting date notice at 30 days.

Article II Section 17: *Action by consent*. Leave as is.

Article V Section 1: last paragraph Operation of Property,
Change the wording from *preliminary* to approved *budget for the ensuing year shall be provided not less than 30 days.*

Article V Section 2: Paragraph 3- omit ***and/or an evaluatian based an risk exposure***

Artilce V Section 11: #4: No Dogs Allowed moved from Rules to Bylaws. The Directors discussed Vince's legal opinion that was emailed to owners, the Directors agreed to hire a VI lawyer and obtain that opinion. The directors agreed to keep #4 as:

1. No dogs are allowed on the property, either long term or visiting. The Board may grant exceptions to the NO DOGS ALLOWED rule, on an individual basis, should an owner require the

DRAFT

**Status on Electronic Banking:** Louanne stated she sent the cost and form to the Directors and did not get a response. Sharon stated she never received it, Louanne will resend it.

**Owner List:** Louanne reported she is calling each owner and updating the list accordingly. The list is available electronically.

**Approval of Minutes:** Max made a motion the minutes to the meetings on November 8th and 18th be approved as read. Rosie 2nd, all were in favour.

**Next Meeting:** The next Board of Directors meeting will be January 11, 2012 at 9am.

**ACTION ITEMS**

| | |
|---|---|
| Retain USVI lawyer to review and give opinion on No Dog Rule | Max |
| Notify Directors of Special Meeting for Budget on 12/12/11 | Max |
| Prepare Bylaws for distribution to Owners | Max & Sharon |
| Complete recommendations for nominations | Nominating Committee |
| Resend information on electronic banking | Louanne |
| Prepare Ballots for distribution to owners | Louanne |
| Owners Directory updated with email address | Louanne |

DRAFT

**Cowpet Bay West**
**Board of Directors Meeting**
**January 11, 2012-01-12**

**Present:** Max Harcourt, Barbara Walters, Bob Cockayne, Rosie Wells, Sharon Koehler, Vince Verdiramo, Jon Cassady, Louanne Schechter
Bill Canfield could not attend

**Owner W-12:** Mr. Kirschenbaum requested to speak to the Directors on behalf of his wife. He made a formal request for an exemption to the no dog policy. He presented a letter from his wife's physician stating the dog was necessary as part of her treatment. He provided the Directors with certification for the dog. He stated he and his wife would be responsible for cleaning up behind the dog. He stated he has purchased a "no bark collar" in the event the dog should bark. He spoke with his neighbours and they have not heard the dog. Mr. Kirschenbaum stated that when he and his wife purchased their condo there was no rule against dogs. Mr. Kirshenbaum left the meeting.

**Executive Session:** Max asked if there was a need for Executive Session. Vince requested Executive Session there was no 2nd, the meeting remained open.

**Nomination Criteria:** Vince asked Bob what criteria were used to determine who was recommended. Bob indicated the committee had discussions on each candidate. Following discussion, Max stated that there was no new issue here to present before the Board of Directors.

**Minutes of the meeting of December 13, 2011** were accepted with the following amendments:
Executive Session: add to the third sentence *but to increase Jon and Louanne's salaries $4k and $2K, respectively (per Max).*
Nomination Committee: Delete *this afternoon* from Bob's comment to bring info to office (per Bob)
Bylaws: Change to: Anna Paiewonsky made provisions for the Association to be an LLC (per Sharon).

**Minutes of the meeting of December 20, 2011** were accepted with the following amendments:
Missing Applications: Last sentence changed to: Max stated he may send all email correspondence out regarding the issue and leave it to the owners (per Max).

Under Executive Session add: The Board voted to award bonuses to Jon, Louanne, the staff and contract workers.

DRAFT

**Treasurer Report:**

2011 Year End Analysis/2012 Budget

Reserve Account

| | |
|---|---|
| Beginning balance -12131/11 | |
| Collected from owners | $ 501,759 |
| Interest eamed (approx) | + 108,800 |
| CI Expenditures | + 3,000 |
| Reserve fund acct total 12131 | 165.391 |
| Bank acct balances (Reserve) | $ 445,468 |
| Owed from General to Reserve | -425.927 |
| | $ 19,541 |

Upon speaking with Jeanne Brennan this week, she recommended we transfer the $19,541from our general account to our Reserve account this week.

So, our yearend balance in our Reserve account will be $445,468 (+ or - interest actual)

2012 Budget

Suggestions

We have not budgeted anything for the completion of the 4-year electrical project. If Mr Havey is not yet scheduled to come down here, we should defer his trip to a more reasonable time

Before commencement of any approved CI projects, Exec committee/Board should be thoroughly briefed on scope and cost and terms of contract, if any.

DRAFT

Max asked if we had any unanticipated projects in the last quarter. Sharon reported the masonry project, specifically cistern repair and spalling replacement under buildings cost us 35,000 that we did not budget. Jon reported most of the expense was on spalling which had to be done.

Max requested the new budget be sent out to owners as soon as possible.
Jeanne Brennan is scheduled to meet with Sharon, February 3, to work on Financials.
Sharon asked how much Jon was budgeting to complete the electrical project. Jon said it will be 7-8K that will come out of Building Expense. He stated we were bringing Kent Harvey down after "season" is over.
Sharon requested that any Capital Project that comes up be brought to the Executive Committee or the Directors with bids if possible.

**Old Business**
**L-41**: The property is scheduled to close around the 18th of this month. We expect to get all arrears paid.

**Bylaw vote**: Max reviewed the votes 10 of 10 are for the changes. Bob suggested the Directors begin a campaign to contact owners to vote.

**Insurance:** Marilyn Blackhall will head up the insurance committee, effective immediately. Anyone interested in joining the committee should contact here. Max has asked the committee to craft what we want which is based on current appraisal, accepted risk- agreed value.
Vince requested the Association obtain a risk assessment.
Bob stated that" we comfortably have through February, if that's the time table we agree upon, to make a change." We will have a 10% cancellation penalty should we change the policy.
Max made the motion: It is the intent of the board to investigate retaining a risk assessor to determine what an accepted value of our insurance should be Sharon 2nd 4 voted for and 1 abstained. Motion passed.
Bob reported that Mapfre is now offering an HO6 policy.

**New Business**

**Dog Letter**: Max received a letter from Karen Benson who is the attorney for Barbara Walters. Barbara stated she was confirming her rights and that she is on the correct side of the law.

Vince made a motion that we abide by the rules and immediately begin fining owners that have dogs. Discussion included utilizing the firm of Hodge & Francois to develop a policy regarding our no dog policy and procedure for exemptions when warranted. Bob distributed information on Service Dog Certification naming businesses that have no requirements for service dog certification.

The motion was repeated that we abide by the rules and immediately begin fining owners that have dogs. Fines may be held in abeyance until the issue is adjudicated. The Vote was 3 for and 3 against. Bob and Vinnie requested we contact Bill for his vote on the motion. Bill was not available, a message was left for him to call.

DRAFT

Max made a motion that the association hire an attorney to appropriately respond to the letter we have received and assist us with determining our status with our no dog rule, Sharon 2nd, all were in favour.

Bill Canfield phoned in and was placed on speaker phone. Vince restated his rule: We strictly adhere to the no dog rule, and that all owners having dogs on the property be fined and the fines be held in abeyance. Sharon 2nd, 4 voted yes, 2 No, 1 Abstained, Bill left the meeting.

Bob made a motion that the fine be assessed at $50/day in abeyance. Sharon 2nd. 4 voted yes, 2 voted no.

Louanne was instructed to send letters by email and mail that informs the owners with dogs of the decision to begin fines tomorrow.

Max made a motion to begin fining owner s with dogs a $50/day fine to be held in abeyance. Sharon 2nd, the vote was taken with 4 yes and 2 no.

Vince suggested that a copy of the letter from Barbara Walters lawyer . be sent to our D & O insurance.

**Non-compliant Enclosed Porch:** Vinnie made a motion regarding Lance Talkington's enclosed back porch: Send a letter to Lance Talkington that he is in violation of the remodelling rules of the condominium association and that he needs to remove it immediately. Rosie 2nd, following discussion and review of records the vote was taken with 3 yes and 3 no, Bill Canfield was contacted by phone, the vote was taken again with 3 yes and 4 no.

During discussion the question was asked should the owner pay more in common fees due to the additional square footage for the unit by enclosing the porch. Max suggested we table the discussion for another meeting

**Additional Weight to Porches:** Max suggested we table until another meeting the addition of additional weight and storing of heavy equipment on porches. Barbara suggested that the owner be responsible for a structural engineer to determine if any additions or equipment can be stored safely.

**Volleyball Court:** The volleyball court appears to be on CBW property. Vince stated the Association should check with our agent of our liability insurance to determine if we are covered should someone get hurt. Should we not be covered, we should find out what the cost of a rider to the policy would cost.

At this time Vince left the meeting.

**Manager Report**

Monthly filter were changed January 3rd. The waste water and treatment plant are functioning well. Typically we exercise the generator on Thursday however, we ran the generator yesterday to decrease the cost of running the R/O plant.

Painting Steps: Jon has added an additional worker to complete the painting of the steps. He hopes to complete 50% this week and the remainder next week (weather permitting).

DRAFT

Security Gate: The electric gate malfunctioned. A WAPA outage shorted out the pedestal on the outside. The pedestal had a message "power down exchange chip. Jon powered down and powered back up. The pedestal stated erase all memory? Jon powered down again and called the vendor. The vendor was unaware of this message and would have to contact the manufacturer (who was closed for the weekend). The manufacturer was contacted, the service people came out reset the chip and cleared the memory. The memory was restored, and the gate is now functioning.

The manual gate is also broken. Jon recommended the existing manual gate be replaced. A drawing and price was obtained and shared with the Directors. Max stated that the pivot point of the existing gate is not salvageable and perhaps dangerous to use.
Sharon made a motion that we proceed with the new manual gate, Max 2nd, all were in favour.

The No Dog signs will be up next week. Cool Signs is producing them.

Owners Workshop: Sharon reported the workshop is cluttered with chairs, carpet, exercise machine, plastic chairs, glass tables, etc. so that the work table is not usable. The area is to be cleaned.

At this time Bob left the meeting.

Roadside Signage: The Directors suggested the knocked over base of the sign be up righted and reused if possible. The quote and the drawing of the sign from Mad Max was provided to the Directors. Max made a motion we have the sign made and reuse the base if possible, Sharon 2nd, all were in favor.

**Action Items** (not completed).
CBE Bylaws: We do not have a copy.
Electronic Banking: Max would like to delay decision until Owners Meeting. Sharon stated that there are many benefits to electronic banking that we don't have now and suggested we go forward with application. Max tabled the discussion until February's meeting.

February BOD Meeting: Tuesday, February 7th at 8:45am same phone in number

Adjournment:
There being no further business the meeting was adjourned.

3055300/000470

DRAFT

## ACTION ITEMS

| | |
|---|---|
| 2012 Budget be sent to Owners | Sharon |
| Attorney for Dog Rule | Max |
| Letter to Owners in Violation of No Dog Rule re:$50/day fine | Louanne |
| Copy of letter from Ms. Walters to D&O Insurance | Max |
| Increase Common Fees to owners that have enclosed porches | Tabled |
| Determination of Additional Weight on Porches | Tabled |
| Contact Liability Insurance re: coverage for Volleyball | Bob |
| Painting of steps | Jon |
| Purchase and implement new manual gate | Jon |
| No Dog Signage | Jon |
| Clean out owners workshop | Jon |
| Contact MadMax re: road side sign | Louanne |
| Reset base of road side sign | Jon |
| CBE Bylaws (obtain a copy) | Jon |
| Electronic Banking | Tabled |

**Cowpet Bay West**
**Board of Directors Meeting**
**February 7, 2012**

**Present**: Max Harcourt, Barbara Walters, Rosie Wells, Sharon Koehler, Bill Canfield, Jon Cassady, Louanne Schechter, Bob Cockayne attended by phone conference. Vince Verdiramo was absent. Jon was excused to attend to a meeting with representatives from Elysian, and CBE and CBR with a public surveyor and joined the meeting in progress. Also present were: Judi Kromenhoek, Doug Rebak and (by phone) Lance Talkington and Al Felice.

**Executive Session**: Max asked if there were any items to be discussed in Executive Session, there being no necessity, the meeting continued.

**Approval of Minutes of January 11, 2012**: Sharon requested in the December BOD minutes should read Anna Paiewonsky contributed language to make provision for LLC's throughout the bylaw document. In the January minutes, the last name of Barbara's Lawyer is incorrect. Also, omitted from this section is Max asking Barbara if she had registered any complaints and she acknowledged the HUD complaint. Max indicated that further discussion was halted pending the hiring of an attorney for the Association. In the second paragraph, the document Bob distributed was entitled "Service Dog Certification-Spotting Fake Certification's".

**Treasurer Report**: Sharon reported the bank balance at the end of January is a total of$ 445,760 in our reserve funds and $82,500 in our operating accounts. L-41 closed in the month of January resulting in full payment of fees in arrears ($21K).

Jeanne Brennan, CPA, met with Sharon, Max, Jon, and Louanne to review the financials. The budget was reviewed for accuracy and the cash and cash equivalents were reviewed. Jeanne made suggestions for adjustments to clarify the work on the beach, the payments from Elysian, and our capital improvement expense at the end of the year was $158,178. This year we have $114,000 budgeted for capital expenses. The gray water project from 2011 and the electrical project from 2011 will require funding to finish that is not in the 2012 Budget.

Sharon will change the signatories on the First Bank account following the election to allow for a member with 3 years to be on the account. She will also add checking to the account to allow for monthly deposits to the fund as well as withdrawals as the CPA has suggested.

**OLD BUSINESS**

**HUD complaint**: At the last meeting the board voted to retain an attorney. Max met with Marie Hodge and subsequently engaged her to handle the dog issue. Marie Hodge and our D&O Insurer were sent a copy of the HUD complaint. The Insurance Company has assigned an attorney to respond to the HUD complaint and Maria Hodge will be providing the opinion on the dog issue. The Executive Committee met with Maria Hodge via teleconference. The Executive Committee is not at liberty to discuss any more detail on advice of Ms. Hodge.

**L-41**: The unit sold and the arrears collected in full.

Jon returned to the meeting at this time.

**Insurance Committee:** Nothing to report at this time.

**Bylaw Vote Status:** Approximately 28 votes have been collected at this time.

**Annual Owners Meeting:** Max thanked the following people:

Rosie set up the catering for the meeting. Randy Driscoll will be catering for $300

Jon negotiated the meeting room for free.

Sharon and Sally have set up the Meet & Greet

Bill Canfield arranged for the use of the Yacht Club for the meet and greet for a minimal fee to be determined.

**Owner Package for Annual Owner Meeting:** Louanne stated she will have the material printed tomorrow, to include: Agenda-Insurance Summary-Cash Equivalents-Budget-Owner Issue Policy

Owners were sent an email to bring the proposed Bylaw changes with them to the meeting.

**Owner Issue Policy:** Max requested the Owner Issue Policy be included in the owner package. Jon requested the Directors verify the spalling example in policy. Jon explained that most interior spalling is caused from rebar, but the rebar is not a structural problem unless the rebar itself shows physical signs of distress. Jon obtained the opinion from Mr. Ferraris, the structural engineer that examined some of our exposed rebar. Mr. Ferraris said rebar "pops" in (mortar) plaster because of the property of the metal reacting to moisture causing rust and swelling which eventually will cause a crack or spalling, no different than drywall "pops". The rebar may need to be sanded and chemically treated to prevent further spalling to the finished surface, which is cosmetic. Owners have been responsible for cosmetic repairs and the Association is responsible for structural problems. Max stated in accordance to our Owner Issue Policy, The GM will inspect the problem, if the owner is not in agreement with the GM, then the owner would submit the complaint to the Board. The Directors will then make a decision on the matter.

**Annual Owner Agenda:** Max presented the proposed agenda.

Parliamentarian: Max requested Ed Wardwell be the parliamentarian to keep order during the meeting.

Roll Call: Louanne

Establishment of Quorum: Rosie

Proof of Notice: Louanne

Meeting Minutes: Rosie will be responsible for the reading of the minutes from last year.

President Report: Max

Insurance for 2012: Marilyn

Treasurer Report: Sharon (utilizing the amended 2011 budget)

Manager's Report: Jon

Nominations Committee Report: Committee has nothing to report.

Old Business: From Owner's 2011 Meeting

New Business:

Announcement of Election Results

3055300/000473

Max made a motion that the Agenda as revised be approved for the Annual Meeting. The motion was 2nd by Bob, all were in favour.

**Set-up for Annual Meeting:** Jon will obtain the key on Friday to set-up the meeting room.

**Walk-around:** The walk-around was conducted by the executive committee, the minutes were sent out to the Directors. The focus on the walk-around was to indentify long-term projects as well as inspect the general area.

**Fines:** Judi Kromenhoek requested more detail to the fine that she received on her statement. She would like to know what it was for and who enforced it. Louanne stated that in the statements sent through QuickBooks, item, quantity and cost are the only information provided; she spoke with Jeanne and confirmed that utilizing the invoice feature would allow for an explanation.
Barbara requested a timeline as to when the Attorney would make a determination on the Service Dog Issue. Max stated he was not at liberty to discuss the issue.

**Mailboxes:** Max had a request from Carolyn Wardwell to have the mailboxes replaced. During the walk around, it was noted the mailboxes were showing signs of rust. Louanne followed up on a lead from Carolyn from CA which was disregarded due to the prohibitive shipping cost. Max requested Jon follow-up with local merchants to see if they can be purchased or ordered on island.

**Employee Parking:** Rosie stated she had a complaint that employee's were parking in guest spots. Jon stated employee's park in available spots as they are available. Sharon suggested employees park alongside the dump truck. Max stated Jon will be responsible for employee parking.

**Illegally Parked Cars:** Sharon requested the parallel parking on Leeward that has 2 parking spots be striped where parking is illegal, signs be posted again, and Stickers be placed on windows of cars that are parked illegally.

**Security Guard Schedule:** Jon reported the sequences of the guard schedules in the past which has evolved to the current guard schedule being a roving guard on our property from 4-6p then at the Guard House from 6p-6a. The weekends are staffed with roving guards from 10am -6p then, from 6p to 6a at the Guard House.
Sharon asked what the events of the theft from L-22 were. Jon reported the facts as given by the owner to the police. The differences between this theft as opposed to the previous midday "crimes of opportunity" (unlocked doors) are:
L-22 was at night others were midday. Owner was in room adjacent to foyer, other; were on the seaside deck or not in the unit. The purse was taken and has not been found, others: cash was taken and the wallet/purse left behind.

Doug Rebak reported that he has installed devices that sound an alarm when the door is open or there is motion.

**Owner Renovation Request:** Max submitted a request to change his electrical panel to bring his power up to code and running a 220v line to his utility room. Max made a motion for approval of renovation, Barbara 2nd, all in favour.

Stickers on car: Sharon would like the security guards to apply stickers to cars parked illegally.

**L-01 Freezer on Porch:** Sharon reported her husband said there is no issue with the weight of the freezer. The owner is willing to make a cover for the freezer if it appears to be unsightly. Max stated that the white freezer is against the white shutters. Should a cover be made, it would be more visible.

**L-03:** Sharon stated L-03 sent a letter to Max that the addition to his unit was approved by the Directors. Max will forward a copy of this letter to the Directors. The Directors will have to decide if the owner will be responsible for increased charges to his common fees because he has increased his square footage. The Directors will also direct the green stripe to be applied.

**Manual Gate:** The gate is finished and will be delivered and installed this month.

**Security Gate:** No bids have been submitted by Kevin Cogan

**No Dog Signs:** Jon reported during a walk-around with Max, they noted CBE had attractive signs with their logo. He is working with Cool Signs to provide a similar design for CBW.

**Cowpet Road Sign:** The concrete needs to be rolled up and reset. The sign has been ordered by through Mad Max.

**Steps & Railing Painted:** Steps are completed up to L-08 with non-skid. Railings were not completed, on Windward they are being sanded down then repainted. Barbara reported that W-51 back of new stair was not painted.

**Step and Landing Repair:** We have replaced 3 with Chris Thompson at this time. Jon has asked several contractors for bids with the scope of work being: remove old brackets, through bolt and reinstall step. Contractors would like to do one before they commit to a price.
Sharon asked why we had purchased the angle iron and bolts for the entire property, Sharon stated that we were going to do partial order and only the steps that need repair were to be completed. The budget was for $20,000 for the entire project and we have already spent $14,000. Jon requested the Directors choose which stairs/landing be repaired. His understanding was we had $50,000 allotted for this capital project. The budget was reviewed and there is $50,000 on the budget for the stairs.

**Masonry:** Jon has not been able to find a contractor to commit to a fixed price to repair the spalling under the buildings.

**Tree wall damage repair:** The walls around the trees. Sharon stated that her husband, Bud, suggested take down the walls and replace with railing. The tree near L-26 is buckling the sidewalk and the road as well as the walls.

**Owner Workshop:** Jon is contacting the people that have items in that room to have them removed.

**CBE Bylaws:** Jon gave Max a copy of the CBE Bylaws.

**Surveyor:** A surveyor from public works has an "as-built" plan with no footings or markings and is attempting to find the property lines for Elysian, CBW, CBE, and CBR.

**Letter to Owners:** Max sent a letter to our neighbors that the volleyball net needed to b e removed from CBW property as our liability insurance does not cover athletic activities.

**W-47:** Jon reported the events leading to the fines that were charged to W-47. There were multiple phone calls leading to our maintenance men looking for a water leak. The manager stated there was a maid there to let him in the unit. There was no one to let him into the locked closet Thursday, Friday, Saturday (x2). The problem was in the locked owner closet. The owner was instructed on Friday to contact a plumber, that it was not an Association issue.

Sharon stated she would write a letter to the owner explaining the events. Louanne provided Sharon a copy of the plumber's bill that explains the problem is the owner's. Jon will provide Sharon with any other data on the events she may need.

**Manager Report:**

**Filter Changes:** Monthly filter changes were completed as scheduled

**DPNR:** There were 2 inspectors on property yesterday. One was the annual inspection of the WWTP, the RO plant, and the potable water systems for the EPA and DPNR. The other inspector was here to inspect our fuel storage and SPCC (Spill Prevention, Control, and Countermeasure Plan) plan, kit, and Terminal permit. Facilities that have fuel storage over a specified limit that if spilled could find its way to navigable waters require this Terminal permit. DPNR began enforcing this permit process January 2012. CBW has in place, a SPCC plan and spill kit, and applied for the permit December 2010 with the application and a check for $750. The inspector did not have the application on file. CBW will need to have formal training from the inspector for use of the oil diapers. Our Water Pollution Control, TPDES permit, Air Pollution Permit , and SPCC Plan and Terminal Facility Permit were all in compliance with no deficiencies.

**Other Action Items**

**Retain an attorney:** See HUD complaint above.

**Electronic Banking:** Louanne resubmitted to Directors. There was no discussion.

**Owners list with email addresses:** Completed and owners informed to request by email

**March Meeting:** The March meeting will be March 6th, at 0845am AST

**Meet & Greet:** Sharon stated the Meet & Greet is a social function and requested W-44, Judi not be permitted to provide any information regarding L-49 Doug to the event. Max agreed that it is a social event.

**Adjournment:** There being no further business, the meeting was adjourned.

3055300/000476

**Action Items**

| | |
|---|---|
| Update signatories on First Account and include checking | Sharon |
| Annual Owner Meeting Package to Print | Louanne |
| Set-up for Annual Meeting | Jon, Max |
| Invoices for fines | Louanne |
| Mailbox replacements | Jon |
| Striping of no parking areas, posting of signs | Jon |
| Letter to W-47 | Jon, Sharon |
| Letter from L-3 to Directors | Max |
| Increasing fees on units that have enclosed common area | Directors |
| Installation of manual gate | Jon |
| Bids on new automatic security gate/cameras | Jon |
| No Dog Signs | Jon |
| Cowpet Road Sign Base/sign | Jon/Louanne |
| Step & Rail Painting progress | Jon |
| Step & Landing Repair bids/progress | Jon |
| Owner Workshop clean-up | Jon |

**Cowpet Bay West**
**Board of Directors Meeting**
**March 6, 2012**

**Present:** Ed Wardwell, Bill Canfield, Rosie Wells, Sharon Koehler, Max Harcourt, Herb Horwitz, Doug Rebak, Jon Cassady, Louanne Schechter

Owners present: Al Felice and by phone Lance Talkington

Comments from the President: Ed asked the Directors to come prepared, be on time, and serve the best interest of all the owners at Cowpet Bay. He asked that Directors leave their personal bias at the door and treat each other with respect as elected individuals of the Association.

Sharon requested conference phone be activated for owner participation. No one knew the conference number. Louanne was to locate the number and activate the call.

Each Board Meeting will be an open Directors meeting for any owner to attend. There will be a closed Executive session following the Board meeting with Board members only. The purpose of this session is to discuss legal and fiduciary matters to be discussed and protect the privacy of all owners.

**Approval of Minutes of February 7, 2012 meeting**: Max stated he had sent correction to Louanne. The corrections from Max are: Also present were: Judi Kromenhoek, Doug Rebak and (by phone) Lance Talkington and Al Felice. Treasurer report last sentence add: ($21K), and Letter to Owners, change *owner* to neighbors. Motion to adopt as amended was made and 2nd. All were in favour, motion carried.

Sharon requested that Louanne send out the minutes, with amendments to all the Directors. Louanne replied she would send them out as soon as the Secretary had made the changes and forwarded them to her. The amended minutes are to be made available to the Directors by March 12, 2012.

**Treasurer's Report:** Sharon reported the current bank balance is approximately $13,000 in our general funds. We have not reimbursed our operating accounts for capital expenditures so far this year. Our First Bank Account has $445,900. We have approximately $11,000 in uncollected owner fees which our 60 days or over. This does not include the fines that are approximately $8,000.

Sharon continued that transfers of money have to be made. As discussed last month there is a concern regarding the FDIC and the amount it insures which is $250,000 per account. We could have 6 accounts each would be covered. The current interest rate is .05% Banco Popular interest is .02% and Fidelity is .021%. Her recommendation is we should open a second account at First Bank. The current account at First Bank has no checking account; a current signatory on the account must sign a withdrawal slip. There is a time lag between obtaining funds from First and moving them to our operating account at Banco.

Herb suggested using Navy Federal Credit Union that utilized electronic banking. Sharon said she would be interested in exploring that option

Ed asked what was involved to immediately get the new signatories on the First Account. Sharon stated we need to have a copy of the minutes of the Annual Meeting that shows the elected officers, the new signatories need to go in person to the bank with a driver's license and sign the signature cards.

The conference phone was activated at this time.

The conference phone dropped the call. The number was redialled

Ed asked when the Annual Meeting Minutes would be available. Max stated his comments had been sent. Ed asked Rosie when she would complete the changes by Max. Rosie asked Max to resend. Ed requested Rosie complete the Annual minutes by March 15.

Ed asked Bill and Sharon to meet him at the office at 2:00pm tomorrow. They will go to First Bank to make the changes on signatories which will be: Ed, Bill, Sharon, and Rosie. Ed is currently on the account.

**Employee Severance package:** Jeanne Brennan was unaware we had a severance package. Four employees, Steve, Arlington, Marcellus, and Joey have letters that state they are entitled to 4 weeks of vacation and they would receive 1 week of pay at current rate of pay for every year if they were let go, if they retired they would receive 1 week of pay, at current rate for every year after the third year of employment. Jeanne suggested we begin funding for it and include it in the budget as a line item of liability. The letter of engagement to Jeanne was revised as well as the financial statement to include this item.

Budget vs. Actual: Sharon stated we have used 44% of our current capital improvement fund and we have 56% of our funds to last us through the remainder of the year. She cited the purchase of the hardware for the stairs at $14,000 and the continuation of the masonry projects as the items utilizing most of the capital funds.

Doug asked when funds are expended what is the protocol. Sharon stated the Property Manager reviews the checks and signs the weekly report. The Treasurer then signs off the checks. She stated when she was Treasurer 3 years ago checks were not released until the Treasurer signed the form except for certain circumstances. Ed tabled the discussion at this time.

**Managers Report**

Systems: The gray and fresh water distribution system filters were changed today. They are changed every month on the first Tuesday of the month approximately 10 am. All the rest of our infrastructure systems: the RO, WWTP, GenSet, Fresh and Gray water Distribution systems have no problems to report since last Board Meeting.

Action Items from last meeting:

- Striping and Parking sign along the Leeward wall were reinstalled

**Insurance Committee Report:** Doug reported that he along with Bob Cockayne and Herb Horwitz have selected 7 brokers to go out with a request for proposals with our bid specifications being made to them. Our objective is to pick ones that are reputable ones that understand that we are trying to reduce our insurance cost and also get it to the first quarter of the year being March 29th for our renewal date. We told them we would like to reduce our cost and we are prepared to increase our risk. We have sent to Tunick, Executive Insurance, Marshall and Sterling, Topa, Guardian, Specialty Brokers (Mapfre) and Red Hook Agency. Six have expressed an interest. The Specifications we sent out included a total property agreed value of $25,916,000, no co-insurance, replacement cost insurance, bid on a windstorm sublimit of both 1 and 2 million dollars with a 3% deductable by building. Earthquake and sublimit of 12.5 Million, with a 5% deductable on earthquake which is standard in the VI, Flood sublimit 3 Million with a deductable of $ 10,000, all other perils 12.5Million with a sublimit deductable of $250. The target date for vendors to return proposals is March 15.
The date is critical in the sense that Insurance carriers have more available capacity before hurricane season so obtaining a policy in the first quarter may save some expense.
Doug stated they only asked for 1M & 2M with the thought process that during Marilyn, CBW took a full frontal hit and sustained a $3,700,000 bill. Of that $700,000 went to the adjuster, 1M was for the brand new doors, 1M was for shutters, and $300,000 went to the seawall, leaving $700,000.
Herb said he did several scenarios with none of them going over our reserve fund.

Doug mentioned that improvements and betterments were covered in the Mapfre policy. This coverage lowers the cost of a HO6 policy.

Doug stated the strap downs, the tie downs, the shutters, and the hurricane rated doors are all improvements allowing us to take more risk.

Ed recessed the Directors Meeting at 9:45.

The Directors meeting reconvened at 11:00 with Louanne and Jon present.

**Owner Inquiry Policy:** Ed stated it is self explanatory and his intention is to recall the owners attention to the policy that there is a procedure and the staff is prepared to respond in accordance to the policy.

Sharon stated that when letters are sent to the Board, there is no Director that is responsible for responding. Ed stated he would be responsible for responding to each and every letter that requires a response. Ed will bring the letters to the Directors that are in conflict with the manager's decision. Max stated Sharon had developed a form. Sharon stated the owner should sign off on the form. Ed requested Sharon supply him with the form.

**By-Law Amendments:** Ed stated we did get approval for over 2/3rds to adopt the amendments. Some owners have replied to Ed regarding the legal status of the By-Laws. Following discussion, the Board decided to go forward with the will of the majority of the owners. Max made a motion that Maria Hodge have the By-Laws registered with the condition that another retainer is not requested. The motion was 2nd, all were in favour. Max will contact Ms. Hodge. Ed provided Max with a letter from Ms. Paiewonsky that outlines her legal opinion on the By-Laws.

**Invoices for fines:** Fines were removed from the statement and transferred to an invoice. The invoice allows for description of fines, the statement does not.

**Mailboxes**: The budget does not allow for new mailboxes. Jon will have maintenance reshingle the roofs over the mailboxes and repaint. To be done by next Board meeting.

**W-47**: Ed will respond to their reply.

**L-03**: Max forwarded the letter to Board members regarding the enclosure. The Directors agree this is not an issue

**Increasing fees when owners enclose common areas:** The Directors decided this is not an issue.

**Owner Workshop**: Jon will have treadmill removed.

**New Business**

**Staff Parking:** Sharon stated with her company and other 2 car families in her area there is not enough guest parking. She suggests Employees Park next to the dump truck. She suggested the pick-up be parked in front of the maintenance shop.
Max suggested we have diagonal parking spaces due to the difficulty of backing out.
Sharon wanted to know when her area would be pressure washed: Jon stated is was done recently
Doug asked if the parking lot was going to be striped: Jon said the numhers would be done over the next week.

**L-3 Water Leak:** Herb Horwitz had water leaking in his unit. The source of the leak was from a pipe in the wall that had been modified by L-3 to accommodate a water line to his icemaker. Jon informed L-3 the damage was his responsibility as the leak was on the unit side of the modified valve. The invoice for the plumber was sent to the owner. The owner refutes the issue. Herb Horwitz took pictures of the alterations to the original water line and distributed them to the Directors. Following discussion, the Directors agreed it is the responsibility of the owner. Ed will contact the owner.

**L-01** Needs the wall patched and painted.

**L-06** Needs a wall patch from the water leak repair done 2 weeks ago.

Herb asked for clarification regarding rebar "pops". Subject was tabled.

**Automatic Gate**: Approximately 3:30am this morning, a renter at CBW rammed the gate and damaged both hydraulic arms and bent the gate. The renter has given Jon his information and accepted responsibility for the accident. The police will be contacted to complete a report.

**Employee shirts:** Rosie said the staff requested new shirts. Rosie made a motion to purchase new employee shirts; the motion was 2nd all were in favour. Louanne will order them.

- The letter for W-47 was completed by Sharon and sent to owner. Jon gave his original notes to Sharon for documentation purposes. Sharon stated W-47 had sent a letter last night refuting the facts sent by Sharon.
- Installation of the Manual Gate is not complete, the pad is completed and the support in place, two brackets ordered from the states have not arrived and the vendor has placed a second order. The gates are on property and the installation will be completed once the brackets arrive. Ed asked for a completion date, Jon stated 3/15/12
- Bids on security cameras. Kevin Cogan, of First Alert, sent bid. He suggested put a remote video recorder in the workshop which will hold up to 4 cameras and if we also want the yacht club area monitored, place another video recorder in the last break room in the end. Ed instructed Jon to forward a copy of the bid to Bill. Bill will have the security committee review and report back to the Directors. Doug suggested that any placement of video recorders should be a secure area.
- No Dog Signs are completed and placed. Sharon said the placement is too far back on the lawn. She would like them placed on the property line of the grass area and add more. Sharon stated at least 4 were necessary along the property line. To be completed by 3/9/12
- Road Sign not complete the base was not budging. Doug suggested leaving it as a safety barrier. Put a new base in front of the old and install the sign.
- Steps & Rail Paint: Steps painting is complete with the exception of 2 on Leeward, 28 and 30, due to renters. Will be completed this week. The rails are just now beginning. Step repair: we have had one contractor do several of them to come up with a firm bid and his price is $225 to remove the old brackets, prime, and drill through and install. He is asking for $100/hr for any additional work. Doug stated the contractor's work, in his opinion, look terrible. He is also concerned the brackets are shorter.
- Owner workshop: Scooter has been removed, the carpet is removed. A treadmill is there. Sharon wants everything removed other than the inventory. Sharon stated the owners' closet also has a scooter and kayak in it.
- L-6, L-10, W-26 Jon is looking for drip edge that will span the difference between the gutter and the roof. The roofs that were replaced in Marilyn were not lined up with the appropriate overhang. The seamless gutter doesn't meet. Jon is looking for drip edge to repair the problem. He has asked Chris Thompson's assistance in obtaining the material.
- L-1 Had a water leak, while chipping the wall away, we found the source of the leak was a modification that L-3 had done to the plumbing.
- W-7 Crack repair. Charleson Burton has completed the Association's responsibility below the window.

**Chairperson Appointments:**

**Committee's** The five standing committees and their respective chairpersons are:

- Nominating – Doug Rebak
- Landscape – Judi Kromenhoek
- Insurance – Doug Rebak
- Security – Bill Canfield
- Property and Planning – Max Harcourt

Ed intends to, in his letter to owners today, identity chairpersons and contact information for any owner interested in serving on these committees

**W-12**: The owner has had problems with condensation on his floor over the last 3 years and submitted multiple requests for the Association to assist in the repairs. The owner was informed on each occasion that this problem is between owners and he should contact the owners of W-11. Ed will inform the owner of W-12 this is not an Association issue.

**W-27**: The owner lost power to the unit and requested the Association investigate. The main breaker was tripped and reset. Jon suggested the owner have his electrical panel checked as the breakers inside shut have tripped first. The owner was charged a service call and now refutes the bill. Ed stated the responsibility was that of the owner. Ed will speak with the owner. The Directors decided to remove the charge.

**L-06**: Sharon stated the cats are now a non-issue. And the other issues were resolved during the meeting.

**Letter to GE**: Bill would like a letter sent to GE regarding their proposals on RO and Waste Water. Bill will draft a letter and Ed will send it.

**Solar Energy**: Herb suggested we follow-up on solar energy. Max stated there is a new company on island that leases a system to offsets the cost. Max will obtain information and incorporate into the long-term planning committee.

**April Meeting**: Wednesday April 11, 2012 at 7:45am. The call in number will be 712-775-7000 the code is 106376

**Action Items**

| | |
|---|---|
| Amend February Minutes by 3/12/12 | Rosie |
| Resend Amended Minutes to Board Members | Louanne |
| Change Signatories on First Bank Account | Sharon, Ed, Bill, Rosie |
| Open additional accounts to maintain FDIC coverage | Sharon |
| Transfer of funds from First Bank to operating account | Sharon |
| Organizational Minutes | Max |
| Annual Minutes with Amendments completed by 3/15 | Rosie |
| Provide protocol for release of funds | Sharon |
| Add employee severance to budget as a liability line item | Sharon |
| Installation of Manual Gate completion date 3/15/12 | Jon |
| Security Committee Review of Bid from Alert 1 | Bill |
| Adjust placement of NO DOG signs and add 2 by 3/9/12 | Sharon |
| Rails painted –starting this week | Jon |
| New Base on roadside sign | Jon |
| Step & Bracket Replacement; evaluate recent work | Jon |
| Owner Workshop | Jon |
| Drip Edge on L-6, L-10, W-26, | Jon |
| Contact Chuck Waggoner re: By-Laws | Ed |
| Contact Maria Hodge re: By-Laws | Ed |
| Mailboxes: Replace shingles and paint by next Board meeting | Jon |
| Assign employee parking | Jon |
| Repaint numbers on parking spaces next week | Jon |
| L-3 re: Discuss owner responsibility | Ed |
| L-01 Patch and Paint area used to repair water leak | Jon |
| L-06 Patch and Paint area used to repair water leak | Jon |
| Entry Gate: obtain police report/begin repairs | Jon |
| Employee Shirts | Louanne |
| W-12 Condensation issue | Ed |
| W-27 Suggest electrical inspection | Ed |
| Letter to GE | Bill |
| Solar Energy Company research | Max |

**Cowpet Bay West**
**Board of Directors Meeting**
**April 11, 2012**

**Present:** Ed Wardwell, Rosie Wells, Bill Canfield, Sharon Koehler, Herb Horwitz, Doug Rebak (by phone conference), Jon Cassady, Louanne Schechter
Owner's in attendance: Judi Kromenhoek and by phone Lance Talkington

Approval of Minutes of March 6, 2012: There being no objections to the minutes, a motion was made to approve the March 6, 2012 minutes as recorded. All were in favor.

**Treasurer's Report:** Sharon's report is as follows:
Bank balances – March 31, 2012
General and Special $ 87,000*
Reserve $397,335
*Owed to Reserve $38,355
**Owed to General $11,550
Outstanding accounts and fines
Due 3/31/12 (no dog fines) $ 28,171*
Dog fines billed, unpaid $ 4,900
*Gate fine included $5788
Review of QBB-1st Quarter 2012
Gray water/Pot. Water $7,500 over
Building Repairs $6,000 over
Security $8,000 over
Legal fees $8,000 over
Masonry $3,000 over ANNUAL
Stairs & rails $7,000 over

Funding Insurance Policy
We collect $23,700 in insurance income every month from our owners. Our April 1 payment for our new policy was covered by our return premium. We have a May and June payment due of $ 86,122(each); a total due of $172,244.
Ideally we will have our April. May and June collections($71,100) to put toward part of the remaining premium due.
As discussed at our special insurance meeting, it is the board's plan to borrow, in the form of a loan to be repaid, the funds necessary to pay the remainder of our principal from our Reserve account. There will need to be a Board resolution to accomplish this transaction.

**Manager's Report:**
Systems: The gray and fresh water distribution systems filters were changed on the first Tuesday of the month.
Doug asked why the gray water last month became dark and dirty. Jon was not aware there was a problem. Sharon stated that the gray water in her unit is getting progressively worse. Doug suggested the intensive rain storm may have affected the gray water. Jon stated the cistern is covered and rain should not affect the cistern. Following discussion, apparently Leeward gray water has more sediment than Windward. Jon will investigate the problem.

Bill stated he spoke with GE Representatives regarding a new RO system. GE would like to come out next week and assess the property. The representative has indicated there would be considerable savings to CBW. GE would provide the system, as well as the monitoring and maintenance. CBW would pay for the water usage. GE would also be interested in replacing the water meters.

Jon stated that all systems were operating efficiently.

Responding to the quarterly report of "overages", Jon noted that his expenses , if averaged over the entire year, would be within the limits of the budget.

There was one issue with a raw sewage lift pump located by the yacht club last month, leaving only one pump operating to push uphill to the WWTP. The pump had to be pulled up from the raw sewage pit to be inspected. The impeller was jammed by a large piece of concrete that was in the pit. The concrete was removed and the impeller spun backwards and restarted. To prevent further jamming, the pit was drained, power washed, the gray water cistern was cleaned. There was a considerable amount of grease in the sludge that was removed. There was no obvious explanation for the grease.

Building Repairs: Predominantly we are repairing water leaks. We have had several this quarter. There is no preventative measure.

Security: The dollar amount in the budget is due to increasing the hours of the guards. The owners requested and the Directors approved increasing hours for guards on weekends and from 4p-6p. Bill said he spoke with the head of security, Dean. Dean suggested the guard walk 20 minutes, then return to the guard house 20 minutes, rather than only monitor the gate. Bill also suggested the golf cart be utilized by the guards to monitor the property.
Jon and Bill will meet with Dean and revise our current plan.

Additional cameras were discussed with Alert 1. Bill believes the expense of cameras is not cost effective. He stated a 6 by law a 60% head shot is required.

Masonry: We have completed the cistern repair, sealing and clean-out and began some of the crawl space spalling projects as the budget permitted. The annual masonry budget is exhausted and the project is on hold until the next budget year. Jon estimates that 25% of the spalling repairs were completed.

Stairs and Rails: The project is on hold. The upfront cost of $14,000 was materials. Jon has estimates of $250/stair. At this cost, the project would be on target for the annual budget.

**Insurance Committee Report:** Mapfre representatives visited CBW and brought the policy. The owners received a copy of the comfort letter. Owners are being offered a 25% discount for HO6 policies.

**Property and Planning Report**: Max held a meeting on solar energy. The minutes are as follows:

*Purpose of this meeting: The purpose of this meeting was to examine some possible options for using solar energy to offset our WAPA electrical bills.*

*Mr. Rosen was invited to tell us about his company and how they might fit into our long-term planning for the use of solar energy to ease our WAPA bills. Prosolar is grid-tied photovoltaic (PV) system*

*accommodation of a non-obvious handicap the Board may require (1) the submission of documentation verifying that the person meets the Federal Fair Housing Act's definition of disability; and (2) documentation from a doctor or other medical professional who is in a position to know about the individual's disability, and that the requested accommodation is related to the individual's disability. All information submitted to the Board that is necessary for the evaluation of the reasonableness of an accommodation will be kept confidential.*

By changing this paragraph the By Laws will bring the Association into Federal compliance. Herb and Bill volunteered to assist Ed in contacting the owners and obtaining the 2/3 necessary vote.

**Action Items:**

| | | |
|---|---|---|
| Amend February Minutes by 3/12/12 | Rosie | Done |
| Resend Amended Minutes to Board Members | Louanne | Done |
| Change Signatories on First Bank Account | Sharon, Ed, Bill, Rosie | Done |
| Open additional accounts to maintain FDIC coverage | Sharon | Will open checking account |
| Transfer of funds from First Bank to operating account | Sharon | Hold |
| Organizational Minutes | Max | Done |
| Annual Minutes with Amendments completed by 3/15 | Rosie | Done |
| Provide protocol for release of funds | Sharon | Satisfied with current procedure |
| Add employee severance to budget as a liability line item | Sharon | Done |
| Installation of Manual Gate completion date 3/15/12 | Jon | Done |
| Security Committee Review of Bid from Alert 1 | Bill | Done |
| Adjust placement of NO DOG signs and add 2 by 3/9/12 | Sharon | Done |
| Rails painted –starting this week | Jon | Metal done wood rails in progress |
| New Base on roadside sign | Jon | Replace sign |
| Step & Bracket Replacement; evaluate recent work | Jon | On-hold |
| Owner Workshop | Jon | Done |
| Drip Edge on L-6, L-10, W-26, | Jon | Material on island |
| Contact Chuck Waggoner re: By-Laws | Ed | Done |
| Contact Maria Hodge re: By-Laws | Ed | Done |
| Mailboxes: Replace shingles and paint by next Board meeting | Jon | Done |
| Assign employee parking | Jon | Done |
| Repaint numbers on parking spaces next week<br>Directors don't like color want redone with teal paint | Jon | 75% Done |
| L-3 re: Discuss owner responsibility | Ed | Done |
| L-01 Patch and Paint area used to repair water leak | Jon | Done |
| L-06 Patch and Paint area used to repair water leak | Jon | Done |
| Entry Gate: obtain police report/begin repairs | Jon | Police Report not available. |
| Employee Shirts | Louanne | Done |
| W-12 Condensation issue | Ed | Done |
| W-27 Suggest electrical inspection | Ed | Done |
| Letter to GE | Bill | Done |
| Solar Energy Company research | Max | Done |

3055300/000487

New Business

W-35 Repaint the edge of the porch following the tile Installation.
W-07 Ed spoke with the owners last week. The issue is between the owner and the contractor.
L-50 Doug request his roof be painted as the patching of leaks has left it unsightly. Ed said he will discuss in Executive session.

Renewal of other Insurance Policies: Doug will follow up with the General Liability, D & O, and Vehicle Insurance policies.

May Board Meeting Schedule: May 8, 2012 at 8:45 AST.

Adjournment: There being no further business the meeting is adjourned. There will be an Executive Meeting in 10 minutes.

**Action Items**

| | |
|---|---|
| Sediment in gray water | Jon |
| Checking Account | Sharon, Ed |
| Meeting with GE Representative | Jon, Bill |
| Meeting with Dean from No-Nonsense Security | Jon, Bill |
| Contact Owners to amend no dog policy | Ed, Bill, Herb |
| Replace sign on roadside (remove distance) and lower | Jon, Louanne |
| Repair fascia with drip Edge | Jon |
| Repaint parking numbers with teal | Jon |
| Obtain police report | Jon |
| Insurance Renewal policies-forward to Doug | Louanne |

*compony that began in Florida and started in St Thomas last year. They have installed 5 systems on St. Thomas, and gave us the names for reference. They have established an excellent working relationship with DPNR and WAPA, and have had no permitting problems.*

*Max made sure everyone knew this was an exploratory conversation, and CBW is just beginning to look at PV system possibilities.*

*In preparation for the meeting Max had called Michael Bornn at Montessori to discuss their system choice and vetting process (at Anna's suggestion). He also met early with Peter, and they walked the property to examine such things as roof structure and orientation and electrical disconnects.*

*Peter explained that WAPA allows only 100 KW PV systems per each meter. The VI Energy Office is out of rebate money and the federal 30% rebate is not available to non-profit organizations like condo associations.*

*To buy a 100KW PV system, which would cover about 8000 square feet of roof area, would cost about $400K-450K installed. A more feasible approach may be to lease the system from Prosolar, and they would provide a guaranteed amount of power. Such a system would cost Zero down, and be financed for 7 to 12 years at an agreed interest rate (perhaps 6%). The amount financed would be about $375K since the contractor/installer could take advantage of the federal rebate. Much of this would be very negotiable.*

*The expected power produced would be worth about $6K per month at current rates, and the loan payments would be about $3k per month. This would provide an estimated savings on our WAPA bill of $3K per month.*

*We then spent some time with Jon discussing roof mount attachments, and how a PV system would tie in to our electrical system.*

Max asked the Directors if there was an interest in following up on solar energy. The Directors support the concept of solar energy to defray the increasing cost of WAPA as a long term (2-3 years) project.

Max will be having a telephone call-in conference for his committee in May.

**Security Committee Report**: Bill stated he has one owner interested in the committee. Bill stated he has spoke with the head of our security and agrees the guards should be roving the property rather than guarding the electric gate.

**Registration of By Laws**: Ed stated he has obtained the opinion from our legal counsel that we hold in abeyance registration of the By Laws until the Association obtain approval from the owners (2/3 of owners) to change the no dog wording to the paragraph that the attorney has recommended:

*No dogs are allowed on the property, either long term or visiting. Owners or occupants who have properly documented and verified disability as defined by Federal Law may make a request for a reasonable accommodation and exception to the prohibition on dogs on the property. An owner or occupant seeking an accommodation can do so in writing to the Board. The request shall include (1) identification of the Owner or occupant seeking the accommodation; (2) explanation of the relationship between the requested accommodation and the disability; and (3) verification of the disability and need for accommodation as set forth in this rule. To facilitate the Board's review of each request for an*

DRAFT

**Cowpet Bay West**
**Board of Directors Meeting**
**June 12, 2012**

**Present:** Ed Wardwell, Herb Horwitz, Bill Canfield, Jon Cassady, Holly Case,
Phone Conference: Max Harcourt, Doug Rebak, Sharon Koehler, Rosie Wells

**Approval of Minutes:**

Approval of Minutes of May 8, 2012: There being no objections to the minutes, a motion was made to approve the May B, 2012 minutes as recorded. All were In favor.

Appreciation to Jon for his hard work over Memorial Day weekend.

**Manager's Report:**

Completion of the scheduled filter changes to our gray and freshwater system was completed June 5th at 10:00am. All other operational systems: the Reverse Osmosis (R/O) Plant, waste water treatment plant, generator Gen Set as well as both distribution systems are all operating well.

Continuing progress on the step and rail painting. The entire complex is approximately 60 percent complete. Windward is almost finished. Leeward 1 through 44 area is what needs to be completed.

Completed the Gray water transfer lines in the Leeward field. It has been operational for over a week. Capped old gray water pipes on each end in case they are needed at a later time.

Continuing to replace exterior lights, an additional 44 sets were ordered.

Owners Request:
Completed the ledge repairs at owners' request for L-46 and L-50. Complete removal of the ledge replacing it with a fiber glass cap with a top coat wax compound to water proof.

**Treasurer Report:**
Report submitted by Sharon:
Bank balances – June 12, 2012

| | |
|---|---|
| General & Special | $ 51,000 |
| Reserve | $ 283,181 |

Banking information :
Due to not receiving end of the month back-up of QuickBooks, unable to report everything. There are some discrepancies but will be resolved once required information is received.

All of the 2012 insurance premiums are paid in full. Total amount paid $307,057.00.

DRAFT

Ed stated that Julie the accountant will be working with Holly to do the required tax payments due on the 15th of the month and will come in again for the end of the quarter tax payments and to close the books and make sure everything is in accordance.

Louanne will be compensated to the end of the June for extra time and unused vacation time.

Sharon will provide an analysis of our six-month operating expenses to the Board at the August 7th Directors Meeting.

Arrears:
1 owner is 3 months in arrears, the remaining 7 are 1 month.

Resolution to Amend Banco Popular Checking Accounts Signatories:
**Association Resolution to remove Louanne Schechter and append Holly Case to the Operating (General) Accounts Signatories**

***Resolution of the Board of Directors of Cowpet Bay West Association ("CBW")***

*WHEREAS, CBW is a Condominium Association orgonized ond existing under the lows of the Territory of the U.S. Virgin Islonds; and*

*WHEREAS, the members desire thot the Associotion sholl act in full occordonce with the rulings ond regulations of the Internal Revenue Service, os odministered by the Virgin Islonds Bureau of Internol Revenue;*

*NOW, THEREFORE, the members hereby adopt , on behalf of the Association, the following resolution*

*RESOLVED, thot the Banco Popular general operating checking occounts (generol & special) signatories be amended ond only Ed Wordwell, Bill Canfield, Rosie Wells, Jon Cossady, Shoron Koehler ond Holly Case to be outhorized signotories .*

*This resolution is adopted and mode a port of the minutes of the meeting of the Boord of Directors on June 12. 2012.*

*BY:________________________________ Ed Wardwell, President*

*ATTESTED:____________________________ Rosie Wells, Secretary*

Sharon made a motion that the Resolution be accepted, Bill 2nd , motion passed.

Sharon stated that she has an objection that the second signature on the special account should be a Board member. She also stated that it was allowed on previous boards but she thought that the original rule was the second signature on the check must be a board member and only with approval from the Treasurer signing the Weekly Report.

**Insurance Committee:** D&O, General Liability, Umbrella and Property are paid. Vehicle Insurance is due in July.

DRAFT

**Planning & Property:** Max Harcourt, Chairman of the Property and Planning Committee, sent out Meeting Minutes from the May 23rd to the Board members. He also submitted a comprehensive report on the current status and projected upgrades for the property. Major future projects including roof sealing/painting, structure maintenance and electrical system upgrades will be addressed in the 2013 budget.

**Solar Sub-Committee:** Max is currently putting a sub-committee together for a Solar System and has received volunteers but no one has come forward to chair the committee. Concerns are the initial cost for the purchase of the system and securing a dependable contractor that will be able to service it for a extended period of time.

- Bill presented the option of contractor/owner/lease program.
- Max stated that the Government puts out incredible incentives to develop Solar Systems. Ed stated at one time they were refunding up to 30% of the cost but not for non-profit organizations at this time.
- Doug stated the possibility of using our reserve fund as collateral to borrow funds to complete sizeable costly projects like Solar System, R/O System, and replacing exterior wood with synthetic material.

The next action item will be the committee drafting up an RFP before the next meeting.

**General Electric Meeting:** Bill stated the meeting with GE went well. GE inspected the 35 year old osmosis machine. A fact brought to attention by GE is that we are using our R/O equipment very little. We collect enough water to handle most usage. Jon also uses the R/O equipment when the generator is on which has little to no cost.

GE's proposal is they will build a plant and sell the water back to CBW. At this time our reverse osmosis usage is not large enough to warrant the proposal. GE will produce a statistic report.

**Water to Yacht Club:** Bill proposed the possibility of selling water to the Yacht Club. They are currently buying water from Anchorage that just increased by 20%. Currently we can store 500,000 gallons of water and average use is 150,000 gallons per month which would allow enough for the Yacht Club. Bill and Jon will look into the logistics of connecting the water supply to the Yacht Club and report to the Board.

**Action Items**

- Notarize & Record Bylaws: Completed
- Arrange Meeting with Security: Completed - Owner car was stolen from the property, security company responded quickly to review the tapes - the guard on duty at the time was released
- Daily Water Usage Data to Bill Canfield: Completed
- Letter to Insurance Carrier re: gate expense: Insurance Co. needs a copy of the back of the insurance check received for the gate damage
- Teleconference Planning & Property: Completed
- Office Manager Replacement: Completed - Holly Case introduced herself
- Roadside Sign: Deciding on final layout and color for the sign
- Gray Water Upgrade connect terminal ends: Completed

DRAFT

**New Business**

L-42 Bob Cockayne sent an email in May to Board formally requesting "the exterior roof of L-42 be power washed, repaired, sealed and painted before peak hurricane season - within the next 3 months by the association." Bob stated that "he would like to know if the Board does not agree with the request he wants a recommendation on who can do it and will pay for it himself."

- Ed stated after looking at the condition of the roof and speaking with Jon, sealing the roof is a proper topic for the 2013 Budget. Concern is the singular request from Bob wanting his roof done at present time.
- The roof was last done in 2008 (typically has a 5-8 year life span), CBW generally does it every 5 years.
- There is no evidence of cracks or leaks at the present time with L-42 roof.
- Estimate to paint the roofs is approximately $75,000, $1,500 per unit.

Board suggested that if he wants to do the repairs himself they would suggest someone that can do it for him, otherwise it will be addressed in the 2013 Budget. Herb volunteered to discuss the decision with Bob and to make sure there are no other concerns.

On June 6, 2012 the Association was notified by letter from the US Department of Housing and Urban Development (HUD) that "HUD has completed its administrative proceeding of this complaint (Barbara Walters vs. Cowpet Bay West Association) under the Act (Fair Housing Act of 1968) and the compliant is hereby dismissed."

- Complaint failed to request for a accommodation, produce evidence, etc.
- Association has complied with the regulations for emotional handicapped individuals.
- Letter was forwarded to Attorney Joe Riopelle; he feels with the HUD dismissal of the Walters complaint that we can expect the Kromenhoek complaint to be dismissed as well. It still leaves the two civil complaints open and he is required by law to respond to both by June 21st.
- Herb suggested letting the owners know the outcome of the complaint. Ed will put an email out to the owners recapping the Board meeting and letting them know HUD's decision.

August Meeting: The next meeting of the Board of Directors will be August 7, 2012. B:45AM AST

Meeting was adjourned.

**ACTION ITEMS**

| | |
|---|---|
| Letter to Insurance Carrier re: gate expense | Herb/Holly |
| Road Sign | Jon |
| RFP for Solar System | Max |
| Supplying water to the Yacht Club | Bill & Jon |
| GE Report | Bill |
| L-42 Roof Painting | Herb |
| Email to Owners re: HUD Decision | Ed |
| Analysis of six-month of Operating Accounts | Sharon/Holly |
| Signatories changed on Banco Popular Accounts | Holly |

Judith A. Kromenhoek

6200 Windward Way #44

St. Thomas, USVI 00802

June 22, 2012 RE: Inquiry No. 336193, HUD Case 02120337B

Mr. Jay Golden

U.S. Department of Housing & Urban Development

New York State Office

Jacob K Javits Federal Building

26 Federal Plaza

New York, New York 10278-0068

Dear Mr. Golden,

I was very disturbed by your letter dated June 15, 2012 **dismissing** my complaint. I have filed a civil lawsuit and your dismissal makes Cowpet Bay West look like they have done nothing wrong. In the words of a Board member, the other members were gloating over your dismissal.

I have been harassed for over a year. July of 2011 my papers were filed in the office. At this time, there was nothing in our by-laws that said a formal request must be made to the Board. These by-laws have been changed in March, 2012 to now include this (after the HUD complaint). They were changed on the advice of their attorney; they were told they must change them to comply with HUD and the ADA.

The reason I did not make a formal request (it was not required by our by-laws at the time) to the Board was because the then President of the Board, Max Harcourt would leak all of this information to a Lance Talkington and he would then post it on his blog. The blog, although not official was named the Cowpet Bay West Blog so the owners thought everything written on it was the truth.

The Board charged me a $50 a day fine for having my dog, they put up signs all over the property and blasted e mails to CBW owners – all negative toward me. If this is not harassment then what is?

The new Board took office February, 2012 and the new President, Ed Wardwell has tried very hard to rectify the situation. He gave written permission to allow the dog in April, 2012 and he has lifted all the fines. The signs are still up.

Many of my neighbors still do not talk to me; they cannot see my disability so they believe all the nasty e mails.

**Retaliation is a violation of the Fair Housing Act**. All the fines, signs, e mails – I believe this is retaliation.

I do believe my complaint to HUD is the only reason the CBW Board decided to seek legal advice and therefore comply with the law. Up to that point, Mr. Harcourt said "we do not go by federal laws, we go by Cowpet laws". I know that my dog is now legal and I am not asking you to fine Cowpet Bay West but just re-word the outcome. **Dismissal** makes it sound like I have no credibility.

Thank you for taking the time to review this matter. I can be reached on my cell phone at 340-677-3267.

Sincerely,

Judith A. Kromenhoek

cc: Ms. Irma Perez-Pillot

DRAFT

**Cowpet Bay West**
**Board of Directors Meeting**
**August 7, 2012**

**Present:** Ed Wardwell, Herb Horwitz, Bill Canfield, Max Harcourt, Holly Case
Phone Conference: Doug Rebak, Sharon Koehler, Rosie Wells

**Approval of Minutes:**

Approval of Minutes of June 12, 2012: Sharon requested that the Treasurer report remove "All of the 2012 insurance premiums are paid in full". At the time vehicle insurance had not been paid.

Motion to adopt as amended was made and 2nd. All were in favor, motion carried.

**Manager's Report:**

Continuing progress on the step and rail painting. The entire complex is approximately 60 percent complete.

Continuing to replace exterior lights, still waiting on the additional 44 sets that were ordered.

Poly Caribe installed new couplings in the waste water transfer piping from Windward Way to the settling basin. The entire piping run is corroded and should be replaced after hurricane season.

Staff is painting the curbs and numbers on parking spots.

Emergency repairs were completed on the seaside balconies of several units. All the railings have been inspected and any that could have resulted in a potential problem were fixed.

**Treasurer Report:**

Bank balances – August 3, 2012

| | |
|---|---|
| General & Special | $ 36,025 |
| Reserve | $ 302,972 |

Reserve account is owed $19,416.
Capital Projects is owed $19,175 from the Reserve Fund.

Mid-Year Report Review:

Sharon completed a comprehensive review of our six month (through 6/30/12) actual operations compared to our 2012 budget. Our income for this period is on budget. Our total expenses exceeded budget by $69,000. The major overruns were:

DRAFT

- $20,000 - for Guard and Gate Security
- $23,000 - for Building and Grounds Contract Labor
- $23,000 - for Building Masonry Repairs

A $27,000 savings in insurance premiums partially offset these and other smaller overruns.

The Board mandated that management undertake only emergency repairs and minimize any expenditures in the months ahead.

Arrears:
1 owner is 4 months in arrears.

Sharon suggested that a lien should be placed on owners that are several months in arrears.

**General Manager:**

Jon Cassady remains in critical condition in the Mayo Jacksonville Clinic Hospital. Jon continues to improve in response to medical treatment and tests.

After discussion, the Directors unanimously approved to continue Jon's salary and benefits pending further review at the September 5th Board Meeting.

In Jon's absence, the Board decided to contract the services of Arran B. McGinnis as our Interim Property Manager through the impending tropical storm season. Arran will be resident at Cowpet Bay West throughout his contract until October 15th when Jon's situation can be reassessed. Legal counsel is drafting a contract with Mr. McGinnis to be paid $175.00 per day for his services. Ed will execute the contract on behalf of the Association.

COBRA eligibility for Association employees was discussed. Doug is going to research what options are available.

**Insurance Committee:** All Insurance has been paid for the year. Doug will be negotiating property liability insurance after hurricane season.

**Security Committee**: Discussion was held on how to decrease spending on security and still keep CBW safe. Suggestion was made to install a card reader to exit the gate, more cameras, replace broken lights and security guard schedule to be random. Bill will investigate the cost for an exit gate card reader and security guard service. Staff will expedite light replacements.

**Planning & Property:** Max is currently putting a sub-committee together for a Solar System and has received volunteers but no one has come forward to chair the committee. Max will continue to organize a sub-committee.

**June Action Items**

- Letter to Insurance Carrier re: gate expense (Completed)
- L-42 Roof Painting (Completed)

DRAFT

- Email to Owners re: HUD Decision (Completed)
- Analysis of six-month of Operating Accounts (Completed)
- Signatories changed on Banco Popular Accounts (Completed)

**New Business**

Legal Proceedings: Received an update from the Travelers Insurance Company, Attorney Joe Riopelle, that the last submission received from Walters/Kromenhoek exceeded the 20 page limit. The judge has given them until the August 8th to amend their 30 page plea down to 25 pages and has given Joe Ripolle until August 20th to reply in 25 pages.

Legal Fees: There is a $5,000 deductible for each of the Walters and Kromenhoek suits. Walters retainer was met and at the end of the month we should have reached Kromenhoek retainer as well. We continue to use Hodge & Francois for other issues. Rosie asked for a breakdown of legal fees, Sharon said she would provide at next meeting.

Staff Evaluations: Jon reported to Ed that he completed the staff evaluations. His recommendation was that each should get a cost of living increase of 3%. Ed met with the staff, discussed Jon's situation with them and informed them he would speak with the board regarding their pay increase for the year.

After board discussion a motion was made to give staff a 3% raise, motion was seconded and passed by majority vote.

Gate Sign: Doug suggested that someone look at the CWB sign to observe the condition and to see what need to be done to have it restored. Max said he would look at it and bring information to next Board meeting.

Parking Issues: Herb suggested that the end of Windward to be dug out and leveled in order to produce more parking spots. Holly volunteered to get estimates and look into what permits are required.

September Meeting: The next meeting of the Board of Directors will be September 5, 2012. B:45AM AST

Meeting was adjourned.

**ACTION ITEMS**

| | |
|---|---|
| Road Sign | Arran/Holly |
| RFP for Solar System | Max |
| Supplying water to the Yacht Club | Bill |
| GE Statistic Report | Bill |
| Insurance information for Jon | Doug |
| Cost of card reader to exit | Bill |
| Security Guard | Bill |
| CBW Sign condition | Max |
| Legal Fee Breakdown | Sharon |
| Additional Parking | Arran/Holly |
| Lighting replacement | Arran |

3055300/000498

DRAFT

**Cowpet Bay West**
**Board of Directors Meeting**
**September 5, 2012**

**Present:** Ed Wardwell, Rosie Wells, Arran McGinnis, Holly Case
Phone Conference: Doug Rebak, Sharon Koehler, Max Harcourt

**Approval of Minutes:**

Approval of Minutes of August 7, 2012:

Ed Wardwell submitted correction - After discussion, the Directors unanimously approved to continue Jon's salary and benefits pending further review at the September 5th Board Meeting.
Doug submitted correction - Under parking Issues: changed end of "Leeward " to "Windward".

Motion to adopt as amended was made and 2nd. All were in favor, motion carried.

**Manager's Report:**

RO, WWTP, Gen Set, Operating systems ran all month with no major issues. On schedule for filter changes and maintenance for the RO plant. Water testing is done through Ocean Systems and all findings are reported through DPNR in St. Thomas and EPA in New York, next report will be sent next week.

All porch lights have been replaced, ordered the remainder street lights (5-year warranty). Will be ordering additional for back-up.

Rebuilt back-up transformer is complete, currently in Miami to be shipped to St. Thomas.

Requiring morning meetings with all staff to determine work for the day and to keep them organized and on track. Will be utilizing additional temporary employee to paint the 17 seaside railings and to complete stair and railing capital project in Leeward.

**Treasurer Report:**

Bank balances – September, 2012

| | |
|---|---|
| General & Special | $ 12,117.92 |
| Reserve | $ 312,680.74 |

Reserve account is owed $19,416, two payments for August and September.

| | |
|---|---|
| Accounting Fees: | $5,940 |
| Legal Fees: | $14,956 ($10,000-Walters & Kromenhoek/4,956-Misc. Legal Expenses) |
| Emergency Rail Repair: | $22,000 |

DRAFT

Sharon expressed concern regarding the cost of repairing the Golf Cart. Parts were ordered beforehand without a disclosure of the cost. The golf cart has been repaired and is being used daily by General Manager and Staff.

Arrears:
1 owner is 3 months and 1 is 4 months in arrears.

**General Manager:**

Jon Cassady is currently in the Brooks Rehabilitation Hospital in Jacksonville. Jon is receiving physical and speech therapy 6 hours a day, 6 days a week. He is responding reasonably well from a physical stand point, he is able to stand and has full range of motion with his arms and legs and retains his physical strength. He is still unable to swallow, therefore they will be testing in ensure there is no blockage in his throat or esophagus.

Ed will be meeting with Jon and his brother Jay in Jacksonville this weekend to discuss how to best serve Jon's needs and the Associations requirements.

**Committee Reports:**

Insurance Committee: All Insurance has been paid for the year.

Security Committee: Porch lights have been replaced.

Planning & Property: Max will continue finding a chair for the Solar System Committee.

**Legal Proceedings:** September 7th, Attorney Joe Riopolle (Travelers Insurance Company) will file the names of the individuals who will have to provide a deposition for the Walters/Kromenhoek suit. He is not expecting any further action on the suit until October when the initial stages of mediation begin.

**August Action Items**

- Supplying water to the Yacht Club (Closed) - Further developments in researching on supplying water to Yacht Club have concluded that CBW will not be pursuing this venture
- GE Statistic Report (Closed)
- Insurance information for Jon (Completed) - Once Jon qualifies for Social Security Disability he has to wait 24 months before applying for Medicare. Jon is not eligible for COBRA Insurance.
- CBW Main Sign Condition Checked (Completed)
- Legal Fee Breakdown (Completed) - See Treasurer's Report
- Lighting replacement (Porch Light Completed)

**New Business**

Arrears: Board discussed an owner that owed over $10,000, approximately 5 months behind, and the final steps to collect Association dues. $1,500 of the fees are a result of tenant having a dog on the premises. After a certified letter was sent to the owner, they responded that they would make a good faith payment of $2,000 and would pay the remainder as soon as possible. Owner was advised to put

DRAFT

their grievance in writing and it would be presented to the Board. As of September 4th neither the letter nor the payment have been received.

Board decided to send a certified letter, final notice, giving the owner 2 more weeks before shutting off utilities.

New Forms: Notice of Parking Violation and Installation Letter of Permission.

Screened in Porch: Owner requested to screen in patio, Board stated that the protocol would be for the owner to put in writing with engineering sketches and present to the Board for approval.

October Meeting: The next meeting of the Board of Directors will be Friday, October 12, 2012. 8:45AM AST

Meeting was adjourned.

**ACTION ITEMS**

| | |
|---|---|
| Road Sign | Arran |
| RFP for Solar System | Max |
| Cost of card reader to exit | Bill |
| Security Guard | Bill |
| Additional Parking | Arran/Holly |
| Street lighting replacement | Arran |
| Confirm Earnings for SSD | Holly |

DRAFT

**Cowpet Bay West**
**Board of Directors Meeting**
**October 12, 2012**

**Present**: Ed Wardwell, Herb Horwitz, Bill Canfield, John Foster, Arran McGinnis, Holly Case
Phone Conference: Doug Rebak, Sharon Koehler, Rosie Wells

Ed Wardwell called a moment of silence in remembrance for Max Harcourt.

Resolution introduced by Ed Wardwell.

Association Resolution to elect John Foster, Windward #36, to fill Board Member vacancy caused by the untimely and tragic death of Max Harcourt to serve until the next annual meeting, February 2013.

Motion to accept Resolution, all were in favor, motion carried.

**Approval of Minutes**:

Approval of Minutes of September 4, 2012:

Doug submitted correction - CBW Sign Condition (Completed) - indicated that it was not complete.

Motion to adopt as amended was made and 2nd. All were in favor, motion carried.

**Manager's Report**:

RO, WWTP, Gen Set, Operating systems ran all month with no major issues.

CBW Sign: New CBW Road Sign presented to the Board. It was determined that it was the same sign approved in earlier Board Meeting, with the exception of changing "Entrance in 400ft" to "Next Right". Sign cost is approximately $900 - this includes the sign, mount and installation. Estimated time to be completed is two weeks.

Construction Approval: W-24 construction plans presented to the Board for approval. Owners are in compliance with all Association renovation requirements. Doug suggested that when raising the ceiling they leave room for the chase. Arran confirmed that it was addressed and in the plans.

Seaside Rail Painting: Windward seaside rail painting will be completed today, staff will begin painting Leeward next week. Completion of all seaside railings is expected to be within three weeks.

New projects: Reconstruct stairs and wall by Leeward 20; and replace brackets under the stairs with hardware already purchased.

Street Lights: Four ten-foot poles will be purchased and installed to light the four dark areas on property to assist with security, estimated to be completed by next week. The remainder street lights are complete. Any that have failed will be shipped back for reimbursement under warranty.

DRAFT

Porch Lights: Herb stated he thought the street side porch lights were going to be all replaced to make them standardized. Arran stated that all the lights that were not working have been changed and everything he has received has been changed as well. Arran said he would check to make sure that we didn't have any left in stock to install to make them standardized.

Transformer: Rebuilt back-up transformer is complete and on island. Will be contacting Skyline Electric to install it. During installation the exposed cables coming from Leeward leading to Windward will be replaced. The rebuilt transformer will be used as the main transformer and the current one as the back-up.

Stair and Railing Capital Project: Board decided to repair only emergency cases. Will not subcontract the repairs, staff will be performing the work supervised by Arran.

Security: There was a theft incident on October 3rd when three unlocked vehicles on Leeward were entered and their contents pilfered. The perpetrator was on foot and uncaught despite search efforts by Arran McGinnis and the security guard. Ed will send out a reminder to the owners to lock their units and car doors.

Security gate circuit board needs to be updated so that when exiting the gate, a card or code will have to be used in order to exit the property. The cost of the board is approximately $2,500. Sharon, Treasurer, stated that we currently have appropriated funds in the 2012 budget to cover the cost of upgrading the security gate. Board approved upgrading the circuit board to eliminate the green exit button.

**Treasurer Report:**

Bank balances – October, 2012

| | |
|---|---|
| General & Special | $ 46,500.00 |
| Reserve | $ 322,700.00 |

Reserve account is owed $19,416, two payments for September and October.

Sharon expressed concern regarding overtime paid to employees. With our current policy, overtime should only be in emergency cases, otherwise needs to be approved through the Board.

Arrears:
1 owner is 3 months and 1 is 4 months in arrears.

**General Manager:**

Jon Cassady is still in the Brooks Rehabilitation Hospital in Jacksonville. Jon is making progress, although it is slow he is physically doing well. He has vision in both eyes and is speaking but continues to have issues with arm/hand coordination and swallowing. Original release date was October 10th, but has now changed to October 31st. Once he is discharged he will become a Brooks out-patient for 30 days.

Ed spoke with Jay Cassady (power of attorney for Jon) informing him that the Association will continue to cover Jon's medical care until he eligible for Social Security Disability on December 27, 2012.

DRAFT

Resolution introduced by Ed Wardwell.

Association Resolution to continue Jon Cassady on full-time payroll, 30 hours per week at VI minimum wage, and the Association will provide continued medical coverage until December 31, 2012.

Motion to accept Resolution, all were in favor, motion carried.

**Committee Reports:**

Security Committee: We will look into the possibly of hiring a designated security person for C8W. This will allow us to have control over shift hours and can have them on a random schedule to cover different days and hours of the week. It was determined not much activity takes place between 0130-0600 and the best time to have security is 1800-Midnight. Also suggested with the gate change we could cut guard time from 80 to 40 hours. The board also discussed adding more cameras; concern was how to monitor them and the quality of the picture. 8ill will look at all options and present at next 8oard meeting.

Insurance Committee: All insurance premiums are paid and completed for 2012.

Planning & Property: Herb Horowitz has volunteered to resume the responsibilities of Chairman for the Planning and Property Committee. He will report at the November Board meeting.

**Legal Proceedings:**

Any Board member who cannot attend the mediation will need to turn in the "Limited Power of Attorney", notarized, before the mediation on October 19, 2012.

**September Action Items:**

- Confirm Earnings for SSD (Completed)
- Additional Parking (Addressed in 2013 8udget)
- Street lighting replacement (Completed)

**New Business:**

W-52: Owner requesting a handicap parking space. It was determined that the Association is in compliance with the Fair Housing Act of 1988, and in accordance with the Act she is currently receiving reasonable accommodations by having a parking spot as physically close to her unit as possible. We are not required to paint, mark or widen the parking spot. Given that we are in compliance with the Fair Housing Act, no further action will be taken at this time.

2013 8udget: The Executive Committee (Ed Wardwell/Rosie Wells/Bill Canfield) will meet with the Planning & Property Chairman (Herb Horwitz) and Property Manager (Arran McGinnis), to prepare a recommended budget to the Board prior to the November Board Meeting. The budget will include Capital Projects and Operating Expenses.

New Property Manager: The Board decided unanimously in the Executive Meeting that Arran McGinnis would be offered long-term employment as Property Manager for Cowpet 8ay West. Board offered the

DRAFT

position under the same terms and agreement made on September 5, 2012, effective October 16, 2012. Arran agreed and accepted the position.

2013 Annual Meeting: Board decided that the Annual Owners Meeting will be Saturday, February 9, 2013.

**November Meeting:** The next meeting of the Board of Directors will be Tuesday, November 13, 2012. 8:45AM AST

Meeting was adjourned.

**ACTION ITEMS**

| | |
|---|---|
| Road Sign | Arran |
| Circuit Board/Card Reader for Security Gate | Bill/Arran |
| Security Guard | Bill |
| Additional Security Lights | Arran |
| Stair/Wall Reconstruct Cost | Arran |
| Porch Lights (standardized) | Arran |
| Reminder to owners lock doors | Ed |
| 2013 Budget | Executive Committee |

**Cowpet Bay West**
**Board of Directors**
**Special Meeting**
**July 27, 2011**

**Present:** Max Harcourt, Barbara Walters, Rosie Wells, Sharon Koehler, Bill Canfield, Vince Verdiramo, Bob Cockayne, Jon Cassady, Louanne Schechter

Jeanne Brennan, CPA for Cowpet Bay West attended by phone conference at the request of the Directors.

**Purpose of Meeting:** Discuss a means to pay the premium of the newly acquired insurance and alter the budget if needed. Note: Insurance was in effect before securing finance.

**Treasurer Overview:** We have about $449,000 in cash, $68,000 was written from the reserve fund as the down payment on the new insurance. The rebate from the previous insurance policy is expected to be approximately $50,000. The remaining Capital Improvements are expected to be $110,425. With these expenditures there should be a cash reserve of $320,442. (See Financial Overview sent by Sharon). Max approved financing the remainder of the insurance premium with a 9 month payout at 3.2% which is $23,632/month. The interest adds approximately $8600 to the cost of the insurance.
As the Board had not voted on the financing, Max made a motion to accept the $68,032 down payment with 9 month financing at 3.2% from Mapfre . Bob 2nd the motion. Following discussion, the vote was taken. Max, Sharon, Bob, and Bill voted yes. Barb abstained. Rosie and Vincent voted no.

Max stated the insurance cost to the Association has consistently increased over the years but the owners' fees have not been increased.

Sharon discussed 3 options:
- Suspend our future "reserve" allocation of income for the rest of this year and allocate the funds solely to "insurance"
- Borrow money from the reserve fund via a note, with the intention of paying back to the reserve fund sometime in the future. There was no plan submitted for the future payback.
- Make a permanent transfer from the reserve fund to the insurance, with disclosure that the funds are not intended to be paid back.

Barb suggested a 4th option of a Special Assessment rather than dipping into again or borrowing from the reserve funds.

Jeanne Brennan, CPA, made the following suggestions:
- The Board needs to determine what you deem proper for your reserve fund based on the level of your future needs. A figure would need to be analyzed.
- If you borrow from the reserve fund you break the integrity of the reserve fund, you have to have a resolution, a method of payment, interest, and a new budget sent to the owners. If there is no intent to pay back, you report it as a change in the equity.
- Factor into the next 7 months the cost of the premium and decide if it will include the down payment for the 2012 premium

3055300/000506

Jeanne reported the Reserve Account is specified in the budget and not intermingled with insurance premiums or deductibles. The insurance is actually part of Operations and Management, the Insurance was reported separately due to the fluctuation of the insurance premiums following a major hurricane.

Max stated the operating budget is over by approximately $66,000, to include, fuel for the generator, tree trimming, repairs to vehicles, and beach drainage. He wanted to know how this will affect the reserves should we suspend payments to the fund for the remainder of the year. Sharon stated we should have enough money in cash flow to complete the capital projects.

Max moved we transfer the beach drainage project from expense account to a capital project. Sharon 2nd, all were in favour. Motion carried.

Mapfre Deductable Overview: Bob stated he sent out **Shep Barrows Appraisal** that has a breakdown of building by cost. The total deductable for the entire property is $520,000. Bob stated that each building is insured separately. Bob suggested we keep in cash flows for insurance deductable $362,000 which is 70% of the entire deductable.
Bob interjected the policy can be renegotiated in January with Mapfre with same premiums over an 1B month premium.

Vince stated he needed to leave the meeting; his recommendation was to maintain the reserve funds at $500,000. He would not approve of anything less. He noted that we have consistently had that level of operating reserves. Vince left the meeting.

Max made a motion that the reserve fund for 2011 decrease to $3B0,000. Our CPA had suggested a review of what our total reserve would need to be. The amount voted on had not been reviewed or substantiated by any figures. Sharon 2nd the motion. Following discussion, Max called for the vote. Max, Bill, Sharon, and Bob voted yes. Barb and Rosie voted no. The motion carried the Board made a resolution to decrease the reserve fund to $3B0,000 with the remainder of funds going to the general operating fund.

The funds ($68,034.) used for the down payment on the new Mapfre insurance policy were drawn off the reserve fund. Sharon moved the Board resolve to permanently diminish the reserve account by $6B,000 to the General Account. Bill 2nd. Following discussion, Max called the vote. Max, Bob, Sharon, and Bill voted yes. Barb and Rosie voted no. The motion carried.

Barb made a motion to have a special assessment of $1000 per unit owner to cover the cost of the policy. She stated that we should not borrow from our reserve fund again and must stay on the agreed budget. Rosie 2nd. Following discussion, the amount did not breakdown the amount by each individual unit equity but the total amount needed to be funded. Max, Bill, Bob, and Sharon voted no. Rosie and Barb voted yes. The motion was vetoed.

Max made a motion to increase insurance fees per month by $60,000 over 5 months. Bill 2nd the motion. Following discussion Max called for the vote. Bill, Sharon, Bob, and Max voted yes. Barb and Rosie voted no.

Sharon moved the Board resolve to decrease payments to the reserve fund from $12,125,a month to $4,7B5 a month and move the difference of $7,340 a month from the reserve fund to the insurance

fund. Bill 2nd. Following discussion Max called the vote. Bob, Max, and Sharon voted yes. Bill did not respond. Rosie and Barb abstained. The motion carried.

Sharon will work on the revision of the budget.

Max stated we will proceed with the work on the Capital projects.
Jon stated while looking at the breakdown on the insurance, there are 5 systems that are not covered in the breakdown. Max asked Jon to send an email to Shep with the missing systems . Barb requested all Board members receive a copy of the systems problems.

Barb made a motion we contribute $750 to the little league sponsored by DPNR . Max called the vote, 4 were in favour, Max abstained.

## CBW Owner Repair/Inquiry Handling Policy

May 10, 2011

The CBW Board of Directors has developed this set of guidelines to establish a pı through which: owners may report issues of concern to the office, the staff is mac aware of the issues, and the concerns/issues are documented and handled in a ti manner.

- Emergency repairs/issues (Normally initiated by phone call)
  - If fire, injury or crime –in-progress is involved, individual noting even call 911.
  - GM or staff member to respond immediately
  - If needed, additional staff called in to handle problem until secured
  - Owner to be billed if owner responsible item. Determination made b GM in conjunction with owner/representative. In case of disagreem only immediate safety issues will be handled, and the owner must sı disputed issues to the board by letter or email.

- General repairs-owners units (Initiated by email/letter to Office)
  - Communication received from owner; Office Manager (OM) enters iı log, note to General Manager (GM), copy to BOD
  - Within 2 business days, acknowledgement of receipt to owner (phor email), indicating receipt and, if appropriate, initial action taken
  - GM, or other staff member, to inspect the problem within 5 business days. Maintenance form (being developed) completed indicating da assessment of problem, expected action to be taken to correct situa along with time frame
    - Form should include disclaimer information regarding owner association responsibility.
    - Form should be signed by GM and owner or owner's agent, i available. If not available, can be done by email. In case of disagreement, only immediate safety issues will be handled, the owner must submit disputed issues to the board by letter

- Owner should be referred to list of association recommended contractors.
- Owner should not be restricted to list only, but must understa should a question arise as to a hidden Association responsibi is the owners/contractor's responsibility to have GM inspect v progress.
- Owner/representative is responsible for directly negotiating w contractor for scope, price and schedule.

❖ Association Responsible

- GM determines scope of work to be done - by staff, by outsid contractor, or by both.
- If complaint requires work to be done by our staff (e.g., tree trimming, porch light replacement, painting, minor wood rail r roof leak, etc.) work needs to be delegated to staff for comple reasonable amount of time, (e.g., 10 business days).
- If complaint solely requires work to be done by an outside contractor, GM to schedule an appointment for inspection an estimate within two weeks, (alternative contractors may have used to meet this schedule). Agreed upon work to be schedu soon as possible after inspection. GM will inspect work in pro as well as completed job.
- Owner will be notified by e-mail or letter of scope of work, expected repair date, and re-contacted when repair is comple or if rescheduling is needed. If the Owner/representative can support the scheduled work, they become responsible for dir negotiating schedule with the contractor – without changing s of work.
- In the event of combined staff/outside contractor work, (e.g., leak by staff; inside wall/rebar repair by outside contractor), s should commence repair as soon as possible, if the job will a for it.

- Landscape requests (Initiated by letter/email to office)

- Landscape committee responds to Office (copy to Board) recommer action to be taken within 3 weeks.
- Office responds to Landscape committee (copy to Board) indicating frame for action (within 1 month), or indicating issue must be discus Board.
- Written (email or letter) reply to owner indicating action to be taken, and time frame.

- Requests for enforcement of Rules and Regulations. (Initiated by phone, or letter to the Office and Board)
  - If safety is involved, handle as an Emergency Request. If fire, injury crime –in-progress is involved, individual noting event must call 911.
  - If not time–urgent, Office issues warning letter to owner (if known); b e-mail message to possible involved owners/renters/agents, if unkn
  - In case of illegal parking, staff will place a sticker on driver side winc of the illegally parked vehicle. If the vehicle is a hindrance to emerg vehicles, it may be booted and fines levied in accordance with Parki Policy.
- Owners general suggestions/requests (Initiated by email/letter to Board)
  - Board will acknowledge letter in a timely manner (within a month), indicating the matter will be discussed at the next Board/Executive E Meeting (giving the date of that meeting).
  - The Board will provide a written reply (e-mail or letter) to the owner v 2 weeks after the meeting indicating its disposition.

# Cowpet Bay West Blog

## An Informed Active Community

### Puppy Dog Diplomas

January 15, 2012

Readers of the blog may recall a comment that Cowpet owner and board candidate Judi Krohmenick made recently regarding the "certification" of her puppy. She claimed that her puppy is a "trained, legally certified service animal". We asked her what that meant and have had no response. After a recent board meeting discussion on the subject of dogs, it's become much clearer what is really happening with puppy dog diplomas.

The board was provided details on the various "certifications" of owner puppies at the January board meeting. Information distributed at the meeting indicated that Judi's puppy is certified by an outfit called Goldstar German Shepherds. We've done some research and found out that for the one time low price of as little as $71.50, a dog owner can obtain all sorts of really cool gadgets and puppy certification without having to leave the comfort of your computer. All anyone has to do is print the little form from their web site; fill out a name; address; and other basic info; write a check; and boom – you get all of the way cool proof needed to tell the world about your very own certified service animal. How tidy is that, right? Heck, if you're in a hurry, operators are standing by at 702-497-7229 to avoid the nasty wait for the mail to make it to them. The link to their site is here for those who would like to see for themselves how all of us can have a certified service animal in darn near no time at all.

http://www.goldstar-germanshepherds.com/certification_licensing.html

The information distributed at the board meeting also indicated that Barbara Walter's and Joel Kirschenbaum's puppies are "certified" by an outfit called the National Service Animal Registry. Here is the link to the similarly totally cool three minute process to get your very own "certified" service puppy from this outfit:

http://www.nsarco.com/cgi-bin/product.cgi?id=081218004

There are at least ten outfits like these two on the Internet that offer the same type of "service". One of them (Service Dogs America) even has the gumption to state that "SDA recognizes that every person in America may have some form of disability". See this fascinating statement for yourself plastered in bold letters squarely in the middle of their home page:

http://www.servicedogsamerica.org/

It is the blog's considered opinion that these outfits serve no legitimate purpose and exist mainly to sidestep what the ADA works diligently to accomplish. These outfits make it plain on their sites that nothing is done to verify either the animal's credentials or the purported disability of

LT-29

PLAINTIFF'S
EXHIBIT
5
PENGAD 800-631-6989

1.

**alfred felice** *said:*

January 3, 2012 at 9:18 pm

NO COMMENT OKAY BUT NO VOTE EITHER FAIR IS FAIR AL

2.

**Anonymous** *said:*

January 4, 2012 at 8:33 am

Thanks for providing this voter material Lance.

LT-28

# Cowpet Bay West Blog

## An Informed Active Community

### Questions Posed to Board Candidates

January 3, 2012

The following was emailed to all board of director candidates:

*To all – my wife and I own 3 Leeward and have the following two questions for the board candidates:*

*What would your vote have been on the recent board vote regarding open or closed meetings in the specific context of the vote taken?*
*Are you in favor of the proposed bylaw revision as stated in the draft regarding dogs on property?*

*Lance Talkington*

Responses received were as follows:

- Herb Horwitz – for open meetings; and for the bylaw revision regarding dogs
- Doug Rebak – 1. I have been in favor of open meetings from the time I voted in favor of Vinny's motion at the Annual Owner's Meeting. This is not theoretical but real. The meetings I held as President were open ,with the few exceptions where we were talking sensitive topics such as Staff Reviews or specific Owner-related problems.
  2. My position on dogs is I love them, have had 2 of our own, but they just do not belong at Cowpet. The issue of a "service dog" can and has been abused, but I feel the Board is taking a reasonable approach in following the ADA guidelines.
  Bottom line, I favor the By Laws revision on dogs.
- Ed Wardwell – declined comment
- Judi Krohmenhoek – declined comment
- Barbara Walters – declined comment
- Dick Lamoreaux – declined comment

While earlier correspondence is not available for Ed Wardwell's position on these issues, Judi; Barbara; and Dick are on record favoring dogs on the property (Judi and Barbara both currently have dogs in their units and have declined to comment as to the basis for it). Barbara is on record favoring closed meetings. Our thanks to Doug and Herb for taking the time to comment.

**Comments on: "Questions Posed to Board Candidates" (2)**

LT-27

*ASK our property manager, Jon Cassady (340-998-0807), our office manager, Louanne (340-775-6675) or any of the CBW employees, Matuba, Steve, Joey, Ken, Mr. Brown, ChiChi or Marsellus just what they think of those who are running and why.*

*Get their opinions of the current Board, Max Harcourt, Sharon Koehler, Bob Cockayne, Rosie Wells, Barbara Walters Vinny Vertiramo and Bill Canfield.*

*Now ask them what they think of those running for the Board in February, Doug Rebak, Dick Lamoureux, Ed Wardwell, Herb Horwitz, Barbara Walters and myself, Judi Kromenhoek.*

*Base your vote on what these people tell you. They are at CBW twelve months a year, they see and know what is going on. They are not political but honest workers. Use their input to help you make the right choice.*

*I hope you all have a very happy holiday season and a happy, healthy 2012.*
*Sincerely,*
*Judi Kromenhoek*
*44 Windward Way*
*(340-677-3267)*

**Comments on: "Letter From Judi Kromenhoek" (1)**

1. 

   **alfred felice** *said:*

   December 24, 2011 at 11:31 am

   I sent an Email response to all included in Judi and Herb's Email. I believe my message was recieved by all on their lists. In short, Judi and Barbara are unqualified to run for our board as they have been terribly disruptive these past 2 years. First Judi, on her own, without board approval, put a disasterous insurance policy on our books which was finally corrected. Second, a board minority tried to oust the majority because they were defeated on a vote!! Third, they defy the entire community by keeping DOGS on our property, that specifically outlaws them. Fourth, they accuse anyone who disagrees with their positions on anything. Also, they recommend the employees as THE primary source of "true" situations. Need I go on? They have some nerve even submitting their names on our ballot.

LT-26

# Cowpet Bay West Blog

## An Informed Active Community

### Letter From Judi Kromenhoek

December 24, 2011

The letter below was posted on the blog yesterday from board candidate and recent blog registrant Judi Kromenhoek. It encourages owners to consult with association employees for input on qualification of the various candidates running for election. Our community faces a number of complex business issues on a regular basis, such as insurance coverage; formulating condo law related to animals; formulation and evaluation of budgets and financial statements; strategic planning; capital planning; and supervision and evaluation of staff to name a few.

Anyone who is able to input on these or any other challenging issues is encouraged to provide their input for evaluation in this public forum, whether it be Matuba; Steve; Joey; Jon; Louanne; or anyone else on staff. We can all benefit from being better informed on the difficult business issues that face our wonderful community.

As an aside, the following questions were posed to Judi yesterday on the blog, responses to which we await:

***Hi Judi. Welcome to the blog. We have a couple of questions. First, what would your vote have been on the recent board vote regarding open or closed meetings in the specific context of the vote taken? Secondly, are you in favor of the proposed bylaw revision as stated in the draft regarding dogs on property?***

Since Judi currently houses a dog in her unit, her input will be valuable in understanding the reasons for allowing dogs on the property.

Following is Judi's letter to the blog:

*Dear Fellow Owners,*
*Many of you only spend short periods of time during the year at Cowpet Bay West and therefore are not aware of all that is going on.*

*There is an election coming up and I urge you to do some investigating on your own. DO NOT take my word or any of the current Board's, or those running for the Board but base your vote on what you learn.*

LT-25

**alfred felice** *said:*

December 5, 2011 at 6:07 pm

Let us not wait !!! Those who are against changing our "NO DOGS " rule AND enforcing its application snould form a slate to replace any empty seats with candidates who will follow the wants of the majority of our residents. ALL candidates should state their position on this issue .A change to our BY -LAWS might be needed to put this issue to permanent rest rather than revisiting this issue every year !!!! "RULES" can be easily changes by a small minority at a poorly attended board meeting ( especialy behind closed doors) or if meetings are "closed" WAKE UP STARTUP A CAMPAIGN FOR A NO DOGS SLATE NOW.

LT-24

# Cowpet Bay West Blog

## An Informed Active Community

### Barking Puppy Dogs

December 5, 2011

So far our illegal neighborhood puppy dogs have been seen and smelled but not heard. Until now. Following is an email sent from an owner this morning:

*Jackie,*

*To answer your specific question there is an existing issue and not just a potential problem. Last Monday, Nov 28th a dog left in a high number Windward unit was incessantly barking to the great distraction of our household. This was in the evening and in order for my daughter to do her homework she had to hide out in our bedroom on the street side of the unit. In addition we had to close our windows and put the air-conditioning on – an expense to us and denying us of the advantage of a balcony situated in the Caribbean.*

*Regards,*

*Niall Bartlett, Leeward 47.*

Niall lives on the end of Leeward nearest the gate house. The 40's area of Windward is directly below his unit, and this coincidentally happens to be the very spot where our known violaters Barbara Walters (current board member) and Judy Kromenhoek (immediate past board president) live. If the noise is a high pitched yip, it's Barbara's dog. If it's a deeper barking noise, the dog is Judy's. Maybe blog readers who live in that area can comment on whose dog may be today's perpetrator. As an aside, trained service dogs are specificaly trained to NOT bark unless the owner is in imminent danger. Maybe one of the pups pooped in the owner's unit and was warning the owner to watch out?

These two owners continue to fight for their puppy dogs tooth and nail out of our collective view due to the monthly board meetings being closed to owners. Don't be surprised to see either or maybe both of them show up as candidates for the three open seats on the board. They desperately want to be in power to control this issue that is very real and very personal to both of them.

**Comments on: "Barking Puppy Dogs" (1)**

1. 

LT-23

I guess there is little hope of changing this nonsensical behavior until the annual meeting,at which time, 2 of the "gang of 3" can be voted off the Board , and a new slate of Officers can be elected by the new Board.
The situation is most disturbing and not at all the way it should be in an upscale Reidential/Resort community!
Doug Rebak

LT-22

for the open part of the meeting and not even have to worry with control utilization. Getting off one private line and moving to the open line takes what, about thirty seconds? Come on Max, all this takes is a little thought and effort. Read the web site you're using for goodness sake rather than for all intents and purposes shutting down the owners. Is it appropriate that you deserve flexibility of access to board meetings while traveling the states since May, but owners don't deserve the same when access can be easily controlled? Oh, and non owners calling in – are you serious? Who in their right mind outside of owners would ever want to subject themselves to this insanity.

OK, so you say that your "camp" is not with Rosie and Barbara and that you're not against accountability and openness. All you can say is "False". What exactly then is the truth Max? Please elaborate so we can know your ground rules without being thrown around in the wind from month to month not knowing what to expect. You deleted my email asking a very simple question that was nothing like your recollection of it – I asked the reasoning behind closing the meeting and made a side observation we felt like fools. Please don't twist what was asked of you. What do you expect for a subsequent response when you purposely ignore a reasonable question? It's pretty simple to draw the conclusion that you're not open and transparent. We're supposed to somehow magically assume you're for open meetings; transparency; and accountability in light of the actions undertaken? Please. We're still listening Max. Actions speak much louder than words.

You bet I resigned from the committee. I will not be associated with clandestine functionality and will only associate with one hundred percent openness and transparency. Until that becomes reality, it's not happening. I've worked too long for a reputation of being completely open and forthright and will not allow that to be tainted by being associated with behind the scenes activities, whether at the board or committee level. Prove that openness and consistency are a commitment, and this issue can be revisited. My participation is completely dependent on how you decide to proceed.

3. 

dougrebak *said:*

November 12, 2011 at 12:37 pm

Lance,
Thank you for your input.
I share your ( and many other owner's) frustration with the unilateral rejection of the owner's overwhelming "yes" vote for open meetings.
I do support the Board's need for closed sessions on "confidential" matters –but the dog issue???PLEASE !!!

LT-21

concerns regarding many people, including perhaps non-owners, calling in. At least 3 Board members intend to address this at our next meeting.

"Owners were purposely excluded from the entire meeting when dogs were on the agenda." We did go into executive session at the beginning of the meeting to discuss dogs and staff issues. As the minutes will reflect, we voted to table dog issues pending the Board engaging ADA expertise. Once this is done, the issue of rule violators and By-Law modification may be more intellegently addressed. After the executive session, the meeting was open.

"Our president is now in the camp of the heretofore minority on the board who insists on closed meetings." False.

"Our president has made it clear that accountability and openness simply isn't priority." False.

"As a sidenote, President Max was asked to respond to our question of his reasoning behind the events detailed here. He did not respond to the request." I received an email from Lance that I've deleted so I can't quote it, but paraphrased it said something like ' Why are you making the blog look foolish?' I don't support, not-support or answer to Lance's blog, so I didn't feel the email warranted an answer.

Shortly after the meeting, I called a meeting of the Long Term Planning Committee, which consisted of Lance, Jon, Bill Canfield and me. Lance responded by resigning from the committee. I hope he wasn't doing this to "punish" me. I hope Lance runs for the Board in our upcoming election so he can address his concerns in a better forum.

Max

o 

**Lance Talkington** *said:*

November 11, 2011 at 11:50 am

The owners voted unanimously for completely open meetings recently. So you say we weren't invited, but we weren't prohibited? Seriously? What in the world does that mean? We should go ahead and try to phone in, but just remember it's against your wishes? Good grief. But wait, it gets better. You have concerns about who calls in, particularly non owners. For goodness sake – you're using Free Conference Call.Com. It's got more access controls than Cowpet's crime count. That's a lot of controls if the comparison isn't clear. All of the access control options are right there in plain view on their web site. You can include or exclude whomever you wish. For that matter, you could have your private executive session on one line and then flip over to the other line where owners are waiting

**LT-20**

So, there you have it fellow owners. Our president has made it clear that accountability and openness simply isn't priority. Our sympathies go out to a few of the other board members who are trying to do the right thing but find themselves serving out a term in the middle of this sort of underhanded activity. As for the blog, we tried and have failed.

As a sidenote, President Max was asked to respond to our question of his reasoning behind the events detailed here. He did not respond to the request.

**Comments on: "The Final Straw" (4)**

1. 

   **alfred felice** *said:*

   November 9, 2011 at 12:43 pm

   A VERY SMALL MINORITY CAN DESTROY DEMOCRACY IF THE MAJORITY ARE PASSIVE !!! IT IS HAPPENING IN THE WORLD -INTHE USA – IN ST. THOMAS- WHY NOT AT CBW !!!! COMPLACENTCY LETS THE BULLIES RULE IF YOU CAN'T REMOVE THE GUILTY , YOU CAN CERTAINLY OSTRACIZE THEM AL FELICE

2. 

   **Anonymous** *said:*

   November 10, 2011 at 2:24 pm

   I have previously refrained from weighing in on Lance's blog, but I have been so badly misrepresented that I feel compelled to respond.

   "The blog received a reminder from the board over the weekend to invite owners to phone into the board meeting on Tuesday." False. The Board has never invited "the Blog" or owners to phone into the meeting. In the past, Lance and other owners have been invited to sit in on meetings. Owner Lance was never specificially invited to join the telephone call-in, nor was he prohibited. The "Blog" has never been invited.

   "President Max now wants owners to be forced to show up in person at the office if they wish to listen in on board meetings." I clearly do not have the desire or authority (or arrogance) to "force" owners to do anything. I did say in an email, and telephonically, to a Board member that I have no trouble with owners sitting in on meetings. The telephone system is provided for the convenience of Board members who are off-island. I do have

LT-19

# Cowpet Bay West Blog

## An Informed Active Community

### The Final Straw

November 9, 2011

The blog received a reminder from the board over the weekend to invite owners to phone into the board meeting on Tuesday. The reminder was published Monday on the blog, with an approach taken solely by the blog's initiative to not publish the call in number but rather to allow it to be shared upon request by owners. We weren't asked to handle it that way, but it seemed prudent. See the Monday blog post for reference.

On Monday night, the blog was informed that the call in number provided to the blog earlier that day would suddenly not be used by the board, but rather President Max had taken it upon himself to use a new undisclosed number for the meeting. And so, here we sat, wondering what in the world had just happened in the span of about 24 hours. The meeting is now effectively closed to owners after owners were reminded to participate.

But wait, it gets better. President Max now wants owners to be forced to show up in person at the office if they wish to listen in on board meetings. Really? And what exactly does this accomplish? Our president now believes that owners need adult supervision in order to listen effectively. And this at the same time the president is traveling the states since May and calling in for every meeting. Seriously?

But wait, it gets even better. All of this nonsense happens in the context of a meeting that has dogs on the agenda. Owners were purposely excluded from the entire meeting when dogs were on the agenda. Surely there isn't any connection between the two, right?

The blog has been made the fool for ever buying into this idea of open meetings and transparency. Invite us; uninvite us; conduct secret meetings to discuss dogs; set up secret phone numbers to eliminate owner participation. John Grisham isn't creative enough to invent this stuff. Board credibility that had been moving in a positive direction is now shot. Done. Over. Our president is now in the camp of the heretofore minority on the board who insists on closed meetings. Bravo to what used to be the minority group – you've succeeded. Congratulations on the victory.

Back track to an earlier annual owners meeting when our now newest board member Vinnie, at that time not on the board, moved that all board meetings be completely open in every respect to owners – every meeting in every respect. His motion, along with the unanimous approval vote from the owners, is recorded in the minutes. Now he is on the board. What is his opinion of all of this cloak of secrecy? Toss what the owners voted? Close 'em down?

LT-18

# Cowpet Bay West Blog

## An Informed Active Community

### Board Response To Request For Rules Enforcement

October 30, 2011

A few days ago, the blog emailed a formal request to the board for rules enforcement. There continue to be owners who are known to have dogs on the property. Two of those owners are current board member Barbara Walters and former board member and immediate past president Judi Kromenhoek. Earlier blog posts about the dogs issue and the request for rules enforcement may be viewed for details. There have been two earlier formal requests to the board from another owner requesting that the dogs rule be enforced. The board has responded to Barbara and Judi with the following correspondence that was copied to the blog as a formal response to our request. Kudos to the board for doing the right thing by enforcing a rule to which we all agreed to abide when purchasing property in the community.

*Judi and Barbara,*

*Cowpet Bay West's current rules are very clear -- No Dogs. You are both in violation of these rules, and owners have complained to the Board.*

*As you know, the Board is considering absorbing the "No Dogs" rule into the by-laws, and allowing exceptions, upon application to the board with supporting documentation, for service dogs.*

*Louanne tells me that both of you have "papers in the office" regarding service dogs; however, you have not applied for an exception to the rule.*

*If you, as owners and users of service dogs as defined and documented in accordance with ADA rules, wish an exception, you must apply in writing or electronically to the Board and submit supporting documentation. You have 10 days to submit this request. It will be considered at the November Board meeting, and you will be informed of the outcome. Barbara, you must recuse yourself from voting since you are a Board Member.*

*Even though you are clearly in violation of the rules, this offer is being made in good faith, and in the spirit of the consensus of the Board as demonstrated in our by-law discussions.*

*If you do not avail yourselves of this offer, you are subject to being fined under the current rules of the association at the November meeting.*

*M. M. Harcourt*

*President, CBW Condo Association*

LT-17

sure that they comply, or I can promise you that it will be corrected at the homeowners expense."

Disgusting, and shameful. She should be removed from your board as she clearly cannot be impartial.

Lance, you should immediately file a complaint for Barbara's clear abuse towards you. Do it the same way you did, in writing and formal. Print this page out as it clearly shows the bias.

Barbara, you are not fit to be a board member and you should resign. Clearly you have it in for Lance over the dog issue. You are not capable of acting in a professional manner and remaining objective.

LT-16

**Lance Talkington** *said:*

October 26, 2011 at 5:48 pm

Well Barbara, you actually beat me to the next blog post. It is certainly time to hit this one head on since I've overheard the office employees talking about this among themselves and the board. Let's recount the events as they occurred. We asked for approval of the board prior to beginning construction. The entire process was overseen by both the board president and Jon. In fact, they personally came to our unit on the day that Chris Thompson began work and told us to stop until we complied with their new request for architectural plans that included all provisions that they deemed necessary and appropriate. Those plans were obtained from the firm suggested by them, and construction then proceeded with their blessing in strict adherence to the design plans. The entire process was in full view of the board and Jon, and they had every opportunity to indicate lack of adherence to the plans. Construction was adhered to in exact specification to the plans drawn by professionals that was accepted by everyone involved. If you or anyone else wants to take up this issue, I can assure you it will be dealt with firmly.

4. 

**Barbara Walters** *said:*

October 26, 2011 at 8:33 pm

I hope that is not meant as a threat to someone from the board of directors who has a great concern that all rules and regulations be followed. Rest assured, the approvals will be checked and double checked to make sure that they comply, or I can promise you that it will be corrected at the homeowners expense.

5. 

**BIG Kahuna** *said:*

October 29, 2011 at 7:14 am

And remember when I wrote Board Members abuse the little power they have? Here is a classic example of it in writing. Barbara, a board member is now threatening a unit owner basically as retaliation for that unit owner asking the board to clarify the dog rule policy. Read above, it's absolutely, clearly abuse of a board members power to act this way. Board members should ALWAYS remain impartial, clearly this is not the case as Barbara is, in her words "Rest assured, the approvals will be checked and double checked to make

LT-15

1. 

**Doug Rebak** *said:*

October 26, 2011 at 10:38 am

Lance,
Your point is well taken.
The solution is quite simple. Fine the "offender" at the current rate, which I believe is $50 per day of offence, and remit the fine when and if proper documentation is provided within a reasonable time period. A "resonable time period" should be established. I would suggest 2 weeks, but that would be up to the Board to decide.
Doug Rebak

2. 

**William Frumkin** *said:*

October 26, 2011 at 11:54 am

If a board is to have any legitimacy they must fulfill their responsibilities and enforce the rules set forth by the members of the Condo Assoc. Perhaps the Association should pass a new amendment to the by-laws stating that any board member found to be in violation of the rules and by-laws shall be removed from the board. It can include an opportunity to cure of say 60 days.

3.

**Barbara Walters** *said:*

October 26, 2011 at 5:22 pm

To my fellow board members,
Well, since we seem to be following the letter of the law, I am also in favor of fining owners with illegal additions retroactively. That should make up quite the shortfall. Lance, don't you have an illegal addition on your seaside patio, and weren't you instructed to put the common areas back to regulation???

- 

LT-14

# Cowpet Bay West Blog

## An Informed Active Community

### Request For Enforcement Of Rules And Regulations

October 26, 2011

The following email was sent today to the board of directors:


To The Cowpet Bay West Board of Directors:

On May 12, 2011 the board adopted a formal written policy titled CBW Owner Repair/Inquiry Handling Policy. The policy includes procedures for owner requests for enforcement of Rules and Regulations. The association has a long standing rule disallowing dogs on the property. It has recently become a well publicized reality that multiple owners, including one current board member, have dogs living in their units. Given that our unit was fined for having a dog when a friend stayed in the unit and unbeknownst to us brought their pet, it is inconceivable how other owners are knowingly permitted to have dogs on a long standing basis without consistent enforcement of fines for such behavior. Repeated requests to the board member for substantiation of her need for a trained service dog have gone purposely unanswered, and in fact her responses have been accompanied by threats of lawsuits against both the board and me if her ability to have a dog is challenged. I have consulted a senior law firm partner who is an expert in condominium association law, and he has confirmed that the board has every right to request any and all documentation and other supporting information for an owner claiming the right to have a service dog as a result of disability. There are no limitations on this right whatsoever. If the board would like to engage the attorney in this regard, I will provide his contact information.

My daughter has repeatedly asked why others are allowed to have dogs while she is not allowed one. It is egregiously inconsistent for me to be fined for a dog in our unit while others are clearly being allowed to have dogs with no consequences. It is our request that the rules be consistently enforced and that any owner with a dog be required to submit documentation as to the need for a trained service dog to assist with their inability to function normally. It is also requested that the ADA guidelines for the definition of a service dog be implemented immediately and also incorporated into the bylaws that are currently being drafted for approval at the February owners meeting. This email is being sent to the board of directors and the association office in accordance with the procedures adopted in the May 12 document.

Lance Talkington
Three Leeward

**Comments on: "Request For Enforcement Of Rules And Regulations" (6)**

LT-13



Case: 3:12-cv-00025-CVG-RM Document #: 190-1 Filed: 05/01/14 Page 15 of 56

**BIG Kahuna** *said:*

October 15, 2011 at 1:54 pm

Barbara you have a dog. The condo has rules that say no dogs. Lance pointed that out because it's unfair because he would like a dog and apparently was fined for a guest having one. Lance in no way slandered you or remotely spoke badly of you, you have invented that. The solution seems very easy. Just prove that you have the right to have the dog and that the dog meets requirements as set by the government. Period.

Lance just send a written request certified return receipt and I'm sure the board will have to respond.

LT-12

**Barbara Walters** *said:*

October 14, 2011 at 10:06 pm

Thank you for your response Scott. I Like that you clarified for everyone what a blog is, it is personal OPINIONS. Not necessarily facts, just ones personal views on their observations or prejudices. Lance has professed to giving a fair assessment on what is going on with the board, and continues to claim things to be fact when he doesn't verify anything as fact, just writing rumor and innuendo.
That he has also mislead people into thinking that his word is gospel, is another injustice to his claim of a "factual" summation. He posted minutes, which were not the official minutes of a meeting, and his motives are not at all altruistic. This is his 15 minutes of fame, and that is really sad. By the way, I did not want, nor need, nor expect my name to be included in his tirade, when it had nothing to do with my serving on the board. These are two separate issues, and the implication that I am abusing"power" because of my position is not only not fair, it is downright untrue. I do not want or need people to be discussing me in anything other than a professional capacity as to how I serve on this board. My personal business is mine, just that. I have never done anything to abuse any power (which one doesn't have from serving anyway). People who have written in have been abusive, derisive, vicious, and just downright mean. I have never seen a collection of people like these, who get their jollies by hurting others.
If one CLAIMS to be writing truth, then it should be the truth. As an owner, just an owner, I am not accountable to the likes of Lance Talkington, and if he did not share the complex with me, he wouldn't even rate a blink of my eye.
And just to clarify the issue, I am mortified, that my personal business has been laid out over the internet without my permission or forewarning.
Maybe one day I'll find out that Lance et al, are incontinent, so I can blast that. Maybe I'd be so kind hearted that I'd buy he and his cronies diapers! But I would first let everyone know about it!
Barbara

- 

  **Lance Talkington** *said:*

  October 15, 2011 at 9:50 am

  It's impossible to give someone grief over a disability that is to date completely undefined and unsubstantiated. Nobody but the board needs to know the details of the disability, but owners have made it clear that they have the right to see that your claim of disability is properly documented and worthy of a waiver for the pet. Fortunately there is a mechanism that you and the rest of the board put in place earlier this year to deal with this very sort of situation. The issue will move in that direction.

LT-11

own an ad agency and developed one of the first blogs in the US. I'm what you'd call a "blogging" expert. You can find my website at http://www.brandidentityguru.com.

I also own 3 condos, 1 in Easton Mass with over 125 units, 1 in Hyannis Cape Cod and 1 here in St. Thomas. And in each location board members have either abused their powers, broken rules and or the worst…let the little power they have to go their small brains.

So let me just chime in on some of the nonsense I'm reading here, and by the way, if you'd like I'll be happy to post this on the St. Thomas Blog for all our readers as well as the 10,000 St. Thomas people that follow me on Facebook and Twitter ☺

First off a Blog is someones personal diary, actually it's name came from the term Web Log which was shortened to just blog. It basically is a way for someone to journal. This particular blog is lance's. Period. He can write whatever his little heart desires, good or bad. Because you know why….it's his. When Rosie attacks Lance for actually writing in his own blog it's because she's ignorant to what a blog is. And being a board member it just goes on to make my case that board members are generally people with a little power. And trust me Rosie will be back to read Lance's blog because haters of a blog are the best customers.

The fact that lance is pointing out issues of concern threatens board members because ultimately it exposes things they don't want exposed. like Barbara's dog.

To the dog issue, if Barbara is legit she has the right to keep a dog because she is disabled then the easy solution is to show the board the correct paperwork. She does not nor should she share her disability. Nor do I think any really cares….just prove it. Simple solution.

To the dog haters here, if she's got the paperwork just shut it. There's nothing you can do, swallow the pill and move on.

I think Lance is doing a great service to the owners of the association by pointing out issues that will ultimately make your community better. Of course board members may disagree with that.

And as a professional blogger that actually makes a living at this sort of stuff I must let everyone know that Lance and I are friends. We golf together, boat together and generally like each others company. But Lance also knows I'm the most brutally honest person he probably knows and I'd be the first person to give him the business if he deserved it ☺

Keep Rockin' Lance, your little blog is now the go to source!

12.

**LT-10**

Barbara's right to have a dog is most certainly open to scrutiny, and she is welcome to carry out her threat to sue both the board and me for asking about it. She isn't applying for a job with us as a disabled person – she wants a dog, and her desire must be scrutinized appropriately. The office has no paperwork on file as is evidenced by Louanne's not replying to our request to confirm paperwork, and Barbara produces nothing other than saying she can't work and is thus entitled to have a dog. It has become clear she has a pet and should be fined just as I was fined in the past when a friend stayed at our unit and had a small dog for a few days without our knowing it.

Lastly, continued attempts by the fractioned group to close meetings to owners as you confirm today is ultimately disturbing. Good things are happening since owners have become more involved earlier this year. While the blog is being criticized for its comments, there has not been a single instance of anyone claiming that something untrue has been said by the blog. The truth in an open forum is powerful and must continue. Kudos to the board as a whole for standing up for truth and openness.

10. 

**pattisays** *said:*

October 14, 2011 at 12:59 am

This is fascinating…and it has become clearly a point of principal with the dog issue serving as the example of blatant disregard for rules, common respect for them and the reasons behind them in the shared community – and by a board member…It seems so simple that this person should excuse herself from this position – unless of course there is a valid reason for her to require an aid dog that the "papers" would have to validate – which this blog suggests have not been produced. If this dog issue can be so hot, the factions be so divided and the rules so easily manipulated we are in for a sad decline in the harmonious management and lifestyle that we have know for decades.

11. 

**BIG Kahuna** *said:*

October 14, 2011 at 10:11 am

My name is Scott White, aka Big Kahuna from the St. Thomas Blog, http://www.stthomasblog.com. I am the first post and I posted under "Anonymous". Really I just quickly posted not even thinking about posting my name. But for those that don't know who I am I run the largest blog in the USVI. I have over 4000 readers a day. I

LT-9

appears that every one of your blogs is to critisize and analyse and stir up the pot. You don't want to sit in on any of the board meetings for constructive intent. You are looking for something that you can take it and "run" with on such a negative level.

If you have an issue about something I suggest you bring it to the next meeting in writing. Your blog is not approved by the board as CBW's official blog. Actually you hijacked the one Max had just started with your first negative on your blog and it seems to attract more negative. No different than newspapers these days. Everything you guys write is negative and put downs and attacks.

You have no right to demand the things you have demanded. You have no right to demand anyone's personal medical information. In fact, it is a violation of HIPPA and you should tread very carefully because I work in a clinic here and they do not take that sort of thing lightly.

I know there is nothing I can say or do that will affect your attitude or behaviour. You seem to enjoy being abrasive and if that is what works for you so be it. Just post my comment without "editing" it. This will be my last post to you as I will not recognize this blog as anything more than your dumping ground for your negative regergitating. I wish it was not this way but you seem to like the negative.

Rosie Wells

- **Lance Talkington** *said:*

  October 14, 2011 at 6:58 am

  Hi Rosie. As has been posted previously, the board has done a tremendous job on our insurance since the disaster last winter. It has also been posted that kudos should go out to those who are working to bring our budget back in line. And solid work is being done on bylaws. All of this positive work has been posted.

  The blog's observations with which issue is being taken boil down to one basic issue. Three board members (Rosie; Vinnie; and Barbara) fractured the board and forced owners to choose sides on issues with which one group disagrees with the other group. That is the source of perceived negativity that is actually objectivity, and it was forced on all of us as owners by the group of dissenters. Owners didn't ask for this, but now we have no choice but to deal with the consequences of that group's actions. The days of the board being a social club with special privileges are gone. Our collective investments here at Cowpet are too important to be compromised by anyone, and the blog will analyze and comment when necessary.

LT-8



# National Service Animal Registry

903 NW F. Street · Grants Pass · Oregon · 97526 Toll Free · (866) 737-3930 Fax · (541) 471-1122

## NSAR CERTIFIED SERVICE ANIMAL

This document affirms that **"HAPPY"** (NSAR database ID [redacted], see adjacent photo) is certified as an emotional support animal (ESA) and registered with National Service Animal Registry (NSAR) on the date listed below. This emotional support has been formally prescribed and deemed necessary to assist **BARBARA WALTERS**, the confirmed disabled handler. The handler and service animal are listed in the National Service Animal Registry (NSAR) database and may be found on the following website: **www.nsarco.com/database.html.**

**HAPPY**

Emotional Support Animals are animals that are necessary for the normal, day-to-day functioning of their emotionally or psychologically disabled handler, facilitating a normalizing effect by their presence.

An ESA is not considered a working service dog under the ADA and is not granted unlimited public access. Protections under federal law include allowing a disabled handler to be accompanied by his/her emotional support animal in the cabin of the aircraft, in accordance with the Air Carrier Access Act 49 U.S.C. 41705 and Dept of Transportation 14 C.F.R. Part 382.

Additionally, property managers and landlords are required to make reasonable accommodation (a change in the rules) to permit a disabled handler to keep an ESA, even when a landlord's policy explicitly prohibits pets, as set forth in the Fair Housing Amendments Act of 1988, Section 504 of the Rehabilitation Act of 1973 and Title II of the Americans with Disabilities Act.

For more information, please call the U.S. Justice Department ADA Information Line at (800) 514-0301 (voice) or (800) 514-0383 (TTY) or visit the ADA Business Connection at **www.ada.gov**.

January 21, 2011

Date

[signature]

Tim Livingood, M.ED. CED

PLAINTIFF'S EXHIBIT 6

3054700/000085

Subj: **Re: 2012 Budget,Reserve Fund Statua end Bylaw Revision Information**
Date: 1/16/2012 11:35:47 A.M. SA Western Standard Time
From: docfelice@gmail.com
To: DONNANATEL@aol.com
CC: shazkoehler@gmail.com, mrcleen44@aol.com, sidmar42@aol.com, ahg20@msn.com, bobayars@hotmail.com, birtbarbara@gmail.com, jerseybarb@aol.com, Beth.Trahos@smithmoorelaw.com, wfrumkin@varizon.net, robert.daleo@gmail.com, rbcusvi@gmail.com, bradking@xmission.com, rbye117@aol.com, cbfulp@aol.com, apollowell@optonline.net, gmoose@facet-purolator.com, mtamasi@sairealestate.com, sallyfcockayne@hotmail.com, gcowlin@comcast.net, ccrapko@verizon.net, dcshear@verizon.com, nannybar@aol.com, rjlamoureux@vitelcom.net, pjpromo@verizon.net, dougrebak@aol.com, ajuliadoyle45@hotmail.com, randysusvi@msn.com, edwardwell@aol.com, thecolonyshop@optonline.net, cfirouz@aol.com, clairecfoster@hotmail.com, georgeblackhall@hotmail.com, mrgitamo@aol.com, billhanson@comcast.net, hardeep@westarindustries.com, dick.harrington@gmail.com, herbert@hihorwitz.com, donald@hoeschrealestate.com, Highroads2@aol.com, jp.jamison@gmail.com, laura.jamison@gmail.com, fozzisnow@gmail.com, jkromes@gmail.com, barwkelly@hotmail.com, mckamey01@comcast.net, lamjk2@aol.com, ltalkington@talkington.cc, elainemalkani@gmail.com, rmarcantonio@aol.com, marich9323@aol.com, marilyn@blackhallrealestate.com, mverdiramo@optonline.net, robmccormack@msn.com, pmcculliss@msn.com, heath@alpha-value.com, MFM304@gmail.com, milligancl@aol.com, milom2@earthlink.net, MMF036@aol.com, karebare93@hotmail.com, varda@insureking.com, niallbartlett@lycos.com, gay@norcom2000.com, PJPROMO@verison.net, spompan@optonline.net, gpompan@yahoo.com, janetrebone@sbcglobal.net, g.bcp@prodigy.net, ct1964ups@aol.com, rolandgeorges@yahoo.com, ronaldcholmes@gmail.com, wellsr_@earthlink.net, admin@barronefoods.com, kikisb60@yahoo.com, JAXOH@aol.com, rshell@bashlin.com, jselfridge@verizon.com, sid@corkysfootwear.com, elainegk@aol.com, alance53@yahoo.com, sharong@4taconic.com, stumpcsw2@gmail.com, cheesa34@optonline.com, canfieldvi@gmail.com, Anna.Paiewonsky@paiewonskylawfirm.com, cowpetbaywest@hotmail.com, joncassady@hotmail.com

Reply to all ; The ADA law does not prevent e communily from excluding DOGS. It does provide e meana for legitimate needs to be allowed !! No ona wishes to prevent proper needs to be satisfied !! We do wiah to prevent a large influx of PETS to Invade our clean and tranquil property .Once there is a removal of our" no dogs policy", pets will abound and there will be no way to control their habits or their owners obeylng the rules to maintain a clean quiet property !! Check other "dogs allowed" properties (especially beach properties)and hear the terrible problems incurred by failure of owners to curb and control their pets !!! Noise,smell,unpaid fines and in-your-face erroganos (we have that now!!).Again REAL needs for service are one thing,phony pets are another !! You tell me what the 3 dogs on property are ? needs or pets ?? How you do deal with arrogant rule breakers ?? Talk about IN-YOUR-FACE ,these three have some gall. We can make our rulea effective with proper wording that is legal . We are not the only community faced with shams for pets . How do others attain their goals within the law? I am sure there la a legal way !! Short of that I auggest they be ostracized,NO dinnar dates,no patronage of their establishments, no conversationa,no beach conclaves,just ignore them completely !!!! Certainly do not reelect them !!!!! PASS THE BY-LAW CHANGE Vote for Doug,Ed and Herb.Board control helpe ,but a by-law change would be harder to overturn.Be serious,what do you want——VOTE Al Felice 27 WWW

On Sun, Jan 15, 2012 at 11:20 AM, <DONNANATEL@aol.com> wrote:

Lance, What you need to do is go to the Government ADA website for the disabled, under Service Animals you will find something surprising, the actual law. You will elso find, legally, what you are allowed to ask and what the service dog owner is required to provide. It also clearly states that no specialized training is required for a service dog. I posted the court decision against Pueblo for a reason, I do not want Cowpet Bay using money that is set asida for improvements for legal fees.

I auggest that all homeowners check out the ADA website because all the amails are setting the association up for an expensive legal fight if the blog or the email authors are tied back to the board or employees of cowpet bay.

I am very concerned that a legal line is being crossed with the Service dog Issue.

Donna M LaScola, CEO
NATELCO Corporation
140 West Hampton Avenue

Capitol Heights, MD 20743

In a message dated 1/14/2012 10:45:46 P.M. Eastern Standard Time, docfelice@gmail.com writes:

> Hi Sharon, thanks for the "true" numbers !! Now perhaps every one else will SHUT UP ,including me. I no longer will have to champion our diligent board.I think you guys and gals did a terrific job ,despite all the negativity from a few dissidents. Congratulations for a job well done. Al Felice 27 WWW
>
> On Sat, Jan 14, 2012 at 10:01 PM, Sharon Koehler <shazkoehler@gmail.com> wrote:
>
> Dear Owners,
> As required in our bylaws, I am attaching a copy of our 2012 Budget, approved by the Board late in December 2011. Also attached you will find documents covering the above two important subjects. Please take the time to review these reports and, if you have any questions, please get back to me.
> Thank you.
> Sjaron Koehler, Treasurer
> CBW Board of Directors

Subj: **Fwd: CBW Liability Insurance**
Date: 1/18/2012 8:37:16 A.M. SA Western Standard Time
From: JERSEYBARB@aol.com
To: jkromes@gmail.com, rjlamoureux@snet.net, iamjk2@aol.com

**Nice ...............now he shows my letter. Real Class act**
**(letter to follow couldn't forward it)**

From: milom2@earthlink.net
To: lance@eisvi.com
CC: stycisv@gmail.com, rbcusvi@gmail.com, shazkoehler@gmail.com, moehogan1@verizon.net, JERSEYBARB@aol.com, wellsr_@earthlink.net, cowpetbaywest@hotmail.com
Sent: 1/17/2012 11:59:02 P.M. SA Western Standard Time
Subj: CBW Liability Insurance

Re: Policies DM-GL11-63 and 105434549

Dear Lance,

The referenced policies are the liability (general and officer) insurance policies for Cowpet Bay West Condominium Association. The Board of Directors would like to make you aware of a situation which may call these into play.

Recently one of our owners had their attorney send us a letter in which the attorney stated they were representing the owner in a "complaint" against the association. The Board is consulting with Atty Maria Hodge to determine what this means to us, and what our exposure, if any, is.

Attached is a copy of the letter from the attorney. At this time, we don't believe any action is required on your part; however, we will keep you informed as this matter progresses.

Max Harcourt

President, CBWCA

505-385-9225

3054700/000334

Q. What were they?

A. Yes. One just having nasty interactions in passing, but the one that really sticks out, to me, is sort of seems to be slanderous information that was published on the internet. That was a major, major, major stressor for Ms. Walters.

Q. Was it the fact that she had private information about her life being posted on the internet or was it something else?

A. No, it was private information. Private information that was.

MR. WILLIAMS: I object to the form of that last question.

Q. So, do you recall what Ms. Walters told you was published on the internet?

A. I believe it was regarding her psychiatric status or what was perceived to be her psychiatric status.

Q. Did she ever bring in any of the stuff that she printed off of the internet and discuss it with you?

A. She did.

Q. Do you have any of that stuff in your file somewhere?

A. I'm not sure, actually, because I believe

PLAINTIFF'S EXHIBIT 9

own life, because they're always depressed because they're born that way, and then there is people who have like a death in their family and go through a major stressor like a divorce, and that's what's called a situational depression. So what would you call Barbara Walters?

A. That is more of a situational, right.

Q. Do you find it ironic, Doctor, that you've prescribed an emotional support animal for Ms. Walters and the very thing that you said this is supposed to do for her actually aggravated her condition?

A. Yes, absolutely.

Q. And why do you agree with me that it's ironic?

A. Again, ironic given that this is something that could be very, very helpful to her and it was just causing a tremendous amount of stress in just -- and she never had any or never mentioned any stress in actually caring for the companionship pet. It was more just her possession of having the pet created adversity around her based on other people's reactions.

Q. Did she share with you some of the things that some of her neighbors did to her?

A. Yes.

to speculate.

Q. Did you believe that Barbara Walters was experiencing harassment by any of her neighbors?

MR. BENHAM: Objection as to form.

MR. WILLIAMS: Objection.

Q. Why do you say that?

A. Later on in our sessions, that became at times the focus of her complaints, unfortunately. She just didn't feel comfortable in her own home, which actually brought up a lot of the issues from her marital distress and reinforced some of those, maybe faulty beliefs. It was very difficult for her.

Q. So, in other words, she lost her home in New Jersey and then she came here to her home in Cowpet, she didn't have that home? Is that what she means?

MR. WILLIAMS: Objection to form. Been.

MS. BENTZ: Objection.

Q. You could answer.

A. Sure. What I meant was -- yes, absolutely, there was disruption in her family and she described St. Thomas as her safe haven. She came here to retreat to wellness, for lack of better

Case: 1:12-cv-00025-CVG-RM Document #: 208 Filed: 05/22/14 Page 1 of 20

**IN THE UNITED STATES DISTRICT COURT OF THE VIRGIN ISLANDS**
**DISTRICT OF ST. THOMAS AND ST. JOHN**
*****************

| | |
|---|---|
| **JUDITH KROMENHOEK,**<br><br>**Plaintiff,**<br><br>**v.**<br><br>**COWPET BAY WEST CONDOMINIUM ASSOCIATION; THE BOARD OF THE COWPET BAY WEST CONDOMINIUM ASSOCIATION; MAX HARCOURT, in his personal capacity; ALFRED FELICE; LANCE TALKINGTON; ROBERT COCKAYNE; VINCENT VERDIRAMO,**<br><br>**Defendants.** | **CIVIL NO. 12-00025**<br><br>**Action for: Housing Discrimination; Discrimination Based on Disability; Invasion of Privacy; Negligent Infliction of Emotional Distress Infliction of Emotional Distress; Punitive Damages; and Injunctive and Declaratory Judgment**<br><br>**JURY TRIAL DEMAND** |

**PLAINTIFF'S RESPONSE TO DEFENDANT'S LANCE TALKINGTON UNDISPUTED MATERIAL FACTS AND PLAINTIFF'S COUNTER-STATEMENTS OF FACTS**

**COMES NOW** the Plaintiff, **JUDITH KROMENHOEK** ("Plaintiff") and by and through the undersigned counsel, the **LAW OFFICES OF KARIN A. BENTZ, P.C.** (Karin A. Bentz, Esq., and Julita K. de León, Esq.) and submits her brief response to Defendant Lance Talkington's ("Talkington") statement of undisputed facts in support of their summary judgment motion, pursuant to Rule 56.1 of the Local Rules of Civil Procedure.

Rule 56. 1 permits a party opposing a summary judgment motion to submit, inter alia, a "concise statement of any additional facts that the respondent contends are material to the motion for summary judgment and as to which the respondent contends there exists a genuine issue to be tried." For ease of reference, Plaintiff has referenced the corresponding paragraphs of Defendants' statement of undisputed facts as ("SOF") where appropriate. Additionally, Plaintiff has also referenced Plaintiff's Counter Statement of Facts ("CSOF") where appropriate.

I. Plaintiff's Response to Talkington's Undisputed Material Facts.

1. Agrees

2. Agrees

*Judith Kromenhoek v. Cowpet Bay West Condominium Ass'n.* Civil No. 12/00025
Plaintiff's Response to Defendant Lance Talkington's Undisputed Material Facts and Plaintiff's Counter-Statement of Facts Page 2

3. Agrees.

4. Agrees.

5. Agrees.

6. Agrees.

7. Agrees.

8. Agrees.

9. Disagrees.

10. Agrees.

11. Agrees.

12. Disagrees.

13. Disagrees.

14. Agrees.

## II. Plaintiff's Counter Statement of Facts

1. Plaintiff Judith Kromenhoek owns and resides at a condo at Cowpet Bay West on the east side of St. Thomas. ( **Exhibit 1** ***Second Amended Compl. §1***).

2. A licensed psychologist wrote a letter stating that he was treating Plaintiff and that she was diagnosed with Anxiety Disorder, citing the DSM-IV. He further explained that Plaintiff had "severe limitations" in coping with stress and anxiety that most people would consider "normal day to day events." He went on to state that he has prescribed the use of an emotional support animal, dog or other, to alleviate her symptoms and that such emotional support animal was necessary. In conclusion, he states that pursuant to the Fair Housing Act, Plaintiff is qualified to keep her emotional support animal despite a policy prohibiting pets in her housing. On that same day, the National Service Animal Registry issued a certification that Plaintiff was allowed to keep her emotional support animal even if there is a policy prohibiting pets. (**Exhibit 2.** ***Letter from S. Sutherland***).

Joint Appendix Vol. II Page 2225

*Judith Kromenhoek v. Cowpet Bay West Condominium Ass'n.* Civil No. 12/00025
Plaintiff's Response to Defendant Lance Talkington's Undisputed Material Facts
and Plaintiff's Counter-Statement of Facts Page 3

3. In 2011, the By-laws of the Cowpet Bay West Condominium Association did not prohibit dogs. (**Exhibit 3. *Bylaws***).

4. The Rules and Regulations of the Board prohibited dogs on the premises. (**Exhibit 4. *Rules and Regulations***)

5. In July of 2011, Plaintiff submitted an application for a reasonable accommodation to keep Oliver, her emotional support dog on the premises. Because Cowpet Bay West did not have a formal application process, Plaintiff submitted a copy of a letter from her doctor and the dog's certification. (**Exhibit 2**)

6. At the time Plaintiff submitted her request for a reasonable accommodation, the Association had no written policy in place for processing a reasonable-accommodation request, although it had a NO DOG RULE in place for at least fifteen (15) years. (**Exhibit 4**)

7. Louanne Schechter accepted the documents, placed them in Kromenhoek's file and discussed Kromenhoek's request with Jon Cassady, Louanne Schechter's immediate supervisor. (**Exhibit 2**)

8. Schechter filed and discussed Kromenhoek's application with Jon Cassady, Schechter's immediate supervisor. (Id.)

9. Jon Cassady discussed Kromenhoek's application with Max Harcourt; and Harcourt subsequently came to the Association's Office to review Kromenhoek's documents. (Id.)

10. Harcourt sent his representative, Bob Canefield, a member of the Board, to review the documents as well. (Id.)

11. There was widespread opposition to having dogs on the premises by members of the Board. (Id.) All of the blog posts related to the dog issues at Cowpet are attached as Exhibit 5.

12. In his first blog post relating to "dogs" on the premises, Talkington, on September 27, 2011, stated that " at least three owners. . . have been seen with dogs that are either living in condos or are being entertained by an owner walking them on the property." He goes on to point out that two of the dog owners are present and past Board members. Talkington called for the

Joint Appendix Vol. II Page 2226

*Judith Kromenhoek v. Cowpet Bay West Condominium Ass'n.* Civil No. 12/00025
Plaintiff's Response to Defendant Lance Talkington's Undisputed Material Facts and Plaintiff's Counter-Statement of Facts Page 4

members of the Association to amend the Association's by-laws to "eliminate any confusion over possible exceptions to the general rule" of no dogs. (Id)

13. In response to increasing attacks by both Talkington and Felice on the blog regarding the requests for a reasonable accommodation, Kromenhoek explained that they were not violating the law or the rules. Kromenhoek stated that she has a disability and is afforded protection under the FHA. (Id)

14. Harcourt and other members of the Board improperly shared the content of the Plaintiff's applications with Talkington. (Id.)

15. Susan Anderson, a Board member, wrote an email complaining that she saw Kromenhoek walking a dog and assumed that she was walking the dog for somebody else "because Judith Kromenhoek does not appear to be disabled." (Id.)

16. The prevailing attitude shared most of the Board members was that Kromenhoek and Walters were not disabled because there was no visible evidence of their disability. (Id.)

17. Notwithstanding the objections to providing Talkington with private and personal information, on October 28, 2011, Harcourt emailed a letter to Kromenhoek and Walters and copied Talkington. Harcourt wrote as President of the Board and falsely accused Kromenhoek and Walters of violating the NO DOGS RULE "because they have not applied for an exception to the no dog rule." Harcourt also acknowledged in that same letter that both Kromenhoek and Walters had "papers for service dogs pending in the office." Contradicting himself, Harcourt ordered Kromenhoek and Walters to apply and submit documentation for a waiver and threatened to levy a monetary fine if they did not take up his offer. (Id.)

18. Talkington posted the entire letter on the blog in his October 30, 2011 post. (Id)

19. Talkington continued his harassing campaign against Kromenhoek and Walters. In a December 5, 2011 post, Talkington shares a complaint of a Mr. Bartlett and the barking of a dog in his area of the community. Talkington goes on to point out that the "known violators" live in this same area. Talkington opined that "trained service dogs are specifically trained

Joint Appendix Vol. II Page 2227

*Judith Kromenhoek v. Cowpet Bay West Condominium Ass'n.* Civil No. 12/00025
Plaintiff's Response to Defendant Lance Talkington's Undisputed Material Facts
and Plaintiff's Counter-Statement of Facts Page 5

to NOT bark unless the owner is in imminent danger." (Id)

20. During the January 11, 2012 Board meeting, Cockayne distributed information about service dog certification naming businesses that have no requirements for service dog certification. Cockayne also circulated copies of Kromenhoek's dog certification. (**Exhibit 6**).

21. In a January 15, 2012 blog entitled "Puppy Dog Diplomas," Talkington attacked the service dogs' certifications by stating they are "certified by an outfit called the National Service Animal Registry." Talkington concludes his blog post by sharing his "considered opinion" that such "outfits serve no legitimate purpose and exist mainly to sidestep what the ADA works diligently to accomplish" and putting forth a call "to stop the doggy diploma silliness and adopt clear ground rules for dogs at Cowpet." Talkington proclaims that the ADA is the sole source of legitimacy for such rules. (Exhibit 5).

22. On January 15, 2012, Donna LaScola voiced concern that the Association may be getting into legal trouble with all the blog posts and emails regarding Kromenhoek's and Walters' service animals. (**Exhibit 7**).

23. On January 17, 2012, ever dutiful to Talkington, Harcourt emailed Talkington informing him that the Board had received a letter from one of the owners stating the owner had filed a complaint. Therefore the Board was retaining counsel. (Exhibit 8).

24. On January 17, 2012, Kromenhoek and Walters received letters from the Board informing them that they were in violation of the no dogs rule and would be fined. (Exhibit 10)

25. Kromenhoek felt hurt and ashamed after reading the letter. (**Exhibit 9: Depo: Dr. Walker: 75: 16-24; 76: 1-25**).

26. In response to Kromenhoek's and Walters' HUD complaints, on March 25, 2012, Talkington blogged, Kromenhoek and Walters will "hang onto their puppies" at any length. In direct response to the HUD Complaint, Talkington says "Really ladies? Do you seriously believe that either of you two owners has any impact whatsoever on the Association's governance of this property in terms of your having those puppies? To call this a fiasco of a complaint

Joint Appendix Vol. II Page 2228

*Judith Kromenhoek v. Cowpet Bay West Condominium Ass'n.* Civil No. 12/00025
Plaintiff's Response to Defendant Lance Talkington's Undisputed Material Facts
and Plaintiff's Counter-Statement of Facts Page 6

'misguided' is at the moment the most charitable description of the thought process (if there even was one) that was involved in filing this complaint." (Exhibit 5)

27. Talkington characterizes Kromenhoek and Walters as "playground bullies" and accused them of making a mockery of the Board. He then calls on the Association to "go on the offensive" and file suit against Kromenhoek and Barbara Walters stating "when these ladies start spending their own cash instead of relying on the government for free help, the rubber will meet the road on how far everyone is willing to go." In closing, Talkington implores the Board to take Kromenhoek and Walters to court. (Id.)

28. In a January 5, 2012 blog, Talkington accused Kromenhoek of being CB Lawton, a person who blogged about having dogs on the premises. Talkington asserted in his blog post that Kromenhoek was CB Lawton citing as evidence Kromenhoek's refusal to respond to questions about "why it is OK for her to have a dog." Talkington says she should "either stand up and face the owners or quietly slide into the sunset." (Id).

Respectfully submitted,

**LAW OFFICES OF KARIN A. BENTZ, P.C.**

Dated: May 21, 2014

/s/Karin A. Bentz

**KARINA. BENTZ, ESQ. (VI Bar #413)**
**JULITA K. de LEÓN, ESQ. (VI Bar #913)**
5150 Dronningens Gade, Suite 8
St. Thomas, Virgin Islands 00802
Telephone: 340-774-2669
Telecopier: 340-774-2665
E-mail: kbentz@virginalaw.com

Joint Appendix Vol. II Page 2229

*Judith Kromenhoek v. Cowpet Bay West Condominium Ass'n.*
Plaintiff's Response to Defendant Lance Talkington's Undisputed Material Facts and Plaintiff's Counter-Statement of Facts
Civil No. 12/00025
Page 7

**CERTIFICATE OF SERVICE**

I hereby certify that I caused the filing and service of the foregoing with the Clerk of the District Court of the Virgin Islands using the CM/ECF system, which will provide electronic notice by email to the following.

Richard P. Farrelly, Esq.
Birch de Jongh & Hindels, PLLC
1330 Taarneberg
St. Thomas, VI 00802
E-mail: rfarrelly@bdhlawvi.com

John H. Benham, III, Esq.
Benham & Chan
P.O. Box 11720
St. Thomas, Virgin Islands 00801
Tel: 340-774-0673
Fax: 340-776-3630
email: benham@bclawvi.com

Joseph G. Riopelle, Esq.
Boyd Richards Parker & Colonnelli, P.L.
Rivergate Tower Suite 1150
400 N. Ashley Drive
Tampa, Fl. 33602
jriopelle@boydlawgroup.com

Ryan S. Meade, Esq.
Quintairos, Prieto, Wood & Boyce, P.A.
9300 South Dadeland Blvd., 4th Floor
Miami, Fl 33156
rmeade@gpwblaw.com

/s/ Karin A. Bentz

Joint Appendix Vol. II Page 2230



# National Service Animal Registry

903 NW F. Street · Grants Pass · Oregon · 97526 Toll Free · (866) 737-3930 Fax · (541) 471-1122

## NSAR CERTIFIED SERVICE ANIMAL

This document affirms that "**OLIVER**" (NSAR database ID[redacted], see adjacent photo) is certified as an emotional support animal (ESA) and registered with National Service Animal Registry (NSAR) on the date listed below. This emotional support has been formally prescribed and deemed necessary to assist **J. KROMENHOEK**, the confirmed disabled handler. The handler and service animal are listed in the National Service Animal Registry (NSAR) database and may be found on the following website: **www.nsarco.com/database.html.**

**OLIVER**

Emotional Support Animals are animals that are necessary for the normal, day-to-day functioning of their emotionally or psychologically disabled handler, facilitating a normalizing effect by their presence.

An ESA is not considered a working service dog under the ADA and is not granted unlimited public access. Protections under federal law include allowing a disabled handler to be accompanied by his/her emotional support animal in the cabin of the aircraft, in accordance with the Air Carrier Access Act 49 U.S.C. 41705 and Dept of Transportation 14 C.F.R. Part 382.

Additionally, property managers and landlords are required to make reasonable accommodation (a change in the rules) to permit a disabled handler to keep an ESA, even when a landlord's policy explicitly prohibits pets, as set forth in the Fair Housing Amendments Act of 1988, Section 504 of the Rehabilitation Act of 1973 and Title II of the Americans with Disabilities Act.

For more information, please call the U.S. Justice Department ADA Information Line at (800) 514-0301 (voice) or (800) 514-0383 (TTY) or visit the ADA Business Connection at **www.ada.gov**.

September 12, 2012
Date

[signature]
Tim Livingood, M.ED. CEO

EXHIBIT 1
PENGAD 800-631-6989

30553.00/000260



# Chilhowee Psychological Services

Testing · Assessment · Treatment

743 Goldhill Pl · Suite 129 · Woodland Park · CO · 80863 · (877) 223-1602

December 15, 2010

Judith Kromenhoek

Dear Ms. Kromenhoek,

Based on the results of the psychosocial battery you recently completed at Chilhowee Psychological Services, a DSM-IV-TR (Diagnostic and Statistical Manual of Mental Disorders, 4th Edition, Text Revision) diagnosis of 300.0, Anxiety Disorder NOS has been provisionally assigned to you.

The following is information designed to help you more clearly understand anxiety disorders in general. The CPS assessment and diagnostic service should increase your awareness of what you are experiencing and provide general information about the characteristics of the condition with which you may be diagnosed. This service is not intended to replace complete face to face assessment and treatment by a local qualified mental health professional.

Mental health and psychiatric conditions are subject to change in an individual, and may become worse without effective treatment. Conversely, these conditions may decrease in severity if left alone. It is based solely on the individual, his/her makeup, and environmental conditions.

Sincerely,

Timothy Livingood, M. Ed.
Executive Director

30553.00/000261

# Mind/Body Health & Psychology, LLC

6115 Estate Smith Bay
Suites 334 & 335
St. Thomas, USVI 00802

mbh&p
Mind/Body Health & Psychology, LLC

**Name:** Judith Kramenhaek
**Date of Birth:** 
**Age:**
**Gender:** Female
**Service:** Psychotherapy, Individual
**Date(s) of Service:** 7/1/2011; 1/31/2012; 3/26/2012; 4/10/2012; 9/14/2012; 3/19/2013; 7/16/2013
**Service Provider:** Sheena M. Walker, Ph.D.
Clinical Psychologist, VI License 10-029-PSY

## CLINICAL SUMMARY

**Presenting Complaint(s):** Judith is a 65 year old European-American woman who self-referred for assistance with the following issues: Anxiety Management, and to fulfill necessary requirements to maintain certification for service dog.

**Symptoms Reported:**

- Describes an overwhelming and persistent sense of worry and fear about a number of events or circumstances.
- Displays feelings of irritability, being on edge, and/or restlessness.
- Experiences difficulty concentrating or mind going blank.
- Feels immobilized or may completely withdraw in response to/anticipation of a real or imagined danger.

**History of the Problem:** Judith reported being diagnosed with Panic Disorder "years ago," and was previously prescribed medication for anxiety management. After education by her son who also struggles with anxiety, Judith explained that she bought a small lap dog that assists in her with management of anxiety. She further stated that the dog assists greatly when traveling to and from North Carolina. Judith explained that one of her sons living in North Carolina has a daughter who is ill. She further stated that her granddaughter's kidneys are failing, and she is in need of transplant surgery. To assist in caring for her other grandchildren and to allow her son and daughter-in-law to care for her ill granddaughter. Judith explained that she wants to fly up to be with her family. She further requests that her dog be with her to assist her through the anticipated emotional time.

**Social History:** Judith described having a healthy and loving marriage, and supportive family. She reported having some difficulty with her condominium association and neighbors within the condominiums regarding her dog. She described experiencing harassment for the possession of her dog, although it is allowed. Despite the difficulty with her neighbors, Judith described having a good social support network. She did report, however, that her recent interactions with condominium association have heightened her overall anxiety.

Phone: 340-714-8FIT (2348)
Facsimile: 340-715-8FIT (2348)
mindbodypsych.vi@gmail.com
www.synergyvi.com

30553.00/000677

**Mental Status/Behavioral Observations:** Judith consistently presented individually, and arrived on time to scheduled sessions. Her attire was consistently tidy with appropriate hygiene and grooming. Her general behavior was cooperative. She generally presents with euthymic mood and anxious affect. On every occasion, she has been oriented to time, place, person and situation. Her speech tone, pitch and speed were all within normal limits. Her gait is normal. Her stream of thought was productive and within normal limits. She is able to abstract, and has demonstrated fair insight with good judgment. Rapport with Judith has remained from for the entire duration of the theropeutic relationship.

**TREATMENT PLAN**

**Goals:**

- Resolve the core conflict that is the source of anxiety.
- Address and eliminate maladaptive thought processes that lead to anxious responses.
- Enhance ability to handle effectively life stressors.
- Increase overall sense of well-being via reduction/elimination of anxiety.

**Objectives:**

- Establish a support system of trusting individuals in order to discuss life stressors and help reduce anxiety.
- Implement steps (e.g., couples therapy, increased communication) to improve relationships deemed necessary to save or enhance; end relationships that have been deemed unsalvageable due to ongoing extreme negativity or abuse.
- Understand specific social mores, gender roles, and expectations that have led to internal conflicts and anxious feelings.
- Commit to a consistent course of action involving volunteering, community service, activism, further education, or other activity focused on contributing to society at least three or four times per month.
- Obtain an emotional support or companionship animal to assist in the alleviation of depressive symptoms and to encourage appropriate activity.
- Identify the relationship between multiple roles, role overload, role strain, and anxiety reactions.
- Learn and practice methods of reducing anxiety in a variety of situations.
- Develop the ability to determine when the use of anxiety-reduction techniques is necessary and how to use them effectively in 9 out of 10 anxiety-arousing situations.
- Implement self-care strategies that serve to augment the positive effects of other interventions.
- Identify precipitating events, thoughts, feelings, and reactions that are believed to contribute to anxiety.

**SUMMARY AND DIFFERENTIAL DIAGNOSTIC IMPRESSIONS**

| | | |
|---|---|---|
| Axis I: | 300.02 | Generalized Anxiety Disorder |
| | V62.81 | Relational Problem NOS |
| Axis II: | V71.09 | No diagnosis on Axis II |
| Axis III: | | None reported |
| Axis IV: | | Socially ostracized |
| Axis V: | GAF (current)= 57 | |

If there are any questions and/or concerns regarding this report, please feel free to call (340) 714-2348 or email at swalker@synergyvi.com.

Sheena M. Walker, Ph.D.
Licensed Psychologist

1/4/14
Date

30553.00/000679

# BY-LAWS OF

# COWPET BAY WEST CONDOMINIUM ASSOCIATION

Cowpet Bay
St. Thomas, Virgin Islands

February, 2012

## Article I
## Plan of Apartment Unit Ownership

**Section 1. Apartment Unit Ownership:** The property located at Parcels 8-56-1 and 8-1-2, 4, 5, & 6 of Estate Nazareth, No.1 Red Hook Quarter has previously been submitted in a declaration forming an association under the provisions of Chapter 33, Title 28 of the Virgin Islands Code, known as the "Condominium Act of the Virgin Islands". The association has been and will continue to be known as "COWPET BAY WEST", hereinafter called the "Condominium".

**Section 2. Applicability of By-Laws:** The provisions of these by-laws are applicable to the Property of the Condominium and the use and occupancy thereof. The term "Property", as used herein, shall include the land and all buildings and other improvements thereon owned by the association and all easements, rights and appurtenances belonging thereto, and all other property, personal or mixed, intended for use in connection therewith, all of which were previously submitted to the provisions of said Chapter 33, Title 28 of the Virgin Islands Code.

**Section 3. Application:** All present and future owners, mortgagees, lessees, occupants of apartment units and any other persons who may use the facilities of the Property in any manner are subject to these By-Laws, the Declaration and the Rules and Regulations.

The Acceptance of a deed, mortgage or conveyance or the entering into of a lease or the act of occupancy of an apartment unit shall constitute an agreement that these By-Laws, the Rules and Regulations and the provisions of the Declaration, as they may be amended from time to time, are accepted, ratified, and will be complied with.

**Section 4. Office:** The office of the Condominium and of the Board of Directors shall be located at Cowpet Bay West, Estate Nazareth, No.1 Red Hook Quarter, St. Thomas, Virgin Islands. The mailing address shall be 6201 Windward Way, St. Thomas, USVI 00802, or such address as may be designated by the Board, upon 30 days written notice to the members of the Association.

## ARTICLE II
## Board of Directors

**Section 1. Number and Qualifications:** The affairs of the Condominium shall be governed by a Board of Directors. The Board of Directors shall be composed of seven persons, all of whom shall be owners or spouses of owners, or in the case of partnership owners, shall be members of said partnership, or in the case of corporate owners, shall be officers or stockholders of such

PLAINTIFF'S EXHIBIT 3

corporations, or in the case of fiduciary owners shall be the fiduciaries or beneficiaries of any such trust or in the case of a limited liability company, shall be the members of such company. A Board member may not base his/her eligibility to sit on the Board on the same unit as any other member of the Board.

No person who is in arrears for ninety days or more on any billing or assessment by the Cowpet Bay West Condominium Association shall be eligible to be elected to or serve as a director on the Board of Directors. In the event such person is serving as a director, that person's position as director shall be declared to be vacant and another person appointed by a majority vote of the remaining Board to fill the vacancy so created, until the next regular election of the Board of Directors. Arrearages of partnerships, corporations, trusts, fiduciary owners, etc. on which a person's eligibility to serve on the board is based, shall be considered in determining the eligibility of a person to be elected to or to continue to serve on the board.

**Section 2. Powers and Duties:** The Board of Directors shall have the powers and duties necessary for the administration of the affairs of the Condominium and may do all such acts and things except as by law, by the Declaration (to the extent still applicable), or by these By-Laws may not be delegated to the Board of Directors by the unit owners. Such powers and duties of the Board of Directors shall include, but shall not be limited to, the following:

(a) Operation, care, upkeep and maintenance of the common areas and facilities.

(b) Determination of Association Charges, which shall include the common expenses required for the operation of the Condominium, insurance, water, utility rates, late fees and interest charges, fines for By-Laws and rules, regulation violations, any reserve fund maintained by the association and the costs of services provided.

(c) Collection of Association charges, as hereinafter defined, from the unit owners, and maintaining and accounting for those funds.

(d) Employment and dismissal of the personnel necessary for the maintenance and operation of the common areas and facilities.

(e) Adoption, amendment and enforcement of rules and regulations covering the details of the operation and use of the Property.

(f) Opening of bank accounts on behalf of the Condominium and designating the signatories required therefore.

(g) Purchasing or leasing or otherwise acquiring in the name of the Association or its designee, corporate or otherwise, on behalf of all unit owners, apartment units offered for sale or surrendered by their owners to the Board of Directors.

(h) Purchasing of apartment units at foreclosure or other judicial sales in the name of the Association or its designee, corporate or otherwise, on behalf of all unit owners.

(i) Selling, leasing, mortgaging, voting the votes appurtenant to (other than for the election of members of the Board of Directors), or otherwise dealing with apartment units acquired

and subleasing apartment units leased by the Association, or its designee, corporate or otherwise on behalf of all unit owners.

(j) Organizing corporations to act as designees of the Board of Directors in acquiring title to or leasing of apartment units on behalf of all unit owners.

(k) Obtaining of insurance for the Property, including the apartment units owned or required to be maintained by the Association, pursuant to the provision of Article V, Section 2 hereof.

(l) Making of repairs, additions and improvements to or alterations of the Property and repairs to and restoration of the Property in accordance with the other provisions of these By-Laws, after damage or destruction by fire or other casualty or as a result of condemnation or eminent domain proceedings.

**Section 3. Managing Agent and Manager:** The Board of Directors may employ for the Condominium a managing agent and/or a manager at a compensation established by the Board of Directors, to perform such duties and services as the Board of Directors shall authorize. The Board of Directors may delegate to the manager or managing agent, all of the powers granted to the Board of Directors by these By-Laws other than the powers set forth in subdivisions (b), (e), (f), (g), (h), (i), (j) and (k) of Section 2 of this Article II.

**Section 4. Election and Term of Office:**
Directors will serve for a term of three years. Two Directors shall be elected the first year, two the second year, and three the third year to replace those directors whose terms are expiring. Where a vacancy has been filled by vote of a majority of the vote of the remaining members of the Board, as provided in Section 6, that person shall be a member until the next Annual Meeting, at which time the unit owners shall elect the replacement for the remainder of the original term, if any. Any candidate for director may run for a full term, or any term created by a vacancy, or both.

Each Director shall be elected by the vote of a majority (as defined in Article III Section 9) of the unit owners. All vacancies shall be voted for on the same ballot, and the candidates with the highest number of votes shall be elected to each of the vacancies. Each candidate's name shall be preceded by a space where an "X" may be placed to vote for said candidate. It shall not be required that a name be crossed out and another inserted to vote for a candidate on the ballot. A space for write-in candidates shall also be provided. Ballots and proxies shall be provided to the owners not less than 30 days prior to the Annual Meeting.

The members of the Board of Directors shall hold office until their respective successors shall have been elected by the unit owners.

A Board member may serve only two consecutive terms and may not hold office for one year before being eligible to run again.

**Section 5. Removal of Members of the Board of Directors:** At any regular or special meeting of unit owners, any one or more of the members of the Board of Directors may be removed with or without cause by a majority of the unit owners and a successor may then and there or thereafter be elected to fill the vacancy thus created. Any members of the Board of Directors whose removal has been proposed by the unit owners shall be given an opportunity to be heard at the meeting.

If a Board member does not attend any of the Board meetings during an entire year, and also does not attend the annual owners meeting that same year, such member may be removed from the Board by a majority of the other members of the Board of Directors.

**Section 6. Vacancies:** Vacancies in the Board of Directors caused by any reason other than the removal of a member thereof by a vote of the unit owners, shall be filled by a vote of a majority of the remaining members at a special meeting of the Board of Directors held for that purpose promptly after the occurrence of any such vacancy, even though the members present at such meeting may constitute less than a quorum, and each person so elected shall be a member of the Board of Directors until a successor shall be elected at the next Annual Meeting of the unit owners. At that time a director shall be elected to serve the remainder of the term of the original vacating director.

**Section 7. Organization Meeting:** The first meeting of the members of the Board of Directors shall be an organizational meeting held directly following the Annual Meeting of the unit owners, at such time and place as shall be fixed by the Board members at said meeting, and no notice shall be necessary to the newly elected members of the Board of Directors in order to legally constitute such meeting, provided a majority of the whole Board of Directors shall be present thereat. If it is not possible to hold such first meeting of the new Board immediately, then it shall be held as soon as possible and proper notice shall be given to each director, as for any special meeting of the Board of Directors.

**Section 8. Regular Meetings:** Regular meetings of the Board of Directors may be held at such time and place as shall be determined from time to time by a majority of the members of the Board of Directors, but at least two such meetings shall be held during each fiscal year. Notice of regular meetings of the Board of Directors shall be given to each member of the Board of Directors by mail, electronic mail or fax transmission, at least thirty days prior to the day named for such meeting.

**Section 9. Special Meetings:** Special meetings of the Board of Directors may be called by the President upon five business days notice to each member of the Board of Directors, given by mail, electronic mail or fax transmission, which notice shall state the time, place and purpose of the meeting. Special meetings of the Board of Directors shall be called by the President or Secretary in like manner and on like notice on the written request of at least two members of the Board of Directors. Such special meeting may be conducted by a teleconference call.

**Section 10. Waiver of Notice:** Any member of the Board of Directors may, at any time, waive notice of any meeting of the Board of Directors in writing, and such waiver shall be deemed equivalent to the giving of such notice. Attendance by a member of the Board of Directors at any meeting of the Board shall constitute a waiver of notice by him of the time and place thereof. If all the members of the Board of Directors are present at any meeting of the Board, no notice shall be required and any business may be transacted at such meeting.

**Section 11. Quorum of Board of Directors**: At all meetings of the Board of Directors, a majority of the members thereof shall constitute a quorum for the transaction of business, and the votes of the majority of the members of the Board of Directors present at a meeting at which a quorum is present shall constitute the decision of the Board of Directors. If at any meeting of the Board of Directors there shall be less than a quorum present, , a majority of those present may adjourn the meeting from time to time. No business may be transacted until a quorum is achieved. Board members may participate by teleconference call.

**Section 12. Fidelity Bonds:** The Board of Directors shall obtain adequate fidelity bonds for all officers and employees of the Condominium handling or responsible for condominium funds. The premiums on such bonds shall constitute a common expense.

**Section 13. Compensation:** No member of the Board of Directors shall receive any compensation from the Condominium Association for serving as a board member. However, verifiable expenses, in accordance with guidelines established by the Board in advance, are reimbursable. A Board member may also be compensated for other services unrelated to his/her Board function.

**Section 14. Liability of the Board of Directors**: The members of the Board of Directors shall not be liable to the unit owners for any mistake of judgment, negligence, or otherwise, except for their own individual willful misconduct or bad faith. The unit owners shall indemnify and hold harmless each of the members of the Board of Directors against all contractual liability to others arising out of contracts made by the Board of Directors on behalf of the Property unless any such contract shall have been made in bad faith or contrary to the provisions of the Declaration or of these By-Laws.

It is intended that the members of the Board of Directors shall have no personal liability with respect to any contract made by them on behalf of the Property. It is also intended that the liability of any unit owner arising out of any contract made by the Board of Directors or out of the aforesaid indemnity in favor of the members of the Board of Directors shall be limited to such proportion of the total liability there under as his interest in the common areas and facilities bears to all such interest.

Every agreement made by the Board of Directors or by the managing agent or by the manager on behalf of the Property shall provide that the members of the Board of Directors or the managing agent, or the manager, as the case may be, are acting only as agents for the unit owners and shall have no personal liability there under (except as unit owners) and that each unit owner's liability there under shall be limited to such proportion of the total liability there under as his interest in the common areas and facilities bears to all such interest.

**Section 15. Executive Committee:** The Board of Directors, by resolution passed by a majority of the entire Board, shall designate at the Organization Meeting or anytime thereafter, three members of the Board to constitute an Executive Committee, with one member thereof designated as Chairman. The purpose of the Executive Committee is to control the day-to-day management of the Association.

The Board of Directors from time to time shall define the authority of the Executive Committee, but shall retain for itself the powers and duties as itemized in Section2 (b), (e), (h), (i), and (j). Additionally, the Board shall retain the right to appoint the manager or managing agent, fill vacancies in the Board, make changes in the Rules and Regulations, and acquire property.

The Board of Directors, at any time, may change the members of, may fill vacancies in, or may discharge the Executive Committee. Two members shall constitute a quorum of the Executive Committee. The act of a majority of the members at any meeting at which there is a quorum shall be the act of the Committee. The Board of Directors shall establish rules of procedure for the Committee governing, but not limited to, such items as notice and powers.

The Executive Committee shall make recommendations to the Board of Directors, and when the Board is not in session may, to the extent that the committee deems necessary, exercise the powers of the Board in the management of the business and affairs of the Association; and it shall have the powers to authorize the seal of the Association to be affixed to all papers which may require it.

The Executive Committee shall keep records of all its proceedings and shall report same to the Board of Directors, and its individual members, in writing within a reasonably short period of time after each significant action and after all meetings.

**Section 16. Inspection by Executive Committee**: The Executive Committee shall make a detailed inspection of the buildings, pump rooms, offices, maintenance shops, sewage and water-making plants, emergency generator, roads, sidewalks, steps, entry bridges, railings, grounds, landscaping, watering systems, the beach and the sea wall at least twice a year in the company of the manager or managing agent,. Additionally, the Committee shall evaluate the operation of the Association office and the overall security situation of the property.

The purpose of such inspections will be to (a) obtain a better understanding of the job being performed by the manager and his staff and (b) make suitable recommendations for possible future actions. Within 30 days after each such semi-annual inspection, the Committee will report its findings and recommendations to the members of the Board of Directors.

**Section 17. Action by Consent**: Any action required or permitted to be taken at any meeting of the Board of Directors, or any committee thereof, may be taken without a meeting if a written consent thereto is signed by three-quarters of the members, (rounded off to the nearest whole number), of the Board of Directors or of such committee as the case may be, and filed with the minutes of proceedings of the Board of Directors or committee.

**Section 18. Nomination of Directors**: Nominations for election to the Board of Directors shall be made by a Nominating Committee. The Nominating Committee shall consist of a chairman, who shall be a member of the Board of Directors, and two or more members of the Association. The Nominating Committee shall be appointed by the Board of Directors at its organizational meeting and serve until the next Annual Meeting.

The Nominating Committee shall make as many nominations for election to the Board of Directors as it shall, in its discretion, determine, but not less than the number of vacancies that are to be filled. Each nomination shall be for a specified vacancy.

Any person qualified under Section1 of Article II of these By-Laws to serve on the Board of Directors may be nominated for the Board of Directors by submitting a request, signed by the owners of two units in which the nominee has no financial interest, to the Board Secretary sixty days prior to the Annual Meeting. The Board shall include his/her name on the ballot directly following the nominee(s) proposed by the Nominating Committee for each vacancy. Any nomination that does not specify a specific vacancy shall be deemed a nomination for all vacancies.

**Section 19 – Communications**

Communications by, from, to and among the Board may be in writing, by fax or by electronic communications (telephone, telephone conference, email, internet, etc.) Telephone and telephone conference conversations must be documented (e.g., minutes or record of conversation). This communication will constitute "official" communication by the Board.

## ARTICLE III
## Unit Owners

**Section 1. Annual Meeting**:

The Annual Meeting of the unit owners shall be held during the first quarter each year. At the Annual Meeting, Directors shall be elected by ballot in accordance with the requirements of

Section 4 of Article II of these By-Laws, and the unit owners may transact such other business at such meetings as may properly come before them.

**Section 2. Place of Meeting**: Meetings of the unit owners shall be held at the principal office of the Condominium or at such other suitable place convenient to the unit owners as may be designated by the Board of Directors.

**Section 3. Special Meetings**: It shall be the duty of the President to call a special meeting of the unit owners if so directed by resolution of the Board of Directors or upon a petition signed and presented to the Secretary by not less than 25% in common interest, in the aggregate, of unit owners. The notice of any special meeting shall state the time and place of such meeting and the purpose thereof. No other business shall be transacted at a special meeting except as stated in the notice.

**Section 4. Notice of Meeting**: It shall be the duty of the Secretary to mail a notice of each annual meeting of the unit owners not less than thirty days nor more than ninety days prior to such meeting, stating the purpose thereof as well as the time and place where it is to be held, to each unit owner of record, at the building or at such other address as such unit owner may have designated by notice in writing to the Secretary. The mailing of a notice of meeting in the manner provided in this section shall be considered service of notice. The Board of Directors may assign the task of providing notice to unit owners to a person other than the Secretary. Special meetings require not less than ten days notice.

**Section 5. Adjournment of Meetings**: If any meeting of unit owners cannot be held because a quorum has not attended, a majority in common interest of the unit owners who are present at such meeting, either in person or by proxy, may adjoum the meeting to a time not less than forty-eight hours from the time the original meeting was called.

**Section 6. Order of Business**: The annual meeting of the unit owners shall be chaired by the President or other member of the Board of Directors chosen by the Board, and the order of business shall be generally as follows:

(a) Roll Call – by unit
(b) Establishment of Quorum (1/3 of all unit owners)
(c) Proof of Notice of Meeting
(d) Approval of Minutes of last year's Annual Meeting
(e) President's Report (including cost and coverage of insurance)
(f) Treasurer's Report (including discussion of Budget and Financial Status)
(g) Property Manager's Report
(h) Report of Nominating Committee
(i) Election of Board Members
(j) Old Business
(k) New Business

**Section 7. Title to Apartment Units**: Title to apartment units may be taken in the name of an individual, or in the names of two or more persons as tenants in common, joint tenants or tenants by the entirety, or in the name of a corporation, partnership, limited liability company or other legal entity authorized to own real property in the Virgin Islands, or in the name of a fiduciary.

**Section 8. Voting**: The owner or owners of each apartment unit, or some person designated by such owner or owners to act as proxy on his or their behalf and who need not be an owner, shall be entitled to cast the vote appurtenant to such apartment unit at all meetings of unit owners. The designation of any such proxy shall be made in writing and shall be revocable at any time by written notice to the Secretary or in person at the meeting. Any or all such owners or proxies may be present at any meeting of the unit owners and may vote or take any other action as a unit owner either in person or by proxy. Votes of unit owners shall be weighted in accordance with their share of the common interest, as follows, with the total of all votes equaling one hundred:

| | |
|---|---|
| **2 Bedroom** | **.911** |
| **3 Bedroom** | **1.062** |
| **2 Bedroom + Loft** | **1.193** |
| **4 Bedroom** | **1.301** |
| **3 Bedroom + Loft** | **1.376** |

The Board of Directors shall accept any vote if the owner is one of the owners of record of the unit, or in the case of a proxy, if there is no obvious defect on the face of such proxy. It shall be the burden of the protestor to offer satisfactory proof that the proffered vote or proxy is invalid and that his is the proper one.

**Section 9. Majority of Unit Owners**: As used in these By-Laws, the term "majority of unit owners: shall mean those unit owners having more than 50% of the total authorized votes of all unit owners present in person or by proxy and voting at any meeting of the unit owners, determined in accordance with the provisions of Section 8 of this Article III.

**Section 10. Quorum**: Except as otherwise provided in these By-Laws, the presence in person or by proxy of unit owners having one-third (1/3) of the total authorized votes of all unit owners shall constitute a quorum at all meetings of the unit owners.

**Section 11. Majority Vote**: The vote of a majority of unit owners at a meeting at which a quorum shall be present shall be binding upon all unit owners for all purposes except where, in the Declaration or these By-Laws, or by law, a higher percentage vote is required.

## ARTICLE IV
## Officers

**Section 1. Designation**: The principal officers of the Condominium shall be the President, the Vice President, the Secretary, and the Treasurer, all of whom shall be elected by the Board of Directors. The Board of Directors may appoint an assistant secretary, an assistant treasurer, and such other officers as in its judgment may be necessary. The President and Vice President, but no other officers, need be members of the Board of Directors.

**Section 2. Election of Officers**: The officers of the Condominium shall be elected annually by the Board of Directors at the Organization Meeting of each new Board of Directors and shall hold office at the pleasure of the Board of Directors.

**Section 3. Removal of Officers**: Upon the affirmative vote of a majority of the members of the Board of Directors, any officer may be removed, either with or without cause, and his successor

may be elected by the Board of Directors at any regular or special meeting of the Board of Directors called for such purpose.

**Section 4. President**: The President shall be the chief executive officer of the Condominium. He shall preside at all meetings of the unit owners and of the Board of Directors. He shall have all of the general powers and duties which are incident to the office of president of a stock corporation organized under the Corporation Law of the Virgin Islands, including but not limited to the power to appoint committees from among the unit owners from time to time as he may in his discretion decide is appropriate to assist in the conduct of the affairs of the Condominium.

**Section 5. Vice President**: The Vice President shall take the place of the President and perform his duties whenever the President shall be absent or unable to act. If neither the President nor the Vice President is able to act, the Board of Directors shall appoint some other member of the Board of Directors to act in the place of the President, on an interim basis. The Vice President shall also perform such other duties as shall from time to time be imposed upon him/her by the Board of Directors or by the President.

**Section 6. Secretary**: The Secretary shall keep the Minutes of all meetings of the unit owners and of the Board of Directors. He shall have charge of such books and papers as the Board of Directors may direct; and he shall, in general, perform all the duties incident to the office of secretary of a stock corporation organized under the Corporate Law of the Virgin Islands.

**Section 7. Treasurer**: The Treasurer shall have the responsibility for Condominium funds and securities and shall be responsible for keeping full and accurate financial records and books of account showing all receipts and disbursements, and for the preparation of all required financial data. He shall be responsible for the deposit of all monies and other valuable effects in the name of the Board of Directors, or the managing agent, in such depositories as may from time to time be designated by the Board of Directors, and he shall, in general, perform all the duties incident to the office of treasurer of a stock corporation organized under the Corporation Law of the Virgin Islands.

**Section 8. Agreements, Contracts, Deeds, Checks, etc.:** All agreements, contracts, deeds, leases and other instruments of the Condominium shall be executed by any two officers of the Condominium or by such other person or persons as may be designated by the Board of Directors.

**Section 9. Compensation of Officers**: No officer shall receive any compensation from the Condominium for acting as such.

## ARTICLE V

## Operation of the Property

**Section 1. Determination of Common Expenses and Fixing of Common Charges:** The Board of Directors shall from time to time, and at least annually, prepare a budget for the condominium, determine the amount of the common charges payable by the unit owners to meet the common expenses of the Condominium, and allocate and assess such common charges among the unit owners according to their respective common interests. Common expenses shall include, among other things, operation and maintenance, insurance premiums,

repairs and such amounts as the Board of Directors may deem proper for a general operating reserve, for a reserve fund for replacements, and to make up any deficit in the common expenses for any prior year.

The common expenses may also include such amounts as may be required for the purchase buy or lease to the Board of Directors or its designee, corporate or otherwise, on behalf of all unit owners, of any apartment unit whose owner has elected to sell or lease such apartment unit to the Board of Directors, or of any apartment unit which is to be sold at a foreclosure or other judicial sale.

The Board of Directors shall advise all unit owners promptly in writing of the amount of common charges payable by each of them, respectively, as determined by the Board of Directors, as aforesaid, and shall furnish to all unit owners copies of each budget on which such common charges are based.

A summary of the previous year's actual income and expenditures, a year end summation of liquid assets and accounts payable/receivable, and an approved budget for the current year shall be provided to all owners not less than 30 days prior to the Annual Meeting.

**Section 2. Insurance:**
The Board of Directors shall annually obtain and maintain, to the extent obtainable, the following insurance:

1. Fire insurance with extended coverage to include earthquake and flood coverage, vandalism and malicious mischief endorsements insuring the entire buildings and "common elements" (including all the individual unit's bathroom and kitchen fixtures and air conditions, but not including any wall, ceiling, or floor decoration, tiles or coverings, together with all service machinery contained therein and covering the interest of the Condominium, the Board of Directors and the Common Interest of the unit owners in an amount to be determined by the Board of Directors.
2. Windstorm, insuring the entire buildings and "common elements" together with all service machinery contained therein and covering the interest of the Condominium, the Board of Directors and the Common Interest of the unit owners in an amount to be determined by the Board of directors.
3. Worker's Compensation; Public Liability covering each member of the Board of Directors, the managing agent, the manager, the office manager and each unit owner; Vehicle and
   other such insurance as the Board of Directors may determine in amounts to be determined by the Board of Directors.

All policies of physical damage shall provide that such policies may not be cancelled or substantially modified without written notice from the Board of Directors.

From time to time or as required by insurers, the Board of Directors shall obtain from a certified and USVI licensed real estate appraiser an appraisal of the full replacement value, without deduction for depreciation, of the buildings, common areas and facilities for the purpose of determining the amount of insurance required.

Unit owners shall be encouraged to carry Home Owners insurance on their "apartment unit" for their own benefit provided that all such policies shall indicate that the liability of the carrier(s) issuing insurance obtained by the Board of Directors shall not be affected or diminished by reason of any such additional insurance carried by any unit owner.

At each Annual Meeting, the Board shall provide to the owners a concise summary of all insurance coverage and costs.

The terms "common elements" and "apartment unit," as mentioned above, are defined in Article 5, Section 10 "Routine Maintenance and Repair."

**Section 3. Repair or Reconstruction After Fire or Other Casualty:** In the event of damage to or destruction of the commonly owned buildings and elements as a result of fire or other casualty (unless 66-2/3% or more of the buildings are destroyed or substantially damaged and 75% or more of the unit owners determine in accordance with the Declaration not to proceed with the repair or restoration), the Board of Directors shall arrange for the prompt repair or restoration of the commonly owned buildings and elements, and the Board of Directors shall disburse the proceeds of all insurance policies to the contractors engaged in such repair or restoration in appropriate progress payments. Any cost of such repair or restoration in excess of the insurance proceeds shall constitute a common expense – and the Board of Directors may assess all the unit owners for such deficit as part of the common charges.

The association shall only be responsible for inspecting unit interiors to determine if damage is structural or due to external causes, or if adjacent unit damage is caused by external causes, or unless that unit is owned by the association. Unless that unit is owned by the association, repair by the association of other unit damage will be limited to structural damage, that caused by external or adjacent unit causes, and will not include property or fixtures installed by the owner or previous owners.

Within ninety days after a casualty of an estimated repair cost of $100,000 or greater, the Board will provide to the owners a financial status report indicating projected repair costs, source(s) of necessary funds, expenditures and commitments to date, and a schedule and plan for completion. This report will be updated and issued to owners on a quarterly basis, thereafter, until repairs are complete. A current report shall be provided at the next Annual Meeting.

If 66-2/3% or more of the Building(s) are destroyed or substantially damaged and if within sixty days of the date of such destruction or damage, 75% or more of the unit owners determine not to proceed with repair and restoration, the Property shall be subject to an auction for partition at the suit of any unit owner or lien holder, as if owned in common, in which event the net proceeds of sale, together with the net proceeds of insurance policies (less any repairs conducted) shall be divided by the Board of Directors among all the unit owners in proportion to their respective common interests, after first paying out of the share of each unit owner the amount of any unpaid liens on his/her apartment unit, in the order of priority of such liens.

**Section 4. Payment of Association Charges:** All unit owners shall be obligated to pay the common charges assessed by the Board of Directors pursuant to the provisions of Section 1 of this Article V at such time or times as the Board of Directors shall determine, as well as "other charges" for utilities, services, unit repairs, late fees, interest, fines and/or collection costs, if incurred. With respect to the following sections concerning payment, collection, default, foreclosure, etc., in Sections 4, 5, 6, 7, & 8 below, the term "association charges" is intended to include, but not be limited to, all the above items, both the "common" and "other" charges.

No unit owner shall be liable for the payment of any part of association charges assessed against his apartment unit subsequent to a sale, transfer or other conveyance by him of such apartment unit, together with the Appurtenant Interests, as defined in Section1 of Article VII hereof. In addition, any unit owner may, subject to acceptance by the Board of Directors provided that his apartment unit is free and clear of liens and encumbrances other than mortgages and statutory liens for unpaid association charges, convey his apartment unit,

together with the "Appurtenant Interests" to the Board of Directors, or its designee, corporate or otherwise, on behalf of all other unit owners, and in such event be exempt from association charges thereafter assessed.

However, a purchaser of an apartment unit shall be liable for the payment of association charges assessed against such apartment unit prior to the acquisition by him of such apartment unit, without prejudice to such purchaser's right, if any, to recover from the seller the amounts paid by the purchaser, except that a first mortgagee or other purchase of an apartment unit at a foreclosure sale of a first priority mortgage of such apartment unit shall not be liable for and such apartment unit shall not be subject to a lien for the payment of association charges which became due prior to the acquisition of title by such acquirer.

**Section 5. Collection of Association Charges**: The Board of Directors shall assess association charges against the unit owners from time to time and shall take prompt action to collect any charges due from any unit owner, which remain unpaid for more than thirty days from the date due for payment thereof. Such action may include placement of a lien on the apartment unit, notification to the mortgagee of the owner's failure to pay association charges and foreclosure on the lien. Additionally, suspension of utilities by a majority vote of the Executive Committee is permitted if an owner is more than 90 days in arrears of any Association charges. Payments received from unit owners will be applied to Association Charges in the chronological order incurred.

**Section 6. Default in Payment of Association Charges:** In the event of default by any unit owner in paying to the association charges as determined by the Board of Directors, such unit owner shall be obligated to:

(1) pay interest from the date of the initial billing at the maximum legal rate of interest, as defined by the Virgin Islands Laws, on all amounts past due,
(2) pay a monthly service charge as determined and promulgated from time-to-time by the Board of Directors,
(3) pay all expenses and attorneys' fees incurred by the Board of Directors in any proceeding brought to collect such unpaid association charges.

All such unpaid association charges shall constitute a lien on such unit prior to all other liens except those specified in Section 922 of Chapter 33, Title 28 of the Virgin Islands Code. The Board of Directors shall have the right and duty to attempt to recover all association charges, together with interest and monthly service charges thereon, and the expenses of the proceeding, including attorneys' fees, in any action to recover the same brought against such unit owner, or by foreclosure of the lien on such apartment unit granted by Section 922 of Chapter 33, Title 28, Virgin Islands Code.

**Section 7. Foreclosure of Liens For Unpaid Association Charges:** In any action brought by the Board of Directors to foreclose a lien on an apartment unit because of unpaid association charges, the unit owner shall be required to pay a reasonable rental for the use of his apartment unit, and the plaintiff in such foreclosure action shall be entitled to the simultaneous appointment of a receiver to collect the same. The Board of Directors, acting on behalf of all unit owners, shall have power to purchase such apartment unit at the foreclosure sale and to acquire, hold, lease, mortgage, vote the votes appurtenant to, convey or otherwise deal with the same. A suit to recover a money judgment for unpaid association charges shall be maintainable without foreclosing or waiving the lien securing the same.

**Section 8. Statement of Association Charges:** The Board of Directors shall promptly provide any unit owner so requesting the same in writing, with a written statement of all unpaid association charges due from such unit owner.

**Section 9. Abatement and Enjoinment of Violations by Unit Owners:** The violation of any rule or regulation adopted by the Board of Directors or the breach of any of these By-Laws contained herein, or the breach of any provisions of the Declaration, shall give the Board of Directors the right, in addition to any other rights set forth in these By-Laws (a) to enter the apartment unit in which, or as to which, such violation or breach exists and to summarily abate or remove, at the expense of the defaulting unit owner, any structure, thing or condition that may exist therein contrary to the intent and meaning of the provisions hereof, and the Board of Directors shall not thereby be deemed guilty in any manner of trespass or (b) to enjoin, abate or remedy by appropriate legal proceedings, either at law or in equity, the continuance of any such breach.

**Section 10. Routine Maintenance and Repair:** All maintenance of and repairs to any "apartment unit" (other than maintenance of and repairs to any common areas and facilities contained therein, and not necessitated by the negligence, misuse or neglect of the owner of such apartment unit) shall be the responsibility of the owner of such apartment unit. Also, each unit owner shall be responsible for damage to other apartment units and/or to the common areas and facilities resulting from conditions for which such owner has responsibility as indicated above.

An "apartment unit" is considered the space inside the perimeter walls, interior walls, floor and ceiling to include:

1. All decorating elements including: paint, wall and floor coverings, paneling, molding and tiles; finished cabinets and mirrors.
2. All electrical appliances including: refrigerator, stove, washer, dryer, dishwasher, garbage disposal, hot water heater and air-conditioning equipment (including compressor).
3. All electrical fixtures including: wall ceiling and floor outlets, switches and fuse box.
4. All plumbing fixtures including: tubs, showers, sinks, toilets and faucets.

Additionally, the unit owner shall be responsible for the routine lubrication and adjustment of doors and windows, and, unless major casualty related, replacement of broken glass, wooden or glass slats and damaged screens. The unit owner shall also maintain and assure the operability of the storm shutters installed on that unit and is responsible to close them in the event of a windstorm. Damage caused by failure to do so is the responsibility of the owner if net insurance proceeds are insufficient to cover such damage.

Screen doors may be installed on the main street-side entry doors at the unit owner's expense provided they meet the existing décor. Once installed, they must be maintained by the unit owner in a good state of repair, or the Association will do so at the owner's expense.

Except for the limited exceptions noted above, all maintenance, repairs and replacements to the "common elements", common areas and facilities, whether located inside or outside of the apartment units, (unless necessitated by the negligence, misuse or neglect of a unit owner, in which case such expense shall be charged to such unit owner), shall be made by the Association and be charged to all the unit owners as a common expense.

"Common elements" are considered to include all other elements of the buildings and property except those specified as being part of the "apartment unit." Additionally, the following are considered common elements:

1. Electrical supply to the fuse box, not including the panel.

2. Water and plumbing lines in the walls (including interior walls), floor and ceiling to the valves at sinks, showers, tubs, hot water heater, and toilets, etc.
3. Drains to the first connection outside a wall.

External air conditioning compressor units shall be maintained by the owner in a reasonable state of preservation. The Association may require owner to remove inoperable and/or un-maintained units or do so at the owner's expense

Below is a guide to assist in clarifying owner and Association responsibility with regard to maintenance/repair and insurance."

Insurance and Maintenance Responsibility Matrix

| **Category (Not Intended to be all-inclusive)** | **Owner Maint/Repair Responsiblity** | **Association Maint/Repair Responsibility** | **Association Insurance Responsibility** | **Owner Insurance Responsibility** |
|---|---|---|---|---|
| Exterior Walls and Interior Damage Caused by Leaks | | X | X | |
| Roof and Interior Damage Caused by Roof Leaks | | X | X | |
| Interior Damage caused by Adjacent Units (Leaks, etc.) | X | | | **Owner or Adjacent Unit's Insurance Responsible** |
| Front Doors | X | | X | |
| Screens | X | | X | |
| Exterior Sliders | | X | X | |
| Exterior Wood Railings, Trim, Benches | | X | X | |
| Exterior Windows | X | | X | |
| Electrical System to Breaker Panel | | X | X | |
| Electrical System, Breaker Panel to Outlets, Junction Boxes | X | | X | |
| Electrical Fixtures-Interior | X | | | X |
| Plumbing Inside Walls, Floors Ceilings to valves | | X | X | |
| Condo plumbing not in walls/floors | X | | | X |
| Plumbing Fixtures | X | | | X |
| Interior Walls | X | | X | |
| Interior Doors | X | | | X |
| Cabinets | X | | | X |
| Furniture | X | | | X |
| Appliances | X | | | X |
| Wall/Floor Coverings (tile/carpet) | X | | | X |
| Hurricane Shutters | X | | X | |
| Furniture | X | | | X |
| Personal Property | X | | | X |
| External A/C elements | X | | | X |
| Internal A/C elements | X | | | X |
| Landside Porch/Steps/Railings | | X **Excluding Tile** | X **Excluding Tile** | |
| Seaside Balcony/Railings | | X **Excluding Tile** | X **Excluding Tile** | |

**Section 11. Restriction on Use of Apartment Units:** In order to provide for congenial occupancy of the Property and for the protection of the value of the apartment units, the use of the Property shall be restricted to and shall be in accordance with the following provisions:

1. The apartment units shall be used for residences only. Units will not be occupied by more than two persons per bedroom for more than thirty days per year.
2. The common areas and facilities, including the limited common areas and facilities, shall be used only for the furnishing of the services and facilities for which they are reasonably suited and which are incident to the use and occupancy of apartment units
3. No nuisances shall be allowed on the Property nor shall any use or practice be allowed which is a source of annoyance to its residents or which interferes with the peaceful possession proper use of the Property by its residents.
4. No improper, offensive or unlawful use shall be made of the Property or any part thereof, and all valid laws, zoning laws and regulations of all governmental bodies having jurisdiction thereof shall be observed.
5. Violations of laws, orders, rules, regulations or requirements of any governmental agency having jurisdiction thereof, relating to any portion of the Property, shall be corrected, by and at the sole expense of the unit owners or the Board of Directors, whichever shall have the obligations to maintain or repair such portion of the Property.
6. No dogs are allowed on the property, either long term or visiting. The Board may grant exceptions to the NO DOGS ALLOWED rule, on an individual basis, should an owner require the assistance of a service animal (dog) as defined by the ADA. Owners seeking to obtain such an exemption are required to apply, in writing, to the Board with supporting documentation.

**Section 12. Additions, Alterations or Improvements by the Board of Directors:** Additions, alterations or improvements to the common areas and/or facilities up to $100,000 may be made by the Board of Directors. Additions, alterations or improvements in excess of $100,000 shall require approval by a vote of two-thirds (2/3) in common interest of the owners. The cost of such additions, alterations or improvements shall constitute a common charge. This section is not applicable to repairs conducted in accordance with Article V Section 3 of these By-Laws.

**Section 13. Additions, Alterations, or Improvements by Unit Owners:** No unit owner shall make any structural addition, alteration or improvement in or to his apartment unit, including any exterior painting or exterior alteration or addition (including awnings, grills, etc.) without the prior written consent thereto of the Board of Directors. The Board of Directors shall have the obligation to answer any written request by a unit owner for approval of a proposed structural addition, alteration or improvement in such unit owner's apartment unit, within thirty (30) days after such request, and failure to do so within the stipulated time shall constitute a consent by the Board of Directors to the proposed addition, alteration or improvement.

A unit owner shall obtain a receipt from any person accepting his written request for a change under this section and shall show the receipt to the manager or any Director upon request. Any application to any department of the Government of the Virgin Islands or to any other governmental authority for a permit to make an addition, alteration or improvement in or to any apartment unit shall be executed by the Board of Directors only, without, however, incurring liability on the part of the Board of Directors or any of them to any contractor, sub-contractor or supplier on account of such additions, alteration or improvement, or to any person having any claim for injury to person or damage to property arising therefrom. The owner in such instance shall provide the Board of Directors with a Hold Harmless Certificate.

**Section 14. Use of Common Areas and Facilities**: A unit owner shall not place or cause to be placed in the stairways or other common areas and facilities, including the limited common areas and facilities, other than the areas designated as storage areas, any furniture, packages or objects of any kind. The entry passages, stairways, entry bridges, etc., shall be used for no purpose other than for normal transit through them.

**Section 15. Right of Access:** A unit owner shall grant a right of access to his apartment unit to the manager and/or the managing agent and/or any other person authorized by the Board of Directors, the manager or the managing agent, for the purpose of making inspections or for the purpose of correcting any condition originating in his apartment unit and threatening another apartment unit or a common area or facility, or for the purpose of performing installations, alterations or repairs to the mechanical or electrical services or other common areas or facilities in his apartment unit or elsewhere in the Building, provided that requests for entry are made in advance and that any such entry is at a time reasonably convenient to the unit owner. In case of an emergency, such right of entry shall be immediate, whether or not the unit owner is present at the time.

**Section 16. Rules of Conduct**: Article V Section II of these By-Laws delineates general restrictions on the use of the property. Additionally, a definitive listing of current Rules and Regulations is provided as Exhibit I hereto. These Rules and Regulations may be amended by the Board of Directors from time to time. The Board is empowered to enforce these By-Laws and Rules and Regulations with monetary fines and other sanctions and may also take any legal action in court to enforce them. An owner is subject to such fines, sanctions and/or legal actions for the actions of his tenant as if those actions were by the owner.

Copies of the Rules and Regulations shall be furnished by the Board of Directors to each unit owner prior to the time when the same shall become effective. The unit owner must insure that the tenant or occupant be fully informed and furnished with a copy of the Rules and Regulations and by fully bound thereby.

**Section 17. Potable Water and Electricity:** Potable water and electricity shall be supplied by the Association through the common facilities of the Condominium directly to each apartment unit through a separate meter, and each unit owner shall be required to pay the charges therefore established, from time to time, by the Board of Directors. Water, electricity and other utility charges will normally be billed monthly incident to the common charges and are considered to be part of the "association" charges. Utility charges more than thirty days in arrears are subject to a late fee and interest per Section 6 Article V of these By-Laws, and said utilities may be suspended by the Association if an owner is more than 90 days in arrears of Association charges per Article V Section 5 thereof.

**Section 18. Gas:** Gas shall not be piped to any apartment unit, and unit owners are specifically prohibited from using gas as a fuel for regular cooking, water heating, or any other regular purpose. Small quantities of propane gas may be used for gas grills kept on street-side galleries and for emergency use inside apartment units.

**Section 19. Grey Water and Sewerage Service:** Grey water for flushing and sewerage service (including sewage disposal and treatment in the condominium's sewerage treatment plant) shall be supplied as a common facility to all unit owners, and the cost thereof shall be treated as a common expense.

## ARTICLE VI
## Mortgages

**Section 1. Notice of Unpaid Common Charges:** The Board of Directors, whenever so requested in writing by a mortgages of an apartment unit, shall promptly report any then unpaid association charges due from, or any other default by the owner of the mortgaged apartment unit.

**Section 2. Notice of Default:** The Board of Directors, when giving notice to a unit owner of a default in paying common charges or other default, may send a copy of such notice to each holder of a mortgage covering such apartment unit.

## ARTICLE VII
## Sales and Mortgages of Units

**Section 1. No severance of Ownership:** No unit owner shall execute any deed, mortgage or other instrument conveying or mortgaging title to his apartment unit without including therein the Appurtenant Interests, it being the intention hereof to prevent any severance of such combined ownership. For the purpose of the By-Laws, the "Appurtenant Interests" shall mean collectively, (i) the unit owner's undivided interest in the common areas and facilities appurtenant to such unit; (ii) the interest of such unit owner in any apartment units theretofore acquired by the Board of Directors, or its designee, on behalf of all unit owners, or the proceeds of the sale or lease thereof, if any; and (iii) the interest of such unit owner in any other assets of the Condominium.

Any such deed, mortgage or other instrument purporting to affect one or more of such interests, without including the interest or interests so omitted, shall be deemed to include such interests even though the latter shall not be expressly mentioned or described therein. No part of the Appurtenant Interests of any apartment unit may be sold, transferred or otherwise disposed of, except as part of a sale, transfer or other disposition of the apartment unit to which such interests are appurtenant, or as part of a sale, transfer or other disposition of such part of the Appurtenant Interests of all apartment units.

**Section 2. Sale to Board of Directors:** A unit owner may, subject to mutual agreement of the parties, and subject to the provisions of Section 1 of this Article VII, sell his unit to the Board of Directors, or its designee; provided, however that such purchase by the Board of Directors shall have the prior approval of two-thirds (2/3) of the unit owners, as expressed by the vote of at least two third (2/3) in number and in common interest, of all unit owners, cast in person or by proxy in accordance with these By-Laws.

**Section 3. Financing of Purchase of Apartment Units By Board of Directors:** Acquisition of apartment units by the Board of Directors, or its designee, on behalf of all unit owners, may be made from the working capital and common charges in the hands of the Board of Directors, or if such funds are insufficient the Board of Directors may levy an assessment against each unit owner in proportion to his ownership in the common areas and facilities as a common charge, which assessment shall be enforceable in the same manner as provided in Section 6 and 7 of Article V, or the Board of Directors, in its discretion, may borrow money to finance the acquisition of such apartment units, provided, however, that no financing may be secured by an encumbrance or hypothecation of any property other than the apartment unit, together with the Appurtenant Interests, so to be acquired by the Board of Directors.

**Section 4. Gifts and Devises, etc:** Any unit owner shall be free to convey or transfer his apartment unit by gift, or to devise his apartment unit by will, or to pass the same by intestacy, without restriction.

**Section 5. Waiver of Right of Partition with Respect to Such Apartment Units as are Acquired by the Board of Directors, or its Designee, on Behalf of All Unit Owners as Tenants in Common:** In the event that an apartment unit shall be acquired by the Board of Directors, or its designee, on behalf of all unit owners as tenants in common, all such unit owners shall be deemed to have waived all rights of partition with respect to such apartment unit.

## ARTICLE VIII

**Section 1. Condemnation – Eminent Domain:** In the event of a taking by condemnation or by eminent domain of part or all of the common areas and facilities, the award made for such taking shall be payable to the Board of Directors for disbursement and/or payment of the common expenses.

## ARTICLE IX
## Records

**Section 1. Records and Audits:** The Board of Directors or the managing agent shall keep detailed records of the actions of the Board of Directors and the managing agent, Minutes of the meetings of the Board of Directors, Minutes of the meetings of unit owners, and financial records and books of account of the Condominium, including a chronological listing of receipts and expenditures, as well as a separate account for each apartment unit which, among other things, shall contain the amount of each assessment of common charges against such apartment unit, the date when due, the amounts paid thereon, and the balance remaining unpaid.

Each unit owner shall be permitted to examine all accounts, records and contracts of the Association in the Condominium office at reasonable times, on business days, but not more often than once a month. All others must request any required information from the Board of Directors.

An annual report of the receipts and expenditures of the Association, examined and approved by a licensed accountant not affiliated with the Association and chosen by the Board of Directors, shall be rendered to the Board and sent, within a reasonable time after the end of each fiscal year, to all unit owners who request it.

## ARTICLE X
## Miscellaneous

**Section 1. Notices:** All notices hereunder shall be sent by registered or certified mail to the Board of Directors c/o the managing agent, or if there is no managing agent, to the office of the Board of Directors or to such other address as the Board of Directors may hereafter designate from time to time, by notice in writing to all unit owners and to all mortgagees of apartment units.

All notices to any unit owner shall be sent by registered or certified mail to the Building or to such other address as may have been designated by him from time to time, in writing, to the Board of Directors. All notices to mortgagees of apartment units shall be sent by registered or certified mail to their respective addresses, as designated by them from time to time, in writing

to the Board of Directors. All notices shall be deemed to have been given when mailed, except notices of change of address, which shall be deemed to have been given when received.

Notwithstanding the requirements of this section, all notices of regular, special and Annual Meetings of the unit owners, Board of Directors, and committees of the Board or otherwise, shall be by first class mail but without the requirement of registration or certification. The applicable notice shall be sent so as to comply with the required time limits, if any, to the regular mailing address of the designated party as recorded in the books of the Association.

**Section 2. Invalidity:** The invalidity of any part of these By-Laws shall not impair or affect in any manner the validity, enforceability or effect of the balance of these By-Laws.

**Section 3. Captions:** The captions herein are inserted only as a matter of convenience and for reference, and in no way define, limit or described the scope of these By-Laws, or the intent of any provision thereof.

**Section 4. Gender:** The use of the masculine gender in these By-Laws shall be deemed to include the feminine gender and the use of the singular shall be deemed to include the plural, whenever the context so requires.

**Section 5. Waiver:** No restrictions, condition, obligation or provisions contained in these By-Laws shall be deemed to have been abrogated or waived by reason of any failure to enforce same, irrespective of the number of violations or breaches thereof which may occur.

**Section 6. Insurance Trustee:** The Board of Directors may appoint a Trustee to distribute large amounts of any insurance proceeds. The trustee so appointed may be any individual or entity, so long as such is properly bonded in relation to the funds and responsibility involved.

## ARTICLE XI
## Amendments to By-Laws

**Section 1. Amendments to By-Laws:** Except as hereinafter provided, these By-Laws may be modified or amended by the vote of 66-2/3% in number and in common interest of all unit owners.

## ARTICLE XII
## Execution of Instruments and Seal

**Section 1. Execution and Instruments:** All instruments of the Condominium shall be executed under seal by such officer or officers as the Board of Directors may designate, or as may be otherwise authorized.

**Section 2. Seal:** The seal of the Condominium shall be as determined by the Board of Directors from time to time.

## ARTICLE XIII
## Conflicts

**Section 1. Conflicts:** These By-Laws are set forth to comply with the provisions of Sections 917 and 918 of Chapter 33, Title 28, Virgin Islands Code. In case any of these By-Laws conflict with the provisions of said statute or of the Declaration, the provisions of said statute or of the Declaration, as the case may be, shall control.

DRAFT

# BY-LAWS OF COWPET BAY WEST

## CONDOMINIUM ASSOCIATION

**Cowpet Bay**

**St. Thomas, Virgin Islands**

**New date**

## Article I

## Plan of Unit Ownership

**Section 1. Unit Ownership:** The property located at Parcels 8-56-1 and 8-1-2, 4, 5, & 6 of Estate Nazareth, No.1 Red Hook Quarter has previously been submitted in a declaration forming an association under the provisions of Chapter 33, Title 28 of the Virgin Islands Code, known as the "Condominium Act of the Virgin Islands". The association has been and will continue to be known as "COWPET BAY WEST", hereinafter called the "Condominium".

**Section 2. Applicability of By-Laws:** The provisions of these by-laws are applicable to the Property of the Condominium and the use and occupancy thereof. The term "Property", as used herein, shall include the land and all buildings and other improvements thereon owned by the association and all easements, rights and appurtenances belonging thereto, and all other property, personal or mixed, intended for use in connection therewith, all of which were previously submitted to the provisions of said Chapter 33, Title 28 of the Virgin Islands Code.

**Section 3. Application:** All present and future owners, mortgagees, lessees, **tenants**, occupants of units and any other persons who may use **or access** the facilities of the Property in any manner are subject to these By-Laws, the Declaration and the Rules and Regulations.

The Acceptance of a deed, mortgage or conveyance or the entering into of a lease or the act of occupancy of a unit shall constitute an agreement that these By-Laws, the Rules and Regulations and the provisions of the Declaration, as they may be amended from time to time, are accepted, ratified, and will be complied with.

**Section 4. Office:** The office of the Condominium and of the Board of Directors shall be located at Cowpet Bay West, Estate Nazareth, No.1 Red Hook Quarter, St. Thomas, Virgin Islands. The mailing address shall be 6201 Windward Way, St. Thomas, USVI 00802, or such address as may be designated by the Board, upon 30 days written notice to the members of the Association.

DRAFT

ARTICLE II

Board of Directors

**Section 1. Number and Qualifications:** The affairs of the Condominium shall be governed by a Board of Directors. The Board of Directors shall be composed of seven persons, all of whom shall be owners or spouses of owners, or in the case of partnership owners, shall be members of said partnership, or in the case of corporate owners, shall be officers or stockholders of such corporations, or in the case of fiduciary owners shall be the fiduciaries or beneficiaries of any such trust, **or in the case of a limited liability company, shall be the members of such company.** A Board member may not base his/her eligibility to sit on the Board, **from the fact that a current Board Director resides** in the same unit **and therefore he/she can stand in said Board Director's position. Only one member of a unit can simultaneously serve on the Board.**

No person who is in arrears for ninety days or more on any billing or assessment by the Cowpet Bay West Condominium Association shall be eligible to be elected to or serve as a director on the Board of Directors. In the event such person is serving as a director, that person's position as director shall be declared to be vacant and another person appointed by a majority vote of the remaining Board to fill the vacancy so created, until the next regular election of the Board of Directors. Arrearages of partnerships, corporations, trusts, fiduciary owners, etc. on which a person's eligibility to serve on the board is based, shall be **subject to the same consequences of ineligibility as set forth above.**

**Section 2. Powers and Duties:** The Board of Directors shall have the powers and duties necessary for the administration of the affairs of the Condominium and may do all such acts and things except as by law, by the Declaration **(to the extent still applicable)**, or by these By-Laws **are** not delegated to the Board of Directors by the unit owners. Such powers and duties of the Board of Directors shall include, but shall not be limited to, the following:

a) Operation, care, upkeep and maintenance of the common areas and facilities.

b) Determination of Association Charges, which shall include the common expenses required for the operation of the Condominium, **insurance,** utility rates, **water,** late fees and interest charges, fines for By-Laws and **for** rules **and** regulation violations, and **any reserve funds maintained by the Association.**

c) Collection of Association charges, as hereinafter defined, from the unit owners.

d) Employment and dismissal of the personnel necessary for the maintenance and operation of the common areas and facilities.

e) Adoption, amendment and Enforcement of rules and regulations covering the details of the operation and use of the Property.

f) Opening of bank accounts on behalf of the Condominium and designating the signatories required therefore **and maintaining and accounting for any funds deposited or withdrawn from said accounts.**

g) Purchasing or leasing or otherwise acquiring, in the name of the **Association** or its designee, corporate or otherwise, on behalf of all unit owners, units offered for sale or surrendered by their owners.

h) Purchasing of units at foreclosure or other judicial sales in the name of the Association or its designees, corporate or otherwise, on behalf of all unit owners.

i) Selling, leasing, voting the votes appurtenant to (other than for the election of members of the Board of Directors), or otherwise dealing with units acquired and subleasing units leased by the Association, or its designee, corporate or otherwise on behalf of all unit owners. **No mortgage shall be entered into without the expressed written consent of a majority (51%) or more of the unit owners.**

j) **Issuing a Power of Attorney for someone** to act as designee of the **Association** in acquiring title to or leasing of units on behalf of all unit owners.

k) Obtaining of insurance for the Property, including **all premises owned or required to be maintained by the Association** pursuant to the provision of Article V, Section 2 hereof.

l) Making of repairs, **restorations,** additions and improvements to or alterations of the Property, **including all premises owned or required to be maintained by the Association** in accordance with the other provisions of these By-Laws, after damage or destruction by fire or casualty or as a result of condemnation or eminent domain proceedings.

__Section 3. Managing Agent and Manager:__ The Board of Directors may employ for the Condominium a managing agent and/or a manager at a compensation established by the Board of Directors, to perform such duties and services as the Board of Directors shall authorize. The Board of Directors may delegate to the manager or managing agent, all of the powers granted to the Board of Directors by these By-Laws other than the powers set forth in subdivisions (b), (e), (f), (g), (h), (i), (j) and (k) of Section 2 of this Article II.

__Section 4. Election and Term of Office:__

Directors will serve for a term of three years. Two Directors shall be elected the first year, two the second year, and three the third year to replace those directors whose terms are expiring. Where a vacancy has been filled by vote of a majority of the vote of the remaining members of the Board, as provided in Section 6, that person shall be a member until the next Annual Meeting, at which time the unit owners shall elect the replacement for the remainder of the original term, if any. Any candidate for director may run for a full term, or any term created by a vacancy, or both.

**Each** director shall be elected by the vote of a majority (as defined in Article III Section 9) of the unit owners. All vacancies shall be voted for on **in a single** ballot, and the candidate(s) with the highest number of votes shall be elected to **fill the respective** vacancies. Each candidate's name shall be preceded by a space where an "X" may be placed to vote for said candidate. It shall not be required that a name be crossed out and another inserted to vote for a candidate on the ballot. A space for write-in

DRAFT

candidates shall also be provided. Ballots and proxies shall be provided to the owners not less than 30 days prior to the Annual Meeting.

**Each** Director shall hold office until their respective successor shall have been elected by the unit owners.

A **Director** may serve only two consecutive terms and shall not hold office for one year before being eligible to run again.

**Section 5. Removal of Members of the Board of Directors:** At any regular or special meeting of unit owners, any one or more of the members of the Board of Directors may be removed with or without cause by a majority of the unit owners and a successor may then and there or thereafter be elected to fill the vacancy thus created. Any members of the Board of Directors whose removal has been proposed by the unit owners shall be given an opportunity to be heard at the meeting.

If a Board member does not attend any of the Board meetings during an entire year, and also does not attend the annual owners meeting that same year, such member may be removed from the Board by a majority of the other members of the Board of Directors.

**If a Director is removed pursuant to Section 5 herein, said Director shall not be eligible for service on the board for a minimum of ___ years.**

**Section 6. Vacancies:** Vacancies in the Board of Directors caused by any reason other than the removal of a member thereof by a vote of the unit owners, shall be filled **subject to Section 4 above,** by a vote of a majority of the remaining members at a special meeting of the Board of Directors held for that purpose promptly after the occurrence of any such vacancy, even though the members present at such meeting may constitute less than a quorum, and each person so elected shall be a member of the Board of Directors until a successor shall be elected at the next Annual Meeting of the unit owners. At that time a director shall be elected to serve the remainder of the term of the original vacating director.

**Section 7. Organization Meeting:** The first meeting of the members of the Board of Directors shall be an organizational meeting held directly following the Annual Meeting of the unit owners, at such time and place as shall be fixed by the Board members at said meeting, and no notice shall be necessary to the newly elected members of the Board of Directors in order to legally constitute such meeting, provided a majority of the whole Board of Directors shall be present, **or available via video or audio conference.** If it is not possible to hold such first meeting of the new Board immediately, then it shall be held as soon as possible and proper notice shall be given to each director, as for any special meeting of the Board of Directors.

**Section 8. Regular Meetings:** Regular meetings of the Board of Directors may be held at such time and place as shall be determined from time to time by a majority of the members of the Board of Directors, but at least two such meetings shall be held during each fiscal year. Notice of regular meetings of the Board of Directors shall be given to each member of the Board of Directors by mail, email or fax transmission, at least ten days prior to the day named for such meeting. Meeting notices

**Section 9. Special Meetings:** Special meetings of the Board of Directors may be called by the President upon five business days notice to each member of the Board of Directors given by mail, email or fax transmission, which notice shall state the time, place and purpose of the meeting. Special meetings of the Board of Directors shall be called by the President or Secretary in like manner and on like notice on

DRAFT

the written request of at least two members of the Board of Directors. Such special meeting may be conducted by a **video and/or audio** conference call.

**Section 10. Waiver of Notice:** Any member of the Board of Directors may, at any time, waive notice of any meeting of the Board of Directors in writing, and such waiver shall be deemed equivalent to the giving of such notice. Attendance by a member of the Board of Directors at any meeting of the Board shall constitute a waiver of notice by him of the time and place thereof. If all the members of the Board of Directors are present at any meeting of the Board, no notice shall be required and any business may be transacted at such meeting.

**Section 11. Quorum of Board of Directors**: At all meetings of the Board of Directors, a majority of the members thereof shall constitute a quorum for the transaction of business, and the votes of the majority of the members of the Board of Directors present at a meeting at which a quorum is present shall constitute the decision of the Board of Directors. If at any meeting of the Board of Directors there shall be less than a quorum present, no business may be transacted until a quorum is achieved. Board members may participate by video or audio conference call.

**Section 12. Fidelity Bonds:** The Board of Directors shall obtain adequate fidelity bonds for all officers and employees of the Condominium handling or responsible for condominium funds. The premiums on such bonds shall constitute a common expense.

**Section 13. Compensation:** No member of the Board of Directors shall receive any compensation from the Condominium Association for serving as a board member. However, verifiable expenses, in accordance with guidelines established by the Board in advance, are reimbursable. A **Director** may also be compensated for other services unrelated to his/her Board function.

**Section 14. Liability of the Board of Directors**: The members of the Board of Directors shall not be liable to the unit owners for any mistake of judgment, negligence, or otherwise, except for their own individual willful misconduct or bad faith. The unit owners shall indemnify and hold harmless each of the members of the Board of Directors against all contractual liability to others arising out of contracts made by the Board of Directors on behalf of the Property unless any such contract shall have been made in bad faith or contrary to the provisions of the Declaration or of these By-Laws.

It is intended that the members of the Board of Directors shall have no personal liability with respect to any contract made by them on behalf of the Property. It is also intended that the liability of any unit owner arising out of any contract made by the Board of Directors or out of the aforesaid indemnity in favor of the members of the Board of Directors shall be limited to such proportion of the total liability thereunder as his interest in the common areas and facilities bears to all such interest.

Every agreement made by the Board of Directors or by the managing agent or by the manager on behalf of the Property shall provide that the members of the Board of Directors or the managing agent, or the manager, as the case may be, are acting only as agents for the unit owners and shall have no personal liability thereunder (except as unit owners) and that each unit owner's liability thereunder shall be limited to such proportion of the total liability thereunder as his interest in the common areas and facilities bears to all such interest.

**Section 15. Executive Committee:** The Board of Directors, by resolution passed by a majority of the entire Board, shall designate at the Organization Meeting or anytime thereafter, three members of the

DRAFT

Board to constitute an Executive Committee, with one member thereof designated as Chairman. The purpose of the Executive Committee is to control the day-to-day management of the Association.

The Board of Directors from time to time shall define the authority of the Executive Committee.

The Board of Directors, at any time, may change the members of, may fill vacancies in, or may discharge the Executive Committee. Two members shall constitute a quorum of the Executive Committee. The act of a majority of the members at any meeting at which there is a quorum shall be the act of the Committee. The Board of Directors shall establish rules of procedure for the Committee governing, but not limited to, such items as notice and powers.

The Executive Committee shall make recommendations to the Board of Directors, and when the Board is not in session may, to the extent that the committee deems necessary, exercise the powers of the Board in the management of the business and affairs of the Association. The Executive Committee shall keep records of all its proceedings and shall report same to the Board of Directors, and its individual members, in writing within a reasonably short period of time after each significant action and after all meetings.

__Section 16. Inspection by Executive Committee__: The Executive Committee shall make a detailed inspection of the buildings, pump rooms, offices, maintenance shops, sewage and water-making plants, emergency generator, roads, sidewalks, steps, entry bridges, railings, grounds, landscaping, watering systems, the beach and the sea wall at least twice a year in the company of the manager or managing agent,. Additionally, the Committee shall evaluate the operation of the Association office and the overall security situation of the property.

The purpose of such inspections will be to (a) obtain a better understanding of the job being performed by the manager and his staff and (b) make suitable recommendations for possible future actions. Within 30 days after each such semi-annual inspection, the Committee will report its findings and recommendations to the members of the Board of Directors.

__Section 17. Action by Consent__: Any action required or permitted to be taken at any meeting of the Board of Directors, or any committee thereof, may be taken without a meeting if a written consent thereto is signed by three-quarters of the members, (rounded off to the nearest whole number), of the Board of Directors or of such committee as the case may be, and filed with the minutes of proceedings of the Board of Directors or committee.

__Section 18. Nomination of Directors__: Nominations for election to the Board of Directors shall be made by a Nominating Committee. The Nominating Committee shall consist of a Chair, who shall be a member of the Board of Directors, and two or more members of the Association, **who are not Directors or related to any current Directors**. The Nominating Committee shall be appointed by the Board of Directors at its organizational meeting and serve until the next Annual Meeting.

The Nominating Committee shall make as many nominations for election to the Board of Directors as it shall, in its discretion, determine, but not less than the number of vacancies that are to be filled. Each nomination shall be for a specified vacancy.

Any person qualified under Section1 of Article II of these By-Laws to serve on the Board of Directors may be nominated for the Board of Directors by submitting a request, signed by the owners of two units in which the nominee has no financial interest, to the Board Secretary sixty days prior to the Annual Meeting. The Board shall include his/her name on the ballot directly following the nominee(s) proposed by the Nominating Committee for each vacancy. Any nomination that does not specify a specific vacancy shall be deemed a nomination for all vacancies.

**Section 19 – Communications**

DRAFT

Communications by, from, to and among the Board may be in writing, by fax or by electronic communications (telephone, telephone conference, email, internet, etc.) Telephone and telephone conference conversations must be documented (e.g., minutes or record of conversation). This communication will constitute "official" communication by the Board.

## ARTICLE III

## Unit Owners

**Section 1. Annual Meeting:**
The Annual Meeting of the unit owners shall be held during the first quarter each year. At the Annual Meeting, Directors shall be elected by ballot in accordance with the requirements of Section 4 of Article II of these By-Laws, and the unit owners may transact such other business at such meetings as may properly come before them.

**Section 2. Place of Meeting:** Meetings of the unit owners shall be held at the principal office of the Condominium or at such other suitable place convenient to the unit owners as may be designated by the Board of Directors.

**Section 3. Special Meetings:** It shall be the duty of the President to call a special meeting of the unit owners if so directed by resolution of the Board of Directors or upon a petition signed and presented to the Secretary by not less than 25% in common interest, in the aggregate, of unit owners. The notice of any special meeting shall state the time and place of such meeting and the purpose thereof. No other business shall be transacted at a special meeting except as stated in the notice.

**Section 4. Notice of Meeting**: It shall be the duty of the Secretary to mail a notice of each annual meeting of the unit owners not less than thirty days nor more than ninety days prior to such meeting, stating the purpose thereof as well as the time and place where it is to be held, to each unit owner of record, at the building or at such other address as such unit owner may have designated by notice in writing to the Secretary. The mailing of a notice of meeting in the manner provided in this section shall be considered service of notice. The Board of Directors may assign the task of providing notice to unit owners to a person other than the Secretary. Special meetings require not less than ten days notice.

DRAFT

**Section 5. Adjournment of Meetings**: If any meeting of unit owners cannot be held because a quorum has not attended, a majority in common interest of the unit owners who are present at such meeting, either in person or by proxy, may adjourn the meeting to a time not less than forty-eight hours from the time the original meeting was called.

**Section 6. Order of Business**: The annual meeting of the unit owners shall be chaired by the President or other member of the Board of Directors chosen by the Board, and the order of business shall be generally as follows:

a) Roll Call – by unit
b) Establishment of Quorum (1/3 of all unit owners)
c) Proof of Notice of Meeting
d) Approval of Minutes of last year's Annual Meeting
e) President's Report (including cost and coverage of insurance
f) Treasurer's Report (including discussion of Budget and Financial Status
g) Property Manager's Report
h) Report of Nominating Committee
i) Election of Board Members
j) Old Business
k) New Business

**Section 7. Title to Units**: Title to units may be taken in the name of an individual, or in the names of two or more persons as tenants in common, joint tenants or tenants by the entirety, or in the name of a corporation, partnership, limited liability company or other legal entity authorized to own real property in the Virgin Islands, or in the name of a fiduciary.

**Section 8. Voting**: The owner or owners of each unit, or some person designated by such owner or owners to act as proxy on his or their behalf and who need not be an owner, shall be entitled to cast the vote appurtenant to such unit at all meetings of unit owners. The designation of any such proxy shall be made in writing and shall be revocable at any time by written notice to the Secretary or in person at the meeting. Any or all such owners or proxies may be present at any meeting of the unit owners and may vote or take any other action as a unit owner either in person or by proxy. Votes of unit owners shall be weighted in accordance with their share of the common interest, as follows, with the total of all votes equaling one hundred:

| | | |
|---|---|---|
| 2 Bedroom | | .911 |
| 3 Bedroom | | 1.062 |
| 2 Bedroom + Loft | 1.193 | |
| 4 Bedroom | | 1.301 |
| 3 Bedroom + Loft | 1.376 | |

The Board of Directors shall accept any vote if the owner is one of the owners of record of the unit, or in the case of a proxy, if there is no obvious defect on the face of such proxy. It shall be the burden of the protestor to offer satisfactory proof that the proffered vote or proxy is invalid and that his is the proper one.

DRAFT

**Section 9. Majority of Unit Owners**: As used in these By-Laws, the term "majority of unit owners: shall mean those unit owners having more than 50% of the total authorized votes of all unit owners present in person or by proxy and voting at any meeting of the unit owners, determined in accordance with the provisions of Section 8 of this Article III.

**Section 10. Quorum**: Except as otherwise provided in these By-Laws, the presence in person or by proxy of unit owners having one-third (1/3) of the total authorized votes of all unit owners shall constitute a quorum at all meetings of the unit owners.

**Section 11. Majority Vote**: The vote of a majority of unit owners at a meeting at which a quorum shall be present shall be binding upon all unit owners for all purposes except where, in the Declaration or these By-Laws, or by law, a higher percentage vote is required.

## ARTICLE IV

## Officers

**Section 1. Designation**: The principal officers of the Condominium shall be the President, the Vice President, the Secretary, and the Treasurer, all of whom shall be elected by the Board of Directors. The Board of Directors may appoint an assistant secretary, an assistant treasurer, and such other officers as in its judgment may be necessary. The President and Vice President, but no other officers, need be members of the Board of Directors.

**Section 2. Election of Officers**: The officers of the Condominium shall be elected annually by the Board of Directors at the Organization Meeting of each new Board of Directors and shall hold office at the pleasure of the Board of Directors.

**Section 3. Removal of Officers**: Upon the affirmative vote of a majority of the members of the Board of Directors, any officer may be removed, either with or without cause, and his successor may be elected by the Board of Directors at any regular or special meeting of the Board of Directors called for such purpose.

**Section 4. President**: The President shall be the chief executive officer of the Condominium. He shall preside at all meetings of the unit owners and of the Board of Directors. He shall have all of the general powers and duties which are incident to the office of president of a stock corporation organized under the Corporation Law of the Virgin Islands, including but not limited to the power to appoint committees from among the unit owners from time to time as he may in his discretion decide is appropriate to assist in the conduct of the affairs of the Condominium.

**Section 5. Vice President**: The Vice President shall take the place of the President and perform his duties whenever the President shall be absent or unable to act. If neither the President nor the Vice President is able to act, the Board of Directors shall appoint some other member of the Board of

DRAFT

Directors to act in the place of the President, on an interim basis. The Vice President shall also perform such other duties as shall from time to time be imposed upon him/her by the Board of Directors or by the President.

**Section 6. Secretary**: The Secretary shall keep the Minutes of all meetings of the unit owners and of the Board of Directors. He shall have charge of such books and papers as the Board of Directors may direct; and he shall, in general, perform all the duties incident to the office of secretary of a stock corporation organized under the Corporate Law of the Virgin Islands.

**Section 7. Treasurer**: The Treasurer shall have the responsibility for Condominium funds and securities and shall be responsible for keeping full and accurate financial records and books of account showing all receipts and disbursements, and for the preparation of all required financial data. The Treasurer shall be responsible for the deposit of all monies and other valuable effects in the name of the Board of Directors, or the managing agent, in such depositories as may from time to time be designated by the Board of Directors, and shall, in general, perform all the duties incident to the office of treasurer of a stock corporation organized under the Corporation Law of the Virgin Islands.

**Section 8. Agreements, Contracts, Deeds, Checks, etc.:** All agreements, contracts, deeds, leases and other instruments of the Condominium shall be executed by any two officers of the Condominium or by such other person or persons as may be designated by the Board of Directors, **in the resolution authorizing the execution of said document.**.

**Section 9. Compensation of Officers**: No officer shall receive any compensation from the Condominium for acting as such.

## ARTICLE V

## Operation of the Property

**Section 1. Determination of Common Expenses and Fixing of Common Charges:** The Board of Directors shall from time to time, and at least annually, prepare a budget for the condominium, determine the amount of the common charges payable by the unit owners to meet the common expenses of the Condominium, and allocate and assess such common charges among the unit owners according to their respective common interests. Common expenses shall include, among other things, operation and maintenance, insurance premiums, repairs and such amounts as the Board of Directors may deem proper for a general operating reserve, for a reserve fund for replacements, and to make up any deficit in the common expenses for any prior year.

DRAFT

**Section 3. Repair or Reconstruction After Fire or Other Casualty:** In the event of damage to or destruction of the commonly owned buildings and elements as a result of fire or other casualty (unless 66-2/3% or more of the buildings are destroyed or substantially damaged and 75% or more of the unit owners determine in accordance with the Declaration not to proceed with the repair or restoration), the Board of Directors shall arrange for the prompt repair or restoration of the commonly owned buildings and elements, and the Board of Directors shall disburse the proceeds of all insurance policies to the contractors engaged in such repair or restoration in appropriate progress payments. Any cost of such repair or restoration in excess of the insurance proceeds shall constitute a common expense – and the Board of Directors may assess all the unit owners for such deficit as part of the common charges. The association shall only be responsible for inspecting unit interiors to determine if damage is structural or due to external causes, or if adjacent unit damage is caused by external causes, or unless that unit is owned by the association. Unless that unit is owned by the association, repair by the association of other unit damage will be limited to structural damage, that caused by external or adjacent unit causes, and will not include property or fixtures installed by the owner or previous owners.

Within ninety days after a casualty of an estimated repair cost of $100,000 or greater, the Board will provide to the owners a financial status report indicating projected repair costs, source(s) of necessary funds, expenditures and commitments to date, and a schedule and plan for completion. This report will be updated and issued to owners on a quarterly basis, thereafter, until repairs are complete. A current report shall be provided at the next Annual Meeting.

If 66-2/3% or more of the Building(s) are destroyed or substantially damaged and if within sixty days of the date of such destruction or damage, 75% or more of the unit owners determine not to proceed with repair and restoration, the Property shall be subject to an auction for partition at the suit of any unit owner or lien holder, as if owned in common, in which event the net proceeds of sale, together with the net proceeds of insurance policies (less any repairs conducted) shall be divided by the Board of Directors among all the unit owners in proportion to their respective common interests, after first paying out of the share of each unit owner the amount of any unpaid liens on his/her/their unit, in the order of priority of such liens.

**Section 4. Payment of Association Charges:** All unit owners shall be obligated to pay the common charges assessed by the Board of Directors pursuant to the provisions of Section 1 of this Article V at such time or times as the Board of Directors shall determine, as well as "other charges" for utilities, services, unit repairs, late fees, interest, fines and/or collection costs, if incurred. With respect to the following sections concerning payment, collection, default, foreclosure, etc., in Sections 4, 5, 6, 7, & 8 below, the term "association charges" is intended to include, but not be limited to, all the above items, both the "common" and "other" charges.

No unit owner shall be liable for the payment of any part of association charges assessed against his unit subsequent to a sale, transfer or other conveyance by him of such unit, together with the Appurtenant Interests, as defined in Section1 of Article VII hereof. In addition, a unit owner may, subject to acceptance by the Board of Directors provided that the unit is free and clear of liens and encumbrances other than mortgages and statutory liens for unpaid association charges, convey the unit, together with the "Appurtenant Interests" to the Board of Directors, or its designee, corporate or otherwise, on behalf of all other unit owners, and in such event be exempt from association charges thereafter assessed.

However, a purchaser of an unit shall be liable for the payment of association charges assessed against such unit prior to the acquisition of such a unit, without prejudice to such purchaser's right, if any, to recover from the seller the amounts paid by the purchaser, except that a first mortgagee or other purchase of a unit at a foreclosure sale of a first priority mortgage of such a unit shall not be liable

DRAFT

for and such a unit shall not be subject to a lien for the payment of association charges which became due prior to the acquisition of title by such acquirer.

**Section 5. Collection of Association Charges**: The Board of Directors shall assess association charges against the unit owners from time to time and shall take prompt action to collect any charges due from any unit owner, which remain unpaid for more than thirty days from the date due for payment thereof. Such action may include placement of a lien on the apartment unit, notification to the mortgagee of the owner's failure to pay association charges and foreclosure on the lien. Additionally, suspension of utilities by a majority vote of the Executive Committee is permitted if an owner is more than 90 days in arrears of any Association charges. Payments received from unit owners will be applied to **the oldest arrearages first.**

**Section 6. Default in Payment of Association Charges:** In the event of default by any unit owner in paying to the association charges as determined by the Board of Directors, such unit owner shall be obligated to:

1. pay interest from the date of the initial billing at the maximum legal rate of interest, as defined by the Virgin Islands Laws, on all amounts past due,
2. pay a monthly service charge as determined and promulgated from time-to-time by the Board of Directors,
3. pay all expenses and attorneys' fees incurred by the Board of Directors in any proceeding brought to collect such unpaid association charges.

All such unpaid association charges shall constitute a lien on such unit prior to all other liens except those specified in Section 922 of Chapter 33, Title 2B of the Virgin Islands Code. The Board of Directors shall have the right and duty to attempt to recover all association charges, together with interest and monthly service charges thereon, and the expenses of the proceeding, including attorneys' fees, in any action to recover the same brought against such unit owner, or by foreclosure of the lien on such unit granted by Section 922 of Chapter 33, Title 28, Virgin Islands Code.

**Section 7. Foreclosure of Liens For Unpaid Association Charges:** In any action brought by the Board of Directors to foreclose a lien on a unit because of unpaid association charges, the unit owner shall be required to pay a reasonable rental for the use of the unit, and the plaintiff in such foreclosure action shall be entitled to the simultaneous appointment of a receiver to collect the same. The Board of Directors, acting on behalf of all unit owners, shall have power to purchase such unit at the foreclosure sale and to acquire, hold, lease, mortgage, vote the votes appurtenant to, convey or otherwise deal with the same. A suit to recover a money judgment for unpaid association charges shall be maintainable without foreclosing or waiving the lien securing the same.

**Section 8. Statement of Association Charges:** The Board of Directors shall promptly provide any unit owner so requesting the same in writing, with a written statement of all unpaid association charges due from such unit owner.

**Section 9. Abatement and Enjoinment of Violations by Unit Owners:** The violation of any rule or regulation adopted by the Board of Directors or the breach of any of these By-Laws contained herein, or the breach of any provisions of the Declaration, shall give the Board of Directors the right, in addition to any other rights set forth in these By-Laws (a) to enter the unit in which, or as to which, such violation or breach exists and to summarily abate or remove, at the expense of the defaulting unit owner, any structure, thing or condition that may exist therein contrary to the intent and meaning of the provisions

hereof, and the Board of Directors shall not thereby be deemed guilty in any manner of trespass or (b) to enjoin, abate or remedy by appropriate legal proceedings, either at law or in equity, the continuance of any such breach.

**Section 10. Routine Maintenance and Repair:** All maintenance of and repairs to any "unit" (other than maintenance of and repairs to any common areas and facilities contained therein, and not necessitated by the negligence, misuse or neglect of the owner of such apartment unit) shall be the responsibility of the owner of such apartment unit. Also, each unit owner shall be responsible for damage to other apartment units and/or to the common areas and facilities resulting from conditions for which such owner has responsibility as indicated above.

A "unit" is considered the space inside the perimeter walls, interior walls, floor and ceiling to include:

- All decorating elements including: paint, wall and floor coverings, paneling, molding and tiles; finished cabinets and mirrors.
- All electrical appliances including: refrigerator, stove, washer, dryer, dishwasher, garbage disposal, hot water heater and air-conditioning equipment (including compressor).
- All electrical fixtures including: wall ceiling and floor outlets, switches and fuse box.
- All plumbing fixtures including: tubs, toilets, showers, sinks and faucets.

Additionally, the unit owner shall be responsible for the routine lubrication and adjustment of doors and windows, and, unless major casualty related, replacement of broken glass, wooden or glass slats and damaged screens. The unit owner shall also maintain and assure the operability of the storm shutters installed on that unit and is responsible to close them in the event of a windstorm. Damage caused by failure to do so is the responsibility of the owner if net insurance proceeds are insufficient to cover such damage.

Screen doors may be installed on the main street-side entry doors at the unit owner's expense provided they meet the existing décor. Once installed, they must be maintained by the unit owner in a good state of repair, or the Association will do so at the owner's expense.

Except for the limited exceptions noted above, all maintenance, repairs and replacements to the "common elements", common areas and facilities, whether located inside or outside of the units, (unless necessitated by the negligence, misuse or neglect of a unit owner, in which case such expense shall be charged to such unit owner), shall be made by the Association and be charged to all the unit owners as a common expense.

"Common elements" are considered to include all other elements of the buildings and property except those specified as being part of the "unit." Additionally, the following are considered common elements:

- Electrical supply to the fuse box.
- Water and plumbing lines in the walls (including interior walls), floor and ceiling to the valves at sinks, showers, tubs, hot water heater, and toilets, etc.
- Drains to the first connection outside a wall.

External air conditioning compressor units shall be maintained by the owner in a reasonable state of preservation. The Association may require owner to remove inoperable and/or un-maintained units or do so at the owner's expense

Below is a guide to assist in clarifying owner and Association responsibility with regard to maintenance/repair and insurance."

DRAFT

**Insurance and Maintenance Responsibility Matrix**

| Category (Not Intended to be all-Inclusive) | Owner Maint/Repair Responsibility | Association Maint/Repair Responsibility | Association Insurance Responsibility | Owner Insurance Responsibility |
|---|---|---|---|---|
| Exterior Walls and Interior Damage Caused by Leaks | | x | x | |
| Roof and Interior Damage Caused by Roof Leaks | | X | X | |
| Interior Damage caused by Adjacent Units (Leaks, etc.) | X | | | Owner or Adjacent Unit's Insurance Responsible |
| Front Doors | X | | X | |
| Screens | X | | X | |
| Exterior Sliders | | X | X | |
| Exterior Wood Railings, Trim, Benches | | X | X | |
| Exterior Windows | X | | X | |
| Electrical System to Breaker Panel | | X | X | |
| Electrical System, Breaker Panel to Outlets, Junction Boxes | X | | X | |
| Electrical Fixtures-Interior | X | | | X |
| Plumbing Inside Walls, Floors Ceilings to valves | | X | X | |
| Condo plumbing not in walls/floors | X | | | X |
| Plumbing Fixtures | X | | | X |
| Interior Walls | X | | X | |
| Interior Doors | X | | | X |
| Cabinets | X | | | X |
| Furniture | X | | | X |
| Appliances | X | | | X |
| Wall/Floor Coverings (tile/carpet) | X | | | X |
| Hurricane Shutters | X | | X | |
| Furniture | X | | | X |
| Personal Property | X | | | X |
| External A/C elements | X | | | X |
| Internal A/C elements | X | | | X |
| Landside Porch/Steps/Railings | | X Excluding Tile | X Excluding Tile | |
| Seaside Balcony/Railings | | X Excluding Tile | X Excluding Tile | |

**<u>Section 11. Restriction on Use of Units:</u>** In order to provide for congenial occupancy of the Property and for the protection of the value of the units, the use of the Property shall be restricted to and shall be in accordance with the following provisions:

The units shall be used for residences only. Units will not be occupied by more than two persons per bedroom for more than thirty days per year.

DRAFT

The common areas and facilities, including the limited common areas and facilities, shall be used only for the furnishing of the services and facilities for which they are reasonably suited and which are incident to the use and occupancy of the units

2. No nuisances shall be allowed on the Property nor shall any use or practice be allowed which is a source of annoyance to its residents or which interferes with the peaceful possession proper use of the Property by its residents.
3. No improper, offensive or unlawful use shall be made of the Property or any part thereof, and all valid laws, zoning laws and regulations of all governmental bodies having jurisdiction thereof shall be observed.
4. Violations of laws, orders, rules, regulations or requirements of any governmental agency having jurisdiction thereof, relating to any portion of the Property, shall be corrected, by and at the sole expense of the unit owners or the Board of Directors, whichever shall have the obligations to maintain or repair such portion of the Property.
5. No dogs are allowed on the property, either long term or visiting. The Board may grant exceptions to the NO DOGS ALLOWED rule, on an individual basis, should an owner require the assistance of a service animal (dog) as defined by the ADA. Owners seeking to obtain such an exemption are required to apply, in writing, to the Board with supporting documentation.

Federal and ADA Compliance, as follows:

*"On July 23, 2010, Attorney General Eric Holder signed final regulations revising the Department's ADA regulations, including a revised definition of "service animal." Effective March 15, 2011, "Service animal means any dog that is individually trained to do work or perform tasks for the benefit of an individual with a disability, including a physical, sensory, psychiatric, intellectual, or other mental disability. The work or tasks performed by a service animal must be directly related to the handler's disability.*

*Dogs used for emotional support, that are not task-trained, are called emotional support animals. They are not service dogs."*

**Section 12. Additions, Alterations or Improvements by the Board of Directors:** Additions, alterations or improvements to the common areas and/or facilities up to $100,000 may be made by the Board of Directors. Additions, alterations or improvements in excess of $100,000 shall require approval by a vote of two-thirds (2/3) in common interest of the owners. The cost of such additions, alterations or improvements shall constitute a common charge. This section is not applicable to repairs conducted in accordance with Article V Section 3 of these By-Laws.

**Section 13. Additions, Alterations, or Improvements by Unit Owners:** No unit owner shall make any structural addition, alteration or improvement in or to the unit, including any exterior painting or exterior alteration or addition (including awnings, grills, etc.) without the prior written consent thereto of the Board of Directors. The Board of Directors shall have the obligation to answer any written request by a unit owner for approval of a proposed structural addition, alteration or improvement in such unit owner's unit, within thirty (30) days after such request, and failure to do so within the stipulated time shall constitute a consent by the Board of Directors to the proposed addition, alteration or improvement.

A unit owner shall obtain a receipt from any person accepting his written request for a change under this section and shall show the receipt to the manager or any Director upon request. Any application to any department of the Government of the Virgin Islands or to any other governmental authority for a permit to make an addition, alteration or improvement in or to any unit shall be executed by the Board of Directors only, without, however, incurring liability on the part of the Board of Directors or any of

them to any contractor, sub-contractor or supplier on account of such additions, alteration or improvement, or to any person having any claim for injury to person or damage to property arising therefrom. The owner in such instance shall provide the Board of Directors with a Hold Harmless Certificate.

**Section 14. Use of Common Areas and Facilities**: A unit owner shall not place or cause to be placed in the stairways or other common areas and facilities, including the limited common areas and facilities, other than the areas designated as storage areas, any furniture, packages or objects of any kind. The entry passages, stairways, entry bridges, etc., shall be used for no purpose other than for normal transit through them.

**Section 15. Right of Access:** A unit owner shall grant a right of access to the unit to the manager and/or the managing agent and/or any other person authorized by the Board of Directors, the manager or the managing agent, for the purpose of making inspections or for the purpose of correcting any condition originating in his apartment unit and threatening another unit or a common area or facility, or for the purpose of performing installations, alterations or repairs to the mechanical or electrical services or other common areas or facilities in the unit or elsewhere in the Building, provided that requests for entry are made in advance and that any such entry is at a time reasonably convenient to the unit owner. In case of an emergency, such right of entry shall be immediate, whether or not the unit owner is present at the time.

**Section 16. Rules of Conduct**: Article V Section II of these By-Laws delineates general restrictions on the use of the property. Additionally, a definitive listing of current Rules and Regulations is provided as Exhibit I hereto. These Rules and Regulations may be amended by the Board of Directors from time to time. The Board is empowered to enforce these By-Laws and Rules and Regulations with monetary fines and other sanctions and may also take any legal action in court to enforce them. An owner is subject to such fines, sanctions and/or legal actions for the actions of tenants as if those actions were by the owner.

Copies of the Rules and Regulations shall be furnished by the Board of Directors to each unit owner prior to the time when the same shall become effective. The unit owner must insure that the tenant or occupant be fully informed and furnished with a copy of the Rules and Regulations and by fully bound thereby.

**Section 17. Potable Water and Electricity: The Association shall supply potable** water and electricity Association through the common facilities of the Condominium directly to each unit through a separate meter, and each unit owner shall be required to pay the charges therefore established, from time to time, by the Board of Directors. Water, electricity and other utility charges will normally be billed monthly incident to the common charges and are considered to be part of the "association" charges. Utility charges more than thirty days in arrears are subject to a late fee and interest per Section 6 Article V of these By-Laws, and said utilities may be suspended by the Association if an owner is more than 90 days in arrears of Association charges per Article V Section 5 thereof.

**Section 18. Gas:** Gas shall not be piped to any apartment unit, and unit owners are specifically prohibited from using gas as a fuel for regular cooking, water heating, or any other regular purpose. Small quantities of propane gas may be used for gas grills kept on street-side galleries and for emergency use inside apartment units.

DRAFT

**Section 19. Grey Water and Sewerage Service:** Grey water for flushing and sewerage service (including sewage disposal and treatment in the condominium's sewerage treatment plant) shall be supplied as a common facility to all unit owners, and the cost thereof shall be treated as a common expense.

## ARTICLE VI

## Mortgages

**Section 1. Notice of Unpaid Common Charges:** The Board of Directors, whenever so requested in writing by a mortgages of a unit, shall promptly report any then unpaid association charges due from, or any other default by the owner of the mortgaged apartment unit.

**Section 2. Notice of Default:** The Board of Directors, when giving notice to a unit owner of a default in paying common charges or other default, may send a copy of such notice to each holder of a mortgage covering such unit.

## ARTICLE VII

## Sales and Mortgages of Units

**Section 1. No severance of Ownership:** No unit owner shall execute any deed, mortgage or other instrument conveying or mortgaging title to the unit without including therein the Appurtenant Interests, it being the intention hereof to prevent any severance of such combined ownership. For the purpose of the By-Laws, the "Appurtenant Interests" shall mean collectively, (i) the unit owner's undivided interest in the common areas and facilities appurtenant to such unit; (ii) the interest of such unit owner in any units theretofore acquired by the Board of Directors, or its designee, on behalf of all unit owners, or the proceeds of the sale or lease thereof, if any; and (iii) the interest of such unit owner in any other assets of the Condominium.

Any such deed, mortgage or other instrument purporting to affect one or more of such interests, without including the interest or interests so omitted, shall be deemed to include such interests even though the latter shall not be expressly mentioned or described therein. No part of the Appurtenant Interests of any apartment unit may be sold, transferred or otherwise disposed of, except as part of a sale, transfer or other disposition of the unit to which such interests are appurtenant, or as part of a sale, transfer or other disposition of such part of the Appurtenant Interests of all apartment units.

DRAFT

**Section 2. Sale to Board of Directors:** A unit owner may, subject to mutual agreement of the parties, and subject to the provisions of Section 1 of this Article VII, sell his unit to the Board of Directors, or its designee; provided, however that such purchase by the Board of Directors shall have the prior approval of two-thirds (2/3) of the unit owners, as expressed by the vote of at least two third (2/3) in number and in common interest, of all unit owners, cast in person or by proxy in accordance with these By-Laws.

**Section 3. Financing of Purchase of Apartment Units By Board of Directors:** Acquisition of units by the Board of Directors, or its designee, on behalf of all unit owners, may be made from the working capital and common charges in the hands of the Board of Directors, or if such funds are insufficient the Board of Directors may levy an assessment against each unit owner in proportion to his ownership in the common areas and facilities as a common charge, which assessment shall be enforceable in the same manner as provided in Section 6 and 7 of Article V, or the Board of Directors, in its discretion, may borrow money to finance the acquisition of such units, provided, however, that no financing may be secured by an encumbrance or hypothecation of any property other than the unit, together with the Appurtenant Interests, so to be acquired by the Board of Directors.

**Section 4. Gifts and Devises, etc:** Any unit owner shall be free to convey or transfer the unit by gift, or to devise the unit by will, or to pass the same by intestacy, without restriction.

**Section 5. Waiver of Right of Partition with Respect to Such Units as are Acquired by the Board of Directors, or its Designee, on Behalf of All Unit Owners as Tenants in Common:** In the event that a unit shall be acquired by the Board of Directors, or its designee, on behalf of all unit owners as tenants in common, all such unit owners shall be deemed to have waived all rights of partition with respect to such unit.

## ARTICLE VIII

**Section 1. Condemnation – Eminent Domain:** In the event of a taking by condemnation or by eminent domain of part or all of the common areas and facilities, the award made for such taking shall be payable to the Board of Directors for disbursement **among all unit owners in proportion to their respective common interests after first paying out all common area and facility expenses pertaining to said taking.**

## ARTICLE IX

### Records

3055300/000400

DRAFT

**Section 1. Records and Audits:** The Board of Directors or the managing agent shall keep detailed records of the actions of the Board of Directors and the managing agent, Minutes of the meetings of the Board of Directors, Minutes of the meetings of unit owners, and financial records and books of account of the Condominium, including a chronological listing of receipts and expenditures, as well as a separate account for each unit which, among other things, shall contain the amount of each assessment of common charges against such unit, the date when due, the amounts paid thereon, and the balance remaining unpaid.

Each unit owner shall be permitted to examine all accounts, records and contracts of the Association in the Condominium office at reasonable times, on business days, but not more often than once a month. All others must request any required information from the Board of Directors.

An annual report of the receipts and expenditures of the Association, examined and approved by a licensed accountant not affiliated with the Association and chosen by the Board of Directors, shall be rendered to the Board and sent, within a reasonable time after the end of each fiscal year, to all unit owners who request it.

**ARTICLE X**

**Miscellaneous**

**Section 1. Notices:** All notices hereunder shall be sent by registered or certified mail to the Board of Directors c/o the managing agent, or if there is no managing agent, to the office of the Board of Directors or to such other address as the Board of Directors may hereafter designate from time to time, by notice in writing to all unit owners and to all mortgagees of units.

All notices to any unit owner shall be sent by registered or certified mail to the Building or to such other address as may have been designated by him from time to time, in writing, to the Board of Directors. All notices to mortgagees of units shall be sent by registered or certified mail to their respective addresses, as designated by them from time to time, in writing to the Board of Directors. All notices shall be deemed to have been given when mailed, except notices of change of address, which shall be deemed to have been given when received.

Notwithstanding the requirements of this section, all notices of regular, special and Annual Meetings of the unit owners, Board of Directors, and committees of the Board or otherwise, shall be by first class mail but without the requirement of registration or certification. The applicable notice shall be sent so as to comply with the required time limits, if any, to the regular mailing address of the designated party as recorded in the books of the Association.

**Section 2. Invalidity:** The invalidity of any part of these By-Laws shall not impair or affect in any manner the validity, enforceability or effect of the balance of these By-Laws.

**Section 3. Captions:** The captions herein are inserted only as a matter of convenience and for reference, and in no way define, limit or described the scope of these By-Laws, or the intent of any provision thereof.

**Section 4. Gender:** The use of the gender in these By-Laws shall he deemed to include the **masculine, feminine or non- gender of the unit owner** and the use of the singular shall be deemed to include the plural, whenever the context so requires.

DRAFT

**Section 5. Waiver:** No restrictions, condition, obligation or provisions contained in these By-Laws shall be deemed to have been abrogated or waived by reason of any failure to enforce same, irrespective of the number of violations or breaches thereof which may occur.

**Section 6. Insurance Trustee:** The Board of Directors may appoint a Trustee to distribute large amounts of any insurance proceeds. The trustee so appointed may be any individual or entity, so long as such is properly bonded in relation to the funds and responsibility involved.

## ARTICLE XI

### Amendments to By-Laws

**Section 1. Amendments to By-Laws:** Except as hereinafter provided, these By-Laws may be modified or amended by the vote of 66-2/3% in number and in common interest of all unit owners.

## ARTICLE XII

### Execution of Instruments and Seal

**Section 1. Execution and Instruments:** All instruments of the Condominium shall be executed under seal by such officer or officers as the Board of Directors may designate, or as may be otherwise authorized.

**Section 2. Seal:** The seal of the Condominium shall be as determined by the Board of Directors from time to time.

## ARTICLE XIII

### Conflicts

**Section 1. Conflicts:** These By-Laws are set forth to comply with the provisions of Sections 917 and918 of Chapter 33, Title 28, Virgin Islands Code. In case any of these By-Laws conflict with the provisions of said statute or of the Declaration, the provisions of said statute or of the Declaration, as the case may be, shall control.

DRAFT

**EXHIBIT I**

Rules and Regulations
for
Cowpet Bay West
2012

1. No articles shall be placed on any of the stairways, railings, or entry bridges.

2. Balconies and street-side porches shall be kept neat and clean, and no articles shall be swept or thrown from them. No laundry, laundry lines, or other unsightly articles shall be placed on the balconies, porches or other common areas and facilities.

3. Radio or television antennas are prohibited and no sign, notice, advertisement or illumination shall be displayed on or at any window or other part of the building.

4. No owner shall make or permit any disturbing noises in his unit or within the common areas and facilities, or do anything, or permit anything to be done wherein which will interfere with the rights and reasonable comfort and convenience of other owners.

5. No inflammable, combustible or explosive fluid, material, chemical or substance is permitted in any unit, except for normal household use.

6. Dogs and farm animals are prohibited, and owners will be fined as specified by the Board of Directors. The Association may require removal of any animal when it becomes bothersome to others or is deemed by the Association to be unacceptable.

7. No garbage or trash will be left or disposed of on or adjacent to the property – except in a dumpster, if such is provided by the Association.

8. One space per unit is provided for parking automobiles on the property. Additional vehicles may be allowed by Management based on space availability. Any vehicle not currently registered and licensed will be considered a derelict and will be towed.

9. No boat, trailer, heavy commercial or non-self-propelled vehicle shall be parked on the property. No vehicle shall be parked in any manner restricting passage of any emergency vehicles, such as ambulances, fire trucks, etc. No vehicle shall be parked so as to impede ready movement by another vehicle, nor shall it be parked in any space assigned to another unit without permission of the said unit owner. Any vehicle in violation of these rules may be towed at the vehicle owner's expense.

10. Beach users shall clean up and remove any trash or other articles on the beach for which they are responsible.

11. The use of barbecues on seaside galleries is prohibited.

DRAFT

12. The number of persons occupying a unit on a routine basis is limited to two per bedroom. Additional "guests" are permitted not to exceed thirty days total per year.

DRAFT

Attachment #2

Owners' Common Interest

30 April 1998

**Unit Type**
**%Common Interest**

2 Bedroom
.911

**Leeward**
#1,2,3,4,5,7,8,9,10,11,12
13,14,15,17,18,23,24,25
26,27,28,29,31,32,33,34,
35,36,37,39,40,41

**Windward**
#3,4,5,6,7,9,10,11,12,13
14,15,16,17,19,20,21,22
25,26,27,28,29,30,31,33
34,35,37,38,39,40,41,47,49

3 Bedroom
**1.062**

**Leeward**
#6,16,19,20,21,22,30,3B,42
,43,44,49

**Windward**
#1,2,8,18,23,24,32,36,42,4
3,44,45,51

2 Bedrooms plus Loft
**1.193**
**Leeward: #** 46,48
**Windward: #**
4B,50

DRAFT

3 Bedrooms plus Loft 1.376
**Leeward: #** 50

**Windward: #** 46,52

4 Bedroom 1.301
**Leeward: #** 45,47

Cowpet Bay West

Board of Directors Meeting

February 7, 2011

**Present:** Judi Kromenhoek, Ed Wardwell, Rosie Wells, Bob Cockayne, Barbara Walters, Greg Miller, Jon Cassady, Louanne Schechter

Max Harcourt is currently hospitalized following emergency surgery.

**Minutes of January 11, 2011:** The minutes of the January Board of Directors meeting were unanimously approved.

**W-27:** Jon reported the seaside sliding doors to this unit are being pinched from spalling rebar. The Association will repair the doors. The Association will not be responsible for replacing tile. Tile is the responsibility of the owner.

**Treasurer Report:** Total cash accounts have a balance of $549,400.18. The Reserve Account total is $501,944.61 with the remainder in the Operating accounts. Louanne reported that the 2nd payment for the insurance was paid from the operating account. There are not sufficient funds in the operating account to make the third and final payment of $60,783.33 The Directors made a resolution RESOLVED, that an authorization of transfer of designated funds - Future Repairs and Replacement fund to undesignated funds –Operating fund was made. The funds will be repaid from the operating fund with a 1% interest rate over the next 10 months (March-December 2011.

**Proposed 2011 Budget:** The Directors unanimously approved of the proposed budget.

3055300/000407

Manager Report

**Systems:** Filter changes for systems occurred as scheduled on the first Tuesday of the month.

**Security Lights Parking Lot:** All but 2 posts have been adjusted to the correct height. The remaining 2 require new poles/pad. These should be completed during the week, weather permitting.

**Street side porch lights:** The lights purchased have been installed. The dusk to dawn sensor requires some adjustment. Flickering off and on is a sign the adjustment isn't correct.

**Security Guard:** The guards have been punctual and professional and no complaints have been registered.

**Beach:** The appropriate permits were obtained and approximately 140 ton of sand was spread across the beach from West to East over the course of 1 day.

**Old Business**

**Voting Procedure:** The Directors agreed that the voting should be kept confidential. Current Board members may check the ballots and votes; however,

any Director disclosing any owners' vote will be removed from the Board. All Directors were in agreement.

**Procedure for Bylaw changes:** Proposals will be brought before the members at the annual meeting.

**Meet & Greet:** The Meet & Greet is scheduled for Roberts American Grill, Thursday, February 10th, 2011, from 5p-7p. Rosie invited the candidates. Rosie and Judi will obtain sodas, beer, and paper goods. The Directors were asked to get there early to help set-up and clean-up.

**Insurance:** Our agent has a conflict and can not attend the meeting. Bob has compiled a list of questions for the agent, Colin Probyn. Judi said Colin will have the answers before the Annual Meeting.

**March BOD:** No date was set.

**Adjournment:** There being no further business, the meeting was adjourned.

**ACTION ITEMS**

| | |
|---|---|
| Report to BOD method used to repair W-27 | Jon |
| Completion of new poles for Security Lights | Jon |
| Beer/Wine/Paper Products for Meet N Greet | Judi/Rosie |
| Handouts for Annual Owners Meeting | Louanne |
| Follow-up with Insurance Agent | Judi |

3055300/000409

DRAFT

# Cowpet Bay West
## Annual Owners Meeting
### February 12, 2011

**Call to Order:** The Annual Owners Meeting was called to order by President Judi Kromenhoek at 9:10 a.m. at Robert's American Grill. Board members present were Judi Kromenhoek, Bob Cockayne, Barbara Walters, Rosie Wells, Greg Miller, and Max Harcourt. Owners were directed to sign in upon arrival (Exhibit 1, sign in sheets for owner attendance).

**Quorum Verification:** Louanne Schechter tallied the attendance Record and verified that a quorum (1/3 of authorized votes) was present by proxy and attendance.

**President Report:**

- Judi welcomed all owners and thanked them for attending today's meeting.
- Judi acknowledged and commended the Board of Directors for volunteering their time and talents throughout the year.
- Judi acknowledged and credited the management staff, Jon & Louanne, for their professionalism and assistance throughout the year. Each staff member was thanked for their work and loyalty to the owners of Cowpet Bay West.
- New owners, L-33 Duzy & L-07 Birt families, were asked to stand and welcomed to the community.
- Judi introduced the candidates running for the Board of Directors.
- Judi listed the projects & accomplishments throughout the year:
  - **Restoration following Fire to W-23:** The restoration process took 9 months to get settled and paid. During this period the Board of Directors became aware of inconsistencies in the Bylaws that caused confusion between the Insurance agencies, owners, and the Association. (Insurance to be discussed)
  - **Seaside Rails:** All damaged seaside rails were removed and replaced. Rails were repainted.

3055300/000410

DRAFT

- **Generator**: The 20 year old generator is in good shape, the circuit board needed to be replaced. This was not easy but Jon located a new board and had Kent Harvey install it. Since the company that manufacturers this is no longer in existence, Kent Harvey rebuilt the components in the old board for a back-up.
- **Fresh Water Booster**: Responding to complaints of low water pressure to Leeward units, a water booster pump was installed and corrected the problem
- **Gravel Walkways**: Walkways on Leeward and Windward were improved by adding crushed gravel.
- **Transformers**: As part of a 3 year plan, all but one transformer was replaced. The remaining transformer will be replaced this year completing a total upgrade to the High Voltage Electrical system.
- **Security Gate**: The conduit that supplied power to the gate, under the road was compromised causing power outages whenever it rained. The conduit was removed and replaced, the road repaired, and the gate is operating without incidence.
- **Transfer Station Building**: Jon noted the concrete roof over the transfer station was cracking and compromised. The roof was removed and replaced without incident.
- **Beach**: Hurricane Earl was responsible for loss of sand on the beach. After obtaining appropriate permits, the Elysian, Cowpet Bay East, and Cowpet Bay West split the cost and provided the workforce to spread 140 tons of sand back onto the beach. New Swim Buoys are in place, and as of today 24 more beach chairs have been added to the beach.
- **Security Streetlights**: Before hurricane Earl, our security streetlights were replaced with new energy efficient fixtures designed to throw a maximum amount of light down to the parking lot. During Earl, Cowpet Bay East lost most of their parking lot light globes while our lights were left intact.
- **Fresh Water Filtration System**: Upon inspection, the existing filtration system required upgrading. The new system was installed.
- **Security Guards**: During the last year, our Association hired different companies with the same results, guards coming late, leaving early, or sleeping on the job. The

DRAFT

current company, No-Nonsense Security, has been with us approximately 5 months and is professional, personable, and friendly.

**Reading of the 2010 Annual Owners Meeting Minutes:** Motion was made and seconded to waive the reading of the 2010 minutes. Copies of the minutes were available for members upon request.

**Proof of Notice of Meeting:** Oocumentation of notice was presented by the Association Office Manager, Louanne Schechter. (Newsletters: November 2010, December 2010, January 2011, February 2011.)

**Property Manager Report:**

**Electrical Upgrade:** Jon reported when he was hired, the complex did not have an ongoing maintenance plan for infrastructure. In 2008 he developed a long term plan to upgrade and maintain the Electrical System. In 2009 Jon brought an electrical engineer to the property to inspect the entire system. The engineer, Kent Harvey, then developed a CADD (computer aided design and draft) program outlining the entire system with all the technical data. Where needed and available, crucial back-up parts were ordered and kept in stock. In 2010, The 3 phase transformer on Windward which runs the beach well, lift station, and fresh water distribution system was replaced. All transformers were balanced for even power distribution. Going forward in 2011, the 3 phase transformer removed from Windward was sent back to the states to be reconditioned. When available, projected in the summer, the reconditioned transformer will replace the last "original" transformer located at the Windward circle which runs the RO Plant, the WWTP, and controls the high voltage systems. Jon proposes in 2012 to replace the disconnect breakers on each building.

**Territorial Pollutant Discharge Elimination System Permit:** During 2010 this permit was up for renewal. The process included inspections of the Waste Water Treatment Plant, Reverse

DRAFT

Osmosis Plant, Grey Water Processing, and Fresh Water Distribution as well as General Maintenance. Along with inspections there were endless forms and reports. Cowpet Bay West was approved for the next 5 years and there were no deficiencies found by DPNR.

Generator: During Hurricane Earl, a WAPA power pole and transformer split and landed near the generator. This power to ground surge, we believe, fried the circuit board that controls the automatic functions of the generator. Jon had to manually start the generator and shut it down until a new mother board could be located. The companies that manufactured the generator and the switch gear both had gone out of business. With the help of Kent Harvey, we were able to locate the last known circuit board. When Mr. Harvey installed the new board, he kept and has since rebuilt the original board so we would have a back-up. We have set a 45 minute time delay on the generator to prevent the power surges during false start-ups (the on-off-on- off when power is restored). The generator will power down when electrical power is restored for 45 consecutive minutes.

**Masonry:** Jon performed a thorough inspection under the buildings and the grey water cisterns. Monies spent this year under the account masonry were used to repair the undersides of some of the buildings that had so much spalling they required immediate attention. Under this year's budget he will continue to repair these areas which include leaking cisterns.

**Sewage & Grey Water:** Included in 2011 Budget is the project to replace the fractured grey water lines. Jon is looking for a new contractor to do this project. The remainder of the monies are to purchase motors and blowers for the grey water system, which are still running on the originals.

**Air Pollution Permit:** Jon reported the air pollution permit which regulates the usage of the generator is up for renewal this year.

**Treasurer Report**

DRAFT

**2010 Expenditures vs. Budget and 2011 Budget:**

Copies of the 2010 budget and the 2011-projected budget were available for owners. Barb reported that the cost of increasing the insurance in 2010 to 2 million and the pre-pay for the insurance in December for 2011 were the major factors in the deficit for 2010. Other contributing factors were costs that were unforeseen and not in the budget such as replacement of a leaking transformer and high voltage power lines.

Barbara made a motion the 2011 budget be accepted as presented, the motion was seconded, all were in favor.

**Cash Equivalents & Member Equity:** Barbara reported cash equivalents and member equity and a handout was provided to owners.

**Insurance Summary:** Judi reported on the current insurance policies. A summary sheet was provided for all owners.

**Roll Call:** Owners were asked to identify themselves as their names were called. Owners that were holding proxies were asked to identify themselves as proxy holders. There were owners of 43 units and owners holding 39 proxies for a 73.2% of authorized votes.

**Old Business**

There was no old business brought before the Board.

**New Business**

**Bylaws review and update:** Judi reported the only by-laws found on file in the Virgin Islands are the ones from 1974. She stated our Bylaws need to be updated. The tragic fire enlightened us on what is and what is not covered by our master insurance policy. A lot of owner thought they were covered when they were not. Anna Paiewonsky (attorney L-04) stated that she believes

DRAFT

the 1998 Bylaws superseded 1974 declarations, and that they were properly filed. Accordingly, subsequent Bylaws should be in effect. Attorney Chuck Waggoner (L-46) has agreed to help us write the bylaws to meet the owner needs. There has been a lot of confusion on the wording on the insurance coverage of owner units vs. CBW Association responsibility. Chuck has written bylaws for several condo complexes. He is very familiar with bylaws and how they should read. The original bylaws were written to protect the lender (Chase Bank) at the time. We need to have them read to protect the owners and our insurance needs. Anna Paiewonsky volunteered to work with Chuck Waggoner on this endeavor.

Max Harcourt made a motion that the Board of Directors continue to operate under the 2007 Bylaws. The motion was seconded by the floor and all were in favor.

Following discussion from the floor, a suggestion was made to start a committee that addresses our current Insurance coverage, what is required by our bylaws, and what is requested by our owners. The committee would send recommendations to the Directors within 30 days of their formation.

**Proposal to Amend Bylaws to include No Dogs on Property:** Bob Cockayne would like to amend Article V, Section 11, found on page 13 (of the 2007 Bylaws), by adding new section6: "Dogs and farm animals are prohibited, and owners will be fined as specified by the Board of Directors. The Association may require removal of any animal when it becomes bothersome to others or is deemed by the Association to be unacceptable."
Amend Exhibit I, Rules and Regulations for Cowpet Bay West by deleting section number 6, found on page 18.

**Petition for dogs to be allowed:** Joel Kirshenbaum asked what happened to the petition begun last year to allow specific size dogs on the property. Judi reported the matter was discussed in the April 2010 Board of Directors Meeting and tabled to be discussed at the 2011 Annual meeting.

DRAFT

**Election of Board Members:** The nominating committee reported the two candidates with the most votes were Bill Canfield and Sharon Koehler.

**Adjournment:** There being no further business, the meeting was adjourned.

Cowpet Bay West

Board of Directors Meeting

March 8, 2011

Present: Max Harcourt, Barbara Walters, Rosie Wells, Bob Cockayne, Greg Miller, Sharon Koehler, Bill Canfield, Jon Cassady, Louanne Schechter

Meeting Ground Rules: Max requested Directors and guests conduct all business before the Board in a civil, professional manner treating each other with courtesy and respect.

L-01: Herb Horwitz came before the Board of Directors to discuss his reasoning for non-payment to the electrician. The Directors stand by their former decision that the responsibility of payment is with the owner. Max made a motion the Association pay $600 of the bill as a Good Will Adjustment. The owner will be responsible for the balance and late charges.

W-27: Dr. Felice asked for minutes of the Organizational Meetings. Max stated the results of the first and second organizational meetings did not meet the Bylaw Requirement of vote by majority, votes were secret ballot, and no minutes were kept. The third meeting lead to a majority vote and minutes are available.

Dr. Felice was told last month that his seaside sliders would be repaired within a week. Jon contacted Karl yesterday, when he was informed the doors were still not fixed. Karl said he would be out on Wednesday. Dr. Felice has a scheduling conflict and will reschedule with Karl. Dr. Felice asked in the event the tile on the deck was broken who would replace it? Directors agreed the tile on the porch is the responsibility of the owner. The Association is responsible for the structural repairs.

Dr. Felice wanted to know the exact difference of votes between the 2nd and 3rd place candidates Louanne believed there was a margin of 5 votes the results are in the safe.

**Minutes of February 7, 2011:** The minutes of the February Board of Directors meeting were unanimously approved.

**Treasurer Report:** Sharon reported there was approximately $565,000 in cash accounts.

Greg requested the Directors have a Profit and Loss statement available each month.

Sharon stated she will provide a quarterly report for the Directors next month.

Sharon stated she doesn't have access to the bank accounts. Max assigned Directors to assist Sharon to be added as signatory to the accounts.

There are 2 units in arrears more than 90 days. Both have liens on the property. The Directors suggested Sharon set-up a payment plan. Owners will be informed that in the event scheduled payments are not made, utilities will be discontinued.

An offer was made by the broker for L-41 for the Association to accept less than what is owed. Ma made a motion to accept the offer, the motion was 2nd the vote was 3-3. The motion did not pass. Bob suggested the broker put all future offers in writing.

**Resolution:** template to be provided by Jeanne Brennan, sample: *The Board of Directors presente to the owners the 2010 actuals and 2011 budget. The owners accepted the budget and therefore the Directors resolve to move $114,000 from the Reserve to the Operating Account.*

**Review of Action Items from Owners Meeting:**

**Property adjacent to L-01:** Owner wanted to know if the property is zoned for boat repair. Bill stated the property is zoned R-1. It's his understanding that boats are stored there and owners ma from time-to-time work on them. Max made a motion that a Board member call CZM and DPNR

3055300/000418

and inquire if boat storage/repair is appropriate for R-1 land. The motion was 2nd all were in favor Greg will call the agencies.

**Automatic Voltage Regulator:** An owner inquired if an AVR could be installed on the generator. Jo will contact Kent Harvey and report his findings.

**Extended Warranty for Reconditioned Transformer:** Jon will ask the company when the transform is repaired.

**Extend hours of generator usage?** Jon and Anna will request extended usage when the air pollution permit is renewed this year.

**Electronic Bulletin Board on Website:** Max will investigate the options for an electronic bulletin board.

**Manager Report**

**Systems:** Filter changes were completed this month as scheduled. The Generator is performing without incident. The WWTP is within normal parameters. New blowers and motors were ordered and will take about 6 weeks before they arrive.

**Security Lights:** Maintenance has completed all but 2 of the security parking light adjustments. Th remaining two are on Leeward and require new concrete bases and poles. The materials are on si and maintenance is working on them.

**Ritz-Carlton Meeting:** Jon attended the meeting posted by the Ritz-Carlton. They are in the preliminary stages of trying to obtain a Title 5 electrical system which would allow them to be self-sustaining and off WAPA's grid. Jon reported they offered no schematics, or basic information othe than they would install a zero noise, zero emissions system.

**Owner Issue Flow Sheet:** Jon shared with the Directors a flow sheet for owner complaints that Louanne developed as a tool to record, track and report back to owners. The March Newsletter contained an article requesting owners to put all complaints in writing with details. Sharon suggeste the Association have a written policy for owners to follow when reporting a problem and the Association to follow once it's reported. She will present a policy next month. Greg suggested that the Association keep repair/maintenance logs for each system as well.

**Security Gate:** Jon reported the most recent issue with the gate is the circuit board for the exit pedestal is non-functional. Although a new circuit board can be ordered (actual cost 2009 was $3750) this gate was not designed to handle the amount of daily traffic. Jon suggested the gate b left open during normal business hours and an exit button, that bypasses the circuitry of the swipe cards) be used in the evening. Following discussion, Max made a motion an exit button be installe on the exit pedestal. Barbara 2nd, the motion passed 6 to 1.

**Vandalism:** Jon was called Saturday February 26th at 10:30pm by an owner that reported a broken security pole/light. The owner witnessed the event. Jon investigated. They were tenants and agreed to pay damages. The owner of the unit was notified and a follow up letter will be sent to th owner with an explanation of charges.

**Police Report:** A police report was made by an owner at Elysian when she witnessed a man lying in the bushes by the pool and firing a gun at the rooster as she was walking by him with a small child. She identified the man as an owner at CBW. Police came to the property to follow up on the complaint. The owner denied any fowl play.

**New Business**

**Office Computer:** The computer has no memory left and is more than 6 years old. The computer on order has an extended warranty of 3 years on site and cost $864. (plus shipping).

Committees

**Bylaw:** Rosie Wells is Chairperson, Chuck Waggoner, Barbara Walters, Judi Kromenhoek, and Anna Paiewonsky are on this committee. Chuck will initially submit changes to the committee. Onc the committee agrees, they will forward to the Directors.

**Landscape & Maintenance:** Bill Canfield is chairperson; Jon has volunteered to be on the committee. Bill and Jon will schedule a walk of the property and invite whoever is interested to join them.

Judi Kromenhoek walked the property and submitted her recommendations for the landscape committee.

Insurance: Bob Cockayne is chairperson. Max Harcourt, Herb Horwitz, Doug Rebak, and Jon met to organize the committee. Bob has minutes for anyone interested.

**Long-term Capital Planning:** Max Harcourt is chairperson. Lance Talkington has volunteered to be on the committee, no meeting has been planned.

Social: Rosie is chairperson, no meeting has been planned.

**Nominating:** Bob Cockayne is chairperson, Holly McGuire, Joel Kirshenbaum, and Marilyn Blackhall volunteered for this committee. Bob made a motion the Board approve the members, Max 2nd, all were in favor.

Max suggested all committees keep minutes and forward them to the Directors. Sharon requested Directors be notified of meeting dates and times.

**Other Business**

**Hen & chicks:** Bob stated that farm animals were not allowed on property and although the rooster is gone, the hen and chicks remain. Max made a motion the Association hire someone to catch the hen and chicks without harming them and have them removed from the property, the motion was 2nd all were in favor

**AED:** The battery is dead on the AED. Jon said he has batteries on order.

**April Meeting:** The next meeting of the Board of Directors is scheduled for April 5th, at 8:45am.

**Adjournment:** There being no further business the meeting was adjourned at noon.

**ACTION ITEMS**

| | |
|---|---|
| Letter to Herb Horwitz: Good Will Adjustment: | Max |
| W-27 Sliding Doors | Jon |
| First Bank Forms for Sharon | Greg |
| Fidelity Forms (if needed) | Judi |
| Banco Forms | Louanne |
| Resolution | Jeanne/Louanne |
| Payment Plan | Sharon |
| Speak with Broker L-41 | Louanne/Rosie |
| Speak with Gita Rose Zoning | Sharon |
| Speak with DPNR/CZM boat repair next door | Greg |
| Recommendations from Kent Harvey AVM for Generator | Jon |
| Extended warranty for transformer | Jon |
| Extended hours for running generator | Jon/Anna |
| Electronic Bulletin Board | Max |
| Security Poles Leeward | Jon |

| | |
|---|---|
| Policy for complaints | Sharon |
| Letter to Owners Vandalism/impose fines | Jon/Louanne |
| Hen and chicks removal | Bob |
| AED Batteries | Jon |
| Post minutes, date and times of meetings | Chairpersons |

Addendum to Meeting Minutes

Amended Resolution for

March 8, 2011

Association Resolution for Transfer of designated funds - Future Repairs and Replacement fund to undesignated funds –Operating fund
Resolution of the Board of Directors of Cowpet Bay West Association ("CBW")
WHEREAS, CBW is a Condominium Association organized and existing under the laws of the Territory of the U.S. Virgin Islands;
and
WHEREAS, the members desire that the Association shall act in full accordance with the rulings and regulations of the Internal Revenue Service, as administered by the Virgin
Islands Bureau of Internal Revenue;
NOW, THEREFORE, the members bereby adopt , on behalf of the Association;
The following resolution
RESOLVED, that an authorization of transfer of designated funds $114,000 - Future Repairs and Replacement fund to undesignated funds –Operating fund was made.
This resolution is adopted and made a part of the minutes of the meeting of the Board of Directors on March 8. 2011.
BY:
President
ATTESTED:
Secretary

Draft

**Cowpet Bay West**
**Board of Directors Meeting**
**May 10, 2011-05-17**

**Present:** Max Harcourt, Barbara Walters, Greg Miller, Bob Cockayne, Bill Canfield, Sharon Koehler, Jon Cassady, Louanne Schechter

**Minutes of April 5, 2011:** The minutes of the April Board of Directors meeting were unanimously approved.

**Treasurer Report:** Sharon stated the total amount of cash funds is $555,408.

- Owner in Arrears- Letter was sent certified, return receipt- no receipt has returned-Sharon will resend letter.
- Owner in Arrears- Short Sale postponed- Directors agreed to extend their offer.

**Manager's Report**

**Infrastructure & Maintenance:** Filters were changed according to schedule.

**Grey Water:** Grey water system malfunctioned 5/2/11. The water distribution pump motor burned, controls would not function and voltage monitor was missing. System was repaired and functioning same day. Housing required welding to prevent future leaks.

**Transformer Covers:** Corrosion was eroding and causing a hazardous situation for the covers of the transformers. New anodized aluminum covers were fabricated for the transformers on Leeward, the Transformer on Windward Circle and the transformer near the generator. Covers were also fabricated for the junction box and each of the 4 splits from the junction box.

**Streetside Inspection:** Street side steps and railings were inspected and repaired on both Windward and Leeward.

**Streetlights:** All security lights were inspected and are in working order and physically secure.

**Owner fine for Vandalism:** A meeting is scheduled for May 19 with the Security Company and the involved parties to discuss fines.

**CBE Bylaws:** Andy LaPlace reported CBE is in the process of revising their Bylaws therefore, a copy is not available at this time.

3055300/000424

Draft

**DPNR Inspection:** Jon reported he had received a written statement from Mr. Donadelle, DPNR Inspector, stating we were not in compliance as DPNR has misplaced our records. We have made copies and provided originals to DPNR.
**Request for external vent:** L-47 has requested an external vent for their stovetop. The manufacturer stated that as long as the filter is maintained, there should be no grease coming through the vent. They will guarantee the product. The Directors agreed to allow the vent if the owner agreed to be responsible for any discoloration of exterior paint around the vent.

**Old Business**

**Insurance:** Bob handed out minutes from the previous meetings of the insurance committee. The committee requested a new appraisal be completed. Shep Barrows completed the appraisal as requested. The committee is reviewing options based on this current information and will present their findings and recommendations at the June Board of Directors Meeting.

**L-01 Electrical Repairs:** The owner retracted his statement that he would abide by the decision of the Board as he feels he should not be responsible for paying the electrician. The Directors rescind their goodwill offer and the $600 will be added back to his statement. The owner has requested to meet with the Executive Committee. Max agreed to meet again.

**Owner Initiated Issues Policy:** The directors suggested the new policy be uploaded to the website. Max will upload. The Directors would like to have a "form" that can be downloaded for owners to complete and submit.

**Operating Accounts:** Louanne will obtain the paperwork to remove Judi and Ed from the account and add Bill and Sharon.

**Debris in neighboring property:** Greg Miller will approach CZM and DPNR with the issues of debris and hazardous materials on the site.

**Light Poles:** It was noted by a Director that many of the light poles are crooked. Jon explained the extensions to the existing poles exaggerated the lean of the poles. To "straighten" them would be a major expense of chipping concrete, following the wiring, new conduit, new poles, etc. Max suggested the idea be added to long-term projects.

**Insurance Bid:** Insurance bids were obtained at the request of the insurance committee. It was suggested, next year, the committee provides the criteria for the bidding process next year, well in advance, to make comparisons relevant.

**W-27:** The office contacted the contractor and asked him to inspect the slider as it was sticking. The contractor went to the unit and was asked (by the owner) to reschedule at a time more

convenient for the owner. The Owner has not contacted the office of a new time or date or if the work was completed.

**Security Gate:** The Directors agreed to maintain the security gate with the exit button.
**Security:** The Directors discussed suggestions from owners regarding security measures. The Directors asked Jon to initiate the following measures:

- Guards will add unit # to their log sheet when recording vehicle make-model-time
- Guards will utilize manual bar gate when electric gate is not functioning

**Electronic Bulletin Board:** Max created the electronic bulletin board. Owners will be notified of the electronic bulletin board by newsletter and on the website.

**Striping:** Directors instructed Jon to have the **NO PARKING ZONES** repainted. Long-term, Max suggested the parking spaces be striped.

**NEW BUSINESS**
**W-7:** Owner notified Directors they have not received any follow-up on some issues. Jon will email Owners.

**Dogs on Property:** An owner notified the Board of a pedestrian walking his dog on property. The Directors agreed to post **NO DOGS ALLOWED** signage by the well pump.

**Property Walk-around:** See attached notes from Board member walk around. Max will discuss recommendations with Jon following meeting. Jon was asked to put significant findings on the maintenance schedule.

**Owner Storage:** The office has received several requests for owner storage. Jon will inspect storage areas for any empty cages. A note will be posted in the newsletter that owners are allotted one storage space per unit and no flammable materials are to be stored.

**Office AC Unit:** A bid was presented to replace the ac unit in the office. Attempts by the vendor to remove all mold and smells have failed. The Directors agreed to replace the unit.

**Reimbursement Request:** The office received a request from an owners' family member to be reimbursed for medical expenses. The family member never reported the incident to the Association. Jon will investigate the incident and provide a written report of the incident and follow-up.

**Balusters:** Bob stated replacement balusters on one unit appeared to be different then the existing ones. Jon stated the goal is to maintain the same appearance but that materials used 40 years ago have changed slightly over the years. He will inspect.

Draft

**Street side rails/steps:** Street side rails and steps will be sanded and painted in August, weather permitting.

**Scorched paint on exterior of unit:** The staff noted scorching of the exterior paint behind a propane grill on one of the units. The Directors agreed the owner is responsible and will be contacted by letter.

**Next Meeting:** The next meeting of the Board of Directors will be June 14, 2011 @ 8:45am AST.

**Adjournment:** There being no further business, the meeting was adjourned.

**ACTION PLAN**

| | |
|---|---|
| Owner in arrears-resend certified, return receipt letter | Sharon |
| Meeting with Owner/Renter/Security May 19, 2011 | Jon |
| CBW Bylaws forward copy to Barbara | Jon |
| Letter to owner regarding external vent | Louanne |
| Create Form for owner issues | Sharon/Max/Louanne |
| Operating accounts signers | Louanne |
| Letter to DPNR/CZM | Greg |
| Inform Security Company to add unit #, and use pole | Jon |
| Notify Owners of Electronic Bulletin Board by Newsletter/Web | Louanne |
| Paint "NO PARKING ZONES" | Jon |
| Email W-7 | Jon |
| "NO DOGS ALLOWED" signage | Jon |
| Owner storage: Newsletter | Louanne |
| Investigate incident report L-40 | Jon |
| Inspect recent repaired Balusters | Jon |
| Letter to owner scorched paint | Louanne |

DRAFT

**Cowpet Bay West**
**Board of Directors Meeting**
**June 14, 2011-06-15**

**Present**: Max Harcourt, Barbara Walters, Bob Cockayne, Rosie Wells, Sharon Koehler, Jon Cassady, Louanne Schechter

**Minutes of May 10, 2011**: The minute of the May Board of Directors Meeting were unanimously approved.

**Treasurer Report:** Sharon reported the total cash accounts as of May 31 are approximately $558,497. Of this amount, $464,776 is reserve funds. Sharon will present a quarterly summary next month of actual vs budget for the second quarter. Items that were purchased this quarter but not budgeted were fuel for the generator, water leaks, and beach drainage.

The Directors asked for a report on owners in arrears: Sharon reported she had not received a response from her letter to one owner that was in arrears, the letter was sent return receipt, but was never picked up from the post office and was returned to the office. She will resend. That owner did make a payment this month. The second owner did not sell the unit as planned and has filed bankruptcy. Louanne requested the Directors obtain legal counsel. Barbara made a motion that legal counsel be hired the motion was 2nd and all were in favour. The Directors instructed Louanne to contact Anna Paiewonsky for legal counsel. Louanne reported that the total for owners in arrears was approximately 19,000.

**Manager Report**

**Infrastructure & Maintenance:** Filters were changed according the maintenance schedule.

**RO Plant:** Due to the continuous rains during the last 4 weeks, the RO plant ran a minimal amount of time without problems. The cisterns are over capacity with the rains.

**Electrical Systems:** The transformer that was sent to the states to be rebuilt is on schedule to be completed in 2 weeks. Once the transformer is on island, Mr. Harvey will direct its placement and installation in the Windward circle and reroute lower Windward power and eliminate the exposed high voltage line from Leeward to Windward that runs across the rock wall. Weather permitting; we hope to have Mr. Harvey on island mid July. This will complete the 3 year plan for replacing the electrical high voltage grid.

**Grounds:** The groundcover is infested with bugs that are eating the leaves. ABC nursery is scheduled to spray the grounds, but due to no break in the weather over the last 5 weeks, they have not been out. The grounds crew have also been ineffective in spraying due to the rains.

DRAFT

There is a tropical wave expected to bring rain on Wednesday, ABC will try to spray Thursday or Friday depending on the amount of precipitation.

**Security:** Jon reported there were two incidents since the last Board Meeting. The first incident involved vandalism of 2 vehicles on Leeward occurring sometime after midnight. Both had windows smashed. One of the vehicles had a laptop inside that was stolen. The second incident occurred about a week later. An owner reported cash and wallet stolen from his unit with no forced entry between 12:30-1:30pm on a Sunday afternoon, while they had lunch on the seaside deck. The contents of the wallet and the money clip were found several days later by the contractors building the retaining wall in the gut. They found the contents in-between the cinder blocks as they were moving them off the pallet to build the wall.
Jon increased security by adding an extra guard immediately following the first incident. Two security guards were posted with one stationary and the other roaming. Following the second incident, the guard hours were expanded to cover from 6p to 6a. Jon reported there were 10 homes burglarized in Cabrita Point this month alone. Recommendations from the police and our security company were to remove the "No Dogs Allowed" signs and add more surveillance cameras.
The Directors instructed Jon to get bids on surveillance cameras. The Directors instructed Louanne to advise owners of the events. She reported she had described the events in the June newsletter.

**OLD BUSINESS**

**Leeward 1**: The executive committee met with the owner of Leeward 1 to discuss the unpaid electricians invoice, late fees and finance charges. The owner insists the problem was caused by flooding and therefore should be covered by Association funds. Max made a motion the Association remove electricians bill, fines and finance charges associated with the unpaid bill. The motion was 2nd, 4 voted yes and one abstained.

**Insurance Committee:** Bob reported the committee met with representatives from Tunick, Executive, and Mapfre insurance to verify that our current coverage is sufficient in light of the the recent updated property evaluation. The insurance representatives stated we are underinsured with the current 90% co-insurance clause. The committee is obtaining bids and will forward the information to all Board members as soon as they are available. Max stated he may call a special meeting when the information is available. The Directors asked the committee to obtain, if possible, favourable group HO-6 rates from each of the vendors.

**Greg Miller Resignation:** Greg Miller publically resigned from the Board through an email to the community. Max reported it was the responsibility of the Directors to appoint a member to the Board until the Annual Owners Meeting in February. This year would be the third year of Mr. Miller's term. Following discussion, Sharon made a motion Vince Verdiramo (L-5) be

appointed to the Board of Directors. Max 2nd, all were in favour. Sharon will contact Mr. Verdiramo of the Board's decision.

**Bylaws Committee:** Rosie said due to critical illness in her family, she was unable to follow-up on any progress Mr. Waggoner may have made. Max stated the most pressing issue with the Bylaws is clarifying the responsibility of the owner and the responsibility of the Association in maintenance and insurance issues. He stated Greg developed a matrix that should be incorporated in the Bylaws to clarify this issue. Barbara suggested Rosie contact Vince for assistance. At this point, Max excused himself from the meeting. Bob excused himself from the meeting.

**July BOD Meeting**: The next meeting of the Board of Directors will be July 12, at 7:45am.

**Adjournment**: There no longer being a quorum, the meeting was adjourned. Items not discussed will be tabled until next month's meeting.

**ACTION ITEMS**

| | |
|---|---|
| Send copy of arrears letter | Sharon |
| Obtain legal counsel re: bankruptcy | Louanne |
| Cost to increase surveillance cameras | Jon |
| Provide information from Insurance Committee to Board | Bob |
| Inquire about group HO-6 Policy rates | Bob |
| Contact Mr. Verdiramo of Appointment to Board | Sharon |
| Invite Mr. Verdiramo to work on Bylaws Committee | Barbara |

3055300/000430

**Cowpet Bay West Condo Association**
Board of Directors Meeting
Tuesday, June 14, 2011, 8:45 AM
Cowpet West Office

Below is the agenda for the meeting - if additions should be made, please bring them up at the beginning of the meeting.

Meeting Ground Rules: ***Respect!***

Call to order

Review and approval of May 10, 2011 Minutes

Treasurer's Report

Manager's Report

Old Business
- Insurance
- By-Laws
- Owner's Storage Space

New Business
- Resignation and Replacement of Greg
- Vandalism and Security

Review Action Items from this meeting

Adjourn



## Fwd: Board of Directors Meeting

**JERSEYBARB@aol.com** <JERSEYBARB@aol.com> Sun, Dec 2, 2012 at 1:55 PM
To: jkromes@gmail.com

From: cowpetbaywest@hotmail.com
Sent: 6/14/2012 2:38:48 P.M. Eastern Standard Time
Subj: Board of Directors Meeting

TO: The Owners Cowpet Bay West Association

FROM: Ed Wardwell

SUBJECT: Board of Directors Meeting

Here are the highlights of Tuesday's Directors Meeting:

Property
- All systems are operating normally.
- The upgraded grey water transfer lines have been connected and are in service.

Treasury
- All of our 2012 insurance premiums have been paid in full.
- The treasurer, Sharon Koehler, will provide an analysis of our six-month operating expenses to the Board at the August 7th Directors Meeting. You will be provided a copy of this report after Board review.

Planning
- Max Harcourt, Chairman of the Property and Planning Committee, submitted a comprehensive report on the current status and projected upgrades for our property. Major future projects including roof sealing/painting, structure maintenance and electrical system upgrades will be addressed in the 2013 budget.

Owner Requests
- The staff is currently servicing owner requests in Leeward 3, 31 & 37 and Windward 10, 12 & 31.

We will continue to respond promptly to all your written requests for service.

Legal Proceedings

- On June 6, 2012 the Association was notified by the US Department of Housing and Urban Development (HUD) that "HUD has completed its administrative proceeding of this complaint (Barbara Walters vs. Cowpet Bay West Association) under the Act (Fair Housing Act of 1968) and the compliant is hereby dismissed."

Draft

**Cowpet Bay West**
**Board of Directors Meeting**
**July 12, 2011**

**Present**: Max Harcourt, Barbara Walters, Bob Cockayne, Rosie Wells, Sharon Koehler, Vincent Verdiramo, Bill Canfield, Jon Cassady, Louanne Schechter
Herb Horwitz is in attendance by request of the insurance committee to answer any questions the Directors have regarding insurance.

**Minutes of June 14, 2011:** The minutes of the June Board of Directors Meeting were unanimously approved.

**Treasurer Report:** Our current bank balance as of end of June is $513,000 of which $442,899 is in the reserve account. The financials (budget vs actual) for the 6 month period were distributed and discussed. Sharon noted 2 issues (1) there was no budget for tree trimming and cost $20,000 and (2) there was $20,000 spent on beach drainage. CBR is splitting the cost of this project. They have the invoice but have not paid.

Sharon would like Louanne to investigate other options for phone conferencing that are more cost effective. Max has some suggestions and will discuss with Louanne after the meeting.

**Insurance:** Bob presented the information obtained by the insurance committee. The insurance committee believes CBW is underinsured going into hurricane season. The potential exposure is due to the low value of insurance being substantially less than the appraised value (half) and a 90% coinsurance clause; we would realize a 48% penalty for any claim less our deductable because the low value is higher than what we are insured.
The committee recommends we cancel our current policy and obtain a policy with MAPFRE for the total agreed value of $25,916,630. 2% Windstorm deductible ($518,332.60) with a premium of $272,124.62. Bob said that the policy is designed to insure each building individually. (See attached summary). Following discussion Max made a motion to accept the recommendation of the Insurance Committee to obtain the Mapfre Policy. Bill 2nd the motion. The vote was called: Vincent-no, Barb-no, Rosie-no, Bill-yes, Max-yes, Bob-yes, Sharon-yes. The motion carries 4 yes, 3 no. Vincent, Barb, and Rosie want the minutes to reflect they are against any increase at this time and will do nothing to implement this plan.

There was discussion regarding how to finance the policy. Louanne stated that of the monies in reserve, $225,000 is earmarked for capital improvements and $61,000 was borrowed from the Reserve Fund in February to make the final payment for the current insurance policy. She recommended a special assessment to pay for the entire premium and an increase of approximately $85 dollars per month to the insurance to be able to fund the renewal. Herb added that the agent offered financing with a 30-60-90 payment plan. Max will conference with Sharon and Bob to discuss funding the policy tomorrow.

Bob Cockayne left the meeting at this time.

**Bylaws**: Vince agreed to replace Chuck Waggoner on the bylaw committee. The committee will meet this week and forward recommendations to the Board of Directors.

**Owner in arrears:** Sharon sent an email to owner in arrears that they make $3000/month payment. When they default their utilities will be shut off.

3055300/000433

Bankruptcy unit: The sale of the unit was stopped by the bankruptcy court. Anna Paiewonsky was contacted and referred Louanne to call Mr. Hodge, an attorney that specializes in bankruptcy issues. Mr. Hodge reviewed the pacer account and noted that Scotia Bank had petitioned the court. Once the bank takes over the property as abandoned, the bank will attempt to make a short sale and we should be able to collect the common charges. He recommended the Association allow the bank to handle the legal issues as CBW would have to hire a lawyer in Maryland to handle the claim for us and the bank is the first mortgagee.

Louanne sent a letter to the bankruptcy lawyer asking if the property is still being rented, and if CBW will receive funds for utilities and common charges. The property appears to be empty. Bill stated the renter had left. Barb suggested we shut off the utilities, Sharon 2nd, all were in favour. Jon will inspect the unit today to be sure there is no garbage left behind.

**Meeting Format:** Following discussion by the Directors, the motion was made by Vince that all future meetings will be conducted in the following manner: initially, issues as determined by the entire Board shall be discussed in Executive session and upon completion of executive session the meeting will be open to general owners. Barb 2nd the motion. The vote was taken with 5 yes and 1 no. Max request the minutes reflect he voted no.

**Vandalism & Security:** The Directors discussed the letter they each received from Kellerhals & Ferguson on behalf of their client, a renter in W-37 (letter on file in office). Vince responded to an owner that the matter has been resolved. Vince also sent a letter from his law office to Kellerhals & Ferguson that the matter was discussed with his client and the matter resolved. The owner received documentation in writing of the incident.
Max made a motion the Board commend Jon for professional handling of lamp pole incident and that we are confident in his ability to continue to manage our property in the manner it needs to be done. Barb 2nd all were in favour.

**Guards**: Guards were increased temporarily following 2 incidents; one was car windows smashed on Leeward and the second was a theft. Jon recommends we reduce the overlap of guard hours and change to one guard from 6p to 6a.

**Managers Report**

**Retention Wall:** Completed

**Tree Trimming** Hurricane prep is completed. The Elysian did not remove coconuts from palms on our beach; that service (31 trees) was performed by the tree trimmers.

**Gray Water Transfer Line:** This project should begin this week and hope to have the backhoe in the morning.

**Electrician**: The rebuilt transformer should be completed and returned to property the first week of August. Once the transformer is on property, we will schedule Kent Harvey to wire the transformer and remove the exposed high voltage line.

**No Dog Sign**: Jon was advised by our security company not to advertise we don't allow dogs. The Directors would like a sign posted near beach drive.

Draft

**Balusters:** Inspections completed, we had a couple of issues on Leeward 12 and L-44. L-12 is complete at this time and L-44 to be inspected this week

**Surveillance Cameras:** Functioning cameras cost approximately $500 each. The installation cost depends on the location. Beach Drive, Gut, and Yacht Club Gate are the areas we have discussed. Jon believes we have sufficient light to view footage.

**Letter to Owner:** Letter was sent to owner explaining charges on his unit for vandalism by his renters.

**Incident Report:** Follow-up from fallen security light and pole. Jon inspected all security poles and found none requiring replacement. Owner came to office requesting reimbursement on his daughter's behalf for medical expense. Stated if she didn't receive check that day, her boyfriend would sue. Owner reimbursed her and is now requesting credit to his account. Vince made a motion the owner be reimbursed, Sharon 2nd, 4 voted yes and 1 no. Motion passed.

**ACTION ITEMS**

**Banco Forms:** Not done.

**OPNR response to neighbour property:** Not Done

**Letter to Owner External Vent:** Completed in May

**CBW Bylaws:** Not available at this time, being reviewed by their attorney.

**Direct Deposit for Owners:** Waiting for Ms. Richards of Banco to set up meeting.

**Parking Lot Striping:** Striping the no parking zones- scheduled for first of September when least amount of cars on property.

**Walk-Around Issues:** No scheduled at this time.

**Owner Issue Form:** Not completed

**Storage Space:** Suggest that we have a storage cleanup day during the week of the Annual Meeting.

**Planning Committee:** Max will provide minutes this summer.

**Owner Request:** Sharon requested all complaints be sent to Board members. Max, Barb, Vince, Bill, and Rosie do not want complaints sent to them, Sharon does.

**W-26 Request for Noise Control:** W-26 requested the Board of Directors speak with the Elysian before they award any contracts to restaurants on property about controlling the noise. The Directors agreed that we have not rights as long as they adhere to the laws on island.

**Next Meeting:** The next meeting will be August 9, 2011 at 8:45am

**Adjournment:** There being no further business the meeting is adjourned.

Draft

**ACTION ITEMS**

| | |
|---|---|
| Banco Forms | Louanne |
| DPNR Response | Max |
| CBE Bylaws | Jon |
| Direct Deposit Banco | Louanne |
| Parking Lot Striping (no parking zones) | Jon |
| Walk-Around Issues on Maintenance Schedule | Jon |
| Owner Issue Form | Max |
| Planning Committee Minutes | Max |
| Owner Request sent to Sharon | Louanne |
| Phone Conferencing Options | Max/Sharon/Louanne |
| Funding Insurance Policy | Max/Sharon/Bob |
| Informing Owners of Insurance Policy & Funding | Max/Sharon/Bob |
| Update Bylaws | Bylaws Committee |
| Baluster L-44 | Jon |
| Surveillance Cameras | BOD next meeting |
| Inspect bankruptcy unit/shut off utilities | Jon |
| No Dog Sign posted by gut/beach drive? | Jon |
| Response to W-44 Guards | Jon |
| Storage Space (table to Feb 2012) | |
| Copy of Letter sent from Vince to Kellerhals for file | Vince |

DRAFT

**Cowpet Bay West**
**Board of Directors Meeting**
**August 9, 2011**

**Present:** Max Harcourt, Barbara Walters, Bob Cockayne, Rosie Wells, Sharon Koehler, Vincent Verdiramo, Bill Canfield, Jon Cassady, Louanne Schechter

**Conference Call**: Directors were given a new conference dial-in number and participant code and asked to call back on the new service *Free Conference Call*. Although the conference call is free, there may be associated long distance charges by individual carriers and Directors were urged to use their cell phones. The meeting continued when all Directors were on line.

**Minutes of July 12, 2011**: The minutes of the July 12 Board of Directors Meeting were unanimously approved.

**Executive session:** Max made a motion the meeting move out of Executive Session. There were 3 votes yes, the motion did not carry

**Minutes of July 27, 2011 Special Meeting:** Sharon requested the cash reserve amount of $320,442 be amended to $372,336 in the minutes under the heading of Treasurer Overview, 3rd sentence. Max made the motion the figure be changed, Sharon 2nd, Bill, Max, Bob, and Sharon approved. Motion carried. There being no other changes, the minutes were approved with amendment.

**Tropical Storm Emily:** Jon reported the storm brought some rain and gusty winds, because it was well South of us it was not a problem

**Treasurer Report:**
As of July 31 in our reserve fund we have approximately $397,000 and approximately $96,000 in the operating accounts for a total of $494,000.

**Owner in arrears:** Owner replied they could commit to $2500/month but not the $3000 that was requested. The Owner is in arrears of $8,178. Max made a motion the Board accept the $2500/month Sharon 2nd, all were in favour.

**Insurance Rebate from Tunick**: Not arrived. Bob will contact Colin for the status of the check.

**CBR Bill:** Not paid for their portion of the Retaining Wall. Jon said Gene will be sending a check next week.

**Mapfre Insurance Policy**: The Policy has not arrived in the office. Max will follow up with the sales representative, Jose, as to when the policy will be available.

**Contact Information**: Louanne requested contact information for the office records. Sharon said she thought the information was on the binder. Max will obtain contact information. Max stated that Jose is planning a visit to St. Thomas this September and will bring a local representative with him to meet the staff and see the property.

**Systems not noted on Appraisal** Sharon asked what systems were not noted on the Appraisal. The systems not mentioned were: the fresh water, beach well, 3 lift stations, gray water, electrical control room, and the office. While Shep Barrows was on property last week, Louanne asked him if the items

DRAFT

were omitted on his appraisal would they be covered by the insurance policy. He said, he wasn't sure he made any omissions, and then left without reviewing the appraisal. Bill will speak with Shep regarding the items.

**Budget Revision**: Sharon will contact Jeanne and work on the revisions and provide to the Directors. Max would like a target date of completion before the September BOD Meeting.

**Hourly Employee Compensation**: Jon reported he has no detrimental reviews for the staff and he proposes a 3% increase to all the hourly employees. Max made a motion the employees receive a 3% raise, Vince 2nd, 6 voted yes. Sharon said without knowing the 3% total of increases, she abstained and would like the minutes noted as such.

**OLD BUSINESS**

**Bylaws**: Vince said he had reviewed the Bylaws, made approximately 20 suggested revisions, and will send copies to the Directors for their review and input. The Directors should receive the revisions next week. Vince requested they review the changes and send him their comments.

**Bankruptcy Unit**: The utilities were disconnected as discussed in last month's meeting. As reported in the Special Meeting, the owner filed Chapter 7 in Maryland and the Bankruptcy Court approved it. The owner had a mortgage with Scotia Bank. Vince will follow-up with the Trustee to find out the current status of the property.

**NEW BUSINESS**

**Teleconference**: The service we are using today is a free conference service. Users may be charged a long distance carrier fee. It was suggested users utilize their cell phones if they have free long distance. The phone number and participant code will stay the same.

**Manager Report**

**Operating systems**: RO plant, gray and fresh water systems working well. The GenSet had a bad cell in the battery and new batteries were purchased and installed

**Capital Projects**:

- Gray Water Lines project to be completed in approximately 10 days
- Cistern Repair (Masonry) 2 cisterns that were leaking are completed.
- Transformer-Mr. Harvey confirmed yesterday the transformer rebuild is complete. He will oversee the shipping back to St. Thomas. When the transformer arrives, we will schedule Mr. Harvey to be in St. Thomas and complete the final phase of the High Voltage Project.
- Retaining Wall shared with Elysian: A third level of block was added to the "back splash". Gene is aware of the added work and will split the cost.

**Action Items**

- CBE Bylaws: Andy will have the completed revisions next week. Jon will obtain a copy and send to Vince

- **Balusters**: Inspection of balusters are complete and repaired except for L-44. The owner had installed his hurricane shutters and would like the work completed after season, when the hurricane shutters have been removed.
- **Parking Lot Striping**: Scheduled for September.
- **No Dog Signage:** Have not completed
- **CBW Road Sign Damage**: The sign was found knocked over and broken. We don't know who or how it broke. We have contacted the original sign maker and waiting for his return call. We will obtain bids and pass on to the Directors.
- **Painting of Steps & Rails**: Scheduled for October
- **Work Orders**: Sharon said she is not getting the work order sheet. Louanne stated she was sending them out on Friday. Sharon agreed once a week would be fine and she will look for them on Friday.
- **Banco Forms**: New paper work was obtained. There is one form that needs to be signed by the Treasurer. Louanne will get Rosie's signature when she gets back on island.
- **DPNR**: Max reported that is on hold for now.
- **Direct Deposit**: Owners would be given the account and routing number. Owners would sign a form for electronic deposit. Barbara suggested we use a separate account for deposits, Vince suggested a lock box through the bank, Max wanted to know the fee schedule. Max asked Louanne to provide all info by the next meeting for a vote.
  Vince had to leave the meeting at this time. Max suggested we set the next meeting date before he left.

**September BOD Meeting:** The next meeting of the Board of Directors is scheduled for September 13, at 7:45am AST.

- **Long Term Plan**: Max would like a copy of the Long-term Plan mailed to him.
- **HO6 Policy rates:** Mapfre is not currently offering this type of policy.
- **Surveillance Cameras**: To be added to the long term planning area. Bill stated in retail business, cameras have not been effective.
- **Satellite TV:** Bill said that Dish is offering a great deal right now of free installation and the box. He would like to take advantage of that by finding a vendor for the complex. Jon is in talks with a vendor .

**Code of Ethics**: Sharon and Max raised the question about a code of ethics for the Directors. Max said he and Sharon would present at the next meeting.

**Adjournment:** There being no further business, the meeting was adjourned.

3055300/000439

DRAFT

**CURRENT ACTION ITEMS**

| | |
|---|---|
| Letter to owner in arrears | Sharon |
| Contact Tunick Insurance re: insurance refund | Bob |
| Cowpet Bay Resort payment for retaining wall | Jon |
| Contact salesperson from Mapfre re: policy | Max |
| Speak to Shep Barrows re: systems missing from appraisal | Bill |
| Speak with Mapfre are all systems and office (not in appraisal) covered | Max |
| Contact information for Mapfre | Max |
| Budget Revision | Sharon |
| Bylaws first draft of revisions to Directors | Vince |
| Bankruptcy update on unit | Vince |
| CBE Bylaws send copy to Vince | Jon |
| No Dog Sign | Jon |
| Obtain bids for repair of road sign | Louanne |
| Work order sent weekly to Sharon | Louanne |
| Banco Forms | Louanne |
| Banco Electronic Banking Package to Directors | Louanne |
| DPNR | Max |
| Long Term Plan to Max | Jon |
| Update on HO6 policy from Mapfre | Bob |
| Satellite TV Vendors | Jon |
| Code of Ethics Presentation | Max/Sharon |

**PENDING ACTION ITEMS**

| | |
|---|---|
| L-44 Baluster repair after hurricane season | Jon |
| Parking lot Striping in September (weather permitting) | Jon |
| Painting of steps and rails | Jon |
| Surveillance Cameras added to long term plan | Max/Jon |

Draft

Max Harcourt Suggested Revisions (in yellow)

**Cowpet Bay West**
**Board of Directors Meeting**
**September 13, 2011**

**Present:** Max Harcourt, Barbara Walters, Bob Cockayne, Rose Wells, Sharon Koehler, Bill Canfield, Jon Cassady, Louanne Schechter,
Vince Verdiramo is out of the country.
Lance Talkington (Leeward -03) announced himself as attending the telephone conference.

**Minutes of August 9, 2011:** Board members reported they did not receive a copy of the August minutes. A copy of the minutes will be emailed to the members and they will vote on them at the next meeting. (Copies were emailed during the meeting).

**Determination of Necessity for Executive Session:** No Executive Session was required.

**Treasurer Report**
**Budget Revision:** Sharon reported she collaborated with Jeanne Brennan, our accountant, on the revised budget for 2011. Jeanne provided analysis with the changes highlighted. Max made a motion to except the revisions, all were in favour.
Barbara made a motion to send the analysis as provided by the accountant to the owners, Rosie 2nd, all in favour.
**Pay off loan from Reserve fund:** Sharon made a motion to pay off the loan from the Reserve fund. She stated the total payment with interest is $54,981.37, the initial loan was for $60,783.33 and the interest is $298.04.
Bill 2nd, all were in favour.
**Transfers of monies:** Sharon will work with Louanne to transfer funds owed to Reserve Fund from the General Funds and transfer funds owed from Reserve Fund (capital projects completed) to General Fund.
**Payment from Elysian:** Sharon asked if we had received a check for the Elysian's portion of the beach and flood control project. Jon stated that he was meeting with Gene today. Max asked Jon to call him after the meeting.
**Bounced Check:** Sharon asked about bounced check- Louanne reported there were none last month,
**Bankruptcy Unit:** Sharon asked who was billed for the account in arrears. Louanne reported that Vince Verdiramo followed up on the ownership of the unit following the awarding of the bankruptcy court; the original owner has retained possession of the property. Louanne contacted the Real Estate agent and the closing attorney. The agent is rewriting the seller's contract as the previous buyer is still interested. The closing attorney, Marcia Resnick, has the current statement and will advise us what is collectable.

**Old Business**

**By-Laws Committee Report:** The committee request the discussion be tabled. Max requested the Directors submit their comments in writing as requested by Vince. Only one Director (Sharon) has responded to Vince's request at this time. Bob asked if the Directors are considered the Committee as a whole. Max stated yes.
Sharon reported she sent copies of Vince's suggested changes to Anna Paiewonsky and Herb Horwitz. The committee has not received any written comments from these owners.

**Owners in Arrears:** Max asked the status of owners in arrears. The owner that has a payment plan is continuing to follow the plan. Another owner that was 90 days in arrears replied by email they were making a payment and would catch-up by December. Bob asked for the total dollar amount over 60 days in arrears. Sharon reported it was $28,466. Sharon's figure was the total for greater than 90 days. The actual 60 days was $5,528.03 [$21,705.54.] as of August 31. One payment was made reducing the total to $4,860 [$20,505.54] current.

**New Business**

**Code of Ethics:** Following discussion, the Directors agreed a written code of ethics is not necessary. The Directors agreed to improve on their communications and move forward.

**Security Gate:** The gate was open after Irene because the phone lines were down. The manual gate is broken at this time and repairs are being made. The security guards are stopping people in a professional and courteous manner.

**E-mail List:** Sharon requested **owners** email addresses are added to the Owners List. Bill stated trying to keep the list current is very difficult. Max suggested Louanne contact the owners and inform them that the Owners List will be updated with the owner's email(s) unless they contact the office that they don't want it included.

**Blog:** Sharon wanted to know why the newsletter stated that we don't have a blog. Louanne stated owners have called the office requesting clarification. The facts were placed in the newsletter as clarification for all owners. Lance was asked about the blog, but he had dropped off the line. Sharon suggested a Board member be appointed to preview the newsletter before it is sent. Max stated there was no problem and we should continue with the newsletter as we have.

**Resolution:** Sharon stated the resolution (from the February meeting) had never been completed and was not in the minutes. She stated it needed to be typed, and signed or put into file and it should be signed by the President and Secretary. Louanne stated the revisions were inserted into the minutes when the Board approved them. Louanne sent Sharon copies of the revisions, as she requested yesterday. Louanne was unaware the resolutions needed signatures and will obtain the signatures that Sharon is requesting.

**Manager Report**

**Infrastructure and Maintenance:** Gray and fresh water filters were changed 8/5/11. All systems are operating efficiently.
**The RO** has not been run recently due to the heavy rains.
**The generator** ran without problems during the storm. Jon switched the generator to manual after the storm while WAPA made any repairs to the area.
**Shutters:** We follow the mariners 3 day avoidance within the vector cone. Irene was made a named tropical storm on Sunday and passed by on Monday, shutters were not closed. There was no 3 days to prepare. Maria was a named Tropical Storm and we were within the vector. Owners were notified on Thursday and shutters were closed on Friday.

Draft

**Transformer:** 3 phase rebuilt transformer should arrive on island in approximately 2 weeks. When it arrives, we will schedule the electrical contractor, Kent Harvey, to install the transformer and complete the high voltage system changes slated.
**Grey Water Lines:** The project is approximately 70% complete. The heavy rains have prevented any work for the last 2 weeks. Work will complete when weather clears.
**Elysian Payment:** Jon is meeting with Gene after meeting
**CBE Bylaws:** CBW has sent their bylaws back to their attorney and are not complete. Bob would like Jon to try to obtain owner responsibility and insurance portions of their bylaws if they are complete.

**Pump Systems:** Jon has information on the pumps to share with the long term planning committee

**Satellite Vendors:** Dish network was installed by Enrique Garcia in two buildings.

**Parking Lot Striping:** On hold until weather clears.

**Balusters:** Repair after hurricane season

**Painting of steps and railings:** When weather clears.

**Dish TV:** Jon reported that Enrique Garcia had installed units in Leeward, and he was pleased with the operation.

**Mapfre Insurance Policy:** Policy is in the office.

**Revision of Appraisal:** Shep will return and revise the appraisal to include the systems that were left off. Bill will contact Shep to revise.

**Contact information from Mapfre:** Available in office

**Road Sign:** Louanne reported another incident occurred where the concrete base was pushed over. The Board was asked if the sign needed replacing. The bid for the sign does not include the base. Max asked to get an inclusive bid.

**NO DOG SIGN:** Jon asked for verification. Max stated the Board had decided to place a NO DOG SIGN, by the beach drive

**Work Orders:** Louanne is sending the work orders on Fridays. She was unable to send this Friday as the hurricane shutters blocked the internet signal. There were no complaints to send.

**Banco Electronic Banking:** Waiting for return call from Banco. Louanne requested information on several options. She will send any info to Directors when available.

**DPNR:** On hold, per Max

**Long Term Planning:** Jon was asked again to send Max a copy of the LTP. Max is planning on scheduling a meeting of the committee in September.

Draft

**HO6 Policy**: Mapfre will contact us when they have them

**Service Dogs:** Dogs must be registered with the ADA. VI does not have guidelines for service dogs.

**Next meeting**: October 11, 2011 at 7:45am.

**Adjournment**: There being no further business the meeting was adjourned.

ACTION ITEMS

| | |
|---|---|
| August Minutes to BOD | Louanne |
| Transfer monies as calculated by Sharon to Reserve Fund on 9/14/11 | Louanne |
| Letter to Owners in Arrears | Louanne |
| Written comments on revisions to Bylaws | Directors |
| Repair manual Security Gate | Jon |
| Inform owners email address(s) will be added to Owner List | Louanne |
| Update owner's list to include email address(s) | Louanne |
| Send Resolutions from February & March Minutes to Max and Rosie for signatures | Louanne |
| Send LTP to Max | Jon |
| Gray Water Lines | Jon |
| Elysian Payment | Jon |
| CBW Bylaws to Directors | Jon |
| Parking lot striping | Jon |
| Painting of steps & rails | Jon |
| Revision of Appraisal | Bill |
| Road Sign Bid for base + sign | Jon |
| No Dog Sign | Jon |
| Electronic Banking for Owners to make direct payment | Louanne |
| DPNR | Max |
| Long Term Planning Committee meeting | Max |

3055300/000444

Draft

**Cowpet Bay West**
**Board of Directors Meeting**
**October 11, 2011**

**Present**: Max Harcourt, Barbara Walter, Bob Cockayne, Rosie Wells, Sharon Koehler, Bill Canfield, Jon Cassady, Louanne Schechter
Vince Verdiramo is out of the country.
Lance Talkington (Leeward 3) announced himself as attending the phone conference

Max announced there would be a brief executive session and Jon would contact Lance when he could rejoin the meeting.

**Executive Session**:
The manager requested Directors do not include the names and titles of vendors used by the Association in their emails as some vendors have agreed to assist us, on their own time, as a second income.
Sharon stated a previous Board recommended the Association not act as a third party vendor. Owners are responsible to hire and pay their own service vendors.
There being no further business for Executive Session, Max opened the meeting to owners, Lance rejoined the meeting.

**Minutes of August 9, 2011**: The minutes of the August minutes were unanimously approved.

**Minutes of September 13, 2011**: The minutes of the September minutes were unanimously approved with the revisions provided by Max Harcourt (see attached).

**Treasurer Report:** The total cash assets as of September 30, 2011 were $557,447. The reserve funds total is $452,300. Sharon presented her analysis of the 3rd quarter budget verses actual report (attached).
CBW BOD-P&L Third Quarter Report 9/30/11 & Treasurer's Report

Cash on Hand 9/30/11 Operating Accounts - $104,000

Reserve Accounts - $ 452,300

We will be depleting the Reserve Account by approximately $ 94,800 and reimbursing same to our general accounts to cover expenses made for capital improvements. After the funds have been cleared, we will write a check to repay the Reserve account current through October, approximately $ 62,855. This will ultimately result in a balance in our Reserve fund of $420,355.

Our 9/30/11 customer receivables are $36,940, of which $25,033 are 60 days and older.

Notes and observations re 3rd quarter P&L-Budget vs Actual

1. Income-fixed charges a little off mark....Louanne and I will work towards finding and correcting the posting problems

3055300/000445

Draft

2. Income is about $4500 on the plus side; due to sale of transformer to Elysian ($5900)
3. Expenses:
   - Items under budget
     - WAPA-Assn ($16,000)
     - Contract Labor Bldgs. ($11,150)
     - Grounds ($8,000)
     - Hurricane ($3,750)
     - Beach Refurb ($5,100) –
   - Items over budget
     - Building repairs ($5,300)
     - Grey Water ($1,900)
     - Electric/Generator ($6,500) – fuel bills
     - Vehicles/Fuel ($4,000)
     - Security Guard ($8,000) Increased hours
     - Office Expense ($4,000) – new computer & AC unit
     - Contract Labor-Grounds ($16,000)
     - Medical ($3500) – increased costs
     - WAPA Owners ($21,000)
     - Beach Refurbish ($5,100) – sand, buoys, chairs, cleanup
     - Legal/Accounting ($1,800) – extra meetings with Jeanne Brennan re insurance

Other observations:

1. A policy was established several years ago that CBW Assn would not act as a 'middleman' between owner and vendor. The primary reason for this was twofold, in that it created a liability situation for the assn. and that it distorted our financial reports. In reviewing our records this year, it has come to my attention that when an owner's phone line is down, we have been having a vendor come and fix the line. The arrangements for these fixes are made by Jon, who then pays the vendor cash ($50) for the repair. Then the office bills the owner for the repair and reimburses Jon via a company check. While I can understand the owners' frustrations not having a working phone, I cannot understand why the owner and the supervisor can't complete the transaction without Jon's involvement. I recommend we cease this practice and find another way to handle these situations.
2. It will soon be time to prepare the 2012 budget. I have been working with Louanne to correct mis-postings throughout the P&L. I believe it is important to have our records accurately reflect our expenses, rather than worry about how much we are over or under compared to our budget. This is the only way to accurately predict the upcoming budget. I will continue to wnrk with Louanne to keep a more accurate accounting of our expenses.

Draft

**2012 Budget:** Max suggested the budget for 2012 be prepared prior to the end of the year. He would like to include the budget with the information sent to owners for the annual meeting.

**OLD BUSINESS**

**Bylaws:** Max set the goal that any changes the Directors would recommend be completed this year and presented to owners so that they could be voted on during the 2012 Owners Meeting. The Directors discussed the changes in the Bylaws suggested by Vince Verdiramo. The following is the recap of suggested Bylaw Revisions

Recap of suggested Bylaw Revisions October 2011

OUTCOME OF BOD'S DECISIONS AT 10/11/11 BOD MEETING INDICATED IN BLUE

Following is a compilation of suggestions for changes to our bylaws following the order of our current document. In each case, the first name listed below each category initiated the suggested change:

Article II, Section 3 – Managing Agent

Sharon – suggested adding (k) to exclusions limiting the securing of property insurance solely to the Board

Max – Agrees Bill OK, Approved

Article II, Section 4, – Election and Term of Office

Paragraph 2....Sharon – recommended we change the method of voting stated in the current bylaws to reflect the manner we currently follow.

Max – suggested wording be changed to '*All vacancies shall be voted for on the same ballot, and the candidates with the highest number of votes shall be elected to each of the vacancies*'.

Change approved

Paragraph 4... Vinnie – suggested changing the 'time-out' for board membership from 1 to 2 years

Sharon – questioned reason, feels it should remain at 1 year

Max – felt no change was necessary

Bob – felt no change was necessary

All agreed that no change was necessary

Article II, Section 5 – Removal of BOD Members

Vinnie – recommended we change the second paragraph to give the Board the ability to remove a board member who has not attended meetings from an entire year to a six month period.

Sharon – felt the verbiage should be changed to 'six consecutive meetings' and that the attendance at the Annual meeting should be further clarified by 'in person'

3055300/000447

Draft

Max – felt no change was necessary

Bob – felt no change was necessary

All agreed that no change was necessary

Article II, Sections 8 & 9 – Regular and Special Board Meetings

Sharon – suggested we include 'email' as an acceptable means of board meeting notification

All agreed

Article II, Section 11 – Quorum of Board of Directors

Max – **recommends the following: Delete** – "... a majority of those present may adjourn the meeting from time to time. At any such adjournment at which a quorum is present, any business, which might have been transacted at the meeting originally called, may be transacted without further notice." **Add, in place:** "no business may be transacted until a quorum is achieved."

Unclear about how this should be worded, but all agreed that no business should be conducted unless a quorum is present.

Article II, Section 15 – Executive Committee

Vinnie – suggests "*in the second paragraph where it states, "merge the association into another," this right, according to this paragraph, is reserved to the Board. However, the merging of the association is a paramount item which in reality should be voted on by all owners and be carried by a simple majority.*"

"*In the next to the last paragraph which now reads, "and it shall have the powers to authorize the seal of the association to be affixed to all papers which may require it," this should be changed to read, "and it shall have the powers to authorize the seal of the association to be affixed to all papers which may require it provided said papers and/or contracts do not involve an Board by either e-mail or fax.*"

Max - **recommends: Revise wording to read:** "...provided said papers and/or contracts do not involve expenditure greater than $50,000. Greater expenditures require approval by a quorum of the Board in regular or special meeting."

Draft

Sharon – asks if we should reconsider the dollar amount

Undecided, requires more discussion.

Article II, Section 16 – Inspection by Executive Committee

Vinnie – suggests we add "*such reporting to the full Board shall be made within 15 days of the semi-annual inspection*"

Sharon – suggests we also add that monthly progress reports be made by the GM to the Board at each Board meeting.

Max – would like the wording revised to read "Within 30 days after each such semi-annual inspection, the Committee will report its findings and recommendations to the Board of Directors."

Bob – agrees that report to the entire Board be submitted 15-30 days thereafter.

All agreed to add 30 day requirement

Article II, Section 19 (added) – Communications

Max – suggested Communications by, from, to and among the Board may be in writing, by fax or by electronic communication (telephone, telephone conference, email, internet, etc.). Telephone and telephone conference conversations must be documented (e.g., minutes or record of conversation). This communication will constitute "official" communication by the Board.

All agreed to include

Article III, Section 1 – Annual Meeting

Max – suggested owner's be allowed to attend the Annual Meeting by telephonic/electronic means.

Withdrawn

Article III, Section 3 – Special Meetings

Vinnie – suggested last sentence should read '*no other business shall be transacted at a special meeting except as stated in the notice*'

Sharon – agreed

Bob – agreed

Max – agreed and suggested we add '*Owners may 'attend' via electronic means*"

PLAINTIFF'S
EXHIBIT
3A

*All agreed*

Article III, Section 5 – Adjournment of Meetings

Max – suggested allowing electronic participation by owners

Withdrawn

Article III, Section 6 – Annual Meeting Order of Business

Max - suggested the order of business should read:

(a) Roll Call – by unit

(b) Establishment of Quorum (1/3 of all unit owners)

(c) Proof of Notice of Meeting

(d) Reading of Minutes of preceding meeting approval

(e) President's Report (including cost and coverage of insurance)

(f) Treasurer's Report (including discussion of Budget and Financial Status)

(g) Property Manager's Report

(h) Report of Nominating Committee

(i) Election of Board members

(j) Old business

(k) New business

All agreed to change format as above, except (d) should be amended to "Approval" rather than 'Reading". Barbara expressed concern that no provision was made for owners to approve the budget. Bob stated the point would be moot, as the bylaws give the Board the power to develop and approve the budget, and a negative vote by the owners would not be valid.

Article III, Section 9 – Majority of Unit Owners

Max – suggested (as stated in sections 1 and 5 above) that electronic participation be included

Withdrawn

Article V - Sections 2, 3,& 10 – Insurance, Repair/Reconstruction After Fire, Routine Maintenance & Repair – TO BE DISCUSSED AT LENGTH LATER, OR ANOTHER TIME

The entire board agreed in principle that all language concerning these sections should specify that the Assn's insurance covers all items within the walls, and that owners are responsible to insure all items from the paint and beyond into the living area, whether they are original or not. A special board meeting may be called before the end of October to discuss these important sections in further detail.

Article V, Section 11 – Restriction on Use of Apartment Units

Draft

Vinnie – suggested we add a paragraph concerning our 'no dogs allowed' policy.

Sharon – provided information from the ADA website regarding 'service dogs'; agreed with Vinnie

Max – provided language as follows:

No dogs are allowed on the property, either long term or visiting. The Board may grant exceptions to the NO DOGS ALLOWED rule, on an individual basis, should an owner require the assistance of a service animal (dog) as defined by the ADA. Owners seeking to obtain such an exemption are required to apply, in writing, to the Board with supporting documentation."

Bob – agreed

Bill – agreed and verified that the USVI follows 'service dog' definition of ADA

**Note – need to establish a minimum fine, or delegate fine ability to the BOD, as this is no longer an R&R

All agreed this restriction should become a part of the bylaws. Barbara cautioned that the ADA act forbids asking service animal owner the cause of disability. Bill stated that we can require proof of ADA compliance documents from owner, but cannot deny ADA approved animals on property. Board ability to assess fines is covered earlier in the bylaws.

<u>Article V, Section 12 – Additions, Alterations or Improvements by BOD</u>

Sharon – recommended we increase the dollar limitation for expenditures with Board approval, and not requiring 2/3rds owner approval.

Max – suggested increasing this to $100,000, from $50,000.

All Board members agreed to increase the dollar limitation to $100,000, except Barbara who felt it should remain at $50,000

<u>Article V, Section 13 – Additions, Alterations or Improvements by Owner</u>

Vinnie – recommended adding an additional paragraph as follows:" *No unit owner may use their seaside patio for the storage of any household goods or appliances* and *shall limit the use to patio furniture only."*

Sharon - disagrees

Bob – agrees with Vinnie

Max – feels this should be covered in either Section 14, or belongs in our Rules and Regulations

All agreed this should not be added to the bylaws, but rather covered under rules and regulations

Draft

Article XIII – Conflicts

Vinnie – recommends this section should be reviewed to determine if this is still a good law.

Bob – agrees

Rules and Regulations

Max – suggests we review our Rules and Regulations

NOTE: Vinnie Verdiramo was not in attendance at this meeting

Max will ask Anna Paiewonsky if she is interested in providing a legal opinion of these changes to the Bylaws.

**NEW BUSINESS**

**February BOD Meeting?**

**Meet & Greet: Thursday February 2nd, Place to be announced**

**Annual Owners Meeting February 4th, Place to be announced**

**Nominating Committee:** Bob said the committee is actively preparing.

**Manager Report**

**Systems:** All systems are doing well. The lab retested one fresh water test. The first sample was negative for ecoli as was the second test.
**Dump-truck**: Dump truck stalled at the light when returning from the dump. The truck was covered under warranty for replacement of fuel injectors Jon had the truck towed to the property until arrangements could be made with the Ford company. The truck was then towed to the Ford repair shop for the scheduled repairs.

**Gate**: The gate is functioning without problems.

**Long Term Plan**: Jon is obtaining additions from Mr. Harvey to add to the plan before sending to Max

**Transformer**: The transformer is in route, when it arrives on island we will schedule Mr. Harvey's visit.

**W-17:** Owner sent complaints that will be entered into log. (Louanne off island will enter when she returns; Jon has copy of her complaints).

**L-07**: Owner complained alarm was beeping for 3 days, owner did not report alarm when it started. Jon spoke with owner and suggested she call office immediately for any alarm.

**CBE:** Andy said the owners are still revising bylaws

Draft

**Bankruptcy:** Statements were sent to the lawyer representing the owner and we have had no response.

**Signage:** No Dogs Allowed and replacement of Parking Signs to be installed this month.

**New Road Sign**: We have a quote for the sign but not the base

**November BOD Meeting**:

**Adjournment:** There being no further business,

ACTION ITEMS

| | |
|---|---|
| Repair of manual Security Gate | Jon |
| Long Term Plan to Max | Jon |
| Elysian Payment | Jon |
| CBE Bylaws to Directors when available | Jon |
| Parking lot striping | Jon |
| Painting of steps and rails | Jon |
| Revision of Appraisal | Bill |
| Contact Anna Paiewonsky | Max |
| Road Sign Bid for base and sign | Jon |
| No Dog Sign and No Parking Signs | Jon |
| Electronic Banking (info was sent to Directors last month) | Directors |
| DPNR | Max |
| Long Term Planning Committee | Max |
| Update on Bankruptcy Ruling | Louanne |
| Notify Owners Annual Meeting | Louanne |
| Notify Dwners Meet & Greet | Louanne |
| Notify Owners how to contact Nominating Committee | Louanne |

3055300/000453

DRAFT

**Cowpet Bay West**
**Board of Directors Meeting**
**November 8, 2011**

**Present:** Max Harcourt, Barbara Walters, Bob Cockayne, Rosie Wells, Sharon Koehler, Vince Verdiramo, Jon Cassady, Louanne Schechter
Bill Canfield is off island.

**Executive Session:**
Max requested the meeting move to executive session, Vince 2nd, there were 5 yes 1 no. The motion carried.

**Telephonic Conference:** Max stated the purpose of telephonic conference was to allow Directors off island have a means of attending the meeting. Max states the meeting is not manageable opening the meeting telephonically to all owners.

**Service Dogs on Property:** Following discussion Vince made a motion to table the situation until the Directors can obtain a legal opinion of the no dog rule and incorporate that opinion into the rules and regulations and or recommended bylaw changes. Max 2nd, and the Directors were in agreement.

**Imposing Fine for Dogs on Property:** Max made a motion any individual in violation of the no dog rule , that have service dog credential will not be fined until the opinion from legal council is obtained, pursuant to the outcome of the previous motion. Sharon 2nd.

**Executive Committee:** Max asked if any Director is interested in being in the Executive Committee. Barbara and Bob said they would be interested, Max requested the Directors vote by email to him and he will tally the vote.

**Manager and Office Manager Review:** Louanne and Jon were asked to leave the office.

**There being no further Executive Business, the Executive Session ended .**

**Security Gate:** Mr. Daryl Padola, the welder, is repairing the manual gate. The bid was for $460.

**September Minutes:** Sharon requested her revisions be made to the minutes. Under Resolution April resolution had not be executed nor was it attached to the minutes. The revisions were accepted.
**Treasurer Report:**
Treasurer's Report – November Board Meeting 2011
October 31, 2011
Bank balance (all accounts) Oct. 31, 2011 - $559,100
Reserve account through 11/4/11 - $473,600
Owner arrears, 60 days and over - $ 32,267; Alton - $17,500
Owed to General fund from Reserve fund for capital improvements - $41,224
Owed to Reserve fund from General-Oct.& Nov.@ $4785= $9570
General Observations
Expenses over budget:

3055300/000454

DRAFT

Lots of fuel for generator, thanks to WAPA outages and storms- 138% over budget ($5,756)
Lots of truck repairs – 243% over budget ($4,058)
Lots of water leaks – 13% over budget ($2,000)
Lots of Accounting fees (insurance funding meetings, attending board meetings regarding insurance, review of revised budget, etc. – 56% over budget ($2,100)
Guard Service, due to increased hours – 22% over budget ($9,400)
Office Expense, new computer, new a/c – 24% over budget ($3,700)
Masonry/Cistern CI- 57% over budget ($25,950)
Sewage/gray water – 11% over budget ($4,230)

(Sharon)Will be on island mid until end of November; will be working with Jon, Bill and Louanne on 2012 budget, and anyone else who wants to join us.

**L-41:** Owner returned statement with a note that he filed for bankruptcy in 3/11 and discharged in May 2011. Vince stated that unless the owner can prove otherwise, because we have a lien on the property, he still owes the Association all charges. Vince suggests the Association consider foreclosing on lien.

**Old Business**

**Meet n Greet and Owners Meeting Date & Place:** The Meet and Greet is February 9 and the Owners' Meeting is February 11 at the Caribbean Fish Market

**Review of Bylaw changes voted on during October Meeting**
Article 2 section 3: Subparagraph k added

Article 2 section4: All vacancies should be voted on the same ballot

Article 2 Section 8: Electronic Mail

Article 2 Section 9: Electronic Mail

Section 11: No business transacted until a forum is achieved

Section 15: Executive Committee 2nd paragraph, last paragraph: Recommend that *merging the Association* should be deleted. All in favour

Section 16: 30 days after the inspection

Section 19: Added

Article 3 Section 3 Special Meeting: Addition

**Bylaw changes discussion continued**

**Article 5 Section 2 Insurance:**

3055300/000455

DRAFT

<u>Section 2. Insurance:</u> Highlighted suggested changes by Max and Bob are inserted into minutes for this discussion. (At this time Vince excused himself from the meeting.)

Changes are highlighted in yellow:

*The Board of Directors shall annually obtain and maintain, to the extent obtainable, the following insurance:*

1. *Fire with extended coverage to include earthquake and flood coverage, vandalism and malicious mischief endorsements insuring the entire buildings and "common elements" together with all service machinery contained therein and covering the interest of the Condominium, the Board of Directors and the Common Interest of the unit owners in an amount to be determined by the Board of Directors.*
2. *Windstorm, insuring the entire buildings and "common elements" together with all service machinery contained therein and covering the interest of the Condominium, the Board of Directors and the Common Interest of the unit owners in an amount to be determined by the Board of directors.*
3. *Worker's Compensation; Public Liability covering each member of the Board of Directors, the managing agent, the manager, the office manager and each unit owner; Vehicle and other such insurance as the Board of Directors may determine in amounts to be determined by the Board of Directors.*

*All policies of physical damage shall to the extent obtainable contain waivers of subrogation and waivers of any defense based on co-insurance or of invalidity arising from any acts of the insured, and shall provide that such policies may not be cancelled or substantially modified without written notice from the Board of Directors.*

*From time to time or as required by insurers, the Board of Directors shall obtain from a certified and USVI licensed real estate appraiser an appraisal of the full replacement value, without*

DRAFT

*deduction for depreciation, of the buildings, common areas and facilities for the purpose of determining the amount of insurance required.*

*Unit owners shall be encouraged to carry Home Owners insurance on their "apartment unit" for their own benefit provided that all such policies shall contain waivers of subrogation and further provided that the liability of the carrier(s) issuing insurance obtained by the Board of Directors shall not be affected or diminished by reason of any such additional insurance carried by any unit owner.*

*The Board of Directors will provide owners a concise summary of all insurance coverage and costs at each Annual meeting.*

*The terms "common elements" and "apartment unit," as mentioned above, are defined*

*in Article 5, Section 10 "Routine Maintenance and Repair."*

Bob will follow-up with several insurance agents regarding information on waivers of subrogation. (At this time Bob excused himself from the meeting) This paragraph requires further discussion by the entire Board. No vote was taken.

Section 3 Recommended changes

*The association shall only be responsible for inspecting unit interiors to determine if damage is structural or due to external causes, or if adjacent unit damage is caused by external causes, or unless that unit is owned by the association. Unless that unit is owned by the association, repair by the association of other unit damage will be limited to structural damage, that caused by external or adjacent unit causes, and will not include property or fixtures installed by the owner or previous owners.*

Max determined that further discussion was needed by the entire board and tabled this section.

DRAFT

Section 10 Recommended changes

*An "apartment unit" is considered the space inside the perimeter walls, interior walls, floor and ceiling to include:*

1. *All decorating elements including: paint, wall and floor coverings, paneling, molding and tiles; finished cabinets and mirrors.*
2. *All electrical appliances including: refrigerator, stove, washer, dryer, dishwasher, garbage disposal, hot water heater and air-conditioning equipment (including compressor).*
3. *All electrical fixtures including: wall ceiling and floor outlets, switches and fuse box.*
4. *All plumbing fixtures including: tubs, showers, sinks and faucets.*

*Additionally, the unit owner shall be responsible for the routine lubrication and adjustment of doors and windows, and, unless major casualty related, replacement of broken glass, wooden or glass slats and damaged screens. The unit owner shall also maintain and assure the operability of the storm shutters installed on that unit and is responsible to close them in the event of a windstorm. Damage caused by failure to do so is the responsibility of the owner if net insurance proceeds are insufficient to cover such damage.*

***Max made a motion to accept the definition of "apartment unit" All were in favour .***

*"Common elements" are considered to include all other elements of the buildings and property except those specified as being part of the "apartment unit." Additionally, the following are considered common elements:*

1. *Electrical supply to the fuse box, electrical supply lines in the walls (including interior walls), floor and ceiling.*
2. *Water and plumbing lines in the walls (including interior walls), floor and ceiling to the valves at sinks, showers, tubs, hot water heater, and toilets, etc.*
3. *Drains to the first connection outside a wall.*

*External air conditioning compressor units shall be maintained by the owner in a reasonable state of preservation. The Association may require owner to remove inoperable and/or un-maintained units or do so at the owner's expense*

DRAFT

Max stated this change (above) includes electrical supply lines in walls. Jon stated the cost to the budget would be substantial with this change. Max assigned Jon to determine the estimated budget implications based on these recommended changes. Max also would like to include a statement that holds the Association harmless if the original wiring and plumbing was changed by the owner.

Matrix

| Category (Not intended to be all-inclusive) | Owner Maint/Repair Responsibility | Association Maint/Repair Responsibility | Association Insurance Responsibility | Owner Insurance Responsibility |
|---|---|---|---|---|
| Exterior Walls and Interior Damage Caused by Leaks | | x | x | |
| Roof and Interior Damage Caused by Roof Leaks | | X | X | |
| Interior Damage caused by Adjacent Units (Leaks, etc.) | X | | | Owner of Adjacent Unit's Insurance Responsible |
| Front Doors | X If Not Original | X If Original | X If Original | X If Not Original |
| Screens | X | | X | |
| Exterior Sliders | | X | X | |
| Exterior Wood Fittings | | X | X | |
| Exterior Windows | X If Not Original | X If Original | X If Original | X If Not Original |
| Electrical System to Breaker Panel | | X | X | |
| Electrical System, Breaker Panel to Outlets, Junction Boxes | X If Not Original | X If Original | X If Original | X If Not Original |
| Electrical Fixtures | X | | | X |
| Plumbing Inside Walls/Floors | X If Not Original | X If Original | X If Original | X If Not Original |
| Condo plumbing not in walls/floors | X | | | X |
| Plumbing Fixtures | X | | | X |
| Interior Walls | X | | X | |
| Interior Doors | X | | | X |
| Cabinets | X | | | X |
| Furniture | X | | | X |
| Appliances | X | | | X |
| Wall/Floor Coverings (tile/carpet) | X | | | X |
| Hurricane Shutters | X | | X | |
| Furniture | X | | | X |
| Personal Property | X | | | X |
| External A/C elements | X | | | X |
| Internal A/C elements | X | | | X |
| Landside Porch/Steps/Railings | | X Excluding Tile | X Excluding Tile | |
| Seaside Balcony/Railings | | X Excluding Tile | X Excluding Tile | |

DRAFT

**Max requested Jon review Matrix and comment on each item.**

**Special Meeting:** Max requested the Directors meet Friday, November 18th, at 9:45AST to complete the discussion on the Matrix and budgetary concerns.

**2012 Budget Meeting:** Sharon plans to set a meeting while she is on island during November.

**Section 11:** Addition to section

1. No dogs are allowed on the property, either long term or visiting. The Board may grant exceptions to the NO DOGS ALLOWED rule, on an individual basis, should an owner require the assistance of a service animal (dog) as defined by the ADA. Owners seeking to obtain such an exemption are required to apply, in writing, to the Board with supporting documentation.

Federal and ADA Compliance, as follows:

*"On July 23, 2010, Attorney General Eric Holder signed final regulations revising the Department's ADA regulations, including a revised definition of "service animal." Effective March 15, 2011, "Service animal means any dog that is individually trained to do work or perform tasks for the benefit of an individual with a disability, including a physical, sensory, psychiatric, intellectual, or other mental disability. The work or tasks performed by a service animal must be directly related to the handler's disability.*

*Dogs used for emotional support, that are not task-trained, are called emotional support animals. They are not service dogs".*

This section is tabled until the opinion of a lawyer is obtained.

**New Business**

**23W:** An inspection of the wiring of this unit resulted in several items that required repair. The repairs were completed , the owner paid the contractor and requested reimbursement. Jon reviewed the repairs and invoices, Max approved the reimbursement.

**Manager's Report:**

DRAFT

**Infrastructure and maintenance**: Monthly scheduled filter changes to gray and fresh water distribution systems were completed. The new fresh water system recommended the filters to be changed every 3 months, Jon has opted to change those filters every month. All other systems are operating properly until this weekend when a WAPA outage heated the breaker of the gray water motor and caused it to burn out. The breaker was changed and we may be changing the meter box. We continue to run the generator for 45 minutes after power is restored as programmed.

**Off season maintenance items:**
Inspection of steps: 1/3 completed, inspecting on sunny days
Pressure washing 50% complete, inspecting on rainy days
Rails, steps, and parking lot painting will be completed by December 15. Striping and painting will be done after pressure washing is completed.

**Transformer**: should be in Miami tomorrow and is scheduled to be in shipped this week. Once in route, we will schedule Mr. Harvey's visit to reroute the final 3 phase leg of our electrical system.

**Long Term Planning Committee**: Thursday 11/17/11 10:00 AST to use original code for telephonic conference

**Elysian Payment**: No payment has been received. Jon spoke with Gene last week and was told the check is forthcoming.

**CBE Bylaws**: Jon to contact Andy

**Thefts**: Multiple thefts are continuing at CBW, CBE, Elysian, and Cabrita Pointe. Most of the issues have typically occurred Sunday afternoon, between 11a-2p. During each of these occurrences the owner/renter has left his door unlocked and purses, wallets, etc. in plain view. The Association has strongly encouraged the owner/renter to file a police report. Max asked Louanne to draft a letter to the Police Chief from the Board, requesting the police to be on increased alert and provide increased patrolling during the week and weekends.

**Nomination Committee**: The nomination committee recommendations need to be submitted this month to be sent out to the owners by December 1.

**December Meeting**: The December meeting will be 12/13/11 at 8:45am

**Adjournment**: There being no further business the meeting was adjourned.

DRAFT

## ACTION ITEMS

| | |
|---|---|
| Retain lawyer to review and give opinion on No Dog Rule | Max |
| Contact Vince to vote on Executive Committee member | Louanne |
| Announce Executive Committee | Max |
| Evaluation of Managers for December meeting | Max |
| Manual Security Gate repairs | Jon |
| Budget Meeting | Sharon |
| L-41 Determine Foreclosure by CBW | Directors |
| Meet N Greet/Annual Owners Meeting confirm meeting place | Rosie |
| Obtain info on waiver of subrogation and HO-6 policies | Bob |
| Budgetary implications based on recommended changes to Bylaws | Jon |
| Long Term Planning Committee Meeting | Max |
| Elysian Payment | Jon |
| CBE Bylaws | Jon |
| Letter to Police Chief | Louanne |
| Nomination Committee Recommendations for mail-out by Dec | Bob |

**Cowpet Bay West**
**Board of Directors Meeting**
**December 13, 2011**

**Present:** Max Harcourt, Barbara Walters, Bob Cockayne, Rosie Wells, Sharon Koehler, Bill Canfield, Vince Verdiramo, Jon Cassady, Louanne Schechter

**Open Meeting:**
Max made a motion that our meetings, except when put into executive session are open. "Open" meaning any owner may attend by phone or in person. Bob 2nd, the vote carried with 4 yes and 3 no.

**Executive Session:**
Max made a motion to go into Executive Session to discuss employee performance and compensation. Bob 2nd, all were in favour. Louanne and Jon were asked to leave the meeting at this time. The Executive Committee met and voted to not give bonuses this year. The Board voted 6 in favour of no bonuses and Barbara declined voting.

Louanne and Jon were invited back into the room. Max made a motion to leave Executive Session, Bob 2nd, 5 voted yes and 1no.

**Treasurer Report:** As of November 30
Regular/Special Account Balances - $135,705
Reserve Fund Balance - $425,677

Analysis of Reserve Fund status, Capital Improvement reimbursement, anticipated Reserve Fund balance at year end:

| | |
|---|---|
| Current Reserve Fund Balance - | $ 425,677 |
| Dec. payment due Reserve | + 4,785 |
| Owed for Capital Improvement | - 41,680 |
| Anticipated Reserve Fund Year End | $ 388,782 |

Uncollected funds 60 days & older - $20,880
Louanne reported L-41 is under contract and that we would be collecting the bulk of the outstanding fees if we accept the offer from the buyer which is approximately $18,000. The Directors voted unanimously to accept the offer. Louanne reported that L-48 was also now current.

Budget Issues

1. Management Salaries/bonuses
2. Capital Improvement Projects

Sharon stated that without Capital Expenditures, we would have to reduce the Reserve Fund by approximately $10,000. We would also continue the $60,000 insurance fee but we would spread it over 12 months.

DRAFT

Max stated he asked Sharon to prepare the budget using (worst case scenario) the current insurance fees. Max tasked the Insurance Committee to obtain bids for the property to be effective preferably by February. Bob reported he spoke with Mapfre and Executive Insurance and will continue to get bids.

Bob asked Vince if he wanted to be considered for the 2012 Board of Directors, Vince declined.

Bill and Vince left the meeting at this time.

Barb asked, do the owners approve the budget? Max stated that according to the Bylaws, the budget is the responsibility of the Directors and that it is presented to the owners.

Max suggested we have a meeting to finalize the budget next week with the intent of distributing it to the owners by year's end. **The meeting will be Tuesday, December 20th, at 8:45 am.**

Max stated that worse case for insurance is if we have to continue with Mapfre at current rates. The insurance committee is creating a bid package to include risk factors, hoping to obtain better rates.

**Old Business**

**ByLaws**

Anna Paiewonsky reviewed proposed Bylaw changes from the Directors. She suggests the Association be an LLC. Anna dropped the word "apartment" from the entire document. Max stated *apartment* remain as it is used throughout the document. Max suggested the Directors look at the proposed changes in the attachment provided by Sharon.

Article II Section 3: Sharon stated exceptions were made to protect the Association from negligent discharge. Following discussion, the directors voted not to accept this change.

Article II Section 5: Suggested change, in red, left out.

Article II Section 6: 4 above, *Subject to section 4 above* leave out.

Article II Section 8: typo: *Meeting notices* at end of section omit. Leave meeting date notice at 30 days.

Article II Section 17: *Action by consent.* Leave as is.

Article V Section 1: last paragraph Operation of Property,
Change the wording from *preliminary* to approved *budget for the ensuing year shall be provided not less than 30 days.*

Article V Section 2: Paragraph 3- omit ***and/or an evaluation based an risk exposure***

Artilce V Section 11: #4: No Dogs Allowed moved from Rules to Bylaws. The Directors discussed Vince's legal opinion that was emailed to owners, the Directors agreed to hire a VI lawyer and obtain that opinion. The directors agreed to keep #4 as:

1. No dogs are allowed on the property, either long term or visiting. The Board may grant exceptions to the NO DOGS ALLOWED rule, on an individual basis, should an owner require the

DRAFT

**Status on Electronic Banking:** Louanne stated she sent the cost and form to the Directors and did not get a response. Sharon stated she never received it, Louanne will resend it.

**Owner List:** Louanne reported she is calling each owner and updating the list accordingly. The list is available electronically.

**Approval of Minutes:** Max made a motion the minutes to the meetings on November 8th and 18th be approved as read. Rosie 2nd, all were in favour.

**Next Meeting:** The next Board of Directors meeting will be January 11, 2012 at 9am.

**ACTION ITEMS**

| | |
|---|---|
| Retain USVI lawyer to review and give opinion on No Dog Rule | Max |
| Notify Directors of Special Meeting for Budget on 12/12/11 | Max |
| Prepare Bylaws for distribution to Owners | Max & Sharon |
| Complete recommendations for nominations | Nominating Committee |
| Resend information on electronic banking | Louanne |
| Prepare Ballots for distribution to owners | Louanne |
| Owners Directory updated with email address | Louanne |

DRAFT

**Cowpet Bay West**
**Board of Directors Meeting**
**January 11, 2012-01-12**

**Present:** Max Harcourt, Barbara Walters, Bob Cockayne, Rosie Wells, Sharon Koehler, Vince Verdiramo, Jon Cassady, Louanne Schechter
Bill Canfield could not attend

**Owner W-12:** Mr. Kirschenbaum requested to speak to the Directors on behalf of his wife. He made a formal request for an exemption to the no dog policy. He presented a letter from his wife's physician stating the dog was necessary as part of her treatment. He provided the Directors with certification for the dog. He stated he and his wife would be responsible for cleaning up behind the dog. He stated he has purchased a "no bark collar" in the event the dog should bark. He spoke with his neighbours and they have not heard the dog. Mr. Kirschenbaum stated that when he and his wife purchased their condo there was no rule against dogs. Mr. Kirshenbaum left the meeting.

**Executive Session:** Max asked if there was a need for Executive Session. Vince requested Executive Session there was no 2nd, the meeting remained open.

**Nomination Criteria:** Vince asked Bob what criteria were used to determine who was recommended. Bob indicated the committee had discussions on each candidate. Following discussion, Max stated that there was no new issue here to present before the Board of Directors.

**Minutes of the meeting of December 13, 2011** were accepted with the following amendments:
Executive Session: add to the third sentence *but to increase Jon and Louanne's salaries $4k and $2K, respectively (per Max).*
Nomination Committee: Delete *this afternoon* from Bob's comment to bring info to office (per Bob)
Bylaws: Change to: Anna Paiewonsky made provisions for the Association to be an LLC (per Sharon).

**Minutes of the meeting of December 20, 2011** were accepted with the following amendments:
Missing Applications: Last sentence changed to: Max stated he may send all email correspondence out regarding the issue and leave it to the owners (per Max).

Under Executive Session add: The Board voted to award bonuses to Jon, Louanne, the staff and contract workers.

DRAFT

**Treasurer Report:**

2011 Year End Analysis/2012 Budget

Reserve Account

| | |
|---|---|
| Beginning balance - *12131/11* | |
| Collected from owners | $ 501,759 |
| Interest eamed (approx) | + 108,800 |
| CI Expenditures | + 3,000 |
| Reserve fund acct total *12131* | 165.391 |
| Bank acct balances (Reserve) | $ 445,468 |
| Owed from General to Reserve | -425.927 |
| | $ 19,541 |

Upon speaking with Jeanne Brennan this week, she recommended we transfer the $19,541from our general account to our Reserve account this week.

So, our yearend balance in our Reserve account will be $445,468 (+ or - interest actual)

2012 Budget

Suggestions

We have not budgeted anything for the completion of the 4-year electrical project. If Mr Havey is not yet scheduled to come down here, we should defer his trip to a more reasonable time

Before commencement of any approved CI projects, Exec committee/Board should be thoroughly briefed on scope and cost and terms of contract, if any.

DRAFT

Max asked if we had any unanticipated projects in the last quarter. Sharon reported the masonry project, specifically cistern repair and spalling replacement under buildings cost us 35,000 that we did not budget. Jon reported most of the expense was on spalling which had to be done.

Max requested the new budget be sent out to owners as soon as possible.
Jeanne Brennan is scheduled to meet with Sharon, February 3, to work on Financials.
Sharon asked how much Jon was budgeting to complete the electrical project. Jon said it will be 7-8K that will come out of Building Expense. He stated we were bringing Kent Harvey down after "season" is over.
Sharon requested that any Capital Project that comes up be brought to the Executive Committee or the Directors with bids if possible.

**Old Business**
**L-41**: The property is scheduled to close around the 18th of this month. We expect to get all arrears paid.

**Bylaw vote**: Max reviewed the votes 10 of 10 are for the changes. Bob suggested the Directors begin a campaign to contact owners to vote.

**Insurance:** Marilyn Blackhall will head up the insurance committee, effective immediately. Anyone interested in joining the committee should contact here. Max has asked the committee to craft what we want which is based on current appraisal, accepted risk- agreed value.
Vince requested the Association obtain a risk assessment.
Bob stated that" we comfortably have through February, if that's the time table we agree upon, to make a change." We will have a 10% cancellation penalty should we change the policy.
Max made the motion: It is the intent of the board to investigate retaining a risk assessor to determine what an accepted value of our insurance should be Sharon 2nd 4 voted for and 1 abstained. Motion passed.
Bob reported that Mapfre is now offering an HO6 policy.

**New Business**

**Dog Letter**: Max received a letter from Karen Benson who is the attorney for Barbara Walters. Barbara stated she was confirming her rights and that she is on the correct side of the law.

Vince made a motion that we abide by the rules and immediately begin fining owners that have dogs. Discussion included utilizing the firm of Hodge & Francois to develop a policy regarding our no dog policy and procedure for exemptions when warranted. Bob distributed information on Service Dog Certification naming businesses that have no requirements for service dog certification.

The motion was repeated that we abide by the rules and immediately begin fining owners that have dogs. Fines may be held in abeyance until the issue is adjudicated. The Vote was 3 for and 3 against. Bob and Vinnie requested we contact Bill for his vote on the motion. Bill was not available, a message was left for him to call.

DRAFT

Max made a motion that the association hire an attorney to appropriately respond to the letter we have received and assist us with determining our status with our no dog rule, Sharon 2nd, all were in favour.

Bill Canfield phoned in and was placed on speaker phone. Vince restated his rule: We strictly adhere to the no dog rule, and that all owners having dogs on the property be fined and the fines be held in abeyance. Sharon 2nd, 4 voted yes, 2 No, 1 Abstained, Bill left the meeting.

Bob made a motion that the fine be assessed at $50/day in abeyance. Sharon 2nd. 4 voted yes, 2 voted no.

Louanne was instructed to send letters by email and mail that informs the owners with dogs of the decision to begin fines tomorrow.

Max made a motion to begin fining owner s with dogs a $50/day fine to be held in abeyance. Sharon 2nd, the vote was taken with 4 yes and 2 no.

Vince suggested that a copy of the letter from Barbara Walters lawyer . be sent to our D & O insurance.

**Non-compliant Enclosed Porch:** Vinnie made a motion regarding Lance Talkington's enclosed back porch: Send a letter to Lance Talkington that he is in violation of the remodelling rules of the condominium association and that he needs to remove it immediately. Rosie 2nd, following discussion and review of records the vote was taken with 3 yes and 3 no, Bill Canfield was contacted by phone, the vote was taken again with 3 yes and 4 no.

During discussion the question was asked should the owner pay more in common fees due to the additional square footage for the unit by enclosing the porch. Max suggested we table the discussion for another meeting

**Additional Weight to Porches:** Max suggested we table until another meeting the addition of additional weight and storing of heavy equipment on porches. Barbara suggested that the owner be responsible for a structural engineer to determine if any additions or equipment can be stored safely.

**Volleyball Court:** The volleyball court appears to be on CBW property. Vince stated the Association should check with our agent of our liability insurance to determine if we are covered should someone get hurt. Should we not be covered, we should find out what the cost of a rider to the policy would cost.

At this time Vince left the meeting.

**Manager Report**

Monthly filter were changed January 3rd. The waste water and treatment plant are functioning well. Typically we exercise the generator on Thursday however, we ran the generator yesterday to decrease the cost of running the R/O plant.

Painting Steps: Jon has added an additional worker to complete the painting of the steps. He hopes to complete 50% this week and the remainder next week (weather permitting).

DRAFT

Security Gate: The electric gate malfunctioned. A WAPA outage shorted out the pedestal on the outside. The pedestal had a message "power down exchange chip. Jon powered down and powered back up. The pedestal stated erase all memory? Jon powered down again and called the vendor. The vendor was unaware of this message and would have to contact the manufacturer (who was closed for the weekend). The manufacturer was contacted, the service people came out reset the chip and cleared the memory. The memory was restored, and the gate is now functioning.

The manual gate is also broken. Jon recommended the existing manual gate be replaced. A drawing and price was obtained and shared with the Directors. Max stated that the pivot point of the existing gate is not salvageable and perhaps dangerous to use.
Sharon made a motion that we proceed with the new manual gate, Max 2nd, all were in favour.

The No Dog signs will be up next week. Cool Signs is producing them.

Owners Workshop: Sharon reported the workshop is cluttered with chairs, carpet, exercise machine, plastic chairs, glass tables, etc. so that the work table is not usable. The area is to be cleaned.

At this time Bob left the meeting.

Roadside Signage: The Directors suggested the knocked over base of the sign be up righted and reused if possible. The quote and the drawing of the sign from Mad Max was provided to the Directors. Max made a motion we have the sign made and reuse the base if possible, Sharon 2nd, all were in favor.

**Action Items** (not completed).
CBE Bylaws: We do not have a copy.
Electronic Banking: Max would like to delay decision until Owners Meeting. Sharon stated that there are many benefits to electronic banking that we don't have now and suggested we go forward with application. Max tabled the discussion until February's meeting.

February BOD Meeting: Tuesday, February 7th at 8:45am same phone in number

Adjournment:
There being no further business the meeting was adjourned.

3055300/000470

DRAFT

## ACTION ITEMS

| | |
|---|---|
| 2012 Budget be sent to Owners | Sharon |
| Attorney for Dog Rule | Max |
| Letter to Owners in Violation of No Dog Rule re:$50/day fine | Louanne |
| Copy of letter from Ms. Walters to D&O Insurance | Max |
| Increase Common Fees to owners that have enclosed porches | Tabled |
| Determination of Additional Weight on Porches | Tabled |
| Contact Liability Insurance re: coverage for Volleyball | Bob |
| Painting of steps | Jon |
| Purchase and implement new manual gate | Jon |
| No Dog Signage | Jon |
| Clean out owners workshop | Jon |
| Contact MadMax re: road side sign | Louanne |
| Reset base of road side sign | Jon |
| CBE Bylaws (obtain a copy) | Jon |
| Electronic Banking | Tabled |

**Cowpet Bay West**
**Board of Directors Meeting**
**February 7, 2012**

**Present**: Max Harcourt, Barbara Walters, Rosie Wells, Sharon Koehler, Bill Canfield, Jon Cassady, Louanne Schechter, Bob Cockayne attended by phone conference. Vince Verdiramo was absent. Jon was excused to attend to a meeting with representatives from Elysian, and CBE and CBR with a public surveyor and joined the meeting in progress. Also present were: Judi Kromenhoek, Doug Rebak and (by phone) Lance Talkington and Al Felice.

**Executive Session**: Max asked if there were any items to be discussed in Executive Session, there being no necessity, the meeting continued.

**Approval of Minutes of January 11, 2012**: Sharon requested in the December BOD minutes should read Anna Paiewonsky contributed language to make provision for LLC's throughout the bylaw document. In the January minutes, the last name of Barbara's Lawyer is incorrect. Also, omitted from this section is Max asking Barbara if she had registered any complaints and she acknowledged the HUD complaint. Max indicated that further discussion was halted pending the hiring of an attorney for the Association. In the second paragraph, the document Bob distributed was entitled "Service Dog Certification-Spotting Fake Certification's".

**Treasurer Report**: Sharon reported the bank balance at the end of January is a total of$ 445,760 in our reserve funds and $82,500 in our operating accounts. L-41 closed in the month of January resulting in full payment of fees in arrears ($21K).

Jeanne Brennan, CPA, met with Sharon, Max, Jon, and Louanne to review the financials. The budget was reviewed for accuracy and the cash and cash equivalents were reviewed. Jeanne made suggestions for adjustments to clarify the work on the beach, the payments from Elysian, and our capital improvement expense at the end of the year was $158,178. This year we have $114,000 budgeted for capital expenses. The gray water project from 2011 and the electrical project from 2011 will require funding to finish that is not in the 2012 Budget.

Sharon will change the signatories on the First Bank account following the election to allow for a member with 3 years to be on the account. She will also add checking to the account to allow for monthly deposits to the fund as well as withdrawals as the CPA has suggested.

**OLD BUSINESS**

**HUD complaint**: At the last meeting the board voted to retain an attorney. Max met with Marie Hodge and subsequently engaged her to handle the dog issue. Marie Hodge and our D&O Insurer were sent a copy of the HUD complaint. The Insurance Company has assigned an attorney to respond to the HUD complaint and Maria Hodge will be providing the opinion on the dog issue. The Executive Committee met with Maria Hodge via teleconference. The Executive Committee is not at liberty to discuss any more detail on advice of Ms. Hodge.

**L-41:** The unit sold and the arrears collected in full.

Jon returned to the meeting at this time.

**Insurance Committee:** Nothing to report at this time.

**Bylaw Vote Status:** Approximately 28 votes have been collected at this time.

**Annual Owners Meeting:** Max thanked the following people:

Rosie set up the catering for the meeting. Randy Driscoll will be catering for $300

Jon negotiated the meeting room for free.

Sharon and Sally have set up the Meet & Greet

Bill Canfield arranged for the use of the Yacht Club for the meet and greet for a minimal fee to be determined.

**Owner Package for Annual Owner Meeting:** Louanne stated she will have the material printed tomorrow, to include: Agenda-Insurance Summary-Cash Equivalents-Budget-Owner Issue Policy

Owners were sent an email to bring the proposed Bylaw changes with them to the meeting.

**Owner Issue Policy:** Max requested the Owner Issue Policy be included in the owner package. Jon requested the Directors verify the spalling example in policy. Jon explained that most interior spalling is caused from rebar, but the rebar is not a structural problem unless the rebar itself shows physical signs of distress. Jon obtained the opinion from Mr. Ferraris, the structural engineer that examined some of our exposed rebar. Mr. Ferraris said rebar "pops" in (mortar) plaster because of the property of the metal reacting to moisture causing rust and swelling which eventually will cause a crack or spalling, no different than drywall "pops". The rebar may need to be sanded and chemically treated to prevent further spalling to the finished surface, which is cosmetic. Owners have been responsible for cosmetic repairs and the Association is responsible for structural problems. Max stated in accordance to our Owner Issue Policy, The GM will inspect the problem, if the owner is not in agreement with the GM, then the owner would submit the complaint to the Board. The Directors will then make a decision on the matter.

**Annual Owner Agenda:** Max presented the proposed agenda.

Parliamentarian: Max requested Ed Wardwell be the parliamentarian to keep order during the meeting.

Roll Call: Louanne

Establishment of Quorum: Rosie

Proof of Notice: Louanne

Meeting Minutes: Rosie will be responsible for the reading of the minutes from last year.

President Report: Max

Insurance for 2012: Marilyn

Treasurer Report: Sharon (utilizing the amended 2011 budget)

Manager's Report: Jon

Nominations Committee Report: Committee has nothing to report.

Old Business: From Owner's 2011 Meeting

New Business:

Announcement of Election Results

Max made a motion that the Agenda as revised be approved for the Annual Meeting. The motion was 2nd by Bob, all were in favour.

**Set-up for Annual Meeting**: Jon will obtain the key on Friday to set-up the meeting room.

**Walk-around:** The walk-around was conducted by the executive committee, the minutes were sent out to the Directors. The focus on the walk-around was to indentify long-term projects as well as inspect the general area.

**Fines:** Judi Kromenhoek requested more detail to the fine that she received on her statement. She would like to know what it was for and who enforced it. Louanne stated that in the statements sent through QuickBooks, item, quantity and cost are the only information provided; she spoke with Jeanne and confirmed that utilizing the invoice feature would allow for an explanation.
Barbara requested a timeline as to when the Attorney would make a determination on the Service Dog Issue. Max stated he was not at liberty to discuss the issue.

**Mailboxes:** Max had a request from Carolyn Wardwell to have the mailboxes replaced. During the walk around, it was noted the mailboxes were showing signs of rust. Louanne followed up on a lead from Carolyn from CA which was disregarded due to the prohibitive shipping cost. Max requested Jon follow-up with local merchants to see if they can be purchased or ordered on island.

**Employee Parking:** Rosie stated she had a complaint that employee's were parking in guest spots. Jon stated employee's park in available spots as they are available. Sharon suggested employees park alongside the dump truck. Max stated Jon will be responsible for employee parking.

**Illegally Parked Cars:** Sharon requested the parallel parking on Leeward that has 2 parking spots be striped where parking is illegal, signs be posted again, and Stickers be placed on windows of cars that are parked illegally.

**Security Guard Schedule:** Jon reported the sequences of the guard schedules in the past which has evolved to the current guard schedule being a roving guard on our property from 4-6p then at the Guard House from 6p-6a. The weekends are staffed with roving guards from 10am -6p then, from 6p to 6a at the Guard House.
Sharon asked what the events of the theft from L-22 were. Jon reported the facts as given by the owner to the police. The differences between this theft as opposed to the previous midday "crimes of opportunity" (unlocked doors) are:
L-22 was at night others were midday. Owner was in room adjacent to foyer, other; were on the seaside deck or not in the unit. The purse was taken and has not been found, others: cash was taken and the wallet/purse left behind.

Doug Rebak reported that he has installed devices that sound an alarm when the door is open or there is motion.

**Owner Renovation Request:** Max submitted a request to change his electrical panel to bring his power up to code and running a 220v line to his utility room. Max made a motion for approval of renovation, Barbara 2nd, all in favour.

**Stickers on car:** Sharon would like the security guards to apply stickers to cars parked illegally.

**L-01 Freezer on Porch:** Sharon reported her husband said there is no issue with the weight of the freezer. The owner is willing to make a cover for the freezer if it appears to be unsightly. Max stated that the white freezer is against the white shutters. Should a cover be made, it would be more visible.

**L-03:** Sharon stated L-03 sent a letter to Max that the addition to his unit was approved by the Directors. Max will forward a copy of this letter to the Directors. The Directors will have to decide if the owner will be responsible for increased charges to his common fees because he has increased his square footage. The Directors will also direct the green stripe to be applied.

**Manual Gate:** The gate is finished and will be delivered and installed this month.

**Security Gate:** No bids have been submitted by Kevin Cogan

**No Dog Signs:** Jon reported during a walk-around with Max, they noted CBE had attractive signs with their logo. He is working with Cool Signs to provide a similar design for CBW.

**Cowpet Road Sign:** The concrete needs to be rolled up and reset. The sign has been ordered by through Mad Max.

**Steps & Railing Painted:** Steps are completed up to L-08 with non-skid. Railings were not completed, on Windward they are being sanded down then repainted. Barbara reported that W-51 back of new stair was not painted.

**Step and Landing Repair:** We have replaced 3 with Chris Thompson at this time. Jon has asked several contractors for bids with the scope of work being: remove old brackets, through bolt and reinstall step. Contractors would like to do one before they commit to a price.
Sharon asked why we had purchased the angle iron and bolts for the entire property, Sharon stated that we were going to do partial order and only the steps that need repair were to be completed. The budget was for $20,000 for the entire project and we have already spent $14,000. Jon requested the Directors choose which stairs/landing be repaired. His understanding was we had $50,000 allotted for this capital project. The budget was reviewed and there is $50,000 on the budget for the stairs.

**Masonry:** Jon has not been able to find a contractor to commit to a fixed price to repair the spalling under the buildings.

**Tree wall damage repair:** The walls around the trees. Sharon stated that her husband, Bud, suggested take down the walls and replace with railing. The tree near L-26 is buckling the sidewalk and the road as well as the walls.

**Owner Workshop:** Jon is contacting the people that have items in that room to have them removed.

**CBE Bylaws:** Jon gave Max a copy of the CBE Bylaws.

**Surveyor:** A surveyor from public works has an "as-built" plan with no footings or markings and is attempting to find the property lines for Elysian, CBW, CBE, and CBR.

**Letter to Owners**: Max sent a letter to our neighbors that the volleyball net needed to b e removed from CBW property as our liability insurance does not cover athletic activities.

**W-47**: Jon reported the events leading to the fines that were charged to W-47. There were multiple phone calls leading to our maintenance men looking for a water leak. The manager stated there was a maid there to let him in the unit. There was no one to let him into the locked closet Thursday, Friday, Saturday (x2). The problem was in the locked owner closet. The owner was instructed on Friday to contact a plumber, that it was not an Association issue.

Sharon stated she would write a letter to the owner explaining the events. Louanne provided Sharon a copy of the plumber's bill that explains the problem is the owner's. Jon will provide Sharon with any other data on the events she may need.

**Manager Report:**

**Filter Changes**: Monthly filter changes were completed as scheduled

**DPNR**: There were 2 inspectors on property yesterday. One was the annual inspection of the WWTP, the RO plant, and the potable water systems for the EPA and DPNR. The other inspector was here to inspect our fuel storage and SPCC (Spill Prevention, Control, and Countermeasure Plan) plan, kit, and Terminal permit. Facilities that have fuel storage over a specified limit that if spilled could find its way to navigable waters require this Terminal permit. DPNR began enforcing this permit process January 2012. CBW has in place, a SPCC plan and spill kit, and applied for the permit December 2010 with the application and a check for $750. The inspector did not have the application on file. CBW will need to have formal training from the inspector for use of the oil diapers. Our Water Pollution Control, TPDES permit, Air Pollution Permit , and SPCC Plan and Terminal Facility Permit were all in compliance with no deficiencies.

**Other Action Items**

**Retain an attorney**: See HUD complaint above.

**Electronic Banking**: Louanne resubmitted to Directors. There was no discussion.

**Owners list with email addresses**: Completed and owners informed to request by email

**March Meeting**: The March meeting will be March 6th, at 0845am AST

**Meet & Greet**: Sharon stated the Meet & Greet is a social function and requested W-44, Judi not be permitted to provide any information regarding L-49 Doug to the event. Max agreed that it is a social event.

**Adjournment**: There being no further business, the meeting was adjourned.

3055300/000476

**Action Items**

| | |
|---|---|
| Update signatories on First Account and include checking | Sharon |
| Annual Owner Meeting Package to Print | Louanne |
| Set-up for Annual Meeting | Jon, Max |
| Invoices for fines | Louanne |
| Mailbox replacements | Jon |
| Striping of no parking areas, posting of signs | Jon |
| Letter to W-47 | Jon, Sharon |
| Letter from L-3 to Directors | Max |
| Increasing fees on units that have enclosed common area | Directors |
| Installation of manual gate | Jon |
| Bids on new automatic security gate/cameras | Jon |
| No Dog Signs | Jon |
| Cowpet Road Sign Base/sign | Jon/Louanne |
| Step & Rail Painting progress | Jon |
| Step & Landing Repair bids/progress | Jon |
| Owner Workshop clean-up | Jon |

**Cowpet Bay West**
**Board of Directors Meeting**
**March 6, 2012**

**Present:** Ed Wardwell, Bill Canfield, Rosie Wells, Sharon Koehler, Max Harcourt, Herb Horwitz, Doug Rebak, Jon Cassady, Louanne Schechter

Owners present: Al Felice and by phone Lance Talkington

Comments from the President: Ed asked the Directors to come prepared, be on time, and serve the best interest of all the owners at Cowpet Bay. He asked that Directors leave their personal bias at the door and treat each other with respect as elected individuals of the Association.

Sharon requested conference phone be activated for owner participation. No one knew the conference number. Louanne was to locate the number and activate the call.

Each Board Meeting will be an open Directors meeting for any owner to attend. There will be a closed Executive session following the Board meeting with Board members only. The purpose of this session is to discuss legal and fiduciary matters to be discussed and protect the privacy of all owners.

**Approval of Minutes of February 7, 2012 meeting**: Max stated he had sent correction to Louanne. The corrections from Max are: Also present were: Judi Kromenhoek, Doug Rebak and (by phone) Lance Talkington and Al Felice. Treasurer report last sentence add: ($21K), and Letter to Owners, change *owner* to neighbors. Motion to adopt as amended was made and 2nd. All were in favour, motion carried.

Sharon requested that Louanne send out the minutes, with amendments to all the Directors. Louanne replied she would send them out as soon as the Secretary had made the changes and forwarded them to her. The amended minutes are to be made available to the Directors by March 12, 2012.

**Treasurer's Report:** Sharon reported the current bank balance is approximately $13,000 in our general funds. We have not reimbursed our operating accounts for capital expenditures so far this year. Our First Bank Account has $445,900. We have approximately $11,000 in uncollected owner fees which our 60 days or over. This does not include the fines that are approximately $B,000.

Sharon continued that transfers of money have to be made. As discussed last month there is a concern regarding the FDIC and the amount it insures which is $250,000 per account. We could have 6 accounts each would be covered. The current interest rate is .05% Banco Popular interest is .02% and Fidelity is .021%. Her recommendation is we should open a second account at First Bank. The current account at First Bank has no checking account; a current signatory on the account must sign a withdrawal slip. There is a time lag between obtaining funds from First and moving them to our operating account at Banco.

Herb suggested using Navy Federal Credit Union that utilized electronic banking. Sharon said she would be interested in exploring that option

Ed asked what was involved to immediately get the new signatories on the First Account. Sharon stated we need to have a copy of the minutes of the Annual Meeting that shows the elected officers, the new signatories need to go in person to the bank with a driver's license and sign the signature cards.

The conference phone was activated at this time.

The conference phone dropped the call. The number was redialled

Ed asked when the Annual Meeting Minutes would be available. Max stated his comments had been sent. Ed asked Rosie when she would complete the changes by Max. Rosie asked Max to resend. Ed requested Rosie complete the Annual minutes by March 15.

Ed asked Bill and Sharon to meet him at the office at 2:00pm tomorrow. They will go to First Bank to make the changes on signatories which will be: Ed, Bill, Sharon, and Rosie. Ed is currently on the account.

**Employee Severance package:** Jeanne Brennan was unaware we had a severance package. Four employees, Steve, Arlington, Marcellus, and Joey have letters that state they are entitled to 4 weeks of vacation and they would receive 1 week of pay at current rate of pay for every year if they were let go, if they retired they would receive 1 week of pay, at current rate for every year after the third year of employment. Jeanne suggested we begin funding for it and include it in the budget as a line item of liability. The letter of engagement to Jeanne was revised as well as the financial statement to include this item.

Budget vs. Actual: Sharon stated we have used 44% of our current capital improvement fund and we have 56% of our funds to last us through the remainder of the year. She cited the purchase of the hardware for the stairs at $14,000 and the continuation of the masonry projects as the items utilizing most of the capital funds.

Doug asked when funds are expended what is the protocol. Sharon stated the Property Manager reviews the checks and signs the weekly report. The Treasurer then signs off the checks. She stated when she was Treasurer 3 years ago checks were not released until the Treasurer signed the form except for certain circumstances. Ed tabled the discussion at this time.

**Managers Report**

Systems: The gray and fresh water distribution system filters were changed today. They are changed every month on the first Tuesday of the month approximately 10 am. All the rest of our infrastructure systems: the RO, WWTP, GenSet, Fresh and Gray water Distribution systems have no problems to report since last Board Meeting.

Action Items from last meeting:

- Striping and Parking sign along the Leeward wall were reinstalled

**Insurance Committee Report:** Doug reported that he along with Bob Cockayne and Herb Horwitz have selected 7 brokers to go out with a request for proposals with our bid specifications being made to them. Our objective is to pick ones that are reputable ones that understand that we are trying to reduce our insurance cost and also get it to the first quarter of the year being March 29th for our renewal date. We told them we would like to reduce our cost and we are prepared to increase our risk. We have sent to Tunick, Executive Insurance, Marshall and Sterling, Topa, Guardian, Specialty Brokers (Mapfre) and Red Hook Agency. Six have expressed an interest. The Specifications we sent out included a total property agreed value of $25,916,000, no co-insurance, replacement cost insurance, bid on a windstorm sublimit of both 1 and 2 million dollars with a 3% deductable by building. Earthquake and sublimit of 12.5 Million, with a 5% deductable on earthquake which is standard in the VI, Flood sublimit 3 Million with a deductable of $ 10,000, all other perils 12.5Million with a sublimit deductable of $250. The target date for vendors to return proposals is March 15.

The date is critical in the sense that insurance carriers have more available capacity before hurricane season so obtaining a policy in the first quarter may save some expense.

Doug stated they only asked for 1M & 2M with the thought process that during Marilyn, CBW took a full frontal hit and sustained a $3,700,000 bill. Of that $700,000 went to the adjuster, 1M was for the brand new doors, 1M was for shutters, and $300,000 went to the seawall, leaving $700,000.

Herb said he did several scenarios with none of them going over our reserve fund.

Doug mentioned that improvements and betterments were covered in the Mapfre policy. This coverage lowers the cost of a HO6 policy.

Doug stated the strap downs, the tie downs, the shutters, and the hurricane rated doors are all improvements allowing us to take more risk.

Ed recessed the Directors Meeting at 9:45.

The Directors meeting reconvened at 11:00 with Louanne and Jon present.

**Owner Inquiry Policy:** Ed stated it is self explanatory and his intention is to recall the owners attention to the policy that there is a procedure and the staff is prepared to respond in accordance to the policy.

Sharon stated that when letters are sent to the Board, there is no Director that is responsible for responding. Ed stated he would be responsible for responding to each and every letter that requires a response. Ed will bring the letters to the Directors that are in conflict with the manager's decision. Max stated Sharon had developed a form. Sharon stated the owner should sign off on the form. Ed requested Sharon supply him with the form.

**By-Law Amendments:** Ed stated we did get approval for over 2/3rds to adopt the amendments. Some owners have replied to Ed regarding the legal status of the By-Laws. Following discussion, the Board decided to go forward with the will of the majority of the owners. Max made a motion that Maria Hodge have the By-Laws registered with the condition that another retainer is not requested. The motion was 2nd, all were in favour. Max will contact Ms. Hodge. Ed provided Max with a letter from Ms. Paiewonsky that outlines her legal opinion on the By-Laws.

**Invoices for fines:** Fines were removed from the statement and transferred to an invoice. The invoice allows for description of fines, the statement does not.

**Mailboxes**: The budget does not allow for new mailboxes. Jon will have maintenance reshingle the roofs over the mailboxes and repaint. To be done by next Board meeting.

**W-47**: Ed will respond to their reply.

**L-03**: Max forwarded the letter to Board members regarding the enclosure. The Directors agree this is not an issue

**Increasing fees when owners enclose common areas:** The Directors decided this is not an issue.

**Owner Workshop**: Jon will have treadmill removed.

**New Business**

**Staff Parking:** Sharon stated with her company and other 2 car families in her area there is not enough guest parking. She suggests Employees Park next to the dump truck. She suggested the pick-up be parked in front of the maintenance shop.
Max suggested we have diagonal parking spaces due to the difficulty of backing out.
Sharon wanted to know when her area would be pressure washed: Jon stated is was done recently
Doug asked if the parking lot was going to be striped: Jon said the numhers would be done over the next week.

**L-3 Water Leak:** Herb Horwitz had water leaking in his unit. The source of the leak was from a pipe in the wall that had been modified by L-3 to accommodate a water line to his icemaker. Jon informed L-3 the damage was his responsibility as the leak was on the unit side of the modified valve. The invoice for the plumber was sent to the owner. The owner refutes the issue. Herb Horwitz took pictures of the alterations to the original water line and distributed them to the Directors. Following discussion, the Directors agreed it is the responsibility of the owner. Ed will contact the owner.

**L-01** Needs the wall patched and painted.

**L-06** Needs a wall patch from the water leak repair done 2 weeks ago.

Herb asked for clarification regarding rebar "pops". Subject was tabled.

**Automatic Gate**: Approximately 3:30am this morning, a renter at CBW rammed the gate and damaged both hydraulic arms and bent the gate. The renter has given Jon his information and accepted responsibility for the accident. The police will be contacted to complete a report.

**Employee shirts:** Rosie said the staff requested new shirts. Rosie made a motion to purchase new employee shirts; the motion was 2nd all were in favour. Louanne will order them.

- The letter for W-47 was completed by Sharon and sent to owner. Jon gave his original notes to Sharon for documentation purposes. Sharon stated W-47 had sent a letter last night refuting the facts sent by Sharon.
- Installation of the Manual Gate is not complete, the pad is completed and the support in place, two brackets ordered from the states have not arrived and the vendor has placed a second order. The gates are on property and the installation will be completed once the brackets arrive. Ed asked for a completion date, Jon stated 3/15/12
- Bids on security cameras. Kevin Cogan, of First Alert, sent bid. He suggested put a remote video recorder in the workshop which will hold up to 4 cameras and if we also want the yacht club area monitored, place another video recorder in the last break room in the end. Ed instructed Jon to forward a copy of the bid to Bill. Bill will have the security committee review and report back to the Directors. Doug suggested that any placement of video recorders should be a secure area.
- No Dog Signs are completed and placed. Sharon said the placement is too far back on the lawn. She would like them placed on the property line of the grass area and add more. Sharon stated at least 4 were necessary along the property line. To be completed by 3/9/12
- Road Sign not complete the base was not budging. Doug suggested leaving it as a safety barrier. Put a new base in front of the old and install the sign.
- Steps & Rail Paint: Steps painting is complete with the exception of 2 on Leeward, 28 and 30, due to renters. Will be completed this week. The rails are just now beginning. Step repair: we have had one contractor do several of them to come up with a firm bid and his price is $225 to remove the old brackets, prime, and drill through and install. He is asking for $100/hr for any additional work. Doug stated the contractor's work, in his opinion, look terrible. He is also concerned the brackets are shorter.
- Owner workshop: Scooter has been removed, the carpet is removed. A treadmill is there. Sharon wants everything removed other than the inventory. Sharon stated the owners' closet also has a scooter and kayak in it.
- L-6, L-10, W-26 Jon is looking for drip edge that will span the difference between the gutter and the roof. The roofs that were replaced in Marilyn were not lined up with the appropriate overhang. The seamless gutter doesn't meet. Jon is looking for drip edge to repair the problem. He has asked Chris Thompson's assistance in obtaining the material.
- L-1 Had a water leak, while chipping the wall away, we found the source of the leak was a modification that L-3 had done to the plumbing.
- W-7 Crack repair. Charleson Burton has completed the Association's responsibility below the window.

**Chairperson Appointments:**

**Committee's** The five standing committees and their respective chairpersons are:

- Nominating – Doug Rebak
- Landscape – Judi Kromenhoek
- Insurance – Doug Rebak
- Security – Bill Canfield
- Property and Planning – Max Harcourt

Ed intends to, in his letter to owners today, identity chairpersons and contact information for any owner interested in serving on these committees

**W-12**: The owner has had problems with condensation on his floor over the last 3 years and submitted multiple requests for the Association to assist in the repairs. The owner was informed on each occasion that this problem is between owners and he should contact the owners of W-11. Ed will inform the owner of W-12 this is not an Association issue.

**W-27**: The owner lost power to the unit and requested the Association investigate. The main breaker was tripped and reset. Jon suggested the owner have his electrical panel checked as the breakers inside shut have tripped first. The owner was charged a service call and now refutes the bill. Ed stated the responsibility was that of the owner. Ed will speak with the owner. The Directors decided to remove the charge.

**L-06**: Sharon stated the cats are now a non-issue. And the other issues were resolved during the meeting.

**Letter to GE**: Bill would like a letter sent to GE regarding their proposals on RO and Waste Water. Bill will draft a letter and Ed will send it.

**Solar Energy**: Herb suggested we follow-up on solar energy. Max stated there is a new company on island that leases a system to offsets the cost. Max will obtain information and incorporate into the long-term planning committee.

**April Meeting**: Wednesday April 11, 2012 at 7:45am. The call in number will be 712-775-7000 the code is 106376

**Action Items**

| | |
|---|---|
| Amend February Minutes by 3/12/12 | Rosie |
| Resend Amended Minutes to Board Members | Louanne |
| Change Signatories on First Bank Account | Sharon, Ed, Bill, Rosie |
| Open additional accounts to maintain FDIC coverage | Sharon |
| Transfer of funds from First Bank to operating account | Sharon |
| Organizational Minutes | Max |
| Annual Minutes with Amendments completed by 3/15 | Rosie |
| Provide protocol for release of funds | Sharon |
| Add employee severance to budget as a liability line item | Sharon |
| Installation of Manual Gate completion date 3/15/12 | Jon |
| Security Committee Review of Bid from Alert 1 | Bill |
| Adjust placement of NO DOG signs and add 2 by 3/9/12 | Sharon |
| Rails painted –starting this week | Jon |
| New Base on roadside sign | Jon |
| Step & Bracket Replacement; evaluate recent work | Jon |
| Owner Workshop | Jon |
| Drip Edge on L-6, L-10, W-26, | Jon |
| Contact Chuck Waggoner re: By-Laws | Ed |
| Contact Maria Hodge re: By-Laws | Ed |
| Mailboxes: Replace shingles and paint by next Board meeting | Jon |
| Assign employee parking | Jon |
| Repaint numbers on parking spaces next week | Jon |
| L-3 re: Discuss owner responsibility | Ed |
| L-01 Patch and Paint area used to repair water leak | Jon |
| L-06 Patch and Paint area used to repair water leak | Jon |
| Entry Gate: obtain police report/begin repairs | Jon |
| Employee Shirts | Louanne |
| W-12 Condensation issue | Ed |
| W-27 Suggest electrical inspection | Ed |
| Letter to GE | Bill |
| Solar Energy Company research | Max |

**Cowpet Bay West**
**Board of Directors Meeting**
**April 11, 2012**

**Present:** Ed Wardwell, Rosie Wells, Bill Canfield, Sharon Koehler, Herb Horwitz, Doug Rebak (by phone conference), Jon Cassady, Louanne Schechter
Owner's in attendance: Judi Kromenhoek and by phone Lance Talkington

Approval of Minutes of March 6, 2012: There being no objections to the minutes, a motion was made to approve the March 6, 2012 minutes as recorded. All were in favor.

**Treasurer's Report:** Sharon's report is as follows:
Bank balances – March 31, 2012

| | | |
|---|---|---|
| General and Special | | $ 87,000* |
| Reserve | | $397,335 |
| *Owed to Reserve | $38,355 | |
| **Owed to General | $11,550 | |

Outstanding accounts and fines

| | |
|---|---|
| Due 3/31/12 (no dog fines) | $ 28,171* |
| Dog fines billed, unpaid | $ 4,900 |
| *Gate fine included $5788 | |

Review of QBB-1st Quarter 2012

| | |
|---|---|
| Gray water/Pot. Water | $7,500 over |
| Building Repairs | $6,000 over |
| Security | $8,000 over |
| Legal fees | $8,000 over |
| Masonry | $3,000 over ANNUAL |
| Stairs & rails | $7,000 over |

Funding Insurance Policy
We collect $23,700 in insurance income every month from our owners. Our April 1 payment for our new policy was covered by our return premium. We have a May and June payment due of $ 86,122(each); a total due of $172,244.
Ideally we will have our April. May and June collections($71,100) to put toward part of the remaining premium due.
As discussed at our special insurance meeting, it is the board's plan to borrow, in the form of a loan to be repaid, the funds necessary to pay the remainder of our principal from our Reserve account. There will need to be a Board resolution to accomplish this transaction.

**Manager's Report:**
Systems: The gray and fresh water distribution systems filters were changed on the first Tuesday of the month.
Doug asked why the gray water last month became dark and dirty. Jon was not aware there was a problem. Sharon stated that the gray water in her unit is getting progressively worse. Doug suggested the intensive rain storm may have affected the gray water. Jon stated the cistern is covered and rain should not affect the cistern. Following discussion, apparently Leeward gray water has more sediment than Windward. Jon will investigate the problem.

Bill stated he spoke with GE Representatives regarding a new RO system. GE would like to come out next week and assess the property. The representative has indicated there would be considerable savings to CBW. GE would provide the system, as well as the monitoring and maintenance. CBW would pay for the water usage. GE would also be interested in replacing the water meters.

Jon stated that all systems were operating efficiently.

Responding to the quarterly report of "overages", Jon noted that his expenses, if averaged over the entire year, would be within the limits of the budget.

There was one issue with a raw sewage lift pump located by the yacht club last month, leaving only one pump operating to push uphill to the WWTP. The pump had to be pulled up from the raw sewage pit to be inspected. The impeller was jammed by a large piece of concrete that was in the pit. The concrete was removed and the impeller spun backwards and restarted. To prevent further jamming, the pit was drained, power washed, the gray water cistern was cleaned. There was a considerable amount of grease in the sludge that was removed. There was no obvious explanation for the grease.

Building Repairs: Predominantly we are repairing water leaks. We have had several this quarter. There is no preventative measure.

Security: The dollar amount in the budget is due to increasing the hours of the guards. The owners requested and the Directors approved increasing hours for guards on weekends and from 4p-6p. Bill said he spoke with the head of security, Dean. Dean suggested the guard walk 20 minutes, then return to the guard house 20 minutes, rather than only monitor the gate. Bill also suggested the golf cart be utilized by the guards to monitor the property.
Jon and Bill will meet with Dean and revise our current plan.

Additional cameras were discussed with Alert 1. Bill believes the expense of cameras is not cost effective. He stated a 6 by law a 60% head shot is required.

Masonry: We have completed the cistern repair, sealing and clean-out and began some of the crawl space spalling projects as the budget permitted. The annual masonry budget is exhausted and the project is on hold until the next budget year. Jon estimates that 25% of the spalling repairs were completed.

Stairs and Rails: The project is on hold. The upfront cost of $14,000 was materials. Jon has estimates of $250/stair. At this cost, the project would be on target for the annual budget.

**Insurance Committee Report:** Mapfre representatives visited CBW and brought the policy. The owners received a copy of the comfort letter. Owners are being offered a 25% discount for HO6 policies.

**Property and Planning Report**: Max held a meeting on solar energy. The minutes are as follows:

*Purpose of this meeting: The purpose of this meeting was to examine some possible options for using solar energy to offset our WAPA electrical bills.*

*Mr. Rosen was invited to tell us about his company and how they might fit into our long-term planning for the use of solar energy to ease our WAPA bills. Prosolar is grid-tied photovoltaic (PV) system*

*accommodation of a non-obvious handicap the Board may require (1) the submission of documentation verifying that the person meets the Federal Fair Housing Act's definition of disability; and (2) documentation from a doctor or other medical professional who is in a position to know about the individual's disability, and that the requested accommodation is related to the individual's disability. All information submitted to the Board that is necessary for the evaluation of the reasonableness of an accommodation will be kept confidential.*

By changing this paragraph the By Laws will bring the Association into Federal compliance. Herb and Bill volunteered to assist Ed in contacting the owners and obtaining the 2/3 necessary vote.

**Action Items:**

| | | |
|---|---|---|
| Amend February Minutes by 3/12/12 | Rosie | Done |
| Resend Amended Minutes to Board Members | Louanne | Done |
| Change Signatories on First Bank Account | Sharon, Ed, Bill, Rosie | Done |
| Open additional accounts to maintain FDIC coverage | Sharon | Will open checking account |
| Transfer of funds from First Bank to operating account | Sharon | Hold |
| Organizational Minutes | Max | Done |
| Annual Minutes with Amendments completed by 3/15 | Rosie | Done |
| Provide protocol for release of funds | Sharon | Satisfied with current procedure |
| Add employee severance to budget as a liability line item | Sharon | Done |
| Installation of Manual Gate completion date 3/15/12 | Jon | Done |
| Security Committee Review of Bid from Alert 1 | Bill | Done |
| Adjust placement of NO DOG signs and add 2 by 3/9/12 | Sharon | Done |
| Rails painted –starting this week | Jon | Metal done wood rails in progress |
| New Base on roadside sign | Jon | Replace sign |
| Step & Bracket Replacement; evaluate recent work | Jon | On-hold |
| Owner Workshop | Jon | Done |
| Drip Edge on L-6, L-10, W-26, | Jon | Material on island |
| Contact Chuck Waggoner re: By-Laws | Ed | Done |
| Contact Maria Hodge re: By-Laws | Ed | Done |
| Mailboxes: Replace shingles and paint by next Board meeting | Jon | Done |
| Assign employee parking | Jon | Done |
| Repaint numbers on parking spaces next week<br>Directors don't like color want redone with teal paint | Jon | 75% Done |
| L-3 re: Discuss owner responsibility | Ed | Done |
| L-01 Patch and Paint area used to repair water leak | Jon | Done |
| L-06 Patch and Paint area used to repair water leak | Jon | Done |
| Entry Gate: obtain police report/begin repairs | Jon | Police Report not available. |
| Employee Shirts | Louanne | Done |
| W-12 Condensation issue | Ed | Done |
| W-27 Suggest electrical inspection | Ed | Done |
| Letter to GE | Bill | Done |
| Solar Energy Company research | Max | Done |

New Business

W-35 Repaint the edge of the porch following the tile Installation.
W-07 Ed spoke with the owners last week. The issue is between the owner and the contractor.
L-50 Doug request his roof be painted as the patching of leaks has left it unsightly. Ed said he will discuss in Executive session.

Renewal of other Insurance Policies: Doug will follow up with the General Liability, D & O, and Vehicle Insurance policies.

May Board Meeting Schedule: May 8, 2012 at 8:45 AST.

Adjournment: There being no further business the meeting is adjourned. There will be an Executive Meeting in 10 minutes.

**Action Items**

| | |
|---|---|
| Sediment in gray water | Jon |
| Checking Account | Sharon, Ed |
| Meeting with GE Representative | Jon, Bill |
| Meeting with Dean from No-Nonsense Security | Jon, Bill |
| Contact Owners to amend no dog policy | Ed, Bill, Herb |
| Replace sign on roadside (remove distance) and lower | Jon, Louanne |
| Repair fascia with drip Edge | Jon |
| Repaint parking numbers with teal | Jon |
| Obtain police report | Jon |
| Insurance Renewal policies-forward to Doug | Louanne |

*compony that began in Florida and started in St Thomas last year. They have installed 5 systems on St. Thomas, and gave us the names for reference. They have established an excellent working relationship with DPNR and WAPA, and have had no permitting problems.*

*Max made sure everyone knew this was an exploratory conversation, and CBW is just beginning to look at PV system possibilities.*

*In preparation for the meeting Max had called Michael Bornn at Montessori to discuss their system choice and vetting process (at Anna's suggestion). He also met early with Peter, and they walked the property to examine such things as roof structure and orientation and electrical disconnects.*

*Peter explained that WAPA allows only 100 KW PV systems per each meter. The VI Energy Office is out of rebate money and the federal 30% rebate is not available to non-profit organizations like condo associations.*

*To buy a 100KW PV system, which would cover about 8000 square feet of roof area, would cost about $400K-450K installed. A more feasible approach may be to lease the system from Prosolar, and they would provide a guaranteed amount of power. Such a system would cost Zero down, and be financed for 7 to 12 years at an agreed interest rate (perhaps 6%). The amount financed would be about $375K since the contractor/installer could take advantage of the federal rebate. Much of this would be very negotiable.*

*The expected power produced would be worth about $6K per month at current rates, and the loan payments would be about $3k per month. This would provide an estimated savings on our WAPA bill of $3K per month.*

*We then spent some time with Jon discussing roof mount attachments, and how a PV system would tie in to our electrical system.*

Max asked the Directors if there was an interest in following up on solar energy. The Directors support the concept of solar energy to defray the increasing cost of WAPA as a long term (2-3 years) project.

Max will be having a telephone call-in conference for his committee in May.

**Security Committee Report**: Bill stated he has one owner interested in the committee. Bill stated he has spoke with the head of our security and agrees the guards should be roving the property rather than guarding the electric gate.

**Registration of By Laws**: Ed stated he has obtained the opinion from our legal counsel that we hold in abeyance registration of the By Laws until the Association obtain approval from the owners (2/3 of owners) to change the no dog wording to the paragraph that the attorney has recommended:

*No dogs are allowed on the property, either long term or visiting. Owners or occupants who have properly documented and verified disability as defined by Federal Law may make a request for a reasonable accommodation and exception to the prohibition on dogs on the property. An owner or occupant seeking an accommodation can do so in writing to the Board. The request shall include (1) identification of the Owner or occupant seeking the accommodation; (2) explanation of the relationship between the requested accommodation and the disability; and (3) verification of the disability and need for accommodation as set forth in this rule. To facilitate the Board's review of each request for an*

DRAFT

**Cowpet Bay West**
**Board of Directors Meeting**
**June 12, 2012**

**Present:** Ed Wardwell, Herb Horwitz, Bill Canfield, Jon Cassady, Holly Case,
Phone Conference: Max Harcourt, Doug Rebak, Sharon Koehler, Rosie Wells

**Approval of Minutes:**

Approval of Minutes of May 8, 2012: There being no objections to the minutes, a motion was made to approve the May B, 2012 minutes as recorded. All were In favor.

Appreciation to Jon for his hard work over Memorial Day weekend.

**Manager's Report:**

Completion of the scheduled filter changes to our gray and freshwater system was completed June 5th at 10:00am. All other operational systems: the Reverse Osmosis (R/O) Plant, waste water treatment plant, generator Gen Set as well as both distribution systems are all operating well.

Continuing progress on the step and rail painting. The entire complex is approximately 60 percent complete. Windward is almost finished. Leeward 1 through 44 area is what needs to be completed.

Completed the Gray water transfer lines in the Leeward field. It has been operational for over a week. Capped old gray water pipes on each end in case they are needed at a later time.

Continuing to replace exterior lights, an additional 44 sets were ordered.

Owners Request:
Completed the ledge repairs at owners' request for L-46 and L-50. Complete removal of the ledge replacing it with a fiber glass cap with a top coat wax compound to water proof.

**Treasurer Report:**
Report submitted by Sharon:
Bank balances – June 12, 2012

| | |
|---|---|
| General & Special | $ 51,000 |
| Reserve | $ 283,181 |

Banking information :
Due to not receiving end of the month back-up of QuickBooks, unable to report everything. There are some discrepancies but will be resolved once required information is received.

All of the 2012 insurance premiums are paid in full. Total amount paid $307,057.00.

DRAFT

Ed stated that Julie the accountant will be working with Holly to do the required tax payments due on the 15th of the month and will come in again for the end of the quarter tax payments and to close the books and make sure everything is in accordance.

Louanne will be compensated to the end of the June for extra time and unused vacation time.

Sharon will provide an analysis of our six-month operating expenses to the Board at the August 7th Directors Meeting.

Arrears:
1 owner is 3 months in arrears, the remaining 7 are 1 month.

Resolution to Amend Banco Popular Checking Accounts Signatories:
**Association Resolution to remove Louanne Schechter and append Holly Case to the Operating (General) Accounts Signatories**

***Resolution of the Board of Directors of Cowpet Bay West Association ("CBW")***

*WHEREAS, CBW is a Condominium Association organized and existing under the laws of the Territory of the U.S. Virgin Islands; and*

*WHEREAS, the members desire that the Association shall act in full accordance with the rulings and regulations of the Internal Revenue Service, as administered by the Virgin Islands Bureau of Internal Revenue;*

*NOW, THEREFORE, the members hereby adopt , on behalf of the Association, the following resolution*

*RESOLVED, that the Banco Popular general operating checking accounts (general & special) signatories be amended and only Ed Wordwell, Bill Canfield, Rosie Wells, Jon Cassady, Sharon Koehler and Holly Case to be authorized signatories .*

*This resolution is adopted and made a part of the minutes of the meeting of the Board of Directors on June 12. 2012.*

*BY:*______________________________ *Ed Wardwell, President*

*ATTESTED:*__________________________ *Rosie Wells, Secretary*

Sharon made a motion that the Resolution be accepted, Bill 2nd , motion passed.

Sharon stated that she has an objection that the second signature on the special account should be a Board member. She also stated that it was allowed on previous boards but she thought that the original rule was the second signature on the check must be a board member and only with approval from the Treasurer signing the Weekly Report.

**Insurance Committee:** D&O, General Liability, Umbrella and Property are paid. Vehicle Insurance is due in July.

DRAFT

**Planning & Property:** Max Harcourt, Chairman of the Property and Planning Committee, sent out Meeting Minutes from the May 23rd to the Board members. He also submitted a comprehensive report on the current status and projected upgrades for the property. Major future projects including roof sealing/painting, structure maintenance and electrical system upgrades will be addressed in the 2013 budget.

**Solar Sub-Committee:** Max is currently putting a sub-committee together for a Solar System and has received volunteers but no one has come forward to chair the committee. Concerns are the initial cost for the purchase of the system and securing a dependable contractor that will be able to service it for a extended period of time.

- Bill presented the option of contractor/owner/lease program.
- Max stated that the Government puts out incredible incentives to develop Solar Systems. Ed stated at one time they were refunding up to 30% of the cost but not for non-profit organizations at this time.
- Doug stated the possibility of using our reserve fund as collateral to borrow funds to complete sizeable costly projects like Solar System, R/O System, and replacing exterior wood with synthetic material.

The next action item will be the committee drafting up an RFP before the next meeting.

**General Electric Meeting:** Bill stated the meeting with GE went well. GE inspected the 35 year old osmosis machine. A fact brought to attention by GE is that we are using our R/O equipment very little. We collect enough water to handle most usage. Jon also uses the R/O equipment when the generator is on which has little to no cost.

GE's proposal is they will build a plant and sell the water back to CBW. At this time our reverse osmosis usage is not large enough to warrant the proposal. GE will produce a statistic report.

**Water to Yacht Club:** Bill proposed the possibility of selling water to the Yacht Club. They are currently buying water from Anchorage that just increased by 20%. Currently we can store 500,000 gallons of water and average use is 150,000 gallons per month which would allow enough for the Yacht Club. Bill and Jon will look into the logistics of connecting the water supply to the Yacht Club and report to the Board.

**Action Items**

- Notarize & Record Bylaws: Completed
- Arrange Meeting with Security: Completed - Owner car was stolen from the property, security company responded quickly to review the tapes - the guard on duty at the time was released
- Daily Water Usage Data to Bill Canfield: Completed
- Letter to Insurance Carrier re: gate expense: Insurance Co. needs a copy of the back of the insurance check received for the gate damage
- Teleconference Planning & Property: Completed
- Office Manager Replacement: Completed - Holly Case introduced herself
- Roadside Sign: Deciding on final layout and color for the sign
- Gray Water Upgrade connect terminal ends: Completed

DRAFT

**New Business**

L-42 Bob Cockayne sent an email in May to Board formally requesting "the exterior roof of L-42 be power washed, repaired, sealed and painted before peak hurricane season - within the next 3 months by the association." Bob stated that "he would like to know if the Board does not agree with the request he wants a recommendation on who can do it and will pay for it himself."

- Ed stated after looking at the condition of the roof and speaking with Jon, sealing the roof is a proper topic for the 2013 Budget. Concern is the singular request from Bob wanting his roof done at present time.
- The roof was last done in 2008 (typically has a 5-8 year life span), CBW generally does it every 5 years.
- There is no evidence of cracks or leaks at the present time with L-42 roof.
- Estimate to paint the roofs is approximately $75,000, $1,500 per unit.

Board suggested that if he wants to do the repairs himself they would suggest someone that can do it for him, otherwise it will be addressed in the 2013 Budget. Herb volunteered to discuss the decision with Bob and to make sure there are no other concerns.

On June 6, 2012 the Association was notified by letter from the US Department of Housing and Urban Development (HUD) that "HUD has completed its administrative proceeding of this complaint (Barbara Walters vs. Cowpet Bay West Association) under the Act (Fair Housing Act of 1968) and the compliant is hereby dismissed."

- Complaint failed to request for a accommodation, produce evidence, etc.
- Association has complied with the regulations for emotional handicapped individuals.
- Letter was forwarded to Attorney Joe Riopelle; he feels with the HUD dismissal of the Walters complaint that we can expect the Kromenhoek complaint to be dismissed as well. It still leaves the two civil complaints open and he is required by law to respond to both by June 21st.
- Herb suggested letting the owners know the outcome of the complaint. Ed will put an email out to the owners recapping the Board meeting and letting them know HUD's decision.

August Meeting: The next meeting of the Board of Directors will be August 7, 2012. B:45AM AST

Meeting was adjourned.

**ACTION ITEMS**

| | |
|---|---|
| Letter to Insurance Carrier re: gate expense | Herb/Holly |
| Road Sign | Jon |
| RFP for Solar System | Max |
| Supplying water to the Yacht Club | Bill & Jon |
| GE Report | Bill |
| L-42 Roof Painting | Herb |
| Email to Owners re: HUD Decision | Ed |
| Analysis of six-month of Operating Accounts | Sharon/Holly |
| Signatories changed on Banco Popular Accounts | Holly |

Judith A. Kromenhoek

6200 Windward Way #44

St. Thomas, USVI 00802

June 22, 2012 RE: Inquiry No. 336193, HUD Case 02120337B

Mr. Jay Golden

U.S. Department of Housing & Urban Development

New York State Office

Jacob K Javits Federal Building

26 Federal Plaza

New York, New York 10278-0068

Dear Mr. Golden,

I was very disturbed by your letter dated June 15, 2012 **dismissing** my complaint. I have filed a civil lawsuit and your dismissal makes Cowpet Bay West look like they have done nothing wrong. In the words of a Board member, the other members were gloating over your dismissal.

I have been harassed for over a year. July of 2011 my papers were filed in the office. At this time, there was nothing in our by-laws that said a formal request must be made to the Board. These by-laws have been changed in March, 2012 to now include this (after the HUD complaint). They were changed on the advice of their attorney; they were told they must change them to comply with HUD and the ADA.

The reason I did not make a formal request (it was not required by our by-laws at the time) to the Board was because the then President of the Board, Max Harcourt would leak all of this information to a Lance Talkington and he would then post it on his blog. The blog, although not official was named the Cowpet Bay West Blog so the owners thought everything written on it was the truth.

The Board charged me a $50 a day fine for having my dog, they put up signs all over the property and blasted e mails to CBW owners – all negative toward me. If this is not harassment then what is?

The new Board took office February, 2012 and the new President, Ed Wardwell has tried very hard to rectify the situation. He gave written permission to allow the dog in April, 2012 and he has lifted all the fines. The signs are still up.

Many of my neighbors still do not talk to me; they cannot see my disability so they believe all the nasty e mails.

**Retaliation is a violation of the Fair Housing Act**. All the fines, signs, e mails – I believe this is retaliation.

I do believe my complaint to HUD is the only reason the CBW Board decided to seek legal advice and therefore comply with the law. Up to that point, Mr. Harcourt said "we do not go by federal laws, we go by Cowpet laws". I know that my dog is now legal and I am not asking you to fine Cowpet Bay West but just re-word the outcome. **Dismissal** makes it sound like I have no credibility.

Thank you for taking the time to review this matter. I can be reached on my cell phone at 340-677-3267.

Sincerely,

Judith A. Kromenhoek

cc: Ms. Irma Perez-Pillot

DRAFT

**Cowpet Bay West**
**Board of Directors Meeting**
**August 7, 2012**

**Present:** Ed Wardwell, Herb Horwitz, Bill Canfield, Max Harcourt, Holly Case
Phone Conference: Doug Rebak, Sharon Koehler, Rosie Wells

**Approval of Minutes:**

Approval of Minutes of June 12, 2012: Sharon requested that the Treasurer report remove "All of the 2012 insurance premiums are paid in full". At the time vehicle insurance had not been paid.

Motion to adopt as amended was made and 2nd. All were in favor, motion carried.

**Manager's Report:**

Continuing progress on the step and rail painting. The entire complex is approximately 60 percent complete.

Continuing to replace exterior lights, still waiting on the additional 44 sets that were ordered.

Poly Caribe installed new couplings in the waste water transfer piping from Windward Way to the settling basin. The entire piping run is corroded and should be replaced after hurricane season.

Staff is painting the curbs and numbers on parking spots.

Emergency repairs were completed on the seaside balconies of several units. All the railings have been inspected and any that could have resulted in a potential problem were fixed.

**Treasurer Report:**

Bank balances – August 3, 2012

| | |
|---|---|
| General & Special | $ 36,025 |
| Reserve | $ 302,972 |

Reserve account is owed $19,416.
Capital Projects is owed $19,175 from the Reserve Fund.

Mid-Year Report Review:

Sharon completed a comprehensive review of our six month (through 6/30/12) actual operations compared to our 2012 budget. Our income for this period is on budget. Our total expenses exceeded budget by $69,000. The major overruns were:

DRAFT

- $20,000 - for Guard and Gate Security
- $23,000 - for Building and Grounds Contract Labor
- $23,000 - for Building Masonry Repairs

A $27,000 savings in insurance premiums partially offset these and other smaller overruns.

The Board mandated that management undertake only emergency repairs and minimize any expenditures in the months ahead.

Arrears:
1 owner is 4 months in arrears.

Sharon suggested that a lien should be placed on owners that are several months in arrears.

**General Manager:**

Jon Cassady remains in critical condition in the Mayo Jacksonville Clinic Hospital. Jon continues to improve in response to medical treatment and tests.

After discussion, the Directors unanimously approved to continue Jon's salary and benefits pending further review at the September 5th Board Meeting.

In Jon's absence, the Board decided to contract the services of Arran B. McGinnis as our Interim Property Manager through the impending tropical storm season. Arran will be resident at Cowpet Bay West throughout his contract until October 15th when Jon's situation can be reassessed. Legal counsel is drafting a contract with Mr. McGinnis to be paid $175.00 per day for his services. Ed will execute the contract on behalf of the Association.

COBRA eligibility for Association employees was discussed. Doug is going to research what options are available.

**Insurance Committee:** All Insurance has been paid for the year. Doug will be negotiating property liability insurance after hurricane season.

**Security Committee**: Discussion was held on how to decrease spending on security and still keep CBW safe. Suggestion was made to install a card reader to exit the gate, more cameras, replace broken lights and security guard schedule to be random. Bill will investigate the cost for an exit gate card reader and security guard service. Staff will expedite light replacements.

**Planning & Property:** Max is currently putting a sub-committee together for a Solar System and has received volunteers but no one has come forward to chair the committee. Max will continue to organize a sub-committee.

**June Action Items**

- Letter to Insurance Carrier re: gate expense (Completed)
- L-42 Roof Painting (Completed)

DRAFT

- Email to Owners re: HUD Decision (Completed)
- Analysis of six-month of Operating Accounts (Completed)
- Signatories changed on Banco Popular Accounts (Completed)

**New Business**

Legal Proceedings: Received an update from the Travelers Insurance Company, Attorney Joe Riopelle, that the last submission received from Walters/Kromenhoek exceeded the 20 page limit. The judge has given them until the August 8th to amend their 30 page plea down to 25 pages and has given Joe Ripolle until August 20th to reply in 25 pages.

Legal Fees: There is a $5,000 deductible for each of the Walters and Kromenhoek suits. Walters retainer was met and at the end of the month we should have reached Kromenhoek retainer as well. We continue to use Hodge & Francois for other issues. Rosie asked for a breakdown of legal fees, Sharon said she would provide at next meeting.

Staff Evaluations: Jon reported to Ed that he completed the staff evaluations. His recommendation was that each should get a cost of living increase of 3%. Ed met with the staff, discussed Jon's situation with them and informed them he would speak with the board regarding their pay increase for the year.

After board discussion a motion was made to give staff a 3% raise, motion was seconded and passed by majority vote.

Gate Sign: Doug suggested that someone look at the CWB sign to observe the condition and to see what need to be done to have it restored. Max said he would look at it and bring information to next Board meeting.

Parking Issues: Herb suggested that the end of Windward to be dug out and leveled in order to produce more parking spots. Holly volunteered to get estimates and look into what permits are required.

September Meeting: The next meeting of the Board of Directors will be September 5, 2012. B:45AM AST

Meeting was adjourned.

**ACTION ITEMS**

| | |
|---|---|
| Road Sign | Arran/Holly |
| RFP for Solar System | Max |
| Supplying water to the Yacht Club | Bill |
| GE Statistic Report | Bill |
| Insurance information for Jon | Doug |
| Cost of card reader to exit | Bill |
| Security Guard | Bill |
| CBW Sign condition | Max |
| Legal Fee Breakdown | Sharon |
| Additional Parking | Arran/Holly |
| Lighting replacement | Arran |

DRAFT

**Cowpet Bay West**
**Board of Directors Meeting**
**September 5, 2012**

**Present:** Ed Wardwell, Rosie Wells, Arran McGinnis, Holly Case
Phone Conference: Doug Rebak, Sharon Koehler, Max Harcourt

**Approval of Minutes:**

Approval of Minutes of August 7, 2012:

Ed Wardwell submitted correction - After discussion, the Directors unanimously approved to continue Jon's salary and benefits pending further review at the September 5th Board Meeting.
Doug submitted correction - Under parking Issues: changed end of "Leeward " to "Windward".

Motion to adopt as amended was made and 2nd. All were in favor, motion carried.

**Manager's Report:**

RO, WWTP, Gen Set, Operating systems ran all month with no major issues. On schedule for filter changes and maintenance for the RO plant. Water testing is done through Ocean Systems and all findings are reported through DPNR in St. Thomas and EPA in New York, next report will be sent next week.

All porch lights have been replaced, ordered the remainder street lights (5-year warranty). Will be ordering additional for back-up.

Rebuilt back-up transformer is complete, currently in Miami to be shipped to St. Thomas.

Requiring morning meetings with all staff to determine work for the day and to keep them organized and on track. Will be utilizing additional temporary employee to paint the 17 seaside railings and to complete stair and railing capital project in Leeward.

**Treasurer Report:**

Bank balances – September, 2012

| | |
|---|---|
| General & Special | $ 12,117.92 |
| Reserve | $ 312,680.74 |

Reserve account is owed $19,416, two payments for August and September.

| | |
|---|---|
| Accounting Fees: | $5,940 |
| Legal Fees: | $14,956 ($10,000-Walters & Kromenhoek/4,956-Misc. Legal Expenses) |
| Emergency Rail Repair: | $22,000 |

3055300/000499

DRAFT

Sharon expressed concern regarding the cost of repairing the Golf Cart. Parts were ordered beforehand without a disclosure of the cost. The golf cart has been repaired and is being used daily by General Manager and Staff.

Arrears:
1 owner is 3 months and 1 is 4 months in arrears.

**General Manager:**

Jon Cassady is currently in the Brooks Rehabilitation Hospital in Jacksonville. Jon is receiving physical and speech therapy 6 hours a day, 6 days a week. He is responding reasonably well from a physical stand point, he is able to stand and has full range of motion with his arms and legs and retains his physical strength. He is still unable to swallow, therefore they will be testing in ensure there is no blockage in his throat or esophagus.

Ed will be meeting with Jon and his brother Jay in Jacksonville this weekend to discuss how to best serve Jon's needs and the Associations requirements.

**Committee Reports:**

Insurance Committee: All Insurance has been paid for the year.

Security Committee: Porch lights have been replaced.

Planning & Property: Max will continue finding a chair for the Solar System Committee.

**Legal Proceedings:** September 7th, Attorney Joe Riopolle (Travelers Insurance Company) will file the names of the individuals who will have to provide a deposition for the Walters/Kromenhoek suit. He is not expecting any further action on the suit until October when the initial stages of mediation begin.

**August Action Items**

- Supplying water to the Yacht Club (Closed) - Further developments in researching on supplying water to Yacht Club have concluded that CBW will not be pursuing this venture
- GE Statistic Report (Closed)
- Insurance information for Jon (Completed) - Once Jon qualifies for Social Security Disability he has to wait 24 months before applying for Medicare. Jon is not eligible for COBRA Insurance.
- CBW Main Sign Condition Checked (Completed)
- Legal Fee Breakdown (Completed) - See Treasurer's Report
- Lighting replacement (Porch Light Completed)

**New Business**

Arrears: Board discussed an owner that owed over $10,000, approximately 5 months behind, and the final steps to collect Association dues. $1,500 of the fees are a result of tenant having a dog on the premises. After a certified letter was sent to the owner, they responded that they would make a good faith payment of $2,000 and would pay the remainder as soon as possible. Owner was advised to put

their grievance in writing and it would be presented to the Board. As of September 4th neither the letter nor the payment have been received.

Board decided to send a certified letter, final notice, giving the owner 2 more weeks before shutting off utilities.

New Forms: Notice of Parking Violation and Installation Letter of Permission.

Screened in Porch: Owner requested to screen in patio, Board stated that the protocol would be for the owner to put in writing with engineering sketches and present to the Board for approval.

October Meeting: The next meeting of the Board of Directors will be Friday, October 12, 2012. 8:45AM AST

Meeting was adjourned.

**ACTION ITEMS**

| | |
|---|---|
| Road Sign | Arran |
| RFP for Solar System | Max |
| Cost of card reader to exit | Bill |
| Security Guard | Bill |
| Additional Parking | Arran/Holly |
| Street lighting replacement | Arran |
| Confirm Earnings for SSD | Holly |

DRAFT

**Cowpet Bay West**
**Board of Directors Meeting**
**October 12, 2012**

**Present**: Ed Wardwell, Herb Horwitz, Bill Canfield, John Foster, Arran McGinnis, Holly Case
Phone Conference: Doug Rebak, Sharon Koehler, Rosie Wells

Ed Wardwell called a moment of silence in remembrance for Max Harcourt.

Resolution introduced by Ed Wardwell.

Association Resolution to elect John Foster, Windward #36, to fill Board Member vacancy caused by the untimely and tragic death of Max Harcourt to serve until the next annual meeting, February 2013.

Motion to accept Resolution, all were in favor, motion carried.

**Approval of Minutes**:

Approval of Minutes of September 4, 2012:

Doug submitted correction - CBW Sign Condition (Completed) - indicated that it was not complete.

Motion to adopt as amended was made and 2nd. All were in favor, motion carried.

**Manager's Report**:

RO, WWTP, Gen Set, Operating systems ran all month with no major issues.

CBW Sign: New CBW Road Sign presented to the Board. It was determined that it was the same sign approved in earlier Board Meeting, with the exception of changing "Entrance in 400ft" to "Next Right". Sign cost is approximately $900 - this includes the sign, mount and installation. Estimated time to be completed is two weeks.

Construction Approval: W-24 construction plans presented to the Board for approval. Owners are in compliance with all Association renovation requirements. Doug suggested that when raising the ceiling they leave room for the chase. Arran confirmed that it was addressed and in the plans.

Seaside Rail Painting: Windward seaside rail painting will be completed today, staff will begin painting Leeward next week. Completion of all seaside railings is expected to be within three weeks.

New projects: Reconstruct stairs and wall by Leeward 20; and replace brackets under the stairs with hardware already purchased.

Street Lights: Four ten-foot poles will be purchased and installed to light the four dark areas on property to assist with security, estimated to be completed by next week. The remainder street lights are complete. Any that have failed will be shipped back for reimbursement under warranty.

DRAFT

Porch Lights: Herb stated he thought the street side porch lights were going to be all replaced to make them standardized. Arran stated that all the lights that were not working have been changed and everything he has received has been changed as well. Arran said he would check to make sure that we didn't have any left in stock to install to make them standardized.

Transformer: Rebuilt back-up transformer is complete and on island. Will be contacting Skyline Electric to install it. During installation the exposed cables coming from Leeward leading to Windward will be replaced. The rebuilt transformer will be used as the main transformer and the current one as the back-up.

Stair and Railing Capital Project: Board decided to repair only emergency cases. Will not subcontract the repairs, staff will be performing the work supervised by Arran.

Security: There was a theft incident on October 3rd when three unlocked vehicles on Leeward were entered and their contents pilfered. The perpetrator was on foot and uncaught despite search efforts by Arran McGinnis and the security guard. Ed will send out a reminder to the owners to lock their units and car doors.

Security gate circuit board needs to be updated so that when exiting the gate, a card or code will have to be used in order to exit the property. The cost of the board is approximately $2,500. Sharon, Treasurer, stated that we currently have appropriated funds in the 2012 budget to cover the cost of upgrading the security gate. Board approved upgrading the circuit board to eliminate the green exit button.

**Treasurer Report:**

Bank balances – October, 2012

| | |
|---|---|
| General & Special | $ 46,500.00 |
| Reserve | $ 322,700.00 |

Reserve account is owed $19,416, two payments for September and October.

Sharon expressed concern regarding overtime paid to employees. With our current policy, overtime should only be in emergency cases, otherwise needs to be approved through the Board.

Arrears:
1 owner is 3 months and 1 is 4 months in arrears.

**General Manager:**

Jon Cassady is still in the Brooks Rehabilitation Hospital in Jacksonville. Jon is making progress, although it is slow he is physically doing well. He has vision in both eyes and is speaking but continues to have issues with arm/hand coordination and swallowing. Original release date was October 10th, but has now changed to October 31st. Once he is discharged he will become a Brooks out-patient for 30 days.

Ed spoke with Jay Cassady (power of attorney for Jon) informing him that the Association will continue to cover Jon's medical care until he eligible for Social Security Disability on December 27, 2012.

DRAFT

Resolution introduced by Ed Wardwell.

Association Resolution to continue Jon Cassady on full-time payroll, 30 hours per week at VI minimum wage, and the Association will provide continued medical coverage until December 31, 2012.

Motion to accept Resolution, all were in favor, motion carried.

**Committee Reports:**

Security Committee: We will look into the possibly of hiring a designated security person for C8W. This will allow us to have control over shift hours and can have them on a random schedule to cover different days and hours of the week. It was determined not much activity takes place between 0130-0600 and the best time to have security is 1800-Midnight. Also suggested with the gate change we could cut guard time from 80 to 40 hours. The board also discussed adding more cameras; concern was how to monitor them and the quality of the picture. 8ill will look at all options and present at next 8oard meeting.

Insurance Committee: All insurance premiums are paid and completed for 2012.

Planning & Property: Herb Horowitz has volunteered to resume the responsibilities of Chairman for the Planning and Property Committee. He will report at the November Board meeting.

**Legal Proceedings:**

Any Board member who cannot attend the mediation will need to turn in the "Limited Power of Attorney", notarized, before the mediation on October 19, 2012.

**September Action Items:**

- Confirm Earnings for SSD (Completed)
- Additional Parking (Addressed in 2013 8udget)
- Street lighting replacement (Completed)

**New Business:**

W-52: Owner requesting a handicap parking space. It was determined that the Association is in compliance with the Fair Housing Act of 1988, and in accordance with the Act she is currently receiving reasonable accommodations by having a parking spot as physically close to her unit as possible. We are not required to paint, mark or widen the parking spot. Given that we are in compliance with the Fair Housing Act, no further action will be taken at this time.

2013 8udget: The Executive Committee (Ed Wardwell/Rosie Wells/Bill Canfield) will meet with the Planning & Property Chairman (Herb Horwitz) and Property Manager (Arran McGinnis), to prepare a recommended budget to the Board prior to the November Board Meeting. The budget will include Capital Projects and Operating Expenses.

New Property Manager: The Board decided unanimously in the Executive Meeting that Arran McGinnis would be offered long-term employment as Property Manager for Cowpet 8ay West. Board offered the

3055300/000504

DRAFT

position under the same terms and agreement made on September 5, 2012, effective October 16, 2012. Arran agreed and accepted the position.

2013 Annual Meeting: Board decided that the Annual Owners Meeting will be Saturday, February 9, 2013.

**November Meeting:** The next meeting of the Board of Directors will be Tuesday, November 13, 2012. 8:45AM AST

Meeting was adjourned.

**ACTION ITEMS**

| | |
|---|---|
| Road Sign | Arran |
| Circuit Board/Card Reader for Security Gate | Bill/Arran |
| Security Guard | Bill |
| Additional Security Lights | Arran |
| Stair/Wall Reconstruct Cost | Arran |
| Porch Lights (standardized) | Arran |
| Reminder to owners lock doors | Ed |
| 2013 Budget | Executive Committee |

**Cowpet Bay West**
**Board of Directors**
**Special Meeting**
**July 27, 2011**

**Present:** Max Harcourt, Barbara Walters, Rosie Wells, Sharon Koehler, Bill Canfield, Vince Verdiramo, Bob Cockayne, Jon Cassady, Louanne Schechter

Jeanne Brennan, CPA for Cowpet Bay West attended by phone conference at the request of the Directors.

**Purpose of Meeting:** Discuss a means to pay the premium of the newly acquired insurance and alter the budget if needed. Note: Insurance was in effect before securing finance.

**Treasurer Overview:** We have about $449,000 in cash, $68,000 was written from the reserve fund as the down payment on the new insurance. The rebate from the previous insurance policy is expected to be approximately $50,000. The remaining Capital Improvements are expected to be $110,425. With these expenditures there should be a cash reserve of $320,442. (See Financial Overview sent by Sharon). Max approved financing the remainder of the insurance premium with a 9 month payout at 3.2% which is $23,632/month. The interest adds approximately $8600 to the cost of the insurance.
As the Board had not voted on the financing, Max made a motion to accept the $68,032 down payment with 9 month financing at 3.2% from Mapfre . Bob 2nd the motion. Following discussion, the vote was taken. Max, Sharon, Bob, and Bill voted yes. Barb abstained. Rosie and Vincent voted no.

Max stated the insurance cost to the Association has consistently increased over the years but the owners' fees have not been increased.

Sharon discussed 3 options:

- Suspend our future "reserve" allocation of income for the rest of this year and allocate the funds solely to "insurance"
- Borrow money from the reserve fund via a note, with the intention of paying back to the reserve fund sometime in the future. There was no plan submitted for the future payback.
- Make a permanent transfer from the reserve fund to the insurance, with disclosure that the funds are not intended to be paid back.

Barb suggested a 4th option of a Special Assessment rather than dipping into again or borrowing from the reserve funds.

Jeanne Brennan, CPA, made the following suggestions:

- The Board needs to determine what you deem proper for your reserve fund based on the level of your future needs. A figure would need to be analyzed.
- If you borrow from the reserve fund you break the integrity of the reserve fund, you have to have a resolution, a method of payment, interest, and a new budget sent to the owners. If there is no intent to pay back, you report it as a change in the equity.
- Factor into the next 7 months the cost of the premium and decide if it will include the down payment for the 2012 premium

Jeanne reported the Reserve Account is specified in the budget and not intermingled with insurance premiums or deductibles. The insurance is actually part of Operations and Management, the Insurance was reported separately due to the fluctuation of the insurance premiums following a major hurricane.

Max stated the operating budget is over by approximately $66,000, to include, fuel for the generator, tree trimming, repairs to vehicles, and beach drainage. He wanted to know how this will affect the reserves should we suspend payments to the fund for the remainder of the year. Sharon stated we should have enough money in cash flow to complete the capital projects.

Max moved we transfer the beach drainage project from expense account to a capital project. Sharon 2nd, all were in favour. Motion carried.

Mapfre Deductable Overview: Bob stated he sent out **Shep Barrows Appraisal** that has a breakdown of building by cost. The total deductable for the entire property is $520,000. Bob stated that each building is insured separately. Bob suggested we keep in cash flows for insurance deductable $362,000 which is 70% of the entire deductable.
Bob interjected the policy can be renegotiated in January with Mapfre with same premiums over an 1B month premium.

Vince stated he needed to leave the meeting; his recommendation was to maintain the reserve funds at $500,000. He would not approve of anything less. He noted that we have consistently had that level of operating reserves. Vince left the meeting.

Max made a motion that the reserve fund for 2011 decrease to $3B0,000. Our CPA had suggested a review of what our total reserve would need to be. The amount voted on had not been reviewed or substantiated by any figures. Sharon 2nd the motion. Following discussion, Max called for the vote. Max, Bill, Sharon, and Bob voted yes. Barb and Rosie voted no. The motion carried the Board made a resolution to decrease the reserve fund to $3B0,000 with the remainder of funds going to the general operating fund.

The funds ($68,034.) used for the down payment on the new Mapfre insurance policy were drawn off the reserve fund. Sharon moved the Board resolve to permanently diminish the reserve account by $6B,000 to the General Account. Bill 2nd. Following discussion, Max called the vote. Max, Bob, Sharon, and Bill voted yes. Barb and Rosie voted no. The motion carried.

Barb made a motion to have a special assessment of $1000 per unit owner to cover the cost of the policy. She stated that we should not borrow from our reserve fund again and must stay on the agreed budget. Rosie 2nd. Following discussion, the amount did not breakdown the amount by each individual unit equity but the total amount needed to be funded. Max, Bill, Bob, and Sharon voted no. Rosie and Barb voted yes. The motion was vetoed.

Max made a motion to increase insurance fees per month by $60,000 over 5 months. Bill 2nd the motion. Following discussion Max called for the vote. Bill, Sharon, Bob, and Max voted yes. Barb and Rosie voted no.

Sharon moved the Board resolve to decrease payments to the reserve fund from $12,125,a month to $4,7B5 a month and move the difference of $7,340 a month from the reserve fund to the insurance

3055300/000507

fund. Bill 2nd. Following discussion Max called the vote. Bob, Max, and Sharon voted yes. Bill did not respond. Rosie and Barb abstained. The motion carried.

Sharon will work on the revision of the budget.

Max stated we will proceed with the work on the Capital projects.
Jon stated while looking at the breakdown on the insurance, there are 5 systems that are not covered in the breakdown. Max asked Jon to send an email to Shep with the missing systems . Barb requested all Board members receive a copy of the systems problems.

Barb made a motion we contribute $750 to the little league sponsored by DPNR . Max called the vote, 4 were in favour, Max abstained.

## CBW Owner Repair/Inquiry Handling Policy

May 10, 2011

The CBW Board of Directors has developed this set of guidelines to establish a pı through which: owners may report issues of concern to the office, the staff is mac aware of the issues, and the concerns/issues are documented and handled in a ti manner.

- Emergency repairs/issues (Normally initiated by phone call)
  - If fire, injury or crime –in-progress is involved, individual noting even call 911.
  - GM or staff member to respond immediately
  - If needed, additional staff called in to handle problem until secured
  - Owner to be billed if owner responsible item. Determination made b GM in conjunction with owner/representative. In case of disagreem only immediate safety issues will be handled, and the owner must sı disputed issues to the board by letter or email.

- General repairs-owners units (Initiated by email/letter to Office)
  - Communication received from owner; Office Manager (OM) enters ıı log, note to General Manager (GM), copy to BOD
  - Within 2 business days, acknowledgement of receipt to owner (phor email), indicating receipt and, if appropriate, initial action taken
  - GM, or other staff member, to inspect the problem within 5 business days. Maintenance form (being developed) completed indicating da assessment of problem, expected action to be taken to correct situa along with time frame
    - Form should include disclaimer information regarding owner association responsibility.
    - Form should be signed by GM and owner or owner's agent, i available. If not available, can be done by email. In case of disagreement, only immediate safety issues will be handled, the owner must submit disputed issues to the board by letter

PLAINTIFF'S
EXHIBIT
4
PENGAD 800-631-6989

- Owner should be referred to list of association recommended contractors.
- Owner should not be restricted to list only, but must understa should a question arise as to a hidden Association responsibi is the owners/contractor's responsibility to have GM inspect v progress.
- Owner/representative is responsible for directly negotiating w contractor for scope, price and schedule.

❖ Association Responsible

- GM determines scope of work to be done - by staff, by outsid contractor, or by both.
- If complaint requires work to be done by our staff (e.g., tree trimming, porch light replacement, painting, minor wood rail r roof leak, etc.) work needs to be delegated to staff for comple reasonable amount of time, (e.g., 10 business days).
- If complaint solely requires work to be done by an outside contractor, GM to schedule an appointment for inspection an estimate within two weeks, (alternative contractors may have used to meet this schedule). Agreed upon work to be schedu soon as possible after inspection. GM will inspect work in pr as well as completed job.
- Owner will be notified by e-mail or letter of scope of work, expected repair date, and re-contacted when repair is comple or if rescheduling is needed. If the Owner/representative can support the scheduled work, they become responsible for dir negotiating schedule with the contractor – without changing s of work.
- In the event of combined staff/outside contractor work, (e.g., leak by staff; inside wall/rebar repair by outside contractor), s should commence repair as soon as possible, if the job will a for it.

- Landscape requests (Initiated by letter/email to office)

- ❖ Landscape committee responds to Office (copy to Board) recommen action to be taken within 3 weeks.
- ❖ Office responds to Landscape committee (copy to Board) indicating frame for action (within 1 month), or indicating issue must be discus Board.
- ❖ Written (email or letter) reply to owner indicating action to be taken, and time frame.

- Requests for enforcement of Rules and Regulations. (Initiated by phone, or letter to the Office and Board)
  - ❖ If safety is involved, handle as an Emergency Request. If fire, injury crime –in-progress is involved, individual noting event must call 911.
  - ❖ If not time–urgent, Office issues warning letter to owner (if known); b e-mail message to possible involved owners/renters/agents, if unkn
  - ❖ In case of illegal parking, staff will place a sticker on driver side winc of the illegally parked vehicle. If the vehicle is a hindrance to emerg vehicles, it may be booted and fines levied in accordance with Parki Policy.
- Owners general suggestions/requests (Initiated by email/letter to Board)
  - ❖ Board will acknowledge letter in a timely manner (within a month), indicating the matter will be discussed at the next Board/Executive E Meeting (giving the date of that meeting).
  - ❖ The Board will provide a written reply (e-mail or letter) to the owner v 2 weeks after the meeting indicating its disposition.

# Cowpet Bay West Blog

## An Informed Active Community

### Puppy Dog Diplomas

January 15, 2012

Readers of the blog may recall a comment that Cowpet owner and board candidate Judi Krohmenick made recently regarding the "certification" of her puppy. She claimed that her puppy is a "trained, legally certified service animal". We asked her what that meant and have had no response. After a recent board meeting discussion on the subject of dogs, it's become much clearer what is really happening with puppy dog diplomas.

The board was provided details on the various "certifications" of owner puppies at the January board meeting. Information distributed at the meeting indicated that Judi's puppy is certified by an outfit called Goldstar German Shepherds. We've done some research and found out that for the one time low price of as little as $71.50, a dog owner can obtain all sorts of really cool gadgets and puppy certification without having to leave the comfort of your computer. All anyone has to do is print the little form from their web site; fill out a name; address; and other basic info; write a check; and boom – you get all of the way cool proof needed to tell the world about your very own certified service animal. How tidy is that, right? Heck, if you're in a hurry, operators are standing by at 702-497-7229 to avoid the nasty wait for the mail to make it to them. The link to their site is here for those who would like to see for themselves how all of us can have a certified service animal in darn near no time at all.

http://www.goldstar-germanshepherds.com/certification_licensing.html

The information distributed at the board meeting also indicated that Barbara Walter's and Joel Kirschenbaum's puppies are "certified" by an outfit called the National Service Animal Registry. Here is the link to the similarly totally cool three minute process to get your very own "certified" service puppy from this outfit:

http://www.nsarco.com/cgi-bin/product.cgi?id=081218004

There are at least ten outfits like these two on the Internet that offer the same type of "service". One of them (Service Dogs America) even has the gumption to state that "SDA recognizes that every person in America may have some form of disability". See this fascinating statement for yourself plastered in bold letters squarely in the middle of their home page:

http://www.servicedogsamerica.org/

It is the blog's considered opinion that these outfits serve no legitimate purpose and exist mainly to sidestep what the ADA works diligently to accomplish. These outfits make it plain on their sites that nothing is done to verify either the animal's credentials or the purported disability of



PLAINTIFF'S
EXHIBIT
5
PENGAD 800-631-6989

LT-29

# Cowpet Bay West Blog

## An Informed Active Community

### Questions Posed to Board Candidates

January 3, 2012

The following was emailed to all board of director candidates:

*To all – my wife and I own 3 Leeward and have the following two questions for the board candidates:*

*What would your vote have been on the recent board vote regarding open or closed meetings in the specific context of the vote taken?*
*Are you in favor of the proposed bylaw revision as stated in the draft regarding dogs on property?*

*Lance Talkington*

Responses received were as follows:

- Herb Horwitz – for open meetings; and for the bylaw revision regarding dogs
- Doug Rebak – 1. I have been in favor of open meetings from the time I voted in favor of Vinny's motion at the Annual Owner's Meeting. This is not theoretical but real. The meetings I held as President were open ,with the few exceptions where we were talking sensitive topics such as Staff Reviews or specific Owner-related problems.
  2. My position on dogs is I love them, have had 2 of our own, but they just do not belong at Cowpet. The issue of a "service dog" can and has been abused, but I feel the Board is taking a reasonable approach in following the ADA guidelines.
  Bottom line, I favor the By Laws revision on dogs.
- Ed Wardwell – declined comment
- Judi Krohmenhoek – declined comment
- Barbara Walters – declined comment
- Dick Lamoreaux – declined comment

While earlier correspondence is not available for Ed Wardwell's position on these issues, Judi; Barbara, and Dick are on record favoring dogs on the property (Judi and Barbara both currently have dogs in their units and have declined to comment as to the basis for it). Barbara is on record favoring closed meetings. Our thanks to Doug and Herb for taking the time to comment.

**Comments on: "Questions Posed to Board Candidates" (2)**

LT-27

# Cowpet Bay West Blog

## An Informed Active Community

### Letter From Judi Kromenhoek

December 24, 2011

The letter below was posted on the blog yesterday from board candidate and recent blog registrant Judi Kromenhoek. It encourages owners to consult with association employees for input on qualification of the various candidates running for election. Our community faces a number of complex business issues on a regular basis, such as insurance coverage; formulating condo law related to animals; formulation and evaluation of budgets and financial statements; strategic planning; capital planning; and supervision and evaluation of staff to name a few.

Anyone who is able to input on these or any other challenging issues is encouraged to provide their input for evaluation in this public forum, whether it be Matuba; Steve; Joey; Jon; Louanne; or anyone else on staff. We can all benefit from being better informed on the difficult business issues that face our wonderful community.

As an aside, the following questions were posed to Judi yesterday on the blog, responses to which we await:

***Hi Judi. Welcome to the blog. We have a couple of questions. First, what would your vote have been on the recent board vote regarding open or closed meetings in the specific context of the vote taken? Secondly, are you in favor of the proposed bylaw revision as stated in the draft regarding dogs on property?***

Since Judi currently houses a dog in her unit, her input will be valuable in understanding the reasons for allowing dogs on the property.

Following is Judi's letter to the blog:

*Dear Fellow Owners,*
*Many of you only spend short periods of time during the year at Cowpet Bay West and therefore are not aware of all that is going on.*

*There is an election coming up and I urge you to do some investigating on your own. DO NOT take my word or any of the current Board's, or those running for the Board but base your vote on what you learn.*

LT-25

# Cowpet Bay West Blog

## An Informed Active Community

### Barking Puppy Dogs

December 5, 2011

So far our illegal neighborhood puppy dogs have been seen and smelled but not heard. Until now. Following is an email sent from an owner this morning:

*Jackie,*

*To answer your specific question there is an existing issue and not just a potential problem. Last Monday, Nov 28th a dog left in a high number Windward unit was incessantly barking to the great distraction of our household. This was in the evening and in order for my daughter to do her homework she had to hide out in our bedroom on the street side of the unit. In addition we had to close our windows and put the air-conditioning on – an expense to us and denying us of the advantage of a balcony situated in the Caribbean.*

*Regards,*

*Niall Bartlett, Leeward 47.*

Niall lives on the end of Leeward nearest the gate house. The 40's area of Windward is directly below his unit, and this coincidentally happens to be the very spot where our known violaters Barbara Walters (current board member) and Judy Kromenhoek (immediate past board president) live. If the noise is a high pitched yip, it's Barbara's dog. If it's a deeper barking noise, the dog is Judy's. Maybe blog readers who live in that area can comment on whose dog may be today's perpetrator. As an aside, trained service dogs are specificaly trained to NOT bark unless the owner is in imminent danger. Maybe one of the pups pooped in the owner's unit and was warning the owner to watch out?

These two owners continue to fight for their puppy dogs tooth and nail out of our collective view due to the monthly board meetings being closed to owners. Don't be surprised to see either or maybe both of them show up as candidates for the three open seats on the board. They desperately want to be in power to control this issue that is very real and very personal to both of them.

**Comments on: "Barking Puppy Dogs" (1)**

1. 

LT-23

for the open part of the meeting and not even have to worry with control utilization. Getting off one private line and moving to the open line takes what, about thirty seconds? Come on Max, all this takes is a little thought and effort. Read the web site you're using for goodness sake rather than for all intents and purposes shutting down the owners. Is it appropriate that you deserve flexibility of access to board meetings while traveling the states since May, but owners don't deserve the same when access can be easily controlled? Oh, and non owners calling in – are you serious? Who in their right mind outside of owners would ever want to subject themselves to this insanity.

OK, so you say that your "camp" is not with Rosie and Barbara and that you're not against accountability and openness. All you can say is "False". What exactly then is the trutb Max? Please elaborate so we can know your ground rules without being thrown around in the wind from month to month not knowing what to expect. You deleted my email asking a very simple question that was nothing like your recollection of it – I asked the reasoning behind closing the meeting and made a side observation we felt like fools. Please don't twist what was asked of you. What do you expect for a subsequent response when you purposely ignore a reasonable question? It's pretty simple to draw the conclusion that you're not open and transparent. We're supposed to somehow magically assume you're for open meetings; transparency; and accountability in light of the actions undertaken? Please. We're still listening Max. Actions speak much louder than words.

You bet I resigned from the committee. I will not be associated with clandestine functionality and will only associate with one hundred percent openness and transparency. Until that becomes reality, it's not happening. I've worked too long for a reputation of being completely open and forthright and will not allow that to be tainted by being associated with behind the scenes activities, whether at the board or committee level. Prove that openness and consistency are a commitment, and this issue can be revisited. My participation is completely dependent on how you decide to proceed.

3. 

**dougrebak** *said:*

November 12, 2011 at 12:37 pm

Lance,
Thank you for your input.
I share your ( and many other owner's) frustration with the unilateral rejection of the owner's overwhelming "yes" vote for open meetings.
I do support the Board's need for closed sessions on "confidential" matters –but the dog issue???PLEASE !!!

LT-21

So, there you have it fellow owners. Our president has made it clear that accountability and openness simply isn't priority. Our sympathies go out to a few of the other board members who are trying to do the right thing but find themselves serving out a term in the middle of this sort of underhanded activity. As for the blog, we tried and have failed.

As a sidenote, President Max was asked to respond to our question of his reasoning behind the events detailed here. He did not respond to the request.

**Comments on: "The Final Straw" (4)**

1. 

   **alfred felice** *said:*

   November 9, 2011 at 12:43 pm

   A VERY SMALL MINORITY CAN DESTROY DEMOCRACY IF THE MAJORITY ARE PASSIVE !!! IT IS HAPPENING IN THE WORLD -INTHE USA – IN ST. THOMAS- WHY NOT AT CBW !!!! COMPLACENTCY LETS THE BULLIES RULE IF YOU CAN'T REMOVE THE GUILTY , YOU CAN CERTAINLY OSTRACIZE THEM AL FELICE

2. 

   **Anonymous** *said:*

   November 10, 2011 at 2:24 pm

   I have previously refrained from weighing in on Lance's blog, but I have been so badly misrepresented that I feel compelled to respond.

   "The blog received a reminder from the board over the weekend to invite owners to phone into the board meeting on Tuesday." False. The Board has never invited "the Blog" or owners to phone into the meeting. In the past, Lance and other owners have been invited to sit in on meetings. Owner Lance was never specificially invited to join the telephone call-in, nor was he prohibited. The "Blog" has never been invited.

   "President Max now wants owners to be forced to show up in person at the office if they wish to listen in on board meetings." I clearly do not have the desire or authority (or arrogance) to "force" owners to do anything. I did say in an email, and telephonically, to a Board member that I have no trouble with owners sitting in on meetings. The telephone system is provided for the convenience of Board members who are off-island. I do have

LT-19

# Cowpet Bay West Blog

## An Informed Active Community

### Board Response To Request For Rules Enforcement

October 30, 2011

A few days ago, the blog emailed a formal request to the board for rules enforcement. There continue to be owners who are known to have dogs on the property. Two of those owners are current board member Barbara Walters and former board member and immediate past president Judi Kromenhoek. Earlier blog posts about the dogs issue and the request for rules enforcement may be viewed for details. There have been two earlier formal requests to the board from another owner requesting that the dogs rule be enforced. The board has responded to Barbara and Judi with the following correspondence that was copied to the blog as a formal response to our request. Kudos to the board for doing the right thing by enforcing a rule to which we all agreed to abide when purchasing property in the community.

*Judi and Barbara,*

*Cowpet Bay West's current rules are very clear – No Dogs. You are both in violation of these rules, and owners have complained to the Board.*

*As you know, the Board is considering absorbing the "No Dogs" rule into the by-laws, and allowing exceptions, upon application to the board with supporting documentation, for service dogs.*

*Louanne tells me that both of you have "papers in the office" regarding service dogs; however, you have not applied for an exception to the rule.*

*If you, as owners and users of service dogs as defined and documented in accordance with ADA rules, wish an exception, you must apply in writing or electronically to the Board and submit supporting documentation. You have 10 days to submit this request. It will be considered at the November Board meeting, and you will be informed of the outcome. Barbara, you must recuse yourself from voting since you are a Board Member.*

*Even though you are clearly in violation of the rules, this offer is being made in good faith, and in the spirit of the consensus of the Board as demonstrated in our by-law discussions.*

*If you do not avail yourselves of this offer, you are subject to being fined under the current rules of the association at the November meeting.*

*M. M. Harcourt*

*President, CBW Condo Association*

LT-17

**Lance Talkington** *said:*

October 26, 2011 at 5:48 pm

Well Barbara, you actually beat me to the next blog post. It is certainly time to hit this one head on since I've overheard the office employees talking about this among themselves and the board. Let's recount the events as they occurred. We asked for approval of the board prior to beginning construction. The entire process was overseen by both the board president and Jon. In fact, they personally came to our unit on the day that Chris Thompson began work and told us to stop until we complied with their new request for architectural plans that included all provisions that they deemed necessary and appropriate. Those plans were obtained from the firm suggested by them, and construction then proceeded with their blessing in strict adherence to the design plans. The entire process was in full view of the board and Jon, and they had every opportunity to indicate lack of adherence to the plans. Construction was adhered to in exact specification to the plans drawn by professionals that was accepted by everyone involved. If you or anyone else wants to take up this issue, I can assure you it will be dealt with firmly.

4. 

**Barbara Walters** *said:*

October 26, 2011 at 8:33 pm

I hope that is not meant as a threat to someone from the board of directors who has a great concern that all rules and regulations be followed. Rest assured, the approvals will be checked and double checked to make sure that they comply, or I can promise you that it will be corrected at the homeowners expense.

5. 

**BIG Kahuna** *said:*

October 29, 2011 at 7:14 am

And remember when I wrote Board Members abuse the little power they have? Here is a classic example of it in writing. Barbara, a board member is now threatening a unit owner basically as retaliation for that unit owner asking the board to clarify the dog rule policy. Read above, it's absolutely, clearly abuse of a board members power to act this way. Board members should ALWAYS remain impartial, clearly this is not the case as Barbara is, in her words "Rest assured, the approvals will be checked and double checked to make

LT-15

# Cowpet Bay West Blog

## An Informed Active Community

### Request For Enforcement Of Rules And Regulations

October 26, 2011

The following email was sent today to the board of directors:

To The Cowpet Bay West Board of Directors:

On May 12, 2011 the board adopted a formal written policy titled CBW Owner Repair/Inquiry Handling Policy. The policy includes procedures for owner requests for enforcement of Rules and Regulations. The association has a long standing rule disallowing dogs on the property. It has recently become a well publicized reality that multiple owners, including one current board member, have dogs living in their units. Given that our unit was fined for having a dog when a friend stayed in the unit and unbeknownst to us brought their pet, it is inconceivable how other owners are knowingly permitted to have dogs on a long standing basis without consistent enforcement of fines for such behavior. Repeated requests to the board member for substantiation of her need for a trained service dog have gone purposely unanswered, and in fact her responses have been accompanied by threats of lawsuits against both the board and me if her ability to have a dog is challenged. I have consulted a senior law firm partner who is an expert in condominium association law, and he has confirmed that the board has every right to request any and all documentation and other supporting information for an owner claiming the right to have a service dog as a result of disability. There are no limitations on this right whatsoever. If the board would like to engage the attorney in this regard, I will provide his contact information.

My daughter has repeatedly asked why others are allowed to have dogs while she is not allowed one. It is egregiously inconsistent for me to be fined for a dog in our unit while others are clearly being allowed to have dogs with no consequences. It is our request that the rules be consistently enforced and that any owner with a dog be required to submit documentation as to the need for a trained service dog to assist with their inability to function normally. It is also requested that the ADA guidelines for the definition of a service dog be implemented immediately and also incorporated into the bylaws that are currently being drafted for approval at the February owners meeting. This email is being sent to the board of directors and the association office in accordance with the procedures adopted in the May 12 document.

Lance Talkington
Three Leeward

**Comments on: "Request For Enforcement Of Rules And Regulations" (6)**

LT-13

**Barbara Walters** *said:*

October 14, 2011 at 10:06 pm

Thank you for your response Scott. I Like that you clarified for everyone what a blog is, it is personal OPINIONS. Not necessarily facts, just ones personal views on their observations or prejudices. Lance has professed to giving a fair assessment on what is going on with the board, and continues to claim things to be fact when he doesn't verify anything as fact, just writing rumor and innuendo.
That he has also mislead people into thinking that his word is gospel, is another injustice to his claim of a "factual" summation. He posted minutes, which were not the official minutes of a meeting, and his motives are not at all altruistic. This is his 15 minutes of fame, and that is really sad. By the way, I did not want, nor need, nor expect my name to be included in his tirade, when it had nothing to do with my serving on the board. These are two separate issues, and the implication that I am abusing"power" because of my position is not only not fair, it is downright untrue. I do not want or need people to be discussing me in anything other than a professional capacity as to how I serve on this board. My personal business is mine, just that. I have never done anything to abuse any power (which one doesn't have from serving anyway). People who have written in have been abusive, derisive, vicious, and just downright mean. I have never seen a collection of people like these, who get their jollies by hurting others.
If one CLAIMS to be writing truth, then it should be the truth. As an owner, just an owner, I am not accountable to the likes of Lance Talkington, and if he did not share the complex with me, he wouldn't even rate a blink of my eye.
And just to clarify the issue, I am mortified, that my personal business has been laid out over the internet without my permission or forewarning.
Maybe one day I'll find out that Lance et al, are incontinent, so I can blast that. Maybe I'd be so kind hearted that I'd buy he and his cronies diapers! But I would first let everyone know about it!
Barbara

- 

  **Lance Talkington** *said:*

  October 15, 2011 at 9:50 am

  It's impossible to give someone grief over a disability that is to date completely undefined and unsubstantiated. Nobody but the board needs to know the details of the disability, but owners have made it clear that they have the right to see that your claim of disability is properly documented and worthy of a waiver for the pet. Fortunately there is a mechanism that you and the rest of the board put in place earlier this year to deal with this very sort of situation. The issue will move in that direction.

LT-11

Barbara's right to have a dog is most certainly open to scrutiny, and she is welcome to carry out her threat to sue both the board and me for asking about it. She isn't applying for a job with us as a disabled person – she wants a dog, and her desire must be scrutinized appropriately. The office has no paperwork on file as is evidenced by Louanne's not replying to our request to confirm paperwork, and Barbara produces nothing other than saying she can't work and is thus entitled to have a dog. It has become clear she has a pet and should be fined just as I was fined in the past when a friend stayed at our unit and had a small dog for a few days without our knowing it.

Lastly, continued attempts by the fractioned group to close meetings to owners as you confirm today is ultimately disturbing. Good things are happening since owners have become more involved earlier this year. While the blog is being criticized for its comments, there has not been a single instance of anyone claiming that something untrue has been said by the blog. The truth in an open forum is powerful and must continue. Kudos to the board as a whole for standing up for truth and openness.

10. 

**pattisays** *said:*

October 14, 2011 at 12:59 am

This is fascinating...and it has become clearly a point of principal with the dog issue serving as the example of blatant disregard for rules, common respect for them and the reasons behind them in the shared community – and by a board member...It seems so simple that this person should excuse herself from this position – unless of course there is a valid reason for her to require an aid dog that the "papers" would have to validate – which this blog suggests have not been produced. If this dog issue can be so hot, the factions be so divided and the rules so easily manipulated we are in for a sad decline in the harmonious management and lifestyle that we have know for decades.

11. 

**BIG Kahuna** *said:*

October 14, 2011 at 10:11 am

My name is Scott White, aka Big Kahuna from the St. Thomas Blog, http://www.stthomasblog.com. I am the first post and I posted under "Anonymous". Really I just quickly posted not even thinking about posting my name. But for those that don't know who I am I run the largest blog in the USVI. I have over 4000 readers a day. I

LT-9



# National Service Animal Registry

903 NW F. Street · Grants Pass · Oregon · 97526 Toll Free · (866) 737-3930 Fax · (541) 471-1122

**NSAR CERTIFIED SERVICE ANIMAL**

This document affirms that **"OLIVER"** (NSAR database ID [redacted] see adjacent photo) is certified as an emotional support animal (ESA) and registered with National Service Animal Registry (NSAR) on the date listed below. This emotional support has been formally prescribed and deemed necessary to assist **J. KROMENHOEK**, the confirmed disabled handler. The handler and service animal are listed in the National Service Animal Registry (NSAR) database and may be found on the following website: **www.nsarco.com/database.html.**

**OLIVER**

Emotional Support Animals are animals that are necessary for the normal, day-to-day functioning of their emotionally or psychologically disabled handler, facilitating a normalizing effect by their presence.

An ESA is not considered a working service dog under the ADA and is not granted unlimited public access. Protections under federal law include allowing a disabled handler to be accompanied by his/her emotional support animal in the cabin of the aircraft, in accordance with the Air Carrier Access Act 49 U.S.C. 41705 and Dept of Transportation 14 C.F.R. Part 382.

Additionally, property managers and landlords are required to make reasonable accommodation (a change in the rules) to permit a disabled handler to keep an ESA, even when a landlord's policy explicitly prohibits pets, as set forth in the Fair Housing Amendments Act of 1988, Section 504 of the Rehabilitation Act of 1973 and Title II of the Americans with Disabilities Act.

For more information, please call the U.S. Justice Department ADA Information Line at (800) 514-0301 (voice) or (800) 514-0383 (TTY) or visit the ADA Business Connection at **www.ada.gov**.

September 12, 2012
Date

[signature]
Tim Livingood, M.ED. CEO

PLAINTIFF'S EXHIBIT 6

30553.00/000260

Subj: **Re: 2012 Budget,Reserve Fund Statua end Bylaw Revision Information**
Date: 1/16/2012 11:35:47 A.M. SA Western Standard Time
From: docfelice@gmail.com
To: DONNANATEL@aol.com
CC: shazkoehler@gmail.com, mrcleen44@aol.com, sidmar42@aol.com, ahg20@msn.com, bobayars@hotmail.com, birtbarbara@gmail.com, jerseybarb@aol.com, Beth.Trahos@smithmoorelaw.com, wfrumkin@varizon.net, robert.daleo@gmail.com, rbcusvi@gmail.com, bradking@xmission.com, rbye117@aol.com, cbfulp@aol.com, apollowell@optonline.net, gmoose@facet-purolator.com, mtamasi@sairealestate.com, sallyfcockayne@hotmail.com, gcowlin@comcast.net, ccrapko@verizon.net, dcshear@verizon.com, nannybar@aol.com, rjlamoureux@vitelcom.net, pjpromo@verizon.net, dougrebak@aol.com, ajuliadoyle45@hotmail.com, randysusvi@msn.com, edwardwell@aol.com, thecolonyshop@optonline.net, cfirouz@aol.com, clairecfoster@hotmail.com, georgeblackhall@hotmail.com, mrgitamo@aol.com, billhanson@comcast.net, hardeep@westarindustries.com, dick.harrington@gmail.com, herbert@hihorwitz.com, donald@hoeschrealestate.com, Highroads2@aol.com, jp.jamison@gmail.com, laura.jamison@gmail.com, fozzisnow@gmail.com, jkromes@gmail.com, barwkelly@hotmail.com, mckamey01@comcast.net, lamjk2@aol.com, ltalkington@talkington.cc, elainemalkani@gmail.com, rmarcantonio@aol.com, marich9323@aol.com, marilyn@blackhallrealestate.com, mverdiramo@optonline.net, robmccormack@msn.com, pmcculliss@msn.com, heath@alpha-value.com, MFM304@gmail.com, milligancl@aol.com, milom2@earthlink.net, MMF036@aol.com, karebare93@hotmail.com, varda@insureking.com, niallbartlett@lycos.com, gay@norcom2000.com, PJPROMO@verison.net, spompan@optonline.net, gpompan@yahoo.com, janetrebone@sbcglobal.net, g.bcp@prodigy.net, ct1964ups@aol.com, rolandgeorges@yahoo.com, ronaldcholmes@gmail.com, wellsr_@earthlink.net, admin@barnonefoods.com, kikisb60@yahoo.com, JAXOH@aol.com, rshell@bashlin.com, jselfridge@verizon.com, sid@corkysfootwear.com, elainegk@aol.com, alance53@yahoo.com, sharong@4taconic.com, stumpcsw2@gmail.com, cheesa34@optonline.com, canfieldvi@gmail.com, Anna.Paiewonsky@paiewonskylawfirm.com, cowpetbaywest@hotmail.com, joncassady@hotmail.com

Reply to all ; The ADA law does not prevent e community from excluding DOGS. It does provide e meana for legitimate needs to be allowed !! No ona wishes to prevent proper needs to be satisfied !! We do wiah to prevent a large influx of PETS to Invade our clean and tranquil property .Once there is a removal of our" no dogs policy", pets will abound and there will be no way to control their habits or their owners obeying the rules to maintain a clean quiet property !! Check other "dogs allowed" properties (especially beach properties)and hear the terrible problems incurred by failure of owners to curb and control their pets !!! Noise,smell,unpaid fines and in-your-face erroganos (we have that now!!).Again REAL needs for service are one thing,phony pets are another !! You tell me what the 3 dogs on property are ? needs or pets ?? How you do deal with arrogant rule breakers ?? Talk about IN-YOUR-FACE ,these three have some gall. We can make our rulea effective with proper wording that is legal . We are not the only community faced with shams for pets . How do others attain their goals within the law? I am sure there Ia a legal way !! Short of that I auggest they be ostracized,NO dinnar dates,no patronage of their establishments, no conversationa,no beach conclaves,just ignore them completely !!!! Certainly do not reelect them !!!!! PASS THE BY-LAW CHANGE Vote for Doug,Ed and Herb.Board control helpe ,but a by-law change would be harder to overturn.Be serious,what do you want——VOTE Al Felice 27 WWW

On Sun, Jan 15, 2012 at 11:20 AM, <DONNANATEL@aol.com> wrote:

Lance, What you need to do is go to the Government ADA website for the disabled, under Service Animals you will find something surprising, the actual law. You will elso find, legally, what you are allowed to ask and what the service dog owner is required to provide. It also clearly states that no specialized training is requlred for a service dog. I posted the court decision against Pueblo for a reason, I do not want Cowpet Bay using money that is set asida for improvements for legal fees.

I auggest that all homeowners check out the ADA website because all the amails are setting the association up for an expensive legal fight if the blog or the email authors are tied back to the board or employees of cowpet bay.

I am very concerned that a legal line is being crossed with the Service dog Issue.

Donna M LaScola, CEO
NATELCO Corporation
140 West Hampton Avenue

3054700/000329

Capitol Heights, MD 20743

In a message dated 1/14/2012 10:45:46 P.M. Eastern Standard Time, docfelice@gmail.com writes:

> Hi Sharon, thanks for the "true" numbers !! Now perhaps every one else will SHUT UP ,including me. I no longer will have to champion our diligent board.I think you guys and gals did a terrific job ,despite all the negativity from a few dissidents. Congratulations for a job well done. Al Felice 27 WWW
>
> On Sat, Jan 14, 2012 at 10:01 PM, Sharon Koehler <shazkoehler@gmail.com> wrote:
>
> Dear Owners,
>
> As required in our bylaws, I am attaching a copy of our 2012 Budget, approved by the Board late in December 2011. Also attached you will find documents covering the above two important subjects. Please take the time to review these reports and, if you have any questions, please get back to me.
>
> Thank you.
>
> Sjaron Koehler, Treasurer
> CBW Board of Directors

Subj: **Fwd: CBW Liability Insurance**
Date: 1/18/2012 8:37:16 A.M. SA Western Standard Time
From: JERSEYBARB@aol.com
To: jkromes@gmail.com, rjlamoureux@snet.net, iamjk2@aol.com

**Nice ...............now he shows my letter. Real Class act**
**(letter to follow couldn't forward it)**

From: milom2@earthlink.net
To: lance@eisvi.com
CC: stycisv@gmail.com, rbcusvi@gmail.com, shazkoehler@gmail.com, moehogan1@verizon.net, JERSEYBARB@aol.com, wellsr_@earthlink.net, cowpetbaywest@hotmail.com
Sent: 1/17/2012 11:59:02 P.M. SA Western Standard Time
Subj: CBW Liability Insurance

Re: Policies DM-GL11-63 and 105434549

Dear Lance,

The referenced policies are the liability (general and officer) insurance policies for Cowpet Bay West Condominium Association. The Board of Directors would like to make you aware of a situation which may call these into play.

Recently one of our owners had their attorney send us a letter in which the attorney stated they were representing the owner in a "complaint" against the association. The Board is consulting with Atty Maria Hodge to determine what this means to us, and what our exposure, if any, is.

Attached is a copy of the letter from the attorney. At this time, we don't believe any action is required on your part; however, we will keep you informed as this matter progresses.

Max Harcourt

President, CBWCA

505-385-9225

3054700/000334



2012, we'll make that Exhibit 13. It's a letter from your office.

Q. Do you recognize this letter?

(Deposition Exhibit No. 13 was marked for identification.)

A. I believe that's the same letter, right.

Q. There is a different date but that's January?

A. Yes. I'm sorry, yes. I do remember. She just needed -- she needed recertification at this time. This is something that you need every year when you travel.

Q. Okay. And at that time you did the recertification, did you do another full evaluation of the patient?

A. Yes. And in fact, I did a more thorough one because, again, she wasn't presenting only for this at that time. So it was much more thorough than the question that she presented with initially.

Q. Okay. And at that time, was there any discussion with any issues with homeowners at the condominium here?

A. Yes.

Q. What was the discussion, if you remember?

A. Again, the discussion was that she was

PLAINTIFF'S EXHIBIT

having difficulty, I believe, in securing the pet or having the pet -- no, no, no, I'm sorry. She had difficulties with her neighbors given that she had possession of this companionship pet, yeah, similar to the prior case.

Q. Was there any indication -- did Ms. Kromenhoek ever tell you that she was not able to be at her condominium with her dog?

A. No, I don't believe it was that, no. I believe her pet was allowed. It was just more of, again, perceived harassment and things of that nature from her -- or made by her neighbors.

MR. RIOPELLE: Okay. I am going to introduce Exhibit 14, composite exhibit, three pages, Bates Nos. 207, 205 and 202.

(Deposition Exhibit No. 14 was marked for identification.)

Q. They appear to be your notes, soap notes?

A. Soap notes.

Q. Dated January 31, 2012, March 26, 2012, and April 16, 2012. You went to just take a look and confirm that those are, in fact, your notes?

A. Yeah. Right. Yes, these are my notes.

Q. Okay. On Exhibit 9, you referenced you

IN THE DISTRICT COURT OF THE VIRGIN ISLANDS
DIVISION OF ST. THOMAS AND ST. JOHN

---

| | |
|---|---|
| BARBARA WALTERS, Plaintiff, vs. COWPET BAY WEST CONDOMINIUM ASSOCIATION, et al., Defendants. | CIVIL NO. 2012-24 |
| JUDITH KROMENHOEK, Plaintiff, vs. COWPET BAY WEST CONDOMINIUM ASSOCIATION, et al., Defendants. | CIVIL NO. 2012-25 |

REPORTER'S TRANSCRIPT

MOTIONS HEARING

May 27, 2014

---

BEFORE: THE HONORABLE CURTIS V. GOMEZ
District Judge

---

COURT REPORTER: CHANDRA R. KEAN, RMR
Official Court Reporter
Virgin Islands District Court
St. Thomas, Virgin Islands

APPEARANCES:

KARIN BENTZ, ESQ.
JULITA DE LEON, ESQ.

For the Plaintiffs

RICHARD FARRELLY, ESQ.
JOSEPH RIOPELLE, ESQ.
JAMES PARKER, ESQ.

For Defendants Cowpet Bay, et al.

RYAN MEADE, ESQ.
KYLE WALDNER, ESQ.

For Defendant Felice

JOHN BENHAM, III, ESQ.

For Defendant Talkington

---

INDEX

ARGUMENT BY THE PLAINTIFFS 7

ARGUMENT BY DEFENDANT TALKINGTON 13

ARGUMENT BY DEFENDANTS COWPET, COCKAYNE, HARCOURT And VERDIRAMO 25

ARGUMENT BY DEFENDANT TALKINGTON 43

ARGUMENT BY THE PLAINTIFFS 49

ARGUMENT BY DEFENDANT TALKINGTON 74

ARGUMENT BY DEFENDANTS COWPET, COCKAYNE, HARCOURT And VERDIRAMO 80

RULINGS BY THE COURT 92

FURTHER MATTERS 106

(Court recessed)

---

PROCEEDINGS

10:59:59 (Court called to order at 11:00 a.m.)

10:59:59 THE CLERK: Judith Kromenhoek versus Cowpet West Condominium Association, the board of the Cowpet West Condominium Association, Max Harcourt in his personal capacity, Alfred Felice, Robert Cockayne and Vincent Verdiramo.

11:00:19 MS. BENTZ: Karin Bentz and Julita de Leon on behalf of the Plaintiff Judith Kromenhoek and also the Plaintiff Barbara Walters.

11:00:30 THE COURT: Good morning, Attorneys Bentz and de Leon.

11:00:33 MR. FARRELLY: Good morning, Your Honor. Richard Farrelly, Joe Riopelle, on behalf of Cowpet Bay West Condominium Association, the board of Cowpet Bay West Condominium Association, Max Harcourt, Robert Cockayne and Vincent Verdiramo, in both the Judith Kromenhoek and Barbara Walters cases.

11:00:57 THE COURT: Good morning, Counsel.

11:00:59 MR. MEADE: Good morning, Your Honor. Attorney Ryan Meade and Kyle Waldner on behalf of Alfred Felice, deceased.

11:01:07 THE COURT: Good morning, Attorneys Meade and Waldner.

11:01:10 MR. WALDNER: Good morning, Your Honor.

11:01:12 MR. BENHAM: Good morning, Your Honor. John Benham, Benham and Chan, for the Defendant Lance Talkington in the Kromenhoek matter, 0025, and also if the Walters matter is on the docket, also in the Walters matter, Number 024.

11:01:31 THE COURT: All right. Thank you. Good morning.

11:01:46 We have a pro hac motion?

11:01:51 MR. FARRELLY: Yes, Your Honor.

11:01:52 THE COURT: You want to be heard on it.

11:01:53 MR. FARRELLY: Thank you. Good morning again, Your Honor. Richard Farrelly.

11:01:56 THE COURT: Good morning.

11:01:57 MR. FARRELLY: Your Honor, I would like to move the admission of James Parker pro hac vice to represent our defendants in these two cases, Barbara Walters and Judith Kromenhoek, Numbers 24 and 25.

11:02:16 Mr. Parker is a partner in the law firm of Boyd Richards Parker and Colonnelli in Miami, and the clients have requested his assistance in the trials of these matters.

11:02:34 THE COURT: All right. I note that there's a certificate of good standing from the Florida Bar. It's dated April 3rd, 2014. Is there anything that has

occurred since that time that you need to bring to the Court's attention, Attorney Farrelly?

MR. FARRELLY: No, Your Honor.

THE COURT: So he remains in good standing, to your knowledge?

MR. FARRELLY: He remains in good standing, Your Honor, to my knowledge.

THE COURT: All right. Have Attorney Parker come forward, then.

(Oath administered.)

THE COURT: Attorney Parker, it's a pleasure to welcome you to the pro hac bar of the court. I'm sure you'll acquit yourself well.

I just remind you to make yourself aware of all the practices and procedures of the Court. They are online. And be prepared to adhere to all the ethical obligations in this court and according to the bar of this court, the District Court bar, as well as the bar association to which you are a member in Florida.

It's a pleasure to have you.

MR. PARKER: Thank you very much, Your Honor. I shall.

THE COURT: All right.

Attorney Bentz, why don't you tell us where we are.

MS. BENTZ: Your Honor, we filed our --

THE COURT: You can come to the lectern.

STATUS / ARGUMENT BY THE PLAINTIFFS

MS. BENTZ: We have filed our joint final pretrial order. It was filed Monday, actually Sunday, I think. And we were about to have the conference with Judge Miller, and we came over here. So that's where we are immediately.

THE COURT: Tell me, motion-wise, where we are --

MS. BENTZ: I have --

THE COURT: -- in the Kromenhoek case. I understand that there's some motions in the Walters case. There might be an issue because there's an issue of the plaintiff, and who would stand in the shoes, or if someone could even stand in the shoes of the plaintiff, whether that action can proceed.

Why don't you fill me in on that briefly. Then I'll give the movants an opportunity to be heard on their dispositive motions.

And then while you're going through that, just after you address those matters, you can let me know what your position is on what would happen if there were no federal claims pending before this Court.

Go ahead.

MS. BENTZ: Okay, Your Honor.

11:06:10 THE COURT: You can take them in any order.

11:06:14 MS. BENTZ: I might forget the latter.

11:06:17 Just for the record, Attorney de Leon is going to argue the substantive motions.

11:06:22 But right now, Barbara Walters and Judith Kromenhoek have pending two housekeeping matters, Your Honor. One is a motion to allow technology in the courtroom, which is docket number 202.

11:06:31 THE COURT: Okay. That's granted.

11:06:33 MS. BENTZ: Thank you.

11:06:34 And also --

11:06:34 THE COURT: That's granted for everyone who needs it.

11:06:37 MS. BENTZ: All right.

11:06:38 And then the other is a motion to consolidate these matters for trial.

11:06:41 The witnesses, the documents, the --

11:06:43 THE COURT: Right. Well, before we get to that, let's deal with some of the other things. That is, there's a survivability issue, I think, that may have to be addressed, because one of your clients has passed, correct?

11:06:59 MS. BENTZ: Yes, Your Honor. Let me get my dockets.

11:07:02 THE COURT: All right. So it would seem that

11:07:03 you don't have someone to whom you can report or from whom you can receive direction.

11:07:08 MS. BENTZ: That's not true, Your Honor. Let me respond to the Court's question.

11:07:14 As soon as I found that Ms. Walters had committed suicide, I called the opposing parties and I told them. I called the Court.

11:07:23 I then made contact with her only -- her daughter -- she has two daughters, but one that's the estate representative, her name is Liana Revock. She was also named as a witness in our Rule 26 discovery.

11:07:36 I then made contact with the attorney handling the probate in North Carolina. I have all the estate documents. I produced the certificate of death to the opposing parties.

11:07:47 I am waiting on a date stamped copy, but the probate has been filed in the -- I have non-stamped date copies, if the Court would like to review. But it's been filed in the State of North Carolina, Mecklenburg County.

11:08:02 And it was filed on, let me see here. It was filed with the law firm of Crosswhite -- Crosswhite Ashley and Johnson, PLLC, who are the attorneys representing the estate, and it was filed on May 27th, 2014.

11:08:23 I did not supply copies to the Court as yet because

I do not have the date stamp.

And when I saw Attorney Benham's motion --

THE COURT: I guess -- let me ask you this. I guess my question was really survivability. Isn't the Court in a better position if it considers the question of survivability first?

That is, if the action is extinguished, then there's no need to talk about substitution, correct?

MS. BENTZ: We don't believe it's extinguished, Your Honor.

THE COURT: I'm asking a hypothetical. Then I'll get to this case. But if an action is extinguished, there's no need to talk about substitution, correct?

MS. BENTZ: If it is; but we don't believe it is.

THE COURT: Okay. We'll get to that.

MS. BENTZ: Okay.

THE COURT: Now with respect to the federal claims, is it your position that those claims survive the death of the plaintiff?

MS. BENTZ: Yes.

THE COURT: Okay. And then tell me the authority for that.

MS. BENTZ: That, I have to refer to

Attorney de Leon. I don't know.

You understand, this motion was just filed last night by Attorney Benham at 6:00 o'clock. We did do an internal memo when Ms. Walters passed away, and Attorney de Leon prepared that.

I would ask the Court to allow her to argue that substantive issue. But we haven't had a chance to even respond to the motion because it was filed last night. But I'm going to turn it over to Attorney de Leon to address that portion.

THE COURT: Well, no, because I'm going to -- you'll get a chance. Because the movants or the person who raised the issue are on the defense side, so I'll have them put their issue before the Court. That's on the Walters matter.

I don't know if you had addressed, or plan to address -- do you have a position with the, what should happen if the federal claims do not survive?

MS. BENTZ: Well, the heart of the issue, the heart of the case is the federal claims, Your Honor. So I don't have a position --

THE COURT: I guess my question is really a jurisdictional one.

That is, you're before the Court on federal -- on the basis of federal question jurisdiction, correct?

11:10:24 MS. BENTZ: Yes.

11:10:25 THE COURT: Okay.

11:10:26 MS. BENTZ: Three statutes.

11:10:27 THE COURT: All right. So if there is no
11:10:30 federal question before the Court, then this case would
11:10:34 fall into that area of supplemental jurisdiction that
11:10:38 the Court may or may not exercise, if we get to that
11:10:41 point, correct?

11:10:42 MS. BENTZ: That would be Your Honor's
11:10:44 prerogative, yes.

11:10:45 THE COURT: All right. We'll go in this order.
11:10:47 Attorney -- thank you, Attorney Bentz.

11:10:52 MS. BENTZ: Your Honor --

11:10:52 THE COURT: You'll get a chance to argue
11:10:53 everything. But I think since the motions are largely
11:10:57 on the defense side, or the issues that have been raised
11:11:00 by the defense with respect to the merits and with
11:11:03 respect to the survivability, I think what we'll do is
11:11:06 we'll hear from the defense first.

11:11:07 Then you'll get a chance to respond, so you can
11:11:09 have clearly before you what it is that defense raises
11:11:15 as matters --

11:11:16 MS. BENTZ: Just one more motion; the motion to
11:11:19 consolidate, which of course will decide whether or not,
11:11:23 whether or not we have a longer trial or two trials.

11:11:25 That is at docket number 180, Your Honor. And I can address that later, after you've heard the substantive issues.

11:11:30 THE COURT: Okay. Very good.

11:11:31 MS. BENTZ: Thank you.

11:11:32 THE COURT: Okay, Attorney Benham.

11:11:55 MR. BENHAM: Good morning, Your Honor.

11:11:57 THE COURT: Good morning.

11:11:57 ARGUMENT BY DEFENDANT TALKINGTON

11:11:58 MR. BENHAM: John Benham on behalf of Lance Talkington.

11:12:01 As I understand where we're at right now is addressing the issue of the motion to substitute parties, to add Leanna Walters Rebak as the representative of the deceased plaintiff, Barbara Walters.

11:12:19 Yesterday, that's correct, I filed an opposition to the motion to substitute. The motion to substitute was filed on May 19th. We filed our opposition yesterday, May 26th, as document number 211 in the Walters matter.

11:12:41 The -- I note from counsel's colloquy with the Court immediately preceding this, states that the sole -- she identifies in the motion to substitute states Leanna Walters Rebak is the sole heir of Barbara Walters.

11:13:03 I would understand now, according to counsel's statement, that there are actually -- that Barbara Walters is actually survived by two daughters, and Leanna Walters Rebak is only one of them.

11:13:14 The -- I have not seen any of the probate papers that are referred as to having been filed in North Carolina. The only thing I've seen is a death certificate of Barbara Walters indicated that she died via gunshot wound to the head on April 22nd.

11:13:34 As to the substance of our opposition, Your Honor, first, the first part goes to who is Leanna Walters Rebak.

11:13:42 She -- it is stated in the motion that she is the sole heir and personal representative. But, of course, she can't be the personal representative of Barbara Walters unless there has been --

11:13:54 THE COURT: Well, before we get to that, does the action, or do the several federal actions survive Ms. Walters' death?

11:14:06 MR. BENHAM: The only action that I addressed in my motion, Your Honor, is the claim against Mr. Talkington, of course, which is based on Section 3617 of the -- of Title 42 portion of the Fair Housing Act Amendments of 1988.

11:14:22 It is our position that that claim does not survive

the death of the plaintiff in this matter. The -- and I understand, and I've discussed it in my, in my motion papers, that this Court has previously addressed the flip side of this issue, when looking at whether or not claims survived against Alfred Felice when he died, whether now we've got the opposite side of the issue as to whether or not the claims survive for the proponent of those claims, and can be carried on by her representative.

Our position is that, number one, you would look at the -- under the Supreme Court case of Robertson v. Wegmann, which is cited also by the Court in its previous order in the Walters' case. It was document number 116 that was filed on June 14th of 2013.

In that order -- and Your Honor, with all due respect, I think that the Court skipped a step by jumping first to the -- by jumping straight into the issue of federal common law, and whether or not the Fair Housing Act in general was a remedial or a penal statute.

I believe if the Court reviews Robertson v. Wegmann from 1978 Supreme Court, found at 436 U.S., 584, you don't get to the question of federal common law until you first find that state law is inconsistent with federal law.

In Robertson v. Wegmann, the Court found that merely because the Louisiana survivorship provisions would not allow the case to go forward on behalf of Mr. Wegmann, who was the executor of the deceased plaintiff -- of the estate of the deceased plaintiff in that case.

The Supreme Court reversed the lower court and found that no, merely because under Louisiana law his claim does not survive, does not mean that Louisiana law is inconsistent with federal law. In the words of the Court, merely because the plaintiff loses, doesn't make the law inconsistent with federal law.

I would -- and also we have cited to the Court in our motion the, at this point at least, unreported in the Fed Supp --

THE COURT: In Wegmann, what was the underlying claim?

MR. BENHAM: He had been -- it was --

THE COURT: Was it a --

MR. BENHAM: If the Court remembers the movie with Kevin Costner, where he played the Jim Garrison, the district attorney of the City of New Orleans, where he sought to prosecute people for being involved in a conspiracy to assassinate President John F. Kennedy, Mr. Clay Shaw was one of the defendants who was -- the

11:17:28 case was dismissed.

11:17:30 Mr. Shaw then turned around and sued the district attorney, Jim Garrison, and others for malicious prosecution. And there were other associated claims also, Your Honor, but that was the gist of his claim, that Garrison had maliciously prosecuted him.

Not only when the first case with Mr. Shaw, he was acquitted by a jury, the case actually went to jury trial, and then Mr. Garrison, the district attorney, turned around and filed another action against him, claiming he had committed perjury during the trial, in which he was acquitted. That, of course, would have been barred by collateral estoppel under the principles of any state, I believe.

Mr. Shaw then turned around and sued District Attorney Garrison and other persons. During the course of -- then it settled into the routine of a normal civil case.

And during the course of it, Mr. Shaw died. His estate was opened up. The Court in Louisiana found that even though the claims of Mr. Clay would not survive -- would not survive if found that the federal claim under Section 1983 did survive because of Louisiana statute, was held to be inconsistent with federal law.

The U.S. Supreme Court reversed, finding that, no,

it was not inconsistent with federal law just because under that, when you apply that law, the plaintiff loses, that doesn't make it inconsistent with federal law. It is -- we are still a law -- a country of many states and we don't get to just -- federal courts are not allowed to just discard state law on the basis that it doesn't further the plaintiff's case.

We have the same thing here, Your Honor. Under the Virgin Islands survival statute and survival statutory scheme, we have first the Title 5, Section 77 of the Virgin Islands Code, which is our general tort, which is our tort survival statute.

Under our tort survival statute, it is limited to claims for physical -- resulting in physical injury to the person.

That -- none of the claims of Plaintiff Barbara Walters in this case allege physical injury to the person. All of her claims are that she was discriminated against because -- on the basis of handicap in the federal claims. And then the state -- the Virgin Islands claims are for emotional distress, intentional infliction of emotional distress, invasion of privacy.

None of these involve physical injuries to the person. They are all emotional harm. And the current

Restatement of Torts draws a clear line between those two types of distinctions.

I believe the Court can look to that for persuasive authority, regardless of whether those particular sections of the newest Restatement of Torts have been specifically adopted in Virgin Islands law.

So we have under Virgin Islands law, these claims don't survive. Then the question is: Is the Virgin Islands statute inconsistent with federal law?

And under the teachings of Robertson v. Wegmann, and it is our position that, no, the Virgin Islands survival statute is not inconsistent with federal law. The Virgin Islands statutory scheme retains a survive -- the successor of the estate can prosecute numerous claims subsequent to the death of the claimant.

But the Legislature has made the decision that certain claims do not survive, and the ones that do not survive are the ones that do not -- at least as far as tort claims -- do not stem from a physical injury to the person.

The Court in -- the District Court in the District of Idaho was faced with somewhat -- with analogous circumstances in this case, in the matter of Community House, Inc., v. City of Boise. It is not recorded in the Fed. Supp. Second. It is found at 2012 WL, in the

Westlaw system, 368, 6001. This is also cited in our motion.

In the Community House case, one -- and I would note from the -- although not set forth in the motion, this case had a long history in Idaho, back and forth two -- at least two times to the Ninth Circuit on various issues.

If you'll note the case number, just from the face of the case is a 2005 case number. The decision I'm referring to is one that was issued by the court in 2012.

The litigation is, I would understand from the history of the case, has finally been resolved by trial last year. But this was a long-running case.

One of the plaintiffs, Greg Luther, who was suing for the same sort of federal claim as the Plaintiff Barbara Walters, he claimed that he had been discriminated against on the basis of handicap in violation of the Federal Fair Housing Act Amendments. He died shortly before the case was set for trial.

The Court was also faced with the situation there where it had no proper -- nothing had been given to the Court indicating that the, that an estate had been created for Mr. Luther, or there was any clear legal representative to continue the case for him.

But the court is -- as I would understand this Court is doing is, first, went to the issue of are the claims extinguished or not?

And the Community House court found that under the -- that the Idaho survival statute, which is very much, worded very much the same as the Virgin Islands survival statute, limited to claims for personal injury and property damage, did not -- would not allow Mr. Luther's claims to survive his death.

The Court found that the Idaho survival statute was not inconsistent with federal law, and ruled that his claims did not survive under the teachings of Robertson v. Wegmann, and he should not -- that these claims are not allowed to go forward, and Mr. Luther's claims died with him.

I would submit that the Court should adopt the same reasoning that Robertson v. Wegmann, and as explained further in the Community House case, that this, these cases are -- the circumstances that the Court is facing in this matter and the Walters' case are the same -- calls for the same result as in those matters --

THE COURT: To whom would the Court address its order?

That is, Ms. Walters has passed.

MR. BENHAM: Yes.

THE COURT: So she is not giving any directions to anyone at this point. So Attorney Bentz is not receiving any instructions from her.

If we don't get to the issue of substitution, which I believe is contingent on the Court first getting to the issue of, "is the claim extinguished," does it survive, if there's no substitution, to whom does the Court address this?

Do I just dismiss it? It being the Walters claim.

MR. BENHAM: That would be my understanding, Your Honor, is that you would just dismiss it.

There is no party --

THE COURT: That is, Attorney Bentz stands here and she has no living client. Ms. Walters is not alive. And she offers someone as a substitute, but I don't reach -- at least the Court's view is I don't reach substitution until I determine extinguishment. If I determine extinguishment in a way that's adverse to her, is there anything for Attorney Bentz to do receive? Or does the Court just dismiss the matter?

MR. BENHAM: I would think the Court would dismiss the matter. And it would be a final judgment at least -- well, at least as to Mr. Talkington, and I would understand other defendants would be --

THE COURT: Assuming it is the same principle

11:25:54 applies to all of the others, because to the extent the federal claims don't survive there either -- well, you can only speak for Talkington, but go ahead.

11:26:06 MR. BENHAM: Your Honor, I would understand what would happen is that assuming that the estate is actually created and that a person is appointed by the Probate Court, that that would be the person who would seek substitution for purposes of appealing, taking an appeal of the Court's order, because it wouldn't be final judgment --

11:26:28 THE COURT: Doesn't Rule 25 and the Virgin Islands statute say if the claim survives, or language to that, then it goes on to substitution?

11:26:40 I think Rule 25, if a party dies and the claim is not extinguished -- that's the first word so -- and the claim is not extinguished. So we have the first part, someone has died. The party has died.

11:26:53 And the question, assuming just for the sake of argument the claim is extinguished, then I don't need to get to the second part. Is that your understand- --

11:27:05 MR. BENHAM: No -- correct, Your Honor. You do not get past the, the beginning part of Rule 25(a).

11:27:11 THE COURT: So tell me why you were mentioning the part about having probate, and thus -- I thought you were getting to a discussion about whether, who would

stand in the shoes of Mrs. Walters.

MR. BENHAM: I understood that the Court was saying if you -- I was trying to respond to the Court's question. I had thought that the Court was saying: Well, if I rule against -- if I rule that these claims are extinguished and that they cannot, and that there is no basis for substitution, then who would I issue the order to on the side -- on the plaintiff's side? Because Barbara Walters is no longer -- she's dead.

If the Court has no, you know, it can't affect her, Attorney Bentz has no -- her authority to act for Ms. Walters clearly terminated upon the death of Ms. Walters. That's the ultimate termination of the attorney-client relationship.

But I think the Court's order would simply be, these claims do not survive, these claims are dismissed. It would then be up to the plaintiff to take whatever steps it thought necessary in order to preserve that issue, if they were to take it up on appeal.

THE COURT: All right. Let me hear you on the -- well, actually, no, that takes care of those federal claims.

Let me hear from Attorney -- who is speaking? Attorney Meade?

Thank you, Attorney Benham?

11:28:50 Not just yet. Probably after Attorney De Leon addresses the issue then we'll come back around.

11:28:53 All right. First we'll hear you on the survivability issue, and then we'll deal with the -- actually no, you represent Felice. Let me pass you for a moment, then, since there are other issues that are attendant there.

11:29:09 Who is speaking for the board, et cetera?

11:29:18 MR. RIOPELLE: I will, Your Honor.

11:29:18 THE COURT: All right. Come to the lectern. Deal with the survival issue and then we'll deal with the substantive issues, the other substantive issues.

11:29:27 MS. BENTZ: Your Honor, I would note for the record that the board did not file a motion to this -- on this point.

11:29:34 THE COURT: All right. Go ahead. You can deal with the survival issue and then deal with the substantive issues.

11:29:40 ARGUMENT BY DEFENDANTS COWPET, HARCOURT, VERDIRAMO, COCKAYNE

11:29:42 MR. RIOPELLE: Your Honor, formally the clients that I represent, which is the association, Harcourt, Verdiramo, Cockayne, and theoretically the board, if that's an actual viable defendant.

11:29:56 We join in what Mr. Benham has argued. We think

the additional claims that are not addressed against Talkington, the same vein is relative to the causes of actions against my clients. They are fair housing claims, ADA Claims, and then there are some local claims.

Again, nowhere in the second, first, second, third fourth amended claim, whichever one -- at some point we'll address which one we're moving under -- nowhere in there is an allegation of any physical injury.

And so I would submit and join Mr. Benham's argument that the survivorship of the FHA, they don't provide, they don't provide anywhere in the statute for survival claims.

And this relevant clause recites the fact that it looked at the local law. And that following the simple path brings us to the Virgin Islands statute that Mr. Benham had raised. Clearly in the first sentence, the only things that survive are causes of action that relate to physical injury to a person.

I would join with Mr. Benham, that I don't believe these claims, first and foremost, survive, and I don't think we need get to --

THE COURT: Let me hear you on the summary judgment then, with respect to the federal claims.

MR. RIOPELLE: On summary judgment, Your Honor?

THE COURT: Yes.

MR. RIOPELLE: Okay. To Kromenhoek or the Walters' claim?

THE COURT: Kromenhoek.

MR. RIOPELLE: Well, Your Honor --

THE COURT: I suspect that they're identical, practically. So it would really -- aren't they pretty much identical?

MR. RIOPELLE: The arguments are that there are no disputed facts and they have not proven their case and they can't prove their case. In that respect, they are identical. The facts are different.

But I think the law goes to the point, but it's up to your Honor --

THE COURT: All right. Go ahead with Kromenhoek.

MR. RIOPELLE: Kromenhoek, Your Honor, we filed summary judgment motions on behalf of Cowpet Bay West Condominium Association/the Board, Max Harcourt, Robert Cockayne and Vincent Verdiramo.

We filed those on behalf of those clients as to the second amended complaint, because one of the housekeeping things that haven't been dealt with is -- there's a second amended complaint. There's also two pending motions for leave to file a third and a fourth--

THE COURT: Just deal with the summary judgment. Let's deal with what we have before us. Go ahead.

MR. RIOPELLE: As to the summary judgment, the initial claims against Mr. Harcourt and the condominium relate to the Fair Housing Act. And that's 3604(3)(b) and 3617. The first count of 3604(3)(b) relates to our reasonable accommodation request.

And we believe -- the law is very clear, that there has to be a disability, that the association or in this case the association should have known the disability, that they did know of it, that they, and that they denied her housing -- or her request.

And in this case we believe it's undisputed -- here is what the disputed facts say.

At best, the association found out that there was paperwork in the file of Ms. Kromenhoek at the office manager's office at the condominium in October of 2011.

Many of the residents around the community had seen Ms. Kromenhoek and Walters --

THE COURT: Well, the facts aren't -- there aren't that many disputes with respect to the facts. That is, there is no dispute that Ms. Kromenhoek wanted to have a dog on the premises, correct?

MR. RIOPELLE: Correct.

11:33:25 THE COURT: There's no dispute that she had a dog on the premises, correct?

11:33:29 MR. RIOPELLE: Correct.

11:33:29 THE COURT: There's no dispute that there was some communication of some kind in 2011 pertaining to the dog, correct?

11:33:35 MR. RIOPELLE: Well, that, I can't say it's correct or not, Your Honor. As far as what you mean by communication, there was no communication directly to the board related to --

11:33:45 THE COURT: Listen to my question. There was some communication in 2011 pertaining to the dog, correct?

11:33:50 MR. RIOPELLE: Correct.

11:33:51 THE COURT: All right. And then there was some other communication in 2012 pertaining to the dog, correct?

11:33:58 MR. RIOPELLE: Correct.

11:33:59 THE COURT: And there was a fine of some sort or some sort of penalty that was imposed, but not collected, correct?

11:34:06 MR. RIOPELLE: Correct.

11:34:06 THE COURT: And then there was a subsequent decision to allow Ms. Kromenhoek to have the pet, correct?

11:34:15 MR. RIOPELLE: Correct.

11:34:18 THE COURT: But there's no dispute to any of
11:34:20 that, what I just said, correct?

11:34:22 MR. RIOPELLE: I think that's fair, Your Honor.

11:34:24 THE COURT: All right. Ms. Kromenhoek lived at
11:34:27 the premises throughout the duration of the events I
11:34:30 just spoke of, correct?

11:34:33 MR. RIOPELLE: To my knowledge, yeah, that's
11:34:35 correct.

11:34:35 THE COURT: As did the pet, correct?

11:34:37 MR. RIOPELLE: Correct.

11:34:38 THE COURT: Tell me what other relevant facts
11:34:41 there are.

11:34:41 MR. RIOPELLE: I think that's a very good
11:34:44 simplification of the facts, Your Honor. And the
11:34:46 reality is is that the plaintiffs in both cases
11:34:48 submitted paperwork --

11:34:50 THE COURT: Then speak to me about the law,
11:34:52 then.

11:34:53 MR. RIOPELLE: The law. The law is very
11:34:54 simple, Your Honor. Let's assume that they're disabled.
11:34:59 The fourth element, which is the most important in this
11:35:01 case, is there has to be a denial of the accommodation.
11:35:05 And what you just recited as far as what the fact
11:35:07 are, they live there, the plaintiffs lived there with

their dog. There was a fine held in abeyance and waived. And eventually in March 2006 -- 2012, March 26, 2012, when the plaintiff formally handed the paperwork in confidential manner to the board president, we held a closed door meeting, we considered the paperwork for the first time.

THE COURT: This is not an eviction, but I'm sure you're familiar that in certain cases when it comes to evictions, you can have a constructive eviction, that is, someone can say you're on the premises, but they turn off the water, for instance.

Is that the plaintiff's argument here?

Sure, they're on the premises, but you've got this cloud, this thing over their head, and you've got these fines that are weighing down on them.

Is that the equivalent of a constructive denial?

MR. RIOPELLE: I don't believe --

THE COURT: What is the authority that goes one way or the other?

MR. RIOPELLE: They've cited and so we have cited different cases related to a time frame.

If someone submits an application, you take a few months to make a decision, is that considered a constructive denial? The case law goes both ways.

I think the important aspect here is that -- and

one fact I think is the most important fact in the whole case -- the association never had the actual paperwork to review until March 2012, and they immediately accommodated her.

THE COURT: Well, there was some communication that was provided to someone, and that was passed on to someone else in 2011, correct?

MR. RIOPELLE: That information was not passed on to anybody of the board. There was knowledge that there was paperwork, for instance, there's paperwork on your desk, that it's there, but there was no -- and there is no evidence that --

THE COURT: Assuming for the sake of argument that that was provided to someone, and the reasonable expectation is that that would have been forwarded, that is, I don't think that most people would expect that if you go to a certain entity and you turn in a document to the receptionist, that it won't get to its desired address.

So assume for the sake of argument that something was communicated in 2011. How does that affect your position?

MR. RIOPELLE: It doesn't, Your Honor.

There are case law that we've cited in our summary judgment motions that indicate, for instance, there was

an association, someone made a request, they said: You know, we need to figure this out, how do we even handle this accommodation request? We're going to give you essentially -- you can hold on to your dog, whatever your request may be, until we make a determination of what we need to do. And that case --

THE COURT: Is there record evidence that in 2011 Mrs. Kromenhoek had her dog?

MR. RIOPELLE: Beyond her own handwritten statements in her complaint, no, because there's no deposition testimony here.

THE COURT: Okay. But the allegations in the pleading indicate that the dog was on premises in 2011.

MR. RIOPELLE: To my knowledge, yes, Your Honor.

THE COURT: Go ahead.

MR. RIOPELLE: So as I was saying, there is no definitive case law in their favor stating that, assuming that sometime in 2011, in the fall of 2011, there's communication.

And assuming we knew about it, which I think a side note is she did hand it to the officer -- I mean the property manager with instructions to keep it secret and let no one see it; so I think it's slightly different than giving it to a secretary at a business.

But assuming it's fall 2011, and we formally vote and review it in March of 2012 and granted the accommodation, there is no denial.

I don't believe that period of time was a constructive denial. We sent them the correspondence saying: There are going to be fines; however, they are going to be held in abeyance until we determine how we're going to go about dealing with an accommodation and developing a policy and procedure.

THE COURT: When was the communication that there was going to be a fine? When was that made?

MR. RIOPELLE: I believe in January of 2012, Your Honor.

THE COURT: All right. And that was a consequence of what, preceding that communication?

MR. RIOPELLE: The board was informed by the office manager that there was, quote, paperwork in the office. They couldn't see it.

And so many residents had looked around and said: There is people on our property with dogs. What's going on?

So as part of the board's response, their fiduciary duty, they asked Ms. Kromenhoek and Ms. Walters: We understand you have paperwork, but can you please provide it to us so that we can look at it, consider it,

11:39:29 and determine if there's an exception to the no dog rule?

11:39:32 They didn't. They responded by saying: It is none of your business.

11:39:35 And that was in October of 2011.

11:39:37 THE COURT: All right.

11:39:38 MR. RIOPELLE: Ms. Kromenhoek said that Mr. Harcourt, the board's president, could review it in confidentiality, but could not tell anybody else what was on it, and would just have to tell the board that it was okay.

11:39:52 And that's not how the law works. It's not how the procedures work for an accomodation of the -- under the FHA.

11:39:57 So they filed their HUD complaints. And part of the conciliation process, the conciliator and investigator for HUD from San Juan convinced Ms. Kromenhoek and Ms. Walters to finally actually hand-deliver the paperwork to the board, and we immediately convened the meeting, conferred, agreed and granted their accommodation, and provided that in writing, including the fact that we waived their fine.

11:40:17 And the HUD investigator in both cases found it was the exact same statement of facts, that their accommodation request was not made until March 2012, and

11:40:27 thereafter it was immediately granted.

11:40:29 THE COURT: All right. There's an FHAA claim
11:40:35 and an ADA claim as well. What's your position with
11:40:40 respect to those claims?

11:40:41 MR. RIOPELLE: The ADA claims, Your Honor, I
11:40:44 think it's fairly simple. There's literally hundreds of
11:40:46 cases around the country that state that condominiums
11:40:49 are not subject to ADA, because they're not a place of
11:40:52 public lodging.

11:40:52 The plaintiffs try to counter that and have
11:40:55 attached in the record evidence ads from individual unit
11:40:58 owners trying to rent their units.

11:41:00 That doesn't make the condominium association
11:41:04 applicable to the ADA. The ADA is for public housing.
11:41:07 There's not a gazebo there. There's not a restaurant
11:41:10 there.

11:41:10 THE COURT: So you would agree that if a
11:41:12 condominium association has rooms, and those rooms or
11:41:22 apartments are let in a way that you would -- you have a
11:41:25 hotel plan, let's say, that it could be construed as a
11:41:28 public accommodation, couldn't it?

11:41:32 MR. RIOPELLE: I would agree with you, Your
11:41:33 Honor. That's not the case here, but I would agree with
11:41:35 you.

11:41:35 THE COURT: All right. Now tell me what's the

record evidence that indicates -- since it's your burden -- to indicate that you're entitled to judgment as a matter of law.

MR. RIOPELLE: Under the Celotex case --

THE COURT: Well, listen to my question. Point me to the record evidence that indicates that you are not a public accommodation, that is, why you shouldn't be treated like a condo that has a hotel plan.

Is there someone or some thing that says that it does not operate like a hotel? Yes or no.

MR. RIOPELLE: No, Your Honor. There is no record evidence on either side that is produced to show --

THE COURT: But it's your burden, correct?

MR. RIOPELLE: My argument, Your Honor, under the Celotex case is that if the plaintiffs -- there is no record evidence. They've missed their burden. Our burden under the Celotex case demonstrates that there is no record evidence, discovery has occurred, and there's nothing out there.

There is no burden -- there is no way we can bring a burden because there is no record evidence we could show to demonstrate that the Cowpet Bay West is not a public place of lodging.

The only record evidence, as I said, is an

11:42:35 individual owner's ad as to their individual unit. There is no record evidence of the condominium association owning the unit--

THE COURT: Well, when you say there is none, that is, is there some declaration, some affirmation, some deposition, sworn testimony that says: Cowpet operates as an individual residence thing for each of the persons who own their units. It is -- there is no hotel plan here?

Did someone say that?

MR. RIOPELLE: I'm sure it's in the bylaws and declarations in 1968. But I can't cite you to the specific provision at this point.

But it's clearly --

THE COURT: Because you can appreciate that you would have to meet your burden to show some sort of facts that would show that you're entitled to judgment as a matter of law.

And then -- well, first, you would have to show that there are no dispute as to the facts. That's a factual issue to some degree, right? It's a fact-dependent issue?

That is, if Attorney Bentz, if you said that Attorney Bentz could say: Well, I've got a flyer here and someone who swore in a deposition that they rent

rooms, just like a hotel does.

So tell me what facts you believe I should be looking at, that would indicate what sort of accommodation you have here.

MR. RIOPELLE: Your Honor, I believe the declaration and the bylaws of the condominium clearly indicate that this is a place of condominiums, and it's registered with the Virgin Islands.

And under the Condominium Act -- and to be clear, I think there is case law evidence in our summary judgment motion that if the plaintiffs have provided no record evidence, after a substantial amount of time for discovery, and there isn't any, then there isn't the essential burden on the defendant on the summary judgment motion. It should be automatically granted, because the plaintiffs cannot prove their case. And they have not.

THE COURT: Now, are you saying that there is some deposition or other discovery that you have -- that indicates that the property is treated as something other than a public accommodation, something for transient lodging?

MR. RIOPELLE: No, Your Honor. There is no deposition --

THE COURT: Or something that shows that it is

something other than transient?

I'm sort of talking in the negative. Do you have something that indicates that this is not -- that this is -- what's the opposite of transient? -- permanent residence?

MR. RIOPELLE: Your Honor, not in my hands. I do know the declaration and bylaws specifically throughout there describes what the community is. It is not a community -- most of the rentals, like I said, none of them are owned by the condominium. So I can't cite to you a specific provision at this time, Your Honor.

But this condominium was incorporated 50 years ago as a condominium, not as a transient resident place. There's no place of public lodging. And plaintiffs in their opposition have not raised any evidence or facts or law to suggest otherwise.

And there's a series of case law from every circuit around the country, clearly indicating condominium associations, any of the resident apartments are not considered ADA.

THE COURT: All right.

Now, assuming just for the sake of argument that you haven't met your burden with respect to that, is there anything else that you would point to as a matter

11:45:49 of law that would, that strengthens your case with
11:45:53 respect to the ADA claim?

11:45:55 MR. RIOPELLE: I mean, nothing more than as I
11:45:58 stated before --

11:45:59 THE COURT: So your claim or your petition for
11:46:01 summary judgment on the ADA claim rises or falls
11:46:07 depending on how the Court treats the public
11:46:10 accommodation issue; is that correct?

11:46:11 MR. RIOPELLE: Correct. We do not believe the
11:46:13 condominium association is subject to the ADA. They are
11:46:17 subject to the FHA.

11:46:18 THE COURT: Okay. No, I can appreciate what
11:46:20 you believe, but what I'm asking you now is just for
11:46:22 the, just show me the record evidence that shows that
11:46:25 you meet your burden.

11:46:26 Okay, anything else?

11:46:27 MR. RIOPELLE: No, Your Honor.

11:46:28 I believe there's a lot of record evidence on
11:46:31 behalf of the plaintiffs that have failed to prove their
11:46:33 burden. I don't think it goes to the plaintiff -- the
11:46:34 defendant's side to actually prove their own burden.

11:46:37 I believe the case law demonstrates that if they
11:46:39 cannot, after a substantial period of time of discovery,
11:46:41 and they submitted no record evidence that the Court has
11:46:43 a --

THE COURT: But in summary judgment, isn't it the movant's burden first to show by way of deposition, affidavit, declaration, some other thing, that you're entitled -- that, one, there's no dispute -- material facts in dispute, and, two, you're entitled to judgment as a matter of law?

So with respect to that issue of public accommodation, it seems, I would expect that the plaintiff is going to get up and say: They haven't met their burden, I've alleged as much. They haven't met their burden to show that I cannot meet this. This doesn't survive summary judgment.

So in the first instance I'm asking you for any sort of indication on the record that addresses that. And you're saying, look at the declaration.

MR. RIOPELLE: I'm not telling you to look at it. I'm suggesting it's in there, and I -- given ample opportunity, I would provide the specific subsection.

What I am saying also in addition that, I cited in my summary judgment standard --

THE COURT: Is that enough, though, that is, the declaration?

Let's assume for the sake of argument that the declaration says this is an association, the units are for permanent residency, and may not be used as X, Y, Z.

Is that good enough for the public accommodation issue?

Is it resolved by looking at that alone?

MR. RIOPELLE: Your Honor, I don't know, to be frank with you, with regard to that question.

I believe that in my summary judgment standard there is case law that says if they have not met their burden in the discovery, the Court doesn't even have to go to the summary judgment standard.

If they have not proven, the Court shall dismiss the case. And as to that count, because they have not, after two years, demonstrated any evidence to support their claim. Now, the only record evidence, I could have gotten an affidavit from a board member saying we don't rent out units, Your Honor. And Your Honor if that's what's necessary, then that's something I have here today.

THE COURT: All right. Thank you.

Attorney de Leon.

We've covered all the defendants, correct?

All right. Attorney de Leon.

MR. BENHAM: Your Honor, did you want to hear our point on any part of the summary judgment motion?

THE COURT: Well, let me hear what Attorney de Leon has to say.

Well, actually, to be fair, so we can just have you up once and you can cover everyone. Attorney Benham, yes.

MR. BENHAM: Thank you, Your Honor.

ARGUMENT BY DEFENDANT TALKINGTON

THE COURT: Attorney Benham, if the, if the claim doesn't survive, do we reach the summary judgment issues with respect to you?

MR. BENHAM: I was -- I have not filed a motion for summary judgment in the Walters case, Your Honor, only in the Kromenhoek matter.

THE COURT: Right.

MR. BENHAM: Because at the time I was preparing the summary judgment motion, Mrs. Walters died.

THE COURT: All right.

MR. BENHAM: I had no opposing party to make a motion for summary judgment against, so I confined my motion for summary judgment to strictly the Kromenhoek matter.

THE COURT: All right. Let me hear you on the Kromenhoek SJ.

MR. BENHAM: As to the Kromenhoek case, we filed our motion for summary judgment on Document Numbers 189 through 191, comprised the motion,

statement of facts and memorandum in support, filed on May 1 of this year.

The claim, there's only one federal claim against Defendant Lance Talkington, which is that he violated -- that he was in violation of Section 3617 of Title 42 of the Fair Housing Act Amendments of 1988 --

THE COURT: So the sole claim is in FHAA?

MR. BENHAM: FHAA.

THE COURT: Go ahead.

MR. BENHAM: There is no ADA claim against Mr. Talkington. Mr. Talkington is not a member of the board, never --

THE COURT: He's a blogger.

MR. BENHAM: He's a blogger, correct.

THE COURT: Go ahead.

MR. BENHAM: And if I were here to advise him again before that, we would not be here. But be that as it may, he did create a blog, and that blog was created and opened to all of the owners in the Cowpet Bay West Condominium community.

That blog covered many topics, not just the no dog rule which is at the heart of this litigation.

The, as an exhibit to our motion for summary judgment motion, Mr. Talkington authenticates all the pages of the blog that refer to the no dog dispute, for

11:51:44 lack of a better term.

11:51:45 I think the Court needs to review all of those and choose to determine whether or not any of these could be realistically deemed to be interference with the plaintiff's rights under the Federal -- Fair Housing Act Amendments. It is a --

11:52:03 THE COURT: What would be an example of something that is? Give me an example.

11:52:09 MR. BENHAM: Of interference?

11:52:11 THE COURT: Yes.

11:52:12 MR. BENHAM: Like threatening someone.

11:52:14 THE COURT: Okay. Like what?

11:52:17 MR. BENHAM: "If you move in here, I will firebomb your car."

11:52:21 THE COURT: Does it have to be that overt?

11:52:24 MR. BENHAM: And, "I don't want your dog on this property, making a mess. And if that happens, I will kill your dog." That would be a threat.

11:52:32 THE COURT: Does it have to be that overt?

11:52:34 Can't there be more subtle threats, that would amount to something that -- I'm using the word "threat" too much, but something that is an interference?

11:52:47 MR. BENHAM: There are other things that have been found by the Court to be interference.

11:52:50 We recite to them in our memo on page -- excuse me

11:52:55 a moment, Your Honor. Pages 8 and 9 contain an
11:53:01 extensive quotation from the Court in the Sporn v. Ocean
11:53:09 Colony Condominium Association, found at, which
11:53:14 contained, which basically canvassed a number of cases
11:53:19 saying what type of conduct can and does and does not
11:53:23 constitute interference with, to rise to the level of
11:53:27 violation of 3617.

11:53:31 And the Sporn case held that there's no federal law
11:53:36 that requires people, neighbors, to be polite to each
11:53:39 other. But things that can rise, you don't have to,
11:53:45 don't have to burn a cross on somebody's lawn. You
11:53:48 don't have to firebomb their car, you don't have to
11:53:53 paint swastikas on their front door, but you certainly
11:53:58 have to have more than just a squabble, just a
11:54:00 disagreement over an issue.

11:54:01 And there's nothing in this, in this matter that
11:54:05 indicates that Mr. Talkington did anything other than
11:54:09 disagree with Mrs. Kromenhoek's position that she was
11:54:13 entitled to have an emotional support animal at the
11:54:19 condominium.

11:54:19 And in fact, he didn't even rise to the level
11:54:21 disagreeing. His position was, if we're going to do it,
11:54:26 we've got to have a rule.

11:54:27 If you look at the very first page of the blog on
11:54:30 this, Mr. Talkington's position isn't that we can't have

11:54:34 dogs. Mr. Talkington's position is: If we're going to have dogs, then we have to have rules that comply with the federal law.

And there's a back and forth debate, including Mrs. Kromenhoek. She chimes in. There's Mr. -- there's -- it's a community issue. It was not a private issue.

Everybody at the condominium could see these dogs. And everybody also knew that the rules and regulations of this condominium, ever since it was created in 1968, the rules and regulations said that no dogs, farm animals, whatever, were allowed on the property.

So clearly a question of interest to all of the owners in the community is, why are these dogs here? What is the, are they to be allowed? There is nothing that says that mere -- because other people disagreed with Mrs. Kromenhoek's position on the blog, that that somehow was interference with her rights.

THE COURT: All right. All right. I think --

MR. BENHAM: The other point that needs more -- one of the legal issues we raised in our case, of course, is the immunity that is offered to -- that is provided to Mr. Talkington by the Federal Communications Decency Act. That -- it's our position that under that federal law, that Mr. Talkington is -- it offers an immunity to claims based on postings on the blog that

are authored by other people, meaning that there's been numerous references to the blog entries posted by Mr. Felice or other people who disagreed with Ms. Kromenhoek's position, and saying that Mr. Talkington is somehow responsible for those. He's not. Legally, he is immune.

The most analogous situation with regards --

THE COURT: But I don't even have to reach that issue if the -- it's threats, coercion, interference, if that element cannot be even proven, do I even need to get into, the Federal Communication Decency Act?

Or are you saying that's a threshold thing that the Court should address?

MR. BENHAM: I think immunity is a threshold issue, Your Honor, that you have to address and then you will consider whether or not what is -- whether he -- what he is not immune from, whether or not that would constitute intimidation, threats, coercion or other sorts of interference with the rights under the Fair Housing Act amendment.

My understanding of the laws of immunity is one of the first things that the Court would consider and not -- and if there's immunity you don't get into the substance.

THE COURT: Right. But that would be for

11:57:28 utterances made by people other than him, correct?
11:57:32 MR. BENHAM: Correct.
11:57:33 THE COURT: So for his utterances, though, the
11:57:35 act wouldn't be triggered, correct?
11:57:37 He wouldn't get any protection, that is.
11:57:41 MR. BENHAM: That is my understanding of the
11:57:41 Federal Communications Decency Act, Your Honor.
11:57:41 THE COURT: All right.
11:57:43 MR. BENHAM: It immunizes you for what other
11:57:46 people say, if you are the one that maintains the
11:57:49 website, but it doesn't get you off the hook.
11:57:49 THE COURT: Right. And is it --
11:57:52 MR. BENHAM: But what does get him, so-called,
11:57:54 off the hook in this manner personally, is that he
11:57:57 didn't commit any violation of Section 3617.
11:58:03 THE COURT: Right. But you're not saying he
11:58:04 didn't make any utterances?
11:58:08 MR. BENHAM: No, I'm not saying he didn't --
11:58:09 THE COURT: All right. You're just saying for
11:58:10 that category of utterances that were made by others, he
11:58:13 gets some protection. For those made by him, he is
11:58:18 absolved of liability because the plaintiffs cannot make
11:58:20 out their case. There's no interference, no coercion,
11:58:22 no threats in any of those utterances, correct?
11:58:24 MR. BENHAM: Correct.

11:58:24 THE COURT: All right. Thank you.

11:58:25 Let me hear from the plaintiff, Attorney de Leon.

11:58:34 MS. DE LEON: Good morning, Your Honor.

11:58:43 THE COURT: Good morning.

11:58:43 ARGUMENT BY THE PLAINTIFFS

11:58:48 MS. DE LEON: Which one -- how would you like 11:58:49 me to handle our response, Your Honor?

11:58:51 THE COURT: However you choose to.

11:58:51 MS. DE LEON: Okay.

11:58:54 THE COURT: Maybe let's deal with Attorney 11:58:58 Benham's issues first.

11:59:00 MS. DE LEON: Okay. It's the issue on the 11:59:03 survivability of Barbara Walters' claim; is that the 11:59:07 one?

11:59:08 THE COURT: Or any -- yes. Well, let's deal 11:59:09 with Kromenhoek first, and then get to Walters after.

11:59:14 MS. DE LEON: Okay. So that's the motion to -- 11:59:15 that's the summary judgment motion.

11:59:16 THE COURT: Yes, summary judgment.

11:59:18 And I think there's an issue saying the Federal 11:59:21 Communication, Federal Communication Decency Act 11:59:25 provides some protection for utterances made by someone 11:59:29 other than Mr. Talkington.

11:59:32 So to the extent he's just the blogger, whatever 11:59:38 that might entail, he's not liable for the utterances of

others; just for those made by himself.

He's not saying he didn't make any, but do you dispute that, that for utterances made by someone other than Mr. Talkington there is no liability for him?

MS. DE LEON: First of all, Your Honor, there are three -- there are two exceptions. One is the utterance made by others on the blog, which Attorney Benham is correct, Mr. Talkington would not be liable.

However, Mr. Talkington made more utterances than everybody else in this case --

THE COURT: Okay. So let's go to those, then, those for which he could be liable.

Their position is, here are the postings, and none of them amount to, I believe it has to be coercive, threatening or interfering, and a few other things along those lines.

Tell me and point me to the record evidence that indicates that the utterance of Mr. Talkington is coercive, interfering with or threatening, since that's something that you would have to prove, correct?

MS. DE LEON: That is correct, Your Honor.

THE COURT: He says, here is what I said. Here -- there's the factual basis for what I said. As a matter of law, this doesn't rise to the level of what is objectionable according to the FHAA. So tell me what he

said and why it's objectionable, or why there's an issue that needs to be left for a trial.

MS. DE LEON: In this case, Your Honor, it is, it is, it is more -- the violation comes more towards the pervasiveness of the attacks, not just that, not just that it was, it was intimidating or coercive, or that he didn't firebomb their apartment.

THE COURT: But you're not saying that if someone says repeatedly, I disagree, I disagree, I disagree, I disapprove of this, I disapprove of this. They say it. Their disapproval and disagreement is pervasive, consistent, probably it might even be annoying. That's not what the FHAA is concerned with, is it?

MS. DE LEON: No, Your Honor. But in this case he went more -- he said more than he disagreed. First, Mr. Talkington continued to attack Ms. Kromenhoek, basically saying that she wasn't disabled because she had an emotional support animal, and that is a service animal.

He kept on using the ADA definition for the emotional support animal. Then at several other posting he accused them of pretty much malingering, just to keep their pet, that she's worth for the emotional support animal.

Then there's a blog posting where he basically said: Stop this puppy mill diploma.

Then in that blog posting he obtained a copy of the dog certification and basically went on to say that they -- they meaning Ms. Kromenhoek and Ms. Walters -- in this case Ms. Kromenhoek, that they acquired, that they acquired the dog certification from an outfit on the Internet and that everybody can get this, and the board needs to start enforcing it because this, there's no validity to the certification.

And then when they -- when Ms. Kromenhoek filed her complaint, he chimed in and basically said that Ms. -- the board should sue Ms. Kromenhoek in this case, that she's an idiot to think that she has any say-so in how the association runs -- the board runs the Cowpet Bay Condominium.

Then another blog post --

THE COURT: Attorney de Leon, you're not saying that debate, even spirited and perhaps annoying debate, that that rises to the level of an FHAA matter, are you?

MS. DE LEON: No, Your Honor. What I'm saying is -- what I'm stating is that the Court has found that pervasive, pervasive interference has actually interfered with the plaintiff's right to enjoy her dwelling, which is basically what we're talking about.

12:04:55 We're talking about interfering with the -- the
12:04:57 standard is whether the action interferes with the
12:05:00 plaintiff's right to interfere with, to interfere with
12:05:06 -- interferes the plaintiff's right to enjoy, to enjoy
12:05:10 her dwelling.

12:05:11 And this case is a lot like --

12:05:13 THE COURT: But how is, how is that -- that is,
12:05:19 as I understand it, the perceived threat here is
12:05:25 something on a blog, correct?

12:05:28 MS. DE LEON: Yes, Your Honor.

12:05:28 THE COURT: It's not something that, for lack
12:05:31 of a better term, that's in your face. That is, it's
12:05:34 not, there's not like this picketing outside the unit,
12:05:44 their placards aren't about the place. This is on a
12:05:49 blog that you have an option to, I guess, I don't know
12:05:51 the word, click on to enter, view, or not view.
12:05:53 Correct?

12:05:54 MS. DE LEON: That is correct. But it's more
12:05:56 than that, in the sense that when Mr. Talkington
12:05:59 blogged, first of all Mr. Talkington had some degree of
12:06:03 authenticity, because he served as the volunteer blogger
12:06:07 for the association.

12:06:08 So basically what Mr. Talkington did, he would
12:06:12 attend -- they allowed him to attend board meetings --
12:06:17 even though some of the topics were private, the board

members allowed him to attend board meetings, and even at times shared information with him which they shouldn't have.

And then what he did --

THE COURT: But direct --

MS. DE LEON -- he would post the bloggings, and then other members of the association would chime in. So what you have, you have the entire community --

THE COURT: But, hold on one second. Point me to the record evidence that you can show me there's this utterance that is a threat, coercion, something intimidating, something threatening? And then we'll start from there.

MS. DE LEON: Your Honor, the standard is not coercion, interference, because HUD drafted rules and regs which basically, which basically, which basically gave the Section 3617 a new definition. And under that definition, under that definition interference with the ability to enjoy your dwelling home is a violation. And that's under 24 CFR Section 100.

So we're not looking at coercion as in -- or intimidation as in the civil rights era. What we're looking at, we're looking at neighbors ganging up on each other to drive the person out.

And there's a case from Kansas City which is so

much similar to this case, in the sense that this African-American moved into a home -- into a neighborhood, and her neighbor wanted to drive her out.

He started taking pictures of her going ins and her coming ins -- her comings and goings. He collected information about her, and then reported her to the Housing Authority, to the Section 8 Housing Authority.

The Court -- the Kansas City District Court found both the neighbor and the homeowner's association liable, because the Court found that that action was persuasive enough to interfere with the African-American woman's right to enjoy her dwelling. And that's the standard, Your Honor.

THE COURT: But what was the conduct there?

MS. DE LEON: The conflict was that --

THE COURT: No, what was the conduct?

MS. DE LEON: The conduct was they were recording her going and her coming out. But it was not the coming, per se. It was compounded. It was the pervasiveness of the action is what actually was the issue.

And there's another case from Illinois where, the Third Circuit -- Seventh Circuit Court of Appeals found that the association and a member of the association was actually -- they were liable because the neighbors --

members of the association, ganged up on this one member by pervasive action, by harassing --

THE COURT: All right. But what is it that was done?

That is, if I understand, blogging, you have -- isn't it sort of like a TV set? You have the option of turning it on or leaving it off.

And you're saying that this interference or threatening or coercive conduct was taking place on the blog.

But doesn't it require both a subject and an object?

And the object here would be the plaintiff, correct?

And the subject who would be doing the action would be Mr. Talkington. I don't think there's any dispute that Mr. Talkington made these, made utterances.

The question is whether there's this object and -- of the utterances, and that the thing that was uttered was something that interfered with, threatened or coerced with respect to the plaintiff's enjoyment.

So I guess I want you to address, one, you've cited to some other cases, and I'm wondering when you say "pervasive," it would seem to me that it's almost in every component of someone's existence.

And here we've got something on a computer, which you would have to go to, I presume, correct?

MS. DE LEON: That is correct.

THE COURT: All right. So why is this case like other cases, where I think you've referred to pervasiveness?

MS. DE LEON: This case --

THE COURT: Is it like other cases where you have referred to pervasive conduct?

MS. DE LEON: Yes, Your Honor. But this case --

THE COURT: So they involves computers?

MS. DE LEON: Well, this case doesn't involve computers, because pervasiveness doesn't always have to involve computers --

THE COURT: All right. Let me ask you the question a different way. Any of the cases where you talk about some pervasive conduct, did they involve the blogs?

MS. DE LEON: No, Your Honor.

THE COURT: Or computers?

MS. DE LEON: No, Your Honor. In this case the blogs were not innocuous. They were not harmless. What happened is that --

THE COURT: Well, let me ask you the question.

12:12:00 Did they result in other people taking direction from
12:12:04 the blogs and interfering with your client's enjoyment?
12:12:10 MS. DE LEON: Yes, Your Honor. This is exactly
12:12:12 where I was leading to. What happened is that
12:12:17 Mr. Talkington ginned up the members of the homeowner's
12:12:22 association by his blog.
12:12:24 And basically what happened, you had an organized
12:12:28 opposition to the plaintiff's application for a -- a
12:12:32 request for reasonable accommodation. To the point
12:12:35 where the board actually, when they voted to amend the
12:12:41 bylaws, because it is undisputed -- I don't think it is
12:12:47 disputed that the members of the Association did not
12:12:50 want dogs on that premises.
12:12:54 And the only exceptions they would accept would be,
12:12:57 is a ADA dog.
12:13:01 And in this case the plaintiff didn't have an ADA
12:13:05 dog. She had an emotional support dog. And the board
12:13:09 members did not perceive emotional support dogs as
12:13:14 legitimate enough to make, to carve out an exception to
12:13:19 their rules.
12:13:20 So what Mr. -- and Mr. Talkington shared that same
12:13:24 sentiment.
12:13:25 So basically what he did, he ginned up the
12:13:28 opposition to the point where the board did not take any
12:13:31 action. And when the board did, you had a new,

completely new board, completely new president --

THE COURT: Why is it that you said he ginned up -- that is, is there some record evidence you can point to? Because I can appreciate your argument, but I also need to look at the record evidence in this case. So --

MS. DE LEON: Because Mr. Talkington would basically write a blog, for instance, the puppy mill diploma blog. He would write a blog and then he would basically, in this blog, once he wrote it, then you had other people saying this is -- you need to enforce it. This is illegitimate. You can go to any of these things and get, and just get, and just get a certification.

So you have other people responding to him.

THE COURT: But why isn't that someone just sharing something, which it may not be favorable to your client, but if someone is sharing something, while you might not like it, it might be objectionable, what makes that something that's threatening or coercive or interfering with the enjoyment?

MS. DE LEON: Because what it does, Your Honor, basically when there's such an outpour of opposition to the application, the pending application, what it really did is to actually prevent the board from taking action.

THE COURT: How is it that you know that?

That is, what record evidence can you show that somehow this had this, this causal effect on the board not taking action?

MS. DE LEON: Because what -- the board members would respond -- board members, just like association members, would respond to Mr. Talkington. In one instance Mr. Talkington sent out a blog, and the one board member basically said: We, we are going to enforce our laws. We know that these people have dogs and we're going to enforce our laws.

I mean, the case in point --

THE COURT: Assuming that that is the case, that is, that someone said, "We're going to enforce," what is the threatening part about that?

That is, you don't dispute that there was a no dog policy, do you?

MS. DE LEON: Well, the board --

THE COURT: My question is a yes or no one. Do you dispute that there was a no dog policy?

MS. DE LEON: No, Your Honor.

THE COURT: All right. And do you dispute that there can be debate on whether to exempt or alter that policy?

MS. DE LEON: No, Your Honor. But this was not debate.

THE COURT: All right. And you don't dispute that there was an exception made for your client, do you?

MS. DE LEON: No. The exception was made almost a year later.

THE COURT: Okay. And you don't dispute that throughout the entirety of the dispute or debate or whatever you wish to categorize it as, that during the entirety of it your client was a resident on the promises, correct?

MS. DE LEON: Yes, Your Honor. While they were--

THE COURT: You do dispute that?

MS. DE LEON: Well, no, Your Honor.

THE COURT: Okay.

MS. DE LEON: But they were suffering emotional distress, where they were fined --

THE COURT: All right. Hold on.

And you don't dispute that your client had the dog throughout the, this dispute or debate?

MS. DE LEON: No, Your Honor. But that's not the standard for the FHA claim.

THE COURT: Okay.

And then with respect to the threatening or coercive or interfering conduct, your position is that

it was repeated comments by Mr. Talkington expressing his disapproval of the dog, that had a -- and that expression had an impact on the board; is that correct?

MS. DE LEON: No, Your Honor. The violation comes from his repeated blogs, which actually harassed, which actually was, according to both the Halpin Court, which is a Seventh Circuit case, and the King case, which is the District Court case, which has been construed as harassment, pervasive harassment. And that's the violation.

THE COURT: All right.

Let me hear you on the other summary judgment.

MS. DE LEON: The other summary judgment is --

THE COURT: Let's deal with the ADA first.

MS. DE LEON: Okay. The ADA claim, the defendants all cited to cases that predated the Department of Justice revision of the ADA case.

THE COURT: I think Mr. Riopelle said his case, with respect to the ADA claim, it rises or falls based on the public accomodation position.

Now, the condominium here, are you suggesting that the condominium is a public accommodation?

MS. DE LEON: The ADA --

THE COURT: The ADA applies -- tell me, do you dispute that the ADA applies to public accommodations,

12:19:08 yes or no?

12:19:10 MS. DE LEON: No, Your Honor, I do not.

12:19:11 THE COURT: You do not dispute that.

12:19:14 All right. So if this is not a public
12:19:15 accommodation, that is, if it is a private dwelling or
12:19:19 entity, ADA doesn't apply, correct?

12:19:22 MS. DE LEON: That is correct.

12:19:27 THE COURT: Do you dispute whether it is a
12:19:30 public accommodation or not. That is, Cowpet?

12:19:34 MS. DE LEON: Yes, Your Honor. Basically, two
12:19:36 things. Number one, the Association obviously has a
12:19:41 different position from their attorney, because the
12:19:46 Association specifically amended their bylaws to make
12:19:49 accommodation for ADA dogs and not for FHA dogs.

12:19:53 So one wonders why the Association would amend its
12:19:59 bylaws for ADA dogs if the ADA did not apply.

12:20:04 The second thing, the second point is that there is
12:20:10 nothing in the bylaws that says that this is a private
12:20:15 condominium. There is nothing in the bylaws that says
12:20:17 that. So the question whether the -- Cowpet Bay has a
12:20:23 hotel plan, is not covered in the bylaws.

12:20:28 The third point is that the Department of Justice
12:20:34 basically enforces ADA claims, revised the rules for,
12:20:40 and the definition for, "public accommodation." And
12:20:44 with this new revision, hotel, I mean, condominiums,

12:20:48 that were excluded before, are now included, depending on how long the rental, how long those condo units are rented.

12:20:59 So in this case there is -- it's not an absolute bar that condominium associations are not covered under the ADA.

12:21:09 I think we'll have to look at the rules and then --

12:21:12 THE COURT: The bylaws indicate that the apartment units shall be used for residences only, don't they?

12:21:23 MS. DE LEON: Yes, Your Honor. But they do rent, they do rent it. They do rent.

12:21:28 THE COURT: Assuming that's established, that is, is there evidence in the record that you can point to that indicates Cowpet is used as a public accommodation, transient lodging accommodation?

12:21:44 MS. DE LEON: Yes, Your Honor. If you go on the website, you'll see --

12:21:47 THE COURT: No, I mean -- when I say "record evidence," I mean in this case. Record evidence that the Court is permitted to rely on.

12:21:54 MS. DE LEON: We did file with our -- I believe when we filed either our opposition to the motion to dismiss or with the complaint, one of the two, we did file an ad from over Easter break, where several ads for

unit, rental unit at Cowpet, and the association does own units over there.

THE COURT: All right. Well, the association owning them, that is, they're owning them, but are they using it as public accommodation, that is, for transient lodging?

MS. DE LEON: That issue, I believe, Your Honor, would have to be -- it's a factual issue in the sense that there are ads posted. We did submit a copy, copies of several ads for renting those units. And so whether or not they're for transient rentals, whether or not the association rents them out, that would have to be decided, I guess, by a jury.

THE COURT: All right. What about the other claims?

MS. DE LEON: The other -- the FHA claims?

THE COURT: Yes.

MS. DE LEON: The issue in this case is basically whether Ms. Kromenhoek actually gave the board notice of her disability.

And the record is replete with instances where she did.

In July of 2011, Mrs. Kromenhoek filed an application. The application consisted of a letter from her doctor, which basically said that he had prescribed

12:23:51 an emotional support dog for her because she suffers
12:23:55 from an anxiety disorder.

12:23:57 Mrs. Kromenhoek filed that application, that
12:24:01 letter, and a certification for the dog with the Cowpet
12:24:08 Bay manager.

12:24:08 Now, the opposition, the defendants argue that
12:24:14 Mrs. Kromenhoek at some point told -- actually precluded
12:24:26 the board from reviewing that application.

12:24:27 For that, I would say there's nothing in the record
12:24:30 that shows that Mrs. Kromenhoek did that.

12:24:35 I believe, first, the board had ample knowledge of
12:24:39 her notice that she had suffered a disability, and she
12:24:43 had an application on file.

12:24:46 The board president mentioned that application in a
12:24:51 letter, which was posted on the blog as early as October
12:24:57 of 2011. A board member, Mr. Vincent Verdiramo,
12:25:07 basically wrote a memo, a legal memo to the board and
12:25:10 then e-mailed the memo to at least 99 members of the
12:25:14 association, informing them that he had informed the
12:25:21 board about the application for reasonable accommodation
12:25:28 under the FHA, and basically stating that to approve --
12:25:33 there's no one qualified on the board to review an FHA
12:25:39 application, and the plaintiff will have to take the
12:25:41 board to court, and then they would have to be --

12:25:44 THE COURT: But Attorney de Leon, your

12:25:49 client -- the accommodation your client sought was to have her dog on premises, correct?

12:25:54 MS. DE LEON: That is correct.

12:25:54 THE COURT: All right. She always had her dog on premises, correct?

12:25:58 MS. DE LEON: That is correct.

12:25:59 THE COURT: And in fact, there was never a denial, correct?

12:26:04 MS. DE LEON: There was a denial, because delay is a denial. In this case they delayed --

12:26:09 THE COURT: All right. Well, let me put it this way: There was a fine that was to be imposed, correct?

12:26:19 MS. DE LEON: It was more than to be imposed. They did fine them.

12:26:23 THE COURT: All right. And was it held in abeyance? That is, was there no collection on it?

12:26:28 MS. DE LEON: No, but that's not the standard.

12:26:31 THE COURT: All right. Well, I'm just asking questions. I'm not saying what the standard is. My question is just: Was there any collection on it?

12:26:37 MS. DE LEON: Not in this case. But they were sent notices. And they were sent notices that they were in violation, and those notices were posted on the blog.

12:26:45 THE COURT: All right. But there was a notice

12:26:54 that there was some violation of the no dog policy, correct?

12:26:57 MS. DE LEON: That is correct.

12:26:58 THE COURT: All right. But at all times your client had her dog, correct?

12:27:02 MS. DE LEON: That is correct.

12:27:06 THE COURT: Was there anything that indicated that the collection would be held in abeyance?

12:27:12 MS. DE LEON: That is correct. They were sent a letter saying that they're in violation, and that they were going -- the board would fine them $50 per day, but then the fine would be held in abeyance.

12:27:22 THE COURT: And in abeyance until when?

12:27:27 MS. DE LEON: Until there's an opinion as to whether the dogs are permitted.

12:27:31 THE COURT: Wouldn't that suggest there hasn't been a final determination on whether the dogs will or will not be permitted?

12:27:39 MS. DE LEON: There was a final determination. The --

12:27:42 THE COURT: Right, but you're not answering my question. Wouldn't that language that you just referred to suggest that there wasn't, at that time, a final determination?

12:27:49 That is, I think my question was, it was held in

abeyance until when?

And then I thought that you answered, "it was held in abeyance until..." And then you suggested that there would be some opinion.

MS. DE LEON: Right.

THE COURT: And then I asked you, well, doesn't that suggest that they haven't yet made a final determination?

MS. DE LEON: That is correct, but then --

THE COURT: All right. Wouldn't that suggest they hadn't yet made a final determination -- or opinion, I think is the word that you used. Wouldn't that suggest they hadn't reached an opinion yet?

MS. DE LEON: Yes, but then subsequent to that, Ms. Kromenhoek reapplied again. She sent an e-mail to the board president, stating that after she watched the horrors that they put Barbara Walters through, she basically wrote a letter -- an e-mail to the board president, stating that she has a dog and that she has the application and her medical records. She filed that with the office. But then seeing that what Ms. Walters is going through, she is not going to allow them to see that until he can guarantee her confidentiality subsequent to that -- to the notices. So then she applied a second time.

12:29:07 THE COURT: And you're saying there was a determination made that denied?

12:29:10 MS. DE LEON: They never made a determination until a new board was elected and a new board president was elected.

12:29:15 THE COURT: Okay. So I'm asking you the question: Was there a refusal or a denial in some document?

12:29:22 MS. DE LEON: Your Honor, the --

12:29:23 THE COURT: It's a yes or no, and then you can explain.

12:29:26 Was there?

12:29:26 MS. DE LEON: No, there wasn't. But the case law, basically if you look at Astralis versus -- the condominium association versus -- HUD versus Astralis Condominium Association, a case out of Puerto Rico, a delay or putting hindrance --

12:29:44 THE COURT: But what happened in that case?

12:29:46 Was someone not allowed to do something that they sought to do?

12:29:50 MS. DE LEON: Basically what happened in Astralis is that -- it's very similar to this case. The plaintiff applied for a parking space because the plaintiff had mobility issues.

12:30:03 The members of the board -- some members of the

board knew about it, just like in this case. There was some opposition to it, just like in this case. And the board took almost a year to grant the application, to grant the waiver.

And in this case the District Court found -- and the Third Circuit upheld it --

THE COURT: That was Puerto Rico?

MS. DE LEON: That's out of Puerto Rico.

-- and found that there was a violation of the FHA, because a delay is just as insidious as denying the application, because you can delay to the point where the person either moved out -- delay can be a tactic where the person either moved out -- in this case you've already -- you've violated the FHA.

And the FHA is a remedial --

THE COURT: Was the party in that case allowed to park in the space?

MS. DE LEON: The --

THE COURT: Yes or no.

MS. DE LEON: Yes, Your Honor.

THE COURT: Okay.

MS. DE LEON: But the party in this case, just like Ms. Kromenhoek, received notices of violation. Although they were allowed to park in the place -- in the space, they received notices of violations.

12:31:16 THE COURT: Okay.

12:31:24 MS. DE LEON: And -- yeah.

12:31:25 THE COURT: All right. Thank you, Attorney de Leon.

12:31:27 All right, last word. We'll hear from the defense.

12:31:31 MS. DE LEON: Your Honor, there's the survivability issue.

12:31:34 THE COURT: Oh, yes. Let me hear you on the survivor.

12:31:37 MS. DE LEON: Okay. The survivability issue is straightforward. I think the Court addressed it in Walters v. Kromenhoek. And, it was a sound decision. The FHA is a remedial statute. And remedial statutes, when you're looking -- the issue of whether a claim survives death rests on basically whether the claim is punitive and remedial.

12:32:15 Remedial action survive. This is found in Schreiber v. Sharpless. It's a United States Supreme Court case from 1884. And penal actions do not. In our case, in Walters v. Cowpet Bay, this Court found that the FHA claims are remedial in nature, so therefore they survived.

12:32:38 The -- and it's not only this Court, it's other circuits, other district courts have found FHA claims to be remedial in nature . FHA itself says it's a remedial

12:32:58 statute.

12:32:58 The issue of whether the state law claims, the territorial claims survives, it's a little bit more completed because the V.I. Supreme Court has not ruled on our survivability statute. So basically what we're citing to is a District Court statute. Notwithstanding that the case law is all over the place.

12:33:32 And if we look at the Third Circuit case in Giles v. Campbell, the first -- the Third Circuit held that if the V.I. law conflicts with the federal laws or Constitution, then, then the -- the issue of whether emotional distress and the like is to be resolved based on V.I. law, but if it conflicts with federal laws or the Constitution, then it's resolved as to federal law.

12:34:15 In this case the FHA is a remedial statute. It allows for emotional distress. It allows for punitive damages, which basically, those two further the goals of the FHA, to make sure that persons with disabilities, both visible and invisible disabilities are not discriminated against.

12:34:40 And in this case --

12:34:45 THE COURT: Attorney Benham suggests that there's another step that obviates the need for the Court going any further.

12:34:52 How do you respond to that?

MS. DE LEON: All three steps were met. All three steps were met in this case.

Attorney -- the issue, basic -- the paramount issue is whether it's a remedial statute or not. And to the extent that is a remedial statute, the statute speaks for itself. It says it's a remedial statute. The FHA itself says it's a remedial statute.

The Supreme Court in Metropolitan v. Washington has ruled that it's a remedial statute. Almost every Circuit Court in the nation has ruled that the FHA is a remedial statute. So therefore actions under the FHA are remedial actions, and if they are remedial actions based on Schreiber, they survive the test.

THE COURT: All right. Thank you.

Attorney Benham.

ARGUMENT BY THE DEFENDANT TALKINGTON

MR. BENHAM: Yes, Your Honor. This is strictly on the survival issue or --

THE COURT: You can cover everything.

MR. BENHAM: As to the survival issue, which was just addressed by Attorney de Leon, the point I was trying to make before is you don't get to the, the question of whether a statute is remedial or penal is a question of federal common law.

My point in my motion and in my argument is you

don't get to the point of considering federal common law unless first you get past Section 1988 of Title 42, which deals -- which has been used by the courts in dealing with the FHA cases and in Robertson V. Wegmann, which is a state law inconsistent with federal law.

And our point is that the Virgin Islands law is not inconsistent with federal law, such that it would be supplanted and then -- by federal common law, and then look at the remedial versus penal.

In response to the Court's anticipated next question, I agree, the Fair Housing Act Amendments are remedial. Every Court that has looked at that question has said that.

My point is, and the point on behalf of Mr. Talkington is, we don't get to that issue because you don't get to the question of the applicability of federal common law unless first you find that the state law in this instance, territorial law is inconsistent with the federal law.

THE COURT: Maybe I misunderstood, but I thought Attorney de Leon was arguing that the FHA has -- always survives.

MR. BENHAM: No --

THE COURT: You're not -- are you saying that, Attorney de Leon, that it survives?

12:37:36 MS. DE LEON: Yes, Your Honor, because it's a remedial action. Penal actions do not survive.

12:37:41 THE COURT: All right. So you're saying because it's remedial, it survives.

12:37:45 MS. DE LEON: If you go through the three factors, it survives because remedial actions survive under Schreiber.

12:37:53 THE COURT: So you're saying because it's remedial, it survives.

12:37:57 MS. DE LEON: That's correct, Your Honor.

12:37:58 THE COURT: All right. That's the argument. Because it's remedial, it survives.

12:38:01 MR. BENHAM: That's what I understand her position, Your Honor. And the point I was attempting to convey is that you don't get to the question of remedial versus penal unless you get past the point of saying that the state law is inconsistent with the federal law. Then you consider whether or not the federal statute creating the right of action is remedial or penal.

12:38:23 Our point is that you don't get to that point in this case, because Virgin Islands law is not inconsistent with federal law.

12:38:30 As was pointed out in Robertson v. Wegmann, the mere fact that the plaintiff loses doesn't make the state law inconsistent with federal law.

THE COURT: All right. Go ahead to your next point.

MR. BENHAM: Okay. On the -- I really have nothing more to say on the -- is this only on the survival part, or on the motion --

THE COURT: No, no, we're done with survival. Go on to your other motion, the Kromenhoek motion.

MR. BENHAM: As to the Kromenhoek motion, Your Honor, the Court has in front of it an authenticated copy of all of the blog postings, which is what the plaintiff bases her claim on, saying that the --

THE COURT: What about the argument about the pervasiveness of these claims?

MR. BENHAM: The plaintiff herself participated in the blog. She argued that she -- both Mrs. Kromenhoek and Mrs. Walters also -- participated in the blog, professing their position and saying that we're justified in having these dogs.

This is an open community forum. The fact that the plaintiff does not agree with what everybody says does not make it pervasive interference with their rights under the Fair Housing Act Amendments.

I would also point out that the, on the accommodation issue, there's been no denial of the accommodation.

12:40:01 Nobody can be found to have interfered with their right if there was never any denial of the accommodation in the first place.

12:40:08 These dogs were always allowed to stay -- whether you look at the Kromenhoek case or the Walters case, the dogs always were there. The fines were never finally imposed and --

12:40:21 THE COURT: I think Attorney de Leon points to a Puerto Rico case, and it deals with a parking spot. And I believe the argument was that in that case, I think the plaintiff had an opportunity to park in the space, but that that court concluded that -- I don't know if it was on summary judgment, I don't know if it was in the final determination, but there was enough anyway for it to -- it -- the case to survive or see another day.

12:40:51 MR. BENHAM: I don't have the case in front of me. I did not bring a copy of that opinion with me. I did review it when I was dealing with this issue. My recollection of the facts is that it was a denial of a handicap -- the association delayed in acting on a request for a handicap parking space at the apartment or condominium complex.

12:41:11 But, in -- so there was no designated space for the people to use. Eventually, the parking space was

created and the request was accommodated.

I'm unclear on this point as to whether or not the Court found the delay to be a denial, or the mere -- or the fact that the -- that there was in fact some physical blocking off and not allowing them to park there.

In this instance, I would point to the cases that are cited in our memorandum, the Dubois case and the Mutual -- excuse me, Your Honor -- the Dubois case from the Ninth Circuit, 2006, found at 453 F3rd, 1175, and the Overlook Mutual Homes case, also from the Sixth Circuit, 2011, found at 415 Federal Appendix, 617.

In each of these instances, there were -- there were questions of allowing an emotional support animal. That's the facts in this case, the question of an emotional support animal being allowed in the home or in the apartment.

In each case, the Court found that the dog was never barred, the people were never evicted from their home or their apartment because they had a dog. And in each instance the court -- the Sixth Circuit found that there was no denial of the accommodation.

As to the -- going back to the claim for base of nature, Your Honor, this was a point of public discussion in the Cowpet Bay West community. Everybody

discussed it. Some of it was discussed on the blog, some of it, I'm sure, was discussed on the streets or in the bars.

But the mere fact that it's a topic of interest doesn't -- and people talk about it, and some people favor it and some people oppose it, it doesn't mean that that mere discussion rises or disagreements arise to the level of interference with federally guaranteed rights.

THE COURT: All right. Thank you, Attorney Benham.

MR. BENHAM: Thank you, Your Honor.

Is there anything else I can help the Court with any questions?

THE COURT: No, thank you.

Attorney Riopelle, you get the last word.

ARGUMENT BY DEFENDANTS COWPET, HARCOURT, VERDIRAMO, COCKAYNE

MR. RIOPELLE: Thank you, Your Honor.

I wanted to touch base on a few things. I kind of reiterate my point on the ADA. I think I properly cited in my summary judgment motions as to the counts that are raised.

I believe it's matter of law, based on the case law throughout the country, that condominiums are not part of the ADA.

12:44:31 I also believe the standard that I cited to discusses the fact that a complete absence of evidence as to an appropriate time to complete discovery by the plaintiff is sufficient to grant summary judgment for the defendants.

12:44:43 I think that's an important aspect here, because as you asked Ms. De Leon, is there any record evidence, there isn't any, because there can't be.

12:44:53 THE COURT: Well that's provided that you provide some record evidence first. You can't shift the burden on summary judgment. The burden is the movant. You are the movant, correct?

12:45:02 MR. RIOPELLE: That's correct, Your Honor, but--

12:45:03 THE COURT: All right. And you acknowledge that you do have a burden in the first instance, correct?

12:45:07 MR. RIOPELLE: I do not, your Honor. I disagree with that. I believe under the case law if there's a complete absence of evidence from the plaintiff -- I've cited it in my motion, after a period of time for them to complete discovery, the Court has to grant summary judgment at that point. It doesn't even get to the point of a burden. Because if we went to trial, for instance --

12:45:23 THE COURT: You're saying that under Rule 56, that you have no obligation to come forward first with such information to meet your burden? I just need a yes or no, then you can explain.

12:45:36 MR. RIOPELLE: No, Your Honor, I'm not suggesting that.

12:45:38 THE COURT: All right. So you agree, then, that you do have a burden to meet? Yes or no.

12:45:43 MR. RIOPELLE: No, Your Honor. I disagree.

12:45:44 THE COURT: You do not have a burden to meet?

12:45:47 MR. RIOPELLE: Only if they have established through record evidence after -- and if there's a complete absence of evidence, then it becomes my burden on the summary judgment motion.

12:45:54 But because there's a complete -- and I again cite to Celotex, it's discussed in that case, and there's a period of time, in this case two years, when they had a chance to complete discovery and there's, and discovery is complete, and there's no record evidence that the complete absence of evidence causes the judge, the Court in that position to have to grant in favor of the defendants.

12:46:14 It doesn't get to the point from the plaintiff -- it's not my job Your Honor, say if we were -- if they, if there's a complete absence of evidence, it doesn't

12:46:22 become the defendant's job to come up with evidence to
12:46:24 prove their case, if they have not established the case
12:46:27 with record evidence after a substantial period of time
12:46:30 to do so, I believe the case law precedent suggests that
12:46:33 the Court must grant in favor of the defendant.

12:46:35 If we were at trial, Your Honor --

12:46:38 THE COURT: Well, let me see if I understand.
12:46:41 For summary judgment, you're asking for judgment in lieu
12:46:44 of trial.

12:46:44 You're saying you don't have to put forward
12:46:49 anything if the, at summary judgment, if you didn't get,
12:46:54 what, in discovery?

12:46:57 MR. RIOPELLE: The case law says if there's a
12:46:58 complete absence of evidence after a period of time for
12:47:01 plaintiffs to complete discovery, then judgment should
12:47:04 be made in favor of the defendants.

12:47:06 If we were at trial, Your Honor -- may I suggest
12:47:08 this: If we did go to trial and the --

12:47:10 THE COURT: Well, I think -- but I'm asking you
12:47:12 questions in the context of summary judgment. If we're
12:47:16 at trial, I think there's no dispute, the burden is on
12:47:18 the plaintiff to put forward their case. If they don't,
12:47:21 you move for directed verdict, the Court rules on it,
12:47:24 and if it isn't there we go no further.

12:47:27 But we're not at trial. So you're asking for

summary judgment, not a trial. So, but you're saying you have -- I'm a little bit unclear. I'm going to have a look at the record again, because I thought I was asking you the same question in two different ways and you answered it differently.

MR. RIOPELLE: To clarify --

THE COURT: So I'm not sure if you're saying you do have a burden. But then you came around right after and said you don't have a burden. But maybe you can help me understand.

MR. RIOPELLE: I can. I'm hopeful --

THE COURT: Do you have a burden, and if so, what is the burden?

MR. RIOPELLE: Under the statute, there is a burden. Also --

THE COURT: Under the statute.

MR. RIOPELLE: I'm sorry, Rule 56.

THE COURT: All right.

MR. RIOPELLE: The case law interpreting Rule 56 clearly states, and I've raised it in my summary judgment standard, that a complete absence of evidence after a substantial period of time for them to complete discovery, if there's no evidence then judgment should be had in favor of the defendant. You don't even have to get to the point of establishing a burden, because

there is a complete absence of evidence.

And I'm suggesting this as to only the ADA claim, Your Honor. And I think there is record evidence that supports our burden as to the other claims throughout the case.

THE COURT: But the way you establish it, you're saying, is -- do you have to establish it by way of affidavit or deposition or something?

That is, ordinarily when a party moves for summary judgment, they would have taken a deposition and they would say: Your first claim is for X, Y and Z. What do you have in support of this?

And then they say: We've got nothing.

And then you offer that up for summary judgment.

Have you done something like that here?

MR. RIOPELLE: No depositions have occurred, or written discovery but for --

THE COURT: Well, that's why I said "something like that." Anything that would say -- that would put the other side on notice: Look, I'm trying to figure out what evidence you have to substantiate this claim, to prove up this claim.

And then the other side says: We've got nothing.

You have no obligation to do anything further than that, or maybe not arguably to do much more than that.

12:49:20 But has something like that occurred in this case?

12:49:22 MR. RIOPELLE: No, Your Honor, besides the dispositive motion that was filed. And we cited to, I believe, it's the matter of law that the condominiums are not subject to the ADA.

12:49:32 I think a pure statutory interpretation clearly, and the case law throughout the country, that it's a matter of law that condominiums are not subject to ADA.

12:49:40 I don't think -- beyond that, I don't have anything besides the provision in declaration and the bylaws that you actually recited today indicating they're public residences.

12:49:48 THE COURT: They are residences. And is there -- I thought there was some filing by -- in the record that indicated that the residences were available for some sort of transient lodging. Is that or is that not the case?

12:50:08 MR. RIOPELLE: They are individual owners -- and here's also the -- the individual owners, there's an ad that they have subjected --

12:50:14 THE COURT: You agree on summary judgment, I can look at the items that you submit, the things that might be properly considered would be the evidence that I can consider on summary judgment. That is, affidavits, declarations, things that would otherwise be

admissible at trial. I can also look at the pleadings, correct?

MR. RIOPELLE: Correct.

THE COURT: All right. And the pleadings in this case, at least the complaint, it refers to the renting or the, something that makes these residences seem other than residences, that transient lodging, correct?

MR. RIOPELLE: Is there an allegation? Yes, there's an allegation of that. But there's no record evidence of that.

THE COURT: Can I look to that, though, in ruling on summary judgment?

Is the Court permitted to look at that?

MR. RIOPELLE: I believe it should be subject to the actual record evidence. It can certainly incorporate the pleadings but --

THE COURT: Well, before we get to your belief, I just want to know, as a matter of law, am I permitted to look at that?

Can I look at the pleadings and the other things that are properly admissible in summary judgment before I rule?

MR. RIOPELLE: Your Honor, I believe the focus should be on the record evidence.

12:51:23 THE COURT: Okay. All right. But what am I permitted to look at, that is, in ruling? Does Rule 56 talk about it?

12:51:30 MR. RIOPELLE: I don't have it in front of me. I can't recite it off the top of my head. But I believe it would be all record evidence, anything filed before the Court, including any opposition, any depositions, interrogatories, as well as any other findings with the Court.

12:51:45 THE COURT: All right. So with respect to the ADA claim, you're relying on the bylaws, is that correct? That says a unit shall be used for residential purposes?

12:52:00 MR. RIOPELLE: If the Court determines that my argument under Celotex, that the Court needs get to my burden, that the fact that there's sheer absence of evidence from the plaintiff's side, if that's the case, yes, that would be the record evidence.

12:52:11 THE COURT: Just so the record is very clear, are you saying that you meet your burden by arguing there's no evidence or by showing that there's no evidence?

12:52:19 Because I hear you arguing it. What I haven't, I don't know if you appreciate the distinction that I might, which is showing it, that is, by someone from the

plaintiff saying something or doing something that suggests there's nothing there.

You're arguing that there's no evidence, correct?

MR. RIOPELLE: Correct.

THE COURT: Are you -- have you also shown that there's no evidence?

And if you have, tell me how you've shown that there's no evidence.

MR. RIOPELLE: Beyond the arguments within our pleadings or our summary judgment motions indicating there is no record evidence, and plaintiff's failure to file any opposition regarding any facts, the record evidence --

THE COURT: No, I can appreciate that you keep saying that, their failure to do something. But I'm asking you, other than you saying it right now, which I construe as argument, have you shown that?

And if you have, tell me how you've shown it. And don't tell me that you've put it in your papers again, because I appreciate that. But I want to know if there's something more.

MR. RIOPELLE: As far as the record evidence that's been submitted, no, in that context we have not.

THE COURT: Okay. All right. So at this point what I have before me then would be the bylaws, correct?

12:53:31 MR. RIOPELLE: Correct.
12:53:32 THE COURT: All right. So I suspect your position would be, assuming that the bylaws would be enough to show that it's a residence and it would be up to the opponents to come forward with something to overcome that this is something less than residential, that it's transient, and your position would be that they have not done that.
12:53:53 MR. RIOPELLE: Correct, Your Honor.
12:53:54 THE COURT: All right. So the question for the Court then would be, looking on the record, the things that I'm permitted to consider on summary judgment, have they come forward with enough to overcome what you may or may not have offered to meet your burden, correct?
12:54:07 MR. RIOPELLE: Correct, Your Honor.
12:54:08 THE COURT: Okay. All right. Thank you.
12:54:12 MR. RIOPELLE: Would you like me to address the --
12:54:14 THE COURT: Yes.
12:54:14 MR. RIOPELLE: And I think some important things to point out regarding the accommodation. You suggested there wasn't a denial. And Ms. de Leon mentioned an amendment from the board regarding ADA.
12:54:27 It was -- frankly, I don't think, the fact that there was a misunderstanding of the board, that are not

lawyers, to use ADA versus FHA as a basis to bring the condominium under the jurisdiction of the ADA.

I think that's a superfluous argument, doesn't really help at all. And that amendment, after legal counsel determined that it wasn't the ADA or the FHA, they did take actions to work with the amendment to take the ADA application out -- or the ADA reference out.

And I also think it's very important to note that just like if you were in a court case and someone tells you that -- someone files a summary judgment against you, but they didn't serve it on you, you don't know what's in the contents of those -- that summary judgment motions.

Here, it's important to note, there's an issue they can't prove, and there's no record evidence that we were actually on notice of the contents of the filing. There's no record evidence that suggests what was actually filed in July.

There is record evidence indicating from Ms. Kromenhoek herself, in her handwritten letter and typed letter to the HUD, as an attachment to the exhibit, that she gave the paperwork to Luanna Schacter, who is the property manager, and made sure no one could see it.

So just as if you file something but you don't

serve it on a person, you're not on notice and you can't possibly know the contents of it.

So as far as a timing point of view, I think that's why the HUD investigator in both cases, ran an investigation, speaking to all the individuals involved and looking at all the documents, determined just as I state here today.

The facts are, Your Honor, that the board was not formally put on notice and actually received copies of the documents until March 2012, when, as I stated before, they immediately granted the accommodation.

And in furtherance, what we talked about before, there was no denial here, there's case law very similar to our particular case, where the individuals were given a waiver to stay on the committee -- at the unit until they made a decision how they wanted to handle it.

That's what happened here. These individuals were never prevented from the unit -- access to the unit with their dog. Never. And that's the heart of an FHA claim. There has to be a denial, and there isn't here.

THE COURT: All right. Thank you.

RULINGS BY THE COURT

THE COURT: All right. I'll deal with the Talkington matter first.

The -- all right. With respect to the survival of

the action, I don't know if the plaintiff has had a sufficient opportunity to address that issue. I'm not sure if the plaintiff can have an opportunity to address the issue since the plaintiff is no longer living, and substitution is something that would be addressed if the action survives.

So I'm inclined to rule on the survival issue as it now presents itself.

And it's not clear to the Court that the action survives. To the extent it doesn't survive -- when I say "the action," I'm talking about the federal claims at this point.

To the extent the federal claims don't survive and the Court's ruling is to dismiss those claims, what would happen to any state claims? And the Court could exercise supplemental jurisdiction, but that's entirely up to the Court. And the Court's disinclined to do that.

So with respect to the Walters' matter, the Court is going to dismiss the federal claims and decline to exercise its supplemental jurisdiction with respect to the remaining state claims.

Now, focusing on the Kromenhoek matter. We'll deal with the Talkington matter first.

The FHAA claim -- what the record evidence

indicates is that Mr. Talkington, I don't know if it's a title, but for lack of a better word I'll just say was a blogger, and there were some claims that -- or some utterances that were made by Mr. Talkington.

The burden, of course, is on the movant when it comes to summary judgment to establish that there are no genuine issues of material fact, and that the movant is entitled to judgment as a matter of law.

And here there is certainly a trove of utterances made by Mr. Talkington. The question is what do those utterances indicate?

What is, what, if anything, of legal significance do they -- what level do they rise to?

Certainly, if it is some sort of utterance that interferes with Ms. Kromenhoek's right to enjoy her property, then I suspect this matter should survive.

And I say that because there is no dispute, or I don't perceive that there's any dispute that she would be a protected individual, that she is engaged in the exercise or enjoyment of her fair housing rights.

The problem is in the other two things that need to be established; significantly, that the defendant coerced, threatened, intimidated or interfered with Ms. Kromenhoek on account of her protected activity under the FHA, and that Mr. Talkington was motivated by

some attempt to discriminate.

And in looking at the communications, the Court finds no legal authority or no support whatever that the utterances attributable to Mr. Talkington rise to the level of something that would coerce, threaten, intimidate or interfere with Ms. Kromenhoek's enjoyment of a protected activity.

Indeed, it seems that there is a dispute among and between neighbors. If this were a dispute that took place orally, you know, the Court questions whether it would rise to the level of being something that would be filed in this court.

Neighbors have disputes about fences, about dogs, about any number of things. This is a dispute. It happens to have taken place digitally. But if the neighbors were arguing over a dog being in a neighborhood where it shouldn't be, or being on property where it shouldn't be, that wouldn't necessarily make it an FHAA violation.

All the utterances here, though some may be on the border of being annoying, they don't rise to the level of some congressionally protected -- violating some congressionally protected activity.

So with respect to Mr. Talkington and the federal claim -- is this the only federal claim with respect to

13:03:12 Mr. Talkington?

13:03:14 MR. BENHAM: Yes, Your Honor.

13:03:18 THE COURT: And there are state claims against 13:03:20 him?

13:03:21 MR. BENHAM: Yes, Your Honor.

13:03:28 THE COURT: All right.

13:03:28 With respect to the federal claim, the federal 13:03:30 claim is going to be dismissed. So I'm going to grant 13:03:37 summary judgment with respect to Mr. Talkington.

13:03:39 In the state claims, the Court will refuse to 13:03:41 exercise or choose not to exercise supplemental 13:03:47 jurisdiction over any remaining claims with respect to 13:03:50 Talkington.

13:03:54 With respect to the other defendants, again, just 13:03:56 focusing on the federal claims now, the burden is on the 13:04:04 movant, always on the movant. And with respect to the 13:04:12 FHA claims, the, what is apparent here is that the 13:04:22 plaintiff wanted to have a dog at her residence, had the 13:04:30 dog at her residence, and received communication that 13:04:34 indicated that while there would be a fine, it would be 13:04:39 held in abeyance pending, in the words of plaintiff's 13:04:43 counsel, until an opinion had been rendered.

13:04:46 At no time was the accommodation request denied. 13:04:58 In fact, the record indicates that it was under 13:05:01 advisement . And in fact, when it was decided it was

13:05:05 decided in the plaintiff's favor.

13:05:10 So the elements that have to be proven would be 13:05:13 that the person is disabled or handicapped within the 13:05:18 meaning of the FHA, and I don't think that's in dispute.

13:05:22 That an accommodation was requested; I don't 13:05:27 believe that's in dispute.

13:05:28 That an accommodation was necessary to afford an 13:05:31 opportunity to use, to enjoy the dwelling; and finally 13:05:35 and significantly, that the defendant refused to make 13:05:38 the requested accommodation.

13:05:39 There is nothing in the record that suggests there 13:05:43 was any refusal.

13:05:43 What the record indicates abundantly was that there 13:05:47 was considerable debate, that there was considerable 13:05:50 disagreement, and that there was some forbearance on 13:05:57 execution of some sort of fine until resolution of the 13:06:01 matter.

13:06:02 That, of course, was obviated because resolution 13:06:05 was in the plaintiff's favor.

13:06:07 The Court simply doesn't find any support at all 13:06:10 that suggests that there is a triable issue for the jury 13:06:21 here.

13:06:22 After the defendant met its burden, the plaintiff 13:06:24 has failed to come forward with anything that would 13:06:27 suggest there's a triable issue. So the FHA claims will

be dismissed.

With respect to the ADA -- let's see. There are ADA claims that are also pending, as well, and subject to summary judgment. The ADA claims, I think as defense pointed out, rise or fall on whether the condominium is a public accommodation or not.

In support of its motion for summary judgment, the defendants who are subject to the ADA claim have indicated that there is, that this is a private residence or condominium units, or it shall be used for residences.

There is a reference to the bylaws, and the bylaws indicate as much. I don't think the other issues are in dispute. But that issue, to the extent the condominium is not used for transient lodging, then it's not a public accommodation. If it's not a public accommodation, it's not covered by the ADA.

In response to that, the defendant -- or rather the plaintiff is obligated to come forward with such evidence or affidavit, affirmation, declarations, deposition testimony, something that is sufficient to overcome the, what has been proven by the movant here.

And in this regard the plaintiff --

Attorney de Leon, it's a little unclear in the record, but tell me what it is in your summary judgment

motion opposition that you have pointed to that indicates that this is not a private residence, but is a public accommodation.

MS. DE LEON: In our verified complaint, Your Honor, we attach a copy of notices for rent taken from the web site.

THE COURT: All right. And that is the, this was from a website of what?

MS. DE LEON: That was over last Easter. And then we did allege in our verified complaint that the units are used as rentals.

THE COURT: And tell me what was the source of that -- why is that admissible evidence?

That is, the Court has to rely on admissible evidence, correct?

MS. DE LEON: The verified complaint or --

THE COURT: You need to speak into a microphone. We can't hear you well. Come to the lectern.

MS. BENTZ: Your Honor, the verified complaint in our case was -- is standard practice, and it's notarized.

THE COURT: Why don't you come to the lectern, Attorney de Leon.

MS. DE LEON: Yes, Your Honor.

THE COURT: My question is, I wanted you to tell me the evidence that you -- that is, I have evidence that indicates that in the bylaws that this is a -- the condos are to be used for residence only.

My question is, is there something that places that in issue?

MS. DE LEON: Okay, Your Honor. I would --

THE COURT: And so what I want you to do is point me to the things I might consider at summary judgment that place that in issue.

MS. DE LEON: I'm not sure that the bylaws says that the condos are to be used for residence only. And I don't know that that language precludes the rental of any condo units at Cowpet Bay.

But to answer your question, we did file a verified complaint. We did allege that the condo units are rented out, and we did file a copy of rental notices -- notices for availability for rent with the Court.

THE COURT: All right. And that was for all the units?

MS. DE LEON: For whatever units that were available at that time.

THE COURT: All right. And when you say -- who was it that put that -- where did you get that from, and tell me why that's admissible?

13:12:44 MS. DE LEON: We filed it with a verified complaint as part of an exhibit with the complaint. And I believe under summary judgment motion the Court, the Court basically, since we're not the moving party, the Court -- there's a requirement -- well, not a requirement -- that the Court accepts -- unless there is proof otherwise, that the Court accepts our allegation unless the other side comes up with proof that that is not the case, because they have the burden of proof.

13:13:23 THE COURT: All right. But as I said, assuming that the movant has met its burden, that is, assuming that the movant has met its burden with respect to it being a place of residence, and residential use only, what is it that you can point me to that indicates that this is not a residence, that is, it's something that accommodation is for transient lodging?

13:14:01 MS. DE LEON: I'm getting confused, Your Honor. Because you're saying -- I think I'm getting confused between the word "residence use only" and "transient lodging."

13:14:12 THE COURT: All right. Let me give an example. For example, a hotel, transient lodging. Residence, your private home is a residence, not for transient lodging.

13:14:27 MS. DE LEON: And is the issue that the bylaws

13:14:29 preclude transient lodging? Is that the issue?

13:14:35 THE COURT: Is the what?

13:14:38 MS. DE LEON: I'm trying to figure out exactly 13:14:40 what the question is, so I can answer it to the best of 13:14:43 my knowledge. Is the claim that the bylaws preclude 13:14:47 transient lodging, is that the claim?

13:14:49 THE COURT: No. I understood the bylaws to 13:14:52 indicate a section that says that it shall be used for 13:14:57 residents only, residential purpose, only residents. 13:15:01 And I think there's, there's authority in the case law 13:15:06 that suggests that depends on how an accommodation is 13:15:12 used, it can be either a public accommodation or not. 13:15:16 Typically condominiums are not public accommodation 13:15:21 units.

13:15:21 But I suspect in the context that a dorm room and 13:15:25 certain other rooms in certain places can be regarded as 13:15:28 public accommodations, it's, you have to evaluate the 13:15:32 facts in the case. And what I have before me are some 13:15:36 bylaws that indicate you're supposed to use the condo 13:15:40 units as residences only.

13:15:42 So assuming for the sake of argument that that 13:15:46 meets the burden to establish this is not a public 13:15:48 accommodation, I'm asking you to tell me what is it that 13:15:54 would indicate that there's a genuine issue of that 13:15:58 material fact?

13:16:00 MS. DE LEON: The allegation in our verified complaint and the exhibit to that complaint.

13:16:05 THE COURT: All right. And because my understanding with respect to the, what is appropriate proof for summary judgment purposes, it cannot just -- it's ordinarily things that would be admissible. And you've referred me to, I believe, a section from the Internet, is that correct? An ad from the Internet.

13:16:31 MS. DE LEON: That is correct.

13:16:32 THE COURT: All right. Tell me, what is that ad.

13:16:34 MS. DE LEON: An ad is for unit -- is for rental at Cowpet Bay.

13:16:39 THE COURT: And tell me why that would be, that would be admissible?

13:16:46 MS. DE LEON: Because it goes towards whether the, whether the units are used as residence only or transient lodging.

13:17:05 THE COURT: Okay. All right.

13:17:06 I'm going to take the ADA matter under advisement.

13:17:17 So as I understand it, that would leave the ADA claim of the -- out of the federal claims; is that correct?

13:17:27 MS. DE LEON: Your Honor, there's one more. Is it --

THE COURT: Is this the one with respect to Harcourt?

MS. DE LEON: No. There's a Section 3617. There's a Section 3604, failure to make reasonable accommodation. And there's retaliation claim, which is 3617.

I'm not sure whether that claim was dismissed as well as to the Cowpet Bay Association and the board.

THE COURT: All right. Well, I was addressing the FHA claims earlier. And you're saying in addition to the FHA claims, the FHAA claims, is that what it is you're asking about?

MS. DE LEON: Yes. There are two sections, one which is failure to make reasonable accommodation, and there's the retaliation claim, which is under 3617. And I wasn't sure whether the 3617 claim --

THE COURT: You're right, I did not address the 3617 with respect to you. I did with respect to the board. I did with respect to Lance Talkington, but not with respect to the board.

All right. The same ruling with respect to the board.

So that would leave the ADA claim under advisement, and that would be in the Kromenhoek matter.

MR. RIOPELLE: Your Honor?

13:18:51 THE COURT: Yes.

13:18:51 MR. RIOPELLE: I think the record may reflect
13:18:54 that the second amended complaint that we're running
13:18:57 under is not verified. The first amended complaint was
13:19:00 verified, but I don't believe the second would reflect
13:19:03 it was verified. I know that was her contention for
13:19:06 admissibility of that ad.

13:19:07 THE COURT: I think Attorney Bentz had just
13:19:10 spoken to, did she not? I think she said it's her
13:19:12 practice. It was verified. Is that --

13:19:15 MR. RIOPELLE: I think the actual record
13:19:16 would --

13:19:19 THE COURT: You're saying it doesn't --

13:19:19 MS. BENTZ: Your Honor, the original
13:19:20 complaint--

13:19:20 THE COURT: All right. Let's do this, Attorney
13:19:21 Bentz. One person will speak for a party. So either --
13:19:23 it's going to be either de Leon or you. I think it's
13:19:27 Attorney de Leon.

13:19:29 So if you need a moment to confer, Attorney de
13:19:32 Leon, you can correct the record if you need to.

13:20:00 (Counsel conferring)

13:20:01 MS. DE LEON: Okay, Your Honor. We checked the
13:20:04 docket and it doesn't say whether the complaint was
13:20:06 amended or not, the second amended complaint was

13:20:08 verified or not.

13:20:11 THE COURT: All right. So what can you point me to, then, Attorney de Leon?

13:20:49 Because as I understand it -- and correct me if I'm wrong -- the movant in -- with respect to the ADA claim attached the bylaws, correct?

13:21:04 That is, the bylaws indicate that there is, that it's residence only, correct?

13:21:12 MS. DE LEON: I'm not sure that the bylaws limit -- basically -- limit it to residence only, Your Honor, but I will answer that they did attach a copy of the bylaws.

13:21:23 THE COURT: All right. And assuming for the sake of argument that the bylaws indicate that it's for residents only, then you would need to come forward with something, because that would suggest it's not a public accommodation, correct?

13:21:40 It's a residence, like any home would be. And to the extent you need to come up with something, you have an unverified complaint with an advertisement attached to it. What else can you point the Court to?

13:22:19 MS. DE LEON: I'm not sure anything was filed with the Court, Your Honor.

13:22:31 THE COURT: Okay. All right.

13:22:32 I'm going to dismiss the ADA claim.

That would dispose of all the federal claims, I believe. And the Court is -- will not exercise its supplemental jurisdiction over any pending state claims.

FURTHER MATTERS

THE COURT: I believe that takes care of all the claims pending in this case, if I'm not mistaken. The state claims, I guess, can be refiled, if the plaintiff intends to, in the state court.

Is there anything else we need to tend to, or does that cover all claims, Attorney de Leon?

MS. DE LEON: I believe that covers all the federal claims, Your Honor.

THE COURT: All right. Attorney -- pronounce your name. Is it Riopelle?

MR. RIOPELLE: Yes, that's exactly right.

THE COURT: Attorney Riopelle, does that cover all the claims?

MR. RIOPELLE: Any federal claims as to my clients, or Cowpet and Max Harcourt and the ADA claims, it does cover all, so --

THE COURT: All right. It seems that we're sort of in this unusual position with respect to Mr. Felice. And also I think you mentioned Harcourt. What's the status of Harcourt?

MR. RIOPELLE: He's deceased. He deceased

several years ago.

THE COURT: So I suspect he's in the same position with Felice, as I understand it. That is -- and I think there are at least three parties who are deceased in this case.

And, of course, the Court's concern is always notice and opportunity to be heard, and significantly who is communicating with whom.

In the case of Walters, there is no direction to be given to Attorney Bentz nor any -- no client to communicate with.

But I believe we'll deal with the Felice and Harcourt and -- Felice and Harcourt in the Kromenhoek matter. And at some point there might be no need to deal with anything further, but I think there's still some lingering issues there.

Attorney Benham, does this cover it for you?

MR. BENHAM: As to Defendant Talkington, I believe all issues have been covered.

THE COURT: All right.

MR. BENHAM: And all claims have been either dismissed, or the Court has determined not to exercise supplemental jurisdiction over the state law claims.

THE COURT: All right. Good.

And then, Attorney Meade, I think you are in the

same position as Attorney Riopelle on the Harcourt and Felice matter, correct?

MR. MEADE: I believe so, Your Honor. I --

THE COURT: I think there's a motion -- is there a motion pending with respect to Felice?

MR. MEADE: It's kind of an interesting situation, Your Honor. I think technically there's no motion pending.

The plaintiffs had moved to substitute someone from Mr. Felice, the first time it was an unknown party. The second time it was Rosemarie Felice. Both of those motions have been denied by Your Honor without prejudice. At this time, there is no pending motion to substitute anyone for Mr. Felice.

And I believe as a matter of law, because he is dead, he is not a party. And because no one has been moved -- no one has been substituted for him, I don't think --

THE COURT: This is the Rosemarie Felice who is in a New York apartment?

MR. MEADE: Yes, Your Honor.

THE COURT: Who the service was on a door person?

MR. MEADE: There's an issue of contested service, but yes, that is --

THE COURT: And the question was, it was, under the New York law, whether that is sufficient. All right.

MR. MEADE: The bigger question really, Your Honor, is whether or not service on her would be proper, because she is not an administrator or executrix of any estate, so she has not been appointed by any court to be the personal representative of Felice. So even -- she's just a relative. So even if service was proper, it doesn't get us to a point where she can be a party here.

THE COURT: I think that just brings home my point, which is that there are still lingering issues that need to be resolved with respect to Felice and Harcourt.

MR. MEADE: Unless, of course, Your Honor, just dismissed all of them and is not exercising supplemental jurisdiction. So we may be in the same boat as everyone as well.

THE COURT: Dismiss the federal claims, you're saying.

MR. MEADE: And is not exercising jurisdiction --

THE COURT: All right. I'm going to take that under advisement, what to do with respect to federal claims, since it's not well established in the record

from whom you're taking direction, to whom you're giving information, whether that person has notice that is appropriate under the case law. That is, there has to be service of a motion to substitute, among other things, on the nonparty. The nonparty would be, I guess in this case Rosemarie Felice.

I don't know what has happened with respect to Harcourt but it seems to me there are some procedural hoops that need to happen. So that, whatever remains with respect to them, processes, we honor whatever process is appropriate.

What has happened with respect to Harcourt?

MR. MEADE: Your Honor, before we go there, if I could just point to your attention to -- I have actually made a special limited appearance on behalf of Rosemarie Felice --

THE COURT: I'm aware we had a hearing sometime ago, yes.

MR. MEADE: And then since that time -- so the instructions are coming -- my appearance here -- I have no objections from Mr. Felice, obviously. Mrs. Felice has instructed as to her role with respect to being a personal representative for Mr. Felice.

THE COURT: Right. Yes. And speak to me for a moment on Harcourt and bring me up to date on Harcourt.

MR. RIOPELLE: Your Honor, where we were with Mr. Harcourt is he passed away two years ago. We filed a suggestion of death, and unfortunately that's where we are.

I don't have a client to report to. I don't have anybody to report to in that respect. Because he was -- allegations are related to his duties as a board member, I would have been retained, we've been retained to defend him in that regard.

And if your question is -- just so I'm understanding Your Honor, are you suggesting that you want to figure this out so for purposes of who you would send the judgment to dismissing the federal claims?

THE COURT: Well, I mean, if there -- if Harcourt or a Harcourt rep isn't here -- because when I look at the caption it says Max Harcourt in his personal capacity, correct?

MR. RIOPELLE: That's what it states. But if you look at the actual allegations, just like Mr. Verdiramo or Cockayne, those allegations are related to their actions as a board member. Those are state claims. We haven't discussed those today, but --

THE COURT: As I said, there are still some lingering issues that need to be attended to with respect to Harcourt and Felice.

It says -- as I look at the caption it says in his personal capacity, which would suggest at some point along the way one might expect a motion to substitute someone to represent the person. And then the person would properly have a representative here who could advance or defend whatever needs to be advanced or defended.

So notwithstanding that there's been a suggestion of death, significantly there's been nothing by the parties. I know there's been significant activity with respect to Felice. I remember we had a hearing sometime ago. There have been at least two attempts to serve. I don't know if this is the third attempt, or there's a third attempt, I think, that's now before the Court, perhaps. So --

MR. RIOPELLE: May --

THE COURT: Yes, go ahead.

MR. RIOPELLE: Sorry, I didn't mean -- just so I understand this, though. As far as the federal claims against Max Harcourt that were dismissed today with summary judgment, there are State Court claims that you're not exercising your supplemental jurisdiction. But if they feel the need to refile, they would have to refile.

And at that point, we would be at that level they

would seek to see if there's a personal representative to bring in substitution of Max Harcourt, rather than dealing with that situation here?

THE COURT: Well, with respect to the living or existing entities who are in the action, there has been disposition of their matters.

With respect to those who are either not living and where there is no finality as to their representative, there's no conclusion with them just yet.

So you have said summary judgment with respect to Max Harcourt. There is no summary judgment with respect to Max Harcourt, and I will take that under advisement.

What we need to do is resolve -- with respect to Harcourt and Felice, that's why I don't think Attorney Meade said too much today. I suspect you'll get the same relief if certain things are ironed out, but we want to look at that a little bit further before the Court concludes on how we go about dealing with Harcourt and Felice.

I think right now, if I'm not mistaken, there's a limited appearance with respect to Felice. There's also a motion to dismiss filed by Attorney Meade. So we'll see where we end up.

There significantly has been nothing done with respect to your client, other than a suggestion of

death.

Now with respect -- for logistical purposes, with respect to the trial, there will be no trial. I think the only thing we need to figure out is Harcourt and Felice. And I'll take the parties' briefs on what, if any, implications today's rulings have on them, what we should do in terms of substantive matters; but before we get to that, what we need to do in terms of process.

That is: Are they properly subject to process in this court.

Are there any hoops that need to be addressed?

Has there been anything that's been lost because of the failure to go through whatever hoops might be necessary?

I suspect that's at the bottom of the Felice motion to dismiss that still remains pending.

There is no motion to dismiss with respect to Harcourt, which is understandable, since you have no client to give you that direction. So -- yes, Attorney de Leon?

MS. DE LEON: If I may, Your Honor?

THE COURT: Yes.

MS. DE LEON: Your Honor, the last time we were here in March of 2012 -- 2013 on the issue of whether, the issue of Harcourt and Felice came up and the

plaintiffs were asked to brief, which we did.

THE COURT: Did Harcourt come up at that time?

MS. DE LEON: Yes, Your Honor. The defendant filed a notice -- a deficient notice of death. The defendant filed a deficient notice of death. They acknowledged that they did. And the Court -- and they said they were going to do something.

The Court ordered the plaintiff to file a brief, which we did. We filed a brief on -- I believe it was on -- in March of 2013 we filed a -- it's called -- it's a Rule 25 brief regarding the successors in interest of Max Harcourt and Alfred Felice.

THE COURT: But I guess my question was, I thought you had said in 2012, you said -- are you talking about when we had the hearing on the Felice matter?

MS. DE LEON: We had the hearing on both Felice and Harcourt, and at that time the defendant filed a notice, a deficient notice of death. They acknowledged that the notice of death was sufficient, and the understanding was that they were going to file something, which they have not done.

In the case of Felice, Attorney Meade continues to file, although he doesn't have a client, he continues to file motions with the Court on behalf of his client.

Prior to filing the notice of limited appearances -- appearance, he filed at least two motions. One to -- one to dismiss -- because we raised that issue in our brief to the Court.

To the extent that Attorney Meade continues to explain that he doesn't have a client, and the only reason why we're substituting is to give notice if he's filing, and the case law is clear, he either has a client or not, if he's filing stuff on behalf of his client, then Rosemarie Felice has notice.

THE COURT: But as I said, I'm -- I think there are some lingering things that need to be addressed. We'll address it. I'm not going to determine that right now. I think I want -- I'll take whatever information you feel is necessary to submit to the Court so I can deal with the Harcourt and Felice matter.

But right now I think we've resolved the issue with respect to everyone else or any pending issues with respect to all other entities; just Harcourt and Felice, and we'll see what, if any, implications today's rulings would have on them. And I'm interested in the process, what necessary process and what substantive results need to be -- or can be obtained based on what we've done today. If nothing, then fine.

I think the only thing that we have disposed of is

13:36:53 the Kromenhoek matter in its entirety, and all the
13:36:57 federal claims, in any event.
13:36:58 The state claims, to the extent you wish to refile
13:37:01 them, you can do them in the state court, if that's
13:37:04 still an option.
13:37:05 MS. DE LEON: Okay, Your Honor. Did you
13:37:07 dismiss the Walters' claim in its entirety? I'm
13:37:13 confused as to that.
13:37:21 THE COURT: No, well, Walters has federal and
13:37:24 state claims, correct?
13:37:26 MS. DE LEON: That is correct.
13:37:27 THE COURT: All right. And we dismissed -- the
13:37:30 Court dismissed the federal claims, and with respect to
13:37:33 the state claims said the Court will decline to exercise
13:37:36 supplemental jurisdiction.
13:37:38 MS. DE LEON: As the same with Kromenhoek?
13:37:41 THE COURT: I'm sorry?
13:37:42 MS. DE LEON: Both the Kromenhoek and Walters
13:37:47 FHA federal claims were dismissed?
13:37:50 I'm just trying to ascertain whether the dismissal
13:37:53 is to both of them, both on the federal claims.
13:37:56 THE COURT: All right. With Kromenhoek, I
13:37:59 think I made my ruling with respect to everyone, as I
13:38:01 said, who is alive or any entity that's here.
13:38:03 I said with respect to Harcourt and Felice, those

matters, I think there are lingering issues which I think the Court wants to take under advisement. So Harcourt and Felice.

With respect to any federal claims, there are no federal claims now pending with the exception of any that may or may not linger with respect to those two individuals.

With respect to all other entities and individuals, the federal claims are dismissed.

MS. DE LEON: Okay.

THE COURT: And that would be the reason why the Court would have to rely on supplemental jurisdictions with respect to state claims, and the Court declines to exercise supplemental with respect to those state claims.

So the only question is what do we do with Felice and Harcourt, to the extent they can't be or haven't already been addressed. But I thought I would take a little more time with respect to those.

MS. BENTZ: Your Honor, might I inquire?

THE COURT: Certainly.

MS. BENTZ: You -- I think Attorney de Leon's question, I'm not sure if it's clear on the record. Just so we've --

THE COURT: All right. I'll tell you what, I

13:39:01 think we've -- if you have something to add -- since Attorney de Leon was pretty clear --

13:39:05 MS. BENTZ: I have something to add, Your Honor. I would like to --

13:39:06 THE COURT: Well, let me -- hold on one second.

13:39:07 Attorney de Leon was speaking for the plaintiff, and usually we have one party speak for -- or one entity speak for the party, one representative speak for the party.

13:39:16 If there's more to add you can certainly -- this is without prejudice to you filing anything you find that is necessary to inform the Court.

13:39:24 MS. BENTZ: It's not a -- it's just a question, Your Honor. May I please have a clarification?

13:39:28 With regard -- my understanding of Your Honor's ruling --

13:39:29 THE COURT: Let's do this. Let's take a break.

13:39:29 MS. BENTZ: Okay.

13:39:31 THE COURT: And then we'll resume.

13:39:36 Thank you, Counsel.

(Court in recess, 1:39 p.m.)

---

CERTIFICATE

This document is hereby certified to be a true and accurate transcript of the foregoing proceedings.

/s______________________________ June 19, 2015
Chandra Kean, RMR DATE
Official Court Reporter

IN THE DISTRICT COURT OF THE VIRGIN ISLANDS
DIVISION OF ST. THOMAS AND ST. JOHN

| | |
|---|---|
| JUDITH KROMENHOEK,<br><br>Plaintiff,<br><br>vs.<br>COWPET BAY WEST CONDOMINIUM ASSOCIATION; THE BOARD OF THE COWPET BAY WEST CONDOMINIUM ASSOCIATION; MAX HARCOURT, in his personal capacity; ALFRED FELICE; LANCE TALKINGTON; ROBERT COCKAYNE; VINCENT VERDIRAMO<br><br>Defendants. | CASE NO. ST-12-CV-00025<br><br>Action for: Housing Discrimination; Discrimination Based on Disability; Invasion of Privacy; Negligent Infliction of Emotional Distress; Intentional Infliction of Emotional Distress; Punitive Damages; and Injunctive and Declaratory Judgment |

**DEFENDANT LANCE TALKINGTON'S ANSWER TO PLAINTIFF'S SECOND AMENDED COMPLAINT**

COMES NOW Defendant Lance Talkington ("Talkington"), by his attorneys Benham & Chan, and here states his Answer to the corresponding numbered paragraphs of Plaintiff's Second Amended Complaint:

1. Paragraph 1 of the Second Amended Complaint states a legal conclusion to which no response is required.

2. Paragraph 2 of the Second Amended Complaint states a legal conclusion to which no response is required.

3. Paragraph 3 of the Second Amended Complaint states a legal conclusion to which no response is required.

4. Paragraph 4 of the Second Amended Complaint states a legal conclusion to which no response is required.

5. Paragraph 5 of the Second Amended Complaint states a legal conclusion to which no response is required.

Talkington Answer to Plaintiff's
Second Amended Complaint
*Kromenhoek v. Cowpet Bay West Condominium Association, et al.*
Case No. ST-12-CV-00025
Page 2

6. Defendant Talkington is without knowledge or information sufficient to form a belief as to the truth of the matters alleged in Paragraph 6 of the Second Amended Complaint.

7. Defendant Talkington is without knowledge or information sufficient to form a belief as to the truth of the matters alleged in Paragraph 7 of the Second Amended Complaint.

8. Defendant Talkington is without knowledge or information sufficient to form a belief as to the truth of the matters alleged in Paragraph 8 of the Second Amended Complaint.

9. Defendant Talkington is without knowledge or information sufficient to form a belief as to the truth of the matters alleged in Paragraph 9 of the Second Amended Complaint.

10. Paragraph 10 of the Second Amended Complaint states a legal conclusion to which no response is required.

11. Paragraph 11 of the Second Amended Complaint states a legal conclusion to which no response is required.

12. Defendant Talkington is without knowledge or information sufficient to form a belief as to the truth of the matters alleged in Paragraph 12 of the Second Amended Complaint.

13. Paragraph 13 of the Second Amended Complaint is admitted.

Joint Appendix Vol. II Page 2527

Talkington Answer to Plaintiff's
Second Amended Complaint
*Kromenhoek v. Cowpet Bay West Condominium Association, et al.*
Case No. ST-12-CV-00025
Page 3

14. Defendant Talkington is without knowledge or information sufficient to form a belief as to the truth of the matters alleged in Paragraph 14 of the Second Amended Complaint.

15. Defendant Talkington is without knowledge or information sufficient to form a belief as to the truth of the matters alleged in Paragraph 15 of the Second Amended Complaint.

16. Paragraph 16 of the Second Amended Complaint is denied.

17. Defendant Talkington is without knowledge or information sufficient to form a belief as to the truth of the matters alleged in Paragraph 17 of the Second Amended Complaint.

18. Defendant Talkington is without knowledge or information sufficient to form a belief as to the truth of the matters alleged in Paragraph 18 of the Second Amended Complaint.

19. Defendant Talkington admits that the members of the Board of Directors are elected by the owners of units at Cowpet Bay West Condominium. Defendant Talkington is without knowledge or information sufficient to form a belief as to the truth of the balance of the matters alleged in Paragraph 19 of the Second Amended Complaint.

20. Defendant Talkington is without knowledge or information sufficient to form a belief as to the truth of the matters alleged in Paragraph 20 of the Second Amended Complaint.

Joint Appendix Vol. II Page 2528

Talkington Answer to Plaintiff's
Second Amended Complaint
*Kromenhoek v. Cowpet Bay West Condominium Association, et al.*
Case No. ST-12-CV-00025
Page 4

---

21. Defendant Talkington is without knowledge or information sufficient to form a belief as to the truth of the matters alleged in Paragraph 21 of the Second Amended Complaint.

22. Defendant Talkington is without knowledge or information sufficient to form a belief as to the truth of the matters alleged in Paragraph 22 of the Second Amended Complaint.

23. Defendant Talkington is without knowledge or information sufficient to form a belief as to the truth of the matters alleged in Paragraph 23 of the Second Amended Complaint.

24. Defendant Talkington is without knowledge or information sufficient to form a belief as to the truth of the matters alleged in Paragraph 24 of the Second Amended Complaint.

25. Paragraph 25 of the Second Amended Complaint is denied. Defendant Alfred Felice is deceased.

26. Paragraph 26 of the Second Amended Complaint is denied. Defendant Max Harcourt is deceased.

27. Paragraph 27 of the Second Amended Complaint is denied.

28. Defendant Talkington is without knowledge or information sufficient to form a belief as to the truth of the matters alleged in Paragraph 28 of the Second Amended Complaint.

29. Defendant Talkington is without knowledge or information sufficient to form a belief as to the truth of the matters alleged in Paragraph 29 of the Second Amended Complaint.

Joint Appendix Vol. II Page 2529

Talkington Answer to Plaintiff's
Second Amended Complaint
*Kromenhoek v. Cowpet Bay West Condominium Association, et al.*
Case No. ST-12-CV-00025
Page 5

---

30. Defendant Talkington is without knowledge or information sufficient to form a belief as to the truth of the matters alleged in Paragraph 30 of the Second Amended Complaint. On information and belief, Stanford S. Sutherland is not a licensed psychologist. On information and belief the National Service Animal Registry is an internet-based, private for-profit company that for a fee of $64.95 issues animal certifications without any verification of disability of the applicant or service-training for animals.

31. Defendant Talkington is without knowledge or information sufficient to form a belief as to the truth of the matters alleged in Paragraph 31 of the Second Amended Complaint.

32. Defendant Talkington is without knowledge or information sufficient to form a belief as to the truth of the matters alleged in Paragraph 32 of the Second Amended Complaint.

33. Defendant Talkington is without knowledge or information sufficient to form a belief as to the truth of the matters alleged in Paragraph 33 of the Second Amended Complaint.

34. Defendant Talkington is without knowledge or information sufficient to form a belief as to the truth of the matters alleged in Paragraph 34 of the Second Amended Complaint.

35. Defendant Talkington is without knowledge or information sufficient to form a belief as to the truth of the matters alleged in Paragraph 35 of the Second Amended Complaint.

Joint Appendix Vol. II Page 2530

Talkington Answer to Plaintiff's
Second Amended Complaint
*Kromenhoek v. Cowpet Bay West Condominium Association, et al.*
Case No. ST-12-CV-00025
Page 6

---

36. Defendant Talkington is without knowledge or information sufficient to form a belief as to the truth of the matters alleged in Paragraph 36 of the Second Amended Complaint.

37. Defendant Talkington is without knowledge or information sufficient to form a belief as to the truth of the matters alleged in Paragraph 37 of the Second Amended Complaint.

38. Defendant Talkington is without knowledge or information sufficient to form a belief as to the truth of the matters alleged in Paragraph 38 of the Second Amended Complaint.

39. Defendant Talkington is without knowledge or information sufficient to form a belief as to the truth of the matters alleged in Paragraph 39 of the Second Amended Complaint.

40. Defendant Talkington is without knowledge or information sufficient to form a belief as to the truth of the matters alleged in Paragraph 40 of the Second Amended Complaint.

41. Defendant Talkington is without knowledge or information sufficient to form a belief as to the truth of the matters alleged in Paragraph 41 of the Second Amended Complaint.

42. Defendant Talkington is without knowledge or information sufficient to form a belief as to the truth of the matters alleged in Paragraph 42 of the Second Amended Complaint.

43. Defendant Talkington is without knowledge or information sufficient to form a belief as to the truth of the matters alleged in Paragraph 43 of the Second Amended Complaint.

Joint Appendix Vol. II Page 2531

Talkington Answer to Plaintiff's
Second Amended Complaint
*Kromenhoek v. Cowpet Bay West Condominium Association, et al.*
Case No. ST-12-CV-00025
Page 7

44. Defendant Talkington is without knowledge or information sufficient to form a belief as to the truth of the matters alleged in the first three sentences of Paragraph 44 of the Second Amended Complaint. The last sentence of paragraph 44 is denied. It is affirmatively stated that Defendant Talkington created the Cowpet Bay West Blog.

45. Paragraph 45 of the Second Amended Complaint is denied as the allegations of this paragraph do not accurately quote or summarize the contents of the September 27, 2011 blog posting. A true and accurate copy of the September 27, 2011 blog posting is attached hereto as Exhibit A.

46. Defendant Talkington is without knowledge or information sufficient to form a belief as to the truth of the matters alleged in Paragraph 46 of the Second Amended Complaint.

47. Defendant Talkington is without knowledge or information sufficient to form a belief as to the truth of the matters alleged in Paragraph 47 of the Second Amended Complaint.

48. Defendant Talkington is without knowledge or information sufficient to form a belief as to the truth of the matters alleged in Paragraph 48 of the Second Amended Complaint.

49 - 50. Paragraphs 49 and 50 of the Second Amended Complaint are denied. A true and accurate copy of Alfred Felice's blog posting of October 13, 2011 is attached as Exhibit B.

Joint Appendix Vol. II Page 2532

Talkington Answer to Plaintiff's
Second Amended Complaint
*Kromenhoek v. Cowpet Bay West Condominium Association, et al.*
Case No. ST-12-CV-00025
Page 8

---

51. Paragraph 51 of the Second Amended Complaint is denied. It is affirmatively stated that Barbara Walters, not Kromenhoek posted the following on the Cowpet Bay West Blog on October 13, 2011:

> Since you so tactfully used my name in this blog, I am required to defend myself, not as a "violator" of any laws, but a person with a disability who is afforded the protection of the law. The Fair Housing act and subsequent rulings by the courts have explicitly stated that an exception to the "no pets" rule qualifies as part of the ADA act, and that violators of the ADA can be required to pay money damages and penalties. Persons are also not allowed under the law to ask what a person's disability is, so it seems that I am being singled out, which is protected by my first amendment rights too. This may very well end up in litigation, and I hope "Anonymous" will help fund any legal fees.

52. Paragraph 52 of the Second Amended Complaint is denied. It is affirmatively stated that on October 13, 2011 posted the following reply to the blog posting of Barbara Walters, not of Kromenhoek:

> This is another "law" with protection for DISABILITY!!!! That is fine except I believe it is sorely ABUSED. Just think "you can't even inquire as to the disability!!! TERRIFIC!!! So if someone has some DBL by which he/she might go off his/her qourd without the pet at his/her side we must all be innocent victims to any violent reaction. We don't even know we need protection!!! BAD LAW!!!!! WE SHOULD NOT HAVE DOGS AT CBW.

53. Paragraph 53 of the Second Amended Complaint is denied.

Joint Appendix Vol. II Page 2533

Talkington Answer to Plaintiff's
Second Amended Complaint
*Kromenhoek v. Cowpet Bay West Condominium Association, et al.*
Case No. ST-12-CV-00025
Page 9

---

54. Defendant Talkington is without knowledge or information sufficient to form a belief as to the truth of the matters alleged in Paragraph 54 of the Second Amended Complaint.

55. Defendant Talkington is without knowledge or information sufficient to form a belief as to the truth of the matters alleged in Paragraph 55 of the Second Amended Complaint.

56. Defendant Talkington is without knowledge or information sufficient to form a belief as to the truth of the matters alleged in Paragraph 56 of the Second Amended Complaint.

57. Defendant Talkington is without knowledge or information sufficient to form a belief as to the truth of the matters alleged in Paragraph 57 of the Second Amended Complaint.

58. Paragraph 58 of the Second Amended Complaint is denied. It is affirmatively stated that on October 26, 2011 Defendant Talkington posted on the blog a copy of his e-mail letter to the Board of Directors of that date.

59. Defendant Talkington is without knowledge or information sufficient to form a belief as to the truth of the matters alleged in Paragraph 59 of the Second Amended Complaint.

60. Defendant Talkington is without knowledge or information sufficient to form a belief as to the truth of the matters alleged in Paragraph 60 of the Second Amended Complaint.

Joint Appendix Vol. II Page 2534

Talkington Answer to Plaintiff's
Second Amended Complaint
*Kromenhoek v. Cowpet Bay West Condominium Association, et al.*
Case No. ST-12-CV-00025
Page 10

61. Defendant Talkington is without knowledge or information sufficient to form a belief as to the truth of the matters alleged in Paragraph 61 of the Second Amended Complaint.

62. Defendant Talkington is without knowledge or information sufficient to form a belief as to the truth of the matters alleged in the first sentence of Paragraph 62 of the Second Amended Complaint. The remaining allegations of paragraph 62 are denied. It is affirmatively stated that Douglas Reebak's blog posting of November 12, 2011 was posted in response to Defendant Talkington's blog posting criticizing the board of directors for excluding owners from meetings of the board of directors in general, with no reference to the Plaintiff's request to allow a dog in her unit.

63. Defendant Talkington is without knowledge or information sufficient to form a belief as to the truth of whether Kromenhoek objected to the release of the October 28, 2011 letter. The balance of paragraph 63 is denied as it inaccurately states the contents of the referenced letter.

64. Paragraph 64 of the Second Amended Complaint is admitted. A true and accurate copy of the October 30, 2011 blog post is attached as Exhibit C.

65. Defendant Talkington is without knowledge or information sufficient to form a belief as to the truth of the matters alleged in Paragraph 65 of the Second Amended Complaint.

Joint Appendix Vol. II Page 2535

Talkington Answer to Plaintiff's
Second Amended Complaint
*Kromenhoek v. Cowpet Bay West Condominium Association, et al.*
Case No. ST-12-CV-00025
Page 11

---

66. Defendant Talkington is without knowledge or information sufficient to form a belief as to the truth of the matters alleged in Paragraph 66 of the Second Amended Complaint.

67. Defendant Talkington is without knowledge or information sufficient to form a belief as to the truth of the matters alleged in Paragraph 67 of the Second Amended Complaint.

68. Defendant Talkington is without knowledge or information sufficient to form a belief as to the truth of the matters alleged in Paragraph 68 of the Second Amended Complaint.

69. Paragraph 69 of the Second Amended Complaint is denied as it is not a complete reference to the December 5, 2011 blog posting. A true, accurate and complete copy of the December 5, 2011 blog posting is attached as Exhibit D.

70. Defendant Talkington is without knowledge or information sufficient to form a belief as to the truth of the matters alleged in Paragraph 70 of the Second Amended Complaint.

71. Defendant Talkington is without knowledge or information sufficient to form a belief as to the truth of the matters alleged in the first sentence of Paragraph 71 of the Second Amended Complaint. The second sentence of Paragraph 71 is denied.

72. Defendant Talkington is without knowledge or information sufficient to form a belief as to the truth of the matters alleged in Paragraph 72 of the Second Amended Complaint.

Joint Appendix Vol. II Page 2536

Talkington Answer to Plaintiff's
Second Amended Complaint
*Kromenhoek v. Cowpet Bay West Condominium Association, et al.*
Case No. ST-12-CV-00025
Page 12

---

73. Defendant Talkington is without knowledge or information sufficient to form a belief as to the truth of the matters alleged in Paragraph 73 of the Second Amended Complaint.

74. Defendant Talkington is without knowledge or information sufficient to form a belief as to the truth of the matters alleged in Paragraph 74 of the Second Amended Complaint.

75. Paragraph 75 of the Second Amended Complaint is denied as it inaccurately states the contents of the January 15, 2012 blog entry. A true and accurate copy of the entire January 15, 2012 blog entry is attached as Exhibit E.

76. Defendant Talkington is without knowledge or information sufficient to form a belief as to the truth of the matters alleged in Paragraph 76 of the Second Amended Complaint.

77. Defendant Talkington is without knowledge or information sufficient to form a belief as to the truth of the matters alleged in Paragraph 77 of the Second Amended Complaint.

78. Defendant Talkington is without knowledge or information sufficient to form a belief as to the truth of the matters alleged in Paragraph 78 of the Second Amended Complaint.

79. Defendant Talkington is without knowledge or information sufficient to form a belief as to the truth of the matters alleged in Paragraph 79 of the Second Amended Complaint.

Joint Appendix Vol. II Page 2537

Talkington Answer to Plaintiff's
Second Amended Complaint
*Kromenhoek v. Cowpet Bay West Condominium Association, et al.*
Case No. ST-12-CV-00025
Page 13

---

80. Defendant Talkington is without knowledge or information sufficient to form a belief as to the truth of the matters alleged in Paragraph 80 of the Second Amended Complaint.

81. Defendant Talkington is without knowledge or information sufficient to form a belief as to the truth of the matters alleged in Paragraph 81 of the Second Amended Complaint.

82. Defendant Talkington is without knowledge or information sufficient to form a belief as to the truth of the matters alleged in Paragraph 82 of the Second Amended Complaint.

83. Defendant Talkington is without knowledge or information sufficient to form a belief as to the truth of the matters alleged in Paragraph 83 of the Second Amended Complaint.

84. Paragraph 84 of the Second Amended Complaint is admitted.

85. Defendant Talkington is without knowledge or information sufficient to form a belief as to the truth of the matters alleged in Paragraph 85 of the Second Amended Complaint.

86. Defendant Talkington is without knowledge or information sufficient to form a belief as to the truth of the matters alleged in Paragraph 86 of the Second Amended Complaint.

87. Defendant Talkington is without knowledge or information sufficient to form a belief as to the truth of the matters alleged in Paragraph 87 of the Second Amended Complaint.

88. Paragraph 88 of the Second Amended Complaint is admitted.

Joint Appendix Vol. II Page 2538

Talkington Answer to Plaintiff's
Second Amended Complaint
*Kromenhoek v. Cowpet Bay West Condominium Association, et al.*
Case No. ST-12-CV-00025
Page 14

89. Paragraph 89 of the Second Amended Complaint is denied as it misstates the contents of the March 25, 2012 blog entry. A true and accurate copy of this blog post is attached as Exhibit F.

90. There is no paragraph 90 in the Second Amended Complaint.

91. Paragraph 91 of the Second Amended Complaint is admitted.

92. Paragraph 92 of the Second Amended Complaint is denied as it fails to accurately state the contents of Mr. Felice's comments. Mr. Felice stated:

> Was it Cary Grant,who spoke the line " JUDY , JUDY , JUDY " In one of his many memorable parts on film ,in years gone by ??? Today ,the same phrase is quite appropriate if one asks ,WHO IS THE SOURCE OF SO MANY CBW PROBLEMS !!! JUDI ,Judi ,judi !!!! She is not alone ,for sure ! She has recruited JerseyBarb, Rosie and sometimes Vinnie,as a warlock,into her coven ,and convinced DICK to be her shill !! Most of our problems began with her 2010 year end E-mail asking for a by-law change to accomodate her insurance plot, allowing for questions to her, but NEVER answering any, AND stating NO RESPONSE WOULD BE USED AS AN AGREED VOTE !!!!! The response was tremendous !!!! I had dozens of emails, with many questions asked, disagreements voiced and general dissatisfaction aroused. JUDI did NOT respond to the avalanche of mail, ignored the reaction , AND OBLIGATED CBW TO A HORRENDOUS INSURANCE POLICY. When board members tried to question'TUNICK' , they were told they would ONLY speak to JUDI !!! Is Tunick in her pocket, do they insure her or her families many restaurants? Subsequent resolution to the insurance disaster, which the board had to fix (without us being co-insurers) cost CBW some $150,000 ($1500 each). THANKS FRAU JUDI !!!! Many individuals who are KNOWLEDGABLE in insurance agree with the boards decisions, despite the minority opposition and attempted coupe. They say it was "rammed down their throat". I thought they just lost the vote 4-3!!! they did have their say ,but lost to the majority !!1 A NATURAL DEMOCRATIC PROCESS !! They just don't like rules and will not abide by them !!! Can you imagine a board member, and the past president to boot, parading a DOG on our

Joint Appendix Vol. II Page 2539

Talkington Answer to Plaintiff's
Second Amended Complaint
*Kromenhoek v. Cowpet Bay West Condominium Association, et al.*
Case No. ST-12-CV-00025
Page 15

> property, when it is specifically a NO NO !!! Anarchy, disrespectful, illegal, unlawful, nasty AND THEY WANT TO BE RE-ELECTED TO OUR BOARD !!! GOOD GRIEF CHARLIE BROWN, DO THEY THINK WE ARE DEAF ,DUMB AND BLIND? Vinnie is wisely not running, but be careful of "DICK", he was at last years meeting to allow Judi to "innocently" answer the airline ticket demise!!! THERE IS ONLY ONE SENSIBLE VOTE DOUG ED AND HERB

93. Paragraph 93 of the Second Amended Complaint is admitted.

94. Paragraph 94 of the Second Amended Complaint is denied. It is affirmatively stated that on or about April 11, 2012 the Board of Directors sent a letter to Plaintiff confirming that she could have an emotional support animal in her residence.

95. Defendant Talkington is without knowledge or information sufficient to form a belief as to the truth of the matters alleged in Paragraph 95 of the Second Amended Complaint.

96. Defendant Talkington is without knowledge or information sufficient to form a belief as to the truth of the matters alleged in Paragraph 96 of the Second Amended Complaint.

97. It is denied that any personal or private information relating to the Plaintiff was provided to Defendant Talkington. Defendant Talkington is without knowledge or information sufficient to form a belief as to the truth of the balance of the matters alleged in Paragraph 97 of the Second Amended Complaint.

98. Defendant Talkington is without knowledge or information sufficient to form a belief as to the truth of the matters alleged in Paragraph 98 of the Second Amended Complaint.

Joint Appendix Vol. II Page 2540

Talkington Answer to Plaintiff's
Second Amended Complaint
*Kromenhoek v. Cowpet Bay West Condominium Association, et al.*
Case No. ST-12-CV-00025
Page 16

---

99. Defendant Talkington is without knowledge or information sufficient to form a belief as to the truth of the matters alleged in Paragraph 99 of the Second Amended Complaint.

**COUNT I - VIOLATION OF THE FHA**

100-109. These paragraphs require no response from Defendant Talkington as this count seeks no relief as to this Defendant.

**COUNT II: VIOLATION OF SECTION 3617 OF THE FHAA**

110-116. These paragraphs require no response from Defendant Talkington as this count seeks no relief as to this Defendant.

**COUNT III: VIOLATION OF SECTION 3617 OF THE FHAA**

117-122. These paragraphs require no response from Defendant Talkington as this count seeks no relief as to this Defendant.

**COUNT IV: VIOLATION OF SECTION 3617 OF THE FHA**

123-128. These paragraphs require no response from Defendant Talkington as this count seeks no relief as to this Defendant.

**COUNT V: VIOLATION OF SECTION 3617 OF THE FHA**

129. Defendant Talkington here incorporates by reference his previous responses to the preceding paragraphs of the Second Amended Complaint.

130. Paragraph 130 of the Second Amended Complaint is denied.

131. Paragraph 131 of the Second Amended Complaint is denied.

132. Paragraph 132 of the Second Amended Complaint is denied.

133. Paragraph 133 of the Second Amended Complaint is denied.

Joint Appendix Vol. II Page 2541

Talkington Answer to Plaintiff's
Second Amended Complaint
*Kromenhoek v. Cowpet Bay West Condominium Association, et al.*
Case No. ST-12-CV-00025
Page 17

134. Paragraph 134 of the Second Amended Complaint is denied.

135. Paragraph 135 of the Second Amended Complaint is denied.

136. Paragraph 136 of the Second Amended Complaint is denied.

137. Paragraph 137 of the Second Amended Complaint is denied.

**COUNT VI: VIOLATION OF THE AMERICAN WITH DISABILITIES ACT**

138-143. These paragraphs require no response from Defendant Talkington as this count seeks no relief as to this Defendant.

**COUNT VII: BOARD EXCEEDED ITS AUTHORITY BY ADOPTING THE NO DOGS RULE**

144-149. These paragraphs require no response from Defendant Talkington as this count seeks no relief as to this Defendant.

**COUNT VIII: THE FEBRUARY 2012 AMENDMENT TO THE BYLAWS IS VOID**

150-156. These paragraphs require no response from Defendant Talkington as this count seeks no relief as to this Defendant.

**COUNT IX - NEGLIGENCE**

157-161. These paragraphs require no response as this count has been dismissed by the Court's Order of March 31, 2014.

**COUNT IX: INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS**

162-170. These paragraphs require no response from Defendant Talkington as this count seeks no relief as to this Defendant, and this Court has ordered Plaintiff to amend the allegations of this count of the Second Amended Complaint.

Joint Appendix Vol. II Page 2542

Talkington Answer to Plaintiff's
Second Amended Complaint
*Kromenhoek v. Cowpet Bay West Condominium Association, et al.*
Case No. ST-12-CV-00025
Page 18

**COUNT X: CONSPIRACY TO COMMIT AN UNAUTHORIZED ACT**

171-174. These paragraphs require no response at this time as this Court has dismissed this count with leave to amend.

**COUNT XI: PRIMA FACIE TORT CLAIM**

175-179. These paragraphs require no response as this Court has dismissed this count without leave to amend.

**COUNT XII: DEFAMATION AND SLANDER PER SE**

181-184. These paragraphs require no response as this Court has dismissed this count without leave to amend.

**COUNT XIII: NEGLIGENT AND/OR INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS**

185. Defendant Talkington here incorporates by reference his previous responses to the preceding paragraphs of the Second Amended Complaint.

186. Paragraph 186 of the Second Amended Complaint is denied.

187. Paragraph 187 of the Second Amended Complaint is denied.

188. Paragraph 188 of the Second Amended Complaint is denied.

189. Defendant Talkington is without knowledge or information sufficient to form a belief as to the truth of the matters alleged in Paragraph 189 of the Second Amended Complaint.

190. Defendant Talkington is without knowledge or information sufficient to form a belief as to the truth of the matters alleged in Paragraph 190 of the Second Amended Complaint.

Joint Appendix Vol. II Page 2543

Talkington Answer to Plaintiff's
Second Amended Complaint
*Kromenhoek v. Cowpet Bay West Condominium Association, et al.*
Case No. ST-12-CV-00025
Page 19

191. Defendant Talkington is without knowledge or information sufficient to form a belief as to the truth of the matters alleged in Paragraph 191 of the Second Amended Complaint.

192. Paragraph 192 of the Second Amended Complaint is denied.

193. Paragraph 193 of the Second Amended Complaint is denied.

194. Paragraph 192 of the Second Amended Complaint is denied.

195. Paragraph 192 of the Second Amended Complaint is denied.

**COUNT XIV: INVASION OF PRIVACY; PUBLIC DISCLOSURE OF PRIVATE FACTS**

196-202. These paragraphs require no response from Defendant Talkington as this count seeks no relief as to this Defendant.

**COUNT XV: INVASION OF PRIVACY; PUBLIC DISCLOSURE OF PRIVATE FACTS**

203. Defendant Talkington here incorporates by reference his previous responses to the preceding paragraphs of the Second Amended Complaint.

204. Paragraph 204 of the Second Amended Complaint is denied.

205. Defendant Talkington is without knowledge or information sufficient to form a belief as to the truth of the matters alleged in Paragraph 205 of the Second Amended Complaint.

206. Defendant Talkington is without knowledge or information sufficient to form a belief as to the truth of the matters alleged in Paragraph 206 of the Second Amended Complaint.

207. Paragraph 207 of the Second Amended Complaint is denied.

Joint Appendix Vol. II Page 2544

Talkington Answer to Plaintiff's
Second Amended Complaint
*Kromenhoek v. Cowpet Bay West Condominium Association, et al.*
Case No. ST-12-CV-00025
Page 20

208. Paragraph 208 of the Second Amended Complaint is denied.

209. Paragraph 209 of the Second Amended Complaint is denied.

**COUNT XVI: INVASION OF PRIVACY; FALSE LIGHT**

211-215. These paragraphs require no response at this time as this Court has dismissed this count with leave to amend.

**COUNT XVII: INVASION OF PRIVACY**

216. Defendant Talkington here incorporates by reference his previous responses to the preceding paragraphs of the Second Amended Complaint.

217. Paragraph 217 of the Second Amended Complaint is denied.

218. Defendant Talkington is without knowledge or information sufficient to form a belief as to the truth of the matters alleged in Paragraph 218 of the Second Amended Complaint.

219. Paragraph 219 of the Second Amended Complaint is denied.

220. Paragraph 220 of the Second Amended Complaint is denied.

221. Paragraph 221 of the Second Amended Complaint is denied.

222. Defendant Talkington is without knowledge or information sufficient to form a belief as to the truth of the matters alleged in Paragraph 222 of the Second Amended Complaint.

223. Paragraph 223 of the Second Amended Complaint is denied as this Defendant did not publish any private information relating to the Plaintiff.

224. Paragraph 224 of the Second Amended Complaint is denied.

Joint Appendix Vol. II Page 2545

Talkington Answer to Plaintiff's
Second Amended Complaint
*Kromenhoek v. Cowpet Bay West Condominium Association, et al.*
Case No. ST-12-CV-00025
Page 21

225-234. There are no paragraphs 225 through 234 in the Second Amended Complaint.

**COUNT XVIII: NEGLIGENCE PER SE/LEGAL MALPRACTICE**

235-239. These paragraphs require no response at this time as this Court has dismissed this count with leave to amend, and this Count seeks no relief against this Defendant.

**AFFIRMATIVE DEFENSES**

1. Plaintiff's Second Amended Complaint, in whole or in part, fails to state a claim upon which relief may be granted.

2. Plaintiff's claims are barred, in whole or in part, by the applicable statute of limitations or otherwise by the passage of time.

3. Plaintiff's Second Amended Complaint fails to state a claim for punitive damages.

4. Plaintiff's claims as to this Defendant are barred, in whole or in part, by the provisions of the federal Communications Decency Act. 47 U.S.C. §230.

5. Plaintiff's claims for invasion of privacy are barred by the Plaintiff's own disclosures of any information claimed to be private.

6. Plaintiff has suffered no damages, and was never denied her requested reasonable accommodation as her dog was never excluded from the premises.

Joint Appendix Vol. II Page 2546

Talkington Answer to Plaintiff's
Second Amended Complaint
*Kromenhoek v. Cowpet Bay West Condominium Association, et al.*
Case No. ST-12-CV-00025
Page 22

---

WHEREFORE, Defendant Lance Talkington prays this Court to enter judgment:

- dismissing Plaintiff's claims with prejudice;
- awarding Defendant his costs and attorneys fees; and
- awarding such other and further relief as is appropriate in the circumstances of this action.

Dated: April 14, 2014

By: /s/ John H. Benham, III
John H. Benham, III, Esq.
V.I. Bar No. 130
Benham & Chan
P.O. Box 11720
St. Thomas, V.I. 00801
Tel. (340) 774-0673
Fax. (340) 776-3630
benham@bclawvi.com

CERTIFICATE OF SERVICE

I hereby certify that on the 14th day of April 2014, I electronically filed the foregoing DEFENDANT LANCE TALKINGTON'S ANSWER TO PLAINTIFF'S SECOND AMENDED COMPLAINT with the Clerk of the Court using the CM/ECF system which will send a notification of such filling (NEF) to:

Karin A. Bentz, Esq.
Julita K. De Leon, Esq.
5150 Dronningens Gade, Suite 8
St. Thomas, VI 00802
kbentz@virginlaw.com

Richard P. Farrelly, Esq.
Birch de Jongh & Hindels, PLLC
1330 Taarneberg
St. Thomas, VI 00802
rfarrelly@bdhlawvi.com

Joseph G. Riopelle, Esq.
Boyd Richards Parker & Colonnelli, P.L.
Rivergate Tower Suite 1150
400 N. Ashley Drive
Tampa, FL 33602

Joint Appendix Vol. II Page 2547

Talkington Answer to Plaintiff's
Second Amended Complaint
*Kromenhoek v. Cowpet Bay West Condominium Association, et al.*
Case No. ST-12-CV-00025
Page 23

---

jriopelle@boydlawgroup.com

Ryan S. Meade, Esq.
Quintairos, Prieto, Wood & Boyce, P.A.
9300 South Dadeland Blvd., 4th Floor
Miami, FL 33156
rmeade@qpwblaw.com

By: /s/ John H. Benham, III

Joint Appendix Vol. II Page 2548

# Cowpet Bay West Blog

## An Informed Active Community

### Dogs At Cowpet

September 27, 2011

Wow – it's been, like, weeks since time has been available to bring more info to the blog. Darned work always seems to find a way to interfere. OK..... finding time has finally happened, so let's go for it.

As our sign at the entrance says, dogs are not allowed on the property. That seems pretty clear and simple, right? Well….operationally it's not quite as simple as it may appear. We have been informed over the last several months of at least three owners who have been seen with dogs that are either living in condos or are being entertained by an owner walking them on the property. From reports made by owners to the blog, two of these owners are present and past board members. To date, the association has not had formal bylaws dealing with the issue of dogs on the property, and it is time to do something in this regard to eliminate any confusion over possible exceptions to the general rule as outlined on our signage.

There may be valid reasons for exceptions to the general rule for an owner who has a clearly defined disability and is unable to function without a "service" type dog. The question revolves around how to define the exception. Recently elected board member Bill Canfield has done some research on the issue by obtaining guidance from the Americans with Disabilities Act, and Treasurer Sharon Koehler has worked to assimilate the information into what hopefully will end up as a workable bylaw revision.

According to the ADA, a service dog is "any guide dog, signal dog, or other animal individually trained to provide assistance to an individual with a disability." This could be a dog helping a wheelchair-bound individual, a blind person, or a sick and/or elderly person. Service dogs are highly trained animals and are often identified by the special collars or harnesses they wear.

Also from the ADA website – The Department is proposing new regulatory text in § 35.104 to formalize its position on emotional support or comfort animals, which is that ''[a]nimals whose sole function is to provide emotional support, comfort, therapy, companionship, therapeutic benefits, or promote emotional wellbeing are not service animals.'' The Department wishes to underscore that the exclusion of emotional support animals from ADA coverage does not mean that persons with psychiatric, cognitive, or mental disabilities cannot use service animals. The Department proposes specific regulatory text in § 35.104 to make this clear: ''[t]he term service animal includes individually trained animals that do work or perform tasks for the benefit of individuals with disabilities, including psychiatric, cognitive, and mental disabilities.'' This language simply clarifies the Department's longstanding position."



The guidance for Cowpet to use appears to be very well laid out by the ADA in these guidelines. We need a bylaw that properly restricts use of animals for very specific and legitimate purposes. Adopting the ADA'a language would be a very simple and straightforward way to achieve an easy to follow bylaw for our association.

LT-2

October 13, 2011 at 8:38 am

Board members notoriously break rules. How can this women have a dog but everyone else can't? The beauty of a condo association is that everyone has to follow the rules and as such supposedly benefits the community. It's not fair for Barbara to have a dog if you can't. Further to her threat of legal action, don't worry about that. You have something called the first amendment behind you and as long as you tell the truth she's just blowing off steam. I would suggest you file a written complaint to the board and ask for a response. I own 3 condo's and whenever something is formal they are required to respond. This is the best approach to seeing her "papers".

2. 

**Lance Talkington** *said:*

October 13, 2011 at 8:41 am

Great idea on making a formal inquiry. Thanks for the input.

3. 

**alfred felice** *said:*

October 13, 2011 at 10:33 am

It would seem to me that it is the same small minority of owners who constantly cause the majority of our communitys disruption !!! Apparently they have no regard for the huge majority. "service dogs " for true needs are LEGAL ,but anyone can get such a designation by simple reguest from a friendly physician ,regardless of any real need.Anyone can also get one via the internet for a minimal fee !!!! When someone joins a community one would be expected to "follow the rules". Failure to do so indicates a total disregard for ones neighbors rights and needs. Many have serious allergies,some are disturbed by constant noise harassment, some dislike the stink of the animal, and many are grossed out by the thought of walking on the beach through the run off of urination and feces !!!! The antics of the cute pups are not so cute when they are sicking their nose in someones crotch or attempting fornication on ones leg .These disgusting actions are why some ,maybe most,owners chose to live in a dog free community.When sneaking around these rules ,the perpetrators might just as well spit in our face. The by-laws must be made to reflect the majorities rights.Perhaps,the dessenters would be happier in another community rather than be ostracized at CBW, which would be another fine recourse , besides a significant $$ fine ,with progressive amounts. Al Felice

# Cowpet Bay West Blog

## An Informed Active Community

### Board Response To Request For Rules Enforcement

October 30, 2011

A few days ago, the blog emailed a formal request to the board for rules enforcement. There continue to be owners who are known to have dogs on the property. Two of those owners are current board member Barbara Walters and former board member and immediate past president Judi Kromenhoek. Earlier blog posts about the dogs issue and the request for rules enforcement may be viewed for details. There have been two earlier formal requests to the board from another owner requesting that the dogs rule be enforced. The board has responded to Barbara and Judi with the following correspondence that was copied to the blog as a formal response to our request. Kudos to the board for doing the right thing by enforcing a rule to which we all agreed to abide when purchasing property in the community.

*Judi and Barbara,*

*Cowpet Bay West's current rules are very clear – No Dogs. You are both in violation of these rules, and owners have complained to the Board.*

*As you know, the Board is considering absorbing the "No Dogs" rule into the by-laws, and allowing exceptions, upon application to the board with supporting documentation, for service dogs.*

*Louanne tells me that both of you have "papers in the office" regarding service dogs; however, you have not applied for an exception to the rule.*

*If you, as owners and users of service dogs as defined and documented in accordance with ADA rules, wish an exception, you must apply in writing or electronically to the Board and submit supporting documentation. You have 10 days to submit this request. It will be considered at the November Board meeting, and you will be informed of the outcome. Barbara, you must recuse yourself from voting since you are a Board Member.*

*Even though you are clearly in violation of the rules, this offer is being made in good faith, and in the spirit of the consensus of the Board as demonstrated in our by-law discussions.*

*If you do not avail yourselves of this offer, you are subject to being fined under the current rules of the association at the November meeting.*

*M. M. Harcourt*

*President, CBW Condo Association*

Exhibit C

# Cowpet Bay West Blog

## An Informed Active Community

### Barking Puppy Dogs

December 5, 2011

So far our illegal neighborhood puppy dogs have been seen and smelled but not heard. Until now. Following is an email sent from an owner this morning:

*Jackie,*

*To answer your specific question there is an existing issue and not just a potential problem. Last Monday, Nov 28th a dog left in a high number Windward unit was incessantly barking to the great distraction of our household. This was in the evening and in order for my daughter to do her homework she had to hide out in our bedroom on the street side of the unit. In addition we had to close our windows and put the air-conditioning on – an expense to us and denying us of the advantage of a balcony situated in the Caribbean.*

*Regards,*

*Niall Bartlett, Leeward 47.*

Niall lives on the end of Leeward nearest the gate house. The 40's area of Windward is directly below his unit, and this coincidentally happens to be the very spot where our known violaters Barbara Walters (current board member) and Judy Kromenhoek (immediate past board president) live. If the noise is a high pitched yip, it's Barbara's dog. If it's a deeper barking noise, the dog is Judy's. Maybe blog readers who live in that area can comment on whose dog may be today's perpetrator. As an aside, trained service dogs are specificaly trained to NOT bark unless the owner is in imminent danger. Maybe one of the pups pooped in the owner's unit and was warning the owner to watch out?

These two owners continue to fight for their puppy dogs tooth and nail out of our collective view due to the monthly board meetings being closed to owners. Don't be surprised to see either or maybe both of them show up as candidates for the three open seats on the board. They desperately want to be in power to control this issue that is very real and very personal to both of them.

**Comments on: "Barking Puppy Dogs" (1)**

1.

# Cowpet Bay West Blog

## An Informed Active Community

### Puppy Dog Diplomas

January 15, 2012

Readers of the blog may recall a comment that Cowpet owner and board candidate Judi Krohmenick made recently regarding the "certification" of her puppy. She claimed that her puppy is a "trained, legally certified service animal". We asked her what that meant and have had no response. After a recent board meeting discussion on the subject of dogs, it's become much clearer what is really happening with puppy dog diplomas.

The board was provided details on the various "certifications" of owner puppies at the January board meeting. Information distributed at the meeting indicated that Judi's puppy is certified by an outfit called Goldstar German Shepherds. We've done some research and found out that for the one time low price of as little as $71.50, a dog owner can obtain all sorts of really cool gadgets and puppy certification without having to leave the comfort of your computer. All anyone has to do is print the little form from their web site; fill out a name; address; and other basic info; write a check; and boom – you get all of the way cool proof needed to tell the world about your very own certified service animal. How tidy is that, right? Heck, if you're in a hurry, operators are standing by at 702-497-7229 to avoid the nasty wait for the mail to make it to them. The link to their site is here for those who would like to see for themselves how all of us can have a certified service animal in darn near no time at all.

http://www.goldstar-germanshepherds.com/certification_licensing.html

The information distributed at the board meeting also indicated that Barbara Walter's and Joel Kirschenbaum's puppies are "certified" by an outfit called the National Service Animal Registry. Here is the link to the similarly totally cool three minute process to get your very own "certified" service puppy from this outfit:

http://www.nsarco.com/cgi-bin/product.cgi?id=081218004

There are at least ten outfits like these two on the Internet that offer the same type of "service". One of them (Service Dogs America) even has the gumption to state that "SDA recognizes that every person in America may have some form of disability". See this fascinating statement for yourself plastered in bold letters squarely in the middle of their home page:

http://www.servicedogsamerica.org/

It is the blog's considered opinion that these outfits serve no legitimate purpose and exist mainly to sidestep what the ADA works diligently to accomplish. These outfits make it plain on their sites that nothing is done to verify either the animal's credentials or the purported disability of

Case: 3:12-cv-00025-CVG-RM Document #: 178-9 Filed: 04/14/14 Page 2 of 2

the applicant owner. The board is working to put plain language in the proposed ByLaws that refers to ADA as the sole source of legitimacy. We now have the opportunity to stop the doggy diploma silliness and adopt clear ground rules for dogs at Cowpet.

# Cowpet Bay West Blog

## An Informed Active Community

### HUD Complaint

March 25, 2012

HUD Complaint Documents

The lengths to which a couple of owners will go to hang onto their puppies has now reached a whole new level. Attached in the above link is a formal complaint filed with HUD against the Association claiming that the association has engaged in "one or more discriminatory housing practices" against Ms. Walters (remember her – the recent board member and recent board candidate?) But wait – it gets better. The complaint also includes Yours Truly and Al Felice as co-offenders in the practice of discriminatory housing practices. That's right – not only has the Association supposedly discriminated against Ms. Walters, but in their minds so have the blog and Al.

And then, shortly after Ms. Walters files her complaint, along comes Ms. Kromenhoek (remember her – former board president and recent candidate for reelection?) who files the identical brand of complaint against the same three parties. It almost seems as though the two of them have been working together on this issue.

So fellow owners, let's ponder this for a moment. The ladies still have their puppies for whatever reason they claim is justifiable for having them. If they're truly disabled and can provide reasonable medical proof to the board, they should have their puppies. Instead of doing what another owner has already done by providing simple proof of disability, they not only refuse to do so but then haul off and file a complaint with the U.S. Government (translated "free legal help") in part against two individuals who are no more their landlords than the man in the moon. Really ladies? Do you seriously believe that either of two owners has any impact whatsoever on the Association's governance of this property in terms of your having those puppies? To call this fiasco of a complaint "misguided" is at the moment the most charitable description of the thought process (if there even was one) that was involved in filing this complaint.

As the attached documents demostrate, it fortunately didn't take HUD long to realize they had goofed in allowing complaints to be filed against non landlords. The complaints have now been properly amended to only include the Association. In the meantime, these ladies continue to have their puppies while the board has continued in vain to require them to produce appropriate evidence of their claimed disabilities.

It is the blog's opinion that these two individuals are doing everything possible in an attempt to be the playground bullie and make a mockery of our board. As the blog posted recently, it is time for the association to go on the offensive and file suit in a court of law to force the issue.

LT-39

Exhibit F

When these ladies have to start spending their own cash instead of relying on the government for free help, the rubber will meet the road on how far everyone is willing to go on this issue. As an owner recently commented on the blog, this is not just about puppy dogs – it's about rules and those who will do whatever they can to avoid abiding by them.

To the board – please take this to the courts. This silliness and demonstration of bully tactics by two owners have gone on long enough. If this situation is allowed to continue unresolved, the domino effect is not going to be pretty since owners will know that they can bend the rules for their own benefit without expecting accountability from the board. Spending money to pursue a legal action is not attractive, but it has become necessary to preserve the integrity of the board. The board may count our unit as being on board to share in the cost of pursuing this necessary action. We're willing to wager that there are plenty of other owners who feel similarly.

Case: 3:12-cv-00024-CVG-RM Document #: 211 Filed: 05/28/14 Page 1 of 11

IN THE DISTRICT COURT OF THE VIRGIN ISLANDS
DIVISION OF ST. THOMAS AND ST. JOHN

| | |
|---|---|
| BARBARA WALTERS,<br>Plaintiff,<br>vs.<br>COWPET BAY WEST CONDOMINIUM ASSOCIATION; THE BOARD OF THE COWPET BAY WEST CONDOMINIUM ASSOCIATION; MAX HARCOURT, in his personal capacity; ALFRED FELICE; LANCE TALKINGTON; ROBERT COCKAYNE; VINCENT VERDIRAMO<br>Defendants. | CASE NO. ST-12-CV-00024<br><br>Action for: Housing Discrimination; Discrimination Based on Disability; Invasion of Privacy; Negligent Infliction of Emotional Distress; Intentional Infliction of Emotional Distress; Punitive Damages; and Injunctive and Declaratory Judgment |

**DEFENDANT LANCE TALKINGTON'S OPPOSITION TO MOTION TO SUBSTITUTE LIANA WALTERS REVOCK AS BARBARA WALTERS' PERSONAL REPRESENTATIVE AND/OR HER SUCCESSOR IN INTEREST**

COMES NOW Defendant Lance Talkington ("Talkington"), by his attorneys Benham & Chan, and here states his Opposition to the Motion to Substitute Liana Walters Revock as Barbara Walters' Personal Representative and/or Her Successor in Interest ("Motion to Substitute", Doc. No. 201).

## I. Introduction and Summary

The Plaintiff Barbara Walters died on April 22, 2014. Counsel for Plaintiff has now moved to substitute Barbara Walters' daughter, Liana Walters Revock, in her stead as Plaintiff. This motion should be denied because:

- Liana Walters Revock cannot substitute as a party merely because she is the daughter of the deceased Plaintiff;

- the Plaintiff's claims based on local law do not survive her death; and

Talkington Opposition to Motion
for Substitution
*Walters v. Cowpet Bay West Condominium Association, et al.*
Case No. ST-12-CV-00024
Page 2

- the Plaintiff’s claim of a violation of the federal Fair Housing Act Amendments does not survive her death.

This Court should deny the motion for substitution.

## II. Analysis and Argument

### A. Liana Walters Revock cannot substitute as the Plaintiff unless she has been appointed as a representative of the Estate of Barbara Walters.

The motion to substitute states that Barbara Walters’ “daughter, Liana Walters Revock”, is her sole heir and personal representative”. *Motion to Substitute at 1.* The motion provides no information as to whether an estate has been opened, if so where the estate is pending, or whether Liana Walters Revock (“Revock”) is the executrix, administratrix or otherwise the “personal representative” of Barbara Walters’ estate. Assuming, *arguendo*, that Revock is Barbara Walters’ daughter and sole heir, that is does not allow her to substitute as a party in this action. Mere kinship is an insufficient basis to substitute as a plaintiff. *Roberson v. Wood*, 500 F.Supp. 854, 859 (S.D.Ill. 1980). Federal Rule of Civil Procedure 25(a) “clearly contemplates appointment of legal representatives, such as an executor or an administrator”. *Id.* Revock cannot substitute as the plaintiff as she is not a legal representative of the estate of Barbara Walters.

Joint Appendix Vol. II Page 2559

Talkington Opposition to Motion
for Substitution
*Walters v. Cowpet Bay West Condominium Association, et al.*
Case No. ST-12-CV-00024
Page 3

---

**B. The claims in the Second Amended Complaint based on Virgin Islands law do not survive the death of Barbara Walters.**

At common law all causes of action for personal tort abated upon the death of either the plaintiff or the defendant. *Farrington v. Benjamin*, 100 F.R.D. 474, 475 (D.V.I. 1984); *see also Restatement (Second) of Torts §900(1)(a)*(a cause of action for a tort may be discharged by the death of either party, in the absence of a statute providing for survival of the cause of action). That rule of the common law has been altered by statute in the Virgin Islands. The Virgin Islands survival statute states as follows:

> Survival of tort actions
>
> A thing in action arising out of a wrong which results in physical injury to the person or out of a statute imposing liability for such injury shall not abate by reason of the death of the wrongdoer or any other person liable for damages for such injury, nor by reason of the death of the person injured or of any other person who owns any such thing in action. When the person entitled to maintain such an action dies before judgment, the damages recoverable for such injury may include loss of earnings and expenses sustained or incurred as a result of the injury may include damages for pain, suffering and disfigurement, or punitive or exemplary damages, or prospective profits or earnings after the date of death. The damages recovered shall form part of the estate of the deceased. Nothing in this section shall be construed as making such a thing assignable.

Joint Appendix Vol. II Page 2560

Talkington Opposition to Motion
for Substitution
*Walters v. Cowpet Bay West Condominium Association, et al.*
Case No. ST-12-CV-00024
Page 4

---

5 V.I.C. § 77 (emphasis added). Barbara Walters' Second Amended Complaint alleges the following causes of action based on Virgin Islands law against Lance Talkington:[1]

- Count X - Conspiracy to Commit an Unauthorized Act ;
- Count XIII - Negligent and/or Intentional Infliction of Emotional Distress;
- Count XV - Invasion of Privacy: Public Disclosure of Private Facts;
- Count XVI - Invasion of Privacy: False Light; and
- Count XVII - Invasion of Privacy.

Nowhere in the above counts, nor anywhere else in the pleading, does Barbara Walters allege any "physical injury" to her person. Accordingly, these claims are subject to the Virgin Islands survival statute, and have been discharged by the death of Barbara Walters.

In a previous ruling in this case, the Court addressed whether the claims of Barbara Walters against Defendant Alfred Felice were discharged by Felice's death. *Order, June 14, 2013, Document No. 116.* In that ruling this Court held, without analysis, that the claims based on Virgin Islands law survived Felice's death. *Id. at 16-17.* In making that ruling this Court quoted the Virgin Islands tort survival statute, but made no reference to that statute's

---

1. These are the claims remaining after this Court's ruling of March 31, 2014 on the Defendants' motions to dismiss. *Document No. 168.*

Joint Appendix Vol. II Page 2561

Talkington Opposition to Motion
for Substitution
*Walters v. Cowpet Bay West Condominium Association, et al.*
Case No. ST-12-CV-00024
Page 5

---

language limiting survival of tort claims to those claims resulting in "physical injury to the person". That previous ruling also quoted a portion of the Virgin Islands probate code, which states as follows:

> Survival of actions
>
> Subject to the provisions of sections 76 and 77 of Title 5, causes of action by one person against another, whether arising on contract or otherwise, survive to the personal representatives of the former and against the personal representatives of the latter. When the cause of action survives, as herein provided, the executors or administrators may maintain an action thereon against the party against whom the cause of action accrued, or, after his death, against his personal representatives.

*15 V.I.C. §601* (emphasis added). To the extent that this portion of the Virgin Islands probate code purports to act as a general survival statute applicable to all causes of action, it is expressly "subject to" the provisions of the Virgin Islands wrongful death statute (section 76) and survival of tort actions statute (section 77).

The phrase "subject to" is not defined by statute. However, when construing a statute of the Virgin Islands, the Virgin Islands legislature has directed that "[w]ords and phrases shall be read with their context and shall be construed according to the common and approved usage of the English language". *1 V.I.C. §42.* The phrase "subject to" is commonly defined as meaning "subordinate, subservient, inferior, obedient to; governed or affected by,..." *Black's Law Dictionary 1594 (4th ed. 1968); see also Flower v.*

Joint Appendix Vol. II Page 2562

Talkington Opposition to Motion
for Substitution
*Walters v. Cowpet Bay West Condominium Association, et al.*
Case No. ST-12-CV-00024
Page 6

---

*Billerica,* 324 Mass. 519, 522, 87 N.E.2d 189 (1949) ("The words 'subject to,' used in their ordinary sense, mean 'subordinate to,' 'subservient to,' or 'limited by"). The general survival provision contained in the Virgin Islands probate code must be read in its entirety, meaning that the general survival language is "subject to" and subordinate to the specific language of the torts survival statute at section 77 of Title 5 Virgin Islands Code. The legislature intended that only personal tort actions resulting in "physical injury" will survive the death of the plaintiff. This reading of the statutory scheme is consistent with the commentary of section 900 of the *Restatement (Second) of Torts*, included at comment a to that section. This comment states, in relevant part:

> At early common law all causes of action for tort terminated on the death of either the tortfeasor or the injured party. As early as 1330, by statute an action could be maintained after the death of the owner for the taking of property that had diminished his estate. Aside from statute, a person who has obtained property from another since deceased is liable for its value, as also is his estate after his death, if suit is brought in a restitutionary action. In many states the early survival statute was accepted as part of the common law, and from the beginning the legislatures of the several states began to modify the common law by enacting statutes, so that today there are numerous statutes providing for survivorship after the death either of the tortfeasor or of the injured party for many kinds of tort claims involving both injury to things and injury to the person. When exceptions from a general survival statute are made, they are usually for actions of defamation, malicious prosecution, criminal conversation and similar wrongs.

Joint Appendix Vol. II Page 2563

Talkington Opposition to Motion
for Substitution
*Walters v. Cowpet Bay West Condominium Association, et al.*
Case No. ST-12-CV-00024
Page 7

---

This Court has previously held that section 77 of Title 5 is "a statute creating an exception to the general rule that personal torts terminate at death". *Hall v. Hall,* 2013 WL 4128465, Case No. 3:11–cv–00054, slip op. August 9, 2013 at *5 (D.V.I. 2013). This exception is limited to claims resulting in "physical injury to the person."[2] The general rule remains that personal torts terminate at death. None of the local law claims in the Second Amended Complaint allege any physical injury was suffered by Barbara Walters. All of the local law claims of Barbara Walters against Lance Talkington were discharged by the death of Barbara Walters.

**C. Barbara Walters' claim against Lance Talkington alleging violation of section 3617 of the federal Fair Housing Act Amendments does not survive Walters' death.**

This Court has previously held that Walters' claim against Alfred Felice for violation of section 3617 of the federal Fair Housing Act Amendments ("FHAA") survived the death of Felice. *Order, June 14, 2013, Document No. 116 at 10-16.* This Court, applying federal common law, held that Walters' claims against Felice were not extinguished by the death of Felice. *Id.* The

---

2. The *Restatement (Third) of Torts: Liability for Physical and Emotional Harm* maintains a clear distinction between "physical harm" and "emotional harm". This most recent *Restatement* defines "physical harm" as "the physical impairment of the human body ("bodily harm") or of real property or tangible personal property ("property damage"). Bodily harm includes physical injury, illness, disease, impairment of bodily function, and death". *Restatement (Third) at §4.*

On the other hand, "emotional harm" is defined as "impairment or injury to a person's emotional tranquility". *Id. at §45.*

Joint Appendix Vol. II Page 2564

Talkington Opposition to Motion
for Substitution
*Walters v. Cowpet Bay West Condominium Association, et al.*
Case No. ST-12-CV-00024
Page 8

---

issue presented now is the reverse of that confronted earlier by this Court - whether Walters' claim that Talkington violated section 3617 was extinguished by Walters' death. It is submitted that federal common law is not applicable to this issue, and that Walters' FHAA claim against Talkington was extinguished by her death.

As noted by this Court in the Felice decision, there is no Third Circuit precedent addressing survival of claims "under the FHA or FHAA". *Id. at 10.* Instead, this Court's analysis was guided by the language of Title 42 United States Code, section 1988 which states as follows:

> The jurisdiction in civil and criminal matters conferred on the district courts by the provisions of this chapter and Title 18, for the protection of all persons in the United States in their civil rights, and for their vindication, shall be exercised and enforced in conformity with the laws of the United States, so far as such laws are suitable to carry the same into effect; but in all cases where they are not adapted to the object, or are deficient in the provisions necessary to furnish suitable remedies and punish offenses against law, <u>the common law, as modified and changed by the constitution and statutes of the State wherein the court having jurisdiction of such civil or criminal cause is held, so far as the same is not inconsistent with the Constitution and laws of the United States, shall be extended to and govern the said courts in the trial and disposition of the cause</u>, and, if it is of a criminal nature, in the infliction of punishment on the party found guilty.

*42 U.S.C. §1988* (emphasis added). Pursuant to section 1988, the law of the Virgin Islands should be applied to this action, unless

Joint Appendix Vol. II Page 2565

application of local law would be "inconsistent with the Constitution and laws of the United States". Whether local law is consistent with federal law is determined by examination of the particular federal statute, and the policies expressed in the statute. *Robertson v. Wegman*, 436 U.S. 584, 590-91 (1978). The underlying policies expressed in the FHA and the FHAA are "to deter unlawful discriminatory conduct with respect to housing and provide compensation to those injured". *Community House, Inc. v. City of Boise, Idaho*, 2012 WL 368001, August 24, 2012 at *4 (D. Idaho 2012). Talkington is not a housing provider, nor does Walters' complaint allege that he is. Instead, Walters' only claim against Talkington alleging violation of section 3617 seeks an award of damages, and nothing more. As stated by the Supreme Court in *Robertson*, "[t]he goal of compensating those injured by a deprivation of rights provides no basis for requiring compensation of one who is merely suing as the executor of the deceased's estate". *Robertson,* 436 U.S. at 592. Further, a "state statute cannot be considered 'inconsistent' with federal law merely because the statute causes the plaintiff to lose the litigation". *Id. at 593.*

The United States District Court for the District of Idaho faced circumstances analogous to this matter in the *Community House* litigation cited above. In that action one of the plaintiffs, Greg Luther ("Luther"), died shortly before trial was to commence. As

Talkington Opposition to Motion
for Substitution
*Walters v. Cowpet Bay West Condominium Association, et al.*
Case No. ST-12-CV-00024
Page 10

---

with Barbara Walters, Luther had alleged housing discrimination on the basis of his handicapped status. *2012 WL 368001 at *1.* Luther's estate sought to be substituted as a party. The Idaho survival statute is limited to claims for personal injury or property damage. *Id. at *3.* Luther did not allege any claims for personal injury or property damage, only the FHAA discrimination claims. *Id.* The *Community House* court held that Luther's FHAA claims did not survive and abated upon his death. *Id. at *4-5.*

It is submitted that this Court should be guided by the decisions of the Supreme Court in *Robertson*, and the Idaho court in the *Community House* case. Resort to federal common law is only justified in those circumstances where local law is inconsistent with federal law. The FHAA does not contain any survivorship provisions, nor are the FHAA's underlying policies of deterring unlawful discrimination in housing served by the pursuit of a claim for damages against Lance Talkington as Talkington is not a housing provider. The mere fact that the plaintiff loses as the result of application of Virgin Islands law does not make Virgin Islands law inconsistent with federal law.

**III. <u>Conclusion</u>**

WHEREFORE, for the reasons set forth in detail above, Defendant Lance Talkington prays this Court to deny Liana Walters Revock's Motion to Substitute.

Joint Appendix Vol. II Page 2567

Talkington Opposition to Motion
for Substitution
*Walters v. Cowpet Bay West Condominium Association, et al.*
Case No. ST-12-CV-00024
Page 11

---

Dated: May 26, 2014

By: /s/ John H. Benham, III

John H. Benham, III, Esq.
V.I. Bar No. 130
Benham & Chan
P.O. Box 11720
St. Thomas, V.I. 00801
Tel. (340) 774-0673
Fax. (340) 776-3630
benham@bclawvi.com

CERTIFICATE OF SERVICE

I hereby certify that on the 26th day of May 2014, I electronically filed the foregoing DEFENDANT LANCE TALKINGTON'S OPPOSITION TO MOTION TO SUBSTITUTE LIANA WALTERS REVOCK AS BARBARA WALTERS' PERSONAL REPRESENTATIVE AND/OR HER SUCCESSOR IN INTEREST with the Clerk of the Court using the CM/ECF system which will send a notification of such filling (NEF) to:

Karin A. Bentz, Esq.
Julita K. De Leon, Esq.
5150 Dronningens Gade, Suite 8
St. Thomas, VI 00802
kbentz@virginlaw.com

Richard P. Farrelly, Esq.
Birch de Jongh & Hindels, PLLC
1330 Taarneberg
St. Thomas, VI 00802
rfarrelly@bdhlawvi.com

Joseph G. Riopelle, Esq.
Boyd Richards Parker & Colonnelli, P.L.
Rivergate Tower Suite 1150
400 N. Ashley Drive
Tampa, FL 33602
jriopelle@boydlawgroup.com

Ryan S. Meade, Esq.
Quintairos, Prieto, Wood & Boyce, P.A.
9300 South Dadeland Blvd., 4th Floor
Miami, FL 33156
rmeade@qpwblaw.com

By: /s/ John H. Benham, III

Joint Appendix Vol. II Page 2568

**DISTRICT COURT OF THE VIRGIN ISLANDS**
**DIVISION OF ST. THOMAS AND ST. JOHN**

**BARBARA WALTERS,**

**Plaintiff,**

**v.** — **Civil No. 2012-24**

**COWPET BAY WEST CONDOMINIUM ASSOCIATION; THE BOARD OF THE COWPET BAY WEST CONDOMINIUM ASSOCIATION; ED WARDWELL, MAX MARCOURT; BILL CANFIELD, ROSIE WELLS, SHARON KOEHLER, DOUG REBAK and HERB HORWITZ as Board members; MAX HARCOURT, in his personal capacity; LANCE TALKINGTON; ALFRED FELICE, ROBERT COKAYNE, and VINCENT VERDIRAMO,**

**Defendants.**

---

**JUDITH KROMENHOEK,**

**Plaintiff,**

**v.** — **Civil No. 2012-25**

**COWPET BAY WEST CONDOMINIUM ASSOCIATION; THE BOARD OF THE COWPET BAY WEST CONDOMINIUM ASSOCIATION; ED WARDWELL, MAX MARCOURT; BILL CANFIELD, ROSIE WELLS, SHARON KOEHLER, DOUG REBAK and HERB HORWITZ as Board members; MAX HARCOURT, in his personal capacity; LANCE TALKINGTON; ALFRED FELICE, ROBERT COKAYNE, and VINCENT VERDIRAMO,**

**Defendants.**

---

*Walters v. Cowpet Bay West Condominium Association, et al.*
Civil No. 2012-24
*Kromenhoek v. Cowpet Bay West Condominium Association, et al.*
Civil No. 2012-25
Memorandum Opinion and Order
Page 2

**ATTORNEYS:**

**Karin A. Bentz, Esq.**
Law Office of Karin Bentz, P.C.
St. Thomas, VI
*For Barbara Walters and Judith Kromenhoek,*

**Joseph G. Riopelle, Esq.**
Boyd Richards Parker & Colonnelli
Tampa, FL
**Carl R. Williams, Esq.**
**Richard P. Farrelly, Esq.**
Birch, Dejongh & Hindels
St. Thomas, VI
*For Cowpet Bay West Condominium Association, Ed Wardwell, Max Harcourt, Bill Canfield, Rosie Wells, Sharon Koehler, Doug Rebak, Robert Cockayne, Vincent Verdiramo, and Herb Horwitz,*

**John H. Benham, III, Esq.**
Watts, Benham & Sprehn, P.C.
St. Thomas, VI
*For Lance Talkington,*

**Ryan C. Meade, Esq.**
Quintairo, Prieto, Woo & Boyer, P.S.
Miami, FL
*For Alfred Felice.*

**ORDER**

**GÓMEZ, J.**

Before the Court are several motions by certain defendants ("the movants") to dismiss Walters v. Cowpet Bay West Condominium Association, et al., Civil No. 2012-24, and Kromenhoek v. Cowpet Bay West Condominium Association, et al., Civil No. 2012-25. The complaints in both cases are

Joint Appendix Vol. II Page 2570

*Walters v. Cowpet Bay West Condominium Association, et al.*
Civil No. 2012-24
*Kromenhoek v. Cowpet Bay West Condominium Association, et al.*
Civil No. 2012-25
Memorandum Opinion and Order
Page 3

substantially identical and involve many common questions of law and fact. Pursuant to Fed. R. Civ. P. 42, the two cases will be joined for the specific purpose of resolving the pending motions to dismiss. This Order applies to both complaints.

To survive a motion to dismiss, a plaintiff must offer "enough facts to state a claim to relief that is plausible on its face." *Bell Atlantic Corp. v. Twombly*, 127 S. Ct. 1955, 1974 (2007). A court must ask whether the complaint "contain[s] either direct or inferential allegations respecting all the material elements necessary to sustain recovery under *some* viable legal theory." *Twombly*, 127 S. Ct. at 1969 (emphasis in original) (quoting *Car Carriers, Inc. v. Ford Motor Co.*, 745 F.2d 1101, 1106 (7th Cir. 1984)).

"While a complaint attacked by a Rule 12(b)(6) motion to dismiss does not need detailed factual allegations, a plaintiff's obligation to provide the 'grounds' of his 'entitlement to relief' requires more than labels and conclusions, and a formulaic recitation of a cause of action's elements will not do." *Id.* at 1964-65 (internal citations omitted). Thus, "[t]o survive a motion to dismiss, a . . . plaintiff must allege facts that 'raise a right to relief above the speculative level on the assumption that the allegations in

Joint Appendix Vol. II Page 2571

*Walters v. Cowpet Bay West Condominium Association, et al.*
Civil No. 2012-24
*Kromenhoek v. Cowpet Bay West Condominium Association, et al.*
Civil No. 2012-25
Memorandum Opinion and Order
Page 4

the complaint are true (even if doubtful in fact).'" *Victaulic Co. v. Tieman*, 499 F.3d 227, 234 (3d Cir. 2007) (quoting *Twombly*, 127 S. Ct. at 1965). The Court, in considering if there are facts in the Complaint sufficient to show plausible entitlement to relief, disregards any allegations in the Complaint which are merely "labels and conclusions [or] a formulaic recitation of the elements." *Twombly*, 550 U.S. at 555.

"Generally, a district court may not consider matters outside the Complaint when ruling on a motion to dismiss." *Cerome v. Moshannon Valley Corr. Center*, 2010 U.S. App. LEXIS 24938, at *9 (3d Cir. 2010). Under Rule 12(d), if, on a motion under Rule 12(b)(6), matters outside of the pleadings are presented to and not excluded by the court, the motion must generally be treated as one for summary judgment under Rule 56. *Id*. "However, 'an exception to the general rule is that a document *integral to or explicitly relied upon* by the complaint may be considered without converting the motion [to dismiss] into one for summary judgment.'" *Id*. (quoting *In re Burlington Coat Factory Sec. Litig.*, 114 F.3d 1410, 1426 (3d Cir. 1997) (internal citations and quotations omitted); *see also In re Trump*, 7 F.3d 357, 368 n.9 (3d Cir. 1993) ("[A] court may consider an undisputedly authentic document that a defendant

Joint Appendix Vol. II Page 2572

*Walters v. Cowpet Bay West Condominium Association, et al.*
Civil No. 2012-24
*Kromenhoek v. Cowpet Bay West Condominium Association, et al.*
Civil No. 2012-25
Memorandum Opinion and Order
Page 5

attaches as an exhibit to a motion to dismiss if the plaintiff's claims are based on the document.") (internal citations and quotations omitted).

Applying the standard outlined above, the Court finds that Walters and Kromenhoek have failed to state a claim on which relief can be granted with respect to Counts Nine (Negligence and IIED), Ten, Eleven, Twelve, Sixteen, and Eighteen. The Court futher finds that it would be futile to grant leave to amend Counts Nine (Negligence), Eleven, and Twelve.

The premises considered, it is hereby

**ORDERED** that the motions to dismiss are **GRANTED IN PART and DENIED IN PART**; it is further

**ORDERED** that the motion to dismiss Counts One, Two, Three, Four, Five, Six, Seven, Eight, Nine (IIED), Ten, Thirteen, Fourteen, Fifteen, Sixteen, Seventeen, and Eighteen, is **DENIED**; it is further

**ORDERED** that the motion to dismiss Counts Nine (Negligence), Eleven, and Twelve, is **GRANTED**; it is further

**ORDERED** that Walters shall, no later than April 14, 2014, amend Counts Nine (IIED), Ten, Sixteen, and Eighteen, of her Complaint; it is further

Joint Appendix Vol. II Page 2573

*Walters v. Cowpet Bay West Condominium Association, et al.*
Civil No. 2012-24
*Kromenhoek v. Cowpet Bay West Condominium Association, et al.*
Civil No. 2012-25
Memorandum Opinion and Order
Page 6

**ORDERED** that, if Walters fails to amend Counts Nine (IIED), Ten, Sixteen, and Eighteen, of her Complaint, those Counts may be dismissed for failure to state a claim on which relief may be granted; it is further

**ORDERED** that Kromenhoek shall, no later April 14, 2014, amend Counts Nine (IIED), Ten, Sixteen, and Eighteen, of her Complaint; it is further

**ORDERED** that, if Kromenhoek fails to amend Counts Nine (IIED), Ten, Sixteen, and Eighteen, of her Complaint, those Counts may be dismissed for failure to state a claim on which relief may be granted.

The Court will issue a memorandum opinion in the coming weeks outlining the reason for this ruling.

**S_______________________**
**Curtis V. Gómez**
**District Judge**

Joint Appendix Vol. II Page 2574

IN THE UNITED STATES DISTRICT COURT OF THE VIRGIN ISLANDS
DISTRICT OF ST. THOMAS AND ST. JOHN

| | |
|---|---|
| BARBARA WALTERS,<br><br>Plaintiff,<br>v.<br><br>COWPET BAY WEST CONDOMINIUM ASSOCIATION; THE BOARD OF THE COWPET BAY WEST CONDOMINIUM ASSOCIATION; MAX HARCOURT, in his personal capacity; ALFRED FELICE; LANCE TALKINGTON ROBERT COCKAYNE;VINCENT VERDIRAMO,<br><br>Defendants. | CIVIL CASE NO: 3:12-cv-00024 |

**DEFENDANTS' MOTION TO DISMISS PLAINTIFF'S AMENDED COMPLAINT AND SUPPORTING MEMORANDUM OF LAW**

Defendants Cowpet Bay West Condominium Association, The Board of the Cowpet Bay West Condominium Association, Max Harcourt, Robert Cockayne and Vincent Verdiramo (jointly sometimes "Defendants"), by and through undersigned counsel and pursuant to Rules 12(b)(6) of the Federal Rules of Civil Procedure, as well as the applicable Local Rules of the United States District Court for the U.S. Virgin Islands, Division of St. Thomas and St. John, and here files its: Motion to Dismiss the Second Amended Complaint filed by Plaintiff, Barbara Walters in the above captioned cause. As grounds therefore, Defendants state as follows:

## I. INTRODUCTION

Despite having three bites at the apple, Plaintiff still has failed to plead sufficient facts to properly support any of her nineteen causes of actions. What's more, even after being given the opportunity to explain and rectify Plaintiff's prior pleading deficiencies,

MIAMI | FT. LAUDERDALE | TAMPA | WEST PALM BEACH

100 S.E. Second Street
36th Floor | Miami | Florida 33131
Phone: 786-425-1045 | Fax: 786-425-3905

1600 W. Commercial Blvd. | Suite 201
P.O. Box 14546 | Ft. Lauderdale | Florida 33302
Phone: 954-848-2460 | Fax: 954-848-2470

400 N. Ashley Drive
Suite 1150 | Tampa | Florida 33602
Phone: 813-223-6021 | Fax: 813-223-6024

824 U.S. Highway One
Suite 305 | North Palm Beach | Florida 33408
Phone: 561-624-8233 | Fax: 561-624-8940

www.boydlawgroup.com

Joint Appendix Vol. II Page 2575

Plaintiff's Second Amended Complaint continues to state nothing more than legal conclusions.

Nevertheless, Plaintiff's Second Amended Complaint, in the majority of circumstances, fails to even recite the basic elements of a cause of action much less anything more than mere conclusory statements. This is not enough to withstand Defendants Rule 12(b)6) Motion to Dismiss. See *American Corporate Soc. v. Valley Forge Ins. Co.*, No. 10–3560, 2011 WL 1490284, at *1 (3d Cir. Apr. 20, 2011). As such, Plaintiff's Second Amended Complaint must be dismissed.

## II. MEMORANDUM OF LAW

In the Second Amended Complaint Plaintiff alleges that she suffers from an Anxiety Disorder and obtained an emotional support animal pursuant to her doctor's advice and thereafter, various Defendants, allegedly violated her privacy, the Fair Housing Act, the ADA, defamed Plaintiff and a litany of other specious accusations.

As set forth below, the various intermingled causes of action asserted against the Defendants fail to state a cause of action upon which relief may be granted. The pleading standard by which the court must measure a motion to dismiss is outlined in the United States Supreme Court's decision in *Bell Atlantic Corp. v. Twombly*, 127 S.Ct. 1955 (2007) In *Twombly*, the Supreme Court ruled that "a plaintiff's obligation to provide the 'grounds' of his 'entitlement to relief' requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." *Twombly* at 1964-1965.

In *Ashcroft v. Iqbal*, 129 S.Ct. 1937, 1949-50 (2009), the Supreme Court found that: "(1) a court must ignore legal conclusions and (2) consider only those allegations

MIAMI | FT. LAUDERDALE | TAMPA | WEST PALM BEACH

100 S.E. Second Street 36th Floor | Miami | Florida 33131 Phone: 786-425-1045 | Fax: 786-425-3905
1600 W. Commercial Blvd. | Suite 201 P.O. Box 14546 | Ft. Lauderdale | Florida 33302 Phone: 954-[illegible] | Fax: 954-[illegible]
400 N. Ashley Drive Suite 1150 | Tampa | Florida 33602 Phone: 813-[illegible] | Fax: 813-[illegible]
824 U.S. Highway One Suite 305 | North Palm Beach | Florida 33408 Phone: 561-624-8233 | Fax: 561-624-8940

www.boydlawgroup.com

Joint Appendix Vol. II Page 2576

Case 1:34172-6v-00024-CVG-RM Document #: 100 Filed: 03/25/13 Page 13 of 20

entitled to a presumption of truth to determine whether they plausibly give rise to an entitlement to relief." *Iqbal*, 129 S.Ct. at 1950; see also *Folwer v. UPMC Shadyside*, 578 F.3d 203, 210 – 12 (3d Cir. 2009).

As the Court of Appeals for the Third Circuit clarified: —in light of *Twombly*, Rule 8(a)(2) requires a 'showing' rather than a blanket assertion of an entitlement to relief. *Phillips v. Allegheny County*, 515 F.3d 224, 233 (3d. Cir. 2007) (emphasis in original). The Third Circuit in *Phillips* went on to sum up the new pleading standard under *Twombly* as follows:

> [S]tating a claim requires a complaint with enough factual matter (taken as true) to suggest the required element [though] this does not impose a probability requirement at the pleadings stage, but instead simply calls for enough facts to raise a reasonable expectation that discovery will reveal evidence of the necessary element. *Phillips*, 515 F.3d at 234 (internal quotation marks and citations omitted.)

Most recently, the Third Circuit stated:

> To withstand a Rule 12(b)(6) motion to dismiss, "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Iqbal,* 129 S.Ct. 1937, 1949, 173 L.Ed.2d 868 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570, 127 S.Ct. 1955, 167 L.Ed.2d 929 (2007)). "Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Id.* In addition to the complaint and any exhibits attached thereto, we may also consider —an undisputedly authentic document ... attache[d] as an exhibit to [the] motion to dismiss if the plaintiff's claims are based on the document," *See Pension Benefit Guar. Corp. v. White Consol. Indus.*, 998 F.2d 1192, 1196 (3d Cir. 1993).

*American Corporate Soc. v. Valley Forge Ins. Co.*, No. 10–3560, 2011 WL 1490284, at *1 (3d Cir. Apr. 20, 2011). The Virgin Islands apply the Third Circuit view on sufficiency of a complaint.

The Defendants will address each count in turn and show that even if all of Plaintiff's accusations are taken as true, the Second Amended Complaint fails for lack of

MIAMI | FT. LAUDERDALE | TAMPA | WEST PALM BEACH
100 S.E. Second Street 36th Floor | Miami | Florida 33131 Phone: 786-425-1045 | Fax: 786-425-3905
1600 W. Commercial Blvd. | Suite 201 P.O. Box 14546 | Ft. Lauderdale | Florida 33302 Phone: 954-[illegible] | Fax: [illegible]
400 N. Ashley Drive Suite 1150 | Tampa | Florida 33602 Phone: 813-[illegible] | Fax: 813-[illegible]
824 U.S. Highway One Suite 305 | North Palm Beach | Florida 33408 Phone: 561-624-8233 | Fax: 561-624-8940
www.boydlawgroup.com
Joint Appendix Vol. II Page 2577

recitation of facts beyond a speculative and merely conclusory level. Further, assuming arguendo that the allegations of fact are true, the Second Amended Complaint fails to meet the legal standards for the causes of action purportedly asserted as to the Defendants.

**a. Plaintiff's Count I Must be Dismissed for Failure to State a Cause of Action**

Unlawful discriminatory housing practices in violation of the FHA (Count I) may be brought under three theories: failure to reasonable accommodate the housing needs of persons with disabilities, disparate impact and disparate treatment. The instant case appears to be premised on an alleged failure of the Association to reasonable accommodate Plaintiff or rather the alleged delay in accommodating Plaintiff's request. Plaintiff has failed to plead the requisite facts to support a violation of the Fair Housing Act.

The elements of an FHAA failure to accommodation claim are as follows:

> "In order to make out a claim for a Fair Housing Act Violation based on failure to provide a reasonable accommodation, [Plaintiff] must show: i) that he is suffering from a disability as defined 42 U.S.C. § 3602(h)(1); ii) that the Defendants knew or reasonably should have been expected to know of the disability; iii) that reasonable accommodation of [Plaintiff's] disability might be necessary to afford him an equal opportunity to use and enjoy his dwelling; and iv) that the Defendants refused to make a reasonable accommodation." See *United States v. Port Liberte Condo 1 Ass'n Inc.*, Docket No. 04-2783, 2006 WL 2792780, *5 (D.N.J. Sept. 27, 2006.)

Plaintiff has finally, on the third try, alleged that she was diagnosed with an anxiety disorder which allegedly qualifies her as disabled as defined by 42 U.S.C. § 3602(h)(1). Thus, for the purposes of this motion to dismiss, Defendants acknowledge that she has alleged a disability. That said, there are not sufficient allegations to establish

MIAMI | FT. LAUDERDALE | TAMPA | WEST PALM BEACH

100 S.E. Second Street 36th Floor | Miami | Florida 33131 Phone: 786-425-1045 | Fax: 786-425-3905
1600 W. Commercial Blvd. | Suite 201 P.O. Box 14546 | Ft. Lauderdale | Florida 33302 Phone: 954-8[illegible] | Fax: 954-[illegible]
400 N. Ashley Drive Suite 1150 | Tampa | Florida 33602 Phone: 813-[illegible] | Fax: 813-[illegible]
824 U.S. Highway One Suite 305 | North Palm Beach | Florida 33408 Phone: 561-624-8233 | Fax: 561-624-8940
www.boydlawgroup.com

Joint Appendix Vol. II Page 2578

elements 2 and 3. More importantly, the last element is impossible for Plaintiff's to establish as there was no refusal to make an accommodation as Plaintiff openly admits that the Association approved her request for an accommodation. (See D.E. 95 at ¶ 102.)

First, there is no evidence that the Association knew or should have reasonably known of Plaintiff's alleged disability. Plaintiff's attached affidavit indicates that Max Harcourt and Bill Canefield came to the Office Manager's office to review Plaintiff's documents, however, there is no allegation that they actually reviewed the alleged documents. Allegedly knowing that some "documents" are contained in a resident's file, without review, is certainly not sufficient to input knowledge on an Association to know of a resident's non-obvious disability.

Second, without a review of said documents, the Association could not possibly know if a reasonable accommodation of [Plaintiff's] disability might be necessary to afford her an equal opportunity to use and enjoy her dwelling.

Lastly, Plaintiff openly admits at Paragraph 102 of D.E. 95 that Plaintiff received a response from the Board approving her request for reasonable accommodation. The most pivotal element of an alleged FHA violation under 3604 is that the Defendants refused to make a reasonable accommodation. Plaintiff's own pleadings refute the possibility of ever establishing the last element. Plaintiff attempts to skirt around this glaring issue by asserting a legal conclusion that the Defendants constructively denied her accommodation because the Defendants allegedly delayed granting the request for accommodation for so long that it acted as a constructive denial. In *United States* v. *Hialeah Housing Authority 418 Fed. App'x 872,* a case previously cited by Plaintiff in support of this spurious contention, the court states: "We have explained that 'a plaintiff

MIAMI | FT. LAUDERDALE | TAMPA | WEST PALM BEACH

100 S.E. Second Street 36th Floor | Miami | Florida 33131 Phone: 786-425-1045 | Fax: 786-425-3905
1600 W. Commercial Blvd. | Suite 201 P.O. Box 14546 | Ft. Lauderdale | Florida 33302 Phone: 954-[illegible] | Fax: 954-[illegible]
400 N. Ashley Drive Suite 1150 | Tampa | Florida 33602 Phone: 813-[illegible] | Fax: 813-[illegible]
824 U.S. Highway One Suite 305 | North Palm Beach | Florida 33408 Phone: 561-624-8233 | Fax: 561-624-8940
www.boydlawgroup.com

Joint Appendix Vol. II Page 2579

must actually request an accommodation and be refused in order to bring a reasonable accommodation claim under the FHA." (citing to *Schwarz v. City of Treasure Island,* 544 F.3d at 1219.) The Court in *Hialeah Housing Authority* continues and states, "In other words, for a demand to be specific enough to trigger the duty to provide a reasonable accommodation, the defendant 'must have enough information to know of both the disability and desire for an accommodation, or circumstances must at least be sufficient to cause a reasonable [landlord] to make appropriate inquiries about the possible need for an accommodation.' *Colwell v. Rite Aid Corp.,* 602 F.3d 495, 506 (3d Cir.2010) (quotation marks omitted)." *Hialeah Housing Authority* at 876. Again, Plaintiff's Second Amended Complaint fails to allege sufficient facts to demonstrate (1) an actual request was made (2) that Plaintiff provided enough information or any information to the Defendants to know of both the disability and desire for an accommodation and (3) that the request was denied.

Thus, based on the four corners of the Second Amended Complaint, Plaintiff has failed to plead facts to support a cause of action for violation of 42 U.S.C. § 3604(f)(3)(b). As such, Defendants Motion to Dismiss must be granted.

**b. <u>Plaintiff's Count II and III Must be Dismissed for Failure to State a Cause of Action</u>**

Plaintiff's Counts II & III assert violations of "Section 3617 of the Fair Housing Act" against Max Harcourt (Count II) and the Association and the "Board" (Count III). Section 3617 provides that it is "unlawful to coerce, intimidate, threaten or interfere with" any person in the exercise or enjoyment of any right granted or protected by § 3603 – 3606 of the Fair Housing Act. It is still unclear what actions of Harcourt, the

MIAMI | FT. LAUDERDALE | TAMPA | WEST PALM BEACH

100 S.E. Second Street 36th Floor | Miami | Florida 33131 Phone: 786-425-1045 | Fax: 786-425-3905

1600 W. Commercial Blvd. | Suite 201 P.O. Box 14546 | Ft. Lauderdale | Florida 33302 Phone: 954-[illegible] | Fax: 954-[illegible]

400 N. Ashley Drive Suite 1150 | Tampa | Florida 33602 Phone: 813-[illegible] | Fax: 813-[illegible]

824 U.S. Highway One Suite 305 | North Palm Beach | Florida 33408 Phone: 561-624-8233 | Fax: 561-624-8940

www.boydlawgroup.com

Joint Appendix Vol. II Page 2580

Association and/or the Board were intimidating or coercive to the extent they prevented Plaintiff from exercising her right to request a reasonable accommodation.

The 3rd Circuit in *Sporn v. Ocean Colony Condominium Association*, 173 F.Supp.2d 244, 252 (U.S.D.C. N.J. 2001), stated:

> Section 3617 does not, however, purport to impose a code of civility on those dealing with individuals who have exercised their FHA rights. Simply put, § 3617 does not require that neighbors smile, say hello or hold the door open for each other. To hold otherwise would be to extend § 3617 to conduct it was never intended to address and would have the effect of demeaning the aims of the Act and the legitimate claims of plaintiffs who have been subjected to invidious and hurtful discrimination and retaliation in the housing market. Id. at 252.

Plaintiff's main basis for the alleged Section 3617 violation is the accusing of Plaintiff for violation the no dogs rule and levying a fine. (See i.e. D.E. 95 at ¶122). However, the 11th Circuit has held that the assessment of a fine against a condominium unit owner does not rise to the level of coercion or intimidation required to find a violation of section 3617. See . *Wood v. Briarwinds Condominium Association Board of Directors*, 369 Fed.Appx.1, at 2, (C.A. 11(Fla.). In fact, other circuits have found that even the shunning of an individual is not sufficient to establish a Section 3617 claim. *Id. Sporn* at 252.

A review of decisions from the circuits around the country reveals the court's ability, in the majority of cases, to draw a line between acts with discriminatory overtones or occasional discriminatory comments and pervasive or severe actions that include cross-burning, fire-bombing and other similarly overt discriminatory acts designed to intimidate, coerce, or interfere with housing rights. See e.g., *Sporn v. Ocean Colony Condo. Ass'n,* 173 F.Supp.2d 244, 252 (D.N.J.2001) (ruling in favor of defendants because "shunning" of handicapped neighbors is not enough to support a § 3617 claim*);*

MIAMI | FT. LAUDERDALE | TAMPA | WEST PALM BEACH

100 S.E. Second Street
36th Floor | Miami | Florida 33131
Phone: 786-425-1045 | Fax: 786-425-3905

1600 W. Commercial Blvd. | Suite 201
P.O. Box 14546 | Ft. Lauderdale | Florida 33302

400 N. Ashley Drive
Suite 1150 | Tampa | Florida 33602

824 U.S. Highway One
Suite 305 | North Palm Beach | Florida 33408
Phone: 561-624-8233 | Fax: 561-624-8940

www.boydlawgroup.com

Joint Appendix Vol. II Page 2581

*United States v. Weisz*, 914 F.Supp. 1050, 1054 (S.D.N.Y.1996) (finding for defendants where conduct alleged was "nothing more than a series of skirmishes in an unfortunate war between neighbors."); *See Whisby-Myers v. Kiekenapp,* 293 F.Supp.2d 845, 852 (N.D.Ill.2003)(detonation of explosive device simulator combined with racial epithets stated Section 3617 claim); *Johnson v. Smith,* 810 F.Supp.235, 238-239 (N.D.ILL.1992)(allegations of cross-burning on plaintiff's lawn and breaking plaintiff's windows stated claim under Section 3617.)

Certainly, amending the bylaws, levying a fine or accusing Plaintiff of violation the no dogs rule does not amount to the coercion, intimidation, threatening or interfering conduct required to establish a Section 3617 violation. As such, Plaintiff's Counts II & III must be dismissed for failure to state a cause of action or facts to support a prima facie cause of action for violation of 42 U.S.C. 3617.

**c. <u>Plaintiff's Count VI Must be Dismissed for Failure to State a Cause of Action</u>**

Plaintiff's Count VI fails to state a claim against the Association or "Board" for a violation of the American with Disabilities Act ("ADA"). In order to state a claim under Title III of the ADA, Plaintiff must allege: (1) she was discriminated against on the basis of disability; (2) in the full and equal enjoyment of the goods, services, facilities, privileges, advantages, or accommodations of any place of public accommodation; (3) by any person who owns, leases (or leases to), or operates a place of public accommodation. See *Bowers v. National Collegiate Athletic Association, Act, Inc.*, 9 F.Supp.2d 460, 480 (U.S.D.C. N.J. 1998). Furthermore, in order for the Association or Board to be subject to Title III of the ADA, Cowpet must be "[a] person who owns, leases (or leases to), or operates a place of public accommodation." *Bowers* at 480.

Plaintiff asserts specifically that Cowpet Bay West is a place of public lodging in an effort to bring it under the purview of the ADA, however, there are no specific allegations, but mere legal conclusions, that the Association and the Board own, operate and/or lease condominium units. In fact, Plaintiff's attach a email listing for a privately owned unit at Cowpet as a basis that somehow Cowpet Bay Association owns, operates or leases condominiums. The exhibit clearly indicates that the unit offered for rent is privately owned with contact numbers based in Minnesota.

Moreover, case law precedent has made it clear that condominiums are not subject to the ADA. (See *Independent Housing Services of San Francisco v. Fillmore Center Associates*, 840 F.Supp. 1328, 1344, (N.D.Ca. 1993)("apartments and condominiums do not constitute public accommodations within the meaning of the Act.")

Additionally, there are no allegations that Cowpet is a commercial facility as defined by 42 U.S.C. 12181(2). Rather, it is a residential facility which is provided an exception to the requirements of the ADA. It is evident from a reading of the Second Amended Complaint that the claims asserted under the ADA are based exclusively on Defendants' alleged failure to grant Plaintiff a reasonable accommodation in relation to her housing unit. As Plaintiff is asserting her ADA claims under Title III, the ADA has language "that mirrors the FHA in all material respects," *McCree v. Lexington Village Apartments,* Civ. No. 08–14185, 2010 WL 931859, *6, 2010 U.S. Dist. Lexis 22873, * 17 (E.D.Mich. Mar.11, 2010), and the court in *Shuper v. Federal Management Co., Inc.*, found that claims under both statutes would have little benefit, which is probably why the statutory exception exists for residential facilities. See *Shuper v. Federal Management Co., Inc.*, 2010 WL 3702364, *4) (D.Me. 2010).

MIAMI | FT. LAUDERDALE | TAMPA | WEST PALM BEACH

100 S.E. Second Street
36th Floor | Miami | Florida 33131
Phone: 786-425-1045 | Fax: 786-425-3905

1600 W. Commercial Blvd. | Suite 201
P.O. Box 14546 | Ft. Lauderdale | Florida 33302
Phone: 954-[illegible] | Fax: [illegible]

400 N. Ashley Drive
Suite 1150 | Tampa | Florida 33602
Phone: 813-223-[illegible] | Fax: [illegible]

824 U.S. Highway One
Suite 305 | North Palm Beach | Florida 33408
Phone: 561-624-8233 | Fax: 561-624-8940

www.boydlawgroup.com

Joint Appendix Vol. II Page 2583

As such, Plaintiff's Count VI continues to fail to plead facts sufficient to subject the Board and Association, a residential facility and condominium to a violation of the ADA. Thus, Plaintiff's Second Amended Complaint must be dismissed.

**d. Plaintiff's Counts VII, VIII and XII must be Dismissed for Failure to State a Cause of Action.**

The general theme of Counts VII and VIII is that the Board and Association did not have the authority to adopt bylaws that placed restrictions on dogs on the Cowpet Bay West premises and/or that the adoption was improper.

Plaintiff attached as Exhibit "A" to her Amended Complaint, the December 20, 2007 Bylaws of the Cowpet Bay West Condominium Association and previously asserted that the Bylaws placed no restrictions on dogs on the Cowpet Bay West premises. A detailed reading and discussion of Plaintiff's prior Exhibit "A" is important in understanding why Counts VII and VIII must be dismissed for failure to state a cause of action.

Under the 2007 bylaws, the Board of Directors is empowered to do a number of things, including the "operation" of the common areas and facilities (Art. II, Sec. 2(a)) and the adoption, amendment and enforcement of rules and regulations (Art. III, Sec.2(e)) covering the details of the operation and use of the Property. Under Art. V, Sec. 9, any violation of a rule or regulation adopted by the Board, or a breach of any by-law, gives the Board the right to enter an apartment unit, and act to summarily abate or remove the violation, without being deemed guilty of trespass, or to enjoin or abate the violation by legal proceedings. Art. V, Section 16, provides that a list of current Rules and Regulations attached as Exhibit "I" are adopted and that the board may enforce them with monetary fines and other sanctions, or by taking legal action to enforce them.

MIAMI | FT. LAUDERDALE | TAMPA | WEST PALM BEACH

100 S.E. Second Street 36th Floor | Miami | Florida 33131 Phone: 786-425-1045 | Fax: 786-425-3905
1600 W. Commercial Blvd. | Suite 201 P.O. Box 14546 | Ft. Lauderdale | Florida 33302 Phone: 954-[illegible] | Fax: 954-[illegible]
400 N. Ashley Drive Suite 1150 | Tampa | Florida 33602 Phone: 813-[illegible] | Fax: 813-[illegible]
824 U.S. Highway One Suite 305 | North Palm Beach | Florida 33408 Phone: 561-624-8233 | Fax: 561-624-8940
www.boydlawgroup.com

Joint Appendix Vol. II Page 2584

The Rules and Regulations set forth in Exhibit "I" to the 2007 By-laws includes a provision that "Dogs and farm animals are prohibited, and owners will be fined as specified by the Board of Directors. The Association may require removal of any animal when it becomes bothersome to others or is deemed by the Association to be unacceptable." Accordingly, because the By-Laws expressly incorporate the rules and regulations in Exhibit "I", the prohibition on dogs was effectively already a requirement of the By-Laws in their 2007 form.

Plaintiff's Exhibit "A," flatly refutes Plaintiff's improper assertions that (I) Cowpet Bay West placed no restrictions on dogs at the time of Plaintiff's "requested reasonable accommodation" (2) that the Board acted outside the scope of its power and (3) that the Board and Association did not have a basis to assess fines for violations of the Rules and Regulations of Cowpet Bay West.

Moreover, Plaintiff's VIII contends that the February 2012 amendments to the bylaws were improper for not obtaining 75% approval of the owners. However, Article XI Section 1. of the Bylaws clearly indicates that the Bylaws can be amended by an affirmative vote of 66 2/3% of the voting membership. Plaintiff alleges that the February 2012 amendments were approved by roughly 69%. Thus, per the actual requirements of the Bylaws for amending of the Bylaws, Defendants in fact received a sufficient amount of affirmative votes to amend the bylaws.

As such, Plaintiff's' allegations in Counts VII and VIII fail to assert allegations that form the basis an improper amendment to the bylaws.

MIAMI | FT. LAUDERDALE | TAMPA | WEST PALM BEACH

100 S.E. Second Street 36th Floor | Miami | Florida 33131 Phone: 786-425-1045 | Fax: 786-425-3905

1600 W. Commercial Blvd. | Suite 201 P.O. Box 14546 | Ft. Lauderdale | Florida 33302 Phone: 954-848-2460 | Fax: 954-848-2470

400 N. Ashley Drive Suite 1150 | Tampa | Florida 33602 Phone: 813-223-6021 | Fax: 813-223-6024

824 U.S. Highway One Suite 305 | North Palm Beach | Florida 33408 Phone: 561-624-8233 | Fax: 561-624-8940

www.boydlawgroup.com

Joint Appendix Vol. II Page 2585

e. **<u>Plaintiff's Count IX Must be Dismissed for Failure to State a Cause of Action</u>**

Plaintiff's Count XI fails to plead any facts sufficient to state a cause of action for Negligence recognized by this Circuit and under Virgin Islands Law. To establish a prima facie claim for Negligence, Plaintiff must demonstrate that the Cowpet Board and Association owed Plaintiff a legal duty, that the Cowpet Board and Association was negligent and that the Cowpet Board and Association's actions were legal cause of Plaintiff's injury. See *Turbe v. Government of the Virgin Islands*, 938 F.2d 427, 428 (U.S.C.A. 3rd Cir. 1991).

Plaintiff continues to fail to allege, beyond mere conclusions, that the Defendants owed her a duty, that the Defendants were negligence and somehow the alleged actions of the Defendants were the legal cause of her alleged injuries. At bottom, Plaintiff has failed to establish a negligence claim, as such, the second amended complaint must be dismissed with prejudice.

f. **<u>Plaintiff's Count X Must be Dismissed for Failure to State a Cause of Action</u>**

Plaintiff's Count X against the "individually named Defendants in their personal capacities and Cowpet Bay West Board" for conspiracy. "Under Virgin Islands law, a civil conspiracy 'consists of an agreement or combination to perform a wrongful act that results in damage to the plaintiff.' A conspiracy may also consist of an agreement to do a lawful act by unlawful means." *Government Guarantee Fund of the Republic of Finland v. Hyatt Corp.*, 955 F.Supp.441, 456 (D.V.I. 1997). Furthermore, "Claims of conspiracy that are vague and provide no basis in fact must be dismissed." *Conway v. Garvey*, 2003 WL 22510384, *3 (S.D.N.Y. Nov. 5, 2003).

MIAMI | FT. LAUDERDALE | TAMPA | WEST PALM BEACH

100 S.E. Second Street 36th Floor | Miami | Florida 33131 Phone: 786-425-1045 | Fax: 786-425-3905

1600 W. Commercial Blvd. | Suite 201 P.O. Box 14546 | Ft. Lauderdale | Florida 33302 Phone: 954-848-2400 | Fax: 954-848-2470

400 N. Ashley Drive Suite 1150 | Tampa | Florida 33602 Phone: 813-223-6011 | Fax: 813-223-6024

824 U.S. Highway One Suite 305 | North Palm Beach | Florida 33408 Phone: 561-624-8233 | Fax: 561-624-8940

www.boydlawgroup.com

Joint Appendix Vol. II Page 2586

Here, Plaintiff's vague allegations include that all the individual Defendants along with the Cowpet Board have somehow conspired with each other and acted in concert, to violate the FHAA and deny Plaintiff her request for reasonable accommodation. Frankly, Plaintiff has not set forth facts to support a plausible claim for civil conspiracy. "Allegations of a conspiracy must provide some factual basis to support the existence of the elements of a conspiracy: agreement and concerted action."

Claims of conspiracy that are vague and provide no basis in fact must be dismissed. (*See Boddie v. Schnieder,* 105 F.3d 857, 862 (2d Cir.1997) (dismissing prisoner's retaliation claim in part because retaliation claims were "unsupported, speculative, and conclusory"); *Polur v. Raffe*, 912 F.2d 52, 56 (2d Cir.1990) (holding that complaint must not rely on "vague, prolix allegations of a conspiracy" and must allege overt acts); *McArthur v. Bell,* 788 F.Supp. 706, 711 (E.D.N.Y.1992) (holding that conspiracy claims are "highly disruptive" and therefore "vague and conclusory allegations" are insufficient) "Claims of conspiracy that are vague and provide no basis in fact must be dismissed.") *Conway v. Garvey*, 2003 WL 22510384, *3 (S.D.N.Y. Nov. 5, 2003).

While Plaintiff may attempt to argue there was an over act, Plaintiff still has failed to plead any facts consisting of an agreement to perform a wrongful act that results in damage to the Plaintiff. *Government Guarantee Fund of the Republic of Finland v. Hyatt Corp.*, 955 F.Supp.441, 456 (D.V.I. 1997).

Plaintiff's Second Amended Complaint asserts only vague and conclusory statements that Defendants conspired, but does not allege facts to demonstrate, or to allow even an inference of a conspiracy. As such, Plaintiff's Count X must be dismissed.

MIAMI | FT. LAUDERDALE | TAMPA | WEST PALM BEACH

100 S.E. Second Street 36th Floor | Miami | Florida 33131 Phone: 786-425-1045 | Fax: 786-425-3905

1600 W. Commercial Blvd. | Suite 201 P.O. Box 14546 | Ft. Lauderdale | Florida 33302 Phone: 954-848-2460 | Fax: 954-848-2470

400 N. Ashley Drive Suite 1150 | Tampa | Florida 33602 Phone: 813-223-6021 | Fax: 813-223-6024

824 U.S. Highway One Suite 305 | North Palm Beach | Florida 33408 Phone: 561-624-8233 | Fax: 561-624-8940

www.boydlawgroup.com

Joint Appendix Vol. II Page 2587

**g. <u>Plaintiff's Count XI Must be Dismissed for Failure to State a Cause of Action</u>**

Plaintiff's Count XI fails to state a cause of action for a Prima Facie Tort Claim as the relief sought does come within the requirements of other well established and named intentional torts. The Restatement (Second) of Torts § 870 confirms that typically a prima facie tort claim only provides relief when the defendant's conduct "does not come within the requirements of one of the well established and named intentional torts.

The courts in the Virgin Islands have maintained this principal in dismissing prima facie tort claims that the courts have deemed insufficiently "distinct" from plaintiff's other, more established tort claims. *See, e.g., Moore v. A.H. Riise Gift Shops,* 659 F.Supp. 1417, 1426 (D.V.I. 1987); *Gov't Guarantee Fund of Republic of Finland v. Hyatt Corp.*, 955 F.Supp.441, 463 (D.V.I. 1997)("[N]o claim for prima facie tort lies if the action complained of fits within another category of tort.")

In the instant case, there appears to be ample overlap between Plaintiff's claims for defamation, slander per se, negligent and/or intentional infliction of emotional distress and Plaintiff's Prima Facie Tort claim. The substance of the allegations and relief sought in Plaintiff's Prima Facie Tort claim are clearly subsumed by the allegations and relief sought in Plaintiff's Counts XII and XIII. Thus, Plaintiff's Count XI must be dismissed as it is not distinct from Plaintiff's other tort claims.

**h. <u>Plaintiff's Count XII Must be Dismissed for Failure to State a Cause of Action</u>**

Plaintiff's Count XII is titled both a Defamation and Slander Per se premised solely on the alleged willful and intentional publication of false and wrongful information on the "blog" and other venues. (D.E. 94 ¶ 182). Yet, Plaintiff fails to allege what

MIAMI | FT. LAUDERDALE | TAMPA | WEST PALM BEACH

100 S.E. Second Street 36th Floor | Miami | Florida 33131 Phone: 786-425-1045 | Fax: 786-425-3905
1600 W. Commercial Blvd. | Suite 201 P.O. Box 14546 | Ft. Lauderdale | Florida 33302 Phone: 954-[illegible] | Fax: [illegible]
400 N. Ashley Drive Suite 1150 | Tampa | Florida 33602 Phone: 813-[illegible] | Fax: 813-[illegible]
824 U.S. Highway One Suite 305 | North Palm Beach | Florida 33408 Phone: 561-624-8233 | Fax: 561-624-8940
www.boydlawgroup.com
Joint Appendix Vol. II Page 2588

Case 1:13-cv-00024-CVG-RM Document #: 100 Filed: 03/25/13 Page 11 of 20

information was published, if it was false, or wrongful, date and time of alleged publication, by who(m) specifically etc.

To state a claim for defamation (same for Slander Per Se), a plaintiff must allege "(1) that the defendant made a defamatory statement of fact; (2) concerning the plaintiff; (3) which was false; (4) which was communicated to persons other than the plaintiff; and (5) fault." *Taj Mahal Travel Inc. v. Delta Airlines, Inc.*, 164 F.3d 186,189 (3d Cir. 1998).

This Court, in granting a motion dismiss a claim of defamation, stated:

> A review of cases where the plaintiff's defamation claim survived a motion to dismiss indicates that the plaintiff had provided some details about the asserted defamatory statements, including the names of the publisher and the person or persons to whom it was published, dates when the statements were made and the specific content of the defamatory comments. . . .
>
> On the other hand, this Court has found that the lack of detail in plaintiff's defamation claim warranted dismissal of plaintiff's claims where the plaintiff did not indicate when, where, or how the alleged statements were made and did not identify the specific content of any challenged statement.

*Illaraza v. Hovensa, L.L.C.* 2010 WL 2342424, at *3 (D.V.I. 2010). Plaintiff's Second Amended Complaint does not make any specific allegations against any of the Defendants to indicate when, where, or how the alleged statements were made and certainly fails to identify the specific content of the alleged false and wrongful information.

As such and under *Illaraza,* Plaintiff's claim for Defamation and/or Slander Per Se must be dismissed for failure to assert any facts to establish a prima facie cause of action for same.

MIAMI | FT. LAUDERDALE | TAMPA | WEST PALM BEACH

100 S.E. Second Street 36th Floor | Miami | Florida 33131 Phone: 786-425-1045 | Fax: 786-425-3905

1600 W. Commercial Blvd. | Suite 201 P.O. Box 14546 | Ft. Lauderdale | Florida 33302 Phone: 954-848-2400 | Fax: 954-848-2470

400 N. Ashley Drive Suite 1150 | Tampa | Florida 33602 Phone: 813-223-6011 | Fax: 813-223-6024

824 U.S. Highway One Suite 305 | North Palm Beach | Florida 33408 Phone: 561-624-8233 | Fax: 561-624-8940

www.boydlawgroup.com

Joint Appendix Vol. II Page 2589

**i. <u>Plaintiff's Count XIII Must be Dismissed for Failure to State a Cause of Action.</u>**

Plaintiff's Count XIII must also be dismissed as Plaintiff has failed to assert facts sufficient to plead both a Negligent and/or Intentional Infliction of Emotional Distress. Under Virgin Islands' Law, a party is entitled to recover for emotional distress that is intentionally or recklessly caused by another, whose "extreme and outrageous conduct intentionally or recklessly causes severe emotional distress . . . and if bodily harm to the other results from it, for such bodily harm." *Smith v. Elias* 2007 WL 4209701, at *4 (V.I.Super.Ct.2007).

The Restatement (Second) of Torts § 46(1) defines outrageous conduct as "so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community." The Court in *Smith* indicated that the court's role when dealing with a claim of intentional infliction of emotional distress is limited to determining "whether the defendant's conduct may reasonably be regarded as so extreme and outrageous as to permit recovery, or whether it is necessarily so." *Id* at *4. Furthermore, this Court in *Ali v. Intertek Testing Services*, F.Supp.2d 827, 831 (D.V.I. 2007) held that where the gravamen of the IIED complaint sounds in defamation, an independent action for intentional infliction of emotional distress cannot lie.

Moreover, the Court in *Illaraza* discussed the basis of Court's rejecting IIED claims when they are sounded in defamation and stated "The basis for rejecting such claims lies in the courts' concern that plaintiffs would circumvent the restrictions imposed on defamation claims, such as the defense of truth or privilege, if allowed to recast such tort claims as intentional infliction of emotional distress." Id at *6.

MIAMI | FT. LAUDERDALE | TAMPA | WEST PALM BEACH
100 S.E. Second Street 36th Floor | Miami | Florida 33131 Phone: 786-425-1045 | Fax: 786-425-3905
1600 W. Commercial Blvd. | Suite 201 P.O. Box 14546 | Ft. Lauderdale | Florida 33302 Phone: 954-848-2460 | Fax: 954-648-2470
400 N. Ashley Drive Suite 1150 | Tampa | Florida 33602 Phone: 813-223-6021 | Fax: 813-223-5026
824 U.S. Highway One Suite 305 | North Palm Beach | Florida 33408 Phone: 561-624-8233 | Fax: 561-624-8940
www.boydlawgroup.com
Joint Appendix Vol. II Page 2590

Case 1:13-cv-00024-CVG-RM Document #: 90 Filed: 03/25/13 Page 11 of 21

Plaintiff's bare assertions for her Negligent or IIED claims are nearly identical and are certainly sounded in the same non-specific allegations that Plaintiff uses to allege her Count XII Defamation and Slander Per se claim. This Court must follow the precedent set in *Illaraza* and *Ali* and deny Plaintiff's Count XIII for Negligent or IIED.

j. **Plaintiff's Counts IVX [sic], VX [sic], XVI and XVII Must be Dismissed for Failure to State Causes of Action.**

Plaintiff has failed to assert specific facts regarding how the Defendants have invaded her privacy, cast her in a false light or intruded on her privacy. Beyond mere conclusions, Plaintiff has asserted nothing to support her claim.

The Restatement (Second) of Torts provides the following standard for establishing an invasion of privacy claim:

> One who gives publicity to a matter concerning the private life of another is subject to liability to the other for invasion of his privacy, if the matter publicized is of a kind that (a) would be highly offensive to a reasonable person, and (b) is not of legitimate concern to the public.

Restatement (Second) of Torts § 652D. Comment (a) to section 652D further explains in relevant part: "[I]t is not an invasion of the right of privacy . . . to communicate a fact concerning a plaintiff's private life to a single person or even to a small group of persons."

Plaintiff asserts that the Board and Association disclosed Plaintiff's private information when the Board and Association allegedly discussed Plaintiff's application for a reasonable accommodation, medical condition and emotional support animal registration at a Board meeting. While these assertions are false, if assumed true for the sake of argument, the Restatement of Torts made it clear above, communications of a fact

MIAMI | FT. LAUDERDALE | TAMPA | WEST PALM BEACH

100 S.E. Second Street 36th Floor | Miami | Florida 33131 Phone: 786-425-1045 | Fax: 786-425-3905

1600 W. Commercial Blvd. | Suite 201 P.O. Box 14546 | Ft. Lauderdale | Florida 33302 Phone: 954-848-2460 | Fax: 954-418-8270

400 N. Ashley Drive Suite 1150 | Tampa | Florida 33602 Phone: 813-223-6121 | Fax: 813-223-6124

824 U.S. Highway One Suite 305 | North Palm Beach | Florida 33408 Phone: 561-624-8233 | Fax: 561-624-8940

www.boydlawgroup.com

Joint Appendix Vol. II Page 2591

to a small group is not an invasion of privacy. Furthermore, Plaintiff does not allege that this information was made public to a sufficiently large audience.

Additionally, the alleged conduct is not "highly offensive to a reasonable person," which is necessary to prove any of Plaintiff's five Invasion of Privacy claims. At bottom, the facts alleged to be publicized by the Defendants were already public knowledge.

As such, Plaintiff's Counts IVX, VX, XVI and XVII must be dismissed for failure to state a cause of action or specific facts to support a prima facie case of invasion of privacy.

**k. <u>Plaintiff's Count XVIII Must be Dismiss for Failure to State a Cause of Action</u>**

Plaintiff's final cause of action is for "Negligence per se/legal malpractice" against Vincent Veridamo. Amazingly, Plaintiff's attempt to alleged that Veridamo, a NJ lawyer, and former board member, somehow was acting in his capacity of an attorney for the board and more amazingly that somehow he had an attorney client relationship with Plaintiff, let alone the board.

To establish a legal malpractice claim or Negligence claim for that matter, the plaintiff has the burden of proving 1) an attorney-client relationship giving rise to a duty; 2) breach of that duty; 3) the causal connection between the negligent conduct and the resulting injury, and 4) actual loss or damage. *Moorehead v. Miller*, 102 F.R.D. 834, 838 (D.C. V.I. 1984).

Plaintiff's Second Amended Complaint fails to allege or establish a (1) attorney-client relationship (2) any duty that Verdiamo owed Plaintiff, (3) any breach of any duty and (4) how plaintiff was damaged by Verdiamo. In other words, there are absolutely no

MIAMI | FT. LAUDERDALE | TAMPA | WEST PALM BEACH

100 S.E. Second Street 36th Floor | Miami | Florida 33131 Phone: 786-425-1045 | Fax: 786-425-3905

1600 W. Commercial Blvd. | Suite 201 P.O. Box 1146 | Ft. Lauderdale | Florida 33302 Phone: 954-848-2460 | Fax: 954-848-2470

400 N. Ashley Drive Suite 1150 | Tampa | Florida 33602 Phone: 813-223-6624 | Fax: 813-223-6024

824 U.S. Highway One Suite 305 | North Palm Beach | Florida 33408 Phone: 561-624-8233 | Fax: 561-624-8940

www.boydlawgroup.com

Joint Appendix Vol. II Page 2592

allegations or facts to support Plaintiff's claims. As such, Plaintiff's Count XVIII must be dismissed with prejudice.

Dated: March ___, 2013.

Respectfully submitted,

**BIRCH, de JONGH & HINDELS, PLLC**
*Counsel for Defendants: Cowpet Bay West Condominium Association, Ed Wardwell, Max Harcourt, Bill Canfield, Rosie Wells, Sharon Koehler, Doug Rebak, Herb Horwitz, Robert Cockayne, and Vincent Verdiramo*
1330 Estate Taarnebjerg
St. Thomas, VI 00802
Tel.: 340-774-1100; Fax: 340-774-7300

By:______________________________
**Richard Farrelly**
Bar No. 105
rfarrelly@bdhlawvi.com
**Joseph Riopelle**
jriopelle@boydlawgroup.com

## CERTIFICATE OF SERVICE

I hereby certify that on the above-indicated date, I electronically filed the foregoing document with the Clerk of the Court using ECF. I also certify that the foregoing document is being served this day on all counsel of record or pro se parties identified below, either via transmission of Notices of Electronic Filing generated by ECF or in some other authorized manner for those counsel or parties who are not authorized to receive electronically Notices of Electronic Filing.

**Karin A. Bentz, Esq.**
(Attorney for Plaintiff)
5150 Dronningens Gade, Suite 8
St. Thomas, VI 00802
Tel: 340-774-2669
kbentz@virginalaw.com

**John H. Benham, III, Esq.**
(Attorney for Talkington)
Post Office Box 11720
St. Thomas, VI 00801
Tel: 340-774-0673
benham@bclawvi.com

______________________________
Richard Farrelly

MIAMI | FT. LAUDERDALE | TAMPA | WEST PALM BEACH

100 S.E. Second Street 36th Floor | Miami | Florida 33131 Phone: 786-425-1045 | Fax: 786-425-3905
1600 W. Commercial Blvd. | Suite 201 P.O. Box 14546 | Ft. Lauderdale | Florida 33302 Phone: 954-846-2460 | Fax: 954-848-2470
400 N. Ashley Drive Suite 1150 | Tampa | Florida 33602 Phone: 813-223-6021 | Fax: 813-221-8024
824 U.S. Highway One Suite 305 | North Palm Beach | Florida 33408 Phone: 561-624-8233 | Fax: 561-624-8940
www.boydlawgroup.com

Joint Appendix Vol. II Page 2593

IN THE UNITED STATES DISTRICT COURT OF THE VIRGIN ISLANDS
DISTRICT OF ST. THOMAS AND ST. JOHN

BARBARA WALTERS, )
)
Plaintiff, )
v. ) CIVIL CASE NO: 3:12-cv-00024
)
COWPET BAY WEST CONDOMINIUM )
ASSOCIATION; THE BOARD OF THE )
COWPET BAY WEST CONDOMINIUM )
ASSOCIATION; MAX HARCOURT, in his)
personal capacity; ALFRED FELICE; )
LANCE TALKINGTON ROBERT )
COCKAYNE;VINCENT VERDIRAMO, )
)
Defendants. )
________________________________)

**ORDER**

This matter came before the Court on Defendants' Cowpet Bay West Condominium Association, The Board of the Cowpet Bay West Condominium Association, Max Harcourt, Robert Cockayne and Vincent Verdiramo Motion to Dismiss Plaintiff's Second Amended Complaint and Supporting Memorandum of Law. The Court being advised of same and in the interest of justice it is herby

**ORDERED,** Defendants Motion To Dismiss is **GRANTED**.

ENTERED this ________day of March, 2013

________________________________
CURTIS V. GOMEZ
Chief Judge

ATTEST:

WILFREDO F. MORALES
Clerk of the Court
By:______________________________

Dated: March ___, 2013.

Respectfully submitted,

**BIRCH, de JONGH & HINDELS, PLLC**
*Counsel for Defendants: Cowpet Bay West Condominium Association, Ed Wardwell, Max Harcourt, Bill Canfield, Rosie Wells, Sharon Koehler, Doug Rebak, Herb Horwitz, Robert Cockayne, and Vincent Verdiramo*
1330 Estate Taarnebjerg
St. Thomas, VI 00802
Tel.: 340-774-1100; Fax: 340-774-7300

By:______________________________
**Richard Farrelly**
Bar No. 105
rfarrelly@bdhlawvi.com
**Joseph Riopelle**
jriopelle@boydlawgroup.com

## CERTIFICATE OF SERVICE

I hereby certify that on the above-indicated date, I electronically filed the foregoing document with the Clerk of the Court using ECF. I also certify that the foregoing document is being served this day on all counsel of record or pro se parties identified below, either via transmission of Notices of Electronic Filing generated by ECF or in some other authorized manner for those counsel or parties who are not authorized to receive electronically Notices of Electronic Filing.

**Karin A. Bentz, Esq.**
(Attorney for Plaintiff)
5150 Dronningens Gade, Suite 8
St. Thomas, VI 00802
Tel: 340-774-2669
kbentz@virginalaw.com

**John H. Benham, III, Esq.**
(Attorney for Talkington)
Post Office Box 11720
St. Thomas, VI 00801
Tel: 340-774-0673
benham@bclawvi.com

______________________________
Richard Farrelly

**Marissa Beldock**

| | |
|---|---|
| **From:** | LaShann R. Sledge |
| **Sent:** | Thursday, July 30, 2015 2:18 PM |
| **To:** | Marissa Beldock |
| **Subject:** | FW: Activity in Case 3:12-cv-00025-CVG-RM Judith Kromenhoek v. Cowpet Bay West Condominium Association Order |

Here you go.

Thank you,

*LaShann R. Wilson*
*Legal Assistant*
*Boyd Richards Parker & Colonnelli, P.L.*

**From:** dcecf_nef@vid.uscourts.gov [mailto:dcecf_nef@vid.uscourts.gov]
**Sent:** Tuesday, December 23, 2014 4:06 PM
**To:** dcecf_nef@vid.uscourts.gov
**Subject:** Activity in Case 3:12-cv-00025-CVG-RM Judith Kromenhoek v. Cowpet Bay West Condominium Association Order

**This is an automatic e-mail message generated by the CM/ECF system. Please DO NOT RESPOND to this e-mail because the mail box is unattended.**
*****NOTE TO PUBLIC ACCESS USERS*** Judicial Conference of the United States policy permits attorneys of record and parties in a case (including pro se litigants) to receive one free electronic copy of all documents filed electronically, if receipt is required by law or directed by the filer. PACER access fees apply to all other users. To avoid later charges, download a copy of each document during this first viewing. However, if the referenced document is a transcript, the free copy and 30 page limit do not apply.**

**District Court of the Virgin Islands**

**District of the Virgin Islands**

### Notice of Electronic Filing

The following transaction was entered on 12/23/2014 at 5:05 PM AST and filed on 12/23/2014

| | |
|---|---|
| **Case Name:** | Judith Kromenhoek v. Cowpet Bay West Condominium Association |
| **Case Number:** | 3:12-cv-00025-CVG-RM |
| **Filer:** | |
| **Document Number:** | 232(No document attached) |

**Docket Text:**
**ORDER (CVG) the memorandum opinions entered on November 18, 2014 [223], and November 19, 2014 [225], and the judgment entered on November 18, 2014 [224], are hereby VACATED as**

**being entered prematurely. (This is a TEXT ENTRY ONLY. There is no PDF document associated with this entry.)(AFS)**

**3:12-cv-00025-CVG-RM Notice has been electronically mailed to:**

Richard P. Farrelly      rfarrelly@bdhlawvi.com, cfrancis@bdhlawvi.com, cwilliams@bdhlawvi.com

John H Benham, III      benham@bclawvi.com, walsh@bclawvi.com

Karin A. Bentz      kbentz@virginlaw.com, legalstaff@virginlaw.com

Bennett Chan      chan@bclawvi.com, meade@bclawvi.com, walsh@bclawvi.com

Carl R Williams      cwilliams@bdhlawvi.com, cfrancis@bdhlawvi.com, rfarrelly@bdhlawvi.com

Ryan C Meade      rmeade@qpwblaw.com, jmena@qpwblaw.com, john.farrish@qpwblaw.com, kwaldner@qpwblaw.com

JOSEPH G. RIOPELLE      jriopelle@boydlawgroup.com, Lsledge@boydlawgroup.com

James Knight Parker      jparker@boydlawgroup.com

**3:12-cv-00025-CVG-RM Notice will be delivered by other means to:**

**Marissa Beldock**

**From:** dcecf_nef@vid.uscourts.gov
**Sent:** Tuesday, December 23, 2014 3:50 PM
**To:** dcecf_nef@vid.uscourts.gov
**Subject:** Activity in Case 3:12-cv-00025-CVG-RM Judith Kromenhoek v. Cowpet Bay West Condominium Association Order

**This is an automatic e-mail message generated by the CM/ECF system. Please DO NOT RESPOND to this e-mail because the mail box is unattended.**
*****NOTE TO PUBLIC ACCESS USERS*** Judicial Conference of the United States policy permits attorneys of record and parties in a case (including pro se litigants) to receive one free electronic copy of all documents filed electronically, if receipt is required by law or directed by the filer. PACER access fees apply to all other users. To avoid later charges, download a copy of each document during this first viewing. However, if the referenced document is a transcript, the free copy and 30 page limit do not apply.**

**District Court of the Virgin Islands**

**District of the Virgin Islands**

**Notice of Electronic Filing**

The following transaction was entered on 12/23/2014 at 4:49 PM AST and filed on 12/23/2014
**Case Name:** Judith Kromenhoek v. Cowpet Bay West Condominium Association
**Case Number:** 3:12-cv-00025-CVG-RM
**Filer:**
**Document Number:** 231(No document attached)

**Docket Text:**
**ORDER (CVG) the memorandum opinions entered on November 18, 2014 [223], and December 2, 2014 [225], and the judgment entered on November 18, 2014 [224], are hereby VACATED as being entered prematurely. (This is a TEXT ENTRY ONLY. There is no PDF document associated with this entry.) (AFS).**

**3:12-cv-00025-CVG-RM Notice has been electronically mailed to:**

Richard P. Farrelly rfarrelly@bdhlawvi.com, cfrancis@bdhlawvi.com, cwilliams@bdhlawvi.com

John H Benham, III benham@bclawvi.com, walsh@bclawvi.com

Karin A. Bentz kbentz@virginlaw.com, legalstaff@virginlaw.com

Bennett Chan chan@bclawvi.com, meade@bclawvi.com, walsh@bclawvi.com

Carl R Williams cwilliams@bdhlawvi.com, cfrancis@bdhlawvi.com, rfarrelly@bdhlawvi.com

Ryan C Meade     rmeade@qpwblaw.com, jmena@qpwblaw.com, john.farrish@qpwblaw.com, kwaldner@qpwblaw.com

JOSEPH G. RIOPELLE     jriopelle@boydlawgroup.com, Lsledge@boydlawgroup.com

James Knight Parker     jparker@boydlawgroup.com

**3:12-cv-00025-CVG-RM Notice will be delivered by other means to:**

**DISTRICT COURT OF THE VIRGIN ISLANDS**
**DIVISION OF ST. THOMAS AND ST. JOHN**

| | |
|---|---|
| **JUDITH KROMENHOEK,**<br><br>**Plaintiff,**<br><br>**v.**<br><br>**COWPET BAY WEST CONDOMINIUM ASSOCIATION; THE BOARD OF THE COWPET BAY WEST CONDOMINIUM ASSOCIATION; ED WARDWELL, MAX HARCOURT; BILL CANFIELD, ROSIE WELLS, SHARON KOEHLER, DOUG REBAK and HERB HORWITZ as Board members; MAX HARCOURT, in his personal capacity; LANCE TALKINGTON; ALFRED FELICE, ROBERT COKAYNE, and VINCENT VERDIRAMO,**<br><br>**Defendants.** | **Civil No. 2012-25** |

**ATTORNEYS:**

**Karin A. Bentz, Esq.**
Law Office of Karin Bentz, P.C.
St. Thomas, VI
*For Barbara Walters and Judith Kromenhoek,*

**Joseph G. Riopelle, Esq.**
Boyd Richards Parker & Colonnelli
Tampa, FL
**Carl R. Williams, Esq.**
**Richard P. Farrelly, Esq.**
Birch, Dejongh & Hindels
St. Thomas, VI
*For Cowpet Bay West Condominium Association, Ed Wardwell, Max Harcourt, Bill Canfield, Rosie Wells, Sharon Koehler, Doug Rebak, Robert Cockayne, Vincent Verdiramo, and Herb Horwitz,*

**John H. Benham, III, Esq.**
Watts, Benham & Sprehn, P.C.
St. Thomas, VI
*For Lance Talkington,*

**Ryan C. Meade, Esq.**
Quintairo, Prieto, Woo & Boyer, P.S.
Miami, FL
*For Alfred Felice.*

## ORDER

**GÓMEZ, J.**

Before the Court are two motions filed by Judith Kromenhoek to amend her complaint.

## I. FACTUAL AND PROCEDURAL BACKGROUND

Judith Kromenhoek ("Kromenhoek") owns a unit in the Cowpet Bay West Condominium complex ("Cowpet"), a condominium community located on St Thomas, United States Virgin Islands.

The Cowpet Bay West Condominium Association ("the Association") was formed under the Condominium Act of the Virgin Islands (the "Condominium Act"), 28 V.I.C. §§ 901-927. (Bylaws at 1, Civil No. 2012-24, ECF No. 31-1.)[1] The Association is comprised of all of the unit owners in the Cowpet condominium

[1] According to the Condominium Act,

> The administration of every property shall be governed by bylaws a true copy of which shall be annexed to the declaration and made a part thereof. No modification of or amendment to the bylaws shall be valid unless set forth in an amendment to the declaration and such amendment is duly recorded.

28 V.I.C. § 917.

community. Association members purchase their units subject to the Association's Declaration,[2] Bylaws, and its Rules and Regulations.[3]

Association members elect a Board of Directors ("the Board"). The Board is made up of seven Association members. The Bylaws provide that the Board has

> the powers and duties necessary for the administration of the affairs of the Condominium and may do all such acts and things except as by law, by the Declaration, or by [its] By-Laws may not be delegated to the Board of Directors by the unit owners.

(Bylaws at 2, Civil No. 2012-24, ECF 31-1.)

The Bylaws provide for the amendment and enforcement of Rules and Regulations by the Board. At all relevant times, the

[2] "'Declaration' means the instrument by which the property is submitted to the provisions of this chapter, as hereinafter provided, and such declaration as from time to time may be lawfully amended." 28 V.I.C. § 901.

[3] The Condominium Act also provides that,

> Each apartment owner shall comply strictly with the bylaws and the administrative rules and regulations adopted pursuant thereto, as either of the same may be lawfully amended from time to time, and with the covenants, conditions and restrictions set forth in the declaration or in the deed to his apartment. Failure to comply with any of the same shall be ground for an action to recover sums due, for damages or injunctive relief or both maintainable by the manager or Board of Directors on behalf of the Association of Apartment Owners or, in a proper case, by an aggrieved apartment owner.

28 V.I.C. § 906.

Rules and Regulations for Association members provide the following:

> Dogs and farm animals are prohibited. Owners will be fined as specified by the Board of Directors. The Association may require removal of any animal when it becomes bothersome to others or is deemed by the Association to be unacceptable.

(Rules and Regulations, Civil No. 2012-24, ECF No. 31-2.)

On or about December 15, 2010, Stansford S. Sutherland (“Sutherland”), “a licensed psychologist wrote a letter stating that he was treating Kromenhoek and that she was diagnosed with Anxiety Disorder . . . .” (Second Am. Compl. ¶ 30, Civil No. 2012-25, ECF No. 94.) In his letter, the psychologist stated “that he has prescribed the use of an emotional support animal, dog or other, to alleviate her symptoms and that such emotional support animal was necessary.” (*Id.*)

Kromenhoek owned a dog named Oliver. Kromenhoek submitted information about her dog’s qualification as an emotional support animal to Louanne Schecter (“Schecter”), the Cowpet Office Manager, including the letter from Sutherland.

Thereafter, members of the Board held a public meeting during which the issue of service dogs was discussed. Kromenhoek alleges that Max Harcourt (“Harcourt”), then President of the Association, shared the content of her documents with some of

the Association members. (Second Am. Compl. at ¶ 53, Civil No. 2012-25, ECF No. 94.)

Subsequently, discussions on Kromenhoek’s pet ownership appeared on an Internet web log, the Cowpet Bay Blog (“the blog”). The blog was maintained by a member of the Association, Lance Talkington. (Second Am. Compl. at ¶ 44, Civil No. 2012-24.)

Kromenhoek alleges that, on or about October 28, 2011, Harcourt e-mailed a letter addressed to Kromenhoek’s e-mail address as well as to Talkington’s e-mail address. The letter stated that Kromenhoek had violated the “no dogs” policy contained in the Rules and Regulations. The letter also requested that Kromenhoek submit applications for reasonable accommodation.

Kromenhoek alleges that Vincent Verdiramo (“Verdiramo”), an attorney and member of the Board advised the Board and the members of the association that accommodations should be determined by the courts, not the Association. In addition, he urged the members of the Association to contact the Board and express their support for the “no dogs” policy.

On or about January 19, 2012, the Board met and voted to assess a fine of $50 per day against owners, including Kromenhoek, who were in violation of the “no dogs” policy.

Thereafter, in February, 2012, the Association voted to add the “no dogs” policy to the Bylaws. The newly added bylaw contained no explicit exception for service animals permitted by the Fair Housing Act (“FHA”).

Based on this policy, fines were assessed against Kromenhoek. Those fines were held in abeyance. Kromenhoek was subsequently granted an exemption from the “no dogs” policy and was not required to pay the fines.

Kromenhoek initiated this action against Cowpet on April 9, 2012. Thereafter, Kromenhoek amended her complaint once as a matter of right. After receiving leave of court, she then filed another amended complaint (the “Second Amended Complaint”). Various defendants moved to dismiss the Second Amended Complaint for failure to state a claim. The Court granted those motions in part. At that time, the Court also granted Kromenhoek leave to amend her complaint to cure deficiently pled claims. Kromenhoek subsequently filed a motion for leave to amend her second amended complaint which, in part, sought to add additional claims. The Magistrate Judge denied Kromenhoek’s motion for leave to amend her complaint.

On April 17, 2014, Kromenhoek filed a motion to amend (the “first motion to amend”) her second amended complaint to which she attached a proposed third amended complaint. The proposed

third amended complaint omitted the additional claims that she had previously sought to assert when the Magistrate denied her leave to amend her complaint. Later that day, Kromenhoek filed a motion to amend (the "second motion to amend") her proposed third amended complaint to which she attached a proposed fourth amended complaint.

Subsequently, at a May 27, 2014, hearing, the Court granted summary judgment on all federal claims asserted against all living defendants, including Verdiramo and the Board. The Court declined to exercise supplemental jurisdiction over the remaining state law claims pending against those defendants.

**II. <u>DISCUSSION</u>**

"After amending once or after an answer has been filed, the plaintiff may amend only with leave of court or the written consent of the opposing party, but 'leave shall be freely given when justice so requires.'" *Shane v. Fauver*, 213 F.3d 113, 116 (3d Cir. 2000)(quoting Fed. R. Civ. P. 15(a).

> [A]lthough "the grant or denial of an opportunity to amend is within the discretion of the District Court, . . . outright refusal to grant the leave without any justifying reason appearing for the denial is not an exercise of discretion; it is merely an abuse of that discretion and inconsistent with the spirit of the Federal Rules. Among the grounds that could justify a denial of leave to amend are undue delay, bad faith, dilatory motive, prejudice,

> and futility. Futility means that the complaint, as amended, would fail to state a claim upon which relief could be granted. In assessing futility, the District Court applies the same standard of legal sufficiency as applies under Rule 12(b)(6). Accordingly, if a claim is vulnerable to dismissal under Rule 12(b)(6), but the plaintiff moves to amend, leave to amend generally must be granted unless the amendment would not cure the deficiency.

*Id.* (internal citations and quotations omitted).

"[When ruling on a [12(b)(6) motion], a judge must accept as true all of the factual allegations contained in the complaint." *Erickson v. Pardus,* 551 U.S. 89, 93-94 (2007) (per curiam) (citing *Bell Atlantic Corp. v. Twombly,* 550 U.S. 555-56 (2007)). All reasonable inferences are drawn in favor of the non-moving party. *Alston v. Parker,* 363 F.3d 229, 233 (3d Cir.2004).

"While a complaint attacked by a Rule 12(b)(6) motion to dismiss does not need detailed factual allegations, a plaintiff's obligation to provide the 'grounds' of his 'entitlement to relief' requires more than labels and conclusions, and a formulaic recitation of a cause of action's elements will not do." *Bell Atlantic Corp.,* 550 U.S. at 555 (internal citations omitted). Thus, "[t]o survive a motion to dismiss, a . . . plaintiff must allege facts that 'raise a right to relief above the speculative level on the assumption that the

allegations in the complaint are true (even if doubtful in fact).'" *Victaulic Co. v. Tieman,* 499 F.3d 227, 234 (3d Cir.2007) (quoting *Bell Atlantic Corp.,* 550 U.S. at 589). The court is "not bound to accept as true a legal conclusion couched as a factual allegation." *Bell Atl. Corp.*, 550 U.S. at 555 (internal quotations and citations omitted).

## III. ANALYSIS

Kromenhoek has filed two pending motions to amend her complaint. Because the other parties have not consented to her amendment, she requires the Court's leave to amend. *See* Fed. R. Civ. P. 15(a).

### 1. First Motion Seeking Leave to Amend the Complaint

The second motion to amend seeks the relief that the first motion to amend sought. When, as here, the plaintiff seeks leave to amend her complaint and subsequently files a second motion seeking leave to amend her complaint, it would seem prudent to treat the second amended complaint as superseding the first, and to find as moot the first motion to amend. *See, e.g., Jenkins-Dyer v. Wood*, 13-CV-2489-JAR, 2014 WL 4261279 (D. Kan. Aug. 29, 2014)("The Magistrate Judge found the first motion to amend moot in light of the second motion, and entered a Memorandum and Order granting in part and denying in part Plaintiff's second motion for leave to amend her complaint."); *Douglas v. Cadence*

*Bancorp, L.L.C.*, 4:12-CV-03571, 2013 WL 3929072 (S.D. Tex. July 29, 2013)(“Because [the plaintiff] has joined in a subsequent motion to amend, his original motion to amend . . . is DENIED AS MOOT.”); *Kalos v. Law Offices of Eugene A. Seidel, P.A.*, 1:09CV833 (JCC), 2009 WL 4683551 (E.D. Va. Dec. 3, 2009)(”The Court will treat Plaintiffs' first Motion for Leave to Amend attaching the Second Amended Complaint as having been superceded by Plaintiffs' second Motion for Leave to Amend attaching the Third and Supplemental Amended Complaint.”); *Cordell v. Pac. Indem.*, CIV A. 4:05CV167-RLV, 2006 WL 1935644 (N.D. Ga. July 11, 2006)(“The court concludes that the plaintiff's filing of a third motion for leave to amend his Complaint on June 16, 2006, moots his previously filed motion to amend filed on May 23, 2006. Therefore, the plaintiff's motion to amend his Complaint to add parties, which was filed on May 23, 2006, is DISMISSED as moot.”).

In accord with these prudential considerations, the Court finds as moot Kromenhoek’s first motion to amend. Given that finding, the Court will determine whether it is appropriate to grant Kromenhoek leave to amend her complaint based on the proposed complaint attached to Kromenhoek’s pending second motion to amend her complaint. That proposed complaint is the proposed fourth amended complaint.

**2. Second Motion Seeking Leave to Amend the Complaint**

In the proposed fourth amended complaint, Kromenhoek alleges new facts which are relevant only to claims that the Court previously disposed at the May 27, 2014, hearing by either granting summary judgment or declining supplemental jurisdiction. Insofar as the proposed fourth amended complaint alleges facts which are relevant to those previously resolved claims, amendment is clearly futile.

The proposed fourth amended complaint asserts two additional claims and additional facts relevant to those claims. The first proposed claim asserts a violation of 42 U.S.C. § 3617 against Verdiramo. The second proposed claim asserts a breach of fiduciary duty claim against the Board. The Court will consider whether those amendments are appropriate.

**A. 42 U.S.C. § 3617 Claim against Verdiramo**

Pursuant to Title 42, U.S.C. § 3617 ("Section 3617"), it is unlawful to

> coerce, intimidate, threaten, or interfere with any person in the exercise or enjoyment of, or on account of his having exercised or enjoyed, or on account of his having aided or encouraged any other person in the exercise or enjoyment of, any right granted or protected by section 3603, 3604, 3605, or 3606 of this title.

42 U.S.C. § 3617.

To prevail on a Section 3617 claim, a plaintiff must show that:

> (1) she is a protected individual under the FHA, (2) she was engaged in the exercise or enjoyment of her fair housing rights, (3) the defendants coerced, threatened, intimidated, or interfered with the plaintiff on account of her protected activity under the FHA, and (4) the defendants were motivated by an intent to discriminate. *East-Miller*, 421 F.3d at 563. "Interference" is more than a "quarrel among neighbors" or an "isolated act of discrimination," but rather is a "pattern of harassment, invidiously motivated." *Halprihn*, 388 F.3d at 330; *cf*. *DiCenso*, 96 F.3d at 1006; *Honce v. Vigil*, 1 F.3d 1085, 1090 (10th Cir. 1993).

*Bloch v. Frischholz*, 587 F.3d 771, 783 (7th Cir. 2009).

A wide range of conduct falls under Section 3617's umbrella. Indeed,

> Section 3617 is not limited to those who used some sort of "potent force or duress," but extends to other actors who are in a position directly to disrupt the exercise or enjoyment of a protected right and exercise their powers with a discriminatory animus. Under this standard, the language "interfere with" encompasses such overt acts as racially-motivated firebombings, sending threatening notes, and less obvious, but equally illegal, practices such as exclusionary zoning, deflating appraisals because of discriminatory animus, and insurance redlining[.]

*Michigan Prot. & Advocacy Serv., Inc. v. Babin*, 18 F.3d 337, 347 (6th Cir. 1994).

Even reading Section 3617 broadly, in order to account for less obvious but still illegal discrimination, unfortunate

Case 3:12-cv-00025-CVG-RM Document #: 238 Filed: 12/12/14 Page 11 of 19

skirmishes between neighbors are not made unlawful. *Bloch*, 587 F.3d at 783. Even potentially discriminatory statements exchanged between neighbors do not necessarily violate Section 3617. *See Sheikh v. Rabin*, 565 F. App'x 512, 517-18 (7th Cir. 2014).

In *Sheikh v. Rabin*, the Seventh Circuit considered whether statements, including discriminatory statements, made in opposition to a zoning variance and in discussions between neighbors, violated Section 3617. In that case, the plaintiff was a Muslim from South Asia who sought to build a home and required various zoning variances. *Id.* at 514-15. He initially sought a variance from the zoning board. *Id.* at 515. Before a final decision on the variances was issued, he filed suit against various neighborhood residents, alleging, in part, violations of Section 3617. *Id.*

Those neighborhood residents had opposed the requested variances and made a number of potentially discriminatory statements. *See id.* at 517-18.

> [One neighbor] once told [the plaintiff] that the subdivision is “all white” and that he did not think [the plaintiff] would “fit in.” The neighbors sometimes referred to [the plaintiff] and his family at [public] meetings as “you people,” and [a neighbor] suggested he move somewhere else, closer to his “people.” At one meeting, [a neighbor] displayed pictures of narrow houses in poor countries, sarcastically

> suggesting that the pictures supported the conclusion that a narrow house should be enough for [the plaintiff]. Another time, some of the neighbors (he does not specify who) expressed worry that [the plaintiff] would allow more than one family to live in his house. (His two adult children will live in the house with him and his wife.) These neighbors talked about other areas in which one “colored family” moving in was a prelude to being “flooded by them” and about how some single-family homes rented by “latinos and blacks” ended up housing multiple families. [The plaintiff] also alleges that [a neighbor] said something threatening about the house burning down if it is built. (Though accepting as true that [that neighbor] said something threatening, [the judge] noted that the allegations are fuzzy. [The plaintiff]'s appellate brief hardly clarifies matters; he maintains that, whatever [the neighbor] said, it was threatening, but he explains that he “can merely speculate on that threat” since only [the neighbor] knows “his true intent.”)

*Id.* Based on these facts, the district court held that the plaintiff’s allegations described “a ‘quarrel among neighbors’ that involved, at most, ‘isolated acts of discrimination’” and did not violate 42 USC 3617. *See Sheikh v. Rabin*, No. 11-CV-425, 2012 WL 5471085, at *5 (N.D. Ill. Nov. 9, 2012). The Seventh Circuit affirmed, holding that “taken together, the[] allegations would establish only that different neighbors at different times made shameful statements, not that any individual neighbor (or the neighbors as a group) interfered with [the plaintiff]'s rights under the Fair Housing Act. *Sheikh*, 565 F. App'x at 518.

Case 3:12-cv-00025-CVG-RM Document #: 228 Filed: 12/12/14 Page 11 of 19

Here, accepting all Kromenhoek's allegations as true and drawing all inferences in her favor, *see Alston,* 363 F.3d at 233, Verdiramo ratified the Board's conduct as a member of the Board. In addition, Verdiramo sent a letter to the Board and an email to a number of members of the Association which the proposed fourth amended complaint summarizes as follows:

> "[W]hen a person claims the need for am\n [sic] an emotional support animal under the FHA, the person must bring the Association to court and have a judge and an expert look at all the evidence and the a decision will be made." . . . Verdiramo continued "[a]nother area of contention is the Fair Housing Act where individuals seek to have animals for this so called emotional support. This is not a blanket law. Every case has to be handled on an individual basis with official judicial adjudication. Therefore, if a person wants to claim the need to have an animal under the Fair housing Act they have to bring the association to court, have a judge and expert look at all the evidence and then a decision will be made. Therefore, the association should be prepared to hire the necessary lawyers and/or doctors to put forth the association's position. PRESENTLY THE POSITION OF THE ASSOCIATION IS NO DOGS ALLOWED. The majority of owners do not want animals. It is just a few who wish to push the envelope and contest the legality of our laws. That is their prerogative. However, the same individuals should be made to understand that it will become necessary for them to adjudicate these matters in a court of law and their positions evaluated by competent third parties. THERE IS NO ONE ON THIS BOARD WITH THE NECESSARY BACKGROUND TO EVALUATE APPLICATION FOR EXEMPTION. The only way to verify the truth and voracity [sic] of the applications being made by individuals for service dogs is to subject the individual and

> their experts to cross examination under oath. . . . It is my understanding that other condominium associations have attempted to allow dogs and it turned out to be a nightmare. The only facility that presently allows dogs is the Elysian. I am therefore urging everyone to contact the Board and make your wishes known. If you sit ideally (sic) by and allow this to happen then we have no one to blame but ourselves. Please take an active part in our endeavor to keep Cowpet Bay animal free.

(Proposed Fourth Am. Compl. at ¶ 67, ECF No. 183-2)

Through this email, Verdiramo used his position as a Board member to rally members of the Association against Kromenhoek's request for a reasonable accommodation by asking members of the association to "please take an active part in our endeavor to keep Cowpet Bay animal free and contact the Board and make your wishes known." (*Id.* at ¶ 159) In addition, "Verdiramo interfered with Kromenhoek's right to a reasonable accommodation by utilizing the imprimatur of his law license to provide legally deficient advise to the Board and at l[e]ast Ninety-Nine members of the Association regarding the requirements of the FHA." (*Id.* at ¶ 158.)

If the alleged conduct fails to state a claim upon which relief can be granted for a violation of Section 3617, amendment would be futile. Considering the alleged conduct in light of the relevant law, Kromenhoek's proposed amendment is legally wanting.

At the May 27, 2014, hearing, the Court granted the Board summary judgment on the Section 3617 claim alleged against it. The Court held that the Board's conduct did not violate Section 3617 because there was no competent record evidence that it retaliated against Kromenhoek. Thus to the extent Verdiramo acted through the Board, his actions as a board member did not violate Section 3617.

Significantly, Verdiramo's other alleged actions indicate only that Verdiramo was contributing to the discussion surrounding the no-dog policy. Indeed, at worst, Verdiramo's conduct is similar to, but less discriminatory than, the conduct presented in *Sheikh v. Rabin*. Thus, the Court holds that Verdiramo's conduct is better characterized as a quarrel between neighbors or isolated acts of discrimination than conduct violating Section 3617.[4] That conduct--which is comprised of

[4] Kromenhoek's characterization of Verdiramo's letter to the Board and email to members of the Association as deficient legal advice does not alter the Court's analysis. The Court first notes that this characterization is conclusory and the Court need not assume its truth for the purposes of determining whether granting leave to amend is appropriate. *Cf. Bell Atlantic Corp.,* 550 U.S. at 555. Even assuming *arguendo* that Verdiramo's letter to the Board or email to the members of the Association constituted legal advice, it is well-established that an attorney is not liable for the actions of a client simply because the attorney provided legal advice to the client. *See Newburger, Loeb & Co. v. Gross,* 563 F.2d 1057, 1080 (2nd Cir.1977); *cf. Heffernan v. Hunter,* 189 F.3d 405, 413 (3d Cir.1999) (in civil rights case under 42 U.S.C. § 1985 no conspiracy possible unless challenged conduct occurs outside scope of representation; in light of "regulatory framework" that protects parties from unscrupulous lawyers, conspiracy immunity in attorney-client context is compelling)). Accordingly, the Court would not hold that merely providing deficient legal advice constitutes a violation of Section 3617.

utterances indicating opposition--cannot give rise to a viable Section 3617 claim.

Accordingly, accepting all Kromenhoek’s allegations as true and drawing all reasonable inferences in her favor, the Court finds that Kromenhoek’s proposed fourth amended complaint would, as a matter of law, fail to state a Section 3617 claim against Verdiramo.

**B. Breach of Fiduciary Duty Claim Against the Board**

The proposed fourth amended complaint seeks to allege a breach of fiduciary duty claim--a state law claim--against the Board. In the Court’s November 19, 2014, memorandum opinion, the Court granted summary judgment in favor of the Board on all federal claims alleged against the Board. The Court then declined to exercise its supplemental jurisdiction over the remaining state law claims then pending against the Board. For the reasons previously stated in the Court’s November 19, 2014, memorandum opinion, the Court would decline to exercise supplemental jurisdiction over this proposed state law claim.

**IV. <u>CONCLUSION</u>**

The proposed Section 3617 claim fails as a matter of law. In addition, the Court would decline to exercise supplemental jurisdiction over the proposed breach of fiduciary duty claim. Accordingly, permitting amendment would be futile.

These premises considered, it is hereby

**ORDERED** that Kromenhoek's first motion to amend the complaint, ECF No. 181, which was filed at 10:49 am on April 17, 2014, is **MOOT**; it is further

**ORDERED** that Kromenhoek's second motion to amend the complaint, ECF No. 182, which was filed at 5:04 pm on April 17, 2014, is **DENIED.**

**S_______________________**
**Curtis V. Gómez**
**District Judge**

.

**DISTRICT COURT OF THE VIRGIN ISLANDS**
**DIVISION OF ST. THOMAS AND ST. JOHN**

| | |
|---|---|
| **BARBARA WALTERS,** | |
| **Plaintiff,** | |
| **v.** | **Civil No. 2012-24** |
| **COWPET BAY WEST CONDOMINIUM ASSOCIATION; THE BOARD OF THE COWPET BAY WEST CONDOMINIUM ASSOCIATION; ED WARDWELL, MAX MARCOURT; BILL CANFIELD, ROSIE WELLS, SHARON KOEHLER, DOUG REBAK and HERB HORWITZ as Board members; MAX HARCOURT, in his personal capacity; LANCE TALKINGTON; ALFRED FELICE, ROBERT COKAYNE, and VINCENT VERDIRAMO,** | |
| **Defendants.** | |
| **JUDITH KROMENHOEK,** | |
| **Plaintiff,** | |
| **v.** | **Civil No. 2012-25** |
| **COWPET BAY WEST CONDOMINIUM ASSOCIATION; THE BOARD OF THE COWPET BAY WEST CONDOMINIUM ASSOCIATION; ED WARDWELL, MAX MARCOURT; BILL CANFIELD, ROSIE WELLS, SHARON KOEHLER, DOUG REBAK and HERB HORWITZ as Board members; MAX HARCOURT, in his personal capacity; LANCE TALKINGTON; ALFRED FELICE, ROBERT COKAYNE, and VINCENT VERDIRAMO,** | |
| **Defendants.** | |

*Walters v. Cowpet Bay West Condominium Association, et al.*
Civil No. 2012-24
*Kromenhoek v. Cowpet Bay West Condominium Association, et al.*
Civil No. 2012-25
Memorandum Opinion and Order
Page 2

**ATTORNEYS:**

**Karin A. Bentz, Esq.**
Law Office of Karin Bentz, P.C.
St. Thomas, VI
*For Barbara Walters and Judith Kromenhoek,*

**Joseph G. Riopelle, Esq.**
Boyd Richards Parker & Colonnelli
Tampa, FL
**Carl R. Williams, Esq.**
**Richard P. Farrelly, Esq.**
Birch, Dejongh & Hindels
St. Thomas, VI
*For Cowpet Bay West Condominium Association, Ed Wardwell, Max Harcourt, Bill Canfield, Rosie Wells, Sharon Koehler, Doug Rebak, Robert Cockayne, Vincent Verdiramo, and Herb Horwitz,*

**John H. Benham, III, Esq.**
Watts, Benham & Sprehn, P.C.
St. Thomas, VI
*For Lance Talkington,*

**Ryan C. Meade, Esq.**
Quintairo, Prieto, Woo & Boyer, P.S.
Miami, FL
*For Alfred Felice.*

**ORDER**

**GÓMEZ, J.**

Before the Court are several motions by certain defendants (“the movants”) to dismiss Walters v. Cowpet Bay West Condominium Association, et al., Civil No. 2012-24, and Kromenhoek v. Cowpet Bay West Condominium Association, et al., Civil No. 2012-25. The complaints in both cases are

Joint Appendix Vol. II Page 2620

*Walters v. Cowpet Bay West Condominium Association, et al.*
Civil No. 2012-24
*Kromenhoek v. Cowpet Bay West Condominium Association, et al.*
Civil No. 2012-25
Memorandum Opinion and Order
Page 3

substantially identical and involve many common questions of law and fact. Pursuant to Fed. R. Civ. P. 42, the two cases will be joined for the specific purpose of resolving the pending motions to dismiss. This Order applies to both complaints.

To survive a motion to dismiss, a plaintiff must offer "enough facts to state a claim to relief that is plausible on its face." *Bell Atlantic Corp. v. Twombly*, 127 S. Ct. 1955, 1974 (2007). A court must ask whether the complaint "contain[s] either direct or inferential allegations respecting all the material elements necessary to sustain recovery under *some* viable legal theory." *Twombly*, 127 S. Ct. at 1969 (emphasis in original) (quoting *Car Carriers, Inc. v. Ford Motor Co.*, 745 F.2d 1101, 1106 (7th Cir. 1984)).

"While a complaint attacked by a Rule 12(b)(6) motion to dismiss does not need detailed factual allegations, a plaintiff's obligation to provide the 'grounds' of his 'entitlement to relief' requires more than labels and conclusions, and a formulaic recitation of a cause of action's elements will not do." *Id.* at 1964-65 (internal citations omitted). Thus, "[t]o survive a motion to dismiss, a . . . plaintiff must allege facts that 'raise a right to relief above the speculative level on the assumption that the allegations in

Joint Appendix Vol. II Page 2621

*Walters v. Cowpet Bay West Condominium Association, et al.*
Civil No. 2012-24
*Kromenhoek v. Cowpet Bay West Condominium Association, et al.*
Civil No. 2012-25
Memorandum Opinion and Order
Page 4

the complaint are true (even if doubtful in fact).'" *Victaulic Co. v. Tieman*, 499 F.3d 227, 234 (3d Cir. 2007) (quoting *Twombly*, 127 S. Ct. at 1965). The Court, in considering if there are facts in the Complaint sufficient to show plausible entitlement to relief, disregards any allegations in the Complaint which are merely "labels and conclusions [or] a formulaic recitation of the elements." *Twombly*, 550 U.S. at 555.

"Generally, a district court may not consider matters outside the Complaint when ruling on a motion to dismiss." *Cerome v. Moshannon Valley Corr. Center*, 2010 U.S. App. LEXIS 24938, at *9 (3d Cir. 2010). Under Rule 12(d), if, on a motion under Rule 12(b)(6), matters outside of the pleadings are presented to and not excluded by the court, the motion must generally be treated as one for summary judgment under Rule 56. *Id*. "However, 'an exception to the general rule is that a document *integral to or explicitly relied upon* by the complaint may be considered without converting the motion [to dismiss] into one for summary judgment.'" *Id*. (quoting *In re Burlington Coat Factory Sec. Litig.*, 114 F.3d 1410, 1426 (3d Cir. 1997) (internal citations and quotations omitted); *see also In re Trump*, 7 F.3d 357, 368 n.9 (3d Cir. 1993) ("[A] court may consider an undisputedly authentic document that a defendant

Joint Appendix Vol. II Page 2622

*Walters v. Cowpet Bay West Condominium Association, et al.*
Civil No. 2012-24
*Kromenhoek v. Cowpet Bay West Condominium Association, et al.*
Civil No. 2012-25
Memorandum Opinion and Order
Page 5

attaches as an exhibit to a motion to dismiss if the plaintiff's claims are based on the document.") (internal citations and quotations omitted).

Applying the standard outlined above, the Court finds that Walters and Kromenhoek have failed to state a claim on which relief can be granted with respect to Counts Nine (Negligence and IIED), Ten, Eleven, Twelve, Sixteen, and Eighteen. The Court futher finds that it would be futile to grant leave to amend Counts Nine (Negligence), Eleven, and Twelve.

The premises considered, it is hereby

**ORDERED** that the motions to dismiss are **GRANTED IN PART and DENIED IN PART**; it is further

**ORDERED** that the motion to dismiss Counts One, Two, Three, Four, Five, Six, Seven, Eight, Nine (IIED), Ten, Thirteen, Fourteen, Fifteen, Sixteen, Seventeen, and Eighteen, is **DENIED**; it is further

**ORDERED** that the motion to dismiss Counts Nine (Negligence), Eleven, and Twelve, is **GRANTED**; it is further

**ORDERED** that Walters shall, no later than April 14, 2014, amend Counts Nine (IIED), Ten, Sixteen, and Eighteen, of her Complaint; it is further

Joint Appendix Vol. II Page 2623

*Walters v. Cowpet Bay West Condominium Association, et al.*
Civil No. 2012-24
*Kromenhoek v. Cowpet Bay West Condominium Association, et al.*
Civil No. 2012-25
Memorandum Opinion and Order
Page 6

**ORDERED** that, if Walters fails to amend Counts Nine (IIED), Ten, Sixteen, and Eighteen, of her Complaint, those Counts may be dismissed for failure to state a claim on which relief may be granted; it is further

**ORDERED** that Kromenhoek shall, no later April 14, 2014, amend Counts Nine (IIED), Ten, Sixteen, and Eighteen, of her Complaint; it is further

**ORDERED** that, if Kromenhoek fails to amend Counts Nine (IIED), Ten, Sixteen, and Eighteen, of her Complaint, those Counts may be dismissed for failure to state a claim on which relief may be granted.

The Court will issue a memorandum opinion in the coming weeks outlining the reason for this ruling.

**S_______________________**
**Curtis V. Gómez**
**District Judge**

Joint Appendix Vol. II Page 2624

Case: 3:12-cv-00025-CVG-RM Document #: 99 Filed: 03/25/13 Page 1

IN THE UNITED STATES DISTRICT COURT OF THE VIRGIN ISLANDS
DISTRICT OF ST. THOMAS AND ST. JOHN

JUDITH KROMENHOEK,

Plaintiff,

v.

COWPET BAY WEST CONDOMINIUM ASSOCIATION; THE BOARD OF THE COWPET BAY WEST CONDOMINIUM ASSOCIATION; MAX HARCOURT, in his personal capacity; ALFRED FELICE; LANCE TALKINGTON ROBERT COCKAYNE;VINCENT VERDIRAMO,

Defendants.

CIVIL CASE NO: 3:12-cv-00025

**DEFENDANTS' MOTION TO DISMISS PLAINTIFF'S AMENDED COMPLAINT AND SUPPORTING MEMORANDUM OF LAW**

Defendants Cowpet Bay West Condominium Association, The Board of the Cowpet Bay West Condominium Association, Max Harcourt, Robert Cockayne and Vincent Verdiramo (jointly sometimes "Defendants"), by and through undersigned counsel and pursuant to Rules 12(b)(6) of the Federal Rules of Civil Procedure, as well as the applicable Local Rules of the United States District Court for the U.S. Virgin Islands, Division of St. Thomas and St. John, and here files its: Motion to Dismiss the Second Amended Complaint filed by Plaintiff, Judith Kromenhoek in the above captioned cause. As grounds therefore, Defendants state as follows:

## I. INTRODUCTION

Despite having three bites at the apple, Plaintiff still has failed to plead sufficient facts to properly support any of her nineteen causes of actions. What's more, even after being given the opportunity to explain and rectify Plaintiff's prior pleading deficiencies,

MIAMI | FT. LAUDERDALE | TAMPA | WEST PALM BEACH

100 S.E. Second Street
36th Floor | Miami | Florida 33131
Phone: 786-425-1045 | Fax: 786-425-3905

1600 W. Commercial Blvd. | Suite 201
P.O. Box 14546 | Ft. Lauderdale | Florida 33302

400 N. Ashley Drive
Suite 1150 | Tampa | Florida 33602

824 U.S. Highway One
Suite 305 | North Palm Beach | Florida 33408
Phone: 561-624-8233 | Fax: 561-624-8940

www.boydlawgroup.com

Joint Appendix Vol. II Page 2625

Plaintiff's Second Amended Complaint continues to state nothing more than legal conclusions.

Nevertheless, Plaintiff's Second Amended Complaint, in the majority of circumstances, fails to even recite the basic elements of a cause of action much less anything more than mere conclusory statements. This is not enough to withstand Defendants Rule 12(b)6) Motion to Dismiss. See *American Corporate Soc. v. Valley Forge Ins. Co.*, No. 10–3560, 2011 WL 1490284, at *1 (3d Cir. Apr. 20, 2011). As such, Plaintiff's Second Amended Complaint must be dismissed.

## II. MEMORANDUM OF LAW

In the Second Amended Complaint Plaintiff alleges that she suffers from an Anxiety Disorder and obtained an emotional support animal pursuant to her doctor's advice and thereafter, various Defendants, allegedly violated her privacy, the Fair Housing Act, the ADA, defamed Plaintiff and a litany of other specious accusations.

As set forth below, the various intermingled causes of action asserted against the Defendants fail to state a cause of action upon which relief may be granted. The pleading standard by which the court must measure a motion to dismiss is outlined in the United States Supreme Court's decision in *Bell Atlantic Corp. v. Twombly*, 127 S.Ct. 1955 (2007) In *Twombly*, the Supreme Court ruled that "a plaintiff's obligation to provide the 'grounds' of his 'entitlement to relief' requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." *Twombly* at 1964-1965.

In *Ashcroft v. Iqbal*, 129 S.Ct. 1937, 1949-50 (2009), the Supreme Court found that: "(1) a court must ignore legal conclusions and (2) consider only those allegations

MIAMI | FT. LAUDERDALE | TAMPA | WEST PALM BEACH

100 S.E. Second Street
36th Floor | Miami | Florida 33131
Phone: 786-425-1045 | Fax: 786-425-3905

1600 W. Commercial Blvd. | Suite 201
P.O. Box 14546 | Ft. Lauderdale | Florida 33302
Phone: 954-848-2460 | Fax: 954-848-2470

400 N. Ashley Drive
Suite 1150 | Tampa | Florida 33602
Phone: 813-223-6021 | Fax: 813-223-6024

824 U.S. Highway One
Suite 305 | North Palm Beach | Florida 33408
Phone: 561-624-8233 | Fax: 561-624-8940

www.boydlawgroup.com

Joint Appendix Vol. II Page 2626

entitled to a presumption of truth to determine whether they plausibly give rise to an entitlement to relief." *Iqbal*, 129 S.Ct. at 1950; see also *Folwer v. UPMC Shadyside*, 578 F.3d 203, 210 – 12 (3d Cir. 2009).

As the Court of Appeals for the Third Circuit clarified: —in light of *Twombly*, Rule 8(a)(2) requires a 'showing' rather than a blanket assertion of an entitlement to relief. *Phillips v. Allegheny County*, 515 F.3d 224, 233 (3d. Cir. 2007) (emphasis in original). The Third Circuit in *Phillips* went on to sum up the new pleading standard under *Twombly* as follows:

> [S]tating a claim requires a complaint with enough factual matter (taken as true) to suggest the required element [though] this does not impose a probability requirement at the pleadings stage, but instead simply calls for enough facts to raise a reasonable expectation that discovery will reveal evidence of the necessary element. *Phillips*, 515 F.3d at 234 (internal quotation marks and citations omitted.)

Most recently, the Third Circuit stated:

> To withstand a Rule 12(b)(6) motion to dismiss, "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Iqbal,* 129 S.Ct. 1937, 1949, 173 L.Ed.2d 868 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570, 127 S.Ct. 1955, 167 L.Ed.2d 929 (2007)). "Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Id.* In addition to the complaint and any exhibits attached thereto, we may also consider —an undisputedly authentic document ... attache[d] as an exhibit to [the] motion to dismiss if the plaintiff's claims are based on the document," *See Pension Benefit Guar. Corp. v. White Consol. Indus.*, 998 F.2d 1192, 1196 (3d Cir. 1993).

*American Corporate Soc. v. Valley Forge Ins. Co.*, No. 10–3560, 2011 WL 1490284, at *1 (3d Cir. Apr. 20, 2011). The Virgin Islands apply the Third Circuit view on sufficiency of a complaint.

The Defendants will address each count in turn and show that even if all of Plaintiff's accusations are taken as true, the Second Amended Complaint fails for lack of

MIAMI | FT. LAUDERDALE | TAMPA | WEST PALM BEACH
100 S.E. Second Street 36th Floor | Miami | Florida 33131 Phone: 786-425-1045 | Fax: 786-425-3905
1600 W. Commercial Blvd. | Suite 201 P.O. Box 14546 | Ft. Lauderdale | Florida 33302 Phone: 954-848-2460 | Fax: 954-648-2470
400 N. Ashley Drive Suite 1150 | Tampa | Florida 33602 Phone: 813-223-6211 | Fax: 813-223-6024
824 U.S. Highway One Suite 305 | North Palm Beach | Florida 33408 Phone: 561-624-8233 | Fax: 561-624-8940
www.boydlawgroup.com
Joint Appendix Vol. II Page 2627

Case 1:14-cv-00025-CVG-RM Document #99 Filed 03/25/15 Page 14 of 20

recitation of facts beyond a speculative and merely conclusory level. Further, assuming arguendo that the allegations of fact are true, the Second Amended Complaint fails to meet the legal standards for the causes of action purportedly asserted as to the Defendants.

**a. Plaintiff's Count I Must be Dismissed for Failure to State a Cause of Action**

Unlawful discriminatory housing practices in violation of the FHA (Count I) may be brought under three theories: failure to reasonable accommodate the housing needs of persons with disabilities, disparate impact and disparate treatment. The instant case appears to be premised on an alleged failure of the Association to reasonable accommodate Plaintiff or rather the alleged delay in accommodating Plaintiff's request. Plaintiff has failed to plead the requisite facts to support a violation of the Fair Housing Act.

The elements of an FHAA failure to accommodation claim are as follows:

> "In order to make out a claim for a Fair Housing Act Violation based on failure to provide a reasonable accommodation, [Plaintiff] must show: i) that he is suffering from a disability as defined 42 U.S.C. § 3602(h)(1); ii) that the Defendants knew or reasonably should have been expected to know of the disability; iii) that reasonable accommodation of [Plaintiff's] disability might be necessary to afford him an equal opportunity to use and enjoy his dwelling; and iv) that the Defendants refused to make a reasonable accommodation." See *United States v. Port Liberte Condo 1 Ass'n Inc.,* Docket No. 04-2783, 2006 WL 2792780, *5 (D.N.J. Sept. 27, 2006.)

Plaintiff has finally, on the third try, alleged that she was diagnosed with an anxiety disorder which allegedly qualifies her as disabled as defined by 42 U.S.C. § 3602(h)(1). Thus, for the purposes of this motion to dismiss, Defendants acknowledge that she has alleged a disability. That said, there are not sufficient allegations to establish

MIAMI | FT. LAUDERDALE | TAMPA | WEST PALM BEACH

100 S.E. Second Street 36th Floor | Miami | Florida 33131 Phone: 786-425-1045 | Fax: 786-425-3905
1600 W. Commercial Blvd. | Suite 201 P.O. Box 14546 | Ft. Lauderdale | Florida 33302 Phone: 954-848-2400 | Fax: 954-848-2470
400 N. Ashley Drive Suite 1150 | Tampa | Florida 33602 Phone: 813-223-6011 | Fax: 813-223-6024
824 U.S. Highway One Suite 305 | North Palm Beach | Florida 33408 Phone: 561-624-8233 | Fax: 561-624-8940

www.boydlawgroup.com

Joint Appendix Vol. II Page 2628

elements 2 and 3. More importantly, the last element is impossible for Plaintiff's to establish as there was no refusal to make an accommodation as Plaintiff openly admits that the Association approved her request for an accommodation. (See D.E. 94 at ¶ 94.)

First, there is no evidence that the Association knew or should have reasonably known of Plaintiff's alleged disability. Plaintiff's attached affidavit indicates that Max Harcourt and Bill Canefield came to the Office Manager's office to review Plaintiff's documents, however, there is no allegation that they actually reviewed the alleged documents. Allegedly knowing that some "documents" are contained in a resident's file, without review, is certainly not sufficient to input knowledge on an Association to know of a resident's non-obvious disability.

Second, without a review of said documents, the Association could not possibly know if a reasonable accommodation of [Plaintiff's] disability might be necessary to afford her an equal opportunity to use and enjoy her dwelling.

Lastly, Plaintiff openly admits at Paragraph 94 of D.E. 94 that Plaintiff received a response from the Board approving her request for reasonable accommodation. The most pivotal element of an alleged FHA violation under 3604 is that the Defendants refused to make a reasonable accommodation. Plaintiff's own pleadings refute the possibility of ever establishing the last element. Plaintiff attempts to skirt around this glaring issue by asserting a legal conclusion that the Defendants constructively denied her accommodation because the Defendants allegedly delayed granting the request for accommodation for so long that it acted as a constructive denial. In *United States* v. *Hialeah Housing Authority 418 Fed. App'x 872,* a case previously cited by Plaintiff in support of this spurious contention, the court states: "We have explained that 'a plaintiff

MIAMI | FT. LAUDERDALE | TAMPA | WEST PALM BEACH

100 S.E. Second Street 36th Floor | Miami | Florida 33131 Phone: 786-425-1045 | Fax: 786-425-3905

1600 W. Commercial Blvd. | Suite 201 P.O. Box 14546 | Ft. Lauderdale | Florida 33302 Phone: 954-848-2460 | Fax: 954-848-2470

400 N. Ashley Drive Suite 1150 | Tampa | Florida 33602 Phone: 813-223-3602 | Fax: 813-223-6024

824 U.S. Highway One Suite 305 | North Palm Beach | Florida 33408 Phone: 561-624-8233 | Fax: 561-624-8940

www.boydlawgroup.com

Joint Appendix Vol. II Page 2629

must actually request an accommodation and be refused in order to bring a reasonable accommodation claim under the FHA." (citing to *Schwarz v. City of Treasure Island,* 544 F.3d at 1219.) The Court in *Hialeah Housing Authority* continues and states, "In other words, for a demand to be specific enough to trigger the duty to provide a reasonable accommodation, the defendant 'must have enough information to know of both the disability and desire for an accommodation, or circumstances must at least be sufficient to cause a reasonable [landlord] to make appropriate inquiries about the possible need for an accommodation.' *Colwell v. Rite Aid Corp.,* 602 F.3d 495, 506 (3d Cir.2010) (quotation marks omitted)." *Hialeah Housing Authority* at 876. Again, Plaintiff's Second Amended Complaint fails to allege sufficient facts to demonstrate (1) an actual request was made (2) that Plaintiff provided enough information or any information to the Defendants to know of both the disability and desire for an accommodation and (3) that the request was denied.

Thus, based on the four corners of the Second Amended Complaint, Plaintiff has failed to plead facts to support a cause of action for violation of 42 U.S.C. § 3604(f)(3)(b). As such, Defendants Motion to Dismiss must be granted.

**b. <u>Plaintiff's Count II and III Must be Dismissed for Failure to State a Cause of Action</u>**

Plaintiff's Counts II & III assert violations of "Section 3617 of the Fair Housing Act" against Max Harcourt (Count II) and the Association and the "Board" (Count III). Section 3617 provides that it is "unlawful to coerce, intimidate, threaten or interfere with" any person in the exercise or enjoyment of any right granted or protected by § 3603 – 3606 of the Fair Housing Act. It is still unclear what actions of Harcourt, the

MIAMI | FT. LAUDERDALE | TAMPA | WEST PALM BEACH

100 S.E. Second Street 36th Floor | Miami | Florida 33131 Phone: 786-425-1045 | Fax: 786-425-3905
1600 W. Commercial Blvd. | Suite 201 P.O. Box 14546 | Ft. Lauderdale | Florida 33302 Phone: 954-[illegible] | Fax: [illegible]
400 N. Ashley Drive Suite 1150 | Tampa | Florida 33602 Phone: 813-[illegible] | Fax: 813-[illegible]
824 U.S. Highway One Suite 305 | North Palm Beach | Florida 33408 Phone: 561-624-8233 | Fax: 561-624-8940
www.boydlawgroup.com

Joint Appendix Vol. II Page 2630

Association and/or the Board were intimidating or coercive to the extent they prevented Plaintiff from exercising her right to request a reasonable accommodation.

The 3rd Circuit in *Sporn v. Ocean Colony Condominium Association*, 173 F.Supp.2d 244, 252 (U.S.D.C. N.J. 2001), stated:

> Section 3617 does not, however, purport to impose a code of civility on those dealing with individuals who have exercised their FHA rights. Simply put, § 3617 does not require that neighbors smile, say hello or hold the door open for each other. To hold otherwise would be to extend § 3617 to conduct it was never intended to address and would have the effect of demeaning the aims of the Act and the legitimate claims of plaintiffs who have been subjected to invidious and hurtful discrimination and retaliation in the housing market. Id. at 252.

Plaintiff's main basis for the alleged Section 3617 violation is the accusing of Plaintiff for violation the no dogs rule and levying a fine. (See i.e. D.E. 94 at ¶114). However, the 11th Circuit has held that the assessment of a fine against a condominium unit owner does not rise to the level of coercion or intimidation required to find a violation of section 3617. See . *Wood v. Briarwinds Condominium Association Board of Directors*, 369 Fed.Appx.1, at 2, (C.A. 11(Fla.). In fact, other circuits have found that even the shunning of an individual is not sufficient to establish a Section 3617 claim. *Id. Sporn* at 252.

A review of decisions from the circuits around the country reveals the court's ability, in the majority of cases, to draw a line between acts with discriminatory overtones or occasional discriminatory comments and pervasive or severe actions that include cross-burning, fire-bombing and other similarly overt discriminatory acts designed to intimidate, coerce, or interfere with housing rights. See e.g., *Sporn v. Ocean Colony Condo. Ass'n,* 173 F.Supp.2d 244, 252 (D.N.J.2001) (ruling in favor of defendants because "shunning" of handicapped neighbors is not enough to support a § 3617 claim*);*

MIAMI | FT. LAUDERDALE | TAMPA | WEST PALM BEACH
100 S.E. Second Street 36th Floor | Miami | Florida 33131 Phone: 786-425-1045 | Fax: 786-425-3905
1600 W. Commercial Blvd. | Suite 201 P.O. Box 14546 | Ft. Lauderdale | Florida 33302 Phone: 954-[illegible] | Fax: 954-[illegible]
400 N. Ashley Drive Suite 1150 | Tampa | Florida 33602 Phone: 813-[illegible] | Fax: 813-[illegible]
824 U.S. Highway One Suite 305 | North Palm Beach | Florida 33408 Phone: 561-624-8233 | Fax: 561-624-8940
www.boydlawgroup.com
Joint Appendix Vol. II Page 2631

United States v. Weisz, 914 F.Supp. 1050, 1054 (S.D.N.Y.1996) (finding for defendants where conduct alleged was "nothing more than a series of skirmishes in an unfortunate war between neighbors."); *See Whisby-Myers v. Kiekenapp,* 293 F.Supp.2d 845, 852 (N.D.Ill.2003)(detonation of explosive device simulator combined with racial epithets stated Section 3617 claim); *Johnson v. Smith,* 810 F.Supp.235, 238-239 (N.D.1LL.1992)(allegations of cross-burning on plaintiff's lawn and breaking plaintiff's windows stated claim under Section 3617.)

Certainly, amending the bylaws, levying a fine or accusing Plaintiff of violation the no dogs rule does not amount to the coercion, intimidation, threatening or interfering conduct required to establish a Section 3617 violation. As such, Plaintiff's Counts II & III must be dismissed for failure to state a cause of action or facts to support a prima facie cause of action for violation of 42 U.S.C. 3617.

**c. <u>Plaintiff's Count VI Must be Dismissed for Failure to State a Cause of Action</u>**

Plaintiff's Count VI fails to state a claim against the Association or "Board" for a violation of the American with Disabilities Act ("ADA"). In order to state a claim under Title III of the ADA, Plaintiff must allege: (1) she was discriminated against on the basis of disability; (2) in the full and equal enjoyment of the goods, services, facilities, privileges, advantages, or accommodations of any place of public accommodation; (3) by any person who owns, leases (or leases to), or operates a place of public accommodation. See *Bowers v. National Collegiate Athletic Association, Act, Inc.*, 9 F.Supp.2d 460, 480 (U.S.D.C. N.J. 1998). Furthermore, in order for the Association or Board to be subject to Title III of the ADA, Cowpet must be "[a] person who owns, leases (or leases to), or operates a place of public accommodation." *Bowers* at 480.

100 S.E. Second Street 36th Floor | Miami | Florida 33131 Phone: 786-425-1045 | Fax: 786-425-3905
1600 W. Commercial Blvd. | Suite 201 P.O. Box 14546 | Ft. Lauderdale | Florida 33302 Phone: 954-848-2400 | Fax: 954-848-8270
400 N. Ashley Drive Suite 1150 | Tampa | Florida 33602 Phone: 813-223-0011 | Fax: 813-223-6024
824 U.S. Highway One Suite 305 | North Palm Beach | Florida 33408 Phone: 561-624-8233 | Fax: 561-624-8940
www.boydlawgroup.com

Plaintiff asserts specifically that Cowpet Bay West is a place of public lodging in an effort to bring it under the purview of the ADA, however, there are no specific allegations, but mere legal conclusions, that the Association and the Board own, operate and/or lease condominium units. In fact, Plaintiff's attach a email listing for a privately owned unit at Cowpet as a basis that somehow Cowpet Bay Association owns, operates or leases condominiums. The exhibit clearly indicates that the unit offered for rent is privately owned with contact numbers based in Minnesota.

Moreover, case law precedent has made it clear that condominiums are not subject to the ADA. (See *Independent Housing Services of San Francisco v. Fillmore Center Associates*, 840 F.Supp. 1328, 1344, (N.D.Ca. 1993)("apartments and condominiums do not constitute public accommodations within the meaning of the Act.")

Additionally, there are no allegations that Cowpet is a commercial facility as defined by 42 U.S.C. 12181(2). Rather, it is a residential facility which is provided an exception to the requirements of the ADA. It is evident from a reading of the Second Amended Complaint that the claims asserted under the ADA are based exclusively on Defendants' alleged failure to grant Plaintiff a reasonable accommodation in relation to her housing unit. As Plaintiff is asserting her ADA claims under Title III, the ADA has language "that mirrors the FHA in all material respects," *McCree v. Lexington Village Apartments,* Civ. No. 08-14185, 2010 WL 931859, *6, 2010 U.S. Dist. Lexis 22873, * 17 (E.D.Mich. Mar.11, 2010), and the court in *Shuper v. Federal Management Co., Inc.*, found that claims under both statutes would have little benefit, which is probably why the statutory exception exists for residential facilities. See *Shuper v. Federal Management Co., Inc.*, 2010 WL 3702364, *4) (D.Me. 2010).

MIAMI | FT. LAUDERDALE | TAMPA | WEST PALM BEACH

100 S.E. Second Street 36th Floor | Miami | Florida 33131 Phone: 786-425-1045 | Fax: 786-425-3905
1600 W. Commercial Blvd. | Suite 201 P.O. Box 14546 | Ft. Lauderdale | Florida 33302 Phone: 954-848-2360 | Fax: 954-848-2470
400 N. Ashley Drive Suite 1150 | Tampa | Florida 33602 Phone: 813-223-1021 | Fax: 813-223-6023
824 U.S. Highway One Suite 305 | North Palm Beach | Florida 33408 Phone: 561-624-8233 | Fax: 561-624-8940
www.boydlawgroup.com
Joint Appendix Vol. II Page 2633

As such, Plaintiff's Count VI continues to fail to plead facts sufficient to subject the Board and Association, a residential facility and condominium to a violation of the ADA. Thus, Plaintiff's Second Amended Complaint must be dismissed.

**d. Plaintiff's Counts VII, VIII and XII must be Dismissed for Failure to State a Cause of Action.**

The general theme of Counts VII and VIII is that the Board and Association did not have the authority to adopt bylaws that placed restrictions on dogs on the Cowpet Bay West premises and/or that the adoption was improper.

Plaintiff attached as Exhibit "A" to her Amended Complaint, the December 20, 2007 Bylaws of the Cowpet Bay West Condominium Association and previously asserted that the Bylaws placed no restrictions on dogs on the Cowpet Bay West premises. A detailed reading and discussion of Plaintiff's prior Exhibit "A" is important in understanding why Counts VII and VIII must be dismissed for failure to state a cause of action.

Under the 2007 bylaws, the Board of Directors is empowered to do a number of things, including the "operation" of the common areas and facilities (Art. II, Sec. 2(a)) and the adoption, amendment and enforcement of rules and regulations (Art. III, Sec.2(e)) covering the details of the operation and use of the Property. Under Art. V, Sec. 9, any violation of a rule or regulation adopted by the Board, or a breach of any by-law, gives the Board the right to enter an apartment unit, and act to summarily abate or remove the violation, without being deemed guilty of trespass, or to enjoin or abate the violation by legal proceedings. Art. V, Section 16, provides that a list of current Rules and Regulations attached as Exhibit "I" are adopted and that the board may enforce them with monetary fines and other sanctions, or by taking legal action to enforce them.

MIAMI | FT. LAUDERDALE | TAMPA | WEST PALM BEACH

100 S.E. Second Street 36th Floor | Miami | Florida 33131 Phone: 786-425-1045 | Fax: 786-425-3905
1600 W. Commercial Blvd. | Suite 201 P.O. Box 14546 | Ft. Lauderdale | Florida 33302 Phone: 954-848-2460 | Fax: 954-848-2400
400 N. Ashley Drive Suite 1150 | Tampa | Florida 33602 Phone: 813-223-6021 | Fax: 813-223-6034
824 U.S. Highway One Suite 305 | North Palm Beach | Florida 33408 Phone: 561-624-8233 | Fax: 561-624-8940
www.boydlawgroup.com

Joint Appendix Vol. II Page 2634

The Rules and Regulations set forth in Exhibit "I" to the 2007 By-laws includes a provision that "Dogs and farm animals are prohibited, and owners will be fined as specified by the Board of Directors. The Association may require removal of any animal when it becomes bothersome to others or is deemed by the Association to be unacceptable." Accordingly, because the By-Laws expressly incorporate the rules and regulations in Exhibit "I", the prohibition on dogs was effectively already a requirement of the By-Laws in their 2007 form.

Plaintiff's Exhibit "A," flatly refutes Plaintiff's improper assertions that (1) Cowpet Bay West placed no restrictions on dogs at the time of Plaintiff's "requested reasonable accommodation" (2) that the Board acted outside the scope of its power and (3) that the Board and Association did not have a basis to assess fines for violations of the Rules and Regulations of Cowpet Bay West.

Moreover, Plaintiff's VIII contends that the February 2012 amendments to the bylaws were improper for not obtaining 75% approval of the owners. However, Article XI Section 1. of the Bylaws clearly indicates that the Bylaws can be amended by an affirmative vote of 66 2/3% of the voting membership. Plaintiff alleges that the February 2012 amendments were approved by roughly 69%. Thus, per the actual requirements of the Bylaws for amending of the Bylaws, Defendants in fact received a sufficient amount of affirmative votes to amend the bylaws.

As such, Plaintiff's' allegations in Counts VII and VIII fail to assert allegations that form the basis an improper amendment to the bylaws.

MIAMI | FT. LAUDERDALE | TAMPA | WEST PALM BEACH

100 S.E. Second Street 36th Floor | Miami | Florida 33131 Phone: 786-425-1045 | Fax: 786-425-3905

1600 W. Commercial Blvd. | Suite 201 P.O. Box 14546 | Ft. Lauderdale | Florida 33302 Phone: 954-848-2360 | Fax: 954-443-2410

400 N. Ashley Drive Suite 1150 | Tampa | Florida 33602 Phone: 813-223-6021 | Fax: 813-223-6024

824 U.S. Highway One Suite 305 | North Palm Beach | Florida 33408 Phone: 561-624-8233 | Fax: 561-624-8940

www.boydlawgroup.com

**e. Plaintiff's Count IX Must be Dismissed for Failure to State a Cause of Action**

Plaintiff's Count XI fails to plead any facts sufficient to state a cause of action for Negligence recognized by this Circuit and under Virgin Islands Law. To establish a prima facie claim for Negligence, Plaintiff must demonstrate that the Cowpet Board and Association owed Plaintiff a legal duty, that the Cowpet Board and Association was negligent and that the Cowpet Board and Association's actions were legal cause of Plaintiff's injury. See *Turbe v. Government of the Virgin Islands*, 938 F.2d 427, 428 (U.S.C.A. 3rd Cir. 1991).

Plaintiff continues to fail to allege, beyond mere conclusions, that the Defendants owed her a duty, that the Defendants were negligence and somehow the alleged actions of the Defendants were the legal cause of her alleged injuries. At bottom, Plaintiff has failed to establish a negligence claim, as such, the second amended complaint must be dismissed with prejudice.

**f. Plaintiff's Count X Must be Dismissed for Failure to State a Cause of Action**

Plaintiff's Count X against the "individually named Defendants in their personal capacities and Cowpet Bay West Board" for conspiracy. "Under Virgin Islands law, a civil conspiracy 'consists of an agreement or combination to perform a wrongful act that results in damage to the plaintiff.' A conspiracy may also consist of an agreement to do a lawful act by unlawful means." *Government Guarantee Fund of the Republic of Finland v. Hyatt Corp.*, 955 F.Supp.441, 456 (D.V.I. 1997). Furthermore, "Claims of conspiracy that are vague and provide no basis in fact must be dismissed." *Conway v. Garvey*, 2003 WL 22510384, *3 (S.D.N.Y. Nov. 5, 2003).

MIAMI | FT. LAUDERDALE | TAMPA | WEST PALM BEACH

100 S.E. Second Street 36th Floor | Miami | Florida 33131 Phone: 786-425-1045 | Fax: 786-425-3905
1600 W. Commercial Blvd. | Suite 201 P.O. Box 14546 | Ft. Lauderdale | Florida 33302 Phone: 954-848-2960 | Fax: 954-848-2970
400 N. Ashley Drive Suite 1150 | Tampa | Florida 33602 Phone: 813-223-6021 | Fax: 813-223-6022
824 U.S. Highway One Suite 305 | North Palm Beach | Florida 33408 Phone: 561-624-8233 | Fax: 561-624-8940
www.boydlawgroup.com

Joint Appendix Vol. II Page 2636

Here, Plaintiff's vague allegations include that all the individual Defendants along with the Cowpet Board have somehow conspired with each other and acted in concert, to violate the FHAA and deny Plaintiff her request for reasonable accommodation. Frankly, Plaintiff has not set forth facts to support a plausible claim for civil conspiracy. "Allegations of a conspiracy must provide some factual basis to support the existence of the elements of a conspiracy: agreement and concerted action."

Claims of conspiracy that are vague and provide no basis in fact must be dismissed. (*See Boddie v. Schnieder,* 105 F.3d 857, 862 (2d Cir.1997) (dismissing prisoner's retaliation claim in part because retaliation claims were "unsupported, speculative, and conclusory"); *Polur v. Raffe,* 912 F.2d 52, 56 (2d Cir.1990) (holding that complaint must not rely on "vague, prolix allegations of a conspiracy" and must allege overt acts); *McArthur v. Bell,* 788 F.Supp. 706, 711 (E.D.N.Y.1992) (holding that conspiracy claims are "highly disruptive" and therefore "vague and conclusory allegations" are insufficient) "Claims of conspiracy that are vague and provide no basis in fact must be dismissed.") *Conway v. Garvey*, 2003 WL 22510384, *3 (S.D.N.Y. Nov. 5, 2003).

While Plaintiff may attempt to argue there was an over act, Plaintiff still has failed to plead any facts consisting of an agreement to perform a wrongful act that results in damage to the Plaintiff. *Government Guarantee Fund of the Republic of Finland v. Hyatt Corp.*, 955 F.Supp.441, 456 (D.V.I. 1997).

Plaintiff's Second Amended Complaint asserts only vague and conclusory statements that Defendants conspired, but does not allege facts to demonstrate, or to allow even an inference of a conspiracy. As such, Plaintiff's Count X must be dismissed.

MIAMI | FT. LAUDERDALE | TAMPA | WEST PALM BEACH

100 S.E. Second Street, 36th Floor | Miami | Florida 33131, Phone: 786-425-1045 | Fax: 786-425-3905
1600 W. Commercial Blvd. | Suite 201, P.O. Box 14546 | Ft. Lauderdale | Florida 33302, Phone: 954-848-2460 | Fax: 954-848-2470
400 N. Ashley Drive, Suite 1150 | Tampa | Florida 33602, Phone: 813-223-6020 | Fax: 813-223-6034
824 U.S. Highway One, Suite 305 | North Palm Beach | Florida 33408, Phone: 561-624-8233 | Fax: 561-624-8940

www.boydlawgroup.com

Joint Appendix Vol. II Page 2637

Case: 14-4776 Document: 003112129997 Page: 1074 Date Filed: 11/15/2015

g. **Plaintiff's Count XI Must be Dismissed for Failure to State a Cause of Action**

Plaintiff's Count XI fails to state a cause of action for a Prima Facie Tort Claim as the relief sought does come within the requirements of other well established and named intentional torts. The Restatement (Second) of Torts § 870 confirms that typically a prima facie tort claim only provides relief when the defendant's conduct "does not come within the requirements of one of the well established and named intentional torts.

The courts in the Virgin Islands have maintained this principal in dismissing prima facie tort claims that the courts have deemed insufficiently "distinct" from plaintiff's other, more established tort claims. *See, e.g., Moore v. A.H. Riise Gift Shops,* 659 F.Supp. 1417, 1426 (D.V.I. 1987); *Gov't Guarantee Fund of Republic of Finland v. Hyatt Corp.*, 955 F.Supp.441, 463 (D.V.I. 1997)("[N]o claim for prima facie tort lies if the action complained of fits within another category of tort.")

In the instant case, there appears to be ample overlap between Plaintiff's claims for defamation, slander per se, negligent and/or intentional infliction of emotional distress and Plaintiff's Prima Facie Tort claim. The substance of the allegations and relief sought in Plaintiff's Prima Facie Tort claim are clearly subsumed by the allegations and relief sought in Plaintiff's Counts XII and XIII. Thus, Plaintiff's Count XI must be dismissed as it is not distinct from Plaintiff's other tort claims.

h. **Plaintiff's Count XII Must be Dismissed for Failure to State a Cause of Action**

Plaintiff's Count XII is titled both a Defamation and Slander Per se premised solely on the alleged willful and intentional publication of false and wrongful information on the "blog" and other venues. (D.E. 94 ¶ 182). Yet, Plaintiff fails to allege what

MIAMI | FT. LAUDERDALE | TAMPA | WEST PALM BEACH

100 S.E. Second Street 36th Floor | Miami | Florida 33131 Phone: 786-425-1045 | Fax: 786-425-3905
1600 W. Commercial Blvd. | Suite 201 P.O. Box 14546 | Ft. Lauderdale | Florida 33302 Phone: 954-848-2460 | Fax: 954-848-2470
400 N. Ashley Drive Suite 1150 | Tampa | Florida 33602 Phone: 813-223-6021 | Fax: 813-223-6024
824 U.S. Highway One Suite 305 | North Palm Beach | Florida 33408 Phone: 561-624-8233 | Fax: 561-624-8940
www.boydlawgroup.com

information was published, if it was false, or wrongful, date and time of alleged publication, by who(m) specifically etc.

To state a claim for defamation (same for Slander Per Se), a plaintiff must allege "(1) that the defendant made a defamatory statement of fact; (2) concerning the plaintiff; (3) which was false; (4) which was communicated to persons other than the plaintiff; and (5) fault." *Taj Mahal Travel Inc. v. Delta Airlines, Inc.*, 164 F.3d 186,189 (3d Cir. 1998).

This Court, in granting a motion dismiss a claim of defamation, stated:

> A review of cases where the plaintiff's defamation claim survived a motion to dismiss indicates that the plaintiff had provided some details about the asserted defamatory statements, including the names of the publisher and the person or persons to whom it was published, dates when the statements were made and the specific content of the defamatory comments. . . .
>
> On the other hand, this Court has found that the lack of detail in plaintiff's defamation claim warranted dismissal of plaintiff's claims where the plaintiff did not indicate when, where, or how the alleged statements were made and did not identify the specific content of any challenged statement.

*Illaraza v. Hovensa, L.L.C.* 2010 WL 2342424, at *3 (D.V.I. 2010). Plaintiff's Second Amended Complaint does not make any specific allegations against any of the Defendants to indicate when, where, or how the alleged statements were made and certainly fails to identify the specific content of the alleged false and wrongful information.

As such and under *Illaraza,* Plaintiff's claim for Defamation and/or Slander Per Se must be dismissed for failure to assert any facts to establish a prima facie cause of action for same.

MIAMI | FT. LAUDERDALE | TAMPA | WEST PALM BEACH

100 S.E. Second Street
36th Floor | Miami | Florida 33131
Phone: 786-425-1045 | Fax: 786-425-3905

1600 W. Commercial Blvd. | Suite 201
P.O. Box 14546 | Ft. Lauderdale | Florida 33302
Phone: 954-848-2460 | Fax: 954-848-2470

400 N. Ashley Drive
Suite 1150 | Tampa | Florida 33602
Phone: 813-223-6602 | Fax: 813-223-6604

824 U.S. Highway One
Suite 305 | North Palm Beach | Florida 33408
Phone: 561-624-8233 | Fax: 561-624-8940

www.boydlawgroup.com

Case: 1:14-cv-00025-CVG-RM Document #: 99 Filed: 03/25/14 Page 11 of 15

i. **Plaintiff's Count XIII Must be Dismissed for Failure to State a Cause of Action.**

Plaintiff's Count XIII must also be dismissed as Plaintiff has failed to assert facts sufficient to plead both a Negligent and/or Intentional Infliction of Emotional Distress. Under Virgin Islands' Law, a party is entitled to recover for emotional distress that is intentionally or recklessly caused by another, whose "extreme and outrageous conduct intentionally or recklessly causes severe emotional distress . . . and if bodily harm to the other results from it, for such bodily harm." *Smith v. Elias* 2007 WL 4209701, at *4 (V.I.Super.Ct.2007).

The Restatement (Second) of Torts § 46(1) defines outrageous conduct as "so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community." The Court in *Smith* indicated that the court's role when dealing with a claim of intentional infliction of emotional distress is limited to determining "whether the defendant's conduct may reasonably be regarded as so extreme and outrageous as to permit recovery, or whether it is necessarily so." *Id* at *4. Furthermore, this Court in *Ali v. Intertek Testing Services*, F.Supp.2d 827, 831 (D.V.I. 2007) held that where the gravamen of the IIED complaint sounds in defamation, an independent action for intentional infliction of emotional distress cannot lie.

Moreover, the Court in *Illaraza* discussed the basis of Court's rejecting IIED claims when they are sounded in defamation and stated "The basis for rejecting such claims lies in the courts' concern that plaintiffs would circumvent the restrictions imposed on defamation claims, such as the defense of truth or privilege, if allowed to recast such tort claims as intentional infliction of emotional distress." Id at *6.

MIAMI | FT. LAUDERDALE | TAMPA | WEST PALM BEACH

100 S.E. Second Street 36th Floor | Miami | Florida 33131 Phone: 786-425-1045 | Fax: 786-425-3905
1600 W. Commercial Blvd. | Suite 201 P.O. Box 14546 | Ft. Lauderdale | Florida 33302 Phone: 954-848-2860 | Fax: 954-848-2410
400 N. Ashley Drive Suite 1150 | Tampa | Florida 33602 Phone: 813-223-6021 | Fax: 813-223-6022
824 U.S. Highway One Suite 305 | North Palm Beach | Florida 33408 Phone: 561-624-8233 | Fax: 561-624-8940
www.boydlawgroup.com

Joint Appendix Vol. II Page 2640

Plaintiff's bare assertions for her Negligent or IIED claims are nearly identical and are certainly sounded in the same non-specific allegations that Plaintiff uses to allege her Count XII Defamation and Slander Per se claim. This Court must follow the precedent set in *Illaraza* and *Ali* and deny Plaintiff's Count XIII for Negligent or IIED.

j. **Plaintiff's Counts IVX [sic], VX [sic], XVI and XVII Must be Dismissed for Failure to State Causes of Action.**

Plaintiff has failed to assert specific facts regarding how the Defendants have invaded her privacy, cast her in a false light or intruded on her privacy. Beyond mere conclusions, Plaintiff has asserted nothing to support her claim.

The Restatement (Second) of Torts provides the following standard for establishing an invasion of privacy claim:

> One who gives publicity to a matter concerning the private life of another is subject to liability to the other for invasion of his privacy, if the matter publicized is of a kind that (a) would be highly offensive to a reasonable person, and (b) is not of legitimate concern to the public.

Restatement (Second) of Torts § 652D. Comment (a) to section 652D further explains in relevant part: "[I]t is not an invasion of the right of privacy . . . to communicate a fact concerning a plaintiff's private life to a single person or even to a small group of persons."

Plaintiff asserts that the Board and Association disclosed Plaintiff's private information when the Board and Association allegedly discussed Plaintiff's application for a reasonable accommodation, medical condition and emotional support animal registration at a Board meeting. While these assertions are false, if assumed true for the sake of argument, the Restatement of Torts made it clear above, communications of a fact

MIAMI | FT. LAUDERDALE | TAMPA | WEST PALM BEACH
100 S.E. Second Street 36th Floor | Miami | Florida 33131 Phone: 786-425-1045 | Fax: 786-425-3905
1600 W. Commercial Blvd. | Suite 201 P.O. Box 14546 | Ft. Lauderdale | Florida 33302 Phone: 954-[illegible] | Fax: 954-[illegible]
400 N. Ashley Drive Suite 1150 | Tampa | Florida 33602 Phone: 813-[illegible] | Fax: 813-[illegible]
824 U.S. Highway One Suite 305 | North Palm Beach | Florida 33408 Phone: 561-624-8233 | Fax: 561-624-8940
www.boydlawgroup.com
Joint Appendix Vol. II Page 2641

to a small group is not an invasion of privacy. Furthermore, Plaintiff does not allege that this information was made public to a sufficiently large audience.

Additionally, the alleged conduct is not "highly offensive to a reasonable person," which is necessary to prove any of Plaintiff's five Invasion of Privacy claims. At bottom, the facts alleged to be publicized by the Defendants were already public knowledge.

As such, Plaintiff's Counts IVX, VX, XVI and XVII must be dismissed for failure to state a cause of action or specific facts to support a prima facie case of invasion of privacy.

**k. <u>Plaintiff's Count XVIII Must be Dismiss for Failure to State a Cause of Action</u>**

Plaintiff's final cause of action is for "Negligence per se/legal malpractice" against Vincent Veridamo. Amazingly, Plaintiff's attempt to alleged that Veridamo, a NJ lawyer, and former board member, somehow was acting in his capacity of an attorney for the board and more amazingly that somehow he had an attorney client relationship with Plaintiff, let alone the board.

To establish a legal malpractice claim or Negligence claim for that matter, the plaintiff has the burden of proving 1) an attorney-client relationship giving rise to a duty; 2) breach of that duty; 3) the causal connection between the negligent conduct and the resulting injury, and 4) actual loss or damage. *Moorehead v. Miller*, 102 F.R.D. 834, 838 (D.C. V.I. 1984).

Plaintiff's Second Amended Complaint fails to allege or establish a (1) attorney-client relationship (2) any duty that Verdiamo owed Plaintiff, (3) any breach of any duty and (4) how plaintiff was damaged by Verdiamo. In other words, there are absolutely no

MIAMI | FT. LAUDERDALE | TAMPA | WEST PALM BEACH

100 S.E. Second Street 36th Floor | Miami | Florida 33131 Phone: 786-425-1045 | Fax: 786-425-3905

1600 W. Commercial Blvd. | Suite 201 P.O. Box 14546 | Ft. Lauderdale | Florida 33302 Phone: 954-8[illegible] | Fax: 954-848-[illegible]

400 N. Ashley Drive Suite 1150 | Tampa | Florida 33602 Phone: 813-[illegible] | Fax: 813-[illegible]

824 U.S. Highway One Suite 305 | North Palm Beach | Florida 33408 Phone: 561-624-8233 | Fax: 561-624-8940

www.boydlawgroup.com
Joint Appendix Vol. II Page 2642

allegations or facts to support Plaintiff's claims. As such, Plaintiff's Count XVIII must be dismissed with prejudice.

Dated: March ___, 2013.

Respectfully submitted,

**BIRCH, de JONGH & HINDELS, PLLC**
*Counsel for Defendants: Cowpet Bay West Condominium Association, Ed Wardwell, Max Harcourt, Bill Canfield, Rosie Wells, Sharon Koehler, Doug Rebak, Herb Horwitz, Robert Cockayne, and Vincent Verdiramo*
1330 Estate Taarnebjerg
St. Thomas, VI 00802
Tel.: 340-774-1100; Fax: 340-774-7300

By:______________________________
**Richard Farrelly**
Bar No. 105
rfarrelly@bdhlawvi.com
**Joseph Riopelle**
jriopelle@boydlawgroup.com

## CERTIFICATE OF SERVICE

I hereby certify that on the above-indicated date, I electronically filed the foregoing document with the Clerk of the Court using ECF. I also certify that the foregoing document is being served this day on all counsel of record or pro se parties identified below, either via transmission of Notices of Electronic Filing generated by ECF or in some other authorized manner for those counsel or parties who are not authorized to receive electronically Notices of Electronic Filing.

**Karin A. Bentz, Esq.**
(Attorney for Plaintiff)
5150 Dronningens Gade, Suite 8
St. Thomas, VI 00802
Tel: 340-774-2669
kbentz@virginalaw.com

**John H. Benham, III, Esq.**
(Attorney for Talkington)
Post Office Box 11720
St. Thomas, VI 00801
Tel: 340-774-0673
benham@bclawvi.com

______________________________
Richard Farrelly

MIAMI | FT. LAUDERDALE | TAMPA | WEST PALM BEACH

100 S.E. Second Street 36th Floor | Miami | Florida 33131 Phone: 786-425-1045 | Fax: 786-425-3905

1600 W. Commercial Blvd. | Suite 201 P.O. Box 14546 | Ft. Lauderdale | Florida 33302 Phone: 954-[illegible] | Fax: 954-[illegible]

400 N. Ashley Drive Suite 1150 | Tampa | Florida 33602 Phone: 813-[illegible] | Fax: 813-[illegible]

824 U.S. Highway One Suite 305 | North Palm Beach | Florida 33408 Phone: 561-624-8233 | Fax: 561-624-8940

www.boydlawgroup.com

Joint Appendix Vol. II Page 2643

IN THE UNITED STATES DISTRICT COURT OF THE VIRGIN ISLANDS
DISTRICT OF ST. THOMAS AND ST. JOHN

JUDITH KROMENHOEK, )
)
Plaintiff, )
v. ) CIVIL CASE NO: 3:12-cv-00025
)
COWPET BAY WEST CONDOMINIUM )
ASSOCIATION; THE BOARD OF THE )
COWPET BAY WEST CONDOMINIUM )
ASSOCIATION; MAX HARCOURT, in his)
personal capacity; ALFRED FELICE; )
LANCE TALKINGTON ROBERT )
COCKAYNE;VINCENT VERDIRAMO, )
)
Defendants. )
______________________________)

**ORDER**

This matter came before the Court on Defendants' Cowpet Bay West Condominium Association, The Board of the Cowpet Bay West Condominium Association, Max Harcourt, Robert Cockayne and Vincent Verdiramo Motion to Dismiss Plaintiff's Second Amended Complaint and Supporting Memorandum of Law. The Court being advised of same and in the interest of justice it is herby

**ORDERED,** Defendants Motion To Dismiss is **GRANTED**.

ENTERED this _______day of March, 2013

______________________________
CURTIS V. GOMEZ
Chief Judge

ATTEST:

WILFREDO F. MORALES
Clerk of the Court
By:___________________________

Case 3:12-cv-00025-CVG-RM Document #: 99 Filed: 03/25/13 Page 11 of 11

Dated: March ___, 2013.

Respectfully submitted,

**BIRCH, de JONGH & HINDELS, PLLC**
*Counsel for Defendants: Cowpet Bay West Condominium Association, Ed Wardwell, Max Harcourt, Bill Canfield, Rosie Wells, Sharon Koehler, Doug Rebak, Herb Horwitz, Robert Cockayne, and Vincent Verdiramo*
1330 Estate Taarnebjerg
St. Thomas, VI 00802
Tel.: 340-774-1100; Fax: 340-774-7300

By:______________________________
**Richard Farrelly**
Bar No. 105
rfarrelly@bdhlawvi.com
**Joseph Riopelle**
jriopelle@boydlawgroup.com

## CERTIFICATE OF SERVICE

I hereby certify that on the above-indicated date, I electronically filed the foregoing document with the Clerk of the Court using ECF. I also certify that the foregoing document is being served this day on all counsel of record or pro se parties identified below, either via transmission of Notices of Electronic Filing generated by ECF or in some other authorized manner for those counsel or parties who are not authorized to receive electronically Notices of Electronic Filing.

**Karin A. Bentz, Esq.**
(Attorney for Plaintiff)
5150 Dronningens Gade, Suite 8
St. Thomas, VI 00802
Tel: 340-774-2669
kbentz@virginalaw.com

**John H. Benham, III, Esq.**
(Attorney for Talkington)
Post Office Box 11720
St. Thomas, VI 00801
Tel: 340-774-0673
benham@bclawvi.com

______________________________
Richard Farrelly